## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| iSun, Inc., *et al.*,[1] | Case No. 24-11144 (TMH) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF JEFFREY PECK OF ISUN, INC. IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jeffrey Peck, hereby declare under penalty of perjury, as follows:

1.     I am the Chief Executive Officer of iSun, Inc. ("iSun").  I am over the age of eighteen (18) and make the statements herein upon my own personal knowledge.  I am qualified and authorized to make the statements herein.

2.     I have more than thirty (30) years experience in business and finance.

3.     Prior to becoming Chief Executive Officer and President of iSun in June 2019, I was the majority owner and President of Peck Electric Co., the predecessor of iSun, where I was responsible for the transformation of Peck Electric into to one of the largest commercial solar EPC companies in the Northeastern United States.

4.     In these capacities, I have become familiar with iSun and its affiliated subsidiaries and entities' (collectively, the "Debtors" or the "Company") day-to-day operations, business and financial affairs.

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172) (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411) ; (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (7316); (collectively referred to as the "Debtors"). The Debtors' mailing address is: 400 Avenue D, Suite 10 Williston, Vermont 05495, with copies to Gellert Seitz Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

5.      I submit this declaration ("Declaration") to assist the Court, as well as creditors and other parties in interest, in understanding the circumstances that compelled the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases") and also in support of: (a) Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code the ("Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the relief that the Debtors have requested from the Court in the form of various motions and applications filed on or about the Petition Date described herein (collectively, the "First Day Motions").

6.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7.      Part I of this Declaration provides an introduction to and of the Debtors and these Chapter 11 Cases.  Part II of this Declaration describes in more detail the Debtors' corporate structure, business, prepetition capital structure, the developments that led to the Debtors' chapter 11 filings, and the Debtors' goals in these Chapter 11 Cases.  Part III sets forth the relief requested by the various First Day Motions and the facts supporting such relief.

## I.      INTRODUCTION

8.      Debtors are one of the largest solar energy services and infrastructure deployment companies in the country.  Nevertheless, various prepetition events have burdened the Debtors with liabilities that render their businesses in their current state no longer viable and have deprived

the Debtors of the liquidity needed to operate their businesses in the immediate and longer-term periods.

9. Prior to the Petition Date, the Debtors were on the precipice of shutting down, but were able to negotiate a series of "save the company" transaction supported by Clean Royalties, LLC ("Clean Royalties").  Clean Royalties has agreed to purchase the Debtors' business as a going concern (the "Sale") and provide the financing needed to prepare, commence and conduct these cases as a means to implement the Sale.  Moreover, Clean Royalties has agreed that the Debtors can conduct a market-test of the Sale in a process conducted by England, who has been assisting the Debtors with various alternative transactions since 2023.

10. The Debtors intend to utilize these Chapter 11 Cases to implement an efficient sale of their business to Clean Royalties as a going concern, subject to higher and better offers. Through these Chapter 11 Cases, the Debtors believe they will maximize value for their stakeholders and avoid the value-destructive alternative to the Sale.

## II.    THE DEBTOR'S BACKGROUND

### A.    The Debtors' Corporate Structure and Publicly Listed Equities

11. The Debtors are composed of twelve (12) separate entities, with Debtor iSun serving as the ultimate, publicly traded parent entity, and each of the other Debtors – iSun Corporate, LLC, a Delaware limited liability company ("Corporate"), iSun Energy LLC, a Delaware limited liability company ("Energy"), iSun Industrial, LLC, a Delaware limited liability company ("Industrial"), iSun Residential, Inc., a Delaware corporation ("Residential"), iSun Utility, LLC, a Delaware limited liability company ("Utility"), Liberty Electric, Inc., a New Hampshire corporation ("Liberty"), Peck Electric Co., a Vermont Corporation ("Peck"), Solar Communities, Inc., a Vermont Corporation ("Solar"), Hudson Solar Services, LLC, a New York

3

limited liability company ("Hudson Solar"), Hudson Valley Clean Energy, Inc., a New York Corporation ("Hudson Valley"), and Sun CSA 36, LLC, a Delaware limited liability company ("Sun CSA") – each serving as a wholly owned direct or indirect subsidiary of iSun.

12.    An organizational chart illustrating the Debtors' corporate structure as of the date hereof is attached hereto as **Exhibit A**.

13.    Shares in iSun were listed on the NASDAQ stock exchange under the trading symbol "ISUN".  On May 23, 2024, NASDAQ suspended trading of iSun's shares in preparation of delisting the shares.  iSun's stock now trades over the counter at a price of $0.08 per share.

**B.    The Debtors' Businesses**

14.    The Debtors are one of the largest solar energy services and infrastructure deployment companies in the country.  The Debtors' services include solar, storage and electric vehicle infrastructure, design, development and professional services, engineering, procurement, installation, O&M and storage. The Debtors target all solar markets including residential, commercial, industrial and utility segments.

15.    iSun is a second-generation family business founded under the name Peck Electric Co. in 1972 as a traditional electrical contractor.

16.    On January 19, 2021, the Debtors completed a business combination pursuant to which they acquired Energy.  The business combination was an acquisition treated as a merger and reorganization and Energy became a wholly owned subsidiary of The Peck Company Holdings, Inc.  Immediately prior to the business combination, the parent company changed its name to iSun, Inc.

