**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iSun, Inc., *et al*.,[1] | Case No. 24-11144 (TMH) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED CREDIT PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH CLEAN ROYALTIES, LLC, (VI) AUTHORIZING USE OF CASH COLLATERAL, (VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Interim Order"), and a final order (the "Proposed Final Order" and together with the Proposed Interim Order, the "Proposed Orders"): (a) authorizing the Debtors to enter into that certain superpriority secured debtor-in-possession term loan in an aggregate principal amount of up to $4 million (the "DIP Facility") provided by Clean Royalties, LLC, directly or with one of its affiliates (the "DIP Lender"); (b) granting liens and superpriority administrative expense status to the DIP Lender as set forth herein; (c) authorizing the Debtors to use cash collateral as

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172) (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411) ; (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (7316); (collectively referred to as the "Debtors"). The Debtors' mailing address is: 400 Avenue D, Suite 10 Williston, Vermont 05495, with copies to Gellert Seitz Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

defined in section 363(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"); (d) granting adequate protection to the Debtors' prepetition lenders (collectively, the "Prepetition Secured Parties"); (e) scheduling a hearing (the "Final Hearing") to consider approval of this motion (this "Motion") on a final basis; and (f) granting related relief. In support of the relief requested herein, the Debtors rely on the *Declaration of Jeff Peck in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and the *Declaration Of Richard F. Nejame In Support Of Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Granting Security Interests And Superpriority Administrative Expense Status, (III) Granting Adequate Protection To Certain Prepetition Secured Credit Parties, (IV) Modifying The Automatic Stay, (V) Authorizing The Debtors To Enter Into Agreements With Clean Royalties, LLC, (VI) Authorizing Use Of Cash Collateral, (VII) Scheduling A Final Hearing, And (VIII) Granting Related Relief* (the "NeJame Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. In further support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United

States Constitution.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 507 and 552 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9014 and Local Rules 2002-1, 4001-2, 9013-1(f), and 9013-1(m).

## BACKGROUND

4.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases. As of the date hereof, no creditors' committee has been appointed.

5.      The Debtors are one of the largest solar energy services and infrastructure deployment companies in the country.  The Debtors' services include solar, storage and electric vehicle infrastructure, design, development and professional services, engineering, procurement, installation, O&M and storage. The Debtors target all solar markets including residential, commercial, industrial and utility segments.

6.      The circumstances leading to the filing of this case are set forth in the First Day Declaration filed in this case at Docket Number [__].

## PRELIMINARY STATEMENT

7.      The DIP Facility consists of a $4 million superpriority senior secured loan facility provided by the DIP Lender.   As is set forth in the Declaration, the Debtors' existing lenders were not willing to provide financing to the Debtors in any amount, much less in an amount which

makes these Chapter 11 Cases feasible.  After considering and exhausting all options, it is apparent that the DIP Facility is the best financing proposal available to the Debtors and should be approved as being in the best interest of the Debtors' estates.

8.      The Debtors, in consultation with their advisors, determined that, under the circumstances, the DIP Facility represents the best postpetition financing alternative available to the Debtors.  The DIP Facility is the product of extensive arm's-length, good-faith negotiations with the DIP Lender and other potential providers of similar facilities.  Alternative sources of postpetition financing (whether unsecured or secured) were not readily available to the Debtors as of the Petition Date, let alone on terms better than or comparable to the DIP Facility.  If approved, the DIP Facility will provide the Debtors with immediate and critical access to liquidity that is necessary to ensure that (a) the Debtors' business operations stabilize, (b) the Debtors can pay administrative costs in full, (c) value is preserved during the course of the Chapter 11 Cases (as defined below), and (d) the Debtors are able to conduct a postpetition sale process for their assets and attempt to identify a bid or bids that yields the highest and best value to the Debtors' estates.

**THE DEBTORS' PREPETITION SECURED INDEBTEDNESS**

9.      As of December 31, 2023, the Debtors had total long term debt of $10.39 million consisting of an $8 million revenue loan with Decathlon Growth Credit, LLC (the "Lender"), the assignee of Decathlon Specialty Finance, LLC.  The Debtors also had $1.2 million in various vehicle loans, interest ranging from 0% to 10.09 secured by vehicles, with varying terms through 2027, and $920 thousand in term loans through NBT Bank with various maturity dates and interest rates.  The Debtors are also parties to merchant cash advance agreements with Lendspark Corporation, Pawn Funding and Cedar Advance LLC, whereby the lenders advance certain amounts in exchange for a promise to repay a greater amount as and when the Debtors collected

certain future receivables. The amount advanced by Lendspark was $1,500,000 for a promise to repay $2,010,000, and $241,000 remains outstanding. For Pawn Funding and Cedar Advance, the amounts advanced were $1,200,000 each, for a promise to repay $1,608,000 respectively. Currently, $1,200,000 remains outstanding to each Pawn Funding and Cedar Advance.

10. As is described in the First Day Declaration and the NeJame Declaration, prior to the onset of these Chapter 11 Cases, the Debtors attempted to obtain secured superpriority postpetition financing from their existing primary secured lender. No financing offers were provided by any of the Debtors' existing lenders or any other financing source on comparable terms, and the DIP Facility was deemed the best offer available by the Debtors, in consultation with their advisors.

## THE DEBTORS HAVE AN IMMEDIATE NEED FOR USE OF CASH COLLATERAL AND DIP FINANCING

11. The Debtors require immediate access to liquidity to ensure that they can continue operating their business during these Chapter 11 Cases, preserve the value of their estates for the benefit of all parties in interest, and pursue a value-maximizing restructuring transaction. Without prompt access to the DIP Facility and Cash Collateral (defined herein), the Debtors will be unable to satisfy employee compensation obligations; pay necessary expenses; preserve and maximize the value of their estates; fund the administration of these Chapter 11 Cases; and service their customers, which would damage the value of the Debtors' estates to the detriment of all stakeholders. Such an outcome would cause immediate and irreparable harm.

12. Absent the relief requested herein, the Debtors' ability to successfully implement a going-concern sale would be jeopardized. The Debtors will be forced to cease operations immediately if they are unable to procure the funds necessary to pay postpetition wages, salaries, and payroll taxes, maintain insurance coverage, pay taxes, and make any other payments necessary

for the continued management, operation, and preservation of the Debtors' business during the pendency of these Chapter 11 Cases.  Such a result would be disastrous.  The ability to satisfy these expenses as and when due is essential to the Debtors' continued operations.  In particular, obtaining financing and the use of Cash Collateral is essential to the Debtors' ability to continue to serve their customers, maintain their business relationships with their employees, vendors and suppliers, and meet their ongoing obligations while finalizing and implementing their restructuring.

13.     As a result of continuing operating losses and increasing interest rates, the Debtors faced liquidity issues and subsequently fell into default with their prepetition secured lender.  As the Debtors' liquidity issues worsened, the filing of these Chapter 11 Cases became necessary after the Debtors' existing lender declined to provide additional financing.

14.     Any lapse in operation, no matter how transitory, would have a devastating impact on the Debtors' ability to service customers and on the going concern value of the Debtors' business.   Since the Debtors have no available alternative sources of financing to fund these Chapter 11 Cases and their restructuring efforts, absent the use of Cash Collateral and the DIP Financing, the Debtors cannot pay expenses necessary in the ordinary course of their business. Without immediate access to Cash Collateral, the Debtors' ability to operate and preserve the value of their business will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' customers, the Debtors' estates, and creditors.   The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court-approved prepetition expenses that may be at issue.

15.     The Debtors, with the assistance of their advisors, have developed a 13-week cash

flow forecast and budget for obtaining DIP Financing and the use of Cash Collateral during the interim period (the "Budget"), a copy of which is attached hereto as **Exhibit B**. The Debtors believe the Budget establishes that the Debtors will have adequate liquidity during the interim period. The Budget contains line items for cash flows anticipated to be received and disbursed during the time period for which the Budget is prepared. The Debtors believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Budget.

## CONCISE STATEMENT OF MATERIAL TERMS OF THE PROPOSED INTERIM ORDER AND DIP FACILITY

16. The below chart contains a summary of the material terms and conditions governing the Debtors' proposed DIP Facility and use of Cash Collateral pursuant to, and in accordance with, Bankruptcy Rule 4001(b) and Local Rule 4001-2:

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Parties to the DIP Credit Agreement**<br>Bankruptcy Rule 4001(c)(1)(B) | **Borrowers**: Each of the Debtors<br><br>**DIP Lender:** Clean Royalties, LLC, directly or with one of its affiliates**.** *See* DIP Term Sheet, attached hereto as **Exhibit C**, p. 1. |
| **Term and Purpose**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B); Local Rule 4001-2(a)(i) | The Debtors have an immediate need to obtain postpetition financing pursuant to the DIP Facility and to obtain use of Cash Collateral (subject to the Budget) in order to, among other things, (a) stabilize the Debtors' business operations, (b) fund the Debtors' working capital needs, (c) pay administrative costs in full, (d) preserve value during the course of the Chapter 11 Cases, and (e) conduct a postpetition sale process for their assets and attempt to identify a bid or bids that yields the highest and best value to the Debtors' estates.<br><br>See DIP Term Sheet, p. 4. |

| | |
|---|---|
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A) | The DIP Facility consists of a $4 million superiority senior secured term loan.<br><br>Initial Draw: $2,000,000 of New Money Commitments, will be made available to be drawn in a single drawing upon entry of the Proposed Interim Order. The Rolled Bridge Loans of approximately $1 million will also be issued at closing.<br><br>Final Draw: $1,000,000 will be funded and made available upon entry of the Proposed Final Order.<br><br>See DIP Term Sheet, p. 2. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) | The Proposed Orders and DIP Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of the DIP Lender to provide the DIP Facility.<br><br>*See* DIP Term Sheet, pages 7-8. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | The interest on the DIP funding shall be SOFR + 18%, paid-in-kind ("PIK") and accrued monthly.<br><br>*See* DIP Term Sheet, pages 2-3. |
| **Use of DIP Facility and Cash Collateral Bankruptcy Rule** 4001(b)(l)(B)(ii) | The proceeds of the DIP Facility shall be used in accordance with and subject to the Proposed Interim Order and the DIP Budget (subject to the Carve-Out and Permitted Variances).<br><br>. *See* DIP Term Sheet, p. 4. |
| **Adequate Protection/Entities with Interests in Cash Collateral** Bankruptcy Rules 4001(b)(l)(B), 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(i)(K) & (P) | The following secured parties have an interest in Cash Collateral:<br><br>DIP Lender; and Prepetition Secured Parties.<br><br>The adequate protection provided to the Prepetition Secured Parties shall be in accordance with the Proposed Interim Order, including the granting of replacement liens and superpriority claims.<br><br>*See* DIP Term Sheet, p. 13.<br><br>. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(K) | Upon entry of the Proposed Interim Order, the payment to the DIP Lender of all fees, including any arrangement fee, commitment fee and exit fee and any amounts due (or that may become due) in respect of the reimbursement and indemnification obligations, in each case referred to in the DIP Term Sheet.<br><br>The DIP Lender shall be entitled to an arrangement fee of 1.0% of the total DIP Commitments which shall be earned upon Closing.<br><br>DIP Lender shall be entitled to a commitment fee equal to 4.0% of the total DIP Commitments which shall be earned upon Closing.<br><br>The DIP Lender shall also be entitled to Exit Fees calculated as follows:<br>• For the first $2 million in principal amount of DIP Loans: 3% of the principal amount of such DIP Loans. |

| | |
|---|---|
| | • For the next $1 million in principal amount of DIP Loans: 6% of the principal amount of such DIP Loans.<br>• For any DIP Loans in excess of the foregoing: 9% of the principal amount of such DIP Loans.<br><br>*See* DIP Term Sheet, p. 3. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B); Local Rule 4001-2(a)(iii) | The use of cash and proceeds from the DIP Facility is subject to the Initial DIP Budget, a copy of which is attached hereto as **<u>Exhibit B</u>**, or any subsequent Approved Budget.<br><br>*See* DIP Term Sheet, p. 4. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | The liens contemplated by the Proposed Interim Order and the DIP Term Sheet shall follow the priorities set forth in paragraph 8 to the Proposed Interim Order.<br><br>*See* Proposed Interim Order, ¶ 8; DIP Term Sheet, p. 6. |
| **Carve-Out**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(F) | The Proposed Interim Order provides a carve-out of certain statutory fees and allowed professional fees of the Debtors (the "<u>Carve-Out</u>").<br><br>*See* Proposed Interim Order, ¶ 10; DIP Term Sheet, p. 6, Annex II. |
| **Postpetition Liens on Unencumbered Assets**<br>Local Rule 4001-2(a)(i)(G) | The Proposed Interim Order provides for valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, and non- avoidable liens on and security interests in the DIP Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) is a Permitted Prior Lien; provided, however, that the DIP Liens shall have priority over all Prepetition Liens.<br><br>*See* Proposed Interim Order, ¶ 8. |
| **Milestones**<br>Local Rule 4001-2(a)(i)(H) | The DIP Term Sheet includes certain milestones concerning the Debtors' sale process that, if not met, will result in an Event of Default,<br><br>DIP Term Sheet, p. 10. |
| **Joint Liability**<br>Local Rule 4001-2(a)(i)(J) | The Proposed Interim Order provides that the Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Term Sheet (and/or the DIP Loan Documents) and the DIP Obligations.<br><br>*See* Proposed Interim Order, ¶ 20(b). |

| | |
|---|---|
| **Payment of Fees**<br>Local Rule 4001-2(a)(i)(K) | The Proposed Interim Order provides that the pre-closing expenses of the DIP Lender and Bridge Lender will be paid at closing. Subsequent fees will be subject to the review process included in Paragraph 20.<br><br>*See* Proposed Interim Order, ¶ 3(d)(3), 20(a)-(c). |
| **Limitations on Use of Funds to Investigate the Liens and Claims of the Prepetition Secured Parties**<br>Local Rule 4001-2(a)(L) | The Proposed Interim Order includes a limitation on the use of the proceeds of the DIP Facility and Cash Collateral with respect to claims against the DIP Lender, Bridge Lender and Prepetition Lender but is subject to a $25,000 investigation budget.<br><br>*See* Proposed Interim Order, ¶ E |
| **Non-Consensual Priming**<br>Local Rule 4001-2(a)(i)(P) | The Proposed Interim Order provides for valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected priming first priority senior liens and security interests in all DIP Collateral, regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to all Prepetition Liens including, among other things all of the assets of Debtors (and any entities that become debtors in these Cases in the future), including, but not limited to, the "Collateral" as defined in any of the Prepetition Loan Documents.<br><br>*See* Proposed Interim Order, ¶ 8(c).<br><br>The Prepetition Lender has consented to the priming lien, and the DIP Liens are junior to those liens that are senior to the Prepetition Lender. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(i)(M) | The DIP Term Sheet contains events of default that are usual and customary for debtor-in-possession financing.<br><br>*See* DIP Term Sheet, page 11. |
| **Roll Up**<br>Local Rule 4001-2(a)(i)(O) | The DIP Facility provides for the issuance of the Rolled Bridge Loans immediately upon the closing, which will be deemed to indefeasibly satisfy the Bridge Laons.<br><br>*See* DIP Term Sheet, page 11. *See* Proposed Interim Order, ¶ 3(b). |

| | |
|---|---|
| **Validity of Prepetition Liens; Challenge Period**Local Rule 4001- 2(a)(i)(Q) | The Interim DIP Order contains Stipulations concerning the Bridge Loan made by Clean Royalties, which will be indefeasibly repaid at the closing and is not subject to a challenge period.<br><br>*See* Proposed Interim Order, ¶ E<br><br>There are no other stipulations concerning any pre-petition debt and, thus, no challenge period.. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U) | The DIP Liens will attach to Avoidance Actions and their proceeds and the Adequate Protection Liens will attach to proceeds of Avoidance Actions only upon entry of the Proposed Final Order.<br><br>*See* Proposed Interim Order ¶¶ 8, 9(b). |
| **Sections 506(c) and 552(b)and Marshalling Waivers** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(V), (W), (X) | The Debtors seek an immediate waiver of their right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code solely as to the DIP Lender and Bridge Lender.<br><br>*See* Proposed Interim Order, ¶ 18<br><br>Subject to entry of the Proposed Final Order, the Debtors seek waiver of (a) their right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code as to the Prepetition Lender, (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code as to the Bridge Lender, and (c) the equitable doctrine of "marshalling" and other similar doctrines with respect to the DIP Collateral as to the DIP Lender.<br><br>*See* Proposed Interim Order, ¶¶ 18, 40, 41. |
| **Waiver / Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Proposed Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Proposed Interim Order.<br><br>*See* Proposed Interim Order, ¶ 17. |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2

17. The explanation for the inclusion of the foregoing material terms is that the Debtors were unable to obtain financing without offering a priming lien as an incentive and the interests of the existing lenders being primed are adequately protected. In addition, the roll-up of the Bridge Loan into the DIP Facility was a condition agreed to when the Bridge Loan was made and is a condition to the DIP Facility. In light of the foregoing, the Debtors submit that the material terms are appropriate under the facts and circumstances of these Chapter 11 Cases.

## BASIS FOR RELIEF

### A. This Court Should Authorize the Debtors to Obtain Postpetition Financing and Grant Priming Liens and Other Rights and Privileges to the DIP Lender.

18. Bankruptcy courts have authority to permit debtors-in-possession to obtain postpetition financing pursuant to section 364 of the Bankruptcy Code. Specifically, section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors, including whether:

(a) unencumbered credit or alternative financing without superpriority status is available to the debtor;

(b) the credit transactions are necessary to preserve assets of the estate;

(c) the terms of the credit agreement are fair, reasonable, and adequate;

(d) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

(e) the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991).

19. The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including "priming" liens on all of the Prepetition Secured Parties' prepetition collateral

("Prepetition Liens").

20. In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

*See also In re Crouse Group, Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e*., by allowing a lender only an administrative claim;
>
> b. the credit transaction is necessary to preserve the assets of the estate; and
>
> c. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp*., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).

21. No party contacted as part of the above-described process was willing to provide postpetition financing to the Debtors on an unsecured basis. Further, the Debtors do not have sufficient unencumbered assets to secure debtor-in-possession financing to fund a non-consensual chapter 11 case. Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

22. Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Lenders' interests in collateral are adequate protected. Here, the Debtors' principal Prepetition Secured Lender has consented to the priming liens securing the DIP Facility. In addition, the Prepetition Secured Lenders will receive adequate protection of replacement liens on the prepetition collateral under the Proposed Orders in accordance with their prepetition security interests and related priorities and all Prepetition Secured Lenders. Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

23. For the reasons discussed herein, the Debtors submit that they satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under section 364(c) of the Bankruptcy Code.

***(a) The Debtors Cannot Obtain Financing on More Favorable Terms***

24. In demonstrating that credit is not available without the protections afforded by section 364(c) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (holding "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*,

*Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

25. As set forth above and in the First Day Declaration and the NeJame Declaration, given their current financial condition, financing arrangements, and debt and capital structure, the only source of financing reasonably available and actionable is that offered by the DIP Lender on the terms under the DIP Term Sheet, and the Debtors were not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. Accordingly, the Debtors submit that, despite their good faith efforts, similar credit is not available to the Debtors without the priming sought through the Proposed Interim Order.

***(b) The DIP Facility and DIP Term Sheet are Necessary to Preserve the Value of the Debtors' Estates***

26. As debtors-in-possession, the Debtors have a fiduciary duty to protect and maximize the value of their estates. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facility and DIP Term Sheet, if approved, will provide working capital critical to fund the Debtors' day-to-day operations and the Chapter 11 Cases, which will provide a path for the Debtors to sell their assets as a going-concern pursuant to section 363 of the Bankruptcy Code by year end. Without access to the DIP Facility, the Debtors will likely be forced to cease operations after the Petition Date, which would result in immediate and irreparable harm to the Debtors' customers and the Debtors' businesses, deplete the going-concern value of such businesses, upend the going-concern sale process that the Debtors believe is the best way to maximize value for creditors. The Debtors also would be unable to administer their Chapter 11 Cases without the liquidity provided by the DIP Facility. The Debtors' ability to service their customers; maintain business relationships with their vendors, suppliers, utilities, and customers; satisfy other working capital and operational needs; and otherwise finance their operations during the Chapter 11 Cases is essential to the Debtors' continued viability and to ensure a value-

maximizing sale process.

27. Because the Debtors' available and projected cash from operations alone is insufficient to fund their operations, *see* Budget, the funds to be provided under the DIP Facility are necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

***(c) The Terms of the DIP Term Sheet are Fair, Reasonable, and Adequate under the Circumstances***

28. In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender. *See In re L.A. Dodgers*, 457 B.R. at 312 (approval of debtor-in-possession financing requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (although many of the terms favored the lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

29. As described in the First Day Declaration and herein, given the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest and fund a sale process in these Chapter 11 Cases, the Debtors submit that the terms of the DIP Term Sheet are fair, appropriate, reasonable, and in the best interests of the Debtors, their estates, and their creditors. The DIP Term Sheet, moreover, was negotiated extensively by the Debtors and the DIP Lender, in good faith and at arm's length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel. The Debtors, therefore, believe that this requirement is satisfied.

***(d) Entry into the DIP Term Sheet Reflects the Debtors' Reasonable Business Judgment***

30. A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility, and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"). Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re L.A. Dodgers*, 457 B.R. at 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").

31. For the reasons set forth above and in the First Day Declaration, the Debtors submit that entry into the DIP Term Sheet is consistent with the exercise of the Debtors' reasonable business judgment. The Debtors, therefore, request that this Court authorize the Debtors to enter into the DIP Term Sheet and access funds under the DIP Facility, subject to the terms of the Proposed Interim Order, and that this Court grant to the DIP Lender all of the rights, privileges, and protections, as set forth herein, in the DIP Term Sheet, and the Proposed Interim Order, that are necessary to protect the DIP Lender and secure the DIP Obligations.

**B. The DIP Lender should be Deemed a Good-Faith Lender under Section 364(e) of the Bankruptcy Code**

32.     The Debtors submit that the DIP Lender should be deemed a good-faith lender under the Bankruptcy Code. Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e). Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

33.     As explained herein and in the First Day Declaration, the DIP Term Sheet is the result of: (i) the Debtors' reasonable judgment that under the circumstances the DIP Lender provided a reasonable and actionable postpetition financing proposal; and (ii) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Term Sheet are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, as more particularly set forth in the DIP Term Sheet and Budget. Accordingly, the Debtors request that this Court find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

### C.     The Debtors' Request to Use Cash Collateral and Proposed Adequate Protection of the Prepetition Secured Parties are Appropriate

34.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their

estates, including Cash Collateral.[2] Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). If a holder of a secured claim does not consent to the use of its cash collateral, section 363(e) of the Bankruptcy Code provides, in relevant part:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. . . .

11 U.S.C. § 363(e).

35. The Bankruptcy Code does not explicitly define "adequate protection," but section 361 of the Bankruptcy Code does provide the following three (3) nonexclusive examples of what may constitute adequate protection: (i) cash payments; (ii) an "additional or replacement lien" to the extent use of Cash Collateral results in a decrease in the value of such entity's interest in such property; and (iii) granting such "other relief" resulting in the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. What constitutes adequate protection is a question of fact that must be evaluated on a case-by-case basis, in light of the particular facts and circumstances presented, the focus being that which is required to protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-

[2] The Bankruptcy Code defines "cash collateral" as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title."11 U.S.C. § 363(a).

12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

36.     The purpose in providing "adequate protection" is to ensure the creditor receives the value for which the creditor bargained pre-bankruptcy. *In re O'Connor*, 808 F.2d at 1396. Adequate protection is intended to protect secured creditors from diminution in value from the debtor's use of the collateral during administration of the case.  *See* 11 U.S.C. § 363(e) ("[O]n request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the [debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."); *see also In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *In re Kain*, 86 B.R. 506, 513 (W.D. Mich. 1988); *In re Becker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

37.     Moreover, the Prepetition Secured Parties are adequately protected as a result of the continuation of the Debtors' business operations. Without the use of the Cash Collateral, the Debtors' operations would be irreparably harmed. Indeed, absent use of the Cash Collateral, the Debtors likely will be unable to continue to meet obligations to their residential, commercial and industrial customers or pay their ordinary business expenses, including rent and employee wages.

