**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **iSUN Inc.,** *et al.,* | § | **Case No. 24-11144 (TMH)** |
| | § | |
| **Debtors**[1] | § | **(Jointly Administered)** |
| | § | **Re: ECF Nos. 65, 183, 186** |
| | § | **Hearing Date:** July 30, 2024 at 2pm (ET) |
| | § | **Obj. Deadline:** July 23, 2024 at 4pm (ET) |

**CONTRACT OBJECTION AND RESERVATION OF RIGHTS OF BNRG
RENEWABLES LIMITED WITH RESPECT TO DEBTORS' AMENDED NOTICE OF
POTENTIAL CONTRACT ASSUMPTION AND ASSIGNMENT**

**-AND-**

**OBJECTION AND RESERVATION OF RIGHTS OF BNRG
RENEWABLES LIMITED WITH RESPECT TO DEBTORS'
MOTION FOR ENTRY OF A SALE ORDER**

BNRG Renewables Limited ("**BNRG**") submits this Contract Objection[2] and Reservation

of Rights to the Debtors' *Amended Notice of Potential Contract Assumption and Assignment* [Dkt.

No. 186] (the "**Contract Notice**") and separately objects to Debtors' request for a Sale Order

pursuant to the *Debtors' Motion For Entry Of Orders (A) (I) Approving Bid Procedures In Connection*

*With The Sale Of Substantially All Of The Debtors' Assets, (II) Scheduling An Auction And A Sale Hearing,*

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172) (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411) ; (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (7316); (collectively referred to as the "Debtors"). The Debtors' mailing address is: 400 Avenue D, Suite 10 Williston, Vermont 05495, with copies to Gellert Seitz Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the *Amended Notice of Potential Contract Assumption and Assignment* [Dkt. No. 186].

*(III) Approving The Form And Manner Of Notice Thereof, (IV) Authorizing The Debtors To Enter Into The Stalking Horse Agreement, (V) Approving Procedures For The Assumption And Assignment Of Contracts And Leases, And (VI) Granting Related Relief; And (B) (I) Approving The Purchase Agreement; (II)) Approving The Sale Of Substantially All Of The Debtors' Assets Free And Clear; (III) Approving The Assumption And Assignment Of Contracts And Leases; And (IV) Granting Related Relief* [Docket No. 65] (the "**Sale Motion**").

In brief, BNRG has no contractual relationship with iSun Industrial, LLC ("**iSun Industrial**") or any other Debtor in these cases and, therefore, BNRG should appear nowhere on the Contract Schedule. Instead, iSun Industrial entered a series of Engineering, Procurement and Construction Agreements with BNRG subsidiaries. At this time, BNRG has sold all of those subsidiaries but one: BD Solar Larson, LLC ("**Solar Larson**"), which developed the Larson solar project located in Scarborough, Maine ("**Larson Project**"). The relationship between iSun Industrial and Solar Larson was governed by an *Engineering, Procurement and Construction Agreement dated December 23, 2022* (the "**Larson Contract**").

Prior to iSun Industrial filing its bankruptcy petition, and given iSun Industrial's repeated defaults and failures to execute on the Larson Project, Solar Larson terminated the Larson Contract. A true and accurate copy of Solar Larson's prepetition notice of termination is appended hereto as **Exhibit A**. In light of Solar Larson's pre-petition termination of the Larson Contract, iSun Industrial's performance bond surety, Merchants National Bonding, Inc. ("**Merchants**"), has undertaken to secure another contractor to complete the Larson project as it is required to do under the terms of the performance bond issued by iSun Industrial in accordance with the provisions of the Larson Contract.

Notwithstanding the foregoing prepetition termination of the Larson Contract, the Debtors identify several purported "executory" contracts between Solar Larson or BNRG and iSun

Industrial in the Contract Notice and assign a $0.00 Cure Amount to each contract.  The Contract Notice then purports to establish that, "until such time as the Contract Objection can be resolved, the Contract *shall be conditionally assumed and assigned* pending a resolution of the Contract Objection after notice and a hearing."  Contract Notice, p. 3 (emphasis supplied).  When, as here, an executory contract has been terminated prior to the petition date, § 365 of the Bankruptcy Code is inapplicable since there is nothing to assume or reject – "conditionally" or otherwise – and the Larson Contract should not appear on the Contract Schedule.  Separately, the Debtors cannot transfer to the Stalking Horse Bidder (or any other successful bidder) Avoidance Actions or "Payment Intangible" claims against BNRG *via* a sale "free and clear" of any rights and/or defenses BNRG may have in respect of such obligations and actions the Debtors' request to do so in the Sale Motion should be denied.

