**EXHIBIT A**

# FUSION RENEWABLE NA, LLC

**A Delaware limited liability company**

# Operating Agreement

**Members:**

**Fusion Renewable, LLC**
**The Investor**
**iSun Utility, LLC**

**Effective:  August 7, 2022**

**THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, THE SECURITIES LAWS OF THE STATE OF DELAWARE OR THE SECURITIES LAWS OF ANY OTHER STATE.  TRANSFER OF SUCH MEMBERSHIP INTERESTS IS RESTRICTED BY THE TERMS OF THIS OPERATING AGREEMENT.**

## OPERATING AGREEMENT

## for

## FUSION RENEWABLE NA, LLC

**THIS OPERATING AGREEMENT** (the "**Agreement**" or the "**Operating Agreement**") is made effective as of August 7th, 2022 (the "**Effective Date**), by and between **Fusion Renewable NA, LLC**, a Delaware Limited Liability Company (the "**Company**"), and (i) **Fusion Renewable, LLC**, a Florida Limited Liability Company with an address at 2136 NE 123rd Street, North Miami, Florida 33181, USA, E-mail address: avi@fusion-renewable.com; or niv@fusion-renewable.com ("**Fusion**"), (ii) **Cressence Solar, LP**, a Delaware Limited Partnership with an address at Hasivim 49 , P.O.B 9596 ,Petah tikva, 4919402, Israel, E-mail address: myriam@essencepartners.co.il; or sarit.cohen@nextcomgroup.com (the "**Investor**"), and (iii) **iSun Utility, LLC**, a Delaware Limited Liability Company with an address at 400 Avenue D, Williston, VT, 05495, USA, E-mail address: ddus@isunenergy.com ("**iSun**"), who have been admitted as Members (each may be individually referred to as a "**Member**" and collectively as "**Members**"), who agree as follows:

## RECITALS:

**WHEREAS,** pursuant to the Certificate of Formation (as in effect from time to time, the "**Certificate of Formation**") of the Company filed in the office of the Secretary of State of the State of Delaware on November 2, 2021, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act (the **"Act"**);

**WHEREAS,** the Members desire to adopt and enter into and hereby do enter into and adopt this Operating Agreement in order to set forth their respective rights, duties and responsibilities with respect to the management and affairs of the Company and memorialize certain other agreements between them with respect to the Company and their interests therein;

**WHEREAS**, concurrently with the adoption of this Agreement, the Investor and the Company have executed a Loan Agreement, in the form attached hereto as **Annex I** (the "**Loan Agreement**"), according to which the Investor has agreed to extend to the Company a loan in the aggregate amount of US$21,000,000 (the "**Loan**"); and

**WHEREAS**, by execution hereof, each Member represents that it has sufficient right and authority to execute this Agreement.

**NOW, THEREFORE,** in consideration of the premises hereof and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows effective as of the date first written above.

**Article I**
**Organization and Term**

**1.1.    Formation.**

a.    Fusion has previously caused the Certificate of Formation to be filed with the Secretary of State of the State of Delaware as required by the Act as of November 2, 2021. The Certificate of Formation shall be amended whenever, and within the time periods, required by the Act, or otherwise when approved by the Management Board.

b.    In order to maintain the Company as a limited liability company under the laws of the State of Delaware and to qualify the Company to do business in any state, the Members shall from time to time take appropriate action, including the preparation and filing of such amendments to the Certificate of Formation and such other assumed name certificates, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

(i)    qualification to do business in any state in which the Company owns property or conducts business, as the Management Board shall determine;

(ii)    a change in the Company name;

(iii)    a correction of defectively or erroneously executed Certificate of Formation;

(iv)    a correction of false or erroneous statements in the Certificate of Formation or the desire of the Management Board to make a change in any statement therein in order that it shall accurately represent the agreement among the Members; or

(v)    a change in the time for dissolution of the Company.

Notwithstanding the foregoing, the Management Board shall not effectuate any amendments to the Certificate of Formation without the approval of the Members in accordance with Section 5.1(e) below, unless such amendment is required to maintain the Company as a limited liability company under the laws of the State of Delaware.

**1.2.    Further Documentation.** Subject to the other provisions of this Agreement, each Member hereby agrees to execute and deliver to the Company within seven (7) days after receipt of a written request therefor from the Management Board, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action (or refrain from taking any action) as the Management Board reasonably deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement, to preserve the Company as a limited liability company under the Act.

**1.3.    Name.** The name of the Company shall be *Fusion Renewable NA, LLC* and all business shall be conducted under such name or under any other assumed name properly filed with Delaware's Division of Corporations.

**1.4.** **Registered Office.**  The registered office of the Company shall be located at 1013 Center Road, Suite 403-B, Wilmington, Delaware 19805, New Castle county, USA, c/o Vcorp Services, LLC, or at such location as shall be designated from time to time by the Management Board.  The Company may also have offices in such other places as the Members may from time to time decide, or as the business of the Company may require.

**1.5.** **Registered Agent.**  The registered agent of the Company shall be Vcorp Services, LLC.  The registered agent may be changed from time to time, and any such change shall be made in accordance with the Act and this Operating Agreement.  If the registered agent resigns or is unable to act, the Management Board shall promptly appoint a successor.

**1.6.** **Effective Date and Term.**  The term of the Company commenced upon the filing of the Certificate of Formation, and shall continue in perpetuity unless it is dissolved or terminated earlier pursuant to the Act or under this Operating Agreement.

**1.7.** **Purpose of the Company.** The Company may engage in any lawful activity in order to generate revenue by maximizing the business opportunities deriving from the development, construction and management of Solar Projects (as defined herein) and associated facilities, holding Solar Projects, as well as engaging in any lawful act or activity which may be required in connection with such development and management of Solar Projects and the ownership thereof.

**1.8.** **Tax Status of Company**. It is intended that the Company will be treated as a partnership for U.S. federal income, state and local tax purposes. Except for the foregoing tax status, the Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member be an agent, partner or joint venturer of any other Member for any purposes other than U.S. federal income, state and local tax purposes, and this Agreement shall not be construed to suggest otherwise.

**1.9.** **No Liability.**  No Member shall be liable for any debt, obligation, judgment, claim against or any other liability of the Company of any type or nature, whenever and however arising, except to the extent expressly assumed.

**Article II**
**Members' Contributions and Interests**

**2.1.** **Classes of Members; Interests**.  As of the date of this Agreement, the Company has one class of membership interest, being Common Units. Subject to the provisions of this Agreement and the Act, the Company may establish and issue, from time to time, different classes of Units, in one or more designations or series, with holders of such Units having the rights, preferences, privileges, and restrictions as determined by the Management Board. All Interests redeemed, purchased or otherwise acquired by the Company shall be canceled and thereupon restored to the status of unissued Interests. Common Units are owned by the Members as set forth in **Exhibit A** hereto (the "**Members' Registrar**"). Each Member shall have a percentage interest (a "**Percentage Interest**") in and hold Units of the Company, as set forth opposite such Member's name in the Members' Registrar. The Management Board may, in its sole discretion, elect to, or the Company shall, at the request of any Member, issue to the Members (or such Member) certificates evidencing their ownership of such Units.

**2.2.    Capital Contributions.**  Prior to or upon the execution of this Agreement, each Member shall have contributed to the Company as a Capital Contribution cash in the amount set forth next to such Member's name as set forth on the Members' Registrar.

**2.3.    No Requirement of Additional Funds**. Except as provided in the Act or as otherwise provided in this Agreement, or in the Loan Agreement, no Member shall be required or, without the prior consent of the Management Board, permitted to loan or make available any money or other property to the Company or make any contributions to the capital of the Company, including to restore any deficit in the Capital Account of such Member which may exist at any time.  No Member will be bound by, or be personally liable for, any expense, liability or obligation of the Company or of any other Member.  No Member shall be liable under a judgment, decree or order of a court, which relates to the Company.

**2.4.    Capital Account.**  A separate capital account shall be maintained for each Member in the pro-rata amount of such Member's ownership of Units. There shall be credited to each Member's account: (a) the amount of cash and the fair market value of any property contributed by each Member, net of any liabilities assumed by the Company and to which the property is subject; (b) the Members' share of profits of the Company as provided in this Agreement; and (c) the amount of any increase to the basis of assets of the Company due to an election under Internal Revenue Code § 754. There shall be charged against each Member's capital account:  (i) the amount of all distributions to each Member; and (ii) the Member's share of Company losses as provided in this Agreement.

**2.5.    Return of Capital; Withdrawals and Interest.**  No Member shall be entitled to the return of any capital contributions (or any portion thereof) of itself or of any other Member, except in accordance with the provisions of this Agreement. No Member shall be required to pay to the Company or to any other Member or Person (for the purpose of this Agreement, the term "**Person**" or "**person**" means any individual, corporation, limited partnership, general partnership, limited liability partnership, limited liability company, joint stock company, joint venture, corporation, unincorporated organization, association, company, trust, group or any governmental or political subdivision or any agency, department or instrumentality thereof) any deficit in such Member's Capital Account upon dissolution of the Company or otherwise and no Member shall be entitled to withdraw any part of the Member's Capital Account, to receive interest on such Capital Account or to receive any distributions (or otherwise receive the fair market value of its Units in compensation for any purported resignation or withdrawal) from the Company, except as expressly provided for in this Agreement or under the Act as then in effect.  Notwithstanding the preceding, if a distribution would be permitted under the Act but not under this Agreement, this Agreement shall govern.

**2.6.    Issuance of Additional Units; Preemptive Rights.**

a.    In the event that, at any time, the Company (through the Management Board) proposes to issue New Units (as defined below) to any Person, the Company shall deliver written notice of such decision to each Member, at least twenty one (21) days prior to issuing such New Units. Such written notice shall describe the amount, type and terms of such New Units, the purchase price per New Unit (the "**New Units Purchase Price**") to be paid by the purchasers of such New Units, the number of New Units that each Member has the right to purchase under this

- 4 -

Section 2.6 and the other terms upon which the Company has decided to issue the New Units, including the expected timing of such issuance (the "**Preemptive Notice**"). Each Member shall have twenty one (21) days from the date on which the Preemptive Notice is given to either agree to purchase all or part of its "*pro rata* portion" of such New Units and, if applicable, any Excess New Units, or to transfer such right to a Permitted Transferee of such Member (provided that such Permitted Transferee gives a Preemptive Exercise Notice, as defined below, during such twenty one (21) days period), in each case, for the New Units Purchase Price and upon the same terms and conditions as specified in the Preemptive Notice, by giving a written notice to the Company (a "**Preemptive Exercise Notice**") stating therein the number of New Units to be purchased by such Member or its Permitted Transferee. In the event that, in connection with such a proposed issuance of New Units, any Member (or its Permitted Transferees) fails or refuses to give a Preemptive Exercise Notice to the Company within such twenty one (21) day period, such Member (and its Permitted Transferees) shall, for all purposes, be deemed to have refused (in that particular instance only) to purchase New Units and to have waived (in that particular instance only) all of its rights to purchase any of such New Units. Such New Units shall be acquired by the exercising Member by making an additional Capital Contribution in the amount equal to the number of New Units acquired by such Member multiplied by the New Units Purchase Price.  For the purpose of this Section 2.6, "*pro rata* portion" of any Member means a fraction, the numerator of which is the number of Units held by such Member, and the denominator of which is the total number of Company Units outstanding immediately prior to the proposed issuance. In the event that any Member does not elect to purchase all or any portion of its "*pro rata* portion", the New Units which were available for purchase by such non-electing Members (the "**Excess New Units**") shall automatically be deemed to be accepted for purchase by the Members who indicated in their Preemptive Exercise Notice a desire to participate in the purchase of New Units in excess of their "*pro rata* portion" (it being understood that such Members may limit, on a dollar or percentage basis, their participation in the purchase of such Excess New Units).  Unless otherwise agreed by all of the Members participating in the purchase, each Member who indicated a desire to purchase more than its "*pro rata* portion" shall purchase a number of Excess New Units equal to the lesser of (x) the number of New Units such Member indicated a desire to purchase in the Preemptive Exercise Notice, if any (as such number of Units may be limited by such Member pursuant to the immediately preceding sentence), and (y) a number of New Units equal to the product of (A) the number of Excess New Units and (B) a fraction, the numerator of which is the number of Units held by such Member and the denominator of which is the total number of Units at such time held by all Members who participate in the purchase of Excess New Units, in each case, without giving effect to any unvested Units (if any).

b.       In the event that any New Units are not acquired by the Members or their respective Permitted Transferees within the period specified in this Section 2.6, the Company shall have ninety (90) days from the end of the twenty one (21) days period mentioned in sub-section (a) above,  to sell the remaining unsubscribed portion of such New Units to any Person; provided, that (x) the price per New Unit at which such New Units are being issued to and purchased by such Person is equal to or greater than the New Units Purchase Price and (y) the other terms and conditions pursuant to which such Person purchases such New Units are not more favorable to the purchaser than the terms set forth in the Preemptive Notice. Any New Units not issued or sold within such ninety (90) days shall again be subject to the provision of this Section 2.6.

For the purpose of this Agreement, the term "**New Units**" shall mean any Units or other securities (other than debt securities not convertible into equity securities) of the Company, whether

authorized now or in the future, and any rights, options or warrants to purchase any Units ("**Options**") or other securities of the Company of any type whatsoever, including any such rights that may become convertible into or exchangeable or exercisable for any Units, such other securities or Options; provided, that "New Units" shall not include (i)  securities issued by the Company in connection with any subdivision of securities, any combination of securities or any recapitalization, reorganization or reclassification of the Company,  (ii) Units sold upon conversion into shares of common stock in connection with an IPO, (iii) Options or Units issued as consideration for the acquisition of an unaffiliated Person or the assets of an unaffiliated Person (whether by merger, recapitalization, business combination or otherwise), or (iv) Units issued under the Plan out of the Option Pool (as such terms are defined in Section 2.8 below) and Units in connection with the exercise of any equity awards issued under the Plan out of the Option Pool.

       **2.7.**     **Admission of New Members.**  New Members may be admitted in accordance with the provisions of this Agreement.  Any Person shall, before being admitted as a Member of the Company and as a condition to admission, execute any document or documents required by the Company, agreeing to be and become a Member of the Company, subject to all of the terms and conditions of this Operating Agreement. The Company may issue additional Units in the Company to new Members admitted in accordance with the provisions of this Agreement, including, with respect to New Units, in accordance with Section 2.6 above. The terms and conditions of such additional Units (including New Units) shall be determined prior to the admission of such new Members and the issuance of such additional Units (including New Units) in accordance with the terms of this Agreement.

       **2.8.**     **Employee Equity Award; Award Pool.**  As soon as practicable following the date of this Agreement, the Company shall adopt an employee equity award plan (the "**Plan**") and shall reserve for issuance under the Plan to Company's employees, and other Persons as the Management Board may determine, all subject to applicable taxation and other laws, and as shall be decided by the Management Board, such number of membership interests constituting on the date hereof up to six percent (6%) of the Company's membership interest (calculated as of immediately prior to the issuance of any awards under the Plan) (the "**Option Pool**").

**Article III**
**Allocation of Profits, Losses and Distributions**

       **3.1.**     **Allocation of Profits and Losses.**  Net profits or losses of the Company (and their various items of income, expenses, and credits for federal income tax purposes) including any profits, gains or losses which are not taken into account for federal income tax purposes, shall be allocated to the Members in direct proportion to the number of Units owned by each of them.

       **3.2.**     **Distribution.**  The Company shall not distribute any dividends in the three (3) years following the date of this Agreement. After the end of such three (3) years period, and until the full repayment of all outstanding amounts under the Loan Agreement, any and all assets, proceeds or dividends available for distribution to the Members pursuant to applicable law (the "**Distributable Assets**"), shall be distributed in the following order and preference:

       a.     First, the Investor shall be entitled to receive, prior and in preference to any distribution in respect of the Members membership interest, an amount equal to the higher

of (i) the outstanding unpaid balance of the Loan; or (ii) 75% of the Distributable Assets (the "**Loan Preference**").

        b.      Second, after the payment in full of the Loan Preference, the remaining Distributable Assets, shall be distributed among all Members (including the Investor), on a Pro-Rata Basis (as defined below).

After the full repayment of all outstanding amounts under the Loan Agreement, any and all Distributable Assets shall be distributed among all Members (including the Investor), on a Pro-Rata Basis.

        **3.3.**     **Distributions in Kind.**  Except as unanimously agreed to in writing by all Members, a Member, regardless of the number of Units owned by such Member, has no right to demand and receive a distribution from the Company in any form other than cash and a Member may not be compelled to accept from the Company a distribution of an asset in kind. The Company shall not make a distribution if such distribution would be in violation of the Act. Any distribution of property shall be based on value of the distributed property on a per Unit basis.

        **3.4.**     **Special Allocations.**  It is intended that the allocations provided in this Article have "substantial economic effect" for purposes of Treasury Regulation § 1.704-2. The Special Allocations set forth below shall be applied in the order presented. All references in this Section to "Partnership" or "Partner" items as defined in the Regulations are intended to apply to this Limited Liability Company and to its Members:

        a.      **Partnership Minimum Gain Charge back.**  The Minimum Gain Charge back provisions as provided under Treasury Regulation § 1.704-2(f) shall apply. This provision is intended to comply with the Partnership Minimum Gain Charge back requirements of the aforementioned Regulation and shall be interpreted and applied in a manner consistent therewith.

        b.      **Non-Recourse Minimum Gain Charge back.**  The Non-Recourse Minimum Gain Charge back provision as provided under Treasury Regulation § 1.704-2(I)(4) shall apply. This provision is intended to comply with the Partner Non-Recourse Minimum Gain Charge back requirements of the aforementioned Regulation and shall be interpreted and applied in a manner consistent therewith.

        c.      **Qualified Income Offset.**  The Qualified Income Offset provision as provided under Treasury Regulation § 1.704-1(b)(2)(ii)(d)(3) shall apply so that any Member who unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulation § 1.704-1(b)(2)(ii)(d), (4), (5), or (6), will be allocated income and gain in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, a deficit balance as quickly as possible; provided that an allocation pursuant to this Section 3.4(c) shall be made only if and to the extent that such Member would have a capital account deficit after all other allocations provided in this Section 3.4 have been made as if this Section 3.4 (c) were not in this Agreement. This provision is intended to comply with the Qualified Income Offset requirements of the aforementioned Regulations and shall be interpreted and applied in a manner consistent therewith.

d.    **Gross Income Allocation.**  If any Member has a deficit capital account at the end of any fiscal year which is in excess of the sum of:  1) the amount such Member is obligated to restore pursuant to any provision of this Agreement;  and 2) the amount such Member is deemed to be obligated to restore pursuant to Treasury Regulations § 1.704-2(g) and 1.704-2(i)(5), each such Member shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 3.4 (d) shall be made only if and to the extent that such Member would have a deficit capital account in excess of such sum after all other allocations provided for in this Section have been made as if Section 3.4 (c) hereof and/or Section 3.4 (d) were not in this Agreement.

e.    **Partnership Non-Recourse Deductions.**    Partnership Non-Recourse Deductions under Treasury Regulation § 1.704-2(b)(1) for each fiscal year shall be allocated among the Members in accordance with their respective Units to the extent and in a manner that satisfies Treasury Regulation § 1.704-2(e), and otherwise in any manner determined by the Members then owning a majority of the Units to satisfy said Regulation.

f.    **Partner Non-Recourse Deductions.**  Partner Non-Recourse Deductions under Treasury Regulation § 1.704-2(I)(2) for any fiscal year shall be allocated to the Members who bear the economic risk of loss with respect to the Partner Non-Recourse Debt to which such Partner Non-Recourse Deductions are attributable in accordance with Treasury Regulation § 1.704-2(i)(1).]

**3.5.**    **Fiscal Year and Accounting Method.**  The Fiscal Year of the Company shall end on December 31st of each year ("**Fiscal Year**").  The Company shall keep its books according to the cash method of accounting.

**3.6.**    **Financial Statements.**    The Company will prepare audited annual financial statements and unaudited quarterly financial statements, and deliver true and complete copies of the annual financial statements and quarterly financial statements to each of the Members (a) with respect to the annual financial statements - within seventy (70) days of the end of each calendar year and (b) with respect to the quarterly financial statements - within forty (40) days of the end of each calendar quarter. The financial statements shall be prepared in accordance with U.S. Generally Accepted Accounting Principles (GAAP) by the Company's auditors appointed pursuant to section 3.7 (Accountants) below. Upon the request of any Member, the Company shall appoint one of the "Big 4" accounting firms to convert such financial statements to be conformed to the International Financial Reporting Standards (IFRS). The Company shall bear the full cost of such conversion to IFRS.

**3.7.**    **Accountants**. The Company's auditors (accountants) shall be appointed by a unanimous decision of the Management Board.

**3.8.**    **Books and Records.**  The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act.  Such books and records shall be kept at the Company's Registered Office, or such other place as designated by the Members of Company.  All Members shall have access to the books and records at all reasonable times.

### Article IV
### Management of the Company

**4.1.    Management of the Company**. Subject to the provisions set forth in this Agreement, the day-to-day business and affairs of the Company shall be managed by the Company's Officers (as defined below) subject to the direction of the Management Board.  Subject to the terms of this Agreement, the Management Board will determine from time to time who may represent and bind the Company.

**4.2.    Officers**.

Subject to the provisions set forth in this Agreement requiring special approvals and consents:

a.    The Management Board may, from time to time, designate one or more persons, including Members, principals, employees and/or agents of the Company, to be officers of the Company (the "**Officers**"). Any Officer so designated shall have such authority and perform such duties as the Management Board may, from time to time, delegate to him. The Management Board may assign titles to particular Officers (including, without limitation, Chief Operating Officer, Chief Financial Officer, President, Executive or Vice President, Secretary and Treasurer). Unless the Management Board decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such Officer by the Management Board.

b.    Each Officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Officer. The salaries or other compensation, if any, of the Officers and agents of the Company shall be fixed from time to time by the Management Board, subject to the terms of any applicable employment agreements. Subject to any applicable employment agreement, any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Management Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any Officer may be removed as such, either with or without cause, by the Management Board; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Officer so removed. Designation of an Officer shall not of itself create contract rights.  Any vacancy occurring in any office of the Company may be filled by the Management Board. The Management Board may confer any of the foregoing rights and responsibilities to any Officer in respect of other Officers.

**4.3.    No Authority of Members**. Subject to any specific provisions of this Agreement, the Company shall be managed by its Management Board. Except as specifically authorized in writing by the Management Board, no individual Member or Members, in his/her capacity as a Member, shall have the authority to make any contracts, enter into any transactions, or make any commitments on behalf of the Company or to bind the Company in any way.

**4.4.    Management Board.**

a.    Subject to Section 4.4(b) below, the Management Board shall consist of up to seven (7) members. The members of the Management Board shall be appointed as follows:

i.    Notwithstanding the initial capital contributions of the Members or their membership interests in the Company, on the Effective Date, each Member shall be entitled to appoint members of the Management Board as follows: (a) Investor – three (3) members; (b) Fusion – two (2) members; and (c) iSun – two (2) members. For the purpose of determining a Member's right to appoint members to the Management Board, any membership interests (or Units) issued pursuant to or in connection with the exercise of the Option Pool set forth in Section 2.8 of this Agreement, shall be excluded and shall not be taken into consideration (thus shall not dilute a Member's Percentage Interest for such purpose).

Thereafter, should any other Person become a Member of the Company or in the event a Member sells any of its Units, the following shall apply:

ii.    Each Member holding between ten percent (10%) (inclusive) to 20% (exclusive) of the outstanding membership interests of the Company, shall have the right to appoint one (1) member to the Management Board;

iii.    Each Member holding between 20% (inclusive) to 50% (inclusive) of the outstanding membership interests of the Company, shall have the right to appoint two (2) members to the Management Board;

iv.    A Member holding more than 50% of the outstanding membership interests of the Company, shall have the right to appoint the majority of the members of the Management Board.

b.    A Member having the right to appoint a member to the Management Board shall also have the right to remove and replace such member. Any right of appointment, removal or replacement of a member of the Management Board shall be exercisable by a notice in writing signed by or on behalf of the Member concerned and the appointment, removal or replacement shall become effective from the date expressed in the notice to be its effective date (and if no such date is specified, then on the date such notice was submitted to the Company).

c.    All decisions made for and on behalf of the Company by the Management Board shall be binding on the Company. Except as expressly provided otherwise in this Agreement, the Management Board (acting for and on behalf of the Company), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall have the full right, power and authority to manage the Company's business, doing anything necessary, proper, or advisable to effectuate or further the purposes of the Company.  Except as expressly provided in this Agreement, all decisions of the Management Board shall be done by a majority vote the members of the Management Board.

**4.5.    Meetings of the Management Board.** The meetings of the Management Board may be called by Management Board's member upon not less than three (3) business days (any reference in this Agreement to "**business days**" shall refer to any day, other than a Friday, a Saturday, a Sunday or a day on which banks located in Delaware, U.S.A. or Tel Aviv, Israel are required by applicable law to close) prior written notice, unless a majority of at least 65% of the voting power in the Management Board determines in good faith that a shorter notice is appropriate due to the urgency of the matter to be discussed or if all of the Management Board's members waive such notice. The meeting will be held at the time and in the manner designated by the requesting Management Board's member, or as agreed among the Management Board's members (which may be in person, by phone, or in any other manner in which all Management Board members can hear and be heard by the other participants). A quorum in any meeting shall be a majority of the Management Board members, to include at least one Board member appointed by each Member who has the right to appoint a member to the Management Board. In addition, the Management Board may also adopt written resolutions approved by all of the Management Board's members and any such decision adopted by a written resolution shall be a resolution duly approved. Any Management Board's member can authorize another Management Board's member in writing to participate in the meeting and vote in its name. If the quorum is not present within thirty (30) minutes from the time set for the commencement of any Management Board meeting, then such meeting shall be adjourned and shall be reconvened at the same time and same place on the 2nd business day thereafter (the "**Reconvened Date**") or any other day, time and place determined by a majority of the Management Board then present. If the meeting is deferred to the Reconvened Date, no notice of the deferred meeting shall be given to the parties. If the meeting is deferred to another day or is to be held at another time or place, notice of the day, time and place of the deferred meeting shall be given to all of the Members. If an adjourned meeting is convened in accordance with this Section 4.5 and a quorum is not present within 30 minutes of the announced time, the requisite quorum at such adjourned meeting shall be any Management Board's member then in office who is/are lawfully entitled to participate in the meeting present at such adjourned meeting. At an adjourned meeting of the Management Board the only matters to be considered shall be those matters which might have been lawfully considered at the meeting of the Management Board originally called if a requisite quorum had been present, and the only resolutions to be adopted are such types of resolutions which could have been adopted at the meeting of the Management Board originally called, provided, that if a Management Board member did not participate at the first meeting or at the adjourned meeting, he or she shall not have any rights under Section 4.7 below with respect to the matters discussed at such adjourned meeting, and the Board members present at such adjourned meeting shall be free to decide on any matter which might have been lawfully considered at the meeting of the Management Board originally called if a requisite quorum had been present (subject to the rights under Section 4.7 below of those members present at such adjourned meeting).

**4.6.    Subject of Meetings.** At a properly called meeting, the members of the Management Board may vote on any matter permissible under the Act and this Agreement.

**4.7.    Protective Provisions.**

4.7.1 Notwithstanding anything to the contrary herein, the following matters shall require the consent of all of the Management Board member(s) appointed by the Investor (the "**Investor's Directors**"), all of the member(s) appointed by Fusion (the "**Fusion**

**Director(s)**") and all of the  member(s) appointed by iSun ("the **iSun Director(s)**"), *provided, however*, that in the event that the directors appointed by the same Member are not voting in the same manner, the decision on the issues listed in this Section below, shall not require a Managing Board Approval, but rather a Members decision in accordance with the provisions of Section 5.1 below:

      a.      Voluntary dissolution and any other decision to liquidate the Company, dissolve it or enter into bankruptcy, receivership or similar proceedings by it;

      b.      The issuance of additional Units of the Company or of any subsidiary thereof (including in excess of the Option Pool and, for the avoidance of doubt, for the purpose of admitting a new Member);

      c.      Any material change in the business, commencement of any new line of business or ceasing of any material business by the Company;

      d.      The approval of a Deemed Liquidation, as such term defined below (other than in connection with the approval of a Controlling Interest Transaction, as such term is defined below);

      e.      Any increase or decrease in the number of members of the Management Board, the delegation or assignment of any substantial rights of the Management Board to any person, except in the manner contemplated under this Agreement, approving the terms and conditions of any payments to the Officers or to any Member;

      f.      Formation of any subsidiary or allowing any entity to become the Company's subsidiary, except where approved in connection with the approval of an Approved Project;

      g.      Any transaction of the Company or any subsidiary thereof with a Member or with an Affiliate or a relative of a Member or any third party in which a Member has interest in (except for interest stemming solely from the holdings of Units in the Company);

      h.      The appointment of the CEO, CFO or any other so-called "C-level executive" of the Company and the terms of such persons' or of the Key Persons engagement with the Company, unless the appointment and the terms of engagement of such persons are approved as part of the annual budget;

      i.      The alteration or change of the rights, preferences, or privileges of the Units including an amendment to the Company's organizational documents (including this Agreement) in a manner that would adversely affect the rights, preferences or privileges of the Units or any of them;

      j.      The creation of a pledge or granting of security interest in a material asset or in all or substantially all of the assets of the Company;

      k.      The approval of an Annual Budget or a deviation of more than 10% from such approved Annual Budget;

l.         Any decision in accordance with Section 6.5 herein including the participation of a Member (or an entity having a participating interest in it) in a Third Party Sale;

m.       Each of the above with respect to any subsidiary of the Company;

n.       Approval of a Project Budget with respect to each Approved Project; and

o.       Any borrowing not in accordance with the Approved Budget;

4.7.2 Notwithstanding anything to the contrary herein, until the Loan is repaid in full, the following matters shall require the consent of the Investor's Director(s):

a.       Any utilisation of 50% or more of the "contingency" or similar line item in such Project Budget;

b.       Any similar decision to those set forth in (a) above, taken by a subsidiary of the Company.

"**Deemed Liquidation**" shall mean each of the following events: (A) the merger or consolidation of the Company with or into any other entity; (B) a sale or other disposition, in a single transaction or series of related transactions, of all or of substantially all of the membership interests of the Company, or (C) a sale, transfer, or other disposition of all or substantially all of the assets of the Company and its subsidiaries taken as a whole; except, in case of sub-articles (A) and (B), any such transaction or series of related transactions in which the Members as of immediately prior to such transaction continue to hold (solely by virtue of the respective membership interests and in the same holding proportions each of them held in the Company as of immediately prior to such transaction) immediately following such transaction, at least a majority, by voting power, of the share capital or membership interests of (1) the surviving, acquiring or resulting company or (2) if the surviving, acquiring or resulting company is a wholly owned subsidiary of another company immediately following such transaction, the parent company of such surviving, acquiring or resulting company.

**4.8.**    **Notice of Meetings.**  When a meeting of the Management Board is properly called, the members of the Management Board calling the meeting shall deliver a written notice stating the date, time, and place of any meeting of the Management Board and, when otherwise required by law, a description of the purposes for which the meeting is called, to each member of the Management Board, at such address as appears in the records of the Company, such notice to be mailed at least five (5), but no more than twenty one (21), days before the date and time of the meeting.  A member of the Management Board may waive notice of any meeting, before or after the date of the meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company.  A Management Board member's attendance at any meeting: (a) waives objection to lack of notice or defective notice of the meeting, unless the member, at the beginning of the meeting, objects to holding the meeting or transacting business at the meeting; and (b) waives objection to consideration of a particular matter at the meeting that is not within any purpose

described in the meeting notice, unless the member objects to considering the matter when it is presented.

**4.9.** <u>**Number of Votes (Voting Power).**</u>  Unless otherwise provided in this Agreement, the voting power of each member of the Management Board with respect to any specific matter or in any specific meeting shall equal (x) the percentage of the membership interests at the time of the relevant meeting, held by the specific Member who appointed such member of the Management Board, divided by (y) the number of members of the Management Board appointed by such appointing Member or group of Members, who actually participate and vote on such matter or in such meeting. No person shall have any casting vote.

**4.10.** <u>**Annual Budget**</u>. Subject to the other provisions of this Agreement requiring special consents and approvals, the Management Board shall approve the annual budget which shall include all Company's fees, costs, expenses, duties and other charges, including inter alia, Company internal costs (such as auditors cost and other required costs to its ongoing operation) and the annual business plan, including sources and uses (the "**Annual Budget**").

**Article V**
**Members' Right**

**5.1.** <u>**Matters Requiring Members' Approval.**</u> Notwithstanding anything to the contrary herein, the following matters shall require the written consent of all Members, in addition to any other majority requirement:

　　　　a.　　　The dissolution of the Company;

　　　　b.　　　An amendment to the Certificate of Formation;

　　　　c.　　　An amendment to this Operating Agreement, in a manner that would adversely affect the rights, preferences or privileges of the Units of any specific Member (in which case, only the approval of the adversely effected Member shall be required) (provided that providing other persons with special Units or rights as a result of or in connection with a bona-fide equity financing round of the Company shall not require such approval);

　　　　d.　　　Any change in voting rights of any Members or class of Members;

　　　　e.　　　Any decision that was not approved by the Management Board in accordance with Section 4.7 above, only due to the fact that members of the Management Board that were appointed by the same Member, voted differently; and

　　　　f.　　　Any similar decision to those set forth in (a) to (e) above, taken by a subsidiary of the Company.

**5.2.** <u>**Access to Information.**</u>  From and after the date hereof, the Company shall permit representatives of a Member, at such Member's expense, to examine all documents and other information in the possession of the Company as may reasonably be requested in order to enable

the Member to monitor their investment in the Company and to exercise their rights under this Agreement.

## Article VI
## Approval of Projects, Budgets and Operations

**6.1.    Definitions.**

a.      "**Solar Project(s)**" means solar photovoltaic power plants, with or without battery storage, in North America.

b.      "**Development**" means the development activities necessary to prepare a project to a stage so that it may achieve Financial Close and commencement of construction of a Solar Project, including, inter alia, securing land rights, connection to utility, engagement with offtakers, permitting and licensing, and securing finance for the Approved Project and securing all such other project agreements, including finance agreements required for the implementation of an Approved Project.

c.      "**Development Budget**" means, with respect to each Potential Project, the budget for the development of such Potential Project, which budget shall include the projected (out-of-pocket) hard and soft costs and expenses for the Development of the Potential Project, and such other information with respect thereto as reasonably requested or required by any member of the Management Board.

d.      "**Field**" means the Development and/or the holding and/or the operation of Solar Projects.

e.      "**Investment Memorandum**" means, collectively, with respect to each Potential Project: (a) an Investment Report for such Potential Project; and (b) a proposed Development Budget for such Potential Project.

f.      "**Investment Report**" means, with respect to each Potential Project, a written summary that describes the following matters with respect to such Potential Project: (a) general information on the Potential Project, (b) an overview of the regulatory environment and other relevant information, (c) the expected construction costs, (d) the pro forma cash flow projections and assumption for the applicable Potential Project and the expected yield and internal rate of return of the investment, and (e) other reasonably relevant information with respect to such Potential Project at such time, if any.

g.      "**EPC Agreement**" means, each of the contracts to be entered into between the Company (or any subsidiary thereof) and the EPC Contractor for the EPC Works, on a lump sum, fixed price basis.

h.      "**EPC Contractor**" means the entity which the Company (or any subsidiary thereof) shall engage to execute the EPC Work.

- 15 -

**6.2.**   **Sourcing.** In the event that a Member or an Officer identifies a potential opportunity in the Field ("**Potential Project**") it shall introduce such Potential Project to the Company in accordance with the process set forth in Section 6.3 below.

**6.3.**   **Approval Process of Potential Projects.** Subject to the provisions set forth in Section 8.1 below, with respect to each Potential Project, the Company shall, no later than thirty (30) days following the written request of a Member, prepare, procure and deliver to the Management Board an Investment Memorandum.  The Management Board shall convene for a meeting within fifteen (15) days after it shall have received the Investment Memorandum, to resolve whether to approve the Development of the Potential Project or not, or to instruct additional inquiry and examination of the Potential Project, in which case, the resolution of the Management Board shall be made within fifteen (15) days as of receipt of such information which shall be submitted to the Management Board as a revised Investment Memorandum. In the event the Management Board provides such approval to proceed, such approval shall include the Development Budget. Once the Management Board has approved a Potential Project, such Potential Project shall be deemed to be an Approved Project. The Company shall obtain approval in accordance with this Section 6.3 with respect to each Potential Project prior to entering into definitive agreements relating thereto; provided that the Company shall enter into such definitive agreements, including the utilization of a Loan under the Loan Agreement, as applicable, no later than thirty (30) days following the approval of the Approved Project by the Management Board. Notwithstanding the foregoing, the projects detailed on **Schedule 6.3** attached hereto shall be deemed Approved Projects.

**6.4.**   **Ongoing Reporting Regarding Approved Projects**. The Company shall provide the Management Board with ongoing updates regarding the progress of such Approved Project on a monthly basis, in a form to be agreed by the Management Board and the Management Board shall meet, at least once every calendar quarter, to discuss the progress of each Approved Project.

**6.5.**   **Sale of Next Stage Development Projects**. At any time after the Company shall have obtained a connection to utility approval for an Approved Project, and prior to securing senior non - recourse financing for such Approved Project, the Company shall submit to the Management Board a recommendation whether to sell such Approved Project to a third party or parties (a "**Third Party Sale**"), or to sell such Approved Project to a subsidiary,  or other Affiliate of the Company for the purpose of building and achieving commercial operation of such Approved Project (a "**Next Stage Development Project**"). For avoidance of doubt, a Third Party Sale shall not include any sale to an entity having any participating interest from the Company or a Member, except in accordance with Section 4.7.1(l) above. The Management Board shall convene within 14 days after the submission of such recommendation, unless a member of the Management Board has asked for further information, and in such case the Management Board shall convene within 14 days after the receipt of such information.

**6.6.**   **Rights upon a Third Party Sale and upon a Next Stage Development Project**.

a.   If the Management Board resolves to approve a recommendation for a Third Party Sale, such Third Party Sale shall be completed by the Management Board upon terms to be agreed upon with the relevant third party purchaser, within the parameters determined by the Management Board, and as approved by the Management Board, but in no event

shall a Third Party Sale be for an amount less than $65,000 per MW, unless unanimously approved by the Management Board otherwise.

b.    If the Management Board resolves to approve a recommendation that the Next Stage Development Project be advanced by an affiliate of the Company, , the Management Board will complete all the arrangements necessary for the construction of the Next Stage Development Project, including the senior lender and equity financing, including, if applicable, to invite additional investors to join the holding of such Next Stage Development Project by investing certain amounts in such Next Stage Development Project (the "**Additional Investors**"), then: (i) such Next Stage Development Project shall be sold, at a price of $65,000 per MW, to a subsidiary of the Company, or of another business entity to be established by the Members in which the rights and powers of the Members shall be the same rights and powers as with respect to the Company (unless otherwise agreed upon in writing by all Members) which shall act as a general partner or in a similar capacity with respect to such Next Stage Development Project (such entity the "**Managing Entity**"), and the Additional Investors and any of the Members wishing to become Additional Investors, shall act as limited partners (or in a similar capacity) with respect such Next Stage Development Project. The Management Board shall receive ongoing reporting on the process of raising capital from Additional Investors on a weekly basis.

c.    In connection with any Next Stage Development Project to be developed by the Company or an affiliate thereof, the Managing Entity shall offer each Member to participate in the financing of such Next Stage Development Project, upon the same terms and conditions as shall be offered to the Additional Investors and each Member shall have the right to so participate in such financing on a Pro-Rata Basis.

**6.7.    EPC Works By iSun.** For so long iSun holds at least 10% of the outstanding membership interests of the Company, iSun shall be granted a right of first offer (the "**ROFO**") consistent with subsection (a) below, to provide the Company, or the subsidiary that will hold such Next Stage Development Project (each an **"Owner"**), such engineering, procurement, construction and associated works as shall be set forth in a scope of work (the "**SOW**") to be prepared and delivered by the Managing Entity ("**EPC Works**") for any Next Stage Development Project on a lump sum fixed price basis.

a.    Right of First Offer: Prior to soliciting offers from any third party for the performance of any EPC Works for a Next Stage Development Project, the Managing Entity shall provide prior written notice to iSun of the Owner's bona fide intention to enter into an EPC Agreement for the performance of the EPC Works (the "**EPC Works Notice**"). The notice shall include details of the intended commercial parameters of the Next Stage Development Project together with an SOW in sufficient detail in order to enable iSun to make a first offer with respect to the performance of the proposed EPC Works. iSun will have the right to make a first offer within thirty (30) days of receipt of the EPC Works Notice. The Managing Entity shall consider the offer in good faith and accept the offer prior to soliciting offers from any third party, if it deems the offer to be (i) competitive, (ii) financeable by the Company (on terms acceptable to the Company, with respect to, inter alia, recourse, gearing, margins etc.(the "**Prospective Financing Terms**"))   and (iii)

- 17 -

generally no less beneficial to the Company than if a third party contractor were contracted for the performance of the EPC Works as set forth in the EPC Works Notice. If the Managing Entity rejects the iSun offer, the Managing Entity may accept an offer from a third party contractor that is listed in the then most recently published top twenty (20) Solar Contractors list published by Solar Power World (https://www.solarpowerworldonline.com/top-solar-contractors/) (or if no longer published another similar publication) for the EPC Works, provided that if the offer from the third party is lower by no more than three percent (3%) of iSun's first offer for EPC Works, then the Company shall engage iSun to perform the EPC Works for such Next Stage Development Project, provided that either (A) iSun provides a customary performance and payment bond, or (B) iSun is able to procure a financing party that accepts iSun as the EPC Contractor without a performance and payment bond, on terms not less favorable to the Owner than the Prospective Financing Terms.

The ROFO shall not apply to any Next Stage Development Projects if any of the following conditions apply: with respect to each respective year when a Next Stage Development Project is being awarded for EPC Works, if the Managing Entity shall have already awarded EPC Works to iSun in such year of one hundred (100) megawatts in capacity in 2023, up to two hundred (200) megawatts in capacity in 2024, and up to three hundred (300) megawatts in capacity in the year 2025; Without derogating from the above, the ROFO shall only apply to projects with a capacity of 20MW or more if iSun can provide a proof of ability (which will be demonstrated via at least one operational project) as set forth below:

| Proof of Ability With Respect to A Single Project with a Capacity Of (in MW) | ROFO Shall Apply to Single Project with a Capacity Of (in MW) |
|---|---|
| 20 | 20-50 |
| 50 | 50-100 |
| 100 | >100 |

b.        In the event the Managing Entity fails to execute a definitive agreement with a third party contractor within one hundred fifty (150) days following its notification of its choice to iSun according to subsection (b), the Managing Partner will revert to iSun and repeat the process set forth in Clause 6.7(a) above.

c.        Notwithstanding anything to the contrary set forth herein, in the event a third party is eventually engaged to perform the EPC Works with respect to any Project (the "**Third Party EPC Project**"), then iSun and the entity developing the specific Project shall enter into a services agreement for the appointment of iSun in the role of the owner's engineer for the purpose of such Third Party EPC Project and iSun shall perform all customary assignments of an owner's engineer with respect thereto, and in consideration for iSun's owner's engineer services with respect to such Third Party EPC Project, the

Company (or the Managing Entity, as applicable) shall pay iSun an amount equal to one and one half percent (1.5%) of the total cost of such Third Party EPC Project, which shall be calculated net of the cost of equipment, provided that in no circumstances will the amount paid to iSun be less than two hundred and fifty thousand Dollars (USD$250,000) or more than one million Dollars (USD$1,000,000).

d.      Notwithstanding anything to the contrary set forth in this Agreement, the Parties acknowledge that iSun shall have a right to perform (and may have been engaged to perform or is already performing, as applicable) the EPC Works with respect to the ongoing projects set forth in **Schedule 6.7** attached hereto.

**Article VII**
**Transfer of Interest**

**7.1.     Restrictions on Transfers.**

a.      The Members each agree that they will not voluntarily, involuntarily, or by operation of law sell, transfer, assign, encumber, pledge, convey, or otherwise dispose of ("**Transfer**") part or all of the Units in the Company they now own or may later acquire ("**Units**") except pursuant to the terms and conditions of this Article VII.  Any Transfer or attempted Transfer in violation of this Article VII shall be null and void and of no effect, and the Company shall refuse to register the Units in question in the name of the transferee.

Any certificate representing Units owned by a Member shall conspicuously bear the following legend:

THE OWNERSHIP, ENCUMBRANCE, PLEDGE, ASSIGNMENT, SALE, TRANSFER, OR OTHER DISPOSITION OF THE MEMBERSHIP INTEREST EVIDENCED BY THIS CERTIFICATE IS SUBJECT TO THE RESTRICTIONS IN AN OPERATING AGREEMENT BETWEEN THE MEMBER, THE COMPANY, AND THE OTHER MEMBERS. THAT AGREEMENT CONTAINS CERTAIN RIGHTS AND OPTIONS OF THE COMPANY AND THE OTHER MEMBERS TO PURCHASE THIS MEMBERSHIP INTEREST. A COPY OF THE OPERATING AGREEMENT IS ON FILE AT THE OFFICE OF THE COMPANY. ANY ENCUMBRANCE, PLEDGE, ASSIGNMENT, SALE, TRANSFER, OR OTHER DISPOSITION OF THIS MEMBERSHIP INTEREST CONTRARY TO THE OPERATING AGREEMENT SHALL BE NULL AND VOID AND OF NO EFFECT.

b.      Notwithstanding the foregoing, each Member is free to transfer and assign all or part of his or her Units to any of the following ("**Permitted Transferee**"):

i.      With respect to any Member who is a natural person – (A) a company wholly owned by such Member; (B) such Member's spouse, parents or children; and (C) in case of death of such Member, his heir(s) by operation of law or in accordance with its will;

ii.      With respect to any Member which is a corporate entity – any person that, directly or indirectly, either alone or through or together with any other

- 19 -

Affiliate(s), controls, is controlled by, or is under common control with, such person (for purposes of the definition of Affiliate, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by agreement or otherwise, and a party holding more than 50% of the voting power or the power to appoint directors or persons performing similar capacity of another Person shall be deemed to control such other Person) ("**Affiliate**");

iii.     With respect to any Member which is a partnership – (A) the limited and general partners of such Member; and (B) any Affiliate of such partnership or the general partner thereof or any entity managed by the same management company or managing general partner or by an entity which is an Affiliate of such management company or managing general partner, or any partner of such Affiliate.

iv.     A trustee (including any successor or replacing trustee) solely for the benefit of a Member; or if the Member is a trustee – any successor or replacing trustee for the same beneficiary, or the person(s) for the benefit of whom the transferred securities are held in trust, as disclosed in writing to the Company upon such time that the trustee became a Member);

v.     From Fusion to the Investor in accordance with the provisions of the MIPA (as defined below).

c.     In the event of the dissolution of a Member that is a partnership, limited liability company, corporation, or any other entity, the successor-in-interest of the dissolved or terminated Member shall, for the purposes of winding up the affairs of the dissolved or terminated Member, have the rights of a mere assignee of the Member's membership interest in the Company, as provided in the Act, and shall not become an additional or substitute Member unless and until the conditions set forth in Section 7.4 are satisfied.

d.     Any transfer or assignment of any direct or indirect ownership or other interest in a Member that is a trust, corporation, limited liability company, limited partnership, or any other entity that the majority of its assets is its holdings in the Company, that results in the Member being controlled by a person or persons other than a person or persons that controlled the Member when the Member first became a Member shall be deemed a Transfer of the Units of the Member and therefore subject to all of the restrictions and provisions of this Article VII (the "**Acquired Member**" and the "**Member Change of Control**", respectively), which shall apply for the avoidance of doubt, with respect to such Acquired Member's Company Units only (and shall not require the Acquired Member to provide any rights with respect to the securities of the Acquired Member being transferred). In addition, any encumbrance, pledge, or other collateral assignment of a direct or indirect ownership or other interest in a Member that is a trust, corporation, limited liability company, partnership, limited partnership, or any other entity the majority of its assets is

its holdings in the Company that, if the pledgee or other assignee were to exercise its right to acquire the interest, would (taking into account any prior transfers or assignments described above and any prior pledges, encumbrances, or collateral assignments) result in the Member being controlled by a person or persons other than a person or persons that control the Member on the date of this Agreement shall be deemed a Transfer of the Units of the Member and therefore shall also be subject to all of the restrictions and provisions of this Article VII.

The Acquired Member shall be treated as a Selling Member for the purpose of this Agreement, and the other Members may purchase all (or a part) of the Company Units then held by the Acquired Member, at a price per Unit based on the terms reflected in such Member Change of Control, subject to adjustments required to reflect the difference between a transaction for (i) a transfer or assignment of any direct or indirect ownership or other interest in the Acquired Member, and (ii) a Transfer of membership interests in the Company (resulting from taxation, assets and liabilities of the Acquired Member, etc.).  If the Members cannot agree on such required adjustments, such determination shall be determined by the U.S. branch of one of the "Big 4" accountancy firms or by a U.S. branch of BDO or affiliates thereof (the "**Expert**") appointed for such purpose by the Acquired Member. The Expert's determination shall be determinative and bind the Members with respect to such adjustments. All reasonable fees and expenses of the Expert shall be borne by the Company.

The provisions of this Section 7.1(d) shall apply to any transfer or assignment of any ownership or other interest in Fusion, as a result of which either Key Person (as defined herein) shall cease to have control over Fusion.

e.      Notwithstanding anything to the contrary herein, during the period of thirty six (36) months following the Effective Date of this Agreement (or until an IPO, as defined below – the earlier), other than in connection with a sale of all or substantially all of the membership interests of the Company and other than to their respective Permitted Transferees, neither iSun, nor Fusion shall be entitled to Transfer all or any part of its Units without the prior written consent of the other Members, other than a Transfer in connection with that certain Share Purchase Agreement, by and between Fusion and the Investor, dated June 23, 2022 (the "**MIPA**").

## 7.2.    <u>Right of First Refusal</u>.

a.      Prior to an IPO, if  a Member ("**Selling Member**") receives a bona fide offer in writing to sell or otherwise dispose of any or all of its Units from a third party who is financially and legally capable of carrying out the terms of the offer (a "**Bona Fide Offer**"), such Member shall notify the Company of such Bona Fide Offer, in writing, within three (3) days of receipt of such offer (the "**Notice**"), which Notice shall include a copy of the Bona Fide Offer. The Bona Fide Offer must be in writing and state the offeror's name and address, the number of Units offered (the "**Offered Unites**"), the offering price per Unit, and all other material terms of the Bona Fide Offer.

b.       Within seven (7) days after the Company receives the Notice and Bona Fide Offer, the Company shall mail a copy of the Bona Fide Offer to the other Members, indicating the date of mailing by the Company (the "**ROFR Notice**").

c.       Upon receipt of the ROFR Notice, and for a period of thirty (30) days thereafter (the "**Offer Period**"), the other Members of the Company shall have the exclusive right and option ("**Option**"), but not the obligation, to purchase all, but not part of, the Selling Member's Offered Units, at the price and upon the terms stated in the Bona Fide Offer.  Any purchase of Offered Units by the other Members of the Company shall be made on a Pro Rata Basis (as defined below).  If the other Members fail to exercise the Option, the Selling Member may sell all, but not less than all (other than in the event of Tag-Along as detailed in Section 7.3 below), the Offered Units subject to the Bona Fide Offer to the purchaser named in the offer, but only strictly in accordance with all of the terms and provisions of the Bona Fide Offer.

d.       If the sale pursuant to the Bona Fide Offer is not consummated within sixty (60) days following the expiration of the Option, the Selling Member must again comply with all of the terms and provisions of this Section 7.2  before any Transfer of any Units pursuant to this or any other Bona Fide Offer.

e.       If Option is exercised in accordance with the terms of the Bona Fide Offer, the sale of Offered Units shall be closed in the time frame provided for within the Bona Fide Offer or at any time within sixty (60) days following the exercise of that option, at the sole election of the party exercising the option.

f.       For the purposes of this Section 7.2 and the other provisions of Article VII, the term "**Pro Rata Basis**" with reference to the purchase of any Units of a Selling Member by the remaining Members shall mean that basis of sharing (i) pursuant to the unanimous written agreement of the remaining Members, or (ii) absent such an agreement, pursuant to each of the remaining Members' respective Percentage Interest in the outstanding Units of the Company (excluding the Units owned by the selling Member); and if one or more of the remaining Members declines to purchase the Member's entire share of the Offered Units being sold, the unpurchased Offered Units shall again be offered to the remaining Members (other than any declining Members) in accordance with their revised respective Percentage Interest (excluding any Units of the selling Member or any declining Member), and this process shall be repeated until all of the remaining Offered Units of the selling Member to be purchased by the remaining Members are purchased.  If the Company obtains additional Members, any right or option of the Members under this Section 7.2 to purchase Units of a selling Member shall accrue to all Members including additional Members, on a Pro Rata Basis or as the Members and additional Members otherwise agree in writing.

g.       The Right of First Refusal under this Section 7.2 shall not apply to a Transfer of any Units or other securities of the Company by the Selling Member to its Permitted Transferees.

**7.3.    Tag Along.**

- 22 -

a.      Without derogating from and subject to the provisions of Section 7.2 above, if, until an IPO (as defined below), any Selling Member desires to Transfer any Offered Units, then the other Members of the Company shall have the right, exercisable within the Offer Period, to require, by a written notice to the Selling Member, in lieu of exercising the Option, as a condition to such Transfer described therein, that the contemplated purchaser of such Offered Units shall purchase from such remaining Member (such member who exercises its Tag-Along right is referred to herein as a "**Participant**") at the same price and on the same terms and conditions of the Bona Fide Offer, that number of Units held by such Participant (or a portion thereof) equal to the lower of: (A) the number of Units indicated by the Participant in its Tag-Along notice; or (B) the number of Units representing such Participant's respective Percentage Interest in the outstanding Units of the all Participants and the Selling Member, multiplied by the number of Offered Units (each Participant's portion – its "**Tag-Along Pro Rata Portion**").

b.      If the Tag-Along option is exercised and the Transfer is consummated, the portion of the Offered Units to be Transferred by the Selling Member shall be decreased to allow each Participant to sale, as part of the Transfer, such Participant's Tag-Along Pro Rata Portion on the same terms and conditions as set forth in the Bona Fide Offer, and no Transfer of any Offered Units by a Selling Member shall be completed unless complied with the above.

h.      If the Tag-Along option is not exercised, the Seller shall be entitled to Transfer all of the Offered Units, to the purchaser at any time within the sixty (60) days following the lapse of the Offer Period. Any such Transfer shall be at terms and conditions not more favorable to the Selling Member than those specified in the Bona Fide Offer. If the sale pursuant to the Bona Fide Offer is not consummated within such period the Selling Member must again comply with all of the terms and provisions of this Section 7.3 before any Transfer of any Units pursuant to this or any other Bona Fide Offer.

c.      The rights of Tag-Along under this Section 7.3 shall not apply to a Transfer of any Units or other securities of the Company by the Selling Member to its Permitted Transferees.

"**IPO**" shall mean any underwritten offering and sale of Units to the public pursuant to an effective registration statement filed with the SEC (as defined below) under the Securities Act of 1933 (or the closing of another transaction that results in any Unit being publicly traded and widely held by the public, including a merger, a share swap or a similar transaction with another entity whose shares are publicly traded (whether the Company is the surviving entity or not, including a transaction pursuant to which the then existing Members of the Company are entitled to shares of the surviving entity, which shares are publicly tradable (subject to any legal or contractual lock-up restrictions) and including through the consummation of a so-called SPAC transaction.

"**SEC**" shall mean, at any time, the Securities and Exchange Commission or any other federal agency at such time administering the Securities Act of 1933.

**7.4.   Purchaser's Status as a Member.**  If a Member sells or assigns all or part of its interest in the Company, the purchaser or assignee of such interest shall be entitled to all of the

rights and privileges of a Member of the Company only upon the unanimous written consent of all of the remaining Members. If all of the remaining Members do not consent to the admission of such purchaser or assignee as a Member, then such purchaser or assignee shall only be entitled to the distributions from the Company to which the Selling Member would have been entitled.

**7.5.    Seller's Status as a Member.**  Whenever a Member sells or assigns all of its interest in the Company, such selling Member shall cease to be a Member of the Company. Notwithstanding the preceding, every transferee of a Member's interest must execute an acknowledgment and consent to be bound by the terms and provisions of this Operating Agreement as a condition precedent to becoming a Member with the attendant rights, benefits and obligations of such membership.  No transfer, whether by sale, devise, or otherwise shall be effective unless and until the execution of such acknowledgment and consent and the effective delivery of the same to the Company.

**7.6.    Drag-Along.**

a.    Notwithstanding any other provision of this Operating Agreement to the contrary, if at any time one or more Members who, at the time, own individually or together more than seventy percent (70%) of the total Units outstanding (a "**Controlling Interest**") receive a Bona Fide Offer (as defined in Section 7.2) from a person or entity that is not affiliated with any Selling Member, to purchase the Controlling Interest, the Members representing a Controlling Interest shall have the right to require all the other Members to sell all (and not less than all) of their Units to the person making the Bona Fide Offer on the same terms and subject to the same conditions of the Bona Fide Offer (a "**Controlling Interest Transaction**"). On receiving such a Bona Fide Offer, the Members holding the Controlling Interest shall immediately provide the Company and all other Members with written notice (the "**Sale Notice**"), together with a copy of the Bona Fide Offer and all related agreements and documents and a certificate signed by officers of the Members holding the Controlling Interest, confirming that there are no other agreements entered into with the Person making the Bona Fide Offer in connection with such offer. Together with the Sale Notice, the Members holding the Controlling Interest shall provide all the other Members with an evaluation prepared by a U.S. branch one of the "Big 4" accountancy firms or by a U.S. branch of BDO or affiliates thereof, appointed for such purpose by them in which it is confirmed that the price offered in the Bona Fide Offer is a reasonable valuation of the Units. All reasonable fees and expenses of the Expert shall be borne by the Company.

b.    Upon receipt of a Sale Notice, each Member shall: (i) be prohibited from agreeing to or consummating the sale or other disposition of any Units other than in connection with the proposed acquisition; (ii) sell all of the Units held by it at such time, on the terms and conditions stated in the Sale Notice; (iii) vote all Units then held by it: (1) in favor of or to approve the sale set out in the Sale Notice and any matter that could reasonably be expected to facilitate such sale; and (2) against any proposal for any business combination (other than the sale set out in the Sale Notice) between the Company and any person or entity or any other action or agreement that would result in a breach of any covenant, representation or warranty or any other obligation or agreement of the Company or any of the Members under the definitive agreement(s) related to sale transaction, or

which could result in any of the conditions to the Company's obligations under such agreement(s) not being fulfilled, or that would otherwise impair the ability of the Company to properly and timely consummate the sale transaction; and (iv) execute the relevant documents (including without limitation any instruments of conveyance and transfer, purchase agreements, merger agreements, escrow agreements, indemnification agreements and any other relevant instruments) in connection with, and shall otherwise take all actions necessary and reasonable to effect the sale.

c.      To the extent permitted by applicable law, and in the event any Member fails to comply with the provisions of this Section 7.6, immediately upon consummation of the Controlling Interest Transaction and subject to the receipt by all Members of the full consideration due to them at such time in connection with the Controlling Interest Transaction as set out in the sale agreement in connection with such sale, the Company shall, and the Company shall thereupon register the Units underlying the Sale Notice in the name of the purchaser named in the Sale Notice. Each Member hereby grants to the Members representing a Controlling Interest an irrevocable proxy, coupled with an interest, effective upon a failure or a refusal by such Member to vote its Units in accordance herewith, to vote all of such Member's Units and to take such other actions to the extent necessary to carry out the provisions of this Section 7.6 in the event of any breach or imminent breach of this Section 7.6 by any Member. The Members agree and acknowledge that: (i) monetary damages would not adequately compensate an injured party for the breach of this  Section 7.6 by any party; (ii) this  Section 7.6(c) shall be specifically enforceable; and (iii) any breach or threatened breach of this Section 7.6(c) shall be the proper subject of a temporary or permanent injunction or restraining order.

**Article VIII**
**Additional Undertakings By the Members**

**8.1.    Exclusivity**.

a.      The Company shall be the exclusive investment vehicle of each Member and such Members' respective Affiliates (for so long as such Member is a Member of the Company) for the acquisition, Development, sale, ownership, leasing, management and operation of, or investment in Solar Projects (as defined in Section 6.1(a) above) located in North America (the "**Specified Activities**", and any entity or business engaged in Specified Activities, a "**Specified Business**"), and it (or any of its Affiliates) shall not (whether for its own behalf or on behalf of any other person or entity and either alone or jointly with any other person or entity) (i) acquire or invest in any Specified Activity or Specified Business, or (ii) otherwise, engage in, manage or participate in the management, operation or control of any person or entity engaged in Specified Activity, other than through the Company.

b.      Notwithstanding the foregoing, iSun shall not be bound by the obligations of Section 8.1(a) with respect to certain Solar Projects (the "**Excluded Projects**"), if and only to the extent all, and not less than all, of the following conditions shall be met: (i) such Excluded Projects shall have a total aggregate capacity that does not exceed 30 MWs per each calendar year during the term of this Agreement; (ii) such Excluded Projects shall

have a total aggregate capacity that does not exceed 10 MW for each site in which an Excluded Project is located; (iii) such Excluded Projects shall only be located in the ISO-New England region of the United States; (iv) the sponsor equity of such Excluded Projects shall be financed by iSun itself from the shareholders equity on its balance sheet (and not by third parties); (v) the purpose and goal of the exclusion of such Excluded Projects shall be tax credits for iSun; and (vi) iSun shall provide to the Management Board of the Company (or to a similar organ of any other Managing Entity, if applicable), prior to excluding any such Excluded Project, a detailed report setting forth the material details of such Excluded Project, including any information relevant to demonstrate the compliance with this Section 8.1(b)).

c.      For the avoidance of doubt, the exclusivity undertaking herein shall further not apply to: (i) any project for which iSun has an existing Development financier on the Effective Date, as set forth in **Schedule 8.1** hereto, and/or (ii) any project in which iSun is, or will be, engaged to perform Development, operations, maintenance or construction services by a third party, including but not limited to those forth in **Schedule 8.1** hereto, and/or (iii) any residential, rooftop commercial, or community solar projects.

**8.2.**    **Time Commitment**. For so long as Fusion is a Member of the Company, it and each of Avi Avitan and/or Niv Sarne (each a "**Key Person**"), with respect to each of the Key Persons - for so long as such Key Person holds, directly or indirectly, at least 5% of the issued and outstanding equity interests of Fusion, shall devote his utmost business time and attention to the performance of the assignments such Key Person is required to perform with respect to the management of the Company and/or its subsidiaries. The Company or any subsidiary thereof (as may be agreed between the parties hereto), shall enter into services or employment agreements with either Fusion and/or each Key Person, setting forth the terms of employment of each Key Person with the Company or any subsidiary of the Company. Such services or employment agreements, shall include provisions prohibiting the termination of the Key Persons' engagement (for as long as they comply with the requirements for being Key Persons) without the approval of all Members, unless such termination is for "Cause" as such term shall be defined in such services or employment agreements.

**8.3.**    **General.**

a.      Each Member hereby acknowledges and agrees that the covenants contained in this Article VIII are reasonable under the circumstances and further agrees that the covenants contained in this Article VIII should be interpreted in such a manner as to be effective and valid under applicable laws. In the event that any of the provisions contained in this Article VIII shall for any reason be held to be excessively broad as to duration, geographic scope, activity or subject, such provision shall be construed by limiting or reducing it so as to be enforceable to the maximum extent compatible with applicable law. Each Member acknowledges that the Company and each other Member may seek monetary damages, specific performance, injunctive relief or other equitable relief for any breach by Fusion or any of its Affiliates of any provision of this Article VIII and may seek to enjoin the defaulting Member or its Affiliates from any further violation in addition to all other rights and remedies available at law or in equity.

- 26 -

b.    Except as provided in this Article VIII, each Member and its Affiliates may engage or invest in, devote its and their time to, and exploit any business opportunity with respect to, any business venture or activity of any nature and description, whether or not such activities are considered competitive with the Company, and neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby in or to such other venture or activity of any Member or its Affiliates (or to the income or proceeds derived therefrom), and the pursuit of such other venture or activity shall not be deemed wrongful or improper.

## Article IX
## Withdrawal or Expulsion of a Member

**9.1.    Covenant Not to Withdraw.**

a.    Notwithstanding any provision of the Act, each Member hereby agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder.  Therefore, except as otherwise expressly required or permitted by this Agreement, each Member hereby covenants not to: (i) withdraw or attempt to withdraw from the Company in breach of Section 7.1(e) above or otherwise transfer any or all of such Member's membership interest in the Company not in accordance with the terms of this Agreement; (ii) exercise any power under the Act to dissolve the Company; or (iii) petition for judicial dissolution of the Company.

b.    In the event that: (i) any Member violates Section 9.1(a) above and/or (ii) any Member or any of its Affiliates violates the terms of Article VIII above and/or (iii) a Member has engaged or is engaging in, wrongful conduct that has or will adversely and materially affect the Company's activities and such conduct is not terminated within thirty (30) days after the Company notifies the Member of such wrongful conduct and/or (iv) a Member has willfully or persistently committed or is willfully and persistently committing, a material breach of this Operating Agreement or the Member's duties and obligations as a Member of the Company, and/or (v) a Member has breached Section 13.9(a) or (b) of this Agreement and was convicted by competent court in a felony related to such breach (each of (i) through (v) above, an "**Event of Default**" and any such Member, a "**Violating Member**"), such Member: (x) shall forfeit its rights to designate any members to the Management Board pursuant to Section 4.4 until such time as such Event of Default has been fully cured, and (y) shall have no right to exercise any voting, consent or approval rights hereunder or to deliver any Election Notice, in each case until such time as such Event of Default has been fully cured, and/or (z) may be expelled as a Member upon an affirmative vote of the Members then owning a majority of the Units in the Company (excluding the Violating Member).

c.    As liquidated damages and not as a penalty (and not as a sole remedy), the Company shall have the right, exercisable by written notice to the Violating Member within forty (40) days after the Company learns of the Event of Default, to acquire the Violating Member's interest in the Company at a price equal to fifty percent (50%) of the balance of the Violating Member's Capital Account as of the date that such notice is given (less the amount of the reserve for insurance charge allocable to such Member's Capital Account)

- 27 -

("**Purchase Price**"). If this right is exercised, the closing shall take place at a time and place designated by the Company, but no later than sixty (60) days after the notice is given to the Violating Member. On the closing date, the Company shall have the option of paying the entire Purchase Price in full or by delivering twenty percent (20%) of the Purchase Price at closing along with a promissory note ("**Note**") for the balance of the Purchase Price. The Note shall be payable in one hundred twenty (120) equal monthly installments of principal and interest with interest accruing at a rate of five percent (5%). The Note shall be unsecured and may be prepaid at any time without penalty but shall not be accelerated in the event of default.

d.       If the Company does not exercise its purchase rights under Section 9.1(c), above, the remaining Members shall have the right to acquire the Units on the same basis described above, but with an additional thirty (30) days after the Company's notice period has expired, with closing also extended an additional thirty (30) days. Exercise of such right shall be given by delivery of notice to the Company and to the Violating Member (or to the successor in interest of a deceased Member). Members who wish to exercise this right shall purchase all available Units among them pro rata according to their Capital Account balances.

**9.2.**     **Expulsion of Member.**  By a unanimous vote of all Member's not being considered for expulsion (all the remaining Members), a Member shall be expelled as a Member of the Company on the occurrence of any of the following, and (i) the Company shall have the right (which can be assigned to the remaining Members, on a pro-rata basis) to purchase all of such expelled Member's membership interests in the Company for an amount equal to the balance of such expelled Member's Capital Account as of such date (less the amount of the reserve for insurance charge allocable to such Member's Capital Account), and (ii) such expelled Member's rights under this Agreement shall automatically be revoked:

a.       If it is unlawful to carry on the Company's activities with the Member as a Member of the Company;

b.       If the Member is a corporation, limited liability company, or partnership and within ninety (90) days after the Company notifies the Member that it will be expelled as a Member because the Member is dissolved, the dissolution of the Member is not revoked;

If the Member has engaged or is engaging in, conduct relating to the Company's activities that make it not reasonably practicable to carry on the Company's business with the Member, and such conduct is not terminated within thirty (30) days after the Company notifies the Member of such conduct.

**9.3.**     **Expulsion of iSun as Member Due to Change of Control.** If there has occurred a Member Change of Control with respect to iSun, and (i) as a result of such Member Change of Control, the person controlling iSun, directly or indirectly or its Affiliates, is directly competing with the Company in the territory of North America in the Field or (ii) following such Member Change of Control, iSun declines to, or otherwise does not comply with Sections 6.7(a) or 8.1, then, (A) the Management Board Member(s) appointed by iSun shall immediately cease to serve

- 28 -

as member(s) of the Management Board and notwithstanding anything to the contrary in this Agreement or otherwise, iSun shall have no right to appoint member(s) to the Management Board and iSun shall immediately cease to have any rights under Sections 4.7 and 6.7 herein, and (B) no later than (1) six (6) months of the date of the Member Change of Control (with respect to clause (i) above), or (2) the later to occur of the date of the Member Change of Control or the date in which iSun first declines to, or otherwise does not comply with Sections 6.7(a) or 8.1, notwithstanding the other provisions of this Section 9.2, then the Company shall have the right to purchase all of iSun's membership interests in the Company and the Company shall purchase such membership interest for an amount equal to the balance of iSun's Capital Account as of such date (less the amount of the reserve for insurance charge allocable to such Member's Capital Account) and such sale shall occur no later than sixty (60) days following the relevant date set forth in clauses (1) or (2) above.

## Article X
## Dissolution & Liquidation

**10.1.    Dissolution.**  The Company shall be dissolved and its affairs shall be wound up only upon the supermajority consent of the Members constituting at least 70% of the outstanding Units or upon the entry of a decree of judicial dissolution.

**10.2.    Termination.**  The Company shall terminate its business and be dissolved in accordance with this Article X upon the first to occur of the following events ("**Events of Dissolution**"):

      a.    The sale of all or substantially all of the Company's assets and the receipt of all consideration therefor; or

      b.    Any event that makes it unlawful for the business of the Company to be carried on by the Members.

**10.3.    Liquidation.**  The dissolution of the Company shall be effective on the ninetieth (90th) day after the occurrence of an Event of Dissolution.  Upon the dissolution of the Company, the Members shall liquidate the assets of the Company, apply and distribute the proceeds thereof as provided by this Agreement and cause the cancellation of the Company's Certificate of Formation.  The Company shall not be wound up until the Company's Certificate of Formation have been canceled and the assets of the Company have been distributed as provided herein. The Management (or other liquidator) shall make all filings required by the Delaware Act in connection with the winding up and dissolution of the LLC.

**10.4.    Distribution in Liquidation.**  Upon the dissolution of the Company and incident to the winding-up of the Company's business and affairs, the Members shall pay or make provision for the payment of all liabilities and obligations of the Company, actual or contingent, and all expenses of liquidation.  Any amounts deemed necessary by the Members to provide a reserve for any unforeseen liabilities and obligations may, in the Members' discretion, be deposited in a bank or trust company upon such terms and for such period of time as the Members may determine. Following the payment of or provision for the liabilities of the Company as provided above, the remaining assets of the Company shall be distributed.

## Article XI
### Indemnification

**11.    Limitation of Liability of Covered Persons.**

a.      Notwithstanding any other terms of this Agreement, whether express or implied, or any obligation or duty at law or in equity, no Company officer, Company employee, member of the Management Board or Member, and no shareholder, member, managing member, partner, general partner, officer or employee of any subsidiary of the Company or of any Member, in each case, in his/her/its capacity as such (each, a "**Covered Person**"), shall be liable to the Company or the Members (i) for mistakes of judgment or for any act or omissions suffered or taken by them, or for losses due to any such mistakes, action or inaction, taken or omitted in good faith by a Covered Person and in the reasonable belief that such act or omission is in, or is not contrary to, the best interests of the Company and is within the scope of authority granted to such Covered Person by this Agreement, unless such act or omission resulted from or related to (A) any breach by the Covered Person of any provision of this Agreement or (B) any fraud, bad faith or willful misconduct by such Covered Person or (ii) for the willful misfeasance, bad faith or other conduct of any independent contractor of the Company selected by the Management Board provided, that such independent contractor (including any who may be a Member) was selected, engaged or retained in good faith. A Covered Person shall also not, solely by reason of being a Covered Person, be bound by, or be personally liable to any third Person for a judgment, decree or order of any governmental authority or in any other manner, for the expenses, liabilities or obligations of the Company whether arising in contract, tort or otherwise.

b.      To the maximum extent permitted by applicable law, no Covered Person shall be liable for, and the Company shall indemnify and hold harmless each Covered Person from and against, any and all damages, losses, liabilities, claims, reasonable out-of-pocket costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) arising from any and all claims, demands, actions, suits or proceedings, civil, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its status as a Covered Person; provided, that notwithstanding the foregoing, a Covered Person shall not be entitled to indemnification hereunder to the extent that any such claims, liabilities, damages, losses, costs or expenses arise out of or relate to (i) any breach by the Covered Person of any provision of this Agreement or (ii) any claim, issue or matter in which such Covered Person has engaged in fraud, bad faith or willful misconduct.  The termination of any action, suit or proceeding by judgment, order, settlement or upon a plea of *nolo contendere* or its equivalent shall not of itself (except insofar as such judgment, order, settlement or plea shall itself specifically provide) create a presumption that the Covered Person acted in a manner described in clauses (i) or (ii) of the preceding sentence.

c.      To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company, such Covered

Person acting under this Agreement shall not, except as otherwise provided in clause (a) of this Section, be liable to the Company for its good faith reliance on the provisions of this Agreement or the advice of accountants and counsel.  The provisions of this Agreement, to the extent they expand or restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members and the Company to modify, to that extent, such other duties and liabilities of such Covered Person.

       d.      Each Covered Person may consult with legal counsel or accountants selected by it, and any action or omission suffered or taken in good faith in reliance and accordance with the written opinion or advice of any such counsel or accountants (provided such have been selected with reasonable care) shall be full protection and justification with respect to the action or omission so suffered or taken.

       e.      Except as otherwise provided by the Act, or otherwise agreed in writing, the debts, liabilities and obligations of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, liability or obligation of the Company solely by reason of being a Covered Person.

       f.      Expenses (including attorneys' fees) incurred by a Covered Person in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount if it shall ultimately be determined that such Person is not entitled to be indemnified by the Company as authorized in this Section 11.1 Such expenses (including attorneys' fees) incurred by other employees and agents of the Company or by Persons serving at the request of the Company as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may be so paid upon such terms and conditions, if any, as the Company deems appropriate.

       g.      In the event that any Member shall, notwithstanding the provisions of Section 18-303 of the Act to the contrary (and solely as a result of the inapplicability, or deemed inapplicability of such provision of the Act), become liable under a judgment, decree or order of a court or any other governmental authority, or in any other manner, for a debt, obligation or liability of the Company, the Company shall indemnify such Member and hold such Member harmless from and against any such debt, obligation or liability of such Member (together with reasonable attorneys' fees and expenses in defending against any claimant seeking to impose any such debt, obligation or liability).

### Article XII
### Dispute Resolution

**12.**     **Dispute Resolution.**

       a.      The parties shall attempt, in good faith, to resolve or cure all disputes relating to this Agreement or the Company by mutual agreement in accordance with this Section 12.1 before initiating any legal action or attempting to enforce any rights or remedies hereunder, at law or in equity. If there is a dispute as to whether any dispute under

this Agreement or in connection with the Company has arisen, either party may give notice thereof to the other party or parties which notice shall describe in reasonable detail the basis and specifics of the dispute. Within five (5) business days after delivery of such notice, representatives of all parties shall meet to discuss and attempt to resolve or cure such dispute. If the representatives are unable to resolve the dispute within fifteen (15) business days after delivery of such notice, the matter shall be referred to the most senior executive officer of each party. If such senior officers are unable to agree on an appropriate cure or resolution within seven (7) business days after the matter has been referred to them, and the parties may have recourse to arbitration in accordance with this Section 12.

b.      All disputes arising out of, relating to or in connection with this Agreement or in connection with the Company, which were not resolved in accordance with Section 12.1 shall be finally settled under the Rules of Arbitration (the "**Rules**") of the International Chamber of Commerce (the "**ICC**"). Each party, on behalf of itself and its Affiliates, irrevocably and unconditionally consents to such arbitration as the sole and exclusive method of resolving any such dispute. The parties irrevocably agree that no party may apply to any court or other judicial authority to determine any question of law arising in the course of any arbitration between the parties and that no party may appeal to any court or other judicial authority on a question of law arising out of an award made in any arbitration between the parties.

c.      The arbitration proceeding will take place in Manhattan, New York City, New York and will be conducted in the English language. There shall be one (1) arbitrator, who shall be appointed by the parties involved in the dispute within thirty (30) days of the first written request to appoint such arbitrator, and if such parties cannot agree on the identity of the arbitrator, then the parties shall as soon as possible and no later than forty five (45) days of the first written request to appoint such arbitrator, submit a written request to the Secretary General of the ICC to appoint an arbitrator pursuant to the Rules. The arbitrator shall be chosen solely from among individuals who are licensed as certified public accountants or to practice law in the State of New York or in the State of Delaware. The award of the arbitral tribunal shall be rendered in writing, shall state which party to the arbitration, if any, should bear the costs and expenses of the other party thereto, and shall be final and binding on the parties, who hereby agree to waive to the fullest extent permitted by law any right they may otherwise have under the laws of any jurisdiction to any form of appeal or collateral attack of such award. Judgment upon any arbitral award rendered may be entered and a confirmation order sought in any court having jurisdiction thereof.

d.      The arbitral tribunal shall have the power to issue injunctions and award specific performance.

## Article XIII
## Miscellaneous

**13.1.   Governing Law.**   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any conflict of law provisions.

**13.2.    Entire Agreement.**  This Agreement contains the entire understanding among the parties and supersedes any previous understanding and agreements between them respecting the subject matter of this Agreement.  There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties to this Agreement, relating to the subject matter of this Agreement, that are not fully expressed in this Agreement.

**13.3.    Non-Solicitation.** For so long as any Person is a Member, and for twelve (12) months thereafter, such Person shall not solicit for employment, recruit, or hire, any employee of another Member or of the Company, without the prior written consent of such Member or of the Company, as the case may be. This shall not include any general solicitations of employment made through public notifications.

**13.4.    Severability.**  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules, and regulations of the jurisdictions in which the Company does business.  If any provision of this Agreement or its application to any person or circumstances shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected by it, but rather shall be enforced to the greatest extent permitted by law.

**13.5.    Notices.**  Notices to Members or to the Company shall be deemed to have been given when delivered in person, by an overnight currier or sent via electronic mail, addressed as set forth in this Agreement or as set forth in any notice or change of address previously given in writing by the addressee to the addresser.

**13.6.    Captions.**  The section titles or captions contained in this Agreement are provided for the sake of convenience only and shall not be deemed part of the context of this Agreement.

**13.7.    Number and Gender.**  All of the terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, that the context or sense of this Agreement may require, as if the words had been fully and properly written in the number and gender.

**13.8.    Counterparts, Facsimile and E-mail Signatures.**  This Agreement may be signed in any number of counterparts with the same effect as if the signature to each counterpart were deemed a single instrument and all such counterparts together shall be deemed an original of this Agreement.  Any signature delivered by a party to this Agreement by facsimile or e-mail transmission shall be deemed to be an original signature hereto.

**13.9.    Anti-Corruption Laws and Compliance**.

a.    The Management Board and the Members shall use their corporate powers so as to not permit Company or any subsidiary thereof, or any personnel, agents and other representatives of the Company or any subsidiary thereof, to violate the U.S. Foreign Corrupt Practices Act of 1977, the U.S. Money Laundering Control Act of 1986 or any other applicable Laws or conventions to which the Company of any of its subsidiaries is subject relating to corruption (governmental or commercial), bribery, money laundering,

political contributions or gifts, entertainment and gratuities, involving or to any governmental authority or any government official or commercial entity ("**Anti-Corruption Laws**").

b.      Each Member represents and warrants to the Company and each other Member that he, she or it has not, directly or indirectly, obtained or induced and will not attempt to so obtain or induce the execution of this Agreement or the entry into or receipt of, as applicable, any contract, consent, approval, right, interest, privilege or other obligation or benefit related to this Agreement, the business of the Company or its other dealings with each other party or its Affiliates in connection with any transaction contemplated hereby through any violation of Anti-Corruption Laws and has not given or agreed to give (and shall not give or agree to give) to any Person, either directly or indirectly, any placement fee, introductory fee, arrangement fee, finder's fee or any other fee, compensation, monetary benefit or any other benefit, gift, commission, gratification, bribe or kickback, whether described as a consultation fee or otherwise, with the object of obtaining or inducing the entry into this Agreement or the entry into or receipt of, as applicable, any contract, right, interest, privilege or other obligation or benefit related to this Agreement, the business of the Company or any transaction contemplated hereby in violation of Anti-Corruption Laws.

c.      The Company shall adopt and maintain internal controls, policies and procedures that are reasonably designed to ensure compliance with Anti-Corruption Laws.

**13.10.  Confidentiality; Public Announcements**.

a.      Each of the Members hereby agrees that throughout the term that he, she or it is a Member and for  a period of 24 months thereafter, it shall keep (and shall cause its directors, officers, general and limited partners, employees, representatives and outside advisors and its Affiliates to keep) all non-public information received by such Member solely by reason of such Member's status as a Member relating to the Company confidential except information which (A) becomes known to such Member from a source, other than the Company, its directors, officers, employees, representatives or outside advisors, which source was not known by such Member to be obligated to the Company or any of its Affiliates to keep such information confidential, or otherwise prohibited from transmitting the information to such Member or any of its representatives or agents by a contractual, legal or fiduciary obligation, (B) was in such Member's possession from a source, prior to being furnished by or on behalf of the Company, which source was not known by such Member to be obligated to the Company or any of its Affiliates to keep such information confidential, or otherwise prohibited from transmitting the information to such Member or any of its representatives or agents by a contractual, legal or fiduciary obligation or (C) becomes generally available to the public through no breach of this Agreement by any party hereto.

b.      No Members shall, nor shall any of their respective Affiliates, without the approval of the other parties (which approval shall not be unreasonably withheld or delayed), issue any press releases or otherwise make any public statements with respect to the transactions contemplated by this Agreement, except as may be required by applicable law or regulation.

- 34 -

**13.11.  <u>Securities Laws</u>.**  Each Member acknowledges and represents as follows:

c.      The Units have not been registered under the Securities Act of 1933, as amended, or under the securities acts of any state in reliance on applicable exemptions under those laws and may not be assigned or otherwise transferred without registration or an exemption; and

d.      Notwithstanding any provisions in this Operating Agreement, no Units may be offered or sold and no transfer of any Units will be made either by the Company or the Members unless:

i.      The Units are registered under the Securities Act of 1933 and any applicable state securities laws; or

ii.      An opinion of counsel for the Company is obtained to the effect that registration is not necessary.

*[signature page to follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written above.

**MEMBERS:**

*Niv Sarne*

**FUSION RENEWABLE, LLC**

**Name:**    Niv Sarne

**Title:**    CEO


**CRESSENCE SOLAR, LP**
**By its General Partner, Cressence, Inc.**
**Name:**
**Title:**


**ISUN UTILITY, LLC**

**Name:** Jeff Peck
**Title:** CEO

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written above.

**MEMBERS:**

---

**FUSION RENEWABLE, LLC**

Name:
Title:

---

**CRESSENCE SOLAR, LP**
**By its General Partner, Cressence, Inc.**

Name:   Shai Weil    Myriam Guez
Title:           Directors

---

---

**ISUN UTILITY, LLC**

Name:
Title:

- 36 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written above.

**MEMBERS:**

_____
**FUSION RENEWABLE, LLC**

**Name:**
**Title:**

_____
**CRESSENCE SOLAR, LP**
**By its General Partner, Cressence, Inc.**

**Name:**
**Title:**

_____

_____

**ISUN UTILITY, LLC**

**Name:**
**Title:**

- 36 -

**Exhibit A**

**Members Register**

| Member Name | Class of Units | Number of Units* | Percentage Interest* |
|---|---|---|---|
| Fusion | Common Units | 875,000 | 43.750% |
| iSun | Common Units | 400,000 | 20% |
| Investor | Common Units | 725,000 | 36.25% |
| **Total** | | **1,500,000** | **100%** |

\* As of the Initial Closing.

- 38 -

## Section 6.3 - List of pre-Approved Projects

None.

**Schedule 6.7**

Any project specifically named or owned by an entity named below, including their subsidiaries:

Projects developed under the Development and Funding Agreement, dated October 1, 2021, by and among Along Gas Energy Development Ltd., Modiin Energy Limited Partnership, Prospero Solar LLC, Fusion Renewable Alabama LLC and Fusion Renewable LLC:

1.  Prospero Solar, LLC (Mobile County, Alabama)
2.  Escatawpa Solar Energy, LLC (Mobile County, Alabama)
3.  Highland Timbers Solar Energy, LLC (Mobile County, Alabama)
4.  Dajojenn Solar Energy, LLC (Mobile County, Alabama)

Projects developed under the Framework Agreement for the Development, Finance and Operation of Solar Projects, dated May 13, 2021, by and among Along Gas Energy Development Ltd., MID-Zach Ltd., and Fusion RE1 LLC:

1.  Johnson Field Renewable, LLC (Richland County, South Carolina)
2.  Woodford Gramling Project (Orangeburg County, South Carolina)
3.  Rum Gully Smoaks-II Project (Colleton County, South Carolina)
4.  Lookout Tower Rd. Project (Fairfield County, South Carolina)

Vermont Project:

1.  ER Kendall Hill Solar, LLC (Rutland County, Vermont)

Georgia Project:

1.  Routh Farm Solar Project (Dodge County, Georgia)

**Section 8.1 - List of Excluded Activities**

1. Any projects for the following iSun, Inc's and its existing minority interest companies:
   a. Encore Renewable Energy
   b. Drive Hive
   c. ampUp
   d. GreenBond Advisors, Green Seed Investors, LLC and Solar Project Partners, LLC
2. Project in development by iSun currently:
   a. CCR Solar 1, LLC
   b. Beta, Inc
   c. Burning Man
   d. Aspen Square
   e. Hartsel Solar, LLC
   f. Boralex Projects
   g. SunCommon rooftop and customer load serving Projects
   h. Terawatt Infrastructure
3. Projects and existing customers for whom iSun owns and operates projects:
   a. Middlebury Natural Food Co-ops
   b. Middlebury Project, VT
   c. Gervais Family Project, VT
   d. Hartford Project, VT
   e. Dunne Project
   f. Public Radio Project
   g. Vermont State Project
   h. State Colleges Project
   i. UV Project
   j. Burlington City Project
   k. Newfane Project
   l. Cole Company Project
   m. Case Street Project
   n. St. Johnsbury Project
   o. Williston City Project

**ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT**

By and between

ER WAITE CEMETERY SOLAR, LLC,

as Owner

and

ISUN INDUSTRIAL, LLC,

as Contractor

September 30, 2022

DB1/ 100666373.3

**TABLE OF CONTENTS**

**Page**

1. DEFINITIONS AND RULES OF INTERPRETATION ........................................... 1

    1.1    Definitions ........................................................................................... 1

    1.2    Exhibits .............................................................................................. 14

    1.3    Interpretation ..................................................................................... 14

    1.4    Headings ............................................................................................ 14

    1.5    Conflicts in Documentation .............................................................. 14

2. RESPONSIBILITIES OF OWNER ................................................................... 14

    2.1    Owner Representative ........................................................................ 15

    2.2    Back Feed Power and Parallel Operation ......................................... 15

    2.3    Access to Site .................................................................................... 15

    2.4    Cooperation ....................................................................................... 15

    2.5    Owner Permits ................................................................................... 15

    2.6    Insurance ........................................................................................... 15

    2.7    Owner-Supplied Information ............................................................ 15

    2.8    Owner Contracts ............................................................................... 16

    2.9    Owner Parent Guaranty .................................................................... 16

    2.10   Remedies for Owner Failure under Article 2 ................................... 16

3. RESPONSIBILITIES OF CONTRACTOR ......................................................... 16

    3.1    General .............................................................................................. 16

    3.2    Standard of Performance ................................................................... 17

    3.3    Design and Construction of the Project ............................................ 17

    3.4    Security ............................................................................................. 17

    3.5    Progress Reports ............................................................................... 17

    3.6    Insurance ........................................................................................... 18

    3.7    Inspection .......................................................................................... 18

    3.8    Organization ..................................................................................... 18

    3.9    Utilities and Services ........................................................................ 18

    3.10   Hazardous Materials ......................................................................... 18

    3.11   Access; Site Security ........................................................................ 19

    3.12   Handling, Shipping and Importation ................................................ 19

    3.13   Applicable Law; Applicable Permits ................................................ 19

    3.14   Commissioning Personnel ................................................................ 20

    3.15   Existing Improvements and Facilities .............................................. 20

    3.16   Contractor Deliverables .................................................................... 20

    3.17   Site Conditions ................................................................................. 20

    3.18   Labor ................................................................................................. 20

    3.19   Permission for Interconnection ........................................................ 20

    3.20   Storage and Maintenance of Project Hardware and Other Items ...... 21

    3.21   Testing of the Work .......................................................................... 21

    3.22   Back Feed Power and Parallel Operation ......................................... 21

4. COVENANTS, WARRANTIES AND REPRESENTATIONS ................................. 21

    4.1    Contractor ......................................................................................... 21

i

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 4.2 | Owner | 23 |
| 5. | | COST OF WORK | 23 |
| | 5.1 | Contract Price | 24 |
| | 5.2 | Price All-Inclusive | 24 |
| | 5.3 | Sales/Use Taxes | 24 |
| 6. | | TERMS OF PAYMENT | 26 |
| | 6.1 | Contractor Payments | 26 |
| | 6.2 | Warranty Work | 28 |
| | 6.3 | Undisputed Payments | 28 |
| | 6.4 | Disputed Payments | 28 |
| | 6.5 | Form and Manner of Payments | 28 |
| | 6.6 | Effect of Payment | 29 |
| | 6.7 | Retainage | 29 |
| | 6.8 | Completion of Punchlist Items | 29 |
| | 6.9 | Withholding Payment | 29 |
| 7. | | COMMENCEMENT AND SCHEDULING OF THE WORK | 30 |
| | 7.1 | Effectiveness of Agreement | 30 |
| | 7.2 | Scheduling of the Work | 31 |
| | 7.3 | Progress Reporting | 31 |
| 8. | | EXCUSABLE EVENT | 31 |
| | 8.1 | Certain Events | 31 |
| | 8.2 | Notice of Excusable Event | 32 |
| | 8.3 | Excusable Event Conditions | 32 |
| | 8.4 | Contractor's Remedies | 32 |
| 9. | | SUBCONTRACTORS | 33 |
| | 9.1 | Use of Subcontractors | 33 |
| | 9.2 | Owner Consent | 33 |
| | 9.3 | Assignment | 33 |
| | 9.4 | Other Terms in Subcontracts | 34 |
| | 9.5 | Information; Access | 34 |
| | 9.6 | Subcontractor Safety; Removal | 34 |
| 10. | | COMMISSIONING AND TESTING | 35 |
| | 10.1 | Commissioning | 35 |
| | 10.2 | Capacity Test | 35 |
| | 10.3 | Annual Energy Test | 35 |
| | 10.4 | Access for Annual Energy Test | 35 |
| | 10.5 | Non-Conforming Work | 36 |
| 11. | | PUNCHLIST; COMPLETION | 36 |
| | 11.1 | Punchlist | 36 |

ii

## TABLE OF CONTENTS
(continued)

**Page**

|       |      |                                                    |    |
|-------|------|----------------------------------------------------|----|
|       | 11.2 | Mechanical Completion                              | 37 |
|       | 11.3 | Substantial Completion                             | 37 |
|       | 11.4 | Notice of Substantial Completion                   | 38 |
|       | 11.5 | Final Completion                                   | 39 |
|       | 11.6 | Notice of Final Completion                         | 39 |
|       | 11.7 | Contractor's Access After Substantial Completion   | 40 |
|       | 11.8 | Energy and Revenues of the Project                 | 40 |
| 12.   | LIQUIDATED DAMAGES |                                      | 40 |
|       | 12.1 | Delay Liquidated Damages                           | 40 |
|       | 12.2 | Capacity Liquidated Damages                        | 40 |
|       | 12.3 | Energy Liquidated Damages                          | 41 |
|       | 12.4 | Sole Remedy; Liquidated Damages Not a Penalty      | 41 |
|       | 12.5 | Enforceability                                     | 41 |
| 13.   | CHANGES IN THE WORK |                                     | 41 |
|       | 13.1 | Change In Work                                     | 41 |
|       | 13.2 | By Owner                                           | 42 |
|       | 13.3 | Preparation of Change Order                        | 42 |
|       | 13.4 | Unable to Agree on Change of Work                  | 43 |
|       | 13.5 | No Change Order Necessary for Emergency            | 43 |
| 14.   | WARRANTIES CONCERNING THE WORK |                          | 43 |
|       | 14.1 | Warranty                                           | 43 |
|       | 14.2 | Warranty Period                                    | 44 |
|       | 14.3 | Remedy                                             | 44 |
|       | 14.4 | Conditions of Warranty                             | 45 |
|       | 14.5 | Warranty Administration                            | 45 |
|       | 14.6 | Limitations On Warranties                          | 45 |
|       | 14.7 | Enforcement of Subcontractor Warranties            | 45 |
| 15.   | TITLE; RISK OF LOSS |                                     | 45 |
|       | 15.1 | Title                                              | 45 |
|       | 15.2 | Risk of Loss                                       | 46 |
| 16.   | DEFAULTS AND REMEDIES |                                   | 46 |
|       | 16.1 | Contractor Events of Default                       | 46 |
|       | 16.2 | Owner's Rights and Remedies                        | 48 |
|       | 16.3 | Owner Event of Default                             | 49 |
|       | 16.4 | Contractor's Rights and Remedies                   | 50 |
|       | 16.5 | Owner Suspension                                   | 50 |
|       | 16.6 | Termination for Extended Force Majeure Event       | 50 |
|       | 16.7 | Termination for Convenience                        | 51 |
| 17.   | INDEMNIFICATION |                                         | 51 |
|       | 17.1 | By Contractor                                      | 51 |

# TABLE OF CONTENTS
(continued)

**Page**

17.2    By Owner .............................................................................................................. 52
17.3    Intellectual Property Indemnity ........................................................................... 52
17.4    Indemnification Procedure .................................................................................... 53

18.    CONFIDENTIAL INFORMATION .................................................................................. 53

18.1    Confidential Information ........................................................................................ 53

19.    LICENSES .......................................................................................................................... 53

19.1    License ................................................................................................................... 54
19.2    Assignment ............................................................................................................ 54
19.3    Contractor Deliverables ........................................................................................ 54

20.    ASSIGNMENT ................................................................................................................... 54

20.1    Assignment to Other Persons ................................................................................ 54

21.    LIENS, LIEN WAIVERS AND SUBORDINATION ....................................................... 55

21.1    Liens ...................................................................................................................... 55
21.2    Pre-NTP and Interim Lien Waivers ...................................................................... 55
21.3    Substantial Completion Lien Waivers .................................................................. 55
21.4    Final Lien Waivers ................................................................................................ 55
21.5    Bond in Lieu of Lien Waivers .............................................................................. 56
21.6    Subordination ........................................................................................................ 56
21.7    Title Insurer and Lender Requirements ................................................................ 56

22.    NOTICES AND COMMUNICATIONS ........................................................................... 56

22.1    Requirements ......................................................................................................... 56
22.2    Representatives ...................................................................................................... 57
22.3    Effective Time ....................................................................................................... 57

23.    LIMITATIONS OF LIABILITY AND REMEDIES ........................................................ 57

23.1    Limitations on Damages ....................................................................................... 57
23.2    Limitations on Liability ........................................................................................ 58
23.3    Releases, Indemnities and Limitations ................................................................. 58

24.    DISPUTES .......................................................................................................................... 59

24.1    Dispute Resolution ................................................................................................ 59
24.2    Interim Relief and Third-Party Claims ................................................................. 59
24.3    Injunctive Relief .................................................................................................... 60
24.4    Pending Dispute: Duty to Continue ...................................................................... 60
24.5    Subcontractors ...................................................................................................... 60

25.    MISCELLANEOUS ........................................................................................................... 60

25.1    Severability ........................................................................................................... 60
25.2    Governing Law; Limited Submission to Jurisdiction ........................................... 60
25.3    Waiver of Jury Trial .............................................................................................. 61
25.4    Survival of Termination ........................................................................................ 61

**TABLE OF CONTENTS**

(continued)

**Page**

25.5   No Oral Modification ............................................................................. 61
25.6   Amendments; Waiver ............................................................................ 61
25.7   Inspection, Review and Approval .......................................................... 61
25.8   Third Party Beneficiaries ..................................................................... 62
25.9   Further Assurances ............................................................................... 62
25.10  Record Retention ................................................................................. 62
25.11  Binding on Successors ......................................................................... 62
25.12  Merger of Prior Contracts ................................................................... 62
25.13  Counterparts ........................................................................................ 63
25.14  Set-Off ................................................................................................. 63
25.15  Fees and Expenses ............................................................................... 63
25.16  Announcements; Publications .............................................................. 63
25.17  Independent Contractor ....................................................................... 63
25.18  Independent Engineer .......................................................................... 63
25.19  Financing Matters ................................................................................ 64

EXHIBITS

| | |
|---|---|
| A | Scope of Work |
| B | Contractor Deliverables |
| C | Applicable Permits |
| D | Project Health and Safety Plan |
| E | Site Layout |
| F | Form of Lien Waivers |
| G | Form of Progress Reports |
| H | Commissioning and Testing |
| I | Interconnection Agreement |
| J | Major Subcontractors |
| K | Liquidated Damages |
| L | Form of Notice to Proceed |
| M | Form of Limited Notice to Proceed |
| N | Site Description |
| O | Form of Change Order |
| P | Form of Mechanical, Substantial and Final Completion Notices |
| Q | Milestone Payment Schedule |
| R | Insurance Requirements |
| S | Project Schedule |
| T | Major Project Hardware Warranties |
| U | Power Purchase Agreement |
| V | Owner-Supplied Information |
| W | Form of Contractor's Invoice |
| X | Form of Subordination Agreement |
| Y | Form of Owner Parent Guaranty |
| Z | Form of Contractor Parent Guaranty |

This **ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT** is made and entered into as of September 30, 2022 (the "**Effective Date**"), by and between **ER Waite Cemetery Solar, LLC**, a Vermont limited liability company ("**Owner**") and **iSun Industrial, LLC**, a Delaware limited liability company ("**Contractor**"). Each of Owner and Contractor is individually referred to herein as a "**Party**" and collectively they are referred to herein as the "**Parties**."

## RECITALS

WHEREAS, Owner is developing an electrical generation facility consisting of approximately 3.1 MWdc/2.2 MWac of solar-powered electric generating capacity, to be designed, engineered, procured, constructed, tested, interconnected and commissioned under this Agreement and to be located in Shaftsbury Town, Bennington County, State of Vermont (the "**Project**");

WHEREAS, Owner desires to engage Contractor to provide or to oversee services related to the design, engineering, procurement, construction, testing, interconnection and commissioning the Project on a turnkey, fixed-price, guaranteed-completion-date basis, and Contractor desires to provide such services, all as further defined by and in accordance with the terms and conditions set forth in this Agreement; and

WHEREAS, Contractor guarantees the timely completion and performance of the Project in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of Contractor's performance thereunder and sums to be paid to Contractor by Owner and of the covenants and agreements set forth herein, the Parties agree as follows:

## AGREEMENT

### 1. DEFINITIONS AND RULES OF INTERPRETATION

1.1     Definitions.  For the purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, the following terms shall have the following meanings.

"**AAA**" shall have the meaning set forth in Section 24.1(c).

"**AC**" means alternating current.

"**Acceptable Credit Rating**" means an issuer credit rating from (a) Standard & Poor's of "A" or better or (b) Moody's of "A2" or better.

"**Affiliate**" shall mean, as to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person in question.  For the purposes of this definition, the concept of "control," when used with respect to any specified Person, shall signify the possession of the power to direct the

DB1/ 100666373.3

management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"**Agreement**" means this Engineering, Procurement and Construction Agreement, including all Exhibits hereto.

"**Applicable Law**" means and includes all laws; codes (including NERC standards and compliance requirements and the National Electric Code); ordinances; statutes; rules; regulations; orders; decrees; judgments; injunctions; specified standards or objective criteria contained in any Applicable Permit or approval; and notices or binding agreements promulgated by any Governmental Authority having jurisdiction over either Party, the Project or a Party's obligations under this Agreement as the same may be modified, amended or repealed from time to time.

"**Applicable Permit**" means any action, approval, consent, waiver, exemption, variance, franchise, order, permit, authorization, right or license of or from a Governmental Authority that is necessary for the performance of the Work or the design, development, engineering, procurement, construction, operation or maintenance of the Project.

"**Backfeed Power**" means flow of Energy from the transmission grid into the Project.

"**Business Day**" means a day, other than a Saturday or Sunday or a public holiday, on which banks are generally open for business in New York, New York.

"**Capacity Liquidated Damages**" means Initial Capacity Liquidated Damages or Final Capacity Liquidated Damages, as the case may be.

"**Capacity Test**" means a test of the Project conducted in accordance with the testing procedures set forth in Exhibit H (Commissioning and Testing).

"**Capacity Test Cure Period**" shall have the meaning set forth in Section 12.2.2.

"**Capacity Test Procedures**" means the written test procedures, standards, protective settings and testing programs for the Capacity Tests developed pursuant to Section 10.2 and Exhibit H (Commissioning and Testing).

"**Change In Law**" means the enactment, adoption, promulgation, modification (including a written change in interpretation by a Governmental Authority), or repeal after the Effective Date of any Applicable Law that establishes new requirements or modifies existing requirements; provided that no Change in Law pursuant to this Agreement shall arise by reason of (a) any national, federal, state or provincial income Tax law (or any other Tax law based on income), (b) any federal law imposing a custom, duty, levy, impost, fee, royalty or similar charge for which Contractor is responsible hereunder with respect to the importation of Project Hardware from outside of the United States, (c) a labor wage law or other Applicable Law that affects Contractor's or its Subcontractor's costs of employment (other than any Prevailing Wage Law that affects the Work on the Site or surrounding area after the Effective Date), (d) any change in law that affects the cost of goods, manufacturing, shipping or other transportation of any Project Hardware and (e) the final enactment, modification, amendment or repeal of an Applicable Law prior to the Effective Date with an effective date of such action that falls after the Effective Date.

"**Change In Work**" means a change in the Work as defined in Section 13.1.

"**Change Order**" means the form in respect of a Change In Work attached as Exhibit O (Form of Change Order).

"**Commencement Date**" means the date on which Owner issues the Notice to Proceed in accordance with Section 7.1(a).

"**Conditional Final Completion Lien Waiver**" means a lien waiver in the applicable form provided in Exhibit F (Form of Lien Waivers) to this Agreement.

"**Confidential Information**" shall have the meaning set forth in Section 18.1.

"**Contract Price**" shall have the meaning set forth in Section 5.1, as the same may be adjusted pursuant to the terms hereof.

"**Contractor**" shall have the meaning set forth in the preamble.

"**Contractor Deliverables**" means all of the deliverables to be provided by Contractor pursuant to the requirements in Exhibit B (Contractor Deliverables).

"**Contractor Event of Default**" shall have the meaning set forth in Section 16.1.

"**Contractor Indemnified Party**" shall have the meaning set forth in Section 17.2.

"Contractor **Parent Guarantor**" means iSun Inc., a Delaware corporation.

"**Contractor Parent Guaranty**" means the guaranty provided by the Contractor Parent Guarantor in the form of Exhibit Z (Form of Contractor Parent Guaranty).

"**Contractor Party**" means each of Contractor and any of its respective Affiliates.

"**Contractor Permits**" means the Applicable Permits set forth in Part I of Exhibit C (Applicable Permits) and any other Applicable Permits, other than Owner Permits.

"**Contractor's Invoice**" means an invoice from Contractor to Owner prepared by Contractor and in a form attached as Exhibit W (Form of Contractor's Invoice).

"**Contractor's Manager**" means the construction and commissioning manager (or any replacement thereof) appointed by Contractor in accordance with this Agreement.

"**Delay Liquidated Damages**" means with respect to the failure to achieve Substantial Completion by the Guaranteed Substantial Completion Date, the applicable amount set forth in Exhibit K (Liquidated Damages).

"**Dispute**" shall have the meaning set forth in Section 24.1.

3

"**Dispute Notice**" shall have the meaning set forth in Section 24.1(a).

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**Effective Date**" shall have the meaning set forth in the preamble.

"**Eligible Bank**" means any bank or financial institution which [has a tangible net worth of at least five hundred million dollars ($500,000,000) and an Acceptable Credit Rating] and is acceptable to Owner.

"**Energy**" shall have the meaning set forth in the PPA.

"**Energy Liquidated Damages**" shall have the meaning set forth in Section 12.3.

"**Event of Default**" means either a Contractor Event of Default or an Owner Event of Default, as the context may require.

"**Excluded Taxes**" means (a) Property Taxes and (b) any Taxes imposed on Owner by any Governmental Authority under Applicable Law (other than any Sales Taxes except as set forth in Section 5.3.3).

"**Excusable Event**"[1] means an event that the Parties agree, or upon a failure of the Parties to agree the Independent Engineer determines, impacts the critical path of the Work, to the extent such event is attributable to: (a) the occurrence of a Change In Law; (b) the occurrence of an Owner-Caused Delay; (c) the discovery of Unforeseeable Site Conditions; ; or (d) the occurrence of an Owner failure under Section 2, in each case, to the extent such occurrence or discovery actually and demonstrably delays Contractor's ability to timely perform the Work as required by this Agreement or results in additional increased cost to perform the Work.

"**Final Capacity Liquidated Damages**" means an amount calculated pursuant to Exhibit H (Commissioning and Testing).

"**Final Capacity Test**" means the last Capacity Test of the Project that has been Successfully Run prior to the expiration of the Capacity Test Cure Period as designated by Notice from Contractor to Owner, which test shall be completed no later than the last day of the Capacity Test Cure Period.

"**Final Completion**" means satisfaction by Contractor or waiver by Owner of all of the conditions for Final Completion set forth in Section 11.5.

"**Final Completion Date**" shall have the meaning set forth in Section 11.6.

"**Final Completion Payment**" shall have the meaning set forth in Section 3.

"**Final Contractor's Invoice**" shall have the meaning set forth in Section 6.1.3.

---

.

4

"**Final Lien Waiver**" shall have the meaning set forth in <u>Section 21.4</u>.

"**Financial Closing Date**" means the date on which the Financing Documents providing for a financing solution sufficient to fund a portion of construction of the Project as Owner may require, has been closed and a drawdown of initial funding pursuant to the Financing Documents has occurred.

"**Financing Documents**" means any loan, credit or note purchase agreements, notes, bonds, securities, indentures, security agreements, lease financing agreements, mortgages, interest rate exchanges, or swap agreements, consents and agreements, and any other documents relating to the development, bridge construction or the permanent financing for the Project, including any equity or tax-equity financing or other joint-venture financing arrangement, even if more than one financing arrangement exists at any time and even if the financing arrangements are of different tiers or tranches, including any credit enhancement, credit support, working capital financing, or refinancing documents, and any and all amendments, modifications or supplements to the foregoing that may be entered into from time to time.

"**Force Majeure Event**" means the occurrence of any act or event after the Effective Date beyond the reasonable control of, and not the result of the fault or negligence of, the affected Party, which (i) prevents the affected Party from performing its obligations under this Agreement, in full or part, (ii) such Party is unable to overcome with the exercise of due diligence (including the expenditure of commercially reasonable sums), and (iii) such Party could not reasonably have foreseen or prevented utilizing all reasonable efforts under the circumstances, including, but not limited to (to the extent the foregoing requirements are met): natural disasters, acts of God, drought, flood, earthquake, storm, fire, explosion, lightening, pandemic, epidemic, war, riot, civil disturbance, sabotage, terrorism or threat of terrorism, strike, lockout or other labor disturbance or dispute, or a delay in the delivery of supplies by vendors caused by an independent Force Majeure Event beyond such supplier or vendor's reasonable control, materially affecting such vendor (and for the avoidance of doubt, any such independent force majeure event occurring after the Effective Date causing a vendor delivery delay shall not be treated as being foreseeable for purposes of determining whether a Force Majeure Event occurred if such delay is related directly to COVID-19 or the responses of any Persons to COVID-19).  Notwithstanding anything in the foregoing to the contrary, Force Majeure Events shall not include any of the following:

    (a)    mechanical or equipment failures (except to the extent any such failure is itself caused by a Force Majeure Event);

    (b)    any condition at the Site for which the affected Party is responsible under this Agreement, other than: (1) the discovery of pre-existing Hazardous Materials or Unforeseeable Site Conditions at the Site so long as the condition was unknown and should not reasonably have been known by Contractor as of the Effective Date and (2) any Hazardous Materials released at the Site other than by Contractor, any Subcontractor or Persons acting on behalf of Contractor;

    (c)    increases in the cost of performance of a Party's obligations under this Agreement (except to the extent any such increase is itself caused by a Force Majeure Event);

5

(d)     any delay or other problems associated with the issuance of any Governmental Approval or for the application therefor (other than the failure of the applicable Governmental Authority to issue construction permits on the Project, through no fault of the Party claiming the Force Majeure Event and despite the affected Party's best efforts, which for the avoidance of doubt shall constitute a Force Majeure Event);

strikes, walkouts, lockouts or other labor disturbances or disputes specific to such Party claiming a Force Majeure Event; and

(e)     if not specifically permitted as a Force Majeure Event in parts (a) through () above, any other event or condition that does not qualify as "force majeure," "uncontrollable circumstance," or other similar concept under one or more of the PPA or any other document related to the Site or the Project; provided that Contractor's recovery for a Force Majeure Event shall not be limited by the recovery available to Owner under the PPA or other Project document.

"**Functional Test**" means the test to determine the functionality of the Project and equipment and components incorporated therein, as described in Exhibit H (Commissioning and Testing).

"**Governmental Authority**" means any federal, state, local, municipal or other governmental, regulatory, administrative, judicial, public or statutory instrumentality, court or governmental tribunal, agency, commission, authority, body or entity, or any political subdivision thereof, having legal jurisdiction over the matter or Person in question (whether foreign or domestic).

"**Guaranteed Substantial Completion Date**" is October 11, 2023.

"**Hazardous Materials**" means any chemical, substance or material regulated or governed by any Applicable Permit or Applicable Law as, or any substance, emission or material now or hereafter deemed by any Governmental Authority to be, a "regulated substance," "hazardous material," "hazardous waste," "hazardous constituent," "hazardous substance," "toxic substance," "radioactive substance," "contaminant," "pollutant," "toxic pollutant" or "pesticide" or words of similar meaning and regulatory effect under Applicable Law.

"**Indemnified Party**" shall have the meaning set forth in Section 17.4.

"**Indemnifying Party**" shall have the meaning set forth in Section 17.4.

"**Independent Engineer**" means any independent engineer or engineering firm designated under Section 25.18.

"**Industry Standards**" means those design, engineering, construction, workmanship, operation, care and diligence standards of construction, workmanship, Project Hardware and components specified in Exhibit A (Scope of Work); provided that if the relevant standard is not so specified or is ambiguous therein, then "Industry Standards" shall mean those standards of design, engineering, construction, workmanship, operation, care and diligence and those practices, methods and acts that would be implemented and normally practiced or followed by prudent

internationally-recognized engineering and construction firms in the design, engineering, procurement, installation, construction, testing, commissioning and interconnection of utility-scale PV facilities in the Southeastern United States and which practices, methods and acts, in the exercise of prudent and responsible professional judgment by those experienced in the industry in light of the facts known (or that reasonably should have been known) at the time the decision was made, could reasonably have been expected to accomplish the desired result consistent with good business practices, good engineering design practices, reliability, safety, Applicable Law, Applicable Permits and codes and other standards established for such work. Industry Standards are not necessarily limited to the optimum practice, method or act, but may be a spectrum of possible practices, methods or acts. Solely with respect to Section 14.4(d), "Industry Standards" shall mean those standards of care and diligence normally practiced by entities that operate and maintain PV power plants.

"**Initial Capacity Liquidated Damages**" means an amount calculated pursuant to Exhibit H (Commissioning and Testing).

"**Initial Capacity Test**" means a Capacity Test of the Project as designated by Notice from Contractor to Owner that has been Successfully Run prior to Substantial Completion.

"**Installed Module Capacity**" means the nameplate value of 3.1 MWdc of installed photovoltaic modules at the Project, as demonstrated by Module Data.

"**Intellectual Property Rights**" means all licenses, trade secrets, copyrights, know-how patents, trademarks, proprietary information or other intellectual property rights of any kind necessary for the design, construction, ownership, use, operation, maintenance, repair, alteration, commissioning, interconnection, de-commissioning, removal and disposal of the Project.

"**Interconnected**" (together with the corollary term "**Interconnect**") means the occurrence of all of the following: (a) the Project is connected and synchronized to the "System" and the "Interconnection Facilities" (each as defined under the Interconnection Agreement) of the Utility and is capable of transmitting electric energy in accordance with the Interconnection Agreement and Applicable Law and (b) the Project is ready to be placed into service.

"**Interconnection Agreement**" means that certain Generation Interconnection Agreement, between the Utility and Owner, dated January 10, 2022, and as set forth in Exhibit I (Interconnection Agreement), including any amendments or modifications thereto.

"**Interim Lien Waiver**" means, as applicable, a conditional or unconditional interim lien waiver to be delivered by Contractor pursuant to Section 21.2 in the applicable form provided in Exhibit F (Form of Lien Waivers) to this Agreement.

"**KWh**" means kilowatt hours.

"**Lien**" means, with respect to any property or asset, any mortgage, deed of trust, lien, pledge, charge, security interest, restrictive covenant or easement or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected or effective under Applicable Law, or any preference, priority or preferential arrangement of any kind or nature

7

whatsoever as well as the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"**Lien Waivers**" means the Interim Lien Waivers, the Substantial Completion Lien Waivers, and the Final Lien Waivers.

"**Limited Notice to Proceed**" or "**LNTP**" has the meaning set forth in Section 7.1.

"**Major Project Hardware**" means the Project Hardware related to the distribution transformers, step-up transformers, inverters, tracker, and PV modules for the Project.

"**Major Subcontractor**" means (a) each Specified Subcontractor and (b) each Specified Supplier. An initial list of approved Major Subcontractors is set out in Exhibit J (Major Subcontractors).

"**Mechanical Completion**" means the satisfaction of all of the conditions set forth in Section 11.2.

"**Mechanical Completion Date**" shall have the meaning set forth in Section 11.2.

"**Minimum Guaranteed Capacity**" shall have the meaning set forth in Exhibit H (Commissioning and Testing).

"**Minimum Guaranteed Generation**" shall have the meaning set forth in Exhibit H (Commissioning and Testing).

"**Module Data**" means, for each photovoltaic module installed in the Project, such module's watts direct current (Wdc) nameplate value recorded at the manufacturing facility for such module.  Contractor shall collect and compile the Module Data based on inspection of the photovoltaic modules and the data sheets and other documentation provided by Module Supplier.

"**Module Supplier**" means any supplier or suppliers (taken together) of PV modules, as described in greater detail in any module supply agreement for the Project.

"**Monthly Progress Report**" means a written monthly progress report prepared by Contractor setting forth the detail required in Exhibit G (Progress Reports).

"**MW**" means 1,000,000 watts of electric power (expressed as AC).

"**NERC**" means the North American Electric Reliability Corporation or a successor organization that is responsible for establishing reliability criteria and protocols.

"**Non-Critical Deficiencies**" means each item of Work that (a) Owner or Contractor identifies as requiring completion or containing defects, (b) does not impede the safe operation of the Project or any portion thereof in accordance with Industry Standards and, in any case, manufacturers' warranties and (c) does not materially affect the capacity, efficiency, reliability, operability, safety or mechanical or electrical integrity of the Project.

8

"**Non-Excusable Event**" means (a) the negligence or willful misconduct of any Contractor Party or any Subcontractor, (b) the failure of any Contractor Party or any Subcontractor to comply in material respects with any of its obligations under, or a material breach by any Contractor Party or any Subcontractor of, this Agreement and (c) any defect in the design, materials, or workmanship of the Work or other matter that could result in a Contractor (or Subcontractor) warranty obligation pursuant to Article 14.

"**Notice**" or "**Notification**" means a written communication between authorized representatives of the Parties required or permitted by this Agreement and conforming to the requirements of Section 22.1. "**Notify**" means to provide a Notice or Notification.

"**Notice of Final Completion**" means a Notice from Contractor to Owner stating that Contractor has satisfied the requirements for Final Completion under Section 11.5, substantially in the form attached hereto as Exhibit P (Mechanical, Substantial and Final Completion Notices), as approved by Owner in accordance with Section 11.6.

"**Notice of Mechanical Completion**" means a Notice from Contractor to Owner stating that Contractor has satisfied the requirements for Mechanical Completion under Section 11.2, substantially in the form attached hereto as Exhibit P (Mechanical, Substantial and Final Completion Notices), as approved by Owner in accordance with Section 11.2.

"**Notice of Substantial Completion**" means a Notice from Contractor to Owner stating that Contractor has satisfied the conditions precedent for Substantial Completion under Section 11.3, substantially in the form attached hereto as Exhibit P (Mechanical, Substantial and Final Completion Notices), as approved by Owner in accordance with Section 11.4.

"**Notice to Proceed**" or "**NTP**" means a written notice, substantially in the form attached hereto as Exhibit L (Form of Notice to Proceed), releasing Contractor to fully proceed with all Work under this Agreement.

"**Owner-Caused Delay**" means (a) a failure by Owner to materially perform any of its obligations under this Agreement, or (b) Owner's interference with the performance of the Work, each of which directly cause delay in Contractor's ability to achieve Substantial Completion by the Guaranteed Substantial Completion Date (which failure or interference is not otherwise excused and for so long as such failure or breach has not been remedied), including any failure to timely respond to Notices of Contractor under this Agreement where a specified period is provided (unless a deemed response to such Notice is provided for hereunder) to the extent that such failure or interference does not result from a Non-Excusable Event. For the purposes of this definition "Owner" shall include Owner, any Owner subcontractor, or other party in contractual privity with Owner, if any, but excluding Contractor and its Subcontractors.

"**Owner Contracts**" shall have the meaning set forth in Section 2.8.

"**Owner Event of Default**" shall have the meaning set forth in Section 16.3.

"**Owner Financing Party**" means (a) any and all Persons, or the agents or trustees representing them, providing senior or subordinated debt, vendor financing, lease or equity financing (including tax equity financing to Owner or an Affiliate thereof) or refinancing to Owner

9

or (b) any Person providing letters of credit, guarantees, insurance or other credit support, or title insurance to Owner, in each case, in connection with the Project or a portfolio of projects that includes the Project. The term "Owner Financing Party" includes, for the avoidance of doubt, any Person or Persons that own the Project and lease the Project to Owner or an Affiliate of Owner, as applicable, under a lease, sale leaseback or synthetic lease structure.

"**Owner Indemnified Party**" shall have the meaning set forth in Section 17.1.

"**Owner-Instituted Change**" shall have the meaning set forth in Section 13.2.

"Owner **Parent Guarantor**" means Fusion Renewable NA, LLC, a Delaware limited liability company.

"**Owner Parent Guaranty**" means the guaranty provided by the Owner Parent Guarantor in the form of Exhibit Y (Form of Owner Parent Guaranty).

"**Owner Permits**" means those Applicable Permits set forth in Part II of Exhibit C (Applicable Permits) and any other Applicable Permits, other than Contractor Permits, as described in Exhibit C (Applicable Permits).

"**Owner Representative**" means Owner's representative designated by Owner pursuant to Section 2.1.

"**Owner-Supplied Information**" means the information set forth in Exhibit V (Owner-Supplied Information).

"**Owner's Engineer**" means any engineering firm or firms or other engineer or engineers selected and designated by Owner.

"**Party**" and "**Parties**" shall have the meanings set forth in the preamble.

"**PCS**" means the power conversion station(s) which consists of the static power inverters, inverter step up transformers, cabling and grounding systems, as further described in Exhibit A (Scope of Work).

"**Performance Requirements**" shall have the meaning set forth in Section 3.2.

"**Permit Expenses**" means the actual costs payable to a Governmental Authority and all other reasonable third-party costs and expenses incurred in connection with the application for and issuance of an Applicable Permit.

"**Person**" means any individual, corporation, company, voluntary association, partnership, incorporated organization, trust, limited liability company, or any other entity or organization,

10

including any Governmental Authority. A Person shall include any officer, director, member, manager, employee or agent of such Person.

"**Point of Interconnection**" is defined in the Interconnection Agreement.

"**PPA**" means that certain Power Purchase Agreement, dated as of May 25th, 2022, between Owner and Utility, as included in Exhibit U (Power Purchase Agreement).

"**Pre-Functional Test**" means the subset of Functional Tests required to be completed in order to achieve Mechanical Completion, as identified and detailed in Exhibit H (Commissioning and Testing).

"**Prime Rate**" means the prime rate as published in the "The Money Rates" Section of *The Wall Street Journal* (U.S. Edition).

"**Project**" shall have the meaning set forth in the recitals.

"**Project Hardware**" means all materials, supplies, apparatus, devices, equipment, machinery, tools, parts, components, instruments and appliances that are to be incorporated into the Project (including the Major Project Hardware) whether provided by Contractor or any Subcontractor.

"**Project Schedule**" means the schedule for the performance of all Work to be performed under this Agreement attached hereto as Exhibit S (Project Schedule).

"**Property Taxes**" means any real or personal property Taxes related to the Site, the Project, or Project Hardware.

"**Proposed Punchlist**" shall have the meaning set forth in Section 11.1.1.

"**Punchlist**" shall have the meaning set forth in Section 11.1.1.

"**Punchlist Amount**" shall have the meaning set forth in Section 11.1.1.

"**Punchlist Holdback**" shall have the meaning set forth in Section 6.8.1.

"**PV**" means photovoltaic.

"**PV Module Price**" means the aggregate price paid or to be paid by Contractor for the purchase of PV modules, as described or set forth in the any module supply agreements or purchase orders for PV modules for the Project.

"**Release**" means the release, discharge, deposit, injection, dumping, spilling, leaking or placing of any Hazardous Material into the environment so that such Hazardous Material or any constituent thereof may enter the environment, or be emitted into the air or discharged into any waters, including ground waters under Applicable Laws.

"**Required Manuals**" means the operating data and manuals, Project Hardware and parts manuals, operation and maintenance manuals and instructions which are reasonably necessary to

safely and efficiently operate, maintain and shut down the Project, in each case, to be provided in accordance with Exhibit B (Contractor Deliverables).

"Required Module Capacity" means the total capacity of the project, of 3.005 MW DC, as adjusted through approved design revisions and final as-built documentation.

"**Retainage**" shall have the meaning set forth in Section 6.7.

"**Rules**" shall have the meaning set forth in Section 24.1(c)(ii).

"**Sales Tax**" means any applicable Vermont state or local sales, use, privilege, or similar Taxes, with respect to the Work and Project Hardware.

"**Site**" means the Project site, as more particularly described in Exhibit N (Site Description).

"**Site Conditions**" shall have the meaning set forth in Section 3.17.

"**Site Layout**" means the layout of the Project set forth in Exhibit E (Site Layout).

"**Spare Parts**" means the spare parts set forth in Exhibit A (Scope of Work).

"**Specified Subcontractor**" means any Subcontractor with a contract value over $500,000. An initial list of approved Specified Subcontractors is set out in Exhibit J (Major Subcontractors).

"**Specified Supplier**" means any Supplier (including any Module Supplier) of the distribution transformers, step-up transformers, inverters, tracker and PV modules for the Project. An initial list of approved Specified Suppliers is set out in Exhibit J (Major Subcontractors).

"**Statement of Work**" means, collectively, the requirements regarding the Work set forth in Exhibit A (Scope of Work).

"**Subcontract**" means any contract for performance of any portion of the Work entered into with a Subcontractor.

"**Subcontractor**" means any Person, directly or indirectly, and of any tier (other than Contractor, but including any Affiliate of Contractor), including any Supplier, that performs any portion of the Work on behalf of Contractor in furtherance of Contractor's obligations under this Agreement.

"**Substantial Completion**" means the satisfaction of all of the conditions set forth in Section 11.3.

"**Substantial Completion Date**" shall have the meaning set forth in Section 11.4.

"**Substantial Completion Lien Waivers**" shall have the meaning set forth in Section 21.3.

12

"**Substation**" means the interconnection substation being constructed by Contractor hereunder.

"**Successfully Run**" means, with respect to the Capacity Test, Functional Tests, and Annual Energy Test, that such tests were completed in accordance with the procedures, conditions and requirements set forth in Exhibit H (Commissioning and Testing).

"**Supplier**" means a Person that supplies Project Hardware directly to Contractor in connection with the performance of the Work, including (for the avoidance of doubt), any Module Supplier.

"**Taxes**" means any and all forms of taxation, charges, duties, imposts, levies, and rates whenever imposed by any Governmental Authority, including transaction privileges, sales tax, use tax, transaction privilege tax, property tax, income tax, withholding taxes, corporation tax, franchise taxes, capital gains tax, capital tax, capital transfer tax, inheritance tax, value added tax, goods and services tax, customs duties, capital duty, excise duties, betterment levy, stamp duty, stamp duty reserve tax, national insurance, social security or other similar contributions, and generally any tax, duty, impost, levy, rate or other similar amount and any interest, penalty, fine or other amount due in connection therewith, but in all cases excluding Permit Expenses.

"**Unconditional Final Completion Lien Waiver**" means, a lien waiver to be delivered pursuant to Section 21.2 in the applicable form provided in Exhibit F (Form of Lien Waivers) to this Agreement.

"**Unforeseeable Site Conditions**" means the presence or discovery of (i) subsurface or latent physical conditions at the Site differing materially from those indicated in the materials provided by Owner to Contractor or (ii) previously unknown physical conditions at the Site of an unusual nature or differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Agreement, which also include archeological artifacts, or religious, historical or archeological resources above or below the surface of the Site that were not identified or otherwise addressed in any of the engineering and geotechnical surveys, reports and other documents provided by Owner to Contractor with respect to the Site and were not identified by Contractor during its inspections of the Site.

"**Utility**" shall mean Green Mountain Power Company.

"**Utility Facilities**" means, collectively, the Interconnection Facilities and System, each as defined in the Interconnection Agreement.

"**Warranty Period**" shall have the meaning set forth in Section 14.2, as the same may be extended pursuant to Section 14.3.

"**Warranty Service**" shall have the meaning set forth in Section 14.3.1.

"**Work**" means all of Contractor's obligations under this Agreement to engineer, design, procure, manufacture, construct and erect, install, equip, start-up, test, commission and complete the Project, set forth in or reasonably inferred from this Agreement (including the Statement of Work), including any of the foregoing obligations performed (a) pursuant to an LNTP or (b)

13

pursuant to a Change Order, all of which shall be deemed to be Work performed by Contractor under this Agreement.

1.2     **Exhibits**.  This Agreement includes the Exhibits annexed hereto and any reference in this Agreement to an "Exhibit" shall mean one of the Exhibits hereto.  Each Exhibit attached hereto is incorporated herein in its entirety by this reference and each reference to this Agreement shall be deemed to include all Exhibits hereto.

1.3     **Interpretation**.  As used in this Agreement, unless otherwise indicated, the terms "herein", herewith" and "hereof" are references to this Agreement as a whole including the Exhibits, and the term "includes" or "including" shall mean "including without limitation"; relative to the determination of any period of time, "from" means "including and after," "to" means "to but excluding" and "through" means "through and including"; unless otherwise specified to the contrary, the word "or" shall be inclusive and shall have the meaning conveyed by "and/or"; any reference to "days" means calendar days; the singular includes the plural and the plural the singular; words importing any gender include the other gender; references to statutes or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending or replacing the statute or regulation referred to; references to agreements and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements, extensions and other modifications to such instruments (without, however, limiting any restrictions to such amendments, restatements, supplements, extension and other modifications imposed by this Agreement); or a reference to a Person shall include its successors and permitted assigns.

1.4     **Headings**.   All headings or captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

1.5     **Conflicts in Documentation**.  This Agreement, including the Exhibits hereto shall be taken as mutually explanatory.  If either Party becomes aware of an express conflict between the provisions of this Agreement or any Exhibit hereto, such Party shall promptly Notify the other Party of such conflict.  In the event of a conflict between any provision within the body of this Agreement and any Exhibit hereto, the terms and provisions of the body of this Agreement shall take precedence over the Exhibits; and in the event of a conflict between any provisions within the Exhibits, Exhibit A (Scope of Work), Exhibit H (Commissioning and Testing), Exhibit I (Interconnection Agreement), and Exhibit U (Power Purchase Agreement) shall take precedence over the remaining Exhibits unless expressly stated otherwise in this Agreement.

## 2.     RESPONSIBILITIES OF OWNER

2.1     Owner Representative.  Owner shall designate an Owner Representative, who shall act as the single point of contact on behalf of Owner with respect to the prosecution and scheduling of the Work and any issues relating to this Agreement.  Owner may designate a new Owner Representative from time to time by a Notice delivered to Contractor.

2.2     Back Feed Power and Parallel Operation.  Owner shall cause the Utility to complete the testing of the Utility Facilities and Substation by no later than the applicable milestone date set forth in Exhibits S (Project Schedule) to enable Contractor to obtain Backfeed Power, commence trial operation or testing (as required by the Interconnection Agreement) and carry out testing of

14

the Project as provided under this Agreement.  The failure of Owner to cause the Utility to comply with such date shall be an Owner-Caused Delay to the extent the Project Schedule is delayed, but shall not to be an Owner Event of Default.

2.3    Access to Site.  Concurrently with the issuance of the Notice to Proceed (or, if applicable, pursuant to an LNTP), Owner shall provide Contractor rights of ingress and egress to and use of the Site for Contractor and its Subcontractors as may be reasonably necessary for the performance of the Work, subject to any applicable restrictions communicated to Contractor in writing in respect of Owner's rights to the Site, which Contractor agrees have been considered in the Project Schedule.

2.4    Cooperation.  Owner shall cooperate with Contractor and the Subcontractors in coordinating the work of Owner's contractors who may be working at or near the Site with the Work being performed by Contractor and the Subcontractors.  Owner shall not allow its, or its Affiliates', operations and activities on the Site to materially interfere with the performance of the Work by Contractor.  At Contractor's written request, Owner shall provide reasonably requested assistance to Contractor with respect to Contractor's obtaining any Contractor Permits and complying with any Applicable Permits; provided that Contractor shall reimburse Owner for any out-of-pocket costs that Owner incurs in providing such assistance.

2.5    Owner Permits.   Subject to Contractor's obligations to provide reasonably requested assistance to Owner in obtaining any Owner Permit (at no cost to Owner) in accordance with Section 3.13.2, Owner shall, at Owner's cost and expense, obtain and maintain all Owner Permits.  In the event that an Applicable Permit not explicitly listed in Exhibit C (Applicable Permits) is required in connection with the Project, such Applicable Permit shall be an Owner Permit for purposes of this Agreement, to the extent that such Applicable Permit constitutes a development or land use Applicable Permit.  Notwithstanding the foregoing, for any "Right of Way Crossings" and "Easements" Owner Permits (or similar Owner Permits), as described in Exhibit C (Applicable Permits), Contractor shall be responsible for any delay in obtaining such Permit, to the extent caused by any re-design or change in the information within Contractor's scope of Work required in order to obtain such Permit.  Contractor shall be precluded from claiming such delay as an Owner-Caused Delay.

2.6    Insurance.   Owner shall, at Owner's cost and expense, obtain and maintain insurance required in accordance with Exhibit R (Insurance Requirements).

2.7    Owner-Supplied Information.  Owner shall provide, or has provided, to Contractor the information for any items provided or to be provided by Owner pursuant to this Agreement, including Owner Contracts, in accordance with Exhibit V (Owner-Supplied Information).  Subject to Section 4.1.10 herein, Contractor shall be entitled to use the Owner-Supplied Information in preparing the final construction designs for the Project.

2.8    Owner Contracts.  On or prior to the Commencement Date, Owner shall provide to Contractor (a) the Power Purchase Agreement, (b) Interconnection Agreement, (c) the land control agreement and (d) land use permit (as applicable) approved by Governmental Authorities as required by Applicable Law, in each case, for the Project (the "**Owner Contracts**").  Owner shall comply with its obligations under the Owner Contracts and other material contracts affecting the

15

Work or the Project to which Owner is party.  Contractor shall not be responsible for any obligations under the Owner Contracts except those specifically assumed in this Agreement, including Exhibit A (Scope of Work). Provided, however, that the Parties agree to negotiate in good faith to amend Exhibit A within five (5) Business Days of the Effective Date to each Party's reasonable satisfaction.

2.9    Owner Parent Guaranty. Owner shall cause Owner Parent Guarantor to provide the Owner Parent Guaranty within ten (10) Business Days following the Effective Date.  Such Owner Parent Guaranty shall terminate upon the earlier of (a) Financial Closing Date, or (b) Owner securing construction debt or any other form of debt funding.

2.10    Remedies for Owner Failure under Article 2.  Notwithstanding the terms of Article 8 (Excusable Event), if Owner fails to satisfy the requirements of this Article 2, Contractor's sole and exclusive remedy shall be a day-for-day extension of the Project Schedule corresponding to the number of days between the milestone date described above and Owner's actual completion of its obligations in this Article 2.

3.    **RESPONSIBILITIES OF CONTRACTOR**

3.1    General.  Contractor shall, in accordance with and subject to the terms of this Agreement diligently, duly and properly perform and complete the Work and all of its other obligations set forth in this Agreement, including but not limited to procuring and paying for all materials, equipment, machinery, tools, labor, transport and other items and services necessary for the proper completion of the Project (including Major Project Hardware) and completing the design, engineering, construction, testing, interconnection and commissioning of the Project through Final Completion  . Contractor acknowledges and agrees that it is obligated to perform the Work on a "turnkey basis" which constitutes a fixed-price (subject to the terms hereof) obligation to design, engineer, procure, construct, test, interconnect and commission the Project (or to oversee and manage the completion of the same by third-party contractors) in accordance with the terms and conditions of this Agreement.  Where this Agreement describes a portion of the Work in general, but not in complete detail, the Parties acknowledge and agree that the Work includes any incidental work inferred or required to complete the Work in accordance with this Agreement. Contractor is obligated to supply and perform all of the Work as set forth in this Agreement and to complete the Work in accordance with and subject to the terms and conditions of this Agreement, including the guarantees of performance (and the remedies applicable thereto) as set forth herein, all for the Contract Price.  For the avoidance of doubt, without limiting the generality of this Section 3.1, the Work to be provided by Contractor shall include any work, services and acts that may be reasonably implied by Exhibit A (Scope of Work) and necessary in order to fully complete the Project and to ensure the Project meets the requirement under this Agreement and is capable of operating in compliance with this Agreement, all Applicable Law, the PPA, the Interconnection Agreement, and Industry Standards.

3.2    Standard of Performance.  Contractor shall perform, or cause to be performed, the Work in a workmanlike manner, using new material, and in compliance, in all material respects, with Applicable Laws, Applicable Permits, Industry Standards, the standards and requirements of

16

the Owner Contracts, all technical specifications set forth in this Agreement (including any Exhibits), the requirements of any contract for any Major Project Hardware (including the warranty provisions thereof), the requirement of any insurance policies held pursuant hereto and any other applicable requirements of this Agreement (the "**Performance Requirements**") as such Performance Requirements specifically pertain to the Work.  If the standards or requirements derived from the foregoing are inconsistent, Contractor shall perform or cause to be performed the Work in accordance with the most stringent standard or requirement.

3.3    Design and Construction of the Project.

3.3.1    Design and Construction Obligation.  In accordance with and subject to the terms of this Agreement, Contractor shall design, engineer, procure, construct, test, commission and interconnect the Project so that it meets the Performance Requirements and any other standards of performance set forth in this Agreement, and is capable of operation in accordance with the design criteria specified in the Statement of Work and the guarantees of performance (subject to the remedies applicable thereto) as set forth in this Agreement.  All drawings, plans and specifications provided as part of Contractor Deliverables shall be reviewed and approved in advance by Owner, such approval not to be unreasonably withheld or delayed. All drawings, plans and specifications provided as part of Contractor Deliverables shall be kept by Contractor in an orderly and catalogued fashion for reference by Owner during the performance by Contractor of the Work.

3.3.2    Major Project Hardware. As part of the Work, Contractor shall negotiate and cause the execution of supply agreements for all Major Project Hardware, which shall provide for (among other things) the timely procurement and delivery of Major Project Hardware to the Site for use in the Project. Contractor, either directly or through a Subcontractor, shall install all Major Project Hardware and related equipment procured and delivered under such supply agreement into the Project as part of the Work and the Contract Price. All Major Project Hardware shall be reviewed and approved in advance by Owner, such approval not to be unreasonably withheld or delayed.

3.3.3    Record-Keeping.  Contractor shall maintain at the Site at least one (1) copy of all Contractor Deliverables, Change Orders and other modifications in good order and marked to record all changes made during performance of the Work, including, without limitation, all field deviations from the construction drawings.

3.4    Reserved.

3.5    Progress Reports.    Contractor shall provide Monthly Progress Reports in accordance with Section 7.3.  In addition, Owner, any Affiliate of Owner or the Independent Engineer shall be entitled to call any meeting with or attend any meeting convened by Contractor on the Site to review progress with Subcontractors performing Work on the Site and, during such meeting, Owner or such Affiliate shall have a reasonable opportunity to ask questions of Contractor and such Subcontractors concerning progress of the Work.  If Owner requests that Contractor cause any Subcontractor to attend any such meeting, Contractor shall use its reasonable efforts to cause such Subcontractor to attend either in-person or via telephone.

17

3.6     Insurance.  Contractor shall obtain and maintain insurance required in accordance with Exhibit R (Insurance Requirements).

3.7     Inspection.  Contractor shall perform all inspection and other like services required for performance of the Work, including inspecting all Project Hardware and performing all inspections required or contemplated under the Statement of Work.

3.8     Organization.  Contractor shall maintain sufficient staff or Subcontractors that are dedicated to the completion of the Work, and that have the technical and managerial expertise to control and execute the Work in accordance with the requirements of this Agreement including but not limited to performance of the work in accordance with the Project Schedule.

3.9     Utilities and Services.  Contractor shall install, connect and maintain at its own expense all temporary utilities, facilities and services required for the performance of the Work within the Site.

3.10    Hazardous Materials.

3.10.1 Contractor shall not Release or dispose of, nor permit any Subcontractor or any Person acting on its or their behalf or under its or their control to Release or dispose of, Hazardous Materials on or about the Site other than as required by Contractor in connection with the performance of the Work and in accordance with Applicable Laws and Applicable Permits and shall, if any such Hazardous Materials are so Released or discharged, prevent the spread of such Hazardous Materials.  In the event Contractor encounters material reasonably believed to be a Hazardous Material on the Site, Contractor shall immediately stop work in the affected area and notify Owner of the condition.  If Contractor or any Subcontractor has brought such Hazardous Materials onto the Site or generated such Hazardous Materials, Contractor shall promptly submit a plan for Owner's approval for remediating such Hazardous Materials.  Upon approval of such plan by Owner, Contractor shall remediate such Hazardous Material in accordance with the approved plan and shall thereafter resume Work in the affected area.  If Contractor or any Subcontractor has brought such Hazardous Materials onto the Site or generated such Hazardous Materials, Contractor shall not be entitled to an adjustment to the Contract Price or Project Schedule, including the Guaranteed Substantial Completion Date.  If the Hazardous Materials were pre-existing, then Contractor shall be entitled to an equitable adjustment to the Contract Price or Project Schedule, including the Guaranteed Substantial Completion Date, so long as such release or discharge was not due to (x) a Non-Excusable Event or (y) exacerbation of such pre-existing Hazardous Materials by Contractor, any Subcontractor or any third party that is under Contractor's or any Subcontractor's control, that the applicable Person knows or should have reasonably known were on the Site.

3.10.2 Contractor shall indemnify, defend and hold harmless the Owner Indemnified Parties from and against all liabilities arising out of or relating to any violations by Contractor or any Subcontractor of any Applicable Laws or Applicable Permits, prior to or after the Commencement Date, including (i) the Release or deposit at, on, above, below or near the Site by Contractor or any Subcontractor of any Hazardous Materials that were brought onto the Site by Contractor or any Subcontractor or (ii) the Release of any preexisting Hazardous Materials on the Site that Contractor knows or reasonably should have known were on the Site of and caused such

18

Release due to its negligence or disregard for Owner's instructions; provided, however, that in no event shall Contractor be obligated under this Section to the extent such liabilities arise due to the negligence or willful misconduct of Owner or any third party that is not under Contractor's or any Subcontractor's control. Owner shall indemnify, defend and hold harmless Contractor Indemnified Parties from and against all liabilities arising out of or relating to any unknown or pre-existing Hazardous Materials that existed at the Site prior to the Effective Date; provided, however, that in no event shall Owner be obligated under this Section 3.10.2 to the extent such liabilities arise due to (x) a Non-Excusable Event or (y) exacerbation of pre-existing Hazardous Materials by Contractor, any Subcontractor or any third party that is under Contractor's or any Subcontractor's control, that the applicable Person knows or should have reasonably known were on the Site.

3.11     Access; Site Security.  Contractor shall provide security measures as necessary to protect the Site and all materials and supplies stored thereon in accordance with Contractor security procedures attached hereto as Exhibit D (Project Health and Safety Plan) until Substantial Completion, but shall provide access to the Site (and any other location where the Work is being performed) as reasonably necessary to Owner, the Owner Financing Parties, Utility, and their respective representatives, agents and, to inspect and review the Work being performed by Contractor; provided that, while on the Site, such Persons shall (a) observe Contractor's reasonable security and safety measures; and (b) not unreasonably interfere with Contractor's performance of the Work.  Contractor shall keep the Site reasonably clean and presentable at all times.  The scope and extent of Contractor's obligations to provide security measures is limited to the description of same as set forth in Exhibit D.

3.12     Handling, Shipping and Importation.  Contractor shall arrange for complete handling, shipping and importation, as necessary, of all Project Hardware and construction equipment, including quality assurance, shipping, loading, unloading, customs clearance, receiving, and any required storage and claims.

3.13     Applicable Law; Applicable Permits.

3.13.1 Applicable Law.  Throughout the performance of all aspects of the Work, Contractor shall comply with, and shall ensure that each Subcontractor complies with, all Applicable Law.

3.13.2 Applicable Permits.  Contractor shall obtain and maintain all Contractor Permits and pay all Permit Expenses in connection with such Contractor Permits.  Contractor shall provide reasonably requested assistance to Owner with respect to obtaining, and complying with, any Owner Permits.  Contractor shall provide Owner with sufficient advance notice (upon learning of such Owner Permit) to allow Owner to obtain such Owner Permit in accordance with Applicable Law in the reasonable course of its business and the exercise of reasonable care.  Subject to Section 2.5, in the event that an Applicable Permit not explicitly listed in Exhibit C (Applicable Permits) is required in connection with the Project, such Applicable Permit shall be a Contractor Permit for purposes of this Agreement.

3.14     Commissioning Personnel.  Contractor shall provide, or cause to be provided, appropriate installation and commissioning representatives, as necessary supervising personnel,

19

all equipment, tools, construction and temporary material and all other labor necessary for all of the Work to complete commissioning in accordance with Exhibit H (Commissioning and Testing).

3.15    Existing Improvements and Facilities.    During the performance of the Work, Contractor shall take reasonable care to protect existing improvements, facilities and equipment at the Site, unless they are to be altered or removed as a part of the Work.  Contractor shall also make reasonable provisions to confine its activities so as to avoid and minimize any damage or compaction to any existing fences, crops or ground.  To the extent that Contractor fails to comply with the requirements of the foregoing sentence and such failure causes Owner to become liable for damages to the owners of the Site or others that have a possessory interest in the Site, Contractor shall reimburse Owner in respect of its actual out-of-pocket expenses and damages.

3.16    Contractor Deliverables.    Contractor shall deliver to Owner all Contractor Deliverables as and when required pursuant to the terms of this Agreement.

3.17    Site Conditions.  Contractor (a) has inspected the Site, including both surface and subsurface conditions, and has satisfied itself as to all matters regarding the geotechnical and physical condition thereof, including those matters related to the environment, availability and quality of water, physical conditions at the Site, topography and ground surface conditions, sound attenuation conditions, subsurface geology and conditions, nature and quality of surface and subsurface materials to be encountered (collectively, "**Site Conditions**"), and shall be responsible for all necessary works in relation to, or because of, such Site Conditions both below and above ground on the Site, and (b) shall be solely responsible for performing any preliminary Work on the Site necessary for the commencement of construction to occur, including removal of all physical impediments to performing Work on the Site, above and below ground.  Contractor acknowledges and accepts the Site Conditions and agrees it shall not be entitled to an adjustment to the Contract Price or Project Schedule on account of the Site Conditions, except that the Parties acknowledge Contractor shall be entitled to a Change in Work with respect to any Unforeseeable Site Conditions as an Excusable Event in accordance with Article 8.

3.18    Labor.  Owner is not a party to any collective bargaining or labor agreement and is under no current obligation to utilize union labor in connection with the performance of any Work under this Agreement.  The Contract Price does not include compliance with any requirement to use union labor or prevailing wage rates in connection with any portion of the Work at the Site or surrounding area.

3.19    Permission for Interconnection.  Contractor and its Subcontractors shall not connect the Project to the transmission grid as contemplated in the Interconnection Agreement or allow the delivery of energy to the transmission grid without Owner's prior written approval, provided that the Owner shall not unreasonably withhold, delay or deny its approval which in no case shall exceed a maximum of sixty (60) calendar days from the date the Contractor has provided a written notice under Section 11.4.

3.20    Storage and Maintenance of Project Hardware and Other Items.  Once any Project Hardware is delivered to the Site, Contractor shall receive, unload, clean, store and maintain the Project Hardware with reasonable care and shall maintain or assume the care, custody and control thereof.

20

3.21    Testing of the Work.  Contractor shall perform, or cause to be performed, all tests, approvals and inspections of the Work required by any Governmental Authority for construction work, or as otherwise necessary, appropriate or customary to assure the proper performance and operation thereof, in accordance with the Performance Requirements, including quality assurance inspections upon the delivery of any Project Hardware to the Site.  These tests, inspections and approvals shall be scheduled by Contractor so as not to delay the progress of the Work.

3.22    Back Feed Power and Parallel Operation.  The Parties acknowledge and agree that Owner's satisfaction of its obligations under Section 2.2 herein require Contractor's timely completion of construction of the substation pad and satisfaction of the conditions precedent to achieve Mechanical Completion.   Subject to Article 8 (Excusable Event), Contractor shall complete construction of the substation pad and achieve Mechanical Completion by no later than the applicable milestone dates set forth in Exhibit S (Project Schedule) for completion of such Work.  If Contractor fails to timely complete the foregoing requirements in accordance with the applicable milestone, Owner shall be entitled to a corresponding day-for-day extension of its milestone completion obligations as set forth in Section 2.2 and Contractor shall not be entitled to any corresponding extension of the Guaranteed Substantial Completion Date, except to the extent of concurrent delay between the Parties, in which case both Parties' applicable milestone completion obligations shall be extended on a day-for-day basis to the extent of such concurrent delay consistent with Section 2.2.

3.23    The Parties agree to negotiate in good faith to enter into a mutually acceptable operations and maintenance agreement with a term equal to the Warranty Period under this Agreement.

3.24    Contractor Parent Guaranty. Contractor shall cause Contractor Parent Guarantor to provide the Contractor Parent Guaranty upon the Effective Date.

## 4.    COVENANTS, WARRANTIES AND REPRESENTATIONS

4.1    Contractor.  Contractor represents and warrants, as of the Effective Date, the effective date of an executed LNTP (if applicable) and the Commencement Date, as follows:

4.1.1    Organization, Standing and Qualification; Financial Capability.  Contractor is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full power and authority to execute, deliver and perform its obligations hereunder and to engage in the business it presently conducts and contemplates conducting, and is and will be duly licensed or qualified to do business and in good standing under the laws of each other jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder.  Contractor is financially solvent, able to pay its debts as they mature, and possessed of sufficient working capital to complete its obligations under this Agreement.

4.1.2    Due Authorization; Enforceability.  This Agreement has been duly authorized, executed and delivered by or on behalf of Contractor and is, upon execution and delivery by each of the Parties hereto, the legal, valid and binding obligation of Contractor, enforceable against

21

Contractor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.

4.1.3   No Conflict.   The execution, delivery and performance by Contractor of this Agreement (a) will not conflict with or cause any default under: (i) its organizational documents; (ii) any indenture, mortgage, chattel mortgage, deed of trust, lease, conditional sales contract, loan or credit arrangement or other agreement or instrument to which Contractor is a party or by which it or its properties may be bound or affected; or (iii) any Applicable Laws; and (b) will not subject the Project or any component part thereof or the Site or any portion thereof to any Lien other than as contemplated or permitted by this Agreement.

4.1.4   Government Approvals.   Neither the execution nor delivery by Contractor of this Agreement requires the consent or approval of, or the giving of notice to or registration with, or the taking of any other action in respect of, any Governmental Authority.   Contractor represents and warrants that all Contractor Permits and other Applicable Permits required to be in Contractor's name either have been obtained by Contractor and are in full force and effect or will be obtained and will be in full force and effect on or prior to the date on which they are required under this Agreement and Applicable Law, so as to permit Contractor to commence and prosecute the Work to completion in accordance with the terms and conditions of this Agreement.

4.1.5   No Suits, Proceedings.   There are no actions, suits, proceedings, patent or license infringements, or investigations pending or, to Contractor's knowledge after due inquiry, threatened in writing against it at law or in equity before any court or before any Governmental Authority (whether or not covered by insurance) that individually or in the aggregate could result in any materially adverse effect on Contractor's ability to perform its obligations under this Agreement.   Contractor has no knowledge of any violation or default with respect to any order, writ, injunction or decree of any court or any Governmental Authority that may result in any such materially adverse effect or such impairment.

4.1.6   Business Practices.   Contractor has not and shall not make any payment or give anything of value to any government official to influence his, her or its decision or to gain any other advantage for Owner or Contractor, including any officer or employee of any Governmental Authority.

4.1.7   Licenses.   Contractor and any Subcontractor who will perform any portion of the Work have and will have all business and professional certifications and licenses if and as required by the terms and conditions of this Agreement, Applicable Law and Applicable Permits to perform such portion of the Work under this Agreement.

4.1.8   Financial Condition and Adequate Resources.   Contractor is financially solvent, able to pay its debts as they mature, and possessed of sufficient working capital to complete its obligations under this Agreement.   Contractor has or will procure adequate resources and is qualified, in each case directly or through its Subcontractors, to perform the Work in accordance with the terms and conditions of this Agreement.

22

4.1.9    Intellectual Property.  Contractor owns or has the right to use, or will be able to secure from its Subcontractors the right to use, all Intellectual Property Rights necessary to perform the Work without conflict with the rights of others and to enable Owner to exercise its rights hereunder to operate the Project without infringement thereof.  Owner's use or sale of the Project does not and will not infringe upon any Intellectual Property Rights.  In no event will Owner Indemnified Parties or their respective successors-in-interest be liable to Contractor or any Subcontractor for infringement of any Intellectual Property Rights or claim thereof.

4.1.10    Reliance on Information.  Owner acknowledges that it is aware and understands that the Contractor will rely on the Owner-Supplied Information shown in Exhibit V (Owner-Supplied Information), for information, data, inferences, conclusions, or other information, including the surface and subsurface conditions at the Site and the condition of the Site. However, Contractor agrees that the Owner-Supplied Information shall not limit Contractor's obligation to conduct its own Site surveys and inspection as necessary to perform its obligations under this Agreement.

4.2    Owner.  Owner represents and warrants, as of the Effective Date, the effective date of an executed LNTP (if applicable) and the Commencement Date, as follows:

4.2.1    Organization, Standing and Qualification.  Owner is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Vermont, and has full limited liability company power and authority to execute, deliver and perform its obligations hereunder and to engage in the business Owner presently conducts and contemplates conducting, and is and will be duly licensed or qualified to do business and in good standing in Vermont and in each other jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder.

4.2.2    Due Authorization; Enforceability.  This Agreement has been duly authorized, executed and delivered by or on behalf of Owner and is, upon execution and delivery by each of the Parties hereto, the legal, valid, and binding obligation of Owner, enforceable against Owner in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.

4.2.3    No Conflict.  The execution, delivery and performance by Owner of this Agreement will not conflict with or cause any default under: (a) its organizational documents; (b) any indenture, mortgage, chattel mortgage, deed of trust, lease, conditional sales contract, loan or credit arrangement or other agreement or instrument to which it is a Party or by which it or its properties may be bound or affected; or (c) any Applicable Laws.

4.2.4    Financial Condition and Adequate Resources.  Owner is financially solvent, able to pay its debts as they mature, and possessed of sufficient working capital to complete its obligations under this Agreement.  Owner shall notify Contractor if Financial Closing is achieved, following which Contractor may request that the Owner provide reasonable evidence confirming such financial arrangements.

## 5.    COST OF WORK

23

5.1     Contract Price.   Contractor hereby agrees to accept as compensation for the performance of the Work and its other obligations hereunder **$3,906,500**  (as the same may be adjusted pursuant to the terms of this Agreement, the "**Contract Price**").   Neither shall the Contract Price be changed nor shall Contractor be entitled to any other compensation, reimbursement of expenses, or additional payment of any kind without prior written authorization of Owner or as otherwise specifically set forth in Article 13.  Payments shall be made at the times and in the manner provided in Article 6.  All amounts paid or payable by Owner or any of Owner's Affiliates with respect to any Work under this Agreement performed by Contractor (including under any Limited Notice to Proceed) prior to either the Effective Date or the issuance of a Notice to Proceed shall be credited toward payment of the Contract Price.

5.2     Price All-Inclusive.   The Contract Price shall include all expenses and costs incurred by Contractor to perform the Work, including, without limitation, the following items: (a) all costs and expenses incurred and to be incurred in connection with the completion of the design and engineering, construction, installation, commissioning, start-up, testing, performance and acceptance testing of the Work, including the price of all labor (including wages, salaries, insurance, taxes and benefits), services, materials, supplies, and equipment furnished under any contract for construction and installation of the Work or otherwise incurred in connection therewith (including the cost of PV modules for the Project), and including all charges of and payments to Subcontractors; (b) the premiums on all insurance required under this Agreement to be obtained and maintained by Contractor and its Subcontractors; (c) all expenses incurred in seeking to enforce any remedy against any Subcontractor with respect to any default under any contract with such Subcontractor; (d) all costs and expenses incurred in order to correct defective Work; (e) all costs and expenses associated with the re-testing of the Work or any portion thereof following a failure to meet a test, including the Capacity Tests (including the Initial Capacity Test and Final Capacity Test) and Functional Tests; (f) all costs and fees required to procure and maintain all Applicable Permits other than Owner Permits; (g) all shipping charges and all duties, fees, and royalties imposed with respect to any equipment, materials, labor or services incorporated into or used in performing the Work; (h) all taxes paid or payable by Contractor in connection with the Work not otherwise allocated to Owner as provided herein; and (i) all costs and expenses for obtaining the Security.

5.3     Sales/Use Taxes.

5.3.1   The Contract Price is inclusive of any and all Taxes that may be imposed or assessed by any Governmental Authority on Contractor or any Subcontractor with respect to this Agreement or Contractor's installation of the Project and performance of the Work, other than Excluded Taxes.  Without limiting the generality of the foregoing, (i) Contractor shall timely pay all such Taxes (other than Excluded Taxes) due in connection with Work under this Agreement and shall make any and all payroll deductions required by any Applicable Law; (ii) Contractor shall provide Owner all certificates and other documentation necessary so that Owner will not be required to pay such Taxes (other than Excluded Taxes) with respect to the Work or any part of it and (iii) Contractor hereby authorizes Owner to perform any withholding for Taxes (other than Excluded Taxes) required under Applicable Law.

5.3.2   Excluded Taxes shall be the sole responsibility of Owner.  Without limiting the generality of the foregoing, (i) Owner shall timely pay all such Excluded Taxes; (ii) Owner shall

24

provide Contractor all certificates and other documentation necessary so that Contractor will not be required to pay such Excluded Taxes with respect to the Work or any part of it and (iii) Owner hereby authorizes Contractor to perform any withholding for Excluded Taxes required under Applicable Law.

5.3.3    Owner and Contractor shall reasonably cooperate to minimize the Taxes of both Parties and shall take all steps reasonably necessary to ensure that [Name of State] sales and privilege Tax is minimized, including but not limited to providing sales Tax exemption certificates.

5.3.4    If any Governmental Authority notifies Owner that Owner will be subject to an audit or examination relating to Sales Taxes, Owner shall promptly provide Contractor with a copy of such notice from such Governmental Authority.  If any Governmental Authority notifies Owner that such Governmental Authority proposes to assess or impose or will assess or impose on Owner Sales Taxes or associated penalties or interest, Owner shall promptly provide Contractor with a copy of such notice from such Governmental Authority.  If any Governmental Authority assesses Sales Taxes, Contractor shall timely pay such Sales Taxes in accordance with the terms of such assessment unless Contractor reasonably determines that such assessment should be disputed.  If Contractor reasonably determines that such assessment should be disputed, Contractor may, at its sole cost and expense, file (or cause or direct Owner to file) such documents as are necessary to dispute such assessment.  Contractor shall control at its sole cost and expense, and Owner may participate in, any dispute, audit, examination, settlement, or other proceeding regarding Contractor's dispute of such assessment.  Contractor shall not submit (or cause to be submitted) any protest, appeal, settlement, brief, or documentation to any Governmental Authority in connection with its dispute of any such assessment without Owner first having had a reasonable opportunity to review and comment on such documentation.  Contractor shall consider and incorporate any reasonable comments and changes proposed by Owner.  The Parties shall reasonably cooperate with each other and assist each other in any dispute, audit, examination, settlement, or other proceeding relating to Sales Taxes.  If any Governmental Authority requires payment of any such proposed or assessed Sales Taxes in connection with Contractor's decision to continue to dispute such Sales Taxes, Contractor shall pay such Sales Taxes in accordance with Applicable Law.  Contractor shall remain liable for any and all such Sales Taxes that become due; provided that in the event of an audit or examination of Owner by any Governmental Authority regarding Sales Taxes, Contractor's reimbursement obligations hereunder shall be reduced to the extent any such Sales Taxes accrued or incurred by or levied upon Owner are attributable to Owner's failure to comply with this Section 5.3.4.  If Owner subsequently receives any refund or credit for any Sales Taxes which Contractor has paid (or for which Contractor is liable) pursuant to this Section 5.3.4, Owner shall promptly pay to Contractor the full amount of such Sales Taxes refund or credit.  This Section 5.3.4 shall not apply to any Sales Taxes treated as an Excluded Tax under Section 5.3.3.

5.3.5    If, after issuance of the Final Contractor's Invoice under Section 6.1.3, any Excluded Taxes are assessed or imposed upon Contractor or any Subcontractor, Owner shall promptly reimburse or pay to Contractor the amount of such Excluded Taxes.  If, after issuance of the Final Contractor's Invoice, any Taxes (other than Excluded Taxes) are assessed or imposed upon Owner in respect of the Work, Contractor shall promptly reimburse or pay to Owner the amount of such Taxes (other than Excluded Taxes) in accordance with this Section 5.3; provided

25

that Owner shall provide reasonable documentary evidence detailing such Taxes (other than Excluded Taxes).

## 6.    TERMS OF PAYMENT

6.1    Contractor Payments.  Subject to the terms of Section 6.11, the Contract Price (plus any applicable Excluded Taxes) shall be paid by Owner to Contractor in connection with the achievement of Project milestones as set forth in Exhibit Q (Milestone Payment Schedule). Each payment to Contractor under this Section 6.1 shall be due and payable only to the extent it is supported, to Owner's reasonable satisfaction, by the completion of the applicable portion of the Work set forth in Contractor's Invoice raised on a monthly basis.  Provided, however, that Owner may review and approve any Major Project Hardware and related supply contract terms selected by Contractor, such approval not to be unreasonably withheld and in accordance with Section 3.3.2, and in such event, Owner may, at its election, pay the supplier of such Major Project Hardware directly all amounts due to such supplier including any required deposits (and which such payments shall take the form reasonably required by the supplier).  Any such payments by Owner shall take the form of a two-party check to be deposited solely by such supplier or other form of payment mutually agreed upon by the Parties to ensure that Contractor may book such payment for accounting purposes.  Any payments made by Owner shall reduce future milestone payments on a pro rata basis.

6.1.1    Payment Assessment.  Contractor and Owner may periodically review the Work completed and assess the progress of on-Site Work completed.  Owner's Engineer and any Independent Engineer may be present during such review and assessment of the Work.

6.1.2    Contractor's Invoices.    Contractor shall electronically deliver to Owner a Contractor's Invoice substantially in the form attached hereto as Exhibit W (Form of Contractor's Invoice) no later than the fifth (5th) Business Day of each month following the Commencement Date for each payment owing to Contractor under this Article 6 and under any other provision of this Agreement for Work performed prior to such month. Each Contractor's Invoice shall be reasonably detailed and shall be accompanied by reasonable supporting documentation evidencing the achievement of the portion of the Work for which the payment is being requested and shall be accompanied by the Lien Waivers required to be delivered therewith as set forth below.  Within five (5) Business Days after the receipt of each Contractor's Invoice (including for the avoidance of doubt the Final Contractor's Invoice), Owner shall review such Contractor's Invoice to verify (i) completion of the Work for which payment is sought; (ii) that the Work conforms to the requirements of this Agreement; (iii) that such Contractor's Invoice and supporting documentation have been properly submitted and that Owner has received the Interim Lien Waivers and Final Completion Lien Waivers required to be delivered; and (iv) that the invoiced amount reflects the percent of each subcategory of the Work completed in the applicable timeframe.  Upon such verification and within five (5) Business Days from receipt of a Contractor's Invoice, Owner shall approve such Contractor's Invoice or shall advise Contractor if all or any portion of the application is not approved. Owner shall provide all specific reasons in writing for any disapproval of a Contractor's Invoice or a portion thereof.  If Owner cannot approve a portion of a Contractor's Invoice, Owner shall nonetheless approve payment of the remaining portion of such Contractor's Invoice for Work performed in accordance with this Agreement.  Notwithstanding anything herein to the contrary (including the last sentence of Section 6.1 purporting to limit billing in advance of

26

amounts set forth in Exhibit Q (Milestone Payment Schedule)), with regards to amounts due from Owner to Contractor hereunder that correspond to payments due from Contractor under a module supply agreement or purchase order for PV modules for the Project, Owner agrees that Contractor is entitled to invoice and be paid by Owner for such amounts ten (10) Business Days in advance of when the corresponding payments would be due from Contractor to its module vendor(s). Accordingly, Contractor may include in its monthly Contractor Invoice amounts associated with payments due from Contractor to its module vendor(s) in the subsequent month, and Owner agrees such amounts shall be due and owing as otherwise provided in Section 6 herein.  Contractor must provide proof of delivery documents in the form of an invoice or purchase order and bill of lading. If a bill of lading can't be supplied, a copy of the flash test data can be used until a bill of lading is available before issuing payment.

6.1.3    Final Completion Payment.  On or after the date on which Contractor delivers to Owner a Notice of Final Completion accepted by Owner pursuant to Section 11.6, Contractor shall submit a final Contractor's Invoice (a "**Final Contractor's Invoice**") which shall set forth all amounts due to Contractor that remain unpaid as of the date of such invoice (including (a) any remaining Punchlist Holdback that has not been released to Contractor in accordance with Section 6.9, (b) any remaining Excluded Taxes for which Owner is liable to indemnify Contractor under this Agreement and (c) any other amount due to Contractor hereunder) and shall be accompanied by the Final Completion Lien Waivers required to be delivered therewith pursuant hereto.  Owner shall pay to Contractor the amount due under such Final Contractor's Invoice (the "**Final Completion Payment**") in accordance with Section 6.4.  Notwithstanding the foregoing, the Final Completion Payment shall only become due and payable to Contractor if and only if all of the requirements of Final Completion set forth in Section 11.5 have been met.

6.1.4    Lien Waivers.

(a)    Each Contractor's Invoice (other than the Final Contractor's Invoice) shall include the following lien waivers and documents:

(i)    from Contractor, a conditional Interim Lien Waiver with respect to the payment specified in such Contractor's Invoice and an unconditional Interim Lien Waiver with respect to all payments previously made to Contractor prior to the payment specified in such Contractor's Application for Payment;

(ii)    from Contractor, a sworn construction statement and related documents and undertakings, in form and substance commonly used in the industry with respect to similar projects in Vermont and reasonably satisfactory to the applicable title company, for purposes of any title insurance (including any mechanics' lien endorsement) being issued with respect to the Project, which sworn construction statement shall specify the names of each Subcontractor for which payment for any Work is being made (including a statement of the amount being paid to such Subcontractor in connection with the current payment that is the subject of such Contractor's Invoice, as applicable, and an aggregate amount which is then due and payable to each such Subcontractor for Work which was included within any Contract Price payments previously invoiced by Contractor, but not yet reimbursed to the applicable Subcontractor); and

27

(iii)    from each Major Subcontractor who performed Work with respect to each milestone or other portion of the Work referenced in such Contractor's Invoice, (A) a conditional Interim Lien Waiver (unless the applicable Major Subcontractor has completed all its Work under the applicable subcontract, in which case Contractor shall submit a conditional Final Lien Waiver for such Subcontractor) and (B) unless such Major Subcontractor has delivered a conditional Interim Lien Waiver pursuant to clause (A) above, an unconditional Interim Lien Waiver for all amounts previously paid to such Major Subcontractor from Progress Payments made prior to such Progress Payment; provided, that for any Major Subcontractor that has delivered a conditional Final Lien Waiver, within thirty (30) days after the receipt of such payment by Contractor, Contractor shall deliver an unconditional Final Lien Waiver from such Major Subcontractor.

(b)    The Final Contractor's Invoice shall include the following lien waivers and documents:

(i)    from Contractor and each Major Subcontractor to whom any final payment will be made from proceeds of such Final Payment, a conditional Final Lien Waiver; provided, that within thirty (30) days after the receipt of the Final Completion Payment by Contractor, Contractor shall deliver an unconditional Final Lien Waiver from Contractor and each such Major Subcontractor; and

(ii)    from Contractor, a sworn construction statement and related documents and undertakings, in form and substance commonly used in the industry and reasonably satisfactory to the applicable title company, for purposes of any title insurance (including any mechanics' lien endorsement) being issued with respect to the Project, which sworn construction statement shall specify the names of each Subcontractor for which the final payment for any Work is being made (including an aggregate not to exceed amount then remaining due and payable under each applicable subcontract but without detailing any mark-up of Contractor).

6.2    Warranty Work.  Any warranty work performed by Contractor pursuant to this Agreement shall be at the sole expense of Contractor.

6.3    Undisputed Payments.  Each Party shall pay any undisputed portion of any amount owed to other Party pursuant to this Agreement within twenty-five (25) days after receipt of the applicable invoice or demand for payment from the Party seeking payment.  Any undisputed payments not paid when due shall bear interest at a rate equal to the Prime Rate then in effect *plus* five percent (5%) per annum.

6.4    Disputed Payments.  If a Dispute arises regarding the payments to be made to Contractor or Owner hereunder, Owner or Contractor, as applicable, shall pay all undisputed amounts, and Owner and Contractor shall resolve the Dispute in accordance with the Dispute resolution provisions of Article 24.

6.5    Form and Manner of Payments.  All payments made pursuant to this Agreement shall be made by check or wire transfer of immediately available funds to a bank account to be designated by the Party receiving such payment.  Either Party may designate from time to time a

28

different bank or account by notice to the other Party given not less than ten (10) Business Days prior to the payment date to which such payment instructions are to apply.  If the date for any payment called for under this Agreement should fall on a day that is not a Business Day at the location designated for receipt of such payment, then such payment may be made on the next succeeding Business Day in such location with the same effect as if made on the date due.

6.6     Effect of Payment.  Payment hereunder shall not constitute Owner's approval of any portion of the Work which has been determined not to be, or subsequently is determined not to have been, performed in accordance with the requirements of this Agreement.

6.7     Retainage.  Commencing on the date of issuance of the full Notice to Proceed under this Agreement, Owner may retain an amount equal to  seven and a half percent (7.5%) of each payment of the Contract Price (including any prior payment under a Limited Notice to Proceed) payable under this Agreement to Contractor (the "**Retainage**") pursuant to a Contractor's Invoice until such time as Contractor achieves Substantial Completion, subject to Section 6.8. Owner may at any time draw upon the Retainage or the Security to cure a Contractor Event of Default, for payment of any Delay Liquidated Damages, for payment of unpaid Subcontractors and to remove Contractor Liens filed by Subcontractors (which have not been removed or covered by a bond or other security reasonably acceptable to Owner and to the extent not arising from a failure by Owner to pay all amounts which are the subject of such Contractor Liens), for purposes of funding the Punchlist Holdback (if sufficient funds are not available in accordance with Section 6.8), to complete any unfinished Punchlist items, to complete or perform any work required for the Project to pass the tests contemplated under Article 10 and to apply to any other amounts due and payable to Owner by Contractor hereunder, including any Delay Liquidated Damages. Any interest on the Retainage shall accrue for the account of Owner and not Contractor.

6.8     Completion of Punchlist Items.

6.8.1   Punchlist Holdback. Concurrent with the payment to be made with respect to the achievement of Substantial Completion, Owner shall pay to Contractor the amount of the Retainage as provided in Section 6.7, less a hold back in an amount equal to one hundred fifty percent (150%) of the Punchlist Amount (the "**Punchlist Holdback**").

6.8.2   Release of Punchlist Holdback. As Contractor completes the Punchlist items pursuant to Section 11.1, Owner shall release to Contractor on a monthly basis that portion of the Punchlist Holdback withheld equal to the Punchlist Amounts for such completed Punchlist items in accordance with the Punchlist. As part of the Final Completion Payment, Owner shall release the amount of the Punchlist Holdback not previously released to Contractor pursuant to this Section 6.8.2.

6.9     Withholding Payment.  Notwithstanding any other provision to the contrary contained herein, Owner may withhold payments to Contractor hereunder, and Owner may decide not to certify payment or may nullify the relevant part of a certification for payment made pursuant to a previous Contractor's Invoice to such extent as may be necessary to protect Owner from loss because of: (i) third party claims filed for which Contractor is responsible (including Liens) against the Work, the Project or the Site, so long as payment therefor was previously made by Owner; (ii) the unexcused failure of Contractor to make payments when due to Subcontractors; (iii) damage

29

to Owner or another contractor, for which Contractor is liable, including damage to the property of Owner or any of its Affiliates; (iv) Contractor's failure to carry out the scope of Work in accordance with this Agreement; (v) the occurrence of a Contractor event of default; and (vi) Contractor's failure to achieve Substantial Completion by the Guaranteed Substantial Completion Date; provided, however, the amount withheld or retained on account of clause (vi) or (vii) shall not exceed the amount of applicable Delay Liquidated Damages for which Contractor is liable hereunder; provided, further, that Owner shall also have the right to invoice Contractor for such Delay Liquidated Damages and, in such event, on the last day of each month during which Delay Liquidated Damages accrue (or the first Business Day thereafter), Owner shall provide Contractor with a statement of the amount of Delay Liquidated Damages accruing and owed since the previous statement, in addition to amounts unpaid from previous statements, if any, and Contractor shall pay any such Delay Liquidated Damages within thirty (30) days after receipt of such statement(s). Contractor shall not have any rights of termination or suspension under this Agreement as a result of Owner's exercise of its rights under this Section 6.9. Owner shall release payments or portions of payment withheld pursuant to this Section 6.9 within five (5) days from the date when the circumstance for which payment or the portion of payment has been withheld is resolved or the amount withheld is otherwise no longer needed to protect Owner.

**7.     COMMENCEMENT AND SCHEDULING OF THE WORK**

> 7.1     Effectiveness of Agreement.
>
> > (a)     Contractor's obligations to fully perform the Work (other than that portion of the Work set forth in one or more LNTPs) shall commence on the Commencement Date, which shall be the day the Owner issues the NTP to Contractor.  If Owner fails to issue the NTP on or prior to February 14, 2023, the Project Schedule milestone (as set forth in Exhibit S) shall be correspondingly extended, on a day-for-day basis, by the period of time of delay from February 14, 2023 until the date on which Owner issues Notice to Proceed.
> >
> > (b)     Prior to the Commencement Date, Owner may submit to Contractor one or more Notices in the form attached as Exhibit M (each, a "**Limited Notice to Proceed**" or an "**LNTP**"), describing any portion of the Work to be completed by Contractor. Upon mutual agreement between Owner and Contractor as to the terms of the LNTP (including, for the avoidance of doubt, the schedule and budget for Work described in the LNTP), Contractor shall commence such portion of the Work pursuant to the schedule specified in the LNTP, and such portion of the Work shall be subject to the terms of this Agreement. The Work, the activities of Contractor and any Project Hardware performed or furnished under an LNTP shall be part of the Work for all purposes hereunder. Owner shall pay Contractor all amounts due and payable for Work performed under any LNTPs agreed between the Parties. Owner shall make such payment in accordance with the payment schedule set forth in the LNTP.  By executing this Agreement, Owner hereby provides Contractor an LNTP, in accordance with the payment terms provided in Exhibit Q regarding milestone payments.
> >
> > (c)     [INTENTIONALLY DELETED.]
>
> 7.2     Scheduling of the Work.

30

(a)      Contractor shall plan, supervise, control and coordinate the performance of the Work in accordance with the Project Schedule, including the Guaranteed Substantial Completion Date.  Contractor shall regularly obtain from Subcontractors information and data about the planning for and progress of the Work and the delivery of Project Hardware, shall coordinate and integrate such information and data into any updates to the status of the Work, and shall monitor the progress of the Work and the delivery of Project Hardware. Contractor shall act as the expeditor of its own forces and those forces of Subcontractors to prevent potential and actual Contractor-caused delays, interruptions, hindrances or disruptions.

(b)      Neither Owner's acceptance of, nor comments about, any schedule shall transfer responsibility for any schedule to Owner, nor imply Owner's agreement with (i) any assumption upon which such schedule is based or (ii) any matter underlying or contained in such schedule.  Failure of Owner to discover errors or omissions in schedules that it has reviewed, to inform Contractor that Subcontractors or others are behind schedule, or to direct or enforce procedures for complying with the Project Schedule shall not relieve Contractor from its sole responsibility to perform and complete the Work to achieve Substantial Completion by the Guaranteed Substantial Completion Date, and shall not be a cause for an adjustment of the Contract Price or the Guaranteed Substantial Completion Date.

7.3      Progress Reporting.  From and after the earlier of execution of an LNTP or the Commencement Date and until the Substantial Completion Date, Contractor shall prepare a Monthly Progress Report, which shall be submitted to Owner no later than five (5) Business Days after the close of each calendar month. If requested by Owner, Contractor's Manager (or his designee) shall attend scheduled meetings between representatives of Owner and Utility to discuss construction progress.  In addition, Contractor shall schedule and hold a monthly meeting with Owner to discuss the Monthly Progress Report, including any delays or changes to the Project Schedule and Contractor's planned work for the next month.

## 8.      EXCUSABLE EVENT AND FORCE MAJEURE EVENT

8.1      Certain Events.  No failure or omission to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim against a Party, or be deemed to be a breach or an Event of Default under this Agreement, if such failure or omission shall be caused by or arise out of an Excusable Event or Force Majeure Event; provided that the Party claiming relief complies with the provisions of this Article 8.  Notwithstanding anything to the contrary in the foregoing, the obligation to pay money in a timely manner in accordance with the terms hereof shall not be subject to the Excusable Event Force Majeure Event provisions hereof.

8.2      Notice of Excusable Event or Force Majeure Event.  If a Party's ability to perform its obligations under this Agreement is affected by an Excusable Event or Force Majeure Event, the Party claiming relief shall give to the other Party (a) verbal or email notification describing the particulars of the Excusable Event or Force Majeure Event within forty-eight (48) hours after such Party becomes aware of the occurrence of the Excusable Event or Force Majeure Event (but in no event later than two (2) Business Days after the initial occurrence of the Excusable Event or Force

Majeure Event) and (b) Notice describing the particulars of the Excusable Event or Force Majeure Event as soon as is reasonably practicable and in any event within five (5) Business Days after when the Party becomes aware of the Excusable Event or Force Majeure Event and its impact on the Work describing in reasonable detail the particulars of the occurrence giving rise to the claim, including what date the Party claiming relief became aware of the occurrence of such event and an estimate of the event's anticipated duration and effect upon the performance of its obligations, and any action being taken to avoid or minimize its effect.  The Party claiming relief due to an Excusable Event or Force Majeure Event shall have a continuing obligation to deliver to the other Party regular updated reports and any additional documentation and analysis supporting its claim regarding an Excusable Event or Force Majeure Event (other than an Owner-Caused Delay) promptly after such information becomes available to such Party.

8.3    Excusable Event or Force Majeure Event Conditions.  Upon the occurrence of an Excusable Event or Force Majeure Event:

(a)    the suspension of, or impact on, performance due to such Excusable Event or Force Majeure Event shall be of no greater scope and no longer duration than is required by such event (taking into account the obligations affected thereby);

(b)    the Party claiming relief due to an Excusable Event or Force Majeure Event shall use its commercially reasonable efforts:

(i)    to mitigate or limit the duration of, and costs arising from, any suspension or delay in, or other impact to, the performance of its obligations under this Agreement (including any impact to the schedule for the performance thereof);

(ii)    to continue to perform its obligations hereunder not affected by such event; and

(iii)    to correct or cure the effect of such event; and

(c)    when the Party claiming relief due to such Excusable Event or Force Majeure Event is able to resume performance of its affected obligations under this Agreement, such Party shall give the other Party Notice to that effect and promptly resume performance of all of its obligations under this Agreement.

8.4    Contractor's Remedies.  As Contractor's remedy for the occurrence of an Excusable Event or Force Majeure Event, and provided that Contractor has otherwise materially complied with the applicable provisions of Article 8, if an Excusable Event or Force Majeure Event occurs, and to the extent such Excusable Event or Force Majeure Event has an actual and demonstrable adverse impact on Contractor's ability to perform its obligations hereunder so as to achieve the Guaranteed Substantial Completion Date: (a) the Project Schedule and the Guaranteed Substantial Completion Date shall be correspondingly extended by the period of time (if any) that Contractor's achievement of Substantial Completion is actually and demonstrably delayed as a result of the impact of such an Excusable Event or Force Majeure, and (b) if due to an Excusable event only, Contractor's costs increase despite Contractor's commercially reasonable efforts to mitigate any such increases, the Contract Price shall be increased by an amount equal to the actual and reasonably substantiated costs (including all Taxes other than those based on net income)

32

incurred by Contractor (including any costs incurred by Contractor in connection with the mitigation measures implemented by Contractor and any demobilization and re-mobilization costs In all cases, Contractor shall use its commercially reasonable efforts to overcome or mitigate the effects of such occurrence without seeking a Change Order.

8.4.1    Changes In Work.  Upon the occurrence of an event that entitles Contractor to relief under this Article 8, and subject to Contractor's compliance with the applicable provisions of this Article 8 and Article 13, Contractor and Owner shall prepare a Change Order in accordance with Article 13.

## 9.    SUBCONTRACTORS

9.1    Use of Subcontractors.  The Parties acknowledge and agree that Contractor shall be entitled to engage Subcontractors in respect of the performance of the Work or portion thereof; provided that neither the use by Contractor of any Subcontractor nor the review or failure to object by Owner of any Major Subcontractor under this Article 9 or Exhibit J (Major Subcontractors) shall (a) constitute any Owner approval of the Work undertaken by any such Person, (b) relieve Contractor of its duties, responsibilities, obligations or liabilities hereunder, (c) relieve Contractor of its responsibility for the performance of any Work rendered by any such Subcontractor, or (d) create any relationship between Owner, on the one hand, and any Subcontractor, on the other hand, or cause Owner to have any responsibility for the actions or payment of such Person.  As between Owner and Contractor, Contractor shall be solely responsible for the acts, omissions or defaults of its Subcontractors and any other Persons for which Contractor or any such Subcontractor is responsible (with the acts, omissions and defaults of its Subcontractors being attributable to it).  In no event shall any act or omission by any Subcontractor constitute an Excusable Event except to the extent caused by an event or circumstance that itself constituted an Excusable Event.

9.2    Owner Consent.  Set forth in Exhibit J (Major Subcontractors) is a schedule of the Major Subcontractors who, notwithstanding anything to the contrary herein, Contractor shall be entitled to engage in furtherance of Contractor's obligations under this Agreement without the consent of Owner.  Contractor shall Notify Owner of any additional suppliers or subcontractors with whom Contractor anticipates engaging that, if engaged, would be deemed a Major Subcontractor.  Owner shall have the right to review and approve such engagement, such approval not to be unreasonably withheld or delayed.  Following such Owner approval, Exhibit J shall be deemed to be amended to reflect such additional approved Major Subcontractor (which thereafter shall be deemed a Major Subcontractor, as applicable).

9.3    Assignment.

9.3.1    No Subcontract or purchase order shall bind or purport to bind Owner, but each Subcontract and purchase order with a Major Subcontractor shall provide for assignment of such Subcontract or purchase order to Owner or, at Owner's request, to the Owner Financing Parties, upon the termination of this Agreement (a) due to a Contractor Event of Default and (b) in accordance with Section 16.6.

9.3.2    Contractor hereby assigns to Owner all its interest in all Subcontracts and purchase orders now existing or hereafter entered into by Contractor for performance of any part of the

33

Work, which assignment will be effective only upon acceptance by Owner in writing, and only after the earlier to occur of Substantial Completion or termination of this Agreement, and only as to those Subcontract agreements and purchase orders that Owner designates in said writing. Such assignment may not be withdrawn by Contractor, and Owner may accept said assignment at any time during the course of construction, throughout the Warranty Period and throughout the term of such Subcontract or purchase order, if longer. Upon such acceptance of assignment by Owner: (a) Contractor shall promptly furnish to Owner the originals or copies of the designated Subcontract agreements and purchase orders, and (b) Owner shall only be required to compensate the designated Subcontractor(s) for compensation accruing to same for Work done or materials delivered from and after the date as of which Owner accepts assignment of the Subcontract agreement(s) or purchase order(s) in writing. All sums due and owing by Contractor to the designated Subcontractor(s) for Work performed or material supplied prior to the date as of which Owner accepts in writing the assignment of such Subcontract agreement(s) or purchase order(s), and all other obligations of Contractor accruing prior to Owner's written acceptance of such assignment, shall constitute an obligation solely between such Subcontractor(s) and Contractor, and Owner shall have no liability with respect to such sums or any other obligations of Contractor, to the extent that Owner has paid Contractor all amounts payable to Contractor under this Agreement, with respect to such obligations prior to the date on which Owner accepts assignment. If Owner elects so to assume by notice of acceptance of assignment any such subcontract agreement or purchase order with a Major Subcontractor as described in this Section 9.3, or to have any such subcontract agreement or purchase order assigned to an Owner Financing Party, then, at the written request of Owner, Contractor shall enter into reasonable assignment documentation requested by Owner confirming the effectiveness of such assignment as between the Parties.

9.4     Other Terms in Subcontracts.  All Subcontracts between Contractor and any of its Affiliates and its or their direct Subcontractors, as well as all Major Subcontractors, shall be consistent with the requirements of this Agreement, insofar as applicable.  All Subcontracts with suppliers of Major Project Hardware shall include the minimum warranties for such Major Project Hardware set forth on Exhibit T (Major Project Hardware Warranties).

9.5     Information; Access.  Contractor shall furnish Owner with (a) reports received from the Subcontractors or Contractor relating to recall notices, defect notices or other similar product communications and (b) such information and access to the Major Subcontractors and any Supplier(s) of PV modules, in each case, as Owner may reasonably request with respect to the subject of clause (a) above.

9.6     Subcontractor Safety; Removal.  No personnel of Contractor or any Subcontractor on the Site or at the Project shall be under the influence of, or in possession of, any alcoholic beverage or controlled substance (except as prescribed by a physician, so long as the performance or safety of the Work is not affected thereby). Contractor shall implement, maintain and enforce a written alcohol and drug abuse policy with respect to its personnel, as may from time to time be revised, consistent with the requirements of Exhibit D (Project Health and Safety Plan), and shall cause Subcontractors to abide by the terms of such alcohol and drug policy. Owner may (in its sole discretion) dismiss from the Site any personnel of Contractor or Subcontractor that Owner has determined undermines the safety of the Site or Project or is non-compliant with Exhibit D.

**10.    COMMISSIONING AND TESTING**

10.1    <u>Commissioning</u>.    Contractor shall perform its commissioning activities in accordance with <u>Exhibit H (Commissioning and Testing)</u>.  Contractor shall provide three (3) Business Days' notice to Owner prior to commencing commissioning activities.

10.2    <u>Capacity Test</u>.  Contractor shall conduct the Capacity Test for the Project in accordance with <u>Exhibit H (Commissioning and Testing)</u>.  If the Project does not pass the Capacity Test, Contractor shall take corrective action and repeat the Capacity Test until the Capacity Test is Successfully Run.  Contractor shall perform such corrective action at Contractor's sole cost and expense.  If Contractor cannot achieve a Successfully Run Capacity Test, Contractor shall pay to Owner the Capacity Liquidated Damages as and when required under <u>Article 12</u>.  Each of the Parties and its representatives (including Owner's Engineer) shall have the right to be present during and to observe any Capacity Test conducted under this Agreement.  Contractor must submit a test report for the Capacity Test within five (5) days after the completion thereof.

10.2.1    <u>Capacity Test Schedules</u>.  Contractor shall give advance Notice to Owner at least three (3) days prior to commencing the Capacity Test; <u>provided</u> that re-performance of tests shall require only two (2) days' notice.  Contractor shall keep the Owner Representative continuously apprised of the schedule for all testing and changes in the schedule, and the commencement and performance of any tests.

10.3    <u>Annual Energy Test</u>.  Contractor shall conduct the Annual Energy Test in accordance with <u>Exhibit H (Commissioning and Testing)</u>.  Contractor shall give advance Notice to Owner at least three (3) days prior to commencing the Annual Energy Test.  Contractor must submit a test report for the Annual Energy Test within ten (10) Business Days after the completion thereof.

10.4    <u>Access for Annual Energy Test</u>.  Commencing on the Substantial Completion Date and until the completion of the Annual Energy Test, Owner shall provide Contractor with:

(a)    reasonable access on a daily basis to the Project and reasonable access to the operating personnel;

(b)    access to all Project maintenance records and all data required to be collected in accordance with <u>Exhibit H (Commissioning and Testing)</u>; and

(c)    subject to compliance by Contractor with Applicable Law and Applicable Permits and subject to Owner's ability to obtain any necessary approvals therefor required under the Financing Documents, Owner shall make the land on the Site available to Contractor to add, construct or otherwise install additional arrays to the existing arrays then-installed as part of the Project, subject to Contractor complying with all other requirements of this Agreement in connection with such construction, installation and operation.  Contractor shall be responsible for acquiring all Applicable Permits for such installation, and the terms of each such Applicable Permit shall be reasonably acceptable to Owner.

10.5    Non-Conforming Work.  If, as a result of any inspection, examination or testing in accordance with this Agreement, Owner identifies any defective Work not in compliance with the requirements of this Agreement, and regardless of whether payment has been made therefor, Owner may reject such portion of the Work prior to the Substantial Completion Date by prompt Notice to Contractor.  Such Notice shall describe such defect in reasonable detail.  Contractor shall, at its sole cost and expense, promptly correct any such defect (except if such defect is a Non-Critical Deficiency, in which case it shall be included on the Punchlist) and promptly provide Notice to Owner that such corrective measures have been completed.  Any Dispute regarding the existence or correction of any such defect shall be resolved pursuant the Dispute resolution provisions hereof.

## 11.    PUNCHLIST; COMPLETION

11.1    Punchlist.

11.1.1 Creation of Punchlist.    Once Contractor believes that a finalized punchlist containing only Non-Critical Deficiencies for the Project is ready for Owner review and approval, Contractor and Owner shall jointly walk-down the Project and confer together as to the items which should be included on the finalized punchlist for the Project.  Contractor shall then create a new list to reflect the result of such joint walk down and deliver the same to Owner for its review and approval, which submitted list shall be explicitly designated as the "**Proposed Punchlist**" and shall set forth all Work remaining to be completed after the Substantial Completion Date.  The Proposed Punchlist may only contain Non-Critical Deficiencies in the Work, and shall include a "**Punchlist Amount**" for the completion or repair of each such Non-Critical Deficiency and Contractor's estimated schedule for completion therefor.  If Owner does not approve the Proposed Punchlist or deliver any changes to the Proposed Punchlist to Contractor within five (5) Business Days after the later to occur of (a) Contractor's submission to Owner of such Proposed Punchlist, and (b) two (2) Business Days after the date of the joint walk-down, then such failure shall constitute an Owner-Caused Delay.  The Proposed Punchlist that is ultimately approved by Owner for the Project shall be referred to as the "**Punchlist**".

11.1.2 Completion of Punchlist.    Contractor shall proceed promptly to complete and correct all items on the Punchlist.  On a monthly basis after the Substantial Completion Date, Contractor shall revise and update the Punchlist to include the date(s) that items listed on such Punchlist are completed by Contractor and accepted by Owner; Contractor shall be able to invoice monthly for completed Punchlist items.  Notwithstanding any of the foregoing, the items listed on such Punchlist shall not be considered complete until Owner shall have inspected such Non-Critical Deficiencies and acknowledged, by notation on the updated Punchlist, that such item of Work is complete.  If Owner does not so inspect and deliver such notations on the updated Punchlist to Contractor (or dispute completion of the applicable items of Work if not accepted) within five (5) Business Days after Contractor submits the updated Punchlist containing such Punchlist item to Owner, and Contractor has actually completed and corrected any such Punchlist item listed on such Punchlist, such failure by Owner shall constitute an Owner-Caused Delay.

11.2    Mechanical Completion.    The following are the conditions precedent for Mechanical Completion:

(a)     the Project is mechanically completed, assembled, erected and installed in accordance with all specifications and otherwise in accordance with this Agreement, is free from detectable and patent defects and deficiencies in installation, so that facility is ready for Backfeed Power and may commence commissioning and thereafter be Interconnected;

(b)     Owner has received Module Data satisfactory to Owner that demonstrates that the Installed Module Capacity is equal or greater to the Required Module Capacity;

(c)     the Project, once Interconnected, will be ready for start-up and thereafter could be operated without damage to the Project, the Site or any other property and without injury to any Person; and

(d)     all Pre-Functional Tests of the Project have been Successfully Run**.**

When Contractor believes that it has satisfied the conditions to Mechanical Completion as set forth above, Contractor shall deliver to Owner a Notice of Mechanical Completion, together with reasonable supporting documentation evidencing the satisfaction of the conditions to Mechanical Completion set forth above.  Owner shall, within five (5) Business Days after receipt of such Notice of Mechanical Completion, deliver its countersignature to such Notice of Mechanical Completion, or if Owner rejects Contractor's Notice, respond in writing, giving its reasons for such rejection.  Thereafter, Contractor shall take the appropriate corrective action.  Upon completion of such corrective action, Contractor shall provide to Owner a new Notice of Mechanical Completion for approval.  This process shall be repeated on an iterative basis until Owner accepts the Notice of Mechanical Completion, as applicable, and delivers its countersignature to such Notice of Mechanical Completion.  The "**Mechanical Completion Date**" shall be the date on which Contractor signed and dated the Notice of Mechanical Completion, as the case may be, provided such Notice of Mechanical Completion is accepted and agreed by Owner.  From the date Contractor submits a Mechanical Completion Notice until the date Owner delivers the Mechanical Completion Certificate, Contractor shall not Interconnect the Project to the transmission grid without Owner's prior written approval.

11.3   Substantial Completion.  Subject to Section 11.4, the following are the conditions precedent for Substantial Completion:

(a)     Mechanical Completion shall have been achieved;

(b)     (i) all instruments and relays have been installed and are functional and (ii) all required protective and control features are operational;

(c)     to the extent in Contractor's scope of Work and control, and subject to relief for schedule delays not caused by Contractor, the Project is synchronized with the transmission system and all testing under the PPA required as a condition to commencing Commercial Operation (as defined in the PPA), including testing required by Utility for delivery of electricity, has been satisfactorily completed;

(d)     all COD-Functional Tests of the Project have been Successfully Run;

37

(e) all interconnection facilities have been satisfactorily completed and the Project has been Interconnected;

(f) the Project is capable of unattended operation in a safe manner without damage to the Project or any sub-system thereof, or any other property on or off the Site, and without injury to any Person in compliance with the Performance Requirements and any other standards of performance set forth herein;

(g) Owner has received all Contractor Deliverables in respect of the Project that are required to be delivered by the Substantial Completion Date, including all Required Manuals identified therein, in accordance with the requirements in Exhibit B (Contractor Deliverables);

(h) the Punchlist for the Project is in final form as provided for in Section 11.1;

(i) the Initial Capacity Test has been Successfully Run;

(j) the results of the Initial Capacity Test reflect achievement of the Minimum Guaranteed Capacity, and where Contractor has failed to achieve the Guaranteed Capacity, Contractor has paid to Owner the Initial Capacity Liquidated Damages;

(k) Contractor has provided, as applicable, a Substantial Completion Lien Waiver as required pursuant to Section 21.3;

(l) Contractor has delivered the Notice of Substantial Completion to Owner pursuant to Section 11.4;

(m) the Project complies with all Applicable Laws, and Industry Standards, and has passed all required tests and has been inspected, reviewed and approved for operation by any applicable Governmental Authority to the extent required by Applicable Law; and

(n) Contractor has paid all undisputed Delay Liquidated Damages, if any, required to have been paid pursuant to Section 6.9.

If any of the foregoing conditions are not satisfied solely due to Owner's willful delay, omission or refusal to allow complete performance of these conditions, the Contractor shall have the right to provide Notice of Substantial Completion as provided under Section 11.4 and receive any payments associated with Substantial Completion under Section 6.1.

11.4 Notice of Substantial Completion. When Contractor believes that it has satisfied the provisions of Section 11.3, Contractor shall deliver to Owner a Notice of Substantial Completion, together with reasonable supporting documentation evidencing the satisfaction of the provisions in Section 11.3. Owner shall, within ten (10) Business Days after receipt of such Notice of Substantial Completion, deliver its countersignature to such Notice of Substantial Completion, or if Owner rejects Contractor's Notice, respond in writing, giving its reasons for such rejection. Thereafter, Contractor shall take the appropriate corrective action. Upon completion of such corrective action, Contractor shall provide to Owner a new Notice of Substantial Completion for approval. This process shall be repeated on an iterative basis until Owner accepts the Notice of

38

Substantial Completion, as applicable, and delivers its countersignature to such Notice of Substantial Completion. The "**Substantial Completion Date**" of the Project shall be the date on which Contractor signed and dated the Notice of Substantial Completion, provided such Notice of Substantial Completion is accepted and agreed by Owner.

11.5    Final Completion. Subject to Section 11.6, "**Final Completion**" shall occur only if all of the following have occurred:

(a)    Substantial Completion shall have been achieved;

(b)    all items on the Punchlist shall have been completed by Contractor (other than any items for which Owner has corrected any defects pursuant to Section 14.3.2 and for which Contractor has paid Owner in accordance with Section 14.3.2);

(c)    the Final Capacity Test of the Project has been Successfully Run, if necessary;

(d)    all Contractor's and Subcontractors' personnel shall have left the Site, and all supplies, tools, equipment, machinery, surplus materials, waste materials, rubbish and construction facilities other than those to which Owner holds title shall have been removed from the Site (other than Contractor's personnel, supplies, tools, machinery, materials and equipment required for the performance of its obligations under all operations and maintenance agreements executed between the Parties, if applicable);

(e)    Contractor shall have delivered to Owner all Contractor Deliverables in accordance with the requirements set forth in Exhibit B (Contractor Deliverables);

(f)    Contractor shall have delivered the Notice of Final Completion to Owner pursuant to Section 11.6;

(g)    Contractor has provided, as applicable, any remaining Final Lien Waivers as required pursuant to Section 21.4; and

(h)    Owner has received from Contractor all final as-built drawings (PDF & CAD files) for the Work and the other documents and information required by the Utility.

11.6    Notice of Final Completion. When Contractor believes that it has satisfied the provisions of Section 11.5, Contractor shall deliver to Owner a Notice of Final Completion, together with reasonable supporting documentation evidencing the satisfaction of the provisions in Section 11.5. Owner shall, within ten (10) Business Days after receipt of such Notice of Final Completion, deliver its countersignature to such Notice of Final Completion, or if Owner rejects Contractor's Notice, respond in writing, giving its reasons for such rejection. Thereafter, Contractor shall take the appropriate corrective action. Upon completion of such corrective action, Contractor shall provide to Owner a new Notice of Final Completion for approval. This process shall be repeated on an iterative basis until Owner accepts the Notice of Final Completion, as applicable, and delivers its countersignature to such Notice of Final Completion. The "**Final Completion Date**" of the Project shall be the date on which Contractor signed and dated the Notice of Final Completion, provided such Notice of Final Completion is accepted and agreed by Owner.

39

11.7    Contractor's Access After Substantial Completion.    Following Substantial Completion, Owner shall provide Contractor with reasonable and timely access to the Project to: (a) complete all remaining items on the Punchlist and (b) satisfy the other requirements with respect to the Project for Final Completion.  Contractor shall perform any Work after Substantial Completion with minimal interference with commercial operation of the Project or any portion thereof and so that reductions in and shut-downs of all or part of the Project's operations will be required only when necessary, taking into consideration the length of the proposed reduction or shut-down, and Owner's obligations and liabilities under the PPA.  Notwithstanding the foregoing, should a reduction in or shut-down of all or part of the Project's operations be required to complete any items on the Punchlist, then such reduction or shutdown shall be scheduled by Owner, acting reasonably, and Contractor shall complete such Work during such Owner scheduled reduction or shut-down.  Contractor acknowledges that Owner may schedule such reduction or shut-down at any time including off-peak hours, nights, weekends and holiday.  For the avoidance of doubt, during the Capacity Test Cure Period, if any, Owner shall have the right to operate the Project, including the right to maximize the economic benefits of the Project.

11.8    Energy and Revenues of the Project.  Any Energy or revenues generated by the Project at any time, including during the performance of any testing, shall be solely for the benefit of Owner.

## 12.    LIQUIDATED DAMAGES

12.1    Delay Liquidated Damages.  Contractor agrees that if Substantial Completion  is not achieved by the Guaranteed Substantial Completion Date, then Contractor shall pay the Delay Liquidated Damages to Owner for each day that Contractor fails to achieve Substantial Completion after the Guaranteed Substantial Completion Date. However, any delay in achieving Substantial Completion caused due to a Force Majeure Event, delay or other inability to obtain necessary materials or export licenses by suppliers if such delay is caused by an independent force majeure event affecting such vendor (and for the avoidance of doubt, any such independent force majeure event beyond such supplier's reasonable control occurring after the Effective Date causing a vendor delivery delay shall not be treated as being foreseeable for purposes of determining whether a force majeure event occurred if such delay is related directly to COVID-19 or the responses of any Persons to COVID-19),  shall not trigger Delay Liquidated Damages.

12.2    Capacity Liquidated Damages.

12.2.1  Contractor agrees that if based on the results of the Initial Capacity Test, the Project shall have failed to satisfy the Minimum Guaranteed Capacity, Contractor shall pay to Owner upon Substantial Completion an amount equal to the Initial Capacity Liquidated Damages.  Upon payment of the Final Completion Payment pursuant to Section 6.1.3, any Initial Capacity Liquidated Damages paid by Contractor to Owner shall either be (a) returned to Contractor in the amount payable to Contractor pursuant to Section 12.2.2 as part of the Final Completion Payment payable in accordance with Section 6.1.33 or (b) retained by Owner in an amount equal to (i) the amount remaining, if any, after payment to Contractor of the amount due to Contractor pursuant to Section 12.2.2 or (ii) the amount of Initial Capacity Liquidated Damages plus the amount paid by Contractor pursuant to Section 12.2.3.

40

12.2.2 After achieving Substantial Completion, Contractor, may, at its option and at its sole cost and expense, continue to attempt to achieve the Minimum Guaranteed Capacity, until the date that is ninety (90) days after the Guaranteed Substantial Completion Date (such period, the "**Capacity Test Cure Period**").  Contractor may, in its sole discretion, terminate the Capacity Test Cure Period at any time prior to the end of the Capacity Test Cure Period by Notice to Owner.

12.2.3 Owner shall pay to Contractor as part of the Final Completion Payment payable in accordance with Section 6.1.3 the amount (if any) by which the Initial Capacity Liquidated Damages paid by Contractor or set-off by Owner against unpaid portions of the Contract Price exceed the Final Capacity Liquidated Damages.  At the time the Final Completion Payment is due, Contractor shall pay to Owner in accordance with Section 6.1.3 the amount (if any) by which the Final Capacity Liquidated Damages exceed the Initial Capacity Liquidated Damages paid by Contractor or set-off by Owner against unpaid portions of the Contract Price.

12.3    Energy Liquidated Damages.  If Contractor does not achieve a Successfully Run Annual Energy Test, Contractor shall pay to Owner Liquidated Damages in accordance with Exhibit H (Commissioning and Testing) (the "**Energy Liquidated Damages**").

12.3.1 Reporting.  In addition to any other reporting requirements under this Agreement, Contractor shall provide a monthly report to Owner no later than ten (10) Business Days after the close of each calendar month during which Contractor carries out the Annual Energy Test describing in reasonable detail the activities carried out.

12.4    Interim Liquidated Damages.  Interim Liquidated Damages, as defined in Exhibit K shall be paid by Contractor to Owner upon a delay of the Guaranteed Substantial Completion Date. Further any such Interim Liquidated Damages shall be adjusted to correspond to the amount of days, if any, by which Contractor misses the Guaranteed Substantial Completion Date.be Sole Remedy; Liquidated Damages Not a Penalty.  The remedies provided for in this Article 12, shall, in addition to Owner's rights to terminate this Contract, be the sole and exclusive remedies of Owner for failure of Contractor or the Project (a) to achieve Substantial Completion by the Guaranteed Substantial Completion Date, (b) to achieve the Minimum Guaranteed Capacity, and (c) to achieve the Minimum Guaranteed Generation.  The Parties agree that Owner's actual damages in the event of such delay or failure may be extremely difficult or impracticable to determine.  After negotiation, the Parties have agreed that the Delay Liquidated Damages, Initial Capacity Liquidated Damages, Final Capacity Liquidated Damages and Energy Liquidated Damages are in the nature of liquidated damages and are a reasonable and appropriate measure of the damages that Owner would incur as a result of such delays or failures, and do not represent a penalty.

12.5    Enforceability.  The Parties explicitly agree and intend that the provisions of this Article 12 shall be fully enforceable by any tribunal exercising jurisdiction over any Dispute between the Parties arising under this Agreement.  Each Party hereby irrevocably waives any defenses available to it under law or equity relating to the enforceability of the liquidated damages provisions set forth in this Article 12.

**13.    CHANGES IN THE WORK**

13.1 <u>Change In Work</u>. A "**Change In Work**" shall be limited to the following: (a) changes in the Work required by Owner as further described in <u>Section 13.2</u>; (b) the addition to, modification of, or deletion from the Work (performed or yet to be performed) during the performance of the Work mutually agreed to by the Parties in writing; (c) the occurrence of an Excusable Event (as and only to the extent permitted by <u>Section 8.4</u>); and (d) changes in the Work caused by or resulting from the existence of Hazardous Materials at the Site prior to the Effective Date (other than any changes in the Work caused by or resulting from the Non-Excusable Event).

13.2 <u>By Owner</u>. Subject to <u>Section 13.3</u>, Owner shall have the right to make changes in the Work, within the general scope thereof, whether such changes are modifications, alterations or additions to the Work or accelerations or decelerations of any aspect of the Work (each such change, an "**Owner-Instituted Change**"). All Owner-Instituted Changes shall be made in accordance with this <u>Article 13</u>, shall be documented in accordance with <u>Section 13.3</u> and shall be considered, for all purposes of this Agreement, as part of the Work. Notwithstanding the foregoing, in no event shall Owner have the right to make any Owner-Instituted Changes, whether individually or in the aggregate, that would result in: (a) any portion of the Project being located at a site other than the Site; (b) any adverse effect on any portion of the Project being able to conduct or satisfy any of the tests provided for in this Agreement, including any Functional Test or Capacity Test, or any other adverse effect whatsoever on the capacity or potential capacity of any portion of the Project or the ability of Contractor to cure any shortfalls in such capacity; or (c) any adverse effect on Contractor's ability to comply with its warranty obligations or any of its other obligations under this Agreement or Contractor's ability to enforce any of its rights and remedies hereunder.

13.3 <u>Preparation of Change Order</u>.

13.3.1 <u>Due to Owner-Initiated Change or Change in Work agreed to by the Parties</u>. Upon the occurrence of any of the events set forth in <u>Section 13.1(a)</u> or <u>Section 13.1(b)</u>, Owner or Contractor, as applicable, shall provide the other Party with a Notice of the occurrence of such event, and Contractor shall, as soon as practicable, prepare and submit to Owner a preliminary written estimate relating to the proposed Change In Work, including (a) any projected change in the cost of the performance of the Work and any projected modification of the Contract Price occasioned by such Change In Work, and (b) the effect such Change In Work could be expected to have on the Guaranteed Substantial Completion Date. Contractor's cost of any such Change in Work shall include and identify all elements of cost (without the cost of each such element) and a total lump sum cost calculated as follows: the actual and reasonably substantiated costs incurred by Contractor (including all Taxes other than those based on net income) and a profit margin of ten percent (10%) over any costs incurred. Owner shall within ten (10) Business Days review and respond to such request, accepting or rejecting the change request or requesting additional information or time for review. During this period or after Owner returns comment to the change request, Contractor may choose to modify or remove the change request. Should Owner desire to request a decrease or increase in the Work or schedule from Contractor, Owner shall assemble and deliver to Contractor in writing the requested change in scope or schedule. Contractor shall within (10) Business Days, return comment to the requested change including the proposed addition or reduction in costs and schedule. Owner shall, upon receipt of such information and within an additional (10) days, respond to Contractor either accepting the proposal by Contractor or rejecting it. In either situation, both Parties shall work together to resolve any open change requests or

42

modifications to the price and schedule of the Project.  If the Parties cannot reach agreement on the matters listed in the Change Order submitted pursuant to this Section 13.3.1, such matter shall be referred to Dispute resolution provisions hereof.

13.3.2  Due to an Excusable Event.  If an Excusable Event occurs for which Contractor is entitled to an adjustment to the Project Schedule or the Contract Price pursuant to Section 8.4, as applicable, then Contractor shall, as soon as practicable, prepare and submit to Owner a proposed Change Order, which shall include (a) any change in the Contract Price occasioned by such Change In Work and (b) the effect such Change In Work could be expected to have on the Project Schedule, as and to the extent provided in Section 8.4 or as otherwise contemplated in Section 13.1 and as set forth in the Change Order accepted by Owner.  Owner shall within ten (10) Business Days review and respond to such request, accepting or rejecting the change request or requesting additional information or time for review.  During this period or after Owner returns comment to the change request, Contractor may choose to modify or remove the change request.  Should Owner desire to request a decrease or increase in the Work or schedule from Contractor, Owner shall assemble and deliver to Contractor in writing the requested change in scope or schedule.  Contractor shall within (10) Business Days, return comment to the requested change including the proposed addition or reduction in costs and schedule.  Owner shall upon receipt of such information, with an additional (10) days respond to Contractor either accepting the proposal by Contractor or rejecting it.  In either situation, both Parties shall work together to resolve any open change requests or modifications to the price and schedule of the project.  If the Parties cannot reach agreement on the matters listed in the Change Order submitted pursuant to this Section 13.3.2, such matter shall be referred to Dispute resolution hereunder.

13.4    Unable to Agree on Change of Work.  Notwithstanding anything herein to the contrary, where the Parties are unable to agree on a Change in Work, Owner may direct Contractor to implement a Change in Work that is generally consistent with Contractor's scope of Work hereunder and in compliance with the limitations set forth in Section 13.2, in which event Contractor shall proceed with such Change in Work and Contractor shall be entitled to reimbursement in accordance with the procedures set forth in Section 13.3.1 for any additional costs and expenses incurred in connection with such Change in Work and any other changes if not agreed to by the Parties, subject to the Dispute resolution hereunder.

13.5    No Change Order Necessary for Emergency.  Contractor shall not be obligated or required to obtain an executed Change Order if immediate action is reasonably required to address an emergency which endangers human health or property; provided that Contractor shall promptly Notify Owner of such emergency and shall seek a Change Order in accordance with Article 13 with respect to any costs associated with such emergency after the initial immediate action has been completed; and provided, further that Contractor shall use commercially reasonable efforts to mitigate or limit the duration of, and costs arising from, and to correct or cure the effect of, such emergency.

## 14.    WARRANTIES CONCERNING THE WORK

14.1    Warranty.  Contractor warrants that (a) the Work and every component thereof will be performed (including, as applicable, by any Subcontractor) in accordance with the Performance Requirements and any other standards of performance set forth in this Agreement, and that all

43

equipment, goods and materials furnished by Contractor (or any Subcontractor) hereunder will be new and free of defects in design, application, engineering, materials, installation, construction and workmanship, and (b) each applicable item of Major Project Hardware shall conform to the applicable warranty requirement set forth on Exhibit T (Major Project Hardware Warranties). Contractor shall assign any warranty related to Major Project Hardware Warranties and Major Subcontractors to Owner and shall make commercially reasonable efforts to assist Owner in enforcing such warranties.

14.2     Warranty Period.  The warranty set forth in Section 14.1 above shall commence on the Effective Date and apply for a period equal to twenty-four (24) months after the Substantial Completion Date; provided that the warranty period for any Work or Major Project Hardware or other item or part required to be re-performed, repaired or replaced following discovery of a defect or other non-compliance with its warranty shall continue until the later of (a) the expiration of the then applicable term of the Warranty Period or one (1) year from the date of completion of such repair or replacement (as such period may be extended as provided in below, the "**Warranty Period**").  In the event any portion of the Work is covered by a warranty of a Subcontractor for a period greater than that stated in the preceding sentence, Contractor will assign such warranty to Owner prior to the end of the Warranty Period.

14.3     Remedy.

14.3.1  If, during the Warranty Period, any of the Work supplied is found to not be in compliance with the warranty set forth in Section 14.1 Contractor shall, at no cost to the Owner, promptly make all necessary alterations, repairs or replacements (the "**Warranty Service**").  If the defect cannot be corrected, Contractor shall replace the Work at no cost to Owner.  The Warranty Service shall include, at no cost to the Owner, all necessary disassembly, transportation, reassembly and retesting, as well as reworking, repair or replacement of such Work, disassembly and reassembly of piping, ducts, machinery, equipment or other Work as necessary to give access to improper, defective or non-conforming Work and correction, removal or repair of any damage to other Work or property that arises from the defect.  Whenever Warranty Service is required, Contractor shall bear the risk of physical loss or damage to the Project as a result of Contractor's activities performing Warranty Service, to the extent not covered by Owner's insurance, and in the event of any reimbursement by Owner's insurance for such damage, Contractor shall be responsible for associated deductibles or retention up to the maximum amount of permitted deductible.

14.3.2  In the event that Contractor fails to promptly undertake and prosecute reasonable actions to correct defects after written notice from Owner then Owner may correct such defect so that the defective component complies with the requirements of this Agreement, and Contractor shall be liable for all direct costs, charges and expenses reasonably incurred by Owner in connection with such repair or replacement and shall forthwith pay to Owner an amount equal to such costs, charges and expenses upon receipt of invoices with supporting documentation certified by Owner.  For the purposes of this Section 14.3.2 "promptly" means (a) as quickly as is reasonably possible and without delay, but in any event not to exceed fifteen (15) Business Days after notice of the defect is provided to Contractor, provided that if such Warranty Service is not preventing operation of all or a portion of the Project or does not present a safety concern and cannot be completed within fifteen (15) Business Days, such longer time (not to exceed forty-five (45)

44

additional days) as is necessary, provided that Contractor continues to diligently execute the Warranty Service or (b) if the Warranty Service is preventing operation of all or a portion of the Project or creates a safety concern, a maximum of five (5) Business Days.  To the extent reasonable, and notwithstanding additional cost and expense which may be incurred by Contractor, Warranty Service requiring downtime of all or a portion of the Project shall be prosecuted during Project non-production hours.  Notwithstanding the foregoing, and limited to the terms set forth in this Section 14.3.2, in the event that corrective actions require procuring additional equipment/components for which Owner has not purchased corresponding Spare Parts, Contractor shall be entitled to an extension of the time periods provided herein for the time between ordering such piece of equipment/components and receipt thereof on the Site.

14.4    Conditions of Warranty.  The warranty set forth herein shall be exclusive of (a) normal wear and tear, (b) normal degradation of the Work or the Project, (c) misuse of the Work or the Project by Owner or negligence in its operation or maintenance, and (d) operation or maintenance of the Work or the Project not in accordance with Industry Standards.

14.5    Warranty Administration.  Contractor shall obtain all customary warranties available from Subcontractors under this Agreement.  Such warranties shall be obtained for the benefit of Owner as well as for Contractor, and shall, other than with respect to any Subcontract in respect of any Major Project Hardware, be assignable to Owner or Owner's designee upon Owner's request; provided that Owner hereby agrees to allow Contractor to call upon such warranties to the extent necessary to allow Contractor to fulfill its warranty obligations hereunder.

14.6    Limitations On Warranties.  The provisions of this Article 14 set forth the exclusive remedies for all warranty claims under Article 14.  The foregoing warranties are exclusive and are in lieu of all other warranties whether written, oral, implied, or statutory.  NO IMPLIED OR STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY.

14.7    Enforcement of Subcontractor Warranties.

14.7.1 Contractor shall be responsible for enforcing the defects warranties and performance warranties of all Subcontractors during the Warranty Period unless Owner acts to give effect to the assignment of such warranties to Owner in accordance with the terms of this Agreement at an earlier date.  In any event, commencing on the expiration of the Warranty Period, Owner shall be entitled to the benefit of and to enforce all unexpired representations, warranties, guarantees and obligations from Subcontractors and Contractor shall provide reasonable assistance to Owner at no additional cost as reasonably requested.  In addition, prior to expiration of the Warranty Period, Owner at its option may enforce the warranties of Subcontractors against such Subcontractors if a Contractor Event of Default exists.

14.7.2 Contractor shall obtain defect warranties for all Work performed or Major Project Hardware supplied by Subcontractors on terms not materially less favorable than the warranties set forth herein, and in the case of Major Project Hardware, also including the minimum warranty coverage set forth on Exhibit T (Major Project Hardware Warranties).

45

14.7.3 In the event any warranty for any Major Project Hardware requires notice or election of any extended warranty period, Contractor shall notify Owner and will, at Owner's direction, elect such extended warranty at Owner's cost unless included explicitly in the Contract Price. Contractor shall cause each Subcontract for Major Project Hardware that includes extended warranties to provide for written notice from such Subcontractor to Owner of any default by Contractor under such Subcontract and to provide Owner a reasonable opportunity to cure any such default.

## 15.    TITLE; RISK OF LOSS

15.1    Title.

15.1.1 Condition.  Contractor warrants good title, free and clear of all Liens, claims, charges, security interests, and encumbrances whatsoever (other than those that result from Owner's failure to make payments hereunder), to all Work, Project Hardware and other items furnished by Contractor or any of the Subcontractors that become part of the Project or that are to be used for the operation, maintenance or repair thereof; provided, however, that this Section 15.1.1 shall not be construed to limit Contractor's mechanics lien rights with respect to the Work provided hereunder.

15.1.2 Transfer.  Subject to Section 15.2, title to the Major Project Hardware and other items that become part of the Project shall pass to Owner upon delivery to the Site of such Major Project Hardware or other items; provided, however, that Contractor will maintain a purchase money security interest (or such other similar interest if a purchase money security interest is not available), until Owner pays for such Major Project Hardware, in such Major Project Hardware and other items and Owner agrees to execute such documents as reasonably requested by Contractor to secure such interest.

15.1.3 Custody During Performance.  The transfer of title shall in no way affect Owner's rights as set forth in any other provision of this Agreement.  Contractor shall have care, custody and control of all Project Hardware and other items that become part of the Project and exercise due care with respect thereto until the earlier of (a) the Substantial Completion Date, and (b) the termination of this Agreement as contemplated in Article 16.

15.2    Risk of Loss.

15.2.1 Risk of Loss Before Substantial Completion.  Until the Substantial Completion Date (except to the extent otherwise provided herein upon the earlier termination of this Agreement as provided in Article 16), Contractor assumes risk of loss and, without limitation of its right to make claims for relief pursuant to Article 8 and specifically excluding loss caused by Force Majeure Event, responsibility for the cost of replacing or repairing any damage to the Work, the Project or any portion thereof (including Project Hardware).

15.2.2 Risk of Loss After Substantial Completion Date.  Risk of loss to the Project shall pass to Owner from and after the Substantial Completion Date (or the earlier termination of this Agreement), unless such loss or damage (a) is caused by Contractor, a Subcontractor or a party over whom Contractor has control or any Affiliate of Contractor or (b) is covered by the warranties provided by Contractor pursuant to Article 14.

46

**16.    DEFAULTS AND REMEDIES**

16.1    <u>Contractor Events of Default</u>.  Contractor shall be in default of its obligations pursuant to this Agreement upon the occurrence of any one or more events of default set forth below (each, a "**Contractor Event of Default**"):

(a)    Contractor becomes insolvent, generally does not pay its debts as they become due, admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors, or Contractor commences any case, proceeding or other action seeking reorganization or receivership, or adopts an arrangement with creditors, under any bankruptcy, insolvency, reorganization or similar law of the United States or any state thereof for the relief of creditors or affecting the rights or remedies of creditors generally;

(b)    insolvency, receivership, reorganization, or bankruptcy or similar proceedings are commenced against Contractor and such proceeding shall remain undismissed or unstayed for a period of thirty (30) days;

(c)    any representation or warranty made by Contractor in <u>Section 4.1</u> was materially false or misleading when made and if capable of remedy, Contractor fails to remedy such materially false or misleading representation or warranty within fifteen (15) days after Contractor receives a Notice from Owner with respect thereto, except such fifteen (15) day limit shall be extended if: (i) such failure is reasonably capable of cure and curing such failure reasonably requires more than fifteen (15) days; and (ii) Contractor commences such cure within such fifteen (15) day period and diligently prosecutes and completes such cure within forty-five (45) days thereafter, in each case, after the date on which Contractor becomes aware of such false or misleading representation;

(d)    Contractor assigns or transfers this Agreement or any right or interest herein except in accordance with <u>Article 20</u>;

(e)    Contractor fails to maintain any insurance coverages required of it hereunder, and Contractor fails to remedy such breach within ten (10) days after the date on which Contractor becomes aware of such failure;

(f)    Contractor fails to perform any provision of this Agreement providing for the payment of money to Owner (except for any amounts disputed by Contractor in good faith) and such failure continues for ten (10) Business Days after Contractor has received a Notice of such payment default from Owner;

(g)    Contractor fails to achieve Substantial Completion by the date on which the aggregate amount of Delay Liquidated Damages paid by or payable by Contractor reaches the cap on Delay Liquidated Damages set forth in <u>Section 23.2.2</u>;

(h)    Contractor falls thirty (30) or more days behind the Guaranteed Substantial Completion Date and the delay is not a result of an Excusable Event;

(i)    Contractor fails to perform the Work in accordance with the Statement of Work, Applicable Law, Applicable Permits, and Industry Standards, and fails to cure or

commence to cure such failure within fifteen (15) days after Notice is made by Owner demanding that Contractor cure the same or, if such failure cannot be cured within fifteen (15) days, Contractor fails to commence to cure such failure within fifteen (15) days after such notice and thereafter diligently pursue such cure to completion, which shall in no event be later than forty-five (45) days after such Notice;

(j)      Contractor fails to maintain labor harmony at the Site; and

(k)      Contractor fails to comply with any material provision of this Agreement not otherwise set forth as a Contractor Event of Default in this Section 16.1 and fails to cure or commence to cure such failure within fifteen (15) days after Notice is made by Owner demanding that Contractor cure the same or, if such failure cannot be cured within fifteen (15) days, Contractor fails to commence to cure such failure within fifteen (15) days after such Notice and thereafter diligently pursue such cure to completion, which shall in no event be later than forty-five (45) days after such Notice.

16.2    Owner's Rights and Remedies.  If a Contractor Event of Default occurs, Owner shall have the following rights and remedies and may elect to pursue any or all of them, in addition to any other rights and remedies that may be available to Owner at law or in equity, and Contractor shall have the following obligations:

(a)      Owner may terminate this Agreement, either in whole or in part, without any additional cure period by giving Notice of such termination to Contractor and, upon such termination, Contractor shall withdraw from the Site, shall assign (to the extent such Subcontract may be assigned) to Owner such of Contractor's Subcontracts as Owner may request, and shall license, in the manner provided herein, to Owner all Intellectual Property Rights (to the extent not previously licensed in accordance with the terms hereof) of Contractor related to the Work reasonably necessary to permit Owner to complete or cause the completion of the Work, and in connection therewith Contractor authorizes Owner and its respective agents to use such information in completing the Work (and otherwise in connection with the Project), shall remove such materials, equipment, tools, and instruments used by and any debris or waste materials generated by Contractor in the performance of the Work as Owner may direct, and Owner may take possession of any or all Contractor Deliverables necessary for completion of the Work (whether or not such Contractor Deliverables are complete);

(b)      Owner may make such payments, acting reasonably, that Contractor is failing to pay in connection with the relevant Contractor Event of Default and either offset the cost of such payment against payments otherwise due to Contractor under this Agreement or Contractor shall be otherwise liable to pay and reimburse such amounts to Owner;

(c)      Owner may require Contractor to assign any and all warranties set forth on Exhibit T (Major Project Hardware Warranties) to Owner to the extent such warranties have not already been assigned to Owner and to require Contractor to provide evidence reasonably acceptable to Owner that Contractor has assigned such warranties to Owner;

(d)     Owner may, without terminating this Agreement, take over some or all of the Work from Contractor and perform such Work itself.  If Owner elects to perform some or all of the Work itself, Contractor shall cooperate with Owner, and, if necessary, allow Owner access to the Site.  Owner may employ any other person, firm, or corporation to perform the Work by whatever reasonable method Owner may deem expedient, and may undertake such reasonable expenditures as in Owner's sole judgment will best accomplish the timely completion of the Work (including, where necessary, the entry into contracts without prior solicitation of proposals).  Owner's exercise of its rights under this Section 16.2(d) will not relieve Contractor of any of its obligations hereunder, and Contractor shall be and remain liable to Owner for all damages, including Delay Liquidated Damages (the amount of which shall be assessed on the date of termination), but not including Capacity and Energy Liquidated Damages, payable hereunder, as well as for the costs incurred by Owner in exercising its rights under this Section 16.2(d); and

(e)     Owner may proceed against the Security.

16.3     Owner Event of Default.  Owner shall be in default of its obligations pursuant to this Agreement upon the occurrence of any one or more events of default set forth below (each, an "**Owner Event of Default**"):

(a)     Owner becomes insolvent, generally does not pay its debts as they become due, admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors, or Owner commences any case, proceeding or other action seeking reorganization or receivership, or adopts an arrangement with creditors, under any bankruptcy, insolvency, reorganization or similar law of the United States or any state thereof for the relief of creditors or affecting the rights or remedies of creditors generally;

(b)     insolvency, receivership, reorganization, or bankruptcy or similar proceedings are commenced against Owner or Parent Guarantor and such proceeding shall remain undismissed or unstayed for a period of thirty (30) days;

(c)     any representation or warranty made by Owner in Section 4.2 was materially false or misleading when made and if capable of remedy, Owner fails to remedy such false or misleading representation or warranty within fifteen (15) days after Owner receives a Notice from Contractor with respect thereto, except such fifteen (15) day limit shall be extended if: (i) such failure is capable of being cured and curing such failure reasonably requires more than fifteen (15) days; and (ii) Owner commences such cure within such fifteen (15) day period and diligently prosecutes and completes such cure within forty five (45) days thereafter, in each case after the date on which Owner becomes aware of such false or misleading representation;

(d)     Owner assigns or transfers this Agreement or any right or interest herein, except in accordance with Article 19;

(e)     Owner fails to perform any provision of this Agreement providing for the payment of money to Contractor (except for any amounts disputed by Owner in good faith)

49

and such failure continues for ten (10) days after Owner has received a Notice of such payment default from Contractor;

(f)    one or more Excusable Events shall have occurred by reason of an Owner-Caused Delay and such Excusable Events shall have, in accordance with Section 8.4, extended the Guaranteed Substantial Completion Date by more than three hundred sixty-five (365) days in the aggregate;

(g)    Owner fails to maintain any other insurance coverages required of it hereunder and Owner fails to remedy such breach within thirty (30) days after the date on which Owner becomes aware of such failure; or

(h)    Owner fails to cause the Owner Parent Guarantor to provide an executed Owner Parent Guaranty within fifteen (15) Business Days following issuance of NTP or Owner Parent Guarantor defaults in the performance of its obligations under the Owner Parent Guaranty or the Owner Parent Guaranty is invalid, no longer in effect (other than through expiration in accordance of its terms) or unenforceable.

16.4    Contractor's Rights and Remedies.    If an Owner Event of Default occurs, Contractor shall have the following rights and remedies and may elect to pursue any or all of them, in addition to any other rights and remedies that may be available to Contractor hereunder:

(a)    Contractor may terminate this Agreement upon providing Notice of such termination to Owner;

(b)    Contractor may suspend the Work by giving Notice of such suspension to Owner, which suspension may last until the earlier of the termination of this Agreement and the date on which the relevant Owner Event of Default has been cured by Owner or waived by Contractor; provided that such Notice of suspension may be given by Contractor either concurrently or at any time after the Notice described in Section 13.5; or

(c)    Contractor may proceed against the Owner Parent Guaranty in accordance with its terms.

16.5    Owner Suspension.    Owner may, in its sole discretion, order Contractor to suspend the Work, in whole or in part, for a period of time as Owner may determine, which shall not exceed sixty (60) calendar days in aggregate duration of suspension.  The suspension shall commence on the day specified in Owner's Notice which shall be at least five (5) days after Owner Notifies Contractor concerning such suspension, unless such suspension is due to an imminent threat of material injury or damage to Persons or property or is the result of a material injury or damage to Persons or property or as otherwise required by Applicable Law. Upon the commencement of the suspension, Contractor shall stop the performance of the suspended Work except as may be necessary to carry out the suspension and protect and preserve the Work completed prior to the suspension.  The provisions of this Agreement related to Excusable Events attributable to Owner-Caused Delays shall be applicable to any suspension by Owner pursuant to this Section 16.5, unless such suspension has been commenced due to an imminent threat of material injury or damage to Persons or property or is the result of a material injury or damage to Persons or property, in each case, caused by Contractor or any of its Subcontractors; provided that such suspension shall be of

50

no greater length of time as may be necessary to adequately address the threat of injury or damage or any actual injury or damage and its cause.  Contractor shall initiate the resumption of any suspended Work within five (5) Business Days after Owner gives Contractor Notice to do so and shall use its commercially reasonable efforts to resume the Work fully as soon as reasonably possible.

16.6    <u>Termination for Extended Force Majeure Event</u>.  If a Force Majeure Event has occurred and continues for a period exceeding three (3) consecutive months, notwithstanding that Contractor may by reason thereof have been granted an extension of time pursuant to a Change Order, either Owner or Contractor shall be entitled to serve upon the other thirty (30) days' notice to terminate this Agreement.  If at the expiry of the thirty (30) Days' Notice period, the Force Majeure Event shall still be continuing, this Agreement shall terminate, and neither Party shall have further liability to the other Party, except that Owner shall pay Contractor amounts due for all Work performed.

16.7    <u>Termination for Convenience</u>.  If the Owner determines not to proceed with completion of the Project such that Owner decides to discontinue engineering, procurement, and construction of the Project , and so long as no further engineering, procurement and construction on the Project actually takes place for at least six (6) months from the date of termination, Owner may terminate this Agreement for convenience in whole or in part following ten (10) days' Notice to Contractor.  If Owner restarts engineering, procurement and construction on the Project within six (6) months following the date of termination hereunder using an alternative contractor to perform all or some portion of the remaining Work, Contractor shall be entitled to payment of lost profits on Work not completed by Contractor (in addition to the termination for convenience payment described below), calculated as an amount not to exceed the total cost of the remaining Work, multiplied by fifteen percent (15%).  Upon receipt of any such notice, Contractor shall, unless the Notice directs otherwise:

(a)    immediately discontinue the Work on the date and to the extent specified in such notice;

(b)    place no further orders for Project Hardware or enter into any Subcontracts except as may be necessary for completion of such portion of the Work that is not discontinued;

(c)    promptly make every reasonable effort to procure cancellations upon terms reasonably satisfactory to Owner of all orders, Subcontracts, and rental agreements to the extent they relate to the performance of the Work that is discontinued on terms that mitigate the cost thereof; and

(d)    thereafter execute only that portion of the Work as may be necessary to preserve and protect Work already in progress and to protect Project Hardware at the Site or in transit thereto.

Contractor waives any claims for damages, including loss of anticipated profits for uncompleted Work due to a termination by Owner pursuant to this <u>Section 16.7</u>, and shall accept as its sole remedy for the payment for the Work performed a sum equal to (i) the Contract Price,

multiplied by the percentage of Work completed plus (ii) Contractor's and its Subcontractors' actual and demonstrable demobilization costs and commercially reasonable Subcontractor cancellation or termination fees for which Contractor is legally liable to pay (provided that Subcontractor cancellation or termination fees shall be reasonably documented), less (iii) the aggregate of amounts paid to Contractor for the Work prior to such termination; less (iv) any recoverable deposits paid to Suppliers.  Contractor's claim shall be submitted within thirty (30) days of the effective date of a termination under this Section 16.7.

## 17.   INDEMNIFICATION

17.1   By Contractor.  To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner and its Affiliates, and the agents, officers, directors, employees, subcontractors and representatives of each of the foregoing (each, an "**Owner Indemnified Party**") from and against any and all loss, damage, expense and liability, including court costs and reasonable attorneys' fees incurred by any Owner Indemnified Party in connection with or arising from (i) any and all Governmental Authority imposed fines or penalties, (ii) Taxes payable by Contractor hereunder, (iii) any Liens not removed by Contractor in accordance with its obligations hereunder, (iv) personal injury or death, (v) third party suits, actions, damages, claims, costs, losses or liability of whatsoever kind or character arising from claims for accidents, injuries, or damage of any kind, to the extent caused by the fault or willful misconduct of, negligent acts or omissions of, or breach of this Agreement by Contractor, any Subcontractor, or their respective agents or employees or others under their control, (vi) subject to Section 12.4 hereof, any breach or violation of or default under the Owner Contracts to the extent caused by the fault or willful misconduct of, negligent acts or omissions of, or breach of this Agreement by Contractor, any Subcontractor, or their respective agents or employees or others under their control, and (v) breach or violation of Contractor's obligations in Section 4.1.6. For the avoidance of doubt, Contractor shall have no liability with respect any Tax benefits including but not limited to federal and state investment Tax credits, and the efforts by Owner, its Affiliates, or the Financing Parties to obtain any of same except to the extent Contractor connects the Project to the transmission grid as contemplated in the Interconnection Agreement or allows the delivery of energy to the transmission grid without first obtaining Owner's prior written approval as required in Section 3.19; provided, however, that Contractor shall use commercially reasonable efforts to provide such information or other assistance as Owner may reasonably request in respect of any such Tax benefits.

17.2   By Owner.  Owner shall indemnify, defend, and hold harmless Contractor, its Affiliates and the agents, officers, directors, employees, subcontractors and representatives of each of the foregoing (each, a "**Contractor Indemnified Party**") from and against any and all Governmental Authority imposed fines or penalties, personal injury or death, third party suits, actions, damages, claims, costs, losses or liability of whatsoever kind or character, including, but not limited to, attorneys' fees and expenses, arising from claims for accidents, injuries, or damage of any kind to the extent caused by the negligence, or willful misconduct of, or breach of this Agreement by, Owner, its agents, employees, vendors or subcontractors.

17.3   Intellectual Property Indemnity.  Contractor shall defend, indemnify and hold harmless each Owner Indemnified Party from and against any and all loss, damage, expense and liability, including court costs and reasonable attorneys' fees incurred by any Owner Indemnified Party in connection with or arising from any and all suits, actions, damages, claims, costs, losses

or liability of whatsoever kind or character arising from Contractor Indemnified Party's infringement of patents or improper use of other Intellectual Property Rights which occur in connection with Contractor's performance of the Work or the ownership or use of any portion of the Work, unless such infringement or improper use is at the specific (as opposed to general) written direction of Owner.  Owner's acceptance of Contractor's engineering design or proposed or supplied materials or equipment shall not be construed to relieve Contractor of any obligation hereunder.  Should any such claim materially impair Contractor's performance of the Work in accordance with the Project Schedule or Owner's continued use of the Work, then Contractor shall, at its own expense, timely procure the right to continue its performance of the Work so as not to materially impair the Project Schedule or Owner's continued use of the Work, or timely procure the right to continue use of the Work, and Contractor shall not settle any such claim in a manner that reasonably might be expected to interfere with its performance of the Work or the operation of the Project.

17.4    Indemnification Procedure.  When a Party hereunder (the "**Indemnifying Party**") is required to indemnify any Person (the "**Indemnified Party**") in accordance with this Article 17, the Indemnifying Party shall assume on behalf of such Indemnified Party, and conduct with due diligence and in good faith, the defense of any claim against such Person, whether or not the Indemnifying Party shall be joined therein, by counsel (including insurance counsel) of the Indemnifying Party's selection reasonably satisfactory to the Indemnified Party and the Indemnified Party shall cooperate with the Indemnifying Party in such defense.  The Indemnifying Party shall be in charge of the defense and settlement of such claim; provided that without relieving the Indemnifying Party of its obligations hereunder or impairing the Indemnifying Party's right to control the defense or settlement thereof, the Indemnified Party may elect to participate through separate counsel in the defense of any such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party, except in the event that (a) the Indemnified Party shall have reasonably concluded, acting in good faith and on the advice of counsel, that there exists a material conflict of interest between the Indemnifying Party and the Indemnified Party in the conduct of the defense of such claim (in which case the Indemnifying Party shall not have the right to control the defense or settlement of such claim, on behalf of such Indemnified Party), or (b) the Indemnifying Party shall not have employed counsel to assume the defense of such claim within a reasonable time after notice of the commencement of an action thereon, then, in each of cases (a) and (b), the fees and expenses of counsel shall be paid by the Indemnifying Party.  The Indemnifying Party shall not, without the Indemnified Party's prior written consent, settle or compromise any claim, suit or cause of action asserted against the Indemnified Party, or consent to entry of a judgment in respect thereof, which imposes any future obligation on the Indemnified Party or which does not include, as an unconditional term thereof, the giving of a release in favor of the Indemnified Party from all liability in respect of such claim, suit or cause of action.

## 18.    CONFIDENTIAL INFORMATION

18.1    Confidential Information.  Owner or Contractor (the "**Disclosing Party**") may disclose or reveal to the other party (the "**Receiving Party**"), either orally or in writing, confidential and proprietary information ("**Confidential Information**") which may include, without limitation, engineering design, data, know-how, intellectual property, inventions, ideas, trade secrets, and construction means and methods.  Confidential Information disclosed by Disclosing Party to the Receiving Party will be kept confidential by the Receiving Party, and shall

not, without the prior written consent of the Disclosing Party, (a) be disclosed by the Receiving Party, or its agents or employees, in any manner whatsoever, in whole or in part, to any third party, and (b) be used by the Receiving Party, or its agents or employees, except for purposes of completing the Work. The Receiving Party shall reveal any Confidential Information only to its agents and employees who need to know the Confidential Information for the purpose of evaluation of or furtherance of completion of the Receiving Party's scope of work under this Agreement, and who have been informed of the confidential nature of the Confidential Information and who have agreed to be bound by the terms of this Section 18; provided that Owner may reveal Confidential Information in connection with construction, financing, sale, operation, or maintenance of the Project.

## 19.   LICENSES

19.1   License.   All Intellectual Property Rights contained within, accompanying or arising from the Work are and shall be solely owned by Contractor and are not being sold to Owner, but rather are being licensed in accordance with the terms and conditions of this Agreement. Contractor hereby grants to Owner, for the life of the Project, a paid-up, irrevocable, non-exclusive, royalty-free right and license under all Intellectual Property Rights of Contractor that are incorporated in or cover all or any part of the Work or that are embodied in any items or materials being provided by Contractor to enable use of the Work to use and exploit the Work, all Contractor Deliverables and all such items and materials provided by Contractor solely for Owner's operation, maintenance, use, modification, repair, disposal, removal or alteration of the Project or components thereof solely in connection with the Project, such use and exploitation, including the right to reproduce, prepare derivative works based on and distribute such Contractor Deliverables and such items and materials provided by Contractor (and derivatives of the foregoing), such licenses and rights subject to the confidentiality provisions of Article 18. Owner shall bear all responsibility for its use of the Intellectual Property Rights other than as specified in the foregoing sentence, and shall indemnify and defend Contractor against all claims, costs, damages arising from Owner's use of the Intellectual Property Rights in any manner not specified in the foregoing sentence.

19.2   Assignment.   The grant of licenses in this Article 19 shall be assignable to other Persons that succeed in interest to all or any portion of the Project or are otherwise assigned by Owner pursuant to Section 20.1.  Contractor shall, prior to directing any Subcontractor to produce any design or engineering work in connection with the Project, obtain a valid license of any such Intellectual Property Rights from such Subcontractor in terms substantially similar to those that obligate Contractor to Owner as expressed in Section 19.1.  Except as specifically stated in Section 19.1, no other license in such Intellectual Property Rights is granted pursuant to this Agreement.

19.3   Contractor Deliverables.   Contractor Deliverables accumulated or developed in respect of the Project, and transferred by Contractor, its employees or any Subcontractors and delivered to Owner, shall become the property of Owner upon delivery without any further consideration to be provided therefor.

## 20.    ASSIGNMENT

20.1    <u>Assignment to Other Persons</u>.  Except as otherwise provided in this <u>Section 19.1</u>, neither Party may assign or otherwise transfer this Agreement to any third party, whether by operation of law or otherwise, without the prior written consent of the other Party. Notwithstanding the foregoing: Owner may, without consent of Contractor, collaterally assign its rights, title and interest under this Agreement (a) to any Owner Financing Party, who, subject to any consent entered into by Contractor with the Owner Financing Parties, may further assign such rights, title and interest under this Agreement upon exercise of remedies by an Owner Financing Party following a default by Owner under the Financing Documents entered into between Owner and the Owner Financing Parties, or (b) to an entity purchasing, in whole or in part, the Owner or Owner's interests in, or the assets of, the Project.  Any Party assigning this Agreement as set forth in this <u>Section 19.1</u> shall deliver Notice of such assignment to the other Party as soon as reasonably practicable; <u>provided</u>, that Contractor's execution of a consent to an assignment as described in subclause (i) of this <u>Section 19.1</u> shall be deemed to constitute Notice to Contractor of the underlying assignment.  Any authorized assignment of this Agreement by either Party shall relieve such Party of its obligations hereunder at such time as the authorized successor agrees in writing to be bound in full by such assigning Party's obligations hereunder.  Any purported assignment of this Agreement in violation of this <u>Section 20.1</u> shall be null and void and shall be ineffective to relieve either Party of its obligations hereunder.

## 21.    LIENS, LIEN WAIVERS AND SUBORDINATION

21.1    <u>Liens</u>.  To the extent that Contractor has been paid all undisputed amounts due from time to time hereunder, Contractor shall pay all labor, Subcontractors, equipment vendors, and providers of services of any kind, in compliance with any supply or service contract.  To the extent that Contractor has been paid all undisputed amounts due from time to time hereunder, Contractor shall not assume, create or suffer to be created by any employee or Subcontractor any Lien on the Work, the Site, the Project, or any portion thereof resulting from Contractor's failure to make a payment to such employee or Subcontractor when due and shall, at Contractor's sole expense discharge and cause to be released, whether by payment or posting of appropriate security, any Lien placed on the Project or the Site by any Subcontractor, unless the Subcontractor in question is placing the Lien on the Project or the Site due to a failure of Contractor to pay such Subcontractor solely caused by Owner's failure to make payments as required hereunder.  Such removal or bonding shall be accomplished within ten (10) Business Days after any filing evidencing such Lien, unless a longer period is agreed between the Parties.  If Contractor fails to remove such Lien within ten (10) Business Days (or agreed period), Owner may, but shall not be required to, bond off such lien or encumbrance, and Contractor shall, within five (5) days of receipt of a request by Owner, reimburse Owner for all reasonable expenses incurred by Owner in connection therewith. Notwithstanding the foregoing, if a Lien is placed on the Project or the Site by a Subcontractor and Contractor fails to discharge or cause the Lien to be released within the time periods set forth above, Owner shall, in addition to the remedies provided in this Section, be entitled to draw upon the Security for the purpose of removing or discharging the Lien from the Project or the Site.

21.2    <u>Pre-NTP and Interim Lien Waivers</u>.  Contractor shall deliver, on or prior to the issuance of the NTP, a lien waiver in the form pre-NTP waiver set forth in <u>Exhibit F (Lien Waivers)</u> for works completed (including pursuant to an LNTP) up to the date of issuance of the NTP by

Owner.  Contractor shall deliver, together with (a) each Contractor's Invoice to be paid as a progress payment, an Interim Lien Waiver from Contractor and each Major Subcontractor, in each case in respect of work performed on, or equipment delivered to, the Site during the period covered by such Contractor's Invoice.

21.3    Substantial Completion Lien Waivers.  As a condition for achieving Substantial Completion, Contractor shall deliver partial or final lien waivers (the best available), substantially in the applicable form provided in Exhibit F (Form of Lien Waivers) and meeting the requirements of this Agreement, from Contractor and each Major Subcontractor, sufficient to release all liens and lien rights under Applicable Law (the "**Substantial Completion Lien Waivers**") to the extent of payments made to date with respect to the Project and a certificate of Contractor in the form provided in Exhibit F, not previously delivered have been received and delivered to Owner.

21.4    Final Lien Waivers.  As a condition for achieving Final Completion, Contractor shall deliver final lien waivers, substantially in the applicable form provided in Exhibit F (Form of Lien Waivers) and meeting the requirements of this Agreement, from Contractor and each Major Subcontractor, sufficient to release all liens and lien rights under applicable Law and a certificate of Contractor in the form provided in Exhibit F, not previously delivered have been received and delivered to Owner.

21.5    Bond in Lieu of Lien Waivers.  If Contractor cannot produce lien waivers from all such Subcontractors to Owner's reasonable satisfaction despite using commercially reasonable efforts to obtain the same, Contractor shall nonetheless be able to satisfy the Lien Waiver requirement by delivering to Owner documentation regarding the amount and nature of the claim or dispute with such Subcontractor and posting a payment bond or letter of credit in favor of Owner or Owner's designee, in form and substance acceptable to Owner (in Owner's sole discretion), including with respect to the terms and conditions governing Owner's ability to draw on such bond, in an amount equal to the aggregate value of the Project Hardware, materials, goods or services provided by the Subcontractor(s) for whom a lien waiver is not provided, which payment bond shall remain in place until the statutory period for valid submission of a lien against the Project has passed.  For clarity, the requirements in the foregoing sentence are in addition to Contractor's obligations per Section 21.1 above.

21.6    Subordination.  At least five (5) Business Days prior to Financial Closing or such other time as Owner may require, Contractor shall deliver a subordination agreement in the form set forth in Exhibit X (Form of Subordination Agreement), as modified or otherwise required by Owner Financing Party or title insurance provider, from Contractor and from each Subcontractor. Owner shall provide Contractor with written notice of the intended Financial Closing date at least fifteen (15) Business Days in advance.

21.7    Title Insurer and Lender Requirements.  Contractor shall provide any of the following no later than seven (7) days prior to Financial Close, or such earlier time as Owner may request, upon reasonable advance notice:

(a)    audited financial statements of Contractor;

56

(b)    complete list of all Subcontractors, including the total contract or purchase order value for each, the total amount owed to each (inclusive of paid, unpaid, due, accrued amounts), and the total amount paid to each; or

(c)    an indemnity from Contractor to Owner with respect to Contractor's payment obligations, in a form acceptable to Owner.

Notwithstanding the above provisions regarding lien waivers and subordination agreements, Contractor shall comply with commercially reasonable Owner Financing Party and title insurer requests regarding lien waivers, subordination and payment status of Subcontractors, including obtaining and delivering to Owner of additional or modified lien waivers or ancillary documentation from Contractor and Subcontractors.

## 22.    NOTICES AND COMMUNICATIONS

22.1    Requirements.  Any Notice made pursuant to the terms and conditions of this Agreement shall be in writing and be: (a) delivered personally; (b) sent by certified mail, return receipt requested; (c) sent by a recognized overnight mail or courier service, with delivery receipt requested; (d) sent by email with read-receipt confirmation or response confirming receipt, to the following addresses:

If to Contractor:
iSun Industrial, LLC
400 Avenue D, Suite 10,
Williston, VT 05495
Email: kip@isunenergy.com
Attn: Frederick (Kip) Myrick

With an email copy to:
Attn: Vatsal Kishore
Email: vkishore@isunenergy.com

If to Owner:
ER Waite Cemetery Solar, LLC
2136 NE 123rd St.,
North Miami, FL  33191
Email:  niv@fusion-renewable.com
Attn: Niv Sarne

22.2    Representatives.  Any technical or other communications pertaining to the Work shall be with the Parties' designated representative.  Each Party shall provide Notice to the other in writing of the name of such representatives promptly after the Effective Date.  Contractor's Manager and the Owner Representative each shall have knowledge of the Work and be available at all reasonable times for consultation.  Each Party's representative shall be authorized on behalf of such Party to administer this Agreement, agree upon procedures for coordinating the efforts of

the Parties, and, when appropriate, to furnish information to or receive information from the other Party in matters concerning the Work.

22.3     Effective Time.  Any Notice or Notification given personally, through overnight mail or through certified letter shall be deemed to have been received on delivery, any Notice given by express courier service shall be deemed to have been received the next Business Day after the same shall have been delivered to the relevant courier, and any Notice given by email transmission shall be deemed to have been received on confirmed dispatch.

## 23.     LIMITATIONS OF LIABILITY AND REMEDIES

23.1     Limitations on Damages.  Except (a) for liquidated damages as expressly set forth in this Agreement, (b) for any breach by Contractor or Owner of its obligations under Article 18 resulting in consequential damages, (c) to the extent damages (or other amounts) claimed by third parties (other than Owner Indemnified Parties or Contractor Indemnified Parties) for which Contractor or Owner has a duty to indemnify hereunder as expressly provided in Article 17 are shown to be consequential in nature, notwithstanding anything else in this Agreement to the contrary, neither Party (nor that Party's subcontractors) shall be liable to the other Party for any loss, damage or other liability otherwise equivalent to or in the nature of any indirect, incidental, consequential, exemplary, punitive or special damages arising from performing or a failure to perform any obligation under this Agreement, whether such liability arises in contract (including breach, indemnity or warranty), tort (including fault, negligence or strict liability), or otherwise, including for any loss of profits, loss of revenue (other than any profit or revenues specific to this Agreement), or loss of use of Project Hardware, the Project, downtime costs, increased expense of operation or maintenance of the Project Hardware or the Project, increased expense of borrowing or financing; loss of tax credits or favorable tax treatment; loss of opportunity or goodwill, cost of purchased or replacement power, loss of use of equipment or systems, cost of capital, and claims of customers for such damages.  For the avoidance of doubt, the costs due to termination allowed under Article 16 shall be deemed to not be consequential or any other type of damages addressed by this Section 23.1.

23.2     Limitations on Liability.

23.2.1  In no event shall Contractor be liable to Owner for any damages, claims, demands, suits, causes of action, losses, costs, expenses or liabilities in excess of an amount equal the Contract Price,[2] regardless of whether such liability arises out of breach of contract, guarantee or warranty, tort, negligence, product liability, indemnity, contribution, misrepresentation, strict liability, equity or any other legal theory; provided, however, the preceding limitation of liability shall not apply to, and no credit shall be issued against such liability for, (i) Contractor's indemnity obligations set forth in Article 17 as to claims by third parties (that are not Owner Indemnified Parties) made against Owner Indemnified Parties, (ii) Contractor's indemnity obligations set forth in Section 3.10.2, (iii) any other claims resulting from the fraud, willful misrepresentation, willful misconduct or gross negligence of Contractor, or (iv) damages for which insurance proceeds are received from insurance required under this Agreement, it being the Parties' specific intent that the limitation of liability shall not relieve the insurers' obligations for such insured risks.

---

[2] NTD:  The changes in this 23.2.1 are accepted.

Notwithstanding any of the foregoing, none of the limits on the amount of insurance required to be maintained hereunder shall operate to limit Contractor's liability under the Agreement. Without limiting the foregoing, this Section 23.2.1 shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to persons or property from the negligence, active or otherwise, of Contractor, Subcontractors and their respective agents and employees, and shall prevail over any conflicting or inconsistent provisions contained in this Agreement, except to the extent such conflicting or inconsistent provisions further restrict Contractor's liability.

23.2.2 Liquidated Damages Caps. In no event will Contractor be liable hereunder for Delay Liquidated Damages in the aggregate, in excess of fifteen percent (15%) of the Contract Price, Capacity Liquidated Damages in excess of fifteen percent (15%) of the Contract Price, or Energy Liquidated Damages in excess of fifteen percent (15%) of the Contract Price; provided that Contractor's aggregate liability for Delay Liquidated Damages, Capacity Liquidated Damages, and Energy Liquidated Damages shall not exceed twenty-five percent (25%) of the Contract Price. Notwithstanding the foregoing, Contractor shall have no liability for Energy Liquidated Damages unless and until the Parties (or their respective Affiliates) have entered into an operations and maintenance agreement with respect to the Project.

23.2.3 Exclusions to Limitations on a Party's Liability. Notwithstanding Section 23.2.1 and Section 23.2.2, there shall be no limitation on a Party's liability under this Agreement for (a) Contractor's indemnity obligations under Section 3.10.2 or Article 17; and (b) claims of, or causes of actions arising from, fraud, willful misrepresentation, willful misconduct or gross negligence by Owner, Contractor, Subcontractors or their respective Affiliates, as applicable.

23.3 Releases, Indemnities and Limitations. The releases, indemnities, waivers, subrogation, assumptions of and limitations on liabilities and limitations on remedies expressed in this Agreement, subject to the terms hereof, shall apply even in the event of fault, negligence, or strict liability of the Party released or indemnified, or whose liability is limited or assumed or against whom rights of subrogation are waived and shall extend to such Party's subcontractors, and in each case to such Party's and its subcontractors' Affiliates, officers, directors, members, managers, employees, licensees, agents and partners.

## 24. DISPUTES

24.1 Dispute Resolution. Any dispute, controversy or claim between the Parties arising out of or relating to this Agreement or the breach termination or validity thereof (a "**Dispute**") shall be resolved pursuant to the procedures set forth in this Article 24.

(a) either Party shall provide Notice to the other Party of the existence of the Dispute (the "**Dispute Notice**");

(b) a designee of each of the Parties, each with authority to negotiate and resolve the Dispute, shall meet, either in person or by telephonic conference, within five (5) Business Days after the receipt by a Party of the Dispute Notice, to seek to resolve the Dispute through mutual agreement; and

(c) in the event the procedure referenced in clause (b) above does not result for any reason in resolution of the dispute within 30 days after receipt by a Party of the Dispute

59

Notice, each Party, without further delay, shall have the right to submit the Dispute to binding arbitration in accordance with the following procedures:

      (i)      the seat of arbitration shall be in New York City, New York;

      (ii)      the arbitration shall be administered by the AAA in accordance with its Commercial Arbitration Rules then in effect (the "**Rules**") (except to the extent modified herein).  There shall be three (3) arbitrators: (A) claimant shall appoint an arbitrator in its demand for arbitration, (B) respondent shall appoint an arbitrator within twenty (20) days after receipt of a copy of the demand, and (C) within fifteen (15) days after the appointment of the second arbitrator, the two (2) arbitrators appointed by the Parties shall select a third arbitrator who shall serve as chair of the arbitral tribunal.  Any arbitrator not timely appointed shall be appointed by the AAA using the listing ranking and striking procedures in the Rules, with each Party being given three (3) strikes.  When acting as appointing authority under this Article 24, AAA shall endeavor to appoint as each arbitrator (including any chair) an attorney who has experience with and is knowledgeable regarding the engineering, procurement and construction industry;

      (iii)      the arbitral tribunal shall have no authority or power to enter an award which is in conflict with governing law.  The award shall be in writing and shall contain the reasons on which it is based.  The award of the arbitral tribunal shall be final and binding on the Parties and may be challenged only on the grounds set forth on the Federal Arbitration Act, 9 U.S.C. §1 *et seq.* Any award may be enforced or confirmed in any court of competent jurisdiction; and

      (iv)      the fees and expenses of the arbitration panel and the AAA shall be borne equally by Owner and Contractor and each Party shall bear its own legal expenses.

24.2    Interim Relief and Third-Party Claims.

      (a)      Third-Party Claims.  Notwithstanding the Parties' agreement to arbitrate disputes arising pursuant to this Agreement, in the event a Party is sued by a third party or sues a third party on claims that concern the other Party's obligations under this Agreement and the allocation of liability or damages among all the Parties (including the Party sought to be joined pursuant to this Section 24.2(a) to the suit), then, the Party sued or the Party initiating suit may join the other Party.  However, as a condition to such joinder, the Party sued or initiating suit must first request the third party to arbitrate the dispute pursuant to this Article 24.  Each Party agrees not to object to such joinder or challenge such proceeding on the grounds that the Parties agreed to arbitrate disputes pursuant to this Article 24.

      (b)      Stay of Arbitration.  In the event the Parties are involved in a pending arbitration pursuant to this Article 24 and both Parties are parties to an action pursuant to Section 24.2(a) that is related to any of the issue(s) or claim(s) raised in the arbitration proceeding, it is agreed that, if the arbitral tribunal in the pending arbitration determines that such a stay would be appropriate, the arbitration proceeding shall be stayed pending the conclusion or settlement of the third-party action.  Any conclusion or settlement of such

60

third-party action shall be admissible as evidence (to the extent relevant) for purposes of the arbitration proceedings under this Agreement.

24.3   Injunctive Relief.  Notwithstanding the foregoing, nothing in this Article 24 shall prevent a Party from pursuing immediate injunctive relief to maintain the status quo or prevent irreparable harm with respect to any Dispute.

24.4   Pending Dispute: Duty to Continue.  Pending the resolution of a Dispute, Contractor shall continue to perform the Work consistent with the applicable provisions of this Agreement, and Owner shall continue to pay all undisputed amounts required in accordance with the applicable provisions of this Agreement.

24.5   Subcontractors.  To the extent that any dispute or matter in question between Contractor and Owner arises in connection with Work provided by any Subcontractor, such Subcontractor may be joined in any such dispute.

## 25.   MISCELLANEOUS

25.1   Severability.  The invalidity or unenforceability of any portion or provision of this Agreement shall in no way affect the validity or enforceability of any other portion or provision hereof.  Any invalid or unenforceable portion or provision shall be deemed severed from this Agreement and the balance of this Agreement shall be construed and enforced as if this Agreement did not contain such invalid or unenforceable portion or provision.  If any such provision of this Agreement is so declared invalid, the Parties shall promptly negotiate in good faith new provisions to eliminate such invalidity and to restore this Agreement as near as possible to its original intent and effect.

25.2   Governing Law; Limited Submission to Jurisdiction.  This Agreement shall be governed by the laws of the State of New York, without regard to any laws regarding conflict of laws thereof that would require the laws of another jurisdiction to apply.  The Parties irrevocably accept and submit to the non-exclusive jurisdiction of the federal courts in the state of New York, with respect to any suit, action or proceeding in aid of arbitration, including an action for an order of interim, provisional or conservatory measures to maintain the status quo and prevent irreparable harm and for recognition and enforcement of any award rendered by the arbitral tribunal, and the Parties irrevocably waive any objection to the laying of venue or defense that the forum is inconvenient with respect to any such suit, action or proceeding for such purpose.  The Parties' right to apply for such judicial relief in aid of arbitration and the commencement of any such suit, action or proceeding in aid of arbitration shall not be deemed incompatible with, or a waiver of, the Parties' agreement to arbitrate.  This consent to jurisdiction is being given solely for purposes of this Agreement, and it is not intended to, and shall not, confer consent to jurisdiction with respect to any other Dispute in which a party to this Agreement may become involved.  The Parties acknowledge and agree that terms and conditions of this Agreement have been freely, fairly and thoroughly negotiated.

25.3   Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS AGREEMENT.

Each Party (a) certifies that no representative of the other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 25.3.

25.4    Survival of Termination.  Contractor shall only be liable to Owner in connection with the non-performance of the Work only for causes of action for acts or omissions prior to Final Completion or, with respect to warranty claims, prior to the end of the applicable Warranty Period; provided that Owner complies with its Notice obligations with respect to such warranty claims. The terms of the preceding sentence shall in no way limit Contractor's or Owner's obligations in connection with provisions which by their nature are intended to survive the termination of this Agreement.

25.5    No Oral Modification.  No oral amendment or modification of this Agreement by any officer, agent, member, manager or employee of Contractor or Owner, either before or after execution of this Agreement, shall be of any force or effect.

25.6    Amendments; Waiver.  Amendments to this Agreement may be made from time to time; provided that no amendment or modification of this Agreement or any provision hereof shall be valid or effective unless in writing and signed by duly authorized representatives of both Parties. No consent to, or waiver, discharge or release of, any provision of or breach under this Agreement shall be valid or effective unless in writing and signed by the Party giving such waiver.  No specific waiver shall constitute a waiver with respect to any other provision or breach, whether or not of similar nature, or in any way affect, limit, modify or waive that Party's right thereafter to enforce or compel strict compliance with any other term, covenant, condition or other provision hereof, any course of dealing or custom of the trade notwithstanding.  Failure on the part of any Party to insist in any instance upon strict, complete and timely performance by the other Party of any provision of or obligation under this Agreement shall not constitute a waiver by such Party of any of its rights under this Agreement or otherwise.

25.7    Inspection, Review and Approval.  Notwithstanding Owner's inspection, review, monitoring, observation, acknowledgement, comment or Owner's approval of any items reviewed, inspected, monitored or observed in accordance with this Agreement, neither Owner nor any of its representatives or agents reviewing such items, including the Owner's Engineer, shall have any liability for, under or in connection with the items such Person reviews or approves, and Contractor shall remain responsible for the quality and performance of the Work in accordance with this Agreement.    Owner's or its representative's inspection, review, monitoring, observation, acknowledgement, comment or approval of any items shall not constitute a waiver of any claim or right that Owner may then or thereafter have against Contractor.  Unless otherwise expressly provided herein, Owner shall not unreasonably delay its review of any item submitted by Contractor for review or approval; provided that the foregoing shall not be used to decrease any express time limitation for such review or approval set forth herein.  Any review, inspection, monitoring or observation by Owner or its representatives in accordance with this Agreement shall not constitute any approval of the Work undertaken by such Person, cause Owner to have any responsibility for the actions, the Work or payment of such Person (other than in respect of Owner's obligations to pay Contractor in accordance with Article 6) or to be deemed to be in an employer-employee relationship with Contractor or any Subcontractor, or in any way relieve

62

Contractor of its responsibilities and obligations under this Agreement or be deemed to be acceptance by Owner with respect to such Work.

25.8    Third Party Beneficiaries.  The provisions of this Agreement and all rights of the Parties hereunder are intended for the sole benefit of Owner and Contractor and there are no third-party beneficiaries hereof (other than the Owner Financing Parties, Contractor Indemnified Parties and the Owner Indemnified Parties).

25.9    Further Assurances.  Owner and Contractor will each use its reasonable efforts to implement the provisions of this Agreement, and for such purpose each, at the reasonable request of the other, will, without further consideration, promptly execute and deliver or cause to be executed and delivered to the other such assistance, or assignments, consents or other instruments in addition to those required by this Agreement, in form and substance satisfactory to the other, as the other may reasonably deem necessary or desirable to implement any provision of this Agreement.

25.10    Record Retention.  Contractor agrees to retain for a period of one (1) year from earlier of the Final Completion Date and the termination of this Agreement all material records relating to its performance of the Work or Contractor's warranty obligations herein.

25.11    Binding on Successors.  Subject to Article 20, this Agreement shall be binding on the Parties and on their respective successors, heirs and assigns.

25.12    Merger of Prior Contracts.  This Agreement supersedes any other agreements, whether written or oral, that may have been made or entered into between Owner and Contractor or by any office or officer of such Party relating to the Project or the Work, except to the extent explicitly incorporated herein.  This Agreement and the Exhibits attached hereto constitute the entire agreement between the Parties with respect to the engineering, procurement and construction of the Project, and there are no other agreements or commitments with respect to the Project except as set forth herein and therein.

25.13    Counterparts.  This Agreement may be executed in any number of counterparts, and either Party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  This Agreement shall become effective when each Party shall have received an executed counterpart of this Agreement, and an executed counterpart delivered by fax, .pdf or other means of electronic communications shall be deemed to be an original and shall be as effective for all purposes as delivery of a manually executed counterpart.

25.14    Set-Off.  Either Party may deduct and set-off against any part of the balance due or to become due to the other Party pursuant to this Agreement any amounts that are due from such other Party pursuant to this Agreement.

25.15    Fees and Expenses.  Except as specifically set forth herein, each Party shall be responsible for any legal fees and expenses, financial advisory fees, accountant fees and any other fees and expenses incurred by such Party in connection with the negotiation, preparation and enforcement of this Agreement and the transactions contemplated hereby.

63

25.16   Announcements; Publications.  Contractor shall not (either directly or indirectly), issue or make any public release or announcement with respect to or concerning entering into this Agreement or a Party's performance of its obligations under this Agreement, or permit any Subcontractor to do the same, without the prior written consent of Owner and affording Owner a reasonable opportunity to provide comments on such proposed release or announcement.

25.17   Independent Contractor.  Contractor is an independent contractor, and nothing contained herein shall be construed as constituting any relationship with Owner other than that of owner and independent contractor, except as expressly provided in this Agreement pursuant to which Owner appoints Contractor as Owner's agent, or as creating any relationship whatsoever between Owner and Contractor's employees.  Neither Contractor nor any of its employees is or shall be deemed to be an employee of Owner.

25.18   Independent Engineer.  Contractor acknowledges that the Independent Engineer will be engaged for the primary purpose of providing to the Owner Financing Parties a neutral, third party overview of the Work.  Owner shall cause the Independent Engineer to provide the Owner Financing Parties with (a) independent opinions and determinations, arrived at reasonably and in good faith, with respect to: (i) the status of the Work; (ii) the performance of the Project and equipment and the Functional Tests and Capacity Tests and the results and procedures related thereto; (iii) invoices submitted by Contractor; (iv) Contractor's quality control procedures for the Work and major components thereof; (v) the approval of Changes In Work; (b) independent opinions and determinations as the Owner Financing Parties otherwise may reasonably request; and (c) confirmation that all requirements for the achievement of Mechanical Completion, Substantial Completion or, as necessary, Final Completion, have been met by Contractor, in each case in form and substance reasonably requested by the Owner Financing Parties.  Owner shall be responsible for any delays, including delays in payment, in approval and in meeting the Guaranteed Substantial Completion Date, attributable to the Independent Engineer and the same shall constitute an Owner-Caused Delay.  Owner undertakes that it will use reasonable efforts to ensure that the Independent Engineer gives its countersignature or indicates that it is not willing to do so in relation to the relevant matter within the time specified in this Agreement for Owner to respond in relation to such matter; provided that any such unwillingness on the part of the Independent Engineer shall not affect or limit Owner's obligations hereunder.  The Independent Engineer may, at its option, attend any meetings between Owner and Contractor related to the progress of the Project and shall approve all Contractor's Invoices prior to any payment being made by Owner thereunder; provided that any failure by the Independent Engineer to approve a Contractor's Invoice shall not affect or limit Owner's obligations hereunder.  Notwithstanding anything else to the contrary contained herein, the Independent Engineer shall have no right to direct Contractor or any portion of the Work or to make any Changes In Work. Contractor shall maintain a complete, accurate and up-to-date log of all Change Orders and, upon request of the Independent Engineer, shall furnish copies of such log to the Independent Engineer.  Contractor shall afford the Independent Engineer the same rights as Owner with respect to access to the Site; provided that (i) the Independent Engineer provides a written notice of no less than five (5) calendar days with regard to Independent Engineer's visit to the Site, (ii) the Independent Engineer observes Exhibit D (Project Health and Safety Plan) while on the Site, and (iii) Owner remains liable for any failure by the Independent Engineer to maintain the confidentiality of Confidential Information as required by Article 18.

64

25.19 <u>Financing Matters</u>.    In connection with any transaction (including collateral assignment by Owner of its rights, title and interest under this Agreement to any Owner Financing Party in accordance with <u>Section 20.1</u>) among the Owner Financing Parties and Owner or any of its Affiliates, Contractor shall:

(a)    execute and deliver, any reasonable consent document (which shall include acknowledgement of the Owner Financing Parties' security interest, assignment as security of Owner's rights under this Agreement, notice of Owner default, step-in/step-out cure rights and other reasonable provisions customary in project financings), legal opinion (regarding due authorization, enforceability and such other matters relating to such consent and this Agreement or the applicable Subcontract, as applicable, as reasonably requested) or other documents reasonably requested by Owner;

(b)    negotiate in good faith with the Owner Financing Parties regarding any modifications to this Agreement which are reasonably requested; and

(c)    shall agree to such modifications so long as such modifications or consent document provided the obligations imposed therein (i) are of a nature typically obtained by financing parties in non-recourse financing, and (ii) based on Contractor's belief, could not reasonably be expected to (A) delay, suspend or otherwise have an adverse impact the Project Schedule, (B) increase or have an adverse impact on Contractor's cost of performing the Work, including the Contract Price, or (C) restrict Contractor's rights or increase its obligations under this Agreement in any material respect.    Contractor agrees to make available, or to use commercially reasonable efforts to cause its Subcontractors to make available, to the Owner Financing Parties and the Independent Engineer, subject to an appropriate confidentiality agreement, independent reviewers, feasibility consultants, and other financial institutions or parties involved in the financing process, such information in the control of Contractor, its Affiliates and Subcontractors (including financial information concerning Contractor, its Affiliates and the Subcontractors) as may be reasonably requested by Owner.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**ER Waite Cemetery Solar, LLC**, as Owner

By: *Niv Sarne*
       Name  Niv Sarne
       Title   CEO

**iSun Industrial LLC**, as Contractor

By:
       Name  Jeffrey Peck
       Title   CEO

*Signature Page to Engineering, Procurement and Construction Agreement – ER Waite Cemetery Solar LLC*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**ER Waite Cemetery Solar, LLC**, as Owner

By: _____

Name   Niv Sarne
Title    CEO

**iSun Industrial LLC**, as Contractor

By: *Jeffrey Peck* _____

Name   Jeffrey Peck
Title    CEO

*Signature Page to Engineering, Procurement and Construction Agreement – ER Waite Cemetery Solar LLC*

**FIRST AMENDMENT TO**
**ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT**

This First Amendment to Engineering, Procurement and Construction Agreement (this "Amendment") is made and entered into as of January 5, 2023, by and between ER Waite Cemetery Solar, LLC, a Vermont limited liability company ("Owner"), and iSun Industrial, LLC, a Delaware limited liability company ("Contractor"). Owner and Contractor are sometimes referred to collectively as the "Parties" or singularly as a "Party."

**W I T N E S S E T H**

WHEREAS, Owner and Contractor previously entered into that certain Engineering, Procurement and Construction Agreement dated as of September 30, 2022 (the "Agreement");

WHEREAS, pursuant to that certain Letter Agreement, dated as of April 13, 2023 (the "Letter Agreement"), Owner and Contractor agreed, inter alia, to use commercially reasonable efforts to amend each of Exhibit Q (*Milestone Payment Schedule*) and Exhibit S (*Project Schedule*) to the EPC Contract;

WHEREAS, Owner and Contractor now desire to amend the Agreement as hereinafter set forth; and

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**Section 1.** **Defined Terms**. Capitalized Terms not otherwise defined in this Amendment shall have the meanings ascribed to such terms in the Agreement.

**Section 2.** **Amendments**.

(a) Exhibit Q (*Milestone Payment Schedule*) to the Agreement is hereby amended and restated in its entirety as set forth in Exhibit A to this Amendment.

**(b)** Exhibit S (*Project Schedule*) to the Agreement is hereby amended and restated in its entirety as set forth in Exhibit B to this Amendment.

**Section 3.** **Cancellation of Letter Agreement.** The Letter Agreement, including the application of the Credited Amount (as such term is defined therein), is hereby rendered null and void ab initio.

**Section 4.** **Waiver**. Each Party hereby waives any claims against the other Party in respect of the delays as of the date hereof, including, for the avoidance of doubt, any delays in respect of the required interconnection upgrades giving rise to the amendments to each of Exhibit Q (*Milestone Payment Schedule*) and Exhibit S (*Project Schedule*) to the EPC Contract included herein.

**Section 5.**     **Effect of Amendment**.     Except as expressly set forth herein, nothing herein shall waive or modify any portion of the Agreement, which shall remain in full force and effect in accordance with its terms.   This Amendment supersedes any other agreements, whether written or oral, that may have been made or entered into between the parties or by any office or officer of such party, except to the extent explicitly incorporated herein.

**Section 5.**     **Governing Law; Limited Submission of Jurisdiction**. This Amendment shall be governed by the laws of the State of New York, without regard to any laws regarding conflict of laws thereof that would require the laws of another jurisdiction to apply. The Parties irrevocably accept and submit to the non-exclusive jurisdiction of the federal courts in the state of New York, with respect to any suit, action or proceeding in aid of arbitration, including an action for an order of interim, provisional or conservatory measures to maintain the status quo and prevent irreparable harm and for recognition and enforcement of any award rendered by the arbitral tribunal, and the Parties irrevocably waive any objection to the laying of venue or defense that the forum is inconvenient with respect to any such suit, action or proceeding for such purpose. The Parties' right to apply for such judicial relief in aid of arbitration and the commencement of any such suit, action or proceeding in aid of arbitration shall not be deemed incompatible with, or a waiver of, the Parties' agreement to arbitrate. This consent to jurisdiction is being given solely for purposes of this Amendment, and it is not intended to, and shall not, confer consent to jurisdiction with respect to any other Dispute in which a party to this Amendment may become involved. The Parties acknowledge and agree that terms and conditions of this Amendment have been freely, fairly and thoroughly negotiated.

**Section 6.**     **Counterparts**.     This Amendment may be executed in any number of counterparts, and either Party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Amendment shall become effective when each Party shall have received an executed counterpart of this Amendment, and an executed counterpart delivered by fax, .pdf or other means of electronic communications shall be deemed to be an original and shall be as effective for all purposes as delivery of a manually executed counterpart.

**Section 7.**     **Headings**.     The headings and captions used in this Amendment are inserted for reference and convenience only and the same shall not limit or construe the sections, articles or paragraphs to which they apply or otherwise affect the interpretation thereof.

**Section 8.**     **Miscellaneous**.     The terms and provisions of Section 25.1 (*Severability*), Section 25.3 (*Waiver of Jury Trial*); Section 25.5 (*No Oral Modification*), Section 25.6 (*Amendments; Waiver*); Section 25.8 (*Third Party Beneficiaries*); Section 25.9 (*Further Assurances*); Section 25.11 (*Binding on Successors*) and Section 25.15 (*Fees and Expenses*) of the Agreement are hereby incorporated, *mutatis mutandis*, by reference and shall apply as if fully set forth herein, as if set forth expressly herein.

[*signature pages follow*]

**IN WITNESS WHEREOF**, the Parties have caused this Amendment to be executed and delivered by their duly authorized representatives as of the date and year first above written.

**OWNER**:                                    **CONTRACTOR**:

**ER Waite Cemetery Solar, LLC**              **iSun Industrial, LLC**

By: _Niv Sarne_                               By: _____
Name:  Niv Sarne                              Name: Jeffrey Peck
Title:                                        Title:  CEO

**EXHIBIT A**

**MILESTONE PAYMENT SCHEDULE**

The notes below this table constitute an integral part of the Milestone Payment Schedule.

| Milestone | Activity | Invoice Amount | Invoice % | Retainage | Payment (Net of Retainage) | Paid to |
|---|---|---|---|---|---|---|
| #1 | Signed Agreement ---> LNTP | $390,650 | 10.00% | 7.50% | $361,351.25 | Contractor |
| #2 | NTP (Module dep. Paid) | $[195,325][*] | 5.00% | 0.00% | $[195,325.00][*] | Module Supplier[*] |
| #3 | Engineering and Permitting ( Tracker, Transformer and Electrical gear deposits due) | $195,325 | 5.00% | 7.50% | $180,675.63 | [Contractor]/ [Supplier] [***] |
| #4 | Mobilization | $195,325 | 5.00% | 7.50% | $180,675.63 | Contractor |
| #5 | Civil Construction Complete | $195,325 | 5.00% | 7.50% | $180,675.63 | Contractor |
| #6 | Module Delivery (payment is in accordance with the Suppliers payment terms) | $[898,495][**] | 23.00% | 0.00% | $[898,495.00][**] | Module Supplier[**] |
| #7 | Tracker  Delivery (payment is in accordance with the Suppliers payment terms) | $546,910 | 14.00% | 7.50% | $505,891.75 | [Contractor]/ [Supplier] [***] |
| #8 | Inverter Delivery | $78,130 | 2.00% | 7.50% | $72,270.25 | [Contractor]/ [Supplier] [***] |
| #9 | Tracker Installation (Billed per 25% completion) | $390,650 | 10.00% | 7.50% | $361,351.25 | Contractor |
| #10 | Module Installation (Billed per 25% completion) | $195,325 | 5.00% | 7.50% | $180,675.63 | Contractor |
| #11 | Inverter Installation Complete | $39,065 | 1.00% | 7.50% | $36,135.13 | Contractor |
| #12 | Mechanical Completion | $195,325 | 5.00% | 7.50% | $180,675.63 | Contractor |
| #13 | Substantial Completion | $195,325 | 5.00% | 0.00% | $195,325.00 | Contractor |
| #14 | Interconnection | $0 | 0.00% | 0.00% | $0.00 | N/A |
| #15 | Final Completion | $195,325 | 5.00% | 0.00% | $195,325.00 | Contractor |
| | *Total* | *$3,906,500* | *100.0%* | | *($3,724,847.75* | |

Notes to Milestone Payment Schedule

[*] The Invoice Amount for Milestone #2 (NTP (Module dep. Paid)) shall be equal to the lesser of (i) the amount set forth in the table above (i.e., $[195,325]) and (ii) the actual deposit required by the Module Supplier in accordance with the terms and conditions of the Module supply agreement.  Such amount shall be paid by the Owner directly to the Module Supplier. In the event the amount of the actual required deposit exceeds the amount set forth in the table above, the Contractor shall be solely responsible for paying such difference to the Module Supplier. In the event the amount of the actual required deposit is less the amount set forth in the table above, the credit amount will be allocated to the Contractor.

For example, if the actual amount of the deposit required by the Module Supplier is $[300,000], then the Owner shall only be responsible for paying the Module Supplier the amount set forth in the table above ($[195,325]) and the Contractor shall be solely responsible for paying the balance (i.e., $[104,675]) to the Module Supplier. For Example, if the actual amount of the deposit required by the Module Supplier is $[96,657], then the Owner shall only be responsible for paying the Module Supplier the amount required by the Module supplier above ($[96,657]) and the owner shall be solely responsible for paying the balance (i.e., $[98,668]) to the Contractor.

[**] The Invoice Amount for Milestone #6 (Module Delivery) shall be equal to the amount set forth in the table above (i.e., $[898,495]). In the event the actual amount due to the Module Supplier upon delivery of the Modules exceeds the amount set forth in the table above, the Contractor shall be solely responsible for paying such difference to the Module Supplier.  In the event the actual amount due to the Module Supplier upon delivery of the Modules is less than the amount set forth in the table above then the Contractor shall be entitled to such difference.

For example, if the actual amount due to the Module Supplier upon delivery of the Modules in accordance with the terms and conditions of the Module supply agreement is $[1,250,000], then the Owner shall only be responsible for paying the amount set forth in the table above ($[898,495]) and the Contractor shall be solely responsible for paying the balance (i.e., $[351,505]) to the Module Supplier.  If the actual amount due to the Module Supplier upon delivery of the Modules in accordance with the terms and conditions of the Module supply agreement is $[500,000], then the Owner shall be responsible for paying such amount directly to the Module Supplier and the Contractor

shall be entitled to the remainder ($[398,495]).

[***] The election of payment to the Contractor or to the Supplier shall be at the discretion of the Owner in accordance with Section 6.1 of the Agreement. In the event that the Owner elects to pay the Supplier directly , then the amounts paid to the supplier/s will be deducted from the payment of the relevant Milestone to the Contractor.

**EXHIBIT B**

**PROJECT SCHEDULE**



*EXECUTION VERSION*

# ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

By and between

FUSION RENEWABLE NA, LLC,

as Owner

and

ISUN UTILITY, LLC,

as Contractor

December 31st, 2021

DB1/ 100666373.3

**TABLE OF CONTENTS**

**Page**

1.    DEFINITIONS AND RULES OF INTERPRETATION ..................................................... 1

    1.1    Definitions ............................................................................................................. 1
    1.2    Exhibits ............................................................................................................... 14
    1.3    Interpretation ...................................................................................................... 14
    1.4    Headings .............................................................................................................. 14
    1.5    Conflicts in Documentation ............................................................................... 14

2.    RESPONSIBILITIES OF OWNER ................................................................................... 14

    2.1    Owner Representative ......................................................................................... 15
    2.2    Back Feed Power and Parallel Operation ........................................................ 15
    2.3    Access to Site ...................................................................................................... 15
    2.4    Cooperation ......................................................................................................... 15
    2.5    Owner Permits .................................................................................................... 15
    2.6    Insurance ............................................................................................................. 15
    2.7    Owner-Supplied Information ............................................................................. 15
    2.8    Owner Contracts ................................................................................................ 16
    2.9    Owner Parent Guaranty ..................................................................................... 16
    2.10  Remedies for Owner Failure under Article 2 ................................................... 16

3.    RESPONSIBILITIES OF CONTRACTOR ...................................................................... 16

    3.1    General ................................................................................................................ 16
    3.2    Standard of Performance ................................................................................... 17
    3.3    Design and Construction of the Project ............................................................ 17
    3.4    Contractor-Parent Guaranty ............................................................................. 17
    3.5    Progress Reports ................................................................................................ 17
    3.6    Insurance ............................................................................................................. 18
    3.7    Inspection ............................................................................................................ 18
    3.8    Organization ....................................................................................................... 18
    3.9    Utilities and Services ......................................................................................... 18
    3.10  Hazardous Materials ......................................................................................... 18
    3.11  Access; Site Security .......................................................................................... 19
    3.12  Handling, Shipping and Importation ................................................................ 19
    3.13  Applicable Law; Applicable Permits ................................................................ 19
    3.14  Commissioning Personnel .................................................................................. 20
    3.15  Existing Improvements and Facilities ............................................................... 20
    3.16  Contractor Deliverables .................................................................................... 20
    3.17  Site Conditions ................................................................................................... 20
    3.18  Labor ................................................................................................................... 20
    3.19  Permission for Interconnection ......................................................................... 20
    3.20  Storage and Maintenance of Project Hardware and Other Items .................... 21
    3.21  Testing of the Work ............................................................................................ 21
    3.22  Back Feed Power and Parallel Operation ........................................................ 21

4.    COVENANTS, WARRANTIES AND REPRESENTATIONS ......................................... 21

    4.1    Contractor ........................................................................................................... 21

i

## TABLE OF CONTENTS
(continued)

**Page**

|  | 4.2 | Owner | 23 |
| 5. | | COST OF WORK | 23 |
|  | 5.1 | Contract Price | 24 |
|  | 5.2 | Price All-Inclusive | 24 |
|  | 5.3 | Sales/Use Taxes | 24 |
| 6. | | TERMS OF PAYMENT | 26 |
|  | 6.1 | Contractor Payments | 26 |
|  | 6.2 | Warranty Work | 28 |
|  | 6.3 | Undisputed Payments | 28 |
|  | 6.4 | Disputed Payments | 28 |
|  | 6.5 | Form and Manner of Payments | 28 |
|  | 6.6 | Effect of Payment | 29 |
|  | 6.7 | Retainage | 29 |
|  | 6.8 | Completion of Punchlist Items | 29 |
|  | 6.9 | Withholding Payment | 29 |
| 7. | | COMMENCEMENT AND SCHEDULING OF THE WORK | 30 |
|  | 7.1 | Effectiveness of Agreement | 30 |
|  | 7.2 | Scheduling of the Work | 31 |
|  | 7.3 | Progress Reporting | 31 |
| 8. | | EXCUSABLE EVENT | 31 |
|  | 8.1 | Certain Events | 31 |
|  | 8.2 | Notice of Excusable Event | 32 |
|  | 8.3 | Excusable Event Conditions | 32 |
|  | 8.4 | Contractor's Remedies | 32 |
| 9. | | SUBCONTRACTORS | 33 |
|  | 9.1 | Use of Subcontractors | 33 |
|  | 9.2 | Owner Consent | 33 |
|  | 9.3 | Assignment | 33 |
|  | 9.4 | Other Terms in Subcontracts | 34 |
|  | 9.5 | Information; Access | 34 |
|  | 9.6 | Subcontractor Safety; Removal | 34 |
| 10. | | COMMISSIONING AND TESTING | 35 |
|  | 10.1 | Commissioning | 35 |
|  | 10.2 | Capacity Test | 35 |
|  | 10.3 | Annual Energy Test | 35 |
|  | 10.4 | Access for Annual Energy Test | 35 |
|  | 10.5 | Non-Conforming Work | 36 |
| 11. | | PUNCHLIST; COMPLETION | 36 |
|  | 11.1 | Punchlist | 36 |

ii

## TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| | 11.2 | Mechanical Completion | 37 |
| | 11.3 | Substantial Completion | 37 |
| | 11.4 | Notice of Substantial Completion | 38 |
| | 11.5 | Final Completion | 39 |
| | 11.6 | Notice of Final Completion | 39 |
| | 11.7 | Contractor's Access After Substantial Completion | 40 |
| | 11.8 | Energy and Revenues of the Project | 40 |
| 12. | | LIQUIDATED DAMAGES | 40 |
| | 12.1 | Delay Liquidated Damages | 40 |
| | 12.2 | Capacity Liquidated Damages | 40 |
| | 12.3 | Energy Liquidated Damages | 41 |
| | 12.4 | Sole Remedy; Liquidated Damages Not a Penalty | 41 |
| | 12.5 | Enforceability | 41 |
| 13. | | CHANGES IN THE WORK | 41 |
| | 13.1 | Change In Work | 41 |
| | 13.2 | By Owner | 42 |
| | 13.3 | Preparation of Change Order | 42 |
| | 13.4 | Unable to Agree on Change of Work | 43 |
| | 13.5 | No Change Order Necessary for Emergency | 43 |
| 14. | | WARRANTIES CONCERNING THE WORK | 43 |
| | 14.1 | Warranty | 43 |
| | 14.2 | Warranty Period | 44 |
| | 14.3 | Remedy | 44 |
| | 14.4 | Conditions of Warranty | 45 |
| | 14.5 | Warranty Administration | 45 |
| | 14.6 | Limitations On Warranties | 45 |
| | 14.7 | Enforcement of Subcontractor Warranties | 45 |
| 15. | | TITLE; RISK OF LOSS | 45 |
| | 15.1 | Title | 45 |
| | 15.2 | Risk of Loss | 46 |
| 16. | | DEFAULTS AND REMEDIES | 46 |
| | 16.1 | Contractor Events of Default | 46 |
| | 16.2 | Owner's Rights and Remedies | 48 |
| | 16.3 | Owner Event of Default | 49 |
| | 16.4 | Contractor's Rights and Remedies | 50 |
| | 16.5 | Owner Suspension | 50 |
| | 16.6 | Termination for Extended Force Majeure Event | 50 |
| | 16.7 | Termination for Convenience | 51 |
| 17. | | INDEMNIFICATION | 51 |
| | 17.1 | By Contractor | 51 |

**TABLE OF CONTENTS**

(continued)

**Page**

17.2    By Owner ................................................................................................................ 52

17.3    Intellectual Property Indemnity ........................................................................... 52

17.4    Indemnification Procedure ................................................................................... 53

18.    CONFIDENTIAL INFORMATION ................................................................................. 53

18.1    Confidential Information ....................................................................................... 53

19.    LICENSES ......................................................................................................................... 53

19.1    License .................................................................................................................. 54

19.2    Assignment ........................................................................................................... 54

19.3    Contractor Deliverables ....................................................................................... 54

20.    ASSIGNMENT .................................................................................................................. 54

20.1    Assignment to Other Persons ............................................................................... 54

21.    LIENS, LIEN WAIVERS AND SUBORDINATION ...................................................... 55

21.1    Liens ...................................................................................................................... 55

21.2    Pre-NTP and Interim Lien Waivers ..................................................................... 55

21.3    Substantial Completion Lien Waivers ................................................................. 55

21.4    Final Lien Waivers ............................................................................................... 55

21.5    Bond in Lieu of Lien Waivers .............................................................................. 56

21.6    Subordination ....................................................................................................... 56

21.7    Title Insurer and Lender Requirements ............................................................... 56

22.    NOTICES AND COMMUNICATIONS .......................................................................... 56

22.1    Requirements ........................................................................................................ 56

22.2    Representatives ..................................................................................................... 57

22.3    Effective Time ...................................................................................................... 57

23.    LIMITATIONS OF LIABILITY AND REMEDIES ........................................................ 57

23.1    Limitations on Damages ....................................................................................... 57

23.2    Limitations on Liability ........................................................................................ 58

23.3    Releases, Indemnities and Limitations ................................................................ 58

24.    DISPUTES ......................................................................................................................... 59

24.1    Dispute Resolution ............................................................................................... 59

24.2    Interim Relief and Third-Party Claims ............................................................... 59

24.3    Injunctive Relief ................................................................................................... 60

24.4    Pending Dispute: Duty to Continue ..................................................................... 60

24.5    Subcontractors ..................................................................................................... 60

25.    MISCELLANEOUS .......................................................................................................... 60

25.1    Severability ........................................................................................................... 60

25.2    Governing Law; Limited Submission to Jurisdiction ......................................... 60

25.3    Waiver of Jury Trial ............................................................................................. 61

25.4    Survival of Termination ....................................................................................... 61

## TABLE OF CONTENTS
(continued)

**Page**

25.5   No Oral Modification.................................................................. 61
25.6   Amendments; Waiver ................................................................ 61
25.7   Inspection, Review and Approval.............................................. 61
25.8   Third Party Beneficiaries .......................................................... 62
25.9   Further Assurances.................................................................... 62
25.10  Record Retention ...................................................................... 62
25.11  Binding on Successors .............................................................. 62
25.12  Merger of Prior Contracts ......................................................... 62
25.13  Counterparts ............................................................................. 63
25.14  Set-Off...................................................................................... 63
25.15  Fees and Expenses ................................................................... 63
25.16  Announcements; Publications.................................................... 63
25.17  Independent Contractor............................................................. 63
25.18  Independent Engineer ............................................................... 63
25.19  Financing Matters ..................................................................... 64

EXHIBITS

| | |
|---|---|
| A | Scope of Work |
| B | Contractor Deliverables |
| C | Applicable Permits |
| D | Project Health and Safety Plan |
| E | Site Layout |
| F | Form of Lien Waivers |
| G | Form of Progress Reports |
| H | Commissioning and Testing |
| I | Interconnection Agreement |
| J | Major Subcontractors |
| K | Liquidated Damages |
| L | Form of Notice to Proceed |
| M | Form of Limited Notice to Proceed |
| N | Site Description |
| O | Form of Change Order |
| P | Form of Mechanical, Substantial and Final Completion Notices |
| Q | Milestone Payment Schedule |
| R | Insurance Requirements |
| S | Project Schedule |
| T | Major Project Hardware Warranties |
| U | Power Purchase Agreement |
| V | Owner-Supplied Information |
| W | Form of Contractor's Invoice |
| X | Form of Subordination Agreement |
| Y | Form of Owner Parent Guaranty |

This **ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT** is made and entered into as of December 31st, 2021 (the "**Effective Date**"), by and between **Fusion Renewable NA, LLC**, a Delaware limited liability company ("**Owner**") and **iSun Utility, LLC**, a Delaware limited liability company ("**Contractor**"). Each of Owner and Contractor is individually referred to herein as a "**Party**" and collectively they are referred to herein as the "**Parties**."

## RECITALS

WHEREAS, Owner is in the process of acquiring ownership rights of ER Kendall Hill Solar, LLC, a Vermont limited liability company (the "**Project Company**") through a membership interest purchase agreement executed between the Owner and Contractor on December 31st, 2021 (the "**MIPA**"), to develop an electrical generation facility consisting of approximately 3.1 MWdc/2.2 MWac of solar-powered electric generating capacity, to be designed, engineered, procured, constructed, tested, interconnected and commissioned under this Agreement and to be located in Pittsford, Vermont (the "**Project**") which is owned by the Project Company;

WHEREAS, Owner desires to engage Contractor to provide or to oversee services related to the design, engineering, procurement, construction, testing, interconnection and commissioning the Project on a turnkey, fixed-price, guaranteed-completion-date basis, and Contractor desires to provide such services, all as further defined by and in accordance with the terms and conditions set forth in this Agreement; and

WHEREAS, Contractor guarantees the timely completion and performance of the Project in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of Contractor's performance thereunder and sums to be paid to Contractor by Owner and of the covenants and agreements set forth herein, the Parties agree as follows:

## AGREEMENT

## 1.    DEFINITIONS AND RULES OF INTERPRETATION

1.1    Definitions.  For the purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, the following terms shall have the following meanings.

"**AAA**" shall have the meaning set forth in Section 24.1(c).

"**AC**" means alternating current.

"**Acceptable Credit Rating**" means an issuer credit rating from (a) Standard & Poor's of "A" or better or (b) Moody's of "A2" or better.

"**Affiliate**" shall mean, as to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person in question.  For the purposes of this definition, the concept of "control," when used

with respect to any specified Person, shall signify the possession of the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"**Agreement**" means this Engineering, Procurement and Construction Agreement, including all Exhibits hereto.

"**Applicable Law**" means and includes all laws; codes (including NERC standards and compliance requirements and the National Electric Code); ordinances; statutes; rules; regulations; orders; decrees; judgments; injunctions; specified standards or objective criteria contained in any Applicable Permit or approval; and notices or binding agreements promulgated by any Governmental Authority having jurisdiction over either Party, the Project or a Party's obligations under this Agreement as the same may be modified, amended or repealed from time to time.

"**Applicable Permit**" means any action, approval, consent, waiver, exemption, variance, franchise, order, permit, authorization, right or license of or from a Governmental Authority that is necessary for the performance of the Work or the design, development, engineering, procurement, construction, operation or maintenance of the Project.

"**Backfeed Power**" means flow of Energy from the transmission grid into the Project.

"**Business Day**" means a day, other than a Saturday or Sunday or a public holiday, on which banks are generally open for business in New York, New York.

"**Capacity Liquidated Damages**" means Initial Capacity Liquidated Damages or Final Capacity Liquidated Damages, as the case may be.

"**Capacity Test**" means a test of the Project conducted in accordance with the testing procedures set forth in Exhibit H (Commissioning and Testing).

"**Capacity Test Cure Period**" shall have the meaning set forth in Section 12.2.2.

"**Capacity Test Procedures**" means the written test procedures, standards, protective settings and testing programs for the Capacity Tests developed pursuant to Section 10.2 and Exhibit H (Commissioning and Testing).

"**Certificate of Public Good**" means the certificate issued by the Vermont Public Utility Commission under 30 V. S.A. § 248 permitting the operation of the Project as an electric generation system.

"**Change In Law**" means the enactment, adoption, promulgation, modification (including a written change in interpretation by a Governmental Authority), or repeal after the Effective Date of any Applicable Law that establishes new requirements or modifies existing requirements; provided that no Change in Law pursuant to this Agreement shall arise by reason of (a) any national, federal, state or provincial income Tax law (or any other Tax law based on income), (b) any federal law imposing a custom, duty, levy, impost, fee, royalty or similar charge for which Contractor is responsible hereunder with respect to the importation of Project Hardware from outside of the United States, (c) a labor wage law or other Applicable Law that affects Contractor's

or its Subcontractor's costs of employment (other than any Prevailing Wage Law that affects the Work on the Site or surrounding area after the Effective Date), (d) any change in law that affects the cost of goods, manufacturing, shipping or other transportation of any Project Hardware and (e) the final enactment, modification, amendment or repeal of an Applicable Law prior to the Effective Date with an effective date of such action that falls after the Effective Date.

"**Change In Work**" means a change in the Work as defined in Section 13.1.

"**Change Order**" means the form in respect of a Change In Work attached as Exhibit O (Form of Change Order).

"**Commencement Date**" means the date on which Owner issues the Notice to Proceed in accordance with Section 7.1(a).

"**Conditional Final Completion Lien Waiver**" means a lien waiver in the applicable form provided in Exhibit F (Form of Lien Waivers) to this Agreement.[1]

"**Confidential Information**" shall have the meaning set forth in Section 18.1.

"**Contract Price**" shall have the meaning set forth in Section 5.1, as the same may be adjusted pursuant to the terms hereof.

"**Contractor**" shall have the meaning set forth in the preamble.

"**Contractor Deliverables**" means all of the deliverables to be provided by Contractor pursuant to the requirements in Exhibit B (Contractor Deliverables).

"**Contractor Event of Default**" shall have the meaning set forth in Section 16.1.

"**Contractor Indemnified Party**" shall have the meaning set forth in Section 17.2.

"**Contractor Party**" means each of Contractor and any of its respective Affiliates.

"**Contractor Permits**" means the Applicable Permits set forth in Part I of Exhibit C (Applicable Permits) and any other Applicable Permits, other than Owner Permits.

"**Contractor's Invoice**" means an invoice from Contractor to Owner prepared by Contractor and in a form attached as Exhibit W (Form of Contractor's Invoice).

"**Contractor's Manager**" means the construction and commissioning manager (or any replacement thereof) appointed by Contractor in accordance with this Agreement.

"**Contractor-Parent**" means iSun Inc., a Vermont corporation.

"**Delay Liquidated Damages**" means with respect to the failure to achieve Substantial Completion by the Guaranteed Substantial Completion Date, the applicable amount set forth in Exhibit K (Liquidated Damages).

"**Dispute**" shall have the meaning set forth in Section 24.1.

"**Dispute Notice**" shall have the meaning set forth in Section 24.1(a).

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**Effective Date**" shall have the meaning set forth in the preamble.

"**Energy**" shall have the meaning set forth in the PPA.

"**Energy Liquidated Damages**" shall have the meaning set forth in Section 12.3.

"**Event of Default**" means either a Contractor Event of Default or an Owner Event of Default, as the context may require.

"**Excluded Taxes**" means (a) Property Taxes and (b) any Taxes imposed on Owner by any Governmental Authority under Applicable Law (other than any Sales Taxes except as set forth in Section 5.3.3).

"**Excusable Event**" means an event that the Parties agree, or upon a failure of the Parties to agree the Independent Engineer determines, impacts the critical path of the Work, to the extent such event is attributable to: (a) the occurrence of a Change In Law; (b) the occurrence of an Owner-Caused Delay; (c) the occurrence of a Force Majeure Event; (d) the discovery of Unforeseeable Site Conditions; (e) not used; or (f) the occurrence of an Owner failure under Section 2, in each case, to the extent such occurrence or discovery actually and demonstrably delays Contractor's ability to timely perform the Work as required by this Agreement or results in additional increased cost to perform the Work.[2]

"**Final Capacity Liquidated Damages**" means an amount calculated pursuant to Exhibit H (Commissioning and Testing).

"**Final Capacity Test**" means the last Capacity Test of the Project that has been Successfully Run prior to the expiration of the Capacity Test Cure Period as designated by Notice from Contractor to Owner, which test shall be completed no later than the last day of the Capacity Test Cure Period.

"**Final Completion**" means satisfaction by Contractor or waiver by Owner of all of the conditions for Final Completion set forth in Section 11.5.

"**Final Completion Date**" shall have the meaning set forth in Section 11.6.

"**Final Completion Payment**" shall have the meaning set forth in Section 6.1.5.

"**Final Contractor's Invoice**" shall have the meaning set forth in Section 6.1.5.

"**Final Lien Waiver**" shall have the meaning set forth in Section 21.4.

"**Financial Closing Date**" means the date on which the Financing Documents providing for a financing solution sufficient to fund a portion of construction of the Project as Owner may require, has been closed and a drawdown of initial funding pursuant to the Financing Documents has occurred.

"**Financing Documents**" means any loan, credit or note purchase agreements, notes, bonds, securities, indentures, security agreements, lease financing agreements, mortgages, interest rate exchanges, or swap agreements, consents and agreements, and any other documents relating to the development, bridge construction or the permanent financing for the Project, including any equity or tax-equity financing or other joint-venture financing arrangement, even if more than one financing arrangement exists at any time and even if the financing arrangements are of different tiers or tranches, including any credit enhancement, credit support, working capital financing, or refinancing documents, and any and all amendments, modifications or supplements to the foregoing that may be entered into from time to time.

"**Force Majeure Event**" means the occurrence of any act or event after the Effective Date beyond the reasonable control of, and not the result of the fault or negligence of, the affected Party, which (i) prevents the affected Party from performing its obligations under this Agreement, in full or part, (ii) such Party is unable to overcome with the exercise of due diligence (including the expenditure of commercially reasonable sums), and (iii) such Party could not reasonably have foreseen or prevented utilizing all reasonable efforts under the circumstances, including, but not limited to (to the extent the foregoing requirements are met): natural disasters, acts of God, drought, flood, earthquake, storm, fire, explosion, lightening, pandemic, epidemic, war, riot, civil disturbance, sabotage, terrorism or threat of terrorism, strike, lockout or other labor disturbance or dispute. Notwithstanding anything in the foregoing to the contrary, Force Majeure Events shall not include any of the following:

(a) mechanical or equipment failures (except to the extent any such failure is itself caused by a Force Majeure Event);

(b) any condition at the Site for which the affected Party is responsible under this Agreement, other than: (1) the discovery of pre-existing Hazardous Materials or Unforeseeable Site Conditions at the Site so long as the condition was unknown and should not reasonably have been known by Contractor as of the Effective Date and (2) any Hazardous Materials released at the Site other than by Contractor, any Subcontractor or Persons acting on behalf of Contractor;

(c) increases in the cost of performance of a Party's obligations under this Agreement (except to the extent any such increase is itself caused by a Force Majeure Event);

(d) delays in customs clearance (except to the extent any such delay is itself caused by a Force Majeure Event) or the imposition of import tariffs, border taxes, or other governmental levies;

(e)      any delay or other problems associated with the issuance of any Governmental Approval or for the application therefor (other than the failure of the applicable Governmental Authority to issue construction permits on the Project, through no fault of the Party claiming the Force Majeure Event and despite the affected Party's best efforts, which for the avoidance of doubt shall constitute a Force Majeure Event);

(f)      strikes, walkouts, lockouts or other labor disturbances or disputes specific to such Party claiming a Force Majeure Event;

(g)      storms or other weather or climate conditions consistent with those recorded for the geographic area of the Site and surrounding regions in the previous twenty (20) years; and

(h)      if not specifically permitted as a Force Majeure Event in parts (a) through (g) above, any other event or condition that does not qualify as "force majeure," "uncontrollable circumstance," or other similar concept under one or more of the PPA or any other document related to the Site or the Project; provided that Contractor's recovery for a Force Majeure Event shall not be limited by the recovery available to Owner under the PPA or other Project document.

"**Functional Test**" means the test to determine the functionality of the Project and equipment and components incorporated therein, as described in Exhibit H (Commissioning and Testing).

"**Governmental Authority**" means any federal, state, local, municipal or other governmental, regulatory, administrative, judicial, public or statutory instrumentality, court or governmental tribunal, agency, commission, authority, body or entity, or any political subdivision thereof, having legal jurisdiction over the matter or Person in question (whether foreign or domestic).

"**Guaranteed Substantial Completion Date**" is eleven months from the issuance of the Project's Certificate of Public Good.

"**Hazardous Materials**" means any chemical, substance or material regulated or governed by any Applicable Permit or Applicable Law as, or any substance, emission or material now or hereafter deemed by any Governmental Authority to be, a "regulated substance," "hazardous material," "hazardous waste," "hazardous constituent," "hazardous substance," "toxic substance," "radioactive substance," "contaminant," "pollutant," "toxic pollutant" or "pesticide" or words of similar meaning and regulatory effect under Applicable Law.

"**Indemnified Party**" shall have the meaning set forth in Section 17.4.

"**Indemnifying Party**" shall have the meaning set forth in Section 17.4.

"**Independent Engineer**" means any independent engineer or engineering firm designated under Section 25.18.

"**Industry Standards**" means those design, engineering, construction, workmanship, operation, care and diligence standards of construction, workmanship, Project Hardware and components specified in Exhibit A (Scope of Work); provided that if the relevant standard is not so specified or is ambiguous therein, then "Industry Standards" shall mean those standards of design, engineering, construction, workmanship, operation, care and diligence and those practices, methods and acts that would be implemented and normally practiced or followed by prudent internationally-recognized engineering and construction firms in the design, engineering, procurement, installation, construction, testing, commissioning and interconnection of utility-scale PV facilities in the Southeastern United States and which practices, methods and acts, in the exercise of prudent and responsible professional judgment by those experienced in the industry in light of the facts known (or that reasonably should have been known) at the time the decision was made, could reasonably have been expected to accomplish the desired result consistent with good business practices, good engineering design practices, reliability, safety, Applicable Law, Applicable Permits and codes and other standards established for such work. Industry Standards are not necessarily limited to the optimum practice, method or act, but may be a spectrum of possible practices, methods or acts. Solely with respect to Section 14.4(d), "Industry Standards" shall mean those standards of care and diligence normally practiced by entities that operate and maintain PV power plants.

"**Initial Capacity Liquidated Damages**" means an amount calculated pursuant to Exhibit H (Commissioning and Testing).

"**Initial Capacity Test**" means a Capacity Test of the Project as designated by Notice from Contractor to Owner that has been Successfully Run prior to Substantial Completion.

"**Installed Module Capacity**" means the nameplate value of [watts direct current (Wdc)] of installed photovoltaic modules at the Project, as demonstrated by Module Data.

"**Intellectual Property Rights**" means all licenses, trade secrets, copyrights, know-how patents, trademarks, proprietary information or other intellectual property rights of any kind necessary for the design, construction, ownership, use, operation, maintenance, repair, alteration, commissioning, interconnection, de-commissioning, removal and disposal of the Project.

"**Interconnected**" (together with the corollary term "**Interconnect**") means the occurrence of all of the following: (a) the Project is connected and synchronized to the "System" and the "Interconnection Facilities" (each as defined under the Interconnection Agreement) of the Utility and is capable of transmitting electric energy in accordance with the Interconnection Agreement and Applicable Law and (b) the Project is ready to be placed into service.

"**Interconnection Agreement**" means that certain interconnection agreement, to be executed between the Utility and Project Company .

"**Interim Lien Waiver**" means, as applicable, a conditional or unconditional interim lien waiver to be delivered by Contractor pursuant to Section 21.2 in the applicable form provided in Exhibit F (Form of Lien Waivers) to this Agreement.

"**KWh**" means kilowatt hours.

"**Lien**" means, with respect to any property or asset, any mortgage, deed of trust, lien, pledge, charge, security interest, restrictive covenant or easement or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected or effective under Applicable Law, or any preference, priority or preferential arrangement of any kind or nature whatsoever as well as the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"**Lien Waivers**" means the Interim Lien Waivers, the Substantial Completion Lien Waivers, and the Final Lien Waivers.

"**Limited Notice to Proceed**" or "**LNTP**" has the meaning set forth in Section 7.1.

"**Major Project Hardware**" means the Project Hardware related to the distribution transformers, step-up transformers, inverters, tracker, and PV modules for the Project.

"**Major Subcontractor**" means (a) each Specified Subcontractor and (b) each Specified Supplier. An initial list of approved Major Subcontractors is set out in Exhibit J (Major Subcontractors).

"**Mechanical Completion**" means the satisfaction of all of the conditions set forth in Section 11.2.

"**Mechanical Completion Date**" shall have the meaning set forth in Section 11.2.

"**Minimum Guaranteed Capacity**" shall have the meaning set forth in Exhibit H (Commissioning and Testing).

"**Minimum Guaranteed Generation**" shall have the meaning set forth in Exhibit H (Commissioning and Testing).

"**Module Data**" means, for each photovoltaic module installed in the Project, such module's watts direct current (Wdc) nameplate value recorded at the manufacturing facility for such module. Contractor shall collect and compile the Module Data based on inspection of the photovoltaic modules and the data sheets and other documentation provided by Module Supplier.

"**Module Supplier**" means any supplier or suppliers (taken together) of PV modules, as described in greater detail in any module supply agreement for the Project.

"**Monthly Progress Report**" means a written monthly progress report prepared by Contractor setting forth the detail required in Exhibit G (Progress Reports).

"**MW**" means 1,000,000 watts of electric power (expressed as AC).

"**NERC**" means the North American Electric Reliability Corporation or a successor organization that is responsible for establishing reliability criteria and protocols.

"**Non-Critical Deficiencies**" means each item of Work that (a) Owner or Contractor identifies as requiring completion or containing defects, (b) does not impede the safe operation of

the Project or any portion thereof in accordance with Industry Standards and, in any case, manufacturers' warranties and (c) does not materially affect the capacity, efficiency, reliability, operability, safety or mechanical or electrical integrity of the Project.

"**Non-Excusable Event**" means (a) the negligence or willful misconduct of any Contractor Party or any Subcontractor, (b) the failure of any Contractor Party or any Subcontractor to comply in material respects with any of its obligations under, or a material breach by any Contractor Party or any Subcontractor of, this Agreement and (c) any defect in the design, materials, or workmanship of the Work or other matter that could result in a Contractor (or Subcontractor) warranty obligation pursuant to Article 14.

"**Notice**" or "**Notification**" means a written communication between authorized representatives of the Parties required or permitted by this Agreement and conforming to the requirements of Section 22.1. "**Notify**" means to provide a Notice or Notification.

"**Notice of Final Completion**" means a Notice from Contractor to Owner stating that Contractor has satisfied the requirements for Final Completion under Section 11.5, substantially in the form attached hereto as Exhibit P (Mechanical, Substantial and Final Completion Notices), as approved by Owner in accordance with Section 11.6.

"**Notice of Mechanical Completion**" means a Notice from Contractor to Owner stating that Contractor has satisfied the requirements for Mechanical Completion under Section 11.2, substantially in the form attached hereto as Exhibit P (Mechanical, Substantial and Final Completion Notices), as approved by Owner in accordance with Section 11.2.

"**Notice of Substantial Completion**" means a Notice from Contractor to Owner stating that Contractor has satisfied the conditions precedent for Substantial Completion under Section 11.3, substantially in the form attached hereto as Exhibit P (Mechanical, Substantial and Final Completion Notices), as approved by Owner in accordance with Section 11.4.

"**Notice to Proceed**" or "**NTP**" means a written notice, substantially in the form attached hereto as Exhibit L (Form of Notice to Proceed), releasing Contractor to fully proceed with all Work under this Agreement.

"**Owner-Caused Delay**" means (a) a failure by Owner to materially perform any of its obligations under this Agreement, or (b) Owner's interference with the performance of the Work, each of which directly cause delay in Contractor's ability to achieve Substantial Completion by the Guaranteed Substantial Completion Date (which failure or interference is not otherwise excused and for so long as such failure or breach has not been remedied), including any failure to timely respond to Notices of Contractor under this Agreement where a specified period is provided (unless a deemed response to such Notice is provided for hereunder) to the extent that such failure or interference does not result from a Non-Excusable Event. For the purposes of this definition "Owner" shall include Owner, any Owner subcontractor, or other party in contractual privity with Owner, if any, but excluding Contractor and its Subcontractors.

"**Owner Contracts**" shall have the meaning set forth in Section 2.8.

"**Owner Event of Default**" shall have the meaning set forth in Section 16.3.

"**Owner Financing Party**" means (a) any and all Persons, or the agents or trustees representing them, providing senior or subordinated debt, vendor financing, lease or equity financing (including tax equity financing to Owner or an Affiliate thereof) or refinancing to Owner or (b) any Person providing letters of credit, guarantees, insurance or other credit support, or title insurance to Owner, in each case, in connection with the Project or a portfolio of projects that includes the Project.  The term "Owner Financing Party" includes, for the avoidance of doubt, any Person or Persons that own the Project and lease the Project to Owner or an Affiliate of Owner, as applicable, under a lease, sale leaseback or synthetic lease structure.

"**Owner Indemnified Party**" shall have the meaning set forth in Section 17.1.

"**Owner-Instituted Change**" shall have the meaning set forth in Section 13.2.

"**Owner Parent Guaranty**" means the guaranty provided by the Parent Guarantor in accordance with the provisions of this Agreement in a form to be agreed between the Parties in accordance with the standard market terms.

"**Owner Permits**" means those Applicable Permits set forth in Part II of Exhibit C (Applicable Permits) and any other Applicable Permits, other than Contractor Permits, as described in Exhibit C (Applicable Permits).

"**Owner Representative**" means Owner's representative designated by Owner pursuant to Section 2.1.

"**Owner-Supplied Information**" means the information set forth in Exhibit V (Owner-Supplied Information).

"**Owner's Engineer**" means any engineering firm or firms or other engineer or engineers selected and designated by Owner.

"**Party**" and "**Parties**" shall have the meanings set forth in the preamble.

"**Parent Guarantor**" means Fusion Renewable NA, LLC (or any permitted assignee hereunder) upon assigning this Agreement to the Project Company.

"**PCS**" means the power conversion station(s) which consists of the static power inverters, inverter step up transformers, cabling and grounding systems, as further described in Exhibit A (Scope of Work).

"**Performance Requirements**" shall have the meaning set forth in Section 3.2.

"**Permit Expenses**" means the actual costs payable to a Governmental Authority and all other reasonable third-party costs and expenses incurred in connection with the application for and issuance of an Applicable Permit.

"**Person**" means any individual, corporation, company, voluntary association, partnership, incorporated organization, trust, limited liability company, or any other entity or organization,

including any Governmental Authority. A Person shall include any officer, director, member, manager, employee or agent of such Person.

"**Point of Interconnection**" is defined in the Interconnection Agreement.

"**PPA**" means that certain Standard Offer Power Purchase Contract between Green Mountain Power Corporation and VEPP, Inc dated December 2, 2020 assigned to the Project Company per the Assignment Agreement dated December 21, 2020 by and between Green Mountain Power Corporation and the Project Company.

"**Pre-Functional Test**" means the subset of Functional Tests required to be completed in order to achieve Mechanical Completion, as identified and detailed in Exhibit H (Commissioning and Testing).

"**Prime Rate**" means the prime rate as published in the "The Money Rates" Section of *The Wall Street Journal* (U.S. Edition).

"**Project**" shall have the meaning set forth in the recitals.

"**Project Company**" shall have the meaning set forth in the recitals.

"**Project Hardware**" means all materials, supplies, apparatus, devices, equipment, machinery, tools, parts, components, instruments and appliances that are to be incorporated into the Project (including the Major Project Hardware) whether provided by Contractor or any Subcontractor.

"**Project Schedule**" means the schedule for the performance of all Work to be performed under this Agreement attached hereto as Exhibit S (Project Schedule).

"**Property Taxes**" means any real or personal property Taxes related to the Site, the Project, or Project Hardware.

"**Proposed Punchlist**" shall have the meaning set forth in Section 11.1.1.

"**Punchlist**" shall have the meaning set forth in Section 11.1.1.

"**Punchlist Amount**" shall have the meaning set forth in Section 11.1.1.

"**Punchlist Holdback**" shall have the meaning set forth in Section 6.8.1.

"**PV**" means photovoltaic.

"**PV Module Price**" means the aggregate price paid or to be paid by Contractor for the purchase of PV modules, as described or set forth in the any module supply agreements or purchase orders for PV modules for the Project.

"**Release**" means the release, discharge, deposit, injection, dumping, spilling, leaking or placing of any Hazardous Material into the environment so that such Hazardous Material or any

11

constituent thereof may enter the environment, or be emitted into the air or discharged into any waters, including ground waters under Applicable Laws.

"**Required Manuals**" means the operating data and manuals, Project Hardware and parts manuals, operation and maintenance manuals and instructions which are reasonably necessary to safely and efficiently operate, maintain and shut down the Project, in each case, to be provided in accordance with Exhibit B (Contractor Deliverables).

"**Retainage**" shall have the meaning set forth in Section 6.7.

"**Rules**" shall have the meaning set forth in Section 24.1(c)(ii).

"**Sales Tax**" means any applicable Vermont state or local sales, use, privilege, or similar Taxes, with respect to the Work and Project Hardware.

"**Site**" means the Project site, as more particularly described in Exhibit N (Site Description).

"**Site Conditions**" shall have the meaning set forth in Section 3.17.

"**Site Layout**" means the layout of the Project set forth in Exhibit E (Site Layout).

"**Spare Parts**" means the spare parts set forth in Exhibit A (Scope of Work).

"**Specified Subcontractor**" means any Subcontractor with a contract value over $500,000. An initial list of approved Specified Subcontractors is set out in Exhibit J (Major Subcontractors).

"**Specified Supplier**" means any Supplier (including any Module Supplier) of the distribution transformers, step-up transformers, inverters, tracker and PV modules for the Project. An initial list of approved Specified Suppliers is set out in Exhibit J (Major Subcontractors).

"**Statement of Work**" means, collectively, the requirements regarding the Work set forth in Exhibit A (Scope of Work).

"**Subcontract**" means any contract for performance of any portion of the Work entered into with a Subcontractor.

"**Subcontractor**" means any Person, directly or indirectly, and of any tier (other than Contractor, but including any Affiliate of Contractor), including any Supplier, that performs any portion of the Work on behalf of Contractor in furtherance of Contractor's obligations under this Agreement.

"**Substantial Completion**" means the satisfaction of all of the conditions set forth in Section 11.3.

"**Substantial Completion Date**" shall have the meaning set forth in Section 11.4.

"**Substantial Completion Lien Waivers**" shall have the meaning set forth in Section 21.3.

"**Substation**" means the interconnection substation being constructed by Contractor hereunder.

"**Successfully Run**" means, with respect to the Capacity Test, Functional Tests, and Annual Energy Test, that such tests were completed in accordance with the procedures, conditions and requirements set forth in Exhibit H (Commissioning and Testing).

"**Supplier**" means a Person that supplies Project Hardware directly to Contractor in connection with the performance of the Work, including (for the avoidance of doubt), any Module Supplier.

"**Taxes**" means any and all forms of taxation, charges, duties, imposts, levies, and rates whenever imposed by any Governmental Authority, including transaction privileges, sales tax, use tax, transaction privilege tax, property tax, income tax, withholding taxes, corporation tax, franchise taxes, capital gains tax, capital tax, capital transfer tax, inheritance tax, value added tax, goods and services tax, customs duties, capital duty, excise duties, betterment levy, stamp duty, stamp duty reserve tax, national insurance, social security or other similar contributions, and generally any tax, duty, impost, levy, rate or other similar amount and any interest, penalty, fine or other amount due in connection therewith, but in all cases excluding Permit Expenses.

"**Unconditional Final Completion Lien Waiver**" means, a lien waiver to be delivered pursuant to Section 21.2 in the applicable form provided in Exhibit F (Form of Lien Waivers) to this Agreement.

"**Unforeseeable Site Conditions**" means the presence or discovery of (i) subsurface or latent physical conditions at the Site differing materially from those indicated in the materials provided by Owner to Contractor or (ii) previously unknown physical conditions at the Site of an unusual nature or differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Agreement, which also include archeological artifacts, or religious, historical or archeological resources above or below the surface of the Site that were not identified or otherwise addressed in any of the engineering and geotechnical surveys, reports and other documents provided by Owner to Contractor with respect to the Site and were not identified by Contractor during its inspections of the Site.

"**Utility**" shall mean Green Mountain Power Company.

"**Utility Facilities**" means, collectively, the Interconnection Facilities and System, each as defined in the Interconnection Agreement.

"**Warranty Period**" shall have the meaning set forth in Section 14.2, as the same may be extended pursuant to Section 14.3.

"**Warranty Service**" shall have the meaning set forth in Section 14.3.1.

"**Work**" means all of Contractor's obligations under this Agreement to engineer, design, procure, manufacture, construct and erect, install, equip, start-up, test, commission and complete the Project, set forth in or reasonably inferred from this Agreement (including the Statement of Work), including any of the foregoing obligations performed (a) pursuant to an LNTP or (b)

pursuant to a Change Order, all of which shall be deemed to be Work performed by Contractor under this Agreement.

1.2     **Exhibits**.  This Agreement includes the Exhibits annexed hereto and any reference in this Agreement to an "Exhibit" shall mean one of the Exhibits hereto.  Each Exhibit attached hereto is incorporated herein in its entirety by this reference and each reference to this Agreement shall be deemed to include all Exhibits hereto.

1.3     **Interpretation**.  As used in this Agreement, unless otherwise indicated, the terms "herein", herewith" and "hereof" are references to this Agreement as a whole including the Exhibits, and the term "includes" or "including" shall mean "including without limitation"; relative to the determination of any period of time, "from" means "including and after," "to" means "to but excluding" and "through" means "through and including"; unless otherwise specified to the contrary, the word "or" shall be inclusive and shall have the meaning conveyed by "and/or"; any reference to "days" means calendar days; the singular includes the plural and the plural the singular; words importing any gender include the other gender; references to statutes or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending or replacing the statute or regulation referred to; references to agreements and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements, extensions and other modifications to such instruments (without, however, limiting any restrictions to such amendments, restatements, supplements, extension and other modifications imposed by this Agreement); or a reference to a Person shall include its successors and permitted assigns.

1.4     **Headings**.  All headings or captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

1.5     **Conflicts in Documentation**.  This Agreement, including the Exhibits hereto shall be taken as mutually explanatory.  If either Party becomes aware of an express conflict between the provisions of this Agreement or any Exhibit hereto, such Party shall promptly Notify the other Party of such conflict.  In the event of a conflict between any provision within the body of this Agreement and any Exhibit hereto, the terms and provisions of the body of this Agreement shall take precedence over the Exhibits; and in the event of a conflict between any provisions within the Exhibits, Exhibit A (Scope of Work), Exhibit H (Commissioning and Testing), Exhibit I (Interconnection Agreement), and Exhibit U (Power Purchase Agreement) shall take precedence over the remaining Exhibits unless expressly stated otherwise in this Agreement.

## 2.    RESPONSIBILITIES OF OWNER

2.1     Owner Representative.  Owner shall designate an Owner Representative, who shall act as the single point of contact on behalf of Owner with respect to the prosecution and scheduling of the Work and any issues relating to this Agreement.  Owner may designate a new Owner Representative from time to time by a Notice delivered to Contractor.

2.2     Back Feed Power and Parallel Operation.  Owner shall cause the Utility to complete the testing of the Utility Facilities and Substation by no later than the applicable milestone date set forth in Exhibits S (Project Schedule) to enable Contractor to obtain Backfeed Power, commence trial operation or testing (as required by the Interconnection Agreement) and carry out testing of

the Project as provided under this Agreement. The failure of Owner to cause the Utility to comply with such date shall be an Owner-Caused Delay to the extent the Project Schedule is delayed, but shall not to be an Owner Event of Default.

2.3     Access to Site. Concurrently with the issuance of the Notice to Proceed (or, if applicable, pursuant to an LNTP), Owner shall provide Contractor rights of ingress and egress to and use of the Site for Contractor and its Subcontractors as may be reasonably necessary for the performance of the Work, subject to any applicable restrictions communicated to Contractor in writing in respect of Owner's rights to the Site, which Contractor agrees have been considered in the Project Schedule.

2.4     Cooperation. Owner shall cooperate with Contractor and the Subcontractors in coordinating the work of Owner's contractors who may be working at or near the Site with the Work being performed by Contractor and the Subcontractors. Owner shall not allow its, or its Affiliates', operations and activities on the Site to materially interfere with the performance of the Work by Contractor. At Contractor's written request, Owner shall provide reasonably requested assistance to Contractor with respect to Contractor's obtaining any Contractor Permits and complying with any Applicable Permits; provided that Contractor shall reimburse Owner for any out-of-pocket costs that Owner incurs in providing such assistance.

2.5     Owner Permits. Subject to Contractor's obligations to provide reasonably requested assistance to Owner in obtaining any Owner Permit (at no cost to Owner) in accordance with Section 3.13.2, Owner shall, at Owner's cost and expense, obtain and maintain all Owner Permits. In the event that an Applicable Permit not explicitly listed in Exhibit C (Applicable Permits) is required in connection with the Project, such Applicable Permit shall be an Owner Permit for purposes of this Agreement, to the extent that such Applicable Permit constitutes a development or land use Applicable Permit. Notwithstanding the foregoing, for any "Right of Way Crossings" and "Easements" Owner Permits (or similar Owner Permits), as described in Exhibit C (Applicable Permits), Contractor shall be responsible for any delay in obtaining such Permit, to the extent caused by any re-design or change in the information within Contractor's scope of Work required in order to obtain such Permit. Contractor shall be precluded from claiming such delay as an Owner-Caused Delay.

2.6     Insurance. Owner shall, at Owner's cost and expense, obtain and maintain insurance required in accordance with Exhibit R (Insurance Requirements).

2.7     Owner-Supplied Information. Owner shall provide, or has provided, to Contractor the information for any items provided or to be provided by Owner pursuant to this Agreement, including Owner Contracts, in accordance with Exhibit V (Owner-Supplied Information). Subject to Section 4.1.10 herein, Contractor shall be entitled to use the Owner-Supplied Information in preparing the final construction designs for the Project.

2.8     Owner Contracts. On or prior to the Commencement Date, Owner shall provide to Contractor (a) the Power Purchase Agreement, (b) Interconnection Agreement, (c) the land control agreement and (d) land use permit (as applicable) approved by Governmental Authorities as required by Applicable Law, in each case, for the Project (the "**Owner Contracts**"). Owner shall comply with its obligations under the Owner Contracts and other material contracts affecting the

Work or the Project to which Owner is party. Contractor shall not be responsible for any obligations under the Owner Contracts except those specifically assumed in this Agreement, including Exhibit A (Scope of Work).

2.9     Owner Parent Guaranty. Owner shall cause Parent Guarantor to provide the Owner Parent Guaranty upon the assignment of this Agreement to Project Company. Notwithstanding anything to the contrary herein: (a) the Owner Parent Guaranty shall expire when the finance agreement for the Project shall be signed, with no outstanding obligations of the Owner Parent; and (b) Parent Guaranty may assign its rights and obligations under the Owner Parent Guaranty to any entity to which it will sells its interest in the Project

2.10     Remedies for Owner Failure under Article 2.  Notwithstanding the terms of Article 8 (Excusable Event), if Owner fails to satisfy the requirements of this Article 2, Contractor's sole and exclusive remedy shall be a day-for-day extension of the Project Schedule corresponding to the number of days between the milestone date described above and Owner's actual completion of its obligations in this Article 2.

3.     **RESPONSIBILITIES OF CONTRACTOR**

3.1     General.  Contractor shall, in accordance with and subject to the terms of this Agreement diligently, duly and properly perform and complete the Work and all of its other obligations set forth in this Agreement, including but not limited to procuring and paying for all materials, equipment, machinery, tools, labor, transport and other items and services necessary for the proper completion of the Project (including Major Project Hardware) and completing the design, engineering, construction, testing, interconnection and commissioning of the Project through Final Completion . Contractor acknowledges and agrees that it is obligated to perform the Work on a "turnkey basis" which constitutes a fixed-price (subject to the terms hereof) obligation to design, engineer, procure, construct, test, interconnect and commission the Project (or to oversee and manage the completion of the same by third-party contractors) in accordance with the terms and conditions of this Agreement.  Where this Agreement describes a portion of the Work in general, but not in complete detail, the Parties acknowledge and agree that the Work includes any incidental work inferred or required to complete the Work in accordance with this Agreement. Contractor is obligated to supply and perform all of the Work as set forth in this Agreement and to complete the Work in accordance with and subject to the terms and conditions of this Agreement, including the guarantees of performance (and the remedies applicable thereto) as set forth herein, all for the Contract Price.  For the avoidance of doubt, without limiting the generality of this Section 3.1, the Work to be provided by Contractor shall include any work, services and acts that may be reasonably implied by Exhibit A (Scope of Work) and necessary in order to fully complete the Project and to ensure the Project meets the requirement under this Agreement and is capable of operating in compliance with this Agreement, all Applicable Law, the PPA, the Interconnection Agreement, and Industry Standards.

3.2     Standard of Performance.  Contractor shall perform, or cause to be performed, the Work in a workmanlike manner, using new material, and in compliance, in all material respects, with Applicable Laws, Applicable Permits, Industry Standards, the standards and requirements of the Owner Contracts, all technical specifications set forth in this Agreement (including any Exhibits), the requirements of any contract for any Major Project Hardware (including the

warranty provisions thereof), the requirement of any insurance policies held pursuant hereto and any other applicable requirements of this Agreement (the "**Performance Requirements**") as such Performance Requirements specifically pertain to the Work.  If the standards or requirements derived from the foregoing are inconsistent, Contractor shall perform or cause to be performed the Work in accordance with the most stringent standard or requirement.

       3.3      Design and Construction of the Project.

       3.3.1    Design and Construction Obligation.  In accordance with and subject to the terms of this Agreement, Contractor shall design, engineer, procure, construct, test, commission and interconnect the Project so that it meets the Performance Requirements and any other standards of performance set forth in this Agreement, and is capable of operation in accordance with the design criteria specified in the Statement of Work and the guarantees of performance (subject to the remedies applicable thereto) as set forth in this Agreement.  All drawings, plans and specifications provided as part of Contractor Deliverables shall be kept by Contractor in an orderly and catalogued fashion for reference by Owner during the performance by Contractor of the Work.

       3.3.2    Major Project Hardware. As part of the Work, Contractor shall negotiate and cause the execution of supply agreements for all Major Project Hardware, which shall provide for (among other things) the timely procurement and delivery of Major Project Hardware to the Site for use in the Project. Contractor, either directly or through a Subcontractor, shall install all Major Project Hardware and related equipment procured and delivered under such supply agreement into the Project as part of the Work and the Contract Price.

       3.3.3    Record-Keeping.  Contractor shall maintain at the Site at least one (1) copy of all Contractor Deliverables, Change Orders and other modifications in good order and marked to record all changes made during performance of the Work, including, without limitation, all field deviations from the construction drawings.

       3.4      Contractor-Parent Guaranty.

       3.4.1    Upon the date of NTP the Contractor shall provide Owner with a Contractor-Parent guarantee guaranteeing the due and proper performance of the obligations of Contractor under this Agreement, including any undertakings and conditions by or on the part of the Contractor contained herein, in the form to be agreed by the parties  (the "**Contractor-Parent Guaranty**"). In the event of the Contractor failing to carry out, observe or perform all or any of the obligations under the Agreement, (unless relieved or prohibited from the performance of any part of the Agreement by statute or by the decision of an authority having competent jurisdiction), the Contractor-Parent shall be liable to the Owner against all losses, damages, costs and expenses whatsoever which the Owner may incur by reason of default or as a consequence of any failure on the part of Contractor to perform its obligations hereunder, subject to and in accordance to the terms herein.

       3.5      Progress Reports.   Contractor shall provide Monthly Progress Reports in accordance with Section 7.4.  In addition, Owner, any Affiliate of Owner or the Independent Engineer shall be entitled to call any meeting with or attend any meeting convened by Contractor on the Site to review progress with Subcontractors performing Work on the Site and, during such

meeting, Owner or such Affiliate shall have a reasonable opportunity to ask questions of Contractor and such Subcontractors concerning progress of the Work.  If Owner requests that Contractor cause any Subcontractor to attend any such meeting, Contractor shall use its reasonable efforts to cause such Subcontractor to attend either in-person or via telephone.

3.6     Insurance.  Contractor shall obtain and maintain insurance required in accordance with Exhibit R (Insurance Requirements).

3.7     Inspection.  Contractor shall perform all inspection and other like services required for performance of the Work, including inspecting all Project Hardware and performing all inspections required or contemplated under the Statement of Work.

3.8     Organization.  Contractor shall maintain sufficient staff or Subcontractors that are dedicated to the completion of the Work, and that have the technical and managerial expertise to control and execute the Work in accordance with the requirements of this Agreement including but not limited to performance of the work in accordance with the Project Schedule.

3.9     Utilities and Services.  Contractor shall install, connect and maintain at its own expense all temporary utilities, facilities and services required for the performance of the Work within the Site.

3.10     Hazardous Materials.

3.10.1 Contractor shall not Release or dispose of, nor permit any Subcontractor or any Person acting on its or their behalf or under its or their control to Release or dispose of, Hazardous Materials on or about the Site other than as required by Contractor in connection with the performance of the Work and in accordance with Applicable Laws and Applicable Permits and shall, if any such Hazardous Materials are so Released or discharged, prevent the spread of such Hazardous Materials.  In the event Contractor encounters material reasonably believed to be a Hazardous Material on the Site, Contractor shall immediately stop work in the affected area and notify Owner of the condition.  If Contractor or any Subcontractor has brought such Hazardous Materials onto the Site or generated such Hazardous Materials, Contractor shall promptly submit a plan for Owner's approval for remediating such Hazardous Materials.  Upon approval of such plan by Owner, Contractor shall remediate such Hazardous Material in accordance with the approved plan and shall thereafter resume Work in the affected area.  If Contractor or any Subcontractor has brought such Hazardous Materials onto the Site or generated such Hazardous Materials, Contractor shall not be entitled to an adjustment to the Contract Price or Project Schedule, including the Guaranteed Substantial Completion Date.  If the Hazardous Materials were pre-existing, then Contractor shall be entitled to an equitable adjustment to the Contract Price or Project Schedule, including the Guaranteed Substantial Completion Date, so long as such release or discharge was not due to (x) a Non-Excusable Event or (y) exacerbation of such pre-existing Hazardous Materials by Contractor, any Subcontractor or any third party that is under Contractor's or any Subcontractor's control, that the applicable Person knows or should have reasonably known were on the Site.

3.10.2 Contractor shall indemnify, defend and hold harmless the Owner Indemnified Parties from and against all liabilities arising out of or relating to any violations by Contractor or

any Subcontractor of any Applicable Laws or Applicable Permits, prior to or after the Commencement Date, including (i) the Release or deposit at, on, above, below or near the Site by Contractor or any Subcontractor of any Hazardous Materials that were brought onto the Site by Contractor or any Subcontractor or (ii) the Release of any preexisting Hazardous Materials on the Site that Contractor knows or reasonably should have known were on the Site of and caused such Release due to its negligence or disregard for Owner's instructions; provided, however, that in no event shall Contractor be obligated under this Section to the extent such liabilities arise due to the negligence or willful misconduct of Owner or any third party that is not under Contractor's or any Subcontractor's control. Owner shall indemnify, defend and hold harmless Contractor Indemnified Parties from and against all liabilities arising out of or relating to any unknown or pre-existing Hazardous Materials that existed at the Site prior to the Effective Date; provided, however, that in no event shall Owner be obligated under this Section 3.10.2 to the extent such liabilities arise due to (x) a Non-Excusable Event or (y) exacerbation of pre-existing Hazardous Materials by Contractor, any Subcontractor or any third party that is under Contractor's or any Subcontractor's control, that the applicable Person knows or should have reasonably known were on the Site.

3.11    Access; Site Security.   Contractor shall provide security measures as necessary to protect the Site and all materials and supplies stored thereon in accordance with Contractor security procedures attached hereto as Exhibit D (Project Health and Safety Plan) until Substantial Completion, but shall provide access to the Site (and any other location where the Work is being performed) as reasonably necessary to Owner, the Owner Financing Parties, Utility, and their respective representatives, agents and, to inspect and review the Work being performed by Contractor; provided that, while on the Site, such Persons shall (a) observe Contractor's reasonable security and safety measures; and (b) not unreasonably interfere with Contractor's performance of the Work.  Contractor shall keep the Site reasonably clean and presentable at all times.  The scope and extent of Contractor's obligations to provide security measures is limited to the description of same as set forth in Exhibit D.

3.12    Handling, Shipping and Importation.   Contractor shall arrange for complete handling, shipping and importation, as necessary, of all Project Hardware and construction equipment, including quality assurance, shipping, loading, unloading, customs clearance, receiving, and any required storage and claims.

3.13    Applicable Law; Applicable Permits.

3.13.1 Applicable Law.   Throughout the performance of all aspects of the Work, Contractor shall comply with, and shall ensure that each Subcontractor complies with, all Applicable Law.

3.13.2 Applicable Permits.  Contractor shall obtain and maintain all Contractor Permits and pay all Permit Expenses in connection with such Contractor Permits.  Contractor shall provide reasonably requested assistance to Owner with respect to obtaining, and complying with, any Owner Permits.  Contractor shall provide Owner with sufficient advance notice (upon learning of such Owner Permit) to allow Owner to obtain such Owner Permit in accordance with Applicable Law in the reasonable course of its business and the exercise of reasonable care.  Subject to Section 2.5, in the event that an Applicable Permit not explicitly listed in Exhibit C (Applicable Permits)

is required in connection with the Project, such Applicable Permit shall be a Contractor Permit for purposes of this Agreement.

3.14    Commissioning Personnel.  Contractor shall provide, or cause to be provided, appropriate installation and commissioning representatives, as necessary supervising personnel, all equipment, tools, construction and temporary material and all other labor necessary for all of the Work to complete commissioning in accordance with Exhibit H (Commissioning and Testing).

3.15    Existing Improvements and Facilities.  During the performance of the Work, Contractor shall take reasonable care to protect existing improvements, facilities and equipment at the Site, unless they are to be altered or removed as a part of the Work.  Contractor shall also make reasonable provisions to confine its activities so as to avoid and minimize any damage or compaction to any existing fences, crops or ground.  To the extent that Contractor fails to comply with the requirements of the foregoing sentence and such failure causes Owner to become liable for damages to the owners of the Site or others that have a possessory interest in the Site, Contractor shall reimburse Owner in respect of its actual out-of-pocket expenses and damages.

3.16    Contractor Deliverables.  Contractor shall deliver to Owner all Contractor Deliverables as and when required pursuant to the terms of this Agreement.

3.17    Site Conditions.  Contractor (a) has inspected the Site, including both surface and subsurface conditions, and has satisfied itself as to all matters regarding the geotechnical and physical condition thereof, including those matters related to the environment, availability and quality of water, physical conditions at the Site, topography and ground surface conditions, sound attenuation conditions, subsurface geology and conditions, nature and quality of surface and subsurface materials to be encountered (collectively, "**Site Conditions**"), and shall be responsible for all necessary works in relation to, or because of, such Site Conditions both below and above ground on the Site, and (b) shall be solely responsible for performing any preliminary Work on the Site necessary for the commencement of construction to occur, including removal of all physical impediments to performing Work on the Site, above and below ground.  Contractor acknowledges and accepts the Site Conditions and agrees it shall not be entitled to an adjustment to the Contract Price or Project Schedule on account of the Site Conditions, except that the Parties acknowledge Contractor shall be entitled to a Change in Work with respect to any Unforeseeable Site Conditions as an Excusable Event in accordance with Article 8.

3.18    Labor.  Owner is not a party to any collective bargaining or labor agreement and is under no current obligation to utilize union labor in connection with the performance of any Work under this Agreement.  The Contract Price does not include compliance with any requirement to use union labor or prevailing wage rates in connection with any portion of the Work at the Site or surrounding area.

3.19    Permission for Interconnection.  Contractor and its Subcontractors shall not connect the Project to the transmission grid as contemplated in the Interconnection Agreement or allow the delivery of energy to the transmission grid without Owner's prior written approval.

3.20    Storage and Maintenance of Project Hardware and Other Items.  Once any Project Hardware is delivered to the Site, Contractor shall receive, unload, clean, store and maintain the

20

Project Hardware with reasonable care and shall maintain or assume the care, custody and control thereof.

3.21   <u>Testing of the Work</u>.  Contractor shall perform, or cause to be performed, all tests, approvals and inspections of the Work required by any Governmental Authority for construction work, or as otherwise necessary, appropriate or customary to assure the proper performance and operation thereof, in accordance with the Performance Requirements, including quality assurance inspections upon the delivery of any Project Hardware to the Site.  These tests, inspections and approvals shall be scheduled by Contractor so as not to delay the progress of the Work.

3.22   <u>Back Feed Power and Parallel Operation</u>.  The Parties acknowledge and agree that Owner's satisfaction of its obligations under <u>Section 2.2</u> herein require Contractor's timely completion of construction of the substation pad and satisfaction of the conditions precedent to achieve Mechanical Completion.  Subject to <u>Article 8 (Excusable Event)</u>, Contractor shall complete construction of the substation pad and achieve Mechanical Completion by no later than the applicable milestone dates set forth in <u>Exhibit S (Project Schedule)</u> for completion of such Work.  If Contractor fails to timely complete the foregoing requirements in accordance with the applicable milestone, Owner shall be entitled to a corresponding day-for-day extension of its milestone completion obligations as set forth in <u>Section 2.2</u> and Contractor shall not be entitled to any corresponding extension of the Guaranteed Substantial Completion Date, except to the extent of concurrent delay between the Parties, in which case both Parties' applicable milestone completion obligations shall be extended on a day-for-day basis to the extent of such concurrent delay consistent with <u>Section 2.2</u>.

3.23   Non-Recourse Financing.

The Contractor hereby acknowledges that during the process of obtaining finance for the Project from lenders, the Owner may receive additional comments and/or requirements from the lenders, their technical advisor and additional advisors to the lenders in connection with this Agreement.

The Contractor shall cooperate with the Owner in any negotiation with the lenders and shall agree to such amendments to, or modifications of this Agreement required by the lenders, provided that those are market-practice-terms for a non-recourse-project-financed EPC agreement. If parties fail to agree on such modification and amendments required, the Owner may be entitled to terminate the Agreement, and the Contractor shall have no claim or demand in connection to such termination.

## 4.   COVENANTS, WARRANTIES AND REPRESENTATIONS

4.1   <u>Contractor</u>.  Contractor represents and warrants, as of the Effective Date, the effective date of an executed LNTP (if applicable) and the Commencement Date, as follows:

4.1.1   <u>Organization, Standing and Qualification; Financial Capability</u>.  Contractor is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has full power and authority to execute, deliver and perform its obligations hereunder and to engage in the business it presently conducts and contemplates conducting, and is and will be duly licensed or qualified to do business and in good standing under the laws of each

other jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder. Contractor is financially solvent, able to pay its debts as they mature, and possessed of sufficient working capital to complete its obligations under this Agreement.

4.1.2   Due Authorization; Enforceability.  This Agreement has been duly authorized, executed and delivered by or on behalf of Contractor and is, upon execution and delivery by each of the Parties hereto, the legal, valid and binding obligation of Contractor, enforceable against Contractor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.

4.1.3   No Conflict.  The execution, delivery and performance by Contractor of this Agreement (a) will not conflict with or cause any default under: (i) its organizational documents; (ii) any indenture, mortgage, chattel mortgage, deed of trust, lease, conditional sales contract, loan or credit arrangement or other agreement or instrument to which Contractor is a party or by which it or its properties may be bound or affected; or (iii) any Applicable Laws; and (b) will not subject the Project or any component part thereof or the Site or any portion thereof to any Lien other than as contemplated or permitted by this Agreement.

4.1.4   Government Approvals.  Neither the execution nor delivery by Contractor of this Agreement requires the consent or approval of, or the giving of notice to or registration with, or the taking of any other action in respect of, any Governmental Authority.  Contractor represents and warrants that all Contractor Permits and other Applicable Permits required to be in Contractor's name either have been obtained by Contractor and are in full force and effect or will be obtained and will be in full force and effect on or prior to the date on which they are required under this Agreement and Applicable Law, so as to permit Contractor to commence and prosecute the Work to completion in accordance with the terms and conditions of this Agreement.

4.1.5   No Suits, Proceedings.  There are no actions, suits, proceedings, patent or license infringements, or investigations pending or, to Contractor's knowledge after due inquiry, threatened in writing against it at law or in equity before any court or before any Governmental Authority (whether or not covered by insurance) that individually or in the aggregate could result in any materially adverse effect on Contractor's ability to perform its obligations under this Agreement.  Contractor has no knowledge of any violation or default with respect to any order, writ, injunction or decree of any court or any Governmental Authority that may result in any such materially adverse effect or such impairment.

4.1.6   Business Practices.  Contractor has not and shall not make any payment or give anything of value to any government official to influence his, her or its decision or to gain any other advantage for Owner or Contractor, including any officer or employee of any Governmental Authority.

4.1.7   Licenses.  Contractor and any Subcontractor who will perform any portion of the Work have and will have all business and professional certifications and licenses if and as required

by the terms and conditions of this Agreement, Applicable Law and Applicable Permits to perform such portion of the Work under this Agreement.

4.1.8   <u>Financial Condition and Adequate Resources</u>.  Contractor is financially solvent, able to pay its debts as they mature, and possessed of sufficient working capital to complete its obligations under this Agreement.  Contractor has or will procure adequate resources and is qualified, in each case directly or through its Subcontractors, to perform the Work in accordance with the terms and conditions of this Agreement.

4.1.9   <u>Intellectual Property</u>.  Contractor owns or has the right to use, or will be able to secure from its Subcontractors the right to use, all Intellectual Property Rights necessary to perform the Work without conflict with the rights of others and to enable Owner to exercise its rights hereunder to operate the Project without infringement thereof.  Owner's use or sale of the Project does not and will not infringe upon any Intellectual Property Rights.  In no event will Owner Indemnified Parties or their respective successors-in-interest be liable to Contractor or any Subcontractor for infringement of any Intellectual Property Rights or claim thereof.

4.1.10 <u>Reliance on Information</u>.  Except for the Owner-Supplied Information shown in <u>Exhibit V (Owner-Supplied Information)</u>, Contractor is not relying on Owner for any information, data, inferences, conclusions, or other information, including the surface and subsurface conditions at the Site and the condition of the Site.  Contractor acknowledges that all Owner-Supplied Information has been provided as background information and as an accommodation to Contractor and that any reliance Contractor places in such information, date, inferences, conclusions, or other information, shall be at Contractor's own risk and Contractor shall not be entitled to any change in the Work or in the Contract Price on account any such information is inaccurate or incomplete.

4.2   <u>Owner</u>.  Owner represents and warrants, as of the Effective Date, the effective date of an executed LNTP (if applicable) and the Commencement Date, as follows:

4.2.1   <u>Organization, Standing and Qualification</u>.  Owner is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Delaware, and has full limited liability company power and authority to execute, deliver and perform its obligations hereunder and to engage in the business Owner presently conducts and contemplates conducting, and is and will be duly licensed or qualified to do business and in good standing in Delaware and in each other jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder.

4.2.2   <u>Due Authorization; Enforceability</u>.  This Agreement has been duly authorized, executed and delivered by or on behalf of Owner and is, upon execution and delivery by each of the Parties hereto, the legal, valid, and binding obligation of Owner, enforceable against Owner in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general equitable principles.

4.2.3   <u>No Conflict</u>.  The execution, delivery and performance by Owner of this Agreement will not conflict with or cause any default under: (a) its organizational documents; (b) any indenture, mortgage, chattel mortgage, deed of trust, lease, conditional sales contract, loan or credit

23

arrangement or other agreement or instrument to which it is a Party or by which it or its properties may be bound or affected; or (c) any Applicable Laws.

4.2.4   <u>Financial Condition and Adequate Resources</u>.  Owner is financially solvent, able to pay its debts as they mature, and possessed of sufficient working capital to complete its obligations under this Agreement.  Owner shall notify Contractor if Financial Closing is achieved, following which Contractor may request that the Owner provide reasonable evidence confirming such financial arrangements.

## 5.   COST OF WORK

5.1   <u>Contract Price</u>.  Contractor hereby agrees to accept as compensation for the performance of the Work and its other obligations hereunder 4,033,014 **USD** (as the same may be adjusted pursuant to the terms of this Agreement, the "**Contract Price**").  Neither shall the Contract Price be changed nor shall Contractor be entitled to any other compensation, reimbursement of expenses, or additional payment of any kind without prior written authorization of Owner or as otherwise specifically set forth in <u>Article 13</u>.  Payments shall be made at the times and in the manner provided in <u>Article 6</u>.  All amounts paid or payable by Owner or any of Owner's Affiliates with respect to any Work under this Agreement performed by Contractor (including under any Limited Notice to Proceed) prior to either the Effective Date or the issuance of a Notice to Proceed shall be credited toward payment of the Contract Price.

5.2   <u>Price All-Inclusive</u>.  The Contract Price shall include all expenses and costs incurred by Contractor to perform the Work, including, without limitation, the following items: (a) all costs and expenses incurred and to be incurred in connection with the completion of the design and engineering, construction, installation, commissioning, start-up, testing, performance and acceptance testing of the Work, including the price of all labor (including wages, salaries, insurance, taxes and benefits), services, materials, supplies, and equipment furnished under any contract for construction and installation of the Work or otherwise incurred in connection therewith (including the cost of PV modules for the Project), and including all charges of and payments to Subcontractors; (b) the premiums on all insurance required under this Agreement to be obtained and maintained by Contractor and its Subcontractors; (c) all expenses incurred in seeking to enforce any remedy against any Subcontractor with respect to any default under any contract with such Subcontractor; (d) all costs and expenses incurred in order to correct defective Work; (e) all costs and expenses associated with the re-testing of the Work or any portion thereof following a failure to meet a test, including the Capacity Tests (including the Initial Capacity Test and Final Capacity Test), Functional Tests and Annual Energy Tests; (f) all costs and expenses associated with providing the Warranty Service (including without limitation responding to claims, enforcement, investigation, etc.); (g) all costs and fees required to procure and maintain all Applicable Permits other than Owner Permits; (h) all shipping charges and all duties, fees, and royalties imposed with respect to any equipment, materials, labor or services incorporated into or used in performing the Work; and (i) all taxes paid or payable by Contractor in connection with the Work not otherwise allocated to Owner as provided herein.

5.3   <u>Sales/Use Taxes</u>.

5.3.1   The Contract Price is inclusive of any and all Taxes that may be imposed or assessed by any Governmental Authority on Contractor or any Subcontractor with respect to this Agreement or Contractor's installation of the Project and performance of the Work, other than Excluded Taxes.  Without limiting the generality of the foregoing, (i) Contractor shall timely pay all such Taxes (other than Excluded Taxes) due in connection with Work under this Agreement and shall make any and all payroll deductions required by any Applicable Law; (ii) Contractor shall provide Owner all certificates and other documentation necessary so that Owner will not be required to pay such Taxes (other than Excluded Taxes) with respect to the Work or any part of it and (iii) Contractor hereby authorizes Owner to perform any withholding for Taxes (other than Excluded Taxes) required under Applicable Law.

5.3.2   Excluded Taxes shall be the sole responsibility of Owner.  Without limiting the generality of the foregoing, (i) Owner shall timely pay all such Excluded Taxes; (ii) Owner shall provide Contractor all certificates and other documentation necessary so that Contractor will not be required to pay such Excluded Taxes with respect to the Work or any part of it and (iii) Owner hereby authorizes Contractor to perform any withholding for Excluded Taxes required under Applicable Law.

5.3.3   Owner and Contractor shall reasonably cooperate to minimize the Taxes of both Parties and shall take all steps reasonably necessary to ensure that Vermont sales and privilege Tax is minimized, including but not limited to providing sales Tax exemption certificates.

5.3.4   If any Governmental Authority notifies Owner that Owner will be subject to an audit or examination relating to Sales Taxes, Owner shall promptly provide Contractor with a copy of such notice from such Governmental Authority.  If any Governmental Authority notifies Owner that such Governmental Authority proposes to assess or impose or will assess or impose on Owner Sales Taxes or associated penalties or interest, Owner shall promptly provide Contractor with a copy of such notice from such Governmental Authority.  If any Governmental Authority assesses Sales Taxes, Contractor shall timely pay such Sales Taxes in accordance with the terms of such assessment unless Contractor reasonably determines that such assessment should be disputed.  If Contractor reasonably determines that such assessment should be disputed, Contractor may, at its sole cost and expense, file (or cause or direct Owner to file) such documents as are necessary to dispute such assessment.  Contractor shall control at its sole cost and expense, and Owner may participate in, any dispute, audit, examination, settlement, or other proceeding regarding Contractor's dispute of such assessment.  Contractor shall not submit (or cause to be submitted) any protest, appeal, settlement, brief, or documentation to any Governmental Authority in connection with its dispute of any such assessment without Owner first having had a reasonable opportunity to review and comment on such documentation.  Contractor shall consider and incorporate any reasonable comments and changes proposed by Owner.  The Parties shall reasonably cooperate with each other and assist each other in any dispute, audit, examination, settlement, or other proceeding relating to Sales Taxes.  If any Governmental Authority requires payment of any such proposed or assessed Sales Taxes in connection with Contractor's decision to continue to dispute such Sales Taxes, Contractor shall pay such Sales Taxes in accordance with Applicable Law.  Contractor shall remain liable for any and all such Sales Taxes that become due; provided that in the event of an audit or examination of Owner by any Governmental Authority regarding Sales Taxes, Contractor's reimbursement obligations hereunder shall be reduced to the extent any such Sales Taxes accrued or incurred by or levied upon Owner are attributable to

Owner's failure to comply with this <u>Section 5.3.4</u>.  If Owner subsequently receives any refund or credit for any Sales Taxes which Contractor has paid (or for which Contractor is liable) pursuant to this <u>Section 5.3.4</u>, Owner shall promptly pay to Contractor the full amount of such Sales Taxes refund or credit.  This <u>Section 5.3.4</u> shall not apply to any Sales Taxes treated as an Excluded Tax under <u>Section 5.3.3</u>.

5.3.5   If, after issuance of the Final Contractor's Invoice under <u>Section 6.1.5</u>, any Excluded Taxes are assessed or imposed upon Contractor or any Subcontractor, Owner shall promptly reimburse or pay to Contractor the amount of such Excluded Taxes.  If, after issuance of the Final Contractor's Invoice, any Taxes (other than Excluded Taxes) are assessed or imposed upon Owner in respect of the Work, Contractor shall promptly reimburse or pay to Owner the amount of such Taxes (other than Excluded Taxes) in accordance with this <u>Section 5.3</u>; <u>provided</u> that Owner shall provide reasonable documentary evidence detailing such Taxes (other than Excluded Taxes).

## 6.    TERMS OF PAYMENT

6.1    <u>Contractor Payments</u>.  Subject to the terms of <u>Section 6.1.1</u>, the Contract Price (plus any applicable Excluded Taxes) shall be paid by Owner to Contractor in connection with the achievement of Project milestones as set forth in <u>Exhibit Q (Milestone Payment Schedule)</u>. Each payment to Contractor under this <u>Section 6.1</u> shall be due and payable only to the extent it is supported, to Owner's reasonable satisfaction, by the completion of the applicable portion of the Work set forth in Contractor's Invoice raised on a monthly basis.

6.1.1   <u>Payment Assessment</u>.  Contractor and Owner may periodically review the Work completed and assess the progress of on-Site Work completed.  Owner's Engineer and any Independent Engineer may be present during such review and assessment of the Work.

6.1.2   <u>Contractor's Invoices</u>.   Contractor shall electronically deliver to Owner a Contractor's Invoice substantially in the form attached hereto as <u>Exhibit W (Form of Contractor's Invoice)</u> no later than the fifth (5th) Business Day of each month following the Commencement Date for each payment owing to Contractor under this <u>Article 6</u> and under any other provision of this Agreement for Work performed prior to such month. Each Contractor's Invoice shall be reasonably detailed and shall be accompanied by reasonable supporting documentation evidencing the achievement of the portion of the Work for which the payment is being requested and shall be accompanied by the Lien Waivers required to be delivered therewith as set forth below.  Within five (5) Business Days after the receipt of each Contractor's Invoice (including for the avoidance of doubt the Final Contractor's Invoice), Owner shall review such Contractor's Invoice to verify (i) completion of the Work for which payment is sought; (ii) that the Work conforms to the requirements of this Agreement; (iii) that such Contractor's Invoice and supporting documentation have been properly submitted and that Owner has received the Interim Lien Waivers and Final Completion Lien Waivers required to be delivered; and (iv) that the invoiced amount reflects the percent of each subcategory of the Work completed in the applicable timeframe.  Upon such verification and within five (5) Business Days from receipt of a Contractor's Invoice, Owner shall approve such Contractor's Invoice or shall advise Contractor if all or any portion of the application

is not approved. Owner shall provide all specific reasons in writing for any disapproval of a Contractor's Invoice or a portion thereof.  If Owner cannot approve a portion of a Contractor's Invoice, Owner shall nonetheless approve payment of the remaining portion of such Contractor's Invoice for Work performed in accordance with this Agreement.  Notwithstanding anything herein to the contrary (including the last sentence of Section 6.1 purporting to limit billing in advance of amounts set forth in Exhibit Q (Milestone Payment Schedule)), with regards to amounts due from Owner to Contractor hereunder that correspond to payments due from Contractor under a module supply agreement or purchase order for PV modules for the Project, Owner agrees that Contractor is entitled to invoice and be paid by Owner for such amounts ten (10) Business Days in advance of when the corresponding payments would be due from Contractor to its module vendor(s). Accordingly, Contractor may include in its monthly Contractor Invoice amounts associated with payments due from Contractor to its module vendor(s) in the subsequent month, and Owner agrees such amounts shall be due and owing as otherwise provided in Section 6 herein.  Contractor must provide proof of delivery documents in the form of an invoice or purchase order and bill of lading. If a bill of lading can't be supplied, a copy of the flash test data can be used until a bill of lading is available before issuing payment.

6.1.3    _Final Completion Payment_.  On or after the date on which Contractor delivers to Owner a Notice of Final Completion accepted by Owner pursuant to Section 11.6, Contractor shall submit a final Contractor's Invoice (a "**Final Contractor's Invoice**") which shall set forth all amounts due to Contractor that remain unpaid as of the date of such invoice (including (a) any remaining Punchlist Holdback that has not been released to Contractor in accordance with Section 6.7, (b) any remaining Excluded Taxes for which Owner is liable to indemnify Contractor under this Agreement and (c) any other amount due to Contractor hereunder) and shall be accompanied by the Final Completion Lien Waivers required to be delivered therewith pursuant hereto.  Owner shall pay to Contractor the amount due under such Final Contractor's Invoice (the "**Final Completion Payment**") in accordance with Section 6.4.  Notwithstanding the foregoing, the Final Completion Payment shall only become due and payable to Contractor if and only if all of the requirements of Final Completion set forth in Section 11.5 have been met.

6.1.4    _Lien Waivers_.

(a)    Each Contractor's Invoice (other than the Final Contractor's Invoice) shall include the following lien waivers and documents:

(i)    from Contractor, a conditional Interim Lien Waiver with respect to the payment specified in such Contractor's Invoice and an unconditional Interim Lien Waiver with respect to all payments previously made to Contractor prior to the payment specified in such Contractor's Application for Payment;

(ii)    from Contractor, a sworn construction statement and related documents and undertakings, in form and substance commonly used in the industry with respect to similar projects in Vermont and reasonably satisfactory to the applicable title company, for purposes of any title insurance (including any mechanics' lien endorsement) being issued with respect to the Project, which sworn construction statement shall specify the names of each Subcontractor for which payment for any Work is being made (including a statement of the amount being paid to such Subcontractor in connection with the current

payment that is the subject of such Contractor's Invoice, as applicable, and an aggregate amount which is then due and payable to each such Subcontractor for Work which was included within any Contract Price payments previously invoiced by Contractor, but not yet reimbursed to the applicable Subcontractor); and

(iii)    from each Major Subcontractor who performed Work with respect to each milestone or other portion of the Work referenced in such Contractor's Invoice, (A) a conditional Interim Lien Waiver (unless the applicable Major Subcontractor has completed all its Work under the applicable subcontract, in which case Contractor shall submit a conditional Final Lien Waiver for such Subcontractor) and (B) unless such Major Subcontractor has delivered a conditional Interim Lien Waiver pursuant to clause (A) above, an unconditional Interim Lien Waiver for all amounts previously paid to such Major Subcontractor from Progress Payments made prior to such Progress Payment; provided, that for any Major Subcontractor that has delivered a conditional Final Lien Waiver, within thirty (30) days after the receipt of such payment by Contractor, Contractor shall deliver an unconditional Final Lien Waiver from such Major Subcontractor.

(b)    The Final Contractor's Invoice shall include the following lien waivers and documents:

(i)    from Contractor and each Major Subcontractor to whom any final payment will be made from proceeds of such Final Payment, a conditional Final Lien Waiver; provided, that within thirty (30) days after the receipt of the Final Completion Payment by Contractor, Contractor shall deliver an unconditional Final Lien Waiver from Contractor and each such Major Subcontractor; and

(ii)    from Contractor, a sworn construction statement and related documents and undertakings, in form and substance commonly used in the industry and reasonably satisfactory to the applicable title company, for purposes of any title insurance (including any mechanics' lien endorsement) being issued with respect to the Project, which sworn construction statement shall specify the names of each Subcontractor for which the final payment for any Work is being made (including an aggregate not to exceed amount then remaining due and payable under each applicable subcontract but without detailing any mark-up of Contractor).

6.2    _Warranty Work_.  Any warranty work performed by Contractor pursuant to this Agreement shall be at the sole expense of Contractor.

6.3    _Undisputed Payments_.  Each Party shall pay any undisputed portion of any amount owed to other Party pursuant to this Agreement within twenty-five (25) days after receipt of the applicable invoice or demand for payment from the Party seeking payment.  Any undisputed payments not paid when due shall bear interest at a rate equal to the Prime Rate then in effect _plus_ five percent (5%) per annum.

6.4    _Disputed Payments_.  If a Dispute arises regarding the payments to be made to Contractor or Owner hereunder, Owner or Contractor, as applicable, shall pay all undisputed

amounts, and Owner and Contractor shall resolve the Dispute in accordance with the Dispute resolution provisions of Article 24.

6.5     Form and Manner of Payments.  All payments made pursuant to this Agreement shall be made by check or wire transfer of immediately available funds to a bank account to be designated by the Party receiving such payment.  Either Party may designate from time to time a different bank or account by notice to the other Party given not less than ten (10) Business Days prior to the payment date to which such payment instructions are to apply.  If the date for any payment called for under this Agreement should fall on a day that is not a Business Day at the location designated for receipt of such payment, then such payment may be made on the next succeeding Business Day in such location with the same effect as if made on the date due.

6.6     Effect of Payment.  Payment hereunder shall not constitute Owner's approval of any portion of the Work which has been determined not to be, or subsequently is determined not to have been, performed in accordance with the requirements of this Agreement.

6.7     Retainage.  Commencing on the date of issuance of the full Notice to Proceed under this Agreement, Owner may retain an amount equal to ten percent (10%) of each payment of the Contract Price (including any prior payment under a Limited Notice to Proceed) payable under this Agreement to Contractor (the "**Retainage**") pursuant to a Contractor's Invoice until such time as Contractor achieves Substantial Completion, subject to Section 6.8. Owner may at any time draw upon the Retainage to cure a Contractor Event of Default, for payment of any Delay Liquidated Damages, for payment of unpaid Subcontractors and to remove Contractor Liens filed by Subcontractors (which have not been removed or covered by a bond or other security reasonably acceptable to Owner and to the extent not arising from a failure by Owner to pay all amounts which are the subject of such Contractor Liens), for purposes of funding the Punchlist Holdback (if sufficient funds are not available in accordance with Section 6.8), to complete any unfinished Punchlist items, to complete or perform any work required for the Project to pass the tests contemplated under Article 10 and to apply to any other amounts due and payable to Owner by Contractor hereunder, including any Delay Liquidated Damages. Any interest on the Retainage shall accrue for the account of Owner and not Contractor.

6.8     Completion of Punchlist Items.

6.8.1   Punchlist Holdback. Concurrent with the payment to be made with respect to the achievement of Substantial Completion, Owner shall pay to Contractor the amount of the Retainage as provided in Section 6.7, less a hold back in an amount equal to one hundred fifty percent (150%) of the Punchlist Amount (the "**Punchlist Holdback**").

6.8.2   Release of Punchlist Holdback. As Contractor completes the Punchlist items pursuant to Section 11.1, Owner shall release to Contractor on a monthly basis that portion of the Punchlist Holdback withheld equal to the Punchlist Amounts for such completed Punchlist items in accordance with the Punchlist. As part of the Final Completion Payment, Owner shall release the amount of the Punchlist Holdback not previously released to Contractor pursuant to this Section 6.8.2.

6.9    <u>Withholding Payment</u>.    Notwithstanding any other provision to the contrary contained herein, Owner may withhold payments to Contractor hereunder, and Owner may decide not to certify payment or may nullify the relevant part of a certification for payment made pursuant to a previous Contractor's Invoice to such extent as may be necessary to protect Owner from loss because of: (i) third party claims filed for which Contractor is responsible (including Liens) against the Work, the Project or the Site, so long as payment therefor was previously made by Owner; (ii) the unexcused failure of Contractor to make payments when due to Subcontractors; (iii) damage to Owner or another contractor, for which Contractor is liable, including damage to the property of Owner or any of its Affiliates; (iv) Contractor's failure to carry out the scope of Work in accordance with this Agreement; (v) the occurrence of a Contractor event of default; and (vi) Contractor's failure to achieve Substantial Completion by the Guaranteed Substantial Completion Date; <u>provided</u>, <u>however</u>, the amount withheld or retained on account of clause (vi) or (vii) shall not exceed the amount of applicable Delay Liquidated Damages for which Contractor is liable hereunder; <u>provided</u>, <u>further</u>, that Owner shall also have the right to invoice Contractor for such Delay Liquidated Damages and, in such event, on the last day of each month during which Delay Liquidated Damages accrue (or the first Business Day thereafter), Owner shall provide Contractor with a statement of the amount of Delay Liquidated Damages accruing and owed since the previous statement, in addition to amounts unpaid from previous statements, if any, and Contractor shall pay any such Delay Liquidated Damages within thirty (30) days after receipt of such statement(s). Contractor shall not have any rights of termination or suspension under this Agreement as a result of Owner's exercise of its rights under this <u>Section 6.7</u>.  Owner shall release payments or portions of payment withheld pursuant to this <u>Section 6.7</u> within five (5) days from the date when the circumstance for which payment or the portion of payment has been withheld is resolved or the amount withheld is otherwise no longer needed to protect Owner.

**7.    COMMENCEMENT AND SCHEDULING OF THE WORK**

7.1    <u>Effectiveness of Agreement</u>.

(a)    Contractor's obligations to fully perform the Work (other than that portion of the Work set forth in one or more LNTPs) shall commence on the Commencement Date, which shall be the day the Owner issues the NTP to Contractor.  If Owner fails to issue the Notice to Proceed on or prior to sixty (60) calendar days from the issuance of the CPG ("**NTP Deadline**"), the Project Schedule milestone (as set forth in <u>Exhibit S</u>) shall be correspondingly extended, on a day-for-day basis, by the period of time of delay from NTP Deadline until the date on which Owner issues Notice to Proceed.

(b)    Prior to the Commencement Date, Owner may submit to Contractor one or more Notices in the form attached as <u>Exhibit M</u> (each, a "**Limited Notice to Proceed**" or an "**LNTP**"), describing any portion of the Work to be completed by Contractor. Upon mutual agreement between Owner and Contractor as to the terms of the LNTP (including, for the avoidance of doubt, the schedule and budget for Work described in the LNTP), Contractor shall commence such portion of the Work pursuant to the schedule specified in the LNTP, and such portion of the Work shall be subject to the terms of this Agreement. The Work, the activities of Contractor and any Project Hardware performed or furnished under an LNTP shall be part of the Work for all purposes hereunder. Owner shall pay Contractor all amounts due and payable for Work performed under any LNTPs agreed

between the Parties. Owner shall make such payment in accordance with the payment schedule set forth in the LNTP.

(c)    [INTENTIONALLY DELETED.]

7.2    Scheduling of the Work.

(a)    Contractor shall plan, supervise, control and coordinate the performance of the Work in accordance with the Project Schedule, including the Guaranteed Substantial Completion Date.  Contractor shall regularly obtain from Subcontractors information and data about the planning for and progress of the Work and the delivery of Project Hardware, shall coordinate and integrate such information and data into any updates to the status of the Work, and shall monitor the progress of the Work and the delivery of Project Hardware. Contractor shall act as the expeditor of its own forces and those forces of Subcontractors to prevent potential and actual Contractor-caused delays, interruptions, hindrances or disruptions.

(b)    Neither Owner's acceptance of, nor comments about, any schedule shall transfer responsibility for any schedule to Owner, nor imply Owner's agreement with (i) any assumption upon which such schedule is based or (ii) any matter underlying or contained in such schedule.  Failure of Owner to discover errors or omissions in schedules that it has reviewed, to inform Contractor that Subcontractors or others are behind schedule, or to direct or enforce procedures for complying with the Project Schedule shall not relieve Contractor from its sole responsibility to perform and complete the Work to achieve Substantial Completion by the Guaranteed Substantial Completion Date, and shall not be a cause for an adjustment of the Contract Price or the Guaranteed Substantial Completion Date.

7.3    Progress Reporting.  From and after the earlier of execution of an LNTP or the Commencement Date and until the Substantial Completion Date, Contractor shall prepare a Monthly Progress Report, which shall be submitted to Owner no later than five (5) Business Days after the close of each calendar month. If requested by Owner, Contractor's Manager (or his designee) shall attend scheduled meetings between representatives of Owner and Utility to discuss construction progress.  In addition, Contractor shall schedule and hold a monthly meeting with Owner to discuss the Monthly Progress Report, including any delays or changes to the Project Schedule and Contractor's planned work for the next month.

**8.    EXCUSABLE EVENT**

8.1    Certain Events.  No failure or omission to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim against a Party, or be deemed to be a breach or an Event of Default under this Agreement, if such failure or omission shall be caused by or arise out of an Excusable Event; provided that the Party claiming relief complies with the provisions of this Article 8.  Notwithstanding anything to the contrary in the foregoing, the obligation to pay money in a timely manner in accordance with the terms hereof shall not be subject to the Excusable Event provisions hereof.

8.2     Notice of Excusable Event.  If a Party's ability to perform its obligations under this Agreement is affected by an Excusable Event, the Party claiming relief shall give to the other Party (a) verbal or email notification describing the particulars of the Excusable Event within forty-eight (48) hours after such Party becomes aware of the occurrence of the Excusable Event (but in no event later than two (2) Business Days after the initial occurrence of the Excusable Event) and (b) Notice describing the particulars of the Excusable Event as soon as is reasonably practicable and in any event within five (5) Business Days after when the Party becomes aware of the Excusable Event and its impact on the Work describing in reasonable detail the particulars of the occurrence giving rise to the claim, including what date the Party claiming relief became aware of the occurrence of such event and an estimate of the event's anticipated duration and effect upon the performance of its obligations, and any action being taken to avoid or minimize its effect.  The Party claiming relief due to an Excusable Event shall have a continuing obligation to deliver to the other Party regular updated reports and any additional documentation and analysis supporting its claim regarding an Excusable Event (other than an Owner-Caused Delay) promptly after such information becomes available to such Party.

8.3     Excusable Event Conditions.  Upon the occurrence of an Excusable Event:

(a)     the suspension of, or impact on, performance due to such Excusable Event shall be of no greater scope and no longer duration than is required by such event (taking into account the obligations affected thereby);

(b)     the Party claiming relief due to an Excusable Event shall use its commercially reasonable efforts:

(i)     to mitigate or limit the duration of, and costs arising from, any suspension or delay in, or other impact to, the performance of its obligations under this Agreement (including any impact to the schedule for the performance thereof);

(ii)    to continue to perform its obligations hereunder not affected by such event; and

(iii)   to correct or cure the effect of such event; and

(c)     when the Party claiming relief due to such Excusable Event is able to resume performance of its affected obligations under this Agreement, such Party shall give the other Party Notice to that effect and promptly resume performance of all of its obligations under this Agreement.

8.4     Contractor's Remedies.  As Contractor's remedy for the occurrence of an Excusable Event, and provided that Contractor has otherwise materially complied with the applicable provisions of Article 8, if an Excusable Event occurs, and to the extent such Excusable Event has an actual and demonstrable adverse impact on Contractor's ability to perform its obligations hereunder so as to achieve the Guaranteed Substantial Completion Date: (a) the Project Schedule and the Guaranteed Substantial Completion Date shall be correspondingly extended by the period of time (if any) that Contractor's achievement of Substantial Completion is actually and demonstrably delayed as a result of the impact of such an Excusable Event, and (b) if Contractor's costs increase despite Contractor's commercially reasonable efforts to mitigate any such increases,

the Contract Price shall be increased by an amount equal to the actual and reasonably substantiated costs (including all Taxes other than those based on net income) incurred by Contractor (including any costs incurred by Contractor in connection with the mitigation measures implemented by Contractor and any demobilization and re-mobilization costs). If the Excusable Event is the result of an Owner-Caused Delay, Contractor shall be entitled to an additional markup of ten percent (10%) of such costs; in all other circumstances, Contractor's recovery of costs incurred shall be limited to Contractor's actual and direct costs with no markup for profit. In all cases, Contractor shall use its commercially reasonable efforts to overcome or mitigate the effects of such occurrence without seeking a Change Order.

8.4.1    Changes In Work. Upon the occurrence of an event that entitles Contractor to relief under this Article 8, and subject to Contractor's compliance with the applicable provisions of this Article 8 and Article 13, Contractor and Owner shall prepare a Change Order in accordance with Article 13.

## 9. SUBCONTRACTORS

9.1    Use of Subcontractors. The Parties acknowledge and agree that Contractor shall be entitled to engage Subcontractors in respect of the performance of the Work or portion thereof; provided that neither the use by Contractor of any Subcontractor nor the review or failure to object by Owner of any Major Subcontractor under this Article 9 or Exhibit J (Major Subcontractors) shall (a) constitute any Owner approval of the Work undertaken by any such Person, (b) relieve Contractor of its duties, responsibilities, obligations or liabilities hereunder, (c) relieve Contractor of its responsibility for the performance of any Work rendered by any such Subcontractor, or (d) create any relationship between Owner, on the one hand, and any Subcontractor, on the other hand, or cause Owner to have any responsibility for the actions or payment of such Person. As between Owner and Contractor, Contractor shall be solely responsible for the acts, omissions or defaults of its Subcontractors and any other Persons for which Contractor or any such Subcontractor is responsible (with the acts, omissions and defaults of its Subcontractors being attributable to it). In no event shall any act or omission by any Subcontractor constitute an Excusable Event except to the extent caused by an event or circumstance that itself constituted an Excusable Event.

9.2    Owner Consent. Set forth in Exhibit J (Major Subcontractors) is a schedule of the Major Subcontractors who, notwithstanding anything to the contrary herein, Contractor shall be entitled to engage in furtherance of Contractor's obligations under this Agreement without the consent of Owner. Contractor shall Notify Owner of any additional suppliers or subcontractors with whom Contractor anticipates engaging that, if engaged, would be deemed a Major Subcontractor. Owner shall have the right to review and approve such engagement, such approval not to be unreasonably withheld or delayed. Following such Owner approval, Exhibit J shall be deemed to be amended to reflect such additional approved Major Subcontractor (which thereafter shall be deemed a Major Subcontractor, as applicable).

9.3    Assignment.

9.3.1    No Subcontract or purchase order shall bind or purport to bind Owner, but each Subcontract and purchase order with a Major Subcontractor shall provide for assignment of such Subcontract or purchase order to Owner or, at Owner's request, to the Owner Financing Parties,

upon the termination of this Agreement (a) due to a Contractor Event of Default and (b) in accordance with Section 16.6.

9.3.2    Contractor hereby assigns to Owner all its interest in all Subcontracts and purchase orders now existing or hereafter entered into by Contractor for performance of any part of the Work, which assignment will be effective only upon acceptance by Owner in writing, and only after the earlier to occur of Substantial Completion or termination of this Agreement, and only as to those Subcontract agreements and purchase orders that Owner designates in said writing. Such assignment may not be withdrawn by Contractor, and Owner may accept said assignment at any time during the course of construction, throughout the Warranty Period and throughout the term of such Subcontract or purchase order, if longer. Upon such acceptance of assignment by Owner: (a) Contractor shall promptly furnish to Owner the originals or copies of the designated Subcontract agreements and purchase orders, and (b) Owner shall only be required to compensate the designated Subcontractor(s) for compensation accruing to same for Work done or materials delivered from and after the date as of which Owner accepts assignment of the Subcontract agreement(s) or purchase order(s) in writing. All sums due and owing by Contractor to the designated Subcontractor(s) for Work performed or material supplied prior to the date as of which Owner accepts in writing the assignment of such Subcontract agreement(s) or purchase order(s), and all other obligations of Contractor accruing prior to Owner's written acceptance of such assignment, shall constitute an obligation solely between such Subcontractor(s) and Contractor, and Owner shall have no liability with respect to such sums or any other obligations of Contractor, to the extent that Owner has paid Contractor all amounts payable to Contractor under this Agreement, with respect to such obligations prior to the date on which Owner accepts assignment. If Owner elects so to assume by notice of acceptance of assignment any such subcontract agreement or purchase order with a Major Subcontractor as described in this Section 9.3, or to have any such subcontract agreement or purchase order assigned to an Owner Financing Party, then, at the written request of Owner, Contractor shall enter into reasonable assignment documentation requested by Owner confirming the effectiveness of such assignment as between the Parties.

9.4    Other Terms in Subcontracts.  All Subcontracts between Contractor and any of its Affiliates and its or their direct Subcontractors, as well as all Major Subcontractors, shall be consistent with the requirements of this Agreement, insofar as applicable.  All Subcontracts with suppliers of Major Project Hardware shall include the minimum warranties for such Major Project Hardware set forth on Exhibit T (Major Project Hardware Warranties).

9.5    Information; Access.  Contractor shall furnish Owner with (a) reports received from the Subcontractors or Contractor relating to recall notices, defect notices or other similar product communications and (b) such information and access to the Major Subcontractors and any Supplier(s) of PV modules, in each case, as Owner may reasonably request with respect to the subject of clause (a) above.

9.6    Subcontractor Safety; Removal.  No personnel of Contractor or any Subcontractor on the Site or at the Project shall be under the influence of, or in possession of, any alcoholic beverage or controlled substance (except as prescribed by a physician, so long as the performance or safety of the Work is not affected thereby). Contractor shall implement, maintain and enforce a written alcohol and drug abuse policy with respect to its personnel, as may from time to time be

revised, consistent with the requirements of <u>Exhibit D (Project Health and Safety Plan)</u>, and shall cause Subcontractors to abide by the terms of such alcohol and drug policy. Owner may (in its sole discretion) dismiss from the Site any personnel of Contractor or Subcontractor that Owner has determined undermines the safety of the Site or Project or is non-compliant with <u>Exhibit D</u>.

## 10. COMMISSIONING AND TESTING

10.1 <u>Commissioning</u>. Contractor shall perform its commissioning activities in accordance with <u>Exhibit H (Commissioning and Testing)</u>. Contractor shall provide three (3) Business Days' notice to Owner prior to commencing commissioning activities.

10.2 <u>Capacity Test</u>. Contractor shall conduct the Capacity Test for the Project in accordance with <u>Exhibit H (Commissioning and Testing)</u>. If the Project does not pass the Capacity Test, Contractor shall take corrective action and repeat the Capacity Test until the Capacity Test is Successfully Run. Contractor shall perform such corrective action at Contractor's sole cost and expense. If Contractor cannot achieve a Successfully Run Capacity Test, Contractor shall pay to Owner the Capacity Liquidated Damages as and when required under <u>Article 12</u>. Each of the Parties and its representatives (including Owner's Engineer) shall have the right to be present during and to observe any Capacity Test conducted under this Agreement. Contractor must submit a test report for the Capacity Test within five (5) days after the completion thereof.

10.2.1 <u>Capacity Test Schedules</u>. Contractor shall give advance Notice to Owner at least three (3) days prior to commencing the Capacity Test; <u>provided</u> that re-performance of tests shall require only two (2) days' notice. Contractor shall keep the Owner Representative continuously apprised of the schedule for all testing and changes in the schedule, and the commencement and performance of any tests.

10.3 <u>Annual Energy Test</u>. Contractor shall conduct the Annual Energy Test in accordance with <u>Exhibit H (Commissioning and Testing)</u>. Contractor shall give advance Notice to Owner at least three (3) days prior to commencing the Annual Energy Test. Contractor must submit a test report for the Annual Energy Test within ten (10) Business Days after the completion thereof.

10.4 <u>Access for Annual Energy Test</u>. Commencing on the Substantial Completion Date and until the completion of the Annual Energy Test, Owner shall provide Contractor with:

(a) reasonable access on a daily basis to the Project and reasonable access to the operating personnel;

(b) access to all Project maintenance records and all data required to be collected in accordance with <u>Exhibit H (Commissioning and Testing)</u>; and

(c) subject to compliance by Contractor with Applicable Law and Applicable Permits and subject to Owner's ability to obtain any necessary approvals therefor required under the Financing Documents, Owner shall make the land on the Site available to Contractor to add, construct or otherwise install additional arrays to the existing arrays then-installed as part of the Project, subject to Contractor complying with all other requirements of this Agreement in connection with such construction, installation and

operation.  Contractor shall be responsible for acquiring all Applicable Permits for such installation, and the terms of each such Applicable Permit shall be reasonably acceptable to Owner.

10.5   Non-Conforming Work.  If, as a result of any inspection, examination or testing in accordance with this Agreement, Owner identifies any defective Work not in compliance with the requirements of this Agreement, and regardless of whether payment has been made therefor, Owner may reject such portion of the Work prior to the Substantial Completion Date by prompt Notice to Contractor.  Such Notice shall describe such defect in reasonable detail.  Contractor shall, at its sole cost and expense, promptly correct any such defect (except if such defect is a Non-Critical Deficiency, in which case it shall be included on the Punchlist) and promptly provide Notice to Owner that such corrective measures have been completed.  Any Dispute regarding the existence or correction of any such defect shall be resolved pursuant the Dispute resolution provisions hereof.

## 11.   PUNCHLIST; COMPLETION

11.1   Punchlist.

11.1.1   Creation of Punchlist.   Once Contractor believes that a finalized punchlist containing only Non-Critical Deficiencies for the Project is ready for Owner review and approval, Contractor and Owner shall jointly walk-down the Project and confer together as to the items which should be included on the finalized punchlist for the Project.  Contractor shall then create a new list to reflect the result of such joint walk down and deliver the same to Owner for its review and approval, which submitted list shall be explicitly designated as the "**Proposed Punchlist**" and shall set forth all Work remaining to be completed after the Substantial Completion Date.  The Proposed Punchlist may only contain Non-Critical Deficiencies in the Work, and shall include a "**Punchlist Amount**" for the completion or repair of each such Non-Critical Deficiency and Contractor's estimated schedule for completion therefor.  If Owner does not approve the Proposed Punchlist or deliver any changes to the Proposed Punchlist to Contractor within five (5) Business Days after the later to occur of (a) Contractor's submission to Owner of such Proposed Punchlist, and (b) two (2) Business Days after the date of the joint walk-down, then such failure shall constitute an Owner-Caused Delay.  The Proposed Punchlist that is ultimately approved by Owner for the Project shall be referred to as the "**Punchlist**".

11.1.2   Completion of Punchlist.   Contractor shall proceed promptly to complete and correct all items on the Punchlist.  On a monthly basis after the Substantial Completion Date, Contractor shall revise and update the Punchlist to include the date(s) that items listed on such Punchlist are completed by Contractor and accepted by Owner; Contractor shall be able to invoice monthly for completed Punchlist items.  Notwithstanding any of the foregoing, the items listed on such Punchlist shall not be considered complete until Owner shall have inspected such Non-Critical Deficiencies and acknowledged, by notation on the updated Punchlist, that such item of Work is complete.  If Owner does not so inspect and deliver such notations on the updated Punchlist to Contractor (or dispute completion of the applicable items of Work if not accepted) within five (5) Business Days after Contractor submits the updated Punchlist containing such Punchlist item to Owner, and Contractor has actually completed and corrected any such Punchlist item listed on such Punchlist, such failure by Owner shall constitute an Owner-Caused Delay.

11.2   <u>Mechanical Completion</u>.   The following are the conditions precedent for Mechanical Completion:

(a)   the Project is mechanically completed, assembled, erected and installed in accordance with all specifications and otherwise in accordance with this Agreement, is free from detectable and patent defects and deficiencies in installation, so that facility is ready for Backfeed Power and may commence commissioning and thereafter be Interconnected;

(b)   Owner has received Module Data satisfactory to Owner that demonstrates that the Installed Module Capacity is equal or greater to the Required Module Capacity;

(c)   the Project, once Interconnected, will be ready for start-up and thereafter could be operated without damage to the Project, the Site or any other property and without injury to any Person; and

(d)   all Pre-Functional Tests of the Project have been Successfully Run**.**

When Contractor believes that it has satisfied the conditions to Mechanical Completion as set forth above, Contractor shall deliver to Owner a Notice of Mechanical Completion, together with reasonable supporting documentation evidencing the satisfaction of the conditions to Mechanical Completion set forth above.   Owner shall, within five (5) Business Days after receipt of such Notice of Mechanical Completion, deliver its countersignature to such Notice of Mechanical Completion, or if Owner rejects Contractor's Notice, respond in writing, giving its reasons for such rejection.   Thereafter, Contractor shall take the appropriate corrective action.   Upon completion of such corrective action, Contractor shall provide to Owner a new Notice of Mechanical Completion for approval.   This process shall be repeated on an iterative basis until Owner accepts the Notice of Mechanical Completion, as applicable, and delivers its countersignature to such Notice of Mechanical Completion.  The "**Mechanical Completion Date**" shall be the date on which Contractor signed and dated the Notice of Mechanical Completion, as the case may be, provided such Notice of Mechanical Completion is accepted and agreed by Owner.  From the date Contractor submits a Mechanical Completion Notice until the date Owner delivers the Mechanical Completion Certificate, Contractor shall not Interconnect the Project to the transmission grid without Owner's prior written approval.

11.3   <u>Substantial Completion</u>.  Subject to <u>Section 11.4</u>, the following are the conditions precedent for Substantial Completion:

(a)   Mechanical Completion shall have been achieved;

(b)   (i) all instruments and relays have been installed and are functional and (ii) all required protective and control features are operational;

(c)   to the extent in Contractor's scope of Work and control, and subject to relief for schedule delays not caused by Contractor, the Project is synchronized with the transmission system and all testing under the PPA required as a condition to commencing Commercial Operation (as defined in the PPA), including testing required by Utility for delivery of electricity, has been satisfactorily completed;

(d)    all COD-Functional Tests of the Project have been Successfully Run;

(e)    all interconnection facilities have been satisfactorily completed and the Project has been Interconnected;

(f)    the Project is capable of unattended operation in a safe manner without damage to the Project or any sub-system thereof, or any other property on or off the Site, and without injury to any Person in compliance with the Performance Requirements and any other standards of performance set forth herein;

(g)    Owner has received all Contractor Deliverables in respect of the Project that are required to be delivered by the Substantial Completion Date, including all Required Manuals identified therein, in accordance with the requirements in Exhibit B (Contractor Deliverables);

(h)    the Punchlist for the Project is in final form as provided for in Section 11.1;

(i)    the Initial Capacity Test has been Successfully Run;

(j)    the results of the Initial Capacity Test reflect achievement of the Minimum Guaranteed Capacity, and where Contractor has failed to achieve the Guaranteed Capacity, Contractor has paid to Owner the Initial Capacity Liquidated Damages;

(k)    Contractor has provided, as applicable, a Substantial Completion Lien Waiver as required pursuant to Section 21.3;

(l)    Contractor has delivered the Notice of Substantial Completion to Owner pursuant to Section 11.4;

(m)    the Project complies with all Applicable Laws, and Industry Standards, and has passed all required tests and has been inspected, reviewed and approved for operation by any applicable Governmental Authority to the extent required by Applicable Law; and

(n)    Contractor has paid all undisputed Delay Liquidated Damages, if any, required to have been paid pursuant to Section 6.7.

11.4    Notice of Substantial Completion.  When Contractor believes that it has satisfied the provisions of Section 11.3, Contractor shall deliver to Owner a Notice of Substantial Completion, together with reasonable supporting documentation evidencing the satisfaction of the provisions in Section 11.3.  Owner shall, within ten (10) Business Days after receipt of such Notice of Substantial Completion, deliver its countersignature to such Notice of Substantial Completion, or if Owner rejects Contractor's Notice, respond in writing, giving its reasons for such rejection. Thereafter, Contractor shall take the appropriate corrective action.  Upon completion of such corrective action, Contractor shall provide to Owner a new Notice of Substantial Completion for approval.  This process shall be repeated on an iterative basis until Owner accepts the Notice of Substantial Completion, as applicable, and delivers its countersignature to such Notice of Substantial Completion.  The "**Substantial Completion Date**" of the Project shall be the date on

which Contractor signed and dated the Notice of Substantial Completion, provided such Notice of Substantial Completion is accepted and agreed by Owner.

11.5    Final Completion.  Subject to Section 11.6, "**Final Completion**" shall occur only if all of the following have occurred:

(a)    Substantial Completion shall have been achieved;

(b)    all items on the Punchlist shall have been completed by Contractor (other than any items for which Owner has corrected any defects pursuant to Section 14.3.2 and for which Contractor has paid Owner in accordance with Section 14.3.2);

(c)    the Final Capacity Test of the Project has been Successfully Run, if necessary;

(d)    all Contractor's and Subcontractors' personnel shall have left the Site, and all supplies, tools, equipment, machinery, surplus materials, waste materials, rubbish and construction facilities other than those to which Owner holds title shall have been removed from the Site (other than Contractor's personnel, supplies, tools, machinery, materials and equipment required for the performance of its obligations under all operations and maintenance agreements executed between the Parties, if applicable);

(e)    Contractor shall have delivered to Owner all Contractor Deliverables in accordance with the requirements set forth in Exhibit B (Contractor Deliverables);

(f)    Contractor shall have delivered the Notice of Final Completion to Owner pursuant to Section 11.6;

(g)    Contractor has provided, as applicable, any remaining Final Lien Waivers as required pursuant to Section 21.4; and

(h)    Owner has received from Contractor all final as-built drawings (PDF & CAD files) for the Work and the other documents and information required by the Utility.

11.6    Notice of Final Completion.  When Contractor believes that it has satisfied the provisions of Section 11.5, Contractor shall deliver to Owner a Notice of Final Completion, together with reasonable supporting documentation evidencing the satisfaction of the provisions in Section 11.5.  Owner shall, within ten (10) Business Days after receipt of such Notice of Final Completion, deliver its countersignature to such Notice of Final Completion, or if Owner rejects Contractor's Notice, respond in writing, giving its reasons for such rejection.  Thereafter, Contractor shall take the appropriate corrective action.  Upon completion of such corrective action, Contractor shall provide to Owner a new Notice of Final Completion for approval.  This process shall be repeated on an iterative basis until Owner accepts the Notice of Final Completion, as applicable, and delivers its countersignature to such Notice of Final Completion.  The "**Final Completion Date**" of the Project shall be the date on which Contractor signed and dated the Notice of Final Completion, provided such Notice of Final Completion is accepted and agreed by Owner.

11.7 <u>Contractor's Access After Substantial Completion</u>. Following Substantial Completion, Owner shall provide Contractor with reasonable and timely access to the Project to: (a) complete all remaining items on the Punchlist and (b) satisfy the other requirements with respect to the Project for Final Completion. Contractor shall perform any Work after Substantial Completion with minimal interference with commercial operation of the Project or any portion thereof and so that reductions in and shut-downs of all or part of the Project's operations will be required only when necessary, taking into consideration the length of the proposed reduction or shut-down, and Owner's obligations and liabilities under the PPA. Notwithstanding the foregoing, should a reduction in or shut-down of all or part of the Project's operations be required to complete any items on the Punchlist, then such reduction or shutdown shall be scheduled by Owner, acting reasonably, and Contractor shall complete such Work during such Owner scheduled reduction or shut-down. Contractor acknowledges that Owner may schedule such reduction or shut-down at any time including off-peak hours, nights, weekends and holiday. For the avoidance of doubt, during the Capacity Test Cure Period, if any, Owner shall have the right to operate the Project, including the right to maximize the economic benefits of the Project.

11.8 <u>Energy and Revenues of the Project</u>. Any Energy or revenues generated by the Project at any time, including during the performance of any testing, shall be solely for the benefit of Owner.

## 12. LIQUIDATED DAMAGES

12.1 <u>Delay Liquidated Damages</u>. Contractor agrees that if Substantial Completion is not achieved by the Guaranteed Substantial Completion Date, then Contractor shall pay the Delay Liquidated Damages to Owner for each day that Contractor fails to achieve Substantial Completion after the Guaranteed Substantial Completion Date.

12.2 <u>Capacity Liquidated Damages</u>.

12.2.1 Contractor agrees that if based on the results of the Initial Capacity Test, the Project shall have failed to satisfy the Minimum Guaranteed Capacity, Contractor shall pay to Owner upon Substantial Completion an amount equal to the Initial Capacity Liquidated Damages. Upon payment of the Final Completion Payment pursuant to <u>Section 6.1.5</u>, any Initial Capacity Liquidated Damages paid by Contractor to Owner shall either be (a) returned to Contractor in the amount payable to Contractor pursuant to <u>Section 12.2.2</u> as part of the Final Completion Payment payable in accordance with <u>Section 6.1.5</u> or (b) retained by Owner in an amount equal to (i) the amount remaining, if any, after payment to Contractor of the amount due to Contractor pursuant to <u>Section 12.2.2</u> or (ii) the amount of Initial Capacity Liquidated Damages plus the amount paid by Contractor pursuant to <u>Section 12.2.3</u>.

12.2.2 After achieving Substantial Completion, Contractor, may, at its option and at its sole cost and expense, continue to attempt to achieve the Minimum Guaranteed Capacity, until the date that is ninety (90) days after the Guaranteed Substantial Completion Date (such period, the "**Capacity Test Cure Period**"). Contractor may, in its sole discretion, terminate the Capacity Test Cure Period at any time prior to the end of the Capacity Test Cure Period by Notice to Owner.

12.2.3  Owner shall pay to Contractor as part of the Final Completion Payment payable in accordance with Section 6.1.5 the amount (if any) by which the Initial Capacity Liquidated Damages paid by Contractor or set-off by Owner against unpaid portions of the Contract Price exceed the Final Capacity Liquidated Damages.  At the time the Final Completion Payment is due, Contractor shall pay to Owner in accordance with Section 6.1.5 the amount (if any) by which the Final Capacity Liquidated Damages exceed the Initial Capacity Liquidated Damages paid by Contractor or set-off by Owner against unpaid portions of the Contract Price.

12.3    Energy Liquidated Damages.  If Contractor does not achieve a Successfully Run Annual Energy Test, Contractor shall pay to Owner Liquidated Damages in accordance with Exhibit H (Commissioning and Testing) (the "**Energy Liquidated Damages**").  Notwithstanding the foregoing, Contractor's obligations with respect to Energy Liquidated Damages shall not be effective or enforceable against Contractor until (and only if) the Parties (or their respective Affiliates) have entered into an operations and maintenance agreement with respect to the Project.

12.3.1  Reporting.  In addition to any other reporting requirements under this Agreement, Contractor shall provide a monthly report to Owner no later than ten (10) Business Days after the close of each calendar month during which Contractor carries out the Annual Energy Test describing in reasonable detail the activities carried out.

12.4    Sole Remedy; Liquidated Damages Not a Penalty.  The remedies provided for in this Article 12, shall, in addition to Owner's rights to terminate this Contract, be the sole and exclusive remedies of Owner for failure of Contractor or the Project (a) to achieve Substantial Completion by the Guaranteed Substantial Completion Date, (b) to achieve the Minimum Guaranteed Capacity, and (c) to achieve the Minimum Guaranteed Generation.  The Parties agree that Owner's actual damages in the event of such delay or failure may be extremely difficult or impracticable to determine.  After negotiation, the Parties have agreed that the Delay Liquidated Damages, Initial Capacity Liquidated Damages, Final Capacity Liquidated Damages and Energy Liquidated Damages are in the nature of liquidated damages and are a reasonable and appropriate measure of the damages that Owner would incur as a result of such delays or failures, and do not represent a penalty.

12.5    Enforceability.  The Parties explicitly agree and intend that the provisions of this Article 12 shall be fully enforceable by any tribunal exercising jurisdiction over any Dispute between the Parties arising under this Agreement.  Each Party hereby irrevocably waives any defenses available to it under law or equity relating to the enforceability of the liquidated damages provisions set forth in this Article 12.

## 13.    CHANGES IN THE WORK

13.1    Change In Work.  A "**Change In Work**" shall be limited to the following: (a) changes in the Work required by Owner as further described in Section 13.2; (b) the addition to, modification of, or deletion from the Work (performed or yet to be performed) during the performance of the Work mutually agreed to by the Parties in writing; (c) the occurrence of an Excusable Event (as and only to the extent permitted by Section 8.4); and (d) changes in the Work caused by or resulting from the existence of Hazardous Materials at the Site prior to the Effective Date (other than any changes in the Work caused by or resulting from the Non-Excusable Event).

DB1/ 100666373.3

13.2    By Owner.  Subject to Section 13.3, Owner shall have the right to make changes in the Work, within the general scope thereof, whether such changes are modifications, alterations or additions to the Work or accelerations or decelerations of any aspect of the Work (each such change, an "**Owner-Instituted Change**").  All Owner-Instituted Changes shall be made in accordance with this Article 13, shall be documented in accordance with Section 13.3 and shall be considered, for all purposes of this Agreement, as part of the Work.   Notwithstanding the foregoing, in no event shall Owner have the right to make any Owner-Instituted Changes, whether individually or in the aggregate, that would result in: (a) any portion of the Project being located at a site other than the Site; (b) any adverse effect on any portion of the Project being able to conduct or satisfy any of the tests provided for in this Agreement, including any Functional Test or Capacity Test, or any other adverse effect whatsoever on the capacity or potential capacity of any portion of the Project or the ability of Contractor to cure any shortfalls in such capacity; or (c) any adverse effect on Contractor's ability to comply with its warranty obligations or any of its other obligations under this Agreement or Contractor's ability to enforce any of its rights and remedies hereunder.

13.3    Preparation of Change Order.

13.3.1  Due to Owner-Initiated Change or Change in Work agreed to by the Parties.  Upon the occurrence of any of the events set forth in Section 13.1(a) or Section 13.1(b), Owner or Contractor, as applicable, shall provide the other Party with a Notice of the occurrence of such event, and Contractor shall, as soon as practicable, prepare and submit to Owner a preliminary written estimate relating to the proposed Change In Work, including (a) any projected change in the cost of the performance of the Work and any projected modification of the Contract Price occasioned by such Change In Work, and (b) the effect such Change In Work could be expected to have on the Guaranteed Substantial Completion Date.  Contractor's cost of any such Change in Work shall include and identify all elements of cost (without the cost of each such element) and a total lump sum cost calculated as follows: the actual and reasonably substantiated costs incurred by Contractor (including all Taxes other than those based on net income) and a profit margin of ten percent (10%) over any costs incurred.  Owner shall within ten (10) Business Days review and respond to such request, accepting or rejecting the change request or requesting additional information or time for review.  During this period or after Owner returns comment to the change request, Contractor may choose to modify or remove the change request.  Should Owner desire to request a decrease or increase in the Work or schedule from Contractor, Owner shall assemble and deliver to Contractor in writing the requested change in scope or schedule.  Contractor shall within (10) Business Days, return comment to the requested change including the proposed addition or reduction in costs and schedule.  Owner shall, upon receipt of such information and within an additional (10) days, respond to Contractor either accepting the proposal by Contractor or rejecting it.  In either situation, both Parties shall work together to resolve any open change requests or modifications to the price and schedule of the Project.  If the Parties cannot reach agreement on the matters listed in the Change Order submitted pursuant to this Section 13.3.1, such matter shall be referred to Dispute resolution provisions hereof.

13.3.2  Due to an Excusable Event.  If an Excusable Event occurs for which Contractor is entitled to an adjustment to the Project Schedule or the Contract Price pursuant to Section 8.4, as applicable, then Contractor shall, as soon as practicable, prepare and submit to Owner a proposed Change Order, which shall include (a) any change in the Contract Price occasioned by such Change

In Work and (b) the effect such Change In Work could be expected to have on the Project Schedule, as and to the extent provided in Section 8.4 or as otherwise contemplated in Section 13.1 and as set forth in the Change Order accepted by Owner.  Owner shall within ten (10) Business Days review and respond to such request, accepting or rejecting the change request or requesting additional information or time for review.  During this period or after Owner returns comment to the change request, Contractor may choose to modify or remove the change request.  Should Owner desire to request a decrease or increase in the Work or schedule from Contractor, Owner shall assemble and deliver to Contractor in writing the requested change in scope or schedule.  Contractor shall within (10) Business Days, return comment to the requested change including the proposed addition or reduction in costs and schedule.  Owner shall upon receipt of such information, with an additional (10) days respond to Contractor either accepting the proposal by Contractor or rejecting it.  In either situation, both Parties shall work together to resolve any open change requests or modifications to the price and schedule of the project.  If the Parties cannot reach agreement on the matters listed in the Change Order submitted pursuant to this Section 13.3.2, such matter shall be referred to Dispute resolution hereunder.

13.4    Unable to Agree on Change of Work.  Notwithstanding anything herein to the contrary, where the Parties are unable to agree on a Change in Work, Owner may direct Contractor to implement a Change in Work that is generally consistent with Contractor's scope of Work hereunder and in compliance with the limitations set forth in Section 13.2, in which event Contractor shall proceed with such Change in Work and Contractor shall be entitled to reimbursement in accordance with the procedures set forth in Section 13.3.1 for any additional costs and expenses incurred in connection with such Change in Work and any other changes if not agreed to by the Parties, subject to the Dispute resolution hereunder.

13.5    No Change Order Necessary for Emergency.  Contractor shall not be obligated or required to obtain an executed Change Order if immediate action is reasonably required to address an emergency which endangers human health or property; provided that Contractor shall promptly Notify Owner of such emergency and shall seek a Change Order in accordance with Article 13 with respect to any costs associated with such emergency after the initial immediate action has been completed; and provided, further that Contractor shall use commercially reasonable efforts to mitigate or limit the duration of, and costs arising from, and to correct or cure the effect of, such emergency.

14.    **WARRANTIES CONCERNING THE WORK**

14.1    Warranty.  Contractor warrants that (a) the Work and every component thereof will be performed (including, as applicable, by any Subcontractor) in accordance with the Performance Requirements and any other standards of performance set forth in this Agreement, and that all equipment, goods and materials furnished by Contractor (or any Subcontractor) hereunder will be new and free of defects in design, application, engineering, materials, installation, construction and workmanship, and (b) each applicable item of Major Project Hardware shall conform to the applicable warranty requirement set forth on Exhibit T (Major Project Hardware Warranties).

14.2    Warranty Period.  The warranty set forth in Section 14.1 above shall commence on the Effective Date and apply for a period equal to eighteen-months (18) months after the Substantial Completion Date; provided that the warranty period for any Work or Major Project

Hardware or other item or part required to be re-performed, repaired or replaced following discovery of a defect or other non-compliance with its warranty shall continue until the later of (a) the expiration of the then applicable term of the Warranty Period or one (1) year from the date of completion of such repair or replacement (as such period may be extended as provided in below, the "**Warranty Period**").  In the event any portion of the Work is covered by a warranty of a Subcontractor for a period greater than that stated in the preceding sentence, Contractor will assign such warranty to Owner prior to the end of the Warranty Period.

    14.3   <u>Remedy</u>.

    14.3.1  If, during the Warranty Period, any of the Work supplied is found to not be in compliance with the warranty set forth in <u>Section 14.1</u> Contractor shall, at no cost to the Owner, promptly make all necessary alterations, repairs or replacements (the "**Warranty Service**").  If the defect cannot be corrected, Contractor shall replace the Work at no cost to Owner.  The Warranty Service shall include, at no cost to the Owner, all necessary disassembly, transportation, reassembly and retesting, as well as reworking, repair or replacement of such Work, disassembly and reassembly of piping, ducts, machinery, equipment or other Work as necessary to give access to improper, defective or non-conforming Work and correction, removal or repair of any damage to other Work or property that arises from the defect.  Whenever Warranty Service is required, Contractor shall bear the risk of physical loss or damage to the Project as a result of Contractor's activities performing Warranty Service, to the extent not covered by Owner's insurance, and in the event of any reimbursement by Owner's insurance for such damage, Contractor shall be responsible for associated deductibles or retention up to the maximum amount of permitted deductible.

    14.3.2  In the event that Contractor fails to promptly undertake and prosecute reasonable actions to correct defects after written notice from Owner then Owner may correct such defect so that the defective component complies with the requirements of this Agreement, and Contractor shall be liable for all direct costs, charges and expenses reasonably incurred by Owner in connection with such repair or replacement and shall forthwith pay to Owner an amount equal to such costs, charges and expenses upon receipt of invoices with supporting documentation certified by Owner.  For the purposes of this <u>Section 14.3.2</u> "promptly" means (a) as quickly as is reasonably possible and without delay, but in any event not to exceed fifteen (15) Business Days after notice of the defect is provided to Contractor, provided that if such Warranty Service is not preventing operation of all or a portion of the Project or does not present a safety concern and cannot be completed within fifteen (15) Business Days, such longer time (not to exceed forty-five (45) additional days) as is necessary, provided that Contractor continues to diligently execute the Warranty Service or (b) if the Warranty Service is preventing operation of all or a portion of the Project or creates a safety concern, a maximum of five (5) Business Days.  To the extent reasonable, and notwithstanding additional cost and expense which may be incurred by Contractor, Warranty Service requiring downtime of all or a portion of the Project shall be prosecuted during Project non-production hours.  Notwithstanding the foregoing, and limited to the terms set forth in this <u>Section 14.3.2</u>, in the event that corrective actions require procuring additional equipment/components for which Owner has not purchased corresponding Spare Parts, Contractor shall be entitled to an extension of the time periods provided herein for the time between ordering such piece of equipment/components and receipt thereof on the Site.

14.4    <u>Conditions of Warranty</u>.  The warranty set forth herein shall be exclusive of (a) normal wear and tear, (b) normal degradation of the Work or the Project, (c) misuse of the Work or the Project by Owner or negligence in its operation or maintenance, and (d) operation or maintenance of the Work or the Project not in accordance with Industry Standards.

14.5    <u>Warranty Administration</u>.   Contractor shall obtain all customary warranties available from Subcontractors under this Agreement.  Such warranties shall be obtained for the benefit of Owner as well as for Contractor, and shall, other than with respect to any Subcontract in respect of any Major Project Hardware, be assignable to Owner or Owner's designee upon Owner's request; <u>provided</u> that Owner hereby agrees to allow Contractor to call upon such warranties to the extent necessary to allow Contractor to fulfill its warranty obligations hereunder.

14.6    <u>Limitations On Warranties</u>.  The provisions of this <u>Article 14</u> set forth the exclusive remedies for all warranty claims under <u>Article 14</u>.  The foregoing warranties are exclusive and are in lieu of all other warranties whether written, oral, implied, or statutory.  NO IMPLIED OR STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY.

14.7    <u>Enforcement of Subcontractor Warranties</u>.

14.7.1 Contractor shall be responsible for enforcing the defects warranties and performance warranties of all Subcontractors during the Warranty Period unless Owner acts to give effect to the assignment of such warranties to Owner in accordance with the terms of this Agreement at an earlier date.  In any event, commencing on the expiration of the Warranty Period, Owner shall be entitled to the benefit of and to enforce all unexpired representations, warranties, guarantees and obligations from Subcontractors and Contractor shall provide reasonable assistance to Owner at no additional cost as reasonably requested.  In addition, prior to expiration of the Warranty Period, Owner at its option may enforce the warranties of Subcontractors against such Subcontractors if a Contractor Event of Default exists.

14.7.2 Contractor shall obtain defect warranties for all Work performed or Major Project Hardware supplied by Subcontractors on terms not materially less favorable than the warranties set forth herein, and in the case of Major Project Hardware, also including the minimum warranty coverage set forth on <u>Exhibit T (Major Project Hardware Warranties)</u>.

14.7.3 In the event any warranty for any Major Project Hardware requires notice or election of any extended warranty period, Contractor shall notify Owner and will, at Owner's direction, elect such extended warranty.  Contractor shall cause each Subcontract for Major Project Hardware that includes extended warranties to provide for written notice from such Subcontractor to Owner of any default by Contractor under such Subcontract and to provide Owner a reasonable opportunity to cure any such default.

## 15.    TITLE; RISK OF LOSS

15.1    <u>Title</u>.

15.1.1 <u>Condition</u>.  Contractor warrants good title, free and clear of all Liens, claims, charges, security interests, and encumbrances whatsoever (other than those that result from

Owner's failure to make payments hereunder), to all Work, Project Hardware and other items furnished by Contractor or any of the Subcontractors that become part of the Project or that are to be used for the operation, maintenance or repair thereof; provided, however, that this Section 15.1.1 shall not be construed to limit Contractor's mechanics lien rights with respect to the Work provided hereunder.

15.1.2   Transfer.  Subject to Section 15.2, title to the Project Hardware and other items that become part of the Project shall pass to Owner upon payment for such Project Hardware or other items.

15.1.3   Custody During Performance.  The transfer of title shall in no way affect Owner's rights as set forth in any other provision of this Agreement.  Contractor shall have care, custody and control of all Project Hardware and other items that become part of the Project and exercise due care with respect thereto until the earlier of (a) the Substantial Completion Date, and (b) the termination of this Agreement as contemplated in Article 16.

15.2   Risk of Loss.

15.2.1   Risk of Loss Before Substantial Completion.  Until the Substantial Completion Date (except to the extent otherwise provided herein upon the earlier termination of this Agreement as provided in Article 16), Contractor assumes risk of loss and, without limitation of its right to make claims for relief pursuant to Article 8 and specifically excluding loss caused by Force Majeure Event, responsibility for the cost of replacing or repairing any damage to the Work, the Project or any portion thereof (including Project Hardware).

15.2.2   Risk of Loss After Substantial Completion Date.  Risk of loss to the Project shall pass to Owner from and after the Substantial Completion Date (or the earlier termination of this Agreement), unless such loss or damage (a) is caused by Contractor, a Subcontractor or a party over whom Contractor has control or any Affiliate of Contractor or (b) is covered by the warranties provided by Contractor pursuant to Article 14.

## 16.   DEFAULTS AND REMEDIES

16.1   Contractor Events of Default.  Contractor shall be in default of its obligations pursuant to this Agreement upon the occurrence of any one or more events of default set forth below (each, a "**Contractor Event of Default**"):

(a)   Contractor becomes insolvent, generally does not pay its debts as they become due, admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors, or Contractor commences any case, proceeding or other action seeking reorganization or receivership, or adopts an arrangement with creditors, under any bankruptcy, insolvency, reorganization or similar law of the United States or any state thereof for the relief of creditors or affecting the rights or remedies of creditors generally;

(b)   insolvency, receivership, reorganization, or bankruptcy or similar proceedings are commenced against Contractor and such proceeding shall remain undismissed or unstayed for a period of thirty (30) days;

(c)     any representation or warranty made by Contractor in Section 4.1 was materially false or misleading when made and if capable of remedy, Contractor fails to remedy such materially false or misleading representation or warranty within fifteen (15) days after Contractor receives a Notice from Owner with respect thereto, except such fifteen (15) day limit shall be extended if: (i) such failure is reasonably capable of cure and curing such failure reasonably requires more than fifteen (15) days; and (ii) Contractor commences such cure within such fifteen (15) day period and diligently prosecutes and completes such cure within forty-five (45) days thereafter, in each case, after the date on which Contractor becomes aware of such false or misleading representation;

(d)     Contractor assigns or transfers this Agreement or any right or interest herein except in accordance with Article 20;

(e)     Contractor fails to maintain any insurance coverages required of it hereunder, and Contractor fails to remedy such breach within ten (10) days after the date on which Contractor becomes aware of such failure;

(f)     Contractor fails to perform any provision of this Agreement providing for the payment of money to Owner (except for any amounts disputed by Contractor in good faith) and such failure continues for ten (10) Business Days after Contractor has received a Notice of such payment default from Owner;

(g)     Contractor fails to achieve Substantial Completion by the date on which the aggregate amount of Delay Liquidated Damages paid by or payable by Contractor reaches the cap on Delay Liquidated Damages set forth in Section 23.2.2;

(h)     Contractor falls thirty (30) or more days behind the Guaranteed Substantial Completion Date and the delay is not a result of an Excusable Event;

(i)     Contractor fails to perform the Work in accordance with the Statement of Work, Applicable Law, Applicable Permits, and Industry Standards, and fails to cure or commence to cure such failure within fifteen (15) days after Notice is made by Owner demanding that Contractor cure the same or, if such failure cannot be cured within fifteen (15) days, Contractor fails to commence to cure such failure within fifteen (15) days after such notice and thereafter diligently pursue such cure to completion, which shall in no event be later than forty-five (45) days after such Notice;

(j)     Contractor fails to maintain labor harmony at the Site; and

(k)     Contractor fails to comply with any material provision of this Agreement not otherwise set forth as a Contractor Event of Default in this Section 16.1 and fails to cure or commence to cure such failure within fifteen (15) days after Notice is made by Owner demanding that Contractor cure the same or, if such failure cannot be cured within fifteen (15) days, Contractor fails to commence to cure such failure within fifteen (15) days after such Notice and thereafter diligently pursue such cure to completion, which shall in no event be later than forty-five (45) days after such Notice.

(l)      Contractor fails to cause the Contactor Guarantor to provide an executed Contractor Parent Guaranty in accordance with Section 3.4 or Contractor Parent Guarantor defaults in the performance of its obligations under the Parent Guaranty or the Contractor Parent Guaranty is invalid, no longer in effect (other than through expiration in accordance with its terms) or unenforceable.

16.2    <u>Owner's Rights and Remedies</u>.  If a Contractor Event of Default occurs, Owner shall have the following rights and remedies and may elect to pursue any or all of them, in addition to any other rights and remedies that may be available to Owner at law or in equity, and Contractor shall have the following obligations:

(a)      Owner may terminate this Agreement, either in whole or in part, without any additional cure period by giving Notice of such termination to Contractor and, upon such termination, Contractor shall withdraw from the Site, shall assign (to the extent such Subcontract may be assigned) to Owner such of Contractor's Subcontracts as Owner may request, and shall license, in the manner provided herein, to Owner all Intellectual Property Rights (to the extent not previously licensed in accordance with the terms hereof) of Contractor related to the Work reasonably necessary to permit Owner to complete or cause the completion of the Work, and in connection therewith Contractor authorizes Owner and its respective agents to use such information in completing the Work (and otherwise in connection with the Project), shall remove such materials, equipment, tools, and instruments used by and any debris or waste materials generated by Contractor in the performance of the Work as Owner may direct, and Owner may take possession of any or all Contractor Deliverables necessary for completion of the Work (whether or not such Contractor Deliverables are complete);

(b)      Owner may make such payments, acting reasonably, that Contractor is failing to pay in connection with the relevant Contractor Event of Default and either offset the cost of such payment against payments otherwise due to Contractor under this Agreement or Contractor shall be otherwise liable to pay and reimburse such amounts to Owner;

(c)      Owner may require Contractor to assign any and all warranties set forth on <u>Exhibit T (Major Project Hardware Warranties)</u> to Owner to the extent such warranties have not already been assigned to Owner and to require Contractor to provide evidence reasonably acceptable to Owner that Contractor has assigned such warranties to Owner;

(d)      Owner may, without terminating this Agreement, take over some or all of the Work from Contractor and perform such Work itself.  If Owner elects to perform some or all of the Work itself, Contractor shall cooperate with Owner, and, if necessary, allow Owner access to the Site.  Owner may employ any other person, firm, or corporation to perform the Work by whatever reasonable method Owner may deem expedient, and may undertake such reasonable expenditures as in Owner's sole judgment will best accomplish the timely completion of the Work (including, where necessary, the entry into contracts without prior solicitation of proposals).  Owner's exercise of its rights under this Section 16.2(d) will not relieve Contractor of any of its obligations hereunder, and Contractor shall be and remain liable to Owner for all damages, including Delay Liquidated Damages (the

amount of which shall be assessed on the date of termination), but not including Capacity and Energy Liquidated Damages, payable hereunder, as well as for the costs incurred by Owner in exercising its rights under this Section 16.2(d).

16.3    Owner Event of Default.  Owner shall be in default of its obligations pursuant to this Agreement upon the occurrence of any one or more events of default set forth below (each, an "**Owner Event of Default**"):

(a)    Owner becomes insolvent, generally does not pay its debts as they become due, admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors, or Owner commences any case, proceeding or other action seeking reorganization or receivership, or adopts an arrangement with creditors, under any bankruptcy, insolvency, reorganization or similar law of the United States or any state thereof for the relief of creditors or affecting the rights or remedies of creditors generally;

(b)    insolvency, receivership, reorganization, or bankruptcy or similar proceedings are commenced against Owner or Parent Guarantor and such proceeding shall remain undismissed or unstayed for a period of thirty (30) days;

(c)    any representation or warranty made by Owner in Section 4.2 was materially false or misleading when made and if capable of remedy, Owner fails to remedy such false or misleading representation or warranty within fifteen (15) days after Owner receives a Notice from Contractor with respect thereto, except such fifteen (15) day limit shall be extended if: (i) such failure is capable of being cured and curing such failure reasonably requires more than fifteen (15) days; and (ii) Owner commences such cure within such fifteen (15) day period and diligently prosecutes and completes such cure within forty five (45) days thereafter, in each case after the date on which Owner becomes aware of such false or misleading representation;

(d)    Owner assigns or transfers this Agreement or any right or interest herein, except in accordance with Article 19;

(e)    Owner fails to perform any provision of this Agreement providing for the payment of money to Contractor (except for any amounts disputed by Owner in good faith) and such failure continues for ten (10) days after Owner has received a Notice of such payment default from Contractor;

(f)    one or more Excusable Events shall have occurred by reason of an Owner-Caused Delay and such Excusable Events shall have, in accordance with Section 8.4, extended the Guaranteed Substantial Completion Date by more than three hundred sixty-five (365) days in the aggregate;

(g)    Owner fails to maintain any other insurance coverages required of it hereunder and Owner fails to remedy such breach within thirty (30) days after the date on which Owner becomes aware of such failure; or

(h)    Owner fails to cause the Parent Guarantor to provide an executed Owner Parent Guaranty in accordance with Section 2.9 or Parent Guarantor defaults in the

performance of its obligations under the Owner Parent Guaranty or the Owner Parent Guaranty is invalid, no longer in effect (other than through expiration in accordance of its terms) or unenforceable.

16.4    Contractor's Rights and Remedies.    If an Owner Event of Default occurs, Contractor shall have the following rights and remedies and may elect to pursue any or all of them, in addition to any other rights and remedies that may be available to Contractor hereunder:

(a)    Contractor may terminate this Agreement upon providing Notice of such termination to Owner;

(b)    Contractor may suspend the Work by giving Notice of such suspension to Owner, which suspension may last until the earlier of the termination of this Agreement and the date on which the relevant Owner Event of Default has been cured by Owner or waived by Contractor; provided that such Notice of suspension may be given by Contractor either concurrently or at any time after the Notice described in Section 13.5; or

(c)    Contractor may proceed against the Owner Parent Guaranty in accordance with its terms.

16.5    Owner Suspension.    Owner may, in its sole discretion, order Contractor to suspend the Work, in whole or in part, for a period of time as Owner may determine.  The suspension shall commence on the day specified in Owner's Notice which shall be at least five (5) days after Owner Notifies Contractor concerning such suspension, unless such suspension is due to an imminent threat of material injury or damage to Persons or property or is the result of a material injury or damage to Persons or property or as otherwise required by Applicable Law. Upon the commencement of the suspension, Contractor shall stop the performance of the suspended Work except as may be necessary to carry out the suspension and protect and preserve the Work completed prior to the suspension.  The provisions of this Agreement related to Excusable Events attributable to Owner-Caused Delays shall be applicable to any suspension by Owner pursuant to this Section 16.5, unless such suspension has been commenced due to an imminent threat of material injury or damage to Persons or property or is the result of a material injury or damage to Persons or property, in each case, caused by Contractor or any of its Subcontractors; provided that such suspension shall be of no greater length of time as may be necessary to adequately address the threat of injury or damage or any actual injury or damage and its cause.  Contractor shall initiate the resumption of any suspended Work within five (5) Business Days after Owner gives Contractor Notice to do so and shall use its commercially reasonable efforts to resume the Work fully as soon as reasonably possible.

16.6    Termination for Extended Force Majeure Event.    If a Force Majeure Event has occurred and continues for a period exceeding three (3) consecutive months, notwithstanding that Contractor may by reason thereof have been granted an extension of time pursuant to a Change Order, either Owner or Contractor shall be entitled to serve upon the other thirty (30) days' notice to terminate this Agreement.  If at the expiry of the thirty (30) Days' Notice period, the Force Majeure Event shall still be continuing, this Agreement shall terminate, and neither Party shall have further liability to the other Party, except that Owner shall pay Contractor amounts due for all Work performed.

16.7    Termination for Convenience.   If the Owner determines not to proceed with completion of the Project such that Owner decides to discontinue engineering, procurement, and construction of the Project for at least three (3) months from the date of termination, and so long as no further engineering, procurement and construction on the Project actually takes place for at least twelve (12) months from the date of termination, Owner may terminate this Agreement for convenience in whole or in part following ten (10) days' Notice to Contractor.  If Owner restarts engineering, procurement and construction on the Project within twelve (12) months following the date of termination hereunder using an alternative contractor to perform all or some portion of the remaining Work, Contractor shall be entitled to payment of lost profits on Work not completed by Contractor (in addition to the termination for convenience payment described below), calculated as an amount not to exceed the total cost of the remaining Work, multiplied by ten percent (10%). Upon receipt of any such notice, Contractor shall, unless the Notice directs otherwise:

(a)    immediately discontinue the Work on the date and to the extent specified in such notice;

(b)    place no further orders for Project Hardware or enter into any Subcontracts except as may be necessary for completion of such portion of the Work that is not discontinued;

(c)    promptly make every reasonable effort to procure cancellations upon terms reasonably satisfactory to Owner of all orders, Subcontracts, and rental agreements to the extent they relate to the performance of the Work that is discontinued on terms that mitigate the cost thereof; and

(d)    thereafter execute only that portion of the Work as may be necessary to preserve and protect Work already in progress and to protect Project Hardware at the Site or in transit thereto.

Contractor waives any claims for damages, including loss of anticipated profits for uncompleted Work due to a termination by Owner pursuant to this Section 16.7, and shall accept as its sole remedy for the payment for the Work performed a sum equal to (i) the Contract Price, multiplied by the percentage of Work completed plus (ii) Contractor's and its Subcontractors' actual and demonstrable demobilization costs and commercially reasonable Subcontractor cancellation or termination fees for which Contractor is legally liable to pay (provided that Subcontractor cancellation or termination fees shall be reasonably documented), less (iii) the aggregate of amounts paid to Contractor for the Work prior to such termination; less (iv) any recoverable deposits paid to Suppliers.  Contractor's claim shall be submitted within thirty (30) days of the effective date of a termination under this Section 16.7.

16.8    Termination upon Failure to Close MIPA. Notwithstanding anything to the contrary herein, if the Parties are unable to consummate Closing under the MIPA, as the term is defined thereunder, in accordance with the terms of the MIPA, this Agreement shall terminate immediately with no outstanding liabilities for either Party hereunder.

## 17.    INDEMNIFICATION

17.1    By Contractor.  To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner and its Affiliates, and the agents, officers, directors, employees, subcontractors and representatives of each of the foregoing (each, an "**Owner Indemnified Party**") from and against any and all loss, damage, expense and liability, including court costs and reasonable attorneys' fees incurred by any Owner Indemnified Party in connection with or arising from (i) any and all Governmental Authority imposed fines or penalties, (ii) Taxes payable by Contractor hereunder, (iii) any Liens not removed by Contractor in accordance with its obligations hereunder, (iv) personal injury or death, (v) third party suits, actions, damages, claims, costs, losses or liability of whatsoever kind or character arising from claims for accidents, injuries, or damage of any kind, to the extent caused by the fault or willful misconduct of, negligent acts or omissions of, or breach of this Agreement by Contractor, any Subcontractor, or their respective agents or employees or others under their control, (vi) subject to Section 12.4 hereof, any breach or violation of or default under the Owner Contracts to the extent caused by the fault or willful misconduct of, negligent acts or omissions of, or breach of this Agreement by Contractor, any Subcontractor, or their respective agents or employees or others under their control, and (v) breach or violation of Contractor's obligations in Section 4.1.6. For the avoidance of doubt, Contractor shall have no liability with respect any Tax benefits including but not limited to federal and state investment Tax credits, and the efforts by Owner, its Affiliates, or the Financing Parties to obtain any of same except to the extent Contractor connects the Project to the transmission grid as contemplated in the Interconnection Agreement or allows the delivery of energy to the transmission grid without first obtaining Owner's prior written approval as required in Section 3.19; provided, however, that Contractor shall use commercially reasonable efforts to provide such information or other assistance as Owner may reasonably request in respect of any such Tax benefits.

17.2    By Owner.  Owner shall indemnify, defend, and hold harmless Contractor, its Affiliates and the agents, officers, directors, employees, subcontractors and representatives of each of the foregoing (each, a "**Contractor Indemnified Party**") from and against any and all Governmental Authority imposed fines or penalties, personal injury or death, third party suits, actions, damages, claims, costs, losses or liability of whatsoever kind or character, including, but not limited to, attorneys' fees and expenses, arising from claims for accidents, injuries, or damage of any kind to the extent caused by the negligence, or willful misconduct of, or breach of this Agreement by, Owner, its agents, employees, vendors or subcontractors.

17.3    Intellectual Property Indemnity.  Contractor shall defend, indemnify and hold harmless each Owner Indemnified Party from and against any and all loss, damage, expense and liability, including court costs and reasonable attorneys' fees incurred by any Owner Indemnified Party in connection with or arising from any and all suits, actions, damages, claims, costs, losses or liability of whatsoever kind or character arising from Contractor Indemnified Party's infringement of patents or improper use of other Intellectual Property Rights which occur in connection with Contractor's performance of the Work or the ownership or use of any portion of the Work, unless such infringement or improper use is at the specific (as opposed to general) written direction of Owner.  Owner's acceptance of Contractor's engineering design or proposed or supplied materials or equipment shall not be construed to relieve Contractor of any obligation hereunder.  Should any such claim materially impair Contractor's performance of the Work in accordance with the Project Schedule or Owner's continued use of the Work, then Contractor shall, at its own expense, timely procure the right to continue its performance of the Work so as not to materially impair the Project Schedule or Owner's continued use of the Work, or timely procure

the right to continue use of the Work, and Contractor shall not settle any such claim in a manner that reasonably might be expected to interfere with its performance of the Work or the operation of the Project.

17.4    Indemnification Procedure.  When a Party hereunder (the "**Indemnifying Party**") is required to indemnify any Person (the "**Indemnified Party**") in accordance with this Article 17, the Indemnifying Party shall assume on behalf of such Indemnified Party, and conduct with due diligence and in good faith, the defense of any claim against such Person, whether or not the Indemnifying Party shall be joined therein, by counsel (including insurance counsel) of the Indemnifying Party's selection reasonably satisfactory to the Indemnified Party and the Indemnified Party shall cooperate with the Indemnifying Party in such defense.  The Indemnifying Party shall be in charge of the defense and settlement of such claim; provided that without relieving the Indemnifying Party of its obligations hereunder or impairing the Indemnifying Party's right to control the defense or settlement thereof, the Indemnified Party may elect to participate through separate counsel in the defense of any such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party, except in the event that (a) the Indemnified Party shall have reasonably concluded, acting in good faith and on the advice of counsel, that there exists a material conflict of interest between the Indemnifying Party and the Indemnified Party in the conduct of the defense of such claim (in which case the Indemnifying Party shall not have the right to control the defense or settlement of such claim, on behalf of such Indemnified Party), or (b) the Indemnifying Party shall not have employed counsel to assume the defense of such claim within a reasonable time after notice of the commencement of an action thereon, then, in each of cases (a) and (b), the fees and expenses of counsel shall be paid by the Indemnifying Party.  The Indemnifying Party shall not, without the Indemnified Party's prior written consent, settle or compromise any claim, suit or cause of action asserted against the Indemnified Party, or consent to entry of a judgment in respect thereof, which imposes any future obligation on the Indemnified Party or which does not include, as an unconditional term thereof, the giving of a release in favor of the Indemnified Party from all liability in respect of such claim, suit or cause of action.

## 18.    CONFIDENTIAL INFORMATION

18.1    Confidential Information.  Owner or Contractor (the "**Disclosing Party**") may disclose or reveal to the other party (the "**Receiving Party**"), either orally or in writing, confidential and proprietary information ("**Confidential Information**") which may include, without limitation, engineering design, data, know-how, intellectual property, inventions, ideas, trade secrets, and construction means and methods.  Confidential Information disclosed by Disclosing Party to the Receiving Party will be kept confidential by the Receiving Party, and shall not, without the prior written consent of the Disclosing Party, (a) be disclosed by the Receiving Party, or its agents or employees, in any manner whatsoever, in whole or in part, to any third party, and (b) be used by the Receiving Party, or its agents or employees, except for purposes of completing the Work. The Receiving Party shall reveal any Confidential Information only to its agents and employees who need to know the Confidential Information for the purpose of evaluation of or furtherance of completion of the Receiving Party's scope of work under this Agreement, and who have been informed of the confidential nature of the Confidential Information and who have agreed to be bound by the terms of this Section 18; provided that Owner may reveal Confidential Information in connection with construction, financing, sale, operation, or maintenance of the Project.

## 19.   LICENSES

19.1   <u>License</u>.   All Intellectual Property Rights contained within, accompanying or arising from the Work are and shall be solely owned by Contractor and are not being sold to Owner, but rather are being licensed in accordance with the terms and conditions of this Agreement. Contractor hereby grants to Owner, for the life of the Project, a paid-up, irrevocable, non-exclusive, royalty-free right and license under all Intellectual Property Rights of Contractor that are incorporated in or cover all or any part of the Work or that are embodied in any items or materials being provided by Contractor to enable use of the Work to use and exploit the Work, all Contractor Deliverables and all such items and materials provided by Contractor solely for Owner's operation, maintenance, use, modification, repair, disposal, removal or alteration of the Project or components thereof solely in connection with the Project, such use and exploitation, including the right to reproduce, prepare derivative works based on and distribute such Contractor Deliverables and such items and materials provided by Contractor (and derivatives of the foregoing), such licenses and rights subject to the confidentiality provisions of <u>Article 18</u>. Owner shall bear all responsibility for its use of the Intellectual Property Rights other than as specified in the foregoing sentence, and shall indemnify and defend Contractor against all claims, costs, damages arising from Owner's use of the Intellectual Property Rights in any manner not specified in the foregoing sentence.

19.2   <u>Assignment</u>.   The grant of licenses in this <u>Article 19</u> shall be assignable to other Persons that succeed in interest to all or any portion of the Project or are otherwise assigned by Owner pursuant to <u>Section 20.1</u>.  Contractor shall, prior to directing any Subcontractor to produce any design or engineering work in connection with the Project, obtain a valid license of any such Intellectual Property Rights from such Subcontractor in terms substantially similar to those that obligate Contractor to Owner as expressed in <u>Section 19.1</u>.  Except as specifically stated in <u>Section 19.1</u>, no other license in such Intellectual Property Rights is granted pursuant to this Agreement.

19.3   <u>Contractor Deliverables</u>.   Contractor Deliverables accumulated or developed in respect of the Project, and transferred by Contractor, its employees or any Subcontractors and delivered to Owner, shall become the property of Owner upon delivery without any further consideration to be provided therefor.

## 20.   ASSIGNMENT

20.1   <u>Assignment to Other Persons</u>.   Except as otherwise provided in this <u>Section 19.1</u>, neither Party may assign or otherwise transfer this Agreement to any third party, whether by operation of law or otherwise, without the prior written consent of the other Party. Notwithstanding the foregoing: Owner may, without consent of Contractor, collaterally assign its rights, title and interest under this Agreement (a) to any Owner Financing Party, who, subject to any consent entered into by Contractor with the Owner Financing Parties, may further assign such rights, title and interest under this Agreement upon exercise of remedies by an Owner Financing Party following a default by Owner under the Financing Documents entered into between Owner and the Owner Financing Parties, or (b) to an entity purchasing, in whole or in part, the Owner or Owner's interests in, or the assets of, the Project or (c) to the Project Company, provided the Parent Guarantor furnishes an Owner Parent Guaranty, if so required under this Agreement. Any Party assigning this Agreement as set forth in this <u>Section 19.1</u> shall deliver Notice of such assignment

to the other Party as soon as reasonably practicable; <u>provided</u>, that Contractor's execution of a consent to an assignment as described in subclause (i) of this <u>Section 19.1</u> shall be deemed to constitute Notice to Contractor of the underlying assignment.  Any authorized assignment of this Agreement by either Party shall relieve such Party of its obligations hereunder at such time as the authorized successor agrees in writing to be bound in full by such assigning Party's obligations hereunder.  Any purported assignment of this Agreement in violation of this <u>Section 20.1</u> shall be null and void and shall be ineffective to relieve either Party of its obligations hereunder.

## 21.    LIENS, LIEN WAIVERS AND SUBORDINATION

21.1    <u>Liens</u>.  To the extent that Contractor has been paid all undisputed amounts due from time to time hereunder, Contractor shall pay all labor, Subcontractors, equipment vendors, and providers of services of any kind, in compliance with any supply or service contract.  To the extent that Contractor has been paid all undisputed amounts due from time to time hereunder, Contractor shall not assume, create or suffer to be created by any employee or Subcontractor any Lien on the Work, the Site, the Project, or any portion thereof resulting from Contractor's failure to make a payment to such employee or Subcontractor when due and shall, at Contractor's sole expense discharge and cause to be released, whether by payment or posting of appropriate security, any Lien placed on the Project or the Site by any Subcontractor, unless the Subcontractor in question is placing the Lien on the Project or the Site due to a failure of Contractor to pay such Subcontractor solely caused by Owner's failure to make payments as required hereunder.  Such removal or bonding shall be accomplished within ten (10) Business Days after any filing evidencing such Lien, unless a longer period is agreed between the Parties.  If Contractor fails to remove such Lien within ten (10) Business Days (or agreed period), Owner may, but shall not be required to, bond off such lien or encumbrance, and Contractor shall, within five (5) days of receipt of a request by Owner, reimburse Owner for all reasonable expenses incurred by Owner in connection therewith.

21.2    <u>Pre-NTP and Interim Lien Waivers</u>.  Contractor shall deliver, on or prior to the issuance of the NTP, a lien waiver in the form pre-NTP waiver set forth in <u>Exhibit F (Lien Waivers)</u> for works completed (including pursuant to an LNTP) up to the date of issuance of the NTP by Owner.  Contractor shall deliver, together with (a) each Contractor's Invoice to be paid as a progress payment, an Interim Lien Waiver from Contractor and each Major Subcontractor, in each case in respect of work performed on, or equipment delivered to, the Site during the period covered by such Contractor's Invoice.

21.3    <u>Substantial Completion Lien Waivers</u>.  As a condition for achieving Substantial Completion, Contractor shall deliver partial or final lien waivers (the best available), substantially in the applicable form provided in <u>Exhibit F (Form of Lien Waivers)</u> and meeting the requirements of this Agreement, from Contractor and each Major Subcontractor, sufficient to release all liens and lien rights under Applicable Law (the "**Substantial Completion Lien Waivers**") to the extent of payments made to date with respect to the Project and a certificate of Contractor in the form provided in <u>Exhibit F</u>, not previously delivered have been received and delivered to Owner.

21.4    <u>Final Lien Waivers</u>.  As a condition for achieving Final Completion, Contractor shall deliver final lien waivers, substantially in the applicable form provided in <u>Exhibit F (Form of Lien Waivers)</u> and meeting the requirements of this Agreement, from Contractor and each Major Subcontractor, sufficient to release all liens and lien rights under applicable Law and a certificate

of Contractor in the form provided in Exhibit F, not previously delivered have been received and delivered to Owner.

21.5    Bond in Lieu of Lien Waivers.  If Contractor cannot produce lien waivers from all such Subcontractors to Owner's reasonable satisfaction despite using commercially reasonable efforts to obtain the same, Contractor shall nonetheless be able to satisfy the Lien Waiver requirement by delivering to Owner documentation regarding the amount and nature of the claim or dispute with such Subcontractor and posting a payment bond or letter of credit in favor of Owner or Owner's designee, in form and substance acceptable to Owner (in Owner's sole discretion), including with respect to the terms and conditions governing Owner's ability to draw on such bond, in an amount equal to the aggregate value of the Project Hardware, materials, goods or services provided by the Subcontractor(s) for whom a lien waiver is not provided, which payment bond shall remain in place until the statutory period for valid submission of a lien against the Project has passed.  For clarity, the requirements in the foregoing sentence are in addition to Contractor's obligations per Section 21.1 above.

21.6    Subordination.  At least five (5) Business Days prior to Financial Closing or such other time as Owner may require, Contractor shall deliver a subordination agreement in the form set forth in Exhibit X (Form of Subordination Agreement), as modified or otherwise required by Owner Financing Party or title insurance provider, from Contractor and from each Subcontractor. Owner shall provide Contractor with written notice of the intended Financial Closing date at least fifteen (15) Business Days in advance.

21.7    Title Insurer and Lender Requirements.  Contractor shall provide any of the following no later than seven (7) days prior to Financial Close, or such earlier time as Owner may request, upon reasonable advance notice:

(a)    audited financial statements of Contractor;

(b)    complete list of all Subcontractors, including the total contract or purchase order value for each, the total amount owed to each (inclusive of paid, unpaid, due, accrued amounts), and the total amount paid to each; or

(c)    an indemnity from Contractor to Owner with respect to Contractor's payment obligations, in a form acceptable to Owner.

Notwithstanding the above provisions regarding lien waivers and subordination agreements, Contractor shall comply with commercially reasonable Owner Financing Party and title insurer requests regarding lien waivers, subordination and payment status of Subcontractors, including obtaining and delivering to Owner of additional or modified lien waivers or ancillary documentation from Contractor and Subcontractors.

## 22.    NOTICES AND COMMUNICATIONS

22.1    Requirements.  Any Notice made pursuant to the terms and conditions of this Agreement shall be in writing and be: (a) delivered personally; (b) sent by certified mail, return receipt requested; (c) sent by a recognized overnight mail or courier service, with delivery receipt

requested; (d) sent by email with read-receipt confirmation or response confirming receipt, to the following addresses:

| If to Contractor: | iSun Utility, LLC<br><br>400 Avenue D, Suite 10,<br><br>Williston, VT 05495<br><br>Attn: Daniel Dus<br><br>Email: ddus@isunenergy.com |
|---|---|
| With copy to: | iSun Utility, LLC<br><br>400 Avenue D, Suite 10,<br><br>Williston, VT 05495<br><br>Attn: Vatsal Kishore<br><br>Email: vkishore@isunenergy.com |
| If to Owner: | Fusion Renewable NA, LLC<br><br>2136 NE 123rd Street,<br><br>North Miami, FL33181<br><br>Attn: Avi Avitan<br><br>Email: avi.avitan@gmail.com |

22.2    Representatives.  Any technical or other communications pertaining to the Work shall be with the Parties' designated representative.  Each Party shall provide Notice to the other in writing of the name of such representatives promptly after the Effective Date.  Contractor's Manager and the Owner Representative each shall have knowledge of the Work and be available at all reasonable times for consultation.  Each Party's representative shall be authorized on behalf of such Party to administer this Agreement, agree upon procedures for coordinating the efforts of the Parties, and, when appropriate, to furnish information to or receive information from the other Party in matters concerning the Work.

22.3    Effective Time.  Any Notice or Notification given personally, through overnight mail or through certified letter shall be deemed to have been received on delivery, any Notice given by express courier service shall be deemed to have been received the next Business Day after the same shall have been delivered to the relevant courier, and any Notice given by email transmission shall be deemed to have been received on confirmed dispatch.

## 23.    LIMITATIONS OF LIABILITY AND REMEDIES

23.1    <u>Limitations on Damages</u>.  Except (a) for liquidated damages as expressly set forth in this Agreement, (b) for any breach by Contractor or Owner of its obligations under <u>Article 18</u> resulting in consequential damages, (c) to the extent damages (or other amounts) claimed by third parties (other than Owner Indemnified Parties or Contractor Indemnified Parties) for which Contractor or Owner has a duty to indemnify hereunder as expressly provided in <u>Article 17</u> are shown to be consequential in nature, notwithstanding anything else in this Agreement to the contrary, neither Party (nor that Party's subcontractors) shall be liable to the other Party for any loss, damage or other liability otherwise equivalent to or in the nature of any indirect, incidental, consequential, exemplary, punitive or special damages arising from performing or a failure to perform any obligation under this Agreement, whether such liability arises in contract (including breach, indemnity or warranty), tort (including fault, negligence or strict liability), or otherwise, including for any loss of profits, loss of revenue (other than any profit or revenues specific to this Agreement), or loss of use of Project Hardware, the Project, downtime costs, increased expense of operation or maintenance of the Project Hardware or the Project, increased expense of borrowing or financing; loss of tax credits or favorable tax treatment; loss of opportunity or goodwill, cost of purchased or replacement power, loss of use of equipment or systems, cost of capital, and claims of customers for such damages.  For the avoidance of doubt, the costs due to termination allowed under <u>Article 16</u> shall be deemed to not be consequential or any other type of damages addressed by this <u>Section 23.1</u>.

23.2    <u>Limitations on Liability</u>.

23.2.1  In no event shall Contractor be liable to Owner for any damages, claims, demands, suits, causes of action, losses, costs, expenses or liabilities in excess of an amount equal to portion of the Contract Price paid to Contractor, regardless of whether such liability arises out of breach of contract, guarantee or warranty, tort, negligence, product liability, indemnity, contribution, misrepresentation, strict liability, equity or any other legal theory; <u>provided</u>, <u>however</u>, the preceding limitation of liability shall not apply to, and no credit shall be issued against such liability for, (i) Contractor's indemnity obligations set forth in <u>Article 17</u> as to claims by third parties (that are not Owner Indemnified Parties) made against Owner Indemnified Parties, (ii) Contractor's indemnity obligations set forth in <u>Section 3.10.2</u>, (iii) any other claims resulting from the fraud, willful misrepresentation, willful misconduct or gross negligence of Contractor, or (iv) damages for which insurance proceeds are received from insurance required under this Agreement, it being the Parties' specific intent that the limitation of liability shall not relieve the insurers' obligations for such insured risks.  Notwithstanding any of the foregoing, none of the limits on the amount of insurance required to be maintained hereunder shall operate to limit Contractor's liability under the Agreement.  Without limiting the foregoing, this <u>Section 23.2.1</u> shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to persons or property from the negligence, active or otherwise, of Contractor, Subcontractors and their respective agents and employees, and shall prevail over any conflicting or inconsistent provisions contained in this Agreement, except to the extent such conflicting or inconsistent provisions further restrict Contractor's liability.

23.2.2  <u>Liquidated Damages Caps</u>.  In no event will Contractor be liable hereunder for Delay Liquidated Damages in the aggregate, in excess of fifteen percent (15%) of the Contract Price, Capacity Liquidated Damages in excess of fifteen percent (15%) of the Contract Price, or Energy Liquidated Damages in excess of fifteen percent (15%) of the Contract Price; <u>provided</u> that

Contractor's aggregate liability for Delay Liquidated Damages, Capacity Liquidated Damages, and Energy Liquidated Damages shall not exceed twenty-five percent (25%) of the Contract Price. Notwithstanding the foregoing, Contractor shall have no liability for Energy Liquidated Damages unless and until the Parties (or their respective Affiliates) have entered into an operations and maintenance agreement with respect to the Project.

23.2.3 Exclusions to Limitations on a Party's Liability. Notwithstanding Section 23.2.1 and Section 23.2.2, there shall be no limitation on a Party's liability under this Agreement for (a) Contractor's indemnity obligations under Section 3.10.2 or Article 17; and (b) claims of, or causes of actions arising from, fraud, willful misrepresentation, willful misconduct or gross negligence by Owner, Contractor, Subcontractors or their respective Affiliates, as applicable.

23.3     Releases, Indemnities and Limitations.  The releases, indemnities, waivers, subrogation, assumptions of and limitations on liabilities and limitations on remedies expressed in this Agreement, subject to the terms hereof, shall apply even in the event of fault, negligence, or strict liability of the Party released or indemnified, or whose liability is limited or assumed or against whom rights of subrogation are waived and shall extend to such Party's subcontractors, and in each case to such Party's and its subcontractors' Affiliates, officers, directors, members, managers, employees, licensees, agents and partners.

## 24.    DISPUTES

24.1    Dispute Resolution.  Any dispute, controversy or claim between the Parties arising out of or relating to this Agreement or the breach termination or validity thereof (a "**Dispute**") shall be resolved pursuant to the procedures set forth in this Article 24.

(a)     either Party shall provide Notice to the other Party of the existence of the Dispute (the "**Dispute Notice**");

(b)     a designee of each of the Parties, each with authority to negotiate and resolve the Dispute, shall meet, either in person or by telephonic conference, within five (5) Business Days after the receipt by a Party of the Dispute Notice, to seek to resolve the Dispute through mutual agreement; and

(c)     in the event the procedure referenced in clause (b) above does not result for any reason in resolution of the dispute within 30 days after receipt by a Party of the Dispute Notice, each Party, without further delay, shall have the right to submit the Dispute to binding arbitration in accordance with the following procedures:

(i)     the seat of arbitration shall be in Burlington, Vermont;

(ii)     the arbitration shall be administered by the AAA in accordance with its Commercial Arbitration Rules then in effect (the "**Rules**") (except to the extent modified herein).  There shall be three (3) arbitrators: (A) claimant shall appoint an arbitrator in its demand for arbitration, (B) respondent shall appoint an arbitrator within twenty (20) days after receipt of a copy of the demand, and (C) within fifteen (15) days after the appointment of the second arbitrator, the two (2) arbitrators appointed by the Parties shall select a third arbitrator who shall serve as chair of the arbitral tribunal.  Any arbitrator not timely

appointed shall be appointed by the AAA using the listing ranking and striking procedures in the Rules, with each Party being given three (3) strikes. When acting as appointing authority under this <u>Article 24</u>, AAA shall endeavor to appoint as each arbitrator (including any chair) an attorney who has experience with and is knowledgeable regarding the engineering, procurement and construction industry;

(iii)    the arbitral tribunal shall have no authority or power to enter an award which is in conflict with governing law. The award shall be in writing and shall contain the reasons on which it is based. The award of the arbitral tribunal shall be final and binding on the Parties and may be challenged only on the grounds set forth on the Federal Arbitration Act, 9 U.S.C. §1 *et seq*. Any award may be enforced or confirmed in any court of competent jurisdiction; and

(iv)    the fees and expenses of the arbitration panel and the AAA shall be borne equally by Owner and Contractor and each Party shall bear its own legal expenses.

24.2    <u>Interim Relief and Third-Party Claims</u>.

(a)    <u>Third-Party Claims</u>.  Notwithstanding the Parties' agreement to arbitrate disputes arising pursuant to this Agreement, in the event a Party is sued by a third party or sues a third party on claims that concern the other Party's obligations under this Agreement and the allocation of liability or damages among all the Parties (including the Party sought to be joined pursuant to this <u>Section 24.2(a)</u> to the suit), then, the Party sued or the Party initiating suit may join the other Party. However, as a condition to such joinder, the Party sued or initiating suit must first request the third party to arbitrate the dispute pursuant to this <u>Article 24</u>. Each Party agrees not to object to such joinder or challenge such proceeding on the grounds that the Parties agreed to arbitrate disputes pursuant to this <u>Article 24</u>.

(b)    <u>Stay of Arbitration</u>.  In the event the Parties are involved in a pending arbitration pursuant to this <u>Article 24</u> and both Parties are parties to an action pursuant to <u>Section 24.2(a)</u> that is related to any of the issue(s) or claim(s) raised in the arbitration proceeding, it is agreed that, if the arbitral tribunal in the pending arbitration determines that such a stay would be appropriate, the arbitration proceeding shall be stayed pending the conclusion or settlement of the third-party action. Any conclusion or settlement of such third-party action shall be admissible as evidence (to the extent relevant) for purposes of the arbitration proceedings under this Agreement.

24.3    <u>Injunctive Relief</u>.  Notwithstanding the foregoing, nothing in this <u>Article 24</u> shall prevent a Party from pursuing immediate injunctive relief to maintain the status quo or prevent irreparable harm with respect to any Dispute.

24.4    <u>Pending Dispute: Duty to Continue</u>.  Pending the resolution of a Dispute, Contractor shall continue to perform the Work consistent with the applicable provisions of this Agreement, and Owner shall continue to pay all undisputed amounts required in accordance with the applicable provisions of this Agreement.

24.5    Subcontractors.  To the extent that any dispute or matter in question between Contractor and Owner arises in connection with Work provided by any Subcontractor, such Subcontractor may be joined in any such dispute.

## 25.    MISCELLANEOUS

25.1    Severability.  The invalidity or unenforceability of any portion or provision of this Agreement shall in no way affect the validity or enforceability of any other portion or provision hereof.  Any invalid or unenforceable portion or provision shall be deemed severed from this Agreement and the balance of this Agreement shall be construed and enforced as if this Agreement did not contain such invalid or unenforceable portion or provision.  If any such provision of this Agreement is so declared invalid, the Parties shall promptly negotiate in good faith new provisions to eliminate such invalidity and to restore this Agreement as near as possible to its original intent and effect.

25.2    Governing Law; Limited Submission to Jurisdiction.  This Agreement shall be governed by the laws of the State of Vermont, without regard to any laws regarding conflict of laws thereof that would require the laws of another jurisdiction to apply.  The Parties irrevocably accept and submit to the non-exclusive jurisdiction of the federal courts in the Burling, Vermont, with respect to any suit, action or proceeding in aid of arbitration, including an action for an order of interim, provisional or conservatory measures to maintain the status quo and prevent irreparable harm and for recognition and enforcement of any award rendered by the arbitral tribunal, and the Parties irrevocably waive any objection to the laying of venue or defense that the forum is inconvenient with respect to any such suit, action or proceeding for such purpose.  The Parties' right to apply for such judicial relief in aid of arbitration and the commencement of any such suit, action or proceeding in aid of arbitration shall not be deemed incompatible with, or a waiver of, the Parties' agreement to arbitrate.  This consent to jurisdiction is being given solely for purposes of this Agreement, and it is not intended to, and shall not, confer consent to jurisdiction with respect to any other Dispute in which a party to this Agreement may become involved.  The Parties acknowledge and agree that terms and conditions of this Agreement have been freely, fairly and thoroughly negotiated.

25.3    Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS AGREEMENT.  Each Party (a) certifies that no representative of the other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 25.3.

25.4    Survival of Termination.  Contractor shall only be liable to Owner in connection with the non-performance of the Work only for causes of action for acts or omissions prior to Final Completion or, with respect to warranty claims, prior to the end of the applicable Warranty Period; provided that Owner complies with its Notice obligations with respect to such warranty claims. The terms of the preceding sentence shall in no way limit Contractor's or Owner's obligations in connection with provisions which by their nature are intended to survive the termination of this Agreement.

25.5    No Oral Modification.  No oral amendment or modification of this Agreement by any officer, agent, member, manager or employee of Contractor or Owner, either before or after execution of this Agreement, shall be of any force or effect.

25.6    Amendments; Waiver.  Amendments to this Agreement may be made from time to time; provided that no amendment or modification of this Agreement or any provision hereof shall be valid or effective unless in writing and signed by duly authorized representatives of both Parties. No consent to, or waiver, discharge or release of, any provision of or breach under this Agreement shall be valid or effective unless in writing and signed by the Party giving such waiver.  No specific waiver shall constitute a waiver with respect to any other provision or breach, whether or not of similar nature, or in any way affect, limit, modify or waive that Party's right thereafter to enforce or compel strict compliance with any other term, covenant, condition or other provision hereof, any course of dealing or custom of the trade notwithstanding.  Failure on the part of any Party to insist in any instance upon strict, complete and timely performance by the other Party of any provision of or obligation under this Agreement shall not constitute a waiver by such Party of any of its rights under this Agreement or otherwise.

25.7    Inspection, Review and Approval.  Notwithstanding Owner's inspection, review, monitoring, observation, acknowledgement, comment or Owner's approval of any items reviewed, inspected, monitored or observed in accordance with this Agreement, neither Owner nor any of its representatives or agents reviewing such items, including the Owner's Engineer, shall have any liability for, under or in connection with the items such Person reviews or approves, and Contractor shall remain responsible for the quality and performance of the Work in accordance with this Agreement.  Owner's or its representative's inspection, review, monitoring, observation, acknowledgement, comment or approval of any items shall not constitute a waiver of any claim or right that Owner may then or thereafter have against Contractor.  Unless otherwise expressly provided herein, Owner shall not unreasonably delay its review of any item submitted by Contractor for review or approval; provided that the foregoing shall not be used to decrease any express time limitation for such review or approval set forth herein.  Any review, inspection, monitoring or observation by Owner or its representatives in accordance with this Agreement shall not constitute any approval of the Work undertaken by such Person, cause Owner to have any responsibility for the actions, the Work or payment of such Person (other than in respect of Owner's obligations to pay Contractor in accordance with Article 6) or to be deemed to be in an employer-employee relationship with Contractor or any Subcontractor, or in any way relieve Contractor of its responsibilities and obligations under this Agreement or be deemed to be acceptance by Owner with respect to such Work.

25.8    Third Party Beneficiaries.  The provisions of this Agreement and all rights of the Parties hereunder are intended for the sole benefit of Owner and Contractor and there are no third-party beneficiaries hereof (other than the Owner Financing Parties, Contractor Indemnified Parties and the Owner Indemnified Parties).

25.9    Further Assurances.  Owner and Contractor will each use its reasonable efforts to implement the provisions of this Agreement, and for such purpose each, at the reasonable request of the other, will, without further consideration, promptly execute and deliver or cause to be executed and delivered to the other such assistance, or assignments, consents or other instruments in addition to those required by this Agreement, in form and substance satisfactory to the other, as

the other may reasonably deem necessary or desirable to implement any provision of this Agreement.

25.10   Record Retention.  Contractor agrees to retain for a period of one (1) year from earlier of the Final Completion Date and the termination of this Agreement all material records relating to its performance of the Work or Contractor's warranty obligations herein.

25.11   Binding on Successors.  Subject to Article 20, this Agreement shall be binding on the Parties and on their respective successors, heirs and assigns.

25.12   Merger of Prior Contracts.  This Agreement supersedes any other agreements, whether written or oral, that may have been made or entered into between Owner and Contractor or by any office or officer of such Party relating to the Project or the Work, except to the extent explicitly incorporated herein.  This Agreement and the Exhibits attached hereto constitute the entire agreement between the Parties with respect to the engineering, procurement and construction of the Project, and there are no other agreements or commitments with respect to the Project except as set forth herein and therein.

25.13   Counterparts.  This Agreement may be executed in any number of counterparts, and either Party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  This Agreement shall become effective when each Party shall have received an executed counterpart of this Agreement, and an executed counterpart delivered by fax, .pdf or other means of electronic communications shall be deemed to be an original and shall be as effective for all purposes as delivery of a manually executed counterpart.

25.14   Set-Off.  Either Party may deduct and set-off against any part of the balance due or to become due to the other Party pursuant to this Agreement any amounts that are due from such other Party pursuant to this Agreement.

25.15   Fees and Expenses.  Except as specifically set forth herein, each Party shall be responsible for any legal fees and expenses, financial advisory fees, accountant fees and any other fees and expenses incurred by such Party in connection with the negotiation, preparation and enforcement of this Agreement and the transactions contemplated hereby.

25.16   Announcements; Publications.  Contractor shall not (either directly or indirectly), issue or make any public release or announcement with respect to or concerning entering into this Agreement or a Party's performance of its obligations under this Agreement, or permit any Subcontractor to do the same, without the prior written consent of Owner and affording Owner a reasonable opportunity to provide comments on such proposed release or announcement.

25.17   Independent Contractor.  Contractor is an independent contractor, and nothing contained herein shall be construed as constituting any relationship with Owner other than that of owner and independent contractor, except as expressly provided in this Agreement pursuant to which Owner appoints Contractor as Owner's agent, or as creating any relationship whatsoever between Owner and Contractor's employees.  Neither Contractor nor any of its employees is or shall be deemed to be an employee of Owner.

25.18  Independent Engineer.  Contractor acknowledges that the Independent Engineer will be engaged for the primary purpose of providing to the Owner Financing Parties a neutral, third party overview of the Work.  Owner shall cause the Independent Engineer to provide the Owner Financing Parties with (a) independent opinions and determinations, arrived at reasonably and in good faith, with respect to: (i) the status of the Work; (ii) the performance of the Project and equipment and the Functional Tests and Capacity Tests and the results and procedures related thereto; (iii) invoices submitted by Contractor; (iv) Contractor's quality control procedures for the Work and major components thereof; (v) the approval of Changes In Work; (b) independent opinions and determinations as the Owner Financing Parties otherwise may reasonably request; and (c) confirmation that all requirements for the achievement of Mechanical Completion, Substantial Completion or, as necessary, Final Completion, have been met by Contractor, in each case in form and substance reasonably requested by the Owner Financing Parties.  Owner shall be responsible for any delays, including delays in payment, in approval and in meeting the Guaranteed Substantial Completion Date, attributable to the Independent Engineer and the same shall constitute an Owner-Caused Delay.  Owner undertakes that it will use reasonable efforts to ensure that the Independent Engineer gives its countersignature or indicates that it is not willing to do so in relation to the relevant matter within the time specified in this Agreement for Owner to respond in relation to such matter; provided that any such unwillingness on the part of the Independent Engineer shall not affect or limit Owner's obligations hereunder.  The Independent Engineer may, at its option, attend any meetings between Owner and Contractor related to the progress of the Project and shall approve all Contractor's Invoices prior to any payment being made by Owner thereunder; provided that any failure by the Independent Engineer to approve a Contractor's Invoice shall not affect or limit Owner's obligations hereunder.  Notwithstanding anything else to the contrary contained herein, the Independent Engineer shall have no right to direct Contractor or any portion of the Work or to make any Changes In Work. Contractor shall maintain a complete, accurate and up-to-date log of all Change Orders and, upon request of the Independent Engineer, shall furnish copies of such log to the Independent Engineer.  Contractor shall afford the Independent Engineer the same rights as Owner with respect to access to the Site; provided that Owner shall be liable for any failure by the Independent Engineer to maintain the confidentiality of Confidential Information as required by Article 18.

25.19  Financing Matters.  In connection with any transaction (including collateral assignment by Owner of its rights, title and interest under this Agreement to any Owner Financing Party in accordance with Section 20.1) among the Owner Financing Parties and Owner or any of its Affiliates, Contractor shall:

(a)  execute and deliver, any reasonable consent document (which shall include acknowledgement of the Owner Financing Parties' security interest, assignment as security of Owner's rights under this Agreement, notice of Owner default, step-in/step-out cure rights and other reasonable provisions customary in project financings), legal opinion (regarding due authorization, enforceability and such other matters relating to such consent and this Agreement or the applicable Subcontract, as applicable, as reasonably requested) or other documents reasonably requested by Owner;

(b)  negotiate in good faith with the Owner Financing Parties regarding any modifications to this Agreement which are reasonably requested; and

(c)      shall agree to such modifications so long as such modifications or consent document provided the obligations imposed therein (i) are of a nature typically obtained by financing parties in non-recourse financing, and (ii) based on Contractor's belief, could not reasonably be expected to (A) delay, suspend or otherwise have an adverse impact the Project Schedule, (B) increase or have an adverse impact on Contractor's cost of performing the Work, including the Contract Price, or (C) restrict Contractor's rights or increase its obligations under this Agreement in any material respect.  Contractor agrees to make available, or to use commercially reasonable efforts to cause its Subcontractors to make available, to the Owner Financing Parties and the Independent Engineer, subject to an appropriate confidentiality agreement, independent reviewers, feasibility consultants, and other financial institutions or parties involved in the financing process, such information in the control of Contractor, its Affiliates and Subcontractors (including financial information concerning Contractor, its Affiliates and the Subcontractors) as may be reasonably requested by Owner.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**Fusion Renewable NA, LLC**, as Owner

By: _____

Name  Avi Avitan
Title   Member

Type text here

**iSun Utility, LLC**, as Contractor

By: _____

Name  Jeff Peck
Title   CEO

*Signature Page to Engineering, Procurement and Construction Agreement (Kendall Hill Project)*



2136 NE 123RD ST
NORTH MIAMI, FL 33181

**Kendall Hill – Amendment to EPC agreement and appendixes - table of contents**          **11.06.2022**

1. **AMENDMENT TO EPC AGREEMENT** ................................................................2-10

2. **Exhibit A** - Contractor's Scope of Work ................................................................ 11

    General ........................................................................................................ 11

    Structural ..................................................................................................... 11

    Electrical....................................................................................................... 11

    Owner-Furnished Equipment ...................................................................... 12

    Construction Requirements ........................................................................ 13

    Commissioning & Testing ............................................................................ 37

    Project Completion ..................................................................................... 37

    Site Layout and Single Line Drawing ..........................................................37-39

    Project Site Information............................................................................... 40

3. **Exhibit C** – Permits ............................................................................................. 41

4. **Exhibit H** – Commissioning & Performance Testing (H1-H3) ............................44-50

5. **Exhibit K** – Delay Liquidated Damages ................................................................ 51

6. **Exhibit B** – Milestone Payment Schedule ........................................................... 52

**\*\*Note from Amendment\*\***
The following Exhibits are deleted in their entireties: Exhibit A (Scope of Work); Exhibit C (Applicable Permits), Exhibit H (Commissioning and Testing"); Exhibit K (Liquidated Damages) and Exhibit Q (Milestone Payment Schedule) and replace with Exhibits A,C,H, K and Q respectively attached hereto and incorporated herein.

# FIRST AMENDMENT TO
# ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

This First Amendment to Engineering, Procurement and Construction Agreement (this "First Amendment") is made and entered into as of September 30, 2022, by and between Fusion Renewable NA, LLC, a Delaware limited liability company ("Purchaser"), and iSun Utility, LLC, a Delaware limited liability company ("Seller").  Purchaser and Seller are sometimes referred to collectively as the "Parties" or singularly as a "Party."

## W I T N E S S E T H:

**WHEREAS**, Owner and Contractor previously entered into that certain **Engineering, Procurement and Construction Agreement** dated as of December 31, 2021 (the "Agreement"); and

**WHEREAS**, Owner and Contractor now desire to amend the Agreement as hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**Section 1. Defined Terms**. Capitalized terms not otherwise defined in this First Amendment shall have the meanings ascribed to such terms in the Agreement.

**Section 2.     Amendments.**

(a)     The first Recital of the Agreement is deleted in its entirety and replaced with the following:

"WHEREAS, Owner maintains all ownership rights of ER Kendall Hill Solar, LLC, a Vermont limited liability company (the "Project Company") to develop an electrical generation facility consisting of approximately 3.1 MWdc/2.2 MWac of solar-powered electric generating capacity, to be designed, engineered, procured, constructed, tested, interconnected and commissioned under this Agreement and to be located in Pittsford, Vermont (the "Project") which is owned by the Project Company".

(b)     Section 1 of the Agreement is amended by adding:

"Contractor **Parent Guarantor**" means iSun Inc., a Delaware corporation.

"**Contractor Parent Guaranty**" means the guaranty provided by the Parent Guarantor in the form of Exhibit Z (Form of Contractor Parent Guaranty)."

"Owner **Parent Guarantor**" means Fusion Renewable NA, LLC, a Delaware limited liability company.

"Required Module Capacity" means the total capacity of the project, of 3.120 MWdc, as adjusted through approved design revisions and final as-built documentation.

(c)     Section 1 of the Agreement is amended by deleting Subsection (c) in the "Excusable Event" definition.

(d)     Section 1 of the Agreement is amended by inserting the following at the end of the first sentence after "dispute" in the "Force Majeure Event" definition: "or a delay in the delivery of supplies by vendors caused by an independent Force Majeure Event beyond such supplier or vendor's reasonable control, materially affecting such vendor (and for the avoidance of doubt, any such independent Force Majeure Event occurring after the Effective Date causing a vendor delivery delay shall not be treated as being foreseeable for purposes of determining whether a Force Majeure Event occurred if such delay is related directly to COVID-19 or the responses of any Persons to COVID-19)".

(e)     Section 1 of the Agreement is amended by deleting:

"**Parent Guarantor**" means Fusion Renewable NA, LLC (or any permitted assignee hereunder) upon assigning this Agreement to the Project Company."

(f)     Section 2.9 of the Agreement is amended by adding: "Such Owner Parent Guaranty shall terminate upon the earlier of (a) Financial Closing Date, or (b) Owner securing construction debt or any other form of debt funding".

(g)     Section 3.3.1 of the Agreement is amended by inserting the following as the second sentence: "All drawings, plans and specifications provided as part of Contractor Deliverables shall be reviewed and approved in advance by Owner, such approval not to be unreasonably withheld or delayed."

(h)     Section 3.3.2 of the Agreement is amended by adding the following as the last sentence: "All Major Project Hardware shall be reviewed and approved in advance by Owner, such approval not to be unreasonably withheld or delayed".

(i)     New Section 3.24 of the Agreement is added as follows: "Contractor Parent Guaranty. Contractor shall cause Contractor Parent Guarantor to provide the Contractor Parent Guaranty upon the Effective Date".

(j)     Not used.

(k)     Section 6.1 of the Agreement is deleted in its entirety and relaced with the following:

"Contractor Payments. Subject to the terms of Section 6.11, the Contract Price (plus any applicable Excluded Taxes) shall be paid by Owner to Contractor in connection with the achievement of Project milestones as set forth in Exhibit Q (Milestone Payment Schedule). Each payment to Contractor under this Section 6.1 shall be due and payable only to the extent it is supported, to Owner's reasonable satisfaction, by the completion of the applicable portion of the Work set forth in Contractor's Invoice raised on a monthly basis.  Provided, however, that Owner

2

may review and approve any Major Project Hardware and related supply contract terms selected by Contractor, such approval not to be unreasonably withheld and in accordance with Section 3.3.2, and in such event, Owner may, at its election, pay the supplier of such Major Project Hardware directly all amounts due to such supplier including any required deposits (and which such payments shall take the form reasonably required by the supplier). Any such payments by Owner shall take the form of a two-party check to be deposited solely by such supplier or other form of payment mutually agreed upon by the Parties to ensure that Contractor may book such payment for accounting purposes. Any payments made by Owner shall reduce future milestone payments on a pro rata basis".

(l)    Section 6.7 of the Agreement is amended by deleting "ten percent (10%)" and inserting "seven and a half percent (7.5%)".

(m)    Section 7.1(b) of the Agreement is amended by adding "By executing this Agreement, Owner hereby provides Contractor an LNTP, in accordance with the payment terms provided in Exhibit Q regarding milestone payment"

(n)    Section 8 of the Agreement is amended by deleting the Section in its entirety and replace with the following:

**"8 EXCUSABLE EVENT AND FORCE MAJEURE EVENT.**

8.1    Certain Events. No failure or omission to carry out or observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim against a Party, or be deemed to be a breach or an Event of Default under this Agreement, if such failure or omission shall be caused by or arise out of an Excusable Event or Force Majeure Event; provided that the Party claiming relief complies with the provisions of this Article 8. Notwithstanding anything to the contrary in the foregoing, the obligation to pay money in a timely manner in accordance with the terms hereof shall not be subject to the Excusable Event  Force Majeure Event provisions hereof.

8.2    Notice of Excusable Event or Force Majeure Event. If a Party's ability to perform its obligations under this Agreement is affected by an Excusable Event or Force Majeure Event, the Party claiming relief shall give to the other Party (a) verbal or email notification describing the particulars of the Excusable Event or Force Majeure Event within forty-eight (48) hours after such Party becomes aware of the occurrence of the Excusable Event or Force Majeure Event (but in no event later than two (2) Business Days after the initial occurrence of the Excusable Event or Force Majeure Event) and (b) Notice describing the particulars of the Excusable Event or Force Majeure Event as soon as is reasonably practicable and in any event within five (5) Business Days after when the Party becomes aware of the Excusable Event or Force Majeure Event and its impact on the Work describing in reasonable detail the particulars of the occurrence giving rise to the claim, including what date the Party claiming relief became aware of the occurrence of such event and an estimate of the event's anticipated duration and effect upon the performance of its obligations, and any action being taken to avoid or minimize its effect. The Party claiming relief due to an Excusable Event or Force Majeure Event shall have a continuing obligation to deliver to the other Party regular updated reports and any additional documentation and analysis

3

supporting its claim regarding an Excusable Event or Force Majeure Event (other than an Owner-Caused Delay) promptly after such information becomes available to such Party.

8.3     Excusable Event or Force Majeure Event Conditions.  Upon the occurrence of an Excusable Event or Force Majeure Event:

(a)     the suspension of, or impact on, performance due to such Excusable Event or Force Majeure Event shall be of no greater scope and no longer duration than is required by such event (taking into account the obligations affected thereby);

(b)     the Party claiming relief due to an Excusable Event or Force Majeure Event shall use its commercially reasonable efforts:

(i)     to mitigate or limit the duration of, and costs arising from, any suspension or delay in, or other impact to, the performance of its obligations under this Agreement (including any impact to the schedule for the performance thereof);

(ii)     to continue to perform its obligations hereunder not affected by such event; and

(iii)     to correct or cure the effect of such event; and

(c)     when the Party claiming relief due to such Excusable Event or Force Majeure Event is able to resume performance of its affected obligations under this Agreement, such Party shall give the other Party Notice to that effect and promptly resume performance of all of its obligations under this Agreement.

8.4     Contractor's Remedies. As Contractor's remedy for the occurrence of an Excusable Event or Force Majeure Event, and provided that Contractor has otherwise materially complied with the applicable provisions of Article 8, if an Excusable Event or Force Majeure Event occurs, and to the extent such Excusable Event or Force Majeure Event has an actual and demonstrable adverse impact on Contractor's ability to perform its obligations hereunder so as to achieve the Guaranteed Substantial Completion Date: (a) the Project Schedule and the Guaranteed Substantial Completion Date shall be correspondingly extended by the period of time (if any) that Contractor's achievement of Substantial Completion is actually and demonstrably delayed as a result of the impact of such an Excusable Event or Force Majeure, and (b) if due to an Excusable event only, Contractor's costs increase despite Contractor's commercially reasonable efforts to mitigate any such increases, the Contract Price shall be increased by an amount equal to the actual and reasonably substantiated costs (including all Taxes other than those based on net income) incurred by Contractor (including any costs incurred by Contractor in connection with the mitigation measures implemented by Contractor and any demobilization and re-mobilization costs In all cases, Contractor shall use its commercially reasonable efforts to overcome or mitigate the effects of such occurrence without seeking a Change Order.

8.4.1  Changes In Work. Upon the occurrence of an event that entitles Contractor to relief under this Section 8.4.1, and subject to Contractor's compliance with the applicable provisions of this Article 8 Contractor and Owner shall prepare a Change Order in accordance with Article 13."

4

(p)    Section 10 .3 of the Agreement is amended by adding: "PVsyst simulation will be prepare and agreed by the parties in good faith by 06.10.22 based on CC PVsyst simulation parameters which is not related to the physical location deference."

(q)    Section 12.1 (Delay Liquidated Damages) of the Agreement is deleted in its entirety and replaced with:

(r)    "Delay Liquidated Damages. Contractor agrees that if Substantial Completion is not achieved by the Guaranteed Substantial Completion Date, then Contractor shall pay the Delay Liquidated Damages to Owner for each day that Contractor fails to achieve Substantial Completion after the Guaranteed Substantial Completion Date. However, any delay in achieving Substantial Completion caused due to a Force Majeure Event, delay or other inability to obtain necessary materials or export licenses or by suppliers if such delay is caused by an independent Force Majeure Event affecting such vendor (and for the avoidance of doubt, any such independent Force Majeure Event beyond such supplier's reasonable control occurring after the Effective Date causing a vendor delivery delay shall not be treated as being foreseeable for purposes of determining whether a Force Majeure Event occurred if such delay is related directly to COVID-19 or the responses of any Persons to COVID-19), shall not trigger Delay Liquidated Damages".

(s)    The following is added as new Section 12.4.1:

(a)    "Interim Liquidated Damages. Interim Liquidated Damages, as defined in Exhibit K, shall be paid by Contractor to Owner upon a delay of the Guaranteed Substantial Completion Date. Further any such Interim Liquidated Damages shall be adjusted to correspond to the amount of days, if any, by which Contractor misses the Guaranteed Substantial Completion Date.

(b)"Sole Remedy; Liquidated Damages Not a Penalty.  The remedies provided for in this Article 12, shall, in addition to Owner's rights to terminate this Contract, be the sole and exclusive remedies of Owner for failure of Contractor or the Project (a) to achieve Substantial Completion by the Guaranteed Substantial Completion Date, (b) to achieve the Minimum Guaranteed Capacity, and (c) to achieve the Minimum Guaranteed Generation.  The Parties agree that Owner's actual damages in the event of such delay or failure may be extremely difficult or impracticable to determine. After negotiation, the Parties have agreed that the Delay Liquidated Damages, Initial Capacity Liquidated Damages, Final Capacity Liquidated Damages and Energy Liquidated Damages are in the nature of liquidated damages and are a reasonable and appropriate measure of the damages that Owner would incur as a result of such delays or failures, and do not represent a penalty".

(t)    Section 14.1 of the Agreement is amended by inserting the following after the last sentence: "Contractor shall assign any warranty related to Major Project Hardware Warranties and Major Subcontractors to Owner and shall make commercially reasonable efforts to assist Owner in enforcing such warranties."

(u)    Section 14.2 of the Agreement is amended by deleting: "eighteen-months (18) months" and inserting "twenty-four (24) months".

5

(v)      Section 15.1.2 of the Agreement is deleted in its entirety and replaced with the following:

"Transfer.  Subject to Section 15.2, title to the Major Project Hardware and other items that become part of the Project shall pass to Owner upon delivery to the Site of such Major Project Hardware or other items; provided, however, that Contractor will maintain a purchase money security interest (or such other similar interest if a purchase money security interest is not available), until Owner pays for such Major Project Hardware, in such Major Project Hardware and other items and Owner agrees to execute such documents as reasonably requested by Contractor to secure such interest."

(w) Section 23.2.1 of the Agreement is amended by deleting "portion of" and "paid to Contractor" in the second and third lines.

(x) The following Exhibits are deleted in their entireties: Exhibit A (Scope of Work); Exhibit C (Applicable Permits), Exhibit H (Commissioning and Testing"); Exhibit K (Liquidated Damages) and Exhibit Q (Milestone Payment Schedule) and replace with Exhibits A,C,H, K and Q respectively attached hereto and incorporated herein.

(y)      Exhibit Z (Form of Contractor Parent Guaranty), attached hereto as Exhibit Z is added to the Agreement.

**Section 3 Effect of Amendment**. Except as expressly amended by this First Amendment, the Agreement shall remain in full force and effect in accordance with its terms.

**Section 4 Governing Law**. This First Amendment and all matters arising hereunder or in connection herewith shall be governed by and construed in accordance with the internal laws of the State of Vermont, without regard to conflicts of law principles that would require the laws of another jurisdiction to apply.

**Section 5 Counterparts**. This Second Amendment may be executed by the Parties in one or more counterparts, all of which taken together, shall constitute one and the same instrument.

**Section 6   Severability**.  In case any provision in this Second Amendment is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not be affected.

**Section 7 Headings**. The headings and captions used in this Second Amendment are inserted for reference and convenience only and the same shall not limit or construe the sections, articles or paragraphs to which they apply or otherwise affect the interpretation thereof.

**Section 8   Signatures**.  The exchange of copies of this Second Amendment and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Second Amendment as to the Parties and may be used in lieu of the original Second Amendment for all purposes. Signatures of the Parties transmitted by facsimile or other electronic means shall be deemed to be their original signatures for all purposes.

6

[*Signature pages follow*]

      **IN WITNESS WHEREOF**, the Parties have caused this Second Amendment to be executed and delivered by their duly authorized representatives as of the date and year first above written.

**OWNER:**

**Fusion Renewable NA, LLC**

By:_____
    Name: <u>Niv Sarne</u>
    Its: <u>CEO</u>

**CONTRACTOR:**

**iSun Utility, LLC**

By: *Jeffrey Peck*_____
    Name: <u>Jeffrey Peck</u>
    Its: <u>CEO</u>

1

**IN WITNESS WHEREOF**, the Parties have caused this Second Amendment to be executed and delivered by their duly authorized representatives as of the date and year first above written.

OWNER:                    CONTRACTOR:

**Fusion Renewable NA, LLC**        **iSun Utility, LLC**

By: *Niv Sarne*        By: _____

   Name  Niv Sarne          Name: _____

   Its: CEO _____      Its: _____

1

Exhibit A

Contractor's Scope of Work – Kendall Hill Solar

- General:

    - Contractor shall construct a turnkey 2.2 MW AC /3.1 MW DC solar field and all other components of the Facility, connected to the Owner-Provided 12.47kV breakers at the Substation.
    - Contractor shall permit, procure, construct, commission and test the Facility and to comply with all Performance Test requirements as well as all applicable Legal Requirements, Prudent Industry Standards, and manufacturer requirements. Contractor shall coordinate with Owner, the Governmental Authority, and third party engineers to deliver of a complete, operational and reliable turnkey Facility.

    - Permitting: Contractor shall design and construct the Facility in accordance with:

    - all Contractor Permits and Owner Permits


- Structural

    o Pile Load Test. Contractor shall confirm that the pile load test performed by Owner conforms to the following requirements and  any other requirements of a Governmental Authority, Equipment manufacturer and Contractor's engineers and structural engineers:
    o The Pile Load Test will have sufficient amount of test piles to cover entire Site potential soil types
    o ASTM D 3689: Standard Test Method for individual Piles under Static Axial Tension (upward, pull-out load);
    o ASTM D 3966: Standard Test Method for Piles Under Lateral Loads;
    o ASTM D 1143: Standard Test Method for individual piles under static axial compressive load (downward).
    o To the extent that Contractor believes that the Owner's pile load test is inadequate in any way, Contractor will perform or reperform the test at Contractor's expense.

- Electrical
    - AC VLF Tan Delta Test Reports for all MV AC cables;
    - DC Megger Test Reports for all DC home runs;
    - DC Megger Test Reports for all string wire;
    - String Voc/Isc testing utilizing Seaward PV-150 Testing equipment (or similar equipment);
    - Transformer oil sample test reports for all transformers;
    - MV Cable Ampacity calculations and Transformer Testing Reports;
    - Contractor shall ensure that they will install appropriate sizing of all conduits that will connect all system components.
    - Contractor shall ensure that all underground wiring and cables shall be installed with

a minimum of two (2) feet of cover and meet code requirements.

□ Contractor shall ensure that the above ground portion of the electrical systems shall be neatly routed through the facility for access, troubleshooting, and maintenance purposes. (Wire management is a key component of the installation)

□ Contractor shall ensure that all protection equipment throughout the Facility will be sized and specified in accord with industry standards.

□ Contractor shall submit all serial numbers of all inverters, transformers and modules used in the installation to Owner. No module scanning will be required, but Contractor shall track bills of lading for the modules used at the Facility so that Owner can use for its records.

□ Owner-Furnished Equipment.

□ Owner shall procure and deliver for unloading by Contractor modules and the Substation in accordance with Exhibit Y, unless changed in accordance with the terms of the Agreement. Contractor shall coordinate delivery of the modules to the Site directly with Adani and its affiliates, as applicable.

□ Wire. Contractor shall procure AC, DC, grounding, monitoring and communications wiring in accordance with all applicable codes and standards (excluding fiber communication demark), including the low voltage (0.6kV) cable from the array site to the circuit breaker switches on the low side of the Facility generator step up transformer inside the Substation. Contractor shall procure aluminum AC and DC conductor wire. All string wire shall be copper.

□ Gen-Tie. Contractor shall procure and install an underground aluminum cable sized appropriately per Owners's engineering studies as well as a 12 strand fiber to the 12.47 KV air switches.

□ Other Equipment. Contractor shall procure all other associated facilities including, but not limited to concrete pads, junction boxes, mounting clamps, wire trays, combiners, supports, disconnect switches, circuit, and galvanization, all in accordance with drawings, specifications, Utility requirements, Prudent Industry Standards and manufacturer requirements.

□ Procurement: Contractor shall procure and install all Equipment and materials to provide a turnkey Facility including, but not limited to the items listed in this Section 4 (except for the of Owner-Furnished Equipment). Contractor will include all sales tax if any for material and Equipment purchased by Contractor. Contractor shall also coordinate delivery of all Equipment and materials to the Site necessary to properly connect the
Facility to the Substation, including the owner furnished equipment.

▢ Security System. Contractor shall procure and install the following Equipment to provide security for the Facility (collectively the "Security System"):

- ▢ a minimum of two locked gates with Knox Box (if required), gate stops, and any additional locked gates required to meet all Fire Department and Governmental Authority requirements;
- ▢ physical address signs and 10 miles per hour speed limit signs at all site entrances.
- ▢ 6.0-foot galvanized chain link fencing with an additional 14-inches of barbed wire enclosing all Facility Equipment.

- o Signage. Contractor shall procure all signage to comply with Fire Department, Governmental Authority, and NEC requirements.
- o Site Logistics. Contractor shall provide required rigging, hoisting, handling and distribution for the entire installation.
- o Construction Facilities. Contractor shall be fully responsible for all general requirements and temporary facilities including, but not limited to storage, dust control, dumpsters, temporary toilets, hand wash stations, temporary culinary water set up and temporary power.
- o All Other Procurement. Contractor shall provide all other materials and equipment necessary to deliver a turnkey facility.

▢ Construction Requirements:

▢ Utility Locate. Contractor shall be fully responsible for verifying the location of existing utilities and staking the Facility prior to performing any subsurface Work on the Site. Following installation of underground Equipment, Contractor shall provide confirmation that all underground facilities have been registered with blue stake DigAlert and any other pertinent utility locate company, and Owner will assist, as necessary.

- o Permits. Contractor shall obtain written approval from Owner and the Governmental Authority prior to deviating from the approved building permits or plans. Contractor shall not perform any Work on Site without obtaining any required encroachment and building permits unless Owner provides approval in writing.

- o 1st Array Block Approval. Shortly after NTP, but prior to commencing construction in earnest, Contractor shall build a typical array block (including rebar, trenching, etc.) showing the array assembly and the wire management Contractor intends to replicate for the balance of the array. Owner will have three Business Days to approve the typical array block constructed by Contractor or to request changes to Contractor's typical array block assembly, for approval by Contractor upon Owner's reasonable request. Following Owner's approval of the typical array block (with the Owner changes described above) Contractor shall replicate that array block throughout the balance of the array and shall consult with Owner if any situations arise that were not originally demonstrated in the typical array block prior to finalizing construction on such portions of the array.
  - ▢ 1st Pad Mount Transformer Approval. Shortly after NTP, but prior to

Exhibit B-1-3

commencing construction in earnest, Contractor shall build a typical string inverter, transformer and associated Equipment (including rebar, trenching, or a preconstructed pad rules apply), app showing the footings, foundations and the wire management Contractor intends to replicate for the balance of the inverter stations. Owner will have three Business Days to approve the typical inverter station constructed by Contractor or to request changes to Contractor's typical inverter station, for approval by Contractor upon Owner's reasonable request. Following Owner's approval of the typical inverter station (with the Owner changes described above) Contractor shall replicate that inverter station throughout the balance of the Facility and shall consult with Owner if any situations arise that were not originally demonstrated in the typical inverter station prior to finalizing construction on such portions of the array (including slopes and adjacent civil work).

☐ Fire Improvements. Contractor shall install all fire protection improvements as required by the Fire Department.

☐ BMPs. Contractor shall install and provide periodic and continuous maintenance of all Best Management Practices (BMP) including devices, protocols and facilities listed in the Governmental Authority SWPPP for the project, including dust control.

☐ Earthwork. Contractor shall be fully responsible for mowing, if applicable, excavation, backfilling, and compaction of the Site in accordance with, applicable Legal Requirements and Prudent Industry Standards.

☐ Trenching. Backfill of electrical trenches shall be native soils if acceptable for that purpose. Trench Compaction shall be min 90% ASTM, as with compaction testing with the exception of roads that will be compacted as stated below. Any excess spoils will be spread on Site.

  ☐ Backfill. All AC and DC conductor wiring shall be direct buried. Backfill shall be native material. Backfill shall be clear of rocks over 3/4" for first foot of cover. Following backfill and compaction, the Site and the property must be capable of being mowed.

  ☐ Elevations. Prior to installation of Equipment, Contractor's civil engineer shall verify that all grading and slopes are in compliance with the grading plans/civil sheets and the geotechnical recommendations. Interior access road compaction can be completed following construction of the Facility. Equipment pads should be elevated above grade (minimum 3") to prevent potential debris from flowing across pads

☐ Security System. All pad lockable equipment (excluding combiner boxes) will be secured with 4 digit programmable combination locks rated for outdoor use (Owner shall provide the combination). All gates will be secured with 4 digit programmable combination locks and Knox boxes (if required) (Owner shall provide the combination).

☐ Roadways. Contractor shall scarify interior access roadways to 12" and provide compaction testing to confirm re-compaction of native material to 90% at a minimum or higher to meet Governmental Authority or County Fire Department requirements if more stringent. The moisture content, density and relative compaction should be consistent with the geotechnical recommendation.

☐ Roadway Elevations. Contractor shall ensure that compacted road elevations

match the pre-compaction existing elevations to ensure natural drainage across the Site. Care shall be taken to ensure that localized depressions do not occur within compacted areas. Compacted areas shall not be lower than adjacent ground elevations.

☐ Driveway. Contractor shall construct all-weather surface entrance and access drive in accordance with the CUP site plans and any approved modifications to those plans by the Governmental Authority , all as approved by the Owner and the Governmental Authority.

☐ Foundations. Contractor shall install all foundations as required to facilitate mounting and anchoring of the Facility in accordance with the requirements specified in the structural engineering package.

☐ Wiring. Contractor shall install all AC, DC, grounding, monitoring, and communications wiring including, but not limited to digging of trenches, directional boring, setting of electrical poles, conduit riser, cable tray and pulling wires.

☐ Grounding. All grounding shall be per approved drawings, and meet NEC as well as racking and module manufacturer requirements.

Exhibit B-1-5

Connections. All Aluminum connections shall be terminated with crimped connections not mechanical lugs.

☐ Wire Standard. Contractor shall ensure all cables and wires are suitably rated and protected from the environment.

☐ USE Cable. Wiring from PV modules to combiner boxes shall be USE copper cable not in conduit, free wired on the back of the solar modules, with wire management clips and minimal use of tie wraps.

☐ Conductors. All MV conductors shall be direct buried aluminum.

☐ String Wire. All array wiring from array to combiner boxes shall be copper conductors

☐ Fence Grounding. Array fence grounding shall comply with NEC, NESC, contractor's grounding study, Utility, and Governmental Authority requirements.

☐ General Wire Routing. All AC utilities on the Site shall be underground with the exception of the switchyard facilities interconnecting to the Substation. The DC wiring between the combiner boxes and the inverters will be in strut supported open ladder cable trays (supported per manufacturer recommendations) with appropriate transitions from the cable trays to underground and from the underground through a conduit into the inverter.

☐ Gen Tie. Contractor shall construct the Facility Gen-Tie consisting of one underground circuit commencing at the Facility vista switch and terminating at the circuit breaker switches on the low side of the Facility generator step up transformer inside the Substation (the Gen-Tie). Contractor shall include as part of the Work, all Equipment required to provide connectivity to the Facility array disconnect switches as well as all Equipment required to provide connectivity to the Facility circuit breaker switches in the Substation. All borings required by the Permits or Owner's Easements and crossing consents will be conducted in accordance with such documents and at a minimum will be constructed using 8" HDPE SDR 13.5 type conduit. Contractor shall install GPS markers on all underground splice locations. Contractor shall install approved plastic "paddles" at the as built location of all for Gen-Tie and collection system crossings of any utility rights of way. Contractor shall install utility markers at all road crossings. Contractor shall ensure that all splices are water-resistant and marked with GPS markers. In addition to the GPS markers, Contractor shall provide Owner with GPS locations of all splices as part of the deliverables. All splices to be tested prior to energization. Contractor shall coordinate closely with Owner to ensure that the Gen-Tie is placed in a location that is approved in Owner's easements and other Site control documents. To the extent that Contractor places the Gen-Tie outside of the areas approved in Owner's easements and Site control documents, or fails to coordinate with Owner, Contractor will be responsible for relocating the Gen-Tie at Contractor's expense.

☐ Fiber Connection. Contractor will provide an underground 12 strand SM fiber-optic communication cable for the Facility from a splice box located at the Facility array near the Facility vista switch to the Facility's control house/SCADA rig located in the Substation. To the extent that any devices, connectors, boards or other Equipment may be required to provide complete fiber connectivity at the Facility array or the Substation, Contractor will provide such equipment as part of the Work.

Exhibit B-1-6

- All splicing will be provided by Contractor with all splices located along the 0.6kV collection feeder routes performed by Contractor. Splices at the line terminals (Substation, and collection feeder risers or vaults) will be performed by the Contractor. The Contractor shall provide fiber-optic cable from the splice box locations, as described herein, into the Facility control house and terminate into communications gear within the Facility substation control house at the Substation. Contractor will provide continuity test data and attenuation test data for the fiber-optic line between the two termination points as described herein. Contractor shall coordinate closely with Owner to ensure that the fiber line is placed in a location that is approved in Owner's easements and other Site control documents. To the extent that Contractor places the fiber line outside of the areas approved in Owner's easements and Site control documents, or fails to Coordinate with Owner, Contractor will be responsible for relocating the fiber line at Contractor's expense.
- Facility Installation. Contractor shall install solar PV modules, racking, power stations and wiring/cabling to those stations in accordance with drawings, specifications, interconnection provider requirements, Prudent Industry Standards and manufacturer requirements.
- Metallurgy. Dissimilar metals shall not come into contact, other than per manufacturer approved components / systems.
- Module Damage Reporting. Contractor shall have fifteen (15) days from the date of delivery to report any damage of Owner-Furnished Equipment.
- Foundations. Contractor shall install power stations and power station foundations to include inverters, step-up transformers, monitoring equipment and vista switch, as applicable. The foundations shall include concrete break testing, as applicable, per approved structural engineer requirements.
- Intentionally omitted.
- Instrumentation. Contractor shall permanently install the equipment listed in Section 10 of this Exhibit.
- Equipment Installation. Contractor shall install all other associated facilities including, but not limited to concrete pads, chain link fencing, block wall, gates, junction boxes, mounting clamps, wire trays, combiner boxes, supports, disconnect switches, circuit breakers, in accordance with drawings, specifications, interconnection provider requirements, prudent industry standards and manufacturer requirements. Contractor shall install all signage to comply with Fire Department, Governmental Authority and NEC requirements. Contractor shall commission combiner box monitoring and ensure connection to SCADA system.
- Turnkey Facility. Contractor shall install all materials, equipment and components required to provide a complete turnkey project as would be required for another project of comparable size in accordance with Prudent Industry Standards.
- Safety. Contractor shall provide safety professionals and personnel capable of performing tasks associated with safety evaluations.

- Must have 6 months of recent construction experience
- Must have reliable transportation
- Must be able to pass a background check and a pre-employment drug screen
- Must be able to work outdoors in varying degrees of weather
- Must be able to lift 50 pounds
- US Citizens and all other candidates that are authorized to work in the US are encouraged to apply. Sponsorship is not available.
- Vegetation. Contractor shall not grade the Site except where authorized in the approved building and grading permits. Mowing is only allowed if grasses are in excess of 6 inches tall. In areas where the surface of the Site is disturbed, Contractor shall apply hydroseed with a native seed mix to all disturbed areas to the satisfaction of the Owner and Governmental Authority. Contractor shall conduct all hydroseeding activities in accordance with the pertinent provisions in the Permits, including the dust control plan, the weed control plan (as applicable), the revegetation plan (as applicable), SWPPP, CUP and MMRP requirements, and building permits. The foregoing obligations are collectively referred to as the "Revegetation Requirements."
- Hydroseed. To the extent permitted by the Revegetation Requirements, a hydroseed slurry of native plant seeds, wood fiber mulch, and tackifier shall be applied under the solar modules only in locations where there is exposed soil once installation of the modules has been completed. If permitted by the Revegetation Requirements and Owner, any areas that have existing vegetation will not be hydroseeded.
- Mulch. Fiber mulch, if used, shall consist of 100 percent wood fibers processed specifically for hydraulic applications. Use of paper mulch shall not be permitted. Wood fiber mulch, such as Conwed Fibers® Hydro Mulch® 1000 with TriFlo™, shall be applied at a rate of approximately 1,200 lbs/acre at a mixing ratio of approximately 400 pounds per 3,000 gallons of water (general guidance- contractor may adjust mixing ratio as needed in the field). Pre-dyed wood fiber mulch will allow identification of where the mixture has been applied and is recommended but not required.

☐ Oil Disposal. All used oil (as defined in Section 25250.1 of the Vermont Health and Safety Code) shall be disposed of in accordance with all local, State, and federal regulations following consultation with the City of Pittsford Public Health Services Department/Environmental Health Division/Hazardous Materials Section, the State of Vermont Department of Health Services, and the Environmental Protection Agency. All used oil and other wastes shall be transported by a registered waste hauler.

☐ Site Cleanup. Following NTP, Contractor shall keep the Site, and the fence free of tumbleweeds, pre-existing trash, as well as construction and laborer generated trash. If any trash is deposited or blows from the Site on to neighboring property, Contractor shall remove and dispose of the trash.

☐ Independent Engineer Support. Contractor shall provide Owner with support for obtaining Owner's reports with the Independent Engineer, including but not limited to scheduling tests (other than the Performance Tests) specified in this Agreement at the times specified by Owner to ensure that all information requested by Owner is received in a timely fashion.

☐ Wire Management. Contractor shall adhere to the following wire management guidelines to ensure the longevity of the Facility.

☐ Use of Wire Clips. Contractor shall use Owner approved wire clips to connect and support wires to module frames (approved wire clip list below). Contractor shall not use tie wraps unless no wire clip can reasonably used. Each use of a tie wrap must be approved by Owner's construction manager.

☐ Approved Wire Clips. In each case the wire clip selected by Contractor must be of sufficient strength to support wires and movement of racking. Subject to the foregoing limitation, Contractor shall only use the following wire clips when constructing the Facility:

☐ Wiley Electronics SS Wire Clips or equal

☐ T&B Nylon Wire Clips or Equal

☐ Heyco Products Straight and 90 degree clips

☐ Wire Loom. Contractor shall use wire loom for transitions on piers and transition across torque tubes between motors and drives. Contractor shall not use tie wraps for such application.

☐ Sunlight Exposure. Contractor shall protect any open wire that is exposed to direct sunlight for a length over 6" from the sun by using wire loom or other form of approved wire cover.

☐ Contractor shall shield all MC connectors from direct exposure to sunlight and weather. IE must be completely under module.

☐ Tie Wraps. Contractor shall adhere to the following specifications when using tie wraps.

☐ Contractor may use tie wraps to bundle wires together but not as the support method to structure or module.

☐ When using tie wraps, Contractor shall avoid pinching wire insulation, and ensure that the tie wrap is pulled to a reasonable tightness.

- Tie wraps may be used to secure wires in cable trays.
- All tie wraps used by contractor shall have a minimum width of 0.185 inches
- Contractor shall only use heat stabilized/ultraviolet resistant cable ties.
- Wire Transitions. Contractor shall adhere to the following specifications regarding wire transitions.
- Transition of wires from one surface to the other over the edge of racking or tray shall be properly protected from chafing and damage by providing protective cover for wire at these locations.
- All wires transitioning from tray to underground shall be properly protected from damage and contact from lawn/vegetation maintenance equipment.
- All transition of wires in cable tray from one elevation to another shall have proper waterfalls installed with protection of wire from any sharp edges.
- Edge guard need to be employed to protect wire from sharp edges and should have metal adhesion properties (not glue) and be UV rated to ensure longevity.
- Minimum Wire Bending Radius. Contractor shall ensure that the minimum bend radius of all wires will be per the manufacturer requirements.
- String Wire. Contractor shall adhere to the following string wire specifications:
- String wire shall be supported within 12" of the module junction box and at interval to properly support cables.
- MC connectors are required to be accessible at all time for maintenance and inspection. MC connectors will never located in conduit or boxes.
- String wire needs to be clear and supported away from sharp edges and hardware like IE bolts. In areas of unavoidable contact, edge and thread guards need to be used.
- Extra care shall be taken to ensure module string wire coming out of the junction box has proper radius and is not pulled too tightly to avoid damaging the wire, insulation, or junction box termination.
- String harness being made off site with MC connectors must be capped to prevent dust infiltration before arriving on site.
- Bundled string wires must be secured/protected from wind
- Wire Marking. Contractor shall adhere to the following wire marking specifications:
- All string wire home runs need to be permanently and clearly printed on both ends of the terminations.
- Wire markers shall be wire sleeves Brady or Equal. No wrap around wire markers are acceptable.
- All DC Home runs from combiner boxes to Inverter or re-combiner need to be permanently and clearly labeled on both ends of the terminations
- Multi Contact Connectors. Contractor shall adhere to the following:
- Module to module wiring MCs must be plugged together into strings and capping the MC connector early in the install.
- Tracking motors and modules must have plugs capped until connecting
- Gland nuts on MC connectors must be on tight.
- Cable Trays. Contractor shall adhere to the following cable tray specifications:
- Minimum height shall be 6 inches up from ground to bottom of rail
- Maximum height shall be 20 inches up to the bottom of rail

Exhibit B-1-10

| AIR-3/COA 23 | Hauling Trucks | All trucks hauling excavated or graded material on-site shall comply with State Vehicle Code Section 23114 regarding the prevention of such material spilling onto public streets by use of shed boards, truck covers, and other protective measures. | Contractor |
|---|---|---|---|
| AIR-4/COA 24 | AVAQMD Measures | During construction activities, excessive construction equipment and vehicle exhaust emissions shall be controlled by implementing the following procedures, as specified by the AVAQMD.<br><br>• Properly and routinely maintain all construction equipment, as recommended by manufacturer manuals, to control exhaust emissions;<br>• Shut down equipment when not in use for extended periods of time to reduce emissions associated with idling engines;<br>• Encourage ride sharing for construction employee commuting to the project site; and<br>• Use electric equipment for construction whenever possible in lieu of fossil fuel fired equipment. | Contractor |
| BIO-1/COA 25 | WEAP | Prior to construction, a qualified biologist shall conduct environmental awareness training for all construction personnel. This training shall be given to construction personnel to brief them on how to recognize special-status plant species, special-status wildlife species, and sensitive habitats. Construction personnel shall also be trained on all required mitigation measures and best management practices. This training shall be provided to each new construction contractor/personnel prior to the individual doing any work on the project site. Copies of the environmental training reference pamphlets shall remain onsite throughout construction of the proposed project. The copies of the pamphlets shall be available to any personnel upon request and shall be visibly posted in the construction trailer. | Owner (provide training program/monitor) / Contractor (training/ compliance) |

| BIO-2/COA 26 | Pre-Construction Survey - Nesting Bird | A nesting bird survey for migratory birds and raptors, including the ferruginous hawk, Swainson's hawk, loggerhead shrike, and mountain plover, shall be conducted within 30 days of the issuance of any construction related permits. In the event that an active bird nest is encountered during the survey, a non-activity buffer zone shall be established and the nest shall be monitored by a biologist to ensure site activities do not cause it to be abandoned. Fencing and/or flagging will be used to delineate the no-activity zone. To minimize the potential effect to the reproductive success of the nesting pair, the extent of the no-activity zone will be based on the distance of the activity to the nest, the type and extent of the proposed activity, the duration and timing of the activity, the sensitivity and habituation of the species, and the dissimilarity of the proposed activity to background activities. The no-activity zone will be large enough to avoid nest abandonment and will generally range between 50 and 500 feet from the nest, or as otherwise required by CDFW, depending upon the species. | Owner (survey/monitor) / Contractor (training/ compliance) |
| --- | --- | --- | --- |
| BIO-3/COA 27 | Pre-Construction Survey - Burrowing Owl | A qualified biologist shall conduct a preconstruction survey for burrowing owls within 30 days of initiating ground-disturbing activities. The survey area shall encompass the work area plus a 500 feet buffer surrounding the project site. If burrowing owls are present in the direct disturbance area and cannot be avoided, passive relocation techniques, such as installing one-way doors at burrow entrances, may be used. Passive relocation methods should only be used during the breeding season if a qualified biologist has determined that the nest is unoccupied. If additional owl burrows are within 500 feet of the project's construction, CDFW shall determine if the owls are or would be affected by construction and, if establishing an exclusion zone is required, determine if the burrow is occupied or not. | Owner (survey/monitor) / Contractor (training/ compliance) |

| BIO-4/COA 28 | Pesticides | No rodenticides, pesticides, or herbicides shall be utilized on the project site. | Contractor |
|---|---|---|---|
| BIO-5/COA 29 | Pre-construction Survey - Kit Fox, Coast Horned Lizard, American Badger | A qualified biologist shall conduct a preconstruction survey for desert kit fox, coast horned lizard, and American badger within 30 days of initiating ground- disturbing activities. The biologists will conduct den searches by systematically walking transects through the project site and a buffer area. Transect distance should be based on the height of vegetation such that 100 perfect visual coverage of the project site is achieved. If a potential or known den is found during the survey, the biologists will measure the size of the den, evaluate the shape of the den entrances, and note tracks, scat, prey remains, and recent excavations at the den site. The biologists will also determine the status of the dens and map the features. Written results of the surveys including the locations of any potential or known desert kit fox dens will be submitted to CDFW within 5 days following completion of the survey and prior to the start of ground disturbance or construction activities.<br><br>After preconstruction den searches and before the commencement of construction activities, exclusion zones will be established outward from the entrance or cluster of entrances of any occupied den. Construction activities will be prohibited or greatly restricted within these exclusion zones. Only essential vehicular operation on existing roads and foot traffic will be permitted. All other construction activities, vehicle operation, material and equipment storage, and other ground-disturbing activities will be prohibited in the exclusion zone. Barrier fencing will be removed within 72 hours of completion of work. | Owner (survey/monitor) / Contractor (training/ compliance) |
| BIO-6/COA 30 | BCCS | In order to minimize potential construction, operations, and maintenance related impacts to bird and bat species, the applicant shall develop a Bird and Bat Conservation Strategy (BCCS) prior to the onset of project activities. As part of the development of | Owner (survey/monitor) / Contractor (training/ compliance) |

| | | | |
|---|---|---|---|
| | | the BCCS, a Nesting Bird Monitoring Plan will be developed to manage bird nesting within the project during operations, which will avoid and minimize any effects to actively nesting avian species. Adaptive management measures will also be included as part of the BCCS in order to effectively manage the results of implemented Monitoring Plan to minimize impacts to bird and bat species. | |
| BIO-7/COA 31 | Pre-construction Survey - Special Status Plants | To avoid or minimize potential impacts to endangered, threatened, rare, and/or special status plants within the project footprint, pre-construction surveys will be conducted specifically for those species that bloom between March and June by a qualified biologist. Given that the botanical surveys conducted within the project site and along the gen-tie lines in 2014 were conducted during June, July, and November 2014, potential special-status plants that bloom between March and June could occur. Of the species identified with having potential suitable habitat within the project site, Peirson's morning-glory, slender mariposa-lily, round-leaved filaree , pale-yellow layia, Parry's spineflower , white pygmy-poppy , Vermont androsace, Mojave spineflower and Mojave paintbrush will be the target species for pre-construction surveys.

Approximately 0.34 acres of Pierson's morning-glory were identified within the southern portion of the project site. The applicant shall pay $2,405 per acre to offset the loss of sensitive plan species. These funds will be held by the City and used to acquire conservation property with the same plant species. | Owner (survey/monitor/mitigation fees) / Contractor (training/ compliance) |
| BIO-8/COA 32 | SAA | Prior to the modification (e.g., dredge, fill, etc.) of any of the identified drainage features within the project site or along Gen-tie Route 4, the applicant shall obtain a streambed alteration permit under Section 1600 et seq. of the CFG Code. | Not applicable |
| BIO-9/COA 33 | Drainage Setbacks | A 7 foot setback shall be provided from the edge of on-site drainages to the edge of any construction activities (internal | /EPC (compliance) |

| | | | |
|---|---|---|---|
| | | roadways or solar arrays) to the extent possible. This setback shall be clearly marked with orange construction fencing or flagging during construction activities . This measure does not apply to drainages that need crossings to accommodate internal circulation. | |
| BIO-10/COA 34 | Erosion Control | Sediment and erosion control materials shall be installed prior to construction and shall be maintained for the duration of construction activities to avoid and minimize effects on existing drainages. | Contractor |
| BIO-11/COA 35 | Lighting | No lighting shall be placed near or oriented towards any transmission lines running through the project site to avoid affecting wildlife that may use this area for nighttime movement. | Contractor |
| BIO-12/COA 36 | Lighting | Narrow spectrum bulbs shall be used to limit the range of species affected by project lighting. | Contractor |
| CR-1/COA 37 | Buried Cultural Resources | If buried cultural resources such as chipped or groundstone, historic debris, or building foundations , are inadvertently discovered during ground-disturbing activities, work shall stop in that area and within a 100- foot radius of the find until a qualified archaeologist can assess the significance of the find and, if necessary, develop a response plan, with appropriate treatment measures, in consultation with the City of Pittsford, State Historic Preservation Officer , and other appropriate agencies. Preservation in place shall be the preferred treatment method per State CEQA Guidelines Section 15126.4(b) (avoidance, open space, capping, easement). Data recovery of important information about the resource, research, or other actions determined during consultation, is allowed if it is the only feasible treatment method. | Owner (survey/monitor) / Contractor (training/ compliance) |
| CR-2/COA 38 | Cultural Resources Training - Fossil Recognition | The applicant shall provide training to all construction personnel to ensure that they can recognize fossil materials in the event any are discovered during construction. The training shall be conducted by a paleontologist. Construction personnel shall be instructed on the importance of paleontological specimens that | Owner (develop training program/monitor) / Contractor (training/ compliance) |

Exhibit B-1-15

| | | | |
|---|---|---|---|
| | | might be recovered. | |
| CR-3/COA 39 | Cultural Resources Training - Paleontologic al Resources | A qualified paleontologist shall conduct a pre-construction training of all personnel involved in any ground disturbing construction activity for the entire proposed project. Construction personnel shall be informed of the possibility of buried paleontological resources within the project site and the protocol to be followed if a paleontological resource is encountered. | Owner (develop training program/monitor) / Contractor (training/ compliance) |
| CR-4/COA 40 | Human Skeletal Remains | If human skeletal remains are encountered, ground-disturbing activities shall be stopped within a 100-foot radius of the discovery. The county coroner shall be contacted immediately and is required to examine the discovery with 48 hours. If the county coroner determines that the remains are Native American, the Coroner shall contact the NAHC within 24 hours. A qualified archaeologist (QA) should also be contacted immediately. The coroner is required to notify and seek out a treatment recommendation of the NAHC designated MLD.<br><br>• If NAHC identified an MLD, and the MLD makes a recommendation, and the landowner accepts the recommendation, then ground-disturbing activities may resume after the QA verifies and notifies the County that the recommendations have been completed.<br>• If NAHC is unable to identify the MLD, or the MLD makes no recommendation, or the landowner rejects the recommendation, and mediation per PRC 5094.98(k) fails, then ground-disturbing activities may resume, but only after the QA verifies and notifies the County that the landowner has completely reinterred the human remains and items associated with Native American burials with appropriate dignity on the property, and ensures no further disturbance of the site per PRC 5097 .98(e) by county | Contractor |

| | | recording, open space designation , or a conservation easement. | |
|---|---|---|---|
| | | If the coroner determines that no investigation of the cause of death is required and that the human remains are not Native American, then ground-disturbing activities may resume, after the coroner information the County of Los Angeles of such determination. According to State law, six or more human burials at one location constitute a cemetery and disturbance of Native American cemeteries is a felony. | |
| GEO-1/COA 41 | Liquefaction | For those parts of the proposed project to be located in mapped liquefaction zones, design and construct project in compliance with applicable local permitting requirements for constructions within liquefaction zones. | Contractor |
| HAZ-1/COA 42 | Dust Suppression Measures June 1 - November 30 | Additional dust suppression measures shall be implemented between June 1 and November 30. The additional dust suppression measures shall be implemented prior to and immediately following ground disturbing activities if wind speeds exceed 15 mph or temperatures exceed 95 degrees Fahrenheit for three consecutive days. The additional dust suppression shall continue until winds are 10 mph or lower and ambient air temperatures are below 90 degrees for at least two consecutive days. The additional dust suppression measures shall be incorporated into the Dust Control Plan. A copy of the approved Dust Control Plan shall be submitted to the City of Pittsford prior to the issuance of construction related permits. | Contractor |
| HAZ-2/COA 43 | Valley Fever Training | Prior to issuance of any construction related permits, the applicant/developer shall prepare and implement a worker training program that describes the potential health hazards associated with Valley Fever, common symptoms, proper safety procedures to minimize health hazards, and notification procedures if suspected work-related symptoms are identified during construction. Copies of the training program shall be provided to the City of Pittsford. | Owner (develop training program) / Contractor (training/ compliance) |

Exhibit B-1-17

| | | The worker training program shall identify safety measures to be implemented by construction contractors during construction. These measures shall include the following:<br><br>• HEPA-filtered, air conditioned enclosed cabs shall be provided on heavy equipment when available. Workers shall be trained on the proper use of cabs, such as turning on air conditioning prior to using the equipment.<br>• Communication methods, such as two-way radios, shall be provided for use by workers in enclosed cabs.<br>• Personal protective equipment (PPE), such as half-mask and/or full-mask respirators equipped with particulate filtration, shall be provided to workers active in dust work areas upon request.<br>• Separate, clean eating areas with hand washing facilities shall be provided for construction workers.<br>• Equipment, vehicles, and other items shall be cleaned before they are moved offsite to other work locations. | |
| HAZ-3/COA 44 | Fire Protection Plan | The applicant shall prepare a Fire Protection Plan prior to beginning construction. The Fire Protection Plan shall include the following measures:<br><br>• Internal combustion engines, stationary and mobile, shall be equipped with spark arresters in good working order.<br>• All personnel shall be trained in the fire safety practices relevant to their duties.<br>• All construction and maintenance personnel shall be trained and equipped to extinguish small fires.<br>• Work crews shall have fire-extinguishing equipment on hand, as well as emergency numbers and cell phone or other means of contacting the Fire Department.<br>• Security gates shall be approved by the Fire Department and include the installation of "Knox" key switch or "Knox" | Contractor |

| | | | |
|---|---|---|---|
| | | padlock, whichever is most appropriate.<br>• Smocking shall be prohibited while operating equipment and shall be limited to paved or graveled areas or areas cleared of all vegetation . Smoking shall be prohibited within 30 feet of any combustible material storage area (including fuels, gases, and solvents). Smoking shall be prohibited in any location during a Red Flag Warning issued by the National Weather Service for the project area. | |
| HYD-1/COA 45 | SWPPP | Prior to the issuance of any construction related permits, the applicant shall prepare and submit an NOI to the State Water Board and prepare a SWPPP in compliance with the NPDES GCP requirements. The final drainage plan shall demonstrate the ability of the planned onsite storm drainage to adequately collect onsite stormwater flows in accordance with all applicable standards and requirements by: minimizing impervious surfaces, and directing flows to BMPs; integrating appropriate sized BMPs to minimize impact on local water quality by controlling runoff from erosion and potential contaminants; and incorporating bio- retention in combination with site planning, and dispersion of<br>runoff to meet Low Impact Development (LID) requirements. | Contractor |
| NOI-1/COA 46 | Speed Limit | The onsite speed limit for all vehicles and construction equipment shall be limited to 15 mph. | Contractor |
| NOI-2/COA 47 | Construction Hours | Construction operations shall not occur between 8 p.m. and 7 a.m. on weekdays or Saturday or at any time on Sunday. The hours of any construction related activities shall be restricted to periods and days permitted by local ordinance. | Contractor |
| NOI-3/COA 48 | Noise Complaints | The on-site construction supervisor shall have the responsibility and authority to receive and resolve noise complaints. A clear appeal process to the owner shall be established prior to construction commencement that will allow for resolution of noise problems that cannot be immediately solved by the site supervisor. | Contractor |

| NOI-4/COA 49 | Electrical Equipment | Electrically powered equipment shall be used instead of pneumatic or internal combustion powered equipment, where feasible. | Contractor |
|---|---|---|---|
| NOI-5/COA 50 | Parking, Staging, and Maintenance Areas | Material stockpiles and mobile equipment staging, parking, and maintenance areas shall be located as far away as practicable from noise-sensitive receptors. | Contractor |
| NOI-6/COA 51 | Fixed Construction Equipment | Fixed construction equipment, including compressor and generators, shall be located as far as practicable from noise-sensitive receptors. | Contractor |
| NOI-7/COA 52 | Noise-Producing Signals | The use of noise-producing signals, including horns, whistles, alarms, and bells, shall be for safety warning purposes only. | Contractor |
| NOI-8/COA 53 | Public Address/Music System | No project-related public address or music system shall be audible at any adjacent receptor. | Contractor |
| NOI-9/COA 54 | Noise Attenuation Devices | All noise producing construction equipment and vehicles using internal combustion engines shall be equipped with mufflers, air-inlet silencers where appropriate, and any other shrouds, shields, or other noise-reducing features in good operating condition that meet or exceed original factory specifications, Mobile or fixed "package" equipment (e.g., arc- welders, air compressors, etc.) shall be equipped with shrouds and noise control features that are readily available for the type of equipment. | Contractor |
| NOI-10/COA 55 | Noise-reducing Enclosures and Barriers | Where necessary, noise-reducing enclosures or temporary barriers shall be used around noise-generating equipment. Where feasible existing barrier features (terrain, structures) shall be used to block sound transmission especially where sensitive receptors are located less than 100 feet from construction activities and construction noise levels are expected to exceed the maximum exterior noise standard. | Contractor |

| TRA-1/COA 56 | Traffic Management Plan | A traffic management plan shall be submitted to the City of Pittsford for review and approval prior to the issuance of any construction permits. The traffic management plan shall include strategies for minimizing impacts to traffic, effectively managing traffic flow and reducing the number of trips accessing the project site during the peak hours of 7 a.m. to 9 a.m. a.m. and 4 p.m. to 6 p.m. These strategies shall include, but not be limited to:<br><br>• Require parking within designated areas on the project site and prohibit parking along the shoulders of the adjacent roadways.<br>• Provide for emergency vehicle movement through the project site at all times during construction and operation.<br>• Provide approved offsite parking for workers with shuttle services to transport them onsite when and if onsite parking becomes restricted or unfeasible.<br>• Facilitate materials delivery during off-peak traffic hours and comply with regulations governing oversized loads.<br>• Encourage vanpool and carpool for construction employees commuting to the project site. | Contractor |

## GENERAL ADVISORY

| COA 1 | Standard Conditions | All standard conditions as set forth in Planning Commission Resolution No. 10-23 shall apply, except Condition Nos. 47, 48, and 49. | Contractor |
| COA 2 | Vermont Sales and Use Tax Regulation | Applicant shall comply with the requirements of Vermont Sales and Use Tax Regulation 1699, subpart (h), Regulation 1699.6 and Regulation 1802, subparts (c) and (d), respectively, and shall cooperate with the City regarding their direct and indirect purchases and leases to ensure compliance with the above | Contractor |

Exhibit B-1-21

| | | | |
|---|---|---|---|
| | | sections, including, if necessary, the formation and use of buying companies, and the direct reporting of purchases of over $500,000. | |
| COA 3 | Outdoor Storage | Per the direction of the Director of Development Services, no unscreened outdoor storage of any kind would be allowed on the site. | Contractor |
| COA 4 | Barbed Wire | Per the direction of the Director of Development Services, barbed wire is acceptable on the top of the fence to provide site security, but not razor wire. | Contractor |
| COA 5 | Restroom Facilities | The applicant shall provide restroom facilities for use by maintenance staff. | Contractor |
| | | ADDITIONAL CONDITIONS | |
| COA 6 | Dedicate Right-of-Way | Per the direction of the Director of Development Services, dedicate the following right-of-way for streets: | Owner |
| COA 7 | Irrevocable Offer of Dedication | Per the direction of the Director of Development Services, grant an irrevocable offer of dedication for the following streets: | Owner |

Exhibit B-1-22

| COA 8 | Paved Driveways | Per the direction of the Director of Development Services, the applicant shall pave any driveway that takes access from any of the paved streets. | Contractor |
|---|---|---|---|
| COA 9 | Bike Paths | Per the direction of the Director of Development Services, dedicate a 12-foot wide easement and construct a Class I Bike path in the following locations: | Constructed by Owner's Affiliate per previous EPC. |
| COA 10 | Equestrian Trails | Per the direction of the Director of Development Services, dedicate an 18-foot wide easement and construct an equestrian trail in the following locations: | Constructed by Owner's Affiliate per previous EPC. |

| COA 11 | 10' Landscaping | Per the direction of the Director of Development Services, the applicant shall install a 10-foot wide landscaped planter along the perimeter of the project site for screening purposes. The specific locations of the landscaping are depicted on the final site plan dated July 1, 2022. | Contractor |
|---|---|---|---|
| COA 12 | Enhanced Landscaping | The landscaped perimeter shall be enhanced in the variety and size of the plants installed. | Not Applicable |
| COA 13 | Damaged Streets from Construction | Per the direction of the Director of Development Services, any public street surfaces damaged by construction traffic shall be restored to its pre-existing condition. | Contractor |
| COA 14 | Applicant defending the City | The applicant shall defend, indemnify, and hold harmless the City and its agents, officers, and employees from any claim, action, or proceeding against the City or its agents, officers, or employees to attack, set aside, void, or annul, an approval of the City concerning this conditional use permit and the use(s) and development permitted by its approval. The City shall promptly notify the applicant of any claim, action, or proceeding and shall cooperate fully in the defense; this condition shall not be imposed if the City fails to promptly notify the applicant or fails to cooperate fully in the defense. | Owner |
| COA 15 | Archaeological Monitoring | Per the Director of Development Services, an archaeologist shall monitor all construction activities within 500 feet of the identified prehistoric cultural resources. Additionally, the archaeologist shall be present to monitor construction-related activities approximately 25% of the time. A copy of the contract with the archaeologist shall be submitted to the City prior to the issuance of construction related permits. | Owner (develop training program/monitor) / Contractor (training/ compliance) |
| COA 16 | Native American Monitoring | Per the Director of Development Services, the applicant shall enter into an agreement with both the San Femandefio Tataviam of Mission Indians and the San Manuel Band of Mission Indians to allow a Native American monitor on the project site at any time during construction activities. A copy of the agreement shall | Owner |

| | | be submitted to the City prior to the issuance of construction related permits | |
|---|---|---|---|
| COA 17 | Solar Power Facility Removal | The property owner shall immediately notify the City in writing upon the cessation of use of the solar power facility, and shall ensure that all equipment and structures used as part of the solar power facility shall be removed within one hundred eighty days following the termination of its operation. (ADDED AT THE xx/xx/xxxx PC MTG). | Owner |

3.1 Contractor shall coordinate with Owner to prepare a landscaping plan for approval by the City of Pittsford install landscaping, and otherwise comply with the requirements of Conditional Use Permit.

3.2 Grading on the Facility Site shall be kept to the minimum required in order to construct the proposed Facility, as determined by the Governmental Authority and the grading plan. Specifically, grading shall be limited to roadways; pads for inverters and transformers; vista switches; and trenching necessary for cables and electrical wires.

3.3 Contractor shall paint the water tanks (if any) in accordance with Pittsford requirements.

3.4 Contractor shall be responsible for implementing dust control measures and otherwise complying with the requirements outlined in the CUP and MMRP

3.5 Contractor shall implement and comply with the approved Worker Environmental Education Program (WEEP) including information provided by Owner.

3.6 To the extent that any sensitive or protected species are identified pursuant to surveys conducted by Owner, Contractor will comply with any exclusion areas identified by Owner or Owner's biologists and will assist Owner in determining how to mitigate (if possible) any impacts to the Project Schedule. Contractor shall not use any rodenticides, pesticides or herbicides.

3.7 Contractor shall comply with the streambed alteration permit (if any) and drainage setbacks on the project.

3.8 Contractor shall implement the following measures during construction of the project:

    3.8.1 All equipment shall be maintained in accordance with the manufacturer's specifications.

    3.8.2 Construction-related equipment, including heavy-duty equipment, motor vehicles, and portable equipment, shall be turned off when not in use for extended periods of time.

    3.8.3 Electric equipment shall be used whenever feasible in lieu of diesel- or gasoline-powered equipment.

    3.8.4 All construction vehicles shall be equipped with proper emissions control equipment and kept in good and proper running order to substantially reduce NOx emissions.

    3.8.5 On-road and off-road diesel equipment shall use diesel particulate filters (or the equivalent) if permitted under manufacturer's guidelines.

    3.8.6 Prohibit the use of heavy-equipment during first- or second-stage smog alerts and suspend all construction activities during second-stage smog alerts.

    3.8.7 Utilize existing power sources (i.e., power poles) when available. This measure would minimize the use of higher polluting gas or diesel generators.

    3.8.8 Limit the hours of operation of heavy-duty equipment and/or the amount of equipment in use to the extent feasible.

    3.8.9 Require that trucks and vehicles in loading or unloading queues have their engines turned-off when not in use.

    3.8.10 Off-road equipment engines over 50 horsepower shall be Tier 2 certified or higher (unless Tier 2 equipment has been determined to not be available).

4.0 Commissioning & Testing:

    4.1  Commissioning Procedures. Contractor shall carry out all of GMP's required commissioning procedures applicable to the Work as well as the commissioning procedures contained in Exhibit B-2 and comply with all applicable rules and tariffs including but not limited to the Utility's (or ISO-NE's as applicable) "Distribution Interconnection Handbook" and the "Wholesale Distribution Tariff."

    4.2  Test Reports. Contractor shall provide the following test reports:

    4.2.1  DC feeder megger reports on all DC feeders.

    4.2.2  Medium Voltage VLF Tan Delta Test Reports for all MV cables. IV Curve test or equal is required on 100% of source circuits.

    4.2.3  Prior to Final Acceptance, Contractor shall perform Infrared (IR) scans of all DC combiner boxes, inverter connections, transformer connections, medium voltage connections and high voltage connections.

    4.2.4  Inverter Step-Up Transformer dielectric/oil test reports.

    4.2.5  Manufactures Equipment Commissioning reports (Inverters, etc.).

    4.3  Inspection/PTO. Upon completion of the installation, Contractor shall coordinate for an inspection with the Owner's representative, the Governmental Authority, the Utility and the ISO-NE's as required to obtain their written permit to operate.

    4.4  Manufacturer Representatives. Upon initial operation, Contractor shall call equipment manufacturers and work with their representatives, if any troubleshooting is necessary to make the system operational.

    4.5  Performance Test. Contractor will execute a 5 day (Exhibit R-1) performance test and provide all backup documentation to substantiate testing results. Results to be validated by Owner's Independent Engineer. All POA's, Back of Module Temp Sensors and other test equipment called out in Exhibit R-1 required for performance test shall remain as permanent components of the installation.

5.0 Project Completion:

    5.1  Contractor shall perform all Work required to achieve Mechanical Completion, Substantial Completion, and Final Acceptance.

    5.2  Contractor shall complete all Punchlist items, clean up the Site and remove any temporary structures, equipment or debris.

    5.3  Contractor to provide the deliverables specified in Exhibit S attached hereto.

    5.4  Contractor shall restore any public streets damaged by construction traffic to pre-construction conditions.

    5.5  If applicable, Contractor shall provide confirmation that all third parties have Owner contact for billing (e.g. comm provider).

6.1 Site Layout and Single Line Drawing. Contractor and Owner shall revise the Owner-approved Site layout and single line drawing prior to issuance of the NTP via a Notice

provided by Owner to Contractor or an Amendment to the Agreement approving the Site layout and single line drawing.





● PRELIMINARY NOT TO BE USED FOR CONSTRUCTION ●

| PROJECT SITE INFORMATION | |
|---|---|
| SYSTEM DESIGN VOLTAGE | 1,500 V |
| ASHRAE LOCATION | ## |
| ASHRAE 0.4% | 21.9 °C |
| ASHRAE 2% | 19.1 °C |
| ASHRAE MINIMUM TEM. | -6.6 °C |
| DC OUTPUT POWER | 3.1 MW DC |
| PROJECT AC OUTPUT POWER | 2.2 MW AC |
| PROJECT DC/AC RATIO | 1.40 |
| STRING QUANTITY | 214 |
| MODULE QUANTITY | 5778 |
| ARRAY GCR | 45.7% |
| | |
| MODULE | BYD Solar 540WO MLTK-36 |
| MODULE POWER | 540 W |
| CELLS | 72 |
| FRAME | ALUMINUM |
| | |
| RACKING/TRACKER | |
| MANUFACTURER | RBI |
| RACKING/TRACKER | Fixed Tilt |
| MODULES PER STRING | 27 |
| MODULE ORIENTATION | 2 x PORTRAIT |
| AISLE SPACING | ## |
| TABLE PITCH | 21' |
| FOUNDATION TYPE | STEEL PILE |
| | |
| INVERTER STATION | Chint Power System String Inverter |
| INVERTER MODEL | CPS SCH275KTL-DO/US- 800 |
| NO. OF INVERTERS | 8 |

EXHIBIT C


PERMITS


| Part A - Owner Permits |
| --- |
| |
| Certificate of Public Good |
| |
| |

| Part B - Contractor Permits |
| --- |
| NPDES construction permit (if applicable) |
| Tree permit (if applicable) |
| Land development permit (if applicable) |
| Building permit - lighting and EV trailer pad (if applicable) |
| Jurisdictional Determination (JD) Permit of Impact to Intermittent Streams and Wetlands(if applicable) |
| Floodplain Permitting (if applicable) |
| Driveway / Utility Crossing Permit (if applicable) |
| Electrical, Grading, Construction, Building Permits (if applicable) |
| On – Site Wastewater Treatment System (if applicable) |
| On-Site Water Well Permit (if applicable) |
| JD Agency Acceptance (if applicable) |
| General Contractor's License (BD5) (if applicable) |
| JD Threatened & Endangered Species (if applicable) |
| Zoning Variance Application (if applicable) |
| Land Disturbance Permit (if applicable) |
| Floodplain Development Permit (if applicable) |
| Land Development Permit (if applicable) |
| Storm Water Pollution Prevention Permit (if applicable) |
| Encroachment Permit (if applicable) |
| Road-Crossing Easements (if applicable) |
| Temporary Power (if applicable) |
| |
| |
| For any Permits not listed under Part A or Part B, Contractor will assist the Owner in obtaining in accordance with Section 2.5 of the Agreement. Any fees associated with these permits will be passed through to the Owner with no mark-up.  To the extent Contractor or Owner become aware of any additional administrative permits, after the Effective Date, Owner shall have responsibility for obtaining such permits at its sole cost, with the reasonable cooperation of Contractor. |

EXHIBIT H

COMMISSIONING & PERFORMANCE TESTING

Any definitions included in Exhibits H-1, H-2, or H-3, shall apply to all three (3) Exhibits. Capitalized terms used and not defined in Exhibits H-1, H-2 or H-3 shall have the meaning ascribed to such terms in the Agreement.

Definitions

1. Plant Monitoring & Control System – Means the system installed and commissioned to satisfy the monitoring and control requirements of the Project.

2. Point of Interconnection – Means the point of delivery for electricity generated by the Project to the local distribution system.

3. Test Meter – Means the Owner's revenue grade meter(s) that measure the power and energy generated by the Project at the Point of Interconnection.

4. Project Commissioning Plan – Means the final commissioning scope developed to meet the unique equipment and configuration of the Project, taking into account specific manufacturer/owner/interconnection requirements necessary for commercial operation.

5. Minimum Guaranteed Capacity – Means ninety-seven percent (97%) of the Contractual Model's estimated capacity during the month which the test is executed, per ASTM E2848-13.

6. Minimum Guaranteed Generation – Means ninety-five percent (95%) of the Contractual Model's estimated energy.

7. Reporting Conditions – A set of conditions including the plane-of-array irradiance, ambient temperature and wind speed conditions to which system performance is reported. Reference conditions are determined per ASTM E2939-13.

8. Contractual Model – Means an hourly series of data for the Project generation at the Point of Interconnection (measured in MWh) that is based on the output of an engineering model that takes into account the physical characteristics, orientation, and layout of the Project, and the performance of the PV modules. The final summation of this data series shall be adjusted for horizontal irradiance values, ambient air temperature values, wind speed values, and soiling values as recorded by the Plant Monitoring & Control System. The Contractual Model used for the purposes of determining the Minimum Guaranteed Capacity and Minimum Guaranteed Generation shall be of equal or greater energy production performance as found in Exhibit H-3.

9. Test Period – Means a minimum of three (3) calendar days, at one (1) minute intervals are recorded. Owner reserves the right to allow as few as 300 Valid Data Points to prevent delay in schedule.

10. Test Conditions - Means that all generating and monitoring equipment is operating as designed; no Force Majeure Events take place during the Testing Period; and the minimum and maximum range of measurements that are considered for the collection of Valid Data Points: (a) POA Irradiance of no less than 400 $W/m^2$ and no greater than 1000 $W/m^2$; (b) air temperatures of no less than 0°C and no greater than 45°C.

11. Capacity Liquidated Damages – Shall be calculated in accordance with Exhibit H-2.

G

EXHIBIT H-1

COMMISSIONING

The Contractor will provide a comprehensive commissioning service for all Project systems and equipment to ensure the total system has been built to the engineering specifications, is ready for commercial operation, and meets all applicable codes and regulations.

The commissioning process consists of (1) Functional Testing (FT) and (2) Performance Testing (PT).  The Contractor shall develop a final commissioning plan for the owner's review thirty (30) days prior to the start of commissioning activities.

The following table includes a list of the commissioning documents that will be included in the final commissioning package.

| Document ID | Name | Description |
|---|---|---|
| Cx-PLAN | Commissioning Plan | Site specific plan for start-up and testing |
| Cx-PFC-DCIR | Insulation Resistance | DC cable testing |
| Cx-PFC-VLF | Very Low Frequency | AC cable testing |
| Cx-PFC-XFMR | Transformer | Electrical, oil & mechanical testing (factory testing acceptable for oil and electrical) |
| Cx-PFC-GND | Ground point to point | Array ground validation |
| Cx-PFC-HCB | Harness Combiner Box | Mechanical inspection |
| Cx-PFC-VOC | Voltage Open Circuit | Circuit level open-circuit voltage testing |
| Cx-PFC-INV | Inverter | Mechanical inspection |
| Cx-PFC-FBR | Fiber | OLTS/OTDR |
| Cx-FNC-DAS | DAS/MET/SMS | Inspection & functional testing of instrumentation and monitoring |
| Cx-FNC-TKR | Tracker | Manufacturer defined testing |
| Cx-FNC-INV | Inverter | Manufacturer defined testing |
| Cx-FNC-SUB | Substation/Metering | Relay and metering validation |
| Cx-FNC-IMP | Current Max Power | DC health verification |
| Cx-FNC-PT | Performance Testing | Operational and Capacity Test Report |
| Cx-APDX | Appendix | Contains all supporting technical documents (calibration certificates, commissioning log, procedures, etc.) |

Functional Testing will be considered complete when the Project has demonstrated normal and un-assisted operation for seventy-two (72) consecutive hours.  For clarity, Contractor may collect data for the Capacity Test during the Operational Test period. Owner or an Owner's Representative shall have the right to be present during all field testing.

If the results of a report are unsatisfactory, then Contractor shall propose a timeframe for completion/correction of unsatisfactory results within three (3) Business Days. This timeframe must be consistent with industry standards for work needing to be performed to remedy the unsatisfactory results and in no event, be greater than (20) calendar days from Owner notice to Contractor of unsatisfactory results.

Before the correction period has expired, Contractor shall submit to Owner another report detailing each correction made and their corresponding results. Unfinished work must still be completed by Contractor in a timely manner consistent with industry standards for similar work.

Contractor must also perform equipment and material testing required to meet local codes and standards (including testing required by the Utility) and testing required by equipment manufacturer to maintain equipment warranties. Contractor shall notify Owner of any procedure that may void a manufacturer warranty or violate local codes and regulations prior to performing the procedure.

All final deliverables will be submitted to the Owner within thirty (30) days following Substantial Completion. This shall include all testing, reports, calibration sheets, specification sheets, manuals, and other support materials which will be delivered in an electronic format (File-Sharing Service) in dedicated folders.

EXHIBIT H-2

PERFORMANCE TESTING - CAPACITY TEST

Capacity Testing of the Project determines the total generating system capacity at Reference Conditions. This performance test verifies that the Project is capable of meeting or exceeding the Minimum Guaranteed Capacity of the Project.

The Project will be tested utilizing a linear regression of the Contractual Model for the Test Period in accordance with ASTM E2848-13, ASTM E2939, and the Capacity Test Procedure set forth in this Exhibit H-2.

The Project achieves a passing result when the tested capacity is at least equal to the Minimum Guaranteed Capacity.

Contractor agrees to cooperate with the Independent Engineer and take such measures as may be reasonably recommended by the Independent Engineer in the course of its certification that the Project is constructed pursuant to this Agreement.

Should the Contractor not be able to demonstrate to the satisfaction of the Owner that the Project can achieve a passing result, Capacity Liquidated Damages will be assessed using the calculation below.

CAPACITY TEST PROCEDURE

PURPOSE

The purpose of the Capacity Test is to determine the total generating system capacity of the 2.2 MWac Project at the ASTM Reference Conditions. This performance test verifies that the Project is capable of meeting or exceeding 97% of the nameplate capacity at Reference Conditions. The project is to undergo Operational and Capacity Tests concurrently.

RESPONSIBLE ENTITIES

- ☐ Contractor's Site Cx Superintendent
- ☐ Contractor's Performance Engineer

REFERENCE DOCUMENTS:

- ☐ ASTM E2848 - Standard Test Method for Reporting Photovoltaic Non-Concentrator System Performance
- ☐ ASTM E2939 - Standard Practice for Determining Reporting Conditions and Expected Capacity for Photovoltaic Non-Concentrator Systems

PREREQUISITES

- ☐ Conduct final system walk down and verify readiness to commence Performance Testing.

G-2-1

☐ Conduct meeting to review testing procedures.
☐ Notify Owner in advance per contract requirement of the start of this test.

PROCEDURE

The Capacity Test will be executed over a period greater than three (3) days and concluding when a minimum of seven hundred fifty (750) valid data points have been obtained, provided that Owner reserves the right to accept as few as three hundred (300) valid data points to conclude the test. The valid dataset must include data from at least three (3) separate days.  Data will be captured at the end of each one (1) minute interval. The Capacity Test will continue without interruption unless apparent operational issues affect the validity of plant output criteria.

Data collection and subsequent calculations of capacity and performance shall conform to ASTM E2848 and E2939.

PRIMARY TEST INSTRUMENTATION

☐ Plane-of-Array and GHI pyranometers
  o Located at Meteorological Stations
  o Calibration sheets will be submitted separately
☐ Site level power meter
  o Located at the Substation control room
  o Calibration sheets will be submitted separately
☐ Air temperature
  o Located at Meteorological Stations
☐ Wind Speed
  o Located at Meteorological Stations

DATA POINT REJECTION CRITERIA

1. Startup Failure
   a. All inverters must be in their On-Line state.  The data from the revenue meter will not be used until all inverters are On-Line.
2. Generation Equipment failure
   a. If any inverter trips off line, the data generated during the time of the outage will be rejected.
3. Grid interruption
   a. If there is a grid interruption and the plant is unable to export power, the data generated during the time of the outage will be rejected, along with five minutes immediately preceding the failure.
4. Environmental conditions
   a. All data occurring with an average irradiance of less than 200 W/m$^2$ and greater than 1000 W/m$^2$ will be rejected.
   b. All data during periods of clipping will be rejected.  Clipping will be defined as 98% of nameplate power.
   c. All data during row-to-row shading as calculated by PVSyst or observed during testing will be rejected.

d. If there is snow on the modules by visual inspection, data will be rejected until it has cleared.

5. Instrumentation failure
   a. If any of the primary instrumentation fails, data from that instrument will not be used in the average.
   b. If communications to inverters, met station, or power meter fail, or data historization fails, data will be rejected for that time period.

*At the end of the Capacity Test period, if 750 data points have not been acquired, the test can either conclude with fewer data points or be extended. Any adjustments to the test procedure will be mutually agreed upon between Contractor and Owner.

NON-CONFORMANCE ITEMS

☐ Definitions of non-conformance items and their priorities will be consistent with definitions found in Contractor's Operational Test Procedure.

☐ Apparent operational issues encountered during Performance Testing will be recorded as non-conformance items and reported in the commissioning log.

☐ Any retesting or extension requirement due to failures, non-conformance items, or operator intervention will be mutually agreed upon between Contractor and Owner.

DAILY ACTION ITEMS

Execute the following items for each day of testing.

☐ Ensure all pyranometers are clean.

☐ Confirm all inverters start within a reasonable amount of time of each other.

☐ Review collected data for any abnormalities.

☐ Review Alarm Log. Document events and their start/stop times.

☐ Confirm that any non-conformance items are documented and determine if any necessary actions are required per the Operational Test Procedure.

RESULT

The Capacity Test is deemed successful if the plant tested capacity exceeds 97% of the expected capacity, per the definition in ASTM 2848.

DELIVERABLES

Following completion of the testing period, Contractor will transmit to Owner the following items:

☐ Raw Data from Primary Instrumentation, one (1) minute intervals

☐ Test report (combined for Capacity & Operational Test, if possible)

G-2-3

☐    Commissioning log, specific to testing period

## CAPACITY LIQUIDATED DAMAGES

For each lost watt below the Guaranteed Capacity achieved, Contractor shall pay $1.85 per watt in liquidated damages to Owner (the "Capacity Liquidated Damages"). Capacity Liquidated Damages shall be assessed pro rata for partial percentage shortfalls in capacity.

EXHIBIT H-3

ENERGY LIQUIDATED DAMAGES

Actual System Output: The electrical energy actually generated by the System during the Annual Energy Test (the "Actual System Output") will be calculated by subtracting the EMS Revenue Meter kWh production reading recorded at the beginning of the Annual Energy Test from the EMS Revenue Meter kWh production reading recorded at the end of the Annual Energy Test.

Nameplate Output: Up to one hundred percent (100%) of the electrical generation committed by the Contractor in the generation report run on PVSyst submitted by the Contractor to the Owner, shall be considered as the Nameplate Output.

If the Actual System Output is less than the Guaranteed System Output;

Contract Price reduction = Contract Price x $\dfrac{\text{(Nameplate Output – Actual System Output)}}{\text{Nameplate Output}}$

For values of Contract Price reduction 5% or less of Contract Price, no price reduction will apply.

Exhibit K

Delay Liquidated Damages

The Guaranteed Substantial Completion Date is October 28, 2023. Contractor shall pay Owner $ 3,000 for each day that the Substantial Completion Date, as determined by Section 11.4 of the Engineering, Procurement and Construction Agreement, occurs after the Guaranteed Substantial Completion Date.

Interim Liquidated Damages shall be allocated and paid in accordance with Section 14.4 of the Engineering, Procurement and Construction Agreement at a rate of $1,000 for each day that the Interim Milestone (defined as completion of racking & PV modules installation) the Interim Milestone occurs after the Interim Milestone scheduled date.

Owner shall invoice Contractor for Delay Liquidated Damages and Interim Liquidated Damages and Contractor shall pay Delay Liquidated Damages and Interim Liquidated Damages in accordance with Sections 6.9, 12.4 and 12.5 of the Engineering, Procurement and Construction Agreement.

Appendix   B:
MILESTONE PAYMENT SCHEDULE

| Project: | ER Kendall Hill Solar | 10/3/2022 |
|---|---|---|

| Milestone Number | Activity | Scheduled Invoice Amount* | Invoice % |
|---|---|---|---|
| 1 | Signed Agreement ---> LNTP | $403,301 | 10.0% |
| 2 | NTP | $201,651 | 5.0% |
| 3 | Engineering and Permitting | $201,651 | 5.0% |
| 4 | Mobilization | $201,651 | 5.0% |
| 5 | Civil Construction Complete | $201,651 | 5.0% |
| 6 | Racking Delivery | $201,651 | 5.0% |
| 7 | Module Delivery | $201,651 | 5.0% |
| 8 | Inverter Delivery | $201,651 | 5.0% |
| 9 | Racking Installation (Billed per 25% completion) | $403,301 | 10.0% |
| 10 | Module Installation (Billed per 25% completion) | $403,301 | 10.0% |
| 11 | Inverter Installation Complete | $403,301 | 10.0% |
| 12 | Mechanical Completion | $302,476 | 7.5% |
| 13 | Substantial Completion | $504,127 | 12.5% |
| 14 | Interconnection | $0 | 0.0% |
| 15 | Retainage | $0 | 0.0% |
| 16 | Final Completion | $201,651 | 5.0% |
| | Total | $4,033,014 | 100.0% |

4033014 Contractor fill in total value in cell C21.

*Payments to be made in accordance with the Agreement upon 100% completion of each milestone.

*Utility costs are not included and will be invoiced as a pass though cost.

*Major equipment payments shall be provided by Owner as needed, including modules, inverters, racking, MPT at the LNTP Milestone

## SECOND AMENDMENT TO
## ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

This Second Amendment to Engineering, Procurement and Construction Agreement (this "Second Amendment") is made and entered into as of January 5, 2023, by and between Fusion Renewable NA, LLC, a Delaware limited liability company ("Owner"), and iSun Utility, LLC, a Delaware limited liability company ("Contractor"). Owner and Contractor are sometimes referred to collectively as the "Parties" or singularly as a "Party."

## W I T N E S S E T H

**WHEREAS**, Owner and Contractor previously entered into that certain Engineering, Procurement and Construction Agreement dated as of December 31, 2021 (as amended by that certain First Amendment to Engineering, Procurement and Construction Agreement, dated as of September 30, 2022, the "Agreement");

**WHEREAS**, pursuant to that certain Letter Agreement, dated as of April 13, 2023 (the "Letter Agreement"), Owner and Contractor agreed, inter alia, to use commercially reasonable efforts to amend each of Exhibit Q (*Milestone Payment Schedule*) and Exhibit S (*Project Schedule*) to the EPC Contract.

**WHEREAS**, Owner and Contractor now desire to amend the Agreement as hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**Section 1.    Defined Terms**.    Capitalized Terms not otherwise defined in this Second Amendment shall have the meanings ascribed to such terms in the Agreement.

**Section 2.    Amendments**.

(a) Exhibit Q (*Milestone Payment Schedule*) to the Agreement is hereby amended and restated in its entirety as set forth in Exhibit A to this Second Amendment.

**(b)** Exhibit S (*Project Schedule*) to the Agreement is hereby amended and restated in its entirety as set forth in Exhibit B to this Second Amendment.

**Section 3.    Milestone Number 1 Payment.**    Section III of the Letter Agreement, including the re-allocation of the amounts set forth therein from the Project to Waite Cemetery, is hereby rendered null and void ab initio.

**Section 4.    Waiver**.    Each Party hereby waives any claims against the other Party in respect of the delays as of the date hereof, including, for the avoidance of doubt, any delays in respect of the required interconnection upgrades giving rise to the amendments to each of Exhibit Q (*Milestone Payment Schedule*) and Exhibit S

(*Project Schedule*) to the EPC Contract included herein.

**Section 5.**   **Effect of Amendment**.   Except as expressly set forth herein, nothing herein shall waive or modify any portion of the Agreement, which shall remain in full force and effect in accordance with its terms.  This Second Amendment supersedes any other agreements, whether written or oral, that may have been made or entered into between the parties or by any office or officer of such party, except to the extent explicitly incorporated herein.

**Section 5.**   **Governing Law**.   This Second Amendment and all matters arising hereunder or in connection herewith shall be governed by and construed in accordance with the internal laws of the State of Vermont, without regard to conflicts of law principles that would require the laws of another jurisdiction to apply.

**Section 6.**   **Counterparts**.   This Second Amendment may be executed by the Parties in one or more counterparts, all of which taken together shall constitute one and the same instrument.

**Section 7.**   **Headings**.   The headings and captions used in this Second Amendment are inserted for reference and convenience only and the same shall not limit or construe the sections, articles or paragraphs to which they apply or otherwise affect the interpretation thereof.

**Section 8.**   **Miscellaneous**.   The terms and provisions of Section 24 (*Disputes*), Section 25.1 (*Severability*), Section 25.5 (*No Oral Modification*), Section 25.6 (*Amendments; Waiver*); Section 25.8 (*Third Party Beneficiaries*); Section 25.9 (*Further Assurances*); Section 25.11 (*Binding on Successors*) and Section 25.15 (*Fees and Expenses*) of the Agreement are hereby incorporated, *mutatis mutandis*, by reference and shall apply as if fully set forth herein, as if set forth expressly herein.

**Section 9.**   **Signatures**.   The Parties understand and agree that they have the right to execute this Agreement through paper or through electronic signature technology, which is in compliance with Vermont and Federal law governing electronic signatures. The Parties agree that to the extent they sign electronically, their electronic signature is the legally binding equivalent to their handwritten signature and shall be considered an original signature on an original document, including when transmitted as a "pdf" file. Neither party will claim that a Party's electronic signature is not legally binding, or object to the admissibility of this Agreement in any legal proceeding.

[*signature pages follow*]

**IN WITNESS WHEREOF**, the Parties have caused this Second Amendment to be executed and delivered by their duly authorized representatives as of the date and year first above written.

**OWNER**:

**CONTRACTOR**:

**Fusion Renewable NA, LLC**

**iSun Utility, LLC**

By: _____

By: _____

Name: Niv Sarne

Name: Jeffrey Peck

Title:

Title: CEO

# EXHIBIT A

## MILESTONE PAYMENT SCHEDULE

The notes below this table constitute an integral part of the Milestone Payment Schedule.

| Milestone | Activity | Invoice Amount | Invoice % | Retainage | Payment (Net of Retainage) | Paid to |
|---|---|---|---|---|---|---|
| #1 | Signed Agreement ---> LNTP | $403,301.40 | 10.00% | 7.50% | $373,053.80 | Contractor |
| #2 | NTP (Module dep. Paid) | $[201,650.70][*] | 5.00% | 0.00% | $[201,650.70] [*] | Module Supplier |
| #3 | Engineering and Permitting (Racking ,Transformer and Electrical gear deposits due) | $201,650.70 | 5.00% | 7.50% | $186,526.90 | [Contractor]/ [Supplier] [***] |
| #4 | Mobilization | $201,650.70 | 5.00% | 7.50% | $186,526.90 | Contractor |
| #5 | Civil Construction Complete | $201,650.70 | 5.00% | 7.50% | $186,526.90 | Contractor |
| #6 | Module Delivery (payment is in accordance with the Suppliers payment terms) | $[927,593.22] [**] | 23.00% | 0.00% | $[927,593.22] [**] | Module Supplier |
| #7 | Racking Delivery ((payment is in accordance with the Suppliers payment terms) | $564,621.96 | 14.00% | 7.50% | $522,275.31 | [Contractor]/ [Supplier] [***] |
| #8 | Inverter Delivery | $80,660.28 | 2.00% | 7.50% | $74,610.76 | [Contractor]/ [Supplier] [***] |
| #9 | Racking Installation (Billed per 25% completion) | $403,301.40 | 10.00% | 7.50% | $373,053.80 | Contractor |
| #10 | Module Installation (Billed per 25% completion) | $201,650.70 | 5.00% | 7.50% | $186,526.90 | Contractor |
| #11 | Inverter Installation Complete | $40,330.14 | 1.00% | 7.50% | $37,305.38 | Contractor |
| #12 | Mechanical Completion | $201,650.70 | 5.00% | 7.50% | $186,526.90 | Contractor |
| #13 | Substantial Completion | $201,650.70 | 5.00% | 0.00% | $201,650.70 | Contractor |
| #14 | Interconnection | $0.00 | 0.00% | 0.00% | $0.00 | N/A |
| #15 | Final Completion | $201,650.70 | 5.00% | 0.00% | $201,650.70 | Contractor |
| | *Total* | *$4,033,014.00* | *100.0%* | | *$3,845,478.85* | |

Notes to Milestone Payment Schedule

[*] The Invoice Amount for Milestone #2 (NTP (Module dep. Paid)) shall be equal to the lesser of (i) the amount set forth in the table above (i.e., $[201,650.70]) and (ii) the actual deposit required by the Module Supplier in accordance with the terms and conditions of the Module supply agreement.  Such amount shall be paid by the Owner directly to the Module Supplier. In the event the amount of the actual required deposit exceeds the amount set forth in the table above, the Contractor shall be solely responsible for paying such difference to the Module Supplier. In the event the amount of the actual required deposit is less the amount set forth in the table above, the credit amount will be allocated to the Contractor.

For example, if the actual amount of the deposit required by the Module Supplier is $300,000, then the Owner shall only be responsible for paying the Module Supplier the amount set forth in the table above ($201,650.70) and the Contractor shall be solely responsible for paying the balance (i.e., $[98,349.30]) to the Module Supplier. For Example, if the actual amount of the deposit required by the Module Supplier is $[97,867], then the Owner shall only be responsible for paying the Module Supplier the amount required by the Module supplier above ($[97,867]) and the owner shall be solely responsible for paying the balance (i.e., $[103,783.70]) to the Contractor.

[**] The Invoice Amount for Milestone #6 (Module Delivery) shall be equal to the amount set forth in the table above (i.e., $[927,593.22]). In the event the actual amount due to the Module Supplier upon delivery of the Modules exceeds the amount set forth in the table above, the Contractor shall be solely responsible for paying such difference to the Module Supplier.  In the event the actual amount due to the Module Supplier upon delivery of the Modules is less than the amount set forth in the table above then the Contractor shall be entitled to such difference.

For example, if the actual amount due to the Module Supplier upon delivery of the Modules in accordance with the terms and conditions of the Module supply agreement is $[1,250,000], then the Owner shall only be responsible for paying the amount set forth in the table above ($[927,593.22]) and the Contractor shall be solely responsible for paying the balance (i.e., $[322,406.78]) to the Module Supplier. If the actual amount due to the Module Supplier upon delivery of the Modules in accordance with the terms and conditions of the Module supply agreement is $[500,000], then the Owner shall be responsible for paying such amount directly to the Module Supplier and the Contractor shall be entitled to the remainder ($[427,583.22]).

[***] The election of payment to the Contractor or to the Supplier shall be at the discretion of the Owner in accordance with Section 6.1 of the Agreement. In the event that the Owner elects to pay the Supplier directly, then the amounts paid to the supplier/s will be deducted from the payment of the relevant Milestone to the Contractor.

**EXHIBIT B**

**PROJECT SCHEDULE**



**FUSION RENEWABLE NA, LLC**
2136 NE 123rd Street
North Miami, FL 33181

April 13, 2023

iSun Industrial, LLC
400 Avenue D, Suite 10
Williston, VT 05495
Attn: Jeffrey Peck, jeff@isunenergy.com

Re:    Waite Cemetery Project

Ladies and Gentlemen:

Reference is hereby made to that certain Engineering, Procurement and Construction Agreement, dated as of September 30, 2022 (the "EPC Agreement"), by and between Fusion Renewable NA, LLC (in such capacity, the "Owner") and iSun Industrial, LLC (in such capacity, the "Contractor").  Capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the EPC Agreement.

I.    Application of Credited Amount

The Contractor acknowledges that in connection with that certain Letter Agreement, dated as of the date hereof, between the Owner and iSun Utility, LLC, and accepted and agreed in relevant part by the Contractor, iSun Utility, LLC credited to the Contractor an aggregate amount equal to $150,000 (the "Credited Amount," as reduced from the Kendall Hill EPC LNTP, Milestone #1 Payment) to be applied by the Contractor hereunder at the direction of the Owner.  Prior to the date of this letter agreement, the Contractor requested the Owner pay an amount equal to $381,300 corresponding to a down payment (the "Module Down Payment") due from the Contractor under a module supply agreement for PV modules for the Project.  The Owner hereby directs, and the Contractor agrees, that the Credited Amount shall be applied in full on a dollar-for-dollar basis to the Module Down Payment.

For avoidance of doubt, the application of the foregoing Credited Amount shall not change the aggregate Contract Price under the EPC Agreement in any manner.

The corresponding amount of the next milestone payment, the 5% "NTP Payment," due or scheduled to become due in accordance with Exhibit Q (Milestone Payment Schedule), shall also be applied to the Module Down Payment

II.    Updates to Milestone Payment Schedule and Project Schedule

The Owner and the Contractor hereby agree that the delay in the payment of the Module Down Payment shall constitute an "Excusable Event"; provided, that (i) notwithstanding subclause (b) of Section 8.4 of the EPC Agreement, in no event shall the Contractor be entitled to any increase in costs or any change in the Contract Price in connection with such delay and (ii) no extension to the Project Schedule or the Guaranteed Substantial Completion Date in connection with such delay shall be taken into account for purposes of Section 16.3(f) of the EPC Agreement.

In furtherance of the foregoing, and notwithstanding anything to the contrary set forth in Section 13.3.2 of the EPC Agreement, upon receipt of further information from the Module Supplier with respect to the delivery of the Modules, and subject to the mitigation obligations of the Contractor set forth in Clause 8.3 of the EPC Agreement, the Owner and the Contractor shall amend Exhibit S (*Project Schedule*) in order to reflect the effect of such delay on the Project Schedule.  In connection with the foregoing, the Owner and the Contractor shall amend Exhibit Q (*Milestone Payment Schedule*) to the EPC Agreement to provide additional detail to the milestone payment schedule. The additional amount of the Module Down Payment over the 5% NTP Payment, and the Credit Amount equal to $47,255 will be accounted for as part amendment of the Milestone Payment Schedule.

III.     <u>Miscellaneous</u>

Except as expressly set forth herein, nothing herein shall waive or modify any portion of any EPC Agreement, which shall remain in full force and effect in accordance with its terms. This letter agreement supersedes any other agreements, whether written or oral, that may have been made or entered into between Owner and Contractor or by any office or officer of such party relating to the Project or the Work, except to the extent explicitly incorporated herein.

The terms and provisions of Section 24 (*Disputes*), Section 25.1 (*Severability*), Section 25.5 (*No Oral Modification*), Section 25.6 (*Amendments; Waiver*); Section 25.8 (*Third Party Beneficiaries*); Section 25.9 (*Further Assurances*); Section 25.11 (*Binding on Successors*) and Section 25.15 (*Fees and Expenses*) are hereby incorporated, mutatis mutandis, by reference and shall apply as if fully set forth herein, as if set forth expressly herein.

This letter agreement shall be governed by the laws of the State of New York, without regard to any laws regarding conflict of laws thereof that would require the laws of another jurisdiction to apply. The parties irrevocably accept and submit to the non-exclusive jurisdiction of the federal courts in the state of New York, with respect to any suit, action or proceeding in aid of arbitration, including an action for an order of interim, provisional or conservatory measures to maintain the status quo and prevent irreparable harm and for recognition and enforcement of any award rendered by the arbitral tribunal, and the parties irrevocably waive any objection to the laying of venue or defense that the forum is inconvenient with respect to any such suit, action or proceeding for such purpose. The parties' right to apply for such judicial relief in aid of arbitration and the commencement of any such suit, action or proceeding in aid of arbitration shall not be deemed incompatible with, or a waiver of, the parties' agreement to arbitrate. This consent to jurisdiction is being given solely for purposes of this letter agreement, and it is not intended to, and shall not, confer consent to jurisdiction with respect to any other Dispute in which a party to this letter agreement may become involved. The parties acknowledge and agree that terms and conditions of this Agreement have been freely, fairly and thoroughly negotiated.

EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS LETTER AGREEMENT. Each party (a) certifies that no representative of the other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver

and (b) acknowledges that it and the other party has been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications herein.

This letter agreement may be executed in any number of counterparts, and either party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This letter agreement shall become effective when each party shall have received an executed counterpart of this letter agreement, and an executed counterpart delivered by fax, .pdf or other means of electronic communications shall be deemed to be an original.

Please indicate your acceptance of the provisions hereof by countersigning the enclosed copy of this letter agreement and returning it to Niv Sarne, Chief Executive Officer, Fusion Renewable, niv@fusion-renewable.com.

[*signature pages follow*]

#
#12797274

Very truly yours,

**FUSION RENEWABLE NA, LLC**

By: _Niv Sarne_
Name: Niv Sarne
Title: CEO

AGREED AND ACCEPTED AS OF THE DATE FIRST SET FORTH ABOVE

**ISUN INDUSTRIAL, LLC**

By: _Jeffrey Peck_
Name: Jeffrey Peck
Title: CEO

[*Signature Page to Letter Agreement re Waite Cemetery*]

**FUSION RENEWABLE NA, LLC**
2136 NE 123rd Street
North Miami, FL 33181

April 14, 2023

iSun Utility, LLC
400 Avenue D, Suite 10
Williston, VT 05495
Attn: Jeffrey Peck, jeff@isunenergy.com

Re:    Kendall Hill Project – Increased Interconnection Costs and Delays

Ladies and Gentlemen:

Reference is hereby made to (i)  that certain Engineering, Procurement and Construction Agreement, dated as of December 31, 2021 (as amended by that certain First Amendment to the Engineering Procurement and Construction Agreement, dated as of September 30, 2022, the "EPC Agreement"), by and between Fusion Renewable NA, LLC (in such capacity, the "Owner") and iSun Utility, LLC (in such capacity, the "Contractor") and (ii) that certain Membership Interest Purchase Agreement, dated as of December 31, 2021 (the "MIPA"), by and between Fusion Renewable NA, LLC (in such capacity, the "Purchaser") and iSun Utility, LLC (in such capacity, the "Seller").  Capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the EPC Agreement or the MIPA, as the context may require.

This letter serves to document certain agreements of the parties with respect to increased costs and delays to the Project arising out of additional required interconnection upgrades that were not disclosed to the Purchaser prior to the Closing Date.

I.    Additional Purchase Price Adjustment

On or prior to the Final Completion Date, the Owner shall deliver to the Contractor its good faith calculation of the Owner's damages resulting from the additional required interconnection upgrades and the resulting delay to the Project, which shall include the actual incremental amount of the interconnection facilities upgrade costs (not to exceed $264,000), less the value of any incremental tax credits accruing to the Project as a result of the increased capital cost (the "Additional Purchase Price Adjustment"), per the example in Exhibit 1.

The Seller hereby agrees that the Purchase Price payable by the Purchaser at COD under the MIPA shall be reduced by an amount equal to the Additional Purchase Price Adjustment. To the extent the Additional Purchase Price Adjustment, together with the amount of any adjustment to the Purchase Price resulting from the reduced capacity of the Project pursuant to Section 2.3 of the MIPA, exceeds 10% of the Purchase Price, the Contractor shall pay such excess amount to the Owner on COD.  The Contractor further agrees, that notwithstanding anything to the contrary in Section 6.7 or 6.8 of the EPC Agreement, the Owner may retain the Retainage under the EPC Agreement until COD and, without limiting the ability of the Owner to draw upon the Retainage for the purposes set forth in Section 6.7 of the EPC Agreement, may also at any time draw upon the Retainage for payment of any amounts due and owing by the Seller to the Purchaser under the MIPA. The Owner shall pay to Contractor any remaining amount of Retainage upon COD.  In the event the Retainage is insufficient to cover any amounts

due and owing by the Seller to the Purchaser hereunder related to the Additional Purchase Price Adjustment or under the MIPA, the Contractor agrees that the Owner may deduct and set-off against any balance due or to become due to the Contractor pursuant to the EPC Contract (including, for the avoidance of doubt, the Milestone Payments payable at COD and Final Completion) any such amounts that are due and owing by the Seller to the Purchaser hereunder or under the MIPA.

II.    Updates to Milestone Payment Schedule and Project Schedule

As a result of the aforementioned delays arising out of the additional required interconnection upgrades, the Owner and the Contractor acknowledge that certain updates will be required to the Project schedules.  Accordingly, the Owner and the Contractor agree to use commercially reasonable efforts to amend each of Exhibit Q (*Milestone Payment Schedule*) to the EPC Agreement and Exhibit S (*Project Schedule*) to the EPC Agreement to reflect the current status of the Project, including the Utility's interconnection upgrade schedule.  The Parties hereby agree that the amendment of each of Exhibit Q (*Milestone Payment Schedule*) to the EPC Agreement and Exhibit S (*Project Schedule*) to the EPC Agreement shall constitute a mutual waiver of any and all claims arising out of such delays provided that such amendments are concluded within 45 days from the date the Owner receives the Utility's updated interconnection upgrade schedule

Pending the amendment of the Milestone Payment Schedule and the Project Schedule, the Contractor shall protect and preserve the existing Works and shall not perform any additional Works without the consent of the Owner.  Notwithstanding anything to the contrary in the EPC Agreement, the suspension of the Works pursuant to this letter agreement shall not constitute or give rise to an Owner-Caused Delay or Owner Event of Default.

III.    Partial Re-Allocation of Milestone Number 1 Payment

On September 30, 2022, in connection with the execution of the First Amendment to the Engineering Procurement and Construction Agreement, the Owner provided Contractor with LNTP and thereafter paid the Contractor an amount equal to $373,053.80 in respect of Milestone Number 1 (Signed Agreement → LNTP) in accordance with Exhibit Q (*Milestone Payment Schedule*) to the EPC Agreement. In light of the delays to the Project, the Owner and the Contractor hereby agree that the scheduled invoice amount for Milestone Number 1 shall be retroactively deemed reduced by $150,000 and that $150,000 of the amount paid by the Owner in respect of Milestone Number 1 shall be deemed withdrawn from the Project and credited by the Contractor to iSun Industrial LLC, to be applied by iSun Industrial LLC for the account of the Owner as directed by the Owner for use of Waite Cemetery module deposit payments, pursuant to that certain Letter Agreement, dated as of the date hereof, between the Owner and iSun Industrial, LLC.

IV.    Miscellaneous

Except as expressly set forth herein, nothing herein shall waive or modify any portion of the EPC Agreement or the MIPA, each which shall remain in full force and effect in accordance with its terms.  This letter agreement supersedes any other agreements, whether written or oral, that may have been made or entered into between the parties or by any office or officer of such party, except to the extent explicitly incorporated herein.

The terms and provisions of Section 24 (*Disputes*), Section 25.1 (*Severability*), Section 25.5 (*No Oral Modification*), Section 25.6 (*Amendments; Waiver*); Section 25.8 (*Third*

*Party Beneficiaries*); Section 25.9 (*Further Assurances*); Section 25.11 (*Binding on Successors*) and Section 25.15 (*Fees and Expenses*) of the EPC Agreement are hereby incorporated, mutatis mutandis, by reference and shall apply as if fully set forth herein, as if set forth expressly herein.

This letter agreement shall be governed by the laws of the State of Vermont, without regard to any laws regarding conflict of laws thereof that would require the laws of another jurisdiction to apply. The parties irrevocably accept and submit to the non-exclusive jurisdiction of the federal courts in Burlington, Vermont with respect to any suit, action or proceeding in aid of arbitration, including an action for an order of interim, provisional or conservatory measures to maintain the status quo and prevent irreparable harm and for recognition and enforcement of any award rendered by the arbitral tribunal, and the parties irrevocably waive any objection to the laying of venue or defense that the forum is inconvenient with respect to any such suit, action or proceeding for such purpose. The parties' right to apply for such judicial relief in aid of arbitration and the commencement of any such suit, action or proceeding in aid of arbitration shall not be deemed incompatible with, or a waiver of, the parties' agreement to arbitrate. This consent to jurisdiction is being given solely for purposes of this letter agreement, and it is not intended to, and shall not, confer consent to jurisdiction with respect to any other Dispute in which a party to this letter agreement may become involved. The parties acknowledge and agree that terms and conditions of this letter agreement have been freely, fairly and thoroughly negotiated.

EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS LETTER AGREEMENT. Each party (a) certifies that no representative of the other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party has been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications herein.

This letter agreement may be executed in any number of counterparts, and either party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This letter agreement shall become effective when each party shall have received an executed counterpart of this letter agreement, and an executed counterpart delivered by fax, .pdf or other means of electronic communications shall be deemed to be an original.

Please indicate your acceptance of the provisions hereof by countersigning the enclosed copy of this letter agreement and returning it to Niv Sarne, Chief Executive Officer, Fusion Renewable, niv@fusion-renewable.com.

[*signature pages follow*]

Very truly yours,

**FUSION RENEWABLE NA, LLC**

By: _Niv Sarne_
Name: Niv Sarne
Title:  CEO

AGREED AND ACCEPTED AS OF THE DATE FIRST SET FORTH ABOVE

**ISUN UTILITY, LLC**

By: _Jeffrey Peck_
Name:   Jeffrey Peck
Title:   CEO

SOLELY WITH RESPECT TO SECTION III OF THIS LETTER AGREEMENT
AGREED AND ACCEPTED AS OF THE DATE FIRST SET FORTH ABOVE

**ISUN INDUSTRIAL, LLC**

By: _Jeffrey Peck_
Name:  Jeffrey Peck
Title:  CEO

#

[*Signature Page to Letter Agreement re Kendall Hill*]

**Exhibit 1**
**Calculation of Additional Purchase Price Adjustment**

30% ITC:
$264,000 X 65% = $171,600


40% ITC:
$264,000 X 55% = $145,200