17.    On April 6, 2021, Utility, a wholly-owned subsidiary of iSun, Adani Solar USA, Inc., a Delaware corporation ("Adani"), and Oakwood Construction Services, Inc., a Delaware

corporation ("Oakwood") entered into an Assignment Agreement, pursuant to which Utility acquired all rights to the intellectual property of Oakwood and its affiliates. Oakwood was a utility-scale solar engineering, procurement, construction, development and design company and a wholly-owned subsidiary of Adani. The transaction included all of the intellectual property, project references, templates, client lists, agreements, forms and processes of Adani's U.S. solar business.

18.    On September 8, 2021, iSun entered into an Agreement and Plan of Merger by and among iSun, iSun Residential Merger Sub, Inc., a Vermont corporation (the "Merger Sub") and wholly-owned subsidiary of Residential (which was a wholly-owned subsidiary of iSun), SolarCommunities, Inc., d/b/a SunCommon, a Vermont benefit corporation ("SunCommon"), and Jeffrey Irish, James Moore, and Duane Peterson as the "Shareholder Representative Group" of the holders of SunCommon's capital stock (the "SunCommon Shareholders"), pursuant to which the Merger Sub merged with and into SunCommon (the "Merger") with SunCommon as the surviving company in the Merger and SunCommon became a wholly-owned subsidiary of iSun Residential. The Merger was effective on October 1, 2021.

19.    As of the Petition Date, the Debtors conduct all of their business operations exclusively through their direct and indirect wholly-owned subsidiaries, iSun Residential, Inc., SolarCommunities, Inc., iSun Industrial, LLC, Peck Electric Co., Liberty Electric, Inc., iSun Utility, LLC, iSun Energy, LLC and iSun Corporate, LLC.

**C.    Capital Structure and Liquidity.**

20.    As of December 31, 2023, the Debtors had total long-term debt of $9.8 million. The Debtors have an $8 million revenue loan with Decathlon Growth Credit, LLC (the "Prepetition Lender"), the assignee of Decathlon Specialty Finance, LLC (the "Decathlon Loan"). The

Decathlon Loan was entered into on or about December 12, 2023 and is secured by substantially all of the Debtors' assets, and is perfected by, among other things, UCC-1 financing statements filed on or about October 26, 2023 against all asset of the Debtors.  The liens securing the Decathlon Loan are first priority, senior liens, subject to certain permitted Senior Liens described below, provided, however, that Decathlon agreed to contractually subordinate itself to liens in favor of the Bridge Lender securing the Bridge Loan (each as defined below) with a principal amount of up to $1 million, pursuant to a letter agreement between Decathlon, the Debtors and Clean Royalties.

21.    The Debtors also have $1.2 million in various vehicle loans, secured by the vehicles, with varying terms through 2027, and $1.13 million in term loans through NBT Bank with various maturity dates and interest rates (the liens securing the foregoing, the "Senior Liens").

22.    The Debtors are also party to merchant cash advance agreements (each an "MCA Agreement") with Lendspark Corporation, Pawn Funding, and Cedar Advance LLC, whereby the lenders advance certain amounts in exchange for a promise to repay a greater amount as and when the Debtors collected certain future receivables.  The amount advanced by Lendspark was $1,500,000 for a promise to repay $2,010,000, and $241,000 remains outstanding.  For Pawn Funding and Cedar Advance, the amounts advanced were $1,200,000 each, for a promise to repay $1,608,000 respectively.  Currently, $1,200,000 remains outstanding to each Pawn Funding and Cedar Advance.  The various MCA Agreements are styled as a sale of future receipts, but the Debtors believe that they are loans.  They also purport to grant security interests in the Debtors' accounts and proceeds thereof to secure the cash advances.  While the lenders under the MCA Agreement have not themselves filed UCC-1 financing statements to perfect any security interest putatively granted by the MCA Agreements, on or about December 18 and 19 2023, two separate

sets of UCC-1 financing statements were filed by "CT Corporation System, as Representative," for undisclosed principals, who may have been the lenders under the MCA Agreements. Any liens perfected by such UCC-1 financing statements would be later in time and, thus, junior to the Prepetition Lender's liens.

23.     As described below, Clean Royalties, as Bridge Lender, entered into and made the Bridge Loan in the full amount of $1 million pursuant to a senior secured promissory note entered into on or about May 15, 2024 and secured by all of the Debtors' assets.

24.     As of December 31, 2023, the Debtors also have approximately $34.3 million in trade debt, contract liabilities and lease liabilities.

25.     On December 12, 2023, iSun entered into a Letter Agreement (the "Letter Agreement") by and between the Company and each of Anson Investments Master Fund LP and Anson East Master Fund LP (together, the "Investors") pursuant to which the Company redeemed all amounts due under those certain Senior Secured Convertible Promissory Notes issued to the Investors, dated November 4, 2022. Pursuant to the Letter Agreement, the Company made cash payments to the Investors in the aggregate amount of $6,000,000 and issued an aggregate amount of 3,500,000 shares of the Company's Common Stock, par value $0.0001 per share ("Common Stock") adding a total of $632,000 to stockholders' equity to the Investors and 300,000 shares of the Company's Series A Convertible Redeemable Preferred Stock, par value $0.0001 per share ("Preferred Stock") to the Investors in a private placement transaction resulting in a $3,882,000 addition to derivative liabilities due to the Company not having enough authorized shares in the event of a full redemption.

26.     The Preferred Stock has a liquidation preference valued at $3,000,000 as of December 31, 2023.

27.     During the years ended December 31, 2023 and 2022, the Debtors incurred net losses of $19.4 million and $53.8 million, respectively, and used cash in operations of $8.9 million and $6.3 million, respectfully.