Failure to make such payments would significantly jeopardize the Debtors' ability to maintain their business and continue their operations.

38. In addition to the adequate protection being provided, the Prepetition Secured Parties are also adequately protected by the process contemplated by the Chapter 11 Cases. Use of Cash Collateral will preserve and enhance the value of the Debtors' estates, all of which are the Prepetition Secured Parties' collateral, whereas if the Chapter 11 Cases were converted immediately to cases under chapter 7, that value would be lost. Entry of the Proposed Interim Order and Proposed Final Order approving use of Cash Collateral is thus not only necessary but will help maximize the value of the Debtors' estates and the ultimate recovery for the Debtors' creditors. Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern, necessitating the cessation of the Debtors' operations. Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, which is unquestionably in the best interests of the Debtors, their estates, and their creditors.

39. The Debtors believe that the going concern value of their business is significantly greater than their liquidation value. Courts routinely have held that adequate protection may be demonstrated by a simple showing that the going concern value of the debtors is preserved by the debtors' continuing operations and use of cash collateral. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1087-89 (4th Cir. 1986) (trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations). The Debtors' continued operations likely present the best opportunity for the Prepetition Secured Parties to receive the greatest recovery on account of their claims. Accordingly, the Debtors submit that use of the Cash Collateral will allow the Debtors to continue their operations and, thereby, protect the Prepetition Secured Parties' interests. *See, e.g.*, *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142

B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (where the court found a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

40.     In addition, the value of the Debtors' assets is enhanced by the Debtors' continued operations while the Debtors conduct their sale process, since the alternative will severely impair value for all of the Debtors' stakeholders, including the Prepetition Secured Parties. *See, e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating "whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor). Despite the tenuous cash position caused by the impacts of rising interest rates which have hampered the Debtors' liquidity, the value of the Debtors' assets are increasing as the Debtors improve their financial footing. This cannot be done without the use of cash collateral. Accordingly, the use of Cash Collateral as contemplated herein is critical.

41.     For the reasons set forth herein, as it relates to the Prepetition Secured Parties, the proposed adequate protections are reasonable, appropriate, and sufficient to satisfy the standard of "adequate protection." The Prepetition Secured Parties will be properly and adequately protected, and the Debtors believe that no further adequate protection is required. The use of Cash Collateral

not only maintains the value of the Prepetition Secured Parties' remaining collateral, but also increases their collateral base, strengthens the value of the Debtors' business and is fair and appropriate on an interim basis under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral in the near term for the benefit of all parties in interest and the Debtors' estates.

### D.   Modification of the Automatic Stay is Warranted and Necessary to Facilitate the Debtors' Postpetition Borrowing through the DIP Facility

42.   The Debtors request that this Court modify the automatic stay provisions of section 362 of the Bankruptcy Code solely to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Term Sheet (all subject to the default and notice provisions set forth in the Proposed Interim Order), and to the extent necessary to grant the adequate protection to the Prepetition Secured Lenders as set forth herein and in the Proposed Interim Order. The Debtors believe that these modifications to the automatic stay are fair and reasonable and are necessary conditions to effectuate the relief sought in this Motion.

### E.   The Debtors Will Suffer Immediate and Irreparable Harm if They Cannot Use Cash Collateral and the Initial Draw on an Interim Basis

43.   Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). Bankruptcy Rule 4001(c) applies a similar standard for initial borrowings under post-petition financing. Bankruptcy Rule 4001(c)(2). The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin.*

*Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008).  In explaining the standards governing preliminary injunctions, the Second Circuit instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Co. 1985); *see also In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bank S.D.N.Y. 1990). After the 14-day period, the request for use of cash collateral or additional borrowings is not limited to those amounts necessary to prevent destruction of the debtor's business.  A debtor is entitled to use cash collateral or obtain financing that it believes prudent in the operation of its business. *See, e.g.*, *Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

44.     The Debtors respectfully request that the Court conduct an expedited preliminary hearing on this Motion and authorize the Debtors (from and after the entry of the Proposed Interim Order and pending the Final Hearing) to use Cash Collateral and make the Initial Draw of $2 million in accordance with the Budget for, among other things, working capital purposes, administrative expenses and the payment of certain obligations in accordance with the relief authorized by the Court.

45.     Where, as here, the debtor is operating a business, it is extremely important that access to cash collateral be allowed to facilitate the survival of the Debtor's business units as going concerns: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting *In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). The Court should authorize

the Debtors to use Cash Collateral, whether existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash collateral into cash. Currently, the Debtors' available cash is insufficient to enable them to operate without the use of Cash Collateral and the Initial Draw.

46.     Interim access to the Cash Collateral and the Initial Draw will ensure that the Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing. The Debtors have an immediate need to use Cash Collateral for, among other things, (i) their operations in the ordinary course of business, (ii) funding payroll for their employees, (iii) purchasing supplies, (iv) maintaining utilities, (v) paying vendors critical to operations, and (vi) administering these Chapter 11 Cases, all in accordance with the Budget. The Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' cash collateral, as that term is used by section 363(c) of the Bankruptcy Code. Accordingly, without immediate access to Cash Collateral, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates and creditors. Based on the foregoing, the Debtors submit that the interim relief requested in this Motion, pending a final hearing, is necessary, appropriate, and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors and their estates and creditors. In short, the Debtors' ability to administer these Chapter 11 Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates. Accordingly, to the extent that the Debtors require the use of Cash Collateral, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

**F. The Scope of the Carve-Out Is Appropriate**

47. The proposed Adequate Protection is subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing the debtor and the creditors' committee because "[a]bsent such protection, the collective rights and expectations of all parties- in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve- Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and the Debtors' and committee's (if appointed) professional fees.

**SATISFACTION OF BANKRUPTCY RULE 6003(b)**

48. Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one (21) days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm. For the reasons discussed above, authorizing the Debtors to secure postpetition financing, be authorized to use Cash Collateral, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these Chapter 11 Cases. Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' ability to administer their estates at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to preserve and maximize the value of the Debtors' estates for the benefit

of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

49. The Debtors seek a waiver of any stay of the effectiveness of an order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above and in the First Day Declaration, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtors' operations, going-concern value and their efforts to pursue a resolution to these Chapter 11 Cases. To implement the foregoing successfully, the Debtors request that the Proposed Orders each include a finding that the Debtors have established cause to exclude such relief from the fourteen day stay period under Bankruptcy Rule 6004(h).

50. For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h).

**RESERVATION OF RIGHTS**

51. Nothing contained herein or any actions taken pursuant to such relief requested (other than what is expressly set forth in the DIP Loan Documents) is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a

finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**NOTICE**

52. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) the Prepetition Lenders; (h) the DIP Lender; (i) the office of Housing and Urban Development; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Proposed Interim Order substantially in the form attached hereto, grating the relief requested herein and such other and further relief as may be just and proper.

Dated: June 3, 2024

GELLERT SEITZ BUSENKELL & BROWN, LLC

*/s/ Michael Busenkell*

Michael Busenkell (DE 3933)
Amy D. Brown (DE 4077)
Michael Van Gorder (DE 6214)
1201 North Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5812
Facsimile: (302) 425-5814
Email: mbusenkell@gsbblaw.com
abrown@gsbblaw.com
mvangorder@gsbblaw.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ISUN, INC., *et al.*,[1] | Case No. 24-11144 (TMH) |
| Debtors. | Jointly Administered |

**DECLARATION OF RICHARD F. NEJAME IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED CREDIT PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH CLEAN ROYALTIES, LLC, (VI) AUTHORIZING NON- CONSENSUAL USE OF CASH COLLATERAL, (VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF**

I, Richard F. NeJame, hereby declare under penalty of perjury, as follows:

1. My name is Richard F. NeJame. I am over the age of eighteen (18) and make the statements herein upon my own personal knowledge. I am qualified and authorized to make the statements herein.

2. I am a Managing Director at England Securities, LLC ("England"), the proposed investment banker for iSun, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172) (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411) ; (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (7316); (collectively referred to as the "Debtors"). The Debtors' mailing address is: 400 Avenue D, Suite 10 Williston, Vermont 05495, with copies to Gellert Seitz Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

3. I make this Declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with Clean Royalties, LLC, (VI) Authorizing Non-consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "DIP Motion").[2]

**Background and Qualifications**

4. I have been a Managing Director of England, a leading independent investment bank, since February 2024. Prior to England, I was a Senior Managing Director at B. Riley / FocalPoint. I have previously worked in the restructuring groups at Lazard Freres & Co., Gleacher and Company, and Oppenheimer & Co. I earned my BSE in Electrical Engineering from Duke University and received my MBA from the Wharton School of Business at the University of Pennsylvania.

5. I personally have over 25 years of experience advising leveraged and distressed corporate clients, and have executed more than $100 billion in aggregated transaction value involving over 80 deals. Some examples of noteworthy transactions include:

a. *In re RTI Holding Company, LLC*, Case No. 20-12456-JTD (Bankr. D. Del.) (investment banker to the debtors);

b. *In re Movie Gallery, Inc.*, Case No. 10-30696-KLP (Bankr. E.D. Va.) (investment banker to the Official Committee of Unsecured Creditors);

c. *In re Lyondell Chemical Company, et al.*, Case No. 09-10023-REG (Bankr. S.D.N.Y.) (financial advisor to certain secured noteholders of the Debtors);

[2] Capitalized terms used but not defined in this Declaration have the meanings assigned in the DIP Motion or the proposed interim order attached to the DIP Motion (the "Interim DIP Order").

d. *In re Youfit Health Clubs, LLC et. al.*, Case No. 20-12841-MFW (Bankr. D. Del.) (investment banker to the Debtors);

e. *In re Formica Corp. et. al.*, Case No. 02-10969-BRL (Bankr. S.D.N.Y.) (investment banker to the Debtors);

f. *In re SafetyKleen Corporation*, Case No. 00-02303-PJW (Bankr. D. Del.) (investment banker to the Debtors)

g. *In re GenTek Inc.*, Case No. 02-12986-MFW (Bankr. D. Del.) (investment banker to the Debtors)

h. *In re NextWave Personal Communications, Inc.*, Case No. 98-B-21529 (ASH) (Bankr. S.D.N.Y.) (investment banker to the Official Committee of Unsecured Creditors),

i. *In re Vlasic Foods International*, Case No. 01-00285-MFW (Bankr. S.D.N.Y.) (investment banker to the Debtors)

6.     England has been retained by the Debtors, subject to Court approval, to facilitate the sale of substantially all of their assets in addition to advising the Debtors with respect to the Chapter 11 proceedings and evaluating any other available alternative transactions for the Debtors. As leader of the engagement, I have independently reviewed, have become familiar with, and have personal knowledge regarding the Debtors' assets, their respective markets, reimbursements, operating expenses, staffing and market valuations.

7.     Both England and I have worked with companies, private equity firms, banks, family offices, and commercial lenders by providing sales advisory and connection to capital for transactions in a wide range of corporate finance transactions, including restructurings and reorganizations, mergers and acquisitions, and debt and equity financings.  England has sold assets for private companies, publicly traded companies, nonprofits, government entities, and lenders.  In particular, England has served as either an agent, broker, and/or investment banker in a number of bankruptcy sale processes.  Attached as **<u>Exhibit A</u>** is a non-exclusive list of sales or other transactions that England personnel have closed in bankruptcy proceedings.

8. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge; information supplied to me by other employees of England and members of the Debtors' management, professionals, and advisors; my review of relevant documents; or my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition. If called to testify, I could and would testify competently as to the facts set forth herein. I am authorized to submit this Declaration.

**Negotiations with the Proposed DIP Lender**

9. In mid-April 2024, Debtors' management asked England to engage in an ongoing discussion with the Proposed DIP Lender with regard to providing funding to the Company. England engaged in numerous phone calls during the latter part of April discussing a proposed investment and accompanied the Proposed DIP Lender to on-site due diligence meetings during the first week of May. With the benefit of this investigation, the Proposed DIP Lender determined and proposed a financing in the form of a DIP loan that would allow the Debtors to finance itself through a Chapter 11 sales process in which the Proposed DIP Lender intended to be the stalking-horse bidder. A round of negotiations ensued in which the Debtors, the Prepetition Ledner and the Proposed DIP Lender participated, negotiated terms, budgets and a process, conditioned upon which urgently needed capital could be injected into the Debtors. The Prepetition Lender was unwilling to provide additional capital to the Debtors; however, it did consent to the Bridge Lender and DIP Lender providing additional capital to the Debtors on a priming basis in furtherance of the Sale. The proposed DIP Financing is the result of these discussions.

**Debtors' Efforts to Obtain Alternative Financing**

10. Prior to the Petition Date, the Debtors, through England, surveyed the credit markets to determine whether there was any alternative DIP financing to the financing proposed

by Clean Royalties, LLC. To that end, England contacted 23 alternative DIP lenders, which included a mix of financial institutions and managed investment funds, in an effort to obtain alternative proposals. Of the alternative DIP lenders contacted, 8 requested a non-disclosure agreement. Ultimately, 3 signed a non-disclosure agreement and were provided access to the Debtors' virtual data room. As of the date of this declaration, the Debtors have not received a proposal from an alternative DIP lender.

11. The failure to obtain the current proposed financing on an interim basis would result in irreparable harm to the Debtors. To the extent the Debtors receive alternative binding commitments for postpetition financing on more favorable terms that the proposed DIP Financing under the DIP Facility, the Debtors will consider them prior to the final hearing on the proposed DIP financing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 3, 2024

*/s/Richard F. NeJame*_______
Richard F. NeJame
Managing Director
England Securities, LLC

**EXHIBIT "A"**

AbitibiBowater, Inc.
Ahern Rental, Inc.
Boston Chicken, Inc.
Blackwood, Inc. and Blackwood Trading, LLC
Birdsall Services Group, Inc.
CAI Wireless Systems, Inc.
Dura Automotive, Corp.
Entergy Corporation N.O., Inc.
EuroFresh Farms, Inc.
Exide Technologies, Inc.
Formica Corporation
GenTek, Inc.
Global Telesystems BV
Graceway Pharmaceuticals, Inc.
Heilig-Meyers Company
INTERMET Corporation (twice)
ION Geophysical, Inc.
Birdsall Services Group, Inc.
LyondellBassell Industries N.V.
NextWave Personal Communications, Inc.
Neff Rental Corp.
Oglebay Norton Company
Oneita Industries, Inc.
Oriental Trading Company
O'Sullivan Industries, Inc.
Radnor Holdings Corporation
Rhythm NetConnections, Inc.
Safety-Kleen Corporation
SkyView Media, Inc.
Simmons Bedding Company
SpectraSite Communications, Inc.
Teksid Aluminum, Ltd.
Trico Marine Services, Inc. (twice)
Vlasic Foods International, Inc.
Wireless Holdings, Inc.

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re: | |
|---|---|
| iSUN, Inc., *et al.*,[1] | Chapter 11 |
| Debtors. | Case No. 24-11144 (TMH) |
| | (Jointly Administered) |
| | Re. D. I. ______ |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

Upon the Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Granting Security Interests And Superpriority Administrative Expense Status, (III) Granting Adequate Protection To Certain Prepetition Secured Credit Parties, (IV) Modifying The Automatic Stay, (V) Authorizing The Debtors To Enter Into Agreements With Clean Royalties, LLC, (VI) Authorizing Use Of Cash Collateral, (VII) Scheduling A Final Hearing, And (VIII) Granting Related Relief [Docket No. __] (the "Motion")2 filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") for

1 The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172) (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411) ; (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA"); (collectively referred to as the "Debtors"). The Debtors' mailing address is: 400 Avenue D, Suite 10 Williston, Vermont 05495, with copies to Gellert Seitz Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

2 Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Motion or the DIP Term Sheet (as defined herein).

entry of an interim order (the "Interim DIP Order") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1(b), 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), among other things:

(i) authorizing iSun, Inc. ("iSun") and each of the other Debtors (with iSun, each a "Borrower" and collectively, the "DIP Loan Parties") to obtain postpetition financing, on a joint and several basis, in connection with a multi-draw senior secured super-priority priming term loan debtor-in-possession credit facility in the aggregate principal amount of up to $4.0 million (the "DIP Facility," and the commitments thereunder, the "DIP Commitments" and the loans made thereunder, the "DIP Loans") subject to the terms and conditions set forth in that certain *DIP Term Sheet* attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet"), accepted by and among the DIP Loan Parties and Clean Royalties, LLC ("CR" or the "DIP Lender"), consisting of:

(a) New Money DIP Loans. A multi-draw senior secured super-priority priming term loan debtor-in-possession credit facility in an aggregate principal amount not to exceed $3.0 million (the "New Money DIP Commitment" and the term loans made thereunder, the "New Money DIP Loans"), consisting of, subject to the DIP Term Sheet:

(1) upon entry of the Interim DIP Order, an initial draw of $2.0 million (the "Initial Draw"); *provided* that each such draw shall be limited to the amount necessary to finance disbursements projected to be made during the two-week period commencing with the date of the draw as set forth in the DIP Budget (subject to Permitted Variances) in effect at the time such draw is requested; and

(2) upon entry of the Final DIP Order (as defined below), subsequent draws up to $1.0 million in the aggregate (the "Final Draws"), *provided* that each such draw shall be limited to the amount necessary to finance disbursements projected to be made during the two-week period commencing with the date of the applicable draw as set forth in the DIP Budget (subject to Permitted Variance) in effect at the time such draw is requested; and

(b) Rolled Bridge Loans. Upon approval of the Interim DIP Order, and the occurrence of the Closing and the Initial Draw, all existing Bridge

Financing Agreement Obligations shall be converted on a cashless, dollar for dollar basis into loans under the DIP Facility (such loans, the "Rolled Bridge Loans").

(ii) authorizing the Debtors to execute, deliver, and perform under the DIP Term Sheet, any security agreement, and any other related documents, including pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, and such other documents that may be reasonably necessary, desirable or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Lender (collectively, as such may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Loan Documents"), each of which shall be in form and substance acceptable to the DIP Lender; and to perform such other acts as may be reasonably necessary, desirable or appropriate in connection with the DIP Loan Documents;

(iii) granting to the DIP Lender, (a) DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, as further described herein and (b) DIP Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code, subject and subordinate to the Carve Out;

(iv) authorizing and directing the Debtors to pay all principal, interest, fees, costs, expenses, and other amounts payable under the DIP Loan Documents as such become due and payable, as provided and in accordance therewith;

(v) authorizing the Debtors to use Cash Collateral (as defined below), including any Cash Collateral in which the Prepetition Secured Lender has a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim DIP Order, or otherwise, in accordance with the Interim DIP Order, the DIP Budget, and the DIP Loan Documents (including the DIP Term Sheet);

(vi) authorizing the Debtor to perform such other and further acts as may be necessary or desirable in connection with the Interim DIP Order, the DIP Loan Documents (including the DIP Term Sheet) and the transactions contemplated hereby and thereby, subject to the Interim DIP Order and the DIP Budget;

(vii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim DIP Order;

(viii) granting adequate protection to the Prepetition Secured Lender as provided in this Interim DIP Order;

(ix) scheduling a final hearing (the "Final Hearing") to consider entry of a final order that grants all of the relief requested in the Motion on a final basis (the "Final DIP Order"), and approving the form of notice with respect to the Final Hearing; and

(x) providing for the immediate effectiveness of this Interim DIP Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the Motion, the *Declaration of Jeffrey Peck of iSun, Inc. in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. XX] (the "First Day Declaration"), the *Declaration of Richard F. NeJame Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with Clean Royalties, LLC, (VI) Authorizing Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* [Docket No. XX] (the "NeJame Declaration") and evidence submitted or proffered at the hearing on the Motion held on [______], 2024 (the "Interim Hearing"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having determined that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion, the First Day Declaration, the NeJame Declaration and the arguments of counsel at the Interim Hearing; and the Court having found that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rules 4001 and 6003; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and other parties in interest; and it appearing that the Debtors' entry into the DIP Facility is a sound and prudent

exercise of the Debtors' business judgment; and the Court having found that proper and adequate notice of the Motion and Interim Hearing thereon has been given under the circumstances and that no other or further notice is necessary for the interim relief requested in the Motion; and the Court having found that good and sufficient cause exists for the granting of the relief requested in the Motion after having given due deliberation to the Motion and all of the proceedings had before the Court in connection with the Motion, **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. Petition Date. On June 3, 2024 (the "Petition Date"), each Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"), commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

B. Debtors in Possession. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C. Jurisdiction and Venue. This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue of the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 507, and 552 of the Bankruptcy

[3] Where appropriate in this Interim DIP Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

Code, Bankruptcy Rules 2002, 4001, 6004, 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, 7007-1, 9013-1, 9013-4, and 9014-2.

D. Committee. As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed an official committee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, "Committee").

E. Debtors' Stipulations. In requesting the DIP Facility and the use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lender and the Bridge Lender to agree to provide, or consent to, the DIP Facility, and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows (collectively, the "Debtors' Stipulations"):

Debtors' Stipulations for Bridge Financing Liens

(i) Bridge Financing Agreement. Pursuant to that certain (i) Senior Secured Promissory Note, dated May 15, 2024 (the "Bridge Note"), between iSun and CR (in such capacity , the "Bridge Lender") and (ii) Security Agreement, dated May 14, 2024 (the "Bridge Security Agreement", and together with the Note, each, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, jointly, the "Bridge Financing Agreement"), by and among iSun, the other Grantors (as defined therein) and CR, the Debtors incurred indebtedness to the Bridge Lender (the "Bridge Financing Claims").

(ii) Bridge Financing Obligations. As of the Petition Date, each of the Debtors was justly and lawfully indebted and liable to the Bridge Lender, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $1,000,000 on account of principal amount of loans outstanding under the Bridge Financing Agreement, plus any accrued but unpaid interest and reimbursement obligations, fees, costs, expenses (including attorneys' fees, financial advisors' fees, related expenses, and disbursements), charges, disbursements, indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, in each case, to the extent provided in the Bridge Financing Agreement (the "Bridge Financing Obligations"). The Bridge Financing

Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Bridge Financing Obligations owing to the Bridge Lender is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any cases under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").

(iii) Bridge Financing Liens: As of the Petition Date, liens and security interests securing the Bridge Financing Agreement (the "Bridge Financing Liens"), (A) are valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Collateral (as defined in the Bridge Security Agreement, the "Bridge Financing Collateral"), (B) are not subject to any offset, contest, objection, recovery, recoupment, reduction, defense, counterclaim, subordination, recharacterization, disgorgement, disallowance, avoidance, challenge, or any other claim or Cause of Action[4] of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or other applicable law, (C) were granted to or for the benefit of the Bridge Lender for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations or consideration secured or obtained thereby, and (D) are senior to the Prepetition Secured Lender Liens (as defined below). The Bridge Financing Liens (1) constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected first-priority security interests in and liens on the Bridge Financing Collateral, (2) encumber all of the Bridge Financing Collateral, as the same existed on the Petition Date, (3) were granted to, or for the benefit of, the Bridge Lender for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby, and (4) are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

[4] As used in this Interim DIP Order, "Causes of Action" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, or offset of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the entry of this Interim DIP Order, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.

(iv) Bridge Financing Collateral. To secure the Bridge Financing Obligations, the Debtors entered into the Bridge Security Agreement. Pursuant to the Bridge Security Agreement, the Debtors granted to the Bridge Lender, the Bridge Financing Liens on the Bridge Financing Collateral.

(v) No Control. The Bridge Lender does not control the Debtors or their properties or operations, has authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Bridge Financing Obligations.

(vi) No Challenges/Claims. No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Bridge Financing Liens or Bridge Financing Obligations exist, and no portion of the Bridge Financing Liens or Bridge Financing Obligations is subject to any challenge or defense including impairment, set-off, avoidance, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (equitable or otherwise), attack, offset, defense, counterclaims or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their respective estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Bridge Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Bridge Financing Agreement, the Bridge Financing Obligations, the Bridge Financing Liens, or otherwise, whether arising at law or at equity, including any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

(vii) Necessity of the Bridge Financing. The Bridge Lender provided the Debtors with the capital necessary to allow the Debtors to prepare these chapter 11 cases in an orderly manner and to pay critical costs, such as advisors and filing fees, which would not have been possible absent the financing provided by the Bridge Lender. The Debtors requested that the Bridge Lender extend such financing as a bridge to a chapter 11 filing and the DIP Facility, with the understanding that such amounts would be repaid with the DIP Facility. At the time that the Bridge Financing Obligations were incurred, the Debtors had no other reasonable prospect for such financing. At the time that the Bridge Financing Obligations were incurred, the Debtors represented all of the foregoing to the Bridge Lender as an inducement to making the Bridge Financing Obligations and for the Bridge Lender to rely on such representations in extending the Bridge Financing Obligations and the broader DIP Commitments.