In support thereof, BNRG respectfully states as follows:

### I.  General Background

*A.     Bankruptcy Case Background.*

1.      On June 3rd, 2024 (the "**Petition Date**"), iSun, Inc. and eleven (11) of its affiliated debtors (collectively, the "**Debtors**") each filed a voluntary petition for bankruptcy relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

2.      After the Petition Date, the Debtors sought approval of a Sale of substantially all their assets pursuant to the Sale Motion to Clean Royalties, LLC (the "**Stalking Horse Bidder**"), pursuant to an *Amended and Restated Asset Purchase Agreement dated July 9, 2024* (the "**Stalking Horse APA**") attached to the *Order (A) (I) Approving Bid Procedures In Connection With The Sale Of Substantially All Of The Debtors Assets, (II) Scheduling An Auction And A Sale Hearing, (III)*

*Approving The Form And Manner Of Notice Thereof, (IV) Authorizing The Debtors To Enter Into The Stalking Horse Agreement, (V) Approving Procedures For The Assumption And Assignment Of Contracts And Leases, And (VI) Granting Related Relief; And (B)(I) Approving The Purchase Agreement; (II)) Approving The Sale Of Substantially All Of The Debtors Assets Free And Clear; (III) Approving The Assumption And Assignment Of Contracts And Leases; And (IV) Granting Related Relief* [Dkt. No. 183] (the "**Bidding Procedures Order**").

3. On July 11, 2024, pursuant to the Bidding Procedures Order, the Debtors filed their Contract Notice. The Contract Notice identifies the following purported "executory" contracts (including, apparently, Solar Larson's notice of termination itself) involved in this Objection:

| Case # | Debtor Name | Counter Party | Contract Description | Cure Amount |
|---|---|---|---|---|
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Third Party Service Agreement: 5th Amendment to Second Amended & Restated Joint Check/Direct Payment | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 01 DTD 4/13/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 02 DTD 4/13/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 03 DTD 8/3/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 04 DTD 8/29/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 05 DTD 9/7/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 06 DTD 9/20/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 07 DTD 9/20/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 08 DTD 10/10/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 10 DTD 10/13/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 11 DTD 12/1/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Change Order 13 DTD 4/11/2024 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Service Agreement: Engineering, Procurement, and Construction Agreement | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Third Party Service Agreement: Engineering, Procurement, and Construction Agreement | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Third Party Service Agreement: Engineering, Procurement, and Construction Agreement Estoppel DTD 12/1/2023 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Third Party Service Agreement: Limited Notice to Proceed | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Third Party Service Agreement: Limited Notice to Proceed 2 | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Third Party Service Agreement: Notice of Termination for Default | $0.00 |
| 24-11149 | iSun Industrial LLC | BD Solar Larson LLC | Finance Agreement: Performance Bond #NME 1133 and Energy Capacity Guarantees | $0.00 |
| 24-1149 | iSun Industrial LLC | BNIX Mercury LLC | Third Party Service Agreement: Engineering, Procurement, and Construction Agreement Estoppel DTD 12/1/2023 | |
| 24-11149 | iSun Industrial LLC | BNRG Renewables Limited | Finance Agreement: Exhibit A Irrevocable Directive of Draw Proceeds | $0.00 |
| 24-11149 | iSun Industrial LLC | BNRG Renewables Limited | Finance Agreement: Exhibit A Irrevocable Directive of Draw Proceeds | $0.00 |

Collectively, these contracts, with the exception of the "Notice of Termination for Default," but including all other contracts involving BNRG Renewables Limited, BNIX Mercury LLC, or BD Solar Larson LLC, are the above defined "**Larson Contract**."[3]

B.      *Solar Larson Background.*

4.      The Larson Project is a 6.51 megawatt direct current community solar power facility located in Scarborough, Maine at which iSun Industrial was contracted to provide engineering, procurement and construction services in connection with the design, installation and commissioning of the Larson Project in accordance with the terms of the Larson Contract.

5.      iSun Industrial was behind schedule from virtually the very start of the Larson Project.  iSun Industrial repeatedly failed to make timely payments to its subcontractors leading its subcontractors to stop work (further exacerbating iSun Industrial's self-inflicted delays), and place liens on the project.  iSun Industrial also defaulted on its obligations to make payments to union organizations, which jeopardized iSun Industrial's ability to comply with their obligation to provide qualified apprentices to the Larson Project.[4]

6.      Despite iSun's Industrial's mismanagement and inability to timely perform its work on the Larson Project, Solar Larson repeatedly tried to mitigate iSun Industrial's failings by altering the payment schedule (by advancing payments ahead of the contracted-for dates) to assist with iSun Industrial's cash flow problems and by making direct payments to its subcontractors (with iSun Industrial's written consent and agreement).  Solar Larson was not contractually

---

[3] Solar Larson does not believe that the Debtors are asserting that each of the agreements listed on the Contract Schedule are separate, divisible, free-standing contracts relative to the Larson Project that may be separately assumed and rejected.  Instead, these are all component parts of the singular (and now-terminated) Larson Contract and under § 365 of the Bankruptcy Code, "a debtor may not 'cherry pick' pieces of contracts it wishes to assume." *In re Atlantic Computer Sys., Inc.,* 173 B.R. 844, 849 (S.D.N.Y. 1994).  Nonetheless, Solar Larson reserves all its rights and objections to the extent the Debtors assert a different position.