28.     The Debtors have been unable to raise additional capital through debt or equity financing.

**D.      Description of Events Leading up to this Chapter 11.**

29.     The Company was not profitable in 2023 and 2022. The Debtors have generated losses since the aforementioned business combination, including net losses of approximately $19.4 million and $53.8 million for the years ended December 31, 2023 and 2022.  The Debtors are currently operating at a deficit of $250,000 per week, and were forecasting a loss of $10 million for 2024.

30.     In addition, increases in interest rates have had an adverse impact on the Debtors' business by increasing their cost of capital, which has increased their interest expense on variable rate indebtedness.  Further, rising interest rates have negatively impacted the Debtors' ability to arrange financing for their customers on favorable terms to facilitate their customers' purchases of our solar energy systems.  The majority of the Debtors cash flows to date have been from the sales of solar energy systems.  Rising interest rates have had the effect of depressing the sales of solar energy systems because many consumers finance their purchases.  As a result, increased interest rates have negatively affected the Debtors' costs and reduced their revenues, which have had an adverse effect on their business, financial condition, and results of operations.

31.     In August 2023, England Securities LLC ("England") was referred by the Board and then hired by the Debtors as their financial advisor to advise on strategic alternatives, and to help the Debtors find a financial or strategic partner that would help the company grow to the point

that it was logical to remain public, and if not feasible, to consider going private. Around the time the engagement commenced, the Debtors received notice from a lender stating that the Company has breached a covenant.  As a result, the emphasis of England's engagement became refinancing the lender to address the ongoing covenant breach and related short-selling of the Debtors' stock, which further impacted the Debtors' access to capital.

32.     Throughout the fourth quarter of 2023, England identified three potential strategic alternatives: (i) the revenue-based Decathlon Loan with an effective interest rate of 23-25%, (ii) a merger of equals with another publicly traded solar installer, and (iii) a go-private transaction with Clean Royalties via a two-step tender offer and sale.

33.     Upon further analysis, England identified the Decathlon Loan as the best option for the company given the circumstances at the time. The company entered into the Decathlon Loan, which closed in December 2023, and provided for an $8 million dollar capital infusion at an effective interest rate greater than 20%.

34.     With the covenant breach behind the Debtors, throughout 2024, England focused on obtaining a value maximizing transaction for the Debtors and their stakeholders, which may have taken the form of a recapitalization, merger, or take private transaction.  During that process, the company continued to struggle to generate free cash flow and the capital infusion was quickly depleted..  As the Company's cash position continued to deteriorate, England was asked to (i) advise on filing for extension with regard to a NASDAQ delisting notice and (ii) canvas the market for additional strategic alternatives.

35.     Upon a thorough search, England found two options: (i) a potential strategic transaction with another party and (ii) Clean Royalties' go-private proposal.  However, the

strategic transaction ultimately did not move forward, leaving the Clean Royalties' offer as the only option available to the company.

36.    On May 9, 2024, the Debtors received notice from the Prepetition Lender, of an "Event of Default" under the Decathlon Loan, with respect to (i) the Debtors' failure to deliver Deposit Account Control Agreements to the Prepetition Lender as required by the applicable loan agreement, (ii) the Debtors' incurrence of indebtedness not permitted under that loan agreement, and (iii) the Debtors' grant of liens on its assets in violation of that loan agreement.  The notice stated that the Prepetition Lender demanded the immediate payment of all obligations owed by the Debtors to the Prepetition Lender, including the Prepetition Lender's costs of collection.

37.    At the same time, during a site visit by Clean Royalties, England, the Company, and Clean Royalties determined that the traditional M&A path was unrealistic due to the considerable obligations burdening the company.  As a result, it was mutually agreed that a transaction via a 363-asset sale was the only viable option for the Debtors' business  to continue as a going-concern.

**E.    Objectives for these Chapter 11 Cases**

38.    The Debtors have secured a commitment from Clean Royalties, an entity affiliated with Siltstone Capital, LLC ("Siltstone"), to serve as a stalking horse bidder (in such capacity, the "Stalking Horse Bidder") in a sale of substantially all of the Debtors' assets (the "Sale").  Siltstone is an energy-focused alternative investment and advisory firm based in Houston, Texas.  Clean Royalties is also a small, recent shareholder of iSun, owning approximately 1% (615,000 shares) of the Debtors' stock.

39.    The Sale will provide for a continuation of the Debtors' businesses as currently operated, thus ensuring that the Debtors' customers will have in-process and contracted for work

completed, that the Debtors' existing work-force will continue to be employed, various contracts and leases will be assumed and cured, and the Debtors' trade creditors have an ongoing business partner, thereby avoiding the resulting claims that would arise should these various things not occur.  To facilitate the Sale, Clean Royalties (in such capacity, the "DIP Lender") agreed to provide the Debtors with up to $4 million of new money capital.  This included $1 million advanced on a senior secured priming basis (the "Bridge Loan") shortly before the Petition Date by Clean Royalties (in such capacity, the "Bridge Lender") to ensure that the Debtors had sufficient run-way to prepare for these cases in an orderly and efficient manner and minimize the disruption to the Debtors and their businesses that is attended to the commencement of these cases.  Clean Royalties has also agreed to provide an incremental $3 million of new money through a senior secured priming debtor in possession financing facility (the "DIP Facility"), and the Bridge Loan will be rolled into the initial obligations under the DIP Facility as a condition to the initial borrowings under the DIP Facility.  The Prepetition Lender has consented to priming by the Bridge Lender and DIP Lender and consents to the DIP Facility.