(viii) Good Faith. The Bridge Lender acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by the Bridge Lender in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the Bridge Financing and DIP

Facility and the use of Cash Collateral, including in respect of granting the DIP Liens and the Adequate Protection, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents relating to any and all transactions contemplated by the foregoing.

(ix) Intercreditor Issues. As a condition to the Bridge Financing Obligations, the Bridge Lender obtained the consent of Decathlon Growth Credit, LLC (the "Prepetition Secured Lender"), who asserts liens and security interests over all or substantially all of the Debtors' assets arising from that certain Revenue Loan and Security Agreement dated as of December 12, 2023 by and among iSun, the other Debtors party thereto as "Guarantors", and the Prepetition Secured Lender (the "Prepetition Secured Lender Agreement"; the obligations thereunder, the "Prepetition Secured Lender Obligations"; any liens and security interest securing such obligations, the "Prepetition Secured Lender Liens"; and any assets subject to such liens, the "Prepetition Secured Lender Collateral"), to the Debtors' entry into the Bridge Financing Agreement and the DIP Facility and to the subordination of the Prepetition Secured Lender Liens to the Bridge Financing Liens and the DIP Liens (as defined herein).

F. Cash Collateral. All of the Debtors' cash including any cash in deposit accounts of the Debtors, wherever located, is cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") of the Bridge Lender, and the Prepetition Secured Lender asserts liens and security interest in such Cash Collateral.

G. Findings Regarding Postpetition Financing and Use of Cash Collateral.

(a) The Debtors have requested from the DIP Lender, and the DIP Lender is willing to provide, financing to the Debtors subject to: (i) for the Initial Draw, entry of this Interim DIP Order (including the deemed conversion of the entirety of the Bridge Financing Obligations into the Rolled Bridge Loans under the DIP Facility) and, for subsequent draws, the Final DIP Order; (ii) Court approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; (iii) satisfaction or waiver of the closing conditions set forth in the DIP Loan Documents; and (iv) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Loan Documents, including satisfaction of the Bridge Financing Obligations with the Rolled Bridge Loans, in good

faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim DIP Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(b)    The Debtors have an immediate and critical need to obtain (i) postpetition financing pursuant to the DIP Facility and (ii) permission to use Cash Collateral (solely to the extent consistent with the DIP Budget, subject to any Permitted Variance set forth herein and in the DIP Term Sheet), in order to, among other things, permit the orderly continuation of the operation of their business, to maintain business relationships, to make capital expenditures, to pay professional fees, to satisfy other working capital and operational needs, and to pursue and consummate a sale of the Debtors' business for the benefit of the Debtors' stakeholders. The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Facility and Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to preserve the value of their businesses without the ability to borrow under the DIP Facility and use Cash Collateral. The Debtors and their estates will be immediately and irreparably harmed if the financing under the DIP Facility is not obtained pursuant to the terms of this Interim DIP Order and, as applicable, the DIP Loan Documents, or if the Debtors are unable to use Cash Collateral. Entry of this Interim DIP Order is necessary and appropriate to avoid such harm to the Debtors, their estates, and other parties in interest.

(c)    The Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility. The Debtors are unable to obtain, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code,

(i) unsecured credit allowable under section 503(b) of the Bankruptcy Code as an administrative expense, (ii) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (iii) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  The Debtors are further unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without as provided for herein (x) granting to the DIP Lender the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claim (as defined below), and (y) granting the Bridge Lender the rights, remedies, privileges, benefits and protections provided herein with respect to the Rolled Bridge Loans.  The Rolled Bridge Loans are an integral part of the DIP Facility, without which the DIP Lender would be unwilling to extend the New Money Loan DIP Commitments.

(d)     The DIP Facility and this Interim DIP Order have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including all loans made to the Debtors pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Lender in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations (including repayment of the Bridge Financing Obligations using the Rolled Bridge Loan), the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim DIP Order or any provision hereof is vacated or reversed or modified on appeal, and any liens or claims granted to, or payments made to, the DIP Lender or Bridge Lender hereunder

arising prior to the effective date of any such reversal or modification of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

H.     Section 506(c). In light of the DIP Lender's agreement to extend credit to the Debtors on the terms described herein, the DIP Lender has negotiated for a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the DIP Collateral, subject to the Carve Out.

I.     Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of the DIP Facility, the DIP Loan Documents, and the fees paid and to be paid thereunder to the DIP Lender, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured postpetition financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Good cause has been shown for entry of this Interim DIP Order, and entry of this Interim DIP Order is in the best interests of the Debtors and their estates, creditors, and other stakeholders.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Lender and the Bridge Lender with the assistance of their respective counsel and advisors.  Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made or extended in good faith by the DIP Lender, within the meaning of section 364(e) of the Bankruptcy Code and shall be entitled to the full protection of section 364(e).  Based on the Motion, the First Day Declaration, and the NeJame Declaration, and on the record presented at the Interim Hearing, the terms of the DIP Facility are fair and reasonable,

reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

J.      Notice. Proper, timely, adequate, and sufficient notice of the interim relief requested in the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, whether by facsimile, email, overnight courier, and or hand delivery, to certain parties in interest, including: (a) the United States Trustee; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate or are formed; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Lender and counsel thereto; (i) any party known to the Debtors to assert a lien or security interest in the  DIP Collateral or who has filed an unterminated financing statement with respect thereto; (j) any landlord or party to a lease, license or other contract concerning the use and occupancy of any real property; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002, as evidenced by the Affidavit of Service filed at Docket No. [__].  No other or further notice of the Motion with respect to the relief requested at the Interim Hearing or entry of this Interim DIP Order is or shall be required.

K.      Immediate Entry. The Debtors have requested immediate entry of this Interim DIP Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003.  Absent entry of this Interim DIP Order, the Debtors' businesses, and estates would be immediately and irreparably harmed. This Court concludes that entry of this Interim DIP Order is in the best interests of the Debtors' respective estates and stakeholders and sufficient cause exists for immediate entry of this Interim DIP Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. Interim Financing Approved. The Motion is GRANTED on an interim basis as set forth herein.

2. Objections Overruled. Any objections, reservations of rights, or other statements with respect to entry of the Interim DIP Order, to the extent not withdrawn or resolved, are OVERRULED on the merits.

3. Authorization of the DIP Facility and the DIP Loan Documents.

(a) The Borrowers are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents, including the DIP Term Sheet, and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Lender to implement the terms or effectuate the purposes of this Interim DIP Order and the DIP Loan Documents and to effectuate the funding of the Rolled Bridge Loans and deemed repayment of the entirety of the Bridge Financing Obligations. To the extent not already negotiated and executed as of the date hereof, and as requested by the DIP Lender, the Debtors and the DIP Lender shall negotiate the DIP Loan Documents in good faith, and in all respects such DIP Loan Documents shall be, subject to the terms of this Interim DIP Order and the Final DIP Order, consistent with the terms of the DIP Term Sheet and otherwise acceptable to the DIP Lender. Upon entry of this Interim DIP Order, the Interim DIP Order, the DIP Term Sheet, and other DIP Loan Documents shall govern and control the DIP Facility. Upon execution and delivery thereof (or entry of this Interim Order with respect to documents executed and delivered prior to the date hereof), the DIP Loan Documents shall constitute valid and binding obligations of the

Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Loan Documents and this Interim DIP Order, the terms and conditions of this Interim DIP Order shall govern and control.

(b) Upon entry of this Interim DIP Order, the Borrowers are hereby authorized to borrow $2.0 million of New Money DIP Loans, which will be made available to the DIP Borrower on or after the date of this Interim DIP Order, subject to, and in accordance with, this Interim DIP Order and the DIP Term Sheet. Upon the Closing, all of the Bridge Financing Obligations shall be deemed converted into the Rolled Bridge Loans issued under the DIP Facility. The initial principal amount of the Rolled Bridge Loans shall be {1.0 million},[5] which shall be exclusive of any fees or interest due and payable with respect thereto under the DIP Facility.

(c) Pursuant to the terms of this Interim DIP Order and the DIP Loan Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Loan Documents and this Interim DIP Order, and in accordance with the DIP Budget, subject to any Permitted Variance as set forth in this Interim DIP Order and the DIP Loan Documents. Attached as **Exhibit B** hereto and incorporated herein by reference is a budget prepared by the Debtors and approved by the DIP Lender in accordance with the DIP Term Sheet, which, for the avoidance of doubt, shall constitute the initial "DIP Budget."

(d) In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including the DIP Term Sheet, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Term Sheet), and to pay all fees

[5] NOTE TO DRAFT: Amount to be all obligations on the $1 million bridge loans.

(including all amounts owed to the DIP Lender under the DIP Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including:

(1) the execution, delivery, and performance of the DIP Loan Documents;

(2) the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the Debtors and the DIP Lender may reasonably agree), it being understood that no further Court approval shall be required for amendments, waivers, consents, or other modifications to and under the DIP Loan Documents or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(3) the non-refundable payment (or issuance of DIP Loans in lieu of payment, as provided for in the DIP Loan Documents) to the DIP Lender and Bridge Lender, of the fees referred to in the DIP Loan Documents, including (x) all fees and other amounts owed to the DIP Lender, including the Arrangement Fee, Commitment Fee, Exit Fees (subject to the last sentence of this clause (3), and (y) all reasonable and documented costs and expenses as may be due from time to time, including the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Interim DIP Order (whether incurred before or after the Petition Date), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 20 of this Interim DIP Order. Notwithstanding anything herein or the DIP Loan Documents to the contrary, this Interim Oder only approves the Exit Fee with respect to the DIP Loans authorized to be made under the Interim Order; and

(4) the performance of all other acts required under or in connection with the DIP Loan Documents.

(e) Upon entry of this Interim DIP Order and subject and subordinate to the Carve Out, the DIP Loan Documents, the DIP Obligations, and the DIP Liens shall constitute valid,

binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Interim DIP Order for all purposes during the Chapter 11 Cases and any Successor Cases. No obligation, payment, transfer, or grant of security under the DIP Loan Documents, or this Interim DIP Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted (a) to or on behalf of the DIP Lender or (b) to or on behalf of the Bridge Lender pursuant to the DIP Loan Documents, the provisions of this Interim DIP Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code.

4. DIP Budget. The proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the DIP Loan Documents and the DIP Budget, subject to the Permitted Variance. The Debtors shall comply in all respects with the terms of the DIP Loan Documents with respect to, among other things, the delivery and compliance with the DIP Budget, the Reporting Packages, and all obligations related thereto.

5. [RESERVED]

6. Access to Records. The Debtors shall provide the DIP Lender, Prepetition Secured Lender, and their respective advisors with all reporting and other information required to be provided to the DIP Lender under the DIP Loan Documents and the Prepetition Secured Lender

under the Prepetition Secured Lender Agreement.  In addition to, and without limiting, whatever rights to access the DIP Lender has under the DIP Loan Documents and the Prepetition Secured Lender has under the Prepetition Secured Lender Agreement, upon reasonable advance notice to counsel to the Debtors (email being sufficient), at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Lender and the Prepetition Secured Lender to have reasonable access to (a) inspect the Debtors' assets, and (b) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Lender and Prepetition Secured Lender shall be provided with access to such information as it shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law or any binding agreement entered into prior to the date of this Interim DIP Order that would violate confidentiality obligations.

7.     DIP Superpriority Claims. Subject and subordinate only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of the DIP Lender against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361,

362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise to the extent allowable under the Bankruptcy Code, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. Except as set forth in this Interim DIP Order or the Final DIP Order, or any superpriotiy claim granted to Clean Royalties, LLC in its capacity as a stalking horse bidder, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

8. DIP Liens. As security for the DIP Obligations, effective and perfected upon the date of this Interim DIP Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral, the following security interests and liens are hereby granted by the Debtors to the DIP Lender on the DIP Collateral (all such liens and security interests granted to the DIP Lender pursuant to this Interim DIP Order and the DIP Loan Documents, the "DIP Liens"). The "DIP Collateral" shall consist of all assets and properties (whether tangible, intangible, real, personal, or mixed) of the Debtors and their estates, whether owned by or owing to the Debtors on the Petition Date, or acquired after the Petition Date, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, or thereafter acquired by, the Debtors, and regardless of where located, before or after the Petition Date, including, without limitation, (a) all Prepetition Secured Lender Collateral, (b) all Prepetition Bridge Collateral, (c) subject to entry of the Final DIP Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code (together "Avoidance

Actions”) and the proceeds thereof, and (d) all interests in leaseholds (except to the extent any DIP Liens thereon would be prohibited by the applicable lease after giving effect to any applicable law regarding the enforceability of such prohibitions) and proceeds thereof (regardless of the aforementioned prohibitions) (all of the foregoing property and assets, collectively, the “DIP Collateral”). The DIP Liens shall have the following priorities (subject in all cases to the Carve Out):

(a) Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected, and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, upon entry of the Final DIP Order, Avoidance Actions and the proceeds thereof (collectively, “Unencumbered Property”).

(b) Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected junior priority liens and security interests in all DIP Collateral that secures obligations that are subject to Senior Permitted Liens, provided that the DIP Liens shall be junior only to each Senior Permitted Lien only with respect to the DIP Collateral encumbered by such Senior Permitted Lien.

(c) Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected super-priority priming liens and security interests in all DIP Collateral that is subject to valid, perfected and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the

extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code), except as set forth in sub-clause (b) above, including the Prepetition Secured Lender Liens.

9.      Adequate Protection for the Prepetition Secured Lender.

(a)      Pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, the Debtors have agreed to provide the Prepetition Secured Lender adequate protection of its interests in the Prepetition Secured Lender Collateral (including Cash Collateral), solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Secured Lender Collateral, the Carve Out, the Debtors' use of the Prepetition Secured Lender Collateral (including Cash Collateral), and the imposition of the automatic stay (such a claim, an "Adequate Protection Claim").  On account of any Adequate Protection Claims of the Prepetition Secured Lender, the Prepetition Secured Lender, is hereby granted the following (collectively, the "Prepetition Secured Lender Adequate Protection Obligations"):

(b)      Adequate Protection Liens. As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim DIP Order ("Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final DIP Order granting such relief, any proceeds or property recovered from Avoidance Actions.  Subject to the terms of this Interim DIP Order, the Adequate Protection Liens granted to

the Prepetition Secured Lender shall be (A) with respect to the Prepetition Secured Lender Collateral, whether now existing or hereafter arising or acquired, subject and subordinate only to the Carve Out, the DIP Liens and the Permitted Senior Liens, and (B) with respect to all other DIP Collateral, subject and subordinate only to the Carve Out and the DIP Liens. The Adequate Protection Liens granted to the Prepetition Secured Lender shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(c)    Adequate Protection Superpriority Claims. As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Adequate Protection Claims of the Prepetition Secured Lender shall be, subject and subordinate to the Carve Out and DIP Superpriority Claim, allowed superpriority administrative expense claims in each of the Chapter 11 Cases ("Adequate Protection Superpriority Claims"). The Adequate Protection Superpriority Claims granted to the Prepetition Secured Lender shall be payable from and have recourse to all prepetition property and postpetition property of the Debtors and shall be senior to any and all other administrative expense claims in such Chapter 11 Cases now existing or hereafter arising, of any kind or nature whatsoever, including administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order granting such relief), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code ("Other Administrative Expense Claims") to the extent of any Diminution in Value, except that the Adequate Protection Superpriority Claims shall be junior to the DIP Superpriority Claims and Carve Out.

10. Carve Out.

(a) Carve Out Defined. As used in this Interim Order, the "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the fees and expenses (and any monthly, restructuring, or sale fees) (the "***Allowed Professional Fees***") incurred by (or payable to) persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and any Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***") at any time before or on the first business day following delivery by the DIP Lender of a Termination Notice (and with respect to any monthly, restructuring, or sale fees, at any time before the date of delivery of the Termination Notice), in the aggregate not to exceed the amount set forth in the prevailing DIP Budget for all Professional Persons through the date a Termination Notice is delivered; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by the DIP Lender of the Termination Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, for all Professional Persons in the aggregate.

(b) No Direct Obligation To Pay Allowed Professional Fees. Neither the DIP DIP Lender nor the Bridge Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order

or otherwise shall be construed to obligate the DIP Lender or the Bridge Lender in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c)     Payment of Allowed Amounts within Carve Out.  Any payment or reimbursement made to Professional Persons in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

11.     [RESERVED]

12.     Reservation of Rights of the DIP Lender, Bridge Lender, and Prepetition Secured Lender.  Subject only to the Carve Out, notwithstanding any other provision in this Interim DIP Order, the DIP Loan Documents, or the Prepetition Secured Lender Agreement to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of the DIP Lender, Bridge Lender, or Prepetition Secured Lender under the DIP Loan Documents, the Bridge Financing Agreement, the Prepetition Secured Lender Agreement, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including the right of either the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender (subject to this Interim DIP Order) to request modification of the automatic stay of section 362 of the Bankruptcy Code or (B) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender.  The delay in or failure of the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender to seek relief or otherwise exercise their respective rights and remedies shall not constitute a waiver of any such rights and remedies.  Notwithstanding anything herein to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Debtors, the Committee (if any), or

any other party in interest to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim DIP Order.

13.     [RESERVED]

14.     [RESERVED]

15.     Events of Default. The occurrence of any of the following events, unless waived by the DIP Lender in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim DIP Order, or (b) the occurrence of an "Event of Default" under the DIP Term Sheet, in each case unless waived by the DIP Lender.

16.     [RESERVED]

17.     Rights and Remedies Upon Event of Default. Immediately upon the occurrence and during the continuation of an Event of Default, unless such Event of Default has been waived by the DIP Lender of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from, the Court, subject to the terms of this Interim DIP Order and the Remedies Notice Period (defined below), (a) the DIP Lender may deliver a Termination Notice to the Debtors, their lead restructuring counsel, the Office of the United States Trustee, and counsel to any Committee declaring (i) all DIP Obligations owing under the DIP Loan Documents to be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP

Lender, but without affecting any of the DIP Liens, DIP Superpriority Claims or the DIP Obligations, (iv) the Carve Out shall be triggered, and (v) interest under the DIP Facility shall accrue at the Default Rate.  The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Lender and the Bridge Lender is hereby modified so that five (5) business days after the delivery of a Termination Notice (the "Remedies Notice Period"), the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim DIP Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; and (b) subject to the foregoing clause (a), the Bridge Lender shall be entitled to exercise its respective rights and remedies to the extent available in accordance with the Bridge Financing Agreement and this Interim DIP Order with respect to the Debtors' use of Cash Collateral; *provided*, *however*, that the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of this Interim DIP Order during any Remedies Notice Period only to make payroll and fund critical expenses necessary to preserve the DIP Collateral, in each case in accordance with the terms of the DIP Budget and this Interim DIP Order.  During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court with respect to any relevant matters; *provided, however*, that nothing herein limits the Court's ability to hear other matters it deems appropriate at such hearing.  Absent a contrary Court order prior to the expiration of the Remedies Notice Period, the automatic stay, as to both the DIP Lender and the Bridge Lender, shall be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period and termination of the stay as set forth in the prior sentence, the DIP Lender and the Bridge Lender shall be permitted to exercise all remedies set forth herein, in the DIP Loan Documents and the Bridge Financing Agreement, and as otherwise available at law without further order of or

application or motion to this Court consistent with this Interim DIP Order.

18. Limitation on Charging Expenses Against Collateral. No expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (except to the extent of the Carve Out), the DIP Lender, the Bridge Lender, or (subject to entry of a the Final DIP Order) the Prepetition Secured Lender, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Lender and the Bridge Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Bridge Lender.

19. Use of Cash Collateral. The Debtors are hereby authorized to use all Cash Collateral, but solely for the purposes set forth in this Interim DIP Order and in accordance with the DIP Budget (subject to Permitted Variances as set forth in this Interim DIP Order and the DIP Loan Documents).

20. Expenses and Indemnification.

(a) The Debtors are hereby authorized to pay, in accordance with this Interim DIP Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Loan Documents as such amounts become due and without need to obtain further Court approval, including the Arrangement Fee, Commitment Fee and Exit Fee payments, the reasonable and documented fees and disbursements of counsel and other professionals, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim DIP Order or the DIP Loan Documents. Notwithstanding the foregoing, the Debtors are authorized to pay on the Closing Date (as defined in the DIP Loan Documents), or at the election of the DIP Lender,

issue additional DIP Loans in lieu of immediate payment, all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lender and the Bridge Lender, incurred on or prior to the Closing Date up to the amount permitted under the DIP Loan Documents without the need for any professional engaged by the DIP Lender or the Bridge Lender to be subject to the procedures set forth in paragraph 20(b), provided that the DIP Lender or Bridge Lender shall deliver courtesy copies of such invoices to counsel for the U.S. Trustee.

(b)     The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute DIP Obligations; *provided*, *however*, at the election of the DIP Lender, the Debtors may issue additional DIP Loans in lieu of immediate payment thereof.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in paragraph 3(d)(3) this Interim DIP Order (collectively, the "Lender Professionals" and each, a "Lender Professional") no later than ten business days (the "Review Period") after the receipt by counsel for the Debtors, any Committee appointed in these chapter 11 cases, or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Chapter 11 Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential

information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law; *provided* that at any time a Lender Professional seeks payment of Invoiced Fees from the Debtors, the Debtors reserve their rights to request additional detail regarding the services rendered and expenses incurred by such Lender Professional, subject to any attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.

(c) The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, any Committee, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten days' prior written notice to the submitting party of any hearing on such motion or other pleading). Any hearing to consider such an objection to the payment of any fees, costs, or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of the objection. For the avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(d) In addition, the Debtors hereby indemnify the DIP Lender, the Bridge Lender and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented legal fees and expenses), and liabilities arising out of or

relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Term Sheet or the Bridge Financing Agreement (subject to entry of the Final DIP Order).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non- appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's bad faith, gross negligence or willful misconduct.  In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

21.     No Third-Party Rights. Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

22.     Insurance.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lender shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Lender shall be and shall be deemed to be, without any further action by or notice to any person, named as loss payee for DIP Collateral on which the DIP Lien holds a first priority lien.  The Debtors are hereby authorized to and shall take any actions necessary to have the DIP Lender added as an additional insured and

loss payee on each insurance policy maintained by DIP Debtors consistent with this Interim Order which in any way relates to the DIP Collateral.

23. No Waiver for Failure to Seek Relief. The failure or delay of the DIP Lender to exercise rights and remedies under this Interim DIP Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of its respective rights hereunder, thereunder, or otherwise.

24. Perfection of the DIP Liens and Adequate Protection Liens.

(a) Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 8 hereof and the Adequate Protection Liens granted pursuant to paragraph 9 hereof, the DIP Lender and the Prepetition Secured Lender are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether the DIP Lender or the Prepetition Secured Lender shall choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of entry of this Interim DIP Order. If the DIP Lender or the Prepetition Secured Lender determines to file or execute any financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Lender or Prepetition Secured Lender, and the automatic stay shall be modified solely to allow such filings as provided for in this Interim DIP Order.

(b)     A certified copy of this Interim DIP Order may be filed with or recorded in filing or recording offices by the DIP Lender or Prepetition Secured Lender in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim DIP Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim DIP Order.

(c)     Subject to entry of the Final DIP Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, shall be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law, and any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Term Sheet or this Interim DIP Order, subject to applicable law.

25.     Release. Each of the Debtors and the Debtors' estates, each on its own behalf and on behalf of each of their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully and forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of this Interim DIP Order, the DIP Lender (solely in its capacities as DIP Lender) and each of its respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants,

attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "Related Parties"), and effective upon entry of the Final DIP Order granting such relief, the Bridge Lender and its respective Related Parties and the Prepetition Secured Lender and its respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Bridge Financing Obligations, the Bridge Financing Liens, the Bridge Financing Agreement, the Prepetition Secured Lender Obligations, the Prepetition Secured Lender Liens, and the Prepetition Secured Lender Agreement, as applicable, including: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender, the Bridge Lender, and the Prepetition Secured Lender; *provided* that nothing in this paragraph shall in any way limit or release the obligations of any party under the DIP Loan Documents, this Interim DIP Order, and the Final DIP Order.