[4] The use of qualified apprentices was an express requirement of the Larson Contract.  *See* Change Order 08 to the Larson Contract dated October 10, 2023.

obligated to take any of these steps but did so in an effort to collaborate with iSun Industrial in order to achieve the joint goal of completing the Larson Project.  Despite Solar Larson's best efforts, iSun Industrial failed to perform the Larson Contract.

7.    iSun Industrial's failures are reflected in the notices of default issued by Solar Larson throughout the Larson Project including, but not limited to, notices of failure to adequately progress the work on April 27, 2023, May 12, 2023, September 7, 2023, and October 27, 2023; notices of unpaid subcontractors and threatened liens, including a notice dated September 28, 2023; a notice to iSun Industrial and its performance bond surety, Merchants, dated January 10, 2024 that Solar Larson was considering declaring iSun Industrial in default (due to failure to achieve Mechanical Completion and non-payment of subcontractors); and, a notice dated March 20, 2024, that iSun Industrial had incurred liquidated damages in the amount of $1,003,242.24 due to iSun Industrial's failure to achieve Mechanical Completion of the Larson Project within the time required by the Larson Contract.

8.    Left with no other option, and given the numerous prior notices of default, effective May 24, 2024, Solar Larson terminated the Larson Contract due to the occurrence of a "Contractor Event of Default" (as defined by the Larson Contract). Specifically, pursuant Section 11.2.1 of the Larson Contract, failure to "achieve Mechanical Completion within six (6) calendar months of the Mechanical Completion Deadline"[5] is a "Contractor Event of Default."  iSun Industrial failed to do so and was in default.  Further, pursuant to Section 11.2.2 of the Larson Contract, upon the occurrence of a Contractor Event of Default, Solar Larson terminated the Larson Contract effective

---

[5] Pursuant to the Larson Contract, iSun Industrial was obligated to achieve Mechanical Completion of the Larson Project by October 26, 2023. The Larson Contract is voluminous, and the Debtors already have a copy in their possession.  Subject to appropriate confidentiality restrictions and redactions, the Larson Contract may be made available to parties in interest by contacting the undersigned attorneys for BNRG, with all rights and objections reserved.

immediately upon delivery of notice to iSun Industrial. That is, given the nature of the Contractor Event of Default in question, iSun Industrial was not entitled to an opportunity to cure its default and the termination was <u>effective immediately</u> upon notice from the Solar Larson.

9.      To be sure, iSun Industrial's failure to achieve Mechanical Completion was only one of iSun Industrial's many Events of Contractor Default that gave rise to the Solar Larson's right to terminate the Larson Contract. And, while terminating the Larson Contract prior to the bankruptcy cases being filed, Solar Larson did not waive and expressly reserved its right to recover any and all damages, costs, and expenses, as may arise out of iSun Industrial's default described herein, as well as iSun Industrial's numerous other material breaches of the Larson Contract.

10.     On July 3, 2024, prior to the Contract Schedule being filed, counsel for Solar Larson notified Debtors' bankruptcy counsel that the Larson Contract was terminated prior to the Petition Date and that BNRG had no contractual relationship with iSun Industrial whatsoever. Shortly thereafter, on July 10, 2024, apparently to resuscitate the Larson Contract, Debtors' non-bankruptcy counsel wrote to Solar Larson asking it to "<u>rescind termination</u>" of the Larson Contract. That request to "<u>rescind termination</u>" of the Larson Contract was swiftly rejected by Solar Larson since iSun Industrial has no ability to complete the Larson Project and, hence, asking Solar Larson to "rescind" the termination was merely an attempt to solve a problem the Bankruptcy Code cannot fix for the Debtors: the Larson Contract was terminated prior to the Petition Date and it cannot be assumed and assigned. Period.

## II.  The Contract Objection

11.     It is true that § 365 of the Bankruptcy Code provides debtors with a valuable tool to assume and assign executory contracts. This statute allows debtors, subject to specific requirements, to free themselves of future performance obligations under contracts and receive

compensation from purchasers and/or assignees. While § 365 of the Bankruptcy Code offers opportunities for debtors, the legislation does not allow debtors: (a) to revive terminated contracts, (b) to ignore the due process and substantive rights of the non-debtor parties to the contracts proposed to be sold or assumed and assigned by creating "conditional" assignments and assumptions, (c) to ignore material, incurable historical defaults under the contracts and escape the bargained for consequences of such defaults, or (d) to transfer contracts absent specific evidentiary showings.