40.     The Sale to the Stalking Horse Bidder will be subject to higher and better offers pursuant to court-approved bidding procedures that the Debtors intend to propose shortly after the Petition Date.  To secure the Stalking Horse Bidder's offer, the Debtors have offered the Stalking Horse Bidder customary bid protections in the form of a break-up fee and expense reimbursement.

### III.     THE FIRST DAY PLEADINGS[2]

41.     As noted above, concurrently with and shortly after the filing of these Chapter 11 Cases, the Debtors are or will be filing First Day Motions requesting relief necessary or appropriate to effectuate the Debtors' entry into and continued operations under Chapter 11.  The Debtors

---

[2] Capitalized terms used in describing the First Day Motions but not otherwise defined herein have the meaning ascribed to them in the applicable First Day Motions.

anticipate that the Court will conduct a hearing within a few business days after the commencement of these Chapter 11 Cases, during which the Court will consider the First Day Motions.

42.     Generally, the First Day Motions have been designed to meet the immediate goals of (i) establishing procedures for the efficient administration of these Chapter 11 Cases; (ii) continuing the Debtors' operations during these Chapter 11 Cases with as little disruption and loss of productivity as possible; and (iii) maintaining the confidence and support of the Debtors' key constituencies.  I have reviewed each of the First Day Motions, including the exhibits, attached thereto, and believe the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in these Chapter 11 Cases.

43.     A summary of the relief requested and the facts supporting each of the First Day Motions follows.[3]

**A.     Joint Administration Motion**

44.     The Debtors are "affiliates" of each other as that term is defined in section 101(2) of the Bankruptcy Code and as used in Bankruptcy Rule 1015(b), as iSun Corporate, iSun Energy, iSun Industrial, iSun Residential, and iSun Utility are all subsidiaries of iSun.  Liberty and Peck are subsidiaries of iSun Industrial.  SolarCommunities is a subsidiary of iSun Residential.  Hudson, Hudson Valley, and Sun CSA are all subsidiaries of SolarCommunities.  Further, Debtors comprise a single business with highly integrated operations.

45.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors. The Debtors envision

---

[3] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

that many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.

**B.      Claims Agent Retention Motion**

46.     Prior to the selection of Epiq Corporate Restructuring ("Epiq") as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from at three (3) other claims and noticing agents to ensure selection through a competitive process.  I believe, based on all engagement proposals obtained and reviewed, that Epiqs's rates are competitive and reasonable given Epiq's quality of services and expertise.

47.     I believe that the appointment of Epiq as claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

**C.      Notice Modification & Consolidation Motion**

48.     Debtor iSun's common stock is listed on the Nasdaq Capital Market under the ticker symbol "ISUN."

49.     As of May 1, 2024, iSun had approximately 47,384,672 shares of issued and outstanding publicly held common stock.  Given the number of shares outstanding and because the Debtors' stock has been actively traded, beneficial ownership of such common stock is widely dispersed and subject to change. As such, the Debtors have only maintained a list of their equity security holders of record and have not maintained a list of all beneficial holders (the "Beneficial Holders").

50.     The Debtors have disclosed each of their equity security holders of record in their list of equity security holders prepared in accordance with Bankruptcy Rule 1007(a)(3) that has been filed with the chapter 11 petitions and contemporaneously herewith.  However, the Debtors submit that preparing a list of all of iSun's Beneficial Holders—those who hold the Debtors' stock

through transfer agents, banks, brokers, intermediaries, and other nominees—would be burdensome, time consuming and expensive. It is estimated that there are hundreds of Beneficial Holders.

51.     Specifically, to obtain the list of Beneficial Holders, the Debtors would have to request their transfer agent, Continental Stock Transfer & Trust Company (the "Transfer Agent"), contact all registered holders, banks, brokers, intermediaries and other nominees (collectively, the "Nominees") that hold stock in "street name" for the beneficial holders of the stock, as applicable, and request that all such Nominees review their books and records to identify the identity of the applicable Beneficial Holder(s). Beneficial Holders would then have an opportunity to object to the release of their identities, in which case the Nominees would not be permitted to disclose their identities, even upon a written request by the Debtors.

52.     Importantly, even if such information is ultimately obtained, it would only represent a snapshot of equity security holders as of a particular point in time—therefore providing little utility, especially when balanced against the cost and burden of accumulating such information. In addition, if a beneficial holder holds the Debtors' stock in "street name" with a Nominee, such Nominee, upon information and belief, may have procedures in place to provide notices from the Chapter 11 Cases to the beneficial holder.

53.     In short, obtaining a list of the Beneficial Holders with last known addressees for each such holder, and providing notice to all such parties, would be a burdensome, time-consuming and expensive process, and would serve little or no beneficial purpose in light of the fact that the transfer agents and brokerage firms have processes in place that would ensure that each beneficial holder obtains requisite notice.

54.     Debtors propose to publish, as soon as practicable, upon filing, a press release on the Debtors' website at https://www.isunenergy.com/news.    And, Securities Exchange Commission ("SEC") regulations require the filing of an 8-K by iSun which iSun will also publish on its website at https://www.investors.isunenergy.com/financial-info.