26.     Credit Bidding. The DIP Lender shall have the unqualified right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the DIP Obligations outstanding, including, for the avoidance of doubt, the Rolled Bridge Loans, in any sale of all or

any portion of the DIP Collateral (including, for the avoidance of doubt, any asset for which the DIP Collateral is limited to the proceeds thereof as a result of applicable law prohibiting encumbrances from being attached to such asset), including sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

29. Preservation of Rights Granted Under this Interim DIP Order.

(a) In the event this Interim DIP Order or any provision hereof is reversed or modified on appeal, any liens or claims granted to the DIP Lender or the Bridge Lender hereunder and the repayment of the Bridge Financing Obligations with the Rolled Bridge Loans, arising prior to the effective date of any such reversal or modification of this Interim DIP Order shall be governed in all respects by the original provisions of this Interim DIP Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Bridge Lender shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(b) Notwithstanding any order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other administrative claims granted pursuant to this Interim DIP Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim DIP Order and notwithstanding any dismissal, remain binding on all parties in interest; and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(c)     Except as expressly provided in this Interim DIP Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and all other rights and remedies of the DIP Lender granted by the provisions of this Interim DIP Order and the DIP Loan Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases or any Successor Cases terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases.  The terms and provisions of this Interim DIP Order and the DIP Loan Documents shall continue and be binding in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and all other rights and remedies of the DIP Lender granted by the provisions of this Interim DIP Order shall continue in full force and effect until the DIP Obligations and any Adequate Protection Claims are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lender).

(d)     Other than as set forth in this Interim DIP Order, subject and subordinate to the Carve Out, none of the DIP Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and none of the DIP Liens or the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

29. Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral. None of the DIP Facility, the DIP Collateral (including Cash Collateral), or the Carve Out or proceeds thereof may be used: (a) to investigate (including by way of examinations or discovery proceedings), analyze, initiate, assert, prosecute, join, commence, threaten, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against either the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender (each in their capacities as such) under the DIP Loan Documents, the Bridge Financing Agreement, the Prepetition Secured Lender Agreement, or this Interim DIP Order, including for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Chapter 11 Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender to recover on the DIP Collateral, the Bridge Financing Collateral, or the Prepetition Secured Lender Collateral or seeking affirmative relief against the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender related to the

DIP Obligations, the Bridge Financing Obligations, or the Prepetition Secured Lender Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations, the Bridge Financing Obligations, or the Prepetition Secured Lender Obligations or the DIP Lender's, the Bridge Lender's, or the Prepetition Secured Lender's liens or security interests in the DIP Collateral, Bridge Financing Collateral, or Prepetition Secured Lender Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender or the DIP Lender's, the Bridge Lender's, or the Prepetition Secured Lender's respective liens on or security interests in the DIP Collateral, the Bridge Financing Collateral, or the Prepetition Secured Lender Collateral that would impair the ability of the DIP Lender, the Bridge Lender, or the Prepetition Secured Lender, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations, the Bridge Financing Obligations, or the Prepetition Secured Lender Obligations to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests held by or on behalf of the Bridge Lender related to the Bridge Financing Obligations or of the Prepetition Secured Lender related to the Prepetition Secured Lender Obligations, respectively, or by the DIP Lender related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Bridge Financing Obligations, the Bridge Financing Liens, the Prepetition Secured Lender Obligations, or the Prepetition Secured Lender Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens, (y) any of the Bridge Financing Liens or

any other rights or interests of the Bridge Lender related to the Bridge Financing Obligations or the Bridge Financing Liens, and (z) any of the Prepetition Secured Lender Liens or any other rights or interests of the Prepetition Secured Lender related to the Prepetition Secured Lender Obligations or the Prepetition Secured Lender Liens; provided, however, that notwithstanding anything herein to the contrary, but otherwise subject to the DIP Budget, the Committee (if any should be appointed) may use up to $25,000 of DIP Collateral (including Cash Collateral) to conduct an investigation, but not commence, or seek standing to commence, any action with respect to the matters described in this paragraph. For the avoidance of doubt, nothing in this paragraph shall prohibit the Debtors from responding to, objecting to, or complying with discovery requests by a Committee (if any) appointed in the chapter 11 cases, in whatever form, made in connection with any such investigation, the payment of any professional fees related thereto, or from contesting or challenging whether an Event of Default, has in fact occurred, from the proceeds of the DIP Loans.

30. Conditions Precedent. No DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

31. Use of DIP Facility Proceeds. From and after the Petition Date, the Debtor shall be permitted to use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim DIP Order and the DIP Loan Documents, and only in compliance with the DIP Budget (subject to the Permitted Variances) and the terms and conditions in this Interim DIP Order and the DIP Loan Documents.

32. No Monitoring Obligation. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon

each Debtor's representations that the use of the DIP Facility at any time is in accordance with the requirements of the DIP Orders and the DIP Loan Documents, including but not limited to the DIP Budget.

33. Repayment of DIP Superpriority Claims. Notwithstanding anything to the contrary herein or in the other DIP Loan Documents, the Debtors shall indefeasibly pay to each holder of a DIP Superpriority Claim cash equal to the full amount of such DIP Superpriority Claim on the effective date of a chapter 11 plan, unless such holder of a DIP Superpriority Claim consents to a different treatment with respect to such DIP Superpriority Claim. The requirements set forth in this paragraph may not be amended without the prior written consent of the DIP Lender.

34. [RESERVED]

35. Proceeds of Subsequent Financing. If the Debtor, any trustee, any examiner, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Documents) and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim DIP Order and the DIP Loan Documents.

36. Payments Held in Trust. Except as expressly permitted in this Interim DIP Order or the DIP Loan Documents, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of

all DIP Obligations under the DIP Loan Documents, and termination of the DIP Facility in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with the DIP Term Sheet and this Interim DIP Order.

37. Binding Effect; Successors and Assigns. The DIP Loan Documents and the provisions of this Interim DIP Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the DIP Lender, the Bridge Lender, any Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors in the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case) to the extent permitted by applicable law and shall inure to the benefit of the DIP Lender and Bridge Lender; *provided* that, except to the extent expressly set forth in this Interim DIP Order, the DIP Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

38. Limitation of Liability. In determining to make any loan under the DIP Loan Documents or permitting the use of Cash Collateral the DIP Lender shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim DIP Order or in the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Bridge Lender of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

39. No Requirement to File Claim for DIP Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, the DIP Lender and Bridge Lender shall not be required to file any proof of claim or request for payment of administrative expenses in the Chapter 11 Case or any Successor Cases with respect to any of the DIP Obligations or Bridge Financing Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents and Bridge Financing Agreement without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents, Bridge Financing Agreement, or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Lender's or Bridge Lender's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim DIP Order, or applicable law. Notwithstanding the foregoing, the DIP Lender or Bridge Lender may, in their sole discretion, but are not required to, file (and amend and/or supplement, as each sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Case for any claim allowed herein. The provisions set forth in this

paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party- in-interest or their respective successors-in-interest.

40. No Marshaling. Subject to and upon entry of the Final DIP Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to the Final DIP Order, the DIP Loan Documents, notwithstanding any other agreement or provision to the contrary.

41. Equities of the Case. The Bridge Lender shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code and the Bridge Lender has negotiated for, and the Debtors believe the Bridge Lender is entitled to, and will seek in the Final DIP Order, a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code, which shall not apply to the Bridge Lender with respect to proceeds, product, offspring, or profits of any of the DIP Collateral (including the Bridge Financing Collateral).

42. Necessary Actions. The Debtors are authorized and directed, on a final basis, to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim DIP Order.

43. Final Hearing. The Final Hearing on the Motion shall be held on **[______], 2024**, **at [____]**, prevailing Eastern Time. Any objections or responses to entry of the Final DIP Order shall be filed on or before 4:00 p.m. **prevailing Eastern Time, on [______], 2024**, and shall be served on: (a) proposed counsel to the Debtors [_]; (b) counsel to the DIP Lender and Bridge Lender, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19802 (Attn: Ryan M. Bartley (rbartley@ycst.com)); (c) counsel to the Prepetition Secured Lender, [__], (d) counsel to the Office of the United States Trustee, [__]; and (e) counsel to any

Committee. In the event no objections to entry of the Final DIP Order on the Motion are timely received, this Court may enter such Final DIP Order without need for the Final Hearing.

44. Effect of this Interim DIP Order. This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

45. Bankruptcy Rule 6003(b) has been satisfied.

46. The requirements of Bankruptcy Rule 6004(a) are waived, or are inapplicable due to Bankruptcy Rules 4001(b)(2) and (c)(2).

47. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim DIP Order shall be immediately effective and enforceable upon entry of this Interim DIP Order.

48. Headings. All paragraph headings used in this Interim DIP Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

49. Retention of Jurisdiction. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Interim DIP Order.

# EXHIBIT A

## DIP Term Sheet

***Execution Version***

**DIP TERM SHEET**

**iSun, Inc.**

This binding term sheet (this "***DIP Term Sheet***") provided to iSun, Inc. (together with its subsidiaries, "***iSun***") sets forth the material terms, requirement and conditions of a superpriority senior secured priming debtor in possession term loan facility (as further described herein, the "***DIP Facility***") that the DIP Lender (as defined below) is contemplating providing to iSun, as debtors and debtors in possession (in such capacity, the "***Debtors***") in connection with chapter 11 cases (the "***Chapter 11 Cases***") to be filed by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware.

| | |
|---|---|
| **Borrowers:** | iSun, Inc. and the other entities set forth on **Schedule 1** (collectively, the "***Borrowers***" or "***DIP Obligors***"). |
| **DIP Lender:** | Clean Royalties, LLC, directly or with one of its affiliates ("***CR***" and together with its successors and assigns, the "***DIP Lender***"). |
| **Documentation** | Initially, this DIP Term Sheet shall serve as the credit agreement for the DIP Facility. Following the entry of the Interim Order, the DIP Lender, in its sole discretion, shall have the right to require the DIP Obligors to enter into a credit agreement incorporating the terms of this DIP Term Sheet and other customary terms and conditions for a facility of this type (the "***DIP Credit Agreement***"), which shall be in form and substance acceptable to the DIP Lender. The DIP Obligors shall also be required to enter into any security agreement or other ancillary documents necessary to carry out the terms of the DIP Facility, as requested by the DIP Lender. The DIP Term Sheet, the Interim Order, the Final Order (if entered), the DIP Budget, the DIP Credit Agreement (if applicable) and all other related security and ancillary documents, shall be referred to herein as the "***DIP Loan Documents.***"<br><br>The DIP Obligors agree to execute such further documents and take such further actions as may be required for the full and complete enjoyment of the rights herein granted to DIP Lender. |
| **DIP Facility:** | The DIP Facility shall be comprised of (i) $3.0 million of new money term loans to be advanced and made available to the Borrowers in multiple draws pursuant to the terms and conditions herein (such loans, the "***New Money DIP Loans***"; the commitment in respect thereof, the "***New Money DIP Commitment***"), and (ii) all existing Bridge Financing Agreement Obligations (as defined below) shall be converted |

***Execution Version***

| | |
|---|---|
| | on a dollar for dollar basis on the Closing Date (as defined below) into loans under the DIP Facility (such loans, the "***Rolled Bridge Loans***", and together with the New Money DIP Loans, the "***DIP Loans***" and the DIP Loans and all other fees, interests, costs, expenses, and other amounts due to the DIP Lender under the DIP Loan Documents, including amounts capitalized into DIP Loans, are collectively, the "***DIP Obligations***"); the commitment in respect thereof, the "***Rolled Bridge Commitment***" and together with the New Money DIP Commitment, the "***DIP Commitments***") pursuant to mechanics agreed to by the Borrowers and the DIP Lender. For the avoidance of doubt, any Bridge Financing Obligations that are converted into Rolled Bridge Loans shall be considered no longer outstanding under the Bridge Financing Agreement upon the effectiveness of such conversion and treated as indefeasibly paid in full and not subject to any claw-back or avoidance.<br><br>Subject to the terms and conditions set forth herein and in the DIP Loan Documents, including the DIP Budget (as defined below), the New Money DIP Loans will be made available to the Borrowers in multiple draws as follows: (i) an initial draw of $2.0 million ($1 million of *Tranche 1* and $1 million of *Tranche 2* DIP Loans) that will be made available to the Borrower upon entry of the Interim DIP Order (as defined below) (the "***Initial Draw***") and (ii) subsequent draws up to $1.0 million (*Tranche 3*) in the aggregate that will be made available to the Borrowers following entry of the Final DIP Order (as defined below) (such entry date, the "***Final Order Entry Date***"). The Rolled Bridge Loans will constitute *Tranche 1* DIP Loans. |
| **Term:** | The DIP Facility will mature on the earliest of (such earliest date, the "***Maturity Date***"):<br><br>(a) 90 days following the Closing Date (the "***Scheduled Maturity Date***");<br><br>(b) the earlier of (i) closing of a sale of all or substantially all of the Debtors' assets or (ii) the effective date of a chapter 11 plan;<br><br>(c) the date of termination of the New Money DIP Commitments, the acceleration of any outstanding DIP Loans, or both in accordance with the terms of the DIP Loan Documents; and<br><br>(d) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code. |
| **Interest:** | Interest on the DIP Obligations shall accrue at a rate per annum equal to SOFR + 18.0% (the "***Interest Rate***") and shall be payable in arrears on the last day of each calendar month. Interest shall be payable in- |

| | |
|---|---|
| | kind and accrued to the balance of the applicable DIP Loan on the last day of each calendar month; *provided* that automatically upon the acceleration of any DIP Loans or upon the Maturity Date, all interest (including Default Interest) shall be due and payable in cash.<br><br>"***SOFR***" shall mean a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.<br><br>"***SOFR Administrator***" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate). |
| **Default Interest:** | Automatically upon the occurrence and during the continuance of an Event of Default, all DIP Obligations, including the principal amount of all DIP Loans outstanding and any other fees or other amounts owed hereunder (or under the DIP Loan Documents), shall from and after the date of the occurrence of such Event of Default bear interest at a rate that is 5.0% per annum in excess of the Interest Rate.<br><br>For the avoidance of doubt, it shall not be a condition to the accrual of Interest at the default rate that a Termination Notice be delivered. |
| **Arrangement Fee** | As consideration for the DIP Lender's negotiation and structuring of the DIP Facility, including arranging the bridge financing arranging, the DIP Lender shall be entitled to an arrangement fee (the "***Arrangement Fee***") of 1.0% of the total DIP Commitments, which Arrangement Fee shall be fully earned upon the Closing and accrued to the balance of the initial DIP Loans made at the Closing. |
| **Commitment Fee:** | In consideration for its commitments to provide the DIP Facility, the DIP Lender shall be entitled to a commitment fee (the "***Commitment Fee***") equal to 4.0% of the total DIP Commitments, which Commitment Fee shall be fully earned upon the Closing and accrued to the balance of the initial DIP Loans made at the Closing. |
| **Exit Fee:** | The DIP Lender shall be entitled to an exit fee, which shall be fully earned and accrued on the date each DIP Loan is made or deemed to be made and due and payable when such DIP Loan is prepaid, repaid or accelerated (or, if earlier, on the Maturity Date) (each an "***Exit Fee***").<br><br>The Exit Fees shall be calculated as follows:<br><br>• *Tranche 1*: For the first $2 million in principal amount of DIP Loans: 3% of the principal amount of such DIP Loans. |

***Execution Version***

| | |
|---|---|
| | • *Tranche 2*: For the next $1 million in principal amount of DIP Loans: 6% of the principal amount of such DIP Loans.<br>• *Tranche 3*: For any DIP Loans in excess of the foregoing: 9% of the principal amount of such DIP Loans. |
| **Use of Cash Collateral:** | The DIP Order shall grant the Debtors authorization to use cash collateral (as defined in section 363 of the Bankruptcy Code) ("***Cash Collateral***") for the limited purpose of funding expenses in accordance with the DIP Budget.<br><br>The Prepetition Secured Lender and the Bridge Lender must consent to the use of Cash Collateral as a condition to the DIP Facility. |
| **Use of Proceeds and Cash Collateral:** | Subject to the DIP Budget and Permitted Variances, proceeds of the DIP Facility and Cash Collateral shall be available solely for the Debtors' working capital needs, including to fund the costs of the administration of the Chapter 11 Cases and to pay professional fees and expenses; *provided* that the Rolled Bridge Loans shall solely be used to effectuate the conversion of Bridge Financing Agreement Obligations into the DIP Facility as set forth above.<br><br>The Debtors shall not be permitted, and covenant not, to use the proceeds of the DIP Facility or Cash Collateral (i) other than to fund the DIP Budget, subject to the Permitted Variances, and (ii) to pay any amount under the "Critical Vendor" and "Materials" line items without the DIP Lender's and Prepetition Secured Lender's consent, such consent not to be unreasonably withheld. On a weekly basis, the Debtors shall provide the DIP Lender and Prepetition Secured Lender a schedule of amounts to be paid for the "Critical Vendor" and "Materials" line items for purposes of soliciting the consent required under clause (ii). |
| **Application of Proceeds** | The Debtors shall apply all proceeds realized by the Debtors in connection with the following to indefeasibly pay the DIP Obligations, unless the DIP Lender, in its sole discretion, consents to a different treatment:<br><br>• Unless the DIP Lender is the purchaser in a Sale Transaction via a credit bid, any Sale Transaction (as defined below);<br>• The proceeds of any financing incurred after the Petition Date;<br>• Insurance proceeds;<br>• Condemnation proceeds;<br>• Tax refunds;<br>• Judgments; and |

***Execution Version***

| | |
|---|---|
| | • Any other "extraordinary receipt." |
| **Budget; Reporting; Variance:** | It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered, all on a consolidated basis: (i) a weekly line-item cash flow forecast covering the period from the date of the filing of the Chapter 11 Cases (the "***Petition Date***") through the anticipated Maturity Date (the "***DIP Cash Flow Forecast***") and (ii) a 13-week budget (the "***DIP Budget***"), in each case, which shall include, at least the line items set forth on **Annex III.**<br><br>Every other Wednesday, starting with Wednesday June 19, 2024, the Debtors shall provide to the DIP Lender a Reporting Package. Each "***Reporting Package***" shall include, as of the end of the prior week: (i) a DIP Cash Flow Forecast reflecting actual amounts and any anticipated changes for future periods; (ii) a variance report showing any favorable or unfavorable variances of cumulative actual amounts versus the cumulative amounts set forth in the prevailing DIP Budget for all weeks since the Petition Date, with a narrative description explaining the variances; and (iii) a proposed revised DIP Budget reflecting the 13-weeks after the last week to which the Reporting Package applies.<br><br>Any revised DIP Budget included in a Reporting Package shall only be deemed accepted, and become the "DIP Budget," upon express written acceptance by the DIP Lender.<br><br>For each Testing Period, the Debtors shall ensure that: (i) the aggregate amount of all receipts collected are at least 75% of the amount set forth in the DIP Budget for the line item "Total Receipts", excluding amounts from "Pre-DIP Funds / DIP Financing" line item (i.e., a 25% unfavorable variance); (ii) the aggregate amount of all "Total Payroll and Related" and "Total Operating Expenses" do not exceed 120% of the amounts set forth in the DIP Budget for each line item in the DIP Budget (i.e., a 20% unfavorable variance); (iii) the aggregate amount of all disbursements for all line items for the "Total Non-Operating Disbursements" section do not exceed 110% of the amount set forth in the DIP Budget for all such line items (i.e., a 10% unfavorable variance); and (iv) the aggregate amount of "Net Cash Flow", excluding amounts from "Pre-DIP Funds / DIP Financing" line item, do not exceed a $400,000 loss as compared to the amounts set forth in the DIP Budget for the line item "Net Cash Flow", excluding amounts from "Pre-DIP Funds / DIP Financing" line item (i.e., a $400,000 unfavorable variance) for the entire Testing Period. Any variance to the DIP Budget that is within the parameters established in the foregoing clauses (i) through (v) shall constitute a "***Permitted Variance***," subject to the aggregate principal amount of DIP Loans never exceeding $4 million. |

***Execution Version***

| | |
|---|---|
| | Each "***Testing Period***" shall begin on the Petition Date and end on the last Saturday occurring prior to the date a Reporting Package is due. The first Testing Period shall end on June 15, 2024, and the first Reporting Package will be due by June 19, 2024. |
| **Collateral** | Subject to the Carve Out, the DIP Obligations shall be secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in (the "***DIP Liens***") all assets and properties (whether tangible, intangible, real, personal, or mixed) of the Debtors, whether owned by or owing to the Debtors on the Petition Date, or acquired after the Petition Date, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, or thereafter acquired by, the Debtors, and regardless of where located, before or after the Petition Date, including, without limitation, (a) all Prepetition Secured Lender Collateral, (b) all Prepetition Bridge Collateral, (c) subject to entry of the Final DIP Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof (together "***Avoidance Actions***"), and (d) all interests in leaseholds (except to the extent any DIP Liens thereon would be prohibited by the applicable lease after giving effect to any applicable law regarding the enforceability of such prohibitions) and proceeds thereof (regardless of the aforementioned prohibitions) (all of the foregoing property and assets, collectively, the "***DIP Collateral***"). |
| **Lien Priority** | The DIP Liens shall have the following priorities (subject in all cases to the Carve Out):<br><br>(a) Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected, and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, upon entry of the Final DIP Order, Avoidance Actions (collectively, "***Unencumbered Property***").<br><br>(b) Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected junior priority liens and security |

***Execution Version***

| | |
|---|---|
| | interests in all DIP Collateral that secures obligations that are subject to Senior Permitted Liens (as defined below).<br><br>(c) Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected super-priority priming liens and security interests in all DIP Collateral that is subject to valid, perfected and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code) including the Prepetition Secured Lender Liens, except as set forth in subclause (b) above.<br><br>"***Senior Permitted Liens***" means (i) the Carve Out and (ii) the Liens and Security Interests identified on <u>Schedule 2</u> solely to the extent such liens were on the Petition Date, senior to the Prepetition Secured Lender Liens or were on assets that did not constitute Prepetition Secured Lender Collateral. For the avoidance of doubt, Senior Permitted Liens expressly <u>***do not include***</u> the Cedar Liens, Lendspark Liens, Pawn Liens, and Prepetition Secured Lender Liens.<br><br>Except to the extent expressly permitted hereunder, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (as defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors, (b) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien, or security interest of the Debtors or their affiliates, or (d) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the Petition Date. |
| **DIP Superpriority Claims** | Subject to the Carve Out, the DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including administrative expenses of the kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), |

***Execution Version***

| | |
|---|---|
| | 726(b), 1113, and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "***DIP Superpriority Claims***"). |
| **Conditions Precedent to Closing and Funding the Initial Draw:** | The effectiveness of the New Money DIP Commitments and the obligations of the DIP Lender to make available the Initial Draw are subject to the satisfaction (or waiver in writing by the DIP Lender) of each of the following conditions precedent:<br><br>(a) The Interim DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified without the prior written consent of the DIP Lender;<br><br>(b) Receipt of a DIP Budget and DIP Cash Flow Forecast, in each case that is acceptable to the DIP Lender;<br><br>(c) All reasonable fees and expenses (including reasonable and documented out-of-pocket fees and expenses of counsel) of the DIP Lender that have been incurred on or before the funding of the Initial Draw (as well as the then unpaid fees and expenses of the Bridge Lender in respect of the Bridge Financing Agreement) shall have been paid; *provided* that the DIP Lender may elect to have such amounts paid-in-kind and capitalized into additional DIP Loans;<br><br>(d) Receipt by the DIP Lender of a borrowing request in respect of the Initial Draw;<br><br>(e) No default or Event of Default shall have occurred and be continuing; and<br><br>(f) All motions seeking "first day relief" and all orders granting such motions shall be in form and substance acceptable to the DIP Lender.<br><br>The date on which the conditions precedent to closing are satisfied (or waived by the DIP Lender) and the Initial Draw is funded is referred to herein as the "***Closing Date***." |
| **Conditions Precedent to Subsequent Draws of New Money DIP Loans:** | In addition to the previous satisfaction (or waiver in accordance therein) of the conditions precedent set forth in the immediately preceding section, the obligations of the DIP Lender to fund any DIP Loans after the Closing Date are subject to the satisfaction (or waiver in writing by each DIP Lender) of the following conditions precedent:<br><br>(a) The Final DIP Order, in form and substance acceptable to the DIP Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified without the prior written consent of the DIP Lender; |