12.     Here, with respect to BNRG and Solar Larson, the Contract Notice and corresponding Contract Schedule should not be approved for at least four reasons:

A.      it proposes to assume a terminated, non-executory contract;

B.      it creates the fictional status of "conditional" assumption and assignment;

C.      it fails to acknowledge the material, incurable historical defaults; and

D.      it fails to satisfy any showing of adequate assurance

13.     First, the Larson Contract cannot be assumed because it was terminated pre-petition. By its terms, the Larson Contract is governed by the laws of the State of Maine[6] and the contract itself supplied the appropriate procedure for termination upon iSun Industrial's "Contractor Event of Default" by unambiguously providing that Solar Larson "may immediately terminate this Agreement on the occurrence of the events listed in . . . Section 11.2.1(f) [Contractor fails to achieve Mechanical Completion within six (6) calendar months of the Mechanical

---

[6] Section 21.8 of the Larson Contract provides "[t]his Agreement is made and shall be interpreted and enforced in accordance with the laws of the State where the Facility is located," which "Facility" is in Scarborough, Maine. Under Maine law, unambiguous termination provisions – like this one – are given effect. *See Baker v. Nat. Semiconductor Corp.*, No. CV-95-1171, 1996 WL 34673676, at *2 (Me. Super. July 05, 1996) ("This court determines that the notice and for cause provisions of the contract are unambiguous. Under the notice provision . . . National Semiconductor could terminate the contract *immediately* if it found a refusal or inability to perform under, or a breach of the agreement by Baker.") (emphasis in original).

Completion Deadline]." The "Mechanical Completion Deadline" passed on October 26, 2023. More than six (6) calendar months after the Mechanical Completion Deadline, on May 24, 2024, Solar Larson sent the notice of termination in accordance with the notice provisions of the Larson Contract. *See* **Exhibit A**. Because the Larson Contract was properly terminated pre-petition in accordance with the Larson Contract terms, the Debtors are prohibited from assuming or assigning the Larson Contract in connection with the Debtors' proposed sale. *See In re Triangle Laboratories, Inc.*, 663 F.2d 463, 467 (3d Cir. 1981) ("For Section 365 to apply, the contract or lease must be in existence. If the contract or lease has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the trustee to assume or assign."). In other words, "an executory contract or lease validly terminated prior to the institution of bankruptcy proceedings is not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's assets." *In re Triangle Laboratories, Inc*., 663 F.2d 463, 467-68 (3d Cir. 1981).

14.     If the Court allowed validly terminated contracts to be revived under § 365 of the Bankruptcy Code, it would be creating rights for the debtor where none existed; "[m]oreover, the implications . . . would render virtually every validly terminated executory contract revivable by a debtor by simply initiating bankruptcy proceedings." *Coast Cities Truck Sales v. Navistar Int'l Transp. Co.*, 147 B.R. 674, 678 (D.N.J. 1992) (discussing §§ 365 & 548 of the Bankruptcy Code); *see also Triangle*, 663 F.2d at 468 ("When a debtor's legal and equitable interests in property are terminated prior to the filing of the petition with the Bankruptcy Court that was intended to preserve the debtor's interest in such property, the Bankruptcy Court cannot then cultivate rights where none can grow.") (internal citation and quotation omitted); 3 Collier on Bankruptcy ¶ 365.02[2][e] (16th ed.) ("If the contract or lease has expired by its own terms or has been terminated

under applicable law before the commencement of the bankruptcy case, there is nothing left for the trustee to assume or assign.").

15.     The Debtors, presumably recognizing that the Larson Contract was validly terminated prior to the Petition Date and cannot be assumed or assigned under the Bankruptcy Code, asked Solar Larson to voluntarily "rescind" the termination nearly seven weeks after the termination was effective.  To be unequivocal, Solar Larson will not "rescind" its prepetition termination and, because the Larson Contract was terminated prior to the Petition Date, it also cannot be assumed and assigned.

16.     Second, § 365 of the Bankruptcy Code permits a trustee to do three things with an executory contract: (i) reject it, (ii) assume it, or (iii) assume and assign it. *In re Thane Int'l, Inc.*, 586 B.R. 540, 546 (Bankr. D. Del. 2018).  There is no fourth option.  The Debtors, however, tell Solar Larson that merely filing this objection means that the Larson Contract is thereafter "conditionally" assumed and assigned pending resolution of the objection.[7]  The fiction of a "conditional" assumption and assignment is wrong as a matter of law and unworkable in practice: a "conditional" assumption and assignment is not a different means to the Debtors' desired end of having Solar Larson's pre-petition termination "rescinded."

17.     Where there has been a default in a contract, the debtor bears the burden of proof that the contract is one subject to assumption and it must then clear three (3) specific hurdles to assume: it must (i) cure, or provides adequate assurance that it will promptly cure, such default; (ii) compensate, or provide adequate assurance that it will promptly compensate for any actual

---

[7] *See* Contract Notice, p. 3, purporting to establish that, "until such time as the Contract Objection can be resolved, the Contract shall be conditionally assumed and assigned pending a resolution of the Contract Objection after notice and a hearing."

pecuniary loss to such party resulting from such default; and (iii) provide adequate assurance of future performance under such contract or lease.  11 U.S.C. §365(b)(1).

18.     Each of the foregoing requirements must be complied with before assumption can be approved. *In re Thane Int'l, Inc.*, 586 B.R. 540, 546 (Bankr. D. Del. 2018); *see also In re Rachels Industries, Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990) (citations omitted). Here, notwithstanding that it cannot clear these hurdles for the Larson Contract because the contract itself is not one that can be subject to assumption, the Debtors attempt to create another option for themselves: a "conditional" assumption and assignment.  This "conditional" assumption and assignment violates the Bankruptcy Code's prerequisites for assumption and assignment and it appears to conflict with the Bidding Procedures Order which instead provides that "[t]o the extent an Assumed Contract Objection or Post-Auction Objection shall be pending as of the date of the closing of any Sale, the Assumed Contract subject to such objection **shall not be deemed assumed and assigned**, as between the Debtors and the Successful Bidder, as of the closing of the Sale until such time as (i) the amount (if any) to be paid under Section 365 of the Bankruptcy Code or (ii) the Debtors' ability to assign the Assumed Contract to the Successful Bidder is determined by the Court."  Bidding Procedures Order, ¶ 26.