55.     Moreover, the Debtors' equity security holders will be aware of the details of these Chapter 11 Cases and their status because (a) the Debtors are filing list of the Debtors' equity security holders of record with their petitions and will serve all notices required under Bankruptcy Rule 2002(d) on the same; (b) the Chapter 11 Cases are subject to reporting with the SEC and the financial press, which will provide notice of same to all equity security holders; and (c) the details and status of the Chapter 11 Cases will be publicly available (i) in the aforementioned press release and 8-K on the Debtors' website, (ii) on the Debtors' case website at https://dm.epiq11.com/iSun (the "Case Website") established by Debtors' noticing agent, Epiq (the "Noticing Agent"), and (iii) accessible through Pacer.    Debtors are confident that these publications will reach the Beneficial Holders.

**D.    DIP Motion**

56.     Pursuant to the DIP Motion,[4] the Debtors request entry of interim and final orders authorizing the Debtors to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $3,000,000 substantially on the terms set forth in the Debtor-in-Possession Financing Term Sheet (the "DIP Term Sheet") between the Debtors and Clean Royalties, LLC, (b) modifying the automatic stay to the extent applicable and (c) granting related relief.

57.     The Debtors propose to enter into the DIP Financing in order to fund the administration of these Cases and their reorganization, solely in accordance with the DIP Budget

---

[4] This description of the DIP Motion is qualified in its entirety by the terms of the DIP Motion, DIP Term Sheet and Interim Order, which shall control in the event of any conflict with this Declaration.

and subject to any Permitted Variances. The DIP Financing will provide the Debtors with up to $4,000,000 to fund necessary operations of the Debtors and to administer these Cases through a successful sale or reorganization of the Debtors' assets and liabilities. Further, the Debtors' existing lenders are not willing to extend any further funding to the Debtors. As such, without such funding, the Debtors would have to cease operations and lose substantial value to the detriment of all creditors.

58.    Based on the Debtors' existing capital structure and their efforts to raise additional capital that were undertaken prepetition, which are described above, the Debtors do not believe that any other financing is reasonably available to the Debtors. Importantly, the Debtors' assets are encumbered by the liens asserted by the Prepetition Lender, which the Debtors believe to be valid, perfected and enforceable. The Prepetition Lender was unwilling to provide additional capital to the Debtors; however, it did consent to the Bridge Lender and DIP Lender providing additional capital to the Debtors on a priming basis in furtherance of the Sale. As consideration for this priming, the Debtors are granting the Prepetition Lender replacements liens and superpriority claims, each of which are junior to the Carve-Out and the liens and claims granted to the DIP Lender under the DIP Facility. I otherwise believe that the Clean Royalties, as Bridge Lender and DIP Lender has stepped up as a lender of last resort for the Debtors.

59.    I also believe that the terms of the DIP Facility are fair and reasonable under the circumstances. Importantly, such amounts are being extended to provide the Debtors the run-way to pursue the Sale, including a marketing process to seek higher and better offers, and come with a cost of capital that is less burdensome than what the Debtors have otherwise had access to.

60.    Finally, the DIP Facility is subject to the DIP Budget which was developed by the Debtors and their professionals to ensure that the Debtors can pay the post-Petition Date expenses

16

that the Debtors anticipate incurring during the Chapter 11 Cases through the closing of the Sale and allows for a Carve-Out that I understand is consistent with customary practices in chapter 11 cases.

61.     I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to manage their business operations during the pendency of these Cases without disruption.  Accordingly, I respectfully submit that the DIP Motion should be approved.

**E.      Cash Management Motion**

62.     In the ordinary course of their business, Debtors maintain a cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets.  The Cash Management System allows the Debtors to efficiently identify their cash requirements and transfer cash as needed to respond to these requirements.  The Cash Management System is important to the efficient execution and achievement of the Debtors' business objectives, and, ultimately, to maximizing the value of the Debtors' estate.

63.     The Cash Management System generally operates similarly to the centralized cash management systems used by other companies to manage their cash in a cost-effective, efficient manner.  The Cash Management Motion describes the Cash Management System in greater detail.

64.     The Cash Management System generally operates similarly to the centralized cash management systems used by other companies to manage their cash in a cost-effective, efficient manner.

65.     The Cash Management System consists of twenty-two bank accounts (the "Bank Accounts"), which are maintained at NBT Bank, First National Bank, TD Bank, Hanover Bank,

New England Federal Credit Union, VESCU, Citizens Bank and M&T Bank.  Exhibit B to the

Cash Management Motion contains a list of all of the Debtors' Bank Accounts.

66.    As of the Petition Date, the Debtors maintained the following Bank Accounts:

- Main Operating Account [NBT Account Number: XXXXXX0305] from which most all disbursements and deposits are made;

- NBT [NBT Account Number XXXXXX0348] solar asset checking;

- Cash reserves [NBT Account Number XXXXXXXX5850] checking;

- Great Horn Bond Account [First National Bank Account Number XXXXXXXX8156] funds control checking;

- Utility Checking [NBT Account Number XXXXXXXX1950];

- iSun Industrial [NBT Account Number XXXXXXXX2078];

- iSun Corporate, LLC [NBT Account Number XXXXXXXX2043] checking account;

- Liberty Electric [TD Bank Account Number XXXXXXXX7568];

- Hanover Bond Account [Hanover Account Number XXXXXXXX1950] funds control-checking;

- New England Federal Credit Union [NEFCU Account Number XXXXXXXX_____;

- TD Bank [TD Account Number XXXXXXXX9491];

- VSECU operating checking [VSECU Account Number XXXXXXXX6164]; checking;

- CITIZENS Operating [Citizens Bank Account Number XXXXXX4859] checking;

- Citizens Bank [Citizens Bank Account Number XXXXXX9937] stand by letter of credit- NY warehouse;

- Citizens Bank [Citizens Bank Account Number XXXXXX4875] Citizens CSA Clearing HoldCo;

- Citizens Bank [Citizens Bank Account Number XXXXXX4883] petty cash;

- Citizens Bank [Citizens Bank Account Number XXXXXX4859];

- Citizens Bank [Citizens Bank Account Number XXXXXX5545]; Citizens CSA 36

- VSECU [VSECU Number XXXXXX6863];

- Citizens Bank [Citizens Bank Account Number XXXXXX2458] Citizens Operating Account;

- VSECU [VSECU Account Number XXXXXX5673] VSECU savings;

- M&T Bank [M&T Bank Account Number XXXXXX3130].