***Execution Version***

| | |
|---|---|
| | (b) The absence of any default or Event of Default under the DIP Loan Documents;<br><br>(c) Entry of the Sale Procedures Order (as defined below), in form and substance satisfactory to the DIP Lender;<br><br>(d) At the election of the DIP Lender, execution and delivery of the DIP Credit Agreement, in form and substance acceptable to the DIP Lender; and<br><br>(e) Receipt by the DIP Lender (at least three (3) business days prior to the applicable drawing) of a borrowing request. |
| **Representations and Warranties:** | Each Borrowers shall provide "bring-downs" of the representations and warranties in the Prepetition Secured Lender Agreement, other than those concerning the solvency of the Borrowers, to be made as of the Closing and as of the date of each Borrowing. Each such representation and warranty so deemed to be made by each of the Borrowers shall also be deemed, as the context may require, to be made subject to an exception for the filing of the Chapter 11 Cases.<br><br>The DIP Lender may require other customary representations and warranties for facilities of this type to be agreed to including, representations and warranties concerning the existence of material litigation, existence of liens and financings, and the Debtors' compliance with environmental and other applicable laws. |
| **Covenants:** | The affirmative and negative covenants set forth in Articles 5 and 6 of the Prepetition Secured Lender Agreement shall apply other than Sections 5.1, 5.10, 5.13 through 5.15 and clauses (i) and (iv) of Section 5.3, and provided that for purposes of Section 6.1(a), no Indebtedness other than the DIP Facility may be incurred from and after the Closing, except where such Indebtedness would not result in the occurrence of an Event of Default. No such covenant shall be deemed to have been breached as a result of the filing of the Chapter 11 Cases or entry into the DIP Facility.<br><br>In addition the Borrowers shall:<br><br>• Make the Debtors' senior management and advisors available to the DIP Lender weekly (if requested) to discuss all matters concerning the Debtors, their business, and the Chapter 11 Cases;<br>• At the election of the DIP Lender, attend daily liquidity calls consistent with the parties' prior course of dealing;<br>• Provide the reporting described herein and such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and |

***Execution Version***

| | |
|---|---|
| | transactions of the Debtors, or concerning any matter that may affect the administration of the estates, as the DIP Lender may from time to time reasonably request within five (5) business days of any such request; and<br>• The DIP Lender and its respective agents and advisors shall have full access, upon reasonable notice during normal business hours, to the Debtors' business records, business premises, and to the DIP Collateral to enable the DIP Lender or its agents and advisors to (a) review, appraise, and evaluate the physical condition of the DIP Collateral, (b) inspect and review the financial records and all other records of the Debtors concerning the operation of the Debtors' business, and (c) evaluate the Debtors' overall financial condition and all other records relating to the operations of the Debtors. The Debtors shall fully cooperate with the DIP Lender regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the DIP Lender and its professionals and consultants to conduct such reviews, evaluations and inspections.<br><br>In addition the Borrower shall not:<br>• Pay any amount that is not permitted by the DIP Budget and Permitted Variances;<br>• File, support or endorse any plan of reorganization or propose any sale of assets outside the ordinary course of business that has not been approved by the DIP Lender (unless such plan or sale is determined by the DIP Lender, in its discretion, to result in the payment in full in cash of all obligations due under the DIP Facility);<br>• File, support or endorse any pleading in the Chapter 11 Cases that would result in an Event of Default if granted or approved; and<br>• Make or permit to be made any change to the DIP Orders. |
| **Carve Out:** | The DIP Orders shall include the professional fee "carve out" (the "***Carve Out***") as set forth on **Annex II** hereto. |
| **Milestones:** | The Debtors shall timely comply with the milestones set forth below (collectively, the "***Milestones***"), which Milestones may be extended in writing by the DIP Lender (provided that email consent from counsel to the DIP Lender shall constitute sufficient written direction) and the DIP Lender in its sole and absolute discretion.<br><br>(a) On or prior to June 3, 2024, the Debtors shall file chapter 11 petitions (such date, the "***Petition Date***"), and the Debtors shall have |

***Execution Version***

| | |
|---|---|
| | filed motions, in form and substance acceptable to the DIP Lender, seeking approval of the DIP Facility on an interim and final basis (the "***DIP Motion***");<br><br>(b) Within two (2) business days of the Petition Date, the Bankruptcy Court shall have entered an order (the "***Interim DIP Order***"), in form and substance acceptable to the DIP Lender, approving the DIP Facility on an interim basis and shall include approval of the Commitment Fee, Arrangement Fee, Exit Fees, issuance of the Rolled Bridge Loan, and the payment of the other amounts required under this DIP Term Sheet;<br><br>(c) By the later of (i) one (1) business day after execution of the Stalking Horse Agreement or (ii) two (2) business days after the Petition Date, the Debtors shall have filed a motion seeking entry of the Sale Procedures Order (as defined below) and approval of the Stalking Horse Agreement. "***Stalking Horse Agreement***" means that certain asset purchase agreement by and among Clean Royalties, LLC and the Debtors for the sale of substantially all of the Debtors' assets;<br><br>(d) On or before the day that is 25 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving the DIP Motion on a final basis (the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***");<br><br>(e) On or before the day that is 25 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving procedures governing the sale and marketing process for the a sale of all or substantially all of the Debtors' assets, which procedures shall be in form and substance acceptable to the DIP Lender, and designating the Stalking Horse Agreement as the stalking horse bid (the "***Sale Procedures Order***");<br><br>(f) On or before June 5, 2024, the Debtors shall have commenced the process of distributing a "teaser" and/or "confidential information memorandum" and/or similar document for a Sale Transaction;<br><br>(g) On or before July 17, 2024, the Debtors shall have commenced an auction for the Sale Transaction or cancelled such auction and declared the Stalking Horse Agreement the "successful bid;"<br><br>(h) On or before July 24, 2024, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Borrowers and the DIP Lender, approving the Stalking Horse Agreement or such other higher and better bid accepted pursuant to the Sale Procedures Order (together with any other sale of the Debtors' assets, each a "***Sale Transaction***"); and |

***Execution Version***

| | |
|---|---|
| | (g) On or before August 2, the Debtors shall have consummated the Sale Transactions. |
| **Events of Default:** | The DIP Facility shall be subject to events of default set forth on **Annex I** hereto, and the DIP Credit Agreement (if entered into) may include other events of default customary for facilities of this type and otherwise acceptable to the DIP Lender (each, an "***Event of Default***" and, collectively, the "***Events of Default***"). |
| **Remedies upon Events of Default:** | Immediately upon the occurrence and during the continuation of an Event of Default, unless such Event of Default has been waived by the DIP Lender, without any application, motion, or notice to, hearing before, or order from, the Bankruptcy Court, subject to the DIP Orders and the Remedies Notice Period (defined below), the DIP Lender may send a notice to the Debtors, their lead restructuring counsel, the Office of the United States Trustee, and counsel to any official committee of unsecured creditors (the "***Termination Notice***") declaring (i) all DIP Obligations owing under the DIP Loan Documents to be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens, DIP Superpriority Claims or the DIP Obligations, (iv) the Carve Out shall be triggered, and (v) interest under the DIP Facility shall accrue at the Default Rate.<br><br>The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Lender and Bridge Lender (if Bridge Financing Obligations remain outstanding) shall be modified five (5) business days after delivery of the Termination Notice (the "***Remedies Notice Period***"). Absent Bankruptcy Court order entered prior to the expiration of the Remedies Notice Period, the automatic stay, as to the DIP Lender and Bridge Lender, shall be terminated at the end of the Remedies Notice Period without further notice or order. Upon such stay termination, the DIP Lender and the Bridge Lender shall be permitted to exercise all remedies set forth in the DIP Loan Documents and as otherwise available at law without further order of or application or motion to the Bankruptcy Court consistent with this Interim DIP Order.<br><br>During any Remedies Notice Period, the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of the DIP Loan Documents only to make payroll and fund critical expenses |

***Execution Version***

| | |
|---|---|
| | necessary to preserve the DIP Collateral, in each case in accordance with the terms of the approved DIP Budget and the DIP Order. |
| **Expenses:** | Subject to the DIP Loan Documents, the Debtors, on a joint and several basis, shall be obligated to pay or reimburse all reasonable and documented out-of-pocket fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of counsel to the DIP Lender, and, as necessary, other local counsel in their capacity as advisors to the DIP Lender, incurred in any of their respective capacities in connection with the Chapter 11 Cases, including, but not limited to, the preparation, execution and delivery of the DIP Loan Documents and the funding of the DIP Facility, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Facility Documents (whether or not executed) and in connection with the enforcement or protection of any of its rights and remedies under the DIP Facility Documents ("Lender Expenses").<br><br>At the election of the DIP Lender, such amounts may be paid by the DIP Lender, and in such instance, such amounts shall be capitalized and treated as additional DIP Loans.<br><br>Notwithstanding anything herein to contrary, if Lender Expenses (including similar amounts paid to the Bridge Lender) exceed $150,000, any amounts in excess of $150,000 shall continue to accrue as DIP Obligations, but shall only be paid upon (i) satisfaction of the Prepetition Secured Lender Obligations or (ii) consent of the Prepetition Secured Lender. |
| **Indemnification:** | The Debtors shall indemnify and hold harmless the DIP Lender and each of its affiliates and each of the respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph |

| | |
|---|---|
| | applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtors, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Debtors further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Waivers:** | The DIP Orders will include terms and conditions customary for interim or final DIP financing orders and shall be acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions, and waivers of the imposition of costs pursuant to section 506(c) of the Bankruptcy Code and the "equities of the case" exception in section 552(b) of the Bankruptcy Code, in each case, to the extent applicable to the DIP Obligations and Bridge Financing Agreement. |
| **Adequate Protection:** | The DIP Orders shall grant the Prepetition Secured Lender the following adequate protection (the "***Adequate Protection***") of its prepetition security interests for, and equal in amount to, the diminution in the value of such party's prepetition security interests, calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not such diminution in value results from the sale, lease or use by the Debtors of such party's collateral (including, without limitation, cash collateral), the priming of liens and security interest securing the obligations owed to such party, or the stay of enforcement of any pre-petition security interest of such party arising from section 362 of the Bankruptcy Code, or otherwise, consisting of: (a) valid, binding, enforceable, and perfected replacement liens on and security interests in the DIP Collateral (the "***Adequate Protection Liens***"); and (b) superpriority administrative expense claims under sections 503(b) and 507(b) of the Bankruptcy Code senior to all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever (including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and |

***Execution Version***

| | |
|---|---|
| | 1114 of the Bankruptcy Code or otherwise), except as expressly set forth herein (the "***Adequate Protection Claims***"). |
| **Order of Priority of Adequate Protection:** | The Adequate Protection Liens granted to Prepetition Secured Lender shall be:<br>• Junior to the Carve-Out<br>• Junior to the DIP Liens<br>• Junior to the Senior Permitted Liens, with respect to the collateral to which such liens attach<br>• Senior to any other liens or security interests<br>The Adequate Protection Claims granted to the Prepetition Secured Lender shall be:<br>• Junior to the Carve-Out<br>• Junior to the DIP Superpriority Claim |
| **Governing Law:** | New York, but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York (and, to the extent applicable, the Bankruptcy Code). |
| **Amendments and Waivers:** | Amendments and waivers shall be in writing and shall require the consent of the DIP Lender. |
| **Assignments and Participations:** | The DIP Lender shall be entitled to assign any of its rights and obligations hereunder, with notice to the Debtors but without any obligation to obtain the consent of any person or entity. The DIP Lender shall be entitled to grant participations in its rights and obligations hereunder, without any obligation to give notice to, or obtain the consent of, any person or entity. |
| **Stipulations:** | The DIP Orders shall include customary stipulations as to the Bridge Financing Agreement, Bridge Financing Obligations, Bridge Financing Liens, and Bridge Financing Collateral and such stipulations shall not be subject to any challenge period. |
| **Release** | The DIP Orders shall have customary releases for the DIP Lender and Bridge Lender. |

***Execution Version***

| | |
|---|---|
| **Prepetition Facilities:** | Bridge Financing Agreement: That certain (i) Senior Secured Promissory Note, dated May 15, 2024 (the "***Bridge Note***;" the obligations arising thereunder, the "***Bridge Financing Obligations***"), between iSun and CR (in such capacity , the "***Bridge Lender***") and (ii) Security Agreement, dated May 14, 2024, by and among iSun, CR, and the other Debtors party thereto (the "***Bridge Security Agreement***;" and together with the Note, each, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, jointly, the "***Bridge Financing Agreement***;" the liens and security interests granted thereby, the "***Bridge Financing Liens***;" and the collateral subject to such liens, the "***Bridge Financing Collateral***"), between iSun, certain subsidiaries of iSun, as Guarantors, and CR.<br><br>Decathlon Financing Agreement: That certain Revenue Loan and Security Agreement dated December 12, 2023, by and among iSun, the Guarantors parties thereto, and Decathlon Growth Credit, LLC, a Delaware limited liability company ("***Decathlon***" or "***Prepetition Secured Lender***"; such agreement, the "***Prepetition Secured Lender Agreement***"; such facility, the "***Prepetition Secured Facility***"; the obligations thereunder, the "***Prepetition Secured Obligations***"; the asserted liens securing such obligations, the "***Prepetition Secured Lender Liens***"; and the asserted collateral subject to such liens, the "***Prepetition Secured Lender Collateral***").<br><br>Lendspark Corporation Financing Agreement: That certain Agreement for the Purchase and Sale of Future Receipts, Agreement No. 3184, dated April 3, 2023 by and between iSun and its affiliated entities and Lendspark Corporation (the asserted liens securing the purported obligations under such agreement, the "***Lendspark Liens***").<br><br>Cedar Advance LLC Financing Agreement: That certain Standard Merchant Cash Agreement dated January 4, 2024 by and between iSun Industrial LLC and its affiliated entities and Cedar Advance LLC (the asserted liens securing the purported obligations under such agreement, the "***Cedar Liens***").<br><br>Pawn Funding Financing Agreement: That certain Standard Merchant Cash Agreement dated January 4, 2024 by and between iSun Industrial LLC and its affiliated entities (the asserted liens securing the purported obligations under such agreement, the "***Pawn Liens***"). |

The Borrowers must evidence their acceptance of this binding Term Sheet by signing in the space indicated below. If the DIP Lender has not received counterparts hereof so executed by the Borrowers by 11:59 p.m. EDT on Monday, June 3, 2024, this offer to provide a commitment for the DIP Facility described herein shall expire and be of no further force or effect, and neither the DIP Lender nor any other person or entity shall have any further obligations or liability with respect to such DIP Facility or any other financing.

CLEAN ROYALTIES, LLC, as DIP Lender

By: Joshua Sanger
Joshua Sanger (Jun 3, 2024 15:41 CDT)

Name: Joshua Sanger

Title: Authorized Signatory

The Borrowers hereby AGREE TO and ACCEPT the foregoing DIP Term Sheet by signing in the space indicated below.

AGREED TO AND ACCEPTED by the Borrowers:

**iSun, Inc.**
**Hudson Solar Service, LLC**
**Hudson Valley Clean Energy, Inc.**
**iSun Corporate, LLC**
**iSun Energy LLC**
**iSun Industrial, LLC**
**iSun Residential, Inc.**
**iSun Utility, LLC**
**Liberty Electric, Inc.**
**Peck Electric Co.**
**SolarCommunities, Inc.**
**Sun CSA 36, LLC**

By: ______________________________

Name: ______________________________

Title: ______________________________

# SCHEDULE 1

## ADDITIONAL BORROWERS

- Hudson Solar Service, LLC
- Hudson Valley Clean Energy, Inc.
- iSun Corporate, LLC
- iSun Energy LLC
- iSun Industrial, LLC
- iSun Residential, Inc.
- iSun Utility, LLC
- Liberty Electric, Inc.
- Peck Electric Co.
- SolarCommunities, Inc.
- Sun CSA 36, LLC

**SCHEDULE 2**

**SENIOR LIENS**

| DEBTOR | SECURED PARTY | JURISCTION | FILING NUMBER |
|---|---|---|---|
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 20-368848 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 20-378269 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 21-389931 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 21-391436 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 20-368848 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 22-410845 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 22-413609 |
| Peck Electric Co. | Canadian Solar (USA) Inc. | VT | 15-290279 |
| Peck Electric Co. | JCB Finance, a program of Bank of the West | VT | 19-352576 |
| Peck Electric Co. | JCB Finance, a program of Bank of the West | VT | 19-352578 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-355069 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-356542 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-356543 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-356544 |
| Peck Electric Co. | Balboa Capital Corporation | VT | 23-427275 |

**Annex I**

**DIP Events of Default**

Each and any one or more of the following shall be an "***Event of Default***" if it occurs for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

i. the failure to meet any of the Milestones[1] unless (a) such failure is the result of any act, omission, or delay on the part of any of the DIP Lender or (b) such Milestone is waived or extended by the DIP Lender in writing;

ii. the Borrowers shall fail to pay any amount under the DIP Facility as and when due;

iii. any representation or warranty made by the Borrowers under the DIP Loan Documents, including in any certificate, document or financial or other statement furnished by it at any time under or in connection with the DIP Loan Document, shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished;

iv. any provision of the DIP Loan Documents shall cease to be valid and binding on the Borrowers, or any Borrower shall so assert in any pleading filed in any court;

v. any DIP Obligor files, files a motion seeking approval of, proposes or supports any plan of liquidation, asset sale of all or any material portion of the DIP Obligors' assets (other than a sale to the DIP Lender or one of its affiliates), or a plan of reorganization, other than one that (i) provides for the indefeasible payment in full in cash of the DIP Obligations and the Bridge Financing Obligations on the effective date thereof and (ii) has committed financing to fund all payments required under the plan or to pay the purchase price in the sale;

vi. any DIP Obligor seeks to obtain, or files a motion for authority to obtain, financing on a secured basis unless the proceeds of such financing shall be used to indefeasibly pay in full all DIP Obligations at the closing of such financing;

vii. the DIP Obligors fail to provide the DIP Lender with at least three (3) calendar days' advance notice of substantially final draft copies of any material motion, pleading, agreement, instrument, order, form, or other document the DIP Obligors intend to file with the Bankruptcy Court in connection with a plan or sale;

viii. any DIP Obligor files a motion, or fails to timely object to any motion filed by any third party, that would result in authorization to pay, or impose an obligation on the Debtors or their estates to pay, any amount that is not permitted to be paid under the DIP Budget, subject to the Permitted Variances;

ix. the Bankruptcy Court enters an order, or the DIP Obligors file any motion or any request for relief (other than with the consent of the DIP Lender) that seeks, to (a) dismiss any of

---

[1] Capitalized terms have the meaning ascribed to them in the DIP Term Sheet.

the Chapter 11 Cases, (b) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appoint a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; or (d) terminate the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

x.  the Bankruptcy Court enters an order granting relief, or any DIP Obligor fails to timely object to any request for an order or other relief, terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) to authorize any party to proceed against any material asset of the DIP Obligors or in such a manner that would adversely affect the DIP Obligors' ability to operate their businesses in the ordinary course or requires the Debtor to pay any claim arising prior to the Petition Date;

xi.  after entry by the Bankruptcy Court of any DIP Order, the relief and authorizations set forth in such order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended, in each case, in a manner materially inconsistent with the terms set forth in the DIP Loan Documents, or the Debtors seek the entry of any such relief, in each case without the consent of the DIP Lender;

xii.  the failure of the Debtors to comply with the DIP Orders or DIP Loan Documents, which remains uncured for a period of five (5) business days after the receipt of written notice of such event or is not otherwise waived in accordance with the terms thereof;

xiii.  the Debtors (a) engage in or publicly support any challenge to the validity, security, perfection, priority, extent, or enforceability of the DIP Loan Documents, the DIP Liens, the DIP Obligations, the Bridge Financing Obligations or the Bridge Financing Liens, including seeking to equitably subordinate or avoid such liens or claims or (b) engage in any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against any of the DIP Lender or the Bridge Lender;

xiv.  the entry of a judgment or order by the Bankruptcy Court (i) sustaining any defense, objection, or challenge to the validity, security, perfection, priority, extent or enforceability of the DIP Loan Documents, the DIP Liens, the DIP Obligations, the Bridge Financing Agreement Obligations, or the Bridge Financing Liens, or (ii) avoiding, subordinating, recharacterizing, or otherwise impairing any of the DIP Obligations, DIP Superpriority Claims, DIP Liens, the Bridge Financing Obligations or the Bridge Financing Liens;

xv.  the entry of any order in any of the Chapter 11 Cases surcharging any of the DIP Collateral with respect to the DIP Lender or Bridge Lender, as applicable, whether under Section 506(c) of the Bankruptcy Code or otherwise;

xvi.  the Bankruptcy Court enters an order allowing any lien or administrative expense claim priority over or ranking in parity with the DIP Liens, DIP Superpriority Claims or the rights of the DIP Lender;

xvii.    the Bankruptcy Court enters an order granting adequate protection with respect to any of the existing secured debt of the Debtors (other than as set forth in the DIP Orders);

xviii.    the use of Cash Collateral provided for in the DIP Orders is either terminated or modified, in each case, without the prior written consent of the DIP Lender; and

xix.    any use of proceeds of the DIP Facility or Cash Collateral inconsistent with the DIP Budget and the Permitted Variance.

# Annex II

## Carve Out

(a) Carve Out. As used in this [Final/Interim] Order, the "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the fees and expenses (and any monthly, restructuring, or sale fees) (the "***Allowed Professional Fees***") incurred by (or payable to) persons or firms retained by the Debtors[2] pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and any official committee of unsecured creditors pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***") at any time before or on the first business day following delivery by the DIP Lender of a Termination Notice (and with respect to any monthly, restructuring, or sale fees, at any time before the date of delivery of the Termination Notice), in the aggregate not to exceed the amount set forth in the prevailing DIP Budget for all Professional Persons through the date a Termination Notice is delivered; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by the DIP Lender of the Termination Notice, to the extent allowed at any

---

[2] Capitalized terms not otherwise defined in this Annex II have the meaning ascribed to them in the DIP Term Sheet.

time, whether by interim order, procedural order, or otherwise, for all Professional Persons in the aggregate.