19.     The fictional "conditional" assumption and assignment is also unworkable in practice because it would leave BNRG in a "no man's land" where the Larson Contract is neither definitively assumed nor definitively rejected, even though the Debtor in fact has no options whatsoever since the Larson Contract was terminated prepetition.  *In re Thane Int'l, Inc.*, 586 B.R. 540, 546 (Bankr. D. Del. 2018).  After Solar Larson's pre-petition termination of the Larson Contract, iSun Industrial's performance bond surety, Merchants, has undertaken to secure another contractor to complete the Larson project, meaning that BNRG is already working overtime to

manage the fallout from iSun Industrial's mismanagement and seeking to complete the Larson project, which is already months behind schedule. BNRG should not be dragged into this sale process and exposed to the risk of further delay by dint of iSun Industrial independently announcing that the Larson Contract has been "conditionally assumed and assigned."

20.     Third, as noted above, the terminated Larson Contract is not assumable because it is no longer an "executory contract" and it cannot be placed in the fictional "no man's land" of "conditional" assumption and assignment. However, even if the Larson Contract was not terminated prepetition and was still "executory" on the Petition Date, the Debtors and the Stalking Horse Bidder have a fundamental problem: they cannot meet the remaining statutory prerequisites to assumption and assignment since there are material, historical incurable defaults that preclude any assumption and assignment without BNRG's consent. In addition, the Debtors and the Stalking Horse Bidder have not provided for cure of those outstanding monetary defaults that exist by inaccurately listing $0.00 as the "Cure Amount."

21.     Section 365(b)(2) of the Bankruptcy Code sets forth a comprehensive list of monetary and non-monetary breaches that a debtor need not cure before assuming a contract. Nothing in section 365(b)(2) exempts from cure a default arising from a debtor's failure to perform non-monetary obligations in an executory contract. Accordingly, to the extent that a debtor has committed a historic, non-monetary default that cannot be cured, the debtor is not be permitted to assume the contract.[8]

---

[8] While prior to 2005 there had been some debate as to a debtor's obligations with respect to non-monetary defaults, "[b]y amending §365(b)(1)(A) [in 2005] Congress provided no room for the contention that non-monetary defaults in non-lease executory contracts are exempt from the cure obligation." *In re Empire Equities Capital Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009).

22.     Notwithstanding the express provisions of § 365(b)(1)(A) of the Bankruptcy Code prohibiting assumption where incurable non-monetary defaults exist, some courts have interposed a materiality component such that where the default in question is non-monetary and not curable, the debtor is precluded from assuming the executory contract if the default is material or has caused "substantial economic detriment." *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990) (in context of disputed shopping center lease). In *Joshua Slocum*, the Third Circuit appeared to apply a "material and economically significant" standard to determine whether the bankruptcy court had the authority to excise an "average sale" clause in a shopping center lease agreement, and then assign the lease to a third party. The Third Circuit determined that the minimum sales figure provision was material "in the sense that it goes to the very essence of the contract, *i.e.*, the bargained for exchange." *In re Joshua Slocum*, 922 F.2d at 1092.

23.     The Larson Contract establishes a number of milestones that iSun Industrial must have achieved by contractually established dates. The Larson Contract expressly provided that time was of the essence as to the timely attainment of the established milestones, including Mechanical Completion. *See, e.g.*, Larson Contract, Section 6.3 ("Time is particularly of the essence in Contractor's timely performance of this Agreement (subject to all express cure periods set forth in this Agreement); *see also* Section 6.4 (same). The establishment of the milestones and the dates assigned were material provisions of the parties' agreement, including as to "Mechanical Completion" of the Larson Project.[9]

---

[9] Mechanical Completion signifies that the solar photovoltaic array has been properly and fully engineered, constructed, and installed according to engineer-approved plans and is ready to start the necessary testing to confirm a safe and reliable connection for providing electricity to the utility grid. In other words, the project has been built properly and the only two remaining steps are to confirm it is ready to be turned on and then turn it on.

24.     To that end, iSun Industrial was to achieve "Mechanical Completion" of the Larson Project no later than the "Mechanical Completion Deadline," which was October 26, 2023. The criteria to be applied by BNRG in determining accomplishment of "Mechanical Completion" are contained in Section 6.1.1 through 6.1.4 of the Larson Contract. iSun Industrial failed to meet several material milestones, including the Mechanical Completion Deadline. Faced with iSun Industrial's failure to achieve the milestone for "Mechanical Completion" or "Mechanical Completion" itself by the "Mechanical Completion Deadline," Solar Larson exercised its right under the Larson Contract and the performance bond provided by iSun Industrial. Solar Larson first notified the Merchants that it was considering declaring iSun Industrial in default, and, then when iSun Industrial still could not meet its performance obligations even with Merchants' financial support, Solar Larson had no alternative but to terminate the Larson Contract. iSun Industrial's default due to its failure to achieve the Mechanical Completion milestone continues to this day, subsequent to iSun Industrial's termination.