67.    The Debtors seek authority to continue using the Cash Management System, including the maintenance of the Debtors' existing Bank Accounts described above and in Exhibit B after the Petition Date, subject to the Debtors' right to close certain Bank Accounts in its discretion and in accordance with any approved postpetition financing.

68.    The Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtor and its estate, including, *inter alia*, the ability to: (a) control and secure corporate funds, (b) ensure the maximum availability of funds, when necessary, (c) reduce costs and administrative expenses associated with the movement of funds, and (d) obtain timely and accurate account balance information.

69.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to manage their business operations in chapter 11 without disruption. Accordingly, I respectfully submit that the Cash Management Motion should be approved.

**F.      Employee Wage Motion**

70.      In the Employee Wage Motion, the Debtors request that the Court enter an order authorizing, but not directing, the Debtors, in their sole discretion: (a) to pay to the Employees all accrued prepetition wages, salaries, and other amounts described more fully below (collectively, the "Pre-petition Employee Obligations"); (b) to honor any prepetition obligations in respect of, and to continue to honor in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off, and holiday time policies, workers' compensation and employee and retiree benefit plans and programs (collectively, the "Employee Benefits"), as described below; and (c) to remit all related prepetition payroll and similar taxes (the "Taxes").

71.      The Debtors also request an order authorizing the Banks to honor and process checks, and electronic transfer requests related to the foregoing.

**i.      Debtors' Employees**

72.      Debtors' full-time employees include 143 hourly employees, and 53 salaried employees, of whom 4 are senior executives.[5] (the "Employees").

**ii.      Wages, Salaries, and Related Obligations**

73.      Before the Petition Date and in the ordinary course of business, Debtors typically paid Employee Compensation Obligations weekly or bi-weekly.  Debtors process payroll through a third-party.

74.      Debtors estimate that, as of the Petition Date, they have approximately $463,112.68, inclusive of Payroll Taxes, outstanding in total accrued prepetition Employee Compensation Obligations, all of which will become due and owing before the final hearing on this motion.  As of the Petition Date, Debtors are aware of one employee who is individually owed

---

5   The senior executives are the Chief Executive Officer, Chief of Staff, Corporate Controller, and Director of Human Resources.

wages ($21,655.13) greater than the $15,150.00 cap established by section 507(a)(4) of the Bankruptcy Code.

### iii.    Leave Policies

75.    Debtors offer their employees other forms of compensation, including vacation days, holidays, civic duties leave, and bereavement days.  These forms of compensation are, in certain cases, required by statute, and in all cases, usual, customary, and necessary for Debtors to retain qualified employees to operate their business.  Failure to provide these benefits could contravene applicable law and harm employee morale and encourage the premature departure of employees.  Debtors therefore request authority to continue these programs in the ordinary course of business during these chapter 11 cases.

### 1.    Vacation Days

76.    Prior to the Petition Date, Debtors offered their employees three weeks of paid leave for the first year of employment and four weeks of paid leave for starting in the second year of employment.  Debtors allowed employees to roll over up to two weeks of unused paid leave, with a maximum six weeks allowed to accumulate in any given year.

### 2.    Bereavement Leave and Civic Duties

77.    With some exceptions, employees are entitled to take paid bereavement leave in the event of the death of an immediate family member. In addition, employees who are obligated to perform certain civic duties, including jury duty, are granted leave to fulfill such obligations.

### 3.    Holiday Pay

78.    Debtors provide paid time off for the following holidays: New Year's Day, Dr. Martin Luther King, Jr. Day, Memorial Day, Juneteenth, Independence Day, Labor Day, Thanksgiving Day, Day After Thanksgiving, Christmas Eve and Christmas Day.

### iv.     Expense Reimbursements

79.     In the ordinary course of their business, some of Debtors' employees incur expenses on behalf of Debtors.  Employees that incur expenses on behalf of Debtors are required to submit signed expense reports with supporting documentation, which are reimbursed each pay period upon approval.  As of the Petition Date, Debtors do have expense reimbursement obligations due and outstanding.

### v.     Obligations Related to Layoffs

80.     On May 29, 2024, Debtors laid off twenty-six (26) employees as part of their efforts to reduce costs in preparation of the filing of these cases.  Per certain state's involuntary termination guidelines, these employees are entitled to certain payments, including, inter alia, outstanding wages and accrued vacation time.  The total amount owed to these employees is approximately $57,350.06.

### vi.     Health and Welfare Benefits

81.     Prior to the Petition Date, Debtors offered their Employees various health and welfare benefits, including medical, dental, vision, life, and disability (long and short term) insurance.  Employees are eligible to enroll on the first day of employment.  Debtors contribute approximately $152,774.16 per month towards the Employee's insurance premiums.  Employee premiums are deducted pre-tax.