(b)    No Direct Obligation To Pay Allowed Professional Fees.  Neither the DIP Lender nor the Bridge Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this [Interim/Final] Order or otherwise shall be construed to obligate the DIP Lender or the Bridge Lender in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c)    Payment of Allowed Amounts within Carve Out.  Any payment or reimbursement made to Professional Persons in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

**Annex III**

iSun, Inc.
DIP Budget

| | Pre-Petition | Pre-Petition | Pre-Petition | Interim DIP Funding Petition Date 6/3 | IB Process Start 6/14 | DIP Funding 6/19 | | | IOI Deadline 7/5 | | Bid Submission 7/26 | 363 Auction 7/31 | Proj. Closing 8/9 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
| Date (Week Ending) | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | 6/21 | 6/28 | 7/5 | 7/12 | 7/19 | 7/26 | 8/2 | 8/9 | 8/16 | 8/23 | 15-Week |
| Budget/Actual | Actual | Actual | Actual | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget |
| **CASH FLOW** | | | | | | | | | | | | | | | | |
| **RECEIPTS** | | | | | | | | | | | | | | | | |
| Customer Receipts | $ 128,029 | $ 346,271 | $ 13,393 | $ 283,000 | $ 500,000 | $ 100,000 | $ 50,533 | $ 500,000 | $ 50,533 | $ 50,000 | $ 250,000 | $ 50,533 | $ 50,533 | $ - | $ - | $ 2,372,827 |
| Other Receipts | - | - | 43,121 | (140,282) | 114,869 | (169,980) | 106,953 | (650) | 149,138 | 48,909 | 106,040 | (112,060) | - | - | - | 146,058 |
| Pre-DIP Funds / DIP Financing | 500,000 | 500,000 | - | 500,000 | - | 1,500,000 | - | - | - | - | - | 1,000,000 | - | - | - | 4,000,000 |
| **TOTAL RECEIPTS** | $ 628,029 | $ 846,271 | $ 56,514 | $ 642,718 | $ 614,869 | $ 1,430,020 | $ 157,486 | $ 499,350 | $ 199,671 | $ 98,909 | $ 356,040 | $ 938,473 | $ 50,533 | $ - | $ - | $ 6,518,885 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | |
| **Payroll & Benefits** | | | | | | | | | | | | | | | | |
| Payroll | 119,872 | 207,053 | 53,710 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | - | - | $ 1,395,757 |
| Union Benefits | - | 67,567 | - | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | - | - | 452,567 |
| Non-Union Benefits | 34,644 | 1,717 | 13,837 | 35,000 | 12,500 | 62,000 | 12,500 | 35,000 | 12,500 | 22,000 | 12,500 | 35,000 | 12,500 | - | - | 301,699 |
| Total Payroll and Related | $ 154,516 | $ 276,337 | $ 67,547 | $ 189,652 | $ 77,873 | $ 366,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ 326,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ - | $ - | $ 2,150,023 |
| **Operating Expenses** | | | | | | | | | | | | | | | | |
| Materials | 62,725 | 47,966 | - | - | - | 87,500 | 47,500 | 47,500 | 47,500 | 87,500 | 47,500 | 47,500 | 47,500 | - | - | 570,691 |
| Critical Vendors | - | - | - | 136,690 | 136,690 | 136,690 | - | - | - | - | - | - | - | - | - | 410,071 |
| Insurance | 31,032 | 115,669 | - | 110,161 | - | - | 5,953 | 110,161 | - | - | 5,953 | 110,161 | - | - | - | 489,091 |
| Rent | - | 13,308 | - | 9,565 | - | - | - | 9,565 | - | - | - | 9,565 | - | - | - | 42,003 |
| Engineering/Consulting Fees | 75,000 | - | 10,172 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | - | - | 189,172 |
| Other | 31,165 | 2,254 | 15,493 | 19,145 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | - | - | 140,413 |
| Total Operating Expenses | $ 199,922 | $ 179,197 | $ 25,665 | $ 291,562 | $ 149,690 | $ 245,070 | $ 66,453 | $ 194,024 | $ 60,500 | $ 188,380 | $ 66,453 | $ 194,024 | $ 60,500 | $ - | $ - | $ 1,841,441 |
| **CASH FLOW FROM OPERATIONS** | $ 273,591 | $ 390,738 | $ (36,698) | $ 161,505 | $ 387,306 | $ 818,298 | $ 13,160 | $ 115,675 | $ 61,299 | $ (336,123) | $ 211,714 | $ 554,798 | $ (87,839) | $ - | $ - | $ 2,527,421 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | |
| Additional Debt Payments | 5,000 | 5,000 | 3,500 | - | - | - | - | - | - | - | - | - | - | - | - | 13,500 |
| Company CFO/CRO and FA | - | 105,770 | 184,609 | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 45,000 | 40,000 | 40,000 | - | - | 715,380 |
| Investment Banker | - | 52,337 | - | - | - | - | - | - | 25,000 | - | - | 300,000 | - | - | - | 377,337 |
| Bankruptcy Counsel | 75,000 | - | 20,856 | - | - | - | - | 35,000 | - | - | - | - | 70,000 | 70,000 | - | 270,856 |
| Company Counsel | - | 64,000 | 1,879 | - | - | 44,000 | - | - | - | 44,000 | - | - | - | - | - | 153,879 |
| Claims & Noticing Agent | - | - | 25,000 | - | - | - | - | 12,500 | - | - | - | - | 50,000 | 37,500 | - | 125,000 |
| Unsecured Creditors Committee Professional Fees | - | - | - | - | - | - | - | 18,750 | - | - | - | - | 75,000 | 56,250 | - | 150,000 |
| Board Counsel | - | 75,000 | - | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | - | 225,000 |
| DIP Legal Lender Fees | - | - | - | 100,000 | - | 50,000 | - | - | - | - | - | - | - | - | - | 150,000 |
| KEIP / KERP | - | - | - | - | - | 50,000 | - | - | - | - | - | - | - | - | - | 50,000 |
| D&O Tail Insurance | - | - | 462,070 | - | - | - | - | - | - | - | - | - | - | - | - | 462,070 |
| Compensation for iSun Board | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | 39,822 | - | - | - | 56,527 | 96,350 |
| Total Non-Operating Disbursements | $ 80,000 | $ 302,107 | $ 697,914 | $ 100,000 | $ 80,000 | $ 194,000 | $ 80,000 | $ 116,250 | $ 105,000 | $ 94,000 | $ 114,822 | $ 340,000 | $ 265,000 | $ 163,750 | $ 56,527 | $ 2,789,372 |
| **TOTAL DISBURSEMENTS** | $ 434,438 | $ 757,641 | $ 791,126 | $ 581,213 | $ 307,563 | $ 805,722 | $ 224,326 | $ 499,926 | $ 243,373 | $ 529,032 | $ 259,149 | $ 723,676 | $ 403,373 | $ 163,750 | $ 56,527 | $ 3,231,483 |
| **NET CASH FLOW** | $ 193,591 | $ 88,630 | $ (734,612) | $ 61,505 | $ 307,306 | $ 624,298 | $ (66,840) | $ (575) | $ (43,701) | $ (430,123) | $ 96,891 | $ 214,798 | $ (352,839) | $ (163,750) | $ (56,527) | $ 3,287,402 |
| **CUMULATIVE NET CASH FLOW** | $ 193,591 | $ 282,221 | $ (452,391) | $ (390,886) | $ (83,581) | $ 540,737 | $ 473,877 | $ 473,302 | $ 429,600 | $ (322) | $ 96,369 | $ 311,166 | $ (41,673) | $ (205,423) | $ (261,950) | $ (261,950) |
| **ROLLFORWARDS** | | | | | | | | | | | | | | | | |
| **CASH ON HAND** | | | | | | | | | | | | | | | | |
| Beginning Balance | 560,223 | 753,814 | 842,444 | 107,832 | 169,336 | 476,642 | 1,100,940 | 1,034,100 | 1,033,524 | 989,823 | 559,700 | 656,591 | 871,389 | 518,550 | 354,800 | $ 560,223 |
| Net Cash Flow | 193,591 | 88,630 | (734,612) | 61,505 | 307,306 | 624,298 | (66,840) | (575) | (43,701) | (430,123) | 96,891 | 214,798 | (352,839) | (163,750) | (56,527) | (261,950) |
| Ending Balance | $ 753,814 | $ 842,444 | $ 107,832 | $ 169,336 | $ 476,642 | $ 1,100,940 | $ 1,034,100 | $ 1,033,524 | $ 989,823 | $ 559,700 | $ 656,591 | $ 871,389 | $ 518,550 | $ 354,800 | $ 298,272 | $ 298,272 |

# iSun - DIP Term Sheet (Execution Version)

Final Audit Report 2024-06-03

| | |
|---|---|
| Created: | 2024-06-03 |
| By: | Ally Herebic (allyson.herebic@siltstone.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAKBbUZIZIP52-Ms-4hL2bPQqw_14iDfcE |

## "iSun - DIP Term Sheet (Execution Version)" History

Document created by Ally Herebic (allyson.herebic@siltstone.com)
2024-06-03 - 8:21:44 PM GMT

Document emailed to joshua.sanger@siltstone.com for signature
2024-06-03 - 8:21:49 PM GMT

Email viewed by joshua.sanger@siltstone.com
2024-06-03 - 8:40:53 PM GMT

Signer joshua.sanger@siltstone.com entered name at signing as Joshua Sanger
2024-06-03 - 8:41:45 PM GMT

Document e-signed by Joshua Sanger (joshua.sanger@siltstone.com)
Signature Date: 2024-06-03 - 8:41:47 PM GMT - Time Source: server

Agreement completed.
2024-06-03 - 8:41:47 PM GMT

# EXHIBIT B

## Initial Budget

**iSun, Inc.**
**DIP Budget**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Pre-Petition* | *Pre-Petition* | *Pre-Petition* | *Interim DIP Funding Petition Date 6/3* | *IB Process Start 6/14* | *DIP Funding 6/19* | | | *IOI Deadline 7/9* | | *Bid Submission 7/26* | *363 Auction 7/31* | *Proj. Closing 8/9* | | | |
| **Week** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | **14** | **15** | |
| **Date (Week Ending)** | **5/17** | **5/24** | **5/31** | **6/7** | **6/14** | **6/21** | **6/28** | **7/5** | **7/12** | **7/19** | **7/26** | **8/2** | **8/9** | **8/16** | **8/23** | **15-Week** |
| Budget/Actual | *Actual* | *Actual* | *Actual* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | **Budget** |
| **CASH FLOW** | | | | | | | | | | | | | | | | |
| **RECEIPTS** | | | | | | | | | | | | | | | | |
| Customer Receipts | $ 128,029 | $ 346,271 | $ 13,393 | $ 283,000 | $ 500,000 | $ 100,000 | $ 50,533 | $ 500,000 | $ 50,533 | $ 50,000 | $ 250,000 | $ 50,533 | $ 50,533 | $ - | $ - | $ 2,372,827 |
| Other Receipts | - | - | 43,121 | (140,282) | 114,869 | (169,980) | 106,953 | (650) | 149,138 | 48,909 | 106,040 | (112,060) | - | - | - | 146,058 |
| Pre-DIP Funds / DIP Financing | 500,000 | 500,000 | - | 500,000 | - | 1,500,000 | - | - | - | - | - | 1,000,000 | - | - | - | 4,000,000 |
| **TOTAL RECEIPTS** | **$ 628,029** | **$ 846,271** | **$ 56,514** | **$ 642,718** | **$ 614,869** | **$ 1,430,020** | **$ 157,486** | **$ 499,350** | **$ 199,671** | **$ 98,909** | **$ 356,040** | **$ 938,473** | **$ 50,533** | **$ -** | **$ -** | **$ 6,518,885** |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | |
| **Payroll & Benefits** | | | | | | | | | | | | | | | | |
| Payroll | 119,872 | 207,053 | 53,710 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | - | - | $ 1,395,757 |
| Union Benefits | - | 67,567 | - | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | - | - | 452,567 |
| Non-Union Benefits | 34,644 | 1,717 | 13,837 | 35,000 | 12,500 | 62,000 | 12,500 | 35,000 | 12,500 | 22,000 | 12,500 | 35,000 | 12,500 | - | - | 301,699 |
| Total Payroll and Related | $ 154,516 | $ 276,337 | $ 67,547 | $ 189,652 | $ 77,873 | $ 366,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ 326,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ - | $ - | $ 2,150,023 |
| **Operating Expenses** | | | | | | | | | | | | | | | | |
| Materials | 62,725 | 47,966 | - | - | - | 87,500 | 47,500 | 47,500 | 47,500 | 87,500 | 47,500 | 47,500 | 47,500 | - | - | 570,691 |
| Critical Vendors | - | - | - | 136,690 | 136,690 | 136,690 | - | - | - | - | - | - | - | - | - | 410,071 |
| Insurance | 31,032 | 115,669 | - | 110,161 | - | - | 5,953 | 110,161 | - | - | 5,953 | 110,161 | - | - | - | 489,091 |
| Rent | - | 13,308 | - | 9,565 | - | - | - | 9,565 | - | - | - | 9,565 | - | - | - | 42,003 |
| Engineering/Consulting Fees | 75,000 | - | 10,172 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | - | - | 189,172 |
| Other | 31,165 | 2,254 | 15,493 | 19,145 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | - | - | 140,413 |
| Total Operating Expenses | $ 199,922 | $ 179,197 | $ 25,665 | $ 291,562 | $ 149,690 | $ 245,070 | $ 66,453 | $ 194,024 | $ 60,500 | $ 108,380 | $ 66,453 | $ 194,024 | $ 60,500 | $ - | $ - | $ 1,841,441 |
| **CASH FLOW FROM OPERATIONS** | **$ 273,591** | **$ 390,738** | **$ (36,698)** | **$ 161,505** | **$ 387,306** | **$ 818,298** | **$ 13,160** | **$ 115,675** | **$ 61,299** | **$ (336,123)** | **$ 211,714** | **$ 554,798** | **$ (87,839)** | **$ -** | **$ -** | **$ 2,527,421** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | |
| Additional Debt Payments | 5,000 | 5,000 | 3,500 | - | - | - | - | - | - | - | - | - | - | - | - | 13,500 |
| Company CFO/CRO and FA | - | 105,770 | 184,609 | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 45,000 | 40,000 | 40,000 | - | - | 715,380 |
| Investment Banker | - | 52,337 | - | - | - | - | - | - | 25,000 | - | - | 300,000 | - | - | - | 377,337 |
| Bankruptcy Counsel | 75,000 | - | 20,856 | - | - | - | - | 35,000 | - | - | - | - | 70,000 | 70,000 | - | 270,856 |
| Company Counsel | - | 64,000 | 1,879 | - | - | 44,000 | - | - | - | 44,000 | - | - | - | - | - | 153,879 |
| Claims & Noticing Agent | - | - | 25,000 | - | - | - | - | 12,500 | - | - | - | - | 50,000 | 37,500 | - | 125,000 |
| Unsecured Creditors Committee Professional Fees | - | - | - | - | - | - | - | 18,750 | - | - | - | - | 75,000 | 56,250 | - | 150,000 |
| Board Counsel | - | 75,000 | - | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | - | 225,000 |
| DIP Legal Lender Fees | - | - | - | 100,000 | - | 50,000 | - | - | - | - | - | - | - | - | - | 150,000 |
| KEIP / KERP | - | - | - | - | - | 50,000 | - | - | - | - | - | - | - | - | - | 50,000 |
| D&O Tail Insurance | - | - | 462,070 | - | - | - | - | - | - | - | - | - | - | - | - | 462,070 |
| Compensation for iSun Board | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | 39,822 | - | - | - | 56,527 | 96,350 |
| Total Non-Operating Disbursements | $ 80,000 | $ 302,107 | $ 697,914 | $ 100,000 | $ 80,000 | $ 194,000 | $ 80,000 | $ 116,250 | $ 105,000 | $ 94,000 | $ 114,822 | $ 340,000 | $ 265,000 | $ 163,750 | $ 56,527 | $ 2,789,372 |
| **TOTAL DISBURSEMENTS** | **$ 434,438** | **$ 757,641** | **$ 791,126** | **$ 581,213** | **$ 307,563** | **$ 805,722** | **$ 224,326** | **$ 499,926** | **$ 243,373** | **$ 529,032** | **$ 259,149** | **$ 723,676** | **$ 403,373** | **$ 163,750** | **$ 56,527** | **$ 3,231,483** |
| **NET CASH FLOW** | **$ 193,591** | **$ 88,630** | **$ (734,612)** | **$ 61,505** | **$ 307,306** | **$ 624,298** | **$ (66,840)** | **$ (575)** | **$ (43,701)** | **$ (430,123)** | **$ 96,891** | **$ 214,798** | **$ (352,839)** | **$ (163,750)** | **$ (56,527)** | **$ 3,287,402** |
| **CUMULATIVE NET CASH FLOW** | **$ 193,591** | **$ 282,221** | **$ (452,391)** | **$ (390,886)** | **$ (83,581)** | **$ 540,717** | **$ 473,877** | **$ 473,302** | **$ 429,600** | **$ (522)** | **$ 96,369** | **$ 311,166** | **$ (41,673)** | **$ (205,423)** | **$ (261,950)** | **$ (261,950)** |
| **ROLLFORWARDS** | | | | | | | | | | | | | | | | |
| **CASH ON HAND** | | | | | | | | | | | | | | | | |
| Beginning Balance | 560,223 | 753,814 | 842,444 | 107,832 | 169,336 | 476,642 | 1,100,940 | 1,034,100 | 1,033,524 | 989,823 | 559,700 | 656,591 | 871,389 | 518,550 | 354,800 | $ 560,223 |
| Net Cash Flow | 193,591 | 88,630 | (734,612) | 61,505 | 307,306 | 624,298 | (66,840) | (575) | (43,701) | (430,123) | 96,891 | 214,798 | (352,839) | (163,750) | (56,527) | (261,950) |
| **Ending Balance** | **$ 753,814** | **$ 842,444** | **$ 107,832** | **$ 169,336** | **$ 476,642** | **$ 1,100,940** | **$ 1,034,100** | **$ 1,033,524** | **$ 989,823** | **$ 559,700** | **$ 656,591** | **$ 871,389** | **$ 518,550** | **$ 354,800** | **$ 298,272** | **$ 298,272** |

# EXHIBIT B

**iSun, Inc.**
**DIP Budget**

| | | | | Interim DIP Funding | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Pre-Petition* | *Pre-Petition* | *Pre-Petition* | *Petition Date 6/3* | *IB Process Start 6/14* | *DIP Funding 6/19* | | | *IOI Deadline 7/9* | | *Bid Submission 7/26* | *363 Auction 7/31* | *Proj. Closing 8/9* | | | |
| **Week** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | **14** | **15** | |
| **Date (Week Ending)** | **5/17** | **5/24** | **5/31** | **6/7** | **6/14** | **6/21** | **6/28** | **7/5** | **7/12** | **7/19** | **7/26** | **8/2** | **8/9** | **8/16** | **8/23** | **15-Week** |
| Budget/Actual | *Actual* | *Actual* | *Actual* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | *Budget* | **Budget** |
| **CASH FLOW** | | | | | | | | | | | | | | | | |
| **RECEIPTS** | | | | | | | | | | | | | | | | |
| Customer Receipts | $ 128,029 | $ 346,271 | $ 13,393 | $ 283,000 | $ 500,000 | $ 100,000 | $ 50,533 | $ 500,000 | $ 50,533 | $ 50,000 | $ 250,000 | $ 50,533 | $ 50,533 | $ - | $ - | $ 2,372,827 |
| Other Receipts | - | - | 43,121 | (140,282) | 114,869 | (169,980) | 106,953 | (650) | 149,138 | 48,909 | 106,040 | (112,060) | - | - | - | 146,058 |
| Pre-DIP Funds / DIP Financing | 500,000 | 500,000 | - | 500,000 | - | 1,500,000 | - | - | - | - | - | 1,000,000 | - | - | - | 4,000,000 |
| **TOTAL RECEIPTS** | **$ 628,029** | **$ 846,271** | **$ 56,514** | **$ 642,718** | **$ 614,869** | **$ 1,430,020** | **$ 157,486** | **$ 499,350** | **$ 199,671** | **$ 98,909** | **$ 356,040** | **$ 938,473** | **$ 50,533** | **$ -** | **$ -** | **$ 6,518,885** |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | |
| **Payroll & Benefits** | | | | | | | | | | | | | | | | |
| Payroll | 119,872 | 207,053 | 53,710 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | - | - | $ 1,395,757 |
| Union Benefits | - | 67,567 | - | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | - | - | 452,567 |
| Non-Union Benefits | 34,644 | 1,717 | 13,837 | 35,000 | 12,500 | 62,000 | 12,500 | 35,000 | 12,500 | 22,000 | 12,500 | 35,000 | 12,500 | - | - | 301,699 |
| Total Payroll and Related | $ 154,516 | $ 276,337 | $ 67,547 | $ 189,652 | $ 77,873 | $ 366,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ 326,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ - | $ - | $ 2,150,023 |
| **Operating Expenses** | | | | | | | | | | | | | | | | |
| Materials | 62,725 | 47,966 | - | - | - | 87,500 | 47,500 | 47,500 | 47,500 | 87,500 | 47,500 | 47,500 | 47,500 | - | - | 570,691 |
| Critical Vendors | - | - | - | 136,690 | 136,690 | 136,690 | - | - | - | - | - | - | - | - | - | 410,071 |
| Insurance | 31,032 | 115,669 | - | 110,161 | - | - | 5,953 | 110,161 | - | - | 5,953 | 110,161 | - | - | - | 489,091 |
| Rent | - | 13,308 | - | 9,565 | - | - | - | 9,565 | - | - | - | 9,565 | - | - | - | 42,003 |
| Engineering/Consulting Fees | 75,000 | - | 10,172 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | - | - | 189,172 |
| Other | 31,165 | 2,254 | 15,493 | 19,145 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | - | - | 140,413 |
| Total Operating Expenses | $ 199,922 | $ 179,197 | $ 25,665 | $ 291,562 | $ 149,690 | $ 245,070 | $ 66,453 | $ 194,024 | $ 60,500 | $ 108,380 | $ 66,453 | $ 194,024 | $ 60,500 | $ - | $ - | $ 1,841,441 |
| **CASH FLOW FROM OPERATIONS** | **$ 273,591** | **$ 390,738** | **$ (36,698)** | **$ 161,505** | **$ 387,306** | **$ 818,298** | **$ 13,160** | **$ 115,675** | **$ 61,299** | **$ (336,123)** | **$ 211,714** | **$ 554,798** | **$ (87,839)** | **$ -** | **$ -** | **$ 2,527,421** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | |
| Additional Debt Payments | 5,000 | 5,000 | 3,500 | - | - | - | - | - | - | - | - | - | - | - | - | 13,500 |
| Company CFO/CRO and FA | - | 105,770 | 184,609 | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 45,000 | 40,000 | 40,000 | - | - | 715,380 |
| Investment Banker | - | 52,337 | - | - | - | - | - | - | 25,000 | - | - | 300,000 | - | - | - | 377,337 |
| Bankruptcy Counsel | 75,000 | - | 20,856 | - | - | - | - | 35,000 | - | - | - | - | 70,000 | 70,000 | - | 270,856 |
| Company Counsel | - | 64,000 | 1,879 | - | - | 44,000 | - | - | - | 44,000 | - | - | - | - | - | 153,879 |
| Claims & Noticing Agent | - | - | 25,000 | - | - | - | - | 12,500 | - | - | - | - | 50,000 | 37,500 | - | 125,000 |
| Unsecured Creditors Committee Professional Fees | - | - | - | - | - | - | - | 18,750 | - | - | - | - | 75,000 | 56,250 | - | 150,000 |
| Board Counsel | - | 75,000 | - | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | - | 225,000 |
| DIP Legal Lender Fees | - | - | - | 100,000 | - | 50,000 | - | - | - | - | - | - | - | - | - | 150,000 |
| KEIP / KERP | - | - | - | - | - | 50,000 | - | - | - | - | - | - | - | - | - | 50,000 |
| D&O Tail Insurance | - | - | 462,070 | - | - | - | - | - | - | - | - | - | - | - | - | 462,070 |
| Compensation for iSun Board | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | 39,822 | - | - | - | 56,527 | 96,350 |
| Total Non-Operating Disbursements | $ 80,000 | $ 302,107 | $ 697,914 | $ 100,000 | $ 80,000 | $ 194,000 | $ 80,000 | $ 116,250 | $ 105,000 | $ 94,000 | $ 114,822 | $ 340,000 | $ 265,000 | $ 163,750 | $ 56,527 | $ 2,789,372 |
| **TOTAL DISBURSEMENTS** | **$ 434,438** | **$ 757,641** | **$ 791,126** | **$ 581,213** | **$ 307,563** | **$ 805,722** | **$ 224,326** | **$ 499,926** | **$ 243,373** | **$ 529,032** | **$ 259,149** | **$ 723,676** | **$ 403,373** | **$ 163,750** | **$ 56,527** | **$ 3,231,483** |
| **NET CASH FLOW** | **$ 193,591** | **$ 88,630** | **$ (734,612)** | **$ 61,505** | **$ 307,306** | **$ 624,298** | **$ (66,840)** | **$ (575)** | **$ (43,701)** | **$ (430,123)** | **$ 96,891** | **$ 214,798** | **$ (352,839)** | **$ (163,750)** | **$ (56,527)** | **$ 3,287,402** |
| **CUMULATIVE NET CASH FLOW** | **$ 193,591** | **$ 282,221** | **$ (452,391)** | **$ (390,886)** | **$ (83,581)** | **$ 540,717** | **$ 473,877** | **$ 473,302** | **$ 429,600** | **$ (522)** | **$ 96,369** | **$ 311,166** | **$ (41,673)** | **$ (205,423)** | **$ (261,950)** | **$ (261,950)** |
| **ROLLFORWARDS** | | | | | | | | | | | | | | | | |
| **CASH ON HAND** | | | | | | | | | | | | | | | | |
| Beginning Balance | 560,223 | 753,814 | 842,444 | 107,832 | 169,336 | 476,642 | 1,100,940 | 1,034,100 | 1,033,524 | 989,823 | 559,700 | 656,591 | 871,389 | 518,550 | 354,800 | $ 560,223 |
| Net Cash Flow | 193,591 | 88,630 | (734,612) | 61,505 | 307,306 | 624,298 | (66,840) | (575) | (43,701) | (430,123) | 96,891 | 214,798 | (352,839) | (163,750) | (56,527) | (261,950) |
| **Ending Balance** | **$ 753,814** | **$ 842,444** | **$ 107,832** | **$ 169,336** | **$ 476,642** | **$ 1,100,940** | **$ 1,034,100** | **$ 1,033,524** | **$ 989,823** | **$ 559,700** | **$ 656,591** | **$ 871,389** | **$ 518,550** | **$ 354,800** | **$ 298,272** | **$ 298,272** |