25.     It is indisputable that the iSun Industrial's failure to achieve Mechanical Completion by October 26, 2023 is an historic, non-monetary default of the Larson Contract that cannot be cured. This default is material because it goes to the very essence of the bargained-for exchange – the Debtors' construction to "Mechanical Completion" of the Larson Project by a date certain. The Debtors cannot, and have not, asserted that it met this requirement.

26.     There is no cure available for the failure to meet already passed deadlines and where, as here, the iSun Industrial has failed to meet a time-is-of-the essence deadline, "the Bankruptcy Code as amended in 2005 makes it clear that §365 provides no recourse to [the] Debtor because its default under the contract cannot be cured and, accordingly, the contract cannot be assumed." *In re Empire Equities Capital Corp.*, 405 B.R. at 691.

27.    Moreover, it would be a wasteful exercise to attempt assumption and assignment since, when a contract or lease is assumed and assigned, it is assumed and assigned with all of its benefits *as well as all of its burdens. See In re Fleming Cos., Inc.,* 499 F.3d 300, 308 (3d Cir. 2007) (Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder). "The [debtor]... may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other." *Id.* (citing *In re Italian Cook Oil Corp.,* 190 F.2d 994, 997 (3d Cir. 1951)).

28.    Therefore, the assignee takes the Larson Contract "as is," including the provision in the Larson that permits Solar Larson to terminate "immediately" with no opportunity to cure if the "Contractor fails to achieve Mechanical Completion within six (6) calendar months of the Mechanical Completion Deadline." *See* Larson Contact, Section 11.2.2 & 11.2.1(f).  Assuming the Debtors could make Solar Larson's pre-petition termination "disappear" and assuming the Debtors could further satisfy the assumption and assignment requirements under § 365 of the Bankruptcy Code (which BNRG asserts the Debtors cannot), it would be nonsensical for a purchaser to acquire the Larson Contract (and the obligations associated with the Larson Contract) when Solar Larson can terminate the Larson Contract for failure to "achieve Mechanical Completion within six (6) calendar months of the Mechanical Completion Deadline" with no opportunity to cure one-day after the closing of the sale.

29.    The Debtors also cannot assume the Larson Contract because the Contract Schedule erroneously lists "$0.00" as the cure amounts for the Larson Contract.[10]  To date, Debtor iSun

---

[10] Although the Larson Contract was terminated, BNRG raises this objection to the cure amount since the Contract Notice provides that

> ANY COUNTERPARTY TO AN ASSIGNED CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A ATTACHED

Industrial owes Solar Larson approximately $1,544,765 in damages.[11]  Additionally, Solar Larson has incurred approximately $49,000 in fees as a result of the Debtors' payment defaults, subcontractor liens being placed on the projects, and the proceedings relating to the bankruptcy case.  Solar Larson reasonably expects to incur additional fees relating to the requested assumption and assignment of the terminated Larson Contract and the Sale Motion. Therefore, BNRG reserves the right to increase the amount of fees and costs incurred through final resolution of the Contract Objection and completion of the Larson Project; however, the "cure" cannot under any circumstances be said to be $0.00.

30.     Fourth, § 365(f)(2) of the Bankruptcy Code provides that a debtor in possession may assign an executory contract only if the trustee assumes the contract and the assignee provides

---

HERETO IN ACCORDANCE WITH THE BID PROCEDURES ORDER AND THE ASSUMPTION PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A ATTACHED HERETO, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE ASSIGNED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.

Contract Notice, p. 4.  BNRG wishes to be assured that it has not waived any objection to the purported "$0.00" cure amounts set forth on the Contract Schedule.

[11] Section 6.3 of the Larson Contract provides that

Contractor shall cause the Facility to reach Mechanical Completion on or before the Mechanical Completion Deadline. If Contractor fails to achieve Mechanical Completion on or before the Mechanical Completion Deadline (as such date may be adjusted pursuant to the terms of this Agreement), then Contractor shall pay to Owner, as liquidated damages and not as a penalty, the amount of $500 per MW per day for each day by which Mechanical Completion is later than the Mechanical Completion Deadline ("Mechanical Completion Delay Liquidated Damages"), which shall be Owner's sole remedy for delay if collected. Owner shall calculate the Mechanical Completion Delay Liquidated Damages for which Contractor is responsible based on the date that Mechanical Completion is achieved. Contractor shall pay Mechanical Completion Delay Liquidated Damages due pursuant to this Section 6.3 monthly in arrears on the first day of each month. Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Mechanical Completion Delay Liquidated Damages due pursuant to this Section.