82.     The Debtors' ability to maximize the value of the estates for all stakeholders depends on the expertise and continued enthusiasm and service of the Debtors' Employees.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the morale and performance of the Employees may be adversely affected.  If the Debtors fail to pay the Employees' wages, Employee Benefits, and Trust Fund Taxes in the ordinary course, the

Employees will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses. This outcome would have a negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby causing immediate and irreparable harm to the Debtors and their estates.

83.     The Debtors seek to continue to pay post-petition costs of payroll, the Employee Benefits, and Trust Fund Taxes in the ordinary course during the pendency of these Cases, including payroll processing fees which may become due and payable to the Debtors' payroll processor in connection with its payroll-related administrative services (for the avoidance of doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

84.     Debtors estimate that before the final hearing on this motion, Prepetition Employee Obligations totaling approximately $520,462.74 will be due and payable (the "Interim Amount"). To fulfill these imminent commitments, the Debtor requests entry of the Interim Order, authorizing Debtors to pay Prepetition Employee Obligations in an aggregate amount not to exceed the Interim Amount, subject to the $15,150.00 per-employee cap established by sections 507(a)(4) and (a)(5) of the Bankruptcy Code. Debtors seek the final hearing on this motion so that it may pay all other Prepetition Employee Obligations.

85.     I believe that the relief requested in the Employee Wage Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to manage their business operations in chapter 11 without disruption. Accordingly, I respectfully submit that the Employee Wage Motion should be approved.

**G.      Utility Motion**

86.     Pursuant to the Utility Motion, the Debtors seek entry of interim and final orders, the proposed forms of which are attached thereto: (a) prohibiting utility companies (each, a

"Utility," and collectively, the "Utilities") from altering, refusing, or discontinuing services to the Debtors; (b) authorizing and approving the amount and method by which the Debtors may furnish the Utilities with adequate assurance of payment for post-petition utility services; and (c) granting related relief.

87.     In connection with operating its business and managing its properties, numerous Utilities provide the Debtors with utility services, such as telephone and communications, electricity, water, internet, and other similar services that are necessary for the continued operation of the Debtors' day-to-day affairs.  A list of all identified Utilities (the "Utility Service List") and proposed Adequate Assurance Deposits is attached as Exhibit A to the Utility Motion.

88.     Uninterrupted Utility services are essential to the Debtors' ongoing operations, and, therefore, to the success of the Debtors' reorganization efforts.  Indeed, any disruption in Utility services—even for a brief period of time—would seriously disrupt the Debtors' continued operations.  Such a disruption would negatively impact the Debtors' business operations and revenue and could jeopardize the Debtors' reorganization efforts and, ultimately, creditors' recoveries.

89.     I believe that the relief requested in the Utility Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to manage their businesses in chapter 11 without disruption.  Accordingly, I respectfully submit that the Utility Motion should be approved.

**H.     Insurance Motion**

90.     The Debtors seek entry of an order authorizing, but not directing, the Debtors to continue and, to the extent necessary, revise, extend, renew, supplement, or change their prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business, pay all prepetition obligations in respect thereof, including brokerage and administrative

fees, and pay post-petition obligations in respect thereof (collectively, the "Insurance Obligations").

91.     In connection with their business operations, the Debtors maintain multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations. The Insurance Policies include general liability, truck liability, business auto liability, umbrella liability, contingent casualty, property, directors' and officers' liability, and workers' compensation and employers' liability.

92.     The total annual premiums under the current Insurance Policies are approximately $1,745,087, including all related fees and charges.

93.     The Debtors do not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies. In an abundance of caution, the Debtors seek authority to pay any prepetition amounts in respect of the Insurance Policies, in an amount not to exceed $120,000, and to continue to pay post-petition costs with respect to the Insurance Policies in the ordinary course of business during the pendency of these Cases.

94.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many instances, such coverage is required by various regulations, laws and contracts that govern the Debtors' business operations. Moreover, I understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. The Debtors may also need to renew or replace certain of the Insurance Policies during the course of these Cases, or enter into new policies. If the Debtors do not pay prepetition amounts owing in respect

of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

95.     For the reasons already set forth herein and in the Insurance Motion, I believe the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their businesses without interruption, and to preserve value for the Debtors' estates.

**I.     Tax Motion**

96.     Through the Tax Motion, the Debtors seek an order (i) authorizing, but not directing, the Debtors to pay certain prepetition taxes, including, franchise fees, property taxes, and similar taxes and fees in the ordinary course of business, as the Debtors, in their sole discretion, deems necessary, (ii) authorizing banks and other financial institutions (the "Banks") to honor and process check and electronic transfer requests related to the foregoing, and (iii) granting related relief.

97.     In the ordinary course of business, the Debtors incur or collect and remit certain taxes including franchise, property and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of its business.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtors believe that none of the Taxes and Fees is past due or delinquent.

98.     The Debtors seek authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities; provided that payments on account of Taxes

and Fees that accrued, in whole or in part, prior to the Petition Date but were not in fact paid or processed prior to the Petition Date shall not exceed $40,334.00 in the aggregate.

99.     Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have wide-ranging and adverse effects on the Debtor's operations as a whole and on the value of its estate.  Specifically, the Debtors' failure to remit the Taxes and Fees could adversely affect the Debtors' business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtors or seek to prevent the Debtors from continuing their businesses and administering their estates, which, even if unsuccessful, would unnecessarily divert the Debtors' attention from the process of maximizing the value of the estate; (b) the Taxing Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtors does not pay the Taxes and Fees; and (d) certain of the Debtors' directors, officers, and employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on their part, which would undoubtedly distract these key people from their duties related to the Case.