# **EXHIBIT C**

***Execution Version***

**DIP TERM SHEET**

**iSun, Inc.**

This binding term sheet (this "***DIP Term Sheet***") provided to iSun, Inc. (together with its subsidiaries, "***iSun***") sets forth the material terms, requirement and conditions of a superpriority senior secured priming debtor in possession term loan facility (as further described herein, the "***DIP Facility***") that the DIP Lender (as defined below) is contemplating providing to iSun, as debtors and debtors in possession (in such capacity, the "***Debtors***") in connection with chapter 11 cases (the "***Chapter 11 Cases***") to be filed by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware.

| | |
|---|---|
| **Borrowers:** | iSun, Inc. and the other entities set forth on **Schedule 1** (collectively, the "***Borrowers***" or "***DIP Obligors***"). |
| **DIP Lender:** | Clean Royalties, LLC, directly or with one of its affiliates ("***CR***" and together with its successors and assigns, the "***DIP Lender***"). |
| **Documentation** | Initially, this DIP Term Sheet shall serve as the credit agreement for the DIP Facility. Following the entry of the Interim Order, the DIP Lender, in its sole discretion, shall have the right to require the DIP Obligors to enter into a credit agreement incorporating the terms of this DIP Term Sheet and other customary terms and conditions for a facility of this type (the "***DIP Credit Agreement***"), which shall be in form and substance acceptable to the DIP Lender. The DIP Obligors shall also be required to enter into any security agreement or other ancillary documents necessary to carry out the terms of the DIP Facility, as requested by the DIP Lender. The DIP Term Sheet, the Interim Order, the Final Order (if entered), the DIP Budget, the DIP Credit Agreement (if applicable) and all other related security and ancillary documents, shall be referred to herein as the "***DIP Loan Documents.***"<br><br>The DIP Obligors agree to execute such further documents and take such further actions as may be required for the full and complete enjoyment of the rights herein granted to DIP Lender. |
| **DIP Facility:** | The DIP Facility shall be comprised of (i) $3.0 million of new money term loans to be advanced and made available to the Borrowers in multiple draws pursuant to the terms and conditions herein (such loans, the "***New Money DIP Loans***"; the commitment in respect thereof, the "***New Money DIP Commitment***"), and (ii) all existing Bridge Financing Agreement Obligations (as defined below) shall be converted |

***Execution Version***

| | |
|---|---|
| | on a dollar for dollar basis on the Closing Date (as defined below) into loans under the DIP Facility (such loans, the "***Rolled Bridge Loans***", and together with the New Money DIP Loans, the "***DIP Loans***" and the DIP Loans and all other fees, interests, costs, expenses, and other amounts due to the DIP Lender under the DIP Loan Documents, including amounts capitalized into DIP Loans, are collectively, the "***DIP Obligations***"); the commitment in respect thereof, the "***Rolled Bridge Commitment***" and together with the New Money DIP Commitment, the "***DIP Commitments***") pursuant to mechanics agreed to by the Borrowers and the DIP Lender. For the avoidance of doubt, any Bridge Financing Obligations that are converted into Rolled Bridge Loans shall be considered no longer outstanding under the Bridge Financing Agreement upon the effectiveness of such conversion and treated as indefeasibly paid in full and not subject to any claw-back or avoidance.<br><br>Subject to the terms and conditions set forth herein and in the DIP Loan Documents, including the DIP Budget (as defined below), the New Money DIP Loans will be made available to the Borrowers in multiple draws as follows: (i) an initial draw of $2.0 million ($1 million of *Tranche 1* and $1 million of *Tranche 2* DIP Loans) that will be made available to the Borrower upon entry of the Interim DIP Order (as defined below) (the "***Initial Draw***") and (ii) subsequent draws up to $1.0 million (*Tranche 3*) in the aggregate that will be made available to the Borrowers following entry of the Final DIP Order (as defined below) (such entry date, the "***Final Order Entry Date***"). The Rolled Bridge Loans will constitute *Tranche 1* DIP Loans. |
| **Term:** | The DIP Facility will mature on the earliest of (such earliest date, the "***Maturity Date***"):<br><br>(a) 90 days following the Closing Date (the "***Scheduled Maturity Date***");<br><br>(b) the earlier of (i) closing of a sale of all or substantially all of the Debtors' assets or (ii) the effective date of a chapter 11 plan;<br><br>(c) the date of termination of the New Money DIP Commitments, the acceleration of any outstanding DIP Loans, or both in accordance with the terms of the DIP Loan Documents; and<br><br>(d) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code. |
| **Interest:** | Interest on the DIP Obligations shall accrue at a rate per annum equal to SOFR + 18.0% (the "***Interest Rate***") and shall be payable in arrears on the last day of each calendar month. Interest shall be payable in- |

| | |
|---|---|
| | kind and accrued to the balance of the applicable DIP Loan on the last day of each calendar month; *provided* that automatically upon the acceleration of any DIP Loans or upon the Maturity Date, all interest (including Default Interest) shall be due and payable in cash.<br><br>"***SOFR***" shall mean a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.<br><br>"***SOFR Administrator***" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate). |
| **Default Interest:** | Automatically upon the occurrence and during the continuance of an Event of Default, all DIP Obligations, including the principal amount of all DIP Loans outstanding and any other fees or other amounts owed hereunder (or under the DIP Loan Documents), shall from and after the date of the occurrence of such Event of Default bear interest at a rate that is 5.0% per annum in excess of the Interest Rate.<br><br>For the avoidance of doubt, it shall not be a condition to the accrual of Interest at the default rate that a Termination Notice be delivered. |
| **Arrangement Fee** | As consideration for the DIP Lender's negotiation and structuring of the DIP Facility, including arranging the bridge financing arranging, the DIP Lender shall be entitled to an arrangement fee (the "***Arrangement Fee***") of 1.0% of the total DIP Commitments, which Arrangement Fee shall be fully earned upon the Closing and accrued to the balance of the initial DIP Loans made at the Closing. |
| **Commitment Fee:** | In consideration for its commitments to provide the DIP Facility, the DIP Lender shall be entitled to a commitment fee (the "***Commitment Fee***") equal to 4.0% of the total DIP Commitments, which Commitment Fee shall be fully earned upon the Closing and accrued to the balance of the initial DIP Loans made at the Closing. |
| **Exit Fee:** | The DIP Lender shall be entitled to an exit fee, which shall be fully earned and accrued on the date each DIP Loan is made or deemed to be made and due and payable when such DIP Loan is prepaid, repaid or accelerated (or, if earlier, on the Maturity Date) (each an "***Exit Fee***").<br><br>The Exit Fees shall be calculated as follows:<br><br>• *Tranche 1*: For the first $2 million in principal amount of DIP Loans: 3% of the principal amount of such DIP Loans. |

***Execution Version***

| | |
|---|---|
| | • *Tranche 2*: For the next $1 million in principal amount of DIP Loans: 6% of the principal amount of such DIP Loans.<br>• *Tranche 3*: For any DIP Loans in excess of the foregoing: 9% of the principal amount of such DIP Loans. |
| **Use of Cash Collateral:** | The DIP Order shall grant the Debtors authorization to use cash collateral (as defined in section 363 of the Bankruptcy Code) ("***Cash Collateral***") for the limited purpose of funding expenses in accordance with the DIP Budget.<br><br>The Prepetition Secured Lender and the Bridge Lender must consent to the use of Cash Collateral as a condition to the DIP Facility. |
| **Use of Proceeds and Cash Collateral:** | Subject to the DIP Budget and Permitted Variances, proceeds of the DIP Facility and Cash Collateral shall be available solely for the Debtors' working capital needs, including to fund the costs of the administration of the Chapter 11 Cases and to pay professional fees and expenses; *provided* that the Rolled Bridge Loans shall solely be used to effectuate the conversion of Bridge Financing Agreement Obligations into the DIP Facility as set forth above.<br><br>The Debtors shall not be permitted, and covenant not, to use the proceeds of the DIP Facility or Cash Collateral (i) other than to fund the DIP Budget, subject to the Permitted Variances, and (ii) to pay any amount under the "Critical Vendor" and "Materials" line items without the DIP Lender's and Prepetition Secured Lender's consent, such consent not to be unreasonably withheld. On a weekly basis, the Debtors shall provide the DIP Lender and Prepetition Secured Lender a schedule of amounts to be paid for the "Critical Vendor" and "Materials" line items for purposes of soliciting the consent required under clause (ii). |
| **Application of Proceeds** | The Debtors shall apply all proceeds realized by the Debtors in connection with the following to indefeasibly pay the DIP Obligations, unless the DIP Lender, in its sole discretion, consents to a different treatment:<br><br>• Unless the DIP Lender is the purchaser in a Sale Transaction via a credit bid, any Sale Transaction (as defined below);<br>• The proceeds of any financing incurred after the Petition Date;<br>• Insurance proceeds;<br>• Condemnation proceeds;<br>• Tax refunds;<br>• Judgments; and |

***Execution Version***

| | |
|---|---|
| | • Any other "extraordinary receipt." |
| **Budget; Reporting; Variance:** | It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered, all on a consolidated basis: (i) a weekly line-item cash flow forecast covering the period from the date of the filing of the Chapter 11 Cases (the "***Petition Date***") through the anticipated Maturity Date (the "***DIP Cash Flow Forecast***") and (ii) a 13-week budget (the "***DIP Budget***"), in each case, which shall include, at least the line items set forth on **Annex III.**<br><br>Every other Wednesday, starting with Wednesday June 19, 2024, the Debtors shall provide to the DIP Lender a Reporting Package. Each "***Reporting Package***" shall include, as of the end of the prior week: (i) a DIP Cash Flow Forecast reflecting actual amounts and any anticipated changes for future periods; (ii) a variance report showing any favorable or unfavorable variances of cumulative actual amounts versus the cumulative amounts set forth in the prevailing DIP Budget for all weeks since the Petition Date, with a narrative description explaining the variances; and (iii) a proposed revised DIP Budget reflecting the 13-weeks after the last week to which the Reporting Package applies.<br><br>Any revised DIP Budget included in a Reporting Package shall only be deemed accepted, and become the "DIP Budget," upon express written acceptance by the DIP Lender.<br><br>For each Testing Period, the Debtors shall ensure that: (i) the aggregate amount of all receipts collected are at least 75% of the amount set forth in the DIP Budget for the line item "Total Receipts", excluding amounts from "Pre-DIP Funds / DIP Financing" line item (i.e., a 25% unfavorable variance); (ii) the aggregate amount of all "Total Payroll and Related" and "Total Operating Expenses" do not exceed 120% of the amounts set forth in the DIP Budget for each line item in the DIP Budget (i.e., a 20% unfavorable variance); (iii) the aggregate amount of all disbursements for all line items for the "Total Non-Operating Disbursements" section do not exceed 110% of the amount set forth in the DIP Budget for all such line items (i.e., a 10% unfavorable variance); and (iv) the aggregate amount of "Net Cash Flow", excluding amounts from "Pre-DIP Funds / DIP Financing" line item, do not exceed a $400,000 loss as compared to the amounts set forth in the DIP Budget for the line item "Net Cash Flow", excluding amounts from "Pre-DIP Funds / DIP Financing" line item (i.e., a $400,000 unfavorable variance) for the entire Testing Period. Any variance to the DIP Budget that is within the parameters established in the foregoing clauses (i) through (v) shall constitute a "***Permitted Variance***," subject to the aggregate principal amount of DIP Loans never exceeding $4 million. |

***Execution Version***

| | |
|---|---|
| | Each "***Testing Period***" shall begin on the Petition Date and end on the last Saturday occurring prior to the date a Reporting Package is due. The first Testing Period shall end on June 15, 2024, and the first Reporting Package will be due by June 19, 2024. |
| **Collateral** | Subject to the Carve Out, the DIP Obligations shall be secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens on and security interests in (the "***DIP Liens***") all assets and properties (whether tangible, intangible, real, personal, or mixed) of the Debtors, whether owned by or owing to the Debtors on the Petition Date, or acquired after the Petition Date, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, or thereafter acquired by, the Debtors, and regardless of where located, before or after the Petition Date, including, without limitation, (a) all Prepetition Secured Lender Collateral, (b) all Prepetition Bridge Collateral, (c) subject to entry of the Final DIP Order, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof (together "***Avoidance Actions***"), and (d) all interests in leaseholds (except to the extent any DIP Liens thereon would be prohibited by the applicable lease after giving effect to any applicable law regarding the enforceability of such prohibitions) and proceeds thereof (regardless of the aforementioned prohibitions) (all of the foregoing property and assets, collectively, the "***DIP Collateral***"). |
| **Lien Priority** | The DIP Liens shall have the following priorities (subject in all cases to the Carve Out):<br><br>(a) Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected, and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, upon entry of the Final DIP Order, Avoidance Actions (collectively, "***Unencumbered Property***").<br><br>(b) Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected junior priority liens and security |

***Execution Version***

| | |
|---|---|
| | interests in all DIP Collateral that secures obligations that are subject to Senior Permitted Liens (as defined below).<br><br>(c) Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully, and automatically perfected super-priority priming liens and security interests in all DIP Collateral that is subject to valid, perfected and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code) including the Prepetition Secured Lender Liens, except as set forth in subclause (b) above.<br><br>"***Senior Permitted Liens***" means (i) the Carve Out and (ii) the Liens and Security Interests identified on Schedule 2 solely to the extent such liens were on the Petition Date, senior to the Prepetition Secured Lender Liens or were on assets that did not constitute Prepetition Secured Lender Collateral. For the avoidance of doubt, Senior Permitted Liens expressly ***do not include*** the Cedar Liens, Lendspark Liens, Pawn Liens, and Prepetition Secured Lender Liens.<br><br>Except to the extent expressly permitted hereunder, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (as defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors, (b) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien, or security interest of the Debtors or their affiliates, or (d) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the Petition Date. |
| **DIP Superpriority Claims** | Subject to the Carve Out, the DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including administrative expenses of the kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), |

***Execution Version***

| | |
|---|---|
| | 726(b), 1113, and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "***DIP Superpriority Claims***"). |
| **Conditions Precedent to Closing and Funding the Initial Draw:** | The effectiveness of the New Money DIP Commitments and the obligations of the DIP Lender to make available the Initial Draw are subject to the satisfaction (or waiver in writing by the DIP Lender) of each of the following conditions precedent:<br><br>(a) The Interim DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified without the prior written consent of the DIP Lender;<br><br>(b) Receipt of a DIP Budget and DIP Cash Flow Forecast, in each case that is acceptable to the DIP Lender;<br><br>(c) All reasonable fees and expenses (including reasonable and documented out-of-pocket fees and expenses of counsel) of the DIP Lender that have been incurred on or before the funding of the Initial Draw (as well as the then unpaid fees and expenses of the Bridge Lender in respect of the Bridge Financing Agreement) shall have been paid; *provided* that the DIP Lender may elect to have such amounts paid-in-kind and capitalized into additional DIP Loans;<br><br>(d) Receipt by the DIP Lender of a borrowing request in respect of the Initial Draw;<br><br>(e) No default or Event of Default shall have occurred and be continuing; and<br><br>(f) All motions seeking "first day relief" and all orders granting such motions shall be in form and substance acceptable to the DIP Lender.<br><br>The date on which the conditions precedent to closing are satisfied (or waived by the DIP Lender) and the Initial Draw is funded is referred to herein as the "***Closing Date***." |
| **Conditions Precedent to Subsequent Draws of New Money DIP Loans:** | In addition to the previous satisfaction (or waiver in accordance therein) of the conditions precedent set forth in the immediately preceding section, the obligations of the DIP Lender to fund any DIP Loans after the Closing Date are subject to the satisfaction (or waiver in writing by each DIP Lender) of the following conditions precedent:<br><br>(a) The Final DIP Order, in form and substance acceptable to the DIP Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified without the prior written consent of the DIP Lender; |

***Execution Version***

| | |
|---|---|
| | (b) The absence of any default or Event of Default under the DIP Loan Documents;<br><br>(c) Entry of the Sale Procedures Order (as defined below), in form and substance satisfactory to the DIP Lender;<br><br>(d) At the election of the DIP Lender, execution and delivery of the DIP Credit Agreement, in form and substance acceptable to the DIP Lender; and<br><br>(e) Receipt by the DIP Lender (at least three (3) business days prior to the applicable drawing) of a borrowing request. |
| **Representations and Warranties:** | Each Borrowers shall provide "bring-downs" of the representations and warranties in the Prepetition Secured Lender Agreement, other than those concerning the solvency of the Borrowers, to be made as of the Closing and as of the date of each Borrowing. Each such representation and warranty so deemed to be made by each of the Borrowers shall also be deemed, as the context may require, to be made subject to an exception for the filing of the Chapter 11 Cases.<br><br>The DIP Lender may require other customary representations and warranties for facilities of this type to be agreed to including, representations and warranties concerning the existence of material litigation, existence of liens and financings, and the Debtors' compliance with environmental and other applicable laws. |
| **Covenants:** | The affirmative and negative covenants set forth in Articles 5 and 6 of the Prepetition Secured Lender Agreement shall apply other than Sections 5.1, 5.10, 5.13 through 5.15 and clauses (i) and (iv) of Section 5.3, and provided that for purposes of Section 6.1(a), no Indebtedness other than the DIP Facility may be incurred from and after the Closing, except where such Indebtedness would not result in the occurrence of an Event of Default. No such covenant shall be deemed to have been breached as a result of the filing of the Chapter 11 Cases or entry into the DIP Facility.<br><br>In addition the Borrowers shall:<br><br>• Make the Debtors' senior management and advisors available to the DIP Lender weekly (if requested) to discuss all matters concerning the Debtors, their business, and the Chapter 11 Cases;<br>• At the election of the DIP Lender, attend daily liquidity calls consistent with the parties' prior course of dealing;<br>• Provide the reporting described herein and such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and |

***Execution Version***

| | |
|---|---|
| | transactions of the Debtors, or concerning any matter that may affect the administration of the estates, as the DIP Lender may from time to time reasonably request within five (5) business days of any such request; and<br>• The DIP Lender and its respective agents and advisors shall have full access, upon reasonable notice during normal business hours, to the Debtors' business records, business premises, and to the DIP Collateral to enable the DIP Lender or its agents and advisors to (a) review, appraise, and evaluate the physical condition of the DIP Collateral, (b) inspect and review the financial records and all other records of the Debtors concerning the operation of the Debtors' business, and (c) evaluate the Debtors' overall financial condition and all other records relating to the operations of the Debtors. The Debtors shall fully cooperate with the DIP Lender regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the DIP Lender and its professionals and consultants to conduct such reviews, evaluations and inspections.<br><br>In addition the Borrower shall not:<br>• Pay any amount that is not permitted by the DIP Budget and Permitted Variances;<br>• File, support or endorse any plan of reorganization or propose any sale of assets outside the ordinary course of business that has not been approved by the DIP Lender (unless such plan or sale is determined by the DIP Lender, in its discretion, to result in the payment in full in cash of all obligations due under the DIP Facility);<br>• File, support or endorse any pleading in the Chapter 11 Cases that would result in an Event of Default if granted or approved; and<br>• Make or permit to be made any change to the DIP Orders. |
| **Carve Out:** | The DIP Orders shall include the professional fee "carve out" (the "***Carve Out***") as set forth on **Annex II** hereto. |
| **Milestones:** | The Debtors shall timely comply with the milestones set forth below (collectively, the "***Milestones***"), which Milestones may be extended in writing by the DIP Lender (provided that email consent from counsel to the DIP Lender shall constitute sufficient written direction) and the DIP Lender in its sole and absolute discretion.<br><br>(a) On or prior to June 3, 2024, the Debtors shall file chapter 11 petitions (such date, the "***Petition Date***"), and the Debtors shall have |

***Execution Version***

| | |
|---|---|
| | filed motions, in form and substance acceptable to the DIP Lender, seeking approval of the DIP Facility on an interim and final basis (the "***DIP Motion***");<br><br>(b) Within two (2) business days of the Petition Date, the Bankruptcy Court shall have entered an order (the "***Interim DIP Order***"), in form and substance acceptable to the DIP Lender, approving the DIP Facility on an interim basis and shall include approval of the Commitment Fee, Arrangement Fee, Exit Fees, issuance of the Rolled Bridge Loan, and the payment of the other amounts required under this DIP Term Sheet;<br><br>(c) By the later of (i) one (1) business day after execution of the Stalking Horse Agreement or (ii) two (2) business days after the Petition Date, the Debtors shall have filed a motion seeking entry of the Sale Procedures Order (as defined below) and approval of the Stalking Horse Agreement. "***Stalking Horse Agreement***" means that certain asset purchase agreement by and among Clean Royalties, LLC and the Debtors for the sale of substantially all of the Debtors' assets;<br><br>(d) On or before the day that is 25 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving the DIP Motion on a final basis (the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***");<br><br>(e) On or before the day that is 25 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving procedures governing the sale and marketing process for the a sale of all or substantially all of the Debtors' assets, which procedures shall be in form and substance acceptable to the DIP Lender, and designating the Stalking Horse Agreement as the stalking horse bid (the "***Sale Procedures Order***");<br><br>(f) On or before June 5, 2024, the Debtors shall have commenced the process of distributing a "teaser" and/or "confidential information memorandum" and/or similar document for a Sale Transaction;<br><br>(g) On or before July 17, 2024, the Debtors shall have commenced an auction for the Sale Transaction or cancelled such auction and declared the Stalking Horse Agreement the "successful bid;"<br><br>(h) On or before July 24, 2024, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Borrowers and the DIP Lender, approving the Stalking Horse Agreement or such other higher and better bid accepted pursuant to the Sale Procedures Order (together with any other sale of the Debtors' assets, each a "***Sale Transaction***"); and |

***Execution Version***

| | |
|---|---|
| | (g) On or before August 2, the Debtors shall have consummated the Sale Transactions. |
| **Events of Default:** | The DIP Facility shall be subject to events of default set forth on **Annex I** hereto, and the DIP Credit Agreement (if entered into) may include other events of default customary for facilities of this type and otherwise acceptable to the DIP Lender (each, an "***Event of Default***" and, collectively, the "***Events of Default***"). |
| **Remedies upon Events of Default:** | Immediately upon the occurrence and during the continuation of an Event of Default, unless such Event of Default has been waived by the DIP Lender, without any application, motion, or notice to, hearing before, or order from, the Bankruptcy Court, subject to the DIP Orders and the Remedies Notice Period (defined below), the DIP Lender may send a notice to the Debtors, their lead restructuring counsel, the Office of the United States Trustee, and counsel to any official committee of unsecured creditors (the "***Termination Notice***") declaring (i) all DIP Obligations owing under the DIP Loan Documents to be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens, DIP Superpriority Claims or the DIP Obligations, (iv) the Carve Out shall be triggered, and (v) interest under the DIP Facility shall accrue at the Default Rate.<br><br>The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Lender and Bridge Lender (if Bridge Financing Obligations remain outstanding) shall be modified five (5) business days after delivery of the Termination Notice (the "***Remedies Notice Period***"). Absent Bankruptcy Court order entered prior to the expiration of the Remedies Notice Period, the automatic stay, as to the DIP Lender and Bridge Lender, shall be terminated at the end of the Remedies Notice Period without further notice or order. Upon such stay termination, the DIP Lender and the Bridge Lender shall be permitted to exercise all remedies set forth in the DIP Loan Documents and as otherwise available at law without further order of or application or motion to the Bankruptcy Court consistent with this Interim DIP Order.<br><br>During any Remedies Notice Period, the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of the DIP Loan Documents only to make payroll and fund critical expenses |