"adequate assurance of future performance." *See* 11 U.S.C. § 365(f)(2).  The Debtors recite in the Sale Motion that "the Court and other interested parties will have ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption or proposed cure amounts." Sale Motion, ¶ 55.  However, to the extent that the "Successful Bidder" emerges at auction, the Debtors contemplate that counterparties will have one single day after the auction to object to the ability of the Successful Bidder to provide adequate assurance of future performance.  *See* Bidding Procedures Order, ¶ 24.  A single day is neither "ample" nor commercial.

31.     Moreover, given that the Contract Schedule understates the "cure" associated with the Larson Contract, it is not evident to BNRG how the Debtors could have thoroughly evaluated the Stalking Horse Bidders financial bona fides to cure and provide adequate assurance of future performance in connection with any assigned executory contracts when the Contract Schedule understates cure amounts and fails to reflect the disarray of iSun Industrial's projects.  Moreover, any potential assignee will be met with the obligation to use union labor including qualified apprentices – an express requirement of the Larson Contract[12] – and BNRG sees no requirement in the Stalking Horse APA the Stalking Horse Bidder (or other bidder) demonstrate this capacity. Thus, the Debtors have not provided adequate assurance of performance under the Larson Project by the Stalking Horse Bidder and BNRG objects to any purported assignment to the Stalking Horse Bidder or another until a showing of adequate assurances, including as to the use of union labor, is made.  In connection therewith, BNRG requests from the Debtors and the Stalking Horse Bidder copies of all financial and other diligence documents it relied upon to determine it could offer adequate assurances with respect to the Larson Contract.

---

[12] Change Order 08 to the Larson Contract dated October 10, 2023.

### III.  The Sale Objection

32.     Make no mistake, the Larson Contract is non-executory because Solar Larson underlined terminated the Larson Contract prior to the Petition Date on account of iSun Industrial's material breaches, rather than because each side had already substantially performed all its material obligations.  *Contra In re Weinstein Co*, 997 F.3d 497, 501 (3[d] Cir. 2021) ("because Cohen's remaining obligations under the Cohen Agreement are not material . . . we . . . hold the Cohen Agreement is not an executory contract").  Without belaboring the point, iSun Industrial repeatedly failed to successfully execute on many of its material obligations under the Larson Contract leading to Solar Larson's pre-petition termination.

33.     Because the Debtors expressly represent that they are proposing to "assume and assign" the Larson Contract, rather than sell it as an "asset,"  Solar Larson must reserve all rights, arguments, and objections to any purported attempt by the Debtors to sell the Larson Contract or rights thereunder, including Solar Larson's right to have its interest in the Larson Contract adequately protected in connection with any such sale.  *See* 11 U.S.C. § 363(e); *see also In re Dewey Ranch Hockey, LLC*, 414 B.R. 577, 592 (Bankr. D. Ariz. 2009) ("the clear statutory statement in Section 363(e) requires that the court 'shall prohibit' any sale, where the interests sought to be removed by the proposed sale free and clear of such interests, can not be adequately protected.").  For now, Solar Larson will point out that the Larson Contract itself is not assignable without Solar Larson's prior written consent[13] and Solar Larson expressly does not consent. *See*

---

[13] Section 11.2.1 provides that it is a "Contractor Event of Default" for iSun Industrial to "assign[] or attempt[] to assign its rights or obligations under the [Larson Contract] or any part thereof to any third party except as permitted under the Agreement."  Section 21.2 of the Larson Contract provides that "neither Party may assign, pledge or otherwise transfer [the Larson Contract] or any right or obligation under [the Larson Contract] without first obtaining the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed." This clear and unambiguous language is enforceable under Maine law. *See, e.g., In re Richardson*, No. CV-05-130, 2005 WL 3804993, at *2 (Me. Super. Nov. 3, 2005) ("This language is clear and unambiguous. Aviva is entitled to enforcement of the anti-assignment provision.").

11 U.S.C. § 363(f)(1) & (l).  Likewise, none of the rights and obligations under the Larson Contract are assignable absent Solar Larson's prior written consent, which it also will not do.[14] *Id*.

34.     Moreover, it is not clear what rights under the Larson Contract the Debtors would even purport to sell.  Merchants has previously raised with this Court and the Debtors that "[i]n accordance with well-settled law, contract funds held by an owner (i.e., the Debtors' contract counterparty) on defaulted bonded projects, or on projects in connection with which the Debtors have failed to pay their subcontractors, suppliers, and laborers, are not "owed" to the debtor/contractor unless and until the defaults and/or failures are cured in full and therefore those funds are not part of the bankruptcy estate and the Debtors have no interest in, among other things, the remaining amounts due."  *See* Dkt. No. 229 *Limited Objection and Reservation of Rights of Merchants National Bonding Company, Inc. and Great Midwest Insurance Company to Debtors' Motion to Approve Procedures for the Settlement of Certain Accounts Receivable*, ¶ 18. Because it is fundamental bankruptcy law that a debtor may not sell property that is owned by a non-debtor pursuant to § 363, *see In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *4 (Bankr. D. Del. July 28, 2008) ("A bankruptcy court may not allow the sale of property as property of the estate without first determining whether the property is property of the estate") (internal quotation omitted), the Debtors must specifically identify what assets or rights they are attempting to sell (if any) with respect to the Larson Contract so that Solar Larson may supplement this objection to address the specific requests and whether the assets are transferable pursuant to § 363 along with seeking adequate protection of its interests in the same.