100.     Further, the Debtors' payment of the Taxes and Fees is an exercise of sound business judgment and is necessary to maximize the value of the Debtors' estates for the benefit of creditors. Any disputes with taxing authorities could adversely affect their ability to conduct business in a particular jurisdiction and have wide-ranging and negative effects on the Debtors' operations as a whole and its efforts to efficiently administer the estate and maximize distributions to their creditors. If the Debtors do not continue paying the Taxes and Fees when they come due on a timely basis, it

is possible that Taxing Authorities, or those parties who ordinarily collect the Taxes and Fees, may interfere with the Debtors' business and the efficient administration of the estates.

101.    For the reasons already set forth herein and in the Tax Motion, I believe the relief requested in the Tax Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their businesses without interruption, and to preserve value for the Debtors' estates.

**J.      Critical Vendor Motion**

102.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay the prepetition claims of certain vendors that are critical to the Debtors' operations, as more fully described herein and in the Critical Vendor Motion (the "Critical Vendor Claims").

103.    The Debtors have a number of key relationships with vendors who provide essential goods and/or services to the Debtors in the ordinary course of business (the "Critical Vendors"). The Debtors believe that if they cannot continue the relationships with the current Critical Vendors, it may be impossible to continue doing business.

104.    In any event the amount of capital required to obtain similar goods or comparable services (if at all possible after a default under an agreement with a Critical Vendor) would be much greater than the combined total of making payments on the past due amounts to the Critical Vendors and the likely payments required on account of post-petition goods and services.

105.    The Debtors believe that they must continue to receive the goods and services provided by the Critical Vendors in order to achieve a successful reorganization.  In some cases, the Debtors believe that absent payment of prepetition amounts due, the Critical Vendors may

refuse to deliver any goods and services on an ongoing basis even if the Debtors can pay post-petition amounts due.

106.    Ultimately, the Debtors believe that their ability to continue operations at the efficient and high-quality levels needed to reorganize successfully will largely depend on the continued participation of the Critical Vendors.  The Debtors, along with their restructuring advisors, have performed an analysis of the payments to Critical Vendors necessary to avoid potentially significant disruptions to the Debtors' business operations.  The Debtors believe that a fund of $410,071 in the aggregate should provide the flexibility necessary for the Debtors to receive the vital goods and/or services they require to continue being successful as a reorganized entity.

**K.    Shippers Motion**

107.    Pursuant to the Shippers Motion, Debtors seek entry of Interim and Final Orders authorizing, but not directing, Debtors to pay (a) claims for goods ordered prepetition that are to be delivered postpetition, and (b) certain prepetition claims for shipping, freight forwarding, warehousing, lien claimants, and customs duties in an amount not to exceed $14,192.80.  The proposed Interim and Final Orders also authorize Debtors' banks to honor all related checks and electronic payment requests.

108.    Prior to the Petition Date, and in the ordinary course of business, Debtors ordered a variety of goods for which delivery will not occur until on or after the Petition Date (the "Outstanding Orders").  I believe that as a result of the commencement of the Chapter 11 Cases, the suppliers of Outstanding Orders may be concerned that goods ordered prior to the Petition Date pursuant to the Outstanding Orders, which are slated to be delivered to Debtors on or after the

Petition Date, will render such suppliers general unsecured creditors of Debtors' estates with respect to its claims in connection with delivering such goods.

109.    Based on such concerns, suppliers may refuse to ship or transport such goods (or recall shipments) with respect to the Outstanding Orders unless Debtors either undertake the burdensome and protracted process of issuing substitute purchase orders postpetition, or obtains the relief reflected in the proposed orders with respect to the Outstanding Orders (a) granting all undisputed obligations of Debtors arising from the acceptance of goods subject to Outstanding Orders administrative expense priority under section 503(b) of the Bankruptcy Code, and (b) authorizing Debtors to satisfy such obligations in the ordinary course of business.

110.    In addition, Debtors maintain the flow of goods by, in part, relying on third-party shippers, freight forwarders, and similar critical transportation vendors (collectively, the "Shippers").  I believe that, absent immediate payment, such Shippers may refuse to continue doing business with Debtors, thereby hindering Debtors' ability to maximize the value of their estates. Additionally, I have been advised that the Shippers and Warehousemen could potentially assert liens against Debtors and their property for amounts owed by Debtors.  I believe that delays in paying the Shippers and Warehousemen, with respect to the goods in their possession, as of the Petition Date will, in many cases, result in the assertion, under applicable law, of possessory liens upon Debtors' property.

111.    Absent the relief requested in the Shippers Motion, I believe Debtors' ability to ship and receive goods will be disrupted, resulting in costs, delays, and damage to the Debtors' business. Accordingly, based on the foregoing and those additional reasons set forth in the Shippers and Warehousemen Motion, I believe that the relief requested in such motion is necessary

to avoid immediate and irreparable harm and in the best interests of Debtors' estates, creditors, and all other parties in interest.

## CONCLUSION

112.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving the Debtors' objectives in these Chapter 11 Cases for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions, and I respectfully request that the Court do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 3, 2024

_____
Jeffrey Peck
Chief Executive Officer
iSun, Inc. and its affiliated entities

**EXHIBIT "A"**

**<u>Corporate Structure Chart</u>**

(Attached)



**Organization Structure**   *Updated 2/22/2024*