***Execution Version***

| | |
|---|---|
| | necessary to preserve the DIP Collateral, in each case in accordance with the terms of the approved DIP Budget and the DIP Order. |
| **Expenses:** | Subject to the DIP Loan Documents, the Debtors, on a joint and several basis, shall be obligated to pay or reimburse all reasonable and documented out-of-pocket fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of counsel to the DIP Lender, and, as necessary, other local counsel in their capacity as advisors to the DIP Lender, incurred in any of their respective capacities in connection with the Chapter 11 Cases, including, but not limited to, the preparation, execution and delivery of the DIP Loan Documents and the funding of the DIP Facility, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Facility Documents (whether or not executed) and in connection with the enforcement or protection of any of its rights and remedies under the DIP Facility Documents ("Lender Expenses").<br><br>At the election of the DIP Lender, such amounts may be paid by the DIP Lender, and in such instance, such amounts shall be capitalized and treated as additional DIP Loans.<br><br>Notwithstanding anything herein to contrary, if Lender Expenses (including similar amounts paid to the Bridge Lender) exceed $150,000, any amounts in excess of $150,000 shall continue to accrue as DIP Obligations, but shall only be paid upon (i) satisfaction of the Prepetition Secured Lender Obligations or (ii) consent of the Prepetition Secured Lender. |
| **Indemnification:** | The Debtors shall indemnify and hold harmless the DIP Lender and each of its affiliates and each of the respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph |

| | |
|---|---|
| | applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtors, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Debtors further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Waivers:** | The DIP Orders will include terms and conditions customary for interim or final DIP financing orders and shall be acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions, and waivers of the imposition of costs pursuant to section 506(c) of the Bankruptcy Code and the "equities of the case" exception in section 552(b) of the Bankruptcy Code, in each case, to the extent applicable to the DIP Obligations and Bridge Financing Agreement. |
| **Adequate Protection:** | The DIP Orders shall grant the Prepetition Secured Lender the following adequate protection (the "***Adequate Protection***") of its prepetition security interests for, and equal in amount to, the diminution in the value of such party's prepetition security interests, calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not such diminution in value results from the sale, lease or use by the Debtors of such party's collateral (including, without limitation, cash collateral), the priming of liens and security interest securing the obligations owed to such party, or the stay of enforcement of any pre-petition security interest of such party arising from section 362 of the Bankruptcy Code, or otherwise, consisting of: (a) valid, binding, enforceable, and perfected replacement liens on and security interests in the DIP Collateral (the "***Adequate Protection Liens***"); and (b) superpriority administrative expense claims under sections 503(b) and 507(b) of the Bankruptcy Code senior to all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever (including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and |

| | |
|---|---|
| | 1114 of the Bankruptcy Code or otherwise), except as expressly set forth herein (the "***Adequate Protection Claims***"). |
| **Order of Priority of Adequate Protection:** | The Adequate Protection Liens granted to Prepetition Secured Lender shall be:<br>• Junior to the Carve-Out<br>• Junior to the DIP Liens<br>• Junior to the Senior Permitted Liens, with respect to the collateral to which such liens attach<br>• Senior to any other liens or security interests<br>The Adequate Protection Claims granted to the Prepetition Secured Lender shall be:<br>• Junior to the Carve-Out<br>• Junior to the DIP Superpriority Claim |
| **Governing Law:** | New York, but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York (and, to the extent applicable, the Bankruptcy Code). |
| **Amendments and Waivers:** | Amendments and waivers shall be in writing and shall require the consent of the DIP Lender. |
| **Assignments and Participations:** | The DIP Lender shall be entitled to assign any of its rights and obligations hereunder, with notice to the Debtors but without any obligation to obtain the consent of any person or entity. The DIP Lender shall be entitled to grant participations in its rights and obligations hereunder, without any obligation to give notice to, or obtain the consent of, any person or entity. |
| **Stipulations:** | The DIP Orders shall include customary stipulations as to the Bridge Financing Agreement, Bridge Financing Obligations, Bridge Financing Liens, and Bridge Financing Collateral and such stipulations shall not be subject to any challenge period. |
| **Release** | The DIP Orders shall have customary releases for the DIP Lender and Bridge Lender. |

***Execution Version***

| | |
|---|---|
| **Prepetition Facilities:** | Bridge Financing Agreement: That certain (i) Senior Secured Promissory Note, dated May 15, 2024 (the "***Bridge Note***;" the obligations arising thereunder, the "***Bridge Financing Obligations***"), between iSun and CR (in such capacity , the "***Bridge Lender***") and (ii) Security Agreement, dated May 14, 2024, by and among iSun, CR, and the other Debtors party thereto (the "***Bridge Security Agreement***;" and together with the Note, each, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, jointly, the "***Bridge Financing Agreement***;" the liens and security interests granted thereby, the "***Bridge Financing Liens***;" and the collateral subject to such liens, the "***Bridge Financing Collateral***"), between iSun, certain subsidiaries of iSun, as Guarantors, and CR.<br><br>Decathlon Financing Agreement: That certain Revenue Loan and Security Agreement dated December 12, 2023, by and among iSun, the Guarantors parties thereto, and Decathlon Growth Credit, LLC, a Delaware limited liability company ("***Decathlon***" or "***Prepetition Secured Lender***"; such agreement, the "***Prepetition Secured Lender Agreement***"; such facility, the "***Prepetition Secured Facility***"; the obligations thereunder, the "***Prepetition Secured Obligations***"; the asserted liens securing such obligations, the "***Prepetition Secured Lender Liens***"; and the asserted collateral subject to such liens, the "***Prepetition Secured Lender Collateral***").<br><br>Lendspark Corporation Financing Agreement: That certain Agreement for the Purchase and Sale of Future Receipts, Agreement No. 3184, dated April 3, 2023 by and between iSun and its affiliated entities and Lendspark Corporation (the asserted liens securing the purported obligations under such agreement, the "***Lendspark Liens***").<br><br>Cedar Advance LLC Financing Agreement: That certain Standard Merchant Cash Agreement dated January 4, 2024 by and between iSun Industrial LLC and its affiliated entities and Cedar Advance LLC (the asserted liens securing the purported obligations under such agreement, the "***Cedar Liens***").<br><br>Pawn Funding Financing Agreement: That certain Standard Merchant Cash Agreement dated January 4, 2024 by and between iSun Industrial LLC and its affiliated entities (the asserted liens securing the purported obligations under such agreement, the "***Pawn Liens***"). |

The Borrowers must evidence their acceptance of this binding Term Sheet by signing in the space indicated below. If the DIP Lender has not received counterparts hereof so executed by the Borrowers by 11:59 p.m. EDT on Monday, June 3, 2024, this offer to provide a commitment for the DIP Facility described herein shall expire and be of no further force or effect, and neither the DIP Lender nor any other person or entity shall have any further obligations or liability with respect to such DIP Facility or any other financing.

CLEAN ROYALTIES, LLC, as DIP Lender

By: Joshua Sanger
Joshua Sanger (Jun 3, 2024 15:41 CDT)

Name: Joshua Sanger

Title: Authorized Signatory

The Borrowers hereby AGREE TO and ACCEPT the foregoing DIP Term Sheet by signing in the space indicated below.

AGREED TO AND ACCEPTED by the Borrowers:

**iSun, Inc.**
**Hudson Solar Service, LLC**
**Hudson Valley Clean Energy, Inc.**
**iSun Corporate, LLC**
**iSun Energy LLC**
**iSun Industrial, LLC**
**iSun Residential, Inc.**
**iSun Utility, LLC**
**Liberty Electric, Inc.**
**Peck Electric Co.**
**SolarCommunities, Inc.**
**Sun CSA 36, LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**SCHEDULE 1**

**ADDITIONAL BORROWERS**

- Hudson Solar Service, LLC
- Hudson Valley Clean Energy, Inc.
- iSun Corporate, LLC
- iSun Energy LLC
- iSun Industrial, LLC
- iSun Residential, Inc.
- iSun Utility, LLC
- Liberty Electric, Inc.
- Peck Electric Co.
- SolarCommunities, Inc.
- Sun CSA 36, LLC

**SCHEDULE 2**

**SENIOR LIENS**

| DEBTOR | SECURED PARTY | JURISCTION | FILING NUMBER |
|---|---|---|---|
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 20-368848 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 20-378269 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 21-389931 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 21-391436 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 20-368848 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 22-410845 |
| SolarCommunities, Inc. | Toyota Industries Commercial Finance, Inc. | VT | 22-413609 |
| Peck Electric Co. | Canadian Solar (USA) Inc. | VT | 15-290279 |
| Peck Electric Co. | JCB Finance, a program of Bank of the West | VT | 19-352576 |
| Peck Electric Co. | JCB Finance, a program of Bank of the West | VT | 19-352578 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-355069 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-356542 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-356543 |
| Peck Electric Co. | NBT Bank, National Association | VT | 19-356544 |
| Peck Electric Co. | Balboa Capital Corporation | VT | 23-427275 |

**Annex I**

**DIP Events of Default**

Each and any one or more of the following shall be an "***Event of Default***" if it occurs for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

i. the failure to meet any of the Milestones[1] unless (a) such failure is the result of any act, omission, or delay on the part of any of the DIP Lender or (b) such Milestone is waived or extended by the DIP Lender in writing;

ii. the Borrowers shall fail to pay any amount under the DIP Facility as and when due;

iii. any representation or warranty made by the Borrowers under the DIP Loan Documents, including in any certificate, document or financial or other statement furnished by it at any time under or in connection with the DIP Loan Document, shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished;

iv. any provision of the DIP Loan Documents shall cease to be valid and binding on the Borrowers, or any Borrower shall so assert in any pleading filed in any court;

v. any DIP Obligor files, files a motion seeking approval of, proposes or supports any plan of liquidation, asset sale of all or any material portion of the DIP Obligors' assets (other than a sale to the DIP Lender or one of its affiliates), or a plan of reorganization, other than one that (i) provides for the indefeasible payment in full in cash of the DIP Obligations and the Bridge Financing Obligations on the effective date thereof and (ii) has committed financing to fund all payments required under the plan or to pay the purchase price in the sale;

vi. any DIP Obligor seeks to obtain, or files a motion for authority to obtain, financing on a secured basis unless the proceeds of such financing shall be used to indefeasibly pay in full all DIP Obligations at the closing of such financing;

vii. the DIP Obligors fail to provide the DIP Lender with at least three (3) calendar days' advance notice of substantially final draft copies of any material motion, pleading, agreement, instrument, order, form, or other document the DIP Obligors intend to file with the Bankruptcy Court in connection with a plan or sale;

viii. any DIP Obligor files a motion, or fails to timely object to any motion filed by any third party, that would result in authorization to pay, or impose an obligation on the Debtors or their estates to pay, any amount that is not permitted to be paid under the DIP Budget, subject to the Permitted Variances;

ix. the Bankruptcy Court enters an order, or the DIP Obligors file any motion or any request for relief (other than with the consent of the DIP Lender) that seeks, to (a) dismiss any of

---

[1] Capitalized terms have the meaning ascribed to them in the DIP Term Sheet.

the Chapter 11 Cases, (b) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appoint a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; or (d) terminate the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

x.   the Bankruptcy Court enters an order granting relief, or any DIP Obligor fails to timely object to any request for an order or other relief, terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) to authorize any party to proceed against any material asset of the DIP Obligors or in such a manner that would adversely affect the DIP Obligors' ability to operate their businesses in the ordinary course or requires the Debtor to pay any claim arising prior to the Petition Date;

xi.   after entry by the Bankruptcy Court of any DIP Order, the relief and authorizations set forth in such order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended, in each case, in a manner materially inconsistent with the terms set forth in the DIP Loan Documents, or the Debtors seek the entry of any such relief, in each case without the consent of the DIP Lender;

xii.   the failure of the Debtors to comply with the DIP Orders or DIP Loan Documents, which remains uncured for a period of five (5) business days after the receipt of written notice of such event or is not otherwise waived in accordance with the terms thereof;

xiii.   the Debtors (a) engage in or publicly support any challenge to the validity, security, perfection, priority, extent, or enforceability of the DIP Loan Documents, the DIP Liens, the DIP Obligations, the Bridge Financing Obligations or the Bridge Financing Liens, including seeking to equitably subordinate or avoid such liens or claims or (b) engage in any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against any of the DIP Lender or the Bridge Lender;

xiv.   the entry of a judgment or order by the Bankruptcy Court (i) sustaining any defense, objection, or challenge to the validity, security, perfection, priority, extent or enforceability of the DIP Loan Documents, the DIP Liens, the DIP Obligations, the Bridge Financing Agreement Obligations, or the Bridge Financing Liens, or (ii) avoiding, subordinating, recharacterizing, or otherwise impairing any of the DIP Obligations, DIP Superpriority Claims, DIP Liens, the Bridge Financing Obligations or the Bridge Financing Liens;

xv.   the entry of any order in any of the Chapter 11 Cases surcharging any of the DIP Collateral with respect to the DIP Lender or Bridge Lender, as applicable, whether under Section 506(c) of the Bankruptcy Code or otherwise;

xvi.   the Bankruptcy Court enters an order allowing any lien or administrative expense claim priority over or ranking in parity with the DIP Liens, DIP Superpriority Claims or the rights of the DIP Lender;

xvii.   the Bankruptcy Court enters an order granting adequate protection with respect to any of the existing secured debt of the Debtors (other than as set forth in the DIP Orders);

xviii.   the use of Cash Collateral provided for in the DIP Orders is either terminated or modified, in each case, without the prior written consent of the DIP Lender; and

xix.   any use of proceeds of the DIP Facility or Cash Collateral inconsistent with the DIP Budget and the Permitted Variance.

**Annex II**

**Carve Out**

(a) Carve Out. As used in this [Final/Interim] Order, the "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the fees and expenses (and any monthly, restructuring, or sale fees) (the "***Allowed Professional Fees***") incurred by (or payable to) persons or firms retained by the Debtors[2] pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and any official committee of unsecured creditors pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***") at any time before or on the first business day following delivery by the DIP Lender of a Termination Notice (and with respect to any monthly, restructuring, or sale fees, at any time before the date of delivery of the Termination Notice), in the aggregate not to exceed the amount set forth in the prevailing DIP Budget for all Professional Persons through the date a Termination Notice is delivered; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by the DIP Lender of the Termination Notice, to the extent allowed at any

---

[2] Capitalized terms not otherwise defined in this Annex II have the meaning ascribed to them in the DIP Term Sheet.

time, whether by interim order, procedural order, or otherwise, for all Professional Persons in the aggregate.

(b) No Direct Obligation To Pay Allowed Professional Fees. Neither the DIP Lender nor the Bridge Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this [Interim/Final] Order or otherwise shall be construed to obligate the DIP Lender or the Bridge Lender in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c) Payment of Allowed Amounts within Carve Out. Any payment or reimbursement made to Professional Persons in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

**Annex III**

iSun, Inc.
DIP Budget

| | Pre-Petition | Pre-Petition | Pre-Petition | Interim DIP Funding Petition Date 6/3 | IB Process Start 6/14 | DIP Funding 6/19 | | | IOI Deadline 7/5 | | Bid Submission 7/26 | 363 Auction 7/31 | Proj. Closing 8/9 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 15-Week |
| Date (Week Ending) | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | 6/21 | 6/28 | 7/5 | 7/12 | 7/19 | 7/26 | 8/2 | 8/9 | 8/16 | 8/23 | |
| Budget/Actual | Actual | Actual | Actual | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget |
| **CASH FLOW** | | | | | | | | | | | | | | | | |
| **RECEIPTS** | | | | | | | | | | | | | | | | |
| Customer Receipts | $ 128,029 | $ 346,271 | $ 13,393 | $ 283,000 | $ 500,000 | $ 100,000 | $ 50,533 | $ 500,000 | $ 50,533 | $ 50,000 | $ 250,000 | $ 50,533 | $ 50,533 | $ - | $ - | $ 2,372,827 |
| Other Receipts | - | - | 43,121 | (140,282) | 114,869 | (169,980) | 106,953 | (650) | 149,138 | 48,909 | 106,040 | (112,060) | - | - | - | 146,058 |
| Pre-DIP Funds / DIP Financing | 500,000 | 500,000 | - | 500,000 | - | 1,500,000 | - | - | - | - | - | 1,000,000 | - | - | - | 4,000,000 |
| **TOTAL RECEIPTS** | $ 628,029 | $ 846,271 | $ 56,514 | $ 642,718 | $ 614,869 | $ 1,430,020 | $ 157,486 | $ 499,350 | $ 199,671 | $ 98,909 | $ 356,040 | $ 938,473 | $ 50,533 | $ - | $ - | $ 6,518,885 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | |
| **Payroll & Benefits** | | | | | | | | | | | | | | | | |
| Payroll | 119,872 | 207,053 | 53,710 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | 146,152 | 56,873 | - | - | $ 1,395,757 |
| Union Benefits | - | 67,567 | - | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | 158,500 | 8,500 | 8,500 | 8,500 | - | - | 452,567 |
| Non-Union Benefits | 34,644 | 1,717 | 13,837 | 35,000 | 12,500 | 62,000 | 12,500 | 35,000 | 12,500 | 22,000 | 12,500 | 35,000 | 12,500 | - | - | 301,699 |
| Total Payroll and Related | $ 154,516 | $ 276,337 | $ 67,547 | $ 189,652 | $ 77,873 | $ 366,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ 326,652 | $ 77,873 | $ 189,652 | $ 77,873 | $ - | $ - | $ 2,150,023 |
| **Operating Expenses** | | | | | | | | | | | | | | | | |
| Materials | 62,725 | 47,966 | - | - | - | 87,500 | 47,500 | 47,500 | 47,500 | 87,500 | 47,500 | 47,500 | 47,500 | - | - | 570,691 |
| Critical Vendors | - | - | - | 136,690 | 136,690 | 136,690 | - | - | - | - | - | - | - | - | - | 410,071 |
| Insurance | 31,032 | 115,669 | - | 110,161 | - | - | 5,953 | 110,161 | - | - | 5,953 | 110,161 | - | - | - | 489,091 |
| Rent | - | 13,308 | - | 9,565 | - | - | - | 9,565 | - | - | - | 9,565 | - | - | - | 42,003 |
| Engineering/Consulting Fees | 75,000 | - | 10,172 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | 8,000 | 8,000 | 16,000 | 8,000 | - | - | 189,172 |
| Other | 31,165 | 2,254 | 15,493 | 19,145 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | 12,880 | 5,000 | 10,798 | 5,000 | - | - | 140,413 |
| Total Operating Expenses | $ 199,922 | $ 179,197 | $ 25,665 | $ 291,562 | $ 149,690 | $ 245,070 | $ 66,453 | $ 194,024 | $ 60,500 | $ 108,380 | $ 66,453 | $ 194,024 | $ 60,500 | $ - | $ - | $ 1,841,441 |
| **CASH FLOW FROM OPERATIONS** | $ 273,591 | $ 390,738 | $ (36,698) | $ 161,505 | $ 387,306 | $ 818,298 | $ 13,160 | $ 115,675 | $ 61,299 | $ (336,123) | $ 211,714 | $ 554,798 | $ (87,839) | $ - | $ - | $ 2,527,421 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | |
| Additional Debt Payments | 5,000 | 5,000 | 3,500 | - | - | - | - | - | - | - | - | - | - | - | - | 13,500 |
| Company CFO/CRO and FA | - | 105,770 | 184,609 | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 45,000 | 40,000 | 40,000 | - | - | 715,380 |
| Investment Banker | - | 52,337 | - | - | - | - | - | - | 25,000 | - | - | 300,000 | - | - | - | 377,337 |
| Bankruptcy Counsel | 75,000 | - | 20,856 | - | - | - | - | 35,000 | - | - | - | - | 70,000 | 70,000 | - | 270,856 |
| Company Counsel | - | 64,000 | 1,879 | - | - | 44,000 | - | - | - | 44,000 | - | - | - | - | - | 153,879 |
| Claims & Noticing Agent | - | - | 25,000 | - | - | - | - | 12,500 | - | - | - | - | 50,000 | 37,500 | - | 125,000 |
| Unsecured Creditors Committee Professional Fees | - | - | - | - | - | - | - | 18,750 | - | - | - | - | 75,000 | 56,250 | - | 150,000 |
| Board Counsel | - | 75,000 | - | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | - | 225,000 |
| DIP Legal Lender Fees | - | - | - | 100,000 | - | 50,000 | - | - | - | - | - | - | - | - | - | 150,000 |
| KEIP / KERP | - | - | - | - | - | 50,000 | - | - | - | - | - | - | - | - | - | 50,000 |
| D&O Tail Insurance | - | - | 462,070 | - | - | - | - | - | - | - | - | - | - | - | - | 462,070 |
| Compensation for iSun Board | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | 39,822 | - | - | - | 56,527 | 96,350 |
| Total Non-Operating Disbursements | $ 80,000 | $ 302,107 | $ 697,914 | $ 100,000 | $ 80,000 | $ 194,000 | $ 80,000 | $ 116,250 | $ 105,000 | $ 94,000 | $ 114,822 | $ 340,000 | $ 265,000 | $ 163,750 | $ 56,527 | $ 2,789,372 |
| **TOTAL DISBURSEMENTS** | $ 434,438 | $ 757,641 | $ 791,126 | $ 581,213 | $ 307,563 | $ 805,722 | $ 224,326 | $ 499,926 | $ 243,373 | $ 528,032 | $ 259,149 | $ 723,676 | $ 403,373 | $ 163,750 | $ 56,527 | $ 3,231,483 |
| **NET CASH FLOW** | $ 193,591 | $ 88,630 | $ (734,612) | $ 61,505 | $ 307,306 | $ 624,298 | $ (66,840) | $ (575) | $ (43,701) | $ (430,123) | $ 96,891 | $ 214,798 | $ (352,839) | $ (163,750) | $ (56,527) | $ 3,287,402 |
| **CUMULATIVE NET CASH FLOW** | $ 193,591 | $ 282,221 | $ (452,391) | $ (390,886) | $ (83,581) | $ 540,737 | $ 473,877 | $ 473,302 | $ 429,600 | $ (522) | $ 96,369 | $ 311,166 | $ (41,673) | $ (205,423) | $ (261,950) | $ (261,950) |
| **ROLLFORWARDS** | | | | | | | | | | | | | | | | |
| **CASH ON HAND** | | | | | | | | | | | | | | | | |
| Beginning Balance | 560,223 | 753,814 | 842,444 | 107,832 | 169,336 | 476,642 | 1,100,940 | 1,034,100 | 1,033,524 | 989,823 | 559,700 | 656,591 | 871,389 | 518,550 | 354,800 | $ 560,223 |
| Net Cash Flow | 193,591 | 88,630 | (734,612) | 61,505 | 307,306 | 624,298 | (66,840) | (575) | (43,701) | (430,123) | 96,891 | 214,798 | (352,839) | (163,750) | (56,527) | (261,950) |
| Ending Balance | $ 753,814 | $ 842,444 | $ 107,832 | $ 169,336 | $ 476,642 | $ 1,100,940 | $ 1,034,100 | $ 1,033,524 | $ 989,823 | $ 559,700 | $ 656,591 | $ 871,389 | $ 518,550 | $ 354,800 | $ 298,272 | $ 298,272 |

# iSun - DIP Term Sheet (Execution Version)

Final Audit Report 2024-06-03

| | |
|---|---|
| Created: | 2024-06-03 |
| By: | Ally Herebic (allyson.herebic@siltstone.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAKBbUZIZIP52-Ms-4hL2bPQqw_14iDfcE |

## "iSun - DIP Term Sheet (Execution Version)" History

Document created by Ally Herebic (allyson.herebic@siltstone.com)
2024-06-03 - 8:21:44 PM GMT

Document emailed to joshua.sanger@siltstone.com for signature
2024-06-03 - 8:21:49 PM GMT

Email viewed by joshua.sanger@siltstone.com
2024-06-03 - 8:40:53 PM GMT

Signer joshua.sanger@siltstone.com entered name at signing as Joshua Sanger
2024-06-03 - 8:41:45 PM GMT

Document e-signed by Joshua Sanger (joshua.sanger@siltstone.com)
Signature Date: 2024-06-03 - 8:41:47 PM GMT - Time Source: server

Agreement completed.
2024-06-03 - 8:41:47 PM GMT