34.     Finally, even if the Debtors could transfer a terminated contract or the rights thereunder, Solar Larson also expressly does not consent to any purported attempt to transfer the

---

[14] *Id*.

rights under the Larson Contract without the corresponding liabilities. *See In re American Home Mortgage Holdings, Inc.,* 402 B.R. 87, 98 (Bankr. D. Del. 2009) ("the *cum onere* rule applies equally to the transfer of rights and obligations under a non-executory contract pursuant to § 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365").

33. Notwithstanding the foregoing the Sale Motion does propose to transfer "Avoidance Actions" and "Payment Intangibles" to the Stalking Horse Bidder. *See* Stalking Horse APA, Schedule 1.1(a). To the extent that the Debtors allege that BNRG or any of its affiliates or subsidiaries owes any monetary obligations to the Debtors that constitute a "Payment Intangible" or there are Avoidance Action against BNRG or any of its affiliates or subsidiaries, those obligations cannot be transferred to the Stalking Horse Bidder (or any other successful bidder) via the sale free and clear of any rights and/or defenses BNRG may have in respect of such obligations and actions. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252 (3d Cir. 2000). Instead, at a minimum, the Sale Order should specifically reserve and preserve all of BNRG's and its affiliate's or subsidiary's rights and defenses with respect to such alleged obligations and actions, including rights of setoff and recoupment, to the extent such alleged obligations and actions are proposed to be transferred to the Stalking Horse Bidder or other successful bidder. In short, BNRG does not yet know who it may be called upon to litigate with over the disarray of the Larson Project but it wishes to be assured that no orders entered in these cases will impair any of its claims, arguments, defenses, and rights, including as to set off, against any party.

33. To that end, BNRG respectfully requests that the Debtors and the Stalking Horse Bidder specifically identify any purported rights they propose to sell with respect to the Larson Contract and that, under any circumstance, the Court add the following language to the Sale Order:

Notwithstanding anything to the contrary herein or in any document related to the Sale, any secured interests, rights, arguments, claims (including counterclaims), or defenses, including any setoff or recoupment rights and defenses, that BNRG Renewables Limited, BNIX Mercury LLC, and/or BD Solar Larson LLC, or their respective affiliates, subsidiaries, successors, and assigns (collectively, "**BNRG**") may have against the Debtors are hereby preserved and are unaffected by this Sale Order or in any document related to the Sale. To the extent that this Sale Order or in any document related to the Sale transfer or purport to transfer any Payment Intangibles (including accounts receivable) or any other asset (including Avoidance Actions) or document which purportedly evidences a payment obligation or credit obligation owed by BNRG to the Debtors or claim against BNRG, BNRG's secured interests, rights, arguments, claims (including counterclaims) and defenses with respect to such alleged obligations and actions, including rights of setoff and recoupment, are hereby preserved and remain unaffected by any transfer and fully enforceable against any party

## IV.  Conclusion

The Larson Contract was terminated prior to the Petition Date, there is nothing left for the Debtors to assume or reject, and the Larson Contract should be removed from the Contract Schedule. Separately, the Sale Motion should be denied until BNRG's rights, arguments, and objections (including the right to supplement this objection) are expressly preserved and reserved in connection with the Sale as set forth herein.

## V.  Reservation of Rights

This Contract Objection and objection to the Sale Motion is submitted without prejudice to, and with full reservation of, BNRG's rights, claims, defenses, and remedies, including the right to supplement the objection or modify, amend, or withdraw this objection, to seek discovery, to raise additional objections and to introduce evidence at any hearing related to the Contract Notice or Sale Motion, and without in any way limiting any other rights of BNRG to object to the Contract Notice, Sale Motion, or any other pleading, on any grounds, as may be appropriate.

**WHEREFORE**, BNRG requests that this Court enter an Order:

1.      Disapproving the Contract Schedule as to BNRG and Solar Larson;

2.      Disapproving the Sale Motion as to BNRG and Solar Larson; and

3.      Granting BNRG such other relief as may be appropriate and just.

**[Remainder of Page Intentionally Left Blank]**

Dated: <u>July 23, 2024</u>
Wilmington, Delaware

Respectfully submitted,

By:  */s/*Martin J. Weis

Martin J. Weis (No. 4333)
**DILWORTH PAXSON LLP**
800 N. King Street, Ste 202
Wilmington, Delaware 19801
Tel: (302) 571-9800
Email: mweis@dilworthlaw.com

Nathaniel R. Hull (*pro hac vice admitted*)
John Giffune
**VERRILL DANA, LLP**
One Portland Square
Portland, Maine 04101
Tel: 207-253-4726
E-mail: nhull@verrill-law.com
         jgiffune@verrill-law.com

*Counsel to BNRG Renewables Limited and BD Solar Larson LLC*