**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| iSun, Inc., *et al.*,[1] | Case No. 24-11144 (TMH) |
| Debtors. | (Jointly Administered) |
|  | Re: Docket Nos. 65, 186 |

**DECLARATION CHRISTOPHER LEE IN SUPPORT OF**
**THE OBJECTION OF NAUTILUS SOLAR TO THE PROPOSED**
**ASSUMPTION AND ASSIGNMENT OF THE TERMINATED EPC AGREEMENTS**

I, Christopher Lee, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the Senior QA/QC Manager at Nautilus US Power Holdco LLC ("Nautilus Solar").  I have been working for Nautilus Solar since 2021 and in the solar industry generally since 2008.

2.      I submit this declaration in support of the *Objection of Nautilus Solar to Sale, Proposed Contract Assumption and Assignment, Proposed Cure, and Adequate Assurance of Future Performance* (the "Objection") filed contemporaneously herewith.[2]

3.      I am generally familiar with the Terminated EPC Agreements and the day-to-day operations of the Solar Projects. Except as otherwise noted, I have personal knowledge of the

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172) (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411) ; (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (7316); (collectively referred to as the "Debtors"). The Debtors' mailing address is: 400 Avenue D, Suite 10 Williston, Vermont 05495, with copies to Gellert Seitz Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

operations of the Solar Projects. Except as otherwise noted, I have personal knowledge of the matters set forth herein in the ordinary course of my responsibilities.  If called upon to testify, I would testify competently as to the facts set forth in this Declaration.

4.      On or about December 27, 2022, iSun Industrial LLC (the "Contractor") and each of BD Solar Norridgewock LLC, BD Solar North Anson LLC, BD Solar Rangeley LLC (collectively, the "Owners") entered into separate Engineering, Procurement and Construction Agreements (each as amended, modified or supplemented, including pursuant to all Change Orders duly executed, a "Terminated EPC Agreement," and collectively the "Terminated EPC Agreements")[3] whereby the Contractor agreed to provide engineering, procurement and constructions services in connection with the design, installation and commissioning of certain solar photovoltaic electric generation facilities located in Maine (each a "Solar Project," and collectively, the "Solar Projects").  True and correct copies of the Terminated EPC Agreements are attached hereto as Exhibits A, B and C.[4]

5.      The Terminated EPC Agreements contain language that time was particularly of the essence in the timely performance of the Terminated EPC Agreements.  *See* Exs. A-C at §§ 6.3, 6.5.  Specifically, each Terminated EPC Agreement contains a Schedule of Work that required the Contractor to achieve Mechanical Completion by October 26, 2023 (the "Mechanical Completion Deadline").  *See id*. § 1.1.

6.      . The Mechanical Completion Deadline was not extended by any Change Order, or under any other mechanism permitted by the Terminated EPC Agreements and the Contractor

---

[3] Capitalized terms in reference to defined terms in the Terminated EPC Agreements not otherwise defined herein shall have the meanings ascribed in the Terminated EPC Agreements.

[4] Due to their voluminous nature, exhibits and schedules to the Terminated EPC Agreements are omitted but will be produced upon written request.

did not submit a request to extend the Mechanical Completion Deadline for any of the Solar Projects. *See id*. A-C §§ 8.1, 8.2, 8.4.

7. Under the Terminated EPC Agreements, the Contractor's failure to achieve Mechanical Completion within six (6) months of the Mechanical Completion Deadline results in a Contractor Event of Default, which gives the Owners the right to immediately terminate their respective Terminated EPC Agreement upon notice to the Contractor. *See id*. § 11.2.2.

8. Upon termination of a Terminated EPC Agreement due to a Contractor Event of Default, the Owners are permitted to engage replacement contractors to finish the remaining Work under the Terminated EPC Agreement, and the Contractor is liable for any costs incurred by the Owners in excess of the contract balance remaining under the Terminated EPC Agreement. *See id.* § 11.2.3.

9. In addition to termination rights, the Owners are also entitled to Mechanical Completion Delay Liquidated Damage of $500 per MW per day for each day by which Mechanical Completion is later than the Mechanical Completion Deadline. *See id*. § 6.3.

10. On May 24, 2024, each of the Owners delivered a Notice of Contractor Event of Default and Termination (collectively, the "Termination Notices") notifying the Contractor that the Terminated EPC Agreements were terminated immediately due to a Contractor Event of Default, specifically the Contractor's failure to achieve Mechanical Completion for each of the Solar Projects within six (6) calendar months of the Mechanical Completion Deadline. *See id.* § 11.2.1(f). True and correct copies of the Termination Notices are attached hereto as Exhibits D, E and F.

11. As of the date of termination, the Contractor had already missed the Mechanical Completion Deadline by 211 days or nearly seven (7) months.

12.     In or around June 2024, as expressly permitted under the Terminated EPC Agreement, the Owners hired replacement contractors to finish the Work at the Solar Projects. *See* Exs. A-C § 11.2.3.

13.     I understand that the replacement contractors have found deficient work done by the Contractor that will lead to increased costs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated July 23, 2024                                      */s/ Christopher Lee*

Christopher Lee
Senior QA/QC Manager
Nautilus US Power Holdco LLC

4

**<u>Exhibit A</u>**

Engineering, Procurement and Construction Agreement (BD Solar Norridgewock, LLC)

DocuSign Envelope ID: 76390266-2A16-45A5-AA71-C5B404DD06B7

ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

BY AND BETWEEN

BD Solar Norridgewock, LLC

AND

ISUN INDUSTRIAL LLC

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

**Table of Contents**

RECITALS ................................................................................................................................ 3

**ARTICLE 1 DEFINITIONS** ..................................................................................... 3

**ARTICLE 2 CONDITIONS PRECEDENT TO THE AGREEMENT** ................................ 15

**ARTICLE 3 CONTRACTOR WORK AND OTHER OBLIGATIONS** ............................. 16

**ARTICLE 4 OWNER OBLIGATIONS** ................................................................... 21

**ARTICLE 5 COMMISSIONING TESTS** ................................................................. 24

**ARTICLE 6 COMPLETION OF THE WORK** .......................................................... 25

**ARTICLE 7 CONTRACT PRICE AND PAYMENT** .................................................. 31

**ARTICLE 8 CHANGE ORDERS** ........................................................................... 34

**ARTICLE 9 FORCE MAJEURE AND OWNER CAUSED DELAY** ............................... 36

**ARTICLE 10 WARRANTIES** ............................................................................... 37

**ARTICLE 11 DEFAULT; TERMINATION** ............................................................. 40

**ARTICLE 12 REPRESENTATIONS AND WARRANTIES** ......................................... 45

**ARTICLE 13 TAXES** ......................................................................................... 46

**ARTICLE 14 TITLE** .......................................................................................... 47

**ARTICLE 15 INDEMNIFICATION** ...................................................................... 48

**ARTICLE 16 LIMITATIONS OF LIABILITY** ........................................................ 50

**ARTICLE 17 INSURANCE REQUIREMENTS** ....................................................... 51

**ARTICLE 18 RELATIONSHIP OF THE PARTIES** .................................................. 55

**ARTICLE 19 DISPUTE RESOLUTIONS** ............................................................... 56

**ARTICLE 20 NOTICES** ...................................................................................... 58

**ARTICLE 21 GENERAL PROVISIONS** ................................................................. 58

**APPENDIX A CONTRACTOR'S SCOPE OF WORK** ................................................ 65

**APPENDIX B OWNER'S SCOPE OF WORK** ......................................................... 66

**EXHIBIT A  Facility Specifications** .................................................................. 67

**EXHIBIT B  CONTRACTOR SCHEDULE AND SCHEDULE OF MILESTONES** ............ 68

**EXHIBIT C  PROJECT SITE DESCRIPTION** ........................................................ 69

**EXHIBIT D  COMMISSIONING AND COMMISSIONING TEST** ............................... 70

**EXHIBIT E  FORM OF SUBSTANTIAL COMPLETION** ........................................... 71

**EXHIBIT F  FORM OF FINAL COMPLETION** ...................................................... 72

**EXHIBIT G  CONTRACT PRICE** ......................................................................... 73

**EXHIBIT H  SCHEDULE OF DELIVERABLES** ...................................................... 74

**EXHIBIT I  ACCEPTANCE DOCUMENTATION LIST** ............................................ 75

**EXHIBIT J  FORM OF CHANGE ORDER** ................................................................................ **76**

**EXHIBIT K  FORM OF PAYMENT APPLICATION** ............................................................... **77**

**EXHIBIT L  CAPACITY AND RELIABILITY TEST PROCEDURE** ................................... **78**

**EXHIBIT M  LIEN WAIVERS** ..................................................................................................... **79**

**EXHIBIT N  FORM OF OWNER PARENT GUARANTY** ..................................................... **80**

**EXHIBIT O  FORM OF MECHANICAL COMPLETION** ....................................................... **81**

**EXHIBIT P  FORM OF PERFORMANCE AND PAYMENT BOND** ..................................... **82**

**EXHIBIT Q  CONDITIONAL USE PERMIT AND ENVIRONMENTAL STUDY REQUIREMENTS** ....... **83**

**EXHIBIT R  DOCUMENTED SITE CONDITIONS** .............................................................. **84**

**EXHIBIT S FORM OF LIMITED NOTICE TO PROCEED** ................................................... **85**

**Exhibit T Key Suppliers** ................................................................................................................**86**

**ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT**

This Engineering, Procurement and Construction Agreement (this "Agreement") is made and entered into and effective as of December 27, 2022 (the "Effective Date"), by and between BD Solar Norridgewock, LLC, a limited liability company ("Owner"), and iSun Industrial LLC, a limited liability company ("Contractor"). Owner and Contractor are sometimes referred to individually herein as a "Party" and collectively as the "Parties".

**RECITALS**

WHEREAS, Owner will develop and own an onsite solar photovoltaic electric generation Facility (as defined below) more fully described in Exhibit A, to be located on that portion of the property located in Cumberland County Maine, as illustrated on Exhibit C;

WHEREAS, Contractor provides engineering, procurement and construction services in connection with the design, installation, and commissioning of solar photovoltaic electric generation systems;

WHEREAS, Owner desires to appoint Contractor to provide engineering, procurement and construction services in connection with the design, installation and commissioning of the Facility in accordance with the terms hereof.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, and for the mutual covenants contained herein, the Parties hereby agree as follows:

**ARTICLE 1
DEFINITIONS**

1.1     Definitions.  In addition to terms defined elsewhere in this Agreement, the Parties agree that capitalized terms used in this Agreement, unless otherwise defined herein, shall have the meanings assigned below:

"Agreement" means this Engineering, Procurement and Construction Agreement, including all Appendices and Exhibits hereto, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof.

"Anti-Bribery Laws" means all applicable anti-bribery and anti-corruption laws, rules or regulations, as may be amended from time to time

"Applicable Laws" means all laws, statutes, rules, regulations, interpretations, ordinances, judgments, decrees, injunctions, writs, tariffs and orders of any Governmental Authority having jurisdiction over the Parties insofar as it relates to the design and construction of the Facility, the Project, the Project Site and the performance of the Work, as may be in effect as of the Effective Date.

"Applicable Permits" means, as to the Facility, all waivers, franchises, variances, permits, authorizations, entitlements, licenses or orders of or from any federal, state, local, county, municipal, regional, environmental or other governmental body, instrumentality, agency, authority, court or other body required to be obtained or maintained in connection with construction and installation of the Facility or performance of the Work.

"As-Builts" means an electronic version in native format of the Design Documents showing all changes made to the "issued for construction" drawings throughout construction and shall be prepared after completion of a given system and they describe the actual installed configuration of the executed Work, the Facility, all equipment and other appurtenances to the Facility, showing the exact as-built locations, sizes and details of the Facility as constructed.

"Associated Persons" means, in relation to the Contractor, a person who performs services for or on behalf of the Contractor in connection with the services provided to the Client under this Agreement, in any capacity and including, without limitation, employees, agents, subsidiaries, representatives and subcontractors of the Contractor;

"Authority Having Jurisdiction" or "AHJ."

"Business Day" means any calendar day, except Saturdays, Sundays, and national and local holidays on which commercial banks in Maine are authorized or required by Applicable Law to be closed.

"Capacity Cure Period" shall have the meaning set forth in Section 6.5.2.

"Capacity Guarantee" means Contractor's guarantee that the Facility will achieve the Facility Capacity.

"Capacity Shortfall Liquidated Damages" means the liquidated damages calculated pursuant to Section 6.5.3.

"Capacity Testing" means the testing prior to Substantial Completion of the Facility, as further described in Exhibit L.

"Change" means a change, modification, addition or deletion to or in the Design Documents, the Contract Price, the Work, the Owner Supplied Datasheets, the Facility Specifications or the Schedule of Work, as applicable.

"Change in Law" means (a) any adoption, rescission or change of Applicable Law, or in the judicial or administrative interpretation of any Applicable Law by a Governmental Authority, after the Effective Date, which is inconsistent or at variance with any Applicable Law in effect on the Effective Date and that adversely impacts the Work (including impact on the cost of Contractor's performance of the work or the time required to perform the Work); (b) the imposition after the Effective Date of any requirement for a new Applicable Permit

not required by Applicable Law as of the Effective Date or any changes to any existing Applicable Permit and/or the requirements under such existing Applicable Permit; or (c) the imposition after the Effective Date of any condition or requirement in either case by any Governmental Authority that adversely impacts the Work (including impact on the cost of Contractor's performance of the work or the time required to perform the Work), which condition or requirement was not required by such Governmental Authority as of the Effective Date and affects the issuance, renewal or extension of any Applicable Permit.

"Change Order" means a written document in a form substantially similar to that which is attached as Exhibit J, issued under this Agreement and signed by Owner and Contractor, which authorizes a Change, and which is incorporated into the Agreement herein by reference.

"Commission" or "Commissioning" means all commissioning, including performance of the Commissioning Tests, as set forth in Exhibit D.

"Commissioning Tests" shall mean the commissioning tests described in Exhibit D.

"Conditional Use Permit and Environmental Study Requirements" shall mean those requirements set forth in Exhibit Q.

"Consent to Energize" shall have the meaning set forth in Section 6.2.

"Construction Change Directive" means a written order prepared by Owner in the circumstances outlined in Section 8.1.1.

"Contract Documents" means this Agreement and all Exhibits and Schedules, reviewed Design Documents (as defined in Section 3.2.1), the Limited Notice to Proceed issued in accordance with Section 2.1, the Notice to Proceed issued in accordance with Section 2.2, Change Orders, Construction Change Directives not subject to a dispute and any written amendments to this Agreement executed by the Parties.

"Contractor Event of Default" shall have the meaning set forth in Section 11.2.1.

"Contractor Indemnitees" means Contractor and its affiliates, any Subcontractor of Contractor, and each of their respective officers, directors, shareholders, partners, employees, representatives and agents.

"Contractor Losses" shall have the meaning set forth in Section 15.2.

"Contractor's Direct Costs" shall mean, when referring to any portion of the Work, an amount equal to the sum of the reasonably incurred actual costs (including temporary and permanent materials, labor, services, supplies, rental, transportation and travel-related costs) incorporated or consumed in the course of carrying out such Work, and any other costs of any nature reasonably attributable to such Work, at Contractor's actual cost

5

including all insurance and bonding, all to be reasonably verified. When determining Contractor's Direct Costs, (a) direct labor costs shall be calculated pursuant to the rates set forth in Appendix A; and (b) the cost of any Work carried out by Subcontractors shall be calculated at Contractor's actual cost broken down and provided in writing.

"Contractor's Personnel" means Contractor, its employees, agents and Subcontractors and its Subcontractor's employees, agents and subcontractors.

"Contractor's Permits" shall have the meaning set forth in Section 3.9.

"Contract Price" shall have the meaning provided in Section 7.1.

"COVID-19" means the coronavirus disease named as such by the World Health Organization.

"Critical Path" means core aspects of the Work including the installation of racking, the installation of modules, the installation of inverters, and the achievement of Mechanical Completion, Substantial Completion, and Final Completion, and any reference to "Critical Path activities" or similar shall be construed accordingly.

"DC" means direct current.

"Default Rate" means the lesser of three percent (3%) per annum, or the maximum rate of interest permissible under Applicable Laws.

"Defects" or "Defective Work" when applied to any Work means any Work that does not materially comply with the Facility Specifications.

"Demobilization Activities" shall have the meaning set forth in Section 11.1.2.

"Design Documents" means design documents for the Facility consisting of drawings, specifications, plans and other documents necessary to describe the Facility with respect to the civil engineering, structural, control, mechanical and electrical systems, as specified in the Scope of Work (as modified or supplemented by any Change Order).

"Documented Site Conditions" shall have the meaning set forth in Section 4.4.

"Early Termination Charge" shall have the meaning set forth in Section 11.1.3.

"Energize" or "Energization" means that the Facility or a part thereof is receiving or consuming back feed power past the medium voltage switchgear breaker.

"Environmental Credits" means any and all mandatory and voluntary federal, state or local renewable energy or emissions credits, carbon credits, rebates, subsidy, incentive payment or any other green tag, renewable energy, emissions reduction, depreciation, tax credit or other benefit, howsoever entitled, related to the environmental characteristics of

the Facility or the generation of energy therefrom, whether related to any renewable portfolio standard or other renewable energy purchase requirement or otherwise, whether existing as of the Effective Date or enacted thereafter, whether available to Owner as the host, producer or user of electricity output and whether administered by any Governmental Authority, utility, transmission and distribution provider (including regional interconnect, independent system operator or regional transmission operator) or any other similar entity or any voluntary regime.

"Environmental Study" means that certain study commissioned by Owner and included as Exhibit Q hereto.

"Equipment" means all photovoltaic modules, inverters, equipment, machinery, apparatus, materials, articles, components, raw materials, supplies, parts, systems, structures and any other equipment or items comprising or otherwise necessary or appropriate to be incorporated or integrated into the Facility, based on the design, engineering, construction, development, operation and maintenance of the Facility, in each case, based on the Facility Specifications and requirements provided herein.

"Equitable Adjustment" shall mean an adjustment in the Schedule of Work or Contract Price, as applicable, which accurately reflects any increase in Contractor's Direct Costs, and any increase in the time necessary to perform the Work, resulting from the changes triggering such adjustment, taking into account all factors which could reasonably increase Contractor's Direct Costs or time necessary to perform the Work, including, but not limited to: availability of materials, labor and other resources; fluctuations in material cost or labor rates; seasonal weather variations; shipping capacity; production delays; and demobilization and remobilization.

"Event of Delay" means (i) a Force Majeure Event, (ii) Change in Law, (iii) Owner Caused Delay, (iv) suspension of the work pursuant to Sections 11.3; (v) failure of the AHJ to issue construction permits within twenty (20) days of Contractor's request (except to the extent such failure is attributable to Contractor's Personnel), (vi) failure of the Interconnection Provider to approve the request for the interconnection of the system within fifteen (15) Business Days of Contractor's request for such approval (except to the extent such failure is attributable to Contractor's Personnel), (vii) failure of Owner to obtain Permission to Operate within ten (10) Business Days of Contractor's request for such authorization (except to the extent such failure is attributable to Contractor's Personnel); (viii) Unknown Site Conditions, (ix) Owner's failure to issue Notice to Proceed by the NTP Deadline; (x) Commissioning Tests or Capacity Testing are delayed by irradiance below the required levels as specified in Exhibit D and Exhibit L (as applicable); (xi) discovery of Hazardous Substances pursuant to Section 3.14; (xii) and (xiii) any other circumstance for which the terms of this Agreement specifically entitle Contractor to a Change Order.

"Existing Structures" means all structures existing at the Project Site at the time when the LNTP is issued including but not limited to buildings, roads, walls, tracks, gates, fences, and drainage systems.

7

"<u>Facility</u>" means the photovoltaic electric generating system consisting of photovoltaic modules, inverters, a data acquisition system and related electrical conduit, wiring, meters, machinery, parts, start-up spares, special maintenance tools, components, appliances, security fencing and equipment, interconnection and transmission equipment, the purpose of which is to produce solar energy, together with the interconnection facilities and related assets, constructed on the Project Site.  The Facility shall meet the Facility Specifications.

"<u>Facility Capacity</u>" shall mean the capacity of the STC rated solar electric system (expressed in kilowatts DC) set forth in the title block of the reviewed Design Documents (as defined in <u>Section 3.2.1</u>).

"<u>Facility Specifications</u>" shall mean the specifications for the Facility as set forth in <u>Exhibit A</u>.

"<u>FC Holdback</u>" shall have the meaning set forth in <u>Section 7.7.1</u>.

"<u>Final Completion</u>" shall have the meaning set forth in <u>Section 6.7</u>.

"<u>Final Lien Waiver</u>" means an unconditional final lien and claim waiver and release in the form set forth in <u>Exhibit M</u> executed by Contractor or a Subcontractor, as applicable.

"<u>Final Punch List</u>" shall have the meaning set forth in <u>Section 6.6.2</u>.

"<u>Financing</u>" means any form of construction, interim, long-term debt, lease, tax-exempt, recourse, non-recourse, equity or other form of funding, or refinancing that Owner, or any affiliate of Owner, obtains or attempts to obtain any or all of the proceeds of which are to be used in connection with the Project and the payment of the costs to engineer, design, procure, and construct the Facility.

"<u>Financing Party</u>" means any and all lenders, security, note or bond holders, lien holders, investors, equity providers and other persons or entities providing Financing, or credit support for Financing, as selected by Owner, or any affiliate of Owner, and/or any trustee(s) or agent(s) acting in connection therewith and their respective successors and assigns.

"<u>Force Majeure Event</u>" means any event or circumstance that (a) prevents or delays the performance by a Party of its obligations hereunder; and (b) is not within the reasonable control, directly or indirectly, of the Party affected, but only if and to the extent that (i) such circumstance, despite the exercise of due diligence, cannot be prevented, avoided or removed by such Party directly or indirectly; (ii) such event or circumstance is not due to such Party's negligence or intentional misconduct; (iii) such Party has taken all reasonable precautions, due care and reasonable alternative measures to avoid the effect of such event or circumstance and to mitigate the consequences thereof; and (iv) such Party has given the other Party prompt notice describing such event or circumstance, the effect and expected duration thereof and the actions being taken in order to comply with this Agreement.

Subject to the foregoing conditions, Force Majeure Events may include: (A) war, riot, sabotage, armed conflict, trade blockades, embargoes, acts of a public enemy, terrorist acts or other civil disturbance; (B) extreme weather conditions or natural phenomena, including floods, explosions or fires arising from natural causes, earthquakes, hailstorms, tornados, typhoons, hurricanes, landslides, volcanic eruptions, range or forest fires and unsafe or hazardous conditions arising from such severe and unusual adverse weather conditions or natural phenomena (any weather related Site conditions not otherwise specified herein that significantly impacts or immobilizes equipment or crew operations, jeopardizes stormwater permit compliance or causes general safety issues shall be reasonably agreed between the Parties); (C) strikes, walkouts, lockouts or similar industrial or labor actions or disputes, other than strikes, walkouts, lockouts or similar industrial or labor actions or disputes by, and directed at, Contractor's Personnel; (D) epidemics; (E) COVID-19 or any impact to Contractor's performance of the Work arising out of or in connection with COVID-19; (F) in the case of Owner only, any disruption to supply chains; and (G) any communication, discussion, policy change, Change in Law by a federal agency of the United States of America in relation to tariffs on modules. Force Majeure Events shall not include: (1) the inability to obtain labor, equipment or other materials for the Work (except to the extent such inability is caused by a Force Majeure Event); (2) equipment failures (except to the extent such failures are caused by a Force Majeure Event); (3) changes in market conditions; (4) a Party's failure to timely apply for Applicable Permits; or (5) failure to pay an amount due.

"Form of Final Completion" shall have the meaning set forth in Section 6.7.

"Form of Mechanical Completion" shall have the meaning set forth in Section 6.1.

"Form of Substantial Completion" shall have the meaning set forth in Section 6.4.

"Governmental Authority" means any international, federal, state, local or municipal government body; any governmental, quasi-governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power; or any court or governmental tribunal.

"Hazardous Substance" means any and all chemicals, constituents, contaminants, pollutants, materials, wastes and any other carcinogenic, corrosive, ignitable, radioactive, reactive, toxic or otherwise hazardous substances or mixtures (whether solids, liquids, gases), or any substances now or at any time subject to regulation, control, remediation or otherwise addressed as a hazardous substance under Applicable Laws, including those laws, regulations and policies relating to the discharge, emission, spill, release, or threatened release into the environment or relating to the disposal, distribution, manufacture, processing, storage, transport, treatment, transport, or other use of such substances.

"Initial Retainage" shall have the meaning set forth in Section 7.7.1.

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CFB404DD06B7

"Independent Engineer" means the independent engineer designated by the Owner through written notice to Contractor. Unless otherwise designated, the Independent Engineer shall be Leidos Engineering, LLC.

"Interconnection Agreement" means the Level 4 Interconnection Agreement between Owner and Interconnection Provider.

"Interconnection Provider" means Central Maine Power Company a Maine corporation and transmission and distribution utility, existing under the laws of the State of Maine, whose electric distribution system the Facility will be interconnected pursuant to the terms of this Agreement and the Interconnection Agreement.

"Interim Punch List" shall have the meaning set forth in Section 6.6.1.

"Investment Price" means all amounts invested in connection with the Project by Owner as of the date of sale, plus eight percent (8%).

"Landowner" means the owner of the Project Site.

"LNTP" shall have the meaning set forth in Section 2.1.

"LNTP Work" shall have the meaning set forth in Section 2.1.

"MC Retainage" shall have the meaning set forth in Section 7.7.1.

"Mechanical Completion" shall have the meaning set forth in Section 6.1.

"Mechanical Completion Deadline" shall mean the date as identified on Exhibit B, as such date may be extended in accordance with the provisions of this Agreement.

"Mechanical Completion Delay Liquidated Damages" shall have the meaning set forth in Section 6.3.

"New Contract Price" has the meaning set forth in Exhibit G.

"Notice to Proceed" means the notice described in Section 2.2 to be issued by Owner. "NTP Deadline" shall have the meaning set forth in Section 2.2.

"Offtaker" as listed in Exhibit C

"Original Contract Price" has the meaning set forth in Exhibit G.

"Owner Caused Delay" means a delay in Contractor's performance of the Work, to the extent such delay is caused by either (a) Owner's delay in performing or failure to perform any covenant or obligation of Owner under this Agreement including, without limitation, failure of Owner to (i) provide sufficient access to the Project Site (ii) provide authorization

10

to commence, perform or complete the Work or any portion thereof and (iii) timely review of Contractor's submittals and notices delivered in connection with this Agreement in accordance with the Schedule of Work, and if not specified therein, within the timeframe specified in such submittal or notice, and if not specified in the Schedule of Work or in such submittal or notice, within a reasonable time not to exceed ten (10) days; (b) any damage, or interference caused to the Work, or omission to act relating to the Work, which directly prevents Contractor from performing a material component or portion of the Work, which damage, interference, or omission to act is (i) caused by Owner, Offtaker, Landowner (in each case, to the extent such delay is not attributable to Contractor or its Subcontractors) or the Financing Party in connection with Contractor's performance of the Work, and (ii) resulting from the negligent acts or omissions or willful misconduct of Owner's personnel, Offtaker's personnel, Landowner's personnel or Financing Party's personnel, and (iii) in the case of any omission to act, is not the result of Contractor failing to communicate to Owner that it requires Owner to act in a particular manner; (c) the acts or omissions of Owner, Offtaker, Landowner, Interconnection Provider, the AHJ, Financing Party, Owner's consultants or contractors (other than Contractor's Personnel) or any other party acting on behalf of Owner or in furtherance of Owner's (and Financing Party's) obligations herein, in each instance that adversely affects the schedule, performance or cost of performing the Work or any other term and condition in this Agreement; (d) any failure by Owner to provide or delays in providing Owner Supplied Equipment or performing Owner's Scope of Work; (e) failure of Owner to replace any damaged or defective Owner Supplied Equipment; (f) failure to achieve the Capacity Guarantee to the extent caused by any Owner Supplied Equipment or Owner's Scope of Work; (g) any inaccuracies in the design set provided by Owner to Contractor (on which Contractor may rely); or (h) delay of the Interconnection Provider to perform the required work under the Interconnection Agreement necessary for Contractor to complete and interconnect the Facility; in each case, provided that Contractor's Personnel have not caused such delay and in respect of paragraph (h), provided that in accordance with the Contractor's scope of Work, Contractor's Personnel have made all reasonable efforts to mitigate any delays by the Interconnection Provider in the performance of the interconnection work and have provided progress reports to Owner regarding such interconnection work.

"Owner Event of Default" shall have the meaning set forth in Section 11.3.1.

"Owner Indemnitees" means Owner, each Financing Party and each of their respective officers, directors, shareholders, affiliates, partners, employees, representatives and agents.

"Owner Losses" shall have the meaning set forth in Section 15.1.

"Owner Parent Guaranty" means the parent guaranty provided by Owner in accordance with Section 7.6.

"Owner's Permits" shall have the meaning set forth in Section 4.5.

11

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-GFB404DD06B7

"Owner's Representative" means the representative designated as such by Owner as set forth in Article 20.

"Owner's Scope of Work" means the scope of work to be performed by Owner as described on Appendix B, or as otherwise expressly excluded from Contractor's Scope of Work.

"Owner's Storage Facility" means any storage facility supplied by the Owner.

"Owner Supplied Equipment" means the equipment set forth in Appendix B to be supplied by Owner to Contractor in accordance with the terms of this Agreement.

"Owner Supplied Datasheets" means the datasheets for certain Owner Supplied Equipment that are labelled as such and set forth in Appendix B.

"P & P Bond Expiration Date" has the meaning set forth in Section 7.8.

"Partial Lien Waiver" means a partial lien and claim waiver and release in the form set forth in Exhibit M executed by Contractor or a Subcontractor, as applicable.

"Payment Milestone" shall have the meaning set forth in Section 7.2 and Exhibit B.

"Performance and Payment Bond" shall have the meaning set forth in Section 7.8.

"Performance Ratio" has the meaning given to it in Exhibit G, L.

"Permission to Operate" means Owner has received authorization for the Facility to commence parallel operation from the Interconnection Provider.

"Power Purchase Agreement" means the agreement between Owner and Offtaker for the purchase of electricity generated by the Facility.

"Progress Payment" shall mean any payment made or to be made by Owner to Contractor that corresponds to a Payment Milestone.

"Pre-Lien Notice" means any preliminary lien notices under Applicable Law required to preserve the right to claim a lien for the Work performed hereunder.

"Project" means the entirety of the Work and the Facility that will result from the Work.

"Project Site" or "Site" shall be as described in Exhibit C.

"Prudent Industry Practices" means, with respect to Contractor's performance of its obligations under this Agreement, at a particular time, in the exercise of reasonable judgment in light of the facts known, or that should have been known, at the time a decision

was made, those practices, standards, designs, methods, means, techniques, equipment and acts that would require a person to: (a) perform its duties in good faith and as a reasonably prudent contractor and in compliance with Applicable Laws and Applicable Permits, (b) perform its duties in compliance with good utility practices and the requirements of this Agreement, (c) exercise such care, skill and diligence as a reasonably prudent business company of established reputation engaged in the solar energy business would exercise in the conduct of its business and for the advancement or protection of its own interests, (d) perform the duties in accordance with applicable solar energy industry standards, taking into account the requirements to qualify for the investment tax credit under Section 48 of the Internal Revenue Code, I use sufficient and properly trained and skilled personnel, and (f) use parts and supplies that meet the specifications set forth in the Scope of Work."

"Public Official" means:
(a) any officer, employee or representative of a government, whether national, federal or local, including employees of law enforcement or regulatory agencies;
(b) any individual in the legislative, administrative, military or judicial branches of government;
(c) any officer, employee or representative of a government-owned or government controlled commercial enterprise (such as state-owned enterprises, sovereign wealth funds and state-owned media organizations) or government-controlled charitable organization.
(d) any officer, employee or representative of a political party or any candidate for or holder of public office;
(e) employees and representatives of public international organizations (such as the World Bank or UN),
(f) any member of a royal family, and
(g) any other persons discharging a public function.

"Reliability Testing" means the testing prior to Substantial Completion of the Facility, as further described in Exhibit L.

"Replacement Contractor" means a person employed by Owner to finish the Work in the event Owner terminates the Agreement due to a Contractor Event of Default, as provided in Section 11.2.3.

"Retainage" shall have the meaning set forth in Section 7.7.1.

"Rules" shall have the meaning set forth in Section 19.2.1.

"SC Retainage" shall have the meaning set forth in Section 7.7.1.

"Schedule of Milestones" means the payment schedule set forth on Exhibit B.

"Schedule of Work" means the baseline schedule(s) for the Work that will support Contractor's achievement of the Work set forth in Exhibit B, as such schedule may be replaced pursuant to the terms of this Agreement.

13

"Scope of Work" shall mean the Work set forth in Appendix A attached hereto.

"Subcontract" means any contract with a Subcontractor with respect to performing any part of the Work or providing any Equipment in connection with the Work.

"Subcontractor" means each and every vendor, Supplier, materialmen or contractor, other than Contractor, performing any part of the Work or providing any Equipment in connection with the Work.

"Substantial Completion" shall have the meaning set forth in Section 6.4.

"Supplier" means each and every vendor supplying the key components or equipment with a contract value equal to or greater than Five Hundred Thousand Dollars ($500,000) (other than Owner Supplied Equipment) outlined in Exhibit I.

"Target Capacity" means the target capacity in kilowatts entitled 'Array Wattage (DC)' set forth in the Facility Specifications.

"Third Party Warranties" shall have the meaning set forth in Section 10.5.

"Turnover Package" means all applicable Design Documents, Owner's manuals, data sheets, plans, drawings, repair and maintenance records, warranties, quality control records, Commissioning and inspection reports, photo records, certifications, permits, As-Builts, training requirements, preventative maintenance requirements, spare parts recommendations and other documents required by this Agreement, that are reasonably necessary or useful to operate and maintain the Facility.

"Unknown Site Conditions" shall mean any latent, unknown or concealed physical or subsurface conditions which (i) differ materially from the Documented Site Conditions, (ii) are identified in a geotechnical report or other data obtained after the Effective Date that materially affect the expected means or methods of construction and (iii) are of an unusual nature, different materially from those ordinarily encountered (including without limitation, Hazardous Substances, man-made subsurface impediments, historical, archaeological and cultural artifacts, human remains, underground structures, storage tanks, liens or encumbrances, and threatened or endangered species) or generally recognized as inherent in work of the character provided for in the Agreement, which were not reasonably ascertainable from a visual Project Site inspection performed by Contractor, and which will substantively and materially affect the Contract Price or Schedule of Work. "Unknown Site Conditions" shall not include materials brought onto the Site by Contractor, Contractor's Personnel or anyone acting on their behalf, or any site condition identified in any environmental studies (including the Environmental Study), ground condition reports or title searches in existence before the execution of this Agreement and provided to Contractor.

"Warranty Bond" shall have the meaning set forth in Section 7.8.

14

"Work" means all necessary design, engineering, procurement, installation, construction, temporary works, testing, demonstration, start-up, Commissioning, and any other work, Equipment and services as described on Appendix A.

"Workmanship Warranty" shall have the meaning set forth in Section 10.1.

"Workmanship Warranty Period" shall have the meaning set forth in Section 10.2.

1.2    Rules of Usage. The Parties hereby agree that the following rules of usage shall apply to this Agreement unless otherwise required by the context or unless otherwise specified:

1.2.1    Singular and Plural.  Definitions set forth herein shall be equally applicable to the singular and plural forms of the terms defined.

1.2.2    Section References; Exhibits.  References to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits in this Agreement. All exhibits and schedules referenced herein are incorporated herein by reference.

1.2.3    Precedence. If there is any conflict between this Agreement, any Change Order, any exhibit, appendix, and any other document referenced in this Agreement, the documents shall be read in the following order of priority: (a) Change Orders and Construction Change Directives, read in reverse chronological order from latest to earliest; (b) this Agreement; and (c) exhibits and appendices to this Agreement; and (d) reviewed Design Documents (as defined in Section 3.2.1).  Any amendment shall have priority over the document it amends.  Unless stated otherwise, any amended document shall have the same order of priority stated in this Section 1.2.3.

1.2.4    Headings.  The headings, subheadings and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect the meaning, construction or effect of any provision of this Agreement.

1.2.5    References to Persons.  References to any person shall include such person and its successors and permitted assigns and transferees.

1.2.6    Grammatical Forms.  Where a word or phrase is specifically defined, other grammatical forms of such word or phrase have corresponding meanings; the words "herein," "hereunder," and "hereof" refer to the provisions of this Agreement as a whole and not to any particular portion or provision of this Agreement; "including" means "including, but not limited to," and other forms of the verb "to include" are to be interpreted similarly; references to "or" shall be deemed to be disjunctive but not necessarily exclusive (i.e., unless the context dictates otherwise, "or" shall be interpreted to mean "and/or" rather than "either/or"); and masculine includes feminine and neuter.

1.2.7    Days. References to "days" shall mean calendar days, unless the term "Business Days" is used.  If the time for performing an obligation under this

15

Agreement expires on a day that is not a Business Day, the time shall be extended until that time on the next Business Day.

1.2.8    Time Zone. A reference to time is a reference to the time in effect at the Project Site on the relevant date.

## ARTICLE 2
## CONDITIONS PRECEDENT TO THE AGREEMENT

2.1    Limited Notice to Proceed.   At any time prior to the date of issuance of the Notice to Proceed, Owner may issue a limited notice to proceed to Contractor in the form set forth in Exhibit S (the "LNTP") which shall authorize Contractor to commence performance of a specified portion of the Work (the "LNTP Work").  Any Work performed under the LNTP shall be performed pursuant to the terms and conditions of this Agreement and payment for Work performed under the LNTP shall be made in accordance with Article 7.  Contractor shall under no circumstance be entitled to payment of any amount in excess of the applicable Payment Milestone for the LNTP Work.  If any LNTP Work has not been achieved by Contractor before the Notice to Proceed is issued by Owner pursuant to Section 2.2, the applicable unperformed LNTP Work shall be deemed to be Work to be performed by Contractor after the date of issuance of the Notice to Proceed save that such non-performance shall not be considered an Event of Delay unless it is attributable to a Force Majeure Event.  Contractor represents and warrants that it has made sufficient allowance in the Schedule of Work and the Contract Price for the fact that Owner may not issue the Notice to Proceed until the NTP Deadline.

2.2    Notice to Proceed.  Owner shall issue a written notice to proceed ("Notice to Proceed") to Contractor, which shall constitute Owner's authorization to Contractor to commence the Work, effective as of the date received by Contractor.  In the event Owner fails to issue a Notice to Proceed by the date set forth in Exhibit B (the "NTP Deadline"), such failure shall be considered an Event of Delay.  If Owner has not provided a Notice to Proceed by one hundred eighty (180) days from the Effective Date, then Contractor may terminate this Agreement by delivery of written notice to Owner and such termination shall be deemed a termination for convenience in accordance with the provisions of Section 11.1.

2.3    Commencement of Work. Contractor shall commence performance of the Work (other than the LNTP Work and any other Work which this Agreement expressly permits to be performed prior to the Notice to Proceed) following the issuance by Owner of a Notice to Proceed.  Prior to or concurrently with issuance of the Notice to Proceed, Owner shall provide all insurance certificates required by it pursuant to Article 17.  Contractor shall provide the following within five (5) Business Days of issuance of the Notice to Proceed:

2.3.1    Insurance.  Contractor shall have provided to Owner all insurance certificates required to be provided to Owner pursuant to Article 17.

2.3.2    Payment Security.  Contractor shall have provided Owner with the Performance and Payment Bond in accordance with Section 7.8 of this Agreement.

2.4    Fixed Price Project. The Parties agree that this Agreement is a fixed price contract and Contractor's obligation is to provide Owner with an operational Facility in accordance with the Scope of Work for the Contract Price, as it may be adjusted as provided

in this Agreement.  Such fixed price is to remain valid until the Notice to Proceed is issued to Contractor.

## ARTICLE 3
## CONTRACTOR WORK AND OTHER OBLIGATIONS

3.1     <u>Work to be Performed</u>.  Except for (a) those matters described as being specifically excluded from the Work in <u>Appendix A</u>, and (b) those items within Owner's Scope of Work in <u>Appendix B</u>, Contractor shall perform or cause to be performed the Work and services described as part of the Scope of Work and all its obligations under this Agreement, in accordance with Applicable Laws, Prudent Industry Practices and the terms of the Contract Documents.

3.2     <u>Engineering and Design</u>. Contractor shall design the Project such that it is capable of complying with the requirements of this Agreement, Applicable Laws and Prudent Solar Industry Practices which includes but is not limited to the National Electric Code (NEC). Based on the technical specifications set forth in this Contract, Contractor shall prepare comprehensive drawings and specifications setting forth in detail the requirements for the construction of the Work.  As the drawings and specifications for the Work are issued, they shall be clearly identified as Design Documents.

      3.2.1     <u>Design Documents</u>.  Contractor shall provide all necessary services to provide reviewed Design Documents to Owner, reviewed in accordance with this <u>Section 3.2.1</u>, by the time specified in the Scope of Work. Contractor shall submit to Owner draft Design Documents for Owner's review at five (5) milestone intervals i.e. 10%, 30%, 50%, 90% and issued for construction (IFC) (together "Engineering Milestones"), incorporating the feedback from Owner at each interval.  Owner shall review and return the draft Design Document for each interval to Contractor within fifteen (15) Business Days unless otherwise agreed to between Contractor and Owner.  If Owner returns the draft Design Document for a milestone interval to Contractor with comments, Contractor shall address the comments, amend the draft Design Document (if necessary) and re-submit to Owner for review within five (5) Business Days of the request and the process in this <u>Section 3.2.1</u> shall be repeated until the Engineering Milestones have been exhausted.  Notwithstanding the foregoing, Owner shall be entitled to reject and return Design Documents to Contractor pursuant to this <u>Section 3.2.1</u> if the capacity of the STC rated solar electric system (expressed in kilowatts DC) set forth in the title block of the draft Design Documents is one hundred and one percent (101%) or more of the Target Capacity. Nothing herein shall be deemed to limit the right of Owner to submit to Contractor a change request as provided for in <u>Section 8.1.1</u>.  Following Owner's review of the Design Documents, Contractor shall not modify the Design Documents or the underlying engineering or design without engineering approval and the written approval of Owner.  If Owner makes no comments within the applicable fifteen (15) Business Day review period, Owner shall be deemed to have approved the applicable Design Document.  Following Owner's approval of the Design Documents, or deemed approval as provided for herein, Design Documents shall be deemed to be, and

17

referred to as, "reviewed Design Documents". Owner's review of the Design Documents shall not waive, limit, or affect the obligations of the Contractor under this Agreement.

3.2.2    Owner Supplied Datasheets. Contractor may rely upon the accuracy and correctness of the Owner Supplied Datasheets; provided, however, that Contractor shall: (a) immediately notify Owner of any inaccuracies, errors or omissions that it might discover in, and seek from Owner any clarification needed in connection with, the Owner Supplied Datasheets; (b) abide by Prudent Industry Practice in the use of Owner Supplied Datasheets; and (c) not be relieved of its obligation to complete the Work in accordance with this Agreement notwithstanding any error or inaccuracy in the Owner Supplied Datasheets. If the Work is prevented or delayed or Contractor incurs additional costs due to: (i) any inaccuracy of or errors in any Owner Supplied Datasheets; or (ii) Owner's modification or revision of any Owner Supplied Datasheets, then subject to Article 8, and except to the extent such delay or cost is caused or contributed to by Contractor's breach of this Section 3.2.2, Contractor shall be entitled to a Change Order to the extent provided in Article 8.

3.2.3    Ownership of Drawings. Subject to the payments to the Contractor corresponding to the Design Documents hereunder, all final Design Documents, specifications and other documents prepared by or for Contractor in respect of the Work and all drawings, specifications, calculations, memoranda, data, notes and other materials containing information supplied by Owner (the "IP Documentation") which shall come into Contractor's possession during its performance hereunder, shall be the property of Owner, and such Owner documents and other materials shall be returned to Owner upon the earlier of Substantial Completion or termination of this Agreement in a format determined by owner. Owner shall have the right to retain a reproducible set of all such IP Documentation for use in respect of the Work. Review (or lack thereof) by Owner or its designees of any Project documents provided by Contractor, and the fact that Owner has not discovered any errors reflected in such Project documents, shall not relieve or release Contractor of any of its duties, obligations, or liabilities under the terms of this Agreement.

3.2.4    Design Documents Register. Contractor shall maintain an up-to-date set of Design Documents and shall provide all written comments, field changes, and redlined Design Documents to Owner, at the request of the Owner.

3.2.5    Bill of Materials. Contractor will provide to Client, within five (5) days of Mechanical Completion, a complete bill of materials.

3.3    Procurement. Contractor shall procure, ensure delivery of, and pay for, in Contractor's name as an independent contractor and not as an agent for Owner, all labor, materials, Equipment (whether stored on or off the Site) (other than Owner Supplied Equipment and items within Owner's Scope of Work), supplies, manufacturing and related goods and services required to construct the Facility and complete the Work in accordance with this Agreement, unless specifically excluded in (i) Appendix A and (ii) those items within Owner's Scope of Work in Appendix B. Subject to the provisions of Section 2.2, and subject further to the requirements of the LNTP (where issued), Contractor shall not be required to procure labor or additional materials or equipment until Owner provides a full Notice to Proceed.

3.4    <u>Construction and Installation</u>.  Contractor shall develop a construction and installation plan, and oversee, coordinate and ensure the expeditious performance of the Work in accordance with the Contract Documents in coordination with the Owner Representative.

3.5    <u>Schedule of Work</u>.

3.5.1    <u>Milestones</u>.  From and after the issuance of the LNTP, Contractor shall perform the Work in accordance with the milestones set forth in the Schedule of Work, as such milestone dates may be adjusted pursuant to this Agreement and subject to Owner's review and approval.

3.5.2    <u>Schedule of Work</u>.  Contractor shall provide Owner with a detailed schedule of work in Gantt chart form no later than ten (10) Business Days following receipt of Owner's LNTP.  The Schedule of Work sets forth all the Work (including Critical Path activities) that must be completed by Contractor, and the dates by which Work shall be completed, in order to support timely achievement of the milestones as provided in this <u>Section 3.5</u>.  Contractor shall circulate an updated Schedule of Work to Owner every two weeks including but not limited to changes to the Schedule needed to reflect any Change Orders.

3.6    <u>Progress Reports</u>. From and after the issuance of the Notice to Proceed until the date Substantial Completion is achieved, Contractor shall (i) provide to Owner a written bi-weekly progress report, and (ii) attend a weekly progress meeting, including minutes of such meetings describing actual progress of Work as compared to the Schedule of Work.  The progress reports shall include any significant problems encountered by Contractor, the cause of such problems, any estimated length of delay and any corrective action required, an update of the Critical Path activities, all issues relating to health and safety, and shall set out all input which Contractor expects to require from Owner in relation to the Work in the course of the 4 weeks following the delivery of the progress report.

3.7    <u>Project Site Security; Safety</u>.  Contractor shall be responsible for the security and protection of (i) the Work, (ii) its (and its Subcontractor's) equipment and materials used in connection with the Work, and (iii) all other property owned or leased by Contractor or any of its Subcontractors located at the Site through the date of Substantial Completion. Contractor shall provide security and protection for Owner Supplied Equipment (only after delivery and acceptance as set forth in <u>Section 4.7</u>) until Substantial Completion.

3.8    <u>Operation, Access and Safety Following Substantial Completion</u>.  Upon achievement of Substantial Completion, Contractor shall have access to the Facility and through the Workmanship Warranty Period as necessary to complete the items of Work on the Final Punch List and any Workmanship Warranty works as may arise; <u>provided</u>, however, that Contractor shall comply with Owner's security and safety programs while on the Project Site, shall use commercially reasonable efforts to mitigate, consistent with Prudent Industry Practices, any impacts on the production of electricity by the Facility from such access, and shall coordinate such access with Owner's Representative.

3.9    <u>Contractor's Permits</u>.  Contractor shall timely obtain and maintain in effect all Applicable Permits required for the performance of the Work as specifically set forth in

19

Appendix A (the "Contractor's Permits").  Owner and Contractor shall cooperate with each other in connection with the other Party's efforts to obtain the Contractor's Permits and Owner's Permits, respectively, required to be obtained by such Party under this Agreement. Contractor shall comply with all conditions set forth in the Conditional Use Permit and Environmental Study Requirements unless explicitly stated otherwise in this Agreement.

3.10    Interconnection Facilities.  Owner shall be responsible for obtaining any interconnection approvals and agreements from the Interconnection Provider; provided that Contractor shall coordinate all interconnection activities with Interconnection Provider required to complete Work in compliance with the Scope of Work. Contractor understands that time is of the essence as it coordinates such interconnection activities. For the avoidance of doubt, notwithstanding the foregoing, final interconnection shall occur only upon Owner's approval.

3.11    Start-Up and Initial Operation. Contractor shall, prior to Substantial Completion, be responsible for all activities and processes necessary for the Commissioning and start-up of the Facility including the calibration and functional testing of all controls and equipment and initial operation of the Facility through to Substantial Completion. Contractor shall perform all acts required in order to enable the Owner to issue Consent to Energize. Contractor shall conduct such start-up, testing, and commissioning to avoid any and all interference with any other property owned by Owner to the greatest extent possible. Owner shall witness such tests and will, within ten (10) ~~three (3)~~ Business Days after receipt of written results of such tests, deliver to Contractor a written notice either (a) accepting such tests as having been passed, or (b) rejecting such tests as having demonstrated that the tested item failed to comply with the performance requirements therefor under this Agreement.  Any rejection shall include a detailed description of the basis for rejection.

3.12    Commissioning and Performance Testing. Contractor shall perform, and re-perform as necessary, the Commissioning Tests, the Reliability Testing and Capacity Testing in accordance with the Scope of Work and Exhibit D and L, respectively, to the reasonable satisfaction of the Owner.

3.13    Clean-Up and Waste Disposal

3.13.1 During Construction.  During the performance of the Work, Contractor shall keep the Project Site and the surrounding areas clean and free from accumulations of waste materials, rubbish and other debris resulting from the Work and shall remove and dispose of such waste materials, rubbish and other debris. Contractor shall ensure that all recyclable materials are recycled.

3.13.2 Prior to Final Completion.  Upon achieving Substantial Completion, Contractor shall remove the waste materials, rubbish, and other debris from the Project Site and dispose of the same.  After Substantial Completion and prior to Final Completion, Contractor shall remove from the Project Site and dispose of any waste materials, rubbish and other debris resulting from its post-Substantial Completion performance of the Work and Contractor shall remove Contractor's tools, construction equipment, machinery, and surplus equipment from the Project Site.

20

3.14    Hazardous Substances. If any Hazardous Substance are discovered by Contractor on the Project Site during Contractor's prosecution of the Work, Contractor shall not further disturb such Hazardous Substance and shall immediately notify Owner of the existence of the Hazardous Substance, and Contractor shall attempt to continue work on the Project while any remediation is ongoing provided such continuation is not deemed a threat to health or safety by the Contractor in its reasonable discretion.  If the remediation efforts prevent Contractor from continuing the Work, Contractor shall suspend the Work until such time as the remediation is completed and Contractor can resume the affected work.  Should the Hazardous Substance impact the Project schedule or involve a Change in the Scope of Work, Contractor shall be entitled to a Change Order. Contractor shall not be entitled to a Change Order for any Hazardous Substance transported onto or generated by the Project Site by Contractor or Contractor's Personnel.  The Parties agree that Contractor shall have no responsibility or liability for any Hazardous Substance at the Project Site, except to the extent transported onto or generated by the Project Site by Contractor or Contractor's Personnel.  Owner will be liable for and shall indemnify, defend and hold harmless Contractor Indemnitees against any Contractor Losses suffered by Contractor relating to or arising out of any Hazardous Substances in each case at, under, or on the Project Site, other than (i) Hazardous Substances transported onto the Project Site by, or (ii) to the extent any losses relating to such Hazardous Substances clearly identified in advance by Owner in writing are exacerbated by, in each case, any of Contractor's Personnel.  Such indemnification shall survive termination of this Agreement.

3.15    Unknown Site Conditions. Discovery of Unknown Site Conditions shall entitle Contractor to a Change Order in accordance with and subject to the terms of this Agreement. If any Unknown Site Conditions are discovered by Contractor on the Project Site during Contractor's prosecution of the Work, Contractor shall not further disturb such Unknown Site Condition and shall immediately notify Owner of the existence of the Unknown Site Condition.

3.16    Risk of Loss.  Risk of loss with respect to the Facility shall transfer from Contractor to Owner upon Substantial Completion pursuant to Section 6.4.  Notwithstanding Contractor's duties of care related to the Facility established in this Agreement, Contractor shall at no time prior to Substantial Completion bear the cost or expense associated with repairs, replacements or reconstruction of the Facility to the extent that such loss of or damage to the Facility is caused by the negligence or willful misconduct of Owner or its employees, affiliates, guests or agents (other than Contractor's Personnel).

3.17    Subcontractors and Suppliers.

3.17.1 Key Suppliers. In this section 3.17, "Key Suppliers" means suppliers of Labor and Equipment and Material services. 15 Business Days prior to executing any new proposed contracts with Key Suppliers and 30 days prior to commencing any work with such Key Supplier, Contractor shall provide Owner with a list of proposed Key Suppliers, which list Contractor can subsequently update as necessary (but subject to prior consultation with Owner).  If Owner has a reasonable objection to any proposed Key Supplier, Owner shall promptly notify Contractor in writing, but no later than fifteen (15) Business Days following receipt of Contractor's notice of the

21

proposed Subcontract(s).  If Owner's objection is reasonable, Contractor shall not delegate, assign, sublet or further subcontract to the proposed Key Supplier and Contractor shall propose another acceptable Key Supplier. All Subcontractors and Key Suppliers shall be fully compliant with federal and state regulations as applicable.

3.17.2 <u>Liability of Subcontractors</u>. No contractual relationship shall exist between Owner and any Subcontractor or Supplier with respect to the Work, and no Subcontractor is intended to be or shall be deemed a third-party beneficiary of this Agreement.  Contractor shall be responsible to Owner for the acts and omissions of Subcontractors and of persons directly employed by them, to the same extent as Contractor is responsible to Owner for the acts and omissions of Contractor and its employees under this Agreement.  Except as required by Applicable Law, nothing contained in this Agreement shall obligate Owner to pay or otherwise be responsible for the direct payment of any Subcontractor.  Entry into any Subcontract shall not relieve Contractor of any of its obligations under this Agreement, including the obligations to perform the Work in accordance with this Agreement.  Owner shall have the right, upon written request, to receive from Contractor a copy of all specifications and warranties for Equipment supplied by any Subcontractors.

3.18    <u>Utilities</u>.  Contractor shall provide readily available and temporary utilities including electricity and portable sanitation, during construction and Commissioning of the Facility.

3.19    <u>Site Conditions</u>.  Except for Unknown Site Conditions, Contractor has satisfied itself as to the general and local conditions and circumstances affecting the Work and as of the Effective Date of this Agreement, Contractor represents that it is familiar with the following:

3.19.1 the typical weather conditions at the Site and the surrounding area (Force Majeure Events are excluded);

3.19.2 Maine laws and administrative government procedures applicable to the Work;

3.19.3 the sufficiency and size of, and the accessibility of and limitations on ingress, egress to and from the Site; and

3.19.4 the availability, character, reliability, and cost of, facilities, roads, and other transportation means to the Project Site.

3.20    <u>Delivery, Unloading, Shipping Fixtures and Special Tools.</u>

3.20.1 (i) load all Owner Supplied Equipment located at the Owner's Storage Facility, (ii) deliver this Owner Supplied Equipment to the Project Site, and (iii) upon delivery to the Project Site, unload and inspect such Owner Supplied Equipment, and

3.20.2 Store such Owner Supplied Equipment after such is delivered to the Project Site until incorporated into the Work through Substantial Completion.

3.21    <u>Installation and Integration of Owner Supplied Equipment.</u>  Contractor shall provide all services, management, Labor, equipment and materials necessary to

22

Install the Owner Supplied Equipment and the Equipment while minimizing any effects on the Owner's other property to the greatest extent possible all in accordance with the Schedule of Work.

3.22 <u>Contractor's Representative</u>. Within fifteen (15) days of issuance of the LNTP, Contractor shall provide a designated point of contact for Contractor ("<u>Contractor's Representative</u>"). Owner will have the right to reasonably refuse the designation of any person as Contractor's Representative. The Parties understand and agree that Contractor's Representative may have limited authority for approval and unless the context clearly indicates that the Contractor's Representative has authority for approval, Contractor shall be responsible for providing such approval.  Contractor shall notify Owner in writing of any change in Contractor's Representative.

3.23 <u>Existing Structures.</u>  Contractor shall act in accordance with Prudent Industry Practices in relation to the Existing Structures and shall take all necessary steps to ensure that the Existing Structures are not damaged, compromised or interfered with in any way.

3.24 <u>Installation Records.</u> Contractor shall record the serial numbers and installed locations of all installed equipment, whether Owner Supplied Equipment or otherwise.

3.25 <u>Document Format.</u> All documents sent to Owner by Contractor must be sent in digital formats which are word-searchable using Microsoft Word, Microsoft Excel or Adobe Acrobat. Where documents require signatures or other input in ink, scans of the wet-inked documents must be shared along with the word-searchable versions.

ARTICLE 4
**OWNER OBLIGATIONS**

4.1    <u>Information and Owner's Work</u>.  Any information to be provided by Owner, including any response to a request for clarification by Contractor, shall be provided in a reasonably timely manner so as not to delay Contractor's performance of the Work, and any delay in excess of five (5) Business Days in providing such information shall be an Owner Caused Delay, provided that the Contractor asked for such information as soon as it knew such information was required.

4.2    <u>Owner's Representative.</u> Within fifteen (15) days of issuance of the Notice to Proceed Owner shall provide a designated point of contact for Owner ("Owner's Representative"). The Parties understand and agree that Owner's Representative may have limited authority for approval and unless the context clearly indicates that the Owner's Representative has authority for approval, Owner shall be responsible for providing such approval.  Owner shall notify Contractor in writing of any change in Owner's Representative.

4.3    <u>Location of and Access to the Project Site</u>.

4.3.1   On and after the date of issue of the LNTP, Owner shall provide to Contractor's Personnel, subject in each case to the Conditional Use Permit and Environmental Study Requirements:

(a)     full, unrestricted and uninterrupted access and use of the Project Site for Contractor to perform the Work pursuant to the terms of this Agreement;

(b)     full, unrestricted and exclusive access and use of Equipment laydown, debris collection and designated parking areas on the Project Site; and

(c)     full and unrestricted rights of ingress and egress to and from the Project Site, including rights of way for the access route to the Project Site.

4.3.2   Owner shall not permit its agents, employees and guests to (a) interfere with Contractor's performance of the Work and (b) cause damage to the Facility.

4.3.3   Contractor and Contractor's Personnel have a duty of care to the Project Site and its and their use of Equipment, sufficient to satisfy any relevant regulatory and/or insurance-related purposes.

4.4     Site Information.  Owner has provided to Contractor, at Owner's expense, all of the following to the extent in existence and in Owner's possession and control and listed on Exhibit R ("Documented Site Conditions):

4.4.1   information describing the physical characteristics of the Project Site, including surveys, legal description, data or drawings depicting existing conditions, subsurface and environmental studies, reports and investigations;

4.4.2   tests, inspections and other reports dealing with environmental matters, Hazardous Substances and other existing conditions, if applicable and available, relating to the Project Site; and

4.4.3   any other information or services reasonably requested by Contractor that are relevant to Contractor's performance of the Work and under Owner's control.

Contractor shall be entitled to rely on Documented Site Conditions furnished by Owner pursuant to this Section 4.4.

4.5     Owner's Permits. Owner hereby represents and warrants to Contractor that (a) Owner shall obtain the Applicable Permits necessary for Owner to purchase, own, operate and maintain the Facility, to perform its obligations hereunder and exercise its rights under this Agreement as specifically set forth in Appendix B (collectively, "Owner's Permits"); and (b) Owner is, and shall at all times be, in compliance with all Applicable Laws.

4.6     Owner, Financing Party and Independent Engineer Oversight.   Owner (including its designees), any applicable Financing Party (including its designees) and the Independent Engineer may, but shall have no obligation to, visit the Project Site to familiarize

24

itself or themselves with the progress and quality of the Work and attend the performance of the Commissioning Tests, the Reliability Testing and Capacity Testing as set forth in this Agreement; provided, however, Owner, the Financing Party and the Independent Engineer shall not materially interfere with Contractor's ability to perform the Work and shall comply with all safety plans established and provided to them by Contractor while on the Project Site.

4.7    Owner Supplied Equipment.

4.7.1    Owner has procured and shall deliver to the Project Site the Owner Supplied Equipment for Contractor's incorporation in the Facility on or before the time specified for delivery of such Owner Supplied Equipment specified in the Schedule of Work. Title to Owner Supplied Equipment remains at all time with Owner. Owner shall deliver the Owner Supplied Equipment to Contractor or a third party nominated by Contractor and reasonably agreed to by Owner at the times set out in the Schedule of Work. Upon request by Contractor, Owner shall provide to Contractor correct and complete copies (redacted as appropriate) of all Owner Supplied Equipment contracts and all other information relating to the Owner Supplied Equipment.

4.7.2    Upon acceptance (or replacement, if necessary, in accordance with Section 4.7.3), Contractor shall secure in accordance with manufacturer's requirements such Owner Supplied Equipment. Contractor shall comply with manufacturer's warranty requirements regarding Owner Supplied Equipment during use, incorporation in the Facility and Final Completion.

4.7.3    Contractor shall receive all Owner Supplied Equipment upon delivery at the Site and shall identify, document and immediately notify Owner of any visual signs of damage observed at the time of delivery; Contractor shall have an independent duty and obligation to examine and receive shipments in accordance with Prudent Industry Practices and in accordance with manufacturer's warranty requirements regarding Owner Supplied Equipment.  Contractor shall be solely responsible for inspecting and accepting all Owner Supplied Equipment upon its delivery to the Site. If at any time after Contractor's acceptance of Owner Supplied Equipment Contractor determines that any Owner Supplied Equipment is broken or otherwise defective or damaged, Contractor shall notify Owner and to the extent such damage is not attributable to Contractor's Personnel, Owner shall have the duty and responsibility to procure replacement Owner Supplied Equipment as promptly as possible so as to not adversely impact the Schedule of Work.

4.7.4    Any Owner Supplied Equipment that Contractor does not use in the Facility shall be returned in mint condition to Owner before Substantial Completion. Owner shall be made whole by Contractor for any unused Owner Supplied Equipment that has been delivered and inspected at the Site and has passed any applicable quality testing but that is returned to Owner in damaged condition after Substantial Completion.

**ARTICLE 5
COMMISSIONING TESTS**

5.1    <u>Commissioning Testing</u>.    Contractor shall perform and successfully pass/complete the Commissioning Tests for the Facility as described in <u>Exhibit D</u> after Mechanical Completion and as a condition of Substantial Completion.  Notwithstanding the foregoing, Contractor may perform Commissioning and Commissioning Tests under <u>Exhibit D</u> that do not involve energization prior to Mechanical Completion of the Facility and shall not allow or provide for the Commissioning or Commissioning Tests that involve energization of the Facility until Mechanical Completion of the Facility has been achieved and Contractor has received Consent to Energize. Performance of the Commissioning Tests and results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative prior to or upon Substantial Completion.  The Independent Engineer shall confirm the completion of the Commissioning Tests for the benefit of Owner.

5.2    <u>Capacity Testing</u>. Contractor shall perform the Capacity Testing as described in Exhibit L after successful completion of the Commissioning Tests and as a condition of Substantial Completion. Performance of the Capacity Testing and the results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative and the Independent Engineer prior to or upon Substantial Completion. The Independent Engineer shall confirm the completion of the Capacity Testing for the benefit of Owner.

5.3    <u>Reliability Testing.</u>    Contractor shall perform the Reliability Testing as described in Exhibit L as a condition of Substantial Completion. Performance of the Reliability Testing and the results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative prior to or upon Substantial Completion. The Independent Engineer shall confirm the completion of the Reliability Testing for the benefit of Owner.

5.4    <u>Output During Testing</u>.  At all times when Contractor conducts the Capacity Testing or the Commissioning Tests, Owner may, at Owner's sole expense, arrange for the disposition of such Facility's electrical output in such manner as Owner and Contractor may mutually and reasonably agree, so as not to hinder, delay or interfere with (or increase the costs of) the Work, Commissioning, testing or Contractor's ability to perform its obligations or exercise its rights under this Agreement.  Any electrical output generated by the Facility at any time, and the proceeds from the sale thereof, shall be the exclusive property of Owner.

5.5    <u>Right to Attend Testing</u>.  For Capacity and Reliability Testing, Contractor will notify the Owner's Representative upon scheduling such Capacity and Reliability Testing, (a) at least five (5) Business Days in advance of such Capacity and Reliability Testing that will occur off the Project Site, and (b) will use reasonable efforts to provide the foregoing notifications as much as ten (10) Business Days in advance, but no later than five (5) Business Days in advance of any such Capacity and Reliability Testing that will occur at the Project Site.  The Owner's (including its designees), the Financing Party's or the Independent Engineer's right to attend the Capacity and Reliability Testing shall not otherwise limit the progress of the Work, and any delay to the Capacity and Reliability Testing that occurs as a result of unreasonable conduct by the Owner, a Financing Party or the Independent Engineer, shall be considered an Owner Caused Delay.

26

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CFB404DD06B7

5.6     Witness Testing. Contractor shall arrange for and coordinate witness testing with the Interconnection Provider. Contractor shall include Owner in all written communications in relation to same and Owner shall have the right to substantial advance notice of, and to attend, all in-person meetings, telephone calls, internet calls and/or similar communications in relation to witness testing.

5.7     Energization Schedule. Contractor shall liaise with the Interconnection Provider in order to agree the energization schedule. Contractor shall include Owner in all written communications in relation to same and Owner shall have the right to substantial advance notice of, and to attend, all in-person meetings, telephone calls, internet calls and/or similar communications in relation to the energization schedule.

## ARTICLE 6
## COMPLETION OF THE WORK

6.1     Mechanical Completion. Mechanical Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.1.1 through to 6.1.4 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.1 ("Mechanical Completion"):

6.1.1   the Facility has been properly and fully engineered, constructed and installed in accordance with this Agreement to the extent that all Work is complete save for pre-Commissioning, Commissioning, start-up, adjustment and testing (including performance of the Commissioning Tests, the Reliability Testing and Capacity Testing);

6.1.2   appropriate barriers have been installed to prevent Energization of the Facility;

6.1.3   Contractor has issued a written notice to Owner confirming that Energization has not occurred in respect of any part of the Facility;

6.1.4   the Interim Punch List has been prepared by Contractor in accordance with Section 6.6.1 and delivered to and accepted by Owner. Owner has right to designate a third party to review the Punch List prior to acceptance;

6.1.5   the Facility is structurally, mechanically and electrically sound, and is ready for the full, safe and reliable pre-Commissioning, Commissioning, start-up, adjustment and testing (including performance of the Commissioning Tests, the Reliability Testing and Capacity Testing);

When Contractor believes that it has achieved the requirements of Mechanical Completion, Contractor shall provide written notice (the "Form of Mechanical Completion"), in substantially the same form as Exhibit O, to Owner's Representative, together with all supporting documentation required by and as set forth in the Scope of Work.  Owner's Representative shall have ten (10) Business Days from receipt to notify Contractor of its approval or rejection of the Form of Mechanical Completion in its reasonable discretion. In the event, the Owner's Representative rejects the Form of Mechanical Completion, it shall provide a feedback statement specifying its observations and issues inhibiting the

27

achievement of Mechanical Completion for Contractor's review. A failure by Owner's Representative to respond to the Form of Mechanical Completion within such ten (10) Business Day period shall be deemed approval of the Form of Mechanical Completion.

6.2    Consent to Energize.  On or after the occurrence of Mechanical Completion pursuant to Section 6.1, Contractor shall not allow Energization of the Facility prior to receiving written consent from Owner to authorize Contractor to Energize the Facility ("Consent to Energize

6.3    Mechanical Completion Delay Liquidated Damages.  Contractor shall cause the Facility to reach Mechanical Completion on or before the Mechanical Completion Deadline. If Contractor fails to achieve Mechanical Completion on or before the Mechanical Completion Deadline (as such date may be adjusted pursuant to the terms of this Agreement), then Contractor shall pay to Owner, as liquidated damages and not as a penalty, the amount of $500 per MW per day for each day by which Mechanical Completion is later than the Mechanical Completion Deadline ("Mechanical Completion Delay Liquidated Damages"), which shall be Owner's sole remedy for delay if collected.  Owner shall calculate the Mechanical Completion Delay Liquidated Damages for which Contractor is responsible based on the date that Mechanical Completion is achieved. Contractor shall pay Mechanical Completion Delay Liquidated Damages due pursuant to this Section 6.3 monthly in arrears on the first day of each month. Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Mechanical Completion Delay Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Contractor does not achieve Mechanical Completion by the Mechanical Completion Deadline, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  Time is particularly of the essence in Contractor's timely performance of this Agreement (subject to all express cure periods set forth in this Agreement).  The Parties agree that (i) Contractor's obligation to pay Mechanical Completion Delay Liquidated Damages shall not require Owner's establishment of any actual damages for such delay, (ii) Owner's actual damages for delay may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any delay damages that may arise relating to this Agreement for such period, and (iii) the payment of Mechanical Completion Delay Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Mechanical Completion Delay Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for delay if the liquidated damages were enforceable.

6.4    Substantial Completion.  Substantial Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.4.1 through to 6.4.8 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.4 ("Substantial Completion"):

6.4.1   Mechanical Completion has occurred;

6.4.2   all items of Work identified on the Interim Punch List have either been completed by Contractor, included on the Final Punch List or waived in writing by Owner;

6.4.3   Commissioning of the Facility has occurred, unless waived by the mutual agreement of Owner and Contractor;

6.4.4   all activities described in Contract Documents, as amended, required to place the Facility into initial operation following Commissioning have been successfully completed, including the preparation and successful execution of all activities described in the Contract Documents required to place the Facility into initial operation following Commissioning and the receipt of all Contractor Permits required to place the Facility into initial operation following Commissioning;

6.4.5   Contractor has furnished to Owner the following lien waivers: (i) Final Lien Waivers from all Subcontractors who have completed all work contemplated by the corresponding Subcontract and have received final payment thereunder; (ii) Partial Lien Waivers from all Subcontractors who have completed all work contemplated by the corresponding Subcontract but who have not received final payment thereunder; and (iii) Contractor has issued a Partial Lien Waiver applicable to all Work performed and all payments which Contractor has received and is entitled to in connection therewith, in each case, applicable to the whole of the Work and the effect of which shall, to the fullest extent permitted by Applicable Laws, be to release Owner from all lien and payment claims by Contractor or its Subcontractors, howsoever arising in connection with the Project;

6.4.6   Contractor has completed the Capacity Testing as described in Exhibit L, and any additional testing as may be required under this Agreement, and (a) the Facility has achieved the Capacity Guarantee as required by the Contract Documents; or (b) the Facility has not achieved the Capacity Guarantee but has achieved at least 95% of the Capacity Guarantee, provided the Contractor has given to Owner's Representative notice of such and has entered the Capacity Cure Period as described in Section 6.5; and Contractor has agreed to pay Owner the Capacity Shortfall Liquidated Damages payment amount;

6.4.7   the Final Punch List, which shall not include any environmental, safety, or performance-related item at any value and valued no greater than at 2% of the Contract Price, has been prepared by Contractor in accordance with Section 6.6.2 and delivered to and accepted by Owner;

6.4.8   the Facility is capable of continuous operation in concert with the other necessary equipment and interconnections for the commercial purpose of generating and delivering electricity in accordance with Prudent Industry Practice, and otherwise meets the requirements of the Scope of Work, other than as will be demonstrated through Capacity Testing at Substantial Completion; and

6.4.9   the Contractor has provided a service schedule, which has in turn been approved by the Owner detailing the maintenance works which Owner ought to perform during the Workmanship Warranty Period;

29

When Contractor believes that it has achieved the requirements of Substantial Completion, Contractor shall provide written notice (the "Form of Substantial Completion"), in substantially the same form as Exhibit E, to Owner's Representative, together with all supporting documentation required by and as set forth in the Scope of Work.  The Owner's Representative shall have twenty (20) Business Days from receipt to notify Contractor of its approval or rejection of the Form of Substantial Completion in its reasonable discretion. In the event, the Owner's Representative rejects the Form of Substantial Completion, it shall provide a feedback statement specifying its observations and issues inhibiting the achievement of Substantial Completion for Contractor's review.  A failure by Owner's Representative to respond to the Form of Substantial Completion within such twenty (20) Business Day period shall be deemed approval of the Form of Substantial Completion.

6.5    Substantial Completion Delay Liquidated Damages.  Contractor shall cause the Facility to reach Substantial Completion on or before the Substantial Completion Deadline. If Contractor fails to achieve Substantial Completion on or before the Substantial Completion Deadline (as such date may be adjusted pursuant to the terms of this Agreement), then Contractor shall pay to Owner, as liquidated damages and not as a penalty, the amount of $375 per MW per day for each day by which Substantial Completion is later than the Substantial Completion Deadline ("Substantial Completion Delay Liquidated Damages"), which shall be Owner's sole remedy for delay if collected.  Owner shall calculate the Substantial Completion Delay Liquidated Damages for which Contractor is responsible based on the date that Substantial Completion is achieved. Contractor shall pay Substantial Completion Delay Liquidated Damages due pursuant to this Section 6.5 monthly in arrears on the first day of each month. Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Substantial Completion Delay Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Contractor does not achieve Substantial Completion by the Substantial Completion Deadline, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  Time is particularly of the essence in Contractor's timely performance of this Agreement (subject to all express cure periods set forth in this Agreement).  The Parties agree that (i) Contractor's obligation to pay Substantial Completion Delay Liquidated Damages shall not require Owner's establishment of any actual damages for such delay, (ii) Owner's actual damages for delay may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any delay damages that may arise relating to this Agreement for such period, and (iii) the payment of Substantial Completion Delay Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Substantial Completion Delay Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for delay if the liquidated damages were enforceable.

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-GFB404DD06B7

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

6.6     Substantial Completion Capacity Testing.  In order for Contractor to achieve Substantial Completion, Contractor shall conduct Capacity Testing of the Facility demonstrating that the Facility has been completed sufficiently to operate reliably, safely and without endangering its mechanical, civil or electrical integrity.  As part of the Capacity Testing, Contractor shall conduct a Capacity Test in accordance with Exhibit L.

6.6.1    Satisfaction of Capacity Guarantee.  If, following the Capacity Testing, Contractor achieves the Capacity Guarantee in accordance with the criteria set forth in Exhibit L, and Contractor has otherwise satisfied all of the requirements for Substantial Completion, Contractor shall notify the Owner that it has successfully achieved Substantial Completion in accordance with the procedures set forth in Section 6.4.

6.6.2    Performance Cure.  If, following the Capacity Testing, Contractor achieves a capacity of at least ninety five percent (95%) of the Capacity Guarantee (as defined in Exhibit L), in accordance with the criteria set forth in Exhibit L but does not satisfy the Capacity Guarantee, and Contractor has otherwise satisfied all of the requirements for Substantial Completion, Contractor shall notify Owner that it has successfully achieved Substantial Completion in accordance with the provisions of Section 6.4 subject to the following: (a)   Contractor shall continue to make any modifications to the Facility, at its sole cost and expense, over a period of sixty (60) days in an effort to attain the Capacity Guarantee ("Capacity Cure Period"); (b) during the Capacity Cure Period,  Contractor shall conduct such additional Capacity Testing with respect to the Facility in accordance with the criteria set forth in Exhibit L in order to determine whether or not Contractor has met the Capacity Guarantee; and (c) during the Capacity Cure Period, Contractor shall coordinate any proposed modifications or testing shall with Owner and so as not to interfere with production of the Facility. If failure to satisfy the Capacity Guarantee is caused by Owner's Scope of Work or Owner Supplied Equipment, Contractor shall (i) immediately notify Owner and provide Owner a reasonable opportunity to cure such cause (ii) be entitled to notify Owner that it has achieved Substantial Completion and Owner shall be solely responsible for the cost and expense of attaining the Capacity Guarantee.

6.6.3    Capacity Shortfall Liquidated Damages. Unless caused by Owner's Scope of Work or Owner Supplied Equipment, if, after the Capacity Cure Period, Contractor still fails to show the Facility has achieved the Capacity Guarantee then Owner shall, subject to Section 6.8, be entitled to Capacity Shortfall Liquidated Damages, which shall be calculated as follows: If Contractor fails to achieve the Capacity Guarantee, for every one percent (1%) of capacity shortfall, Contractor will pay Capacity Shortfall Liquidated Damages in the amount of $10,000 per MegaWatt DC.  Contractor shall calculate the Capacity Shortfall Liquidated Damages and provide such calculations to Owner for review and approval, such approval not to be unreasonably withheld.  If Contractor fails to achieve at least ninety five percent (95%) of the Capacity Guarantee, Capacity Shortfall Liquidated Damages shall constitute Owner's sole remedy for Contractor's failure to achieve the Capacity Guarantee.  Contractor shall pay to Owner all Capacity Shortfall Liquidated Damages due pursuant to this Section 6.5 within thirty (30) days of the occurrence of

31

Substantial Completion.   So long as Owner has timely paid to Contractor undisputed amounts due under and in accordance with this Contract for any milestones associates with Substantial Completion, Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Capacity Shortfall Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Capacity Guarantee is not satisfied, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  The Parties agree that (i) Contractor's obligation to pay Capacity Shortfall Liquidated Damages shall not require Owner's establishment of any actual damages for performance failure, (ii) Owner's actual damages for such performance failure may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any liquidated damages that may arise relating to this Agreement for such period, and (iii) the payment of Capacity Shortfall Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Capacity Shortfall Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for failure to achieve the Capacity Guarantee if the liquidated damages were enforceable.

6.6.4   If the Capacity Guarantee is not achieved (unless the failure to achieve the Capacity Guarantee is the result of the Owner Supplied Equipment or Owner's Scope of Work) Contractor shall maintain completion security specified in Section 7.8 of this Agreement until such time as Capacity Guarantee is achieved.

6.6.5   If following Capacity Testing Contractor fails to show the Facility has achieved at least ninety five percent (95%) of the Capacity Guarantee, Substantial Completion will not have occurred.

6.6.6   Contractor shall continue to make any modifications to the Facility, at its sole cost and expense (unless the failure to achieve the Capacity Guarantee is the result of the Owner Supplied Equipment or Owner's Scope of Work then it shall be an Owner Caused Delay), in an effort to attain the Capacity Guarantee and shall conduct such additional Capacity Testing with respect to the Facility in accordance with the criteria set forth in Exhibit L in order to determine whether or not Contractor has met at least ninety five (95%) of the Capacity Guarantee, until the limit on liquidated damages referred to in Section 6.8 is met. Notwithstanding the foregoing, Contractor's failure to achieve Substantial Completion within sixty (60) calendar days of Permission to Operate shall constitute a material breach of this Agreement and nothing in this Section 6.5.6 shall limit Owner's damages or remedies for breach of contract or damages or remedies available to the Owner under the Parent Guaranty.

6.7     Punch Lists.

     6.7.1     Interim Punch List. At the time Contractor delivers the Form of Mechanical Completion, Contractor shall also provide to Owner's Representative a list of Work, if any, that remains to be completed prior to Substantial Completion that, consistent with Prudent Industry Practice, will not affect the operability, reliability, safety or mechanical or electrical integrity of the Facility (the "Interim Punch List"). The Interim Punch List shall include the estimated cost and schedule to complete the items of Work identified in the Interim Punch List, which schedule shall be mutually agreed to by the Parties based upon the items of Work that remain to be completed. Approval of the Form of Mechanical Completion shall constitute both the Owner and each Financing Party's agreement to the Interim Punch List.

     6.7.2     Final Punch List. At the time Contractor delivers the Form of Substantial Completion, Contractor shall also provide to Owner's Representative a list of Work, if any, that remains to be completed prior to Final Completion that, consistent with Prudent Industry Practice, will not affect the operability, reliability, safety or mechanical, civil or electrical integrity of the Facility (the "Final Punch List"). The Final Punch List shall include the estimated cost and schedule to complete the items of Work identified in the Final Punch List, which schedule shall be mutually agreed to by the Parties based upon the items of Work that remain to be completed. Approval of the Form of Substantial Completion shall constitute both Owner and each Financing Party's agreement to the Final Punch List.  As security for performance of Contractor's obligations to complete the items on the Final Punch List, Owner shall withhold two hundred percent (200%) of Contractor's estimated cost to complete the items on the Final Punch List from the Substantial Completion Payment Milestone Amount The amount withheld will become payable only once every Final Punch List item has been completed to the satisfaction of Owner.

6.8     Final Completion.   Final Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.7.1 through to 6.7.7 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.7 ("Final Completion"):

     6.8.1     Substantial Completion has occurred;

all of the Work on the Project is fully complete and the Facility is fully operational;

all Final Punch List items have either been completed by Contractor, or extended or waived in writing by Owner;

all debris, rubbish and other material resulting from the Work has been removed from the Project Site;

Contractor has provided to Owner any necessary or otherwise customary training with respect to operation and maintenance of the Facility;

Final Lien Waivers (substantially in the form included in Exhibit M) from Contractor, its Subcontractors and all other persons possessing lien rights related to the Work have been executed and delivered to Owner; and

Contractor has delivered to Owner the Turnover Package and any other deliverables that are required, and to be delivered to Owner by Contractor or Subcontractors on or before Final Completion.

When Contractor believes it has achieved the requirements of Final Completion, Contractor shall provide written notice (the "Form of Final Completion"), in substantially the same form as Exhibit F, to the Owner's Representative, respectively, along with all backup documentation supporting Contractor's determination of Final Completion. Owner's Representative shall have ten (10) Business Days from receipt to notify Contractor of its approval or rejection to the Form of Final Completion. Owner or Financing Party's failure to respond to the Form of Final Completion within such ten-day period shall be deemed approval of the Form of Final Completion. Contractor shall resolve such exceptions prior to resubmitting a Form of Final Completion.

6.9    Limitation on Liquidated Damages. The aggregate liability of Contractor for Mechanical Completion Delay Liquidated Damages, together with the amount of any Capacity Shortfall Liquidated Damages, shall not exceed an amount equal to fifteen percent (15%) of the sum of the Contract Price.

## ARTICLE 7
## CONTRACT PRICE AND PAYMENT

7.1    Contract Price. As full consideration to Contractor for the performance of the Work and for Contractor's other obligations under this Agreement, and all costs incurred in connection therewith, Owner shall pay Contractor the total contract price set forth in Exhibit G (the "Contract Price"). The Contract Price is a fixed price and is subject to change only as provided in this Agreement.

7.2    Milestone Payments. Owner shall pay Contractor the Contract Price in Progress Payments based on Contractor's achievement (or partial achievement as set forth in Section 8.3 and otherwise at the reasonable discretion of Owner) of the applicable payment milestones (each, a "Payment Milestone"), as set forth in the payment schedule attached hereto as Exhibit B, (the "Contract Schedule and Schedule of Milestones"). Unless otherwise specifically agreed upon by the Parties, Contractor shall deliver to Owner an invoice for each Progress Payment following achievement of the corresponding Payment Milestone based on the Schedule of Milestones. Each invoice shall be delivered together with (i) a description of the completion of the Work for the applicable Payment Milestone

(Contractor shall ensure that the breakdown is consistent with and in accordance with the Schedule of Milestones set forth in Exhibit B and that the invoice clearly describes, to the satisfaction of Owner, the scheduled value completed), (ii) Partial Lien Waivers and, if applicable, Final Lien Waivers, (substantially in the form included in Exhibit M) from Contractor and its Subcontractors and all other persons possessing lien rights related to the Work, and (iii) such other information as may be reasonably requested by Owner.  Any applicable taxes shall be separately identified.

7.3     Timeliness of Payment.  Unless otherwise agreed to in writing by the Parties, all undisputed amounts invoiced under this Agreement shall be due and payable no later than thirty (30) days after receipt of the invoice and all required supporting information. Each Party will make payments by electronic funds transfer, or by other mutually agreeable method(s), to the account designated by the other Party.  Any undisputed amounts not paid by the due date will be deemed delinquent and will accrue interest at the Default Rate, such interest to be calculated from and including the due date to but excluding the date the delinquent amount is paid in full. The payment terms referenced in this paragraph shall be subject to a day-for-day adjustment until the foregoing conditions are satisfied.

7.4     Payment Disputes.  If either Party disputes the other Party's request for payment under this Agreement, the Party withholding payment shall within ten (10) days give written notice to the requesting Party of the disputed amount, together with sufficient information to allow the requesting Party to understand the nature of the dispute.  If a Party fails to respond to a request for payment within such ten (10) day period, it shall be deemed to have approved such request for payment.  Notwithstanding the dispute, Contractor shall proceed with the performance of the Work.  A Party withholding payment as part of a bona fide dispute will not be in default under this Agreement.  Resolution of any disputes under this Section 7.4 shall be made in accordance with the procedures set forth in Article 19. Payments made upon resolution of the related disputes shall be along with interest at the Default Rate applicable from the date when the payments should have been made originally.

7.5     Set-Off.  Owner may deduct and set off against any part of the balance due or to become due to Contractor under this Agreement any amounts due from Contractor to Owner and relating to this Agreement.

7.6     Owner Parent Guaranty. Within five (5) days following the Effective Date, Owner shall provide to Contractor, as security for the payment obligations herein, an Owner Parent Guaranty through Final Completion.  The Owner Parent Guaranty shall be in a form substantially similar to that which is attached as Exhibit N.

7.7     Retainage

7.7.1     Withholding.  Owner shall withhold from (i) each Progress Payment prior to Mechanical Completion an amount equal to ten percent (10%) of such payment as retainage (the "Initial Retainage"), (ii) the Progress Payment for Mechanical Completion an amount equal to five percent (5%) as retainage (the "MC Retainage"), and (iii) the Progress Payment for Substantial Completion an amount

35

equal to five percent (5%) as retainage (the "SC Retainage", and collectively with the Initial Retainage and MC Retainage, the "Retainage"); and (iv) the Progress Payment for Final Completion an amount equal to two percent (2%) (the "FC Holdback").  The Retainage shall be held by Owner as security for the performance of Contractor's obligations hereunder, and any interest thereon shall accrue for the account of Owner and not Contractor.  Owner may use the Retainage, among other uses, to cure a Contractor Event of Default, for Mechanical Completion Delay Liquidated Damages and/or Capacity Shortfall Liquidated Damages, to remove liens filed by Subcontractors (so long as Owner is current in its payment obligations to Contractor) and to satisfy any and all other undisputed amounts payable by Owner hereunder.  Owner may use the FC Holdback to cure any breach of the Workmanship Warranty by Contractor.  Unused Retainage and the FC Holdback shall be paid to Contractor in accordance with Section 7.7.2 below.

7.7.2    Payment.  Upon the earlier of (i) termination of this Agreement and (ii) Mechanical Completion and receipt of Contractor's invoice, Owner shall release any unused Initial Retainage.  Upon the earlier of (i) termination of this Agreement and (ii) Substantial Completion and receipt of Contractor's invoice, Owner shall release any unused MC Retainage.  Upon the earlier of (i) termination of this Agreement and (ii) Final Completion and receipt of Contractor's invoice, Owner shall release any unused SC Retainage.  Upon the first (1st) anniversary of Substantial Completion of the Work and receipt of Contractor's invoice for same, Owner shall release any unused FC Holdback. Upon the occurrence of an Owner Caused Delay exceeding twenty (20) days, Owner shall release Retainage (Owner's rights to future Retainage will continue in accordance with Section7.7.1).

7.8    Completion Security.  Within five (5) Business Days of issuance of the LNTP, Contractor shall post a parent guaranty (the "Parent Guaranty") guaranteeing the performance of obligations of Contractor in the form attached as Exhibit P.  The Parent Guaranty shall cover the delivery and installation of the Facility, payment of valid labor and material bills incurred during the delivery and installation portion of this Agreement with respect to the Facility. The Parent Guaranty shall remain in effect until the one (1) year anniversary of Substantial Completion (the "Parent Guaranty Expiration Date") at which time the Parent Guaranty will be released and exonerated. It is further understood that except as otherwise stated in the Parent Guaranty, no Parent Guaranty covers, whatsoever, any Owner's Scope of Work, Owner Supplied Equipment, warranties, operations and maintenance requirements, including system production.

7.9    Payment Details.

7.9.1   All first-time payments from Owner to Contractor under this Agreement will be verified with a call back procedure to confirm authenticity on the first payment run.

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CEB404DD06B7

7.9.2   Any requests to change bank account details should be sent in writing on company headed paper and email from Contractor to Owner directors. The call back procedure shall be performed again.

## ARTICLE 8
## CHANGE ORDERS

8.1   <u>Changes; Change Orders Requests</u>.   No Change shall be effective unless executed by the Parties in accordance with the procedures described in this <u>Section 8.1</u>.  Any Change permitted to be made in accordance with this Agreement shall take the form of a written Change Order (each a "<u>Change Order</u>").   A Change Order shall be in the form substantially similar to the Change Order form attached as <u>Exhibit J</u>.  Each Change Order shall contain details of the Change, and any adjustments of the Design Documents, the Contract Price or the Schedule, as applicable.

8.1.1   Owner may request changes in the Work within the general scope of the Agreement, consisting of additions, deletions, or other revisions.  If Owner desires a change in the Work as provided for herein, Owner shall submit a change request to Contractor in writing.  Within ten (10) Business Days of its receipt of any such request, unless otherwise agreed to by the Parties, Contractor shall submit a detailed proposal to Owner stating (i) the increase or decrease, if any, in the Contract Price which would result from such change, and/or (ii) the effect, if any, upon the Schedule of Work or the Schedule of Milestones, and/or the terms and conditions of this Agreement.  Owner shall have ten (10) Business Days to accept or reject Contractor's proposal in relation to the requested change.  If Owner agrees with Contractor's proposal, Owner and Contractor shall execute a Change Order reflecting the requested change in the Work and proposed adjustments, if any, in the Contract Price and/or the Schedule of Work.  If Owner disagrees with Contractor's proposal, Owner shall either (a) notify Contractor that Owner has decided to withdraw its requested change; or (b) issue a Construction Change Directive and Contractor shall proceed with the change on a time and materials basis at the rates set forth in <u>Appendix A.</u> Notwithstanding the foregoing, under no circumstances shall Contractor be required to execute the Work described in a Construction Change Directive that would (i) in the aggregate result in a ten percent (10%) or larger increase in the Contract Price, (ii) at the reasonable discretion of Contractor, require Contractor to perform work beyond its ability, skills, experience or capacity, or (iii) reduce the Facility size (in kW), unless such reduction is (1) required by a Governmental Authority or the Interconnection Provider or Offtaker or (2) reasonably required as a result of an Unknown Site Condition.

8.1.2     If a change requested by the Owner pursuant to Section 8.1.1: (a) constitutes a minor change to the Work and (b) would not (i) adversely affect the validity of any manufacturer's warranty; (ii) increase or decrease the Contract Price, or (iii) adversely affect Contractor's obligations or economic benefits hereunder, including the Contractor's warranty obligations, then the Contractor shall be obligated to implement such Change, subject to Contract Price changes and Schedule adjustments made pursuant to Section 8.3 and Section 8.4, respectively.

8.1.3     Except where Owner has issued a Construction Change Directive in accordance with Section 8.1.1, Contractor shall not be obligated to make any Changes unless and until a Change Order therefor has been executed by both Parties or deemed approved in accordance with the provisions under the Agreement.

8.2     Change Orders for Events of Delay; Scope of Work.  Subject to Section 8.3 and Section 8.4, Contractor shall be entitled to a Change Order granting an Equitable Adjustment of the Contract Price and Schedule of Work attributable to an Event of Delay, a change to the Interconnection Provider requirements after the Effective Date, or the Scope of Work becoming (through no fault of Contractor) incorrect, incomplete or inaccurate.

8.3     Adjustments to Contract Price.  The price of any Work required or modified by a Change (other than a Change for an Unknown Site Condition) shall be, at Owner's sole election, a lump-sum fixed price mutually agreed to by the Parties (which lump-sum shall provide for an Equitable Adjustment of the Contract Price); provided that, if the Parties are unable to agree on a fixed price for such Change, or if the Change is for an Unknown Site Condition, then Owner may issue a Construction Change Directive (subject to Section 8.1.1). Notwithstanding the foregoing: (a) Contractor shall only be entitled to an adjustment to the Contract Price in respect of Changes for an Event of Delay specified in paragraph (vi) of the definition of "Event of Delay" (relating to AHJ final inspection approval), if Contractor is entitled to an Equitable Adjustment to the Schedule of Work pursuant to Section 8.4 for more than fifteen (15) Business Days; and (b) Contractor shall not be entitled to claim any adjustment to the Contract Price in respect of any Change for an Event of Delay relating to modules; provided, however, the foregoing is without prejudice to Contractor's right to claim an Equitable Adjustment to the Contract Price pursuant to this Section 8.3 if a Module Event of Delay has been caused by any other Event of Delay. The mark-up shall be no more than five percent (5%).

8.4     Adjustments to Schedule of Work.  Provided that Contractor has used all reasonable efforts to avoid and mitigate any potential delays to the Project Schedule and/or increased Direct Costs (as defined below) or indirect costs resulting from such events  and to the extent that Contractor demonstrates that an event necessitating a Change Order has occurred, Contractor shall be entitled to an Equitable Adjustment to the Schedule of Work as a result

of a Change requiring additional time but only to the extent that the Change directly affects the Critical Path of the Work and subject to adjustments to the Work or to the methods or sequence of performing the Work that can in Contractor's judgment be implemented by Contractor to mitigate the delay.  Adjustments shall be based on the baseline Schedule of Work set forth in Exhibit B, as such Schedule of Work is updated in accordance with Section 3.5.2.  Notwithstanding the foregoing, Contractor shall not be entitled to claim an Equitable Adjustment to the Schedule of Work pursuant to this Section 8.4 for a period in excess of thirty (30) days in respect of any Change for a Event of Delay relating to modules; provided, however, the foregoing is without prejudice to Contractor's right to claim an Equitable Adjustment to the Schedule of Work pursuant to this Section 8.4 in excess of thirty (30) days if a Event of Delay relating to modules has been caused by any other Event of Delay.

8.5     Other Provisions Unaffected. Except to the extent the Parties specifically modify any of the provisions of this Agreement as part of an executed Change Order, all provisions of this Agreement shall apply to all Changes, and no modification, amendment or waiver shall be implied as a result of any other Change.

8.6     Facility Plans and Specifications.   Notwithstanding the Change Order provisions set forth in this Article 8, upon prior notice to Owner, Contractor reserves the right to make changes after the Effective Date that will not have an effect on the Schedule of Work, Contract Price or in the Facility Specifications for the purposes of mechanical installations, building code and Project Site requirements and reasonable design improvements, provided that components are of equal quality.

8.7     Materials.  Upon prior written approval of Owner, Contractor shall have the right to substitute similar materials of equal or better quality than may be specified in the Facility Specifications without impacting the form, fit or function of other aspects of the Facility.  Owner shall respond to such a request within ten (10) Business Days, and Owner's approval shall not be unreasonably withheld.

8.8     Adjustment to the Schedule of Milestones.  If the Contract Price is adjusted pursuant to a Change Order, the Parties, if necessary, shall make corresponding changes to the Schedule of Milestones.

8.9     Direct Costs

8.9.1   In no event will Contractor be entitled to payment for Direct Costs hereunder to the extent that such costs would have occurred notwithstanding such event, due to the concurrent fault, actions or omissions of Contractor or its Subcontractors.

8.9.2   For the purposes hereof, Contractor may use an Affiliate, but shall not charge Owner any mark-up on that Affiliate's costs as part of Contractor's Direct Costs hereunder.  "Direct Costs" shall mean only the actual costs and expenses that are incurred by Contractor as a

result of the event giving rise to the Change Order including: (i) compensation for Labor utilized and in the direct employ of Contractor at the Facility Site, at the rates as set forth in Contract Price Exhibit; (ii) cost of materials and permanent equipment; (iii) payments properly made by Contractor to Subcontractors; (iv) rental charges of necessary machinery and equipment (but excluding hand tools) used at the Project Site; (v) Permit fees; (vi) compensation of engineers or other design professionals employed directly by Contractor; and (vii) reasonable costs of mobilization and/or demobilization.  Notwithstanding the foregoing, "Direct Costs" shall not include (t) salaries or other compensation (including costs of contributions, assessments, fringe benefits or taxes based on salaries or compensation) of Contractor's Personnel at Contractor's principal office and branch offices (except as provided in the previous sentence); (u) expenses of Contractor's principal and branch offices; (v) Contractor's profit, overhead or general expenses of any kind; (w) replacement, repair or other costs or liabilities arising from any loss of or damage to any equipment, tools or other property owned or used by Contractor or its Subcontractors; (x) costs to correct or re-perform any components of such Work as a result of the acts or omissions of Contractor or its Personnel; (y) any fines or penalties assessed against Contractor or its Personnel in connection with such Work that were assessed due to the fault of Contractor or its Personnel; or (z) any costs or expenses other than those specifically set forth above as Direct Costs.

8.10 Contractor may invoice Owner for partial payment for Work performed if (i) Contractor is entitled to an Equitable Adjustment to the Schedule of Work due to an Owner Caused Delay of more than twenty (20) Business Days or (ii) if following Capacity Testing the Facility fails to achieve at least ninety-five percent (95%) of the Capacity Guarantee as a result of the Owner Supplied Equipment or Owner's Scope of Work.  Any partial payment paid by Owner pursuant to this Section 8.9 shall be deducted from the subsequent Payment Milestone payment (the amount deducted shall be limited to only the amount of any such partial payment and will not include any amounts attributable to an adjustment to the Contract Price in relation to such Owner Caused Delay pursuant to a Change Order or Construction Change Directive).

**ARTICLE 9**
**FORCE MAJEURE AND OWNER CAUSED DELAY**

9.1    Excused Performance Due to Force Majeure.  If either Party can reasonably demonstrate that it is rendered wholly or partly unable to perform its obligations under this Agreement because of a Force Majeure Event, for the duration of such Force Majeure Event, that Party will be excused from whatever performance is affected by the Force Majeure Event

40

to the extent so affected; provided that, a Force Majeure Event, whether affecting Owner or Contractor, shall not excuse Owner from performing its payment obligations hereunder, including its obligation to pay Contractor the Contract Price for all portions of the Work completed consistent with this Agreement and not affected by the Force Majeure Event. If either Party is unable to perform its obligations under this Agreement due to a Force Majeure Event for a consecutive period of more than one hundred eighty (180) days, then either Party shall be entitled to terminate this Agreement by written notice to the other Party.  In the event of termination by a Party pursuant to this Section 9.1, Contractor shall be entitled, as its sole and exclusive remedy with respect to such termination, to such amounts as are required to be paid in the event this Agreement is terminated pursuant to Section 11.1.

9.2     Notification of Force Majeure and Mitigation.  The Party affected by the Force Majeure Event shall (i) promptly, in the case of Owner, and immediately, in the case of Contractor, notify the other Party of its Force Majeure Event in writing or orally (to be confirmed in writing); (ii) as soon as reasonably possible after the Force Majeure Event, fulfill or resume fulfilling its obligations hereunder; and (iii) provide the other Party with notice of the cessation or partial cessation of the Force Majeure Event.

9.3     Force Majeure Suspension. If the Owner, acting reasonably, determines that the completion of the Work will be delayed by six weeks or more due to a Force Majeure Event, the Owner may deliver to the Contractor a written notice informing the Contractor that the completion of the Work is to be suspended until the completion of the Work is no longer prevented by that or any other Force Majeure Event. On receipt of a notice under this Article 9.3, the Contractor must immediately prepare and, within ten (10) Business Days, deliver to the Owner a plan (the **"Suspension Plan"**) for the re-scheduling of the completion of the Work, the storage of equipment, and demobilization of any unnecessary workers. Owner shall, acting reasonably and within five (5) business days, review and either approve or reject the Suspension Plan. In case Owner approves the Suspension Plan, the Contractor must immediately implement the Suspension Plan. In case Owner rejects the Suspension Plan, the Contractor must immediately prepare and, within five (5) Business Days, deliver to the Owner an updated Suspension Plan. In case Owner exercises its rights under this section, Owner shall not be liable to Contractor for any costs other than those incurred as a direct result of the suspension and shall, for the avoidance of doubt, not be liable for lost profits of the Contractor.

**ARTICLE 10**
**WARRANTIES**

10.1    Warranties.  Contractor warrants that as of the date of Substantial Completion, the Work (a) will be composed of all new materials and components free from material defects in design and workmanship which are, in all respects, fit for purpose; and (b) will conform to the Contract Documents, Facility Specifications any manufacturer installation requirements (including for Owner Supplied Equipment, and for such, to extent such manufacturer installation requirements are provided to Contractor prior to Contractor

41

commencing the Work)(the "Workmanship Warranty"). During the Workmanship Warranty Period, the Contractor shall warrant the Work and manage any equipment warranty issues (except with respect to the Owner Supplied Equipment) and shall provide any necessary assistance to Owner in Owner's management of any equipment warranty issues relating to the Owner Supplied Equipment. The Workmanship Warranty does not warrant or guarantee a specified level of energy output. Any such warranty or guarantee, if any, shall be as set forth in a separate performance guarantee or in the warranty of the PV module supplier. Notwithstanding any provision herein to the contrary, Contractor's liability with respect to Owner's Scope of Work and Owner Supplied Equipment shall be strictly limited to defects arising out of or related to Contractor's performance of the Work.

10.2    Workmanship Warranty Period. Any claim for breach of the Workmanship Warranty must arise during the twenty-four (24) month period commencing on the date of Substantial Completion (such period, the "Workmanship Warranty Period"), save for repair, rework or replacement under Article 10.3, and a claim must be made, if at all, by Owner within ten (10) Business Days after the end of the Workmanship Warranty Period for any such claim for breach which arose within such warranty period. Neither payment by Owner, nor any other provision of this Agreement, nor partial or entire use or possession of the Work by Owner shall relieve Contractor of liability with respect to the Workmanship Warranty.

10.3    Repair of Defects.

10.3.1  The sole and exclusive remedy for breach of the Workmanship Warranty shall be repair, rework or replacement of the relevant Work, at Contractor's sole cost and expense provided, however, that if there is a defect in the Owner Supplied Equipment caused by Owner or another third party not associated with Contractor, Owner shall be responsible for the cost of removing and reinstalling or replacing any Owner Supplied Equipment.  If Contractor is obligated to repair, replace or renew any Equipment, item or portion of the Work hereunder, Contractor will undertake a technical analysis of the problem and correct the "root cause" unless Contractor can demonstrate to Owner's reasonable satisfaction that there is no material risk of the reoccurrence of such problem.

10.3.2  If Owner discovers that the Facility or the Work or any part thereof fails to meet the Workmanship Warranty, Owner will promptly notify Contractor of such failure along with the reasonable basis for its belief that such failure is a breach of the Workmanship Warranty, and to the extent Contractor does not dispute such warranty claim (or is required to following resolution of any dispute in accordance with the terms hereof), Contractor shall repair, rework or replace the Defective Work or portion of the Facility, at Contractor's sole cost and expense. Any repair, rework or replacement carried out by Contractor or Subcontractor should be documented and reported to Owner within 10 Business Days of same.  If, in Owner's professional opinion, the Contractor has not satisfactorily

42

repaired the failure, Owner shall have the right to make such repairs at Contractor's cost.

10.3.3  Where the O&M Provider identifies a fault in the system and attributes that fault to the Work, the Contractor shall respond to the formal notice of such issue to the Contractor within 24 hours and shall mobilize to resolve the issue within three business days. The issue shall be resolved no later than the response times listed below from the date and time of formal notice of such issue to the Contractor, according to the extent of the issue. If they fail to address the issue within those time frames the O&M Provider will resolve the issue at the Contractor's cost and the O&M Provider's works will be covered by the Workmanship Warranty.

    10.3.3.1      A fault or issue greater than 1MW – 25 hours

    10.3.3.2      A fault or issue between or equal to 100 kW and 1 MW – 5 Business Days

    10.3.3.3      A fault or issue less than 100 kW – 10 Business Days

10.3.4  All Work performed to repair defects will be done by installers certified by the proper manufacturers and be undertaken in compliance with manufacturer warranties.  Any warranty disputes between the Parties shall be resolved consistent with Article 19.

10.3.5  Owner shall provide Contractor with reasonable access to the Project in order to perform its obligation under this Article 10.3 and the Parties shall schedule such work as necessary so as to minimize disruptions to the operation of the Project. Owner shall have the right to operate and otherwise use the Equipment until such time as Owner deems prudent to suspend such operation or use in order to accommodate Contractor's Warranty Services.

10.3.6  Contractor will use best efforts to perform its warranty obligations pursuant to this Article 10 so as to minimize any adverse effect on the operation of the Facility, including the ability of Owner to meets its obligations and exercise its rights under any agreement for the sale of power from the Facility.

10.3.7  Contractor's obligations under this Article 10.3 shall not be impaired or otherwise adversely affected by any actual or possible legal obligation or duty of any vendor or Subcontractor to Contractor or Owner.

Contractor warrants that all materials incorporated into the Work as part of repairs to and replacements of the Work by Contractor or any Subcontractor, and repairs to and replacements of the Work pursuant to Article 10.3 shall conform to the requirements of this Agreement and the Workmanship Warranty. Contractor shall perform, at its cost and expense,

43

such tests as Owner may reasonably request to verify that any correction, repair, replacement or re-performance of the Work pursuant to Article 10.3 complies with the requirements of the Workmanship Warranty.

10.3.8    Contractor shall perform its obligations under this Article 10.3 as promptly as possible after being notified of the noncompliance by Owner, and in any event shall commence performance of its obligations under this Article 10.3 no later than two (2) Business Days after such notice.

10.3.9    If, after notification of a Defect or breach of Warranty, Contractor fails to commence repair, rework or replacement within the relevant time period or shall fail to continue performing or completing, its obligations under this Article 10.3 with respect to such Defect or breach of Warranty, Owner may correct such breach of Warranty so that the Work and Equipment comply with the Warranty (including by instructing the O&M Provider to do so) after giving Contractor three (3) Business Days written notice, and Contractor shall be liable for all reasonable direct costs, charges and expenses incurred by Owner in connection with the same and shall pay the same to Owner upon receipt of invoices with supporting documentation from Owner. Such correction of a breach of the Workmanship Warranty condition shall be deemed to be repair performed by Contractor and the Warranty Period for such corrected Work shall be extended accordingly.

10.3.10    No correction of a Defect or breach of Warranty pursuant to this Section 10.3 shall void the Workmanship Warranty.

10.3.11    No correction or cure shall be considered complete until Owner has reviewed and accepted such remedial work.

10.3.12    So long as Contractor has been notified of a breach of the Workmanship Warranty prior to the end of the Warranty Period, the obligation of Contractor to correct such noncompliance, defect or breach of the Workmanship Warranty shall survive the expiration of the Warranty Period.

10.3.13    Upon completion of any repair, rework or replacement hereunder, all Equipment shall be returned or restored to its proper condition (subject to normal wear and tear), including but not limited to fit alignment, adjustment, operability, and finish.

10.3.14    Contractor shall bear all costs and expenses directly associated with repair, rework or replacement under this Article 10.3, including, all costs of Labor and equipment and of any necessary disassembly removal, replacement, transportation, reassembly, reinstallation, and retesting, as

44

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CEB404DD06B7

well as reworking, repair, or replacement of such Work, and reassembly of structures, electrical work, machinery, Equipment, or any other obstruction as necessary to give access to the non-conforming item for correction, and for removal, repair and/or replacement of any damage to other work or property that arises from the breach of the Workmanship Warranty.

10.4    <u>Performance Guaranty.</u>

10.4.1  Contractor guaranties that the Work will perform in accordance with the specifications of Exhibit A.

10.4.2  Contractor shall conduct performance testing of the Facility one year, two years, and three years from the date of Substantial Completion in accordance with ExhibitL.

10.4.3  If the works do not satisfy the specifications of ExhibitA, Contractor shall make any modifications to the Facility, at its sole cost and expense, during the Performance Cure Period of sixty (60) days following the delivery of the results of the performance testing in an effort to meet the specifications of ExhibitA

10.4.4  If after the Performance Cure Period, Contractor still fails to achieve the specifications of Exhibit A, then Owner shall be entitled to a Performance Ratio Price Adjustment which shall be calculated in accordance with Exhibit G, L Such adjustment shall be paid within ten days after confirmation by both parties that Contractor has failed to achieve the Performance Guarantee and agreement on the Performance Ratio Price Adjustment amount.

10.4.5  In support of the performance testing process, Owner shall provide Contractor with (i) access rights to the performance data throughout the site operations (direct "read only" access to live/real-time, or historic on a daily basis) for a period of three (3) years from the date of Substantial Completion and subject to the confidentiality provisions of this Agreement during the period of performance of this Agreement and thereafter, and (ii) physical access rights to visit the Site at any time without restriction to spot-check the level of service and care of the O&M provider.

10.5    <u>Enforcement by Owner; Subcontractor Warranties; Assignment of Warranties</u>. Contractor shall obtain for the benefit of Owner the warranties provided by Subcontractors and those warranties of suppliers provided with respect to any Equipment (other than Owner Supplied Equipment) (the "<u>Third Party Warranties</u>"). Contractor shall comply with

45

the terms and conditions of each Third Party Warranty applicable to the Equipment (as it relates to Owner Supplied Equipment, only to the extent that Owner has previously provided the same to Contractor) so that each such Third Party Warranty remains in full force and effect and, until the end of the Workmanship Warranty Period, Contractor shall be responsible for making claims under and taking all such actions necessary to enforce all Third Party Warranties (excluding Owner Supplied Equipment) with respect to the Facility until the end of the Workmanship Warranty Period. On and from the expiration of the Workmanship Warranty Period (or at the earlier request of Owner), Contractor shall be responsible for the valid assignment of such Third Party Warranties to Owner and thereafter Owner or its O&M provider shall be responsible for administering, maintaining, complying with and supervising all such Third Party Warranties. If, during the Workmanship Warranty Period, any original equipment manufacturer claims that a failure, defect or damage to the Owner Supplied Equipment resulted from improper actions or negligence (not otherwise attributed to Contractor's Personnel) causing the manufacturer to deny such warranty claim on such basis, to the extent that the Owner elects to legally pursue a claim against the original equipment manufacturer in a court of law or other tribunal or governmental proceeding, Owner shall pay all such costs and expenses associated with such pursuit and Contractor shall only have the obligation to assist Owner in such pursuit provided that Owner shall reimburse Contractor for all reasonable costs and expenses incurred by Contractor in providing such assistance. Commencing on the expiration of the Workmanship Warranty Period (or in the event that this Agreement is terminated and Owner has paid Contractor all amounts due and owing under this Agreement, upon such termination date), Contractor shall cause the valid assignment of the manufacturer's warranties for all Equipment (other than Owner Supplied Equipment) incorporated into the Facility to Owner.

10.6    Exclusions from Workmanship Warranty. The Workmanship Warranty shall not extend or apply to any failure of the Facility to comply with the Workmanship Warranty that is caused by (a) normal wear and tear resulting from the operation of the Facility; (b) any modifications made to the Facility by any person other than Contractor's Personnel without Contractor's prior written consent; (c) any neglect, abuse, malicious mischief or vandalism affecting the Facility or damage to the Work or Facility not caused by Contractor or its Subcontractors; (d) to the extent that any failure caused by a negligent act of Owner or its employees, affiliates or guests; (e) failure to operate or maintain the Facility or Equipment in accordance with industry standards the manufacturers' guidelines; (f) operation of such Work or Facility by Owner or its representatives, agents or contractors in excess of or outside of the operating parameters or specifications for such Work or Facility as set forth in the applicable user manuals; (g) a Force Majeure Event; (h) the failure of any part, material or equipment, if (A) the manufacturer of the part, material or equipment fails to honor its product warranty to Owner within the timeframe specified in such product warranty or, if not specified, a reasonable timeframe; (B) the warranty for such part, material or equipment has expired; or (C) the part, material or equipment did not benefit from a manufacturer's warranty, and in each case Owner does not remedy by replacement of the part, material or equipment at its own expense; and (i) Contractor's compliance with a specific written direction from Owner if, prior to implementing such direction, Contractor reasonably advised Owner that Owner's written direction would so affect the Workmanship Warranty.

10.7    Limitation of Warranty. THE EXPRESS WARRANTIES PROVIDED IN THIS ARTICLE 10 ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OR GUARANTEES OF ANY KIND, WHETHER EXPRESS OR IMPLIED (INCLUDING ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE), RELATING TO CONTRACTOR'S OBLIGATIONS FOR THE WORK, AND ALL SUCH OTHER WARRANTIES AND REPRESENTATIONS ARE HEREBY DISCLAIMED.  THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE 10 SHALL CONSTITUTE THE ENTIRE LIABILITY OF CONTRACTOR WITH RESPECT TO DEFECTS IN THE WORK.

10.8    Serial Defects.

10.8.1 Contractor shall immediately notify Owner if it becomes aware of any defect affecting five percent (5%) or more of the module portion of the Owner Supplied Equipment and shall comply with any reasonable request of Owner to provide assistance to the module supplier in its remedying of any such defects, provided that Contractor shall not be obliged to provide such assistance where it would require Contractor to incur cost.

10.8.2 Should substantially the same defect, having the same root cause, of a non-aesthetic nature, affecting the performance of any component supplied by the Contractor, be identified in 10% of such components, all such components shall be deemed not fit for purpose and Contractor will be obliged to replace all such components on the Project Site.

**ARTICLE 11
DEFAULT; TERMINATION**

11.1    Termination for Convenience.

11.1.1 Notice of Termination for Convenience.  Owner may terminate this Agreement at any time for convenience by providing written notice of termination to Contractor at any time at least thirty (30) Business Days before the effective date of termination.

11.1.2 Contractor's Obligations Upon Termination for Convenience.  Upon the date specified in any notice delivered by Owner under Section 11.1.1, Contractor shall, unless the notice requires otherwise:

(a)     as soon as possible, discontinue Work and demobilize from the Project Site, except in respect of items of Work the value of which would otherwise be lost or as necessary to secure the Project Site or the Work in a safe and secure state (provided that Owner shall be responsible for payment in respect of such items of Work pursuant to Section 11.1.3(b));

47

(b)     if Owner notifies Contractor that it intends to re-contract the Work or sell the Project and pay the additional amount referred to in Section 11.1.3(e), upon receipt of such payment, assign to Owner or its designee such of the Subcontracts as Owner may reasonably request (to the extent possible), and otherwise cancel orders for undelivered materials (to the extent possible);

(c)     use best efforts to liquidate delivered materials;

(d)     if Owner has notified Contractor it intends to re-contract the Work or sell the Project and pay the additional amount referred to in Section 11.1.3(e), upon receipt of such payment, seek to obtain licenses for Owner's benefit to any proprietary property incorporated into the Work; and

(e)     document the status of the Work and activities taken in connection with termination,

(collectively, the "Demobilization Activities"), all in a manner deemed reasonable by Contractor under the circumstances and in accordance with Prudent Industry Practices.

11.1.3  Payment Upon Termination for Convenience.  For the avoidance of doubt, this Section 11.1.3 (Payment Upon Termination for Convenience) shall not apply to any LNTPs between the Parties.  After notice of termination, Owner shall, subject to receipt of all necessary information from Contractor, use all reasonable endeavors to pay to Contractor (i) within sixty (60) days, the amounts payable under subsections (a), (b), (c), and (d) of this Section 11.1.3; and (ii) within a mutually agreeable time frame, the amounts payable under subsection (e) of this Section 11.1.3 (collectively, the "Early Termination Charge"):

(a)     all amounts due and not previously paid to Contractor for Work performed and wholly or partially completed (payment for partially completed Work is payable by Owner as follows: one hundred five percent (105%) of Contractor's Direct Costs attributable to such partially completed Work) in accordance with this Agreement prior to the date of notice of termination and for Work thereafter completed pursuant to Section 11.1.2(a) or as specified in such notice, inclusive of amounts withheld under Section 7.7;

(b)     actual costs incurred by Contractor in connection with the Demobilization Activities (e.g., costs of demobilization from the Project Site, cost of completion of Work, amounts paid to

Subcontractors, shipping costs, costs of material disposition, etc.) plus fifteen percent (15%) of such costs;

(c)    costs of materials for which Contractor is liable to take delivery of and are delivered to Owner, which could not be disposed or utilized;

(d)    any sales tax imposed by Applicable Law; and

(e)    if and to the extent Owner, following such termination for convenience, within a period of eighteen (18) months, either (i) contracts with any other contractor(s) to complete the Work or (ii) sells the Project for an amount greater than the Investment Price, an additional amount equal to fifteen percent (15%) of the difference between amounts paid under Section 11.1.3(a) to 11.1.3(d) and the Contract Price, subject to a cap of one hundred and twenty five thousand dollars ($125,000), payable within thirty (30) days of the occurrence.

11.2    Termination Upon Contractor's Material Breach.

11.2.1 Event of Default by Contractor.  A "Contractor Event of Default" shall mean, with respect to Contractor, the occurrence of any of the following:

(a)    Any representation or warranty made by Contractor herein is materially false or misleading in any material respect when made or Contractor fails to perform any of its material obligations contained in this Agreement (other than such covenants or agreements specifically addressed in other provisions of this Section 11.2) and such false representation or warranty or failure of performance is not corrected or cured or initiated to be corrected/cured within ten (10) Business Days after written notice from Owner, or if such remedy cannot reasonably be completed within such period, Contractor fails immediately to commence and diligently pursue remedial action within such period and conclude such action within one hundred twenty (120) days;

(b)    Contractor (i) fails to maintain the Parent Guaranty as set forth in Section 7.8 or (ii) fails to make payment to Owner of any undisputed amounts when due and payable and in the case of clause (ii) such failure continues for more than twenty (20) Business Days after written notice from Owner;

(c)    Contractor abandons the Work; "Abandon" for the purposes of this paragraph shall mean that Contractor, except to the extent

49

caused by an Event of Delay, has substantially and voluntarily reduced personnel at the Project Site resulting in Contractor not being capable of completing the Work consistent with reasonable and Prudent Industry Practices and in accordance with the Schedule of Work in a material and significant manner and such abandonment continues for more than thirty (30) days after written notice from Owner;

(d)     Contractor assigns or attempts to assign its rights or obligations under this Agreement or any part thereof to any third party except as permitted under this Agreement;

(e)     Contractor is adjudicated insolvent, or if any proceeding is instituted against it seeking to adjudicate Contractor as bankrupt or insolvent and such proceeding is not dismissed within ninety (90) days of its filing, or Contractor makes a general assignment for the benefit of its creditors, has a trustee or receiver appointed for its property, or files a petition to take advantage of any insolvency laws;

(f)     Contractor fails to achieve Mechanical Completion within six (6) calendar months of the Mechanical Completion Deadline; or

(g)     Contractor fails to achieve Substantial Completion within sixty (60) calendar days of Permission to Operate.

11.2.2   <u>Notice of Contractor Event of Default</u>.  Owner may, without prejudice to any other right or remedy that it may have under law or in equity, terminate this Agreement immediately upon delivery of notice to Contractor, provided that (i) Owner notifies Contractor of the Contractor Event of Default, (ii) Contractor does not cure the Contractor Event of Default within the cure period for such Contractor Event of Default set out in <u>Section 11.2.1</u> (Owner may immediately terminate this Agreement on the occurrence of the events listed in <u>Sections 11.2.1(b)(i)</u>, <u>11.2.1(c)</u>, <u>11.2.1(d)</u>, <u>11.2.1(f)</u> and <u>11.2.1(g)</u>) and (iii) Owner subsequently notifies Contractor of its intent to terminate the Agreement.

11.2.3   <u>Consequences of Termination for Default</u>. If Owner elects to terminate this Agreement pursuant to this <u>Section 11.2</u>, then Owner may employ any other person (a "<u>Replacement Contractor</u>") to finish the Work.  In such event, Owner may make such reasonable expenditures as would accomplish the timely completion of the Facility.  Contractor shall provide Owner or any Replacement Contractor, at Contractor's expense, and to the extent not otherwise having been granted and conveyed hereunder, with the right to continue to use any and all intellectual property and other patented and/or proprietary information that Contractor has rights to use, if any, that Owner deems necessary to complete the Facility (including the Design Documents).  If the completion cost utilizing a Replacement Contractor

exceeds the unpaid portion of the Contract Price at the time of the termination of this Agreement, then Contractor shall pay to Owner the amount of such excess within twenty (20) days following receipt of Owner's demand for such payment, which shall be accompanied by reasonable supporting documentation.  Contractor shall remain liable for any amounts paid by Owner to Contractor for work completed by any Subcontractor(s) up to the date of termination. Contractor shall be entitled to payment for Work wholly or partially performed (payment for partially completed work is payable by Owner as follows: one hundred fifteen percent (115%) of Contractor's Direct Costs attributable to such partially completed Work) before the effective date of termination.

11.2.4 <u>Contractor's Obligations Upon Termination for Default</u>.    If this Agreement is terminated in accordance with <u>Section 11.2.2</u>, Contractor shall proceed in accordance with <u>Section 11.1.2</u> and shall be entitled to payment in accordance with <u>Section 11.2.3</u>.

11.3    <u>Termination Upon Owner's Material Breach</u>.

11.3.1 <u>Event of Default by Owner</u>.  An "<u>Owner Event of Default</u>" shall mean, with respect to the Owner, the occurrence of any of the following:

(a)    Any representation or warranty made by Owner herein is false or misleading in any material respect when made or Owner fails to perform any of its material obligations contained in this Agreement (other than such covenants or agreements specifically addressed in other provisions of this <u>Section 11.3</u>) and such false representation or warranty or failure of performance is not corrected or cured within ten (10) Business Days after written notice from Contractor, or if such remedy cannot reasonably be completed within such period, Owner fails promptly to commence and diligently pursue remedial action within such period and conclude such action within one hundred twenty (120) days;

(b)    Owner fails to make payment to Contractor of any undisputed amounts when due and payable and such failure continues for twenty (20) days after written notice thereof has been given to Owner by Contractor;

(c)    Owner assigns or attempts to assign its rights or obligations under this Agreement or any part thereof to any third party except as permitted under this Agreement; or

(d)    Owner is adjudicated insolvent, or if any proceeding is instituted against it seeking to adjudicate Owner as bankrupt or insolvent and such proceeding is not dismissed within ninety (90) days of

51

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CEB404DD06B7

its filing, or Owner makes a general assignment for the benefit of its creditors, has a trustee or receiver appointed for its property, or files a petition to take advantage of any insolvency laws.

11.3.2 <u>Notice of Owner Event of Default</u>.  Contractor may, without prejudice to any other right or remedy that it may have under law or in equity, terminate this Agreement immediately upon delivery of notice to Owner, provided that (i) Contractor notifies Owner of the Owner Event of Default, (ii) Owner does not cure the Owner Event of Default within the cure period for such Owner Event of Default set out in <u>Section 11.3.1</u> (Contractor may immediately terminate this Agreement on the occurrence of the event listed in <u>Section 11.3.1(c)</u>) and (iii) Contractor subsequently notifies Owner of its intent to terminate the Agreement.

11.3.3 <u>Consequences of Termination by Contractor</u>.  If this Agreement is terminated in accordance with <u>Section 11.3.2</u>, Contractor shall proceed in accordance with <u>Section 11.1.2</u> and shall be entitled to the Early Termination Charge.

11.4    <u>Surviving Obligations</u>.  Termination or completion of this Agreement shall not relieve Contractor or Owner of any obligation hereunder which expressly survives termination or completion hereof and shall not relieve Owner of its payment obligations with respect to any Work already performed consistent with the terms of this Agreement or of obligations by Owner assumed prior to the date of termination.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

12.1    <u>Business Organization</u>.  Each Party represents and warrants that it is an entity duly organized, validly existing and in good standing under the laws of its state of organization and is qualified to do business in the state in which the Project Site is located.

12.2    <u>Litigation</u>.  Each Party represents and warrants that (a) it is not in violation of any laws, ordinances, judgments, decrees, injunctions, writs and orders of any Governmental Authority, which violations, individually or in the aggregate, would adversely affect its performance of its material obligations under this Agreement; and (b) there is no litigation nor any arbitration proceedings by or before any arbitrators, court or other Governmental Authority now pending or (to its knowledge) threatened against it which, if adversely determined, could reasonably be expected to have a material adverse effect on its ability to perform its obligations under this Agreement.

12.3    <u>Corporate Action; Enforceability</u>.  Each Party represents and warrants that (a) it has all necessary organizational power and authority to execute, deliver and perform its obligations under this Agreement; (b) the execution, delivery and performance by it of this Agreement has been duly authorized by all necessary action on its part; and (c) this Agreement has been duly and validly executed and delivered by it and constitutes the legal,

valid and binding obligation of it enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

12.4    Property Ownership; Conditions. Owner represents and warrants to Contractor that (a) Owner has exclusive and full fee title ownership to the Project Site or valid leasehold interest; (b) the Project Site is free of any and all liens and encumbrances that could have an adverse effect on the Work, the Facility (or the construction, installation, ownership, operating or maintenance thereof) or Contractor's ability to perform any of its obligations hereunder; (c) there are no conditions of any kind, as described in 3.14 at or affecting the Project Site that could have an adverse effect on the Work, the Facility (or the construction, installation, ownership, operating or maintenance thereof) or Contractor's ability to perform any of its obligations hereunder; and (d) to its knowledge, other than to the extent disclosed in the Environmental Study, there are no Hazardous Substances located on the Project Site.

12.5    Licensing.  Contractor represents that it is and shall for the duration of the Work be properly licensed in the State where the Project is located to perform the Work to the extent required by Applicable Laws, and that all architects or engineers performing any of the Work will, for the duration of the Project, be duly licensed in the State where the Project is located if required by Applicable Law.

12.6    Corporate Benefit.  Each Party represents that the entry into and performance of this Agreement is in its commercial interest and to its corporate benefit and the competent corporate bodies have assessed and satisfied themselves as to the existence of such corporate benefit.

12.7    Adequate Resources.  Each Party represents that it has access to adequate resources, including financial resources, to perform all its obligations under this Agreement.

## ARTICLE 13
## TAXES

13.1    Contractor Taxes.  The Contract Price includes all corporate income tax assessable on income of Contractor, employee benefit taxes for all Work (whether performed by Contractor or any Subcontractor, and whether performed at the Project Site or elsewhere), taxes imposed upon the Work (excluding any Owner Supplied Equipment and Owner's Scope of Work), taxes imposed upon the wages of the Contractor's Personnel and similar assessments (all such foregoing taxes collectively, the "Contractor Taxes"), but specifically excludes sales and use and other similar taxes on the sale of the Facility.  Owner shall obtain (and provide copies to Contractor) exemption certificates for sales tax imposed on the purchase of Equipment, if obtainable in the State or other jurisdiction relating to the Project Site (if Contractor is assessed sales taxes for Equipment that Owner believed was exempt, Owner shall promptly reimburse Contractor for such taxes paid by Contractor).  If any Contractor Taxes are due and payable, Contractor shall timely pay or cause to be paid such Contractor Taxes.

13.2    Sales Tax. In addition to the Contract Price, Owner shall be responsible for all sales, use and similar taxes imposed upon the sale or transfer of the Facility under Applicable Laws and shall provide any appropriate waivers or exemptions.  The Parties will cooperate in effecting any exemption by signing all necessary certificates, as required by Applicable Law.  Owner shall be responsible and shall pay any and all other taxes, charges, and fees directly or indirectly associated with the Project Site, the Facility, the transactions described in this Agreement, and/or the Work including but not limited to sales, use, and excise taxes. If any of the foregoing taxes are due and payable, Owner shall timely pay or cause to be paid such taxes.

**ARTICLE 14**
**TITLE**

14.1    No Encumbrances.  Contractor warrants that, to the extent of timely payment by Owner to Contractor hereunder, (a) subject to its rights under Section 14.4, it will keep the Work, Equipment, Project and Project Site, as well as any property of Owner and its affiliates, free from liens and will ensure that none of its Subcontractors will file or permit the filing of liens thereon (excluding Pre-Lien Notices); and (b) legal title to and ownership of the Facility and Equipment shall be free and clear of any and all liens, claims, security interests or other encumbrances arising from the Work when title thereto passes to Owner. Contractor agrees to execute such ancillary documents required by Owner or any Financing Party to give effect to this provision.

14.2    Title to Equipment and the Facility.   Title to the Facility and all Equipment (other than Owner Supplied Equipment) and other materials shall vest in Owner upon the earlier of:  (a) incorporation into the Facility; or (b) as and to the extent Owner has paid for such Equipment (other than Owner Supplied Equipment) and materials; provided, however, that title to the Facility and all Equipment and other materials shall vest in Owner no later than the date of Substantial Completion.

14.3    Work Product.   Contractor shall retain all property rights (including copyright) in the Design Documents and in its standard drawing details, designs, specifications, databases, computer software and any other proprietary property; provided that, Owner shall at all times (including after any termination of this Agreement) have the right to retain copies thereof and, upon transfer of the Facility to Owner, is hereby granted a royalty-free, perpetual, irrevocable, non-transferable (except in connection with a sale of the Facility) license to use such Design Documents, drawings, designs, specifications and any other information of Contractor related to the Facility for the sole purpose of owning, operating, maintaining, repairing, financing, insuring and if so desired, selling, the Facility. Owner's use of any such documents or information for any purpose other than as set forth in this Agreement, or modification to such documents by anyone other than Contractor, shall be at the Owner's sole risk and without liability or legal exposure to Contractor, and Owner shall defend, indemnify and hold harmless Contractor for claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs,

54

experts' fees and reasonable attorneys' fees, resulting from or in connection with such use by Owner.  Upon termination of this Agreement pursuant to Sections 11.1 or 11.3, the license granted hereunder shall terminate; provided, however, if Owner pays the amount set forth in Section 11.1.3, the license shall be reinstated.

14.4    Nonconformity.  In the event of any defect in title or lien on the Equipment, Facility, or Project Site resulting from the action or inaction of Contractor's Personnel, Contractor shall immediately (a)  at its own cost, defend Owner's title to the Work, Facility, Project Site and any Equipment; and (b) remove and discharge any such lien, claim, security interest or other encumbrance from the Equipment, Facility, Work or the Project Site; provided that, if Contractor is unable to so immediately remove and discharge any such encumbrance, Contractor, at its own cost, may provide to Owner in lieu thereof a bond or other collateral, in form and substance reasonably satisfactory to Owner, to indemnify Owner against any loss resulting from such liens, claims, security interests or other encumbrances.

## ARTICLE 15
## INDEMNIFICATION

15.1    Contractor Indemnity. To the fullest extent allowed by law, Contractor agrees to indemnify, defend, and hold harmless Owner Indemnitees, from and against any and all claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs, experts' fees and reasonable attorney's fees, resulting from or in connection with the claims of third parties, whether arising in equity, at common law or by statute, or under the law of contracts, torts (including negligence and strict liability without regard to fault) or property,  and including those arising in favor of or brought by any of Contractor's Personnel (collectively, the "Owner Losses"), for  (a) physical damage to, or physical destruction of, property (including the Owner Supplied Equipment), or death of or bodily injury to any person; (b) (i) actual or alleged infringement or misappropriation by Contractor of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the Facility (excluding in relation to the (1) Owner Supplied Equipment and (2) design set provided by Owner to Contractor), including any deliverable or (ii) Contractor's violation of any third-party license to use intellectual property in connection with the Work (excluding in relation to the (1) Owner Supplied Equipment and (2) the design set provided by Owner to Contractor), including any deliverable; or (c) (i) any release of a Hazardous Substance transported onto the Project by Contractor or anyone for whom Contractor is responsible, (ii) any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation by Contractor or anyone for whom Contractor is responsible of any Applicable Law, or (iii) any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law for which Contractor is responsible, in all cases to the extent caused by negligence, gross negligence or willful misconduct of Contractor or Contractor's Personnel.  Notwithstanding the foregoing, nothing herein shall require Contractor to indemnify, hold harmless or defend an Owner Indemnitee for Owner Losses to the extent such Owner Losses resulted from the negligence, gross negligence or willful misconduct of any Owner Indemnitee.

15.2    Owner Indemnity.  To the fullest extent allowed by law, Owner agrees to indemnify, defend, and hold harmless Contractor Indemnitees from and against any and all claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs, experts' fees and reasonable attorney's fees, resulting from or in connection with the claims of third parties, whether arising in equity, at common law or by statute, or under the law of contracts, torts (including negligence and strict liability without regard to fault) or property, and including those arising in favor of or brought by any of Owner's personnel (collectively, the "Contractor Losses"), for (a) physical damage to, or physical destruction of, property, or death of or bodily injury to any person; (b) (i) actual or alleged infringement or misappropriation by Owner of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the Facility, including any deliverable or (ii) Owner's violation of any third-party license to use intellectual property in connection with the Work, including any deliverable; or (c)(i) any Hazardous Substance on the Project Site other than Hazardous Substances transported onto the Project Site by Contractor Indemnitees, (ii) any Unknown Site Conditions discovered at the Project Site, provided Contractor materially complies with its obligations under Section 3.15 with respect thereto and any Applicable Laws (if Contractor fails to materially comply, Owner's obligations hereunder may be reduced only to the extent of any prejudice to Owner directly caused by such failure); (iii) any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation by Owner or anyone for whom Owner is responsible of any Applicable Law, or (iv) any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law for which Owner is responsible, in all cases to the extent caused by negligence, gross negligence or willful misconduct of Owner or Owner's personnel.  Notwithstanding the foregoing, nothing herein shall require Owner to indemnify, hold harmless or defend a Contractor Indemnitee for Contractor Losses to the extent such Contractor Losses resulted from the negligence, gross negligence or willful misconduct of any Contractor Indemnitee.

15.3    Notices.  Each Party shall promptly, in the case of Owner, and immediately, in the case of Contractor, notify the other in writing of any claims from any third party that may be covered by the indemnities set forth in this Article 15 within ten (10) Business Days of receipt of notice of such claim from such third party.  The failure of the indemnified Party to promptly, in the case of Owner, and immediately, in the case of Contractor, notify the indemnifying Party will not relieve the indemnifying Party of any indemnification responsibility under this Article 15, except to the extent, if any, that such failure materially prejudices the ability of the indemnifying Party to defend such claim.

15.4    Defense of Claims.  The indemnifying Party under this Agreement ("Indemnitor") shall have the sole right to control the defense of any suit or proceeding with its choice of counsel based on any claim, demand, loss, damage, cause of action, suit or liability for which Indemnitor is responsible under any such indemnification.  Indemnitor shall not settle any claim without the prior written consent of the indemnified Party ("Indemnitee") if such settlement (a) does not include an irrevocable release of all claims against the Indemnitee; (b) materially diminishes any of Indemnitee's rights under this

Agreement or seeks to impose additional obligations on Indemnitee; (c) modifies the Facility or the operation or maintenance of the Facility; or (d) contains a stipulation or admission or acknowledgement of any liability or wrongdoing on the part of Indemnitee. Indemnitee shall give the Indemnitor such assistance as the Indemnitor may reasonably require in such defense, at Indemnitor's expense. Indemnitee shall have the right to be represented in such defense and settlement by counsel of its own choice at its own expense. If the Indemnitor fails to defend diligently such suit or proceeding, the Indemnitee may, in its reasonable discretion, either defend such suit or proceeding or settle the claim which is the basis thereof, without the consent of the Indemnitor, but with prior notice to the Indemnitor, without relieving the Indemnitor of its indemnification obligations hereunder and in each case the Indemnitor shall reimburse the Indemnitee for the settlement payment, expenses, court costs and reasonable attorneys' fees.

15.5    Survival of Indemnity Obligation. The Parties' indemnification obligations contained in this Article 15 shall survive the termination, cancellation or expiration of this Agreement until expiration of any applicable statute of limitations.

**ARTICLE 16**
**LIMITATIONS OF LIABILITY**

16.1    Waiver of Certain Damages. Neither Party nor any of their respective shareholders, members, partners, officers, directors, agents, affiliates, subcontractors, vendors or employees shall be liable to the other Party or its affiliates hereunder for any consequential damages (other than actual and direct damages) or indirect loss or damage arising out of this Agreement, whether such loss or damage arises in contract, tort (including negligence), strict liability, warranty, statute or otherwise, including loss of revenues, loss of profit, cost of capital, loss of goodwill, increased operating costs or any other special or incidental damages. For purposes of the foregoing, (i) Mechanical Completion Delay Liquidated Damages, and (ii) the Capacity Shortfall Liquidated Damages and (iii) the Early Termination Charge shall not be considered consequential, indirect, special, or incidental damages. The Parties further agree that the waivers and disclaimers set forth above shall survive the expiration or termination of this Agreement.

16.2    Limitations of Liability.

16.2.1 It is specifically understood and agreed that there shall be absolutely no personal liability on the part of any of the officers, directors, employees, shareholders or members of the Parties for the payment of any amounts due hereunder, or the performance of any obligations hereunder, and each Party shall look solely to the assets of the other Party for the satisfaction of each and every remedy of such Party in the event of any breach by the other Party. In furtherance of the foregoing, each Party agrees that it shall neither seek nor obtain, nor be entitled to seek or obtain, any deficiency or other judgment against any of the officers, directors, employees, shareholders or members of the other Party for any action or inaction on the part of any shareholder or member or its respective officers, employees, controlling persons, executives, directors, agents, authorized

57

representatives or affiliates, and such Party therefore releases such persons from such claims.

16.2.2 Notwithstanding anything to the contrary contained in this Agreement, in no event will the aggregate liability of Contractor to Owner under this Agreement, save as provided in this Section 16.2.2, exceed an amount equal to one hundred percent (100%) of the Contract Price (the "Liability Limitation").   The Liability Limitation shall not apply to or be reduced by:

(a)     any loss, liability or damage arising from or due to the fraud, fraudulent misrepresentation, gross negligence, or willful misconduct of Contractor;

(b)     Contractor's indemnification obligations under Section 15 of this Agreement; and

(c)     any payments received by Contractor or Owner from insurance companies under insurance coverage carried by Contractor pursuant to this Agreement.

For the avoidance of doubt, Contractor's aggregate liability for Mechanical Completion Delay Liquidated Damages, plus the amount of any Capacity Shortfall Liquidated Damages adjustment, shall be limited as set forth in Section 6.8.

16.2.3 Environmental Credits. Owner shall be solely responsible for soliciting and obtaining any Environmental Credits.  Contractor neither makes nor has made any representation or warranty to Owner as to the availability of any Environmental Credits. ANYTHING TO THE CONTRARY IN THIS AGREEMENT NOTWITHSTANDING, CONTRACTOR SHALL HAVE NO LIABILITY TO OWNER OR ANY OTHER PERSON FOR ANY FAILURE BY OWNER OR ANY OTHER PERSON TO OBTAIN ANY ENVIRONMENTAL CREDITS.

## ARTICLE 17
## INSURANCE REQUIREMENTS

17.1    Contractor's Insurance Coverage.

17.1.1 Term and Coverage.  Contractor shall procure and maintain, and shall cause each Subcontractor, except as provided below, to procure and to maintain, in full force and effect while this Agreement is in effect with responsible insurance providers (as evidenced by an AM Best rating of A-/VIII or better, and in the case of Builders All Risk coverage, A-/X or better) the following insurance in at least the minimum amounts specified below, as applicable.   The procurement and maintenance of such insurance shall be at Contractor's or Subcontractor's own expense.

58

(a) <u>Workers' Compensation and Employers Liability</u>.    Workers' compensation insurance in compliance with appropriate federal and state laws, and Employers Liability Insurance with limit of not less than $1,000,000 for bodily injury per occurrence and $1,000,000 in the aggregate, and $1,000,000 disease policy limit.

(b) <u>Commercial General Liability</u>.  Commercial general liability insurance, occurrence form, including, but not limited to, contractual coverage for all of the provisions of this Agreement, with limits of not less than $5,000,000 per occurrence and $5,000,000 in the aggregate, $5,000,000 Products and Completed Operations aggregate; $5,000,000 Personal Injury and Advertising injury per offense.

(c) <u>Automobile Liability</u>.  Automobile liability insurance, including vehicles owned, hired and non-owned, with a combined single limit of not less than $1,000,000 per accident.

(d) <u>Excess Liability</u>.  Excess liability insurance, Umbrella Form, in excess of the limits provided for in the above policies (except Workers' Compensation and Employers Liability insurance), with a limit of not less than $5,000,000.

(e) <u>Professional Liability</u>.    Professional Liability insurance providing "errors and omissions liability" or equivalent coverage for the work being performed, with limits of not less than $1,000,000 per claim for the duration of this contract and its warranties.  If Contractor subcontracts the design and engineering portion of the Work, then such design or engineering professional (or firm) shall procure and maintain the professional liability (errors & omissions) insurance required in lieu of Contractor proving such professional liability insurance. Notwithstanding the foregoing, Professional Liability insurance is only required for Subcontractors providing design-build professional services.

17.1.2 Any other insurance of Contractor's property that is legally required in any jurisdiction where any part of the work is performed.

17.1.3 <u>Evidence of Insurance</u>.  Owner and Financing Party shall be furnished with satisfactory evidence that the foregoing insurance is in effect, and Owner and Financing Party shall be notified thirty (30) days prior to the cancellation or material change of any such coverage.  Owner and Financing Party shall be named as an additional insured with respect to Contractor's activities under this Agreement under the coverages required by <u>Section 17.1.1.</u>

59

17.1.4 Contractor's insurance coverage shall be primary coverage without right of contribution from any other insurance carried by Owner or Financing Party and shall require the insurer to waive subrogation against Owner and Financing Party.

17.2     Owner Insurance Requirements.

17.2.1 Term and Coverage.  Owner, or Owner's ultimate parent, shall procure at its own expense and maintain in full force and effect, while this Agreement is in effect, (a) comprehensive general liability insurance for bodily injury and property damage, in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate; (b)  Products and Completed Operations $2,000,000 in the aggregate;  (c) Personal Injury and Advertising injury $1,000,000 per offense; (d) workers' compensation $2,000,000 in the aggregate; (e) automobile liability $2,000,000 per accident and (f) builder's risk as set forth in Section 17.2.2.  All policies procured by Owner, or Owner's ultimate parent, shall require the insurer to waive subrogation against Contractor.

17.2.2 Builders Risk.

(a)     On or prior to construction or erection of the Project, builder's all risk insurance for the benefit of Owner, Financing Party, and the Offtaker, Contractor and all Subcontractors or suppliers performing work at the Project Site.  The policy shall include Contractor and Subcontractors as additional insureds and Financing Party as sole loss payee via an industry standard lender loss payable endorsement approved by the Financing Party, and shall include provisions for non-vitiation.

The builders all risk policy shall cover all construction, erection or installation work including without limitation coverage for mechanical and electrical breakdown and all forms of testing and commissioning required to complete the Project plus resulting or ensuing damage arising out of design error or faulty workmanship, the perils of flood, earthquake, windstorm (named or unnamed), hail, lightning, strike, riot and civil commotion, vandalism and malicious mischief, subject to terms that are consistent with current industry practice insuring real and personal property of the Owner whether on or off the Project Site or the real property (including an off-site storage or warehouse location) and while in the course of inland transit, for an amount of not less than the full replacement cost value of the property and equipment at each location.

Sublimits are permitted with respect to the following perils:

60

(i)  off-site property, in an amount that is not less than the full replacement cost value of any property in storage (including earthquake coverage to the extent payments on such property are required prior to delivery to the Project Site);

(ii)  inland transit, in an amount that is not less than the full replacement cost value of any shipment (unless insured under a separate policy);

(iii)  earth movement (including earthquake), an amount not less than 50% of the Project's total insured values per occurrence and in the annual aggregate when such limits are specific to the Project, or such other amount required or agreed by the Owner and Financing Party;

(iv)  flood, an amount not less than 50% of the Project's total insured values per occurrence and in the annual aggregate for all flood zones, including Project property and equipment located in flood zone A or V when such limits are specific to the Project or such other amount required or agreed by the Owner and Financing Party;

(v)  windstorm (named or unnamed), full policy limits per occurrence and in the annual aggregate for the Project, or such other amount required or agreed by the Owner and Financing Party; and

(vi)  such other coverages customarily sub-limited and/or aggregated or restricted in reasonable amounts consistent with current industry practice with respect to similar risks and acceptable to the Owner and Financing Party, including without limitation, extra expense, expediting expense and ordinance or law coverage including the increased cost of construction to comply with the enforcement of any law that regulates the construction or repair of damaged property including the cost to demolish undamaged portions of the Project, debris removal, pollutant cleanup, professional fees, etc.

Such policy shall include: (a) an automatic reinstatement of limits following each loss (except for the perils of earthquake, windstorm, pollution cleanup, flood and other aggregated limits that typically apply under Section 1.1(a)(vi) above); (b) replacement cost valuation with no deduction for depreciation and no coinsurance clauses (or a waiver thereof) and (c) coverage for physical damage that is not covered by warranty or guaranty, to the extent normally insured.

All such policies may have per occurrence deductibles of not greater than $55,000 for all perils, except five percent (5%) of the value of the Project property damaged (which may be subject to a $100,000 minimum per occurrence), of the Project for earth movement (including earthquake), windstorm and flood and/or as otherwise required by or approved by the Owner and Financing Party. Owner shall use commercially reasonable efforts to obtain a maximum cap of $100,000 for earth movement (including earthquake), windstorm and flood.  All deductibles are payable by Owner; provided that with respect to physical loss or damage attributable to Contractor (i.e., caused by Contractor or its Subcontractors, or resulting from acts or omissions for which Contractor is responsible under this Agreement), Contractor shall pay any deductibles for such builder's all risk claims.

17.2.3 <u>Delay in Startup</u>.  If requested by Owner in writing, Contractor shall also maintain or cause to be maintained, with respect to the Project, delay in startup insurance following all perils required and insured above under <u>Section 1.1(a)</u>, including without limitation coverage for inland transit and off-site storage risks, mechanical and electrical breakdown including all forms of testing and commissioning required to complete the Project plus any delay caused by resulting or ensuing damage arising out of design error or faulty workmanship, with limits of not less than the projected equivalent of twelve (12) months of gross revenues, less non-continuing expenses. Contractor shall be entitled to a Change Order for the additional costs incurred to comply with such an Owner request, such additional costs to be pre-agreed between the Parties, properly vouched, and solely a pass-through cost with no margin for Contractor. If coverage is subject to an indemnification period, such period shall not be less than twelve (12) months. Subject to commercial availability and a requirement of the Owner and Financing Party, contingent delay in startup shall also be included with respect to key suppliers and customers with a limit acceptable to the Owner and Financing Party. To the extent inland transit coverage is provided under a policy separate from the builders all-risk policy, such policy shall provide delay in startup insurance with a loss limit and associated indemnity period equivalent to the loss of gross revenues less non-continuing expenses for the longest period of interruption or delay reasonably expected to occur, to the extent available on commercially reasonable terms. The deductible or waiting period shall not exceed thirty (30) days.

17.2.4 <u>Evidence of Insurance</u>.  Contractor shall be furnished with satisfactory evidence that the foregoing insurance is in effect within ten (10) Business Days of issuance of the Notice to Proceed, and Contractor shall be notified thirty (30) days prior to the cancellation or material change of any such coverage.  Contractor shall be named as an additional insured under the coverages required by <u>Sections 17.2.1</u> and <u>17.2.2</u>.

17.2.5 Owner's insurance coverage shall be primary coverage without right of contribution from any other insurance carried by Contractor.  Insurance maintained

by Contractor is for the exclusive benefit of Contractor and shall not inure to the benefit of Owner.  All policies procured by Owner shall require the insurer to waive subrogation against Contractor.

## ARTICLE 18
## RELATIONSHIP OF THE PARTIES

18.1    Contractor is an independent contractor and this Agreement is not, and shall not be construed as, an agreement of partnership, joint venture or employment between Owner and Contractor or between Owner and any of Contractor's Personnel.  The equipment and personnel used by Contractor in performing its obligations under this Agreement shall at all times be under the sole and exclusive control of Contractor.  Contractor shall not create any obligation for Owner, assume any responsibility for Owner or attempt to bind Owner in any way except as expressly permitted herein.  Contractor shall not, in any manner, represent that it is an agent of Owner or associated or affiliated with Owner in any capacity other than as an independent contractor.  Contractor is not authorized to enter into any contract with any person or entity on behalf of Owner and shall not represent itself as being so authorized.

## ARTICLE 19
## DISPUTE RESOLUTION

19.1    Procedure. If representatives of the Parties are unable to resolve a dispute, controversy or claim arising out of or relating to this Agreement or any breach, termination or invalidity hereof (a "Dispute") within ten (10) Business Days after one Party's receipt of notice of such Dispute from the other Party, then each Party shall immediately designate a senior executive with authority to resolve the Dispute.  If the senior executives do not agree upon a resolution of the Dispute within twenty (20) Business Days after the referral to them, either Party by notice to the other Party may submit the Dispute to arbitration as provided in Section 19.2.

19.2    Binding Arbitration.

19.2.1 Any Dispute arising out of or relating to this Agreement that is not resolved in accordance with Section 19.1 shall be submitted to binding arbitration administered by the American Arbitration Association in accordance with its Construction Industry Rules (the "Rules").  The arbitration shall be held in the city of Boston, Massachusetts, which shall be considered the seat of the arbitration.  The Parties will attempt to agree on an arbitrator, failing which the arbitrator will be selected by the Rules.  The arbitrator(s) shall be attorneys actively practicing in the area of construction law.  Discovery shall conclude within 90 days of the appointment of the arbitrator; each party shall be limited to a maximum of three (3) depositions and collection of documents from no more than five (5) custodians per side.

19.2.2 The award shall be made within eight (8) months following the appointment of the arbitrator and the arbitrator shall agree to comply with this schedule before accepting appointment.  The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute.  The award of the arbitrator(s) shall be accompanied by a reasoned decision.  The parties agree that failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witnesses.  In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award.  Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.  The award shall be final and binding on the Parties and judgment upon the award may be entered in a court of competent jurisdiction.  Owner and Contractor each consent to the nonexclusive jurisdiction of, and to the laying of venue in, the U.S. District Court in Maine, to confirm and enforce the award.  All procedural aspects of this Agreement to arbitrate, including the construction and interpretation of this Agreement to arbitrate, the scope of the arbitrable issues, allegations of waiver, delay or defenses as to arbitrability, and the rules governing the conduct of the arbitration, to the extent not governed by the Rules, shall be governed by and construed pursuant to the United States Arbitration Act, 9 U.S.C. §§1-16.

19.2.3 The costs and expenses of the arbitration (excluding attorneys' fees) shall be borne equally by the Parties, and (other than in connection with the enforcement of indemnities pursuant to Article 19, in which event the applicable indemnifying Party shall pay such fees in accordance with such provisions) each Party shall bear the fees, costs and expenses of its own attorneys, regardless of the outcome of the arbitration.

19.2.4 Applicable Law; Limitation on Arbitrators' Authority.  In deciding the substance of any Dispute, the arbitrators shall apply the substantive laws of the state in which the Facility is located; provided that, the arbitrators shall have no authority to compel specific performance of this Agreement or, except to the extent included in a Party's damages, in any liquidated damages or in any third party claim for which indemnification is provided hereunder, to award punitive or consequential damages under any circumstances (whether exemplary damages, treble damages, or any other penalty or punitive type of damages) regardless of whether such damages may be available under law.  Without limitation on the Parties' indemnification obligations hereunder, the Parties hereby waive their right, if any, to recover punitive damages in connection with any such claims, disputes or disagreements, regardless of whether any such claims, disputes or disagreements arise under the law of contracts, torts (including negligence of every kind and strict liability without fault), property, or at common law or in equity or otherwise.  The arbitrators shall certify in their award that they have faithfully applied the terms and conditions of this Agreement and that no part of their award includes any amount for consequential, exemplary or punitive damages prohibited as aforesaid.  To the fullest extent permitted by law, the

64

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CEB404DD06B7

arbitration proceeding and the arbitrators' award shall be maintained in confidence by the Parties.

19.2.5 <u>Judicial Relief</u>.  Either Party may petition a court of appropriate jurisdiction for non-monetary relief relating to any claim of breach of this Agreement in order to prevent undue hardship relating to any such claimed breach pending the appointment of an arbitration panel as described in <u>Section 19.2.1</u>.

19.2.6 <u>Continuation of Services</u>.  Pending final resolution of any Dispute, whether or not submitted to arbitration hereunder, the Parties shall continue to fulfill their obligations hereunder.

19.2.7 <u>Incorporation and Consolidation</u>.  Contractor shall incorporate the provisions of this <u>Article 19</u> into its agreements with any Subcontractor so that all Subcontractors shall also be bound to this Dispute resolution procedure.  Either Party shall have the right, but not the obligation, to consolidate all related Disputes, whether involving Owner, Subcontractor and/or any third parties, into a single consolidated arbitration or other proceeding.

## ARTICLE 20
## NOTICES

20.1    All notices permitted or required to be given under this Agreement shall be in writing and shall be deemed duly given when sent by overnight courier, by personal delivery or upon delivery or refusal thereof if notice is deposited in the mail, postage prepaid, certified, return receipt requested.  All notices shall be delivered or sent to the Parties at the respective addresses set forth below:

| | |
|---|---|
| Owner: | C/O BNRG Maine LLC |
| | 622 Congress Street, Suite 202, |
| | Portland, ME 04101 |
| | Attention: Adam Farkes |
| | Email:  afarkes@bnrg.ie |
| | |
| With a copy to: | Richard Jackson |
| | Unit 1B, 3 Custom House Plaza, |
| | Harbourmaster Place, |
| | Dublin 1, D01VY76 |
| | Ireland |
| | Email: |

65

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

Contractor:           iSun Industrial LLC
400 Avenue D, Suite 10,
Williston, VT 05495
Attention: Frederick (Kip) Myrick
Email: kip@isunenergy.com

With a copy to:      Tylor Thibault
400 Avenue D, Suite 10,
Williston, VT 05495
Email: tylor@isunenergy.com

**ARTICLE 21**
**GENERAL PROVISIONS**

21.1    <u>Amendments</u>. No amendments or modifications of this Agreement shall be valid unless evidenced in writing and signed by duly authorized representatives of both Parties.

21.2    <u>Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Any purported assignment in contravention of this <u>Section 21.2</u> shall be void.  Except as set forth below, neither Party may assign, pledge or otherwise transfer this Agreement or any right or obligation under this Agreement without first obtaining the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Without Contractor's consent, the Owner may (i) collaterally assign this Agreement to one or more Financing Parties and, in connection with the exercise of remedies pursuant to any such permitted collateral assignment, such Financing Party may complete a further assignment of the Owner's rights and obligations under this Agreement, and (ii) assign all of its rights and obligations under this Agreement to a successor owner of the Project.  No assignment permitted under this Agreement shall relieve the assigning Party of its obligations hereunder except as otherwise agreed by the other Party.

21.3    <u>No Waiver</u>. No waiver of any of the terms and conditions of this Agreement shall be effective unless in writing and signed by the Party against whom such waiver is sought to be enforced.  Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.  The failure of a Party to insist, in any instance, on the strict performance of any of the terms and conditions hereof shall not be construed as a waiver of such Party's right in the future to insist on such strict performance.

21.4    <u>Survival</u>. Any provisions necessary to give effect to the intent of the Parties hereunder after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement.

66

21.5    Rights and Remedies. Except where this Agreement expressly provides to the contrary, the rights and remedies contained in this Agreement are cumulative and not exclusive of any rights and remedies provided by law or equity.

21.6    Severability. If and for so long as any provision or portion of any provision of this Agreement shall be deemed to be judged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this Agreement except only so far as shall be necessary to give effect to the installation of such invalidity, and any such invalid provision shall be deemed severed from this Agreement without affecting the validity of the balance of this Agreement.

21.7    Compliance with Laws. In performance of their respective obligations under this Agreement, each Party agrees to comply with all Applicable Laws, statutes, rules, regulations, judgments, decrees, injunctions, writs and orders, and all interpretations thereof, of all Government Authorities having jurisdiction over such Party.

21.8    Governing Law; Jurisdiction; Waiver of Jury Trial.

21.8.1 This Agreement is made and shall be interpreted and enforced in accordance with the laws of the State where the Facility is located.  The Parties hereby consent and submit to the personal jurisdiction of the courts in the State where the Facility is located.

21.8.2 EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION.  EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

21.9    Counterpart Execution. The Parties may execute this Agreement in counterparts, which shall, in the aggregate, when signed by both Parties constitute one and the same instrument; and, thereafter, each counterpart shall be deemed an original instrument as against any Party who has signed it. Counterparts may be executed by electronic signature complying with the U.S. federal ESIGN Act of 2000, which shall be

considered as an original signature for all purposes and shall have the same force and effect as an original signature. Counterparts may be delivered via facsimile or electronic mail (including pdf) and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

21.10 <u>Confidentiality</u>. The Parties will make best efforts to safeguard confidential information against disclosure by employing the same means to protect such information as that Party uses to protect its own non-public, confidential or proprietary information, any information supplied to it by the other Party and designated in writing as confidential or which by its nature can reasonably be inferred to be confidential, but in no event less than commercially reasonable means. The Parties shall make individuals within their organization, to whom confidential information is disclosed, aware of this confidentiality provision and shall cause such persons to abide by the agreements herein set forth. The provisions of this <u>Section 21.10</u> shall not apply to information within any one of the following categories: (a) information which was in the public domain prior to a Party's receipt thereof or which subsequently becomes part of the public domain by publication or otherwise except by the receiving Party's wrongful act; (b) information which the receiving Party can show was in the receiving Party's possession prior to its receipt thereof through no breach of any confidentiality obligation; (c) information received by a Party from a third party which did not have a confidentiality obligation with respect thereto; or (d) information the disclosure of which is required by Applicable Law or is necessary or appropriate to disclose to a Governmental Authority having jurisdiction over the Parties.

21.11 <u>Financing Assistance</u>.

21.11.1    Contractor shall cooperate with any Financing efforts of Owner, at Owner's sole cost and expense (this applies to <u>Sections 21.11.1</u> and <u>21.11.2</u>), including by providing reasonable assistance to Owner, the Financing Parties and the Project insurers.

21.11.2    In connection with such cooperation with Financing efforts, Contractor agrees that that it shall execute and deliver such further instruments and documents, including notices, assignments, acknowledgements, consents and related instruments that may be reasonably required in order to effectuate the purposes or intent of this Agreement, including to facilitate any Financing assignments. Contractor shall cooperate with Owner's efforts in obtaining, maintaining and administering Financing (including any refinancing thereof) on a non-recourse (or other) basis for the Facility and shall procure and/or execute such documents (including consents, certificates and legal opinions from counsel chosen by Contractor and reasonably acceptable to Owner) and do such other things (including providing access to Work locations) as Owner or the Financing Parties may reasonably request (and upon terms and conditions that are customary for similar types of Financing) in connection therewith.

21.11.3    If required by the Financing Parties, Contractor agrees that it shall enter into a direct agreement between the Collateral Agent and Contractor upon

request by Owner to do so, on terms reasonably required by the Financing Parties, including terms (i) acknowledging the Collateral Agent's interests and step-in rights, and providing that Contractor's rights to terminate this Agreement are subject to the Financing Parties' cure rights; (ii) providing for payment of amounts payable by Contractor to Owner under this Agreement directly to accounts maintained by the Collateral Agent and/or the Financing Parties; and/or (iii) under which Contractor agrees not to enter into amendments, modifications or supplements to this Agreement without the consent of the Financing Parties. For purposes of this Section 21.11, "Collateral Agent" shall mean the person appointed by the Financing Parties to hold such collateral as Owner may pledge to the Financing Parties (including this Agreement, the Work and the Facility) in connection with the Financing of the Project.

21.12 Public Communication. Neither Party shall publish or release any Public Communication(s) without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), provided that the foregoing shall not restrict disclosures permitted in accordance with Section 21.10. For the purposes of this Section 21.12, "Public Communication(s)" shall include any publicity, press release or public announcements or public relations materials of any kind relating to the Project generally, the existence of this Agreement, the contents hereof or the transactions contemplated hereby.

21.13 No Confidentiality Regarding Tax Structure or Treatment. Notwithstanding anything to the contrary set forth herein or in any other agreement to which the Parties are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to the transaction, shall not apply to the U.S. federal tax structure or U.S. federal tax treatment of the transaction, and each Party (and any employee, representative or agent of any Party hereto) may disclose to any and all persons, without limitation of any kind, the U.S. federal tax structure and U.S. federal tax treatment of the transaction. The preceding sentence is intended to cause the transaction not to be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Code and shall be construed in a manner consistent with such purpose. In addition, each Party acknowledges that it has no proprietary or exclusive rights to the tax structure of the transaction or any tax matter or tax idea related to the transaction.

21.14 Exclusivity. During the term of this Agreement, Owner agrees that it shall not solicit or enter into any other contracts relating to the provision of solar energy generation system services that are provided under this Agreement for the Project Site, including any contracts relating to the construction or equipment procurement of any solar generation system at the Project Site.

21.15 Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the Project, and merges and supersedes all prior and contemporaneous agreements, commitments, representations, writings and discussions, whether written or oral, between them.

69

21.16  <u>Incorporation of Recitals</u>. The Recitals are incorporated herein by reference and form a part of this Agreement.

21.17 Novation<u> of Contracts</u>.  Upon Owner's request, Owner will enter into a novation agreement with Contractor to assign the contracts for relevant supplies and equipment, including Owner Supplied Equipment, to be used pursuant to this Agreement.  In exchange for entering into such a novation agreement with Owner, Contractor will charge Owner a fee of three (3) per cent of the value of the aforementioned contracts.  For the avoidance of doubt, the definition of "Owner Supplied Equipment" shall be updated upon novation of the relevant contracts.

## ARTICLE 22
## ANTI-CORRUPTION

22.1   Neither the Contractor nor its Associated Persons shall authorize, promise, offer, provide, accept or agree to offer or give, directly or indirectly, any payment, gift or other advantage with respect to any activities undertaken relating to this Agreement, or any other activity carried out for or on behalf of the Client which,

22.1.1  is intended to, or does, influence any person to act, or reward any person for acting, in breach of an expectation of good faith, impartiality or trust, or which it would otherwise be improper for the recipient to accept; or

22.1.2  is made to or for a Public Official, or to another person at the request of a Public Official, or to any person while knowing or being aware of a high probability that all or a portion of the payment, gift, or other advantage will be offered or given to a Public Official, with the intention of influencing any act or decision of a Public Official in their official capacity, inducing a Public Official to use their influence to affect any act or decision of a government entity, or securing any other improper advantage.

22.2   Neither the Contractor nor its Associated Persons shall otherwise act in a manner contrary to any Anti-Bribery Laws, to which either the Client, the Contractor, or the Contractor's Associated Person is subject.

22.3   The Contractor shall:

22.3.1  maintain sufficient policies and procedures to ensure compliance with this Article 22 and all applicable Anti-Bribery Laws;

22.3.2  notify Client in writing if it becomes aware of any breach of this Article 22, or has reason to believe that it or any of its Associated Persons has

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CFR404DD06B7

received a request or demand, the acceptance of which would be contrary to this Article 22;

22.3.3 notify Client in writing if a Public Official becomes an officer or employee of the Contractor or any of its Associated Persons, or acquires a direct or indirect interest in the Contractor or any of its Associated Persons and the Contractor warrants that neither it, nor any of its Associated Persons, has any Public Officials as direct or indirect owners, officers or employees at the date of this Agreement; And

22.3.4 notify Client in writing if it or any of its Associated Persons are the subject of any police, judicial or regulatory investigation or proceedings in relation to any suspected breach of any Anti-Bribery Laws.

22.4    The Contractor shall ensure that any Associated Person who is performing services in connection with this Agreement does so only on the basis of a written contract which imposes on and secures from such person terms equivalent to those imposed on the Contractor in this Article 22. The Contractor shall be responsible for the observance and performance by such persons of the obligations under this Article 22 and shall be directly liable to Client for any breach by such persons of any of the provisions of this Article 22.

22.5    The Contractor shall provide reasonable assistance and cooperation to Client in relation to any investigation or enquiry by Client into any suspected breach of Anti-Bribery Laws, or to enable Client to perform any activity required by any government, agency or authority in relation to any suspected breach of Anti-Bribery Laws, whether during the term of this Agreement or up to six years after its termination.

22.6    The Contractor shall, on request, certify to Client in writing, compliance with this Article 22 by the Contractor and its Associated Persons. The Contractor shall provide such supporting evidence of compliance as Client may reasonably request.

22.7    The Contractor and any third-party service providers with whom they engage confirms that it will take all reasonable steps to ensure compliance with all applicable money laundering and terrorist financing laws and regulations or any similar rules and regulations in the jurisdictions where they operate.

22.8    Upon request of Client, the Contractor agrees to provide reasonable assistance as may be necessary to procure any documentation that may be required in order to comply with relevant regulatory requests.

**ARTICLE 23**
**MODERN SLAVERY AND TAX EVASION CLAUSE**

71

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CEB404DD06B7

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

23.1 Contractor hereby represents, warrants and undertakes to Client as follows:

23.1.1 it will not engage in any activity, practice or conduct which would constitute tax evasion or tax evasion facilitation under applicable laws and regulations from time to time in force;

23.1.2 it will comply with all applicable anti-slavery and human trafficking laws and regulations from time to time in force, and will ensure its staff and staff of any of its service providers are paid at least the applicable living wage.

23.2 Contractor will notify Client immediately if at any time the foregoing representations and warranties shall not be true and correct.

23.3 Contractor shall on request certify to Client in writing compliance with any or all of the foregoing clauses and shall provide such supporting evidence of compliance as Client may reasonably request.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

iSun Industrial, LLC

By: *Fredrick Myrick*
36EFFFD35F3F430...

Name: Fredrick Myrick

Title: EVP

27 December 2022

Signature Page to Engineering, Procurement and Construction Agreement

DocuSign Envelope ID: 763902C6-2A16-45A5-AA71-CEB404DD06B7

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

BD Solar Norridgewock, LLC

DocuSigned by:

By: _ROBERT CLEAVES_____
434DAFC842ED45C...

Name: ROBERT CLEAVES_____

Title: Manager_____
27 December 2022

Signature Page to Engineering, Procurement and Construction Agreement

## **Exhibit B**

Engineering, Procurement and Construction Agreement (BD Solar North Anson, LLC)

ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

BY AND BETWEEN

BD Solar North Anson, LLC

AND

ISUN INDUSTRIAL LLC

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

## Table of Contents

RECITALS ................................................................................................................................3

**ARTICLE 1 DEFINITIONS** ..................................................................................................3

**ARTICLE 2 CONDITIONS PRECEDENT TO THE AGREEMENT** ................................. 15

**ARTICLE 3 CONTRACTOR WORK AND OTHER OBLIGATIONS** ............................... 16

**ARTICLE 4 OWNER OBLIGATIONS** ................................................................................ 21

**ARTICLE 5 COMMISSIONING TESTS** ............................................................................. 24

**ARTICLE 6 COMPLETION OF THE WORK** .................................................................... 25

**ARTICLE 7 CONTRACT PRICE AND PAYMENT** ........................................................... 31

**ARTICLE 8 CHANGE ORDERS** ........................................................................................ 34

**ARTICLE 9 FORCE MAJEURE AND OWNER CAUSED DELAY** ................................... 36

**ARTICLE 10 WARRANTIES** ............................................................................................. 37

**ARTICLE 11 DEFAULT; TERMINATION** ........................................................................ 40

**ARTICLE 12 REPRESENTATIONS AND WARRANTIES** ............................................... 45

**ARTICLE 13 TAXES** .......................................................................................................... 46

**ARTICLE 14 TITLE** ........................................................................................................... 47

**ARTICLE 15 INDEMNIFICATION** ................................................................................... 48

**ARTICLE 16 LIMITATIONS OF LIABILITY** .................................................................. 50

**ARTICLE 17 INSURANCE REQUIREMENTS** ................................................................. 51

**ARTICLE 18 RELATIONSHIP OF THE PARTIES** .......................................................... 55

**ARTICLE 19 DISPUTE RESOLUTIONS** .......................................................................... 56

**ARTICLE 20 NOTICES** ...................................................................................................... 58

**ARTICLE 21 GENERAL PROVISIONS** ............................................................................ 58

**APPENDIX A CONTRACTOR'S SCOPE OF WORK** ....................................................... 65

**APPENDIX B OWNER'S SCOPE OF WORK** ................................................................... 66

**EXHIBIT A  Facility Specifications** .................................................................................. 67

**EXHIBIT B  CONTRACTOR SCHEDULE AND SCHEDULE OF MILESTONES** ........... 68

**EXHIBIT C  PROJECT SITE DESCRIPTION** .................................................................. 69

**EXHIBIT D  COMMISSIONING AND COMMISSIONING TEST** .................................... 70

**EXHIBIT E  FORM OF SUBSTANTIAL COMPLETION** ................................................. 71

**EXHIBIT F  FORM OF FINAL COMPLETION** ................................................................ 72

**EXHIBIT G  CONTRACT PRICE** ..................................................................................... 73

**EXHIBIT H  SCHEDULE OF DELIVERABLES** ............................................................... 74

**EXHIBIT I  ACCEPTANCE DOCUMENTATION LIST** ................................................... 75

1

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DEBD831CD

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

**EXHIBIT J  FORM OF CHANGE ORDER** ........................................................................... **76**

**EXHIBIT K  FORM OF PAYMENT APPLICATION** ........................................................... **77**

**EXHIBIT L  CAPACITY AND RELIABILITY TEST PROCEDURE** ............................. **78**

**EXHIBIT M  LIEN WAIVERS** ............................................................................................ **79**

**EXHIBIT N  FORM OF OWNER PARENT GUARANTY** ............................................... **80**

**EXHIBIT O  FORM OF MECHANICAL COMPLETION** ............................................... **81**

**EXHIBIT P  FORM OF PERFORMANCE AND PAYMENT BOND** ............................. **82**

**EXHIBIT Q  CONDITIONAL USE PERMIT AND ENVIRONMENTAL STUDY REQUIREMENTS** ....... **83**

**EXHIBIT R  DOCUMENTED SITE CONDITIONS** ....................................................... **84**

**EXHIBIT S FORM OF LIMITED NOTICE TO PROCEED** ........................................... **85**

**Exhibit T Key Suppliers** ............................................................................. ...........................**86**

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DEBD831CD

**ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT**

This Engineering, Procurement and Construction Agreement (this "Agreement") is made and entered into and effective as of December 27, 2022 (the "Effective Date"), by and between BD Solar North Anson, LLC, a limited liability company ("Owner"), and iSun Industrial LLC, a limited liability company ("Contractor").  Owner and Contractor are sometimes referred to individually herein as a "Party" and collectively as the "Parties".

**RECITALS**

WHEREAS, Owner will develop and own an onsite solar photovoltaic electric generation Facility (as defined below) more fully described in Exhibit A, to be located on that portion of the property located in Cumberland County Maine, as illustrated on Exhibit C;

WHEREAS, Contractor provides engineering, procurement and construction services in connection with the design, installation, and commissioning of solar photovoltaic electric generation systems;

WHEREAS, Owner desires to appoint Contractor to provide engineering, procurement and construction services in connection with the design, installation and commissioning of the Facility in accordance with the terms hereof.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, and for the mutual covenants contained herein, the Parties hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1     Definitions.  In addition to terms defined elsewhere in this Agreement, the Parties agree that capitalized terms used in this Agreement, unless otherwise defined herein, shall have the meanings assigned below:

"Agreement" means this Engineering, Procurement and Construction Agreement, including all Appendices and Exhibits hereto, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof.

"Anti-Bribery Laws" means all applicable anti-bribery and anti-corruption laws, rules or regulations, as may be amended from time to time

"Applicable Laws" means all laws, statutes, rules, regulations, interpretations, ordinances, judgments, decrees, injunctions, writs, tariffs and orders of any Governmental Authority having jurisdiction over the Parties insofar as it relates to the design and construction of the Facility, the Project, the Project Site and the performance of the Work, as may be in effect as of the Effective Date.

3

"Applicable Permits" means, as to the Facility, all waivers, franchises, variances, permits, authorizations, entitlements, licenses or orders of or from any federal, state, local, county, municipal, regional, environmental or other governmental body, instrumentality, agency, authority, court or other body required to be obtained or maintained in connection with construction and installation of the Facility or performance of the Work.

"As-Builts" means an electronic version in native format of the Design Documents showing all changes made to the "issued for construction" drawings throughout construction and shall be prepared after completion of a given system and they describe the actual installed configuration of the executed Work, the Facility, all equipment and other appurtenances to the Facility, showing the exact as-built locations, sizes and details of the Facility as constructed.

"Associated Persons" means, in relation to the Contractor, a person who performs services for or on behalf of the Contractor in connection with the services provided to the Client under this Agreement, in any capacity and including, without limitation, employees, agents, subsidiaries, representatives and subcontractors of the Contractor;

"Authority Having Jurisdiction" or "AHJ."

"Business Day" means any calendar day, except Saturdays, Sundays, and national and local holidays on which commercial banks in Maine are authorized or required by Applicable Law to be closed.

"Capacity Cure Period" shall have the meaning set forth in Section 6.5.2.

"Capacity Guarantee" means Contractor's guarantee that the Facility will achieve the Facility Capacity.

"Capacity Shortfall Liquidated Damages" means the liquidated damages calculated pursuant to Section 6.5.3.

"Capacity Testing" means the testing prior to Substantial Completion of the Facility, as further described in Exhibit L.

"Change" means a change, modification, addition or deletion to or in the Design Documents, the Contract Price, the Work, the Owner Supplied Datasheets, the Facility Specifications or the Schedule of Work, as applicable.

"Change in Law" means (a) any adoption, rescission or change of Applicable Law, or in the judicial or administrative interpretation of any Applicable Law by a Governmental Authority, after the Effective Date, which is inconsistent or at variance with any Applicable Law in effect on the Effective Date and that adversely impacts the Work (including impact on the cost of Contractor's performance of the work or the time required to perform the Work); (b) the imposition after the Effective Date of any requirement for a new Applicable Permit

not required by Applicable Law as of the Effective Date or any changes to any existing Applicable Permit and/or the requirements under such existing Applicable Permit; or (c) the imposition after the Effective Date of any condition or requirement in either case by any Governmental Authority that adversely impacts the Work (including impact on the cost of Contractor's performance of the work or the time required to perform the Work), which condition or requirement was not required by such Governmental Authority as of the Effective Date and affects the issuance, renewal or extension of any Applicable Permit.

"Change Order" means a written document in a form substantially similar to that which is attached as Exhibit J, issued under this Agreement and signed by Owner and Contractor, which authorizes a Change, and which is incorporated into the Agreement herein by reference.

"Commission" or "Commissioning" means all commissioning, including performance of the Commissioning Tests, as set forth in Exhibit D.

"Commissioning Tests" shall mean the commissioning tests described in Exhibit D.

"Conditional Use Permit and Environmental Study Requirements" shall mean those requirements set forth in Exhibit Q.

"Consent to Energize" shall have the meaning set forth in Section 6.2.

"Construction Change Directive" means a written order prepared by Owner in the circumstances outlined in Section 8.1.1.

"Contract Documents" means this Agreement and all Exhibits and Schedules, reviewed Design Documents (as defined in Section 3.2.1), the Limited Notice to Proceed issued in accordance with Section 2.1, the Notice to Proceed issued in accordance with Section 2.2, Change Orders, Construction Change Directives not subject to a dispute and any written amendments to this Agreement executed by the Parties.

"Contractor Event of Default" shall have the meaning set forth in Section 11.2.1.

"Contractor Indemnitees" means Contractor and its affiliates, any Subcontractor of Contractor, and each of their respective officers, directors, shareholders, partners, employees, representatives and agents.

"Contractor Losses" shall have the meaning set forth in Section 15.2.

"Contractor's Direct Costs" shall mean, when referring to any portion of the Work, an amount equal to the sum of the reasonably incurred actual costs (including temporary and permanent materials, labor, services, supplies, rental, transportation and travel-related costs) incorporated or consumed in the course of carrying out such Work, and any other costs of any nature reasonably attributable to such Work, at Contractor's actual cost

5

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DEBD831CD

including all insurance and bonding, all to be reasonably verified. When determining Contractor's Direct Costs, (a) direct labor costs shall be calculated pursuant to the rates set forth in Appendix A; and (b) the cost of any Work carried out by Subcontractors shall be calculated at Contractor's actual cost broken down and provided in writing.

"Contractor's Personnel" means Contractor, its employees, agents and Subcontractors and its Subcontractor's employees, agents and subcontractors.

"Contractor's Permits" shall have the meaning set forth in Section 3.9.

"Contract Price" shall have the meaning provided in Section 7.1.

"COVID-19" means the coronavirus disease named as such by the World Health Organization.

"Critical Path" means core aspects of the Work including the installation of racking, the installation of modules, the installation of inverters, and the achievement of Mechanical Completion, Substantial Completion, and Final Completion, and any reference to "Critical Path activities" or similar shall be construed accordingly.

"DC" means direct current.

"Default Rate" means the lesser of three percent (3%) per annum, or the maximum rate of interest permissible under Applicable Laws.

"Defects" or "Defective Work" when applied to any Work means any Work that does not materially comply with the Facility Specifications.

"Demobilization Activities" shall have the meaning set forth in Section 11.1.2.

"Design Documents" means design documents for the Facility consisting of drawings, specifications, plans and other documents necessary to describe the Facility with respect to the civil engineering, structural, control, mechanical and electrical systems, as specified in the Scope of Work (as modified or supplemented by any Change Order).

"Documented Site Conditions" shall have the meaning set forth in Section 4.4.

"Early Termination Charge" shall have the meaning set forth in Section 11.1.3.

"Energize" or "Energization" means that the Facility or a part thereof is receiving or consuming back feed power past the medium voltage switchgear breaker.

"Environmental Credits" means any and all mandatory and voluntary federal, state or local renewable energy or emissions credits, carbon credits, rebates, subsidy, incentive payment or any other green tag, renewable energy, emissions reduction, depreciation, tax credit or other benefit, howsoever entitled, related to the environmental characteristics of

the Facility or the generation of energy therefrom, whether related to any renewable portfolio standard or other renewable energy purchase requirement or otherwise, whether existing as of the Effective Date or enacted thereafter, whether available to Owner as the host, producer or user of electricity output and whether administered by any Governmental Authority, utility, transmission and distribution provider (including regional interconnect, independent system operator or regional transmission operator) or any other similar entity or any voluntary regime.

"Environmental Study" means that certain study commissioned by Owner and included as Exhibit Q hereto.

"Equipment" means all photovoltaic modules, inverters, equipment, machinery, apparatus, materials, articles, components, raw materials, supplies, parts, systems, structures and any other equipment or items comprising or otherwise necessary or appropriate to be incorporated or integrated into the Facility, based on the design, engineering, construction, development, operation and maintenance of the Facility, in each case, based on the Facility Specifications and requirements provided herein.

"Equitable Adjustment" shall mean an adjustment in the Schedule of Work or Contract Price, as applicable, which accurately reflects any increase in Contractor's Direct Costs, and any increase in the time necessary to perform the Work, resulting from the changes triggering such adjustment, taking into account all factors which could reasonably increase Contractor's Direct Costs or time necessary to perform the Work, including, but not limited to: availability of materials, labor and other resources; fluctuations in material cost or labor rates; seasonal weather variations; shipping capacity; production delays; and demobilization and remobilization.

"Event of Delay" means (i) a Force Majeure Event, (ii) Change in Law, (iii) Owner Caused Delay, (iv) suspension of the work pursuant to Sections 11.3; (v) failure of the AHJ to issue construction permits within twenty (20) days of Contractor's request (except to the extent such failure is attributable to Contractor's Personnel), (vi) failure of the Interconnection Provider to approve the request for the interconnection of the system within fifteen (15) Business Days of Contractor's request for such approval (except to the extent such failure is attributable to Contractor's Personnel), (vii) failure of Owner to obtain Permission to Operate within ten (10) Business Days of Contractor's request for such authorization (except to the extent such failure is attributable to Contractor's Personnel); (viii) Unknown Site Conditions, (ix) Owner's failure to issue Notice to Proceed by the NTP Deadline; (x) Commissioning Tests or Capacity Testing are delayed by irradiance below the required levels as specified in Exhibit D and Exhibit L (as applicable); (xi) discovery of Hazardous Substances pursuant to Section 3.14; (xii) and (xiii) any other circumstance for which the terms of this Agreement specifically entitle Contractor to a Change Order.

"Existing Structures" means all structures existing at the Project Site at the time when the LNTP is issued including but not limited to buildings, roads, walls, tracks, gates, fences, and drainage systems.

"<u>Facility</u>" means the photovoltaic electric generating system consisting of photovoltaic modules, inverters, a data acquisition system and related electrical conduit, wiring, meters, machinery, parts, start-up spares, special maintenance tools, components, appliances, security fencing and equipment, interconnection and transmission equipment, the purpose of which is to produce solar energy, together with the interconnection facilities and related assets, constructed on the Project Site. The Facility shall meet the Facility Specifications.

"<u>Facility Capacity</u>" shall mean the capacity of the STC rated solar electric system (expressed in kilowatts DC) set forth in the title block of the reviewed Design Documents (as defined in <u>Section 3.2.1</u>).

"<u>Facility Specifications</u>" shall mean the specifications for the Facility as set forth in <u>Exhibit A</u>.

"<u>FC Holdback</u>" shall have the meaning set forth in <u>Section 7.7.1</u>.

"<u>Final Completion</u>" shall have the meaning set forth in <u>Section 6.7</u>.

"<u>Final Lien Waiver</u>" means an unconditional final lien and claim waiver and release in the form set forth in <u>Exhibit M</u> executed by Contractor or a Subcontractor, as applicable.

"<u>Final Punch List</u>" shall have the meaning set forth in <u>Section 6.6.2</u>.

"<u>Financing</u>" means any form of construction, interim, long-term debt, lease, tax-exempt, recourse, non-recourse, equity or other form of funding, or refinancing that Owner, or any affiliate of Owner, obtains or attempts to obtain any or all of the proceeds of which are to be used in connection with the Project and the payment of the costs to engineer, design, procure, and construct the Facility.

"<u>Financing Party</u>" means any and all lenders, security, note or bond holders, lien holders, investors, equity providers and other persons or entities providing Financing, or credit support for Financing, as selected by Owner, or any affiliate of Owner, and/or any trustee(s) or agent(s) acting in connection therewith and their respective successors and assigns.

"<u>Force Majeure Event</u>" means any event or circumstance that (a) prevents or delays the performance by a Party of its obligations hereunder; and (b) is not within the reasonable control, directly or indirectly, of the Party affected, but only if and to the extent that (i) such circumstance, despite the exercise of due diligence, cannot be prevented, avoided or removed by such Party directly or indirectly; (ii) such event or circumstance is not due to such Party's negligence or intentional misconduct; (iii) such Party has taken all reasonable precautions, due care and reasonable alternative measures to avoid the effect of such event or circumstance and to mitigate the consequences thereof; and (iv) such Party has given the other Party prompt notice describing such event or circumstance, the effect and expected duration thereof and the actions being taken in order to comply with this Agreement.

Subject to the foregoing conditions, Force Majeure Events may include: (A) war, riot, sabotage, armed conflict, trade blockades, embargoes, acts of a public enemy, terrorist acts or other civil disturbance; (B) extreme weather conditions or natural phenomena, including floods, explosions or fires arising from natural causes, earthquakes, hailstorms, tornados, typhoons, hurricanes, landslides, volcanic eruptions, range or forest fires and unsafe or hazardous conditions arising from such severe and unusual adverse weather conditions or natural phenomena (any weather related Site conditions not otherwise specified herein that significantly impacts or immobilizes equipment or crew operations, jeopardizes stormwater permit compliance or causes general safety issues shall be reasonably agreed between the Parties); (C) strikes, walkouts, lockouts or similar industrial or labor actions or disputes, other than strikes, walkouts, lockouts or similar industrial or labor actions or disputes by, and directed at, Contractor's Personnel; (D) epidemics; (E) COVID-19 or any impact to Contractor's performance of the Work arising out of or in connection with COVID-19; (F) in the case of Owner only, any disruption to supply chains; and (G) any communication, discussion, policy change, Change in Law by a federal agency of the United States of America in relation to tariffs on modules.  Force Majeure Events shall not include: (1) the inability to obtain labor, equipment or other materials for the Work (except to the extent such inability is caused by a Force Majeure Event); (2) equipment failures (except to the extent such failures are caused by a Force Majeure Event); (3) changes in market conditions; (4) a Party's failure to timely apply for Applicable Permits; or (5) failure to pay an amount due.

"Form of Final Completion" shall have the meaning set forth in Section 6.7.

"Form of Mechanical Completion" shall have the meaning set forth in Section 6.1.

"Form of Substantial Completion" shall have the meaning set forth in Section 6.4.

"Governmental Authority" means any international, federal, state, local or municipal government body; any governmental, quasi-governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power; or any court or governmental tribunal.

"Hazardous Substance" means any and all chemicals, constituents, contaminants, pollutants, materials, wastes and any other carcinogenic, corrosive, ignitable, radioactive, reactive, toxic or otherwise hazardous substances or mixtures (whether solids, liquids, gases), or any substances now or at any time subject to regulation, control, remediation or otherwise addressed as a hazardous substance under Applicable Laws, including those laws, regulations and policies relating to the discharge, emission, spill, release, or threatened release into the environment or relating to the disposal, distribution, manufacture, processing, storage, transport, treatment, transport, or other use of such substances.

"Initial Retainage" shall have the meaning set forth in Section 7.7.1.

9

"Independent Engineer" means the independent engineer designated by the Owner through written notice to Contractor. Unless otherwise designated, the Independent Engineer shall be Leidos Engineering, LLC.

"Interconnection Agreement" means the Level 4 Interconnection Agreement between Owner and Interconnection Provider.

"Interconnection Provider" means Central Maine Power Company a Maine corporation and transmission and distribution utility, existing under the laws of the State of Maine, whose electric distribution system the Facility will be interconnected pursuant to the terms of this Agreement and the Interconnection Agreement.

"Interim Punch List" shall have the meaning set forth in Section 6.6.1.

"Investment Price" means all amounts invested in connection with the Project by Owner as of the date of sale, plus eight percent (8%).

"Landowner" means the owner of the Project Site.

"LNTP" shall have the meaning set forth in Section 2.1.

"LNTP Work" shall have the meaning set forth in Section 2.1.

"MC Retainage" shall have the meaning set forth in Section 7.7.1.

"Mechanical Completion" shall have the meaning set forth in Section 6.1.

"Mechanical Completion Deadline" shall mean the date as identified on Exhibit B, as such date may be extended in accordance with the provisions of this Agreement.

"Mechanical Completion Delay Liquidated Damages" shall have the meaning set forth in Section 6.3.

"New Contract Price" has the meaning set forth in Exhibit G.

"Notice to Proceed" means the notice described in Section 2.2 to be issued by Owner. "NTP Deadline" shall have the meaning set forth in Section 2.2.

"Offtaker" as listed in Exhibit C

"Original Contract Price" has the meaning set forth in Exhibit G.

"Owner Caused Delay" means a delay in Contractor's performance of the Work, to the extent such delay is caused by either (a) Owner's delay in performing or failure to perform any covenant or obligation of Owner under this Agreement including, without limitation, failure of Owner to (i) provide sufficient access to the Project Site (ii) provide authorization

10

to commence, perform or complete the Work or any portion thereof  and (iii) timely review of Contractor's submittals and notices delivered in connection with this Agreement in accordance with the Schedule of Work, and if not specified therein, within the timeframe specified in such submittal or notice, and if not specified in the Schedule of Work or in such submittal or notice, within a reasonable time not to exceed ten (10) days; (b) any damage, or interference caused to the Work, or omission to act relating to the Work, which directly prevents Contractor from performing a material component or portion of the Work, which damage, interference, or omission to act is (i) caused by Owner, Offtaker, Landowner (in each case, to the extent such delay is not attributable to Contractor or its Subcontractors) or the Financing Party in connection with Contractor's performance of the Work, and (ii) resulting from the negligent acts or omissions or willful misconduct of Owner's personnel, Offtaker's personnel, Landowner's personnel or Financing Party's personnel, and (iii) in the case of any omission to act, is not the result of Contractor failing to communicate to Owner that it requires Owner to act in a particular manner; (c) the acts or omissions of Owner, Offtaker, Landowner, Interconnection Provider, the AHJ, Financing Party, Owner's consultants or contractors (other than Contractor's Personnel) or any other party acting on behalf of Owner or in furtherance of Owner's (and Financing Party's) obligations herein, in each instance that adversely affects the schedule, performance or cost of performing the Work or any other term and condition in this Agreement; (d) any failure by Owner to provide or delays in providing Owner Supplied Equipment or performing Owner's Scope of Work; (e) failure of Owner to replace any damaged or defective Owner Supplied Equipment; (f) failure to achieve the Capacity Guarantee to the extent caused by any Owner Supplied Equipment or Owner's Scope of Work; (g) any inaccuracies in the design set provided by Owner to Contractor (on which Contractor may rely); or (h) delay of the Interconnection Provider to perform the required work under the Interconnection Agreement necessary for Contractor to complete and interconnect the Facility; in each case, provided that Contractor's Personnel have not caused such delay and in respect of paragraph (h), provided that in accordance with the Contractor's scope of Work, Contractor's Personnel have made all reasonable efforts to mitigate any delays by the Interconnection Provider in the performance of the interconnection work and have provided progress reports to Owner regarding such interconnection work.

"Owner Event of Default" shall have the meaning set forth in Section 11.3.1.

"Owner Indemnitees" means Owner, each Financing Party and each of their respective officers, directors, shareholders, affiliates, partners, employees, representatives and agents.

"Owner Losses" shall have the meaning set forth in Section 15.1.

"Owner Parent Guaranty" means the parent guaranty provided by Owner in accordance with Section 7.6.

"Owner's Permits" shall have the meaning set forth in Section 4.5.

11

"Owner's Representative" means the representative designated as such by Owner as set forth in Article 20.

"Owner's Scope of Work" means the scope of work to be performed by Owner as described on Appendix B, or as otherwise expressly excluded from Contractor's Scope of Work.

"Owner's Storage Facility" means any storage facility supplied by the Owner.

"Owner Supplied Equipment" means the equipment set forth in Appendix B to be supplied by Owner to Contractor in accordance with the terms of this Agreement.

"Owner Supplied Datasheets" means the datasheets for certain Owner Supplied Equipment that are labelled as such and set forth in Appendix B.

"P & P Bond Expiration Date" has the meaning set forth in Section 7.8.

"Partial Lien Waiver" means a partial lien and claim waiver and release in the form set forth in Exhibit M executed by Contractor or a Subcontractor, as applicable.

"Payment Milestone" shall have the meaning set forth in Section 7.2 and Exhibit B.

"Performance and Payment Bond" shall have the meaning set forth in Section 7.8.

"Performance Ratio" has the meaning given to it in Exhibit G, L.

"Permission to Operate" means Owner has received authorization for the Facility to commence parallel operation from the Interconnection Provider.

"Power Purchase Agreement" means the agreement between Owner and Offtaker for the purchase of electricity generated by the Facility.

"Progress Payment" shall mean any payment made or to be made by Owner to Contractor that corresponds to a Payment Milestone.

"Pre-Lien Notice" means any preliminary lien notices under Applicable Law required to preserve the right to claim a lien for the Work performed hereunder.

"Project" means the entirety of the Work and the Facility that will result from the Work.

"Project Site" or "Site" shall be as described in Exhibit C.

"Prudent Industry Practices" means, with respect to Contractor's performance of its obligations under this Agreement, at a particular time, in the exercise of reasonable judgment in light of the facts known, or that should have been known, at the time a decision

was made, those practices, standards, designs, methods, means, techniques, equipment and acts that would require a person to: (a) perform its duties in good faith and as a reasonably prudent contractor and in compliance with Applicable Laws and Applicable Permits, (b) perform its duties in compliance with good utility practices and the requirements of this Agreement, (c) exercise such care, skill and diligence as a reasonably prudent business company of established reputation engaged in the solar energy business would exercise in the conduct of its business and for the advancement or protection of its own interests, (d) perform the duties in accordance with applicable solar energy industry standards, taking into account the requirements to qualify for the investment tax credit under Section 48 of the Internal Revenue Code, I use sufficient and properly trained and skilled personnel, and (f) use parts and supplies that meet the specifications set forth in the Scope of Work."

"Public Official" means:
(a) any officer, employee or representative of a government, whether national, federal or local, including employees of law enforcement or regulatory agencies;
(b) any individual in the legislative, administrative, military or judicial branches of government;
(c) any officer, employee or representative of a government-owned or government controlled commercial enterprise (such as state-owned enterprises, sovereign wealth funds and state-owned media organizations) or government-controlled charitable organization.
(d) any officer, employee or representative of a political party or any candidate for or holder of public office;
(e) employees and representatives of public international organizations (such as the World Bank or UN),
(f) any member of a royal family, and
(g) any other persons discharging a public function.

"Reliability Testing" means the testing prior to Substantial Completion of the Facility, as further described in Exhibit L.

"Replacement Contractor" means a person employed by Owner to finish the Work in the event Owner terminates the Agreement due to a Contractor Event of Default, as provided in Section 11.2.3.

"Retainage" shall have the meaning set forth in Section 7.7.1.

"Rules" shall have the meaning set forth in Section 19.2.1.

"SC Retainage" shall have the meaning set forth in Section 7.7.1.

"Schedule of Milestones" means the payment schedule set forth on Exhibit B.

"Schedule of Work" means the baseline schedule(s) for the Work that will support Contractor's achievement of the Work set forth in Exhibit B, as such schedule may be replaced pursuant to the terms of this Agreement.

13

"Scope of Work" shall mean the Work set forth in Appendix A attached hereto.

"Subcontract" means any contract with a Subcontractor with respect to performing any part of the Work or providing any Equipment in connection with the Work.

"Subcontractor" means each and every vendor, Supplier, materialmen or contractor, other than Contractor, performing any part of the Work or providing any Equipment in connection with the Work.

"Substantial Completion" shall have the meaning set forth in Section 6.4.

"Supplier" means each and every vendor supplying the key components or equipment with a contract value equal to or greater than Five Hundred Thousand Dollars ($500,000) (other than Owner Supplied Equipment) outlined in Exhibit I.

"Target Capacity" means the target capacity in kilowatts entitled 'Array Wattage (DC)' set forth in the Facility Specifications.

"Third Party Warranties" shall have the meaning set forth in Section 10.5.

"Turnover Package" means all applicable Design Documents, Owner's manuals, data sheets, plans, drawings, repair and maintenance records, warranties, quality control records, Commissioning and inspection reports, photo records, certifications, permits, As-Builts, training requirements, preventative maintenance requirements, spare parts recommendations and other documents required by this Agreement, that are reasonably necessary or useful to operate and maintain the Facility.

"Unknown Site Conditions" shall mean any latent, unknown or concealed physical or subsurface conditions which (i) differ materially from the Documented Site Conditions, (ii) are identified in a geotechnical report or other data obtained after the Effective Date that materially affect the expected means or methods of construction and (iii) are of an unusual nature, different materially from those ordinarily encountered (including without limitation, Hazardous Substances, man-made subsurface impediments, historical, archaeological and cultural artifacts, human remains, underground structures, storage tanks, liens or encumbrances, and threatened or endangered species) or generally recognized as inherent in work of the character provided for in the Agreement, which were not reasonably ascertainable from a visual Project Site inspection performed by Contractor, and which will substantively and materially affect the Contract Price or Schedule of Work. "Unknown Site Conditions" shall not include materials brought onto the Site by Contractor, Contractor's Personnel or anyone acting on their behalf, or any site condition identified in any environmental studies (including the Environmental Study), ground condition reports or title searches in existence before the execution of this Agreement and provided to Contractor.

"Warranty Bond" shall have the meaning set forth in Section 7.8.

14

"Work" means all necessary design, engineering, procurement, installation, construction, temporary works, testing, demonstration, start-up, Commissioning, and any other work, Equipment and services as described on Appendix A.

"Workmanship Warranty" shall have the meaning set forth in Section 10.1.

"Workmanship Warranty Period" shall have the meaning set forth in Section 10.2.

1.2     Rules of Usage. The Parties hereby agree that the following rules of usage shall apply to this Agreement unless otherwise required by the context or unless otherwise specified:

1.2.1     Singular and Plural.   Definitions set forth herein shall be equally applicable to the singular and plural forms of the terms defined.

1.2.2     Section References; Exhibits.    References to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits in this Agreement. All exhibits and schedules referenced herein are incorporated herein by reference.

1.2.3     Precedence. If there is any conflict between this Agreement, any Change Order, any exhibit, appendix, and any other document referenced in this Agreement, the documents shall be read in the following order of priority: (a) Change Orders and Construction Change Directives, read in reverse chronological order from latest to earliest; (b) this Agreement; and (c) exhibits and appendices to this Agreement; and (d) reviewed Design Documents (as defined in Section 3.2.1).   Any amendment shall have priority over the document it amends.   Unless stated otherwise, any amended document shall have the same order of priority stated in this Section 1.2.3.

1.2.4     Headings.  The headings, subheadings and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect the meaning, construction or effect of any provision of this Agreement.

1.2.5     References to Persons.  References to any person shall include such person and its successors and permitted assigns and transferees.

1.2.6     Grammatical Forms.  Where a word or phrase is specifically defined, other grammatical forms of such word or phrase have corresponding meanings; the words "herein," "hereunder," and "hereof" refer to the provisions of this Agreement as a whole and not to any particular portion or provision of this Agreement; "including" means "including, but not limited to," and other forms of the verb "to include" are to be interpreted similarly; references to "or" shall be deemed to be disjunctive but not necessarily exclusive (i.e., unless the context dictates otherwise, "or" shall be interpreted to mean "and/or" rather than "either/or"); and masculine includes feminine and neuter.

1.2.7     Days. References to "days" shall mean calendar days, unless the term "Business Days" is used.  If the time for performing an obligation under this

Agreement expires on a day that is not a Business Day, the time shall be extended until that time on the next Business Day.

       1.2.8   Time Zone. A reference to time is a reference to the time in effect at the Project Site on the relevant date.

# ARTICLE 2
# CONDITIONS PRECEDENT TO THE AGREEMENT

       2.1   Limited Notice to Proceed.  At any time prior to the date of issuance of the Notice to Proceed, Owner may issue a limited notice to proceed to Contractor in the form set forth in Exhibit S (the "LNTP") which shall authorize Contractor to commence performance of a specified portion of the Work (the "LNTP Work").  Any Work performed under the LNTP shall be performed pursuant to the terms and conditions of this Agreement and payment for Work performed under the LNTP shall be made in accordance with Article 7.  Contractor shall under no circumstance be entitled to payment of any amount in excess of the applicable Payment Milestone for the LNTP Work.  If any LNTP Work has not been achieved by Contractor before the Notice to Proceed is issued by Owner pursuant to Section 2.2, the applicable unperformed LNTP Work shall be deemed to be Work to be performed by Contractor after the date of issuance of the Notice to Proceed save that such non-performance shall not be considered an Event of Delay unless it is attributable to a Force Majeure Event.  Contractor represents and warrants that it has made sufficient allowance in the Schedule of Work and the Contract Price for the fact that Owner may not issue the Notice to Proceed until the NTP Deadline.

       2.2   Notice to Proceed.  Owner shall issue a written notice to proceed ("Notice to Proceed") to Contractor, which shall constitute Owner's authorization to Contractor to commence the Work, effective as of the date received by Contractor.  In the event Owner fails to issue a Notice to Proceed by the date set forth in Exhibit B (the "NTP Deadline"), such failure shall be considered an Event of Delay.  If Owner has not provided a Notice to Proceed by one hundred eighty (180) days from the Effective Date, then Contractor may terminate this Agreement by delivery of written notice to Owner and such termination shall be deemed a termination for convenience in accordance with the provisions of Section 11.1.

       2.3   Commencement of Work. Contractor shall commence performance of the Work (other than the LNTP Work and any other Work which this Agreement expressly permits to be performed prior to the Notice to Proceed) following the issuance by Owner of a Notice to Proceed.  Prior to or concurrently with issuance of the Notice to Proceed, Owner shall provide all insurance certificates required by it pursuant to Article 17.  Contractor shall provide the following within five (5) Business Days of issuance of the Notice to Proceed:

       2.3.1   Insurance.  Contractor shall have provided to Owner all insurance certificates required to be provided to Owner pursuant to Article 17.

       2.3.2   Payment Security.  Contractor shall have provided Owner with the Performance and Payment Bond in accordance with Section 7.8 of this Agreement.

       2.4   Fixed Price Project. The Parties agree that this Agreement is a fixed price contract and Contractor's obligation is to provide Owner with an operational Facility in accordance with the Scope of Work for the Contract Price, as it may be adjusted as provided

in this Agreement.  Such fixed price is to remain valid until the Notice to Proceed is issued to Contractor.

## ARTICLE 3
## CONTRACTOR WORK AND OTHER OBLIGATIONS

3.1     Work to be Performed.  Except for (a) those matters described as being specifically excluded from the Work in Appendix A, and (b) those items within Owner's Scope of Work in Appendix B, Contractor shall perform or cause to be performed the Work and services described as part of the Scope of Work and all its obligations under this Agreement, in accordance with Applicable Laws, Prudent Industry Practices and the terms of the Contract Documents.

3.2     Engineering and Design. Contractor shall design the Project such that it is capable of complying with the requirements of this Agreement, Applicable Laws and Prudent Solar Industry Practices which includes but is not limited to the National Electric Code (NEC). Based on the technical specifications set forth in this Contract, Contractor shall prepare comprehensive drawings and specifications setting forth in detail the requirements for the construction of the Work.  As the drawings and specifications for the Work are issued, they shall be clearly identified as Design Documents.

3.2.1   Design Documents.  Contractor shall provide all necessary services to provide reviewed Design Documents to Owner, reviewed in accordance with this Section 3.2.1, by the time specified in the Scope of Work. Contractor shall submit to Owner draft Design Documents for Owner's review at five (5) milestone intervals i.e. 10%, 30%, 50%, 90% and issued for construction (IFC) (together "Engineering Milestones"), incorporating the feedback from Owner at each interval.  Owner shall review and return the draft Design Document for each interval to Contractor within fifteen (15) Business Days unless otherwise agreed to between Contractor and Owner.  If Owner returns the draft Design Document for a milestone interval to Contractor with comments, Contractor shall address the comments, amend the draft Design Document (if necessary) and re-submit to Owner for review within five (5) Business Days of the request and the process in this Section 3.2.1 shall be repeated until the Engineering Milestones have been exhausted.  Notwithstanding the foregoing, Owner shall be entitled to reject and return Design Documents to Contractor pursuant to this Section 3.2.1 if the capacity of the STC rated solar electric system (expressed in kilowatts DC) set forth in the title block of the draft Design Documents is one hundred and one percent (101%) or more of the Target Capacity. Nothing herein shall be deemed to limit the right of Owner to submit to Contractor a change request as provided for in Section 8.1.1.  Following Owner's review of the Design Documents, Contractor shall not modify the Design Documents or the underlying engineering or design without engineering approval and the written approval of Owner.  If Owner makes no comments within the applicable fifteen (15) Business Day review period, Owner shall be deemed to have approved the applicable Design Document.  Following Owner's approval of the Design Documents, or deemed approval as provided for herein, Design Documents shall be deemed to be, and

17

referred to as, "reviewed Design Documents".  Owner's review of the Design Documents shall not waive, limit, or affect the obligations of the Contractor under this Agreement.

      3.2.2   Owner Supplied Datasheets.  Contractor may rely upon the accuracy and correctness of the Owner Supplied Datasheets; provided, however, that Contractor shall: (a) immediately notify Owner of any inaccuracies, errors or omissions that it might discover in, and seek from Owner any clarification needed in connection with, the Owner Supplied Datasheets; (b) abide by Prudent Industry Practice in the use of Owner Supplied Datasheets; and (c) not be relieved of its obligation to complete the Work in accordance with this Agreement notwithstanding any error or inaccuracy in the Owner Supplied Datasheets.  If the Work is prevented or delayed or Contractor incurs additional costs due to: (i) any inaccuracy of or errors in any Owner Supplied Datasheets; or (ii) Owner's modification or revision of any Owner Supplied Datasheets, then subject to Article 8, and except to the extent such delay or cost is caused or contributed to by Contractor's breach of this Section 3.2.2, Contractor shall be entitled to a Change Order to the extent provided in Article 8.

      3.2.3   Ownership of Drawings.  Subject to the payments to the Contractor corresponding to the Design Documents hereunder, all final Design Documents, specifications and other documents prepared by or for Contractor in respect of the Work and all drawings, specifications, calculations, memoranda, data, notes and other materials containing information supplied by Owner (the "IP Documentation") which shall come into Contractor's possession during its performance hereunder, shall be the property of Owner, and such Owner documents and other materials shall be returned to Owner upon the earlier of Substantial Completion or termination of this Agreement in a format determined by owner.  Owner shall have the right to retain a reproducible set of all such IP Documentation for use in respect of the Work.  Review (or lack thereof) by Owner or its designees of any Project documents provided by Contractor, and the fact that Owner has not discovered any errors reflected in such Project documents, shall not relieve or release Contractor of any of its duties, obligations, or liabilities under the terms of this Agreement.

      3.2.4   Design Documents Register.  Contractor shall maintain an up-to-date set of Design Documents and shall provide all written comments, field changes, and redlined Design Documents to Owner, at the request of the Owner.

      3.2.5   Bill of Materials. Contractor will provide to Client, within five (5) days of Mechanical Completion, a complete bill of materials.

    3.3   Procurement.  Contractor shall procure, ensure delivery of, and pay for, in Contractor's name as an independent contractor and not as an agent for Owner, all labor, materials, Equipment (whether stored on or off the Site) (other than Owner Supplied Equipment and items within Owner's Scope of Work), supplies, manufacturing and related goods and services required to construct the Facility and complete the Work in accordance with this Agreement, unless specifically excluded in (i) Appendix A and (ii) those items within Owner's Scope of Work in Appendix B.  Subject to the provisions of Section 2.2, and subject further to the requirements of the LNTP (where issued), Contractor shall not be required to procure labor or additional materials or equipment until Owner provides a full Notice to Proceed.

3.4 <u>Construction and Installation</u>.  Contractor shall develop a construction and installation plan, and oversee, coordinate and ensure the expeditious performance of the Work in accordance with the Contract Documents in coordination with the Owner Representative.

3.5 <u>Schedule of Work</u>.

3.5.1 <u>Milestones</u>.  From and after the issuance of the LNTP, Contractor shall perform the Work in accordance with the milestones set forth in the Schedule of Work, as such milestone dates may be adjusted pursuant to this Agreement and subject to Owner's review and approval.

3.5.2 <u>Schedule of Work</u>.  Contractor shall provide Owner with a detailed schedule of work in Gantt chart form no later than ten (10) Business Days following receipt of Owner's LNTP.  The Schedule of Work sets forth all the Work (including Critical Path activities) that must be completed by Contractor, and the dates by which Work shall be completed, in order to support timely achievement of the milestones as provided in this <u>Section 3.5</u>.  Contractor shall circulate an updated Schedule of Work to Owner every two weeks including but not limited to changes to the Schedule needed to reflect any Change Orders.

3.6 <u>Progress Reports</u>. From and after the issuance of the Notice to Proceed until the date Substantial Completion is achieved, Contractor shall (i) provide to Owner a written bi-weekly progress report, and (ii) attend a weekly progress meeting, including minutes of such meetings describing actual progress of Work as compared to the Schedule of Work.  The progress reports shall include any significant problems encountered by Contractor, the cause of such problems, any estimated length of delay and any corrective action required, an update of the Critical Path activities, all issues relating to health and safety, and shall set out all input which Contractor expects to require from Owner in relation to the Work in the course of the 4 weeks following the delivery of the progress report.

3.7 <u>Project Site Security; Safety</u>.  Contractor shall be responsible for the security and protection of (i) the Work, (ii) its (and its Subcontractor's) equipment and materials used in connection with the Work, and (iii) all other property owned or leased by Contractor or any of its Subcontractors located at the Site through the date of Substantial Completion. Contractor shall provide security and protection for Owner Supplied Equipment (only after delivery and acceptance as set forth in <u>Section 4.7</u>) until Substantial Completion.

3.8 <u>Operation, Access and Safety Following Substantial Completion</u>.  Upon achievement of Substantial Completion, Contractor shall have access to the Facility and through the Workmanship Warranty Period as necessary to complete the items of Work on the Final Punch List and any Workmanship Warranty works as may arise; <u>provided</u>, however, that Contractor shall comply with Owner's security and safety programs while on the Project Site, shall use commercially reasonable efforts to mitigate, consistent with Prudent Industry Practices, any impacts on the production of electricity by the Facility from such access, and shall coordinate such access with Owner's Representative.

3.9 <u>Contractor's Permits</u>. Contractor shall timely obtain and maintain in effect all Applicable Permits required for the performance of the Work as specifically set forth in

Appendix A (the "Contractor's Permits").  Owner and Contractor shall cooperate with each other in connection with the other Party's efforts to obtain the Contractor's Permits and Owner's Permits, respectively, required to be obtained by such Party under this Agreement. Contractor shall comply with all conditions set forth in the Conditional Use Permit and Environmental Study Requirements unless explicitly stated otherwise in this Agreement.

3.10    Interconnection Facilities.  Owner shall be responsible for obtaining any interconnection approvals and agreements from the Interconnection Provider; provided that Contractor shall coordinate all interconnection activities with Interconnection Provider required to complete Work in compliance with the Scope of Work. Contractor understands that time is of the essence as it coordinates such interconnection activities. For the avoidance of doubt, notwithstanding the foregoing, final interconnection shall occur only upon Owner's approval.

3.11    Start-Up and Initial Operation. Contractor shall, prior to Substantial Completion, be responsible for all activities and processes necessary for the Commissioning and start-up of the Facility including the calibration and functional testing of all controls and equipment and initial operation of the Facility through to Substantial Completion. Contractor shall perform all acts required in order to enable the Owner to issue Consent to Energize. Contractor shall conduct such start-up, testing, and commissioning to avoid any and all interference with any other property owned by Owner to the greatest extent possible. Owner shall witness such tests and will, within ten (10) three (3) Business Days after receipt of written results of such tests, deliver to Contractor a written notice either (a) accepting such tests as having been passed, or (b) rejecting such tests as having demonstrated that the tested item failed to comply with the performance requirements therefor under this Agreement.  Any rejection shall include a detailed description of the basis for rejection.

3.12    Commissioning and Performance Testing. Contractor shall perform, and re-perform as necessary, the Commissioning Tests, the Reliability Testing and Capacity Testing in accordance with the Scope of Work and Exhibit D and L, respectively, to the reasonable satisfaction of the Owner.

3.13    Clean-Up and Waste Disposal

3.13.1 During Construction.  During the performance of the Work, Contractor shall keep the Project Site and the surrounding areas clean and free from accumulations of waste materials, rubbish and other debris resulting from the Work and shall remove and dispose of such waste materials, rubbish and other debris. Contractor shall ensure that all recyclable materials are recycled.

3.13.2 Prior to Final Completion.  Upon achieving Substantial Completion, Contractor shall remove the waste materials, rubbish, and other debris from the Project Site and dispose of the same.  After Substantial Completion and prior to Final Completion, Contractor shall remove from the Project Site and dispose of any waste materials, rubbish and other debris resulting from its post-Substantial Completion performance of the Work and Contractor shall remove Contractor's tools, construction equipment, machinery, and surplus equipment from the Project Site.

3.14    Hazardous Substances. If any Hazardous Substance are discovered by Contractor on the Project Site during Contractor's prosecution of the Work, Contractor shall not further disturb such Hazardous Substance and shall immediately notify Owner of the existence of the Hazardous Substance, and Contractor shall attempt to continue work on the Project while any remediation is ongoing provided such continuation is not deemed a threat to health or safety by the Contractor in its reasonable discretion.  If the remediation efforts prevent Contractor from continuing the Work, Contractor shall suspend the Work until such time as the remediation is completed and Contractor can resume the affected work.  Should the Hazardous Substance impact the Project schedule or involve a Change in the Scope of Work, Contractor shall be entitled to a Change Order. Contractor shall not be entitled to a Change Order for any Hazardous Substance transported onto or generated by the Project Site by Contractor or Contractor's Personnel.  The Parties agree that Contractor shall have no responsibility or liability for any Hazardous Substance at the Project Site, except to the extent transported onto or generated by the Project Site by Contractor or Contractor's Personnel.  Owner will be liable for and shall indemnify, defend and hold harmless Contractor Indemnitees against any Contractor Losses suffered by Contractor relating to or arising out of any Hazardous Substances in each case at, under, or on the Project Site, other than (i) Hazardous Substances transported onto the Project Site by, or (ii) to the extent any losses relating to such Hazardous Substances clearly identified in advance by Owner in writing are exacerbated by, in each case, any of Contractor's Personnel.  Such indemnification shall survive termination of this Agreement.

3.15    Unknown Site Conditions.  Discovery of Unknown Site Conditions shall entitle Contractor to a Change Order in accordance with and subject to the terms of this Agreement. If any Unknown Site Conditions are discovered by Contractor on the Project Site during Contractor's prosecution of the Work, Contractor shall not further disturb such Unknown Site Condition and shall immediately notify Owner of the existence of the Unknown Site Condition.

3.16    Risk of Loss.  Risk of loss with respect to the Facility shall transfer from Contractor to Owner upon Substantial Completion pursuant to Section 6.4.  Notwithstanding Contractor's duties of care related to the Facility established in this Agreement, Contractor shall at no time prior to Substantial Completion bear the cost or expense associated with repairs, replacements or reconstruction of the Facility to the extent that such loss of or damage to the Facility is caused by the negligence or willful misconduct of Owner or its employees, affiliates, guests or agents (other than Contractor's Personnel).

3.17    Subcontractors and Suppliers.

3.17.1  Key Suppliers. In this section 3.17, "Key Suppliers" means suppliers of Labor and Equipment and Material services. 15 Business Days prior to executing any new proposed contracts with Key Suppliers and30 days prior to commencing any work with such Key Supplier, Contractor shall provide Owner with a list of proposed Key Suppliers, which list Contractor can subsequently update as necessary (but subject to prior consultation with Owner).  If Owner has a reasonable objection to any proposed Key Supplier, Owner shall promptly notify Contractor in writing, but no later than fifteen (15) Business Days following receipt of Contractor's notice of the

21

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

proposed Subcontract(s). If Owner's objection is reasonable, Contractor shall not delegate, assign, sublet or further subcontract to the proposed Key Supplier and Contractor shall propose another acceptable Key Supplier. All Subcontractors and Key Suppliers shall be fully compliant with federal and state regulations as applicable.

       3.17.2 <u>Liability of Subcontractors</u>. No contractual relationship shall exist between Owner and any Subcontractor or Supplier with respect to the Work, and no Subcontractor is intended to be or shall be deemed a third-party beneficiary of this Agreement. Contractor shall be responsible to Owner for the acts and omissions of Subcontractors and of persons directly employed by them, to the same extent as Contractor is responsible to Owner for the acts and omissions of Contractor and its employees under this Agreement. Except as required by Applicable Law, nothing contained in this Agreement shall obligate Owner to pay or otherwise be responsible for the direct payment of any Subcontractor. Entry into any Subcontract shall not relieve Contractor of any of its obligations under this Agreement, including the obligations to perform the Work in accordance with this Agreement. Owner shall have the right, upon written request, to receive from Contractor a copy of all specifications and warranties for Equipment supplied by any Subcontractors.

       3.18    <u>Utilities</u>. Contractor shall provide readily available and temporary utilities including electricity and portable sanitation, during construction and Commissioning of the Facility.

       3.19    <u>Site Conditions</u>. Except for Unknown Site Conditions, Contractor has satisfied itself as to the general and local conditions and circumstances affecting the Work and as of the Effective Date of this Agreement, Contractor represents that it is familiar with the following:

         3.19.1 the typical weather conditions at the Site and the surrounding area (Force Majeure Events are excluded);

         3.19.2 Maine laws and administrative government procedures applicable to the Work;

         3.19.3 the sufficiency and size of, and the accessibility of and limitations on ingress, egress to and from the Site; and

         3.19.4 the availability, character, reliability, and cost of, facilities, roads, and other transportation means to the Project Site.

       3.20   <u>Delivery, Unloading, Shipping Fixtures and Special Tools.</u>

         3.20.1 (i) load all Owner Supplied Equipment located at the Owner's Storage Facility, (ii) deliver this Owner Supplied Equipment to the Project Site, and (iii) upon delivery to the Project Site, unload and inspect such Owner Supplied Equipment, and

         3.20.2 Store such Owner Supplied Equipment after such is delivered to the Project Site until incorporated into the Work through Substantial Completion.

       3.21   <u>Installation and Integration of Owner Supplied Equipment.</u> Contractor shall provide all services, management, Labor, equipment and materials necessary to

Install the Owner Supplied Equipment and the Equipment while minimizing any effects on the Owner's other property to the greatest extent possible all in accordance with the Schedule of Work.

3.22  <u>Contractor's Representative</u>. Within fifteen (15) days of issuance of the LNTP, Contractor shall provide a designated point of contact for Contractor ("<u>Contractor's Representative</u>"). Owner will have the right to reasonably refuse the designation of any person as Contractor's Representative. The Parties understand and agree that Contractor's Representative may have limited authority for approval and unless the context clearly indicates that the Contractor's Representative has authority for approval, Contractor shall be responsible for providing such approval.  Contractor shall notify Owner in writing of any change in Contractor's Representative.

3.23  <u>Existing Structures.</u>  Contractor shall act in accordance with Prudent Industry Practices in relation to the Existing Structures and shall take all necessary steps to ensure that the Existing Structures are not damaged, compromised or interfered with in any way.

3.24  <u>Installation Records.</u> Contractor shall record the serial numbers and installed locations of all installed equipment, whether Owner Supplied Equipment or otherwise.

3.25  <u>Document Format.</u> All documents sent to Owner by Contractor must be sent in digital formats which are word-searchable using Microsoft Word, Microsoft Excel or Adobe Acrobat. Where documents require signatures or other input in ink, scans of the wet-inked documents must be shared along with the word-searchable versions.

ARTICLE 4
**OWNER OBLIGATIONS**

4.1  <u>Information and Owner's Work</u>.  Any information to be provided by Owner, including any response to a request for clarification by Contractor, shall be provided in a reasonably timely manner so as not to delay Contractor's performance of the Work, and any delay in excess of five (5) Business Days in providing such information shall be an Owner Caused Delay, provided that the Contractor asked for such information as soon as it knew such information was required.

4.2  <u>Owner's Representative.</u> Within fifteen (15) days of issuance of the Notice to Proceed Owner shall provide a designated point of contact for Owner ("Owner's Representative"). The Parties understand and agree that Owner's Representative may have limited authority for approval and unless the context clearly indicates that the Owner's Representative has authority for approval, Owner shall be responsible for providing such approval.  Owner shall notify Contractor in writing of any change in Owner's Representative.

4.3  <u>Location of and Access to the Project Site</u>.

23

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

4.3.1    On and after the date of issue of the LNTP, Owner shall provide to Contractor's Personnel, subject in each case to the Conditional Use Permit and Environmental Study Requirements:

(a)    full, unrestricted and uninterrupted access and use of the Project Site for Contractor to perform the Work pursuant to the terms of this Agreement;

(b)    full, unrestricted and exclusive access and use of Equipment laydown, debris collection and designated parking areas on the Project Site; and

(c)    full and unrestricted rights of ingress and egress to and from the Project Site, including rights of way for the access route to the Project Site.

4.3.2    Owner shall not permit its agents, employees and guests to (a) interfere with Contractor's performance of the Work and (b) cause damage to the Facility.

4.3.3    Contractor and Contractor's Personnel have a duty of care to the Project Site and its and their use of Equipment, sufficient to satisfy any relevant regulatory and/or insurance-related purposes.

4.4    Site Information.  Owner has provided to Contractor, at Owner's expense, all of the following to the extent in existence and in Owner's possession and control and listed on Exhibit R ("Documented Site Conditions):

4.4.1    information describing the physical characteristics of the Project Site, including surveys, legal description, data or drawings depicting existing conditions, subsurface and environmental studies, reports and investigations;

4.4.2    tests, inspections and other reports dealing with environmental matters, Hazardous Substances and other existing conditions, if applicable and available, relating to the Project Site; and

4.4.3    any other information or services reasonably requested by Contractor that are relevant to Contractor's performance of the Work and under Owner's control.

Contractor shall be entitled to rely on Documented Site Conditions furnished by Owner pursuant to this Section 4.4.

4.5    Owner's Permits. Owner hereby represents and warrants to Contractor that (a) Owner shall obtain the Applicable Permits necessary for Owner to purchase, own, operate and maintain the Facility, to perform its obligations hereunder and exercise its rights under this Agreement as specifically set forth in Appendix B (collectively, "Owner's Permits"); and (b) Owner is, and shall at all times be, in compliance with all Applicable Laws.

4.6    Owner, Financing Party and Independent Engineer Oversight.    Owner (including its designees), any applicable Financing Party (including its designees) and the Independent Engineer may, but shall have no obligation to, visit the Project Site to familiarize

itself or themselves with the progress and quality of the Work and attend the performance of the Commissioning Tests, the Reliability Testing and Capacity Testing as set forth in this Agreement; provided, however, Owner, the Financing Party and the Independent Engineer shall not materially interfere with Contractor's ability to perform the Work and shall comply with all safety plans established and provided to them by Contractor while on the Project Site.

4.7    Owner Supplied Equipment.

4.7.1    Owner has procured and shall deliver to the Project Site the Owner Supplied Equipment for Contractor's incorporation in the Facility on or before the time specified for delivery of such Owner Supplied Equipment specified in the Schedule of Work. Title to Owner Supplied Equipment remains at all time with Owner. Owner shall deliver the Owner Supplied Equipment to Contractor or a third party nominated by Contractor and reasonably agreed to by Owner at the times set out in the Schedule of Work. Upon request by Contractor, Owner shall provide to Contractor correct and complete copies (redacted as appropriate) of all Owner Supplied Equipment contracts and all other information relating to the Owner Supplied Equipment.

4.7.2    Upon acceptance (or replacement, if necessary, in accordance with Section 4.7.3), Contractor shall secure in accordance with manufacturer's requirements such Owner Supplied Equipment. Contractor shall comply with manufacturer's warranty requirements regarding Owner Supplied Equipment during use, incorporation in the Facility and Final Completion.

4.7.3    Contractor shall receive all Owner Supplied Equipment upon delivery at the Site and shall identify, document and immediately notify Owner of any visual signs of damage observed at the time of delivery; Contractor shall have an independent duty and obligation to examine and receive shipments in accordance with Prudent Industry Practices and in accordance with manufacturer's warranty requirements regarding Owner Supplied Equipment.  Contractor shall be solely responsible for inspecting and accepting all Owner Supplied Equipment upon its delivery to the Site. If at any time after Contractor's acceptance of Owner Supplied Equipment Contractor determines that any Owner Supplied Equipment is broken or otherwise defective or damaged, Contractor shall notify Owner and to the extent such damage is not attributable to Contractor's Personnel, Owner shall have the duty and responsibility to procure replacement Owner Supplied Equipment as promptly as possible so as to not adversely impact the Schedule of Work.

4.7.4    Any Owner Supplied Equipment that Contractor does not use in the Facility shall be returned in mint condition to Owner before Substantial Completion. Owner shall be made whole by Contractor for any unused Owner Supplied Equipment that has been delivered and inspected at the Site and has passed any applicable quality testing but that is returned to Owner in damaged condition after Substantial Completion.

**ARTICLE 5**
**COMMISSIONING TESTS**

5.1    <u>Commissioning Testing</u>.    Contractor shall perform and successfully pass/complete the Commissioning Tests for the Facility as described in <u>Exhibit D</u> after Mechanical Completion and as a condition of Substantial Completion.  Notwithstanding the foregoing, Contractor may perform Commissioning and Commissioning Tests under <u>Exhibit D</u> that do not involve energization prior to Mechanical Completion of the Facility and shall not allow or provide for the Commissioning or Commissioning Tests that involve energization of the Facility until Mechanical Completion of the Facility has been achieved and Contractor has received Consent to Energize. Performance of the Commissioning Tests and results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative prior to or upon Substantial Completion.  The Independent Engineer shall confirm the completion of the Commissioning Tests for the benefit of Owner.

5.2    <u>Capacity Testing</u>. Contractor shall perform the Capacity Testing as described in Exhibit L after successful completion of the Commissioning Tests and as a condition of Substantial Completion. Performance of the Capacity Testing and the results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative and the Independent Engineer prior to or upon Substantial Completion. The Independent Engineer shall confirm the completion of the Capacity Testing for the benefit of Owner.

5.3    <u>Reliability Testing.</u>    Contractor shall perform the Reliability Testing as described in Exhibit L as a condition of Substantial Completion. Performance of the Reliability Testing and the results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative prior to or upon Substantial Completion. The Independent Engineer shall confirm the completion of the Reliability Testing for the benefit of Owner.

5.4    <u>Output During Testing</u>.  At all times when Contractor conducts the Capacity Testing or the Commissioning Tests, Owner may, at Owner's sole expense, arrange for the disposition of such Facility's electrical output in such manner as Owner and Contractor may mutually and reasonably agree, so as not to hinder, delay or interfere with (or increase the costs of) the Work, Commissioning, testing or Contractor's ability to perform its obligations or exercise its rights under this Agreement.  Any electrical output generated by the Facility at any time, and the proceeds from the sale thereof, shall be the exclusive property of Owner.

5.5    <u>Right to Attend Testing</u>.  For Capacity and Reliability Testing, Contractor will notify the Owner's Representative upon scheduling such Capacity and Reliability Testing, (a) at least five (5) Business Days in advance of such Capacity and Reliability Testing that will occur off the Project Site, and (b) will use reasonable efforts to provide the foregoing notifications as much as ten (10) Business Days in advance, but no later than five (5) Business Days in advance of any such Capacity and Reliability Testing that will occur at the Project Site.  The Owner's (including its designees), the Financing Party's or the Independent Engineer's right to attend the Capacity and Reliability Testing shall not otherwise limit the progress of the Work, and any delay to the Capacity and Reliability Testing that occurs as a result of unreasonable conduct by the Owner, a Financing Party or the Independent Engineer, shall be considered an Owner Caused Delay.

5.6    Witness Testing. Contractor shall arrange for and coordinate witness testing with the Interconnection Provider. Contractor shall include Owner in all written communications in relation to same and Owner shall have the right to substantial advance notice of, and to attend, all in-person meetings, telephone calls, internet calls and/or similar communications in relation to witness testing.

5.7    Energization Schedule. Contractor shall liaise with the Interconnection Provider in order to agree the energization schedule. Contractor shall include Owner in all written communications in relation to same and Owner shall have the right to substantial advance notice of, and to attend, all in-person meetings, telephone calls, internet calls and/or similar communications in relation to the energization schedule.

## ARTICLE 6
## COMPLETION OF THE WORK

6.1    Mechanical Completion. Mechanical Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.1.1 through to 6.1.4 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.1 ("Mechanical Completion"):

6.1.1    the Facility has been properly and fully engineered, constructed and installed in accordance with this Agreement to the extent that all Work is complete save for pre-Commissioning, Commissioning, start-up, adjustment and testing (including performance of the Commissioning Tests, the Reliability Testing and Capacity Testing);

6.1.2    appropriate barriers have been installed to prevent Energization of the Facility;

6.1.3    Contractor has issued a written notice to Owner confirming that Energization has not occurred in respect of any part of the Facility;

6.1.4    the Interim Punch List has been prepared by Contractor in accordance with Section 6.6.1 and delivered to and accepted by Owner. Owner has right to designate a third party to review the Punch List prior to acceptance;

6.1.5    the Facility is structurally, mechanically and electrically sound, and is ready for the full, safe and reliable pre-Commissioning, Commissioning, start-up, adjustment and testing (including performance of the Commissioning Tests, the Reliability Testing and Capacity Testing);

When Contractor believes that it has achieved the requirements of Mechanical Completion, Contractor shall provide written notice (the "Form of Mechanical Completion"), in substantially the same form as Exhibit O, to Owner's Representative, together with all supporting documentation required by and as set forth in the Scope of Work.  Owner's Representative shall have ten (10) Business Days from receipt to notify Contractor of its approval or rejection of the Form of Mechanical Completion in its reasonable discretion. In the event, the Owner's Representative rejects the Form of Mechanical Completion, it shall provide a feedback statement specifying its observations and issues inhibiting the

27

achievement of Mechanical Completion for Contractor's review. A failure by Owner's Representative to respond to the Form of Mechanical Completion within such ten (10) Business Day period shall be deemed approval of the Form of Mechanical Completion.

6.2    Consent to Energize.  On or after the occurrence of Mechanical Completion pursuant to Section 6.1, Contractor shall not allow Energization of the Facility prior to receiving written consent from Owner to authorize Contractor to Energize the Facility ("Consent to Energize

6.3    Mechanical Completion Delay Liquidated Damages.  Contractor shall cause the Facility to reach Mechanical Completion on or before the Mechanical Completion Deadline. If Contractor fails to achieve Mechanical Completion on or before the Mechanical Completion Deadline (as such date may be adjusted pursuant to the terms of this Agreement), then Contractor shall pay to Owner, as liquidated damages and not as a penalty, the amount of $500 per MW per day for each day by which Mechanical Completion is later than the Mechanical Completion Deadline ("Mechanical Completion Delay Liquidated Damages"), which shall be Owner's sole remedy for delay if collected.  Owner shall calculate the Mechanical Completion Delay Liquidated Damages for which Contractor is responsible based on the date that Mechanical Completion is achieved. Contractor shall pay Mechanical Completion Delay Liquidated Damages due pursuant to this Section 6.3 monthly in arrears on the first day of each month. Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Mechanical Completion Delay Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Contractor does not achieve Mechanical Completion by the Mechanical Completion Deadline, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  Time is particularly of the essence in Contractor's timely performance of this Agreement (subject to all express cure periods set forth in this Agreement).  The Parties agree that (i) Contractor's obligation to pay Mechanical Completion Delay Liquidated Damages shall not require Owner's establishment of any actual damages for such delay, (ii) Owner's actual damages for delay may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any delay damages that may arise relating to this Agreement for such period, and (iii) the payment of Mechanical Completion Delay Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Mechanical Completion Delay Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for delay if the liquidated damages were enforceable.

6.4    Substantial Completion.  Substantial Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.4.1 through to 6.4.8 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.4 ("Substantial Completion"):

6.4.1    Mechanical Completion has occurred;

6.4.2    all items of Work identified on the Interim Punch List have either been completed by Contractor, included on the Final Punch List or waived in writing by Owner;

6.4.3    Commissioning of the Facility has occurred, unless waived by the mutual agreement of Owner and Contractor;

6.4.4    all activities described in Contract Documents, as amended, required to place the Facility into initial operation following Commissioning have been successfully completed, including the preparation and successful execution of all activities described in the Contract Documents required to place the Facility into initial operation following Commissioning and the receipt of all Contractor Permits required to place the Facility into initial operation following Commissioning;

6.4.5    Contractor has furnished to Owner the following lien waivers: (i) Final Lien Waivers from all Subcontractors who have completed all work contemplated by the corresponding Subcontract and have received final payment thereunder; (ii) Partial Lien Waivers from all Subcontractors who have completed all work contemplated by the corresponding Subcontract but who have not received final payment thereunder; and (iii) Contractor has issued a Partial Lien Waiver applicable to all Work performed and all payments which Contractor has received and is entitled to in connection therewith, in each case, applicable to the whole of the Work and the effect of which shall, to the fullest extent permitted by Applicable Laws, be to release Owner from all lien and payment claims by Contractor or its Subcontractors, howsoever arising in connection with the Project;

6.4.6    Contractor has completed the Capacity Testing as described in Exhibit L, and any additional testing as may be required under this Agreement, and (a) the Facility has achieved the Capacity Guarantee as required by the Contract Documents; or (b) the Facility has not achieved the Capacity Guarantee but has achieved at least 95% of the Capacity Guarantee, provided the Contractor has given to Owner's Representative notice of such and has entered the Capacity Cure Period as described in Section 6.5; and Contractor has agreed to pay Owner the Capacity Shortfall Liquidated Damages payment amount;

6.4.7    the Final Punch List, which shall not include any environmental, safety, or performance-related item at any value and valued no greater than at 2% of the Contract Price, has been prepared by Contractor in accordance with Section 6.6.2 and delivered to and accepted by Owner;

6.4.8    the Facility is capable of continuous operation in concert with the other necessary equipment and interconnections for the commercial purpose of generating and delivering electricity in accordance with Prudent Industry Practice, and otherwise meets the requirements of the Scope of Work, other than as will be demonstrated through Capacity Testing at Substantial Completion; and

6.4.9    the Contractor has provided a service schedule, which has in turn been approved by the Owner detailing the maintenance works which Owner ought to perform during the Workmanship Warranty Period;

When Contractor believes that it has achieved the requirements of Substantial Completion, Contractor shall provide written notice (the "Form of Substantial Completion"), in substantially the same form as Exhibit E, to Owner's Representative, together with all supporting documentation required by and as set forth in the Scope of Work.  The Owner's Representative shall have twenty (20) Business Days from receipt to notify Contractor of its approval or rejection of the Form of Substantial Completion in its reasonable discretion. In the event, the Owner's Representative rejects the Form of Substantial Completion, it shall provide a feedback statement specifying its observations and issues inhibiting the achievement of Substantial Completion for Contractor's review.  A failure by Owner's Representative to respond to the Form of Substantial Completion within such twenty (20) Business Day period shall be deemed approval of the Form of Substantial Completion.

6.5    Substantial Completion Delay Liquidated Damages.  Contractor shall cause the Facility to reach Substantial Completion on or before the Substantial Completion Deadline. If Contractor fails to achieve Substantial Completion on or before the Substantial Completion Deadline (as such date may be adjusted pursuant to the terms of this Agreement), then Contractor shall pay to Owner, as liquidated damages and not as a penalty, the amount of $375 per MW per day for each day by which Substantial Completion is later than the Substantial Completion Deadline ("Substantial Completion Delay Liquidated Damages"), which shall be Owner's sole remedy for delay if collected.  Owner shall calculate the Substantial Completion Delay Liquidated Damages for which Contractor is responsible based on the date that Substantial Completion is achieved. Contractor shall pay Substantial Completion Delay Liquidated Damages due pursuant to this Section 6.5 monthly in arrears on the first day of each month. Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Substantial Completion Delay Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Contractor does not achieve Substantial Completion by the Substantial Completion Deadline, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  Time is particularly of the essence in Contractor's timely performance of this Agreement (subject to all express cure periods set forth in this Agreement).  The Parties agree that (i) Contractor's obligation to pay Substantial Completion Delay Liquidated Damages shall not require Owner's establishment of any actual damages for such delay, (ii) Owner's actual damages for delay may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any delay damages that may arise relating to this Agreement for such period, and (iii) the payment of Substantial Completion Delay Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Substantial Completion Delay Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for delay if the liquidated damages were enforceable.

6.6     Substantial Completion Capacity Testing.  In order for Contractor to achieve Substantial Completion, Contractor shall conduct Capacity Testing of the Facility demonstrating that the Facility has been completed sufficiently to operate reliably, safely and without endangering its mechanical, civil or electrical integrity.  As part of the Capacity Testing, Contractor shall conduct a Capacity Test in accordance with Exhibit L.

6.6.1   Satisfaction of Capacity Guarantee.  If, following the Capacity Testing, Contractor achieves the Capacity Guarantee in accordance with the criteria set forth in Exhibit L, and Contractor has otherwise satisfied all of the requirements for Substantial Completion, Contractor shall notify the Owner that it has successfully achieved Substantial Completion in accordance with the procedures set forth in Section 6.4.

6.6.2   Performance Cure.  If, following the Capacity Testing, Contractor achieves a capacity of at least ninety five percent (95%) of the Capacity Guarantee (as defined in Exhibit L), in accordance with the criteria set forth in Exhibit L but does not satisfy the Capacity Guarantee, and Contractor has otherwise satisfied all of the requirements for Substantial Completion, Contractor shall notify Owner that it has successfully achieved Substantial Completion in accordance with the provisions of Section 6.4 subject to the following: (a)  Contractor shall continue to make any modifications to the Facility, at its sole cost and expense, over a period of sixty (60) days in an effort to attain the Capacity Guarantee ("Capacity Cure Period"); (b) during the Capacity Cure Period,  Contractor shall conduct such additional Capacity Testing with respect to the Facility in accordance with the criteria set forth in Exhibit L in order to determine whether or not Contractor has met the Capacity Guarantee; and (c) during the Capacity Cure Period, Contractor shall coordinate any proposed modifications or testing shall with Owner and so as not to interfere with production of the Facility. If failure to satisfy the Capacity Guarantee is caused by Owner's Scope of Work or Owner Supplied Equipment, Contractor shall (i) immediately notify Owner and provide Owner a reasonable opportunity to cure such cause (ii) be entitled to notify Owner that it has achieved Substantial Completion and Owner shall be solely responsible for the cost and expense of attaining the Capacity Guarantee.

6.6.3   Capacity Shortfall Liquidated Damages. Unless caused by Owner's Scope of Work or Owner Supplied Equipment, if, after the Capacity Cure Period, Contractor still fails to show the Facility has achieved the Capacity Guarantee then Owner shall, subject to Section 6.8, be entitled to Capacity Shortfall Liquidated Damages, which shall be calculated as follows: If Contractor fails to achieve the Capacity Guarantee, for every one percent (1%) of capacity shortfall, Contractor will pay Capacity Shortfall Liquidated Damages in the amount of $10,000 per MegaWatt DC.  Contractor shall calculate the Capacity Shortfall Liquidated Damages and provide such calculations to Owner for review and approval, such approval not to be unreasonably withheld.  If Contractor fails to achieve at least ninety five percent (95%) of the Capacity Guarantee, Capacity Shortfall Liquidated Damages shall constitute Owner's sole remedy for Contractor's failure to achieve the Capacity Guarantee.  Contractor shall pay to Owner all Capacity Shortfall Liquidated Damages due pursuant to this Section 6.5 within thirty (30) days of the occurrence of

Substantial Completion.   So long as Owner has timely paid to Contractor undisputed amounts due under and in accordance with this Contract for any milestones associates with Substantial Completion, Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Capacity Shortfall Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Capacity Guarantee is not satisfied, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  The Parties agree that (i) Contractor's obligation to pay Capacity Shortfall Liquidated Damages shall not require Owner's establishment of any actual damages for performance failure, (ii) Owner's actual damages for such performance failure may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any liquidated damages that may arise relating to this Agreement for such period, and (iii) the payment of Capacity Shortfall Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Capacity Shortfall Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for failure to achieve the Capacity Guarantee if the liquidated damages were enforceable.

6.6.4    If the Capacity Guarantee is not achieved (unless the failure to achieve the Capacity Guarantee is the result of the Owner Supplied Equipment or Owner's Scope of Work) Contractor shall maintain completion security specified in Section 7.8 of this Agreement until such time as Capacity Guarantee is achieved.

6.6.5    If following Capacity Testing Contractor fails to show the Facility has achieved at least ninety five percent (95%) of the Capacity Guarantee, Substantial Completion will not have occurred.

6.6.6    Contractor shall continue to make any modifications to the Facility, at its sole cost and expense (unless the failure to achieve the Capacity Guarantee is the result of the Owner Supplied Equipment or Owner's Scope of Work then it shall be an Owner Caused Delay), in an effort to attain the Capacity Guarantee and shall conduct such additional Capacity Testing with respect to the Facility in accordance with the criteria set forth in Exhibit L in order to determine whether or not Contractor has met at least ninety five (95%) of the Capacity Guarantee, until the limit on liquidated damages referred to in Section 6.8 is met. Notwithstanding the foregoing, Contractor's failure to achieve Substantial Completion within sixty (60) calendar days of Permission to Operate shall constitute a material breach of this Agreement and nothing in this Section 6.5.6 shall limit Owner's damages or remedies for breach of contract or damages or remedies available to the Owner under the Parent Guaranty.

32

6.7     Punch Lists.

6.7.1     Interim Punch List. At the time Contractor delivers the Form of Mechanical Completion, Contractor shall also provide to Owner's Representative a list of Work, if any, that remains to be completed prior to Substantial Completion that, consistent with Prudent Industry Practice, will not affect the operability, reliability, safety or mechanical or electrical integrity of the Facility (the "Interim Punch List"). The Interim Punch List shall include the estimated cost and schedule to complete the items of Work identified in the Interim Punch List, which schedule shall be mutually agreed to by the Parties based upon the items of Work that remain to be completed. Approval of the Form of Mechanical Completion shall constitute both the Owner and each Financing Party's agreement to the Interim Punch List.

6.7.2     Final Punch List. At the time Contractor delivers the Form of Substantial Completion, Contractor shall also provide to Owner's Representative a list of Work, if any, that remains to be completed prior to Final Completion that, consistent with Prudent Industry Practice, will not affect the operability, reliability, safety or mechanical, civil or electrical integrity of the Facility (the "Final Punch List"). The Final Punch List shall include the estimated cost and schedule to complete the items of Work identified in the Final Punch List, which schedule shall be mutually agreed to by the Parties based upon the items of Work that remain to be completed. Approval of the Form of Substantial Completion shall constitute both Owner and each Financing Party's agreement to the Final Punch List.  As security for performance of Contractor's obligations to complete the items on the Final Punch List, Owner shall withhold two hundred percent (200%) of Contractor's estimated cost to complete the items on the Final Punch List from the Substantial Completion Payment Milestone Amount The amount withheld will become payable only once every Final Punch List item has been completed to the satisfaction of Owner.

6.8     Final Completion.   Final Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.7.1 through to 6.7.7 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.7 ("Final Completion"):

6.8.1   Substantial Completion has occurred;

all of the Work on the Project is fully complete and the Facility is fully operational;

all Final Punch List items have either been completed by Contractor, or extended or waived in writing by Owner;

all debris, rubbish and other material resulting from the Work has been removed from the Project Site;

33

Contractor has provided to Owner any necessary or otherwise customary training with respect to operation and maintenance of the Facility;

Final Lien Waivers (substantially in the form included in Exhibit M) from Contractor, its Subcontractors and all other persons possessing lien rights related to the Work have been executed and delivered to Owner; and

Contractor has delivered to Owner the Turnover Package and any other deliverables that are required, and to be delivered to Owner by Contractor or Subcontractors on or before Final Completion.

When Contractor believes it has achieved the requirements of Final Completion, Contractor shall provide written notice (the "Form of Final Completion"), in substantially the same form as Exhibit F, to the Owner's Representative, respectively, along with all backup documentation supporting Contractor's determination of Final Completion. Owner's Representative shall have ten (10) Business Days from receipt to notify Contractor of its approval or rejection to the Form of Final Completion. Owner or Financing Party's failure to respond to the Form of Final Completion within such ten-day period shall be deemed approval of the Form of Final Completion. Contractor shall resolve such exceptions prior to resubmitting a Form of Final Completion.

6.9    Limitation on Liquidated Damages. The aggregate liability of Contractor for Mechanical Completion Delay Liquidated Damages, together with the amount of any Capacity Shortfall Liquidated Damages, shall not exceed an amount equal to fifteen percent (15%) of the sum of the Contract Price.

## ARTICLE 7
## CONTRACT PRICE AND PAYMENT

7.1    Contract Price. As full consideration to Contractor for the performance of the Work and for Contractor's other obligations under this Agreement, and all costs incurred in connection therewith, Owner shall pay Contractor the total contract price set forth in Exhibit G (the "Contract Price"). The Contract Price is a fixed price and is subject to change only as provided in this Agreement.

7.2    Milestone Payments. Owner shall pay Contractor the Contract Price in Progress Payments based on Contractor's achievement (or partial achievement as set forth in Section 8.3 and otherwise at the reasonable discretion of Owner) of the applicable payment milestones (each, a "Payment Milestone"), as set forth in the payment schedule attached hereto as Exhibit B, (the "Contract Schedule and Schedule of Milestones"). Unless otherwise specifically agreed upon by the Parties, Contractor shall deliver to Owner an invoice for each Progress Payment following achievement of the corresponding Payment Milestone based on the Schedule of Milestones. Each invoice shall be delivered together with (i) a description of the completion of the Work for the applicable Payment Milestone

(Contractor shall ensure that the breakdown is consistent with and in accordance with the Schedule of Milestones set forth in Exhibit B and that the invoice clearly describes, to the satisfaction of Owner, the scheduled value completed), (ii) Partial Lien Waivers and, if applicable, Final Lien Waivers, (substantially in the form included in Exhibit M) from Contractor and its Subcontractors and all other persons possessing lien rights related to the Work, and (iii) such other information as may be reasonably requested by Owner.  Any applicable taxes shall be separately identified.

7.3    Timeliness of Payment.  Unless otherwise agreed to in writing by the Parties, all undisputed amounts invoiced under this Agreement shall be due and payable no later than thirty (30) days after receipt of the invoice and all required supporting information. Each Party will make payments by electronic funds transfer, or by other mutually agreeable method(s), to the account designated by the other Party.  Any undisputed amounts not paid by the due date will be deemed delinquent and will accrue interest at the Default Rate, such interest to be calculated from and including the due date to but excluding the date the delinquent amount is paid in full. The payment terms referenced in this paragraph shall be subject to a day-for-day adjustment until the foregoing conditions are satisfied.

7.4    Payment Disputes.  If either Party disputes the other Party's request for payment under this Agreement, the Party withholding payment shall within ten (10) days give written notice to the requesting Party of the disputed amount, together with sufficient information to allow the requesting Party to understand the nature of the dispute.  If a Party fails to respond to a request for payment within such ten (10) day period, it shall be deemed to have approved such request for payment.  Notwithstanding the dispute, Contractor shall proceed with the performance of the Work.  A Party withholding payment as part of a bona fide dispute will not be in default under this Agreement.  Resolution of any disputes under this Section 7.4 shall be made in accordance with the procedures set forth in Article 19. Payments made upon resolution of the related disputes shall be along with interest at the Default Rate applicable from the date when the payments should have been made originally.

7.5    Set-Off.  Owner may deduct and set off against any part of the balance due or to become due to Contractor under this Agreement any amounts due from Contractor to Owner and relating to this Agreement.

7.6    Owner Parent Guaranty. Within five (5) days following the Effective Date, Owner shall provide to Contractor, as security for the payment obligations herein, an Owner Parent Guaranty through Final Completion.  The Owner Parent Guaranty shall be in a form substantially similar to that which is attached as Exhibit N.

7.7    Retainage

7.7.1    Withholding.  Owner shall withhold from (i) each Progress Payment prior to Mechanical Completion an amount equal to ten percent (10%) of such payment as retainage (the "Initial Retainage"), (ii) the Progress Payment for Mechanical Completion an amount equal to five percent (5%) as retainage (the "MC Retainage"), and (iii) the Progress Payment for Substantial Completion an amount

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

equal to five percent (5%) as retainage (the "SC Retainage", and collectively with the Initial Retainage and MC Retainage, the "Retainage"); and (iv) the Progress Payment for Final Completion an amount equal to two percent (2%) (the "FC Holdback").  The Retainage shall be held by Owner as security for the performance of Contractor's obligations hereunder, and any interest thereon shall accrue for the account of Owner and not Contractor.  Owner may use the Retainage, among other uses, to cure a Contractor Event of Default, for Mechanical Completion Delay Liquidated Damages and/or Capacity Shortfall Liquidated Damages, to remove liens filed by Subcontractors (so long as Owner is current in its payment obligations to Contractor) and to satisfy any and all other undisputed amounts payable by Owner hereunder. Owner may use the FC Holdback to cure any breach of the Workmanship Warranty by Contractor.  Unused Retainage and the FC Holdback shall be paid to Contractor in accordance with Section 7.7.2 below.

7.7.2    Payment.  Upon the earlier of (i) termination of this Agreement and (ii) Mechanical Completion and receipt of Contractor's invoice, Owner shall release any unused Initial Retainage.  Upon the earlier of (i) termination of this Agreement and (ii) Substantial Completion and receipt of Contractor's invoice, Owner shall release any unused MC Retainage.  Upon the earlier of (i) termination of this Agreement and (ii) Final Completion and receipt of Contractor's invoice, Owner shall release any unused SC Retainage.  Upon the first (1st) anniversary of Substantial Completion of the Work and receipt of Contractor's invoice for same, Owner shall release any unused FC Holdback. Upon the occurrence of an Owner Caused Delay exceeding twenty (20) days, Owner shall release Retainage (Owner's rights to future Retainage will continue in accordance with Section7.7.1).

7.8    Completion Security.  Within five (5) Business Days of issuance of the LNTP, Contractor shall post a parent guaranty (the "Parent Guaranty") guaranteeing the performance of obligations of Contractor in the form attached as Exhibit P.  The Parent Guaranty shall cover the delivery and installation of the Facility, payment of valid labor and material bills incurred during the delivery and installation portion of this Agreement with respect to the Facility. The Parent Guaranty shall remain in effect until the one (1) year anniversary of Substantial Completion (the "Parent Guaranty Expiration Date") at which time the Parent Guaranty will be released and exonerated. It is further understood that except as otherwise stated in the Parent Guaranty, no Parent Guaranty covers, whatsoever, any Owner's Scope of Work, Owner Supplied Equipment, warranties, operations and maintenance requirements, including system production.

7.9    Payment Details.

7.9.1  All first-time payments from Owner to Contractor under this Agreement will be verified with a call back procedure to confirm authenticity on the first payment run.

7.9.2   Any requests to change bank account details should be sent in writing on company headed paper and email from Contractor to Owner directors. The call back procedure shall be performed again.

## ARTICLE 8
## CHANGE ORDERS

8.1   Changes; Change Orders Requests.  No Change shall be effective unless executed by the Parties in accordance with the procedures described in this Section 8.1.  Any Change permitted to be made in accordance with this Agreement shall take the form of a written Change Order (each a "Change Order").  A Change Order shall be in the form substantially similar to the Change Order form attached as Exhibit J.  Each Change Order shall contain details of the Change, and any adjustments of the Design Documents, the Contract Price or the Schedule, as applicable.

8.1.1    Owner may request changes in the Work within the general scope of the Agreement, consisting of additions, deletions, or other revisions.  If Owner desires a change in the Work as provided for herein, Owner shall submit a change request to Contractor in writing.  Within ten (10) Business Days of its receipt of any such request, unless otherwise agreed to by the Parties, Contractor shall submit a detailed proposal to Owner stating (i) the increase or decrease, if any, in the Contract Price which would result from such change, and/or (ii) the effect, if any, upon the Schedule of Work or the Schedule of Milestones, and/or the terms and conditions of this Agreement.  Owner shall have ten (10) Business Days to accept or reject Contractor's proposal in relation to the requested change.  If Owner agrees with Contractor's proposal, Owner and Contractor shall execute a Change Order reflecting the requested change in the Work and proposed adjustments, if any, in the Contract Price and/or the Schedule of Work.  If Owner disagrees with Contractor's proposal, Owner shall either (a) notify Contractor that Owner has decided to withdraw its requested change; or (b) issue a Construction Change Directive and Contractor shall proceed with the change on a time and materials basis at the rates set forth in Appendix A. Notwithstanding the foregoing, under no circumstances shall Contractor be required to execute the Work described in a Construction Change Directive that would (i) in the aggregate result in a ten percent (10%) or larger increase in the Contract Price, (ii) at the reasonable discretion of Contractor, require Contractor to perform work beyond its ability, skills, experience or capacity, or (iii) reduce the Facility size (in kW), unless such reduction is (1) required by a Governmental Authority or the Interconnection Provider or Offtaker or (2) reasonably required as a result of an Unknown Site Condition.

37

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

8.1.2     If a change requested by the Owner pursuant to Section 8.1.1: (a) constitutes a minor change to the Work and (b) would not (i) adversely affect the validity of any manufacturer's warranty; (ii) increase or decrease the Contract Price, or (iii) adversely affect Contractor's obligations or economic benefits hereunder, including the Contractor's warranty obligations, then the Contractor shall be obligated to implement such Change, subject to Contract Price changes and Schedule adjustments made pursuant to Section 8.3 and Section 8.4, respectively.

8.1.3     Except where Owner has issued a Construction Change Directive in accordance with Section 8.1.1, Contractor shall not be obligated to make any Changes unless and until a Change Order therefor has been executed by both Parties or deemed approved in accordance with the provisions under the Agreement.

8.2     Change Orders for Events of Delay; Scope of Work.  Subject to Section 8.3 and Section 8.4, Contractor shall be entitled to a Change Order granting an Equitable Adjustment of the Contract Price and Schedule of Work attributable to an Event of Delay, a change to the Interconnection Provider requirements after the Effective Date, or the Scope of Work becoming (through no fault of Contractor) incorrect, incomplete or inaccurate.

8.3     Adjustments to Contract Price.  The price of any Work required or modified by a Change (other than a Change for an Unknown Site Condition) shall be, at Owner's sole election, a lump-sum fixed price mutually agreed to by the Parties (which lump-sum shall provide for an Equitable Adjustment of the Contract Price); provided that, if the Parties are unable to agree on a fixed price for such Change, or if the Change is for an Unknown Site Condition, then Owner may issue a Construction Change Directive (subject to Section 8.1.1). Notwithstanding the foregoing: (a) Contractor shall only be entitled to an adjustment to the Contract Price in respect of Changes for an Event of Delay specified in paragraph (vi) of the definition of "Event of Delay" (relating to AHJ final inspection approval), if Contractor is entitled to an Equitable Adjustment to the Schedule of Work pursuant to Section 8.4 for more than fifteen (15) Business Days; and (b) Contractor shall not be entitled to claim any adjustment to the Contract Price in respect of any Change for an Event of Delay relating to modules; provided, however, the foregoing is without prejudice to Contractor's right to claim an Equitable Adjustment to the Contract Price pursuant to this Section 8.3 if a Module Event of Delay has been caused by any other Event of Delay. The mark-up shall be no more than five percent (5%).

8.4     Adjustments to Schedule of Work.  Provided that Contractor has used all reasonable efforts to avoid and mitigate any potential delays to the Project Schedule and/or increased Direct Costs (as defined below) or indirect costs resulting from such events  and to the extent that Contractor demonstrates that an event necessitating a Change Order has occurred, Contractor shall be entitled to an Equitable Adjustment to the Schedule of Work as a result

of a Change requiring additional time but only to the extent that the Change directly affects the Critical Path of the Work and subject to adjustments to the Work or to the methods or sequence of performing the Work that can in Contractor's judgment be implemented by Contractor to mitigate the delay.  Adjustments shall be based on the baseline Schedule of Work set forth in Exhibit B, as such Schedule of Work is updated in accordance with Section 3.5.2.  Notwithstanding the foregoing, Contractor shall not be entitled to claim an Equitable Adjustment to the Schedule of Work pursuant to this Section 8.4 for a period in excess of thirty (30) days in respect of any Change for a Event of Delay relating to modules; provided, however, the foregoing is without prejudice to Contractor's right to claim an Equitable Adjustment to the Schedule of Work pursuant to this Section 8.4 in excess of thirty (30) days if a Event of Delay relating to modules has been caused by any other Event of Delay.

8.5    Other Provisions Unaffected. Except to the extent the Parties specifically modify any of the provisions of this Agreement as part of an executed Change Order, all provisions of this Agreement shall apply to all Changes, and no modification, amendment or waiver shall be implied as a result of any other Change.

8.6    Facility Plans and Specifications.    Notwithstanding the Change Order provisions set forth in this Article 8, upon prior notice to Owner, Contractor reserves the right to make changes after the Effective Date that will not have an effect on the Schedule of Work, Contract Price or in the Facility Specifications for the purposes of mechanical installations, building code and Project Site requirements and reasonable design improvements, provided that components are of equal quality.

8.7    Materials.  Upon prior written approval of Owner, Contractor shall have the right to substitute similar materials of equal or better quality than may be specified in the Facility Specifications without impacting the form, fit or function of other aspects of the Facility.  Owner shall respond to such a request within ten (10) Business Days, and Owner's approval shall not be unreasonably withheld.

8.8    Adjustment to the Schedule of Milestones.  If the Contract Price is adjusted pursuant to a Change Order, the Parties, if necessary, shall make corresponding changes to the Schedule of Milestones.

8.9    Direct Costs

8.9.1    In no event will Contractor be entitled to payment for Direct Costs hereunder to the extent that such costs would have occurred notwithstanding such event, due to the concurrent fault, actions or omissions of Contractor or its Subcontractors.

8.9.2    For the purposes hereof, Contractor may use an Affiliate, but shall not charge Owner any mark-up on that Affiliate's costs as part of Contractor's Direct Costs hereunder.  "Direct Costs" shall mean only the actual costs and expenses that are incurred by Contractor as a

39

result of the event giving rise to the Change Order including: (i) compensation for Labor utilized and in the direct employ of Contractor at the Facility Site, at the rates as set forth in Contract Price Exhibit; (ii) cost of materials and permanent equipment; (iii) payments properly made by Contractor to Subcontractors; (iv) rental charges of necessary machinery and equipment (but excluding hand tools) used at the Project Site; (v) Permit fees; (vi) compensation of engineers or other design professionals employed directly by Contractor; and (vii) reasonable costs of mobilization and/or demobilization. Notwithstanding the foregoing, "Direct Costs" shall not include (t) salaries or other compensation (including costs of contributions, assessments, fringe benefits or taxes based on salaries or compensation) of Contractor's Personnel at Contractor's principal office and branch offices (except as provided in the previous sentence); (u) expenses of Contractor's principal and branch offices; (v) Contractor's profit, overhead or general expenses of any kind; (w) replacement, repair or other costs or liabilities arising from any loss of or damage to any equipment, tools or other property owned or used by Contractor or its Subcontractors; (x) costs to correct or re-perform any components of such Work as a result of the acts or omissions of Contractor or its Personnel; (y) any fines or penalties assessed against Contractor or its Personnel in connection with such Work that were assessed due to the fault of Contractor or its Personnel; or (z) any costs or expenses other than those specifically set forth above as Direct Costs.

8.10 Contractor may invoice Owner for partial payment for Work performed if (i) Contractor is entitled to an Equitable Adjustment to the Schedule of Work due to an Owner Caused Delay of more than twenty (20) Business Days or (ii) if following Capacity Testing the Facility fails to achieve at least ninety-five percent (95%) of the Capacity Guarantee as a result of the Owner Supplied Equipment or Owner's Scope of Work. Any partial payment paid by Owner pursuant to this Section 8.9 shall be deducted from the subsequent Payment Milestone payment (the amount deducted shall be limited to only the amount of any such partial payment and will not include any amounts attributable to an adjustment to the Contract Price in relation to such Owner Caused Delay pursuant to a Change Order or Construction Change Directive).

## ARTICLE 9
## FORCE MAJEURE AND OWNER CAUSED DELAY

9.1 <u>Excused Performance Due to Force Majeure</u>. If either Party can reasonably demonstrate that it is rendered wholly or partly unable to perform its obligations under this Agreement because of a Force Majeure Event, for the duration of such Force Majeure Event, that Party will be excused from whatever performance is affected by the Force Majeure Event

40

to the extent so affected; provided that, a Force Majeure Event, whether affecting Owner or Contractor, shall not excuse Owner from performing its payment obligations hereunder, including its obligation to pay Contractor the Contract Price for all portions of the Work completed consistent with this Agreement and not affected by the Force Majeure Event. If either Party is unable to perform its obligations under this Agreement due to a Force Majeure Event for a consecutive period of more than one hundred eighty (180) days, then either Party shall be entitled to terminate this Agreement by written notice to the other Party.  In the event of termination by a Party pursuant to this Section 9.1, Contractor shall be entitled, as its sole and exclusive remedy with respect to such termination, to such amounts as are required to be paid in the event this Agreement is terminated pursuant to Section 11.1.

9.2     Notification of Force Majeure and Mitigation.  The Party affected by the Force Majeure Event shall (i) promptly, in the case of Owner, and immediately, in the case of Contractor, notify the other Party of its Force Majeure Event in writing or orally (to be confirmed in writing); (ii) as soon as reasonably possible after the Force Majeure Event, fulfill or resume fulfilling its obligations hereunder; and (iii) provide the other Party with notice of the cessation or partial cessation of the Force Majeure Event.

9.3     Force Majeure Suspension. If the Owner, acting reasonably, determines that the completion of the Work will be delayed by six weeks or more due to a Force Majeure Event, the Owner may deliver to the Contractor a written notice informing the Contractor that the completion of the Work is to be suspended until the completion of the Work is no longer prevented by that or any other Force Majeure Event. On receipt of a notice under this Article 9.3, the Contractor must immediately prepare and, within ten (10) Business Days, deliver to the Owner a plan (the **"Suspension Plan"**) for the re-scheduling of the completion of the Work, the storage of equipment, and demobilization of any unnecessary workers. Owner shall, acting reasonably and within five (5) business days, review and either approve or reject the Suspension Plan. In case Owner approves the Suspension Plan, the Contractor must immediately implement the Suspension Plan. In case Owner rejects the Suspension Plan, the Contractor must immediately prepare and, within five (5) Business Days, deliver to the Owner an updated Suspension Plan. In case Owner exercises its rights under this section, Owner shall not be liable to Contractor for any costs other than those incurred as a direct result of the suspension and shall, for the avoidance of doubt, not be liable for lost profits of the Contractor.

**ARTICLE 10**
**WARRANTIES**

10.1    Warranties.  Contractor warrants that as of the date of Substantial Completion, the Work (a) will be composed of all new materials and components free from material defects in design and workmanship which are, in all respects, fit for purpose; and (b) will conform to the Contract Documents, Facility Specifications any manufacturer installation requirements (including for Owner Supplied Equipment, and for such, to extent such manufacturer installation requirements are provided to Contractor prior to Contractor

41

commencing the Work)(the "Workmanship Warranty"). During the Workmanship Warranty Period, the Contractor shall warrant the Work and manage any equipment warranty issues (except with respect to the Owner Supplied Equipment) and shall provide any necessary assistance to Owner in Owner's management of any equipment warranty issues relating to the Owner Supplied Equipment. The Workmanship Warranty does not warrant or guarantee a specified level of energy output. Any such warranty or guarantee, if any, shall be as set forth in a separate performance guarantee or in the warranty of the PV module supplier. Notwithstanding any provision herein to the contrary, Contractor's liability with respect to Owner's Scope of Work and Owner Supplied Equipment shall be strictly limited to defects arising out of or related to Contractor's performance of the Work.

10.2    Workmanship Warranty Period. Any claim for breach of the Workmanship Warranty must arise during the twenty-four (24) month period commencing on the date of Substantial Completion (such period, the "Workmanship Warranty Period"), save for repair, rework or replacement under Article 10.3, and a claim must be made, if at all, by Owner within ten (10) Business Days after the end of the Workmanship Warranty Period for any such claim for breach which arose within such warranty period. Neither payment by Owner, nor any other provision of this Agreement, nor partial or entire use or possession of the Work by Owner shall relieve Contractor of liability with respect to the Workmanship Warranty.

10.3    Repair of Defects.

10.3.1    The sole and exclusive remedy for breach of the Workmanship Warranty shall be repair, rework or replacement of the relevant Work, at Contractor's sole cost and expense provided, however, that if there is a defect in the Owner Supplied Equipment caused by Owner or another third party not associated with Contractor, Owner shall be responsible for the cost of removing and reinstalling or replacing any Owner Supplied Equipment. If Contractor is obligated to repair, replace or renew any Equipment, item or portion of the Work hereunder, Contractor will undertake a technical analysis of the problem and correct the "root cause" unless Contractor can demonstrate to Owner's reasonable satisfaction that there is no material risk of the reoccurrence of such problem.

10.3.2    If Owner discovers that the Facility or the Work or any part thereof fails to meet the Workmanship Warranty, Owner will promptly notify Contractor of such failure along with the reasonable basis for its belief that such failure is a breach of the Workmanship Warranty, and to the extent Contractor does not dispute such warranty claim (or is required to following resolution of any dispute in accordance with the terms hereof), Contractor shall repair, rework or replace the Defective Work or portion of the Facility, at Contractor's sole cost and expense. Any repair, rework or replacement carried out by Contractor or Subcontractor should be documented and reported to Owner within 10 Business Days of same. If, in Owner's professional opinion, the Contractor has not satisfactorily

42

repaired the failure, Owner shall have the right to make such repairs at Contractor's cost.

10.3.3   Where the O&M Provider identifies a fault in the system and attributes that fault to the Work, the Contractor shall respond to the formal notice of such issue to the Contractor within 24 hours and shall mobilize to resolve the issue within three business days. The issue shall be resolved no later than the response times listed below from the date and time of formal notice of such issue to the Contractor, according to the extent of the issue. If they fail to address the issue within those time frames the O&M Provider will resolve the issue at the Contractor's cost and the O&M Provider's works will be covered by the Workmanship Warranty.

    10.3.3.1        A fault or issue greater than 1MW – 25 hours

    10.3.3.2        A fault or issue between or equal to 100 kW and 1 MW – 5 Business Days

    10.3.3.3        A fault or issue less than 100 kW – 10 Business Days

10.3.4   All Work performed to repair defects will be done by installers certified by the proper manufacturers and be undertaken in compliance with manufacturer warranties.  Any warranty disputes between the Parties shall be resolved consistent with Article 19.

10.3.5   Owner shall provide Contractor with reasonable access to the Project in order to perform its obligation under this Article 10.3 and the Parties shall schedule such work as necessary so as to minimize disruptions to the operation of the Project. Owner shall have the right to operate and otherwise use the Equipment until such time as Owner deems prudent to suspend such operation or use in order to accommodate Contractor's Warranty Services.

10.3.6   Contractor will use best efforts to perform its warranty obligations pursuant to this Article 10 so as to minimize any adverse effect on the operation of the Facility, including the ability of Owner to meets its obligations and exercise its rights under any agreement for the sale of power from the Facility.

10.3.7   Contractor's obligations under this Article 10.3 shall not be impaired or otherwise adversely affected by any actual or possible legal obligation or duty of any vendor or Subcontractor to Contractor or Owner.

Contractor warrants that all materials incorporated into the Work as part of repairs to and replacements of the Work by Contractor or any Subcontractor, and repairs to and replacements of the Work pursuant to Article 10.3 shall conform to the requirements of this Agreement and the Workmanship Warranty. Contractor shall perform, at its cost and expense,

43

such tests as Owner may reasonably request to verify that any correction, repair, replacement or re-performance of the Work pursuant to Article 10.3 complies with the requirements of the Workmanship Warranty.

10.3.8   Contractor shall perform its obligations under this Article 10.3 as promptly as possible after being notified of the noncompliance by Owner, and in any event shall commence performance of its obligations under this Article 10.3 no later than two (2) Business Days after such notice.

10.3.9   If, after notification of a Defect or breach of Warranty, Contractor fails to commence repair, rework or replacement within the relevant time period or shall fail to continue performing or completing, its obligations under this Article 10.3 with respect to such Defect or breach of Warranty, Owner may correct such breach of Warranty so that the Work and Equipment comply with the Warranty (including by instructing the O&M Provider to do so) after giving Contractor three (3) Business Days written notice, and Contractor shall be liable for all reasonable direct costs, charges and expenses incurred by Owner in connection with the same and shall pay the same to Owner upon receipt of invoices with supporting documentation from Owner. Such correction of a breach of the Workmanship Warranty condition shall be deemed to be repair performed by Contractor and the Warranty Period for such corrected Work                shall                 be                 extended                 accordingly.

10.3.10    No correction of a Defect or breach of Warranty pursuant to this Section 10.3 shall void the Workmanship Warranty.

10.3.11    No correction or cure shall be considered complete until Owner has reviewed and accepted such remedial work.

10.3.12    So long as Contractor has been notified of a breach of the Workmanship Warranty prior to the end of the Warranty Period, the obligation of Contractor to correct such noncompliance, defect or breach of the Workmanship Warranty shall survive the expiration of the Warranty Period.

10.3.13    Upon completion of any repair, rework or replacement hereunder, all Equipment shall be returned or restored to its proper condition (subject to normal wear and tear), including but not limited to fit alignment, adjustment, operability, and finish.

10.3.14    Contractor shall bear all costs and expenses directly associated with repair, rework or replacement under this Article 10.3, including, all costs of Labor and equipment and of any necessary disassembly removal, replacement, transportation, reassembly, reinstallation, and retesting, as

44

well as reworking, repair, or replacement of such Work, and reassembly of structures, electrical work, machinery, Equipment, or any other obstruction as necessary to give access to the non-conforming item for correction, and for removal, repair and/or replacement of any damage to other work or property that arises from the breach of the Workmanship Warranty.

10.4    Performance Guaranty.

10.4.1 Contractor guaranties that the Work will perform in accordance with the specifications of Exhibit A.

10.4.2 Contractor shall conduct performance testing of the Facility one year, two years, and three years from the date of Substantial Completion in accordance with ExhibitL.

10.4.3 If the works do not satisfy the specifications of ExhibitA, Contractor shall make any modifications to the Facility, at its sole cost and expense, during the Performance Cure Period of sixty (60) days following the delivery of the results of the performance testing in an effort to meet the specifications of ExhibitA

10.4.4 If after the Performance Cure Period, Contractor still fails to achieve the specifications of Exhibit A, then Owner shall be entitled to a Performance Ratio Price Adjustment which shall be calculated in accordance with Exhibit G, L Such adjustment shall be paid within ten days after confirmation by both parties that Contractor has failed to achieve the Performance Guarantee and agreement on the Performance Ratio Price Adjustment amount.

10.4.5 In support of the performance testing process, Owner shall provide Contractor with (i) access rights to the performance data throughout the site operations (direct "read only" access to live/real-time, or historic on a daily basis) for a period of three (3) years from the date of Substantial Completion and subject to the confidentiality provisions of this Agreement during the period of performance of this Agreement and thereafter, and (ii) physical access rights to visit the Site at any time without restriction to spot-check the level of service and care of the O&M provider.

10.5    Enforcement by Owner; Subcontractor Warranties; Assignment of Warranties. Contractor shall obtain for the benefit of Owner the warranties provided by Subcontractors and those warranties of suppliers provided with respect to any Equipment (other than Owner Supplied Equipment) (the "Third Party Warranties"). Contractor shall comply with

45

the terms and conditions of each Third Party Warranty applicable to the  Equipment (as it relates to Owner Supplied Equipment, only to the extent that Owner has previously provided the same to Contractor) so that each such Third Party Warranty remains in full force and effect and, until the end of the Workmanship Warranty Period, Contractor shall be responsible for making claims under and taking all such actions necessary to enforce all Third Party Warranties (excluding Owner Supplied Equipment) with respect to the Facility until the end of the Workmanship Warranty Period.  On and from the expiration of the Workmanship Warranty Period (or at the earlier request of Owner), Contractor shall be responsible for the valid assignment of such Third Party Warranties to Owner and thereafter Owner or its O&M provider shall be responsible for administering, maintaining, complying with and supervising all such Third Party Warranties.  If, during the Workmanship Warranty Period, any original equipment manufacturer claims that a failure, defect or damage to the Owner Supplied Equipment resulted from improper actions or negligence (not otherwise attributed to Contractor's Personnel) causing the manufacturer to deny such warranty claim on such basis, to the extent that the Owner elects to legally pursue a claim against the original equipment manufacturer in a court of law or other tribunal or governmental proceeding, Owner shall pay all such costs and expenses associated with such pursuit and Contractor shall only have the obligation to assist Owner in such pursuit provided that Owner shall reimburse Contractor for all reasonable costs and expenses incurred by Contractor in providing such assistance.  Commencing on the expiration of the Workmanship Warranty Period (or in the event that this Agreement is terminated and Owner has paid Contractor all amounts due and owing under this Agreement, upon such termination date), Contractor shall cause the valid assignment of the manufacturer's warranties for all Equipment (other than Owner Supplied Equipment) incorporated into the Facility to Owner.

10.6    Exclusions from Workmanship Warranty.  The Workmanship Warranty shall not extend or apply to any failure of the Facility to comply with the Workmanship Warranty that is caused by (a) normal wear and tear resulting from the operation of the Facility; (b) any modifications made to the Facility by any person other than Contractor's Personnel without Contractor's prior written consent; (c) any neglect, abuse, malicious mischief or vandalism affecting the Facility or damage to the Work or Facility not caused by Contractor or its Subcontractors; (d) to the extent that any failure caused by a negligent act of Owner or its employees, affiliates or guests; (e) failure to operate or maintain the Facility or Equipment in accordance with industry standards the manufacturers' guidelines; (f) operation of such Work or Facility by Owner or its representatives, agents or contractors in excess of or outside of the operating parameters or specifications for such Work or Facility as set forth in the applicable user manuals; (g) a Force Majeure Event; (h) the failure of any part, material or equipment, if  (A) the manufacturer of the part, material or equipment fails to honor its product warranty to Owner within the timeframe specified in such product warranty or, if not specified, a reasonable timeframe; (B) the warranty for such part, material or equipment has expired; or (C) the part, material or equipment did not benefit from a manufacturer's warranty, and in each case Owner does not remedy by replacement of the part, material or equipment at its own expense; and (i) Contractor's compliance with a specific written direction from Owner if, prior to implementing such direction, Contractor reasonably advised Owner that Owner's written direction would so affect the Workmanship Warranty.

46

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

10.7     Limitation of Warranty. THE EXPRESS WARRANTIES PROVIDED IN THIS ARTICLE 10 ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OR GUARANTEES OF ANY KIND, WHETHER EXPRESS OR IMPLIED (INCLUDING ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE), RELATING TO CONTRACTOR'S OBLIGATIONS FOR THE WORK, AND ALL SUCH OTHER WARRANTIES AND REPRESENTATIONS ARE HEREBY DISCLAIMED.  THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE 10 SHALL CONSTITUTE THE ENTIRE LIABILITY OF CONTRACTOR WITH RESPECT TO DEFECTS IN THE WORK.

10.8     Serial Defects.

10.8.1 Contractor shall immediately notify Owner if it becomes aware of any defect affecting five percent (5%) or more of the module portion of the Owner Supplied Equipment and shall comply with any reasonable request of Owner to provide assistance to the module supplier in its remedying of any such defects, provided that Contractor shall not be obliged to provide such assistance where it would require Contractor to incur cost.

10.8.2 Should substantially the same defect, having the same root cause, of a non-aesthetic nature, affecting the performance of any component supplied by the Contractor, be identified in 10% of such components, all such components shall be deemed not fit for purpose and Contractor will be obliged to replace all such components on the Project Site.

## ARTICLE 11
## DEFAULT; TERMINATION

11.1     Termination for Convenience.

11.1.1 Notice of Termination for Convenience.  Owner may terminate this Agreement at any time for convenience by providing written notice of termination to Contractor at any time at least thirty (30) Business Days before the effective date of termination.

11.1.2 Contractor's Obligations Upon Termination for Convenience.  Upon the date specified in any notice delivered by Owner under Section 11.1.1, Contractor shall, unless the notice requires otherwise:

(a)     as soon as possible, discontinue Work and demobilize from the Project Site, except in respect of items of Work the value of which would otherwise be lost or as necessary to secure the Project Site or the Work in a safe and secure state (provided that Owner shall be responsible for payment in respect of such items of Work pursuant to Section 11.1.3(b));

47

(b)     if Owner notifies Contractor that it intends to re-contract the Work or sell the Project and pay the additional amount referred to in Section 11.1.3(e), upon receipt of such payment, assign to Owner or its designee such of the Subcontracts as Owner may reasonably request (to the extent possible), and otherwise cancel orders for undelivered materials (to the extent possible);

(c)     use best efforts to liquidate delivered materials;

(d)     if Owner has notified Contractor it intends to re-contract the Work or sell the Project and pay the additional amount referred to in Section 11.1.3(e), upon receipt of such payment, seek to obtain licenses for Owner's benefit to any proprietary property incorporated into the Work; and

(e)     document the status of the Work and activities taken in connection with termination,

(collectively, the "Demobilization Activities"), all in a manner deemed reasonable by Contractor under the circumstances and in accordance with Prudent Industry Practices.

11.1.3  Payment Upon Termination for Convenience.  For the avoidance of doubt, this Section 11.1.3 (Payment Upon Termination for Convenience) shall not apply to any LNTPs between the Parties.  After notice of termination, Owner shall, subject to receipt of all necessary information from Contractor, use all reasonable endeavors to pay to Contractor (i) within sixty (60) days, the amounts payable under subsections (a), (b), (c), and (d) of this Section 11.1.3; and (ii) within a mutually agreeable time frame, the amounts payable under subsection (e) of this Section 11.1.3 (collectively, the "Early Termination Charge"):

(a)     all amounts due and not previously paid to Contractor for Work performed and wholly or partially completed (payment for partially completed Work is payable by Owner as follows: one hundred five percent (105%) of Contractor's Direct Costs attributable to such partially completed Work) in accordance with this Agreement prior to the date of notice of termination and for Work thereafter completed pursuant to Section 11.1.2(a) or as specified in such notice, inclusive of amounts withheld under Section 7.7;

(b)     actual costs incurred by Contractor in connection with the Demobilization Activities (e.g., costs of demobilization from the Project Site, cost of completion of Work, amounts paid to

48

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

Subcontractors, shipping costs, costs of material disposition, etc.) plus fifteen percent (15%) of such costs;

(c)     costs of materials for which Contractor is liable to take delivery of and are delivered to Owner, which could not be disposed or utilized;

(d)     any sales tax imposed by Applicable Law; and

(e)     if and to the extent Owner, following such termination for convenience, within a period of eighteen (18) months, either (i) contracts with any other contractor(s) to complete the Work or (ii) sells the Project for an amount greater than the Investment Price, an additional amount equal to fifteen percent (15%) of the difference between amounts paid under Section 11.1.3(a) to 11.1.3(d) and the Contract Price, subject to a cap of one hundred and twenty five thousand dollars ($125,000), payable within thirty (30) days of the occurrence.

11.2    Termination Upon Contractor's Material Breach.

11.2.1 Event of Default by Contractor.  A "Contractor Event of Default" shall mean, with respect to Contractor, the occurrence of any of the following:

(a)     Any representation or warranty made by Contractor herein is materially false or misleading in any material respect when made or Contractor fails to perform any of its material obligations contained in this Agreement (other than such covenants or agreements specifically addressed in other provisions of this Section 11.2) and such false representation or warranty or failure of performance is not corrected or cured or initiated to be corrected/cured within ten (10) Business Days after written notice from Owner, or if such remedy cannot reasonably be completed within such period, Contractor fails immediately to commence and diligently pursue remedial action within such period and conclude such action within one hundred twenty (120) days;

(b)     Contractor (i) fails to maintain the Parent Guaranty as set forth in Section 7.8 or (ii) fails to make payment to Owner of any undisputed amounts when due and payable and in the case of clause (ii) such failure continues for more than twenty (20) Business Days after written notice from Owner;

(c)     Contractor abandons the Work; "Abandon" for the purposes of this paragraph shall mean that Contractor, except to the extent

49

caused by an Event of Delay, has substantially and voluntarily reduced personnel at the Project Site resulting in Contractor not being capable of completing the Work consistent with reasonable and Prudent Industry Practices and in accordance with the Schedule of Work in a material and significant manner and such abandonment continues for more than thirty (30) days after written notice from Owner;

(d) Contractor assigns or attempts to assign its rights or obligations under this Agreement or any part thereof to any third party except as permitted under this Agreement;

(e) Contractor is adjudicated insolvent, or if any proceeding is instituted against it seeking to adjudicate Contractor as bankrupt or insolvent and such proceeding is not dismissed within ninety (90) days of its filing, or Contractor makes a general assignment for the benefit of its creditors, has a trustee or receiver appointed for its property, or files a petition to take advantage of any insolvency laws;

(f) Contractor fails to achieve Mechanical Completion within six (6) calendar months of the Mechanical Completion Deadline; or

(g) Contractor fails to achieve Substantial Completion within sixty (60) calendar days of Permission to Operate.

11.2.2  <u>Notice of Contractor Event of Default</u>.  Owner may, without prejudice to any other right or remedy that it may have under law or in equity, terminate this Agreement immediately upon delivery of notice to Contractor, provided that (i) Owner notifies Contractor of the Contractor Event of Default, (ii) Contractor does not cure the Contractor Event of Default within the cure period for such Contractor Event of Default set out in <u>Section 11.2.1</u> (Owner may immediately terminate this Agreement on the occurrence of the events listed in <u>Sections 11.2.1(b)(i)</u>, <u>11.2.1(c)</u>, <u>11.2.1(d)</u>, <u>11.2.1(f)</u> and <u>11.2.1(g)</u>) and (iii) Owner subsequently notifies Contractor of its intent to terminate the Agreement.

11.2.3  <u>Consequences of Termination for Default</u>. If Owner elects to terminate this Agreement pursuant to this <u>Section 11.2</u>, then Owner may employ any other person (a "<u>Replacement Contractor</u>") to finish the Work.  In such event, Owner may make such reasonable expenditures as would accomplish the timely completion of the Facility.  Contractor shall provide Owner or any Replacement Contractor, at Contractor's expense, and to the extent not otherwise having been granted and conveyed hereunder, with the right to continue to use any and all intellectual property and other patented and/or proprietary information that Contractor has rights to use, if any, that Owner deems necessary to complete the Facility (including the Design Documents).  If the completion cost utilizing a Replacement Contractor

exceeds the unpaid portion of the Contract Price at the time of the termination of this Agreement, then Contractor shall pay to Owner the amount of such excess within twenty (20) days following receipt of Owner's demand for such payment, which shall be accompanied by reasonable supporting documentation.  Contractor shall remain liable for any amounts paid by Owner to Contractor for work completed by any Subcontractor(s) up to the date of termination. Contractor shall be entitled to payment for Work wholly or partially performed (payment for partially completed work is payable by Owner as follows: one hundred fifteen percent (115%) of Contractor's Direct Costs attributable to such partially completed Work) before the effective date of termination.

11.2.4 <u>Contractor's Obligations Upon Termination for Default</u>.   If this Agreement is terminated in accordance with <u>Section 11.2.2</u>, Contractor shall proceed in accordance with <u>Section 11.1.2</u> and shall be entitled to payment in accordance with <u>Section 11.2.3</u>.

11.3    <u>Termination Upon Owner's Material Breach</u>.

11.3.1 <u>Event of Default by Owner</u>.  An "<u>Owner Event of Default</u>" shall mean, with respect to the Owner, the occurrence of any of the following:

(a)     Any representation or warranty made by Owner herein is false or misleading in any material respect when made or Owner fails to perform any of its material obligations contained in this Agreement (other than such covenants or agreements specifically addressed in other provisions of this <u>Section 11.3</u>) and such false representation or warranty or failure of performance is not corrected or cured within ten (10) Business Days after written notice from Contractor, or if such remedy cannot reasonably be completed within such period, Owner fails promptly to commence and diligently pursue remedial action within such period and conclude such action within one hundred twenty (120) days;

(b)     Owner fails to make payment to Contractor of any undisputed amounts when due and payable and such failure continues for twenty (20) days after written notice thereof has been given to Owner by Contractor;

(c)     Owner assigns or attempts to assign its rights or obligations under this Agreement or any part thereof to any third party except as permitted under this Agreement; or

(d)     Owner is adjudicated insolvent, or if any proceeding is instituted against it seeking to adjudicate Owner as bankrupt or insolvent and such proceeding is not dismissed within ninety (90) days of

its filing, or Owner makes a general assignment for the benefit of its creditors, has a trustee or receiver appointed for its property, or files a petition to take advantage of any insolvency laws.

11.3.2 <u>Notice of Owner Event of Default</u>.  Contractor may, without prejudice to any other right or remedy that it may have under law or in equity, terminate this Agreement immediately upon delivery of notice to Owner, provided that (i) Contractor notifies Owner of the Owner Event of Default, (ii) Owner does not cure the Owner Event of Default within the cure period for such Owner Event of Default set out in <u>Section 11.3.1</u> (Contractor may immediately terminate this Agreement on the occurrence of the event listed in <u>Section 11.3.1(c)</u>) and (iii) Contractor subsequently notifies Owner of its intent to terminate the Agreement.

11.3.3 <u>Consequences of Termination by Contractor</u>.  If this Agreement is terminated in accordance with <u>Section 11.3.2</u>, Contractor shall proceed in accordance with <u>Section 11.1.2</u> and shall be entitled to the Early Termination Charge.

11.4 <u>Surviving Obligations</u>.  Termination or completion of this Agreement shall not relieve Contractor or Owner of any obligation hereunder which expressly survives termination or completion hereof and shall not relieve Owner of its payment obligations with respect to any Work already performed consistent with the terms of this Agreement or of obligations by Owner assumed prior to the date of termination.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

12.1 <u>Business Organization</u>.  Each Party represents and warrants that it is an entity duly organized, validly existing and in good standing under the laws of its state of organization and is qualified to do business in the state in which the Project Site is located.

12.2 <u>Litigation</u>.  Each Party represents and warrants that (a) it is not in violation of any laws, ordinances, judgments, decrees, injunctions, writs and orders of any Governmental Authority, which violations, individually or in the aggregate, would adversely affect its performance of its material obligations under this Agreement; and (b) there is no litigation nor any arbitration proceedings by or before any arbitrators, court or other Governmental Authority now pending or (to its knowledge) threatened against it which, if adversely determined, could reasonably be expected to have a material adverse effect on its ability to perform its obligations under this Agreement.

12.3 <u>Corporate Action; Enforceability</u>.  Each Party represents and warrants that (a) it has all necessary organizational power and authority to execute, deliver and perform its obligations under this Agreement; (b) the execution, delivery and performance by it of this Agreement has been duly authorized by all necessary action on its part; and (c) this Agreement has been duly and validly executed and delivered by it and constitutes the legal,

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

valid and binding obligation of it enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

12.4    Property Ownership; Conditions.  Owner represents and warrants to Contractor that (a) Owner has exclusive and full fee title ownership to the Project Site or valid leasehold interest; (b) the Project Site is free of any and all liens and encumbrances that could have an adverse effect on the Work, the Facility (or the construction, installation, ownership, operating or maintenance thereof) or Contractor's ability to perform any of its obligations hereunder; (c) there are no conditions of any kind, as described in 3.14 at or affecting the Project Site that could have an adverse effect on the Work, the Facility (or the construction, installation, ownership, operating or maintenance thereof) or Contractor's ability to perform any of its obligations hereunder; and (d) to its knowledge, other than to the extent disclosed in the Environmental Study, there are no Hazardous Substances located on the Project Site.

12.5    Licensing.  Contractor represents that it is and shall for the duration of the Work be properly licensed in the State where the Project is located to perform the Work to the extent required by Applicable Laws, and that all architects or engineers performing any of the Work will, for the duration of the Project, be duly licensed in the State where the Project is located if required by Applicable Law.

12.6    Corporate Benefit.  Each Party represents that the entry into and performance of this Agreement is in its commercial interest and to its corporate benefit and the competent corporate bodies have assessed and satisfied themselves as to the existence of such corporate benefit.

12.7    Adequate Resources.  Each Party represents that it has access to adequate resources, including financial resources, to perform all its obligations under this Agreement.

**ARTICLE 13**
**TAXES**

13.1    Contractor Taxes.  The Contract Price includes all corporate income tax assessable on income of Contractor, employee benefit taxes for all Work (whether performed by Contractor or any Subcontractor, and whether performed at the Project Site or elsewhere), taxes imposed upon the Work (excluding any Owner Supplied Equipment and Owner's Scope of Work), taxes imposed upon the wages of the Contractor's Personnel and similar assessments (all such foregoing taxes collectively, the "Contractor Taxes"), but specifically excludes sales and use and other similar taxes on the sale of the Facility.  Owner shall obtain (and provide copies to Contractor) exemption certificates for sales tax imposed on the purchase of Equipment, if obtainable in the State or other jurisdiction relating to the Project Site (if Contractor is assessed sales taxes for Equipment that Owner believed was exempt, Owner shall promptly reimburse Contractor for such taxes paid by Contractor).  If

53

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

any Contractor Taxes are due and payable, Contractor shall timely pay or cause to be paid such Contractor Taxes.

13.2    <u>Sales Tax</u>. In addition to the Contract Price, Owner shall be responsible for all sales, use and similar taxes imposed upon the sale or transfer of the Facility under Applicable Laws and shall provide any appropriate waivers or exemptions.  The Parties will cooperate in effecting any exemption by signing all necessary certificates, as required by Applicable Law.  Owner shall be responsible and shall pay any and all other taxes, charges, and fees directly or indirectly associated with the Project Site, the Facility, the transactions described in this Agreement, and/or the Work including but not limited to sales, use, and excise taxes. If any of the foregoing taxes are due and payable, Owner shall timely pay or cause to be paid such taxes.

**ARTICLE 14
TITLE**

14.1    <u>No Encumbrances</u>.  Contractor warrants that, to the extent of timely payment by Owner to Contractor hereunder, (a) subject to its rights under <u>Section 14.4</u>, it will keep the Work, Equipment, Project and Project Site, as well as any property of Owner and its affiliates, free from liens and will ensure that none of its Subcontractors will file or permit the filing of liens thereon (excluding Pre-Lien Notices); and (b) legal title to and ownership of the Facility and Equipment shall be free and clear of any and all liens, claims, security interests or other encumbrances arising from the Work when title thereto passes to Owner. Contractor agrees to execute such ancillary documents required by Owner or any Financing Party to give effect to this provision.

14.2    <u>Title to Equipment and the Facility</u>.   Title to the Facility and all Equipment (other than Owner Supplied Equipment) and other materials shall vest in Owner upon the earlier of:  (a) incorporation into the Facility; or (b) as and to the extent Owner has paid for such Equipment (other than Owner Supplied Equipment) and materials; provided, however, that title to the Facility and all Equipment and other materials shall vest in Owner no later than the date of Substantial Completion.

14.3    <u>Work Product</u>.   Contractor shall retain all property rights (including copyright) in the Design Documents and in its standard drawing details, designs, specifications, databases, computer software and any other proprietary property; provided that, Owner shall at all times (including after any termination of this Agreement) have the right to retain copies thereof and, upon transfer of the Facility to Owner, is hereby granted a royalty-free, perpetual, irrevocable, non-transferable (except in connection with a sale of the Facility) license to use such Design Documents, drawings, designs, specifications and any other information of Contractor related to the Facility for the sole purpose of owning, operating, maintaining, repairing, financing, insuring and if so desired, selling, the Facility. Owner's use of any such documents or information for any purpose other than as set forth in this Agreement, or modification to such documents by anyone other than Contractor, shall be at the Owner's sole risk and without liability or legal exposure to Contractor, and Owner

shall defend, indemnify and hold harmless Contractor for claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs, experts' fees and reasonable attorneys' fees, resulting from or in connection with such use by Owner.  Upon termination of this Agreement pursuant to Sections 11.1 or 11.3, the license granted hereunder shall terminate; provided, however, if Owner pays the amount set forth in Section 11.1.3, the license shall be reinstated.

14.4    Nonconformity.  In the event of any defect in title or lien on the Equipment, Facility, or Project Site resulting from the action or inaction of Contractor's Personnel, Contractor shall immediately (a)  at its own cost, defend Owner's title to the Work, Facility, Project Site and any Equipment; and (b) remove and discharge any such lien, claim, security interest or other encumbrance from the Equipment, Facility, Work or the Project Site; provided that, if Contractor is unable to so immediately remove and discharge any such encumbrance, Contractor, at its own cost, may provide to Owner in lieu thereof a bond or other collateral, in form and substance reasonably satisfactory to Owner, to indemnify Owner against any loss resulting from such liens, claims, security interests or other encumbrances.

**ARTICLE 15**
**INDEMNIFICATION**

15.1    Contractor Indemnity. To the fullest extent allowed by law, Contractor agrees to indemnify, defend, and hold harmless Owner Indemnitees, from and against any and all claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs, experts' fees and reasonable attorney's fees, resulting from or in connection with the claims of third parties, whether arising in equity, at common law or by statute, or under the law of contracts, torts (including negligence and strict liability without regard to fault) or property,  and including those arising in favor of or brought by any of Contractor's Personnel (collectively, the "Owner Losses"), for  (a) physical damage to, or physical destruction of, property (including the Owner Supplied Equipment), or death of or bodily injury to any person; (b) (i) actual or alleged infringement or misappropriation by Contractor of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the Facility (excluding in relation to the (1) Owner Supplied Equipment and (2) design set provided by Owner to Contractor), including any deliverable or (ii) Contractor's violation of any third-party license to use intellectual property in connection with the Work (excluding in relation to the (1) Owner Supplied Equipment and (2) the design set provided by Owner to Contractor), including any deliverable; or (c) (i) any release of a Hazardous Substance transported onto the Project by Contractor or anyone for whom Contractor is responsible, (ii) any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation by Contractor or anyone for whom Contractor is responsible of any Applicable Law, or (iii) any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law for which Contractor is responsible, in all cases to the extent caused by negligence, gross negligence or willful misconduct of Contractor or Contractor's Personnel.  Notwithstanding the foregoing, nothing herein shall require Contractor to indemnify, hold harmless or defend

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

an Owner Indemnitee for Owner Losses to the extent such Owner Losses resulted from the negligence, gross negligence or willful misconduct of any Owner Indemnitee.

15.2    Owner Indemnity.  To the fullest extent allowed by law, Owner agrees to indemnify, defend, and hold harmless Contractor Indemnitees from and against any and all claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs, experts' fees and reasonable attorney's fees, resulting from or in connection with the claims of third parties, whether arising in equity, at common law or by statute, or under the law of contracts, torts (including negligence and strict liability without regard to fault) or property, and including those arising in favor of or brought by any of Owner's personnel (collectively, the "Contractor Losses"), for (a) physical damage to, or physical destruction of, property, or death of or bodily injury to any person; (b) (i) actual or alleged infringement or misappropriation by Owner of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the Facility, including any deliverable or (ii) Owner's violation of any third-party license to use intellectual property in connection with the Work, including any deliverable; or (c)(i) any Hazardous Substance on the Project Site other than Hazardous Substances transported onto the Project Site by Contractor Indemnitees, (ii) any Unknown Site Conditions discovered at the Project Site, provided Contractor materially complies with its obligations under Section 3.15 with respect thereto and any Applicable Laws (if Contractor fails to materially comply, Owner's obligations hereunder may be reduced only to the extent of any prejudice to Owner directly caused by such failure); (iii) any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation by Owner or anyone for whom Owner is responsible of any Applicable Law, or (iv) any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law for which Owner is responsible, in all cases to the extent caused by negligence, gross negligence or willful misconduct of Owner or Owner's personnel.  Notwithstanding the foregoing, nothing herein shall require Owner to indemnify, hold harmless or defend a Contractor Indemnitee for Contractor Losses to the extent such Contractor Losses resulted from the negligence, gross negligence or willful misconduct of any Contractor Indemnitee.

15.3    Notices.  Each Party shall promptly, in the case of Owner, and immediately, in the case of Contractor, notify the other in writing of any claims from any third party that may be covered by the indemnities set forth in this Article 15 within ten (10) Business Days of receipt of notice of such claim from such third party.  The failure of the indemnified Party to promptly, in the case of Owner, and immediately, in the case of Contractor, notify the indemnifying Party will not relieve the indemnifying Party of any indemnification responsibility under this Article 15, except to the extent, if any, that such failure materially prejudices the ability of the indemnifying Party to defend such claim.

15.4    Defense of Claims.  The indemnifying Party under this Agreement ("Indemnitor") shall have the sole right to control the defense of any suit or proceeding with its choice of counsel based on any claim, demand, loss, damage, cause of action, suit or liability for which Indemnitor is responsible under any such indemnification.  Indemnitor shall not settle any claim without the prior written consent of the indemnified Party

56

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

("Indemnitee") if such settlement (a) does not include an irrevocable release of all claims against the Indemnitee; (b) materially diminishes any of Indemnitee's rights under this Agreement or seeks to impose additional obligations on Indemnitee; (c) modifies the Facility or the operation or maintenance of the Facility; or (d) contains a stipulation or admission or acknowledgement of any liability or wrongdoing on the part of Indemnitee.  Indemnitee shall give the Indemnitor such assistance as the Indemnitor may reasonably require in such defense, at Indemnitor's expense.  Indemnitee shall have the right to be represented in such defense and settlement by counsel of its own choice at its own expense.  If the Indemnitor fails to defend diligently such suit or proceeding, the Indemnitee may, in its reasonable discretion, either defend such suit or proceeding or settle the claim which is the basis thereof, without the consent of the Indemnitor, but with prior notice to the Indemnitor, without relieving the Indemnitor of its indemnification obligations hereunder and in each case the Indemnitor shall reimburse the Indemnitee for the settlement payment, expenses, court costs and reasonable attorneys' fees.

15.5    <u>Survival of Indemnity Obligation</u>. The Parties' indemnification obligations contained in this <u>Article 15</u> shall survive the termination, cancellation or expiration of this Agreement until expiration of any applicable statute of limitations.

## ARTICLE 16
## LIMITATIONS OF LIABILITY

16.1    <u>Waiver of Certain Damages</u>. Neither Party nor any of their respective shareholders, members, partners, officers, directors, agents, affiliates, subcontractors, vendors or employees shall be liable to the other Party or its affiliates hereunder for any consequential damages (other than actual and direct damages) or indirect loss or damage arising out of this Agreement, whether such loss or damage arises in contract, tort (including negligence), strict liability, warranty, statute or otherwise, including loss of revenues, loss of profit, cost of capital, loss of goodwill, increased operating costs or any other special or incidental damages.  For purposes of the foregoing, (i) Mechanical Completion Delay Liquidated Damages, and (ii) the Capacity Shortfall Liquidated Damages and (iii) the Early Termination Charge shall not be considered consequential, indirect, special, or incidental damages.  The Parties further agree that the waivers and disclaimers set forth above shall survive the expiration or termination of this Agreement.

16.2    <u>Limitations of Liability</u>.

16.2.1 It is specifically understood and agreed that there shall be absolutely no personal liability on the part of any of the officers, directors, employees, shareholders or members of the Parties for the payment of any amounts due hereunder, or the performance of any obligations hereunder, and each Party shall look solely to the assets of the other Party for the satisfaction of each and every remedy of such Party in the event of any breach by the other Party.  In furtherance of the foregoing, each Party agrees that it shall neither seek nor obtain, nor be entitled to seek or obtain, any deficiency or other judgment against any of the officers, directors, employees, shareholders or members of the other Party for any action or

inaction on the part of any shareholder or member or its respective officers, employees, controlling persons, executives, directors, agents, authorized representatives or affiliates, and such Party therefore releases such persons from such claims.

16.2.2 Notwithstanding anything to the contrary contained in this Agreement, in no event will the aggregate liability of Contractor to Owner under this Agreement, save as provided in this Section 16.2.2, exceed an amount equal to one hundred percent (100%) of the Contract Price (the "Liability Limitation"). The Liability Limitation shall not apply to or be reduced by:

(a)  any loss, liability or damage arising from or due to the fraud, fraudulent misrepresentation, gross negligence, or willful misconduct of Contractor;

(b)  Contractor's indemnification obligations under Section 15 of this Agreement; and

(c)  any payments received by Contractor or Owner from insurance companies under insurance coverage carried by Contractor pursuant to this Agreement.

For the avoidance of doubt, Contractor's aggregate liability for Mechanical Completion Delay Liquidated Damages, plus the amount of any Capacity Shortfall Liquidated Damages adjustment, shall be limited as set forth in Section 6.8.

16.2.3 Environmental Credits. Owner shall be solely responsible for soliciting and obtaining any Environmental Credits. Contractor neither makes nor has made any representation or warranty to Owner as to the availability of any Environmental Credits. ANYTHING TO THE CONTRARY IN THIS AGREEMENT NOTWITHSTANDING, CONTRACTOR SHALL HAVE NO LIABILITY TO OWNER OR ANY OTHER PERSON FOR ANY FAILURE BY OWNER OR ANY OTHER PERSON TO OBTAIN ANY ENVIRONMENTAL CREDITS.

## ARTICLE 17
## INSURANCE REQUIREMENTS

17.1  Contractor's Insurance Coverage.

17.1.1 Term and Coverage. Contractor shall procure and maintain, and shall cause each Subcontractor, except as provided below, to procure and to maintain, in full force and effect while this Agreement is in effect with responsible insurance providers (as evidenced by an AM Best rating of A-/VIII or better, and in the case of Builders All Risk coverage, A-/X or better) the following insurance in at least the minimum amounts specified below, as applicable. The procurement and

maintenance of such insurance shall be at Contractor's or Subcontractor's own expense.

    (a)    <u>Workers' Compensation and Employers Liability</u>.  Workers' compensation insurance in compliance with appropriate federal and state laws, and Employers Liability Insurance with limit of not less than $1,000,000 for bodily injury per occurrence and $1,000,000 in the aggregate, and $1,000,000 disease policy limit.

    (b)    <u>Commercial General Liability</u>.  Commercial general liability insurance, occurrence form, including, but not limited to, contractual coverage for all of the provisions of this Agreement, with limits of not less than $5,000,000 per occurrence and $5,000,000 in the aggregate, $5,000,000 Products and Completed Operations aggregate; $5,000,000 Personal Injury and Advertising injury per offense.

    (c)    <u>Automobile Liability</u>.  Automobile liability insurance, including vehicles owned, hired and non-owned, with a combined single limit of not less than $1,000,000 per accident.

    (d)    <u>Excess Liability</u>.  Excess liability insurance, Umbrella Form, in excess of the limits provided for in the above policies (except Workers' Compensation and Employers Liability insurance), with a limit of not less than $5,000,000.

    (e)    <u>Professional Liability</u>.  Professional Liability insurance providing "errors and omissions liability" or equivalent coverage for the work being performed, with limits of not less than $1,000,000 per claim for the duration of this contract and its warranties.  If Contractor subcontracts the design and engineering portion of the Work, then such design or engineering professional (or firm) shall procure and maintain the professional liability (errors & omissions) insurance required in lieu of Contractor proving such professional liability insurance. Notwithstanding the foregoing, Professional Liability insurance is only required for Subcontractors providing design-build professional services.

    17.1.2  Any other insurance of Contractor's property that is legally required in any jurisdiction where any part of the work is performed.

    17.1.3  <u>Evidence of Insurance</u>.  Owner and Financing Party shall be furnished with satisfactory evidence that the foregoing insurance is in effect, and Owner and Financing Party shall be notified thirty (30) days prior to the cancellation or material change of any such coverage.  Owner and Financing Party shall be named as an additional insured with respect to Contractor's activities under this Agreement under the coverages required by <u>Section 17.1.1.</u>

17.1.4 Contractor's insurance coverage shall be primary coverage without right of contribution from any other insurance carried by Owner or Financing Party and shall require the insurer to waive subrogation against Owner and Financing Party.

17.2    Owner Insurance Requirements.

17.2.1 Term and Coverage.  Owner, or Owner's ultimate parent, shall procure at its own expense and maintain in full force and effect, while this Agreement is in effect, (a) comprehensive general liability insurance for bodily injury and property damage, in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate; (b)  Products and Completed Operations $2,000,000 in the aggregate;  (c) Personal Injury and Advertising injury $1,000,000 per offense; (d) workers' compensation $2,000,000 in the aggregate; (e) automobile liability $2,000,000 per accident and (f) builder's risk as set forth in Section 17.2.2.  All policies procured by Owner, or Owner's ultimate parent, shall require the insurer to waive subrogation against Contractor.

17.2.2 Builders Risk.

(a)    On or prior to construction or erection of the Project, builder's all risk insurance for the benefit of Owner, Financing Party, and the Offtaker, Contractor and all Subcontractors or suppliers performing work at the Project Site.  The policy shall include Contractor and Subcontractors as additional insureds and Financing Party as sole loss payee via an industry standard lender loss payable endorsement approved by the Financing Party, and shall include provisions for non-vitiation.

The builders all risk policy shall cover all construction, erection or installation work including without limitation coverage for mechanical and electrical breakdown and all forms of testing and commissioning required to complete the Project plus resulting or ensuing damage arising out of design error or faulty workmanship, the perils of flood, earthquake, windstorm (named or unnamed), hail, lightning, strike, riot and civil commotion, vandalism and malicious mischief, subject to terms that are consistent with current industry practice insuring real and personal property of the Owner whether on or off the Project Site or the real property (including an off-site storage or warehouse location) and while in the course of inland transit, for an amount of not less than the full replacement cost value of the property and equipment at each location.

Sublimits are permitted with respect to the following perils:

60

(i)     off-site property, in an amount that is not less than the full replacement cost value of any property in storage (including earthquake coverage to the extent payments on such property are required prior to delivery to the Project Site);

(ii)    inland transit, in an amount that is not less than the full replacement cost value of any shipment (unless insured under a separate policy);

(iii)   earth movement (including earthquake), an amount not less than 50% of the Project's total insured values per occurrence and in the annual aggregate when such limits are specific to the Project, or such other amount required or agreed by the Owner and Financing Party;

(iv)    flood, an amount not less than 50% of the Project's total insured values per occurrence and in the annual aggregate for all flood zones, including Project property and equipment located in flood zone A or V when such limits are specific to the Project or such other amount required or agreed by the Owner and Financing Party;

(v)     windstorm (named or unnamed), full policy limits per occurrence and in the annual aggregate for the Project, or such other amount required or agreed by the Owner and Financing Party; and

(vi)    such other coverages customarily sub-limited and/or aggregated or restricted in reasonable amounts consistent with current industry practice with respect to similar risks and acceptable to the Owner and Financing Party, including without limitation, extra expense, expediting expense and ordinance or law coverage including the increased cost of construction to comply with the enforcement of any law that regulates the construction or repair of damaged property including the cost to demolish undamaged portions of the Project, debris removal, pollutant cleanup, professional fees, etc.

Such policy shall include: (a) an automatic reinstatement of limits following each loss (except for the perils of earthquake, windstorm, pollution cleanup, flood and other aggregated limits that typically apply under Section 1.1(a)(vi) above); (b) replacement cost valuation with no deduction for depreciation and no coinsurance clauses (or a waiver thereof) and (c) coverage for physical damage that is not covered by warranty or guaranty, to the extent normally insured.

61

All such policies may have per occurrence deductibles of not greater than $55,000 for all perils, except five percent (5%) of the value of the Project property damaged (which may be subject to a $100,000 minimum per occurrence), of the Project for earth movement (including earthquake), windstorm and flood and/or as otherwise required by or approved by the Owner and Financing Party. Owner shall use commercially reasonable efforts to obtain a maximum cap of $100,000 for earth movement (including earthquake), windstorm and flood. All deductibles are payable by Owner; provided that with respect to physical loss or damage attributable to Contractor (i.e., caused by Contractor or its Subcontractors, or resulting from acts or omissions for which Contractor is responsible under this Agreement), Contractor shall pay any deductibles for such builder's all risk claims.

17.2.3 <u>Delay in Startup</u>.  If requested by Owner in writing, Contractor shall also maintain or cause to be maintained, with respect to the Project, delay in startup insurance following all perils required and insured above under <u>Section 1.1(a)</u>, including without limitation coverage for inland transit and off-site storage risks, mechanical and electrical breakdown including all forms of testing and commissioning required to complete the Project plus any delay caused by resulting or ensuing damage arising out of design error or faulty workmanship, with limits of not less than the projected equivalent of twelve (12) months of gross revenues, less non-continuing expenses. Contractor shall be entitled to a Change Order for the additional costs incurred to comply with such an Owner request, such additional costs to be pre-agreed between the Parties, properly vouched, and solely a pass-through cost with no margin for Contractor. If coverage is subject to an indemnification period, such period shall not be less than twelve (12) months. Subject to commercial availability and a requirement of the Owner and Financing Party, contingent delay in startup shall also be included with respect to key suppliers and customers with a limit acceptable to the Owner and Financing Party. To the extent inland transit coverage is provided under a policy separate from the builders all-risk policy, such policy shall provide delay in startup insurance with a loss limit and associated indemnity period equivalent to the loss of gross revenues less non-continuing expenses for the longest period of interruption or delay reasonably expected to occur, to the extent available on commercially reasonable terms. The deductible or waiting period shall not exceed thirty (30) days.

17.2.4 <u>Evidence of Insurance</u>.  Contractor shall be furnished with satisfactory evidence that the foregoing insurance is in effect within ten (10) Business Days of issuance of the Notice to Proceed, and Contractor shall be notified thirty (30) days prior to the cancellation or material change of any such coverage.  Contractor shall be named as an additional insured under the coverages required by <u>Sections 17.2.1</u> and <u>17.2.2</u>.

17.2.5  Owner's insurance coverage shall be primary coverage without right of contribution from any other insurance carried by Contractor.  Insurance maintained by Contractor is for the exclusive benefit of Contractor and shall not inure to the benefit of Owner.  All policies procured by Owner shall require the insurer to waive subrogation against Contractor.

## ARTICLE 18
## RELATIONSHIP OF THE PARTIES

18.1    Contractor is an independent contractor and this Agreement is not, and shall not be construed as, an agreement of partnership, joint venture or employment between Owner and Contractor or between Owner and any of Contractor's Personnel.  The equipment and personnel used by Contractor in performing its obligations under this Agreement shall at all times be under the sole and exclusive control of Contractor.  Contractor shall not create any obligation for Owner, assume any responsibility for Owner or attempt to bind Owner in any way except as expressly permitted herein.  Contractor shall not, in any manner, represent that it is an agent of Owner or associated or affiliated with Owner in any capacity other than as an independent contractor.  Contractor is not authorized to enter into any contract with any person or entity on behalf of Owner and shall not represent itself as being so authorized.

## ARTICLE 19
## DISPUTE RESOLUTION

19.1    <u>Procedure</u>. If representatives of the Parties are unable to resolve a dispute, controversy or claim arising out of or relating to this Agreement or any breach, termination or invalidity hereof (a "<u>Dispute</u>") within ten (10) Business Days after one Party's receipt of notice of such Dispute from the other Party, then each Party shall immediately designate a senior executive with authority to resolve the Dispute.  If the senior executives do not agree upon a resolution of the Dispute within twenty (20) Business Days after the referral to them, either Party by notice to the other Party may submit the Dispute to arbitration as provided in <u>Section 19.2</u>.

19.2    <u>Binding Arbitration</u>.

19.2.1 Any Dispute arising out of or relating to this Agreement that is not resolved in accordance with <u>Section 19.1</u> shall be submitted to binding arbitration administered by the American Arbitration Association in accordance with its Construction Industry Rules (the "<u>Rules</u>").  The arbitration shall be held in the city of Boston, Massachusetts, which shall be considered the seat of the arbitration.  The Parties will attempt to agree on an arbitrator, failing which the arbitrator will be selected by the Rules.  The arbitrator(s) shall be attorneys actively practicing in the area of construction law.  Discovery shall conclude within 90 days of the appointment of the arbitrator; each party shall be limited to a maximum of three (3) depositions and collection of documents from no more than five (5) custodians per side.

19.2.2 The award shall be made within eight (8) months following the appointment of the arbitrator and the arbitrator shall agree to comply with this schedule before accepting appointment.  The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute.  The award of the arbitrator(s) shall be accompanied by a reasoned decision.  The parties agree that failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witnesses.  In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award.  Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.  The award shall be final and binding on the Parties and judgment upon the award may be entered in a court of competent jurisdiction.  Owner and Contractor each consent to the nonexclusive jurisdiction of, and to the laying of venue in, the U.S. District Court in Maine, to confirm and enforce the award. All procedural aspects of this Agreement to arbitrate, including the construction and interpretation of this Agreement to arbitrate, the scope of the arbitrable issues, allegations of waiver, delay or defenses as to arbitrability, and the rules governing the conduct of the arbitration, to the extent not governed by the Rules, shall be governed by and construed pursuant to the United States Arbitration Act, 9 U.S.C. §§1-16.

19.2.3 The costs and expenses of the arbitration (excluding attorneys' fees) shall be borne equally by the Parties, and (other than in connection with the enforcement of indemnities pursuant to Article 19, in which event the applicable indemnifying Party shall pay such fees in accordance with such provisions) each Party shall bear the fees, costs and expenses of its own attorneys, regardless of the outcome of the arbitration.

19.2.4 Applicable Law; Limitation on Arbitrators' Authority.  In deciding the substance of any Dispute, the arbitrators shall apply the substantive laws of the state in which the Facility is located; provided that, the arbitrators shall have no authority to compel specific performance of this Agreement or, except to the extent included in a Party's damages, in any liquidated damages or in any third party claim for which indemnification is provided hereunder, to award punitive or consequential damages under any circumstances (whether exemplary damages, treble damages, or any other penalty or punitive type of damages) regardless of whether such damages may be available under law.  Without limitation on the Parties' indemnification obligations hereunder, the Parties hereby waive their right, if any, to recover punitive damages in connection with any such claims, disputes or disagreements, regardless of whether any such claims, disputes or disagreements arise under the law of contracts, torts (including negligence of every kind and strict liability without fault), property, or at common law or in equity or otherwise.  The arbitrators shall certify in their award that they have faithfully applied the terms and conditions of this Agreement and that no part of their award includes any amount for consequential, exemplary or punitive

64

damages prohibited as aforesaid.  To the fullest extent permitted by law, the arbitration proceeding and the arbitrators' award shall be maintained in confidence by the Parties.

19.2.5 Judicial Relief.  Either Party may petition a court of appropriate jurisdiction for non-monetary relief relating to any claim of breach of this Agreement in order to prevent undue hardship relating to any such claimed breach pending the appointment of an arbitration panel as described in Section 19.2.1.

19.2.6 Continuation of Services.  Pending final resolution of any Dispute, whether or not submitted to arbitration hereunder, the Parties shall continue to fulfill their obligations hereunder.

19.2.7 Incorporation and Consolidation.  Contractor shall incorporate the provisions of this Article 19 into its agreements with any Subcontractor so that all Subcontractors shall also be bound to this Dispute resolution procedure.  Either Party shall have the right, but not the obligation, to consolidate all related Disputes, whether involving Owner, Subcontractor and/or any third parties, into a single consolidated arbitration or other proceeding.

# ARTICLE 20
# NOTICES

20.1    All notices permitted or required to be given under this Agreement shall be in writing and shall be deemed duly given when sent by overnight courier, by personal delivery or upon delivery or refusal thereof if notice is deposited in the mail, postage prepaid, certified, return receipt requested.  All notices shall be delivered or sent to the Parties at the respective addresses set forth below:

|  |  |
|---|---|
| Owner: | C/O BNRG Maine LLC |
|  | 622 Congress Street, Suite 202, |
|  | Portland, ME 04101 |
|  | Attention: Adam Farkes |
|  | Email:  afarkes@bnrg.ie |
|  |  |
| With a copy to: | Richard Jackson |
|  | Unit 1B, 3 Custom House Plaza, |
|  | Harbourmaster Place, |
|  | Dublin 1, D01VY76 |
|  | Ireland |
|  | Email: |

| | |
|---|---|
| Contractor: | iSun Industrial LLC |
| | 400 Avenue D, Suite 10, |
| | Williston, VT 05495 |
| | Attention: Frederick (Kip) Myrick |
| | Email: kip@isunenergy.com |
| | |
| With a copy to: | Tylor Thibault |
| | 400 Avenue D, Suite 10, |
| | Williston, VT 05495 |
| | Email: tylor@isunenergy.com |

**ARTICLE 21**
**GENERAL PROVISIONS**

21.1    Amendments. No amendments or modifications of this Agreement shall be valid unless evidenced in writing and signed by duly authorized representatives of both Parties.

21.2    Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.   Any purported assignment in contravention of this Section 21.2 shall be void.  Except as set forth below, neither Party may assign, pledge or otherwise transfer this Agreement or any right or obligation under this Agreement without first obtaining the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Without Contractor's consent, the Owner may (i) collaterally assign this Agreement to one or more Financing Parties and, in connection with the exercise of remedies pursuant to any such permitted collateral assignment, such Financing Party may complete a further assignment of the Owner's rights and obligations under this Agreement, and (ii) assign all of its rights and obligations under this Agreement to a successor owner of the Project.  No assignment permitted under this Agreement shall relieve the assigning Party of its obligations hereunder except as otherwise agreed by the other Party.

21.3    No Waiver. No waiver of any of the terms and conditions of this Agreement shall be effective unless in writing and signed by the Party against whom such waiver is sought to be enforced.  Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.  The failure of a Party to insist, in any instance, on the strict performance of any of the terms and conditions hereof shall not be construed as a waiver of such Party's right in the future to insist on such strict performance.

21.4    <u>Survival</u>. Any provisions necessary to give effect to the intent of the Parties hereunder after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement.

21.5    <u>Rights and Remedies</u>. Except where this Agreement expressly provides to the contrary, the rights and remedies contained in this Agreement are cumulative and not exclusive of any rights and remedies provided by law or equity.

21.6    <u>Severability</u>. If and for so long as any provision or portion of any provision of this Agreement shall be deemed to be judged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this Agreement except only so far as shall be necessary to give effect to the installation of such invalidity, and any such invalid provision shall be deemed severed from this Agreement without affecting the validity of the balance of this Agreement.

21.7    <u>Compliance with Laws.</u> In performance of their respective obligations under this Agreement, each Party agrees to comply with all Applicable Laws, statutes, rules, regulations, judgments, decrees, injunctions, writs and orders, and all interpretations thereof, of all Government Authorities having jurisdiction over such Party.

21.8    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

21.8.1 This Agreement is made and shall be interpreted and enforced in accordance with the laws of the State where the Facility is located.  The Parties hereby consent and submit to the personal jurisdiction of the courts in the State where the Facility is located.

21.8.2 EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION.  EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

21.9    <u>Counterpart Execution</u>. The Parties may execute this Agreement in counterparts, which shall, in the aggregate, when signed by both Parties constitute one and

67

the same instrument; and, thereafter, each counterpart shall be deemed an original instrument as against any Party who has signed it. Counterparts may be executed by electronic signature complying with the U.S. federal ESIGN Act of 2000, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Counterparts may be delivered via facsimile or electronic mail (including pdf) and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

21.10  <u>Confidentiality</u>.  The Parties will make best efforts to safeguard confidential information against disclosure by employing the same means to protect such information as that Party uses to protect its own non-public, confidential or proprietary information, any information supplied to it by the other Party and designated in writing as confidential or which by its nature can reasonably be inferred to be confidential, but in no event less than commercially reasonable means.  The Parties shall make individuals within their organization, to whom confidential information is disclosed, aware of this confidentiality provision and shall cause such persons to abide by the agreements herein set forth.  The provisions of this <u>Section 21.10</u> shall not apply to information within any one of the following categories: (a) information which was in the public domain prior to a Party's receipt thereof or which subsequently becomes part of the public domain by publication or otherwise except by the receiving Party's wrongful act; (b) information which the receiving Party can show was in the receiving Party's possession prior to its receipt thereof through no breach of any confidentiality obligation; (c) information received by a Party from a third party which did not have a confidentiality obligation with respect thereto; or (d) information the disclosure of which is required by Applicable Law or is necessary or appropriate to disclose to a Governmental Authority having jurisdiction over the Parties.

21.11 <u>Financing Assistance</u>.

21.11.1      Contractor shall cooperate with any Financing efforts of Owner, at Owner's sole cost and expense (this applies to <u>Sections 21.11.1</u> and <u>21.11.2</u>), including by providing reasonable assistance to Owner, the Financing Parties and the Project insurers.

21.11.2      In connection with such cooperation with Financing efforts, Contractor agrees that that it shall execute and deliver such further instruments and documents, including notices, assignments, acknowledgements, consents and related instruments that may be reasonably required in order to effectuate the purposes or intent of this Agreement, including to facilitate any Financing assignments. Contractor shall cooperate with Owner's efforts in obtaining, maintaining and administering Financing (including any refinancing thereof) on a non-recourse (or other) basis for the Facility and shall procure and/or execute such documents (including consents, certificates and legal opinions from counsel chosen by Contractor and reasonably acceptable to Owner) and do such other things (including providing access to Work locations) as Owner or the Financing Parties may reasonably request (and upon terms and conditions that are customary for similar types of Financing) in connection therewith.

21.11.3      If required by the Financing Parties, Contractor agrees that it shall enter into a direct agreement between the Collateral Agent and Contractor upon request by Owner to do so, on terms reasonably required by the Financing Parties, including terms (i) acknowledging the Collateral Agent's interests and step-in rights, and providing that Contractor's rights to terminate this Agreement are subject to the Financing Parties' cure rights; (ii) providing for payment of amounts payable by Contractor to Owner under this Agreement directly to accounts maintained by the Collateral Agent and/or the Financing Parties; and/or (iii) under which Contractor agrees not to enter into amendments, modifications or supplements to this Agreement without the consent of the Financing Parties.  For purposes of this Section 21.11, "Collateral Agent" shall mean the person appointed by the Financing Parties to hold such collateral as Owner may pledge to the Financing Parties (including this Agreement, the Work and the Facility) in connection with the Financing of the Project.

21.12  Public Communication.  Neither Party shall publish or release any Public Communication(s) without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), provided that the foregoing shall not restrict disclosures permitted in accordance with Section 21.10.  For the purposes of this Section 21.12, "Public Communication(s)" shall include any publicity, press release or public announcements or public relations materials of any kind relating to the Project generally, the existence of this Agreement, the contents hereof or the transactions contemplated hereby.

21.13  No Confidentiality Regarding Tax Structure or Treatment.  Notwithstanding anything to the contrary set forth herein or in any other agreement to which the Parties are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to the transaction, shall not apply to the U.S. federal tax structure or U.S. federal tax treatment of the transaction, and each Party (and any employee, representative or agent of any Party hereto) may disclose to any and all persons, without limitation of any kind, the U.S. federal tax structure and U.S. federal tax treatment of the transaction.  The preceding sentence is intended to cause the transaction not to be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Code and shall be construed in a manner consistent with such purpose.  In addition, each Party acknowledges that it has no proprietary or exclusive rights to the tax structure of the transaction or any tax matter or tax idea related to the transaction.

21.14  Exclusivity.  During the term of this Agreement, Owner agrees that it shall not solicit or enter into any other contracts relating to the provision of solar energy generation system services that are provided under this Agreement for the Project Site, including any contracts relating to the construction or equipment procurement of any solar generation system at the Project Site.

69

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DEBD831CD

21.15  Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the Project, and merges and supersedes all prior and contemporaneous agreements, commitments, representations, writings and discussions, whether written or oral, between them.

21.16  Incorporation of Recitals. The Recitals are incorporated herein by reference and form a part of this Agreement.

21.17 Novation of Contracts.  Upon Owner's request, Owner will enter into a novation agreement with Contractor to assign the contracts for relevant supplies and equipment, including Owner Supplied Equipment, to be used pursuant to this Agreement.  In exchange for entering into such a novation agreement with Owner, Contractor will charge Owner a fee of three (3) per cent of the value of the aforementioned contracts.  For the avoidance of doubt, the definition of "Owner Supplied Equipment" shall be updated upon novation of the relevant contracts.

**ARTICLE 22**
**ANTI-CORRUPTION**

22.1  Neither the Contractor nor its Associated Persons shall authorize, promise, offer, provide, accept or agree to offer or give, directly or indirectly, any payment, gift or other advantage with respect to any activities undertaken relating to this Agreement, or any other activity carried out for or on behalf of the Client which,

22.1.1  is intended to, or does, influence any person to act, or reward any person for acting, in breach of an expectation of good faith, impartiality or trust, or which it would otherwise be improper for the recipient to accept; or

22.1.2  is made to or for a Public Official, or to another person at the request of a Public Official, or to any person while knowing or being aware of a high probability that all or a portion of the payment, gift, or other advantage will be offered or given to a Public Official, with the intention of influencing any act or decision of a Public Official in their official capacity, inducing a

70

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

Public Official to use their influence to affect any act or decision of a government entity, or securing any other improper advantage.

22.2     Neither the Contractor nor its Associated Persons shall otherwise act in a manner contrary to any Anti-Bribery Laws, to which either the Client, the Contractor, or the Contractor's Associated Person is subject.

22.3     The Contractor shall:

22.3.1   maintain sufficient policies and procedures to ensure compliance with this Article 22 and all applicable Anti-Bribery Laws;

22.3.2   notify Client in writing if it becomes aware of any breach of this Article 22, or has reason to believe that it or any of its Associated Persons has received a request or demand, the acceptance of which would be contrary to this Article 22;

22.3.3   notify Client in writing if a Public Official becomes an officer or employee of the Contractor or any of its Associated Persons, or acquires a direct or indirect interest in the Contractor or any of its Associated Persons and the Contractor warrants that neither it, nor any of its Associated Persons, has any Public Officials as direct or indirect owners, officers or employees at the date of this Agreement; And

22.3.4   notify Client in writing if it or any of its Associated Persons are the subject of any police, judicial or regulatory investigation or proceedings in relation to any suspected breach of any Anti-Bribery Laws.

22.4     The Contractor shall ensure that any Associated Person who is performing services in connection with this Agreement does so only on the basis of a written contract which imposes on and secures from such person terms equivalent to those imposed on the Contractor in this Article 22. The Contractor shall be responsible for the observance and performance by such persons of the obligations under this Article 22 and shall be directly liable to Client for any breach by such persons of any of the provisions of this Article 22.

22.5     The Contractor shall provide reasonable assistance and cooperation to Client in relation to any investigation or enquiry by Client into any suspected breach of Anti-Bribery Laws, or to enable Client to perform any activity required by any government, agency or authority in relation to any suspected breach of Anti-Bribery Laws, whether during the term of this Agreement or up to six years after its termination.

22.6     The Contractor shall, on request, certify to Client in writing, compliance with this Article 22 by the Contractor and its Associated Persons. The Contractor shall provide such supporting evidence of compliance as Client may reasonably request.

22.7   The Contractor and any third-party service providers with whom they engage confirms that it will take all reasonable steps to ensure compliance with all applicable money laundering and terrorist financing laws and regulations or any similar rules and regulations in the jurisdictions where they operate.

22.8   Upon request of Client, the Contractor agrees to provide reasonable assistance as may be necessary to procure any documentation that may be required in order to comply with relevant regulatory requests.

## ARTICLE 23
## MODERN SLAVERY AND TAX EVASION CLAUSE

23.1   Contractor hereby represents, warrants and undertakes to Client as follows:

23.1.1 it will not engage in any activity, practice or conduct which would constitute tax evasion or tax evasion facilitation under applicable laws and regulations from time to time in force;

23.1.2 it will comply with all applicable anti-slavery and human trafficking laws and regulations from time to time in force, and will ensure its staff and staff of any of its service providers are paid at least the applicable living wage.

23.2   Contractor will notify Client immediately if at any time the foregoing representations and warranties shall not be true and correct.

23.3   Contractor shall on request certify to Client in writing compliance with any or all of the foregoing clauses and shall provide such supporting evidence of compliance as Client may reasonably request.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DocuSign Envelope ID: BB0D4B83-C41B-4438-8FA8-2D1DFBD831CD

ENGINEERING, PROCUREMENT AND<br/>CONSTRUCTION AGREEMENT

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

iSun Industrial, LLC

By: _Fredrick Myrick_
36EFFFD35F3F430...

Name: Fredrick Myrick

Title: EVP

27 December 2022

Signature Page to Engineering, Procurement and Construction Agreement

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

BD Solar North Anson, LLC

By: ROBERT CLEAVES

Name: ROBERT CLEAVES

Title: Manager

27 December 2022

Signature Page to Engineering, Procurement and Construction Agreement

**Exhibit C**

Engineering, Procurement and Construction Agreement (BD Solar Rangeley, LLC)

# ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

BY AND BETWEEN

## BD Solar Rangeley, LLC

AND

## ISUN INDUSTRIAL LLC

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

## Table of Contents

RECITALS ..........................................................................................................................3

**ARTICLE 1 DEFINITIONS** ...............................................................................................3

**ARTICLE 2 CONDITIONS PRECEDENT TO THE AGREEMENT** .............................. 15

**ARTICLE 3 CONTRACTOR WORK AND OTHER OBLIGATIONS** ............................ 16

**ARTICLE 4 OWNER OBLIGATIONS** ........................................................................... 21

**ARTICLE 5 COMMISSIONING TESTS** ........................................................................ 24

**ARTICLE 6 COMPLETION OF THE WORK** ............................................................... 25

**ARTICLE 7 CONTRACT PRICE AND PAYMENT** ...................................................... 31

**ARTICLE 8 CHANGE ORDERS** .................................................................................... 34

**ARTICLE 9 FORCE MAJEURE AND OWNER CAUSED DELAY** ............................. 36

**ARTICLE 10 WARRANTIES** .......................................................................................... 37

**ARTICLE 11 DEFAULT; TERMINATION** ..................................................................... 40

**ARTICLE 12 REPRESENTATIONS AND WARRANTIES** ........................................... 45

**ARTICLE 13 TAXES** ....................................................................................................... 46

**ARTICLE 14 TITLE** ........................................................................................................ 47

**ARTICLE 15 INDEMNIFICATION** ............................................................................... 48

**ARTICLE 16 LIMITATIONS OF LIABILITY** ............................................................... 50

**ARTICLE 17 INSURANCE REQUIREMENTS** ............................................................. 51

**ARTICLE 18 RELATIONSHIP OF THE PARTIES** ....................................................... 55

**ARTICLE 19 DISPUTE RESOLUTIONS** ....................................................................... 56

**ARTICLE 20 NOTICES** ................................................................................................... 58

**ARTICLE 21 GENERAL PROVISIONS** ........................................................................ 58

**APPENDIX A CONTRACTOR'S SCOPE OF WORK** .................................................... 65

**APPENDIX B OWNER'S SCOPE OF WORK** ................................................................ 66

**EXHIBIT A  Facility Specifications** ................................................................................ 67

**EXHIBIT B  CONTRACTOR SCHEDULE AND SCHEDULE OF MILESTONES** ........ 68

**EXHIBIT C  PROJECT SITE DESCRIPTION** ................................................................ 69

**EXHIBIT D  COMMISSIONING AND COMMISSIONING TEST** ................................ 70

**EXHIBIT E  FORM OF SUBSTANTIAL COMPLETION** ............................................... 71

**EXHIBIT F  FORM OF FINAL COMPLETION** .............................................................. 72

**EXHIBIT G  CONTRACT PRICE** .................................................................................... 73

**EXHIBIT H  SCHEDULE OF DELIVERABLES** ............................................................. 74

**EXHIBIT I  ACCEPTANCE DOCUMENTATION LIST** ................................................. 75

**EXHIBIT J  FORM OF CHANGE ORDER** ........................................................................ **76**

**EXHIBIT K  FORM OF PAYMENT APPLICATION** ........................................................ **77**

**EXHIBIT L  CAPACITY AND RELIABILITY TEST PROCEDURE** .............................. **78**

**EXHIBIT M  LIEN WAIVERS** ........................................................................................ **79**

**EXHIBIT N  FORM OF OWNER PARENT GUARANTY** ............................................... **80**

**EXHIBIT O  FORM OF MECHANICAL COMPLETION** ............................................... **81**

**EXHIBIT P  FORM OF PERFORMANCE AND PAYMENT BOND** ............................... **82**

**EXHIBIT Q  CONDITIONAL USE PERMIT AND ENVIRONMENTAL STUDY REQUIREMENTS** ....... **83**

**EXHIBIT R  DOCUMENTED SITE CONDITIONS** ...................................................... **84**

**EXHIBIT S FORM OF LIMITED NOTICE TO PROCEED** ........................................... **85**

**Exhibit T Key Suppliers**.............................................................................. ...............................**86**

**ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT**

This Engineering, Procurement and Construction Agreement (this "Agreement") is made and entered into and effective as of December 27, 2022 (the "Effective Date"), by and between BD Solar Rangeley, LLC, a limited liability company ("Owner"), and iSun Industrial LLC, a limited liability company ("Contractor"). Owner and Contractor are sometimes referred to individually herein as a "Party" and collectively as the "Parties".

**RECITALS**

WHEREAS, Owner will develop and own an onsite solar photovoltaic electric generation Facility (as defined below) more fully described in Exhibit A, to be located on that portion of the property located in Cumberland County Maine, as illustrated on Exhibit C;

WHEREAS, Contractor provides engineering, procurement and construction services in connection with the design, installation, and commissioning of solar photovoltaic electric generation systems;

WHEREAS, Owner desires to appoint Contractor to provide engineering, procurement and construction services in connection with the design, installation and commissioning of the Facility in accordance with the terms hereof.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, and for the mutual covenants contained herein, the Parties hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1    Definitions.  In addition to terms defined elsewhere in this Agreement, the Parties agree that capitalized terms used in this Agreement, unless otherwise defined herein, shall have the meanings assigned below:

"Agreement" means this Engineering, Procurement and Construction Agreement, including all Appendices and Exhibits hereto, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof.

"Anti-Bribery Laws" means all applicable anti-bribery and anti-corruption laws, rules or regulations, as may be amended from time to time

"Applicable Laws" means all laws, statutes, rules, regulations, interpretations, ordinances, judgments, decrees, injunctions, writs, tariffs and orders of any Governmental Authority having jurisdiction over the Parties insofar as it relates to the design and construction of the Facility, the Project, the Project Site and the performance of the Work, as may be in effect as of the Effective Date.

3

"Applicable Permits" means, as to the Facility, all waivers, franchises, variances, permits, authorizations, entitlements, licenses or orders of or from any federal, state, local, county, municipal, regional, environmental or other governmental body, instrumentality, agency, authority, court or other body required to be obtained or maintained in connection with construction and installation of the Facility or performance of the Work.

"As-Builts" means an electronic version in native format of the Design Documents showing all changes made to the "issued for construction" drawings throughout construction and shall be prepared after completion of a given system and they describe the actual installed configuration of the executed Work, the Facility, all equipment and other appurtenances to the Facility, showing the exact as-built locations, sizes and details of the Facility as constructed.

"Associated Persons" means, in relation to the Contractor, a person who performs services for or on behalf of the Contractor in connection with the services provided to the Client under this Agreement, in any capacity and including, without limitation, employees, agents, subsidiaries, representatives and subcontractors of the Contractor;

"Authority Having Jurisdiction" or "AHJ."

"Business Day" means any calendar day, except Saturdays, Sundays, and national and local holidays on which commercial banks in Maine are authorized or required by Applicable Law to be closed.

"Capacity Cure Period" shall have the meaning set forth in Section 6.5.2.

"Capacity Guarantee" means Contractor's guarantee that the Facility will achieve the Facility Capacity.

"Capacity Shortfall Liquidated Damages" means the liquidated damages calculated pursuant to Section 6.5.3.

"Capacity Testing" means the testing prior to Substantial Completion of the Facility, as further described in Exhibit L.

"Change" means a change, modification, addition or deletion to or in the Design Documents, the Contract Price, the Work, the Owner Supplied Datasheets, the Facility Specifications or the Schedule of Work, as applicable.

"Change in Law" means (a) any adoption, rescission or change of Applicable Law, or in the judicial or administrative interpretation of any Applicable Law by a Governmental Authority, after the Effective Date, which is inconsistent or at variance with any Applicable Law in effect on the Effective Date and that adversely impacts the Work (including impact on the cost of Contractor's performance of the work or the time required to perform the Work); (b) the imposition after the Effective Date of any requirement for a new Applicable Permit

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7FF9518C9BD

not required by Applicable Law as of the Effective Date or any changes to any existing Applicable Permit and/or the requirements under such existing Applicable Permit; or (c) the imposition after the Effective Date of any condition or requirement in either case by any Governmental Authority that adversely impacts the Work (including impact on the cost of Contractor's performance of the work or the time required to perform the Work), which condition or requirement was not required by such Governmental Authority as of the Effective Date and affects the issuance, renewal or extension of any Applicable Permit.

"Change Order" means a written document in a form substantially similar to that which is attached as Exhibit J, issued under this Agreement and signed by Owner and Contractor, which authorizes a Change, and which is incorporated into the Agreement herein by reference.

"Commission" or "Commissioning" means all commissioning, including performance of the Commissioning Tests, as set forth in Exhibit D.

"Commissioning Tests" shall mean the commissioning tests described in Exhibit D.

"Conditional Use Permit and Environmental Study Requirements" shall mean those requirements set forth in Exhibit Q.

"Consent to Energize" shall have the meaning set forth in Section 6.2.

"Construction Change Directive" means a written order prepared by Owner in the circumstances outlined in Section 8.1.1.

"Contract Documents" means this Agreement and all Exhibits and Schedules, reviewed Design Documents (as defined in Section 3.2.1), the Limited Notice to Proceed issued in accordance with Section 2.1, the Notice to Proceed issued in accordance with Section 2.2, Change Orders, Construction Change Directives not subject to a dispute and any written amendments to this Agreement executed by the Parties.

"Contractor Event of Default" shall have the meaning set forth in Section 11.2.1.

"Contractor Indemnitees" means Contractor and its affiliates, any Subcontractor of Contractor, and each of their respective officers, directors, shareholders, partners, employees, representatives and agents.

"Contractor Losses" shall have the meaning set forth in Section 15.2.

"Contractor's Direct Costs" shall mean, when referring to any portion of the Work, an amount equal to the sum of the reasonably incurred actual costs (including temporary and permanent materials, labor, services, supplies, rental, transportation and travel-related costs) incorporated or consumed in the course of carrying out such Work, and any other costs of any nature reasonably attributable to such Work, at Contractor's actual cost

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7EF9518C9BD

including all insurance and bonding, all to be reasonably verified. When determining Contractor's Direct Costs, (a) direct labor costs shall be calculated pursuant to the rates set forth in Appendix A; and (b) the cost of any Work carried out by Subcontractors shall be calculated at Contractor's actual cost broken down and provided in writing.

"Contractor's Personnel" means Contractor, its employees, agents and Subcontractors and its Subcontractor's employees, agents and subcontractors.

"Contractor's Permits" shall have the meaning set forth in Section 3.9.

"Contract Price" shall have the meaning provided in Section 7.1.

"COVID-19" means the coronavirus disease named as such by the World Health Organization.

"Critical Path" means core aspects of the Work including the installation of racking, the installation of modules, the installation of inverters, and the achievement of Mechanical Completion, Substantial Completion, and Final Completion, and any reference to "Critical Path activities" or similar shall be construed accordingly.

"DC" means direct current.

"Default Rate" means the lesser of three percent (3%) per annum, or the maximum rate of interest permissible under Applicable Laws.

"Defects" or "Defective Work" when applied to any Work means any Work that does not materially comply with the Facility Specifications.

"Demobilization Activities" shall have the meaning set forth in Section 11.1.2.

"Design Documents" means design documents for the Facility consisting of drawings, specifications, plans and other documents necessary to describe the Facility with respect to the civil engineering, structural, control, mechanical and electrical systems, as specified in the Scope of Work (as modified or supplemented by any Change Order).

"Documented Site Conditions" shall have the meaning set forth in Section 4.4.

"Early Termination Charge" shall have the meaning set forth in Section 11.1.3.

"Energize" or "Energization" means that the Facility or a part thereof is receiving or consuming back feed power past the medium voltage switchgear breaker.

"Environmental Credits" means any and all mandatory and voluntary federal, state or local renewable energy or emissions credits, carbon credits, rebates, subsidy, incentive payment or any other green tag, renewable energy, emissions reduction, depreciation, tax credit or other benefit, howsoever entitled, related to the environmental characteristics of

6

the Facility or the generation of energy therefrom, whether related to any renewable portfolio standard or other renewable energy purchase requirement or otherwise, whether existing as of the Effective Date or enacted thereafter, whether available to Owner as the host, producer or user of electricity output and whether administered by any Governmental Authority, utility, transmission and distribution provider (including regional interconnect, independent system operator or regional transmission operator) or any other similar entity or any voluntary regime.

"Environmental Study" means that certain study commissioned by Owner and included as Exhibit Q hereto.

"Equipment" means all photovoltaic modules, inverters, equipment, machinery, apparatus, materials, articles, components, raw materials, supplies, parts, systems, structures and any other equipment or items comprising or otherwise necessary or appropriate to be incorporated or integrated into the Facility, based on the design, engineering, construction, development, operation and maintenance of the Facility, in each case, based on the Facility Specifications and requirements provided herein.

"Equitable Adjustment" shall mean an adjustment in the Schedule of Work or Contract Price, as applicable, which accurately reflects any increase in Contractor's Direct Costs, and any increase in the time necessary to perform the Work, resulting from the changes triggering such adjustment, taking into account all factors which could reasonably increase Contractor's Direct Costs or time necessary to perform the Work, including, but not limited to: availability of materials, labor and other resources; fluctuations in material cost or labor rates; seasonal weather variations; shipping capacity; production delays; and demobilization and remobilization.

"Event of Delay" means (i) a Force Majeure Event, (ii) Change in Law, (iii) Owner Caused Delay, (iv) suspension of the work pursuant to Sections 11.3; (v) failure of the AHJ to issue construction permits within twenty (20) days of Contractor's request (except to the extent such failure is attributable to Contractor's Personnel), (vi) failure of the Interconnection Provider to approve the request for the interconnection of the system within fifteen (15) Business Days of Contractor's request for such approval (except to the extent such failure is attributable to Contractor's Personnel), (vii) failure of Owner to obtain Permission to Operate within ten (10) Business Days of Contractor's request for such authorization (except to the extent such failure is attributable to Contractor's Personnel); (viii) Unknown Site Conditions, (ix) Owner's failure to issue Notice to Proceed by the NTP Deadline; (x) Commissioning Tests or Capacity Testing are delayed by irradiance below the required levels as specified in Exhibit D and Exhibit L (as applicable); (xi) discovery of Hazardous Substances pursuant to Section 3.14; (xii) and (xiii) any other circumstance for which the terms of this Agreement specifically entitle Contractor to a Change Order.

"Existing Structures" means all structures existing at the Project Site at the time when the LNTP is issued including but not limited to buildings, roads, walls, tracks, gates, fences, and drainage systems.

"<u>Facility</u>" means the photovoltaic electric generating system consisting of photovoltaic modules, inverters, a data acquisition system and related electrical conduit, wiring, meters, machinery, parts, start-up spares, special maintenance tools, components, appliances, security fencing and equipment, interconnection and transmission equipment, the purpose of which is to produce solar energy, together with the interconnection facilities and related assets, constructed on the Project Site. The Facility shall meet the Facility Specifications.

"<u>Facility Capacity</u>" shall mean the capacity of the STC rated solar electric system (expressed in kilowatts DC) set forth in the title block of the reviewed Design Documents (as defined in <u>Section 3.2.1</u>).

"<u>Facility Specifications</u>" shall mean the specifications for the Facility as set forth in <u>Exhibit A</u>.

"<u>FC Holdback</u>" shall have the meaning set forth in <u>Section 7.7.1</u>.

"<u>Final Completion</u>" shall have the meaning set forth in <u>Section 6.7</u>.

"<u>Final Lien Waiver</u>" means an unconditional final lien and claim waiver and release in the form set forth in <u>Exhibit M</u> executed by Contractor or a Subcontractor, as applicable.

"<u>Final Punch List</u>" shall have the meaning set forth in <u>Section 6.6.2</u>.

"<u>Financing</u>" means any form of construction, interim, long-term debt, lease, tax-exempt, recourse, non-recourse, equity or other form of funding, or refinancing that Owner, or any affiliate of Owner, obtains or attempts to obtain any or all of the proceeds of which are to be used in connection with the Project and the payment of the costs to engineer, design, procure, and construct the Facility.

"<u>Financing Party</u>" means any and all lenders, security, note or bond holders, lien holders, investors, equity providers and other persons or entities providing Financing, or credit support for Financing, as selected by Owner, or any affiliate of Owner, and/or any trustee(s) or agent(s) acting in connection therewith and their respective successors and assigns.

"<u>Force Majeure Event</u>" means any event or circumstance that (a) prevents or delays the performance by a Party of its obligations hereunder; and (b) is not within the reasonable control, directly or indirectly, of the Party affected, but only if and to the extent that (i) such circumstance, despite the exercise of due diligence, cannot be prevented, avoided or removed by such Party directly or indirectly; (ii) such event or circumstance is not due to such Party's negligence or intentional misconduct; (iii) such Party has taken all reasonable precautions, due care and reasonable alternative measures to avoid the effect of such event or circumstance and to mitigate the consequences thereof; and (iv) such Party has given the other Party prompt notice describing such event or circumstance, the effect and expected duration thereof and the actions being taken in order to comply with this Agreement.

Subject to the foregoing conditions, Force Majeure Events may include: (A) war, riot, sabotage, armed conflict, trade blockades, embargoes, acts of a public enemy, terrorist acts or other civil disturbance; (B) extreme weather conditions or natural phenomena, including floods, explosions or fires arising from natural causes, earthquakes, hailstorms, tornados, typhoons, hurricanes, landslides, volcanic eruptions, range or forest fires and unsafe or hazardous conditions arising from such severe and unusual adverse weather conditions or natural phenomena (any weather related Site conditions not otherwise specified herein that significantly impacts or immobilizes equipment or crew operations, jeopardizes stormwater permit compliance or causes general safety issues shall be reasonably agreed between the Parties); (C) strikes, walkouts, lockouts or similar industrial or labor actions or disputes, other than strikes, walkouts, lockouts or similar industrial or labor actions or disputes by, and directed at, Contractor's Personnel; (D) epidemics; (E) COVID-19 or any impact to Contractor's performance of the Work arising out of or in connection with COVID-19; (F) in the case of Owner only, any disruption to supply chains; and (G) any communication, discussion, policy change, Change in Law by a federal agency of the United States of America in relation to tariffs on modules.  Force Majeure Events shall not include: (1) the inability to obtain labor, equipment or other materials for the Work (except to the extent such inability is caused by a Force Majeure Event); (2) equipment failures (except to the extent such failures are caused by a Force Majeure Event); (3) changes in market conditions; (4) a Party's failure to timely apply for Applicable Permits; or (5) failure to pay an amount due.

"Form of Final Completion" shall have the meaning set forth in Section 6.7.

"Form of Mechanical Completion" shall have the meaning set forth in Section 6.1.

"Form of Substantial Completion" shall have the meaning set forth in Section 6.4.

"Governmental Authority" means any international, federal, state, local or municipal government body; any governmental, quasi-governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power; or any court or governmental tribunal.

"Hazardous Substance" means any and all chemicals, constituents, contaminants, pollutants, materials, wastes and any other carcinogenic, corrosive, ignitable, radioactive, reactive, toxic or otherwise hazardous substances or mixtures (whether solids, liquids, gases), or any substances now or at any time subject to regulation, control, remediation or otherwise addressed as a hazardous substance under Applicable Laws, including those laws, regulations and policies relating to the discharge, emission, spill, release, or threatened release into the environment or relating to the disposal, distribution, manufacture, processing, storage, transport, treatment, transport, or other use of such substances.

"Initial Retainage" shall have the meaning set forth in Section 7.7.1.

9

"Independent Engineer" means the independent engineer designated by the Owner through written notice to Contractor. Unless otherwise designated, the Independent Engineer shall be Leidos Engineering, LLC.

"Interconnection Agreement" means the Level 4 Interconnection Agreement between Owner and Interconnection Provider.

"Interconnection Provider" means Central Maine Power Company a Maine corporation and transmission and distribution utility, existing under the laws of the State of Maine, whose electric distribution system the Facility will be interconnected pursuant to the terms of this Agreement and the Interconnection Agreement.

"Interim Punch List" shall have the meaning set forth in Section 6.6.1.

"Investment Price" means all amounts invested in connection with the Project by Owner as of the date of sale, plus eight percent (8%).

"Landowner" means the owner of the Project Site.

"LNTP" shall have the meaning set forth in Section 2.1.

"LNTP Work" shall have the meaning set forth in Section 2.1.

"MC Retainage" shall have the meaning set forth in Section 7.7.1.

"Mechanical Completion" shall have the meaning set forth in Section 6.1.

"Mechanical Completion Deadline" shall mean the date as identified on Exhibit B, as such date may be extended in accordance with the provisions of this Agreement.

"Mechanical Completion Delay Liquidated Damages" shall have the meaning set forth in Section 6.3.

"New Contract Price" has the meaning set forth in Exhibit G.

"Notice to Proceed" means the notice described in Section 2.2 to be issued by Owner. "NTP Deadline" shall have the meaning set forth in Section 2.2.

"Offtaker" as listed in Exhibit C

"Original Contract Price" has the meaning set forth in Exhibit G.

"Owner Caused Delay" means a delay in Contractor's performance of the Work, to the extent such delay is caused by either (a) Owner's delay in performing or failure to perform any covenant or obligation of Owner under this Agreement including, without limitation, failure of Owner to (i) provide sufficient access to the Project Site (ii) provide authorization

10

to commence, perform or complete the Work or any portion thereof and (iii) timely review of Contractor's submittals and notices delivered in connection with this Agreement in accordance with the Schedule of Work, and if not specified therein, within the timeframe specified in such submittal or notice, and if not specified in the Schedule of Work or in such submittal or notice, within a reasonable time not to exceed ten (10) days; (b) any damage, or interference caused to the Work, or omission to act relating to the Work, which directly prevents Contractor from performing a material component or portion of the Work, which damage, interference, or omission to act is (i) caused by Owner, Offtaker, Landowner (in each case, to the extent such delay is not attributable to Contractor or its Subcontractors) or the Financing Party in connection with Contractor's performance of the Work, and (ii) resulting from the negligent acts or omissions or willful misconduct of Owner's personnel, Offtaker's personnel, Landowner's personnel or Financing Party's personnel, and (iii) in the case of any omission to act, is not the result of Contractor failing to communicate to Owner that it requires Owner to act in a particular manner; (c) the acts or omissions of Owner, Offtaker, Landowner, Interconnection Provider, the AHJ, Financing Party, Owner's consultants or contractors (other than Contractor's Personnel) or any other party acting on behalf of Owner or in furtherance of Owner's (and Financing Party's) obligations herein, in each instance that adversely affects the schedule, performance or cost of performing the Work or any other term and condition in this Agreement; (d) any failure by Owner to provide or delays in providing Owner Supplied Equipment or performing Owner's Scope of Work; (e) failure of Owner to replace any damaged or defective Owner Supplied Equipment; (f) failure to achieve the Capacity Guarantee to the extent caused by any Owner Supplied Equipment or Owner's Scope of Work; (g) any inaccuracies in the design set provided by Owner to Contractor (on which Contractor may rely); or (h) delay of the Interconnection Provider to perform the required work under the Interconnection Agreement necessary for Contractor to complete and interconnect the Facility; in each case, provided that Contractor's Personnel have not caused such delay and in respect of paragraph (h), provided that in accordance with the Contractor's scope of Work, Contractor's Personnel have made all reasonable efforts to mitigate any delays by the Interconnection Provider in the performance of the interconnection work and have provided progress reports to Owner regarding such interconnection work.

"Owner Event of Default" shall have the meaning set forth in Section 11.3.1.

"Owner Indemnitees" means Owner, each Financing Party and each of their respective officers, directors, shareholders, affiliates, partners, employees, representatives and agents.

"Owner Losses" shall have the meaning set forth in Section 15.1.

"Owner Parent Guaranty" means the parent guaranty provided by Owner in accordance with Section 7.6.

"Owner's Permits" shall have the meaning set forth in Section 4.5.

11

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A75F9518C9BD

"Owner's Representative" means the representative designated as such by Owner as set forth in Article 20.

"Owner's Scope of Work" means the scope of work to be performed by Owner as described on Appendix B, or as otherwise expressly excluded from Contractor's Scope of Work.

"Owner's Storage Facility" means any storage facility supplied by the Owner.

"Owner Supplied Equipment" means the equipment set forth in Appendix B to be supplied by Owner to Contractor in accordance with the terms of this Agreement.

"Owner Supplied Datasheets" means the datasheets for certain Owner Supplied Equipment that are labelled as such and set forth in Appendix B.

"P & P Bond Expiration Date" has the meaning set forth in Section 7.8.

"Partial Lien Waiver" means a partial lien and claim waiver and release in the form set forth in Exhibit M executed by Contractor or a Subcontractor, as applicable.

"Payment Milestone" shall have the meaning set forth in Section 7.2 and Exhibit B.

"Performance and Payment Bond" shall have the meaning set forth in Section 7.8.

"Performance Ratio" has the meaning given to it in Exhibit G, L.

"Permission to Operate" means Owner has received authorization for the Facility to commence parallel operation from the Interconnection Provider.

"Power Purchase Agreement" means the agreement between Owner and Offtaker for the purchase of electricity generated by the Facility.

"Progress Payment" shall mean any payment made or to be made by Owner to Contractor that corresponds to a Payment Milestone.

"Pre-Lien Notice" means any preliminary lien notices under Applicable Law required to preserve the right to claim a lien for the Work performed hereunder.

"Project" means the entirety of the Work and the Facility that will result from the Work.

"Project Site" or "Site" shall be as described in Exhibit C.

"Prudent Industry Practices" means, with respect to Contractor's performance of its obligations under this Agreement, at a particular time, in the exercise of reasonable judgment in light of the facts known, or that should have been known, at the time a decision

12

was made, those practices, standards, designs, methods, means, techniques, equipment and acts that would require a person to: (a) perform its duties in good faith and as a reasonably prudent contractor and in compliance with Applicable Laws and Applicable Permits, (b) perform its duties in compliance with good utility practices and the requirements of this Agreement, (c) exercise such care, skill and diligence as a reasonably prudent business company of established reputation engaged in the solar energy business would exercise in the conduct of its business and for the advancement or protection of its own interests, (d) perform the duties in accordance with applicable solar energy industry standards, taking into account the requirements to qualify for the investment tax credit under Section 48 of the Internal Revenue Code, I use sufficient and properly trained and skilled personnel, and (f) use parts and supplies that meet the specifications set forth in the Scope of Work."

"Public Official" means:
(a) any officer, employee or representative of a government, whether national, federal or local, including employees of law enforcement or regulatory agencies;
(b) any individual in the legislative, administrative, military or judicial branches of government;
(c) any officer, employee or representative of a government-owned or government controlled commercial enterprise (such as state-owned enterprises, sovereign wealth funds and state-owned media organizations) or government-controlled charitable organization.
(d) any officer, employee or representative of a political party or any candidate for or holder of public office;
(e) employees and representatives of public international organizations (such as the World Bank or UN),
(f) any member of a royal family, and
(g) any other persons discharging a public function.

"Reliability Testing" means the testing prior to Substantial Completion of the Facility, as further described in Exhibit L.

"Replacement Contractor" means a person employed by Owner to finish the Work in the event Owner terminates the Agreement due to a Contractor Event of Default, as provided in Section 11.2.3.

"Retainage" shall have the meaning set forth in Section 7.7.1.

"Rules" shall have the meaning set forth in Section 19.2.1.

"SC Retainage" shall have the meaning set forth in Section 7.7.1.

"Schedule of Milestones" means the payment schedule set forth on Exhibit B.

"Schedule of Work" means the baseline schedule(s) for the Work that will support Contractor's achievement of the Work set forth in Exhibit B, as such schedule may be replaced pursuant to the terms of this Agreement.

13

"Scope of Work" shall mean the Work set forth in Appendix A attached hereto.

"Subcontract" means any contract with a Subcontractor with respect to performing any part of the Work or providing any Equipment in connection with the Work.

"Subcontractor" means each and every vendor, Supplier, materialmen or contractor, other than Contractor, performing any part of the Work or providing any Equipment in connection with the Work.

"Substantial Completion" shall have the meaning set forth in Section 6.4.

"Supplier" means each and every vendor supplying the key components or equipment with a contract value equal to or greater than Five Hundred Thousand Dollars ($500,000) (other than Owner Supplied Equipment) outlined in Exhibit I.

"Target Capacity" means the target capacity in kilowatts entitled 'Array Wattage (DC)' set forth in the Facility Specifications.

"Third Party Warranties" shall have the meaning set forth in Section 10.5.

"Turnover Package" means all applicable Design Documents, Owner's manuals, data sheets, plans, drawings, repair and maintenance records, warranties, quality control records, Commissioning and inspection reports, photo records, certifications, permits, As-Builts, training requirements, preventative maintenance requirements, spare parts recommendations and other documents required by this Agreement, that are reasonably necessary or useful to operate and maintain the Facility.

"Unknown Site Conditions" shall mean any latent, unknown or concealed physical or subsurface conditions which (i) differ materially from the Documented Site Conditions, (ii) are identified in a geotechnical report or other data obtained after the Effective Date that materially affect the expected means or methods of construction and (iii) are of an unusual nature, different materially from those ordinarily encountered (including without limitation, Hazardous Substances, man-made subsurface impediments, historical, archaeological and cultural artifacts, human remains, underground structures, storage tanks, liens or encumbrances, and threatened or endangered species) or generally recognized as inherent in work of the character provided for in the Agreement, which were not reasonably ascertainable from a visual Project Site inspection performed by Contractor, and which will substantively and materially affect the Contract Price or Schedule of Work. "Unknown Site Conditions" shall not include materials brought onto the Site by Contractor, Contractor's Personnel or anyone acting on their behalf, or any site condition identified in any environmental studies (including the Environmental Study), ground condition reports or title searches in existence before the execution of this Agreement and provided to Contractor.

"Warranty Bond" shall have the meaning set forth in Section 7.8.

"<u>Work</u>" means all necessary design, engineering, procurement, installation, construction, temporary works, testing, demonstration, start-up, Commissioning, and any other work, Equipment and services as described on <u>Appendix A</u>.

"<u>Workmanship Warranty</u>" shall have the meaning set forth in <u>Section 10.1</u>.

"<u>Workmanship Warranty Period</u>" shall have the meaning set forth in <u>Section 10.2</u>.

1.2     <u>Rules of Usage</u>. The Parties hereby agree that the following rules of usage shall apply to this Agreement unless otherwise required by the context or unless otherwise specified:

1.2.1   <u>Singular and Plural</u>.   Definitions set forth herein shall be equally applicable to the singular and plural forms of the terms defined.

1.2.2   <u>Section References; Exhibits</u>.   References to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules or exhibits in this Agreement. All exhibits and schedules referenced herein are incorporated herein by reference.

1.2.3   <u>Precedence</u>. If there is any conflict between this Agreement, any Change Order, any exhibit, appendix, and any other document referenced in this Agreement, the documents shall be read in the following order of priority: (a) Change Orders and Construction Change Directives, read in reverse chronological order from latest to earliest; (b) this Agreement; and (c) exhibits and appendices to this Agreement; and (d) reviewed Design Documents (as defined in <u>Section 3.2.1</u>).   Any amendment shall have priority over the document it amends.   Unless stated otherwise, any amended document shall have the same order of priority stated in this <u>Section 1.2.3</u>.

1.2.4   <u>Headings</u>.   The headings, subheadings and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect the meaning, construction or effect of any provision of this Agreement.

1.2.5   <u>References to Persons</u>.   References to any person shall include such person and its successors and permitted assigns and transferees.

1.2.6   <u>Grammatical Forms</u>.   Where a word or phrase is specifically defined, other grammatical forms of such word or phrase have corresponding meanings; the words "herein," "hereunder," and "hereof" refer to the provisions of this Agreement as a whole and not to any particular portion or provision of this Agreement; "including" means "including, but not limited to," and other forms of the verb "to include" are to be interpreted similarly; references to "or" shall be deemed to be disjunctive but not necessarily exclusive (i.e., unless the context dictates otherwise, "or" shall be interpreted to mean "and/or" rather than "either/or"); and masculine includes feminine and neuter.

1.2.7   <u>Days</u>. References to "days" shall mean calendar days, unless the term "Business Days" is used.   If the time for performing an obligation under this

Agreement expires on a day that is not a Business Day, the time shall be extended until that time on the next Business Day.

1.2.8    Time Zone. A reference to time is a reference to the time in effect at the Project Site on the relevant date.

## ARTICLE 2
## CONDITIONS PRECEDENT TO THE AGREEMENT

2.1    Limited Notice to Proceed.    At any time prior to the date of issuance of the Notice to Proceed, Owner may issue a limited notice to proceed to Contractor in the form set forth in Exhibit S (the "LNTP") which shall authorize Contractor to commence performance of a specified portion of the Work (the "LNTP Work").  Any Work performed under the LNTP shall be performed pursuant to the terms and conditions of this Agreement and payment for Work performed under the LNTP shall be made in accordance with Article 7.  Contractor shall under no circumstance be entitled to payment of any amount in excess of the applicable Payment Milestone for the LNTP Work.  If any LNTP Work has not been achieved by Contractor before the Notice to Proceed is issued by Owner pursuant to Section 2.2, the applicable unperformed LNTP Work shall be deemed to be Work to be performed by Contractor after the date of issuance of the Notice to Proceed save that such non-performance shall not be considered an Event of Delay unless it is attributable to a Force Majeure Event.  Contractor represents and warrants that it has made sufficient allowance in the Schedule of Work and the Contract Price for the fact that Owner may not issue the Notice to Proceed until the NTP Deadline.

2.2    Notice to Proceed.  Owner shall issue a written notice to proceed ("Notice to Proceed") to Contractor, which shall constitute Owner's authorization to Contractor to commence the Work, effective as of the date received by Contractor.  In the event Owner fails to issue a Notice to Proceed by the date set forth in Exhibit B (the "NTP Deadline"), such failure shall be considered an Event of Delay.  If Owner has not provided a Notice to Proceed by one hundred eighty (180) days from the Effective Date, then Contractor may terminate this Agreement by delivery of written notice to Owner and such termination shall be deemed a termination for convenience in accordance with the provisions of Section 11.1.

2.3    Commencement of Work. Contractor shall commence performance of the Work (other than the LNTP Work and any other Work which this Agreement expressly permits to be performed prior to the Notice to Proceed) following the issuance by Owner of a Notice to Proceed.  Prior to or concurrently with issuance of the Notice to Proceed, Owner shall provide all insurance certificates required by it pursuant to Article 17.  Contractor shall provide the following within five (5) Business Days of issuance of the Notice to Proceed:

2.3.1    Insurance.  Contractor shall have provided to Owner all insurance certificates required to be provided to Owner pursuant to Article 17.

2.3.2    Payment Security.  Contractor shall have provided Owner with the Performance and Payment Bond in accordance with Section 7.8 of this Agreement.

2.4    Fixed Price Project. The Parties agree that this Agreement is a fixed price contract and Contractor's obligation is to provide Owner with an operational Facility in accordance with the Scope of Work for the Contract Price, as it may be adjusted as provided

16

in this Agreement.  Such fixed price is to remain valid until the Notice to Proceed is issued to Contractor.

## ARTICLE 3
## CONTRACTOR WORK AND OTHER OBLIGATIONS

     3.1    <u>Work to be Performed</u>.  Except for (a) those matters described as being specifically excluded from the Work in <u>Appendix A</u>, and (b) those items within Owner's Scope of Work in <u>Appendix B</u>, Contractor shall perform or cause to be performed the Work and services described as part of the Scope of Work and all its obligations under this Agreement, in accordance with Applicable Laws, Prudent Industry Practices and the terms of the Contract Documents.

     3.2    <u>Engineering and Design</u>. Contractor shall design the Project such that it is capable of complying with the requirements of this Agreement, Applicable Laws and Prudent Solar Industry Practices which includes but is not limited to the National Electric Code (NEC). Based on the technical specifications set forth in this Contract, Contractor shall prepare comprehensive drawings and specifications setting forth in detail the requirements for the construction of the Work.  As the drawings and specifications for the Work are issued, they shall be clearly identified as Design Documents.

        3.2.1    <u>Design Documents</u>.  Contractor shall provide all necessary services to provide reviewed Design Documents to Owner, reviewed in accordance with this <u>Section 3.2.1</u>, by the time specified in the Scope of Work. Contractor shall submit to Owner draft Design Documents for Owner's review at five (5) milestone intervals i.e. 10%, 30%, 50%, 90% and issued for construction (IFC) (together "Engineering Milestones"), incorporating the feedback from Owner at each interval.  Owner shall review and return the draft Design Document for each interval to Contractor within fifteen (15) Business Days unless otherwise agreed to between Contractor and Owner.  If Owner returns the draft Design Document for a milestone interval to Contractor with comments, Contractor shall address the comments, amend the draft Design Document (if necessary) and re-submit to Owner for review within five (5) Business Days of the request and the process in this <u>Section 3.2.1</u> shall be repeated until the Engineering Milestones have been exhausted.  Notwithstanding the foregoing, Owner shall be entitled to reject and return Design Documents to Contractor pursuant to this <u>Section 3.2.1</u> if the capacity of the STC rated solar electric system (expressed in kilowatts DC) set forth in the title block of the draft Design Documents is one hundred and one percent (101%) or more of the Target Capacity. Nothing herein shall be deemed to limit the right of Owner to submit to Contractor a change request as provided for in <u>Section 8.1.1</u>.  Following Owner's review of the Design Documents, Contractor shall not modify the Design Documents or the underlying engineering or design without engineering approval and the written approval of Owner.  If Owner makes no comments within the applicable fifteen (15) Business Day review period, Owner shall be deemed to have approved the applicable Design Document.  Following Owner's approval of the Design Documents, or deemed approval as provided for herein, Design Documents shall be deemed to be, and

17

referred to as, "reviewed Design Documents".  Owner's review of the Design Documents shall not waive, limit, or affect the obligations of the Contractor under this Agreement.

3.2.2    Owner Supplied Datasheets.  Contractor may rely upon the accuracy and correctness of the Owner Supplied Datasheets; provided, however, that Contractor shall: (a) immediately notify Owner of any inaccuracies, errors or omissions that it might discover in, and seek from Owner any clarification needed in connection with, the Owner Supplied Datasheets; (b) abide by Prudent Industry Practice in the use of Owner Supplied Datasheets; and (c) not be relieved of its obligation to complete the Work in accordance with this Agreement notwithstanding any error or inaccuracy in the Owner Supplied Datasheets.  If the Work is prevented or delayed or Contractor incurs additional costs due to: (i) any inaccuracy of or errors in any Owner Supplied Datasheets; or (ii) Owner's modification or revision of any Owner Supplied Datasheets, then subject to Article 8, and except to the extent such delay or cost is caused or contributed to by Contractor's breach of this Section 3.2.2, Contractor shall be entitled to a Change Order to the extent provided in Article 8.

3.2.3    Ownership of Drawings.  Subject to the payments to the Contractor corresponding to the Design Documents hereunder, all final Design Documents, specifications and other documents prepared by or for Contractor in respect of the Work and all drawings, specifications, calculations, memoranda, data, notes and other materials containing information supplied by Owner (the "IP Documentation") which shall come into Contractor's possession during its performance hereunder, shall be the property of Owner, and such Owner documents and other materials shall be returned to Owner upon the earlier of Substantial Completion or termination of this Agreement in a format determined by owner.  Owner shall have the right to retain a reproducible set of all such IP Documentation for use in respect of the Work.  Review (or lack thereof) by Owner or its designees of any Project documents provided by Contractor, and the fact that Owner has not discovered any errors reflected in such Project documents, shall not relieve or release Contractor of any of its duties, obligations, or liabilities under the terms of this Agreement.

3.2.4    Design Documents Register.  Contractor shall maintain an up-to-date set of Design Documents and shall provide all written comments, field changes, and redlined Design Documents to Owner, at the request of the Owner.

3.2.5    Bill of Materials. Contractor will provide to Client, within five (5) days of Mechanical Completion, a complete bill of materials.

3.3    Procurement.  Contractor shall procure, ensure delivery of, and pay for, in Contractor's name as an independent contractor and not as an agent for Owner, all labor, materials, Equipment (whether stored on or off the Site) (other than Owner Supplied Equipment and items within Owner's Scope of Work), supplies, manufacturing and related goods and services required to construct the Facility and complete the Work in accordance with this Agreement, unless specifically excluded in (i) Appendix A and (ii) those items within Owner's Scope of Work in Appendix B.  Subject to the provisions of Section 2.2, and subject further to the requirements of the LNTP (where issued), Contractor shall not be required to procure labor or additional materials or equipment until Owner provides a full Notice to Proceed.

18

3.4 <u>Construction and Installation</u>. Contractor shall develop a construction and installation plan, and oversee, coordinate and ensure the expeditious performance of the Work in accordance with the Contract Documents in coordination with the Owner Representative.

3.5 <u>Schedule of Work</u>.

3.5.1 <u>Milestones</u>. From and after the issuance of the LNTP, Contractor shall perform the Work in accordance with the milestones set forth in the Schedule of Work, as such milestone dates may be adjusted pursuant to this Agreement and subject to Owner's review and approval.

3.5.2 <u>Schedule of Work</u>. Contractor shall provide Owner with a detailed schedule of work in Gantt chart form no later than ten (10) Business Days following receipt of Owner's LNTP. The Schedule of Work sets forth all the Work (including Critical Path activities) that must be completed by Contractor, and the dates by which Work shall be completed, in order to support timely achievement of the milestones as provided in this <u>Section 3.5</u>. Contractor shall circulate an updated Schedule of Work to Owner every two weeks including but not limited to changes to the Schedule needed to reflect any Change Orders.

3.6 <u>Progress Reports</u>. From and after the issuance of the Notice to Proceed until the date Substantial Completion is achieved, Contractor shall (i) provide to Owner a written bi-weekly progress report, and (ii) attend a weekly progress meeting, including minutes of such meetings describing actual progress of Work as compared to the Schedule of Work. The progress reports shall include any significant problems encountered by Contractor, the cause of such problems, any estimated length of delay and any corrective action required, an update of the Critical Path activities, all issues relating to health and safety, and shall set out all input which Contractor expects to require from Owner in relation to the Work in the course of the 4 weeks following the delivery of the progress report.

3.7 <u>Project Site Security; Safety</u>. Contractor shall be responsible for the security and protection of (i) the Work, (ii) its (and its Subcontractor's) equipment and materials used in connection with the Work, and (iii) all other property owned or leased by Contractor or any of its Subcontractors located at the Site through the date of Substantial Completion. Contractor shall provide security and protection for Owner Supplied Equipment (only after delivery and acceptance as set forth in <u>Section 4.7</u>) until Substantial Completion.

3.8 <u>Operation, Access and Safety Following Substantial Completion</u>. Upon achievement of Substantial Completion, Contractor shall have access to the Facility and through the Workmanship Warranty Period as necessary to complete the items of Work on the Final Punch List and any Workmanship Warranty works as may arise; <u>provided</u>, however, that Contractor shall comply with Owner's security and safety programs while on the Project Site, shall use commercially reasonable efforts to mitigate, consistent with Prudent Industry Practices, any impacts on the production of electricity by the Facility from such access, and shall coordinate such access with Owner's Representative.

3.9 <u>Contractor's Permits</u>. Contractor shall timely obtain and maintain in effect all Applicable Permits required for the performance of the Work as specifically set forth in

19

Appendix A (the "Contractor's Permits").  Owner and Contractor shall cooperate with each other in connection with the other Party's efforts to obtain the Contractor's Permits and Owner's Permits, respectively, required to be obtained by such Party under this Agreement. Contractor shall comply with all conditions set forth in the Conditional Use Permit and Environmental Study Requirements unless explicitly stated otherwise in this Agreement.

3.10    Interconnection Facilities.  Owner shall be responsible for obtaining any interconnection approvals and agreements from the Interconnection Provider; provided that Contractor shall coordinate all interconnection activities with Interconnection Provider required to complete Work in compliance with the Scope of Work. Contractor understands that time is of the essence as it coordinates such interconnection activities. For the avoidance of doubt, notwithstanding the foregoing, final interconnection shall occur only upon Owner's approval.

3.11    Start-Up and Initial Operation. Contractor shall, prior to Substantial Completion, be responsible for all activities and processes necessary for the Commissioning and start-up of the Facility including the calibration and functional testing of all controls and equipment and initial operation of the Facility through to Substantial Completion. Contractor shall perform all acts required in order to enable the Owner to issue Consent to Energize. Contractor shall conduct such start-up, testing, and commissioning to avoid any and all interference with any other property owned by Owner to the greatest extent possible.  Owner shall witness such tests and will, within ten (10) ~~three (3)~~ Business Days after receipt of written results of such tests, deliver to Contractor a written notice either (a) accepting such tests as having been passed, or (b) rejecting such tests as having demonstrated that the tested item failed to comply with the performance requirements therefor under this Agreement.  Any rejection shall include a detailed description of the basis for rejection.

3.12    Commissioning and Performance Testing. Contractor shall perform, and re-perform as necessary, the Commissioning Tests, the Reliability Testing and Capacity Testing in accordance with the Scope of Work and Exhibit D and L, respectively, to the reasonable satisfaction of the Owner.

3.13    Clean-Up and Waste Disposal

3.13.1 During Construction.  During the performance of the Work, Contractor shall keep the Project Site and the surrounding areas clean and free from accumulations of waste materials, rubbish and other debris resulting from the Work and shall remove and dispose of such waste materials, rubbish and other debris. Contractor shall ensure that all recyclable materials are recycled.

3.13.2 Prior to Final Completion.  Upon achieving Substantial Completion, Contractor shall remove the waste materials, rubbish, and other debris from the Project Site and dispose of the same.  After Substantial Completion and prior to Final Completion, Contractor shall remove from the Project Site and dispose of any waste materials, rubbish and other debris resulting from its post-Substantial Completion performance of the Work and Contractor shall remove Contractor's tools, construction equipment, machinery, and surplus equipment from the Project Site.

3.14    Hazardous Substances. If any Hazardous Substance are discovered by Contractor on the Project Site during Contractor's prosecution of the Work, Contractor shall not further disturb such Hazardous Substance and shall immediately notify Owner of the existence of the Hazardous Substance, and Contractor shall attempt to continue work on the Project while any remediation is ongoing provided such continuation is not deemed a threat to health or safety by the Contractor in its reasonable discretion.  If the remediation efforts prevent Contractor from continuing the Work, Contractor shall suspend the Work until such time as the remediation is completed and Contractor can resume the affected work.  Should the Hazardous Substance impact the Project schedule or involve a Change in the Scope of Work, Contractor shall be entitled to a Change Order. Contractor shall not be entitled to a Change Order for any Hazardous Substance transported onto or generated by the Project Site by Contractor or Contractor's Personnel.  The Parties agree that Contractor shall have no responsibility or liability for any Hazardous Substance at the Project Site, except to the extent transported onto or generated by the Project Site by Contractor or Contractor's Personnel.   Owner will be liable for and shall indemnify, defend and hold harmless Contractor Indemnitees against any Contractor Losses suffered by Contractor relating to or arising out of any Hazardous Substances in each case at, under, or on the Project Site, other than (i) Hazardous Substances transported onto the Project Site by, or (ii) to the extent any losses relating to such Hazardous Substances clearly identified in advance by Owner in writing are exacerbated by, in each case, any of Contractor's Personnel.  Such indemnification shall survive termination of this Agreement.

3.15    Unknown Site Conditions.  Discovery of Unknown Site Conditions shall entitle Contractor to a Change Order in accordance with and subject to the terms of this Agreement. If any Unknown Site Conditions are discovered by Contractor on the Project Site during Contractor's prosecution of the Work, Contractor shall not further disturb such Unknown Site Condition and shall immediately notify Owner of the existence of the Unknown Site Condition.

3.16    Risk of Loss.  Risk of loss with respect to the Facility shall transfer from Contractor to Owner upon Substantial Completion pursuant to Section 6.4.  Notwithstanding Contractor's duties of care related to the Facility established in this Agreement, Contractor shall at no time prior to Substantial Completion bear the cost or expense associated with repairs, replacements or reconstruction of the Facility to the extent that such loss of or damage to the Facility is caused by the negligence or willful misconduct of Owner or its employees, affiliates, guests or agents (other than Contractor's Personnel).

3.17    Subcontractors and Suppliers.

3.17.1  Key Suppliers. In this section 3.17, "Key Suppliers" means suppliers of Labor and Equipment and Material services. 15 Business Days prior to executing any new proposed contracts with Key Suppliers and 30 days prior to commencing any work with such Key Supplier, Contractor shall provide Owner with a list of proposed Key Suppliers, which list Contractor can subsequently update as necessary (but subject to prior consultation with Owner).  If Owner has a reasonable objection to any proposed Key Supplier, Owner shall promptly notify Contractor in writing, but no later than fifteen (15) Business Days following receipt of Contractor's notice of the

21

proposed Subcontract(s).  If Owner's objection is reasonable, Contractor shall not delegate, assign, sublet or further subcontract to the proposed Key Supplier and Contractor shall propose another acceptable Key Supplier. All Subcontractors and Key Suppliers shall be fully compliant with federal and state regulations as applicable.

3.17.2 Liability of Subcontractors. No contractual relationship shall exist between Owner and any Subcontractor or Supplier with respect to the Work, and no Subcontractor is intended to be or shall be deemed a third-party beneficiary of this Agreement.  Contractor shall be responsible to Owner for the acts and omissions of Subcontractors and of persons directly employed by them, to the same extent as Contractor is responsible to Owner for the acts and omissions of Contractor and its employees under this Agreement.  Except as required by Applicable Law, nothing contained in this Agreement shall obligate Owner to pay or otherwise be responsible for the direct payment of any Subcontractor.  Entry into any Subcontract shall not relieve Contractor of any of its obligations under this Agreement, including the obligations to perform the Work in accordance with this Agreement.  Owner shall have the right, upon written request, to receive from Contractor a copy of all specifications and warranties for Equipment supplied by any Subcontractors.

3.18    Utilities.  Contractor shall provide readily available and temporary utilities including electricity and portable sanitation, during construction and Commissioning of the Facility.

3.19    Site Conditions.  Except for Unknown Site Conditions, Contractor has satisfied itself as to the general and local conditions and circumstances affecting the Work and as of the Effective Date of this Agreement, Contractor represents that it is familiar with the following:

3.19.1 the typical weather conditions at the Site and the surrounding area (Force Majeure Events are excluded);

3.19.2 Maine laws and administrative government procedures applicable to the Work;

3.19.3 the sufficiency and size of, and the accessibility of and limitations on ingress, egress to and from the Site; and

3.19.4 the availability, character, reliability, and cost of, facilities, roads, and other transportation means to the Project Site.

3.20    Delivery, Unloading, Shipping Fixtures and Special Tools.

3.20.1 (i) load all Owner Supplied Equipment located at the Owner's Storage Facility, (ii) deliver this Owner Supplied Equipment to the Project Site, and (iii) upon delivery to the Project Site, unload and inspect such Owner Supplied Equipment, and

3.20.2 Store such Owner Supplied Equipment after such is delivered to the Project Site until incorporated into the Work through Substantial Completion.

3.21    Installation and Integration of Owner Supplied Equipment.  Contractor shall provide all services, management, Labor, equipment and materials necessary to

22

Install the Owner Supplied Equipment and the Equipment while minimizing any effects on the Owner's other property to the greatest extent possible all in accordance with the Schedule of Work.

3.22    Contractor's Representative. Within fifteen (15) days of issuance of the LNTP, Contractor shall provide a designated point of contact for Contractor ("Contractor's Representative"). Owner will have the right to reasonably refuse the designation of any person as Contractor's Representative. The Parties understand and agree that Contractor's Representative may have limited authority for approval and unless the context clearly indicates that the Contractor's Representative has authority for approval, Contractor shall be responsible for providing such approval.  Contractor shall notify Owner in writing of any change in Contractor's Representative.

3.23    Existing Structures.  Contractor shall act in accordance with Prudent Industry Practices in relation to the Existing Structures and shall take all necessary steps to ensure that the Existing Structures are not damaged, compromised or interfered with in any way.

3.24    Installation Records. Contractor shall record the serial numbers and installed locations of all installed equipment, whether Owner Supplied Equipment or otherwise.

3.25    Document Format. All documents sent to Owner by Contractor must be sent in digital formats which are word-searchable using Microsoft Word, Microsoft Excel or Adobe Acrobat. Where documents require signatures or other input in ink, scans of the wet-inked documents must be shared along with the word-searchable versions.

ARTICLE 4
**OWNER OBLIGATIONS**

4.1    Information and Owner's Work.  Any information to be provided by Owner, including any response to a request for clarification by Contractor, shall be provided in a reasonably timely manner so as not to delay Contractor's performance of the Work, and any delay in excess of five (5) Business Days in providing such information shall be an Owner Caused Delay, provided that the Contractor asked for such information as soon as it knew such information was required.

4.2    Owner's Representative. Within fifteen (15) days of issuance of the Notice to Proceed Owner shall provide a designated point of contact for Owner ("Owner's Representative"). The Parties understand and agree that Owner's Representative may have limited authority for approval and unless the context clearly indicates that the Owner's Representative has authority for approval, Owner shall be responsible for providing such approval.  Owner shall notify Contractor in writing of any change in Owner's Representative.

4.3    Location of and Access to the Project Site.

23

4.3.1   On and after the date of issue of the LNTP, Owner shall provide to Contractor's Personnel, subject in each case to the Conditional Use Permit and Environmental Study Requirements:

(a)   full, unrestricted and uninterrupted access and use of the Project Site for Contractor to perform the Work pursuant to the terms of this Agreement;

(b)   full, unrestricted and exclusive access and use of Equipment laydown, debris collection and designated parking areas on the Project Site; and

(c)   full and unrestricted rights of ingress and egress to and from the Project Site, including rights of way for the access route to the Project Site.

4.3.2   Owner shall not permit its agents, employees and guests to (a) interfere with Contractor's performance of the Work and (b) cause damage to the Facility.

4.3.3   Contractor and Contractor's Personnel have a duty of care to the Project Site and its and their use of Equipment, sufficient to satisfy any relevant regulatory and/or insurance-related purposes.

4.4   Site Information.  Owner has provided to Contractor, at Owner's expense, all of the following to the extent in existence and in Owner's possession and control and listed on Exhibit R ("Documented Site Conditions):

4.4.1   information describing the physical characteristics of the Project Site, including surveys, legal description, data or drawings depicting existing conditions, subsurface and environmental studies, reports and investigations;

4.4.2   tests, inspections and other reports dealing with environmental matters, Hazardous Substances and other existing conditions, if applicable and available, relating to the Project Site; and

4.4.3   any other information or services reasonably requested by Contractor that are relevant to Contractor's performance of the Work and under Owner's control.

Contractor shall be entitled to rely on Documented Site Conditions furnished by Owner pursuant to this Section 4.4.

4.5   Owner's Permits. Owner hereby represents and warrants to Contractor that (a) Owner shall obtain the Applicable Permits necessary for Owner to purchase, own, operate and maintain the Facility, to perform its obligations hereunder and exercise its rights under this Agreement as specifically set forth in Appendix B (collectively, "Owner's Permits"); and (b) Owner is, and shall at all times be, in compliance with all Applicable Laws.

4.6   Owner, Financing Party and Independent Engineer Oversight.   Owner (including its designees), any applicable Financing Party (including its designees) and the Independent Engineer may, but shall have no obligation to, visit the Project Site to familiarize

24

itself or themselves with the progress and quality of the Work and attend the performance of the Commissioning Tests, the Reliability Testing and Capacity Testing as set forth in this Agreement; provided, however, Owner, the Financing Party and the Independent Engineer shall not materially interfere with Contractor's ability to perform the Work and shall comply with all safety plans established and provided to them by Contractor while on the Project Site.

4.7     Owner Supplied Equipment.

4.7.1   Owner has procured and shall deliver to the Project Site the Owner Supplied Equipment for Contractor's incorporation in the Facility on or before the time specified for delivery of such Owner Supplied Equipment specified in the Schedule of Work. Title to Owner Supplied Equipment remains at all time with Owner. Owner shall deliver the Owner Supplied Equipment to Contractor or a third party nominated by Contractor and reasonably agreed to by Owner at the times set out in the Schedule of Work. Upon request by Contractor, Owner shall provide to Contractor correct and complete copies (redacted as appropriate) of all Owner Supplied Equipment contracts and all other information relating to the Owner Supplied Equipment.

4.7.2   Upon acceptance (or replacement, if necessary, in accordance with Section 4.7.3), Contractor shall secure in accordance with manufacturer's requirements such Owner Supplied Equipment. Contractor shall comply with manufacturer's warranty requirements regarding Owner Supplied Equipment during use, incorporation in the Facility and Final Completion.

4.7.3   Contractor shall receive all Owner Supplied Equipment upon delivery at the Site and shall identify, document and immediately notify Owner of any visual signs of damage observed at the time of delivery; Contractor shall have an independent duty and obligation to examine and receive shipments in accordance with Prudent Industry Practices and in accordance with manufacturer's warranty requirements regarding Owner Supplied Equipment.  Contractor shall be solely responsible for inspecting and accepting all Owner Supplied Equipment upon its delivery to the Site. If at any time after Contractor's acceptance of Owner Supplied Equipment Contractor determines that any Owner Supplied Equipment is broken or otherwise defective or damaged, Contractor shall notify Owner and to the extent such damage is not attributable to Contractor's Personnel, Owner shall have the duty and responsibility to procure replacement Owner Supplied Equipment as promptly as possible  so  as  to  not  adversely  impact  the  Schedule  of  Work.

4.7.4   Any Owner Supplied Equipment that Contractor does not use in the Facility shall be returned in mint condition to Owner before Substantial Completion. Owner shall be made whole by Contractor for any unused Owner Supplied Equipment that has been delivered and inspected at the Site and has passed any applicable quality testing but that is returned to Owner in damaged condition after Substantial Completion.

25

## ARTICLE 5
## COMMISSIONING TESTS

5.1 <u>Commissioning Testing</u>.    Contractor  shall  perform  and  successfully pass/complete the Commissioning Tests for the Facility as described in <u>Exhibit D</u> after Mechanical Completion and as a condition of Substantial Completion.  Notwithstanding the foregoing, Contractor may perform Commissioning and Commissioning Tests under <u>Exhibit D</u> that do not involve energization prior to Mechanical Completion of the Facility and shall not  allow  or  provide  for  the  Commissioning  or  Commissioning  Tests  that  involve energization of the Facility until Mechanical Completion of the Facility has been achieved and Contractor has received Consent to Energize. Performance of the Commissioning Tests and results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative prior to or upon Substantial Completion.  The Independent Engineer shall confirm the completion of the Commissioning Tests for the benefit of Owner.

5.2 <u>Capacity Testing</u>. Contractor shall perform the Capacity Testing as described in Exhibit L after successful completion of the Commissioning Tests and as a condition of Substantial Completion. Performance of the Capacity Testing and the results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's  Representative  and  the  Independent  Engineer  prior  to  or  upon  Substantial Completion. The Independent Engineer shall confirm the completion of the Capacity Testing for the benefit of Owner.

5.3 <u>Reliability Testing.</u>    Contractor  shall  perform  the  Reliability  Testing  as described in Exhibit L as a condition of Substantial Completion. Performance of the Reliability Testing and the results of such tests shall be documented by Contractor and Contractor shall deliver such documentation to Owner's Representative prior to or upon Substantial Completion. The Independent Engineer shall confirm the completion of the Reliability Testing for the benefit of Owner.

5.4 <u>Output During Testing</u>.  At all times when Contractor conducts the Capacity Testing or the Commissioning Tests, Owner may, at Owner's sole expense, arrange for the disposition of such Facility's electrical output in such manner as Owner and Contractor may mutually and reasonably agree, so as not to hinder, delay or interfere with (or increase the costs of) the Work, Commissioning, testing or Contractor's ability to perform its obligations or exercise its rights under this Agreement.  Any electrical output generated by the Facility at any time, and the proceeds from the sale thereof, shall be the exclusive property of Owner.

5.5 <u>Right to Attend Testing</u>.  For Capacity and Reliability Testing, Contractor will notify the Owner's Representative upon scheduling such Capacity and Reliability Testing, (a) at least five (5) Business Days in advance of such Capacity and Reliability Testing that will occur off the Project Site, and (b) will use reasonable efforts to provide the foregoing notifications  as  much  as  ten  (10)  Business  Days  in  advance,  but  no  later  than  five  (5) Business Days in advance of any such Capacity and Reliability Testing that will occur at the Project Site.  The Owner's (including its designees), the Financing Party's or the Independent Engineer's right to attend the Capacity and Reliability Testing shall not otherwise limit the progress of the Work, and any delay to the Capacity and Reliability Testing that occurs as a result  of  unreasonable  conduct  by  the  Owner,  a  Financing  Party  or  the  Independent Engineer, shall be considered an Owner Caused Delay.

5.6     Witness Testing. Contractor shall arrange for and coordinate witness testing with the Interconnection Provider. Contractor shall include Owner in all written communications in relation to same and Owner shall have the right to substantial advance notice of, and to attend, all in-person meetings, telephone calls, internet calls and/or similar communications in relation to witness testing.

5.7     Energization Schedule. Contractor shall liaise with the Interconnection Provider in order to agree the energization schedule. Contractor shall include Owner in all written communications in relation to same and Owner shall have the right to substantial advance notice of, and to attend, all in-person meetings, telephone calls, internet calls and/or similar communications in relation to the energization schedule.

## ARTICLE 6
## COMPLETION OF THE WORK

6.1     Mechanical Completion. Mechanical Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.1.1 through to 6.1.4 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.1 ("Mechanical Completion"):

6.1.1   the Facility has been properly and fully engineered, constructed and installed in accordance with this Agreement to the extent that all Work is complete save for pre-Commissioning, Commissioning, start-up, adjustment and testing (including performance of the Commissioning Tests, the Reliability Testing and Capacity Testing);

6.1.2   appropriate barriers have been installed to prevent Energization of the Facility;

6.1.3   Contractor has issued a written notice to Owner confirming that Energization has not occurred in respect of any part of the Facility;

6.1.4   the Interim Punch List has been prepared by Contractor in accordance with Section 6.6.1 and delivered to and accepted by Owner. Owner has right to designate a third party to review the Punch List prior to acceptance;

6.1.5   the Facility is structurally, mechanically and electrically sound, and is ready for the full, safe and reliable pre-Commissioning, Commissioning, start-up, adjustment and testing (including performance of the Commissioning Tests, the Reliability Testing and Capacity Testing);

When Contractor believes that it has achieved the requirements of Mechanical Completion, Contractor shall provide written notice (the "Form of Mechanical Completion"), in substantially the same form as Exhibit O, to Owner's Representative, together with all supporting documentation required by and as set forth in the Scope of Work.  Owner's Representative shall have ten (10) Business Days from receipt to notify Contractor of its approval or rejection of the Form of Mechanical Completion in its reasonable discretion. In the event, the Owner's Representative rejects the Form of Mechanical Completion, it shall provide a feedback statement specifying its observations and issues inhibiting the

27

achievement of Mechanical Completion for Contractor's review. A failure by Owner's Representative to respond to the Form of Mechanical Completion within such ten (10) Business Day period shall be deemed approval of the Form of Mechanical Completion.

6.2     Consent to Energize.  On or after the occurrence of Mechanical Completion pursuant to Section 6.1, Contractor shall not allow Energization of the Facility prior to receiving written consent from Owner to authorize Contractor to Energize the Facility ("Consent to Energize

6.3     Mechanical Completion Delay Liquidated Damages.  Contractor shall cause the Facility to reach Mechanical Completion on or before the Mechanical Completion Deadline. If Contractor fails to achieve Mechanical Completion on or before the Mechanical Completion Deadline (as such date may be adjusted pursuant to the terms of this Agreement), then Contractor shall pay to Owner, as liquidated damages and not as a penalty, the amount of $500 per MW per day for each day by which Mechanical Completion is later than the Mechanical Completion Deadline ("Mechanical Completion Delay Liquidated Damages"), which shall be Owner's sole remedy for delay if collected.  Owner shall calculate the Mechanical Completion Delay Liquidated Damages for which Contractor is responsible based on the date that Mechanical Completion is achieved. Contractor shall pay Mechanical Completion Delay Liquidated Damages due pursuant to this Section 6.3 monthly in arrears on the first day of each month. Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Mechanical Completion Delay Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Contractor does not achieve Mechanical Completion by the Mechanical Completion Deadline, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  Time is particularly of the essence in Contractor's timely performance of this Agreement (subject to all express cure periods set forth in this Agreement).  The Parties agree that (i) Contractor's obligation to pay Mechanical Completion Delay Liquidated Damages shall not require Owner's establishment of any actual damages for such delay, (ii) Owner's actual damages for delay may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any delay damages that may arise relating to this Agreement for such period, and (iii) the payment of Mechanical Completion Delay Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Mechanical Completion Delay Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for delay if the liquidated damages were enforceable.

6.4     Substantial Completion.  Substantial Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.4.1 through to 6.4.8 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.4 ("Substantial Completion"):

6.4.1    Mechanical Completion has occurred;

6.4.2    all items of Work identified on the Interim Punch List have either been completed by Contractor, included on the Final Punch List or waived in writing by Owner;

6.4.3    Commissioning of the Facility has occurred, unless waived by the mutual agreement of Owner and Contractor;

6.4.4    all activities described in Contract Documents, as amended, required to place the Facility into initial operation following Commissioning have been successfully completed, including the preparation and successful execution of all activities described in the Contract Documents required to place the Facility into initial operation following Commissioning and the receipt of all Contractor Permits required to place the Facility into initial operation following Commissioning;

6.4.5    Contractor has furnished to Owner the following lien waivers: (i) Final Lien Waivers from all Subcontractors who have completed all work contemplated by the corresponding Subcontract and have received final payment thereunder; (ii) Partial Lien Waivers from all Subcontractors who have completed all work contemplated by the corresponding Subcontract but who have not received final payment thereunder; and (iii) Contractor has issued a Partial Lien Waiver applicable to all Work performed and all payments which Contractor has received and is entitled to in connection therewith, in each case, applicable to the whole of the Work and the effect of which shall, to the fullest extent permitted by Applicable Laws, be to release Owner from all lien and payment claims by Contractor or its Subcontractors, howsoever arising in connection with the Project;

6.4.6    Contractor has completed the Capacity Testing as described in Exhibit L, and any additional testing as may be required under this Agreement, and (a) the Facility has achieved the Capacity Guarantee as required by the Contract Documents; or (b) the Facility has not achieved the Capacity Guarantee but has achieved at least 95% of the Capacity Guarantee, provided the Contractor has given to Owner's Representative notice of such and has entered the Capacity Cure Period as described in Section 6.5; and Contractor has agreed to pay Owner the Capacity Shortfall Liquidated Damages payment amount;

6.4.7    the Final Punch List, which shall not include any environmental, safety, or performance-related item at any value and valued no greater than at 2% of the Contract Price, has been prepared by Contractor in accordance with Section 6.6.2 and delivered to and accepted by Owner;

6.4.8    the Facility is capable of continuous operation in concert with the other necessary equipment and interconnections for the commercial purpose of generating and delivering electricity in accordance with Prudent Industry Practice, and otherwise meets the requirements of the Scope of Work, other than as will be demonstrated through Capacity Testing at Substantial Completion; and

6.4.9    the Contractor has provided a service schedule, which has in turn been approved by the Owner detailing the maintenance works which Owner ought to perform during the Workmanship Warranty Period;

When Contractor believes that it has achieved the requirements of Substantial Completion, Contractor shall provide written notice (the "Form of Substantial Completion"), in substantially the same form as Exhibit E, to Owner's Representative, together with all supporting documentation required by and as set forth in the Scope of Work.  The Owner's Representative shall have twenty (20) Business Days from receipt to notify Contractor of its approval or rejection of the Form of Substantial Completion in its reasonable discretion. In the event, the Owner's Representative rejects the Form of Substantial Completion, it shall provide a feedback statement specifying its observations and issues inhibiting the achievement of Substantial Completion for Contractor's review.  A failure by Owner's Representative to respond to the Form of Substantial Completion within such twenty (20) Business Day period shall be deemed approval of the Form of Substantial Completion.

6.5    Substantial Completion Delay Liquidated Damages.  Contractor shall cause the Facility to reach Substantial Completion on or before the Substantial Completion Deadline. If Contractor fails to achieve Substantial Completion on or before the Substantial Completion Deadline (as such date may be adjusted pursuant to the terms of this Agreement), then Contractor shall pay to Owner, as liquidated damages and not as a penalty, the amount of $375 per MW per day for each day by which Substantial Completion is later than the Substantial Completion Deadline ("Substantial Completion Delay Liquidated Damages"), which shall be Owner's sole remedy for delay if collected.  Owner shall calculate the Substantial Completion Delay Liquidated Damages for which Contractor is responsible based on the date that Substantial Completion is achieved. Contractor shall pay Substantial Completion Delay Liquidated Damages due pursuant to this Section 6.5 monthly in arrears on the first day of each month. Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Substantial Completion Delay Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Contractor does not achieve Substantial Completion by the Substantial Completion Deadline, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  Time is particularly of the essence in Contractor's timely performance of this Agreement (subject to all express cure periods set forth in this Agreement).  The Parties agree that (i) Contractor's obligation to pay Substantial Completion Delay Liquidated Damages shall not require Owner's establishment of any actual damages for such delay, (ii) Owner's actual damages for delay may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any delay damages that may arise relating to this Agreement for such period, and (iii) the payment of Substantial Completion Delay Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Substantial Completion Delay Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for delay if the liquidated damages were enforceable.

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7FF9518C9BD

6.6     Substantial Completion Capacity Testing.  In order for Contractor to achieve Substantial Completion, Contractor shall conduct Capacity Testing of the Facility demonstrating that the Facility has been completed sufficiently to operate reliably, safely and without endangering its mechanical, civil or electrical integrity.  As part of the Capacity Testing, Contractor shall conduct a Capacity Test in accordance with Exhibit L.

6.6.1    Satisfaction of Capacity Guarantee.  If, following the Capacity Testing, Contractor achieves the Capacity Guarantee in accordance with the criteria set forth in Exhibit L, and Contractor has otherwise satisfied all of the requirements for Substantial Completion, Contractor shall notify the Owner that it has successfully achieved Substantial Completion in accordance with the procedures set forth in Section 6.4.

6.6.2    Performance Cure.   If, following the Capacity Testing, Contractor achieves a capacity of at least ninety five percent (95%) of the Capacity Guarantee (as defined in Exhibit L), in accordance with the criteria set forth in Exhibit L but does not satisfy the Capacity Guarantee, and Contractor has otherwise satisfied all of the requirements for Substantial Completion, Contractor shall notify Owner that it has successfully achieved Substantial Completion in accordance with the provisions of Section 6.4 subject to the following: (a)   Contractor shall continue to make any modifications to the Facility, at its sole cost and expense, over a period of sixty (60) days in an effort to attain the Capacity Guarantee ("Capacity Cure Period"); (b) during the Capacity Cure Period,  Contractor shall conduct such additional Capacity Testing with respect to the Facility in accordance with the criteria set forth in Exhibit L in order to determine whether or not Contractor has met the Capacity Guarantee; and (c) during the Capacity Cure Period, Contractor shall coordinate any proposed modifications or testing shall with Owner and so as not to interfere with production of the Facility. If failure to satisfy the Capacity Guarantee is caused by Owner's Scope of Work or Owner Supplied Equipment, Contractor shall (i) immediately notify Owner and provide Owner a reasonable opportunity to cure such cause (ii) be entitled to notify Owner that it has achieved Substantial Completion and Owner shall be solely responsible for the cost and expense of attaining the Capacity Guarantee.

6.6.3    Capacity Shortfall Liquidated Damages. Unless caused by Owner's Scope of Work or Owner Supplied Equipment, if, after the Capacity Cure Period, Contractor still fails to show the Facility has achieved the Capacity Guarantee then Owner shall, subject to Section 6.8, be entitled to Capacity Shortfall Liquidated Damages, which shall be calculated as follows: If Contractor fails to achieve the Capacity Guarantee, for every one percent (1%) of capacity shortfall, Contractor will pay Capacity Shortfall Liquidated Damages in the amount of $10,000 per MegaWatt DC.  Contractor shall calculate the Capacity Shortfall Liquidated Damages and provide such calculations to Owner for review and approval, such approval not to be unreasonably withheld.  If Contractor fails to achieve at least ninety five percent (95%) of the Capacity Guarantee, Capacity Shortfall Liquidated Damages shall constitute Owner's sole remedy for Contractor's failure to achieve the Capacity Guarantee.  Contractor shall pay to Owner all Capacity Shortfall Liquidated Damages due pursuant to this Section 6.5 within thirty (30) days of the occurrence of

31

Substantial Completion.  So long as Owner has timely paid to Contractor undisputed amounts due under and in accordance with this Contract for any milestones associates with Substantial Completion, Contractor shall not be entitled to set off any amounts due from Owner to Contractor against the Capacity Shortfall Liquidated Damages due pursuant to this Section.

Contractor acknowledges that the Owner will incur significant losses if the Capacity Guarantee is not satisfied, including without limitation losses in the form of lost revenue, missed contract commitments, increased costs under other contracts, finance costs, loss of use and enjoyment, and associated costs.  The Parties agree that (i) Contractor's obligation to pay Capacity Shortfall Liquidated Damages shall not require Owner's establishment of any actual damages for performance failure, (ii) Owner's actual damages for such performance failure may be difficult to calculate and the sums in liquidated damages to be paid as set forth above are a reasonable estimate of any liquidated damages that may arise relating to this Agreement for such period, and (iii) the payment of Capacity Shortfall Liquidated Damages is not a penalty or forfeiture. Owner may withhold or offset such liquidated damages against any sums otherwise owed to Contractor under this Agreement.  Owner shall have the right to collect actual damages in any case only where Capacity Shortfall Liquidated Damages are due but are unenforceable, provided such actual damages shall not exceed the amounts payable by the Contractor for failure to achieve the Capacity Guarantee if the liquidated damages were enforceable.

6.6.4   If the Capacity Guarantee is not achieved (unless the failure to achieve the Capacity Guarantee is the result of the Owner Supplied Equipment or Owner's Scope of Work) Contractor shall maintain completion security specified in Section 7.8 of this Agreement until such time as Capacity Guarantee is achieved.

6.6.5   If following Capacity Testing Contractor fails to show the Facility has achieved at least ninety five percent (95%) of the Capacity Guarantee, Substantial Completion will not have occurred.

6.6.6   Contractor shall continue to make any modifications to the Facility, at its sole cost and expense (unless the failure to achieve the Capacity Guarantee is the result of the Owner Supplied Equipment or Owner's Scope of Work then it shall be an Owner Caused Delay), in an effort to attain the Capacity Guarantee and shall conduct such additional Capacity Testing with respect to the Facility in accordance with the criteria set forth in Exhibit L in order to determine whether or not Contractor has met at least ninety five (95%) of the Capacity Guarantee, until the limit on liquidated damages referred to in Section 6.8 is met. Notwithstanding the foregoing, Contractor's failure to achieve Substantial Completion within sixty (60) calendar days of Permission to Operate shall constitute a material breach of this Agreement and nothing in this Section 6.5.6 shall limit Owner's damages or remedies for breach of contract or damages or remedies available to the Owner under the Parent Guaranty.

32

6.7     Punch Lists.

6.7.1     Interim Punch List. At the time Contractor delivers the Form of Mechanical Completion, Contractor shall also provide to Owner's Representative a list of Work, if any, that remains to be completed prior to Substantial Completion that, consistent with Prudent Industry Practice, will not affect the operability, reliability, safety or mechanical or electrical integrity of the Facility (the "Interim Punch List"). The Interim Punch List shall include the estimated cost and schedule to complete the items of Work identified in the Interim Punch List, which schedule shall be mutually agreed to by the Parties based upon the items of Work that remain to be completed. Approval of the Form of Mechanical Completion shall constitute both the Owner and each Financing Party's agreement to the Interim Punch List.

6.7.2     Final Punch List. At the time Contractor delivers the Form of Substantial Completion, Contractor shall also provide to Owner's Representative a list of Work, if any, that remains to be completed prior to Final Completion that, consistent with Prudent Industry Practice, will not affect the operability, reliability, safety or mechanical, civil or electrical integrity of the Facility (the "Final Punch List"). The Final Punch List shall include the estimated cost and schedule to complete the items of Work identified in the Final Punch List, which schedule shall be mutually agreed to by the Parties based upon the items of Work that remain to be completed. Approval of the Form of Substantial Completion shall constitute both Owner and each Financing Party's agreement to the Final Punch List.  As security for performance of Contractor's obligations to complete the items on the Final Punch List, Owner shall withhold two hundred percent (200%) of Contractor's estimated cost to complete the items on the Final Punch List from the Substantial Completion Payment Milestone Amount The amount withheld will become payable only once every Final Punch List item has been completed to the satisfaction of Owner.

6.8     Final Completion.   Final Completion shall occur when Contractor has satisfied the following conditions set forth in Sections 6.7.1 through to 6.7.7 and such satisfaction has been confirmed to Contractor by Owner's Representative pursuant to this Section 6.7 ("Final Completion"):

6.8.1     Substantial Completion has occurred;

all of the Work on the Project is fully complete and the Facility is fully operational;

all Final Punch List items have either been completed by Contractor, or extended or waived in writing by Owner;

all debris, rubbish and other material resulting from the Work has been removed from the Project Site;

33

Contractor has provided to Owner any necessary or otherwise customary training with respect to operation and maintenance of the Facility;

Final Lien Waivers (substantially in the form included in Exhibit M) from Contractor, its Subcontractors and all other persons possessing lien rights related to the Work have been executed and delivered to Owner; and

Contractor has delivered to Owner the Turnover Package and any other deliverables that are required, and to be delivered to Owner by Contractor or Subcontractors on or before Final Completion.

When Contractor believes it has achieved the requirements of Final Completion, Contractor shall provide written notice (the "Form of Final Completion"), in substantially the same form as Exhibit F, to the Owner's Representative, respectively, along with all backup documentation supporting Contractor's determination of Final Completion. Owner's Representative shall have ten (10) Business Days from receipt to notify Contractor of its approval or rejection to the Form of Final Completion. Owner or Financing Party's failure to respond to the Form of Final Completion within such ten-day period shall be deemed approval of the Form of Final Completion. Contractor shall resolve such exceptions prior to resubmitting a Form of Final Completion.

6.9     Limitation on Liquidated Damages. The aggregate liability of Contractor for Mechanical Completion Delay Liquidated Damages, together with the amount of any Capacity Shortfall Liquidated Damages, shall not exceed an amount equal to fifteen percent (15%) of the sum of the Contract Price.

## ARTICLE 7
## CONTRACT PRICE AND PAYMENT

7.1     Contract Price. As full consideration to Contractor for the performance of the Work and for Contractor's other obligations under this Agreement, and all costs incurred in connection therewith, Owner shall pay Contractor the total contract price set forth in Exhibit G (the "Contract Price"). The Contract Price is a fixed price and is subject to change only as provided in this Agreement.

7.2     Milestone Payments. Owner shall pay Contractor the Contract Price in Progress Payments based on Contractor's achievement (or partial achievement as set forth in Section 8.3 and otherwise at the reasonable discretion of Owner) of the applicable payment milestones (each, a "Payment Milestone"), as set forth in the payment schedule attached hereto as Exhibit B, (the "Contract Schedule and Schedule of Milestones"). Unless otherwise specifically agreed upon by the Parties, Contractor shall deliver to Owner an invoice for each Progress Payment following achievement of the corresponding Payment Milestone based on the Schedule of Milestones. Each invoice shall be delivered together with (i) a description of the completion of the Work for the applicable Payment Milestone

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A75F9518C9BD

(Contractor shall ensure that the breakdown is consistent with and in accordance with the Schedule of Milestones set forth in Exhibit B and that the invoice clearly describes, to the satisfaction of Owner, the scheduled value completed), (ii) Partial Lien Waivers and, if applicable, Final Lien Waivers, (substantially in the form included in Exhibit M) from Contractor and its Subcontractors and all other persons possessing lien rights related to the Work, and (iii) such other information as may be reasonably requested by Owner.  Any applicable taxes shall be separately identified.

7.3     Timeliness of Payment.  Unless otherwise agreed to in writing by the Parties, all undisputed amounts invoiced under this Agreement shall be due and payable no later than thirty (30) days after receipt of the invoice and all required supporting information.  Each Party will make payments by electronic funds transfer, or by other mutually agreeable method(s), to the account designated by the other Party.  Any undisputed amounts not paid by the due date will be deemed delinquent and will accrue interest at the Default Rate, such interest to be calculated from and including the due date to but excluding the date the delinquent amount is paid in full. The payment terms referenced in this paragraph shall be subject to a day-for-day adjustment until the foregoing conditions are satisfied.

7.4     Payment Disputes.  If either Party disputes the other Party's request for payment under this Agreement, the Party withholding payment shall within ten (10) days give written notice to the requesting Party of the disputed amount, together with sufficient information to allow the requesting Party to understand the nature of the dispute.  If a Party fails to respond to a request for payment within such ten (10) day period, it shall be deemed to have approved such request for payment.  Notwithstanding the dispute, Contractor shall proceed with the performance of the Work.  A Party withholding payment as part of a bona fide dispute will not be in default under this Agreement.  Resolution of any disputes under this Section 7.4 shall be made in accordance with the procedures set forth in Article 19.  Payments made upon resolution of the related disputes shall be along with interest at the Default Rate applicable from the date when the payments should have been made originally.

7.5     Set-Off.  Owner may deduct and set off against any part of the balance due or to become due to Contractor under this Agreement any amounts due from Contractor to Owner and relating to this Agreement.

7.6     Owner Parent Guaranty. Within five (5) days following the Effective Date, Owner shall provide to Contractor, as security for the payment obligations herein, an Owner Parent Guaranty through Final Completion.  The Owner Parent Guaranty shall be in a form substantially similar to that which is attached as Exhibit N.

7.7     Retainage

7.7.1     Withholding.  Owner shall withhold from (i) each Progress Payment prior to Mechanical Completion an amount equal to ten percent (10%) of such payment as retainage (the "Initial Retainage"), (ii) the Progress Payment for Mechanical Completion an amount equal to five percent (5%) as retainage (the "MC Retainage"), and (iii) the Progress Payment for Substantial Completion an amount

35

DocuSign Envelope ID: 9AE05666-E5B0-448D-BE5F-A7FE9518C9BD

equal to five percent (5%) as retainage (the "SC Retainage", and collectively with the Initial Retainage and MC Retainage, the "Retainage"); and (iv) the Progress Payment for Final Completion an amount equal to two percent (2%) (the "FC Holdback").  The Retainage shall be held by Owner as security for the performance of Contractor's obligations hereunder, and any interest thereon shall accrue for the account of Owner and not Contractor.  Owner may use the Retainage, among other uses, to cure a Contractor Event of Default, for Mechanical Completion Delay Liquidated Damages and/or Capacity Shortfall Liquidated Damages, to remove liens filed by Subcontractors (so long as Owner is current in its payment obligations to Contractor) and to satisfy any and all other undisputed amounts payable by Owner hereunder. Owner may use the FC Holdback to cure any breach of the Workmanship Warranty by Contractor.  Unused Retainage and the FC Holdback shall be paid to Contractor in accordance with Section 7.7.2 below.

7.7.2    Payment.  Upon the earlier of (i) termination of this Agreement and (ii) Mechanical Completion and receipt of Contractor's invoice, Owner shall release any unused Initial Retainage.  Upon the earlier of (i) termination of this Agreement and (ii) Substantial Completion and receipt of Contractor's invoice, Owner shall release any unused MC Retainage.  Upon the earlier of (i) termination of this Agreement and (ii) Final Completion and receipt of Contractor's invoice, Owner shall release any unused SC Retainage.  Upon the first (1st) anniversary of Substantial Completion of the Work and receipt of Contractor's invoice for same, Owner shall release any unused FC Holdback. Upon the occurrence of an Owner Caused Delay exceeding twenty (20) days, Owner shall release Retainage (Owner's rights to future Retainage will continue in accordance with Section7.7.1).

7.8    Completion Security.  Within five (5) Business Days of issuance of the LNTP, Contractor shall post a parent guaranty (the "Parent Guaranty") guaranteeing the performance of obligations of Contractor in the form attached as Exhibit P.  The Parent Guaranty shall cover the delivery and installation of the Facility, payment of valid labor and material bills incurred during the delivery and installation portion of this Agreement with respect to the Facility. The Parent Guaranty shall remain in effect until the one (1) year anniversary of Substantial Completion (the "Parent Guaranty Expiration Date") at which time the Parent Guaranty will be released and exonerated. It is further understood that except as otherwise stated in the Parent Guaranty, no Parent Guaranty covers, whatsoever, any Owner's Scope of Work, Owner Supplied Equipment, warranties, operations and maintenance requirements, including system production.

7.9    Payment Details.

7.9.1  All first-time payments from Owner to Contractor under this Agreement will be verified with a call back procedure to confirm authenticity on the first payment run.

36

7.9.2   Any requests to change bank account details should be sent in writing on company headed paper and email from Contractor to Owner directors. The call back procedure shall be performed again.

## ARTICLE 8
## CHANGE ORDERS

8.1   <u>Changes; Change Orders Requests</u>.   No Change shall be effective unless executed by the Parties in accordance with the procedures described in this <u>Section 8.1</u>.  Any Change permitted to be made in accordance with this Agreement shall take the form of a written Change Order (each a "<u>Change Order</u>").   A Change Order shall be in the form substantially similar to the Change Order form attached as <u>Exhibit J</u>.  Each Change Order shall contain details of the Change, and any adjustments of the Design Documents, the Contract Price or the Schedule, as applicable.

8.1.1      Owner may request changes in the Work within the general scope of the Agreement, consisting of additions, deletions, or other revisions.  If Owner desires a change in the Work as provided for herein, Owner shall submit a change request to Contractor in writing.  Within ten (10) Business Days of its receipt of any such request, unless otherwise agreed to by the Parties, Contractor shall submit a detailed proposal to Owner stating (i) the increase or decrease, if any, in the Contract Price which would result from such change, and/or (ii) the effect, if any, upon the Schedule of Work or the Schedule of Milestones, and/or the terms and conditions of this Agreement.  Owner shall have ten (10) Business Days to accept or reject Contractor's proposal in relation to the requested change.  If Owner agrees with Contractor's proposal, Owner and Contractor shall execute a Change Order reflecting the requested change in the Work and proposed adjustments, if any, in the Contract Price and/or the Schedule of Work.  If Owner disagrees with Contractor's proposal, Owner shall either (a) notify Contractor that Owner has decided to withdraw its requested change; or (b) issue a Construction Change Directive and Contractor shall proceed with the change on a time and materials basis at the rates set forth in <u>Appendix A.</u> Notwithstanding the foregoing, under no circumstances shall Contractor be required to execute the Work described in a Construction Change Directive that would (i) in the aggregate result in a ten percent (10%) or larger increase in the Contract Price, (ii) at the reasonable discretion of Contractor, require Contractor to perform work beyond its ability, skills, experience or capacity, or (iii) reduce the Facility size (in kW), unless such reduction is (1) required by a Governmental Authority or the Interconnection Provider or Offtaker or (2) reasonably required as a result of an Unknown Site Condition.

8.1.2     If a change requested by the Owner pursuant to Section 8.1.1: (a) constitutes a minor change to the Work and (b) would not (i) adversely affect the validity of any manufacturer's warranty; (ii) increase or decrease the Contract Price, or (iii) adversely affect Contractor's obligations or economic benefits hereunder, including the Contractor's warranty obligations, then the Contractor shall be obligated to implement such Change, subject to Contract Price changes and Schedule adjustments made pursuant to Section 8.3 and Section 8.4, respectively.

8.1.3     Except where Owner has issued a Construction Change Directive in accordance with Section 8.1.1, Contractor shall not be obligated to make any Changes unless and until a Change Order therefor has been executed by both Parties or deemed approved in accordance with the provisions under the Agreement.

8.2     Change Orders for Events of Delay; Scope of Work.  Subject to Section 8.3 and Section 8.4, Contractor shall be entitled to a Change Order granting an Equitable Adjustment of the Contract Price and Schedule of Work attributable to an Event of Delay, a change to the Interconnection Provider requirements after the Effective Date, or the Scope of Work becoming (through no fault of Contractor) incorrect, incomplete or inaccurate.

8.3     Adjustments to Contract Price.  The price of any Work required or modified by a Change (other than a Change for an Unknown Site Condition) shall be, at Owner's sole election, a lump-sum fixed price mutually agreed to by the Parties (which lump-sum shall provide for an Equitable Adjustment of the Contract Price); provided that, if the Parties are unable to agree on a fixed price for such Change, or if the Change is for an Unknown Site Condition, then Owner may issue a Construction Change Directive (subject to Section 8.1.1). Notwithstanding the foregoing: (a) Contractor shall only be entitled to an adjustment to the Contract Price in respect of Changes for an Event of Delay specified in paragraph (vi) of the definition of "Event of Delay" (relating to AHJ final inspection approval), if Contractor is entitled to an Equitable Adjustment to the Schedule of Work pursuant to Section 8.4 for more than fifteen (15) Business Days; and (b) Contractor shall not be entitled to claim any adjustment to the Contract Price in respect of any Change for an Event of Delay relating to modules; provided, however, the foregoing is without prejudice to Contractor's right to claim an Equitable Adjustment to the Contract Price pursuant to this Section 8.3 if a Module Event of Delay has been caused by any other Event of Delay. The mark-up shall be no more than five percent (5%).

8.4     Adjustments to Schedule of Work.  Provided that Contractor has used all reasonable efforts to avoid and mitigate any potential delays to the Project Schedule and/or increased Direct Costs (as defined below) or indirect costs resulting from such events  and to the extent that Contractor demonstrates that an event necessitating a Change Order has occurred, Contractor shall be entitled to an Equitable Adjustment to the Schedule of Work as a result

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7FF9518C9BD

of a Change requiring additional time but only to the extent that the Change directly affects the Critical Path of the Work and subject to adjustments to the Work or to the methods or sequence of performing the Work that can in Contractor's judgment be implemented by Contractor to mitigate the delay.  Adjustments shall be based on the baseline Schedule of Work set forth in Exhibit B, as such Schedule of Work is updated in accordance with Section 3.5.2.  Notwithstanding the foregoing, Contractor shall not be entitled to claim an Equitable Adjustment to the Schedule of Work pursuant to this Section 8.4 for a period in excess of thirty (30) days in respect of any Change for a Event of Delay relating to modules; provided, however, the foregoing is without prejudice to Contractor's right to claim an Equitable Adjustment to the Schedule of Work pursuant to this Section 8.4 in excess of thirty (30) days if a Event of Delay relating to modules has been caused by any other Event of Delay.

8.5     Other Provisions Unaffected. Except to the extent the Parties specifically modify any of the provisions of this Agreement as part of an executed Change Order, all provisions of this Agreement shall apply to all Changes, and no modification, amendment or waiver shall be implied as a result of any other Change.

8.6     Facility Plans and Specifications.   Notwithstanding the Change Order provisions set forth in this Article 8, upon prior notice to Owner, Contractor reserves the right to make changes after the Effective Date that will not have an effect on the Schedule of Work, Contract Price or in the Facility Specifications for the purposes of mechanical installations, building code and Project Site requirements and reasonable design improvements, provided that components are of equal quality.

8.7     Materials.  Upon prior written approval of Owner, Contractor shall have the right to substitute similar materials of equal or better quality than may be specified in the Facility Specifications without impacting the form, fit or function of other aspects of the Facility.  Owner shall respond to such a request within ten (10) Business Days, and Owner's approval shall not be unreasonably withheld.

8.8     Adjustment to the Schedule of Milestones.  If the Contract Price is adjusted pursuant to a Change Order, the Parties, if necessary, shall make corresponding changes to the Schedule of Milestones.

8.9     Direct Costs

8.9.1   In no event will Contractor be entitled to payment for Direct Costs hereunder to the extent that such costs would have occurred notwithstanding such event, due to the concurrent fault, actions or omissions of Contractor or its Subcontractors.

8.9.2   For the purposes hereof, Contractor may use an Affiliate, but shall not charge Owner any mark-up on that Affiliate's costs as part of Contractor's Direct Costs hereunder.  "Direct Costs" shall mean only the actual costs and expenses that are incurred by Contractor as a

result of the event giving rise to the Change Order including: (i) compensation for Labor utilized and in the direct employ of Contractor at the Facility Site, at the rates as set forth in Contract Price Exhibit; (ii) cost of materials and permanent equipment; (iii) payments properly made by Contractor to Subcontractors; (iv) rental charges of necessary machinery and equipment (but excluding hand tools) used at the Project Site; (v) Permit fees; (vi) compensation of engineers or other design professionals employed directly by Contractor; and (vii) reasonable costs of mobilization and/or demobilization.  Notwithstanding the foregoing, "Direct Costs" shall not include (t) salaries or other compensation (including costs of contributions, assessments, fringe benefits or taxes based on salaries or compensation) of Contractor's Personnel at Contractor's principal office and branch offices (except as provided in the previous sentence); (u) expenses of Contractor's principal and branch offices; (v) Contractor's profit, overhead or general expenses of any kind; (w) replacement, repair or other costs or liabilities arising from any loss of or damage to any equipment, tools or other property owned or used by Contractor or its Subcontractors; (x) costs to correct or re-perform any components of such Work as a result of the acts or omissions of Contractor or its Personnel; (y) any fines or penalties assessed against Contractor or its Personnel in connection with such Work that were assessed due to the fault of Contractor or its Personnel; or (z) any costs or expenses other than those specifically set forth above as Direct Costs.

8.10 Contractor may invoice Owner for partial payment for Work performed if (i) Contractor is entitled to an Equitable Adjustment to the Schedule of Work due to an Owner Caused Delay of more than twenty (20) Business Days or (ii) if following Capacity Testing the Facility fails to achieve at least ninety-five percent (95%) of the Capacity Guarantee as a result of the Owner Supplied Equipment or Owner's Scope of Work.  Any partial payment paid by Owner pursuant to this Section 8.9 shall be deducted from the subsequent Payment Milestone payment (the amount deducted shall be limited to only the amount of any such partial payment and will not include any amounts attributable to an adjustment to the Contract Price in relation to such Owner Caused Delay pursuant to a Change Order or Construction Change Directive).

**ARTICLE 9**
**FORCE MAJEURE AND OWNER CAUSED DELAY**

9.1    <u>Excused Performance Due to Force Majeure</u>.  If either Party can reasonably demonstrate that it is rendered wholly or partly unable to perform its obligations under this Agreement because of a Force Majeure Event, for the duration of such Force Majeure Event, that Party will be excused from whatever performance is affected by the Force Majeure Event

to the extent so affected; provided that, a Force Majeure Event, whether affecting Owner or Contractor, shall not excuse Owner from performing its payment obligations hereunder, including its obligation to pay Contractor the Contract Price for all portions of the Work completed consistent with this Agreement and not affected by the Force Majeure Event. If either Party is unable to perform its obligations under this Agreement due to a Force Majeure Event for a consecutive period of more than one hundred eighty (180) days, then either Party shall be entitled to terminate this Agreement by written notice to the other Party. In the event of termination by a Party pursuant to this Section 9.1, Contractor shall be entitled, as its sole and exclusive remedy with respect to such termination, to such amounts as are required to be paid in the event this Agreement is terminated pursuant to Section 11.1.

9.2     Notification of Force Majeure and Mitigation. The Party affected by the Force Majeure Event shall (i) promptly, in the case of Owner, and immediately, in the case of Contractor, notify the other Party of its Force Majeure Event in writing or orally (to be confirmed in writing); (ii) as soon as reasonably possible after the Force Majeure Event, fulfill or resume fulfilling its obligations hereunder; and (iii) provide the other Party with notice of the cessation or partial cessation of the Force Majeure Event.

9.3     Force Majeure Suspension. If the Owner, acting reasonably, determines that the completion of the Work will be delayed by six weeks or more due to a Force Majeure Event, the Owner may deliver to the Contractor a written notice informing the Contractor that the completion of the Work is to be suspended until the completion of the Work is no longer prevented by that or any other Force Majeure Event. On receipt of a notice under this Article 9.3, the Contractor must immediately prepare and, within ten (10) Business Days, deliver to the Owner a plan (the **"Suspension Plan"**) for the re-scheduling of the completion of the Work, the storage of equipment, and demobilization of any unnecessary workers. Owner shall, acting reasonably and within five (5) business days, review and either approve or reject the Suspension Plan. In case Owner approves the Suspension Plan, the Contractor must immediately implement the Suspension Plan. In case Owner rejects the Suspension Plan, the Contractor must immediately prepare and, within five (5) Business Days, deliver to the Owner an updated Suspension Plan. In case Owner exercises its rights under this section, Owner shall not be liable to Contractor for any costs other than those incurred as a direct result of the suspension and shall, for the avoidance of doubt, not be liable for lost profits of the Contractor.

**ARTICLE 10**
**WARRANTIES**

10.1     Warranties. Contractor warrants that as of the date of Substantial Completion, the Work (a) will be composed of all new materials and components free from material defects in design and workmanship which are, in all respects, fit for purpose; and (b) will conform to the Contract Documents, Facility Specifications any manufacturer installation requirements (including for Owner Supplied Equipment, and for such, to extent such manufacturer installation requirements are provided to Contractor prior to Contractor

41

commencing the Work)(the "Workmanship Warranty"). During the Workmanship Warranty Period, the Contractor shall warrant the Work and manage any equipment warranty issues (except with respect to the Owner Supplied Equipment) and shall provide any necessary assistance to Owner in Owner's management of any equipment warranty issues relating to the Owner Supplied Equipment.  The Workmanship Warranty does not warrant or guarantee a specified level of energy output. Any such warranty or guarantee, if any, shall be as set forth in a separate performance guarantee or in the warranty of the PV module supplier. Notwithstanding any provision herein to the contrary, Contractor's liability with respect to Owner's Scope of Work and Owner Supplied Equipment shall be strictly limited to defects arising out of or related to Contractor's performance of the Work.

10.2    Workmanship Warranty Period. Any claim for breach of the Workmanship Warranty must arise during the twenty-four (24) month period commencing on the date of Substantial Completion (such period, the "Workmanship Warranty Period"), save for  repair, rework or replacement under Article 10.3, and a claim must be made, if at all, by Owner within ten (10) Business Days after the end of the Workmanship Warranty Period for any such claim for breach which arose within such warranty period. Neither payment by Owner, nor any other provision of this Agreement, nor partial or entire use or possession of the Work by Owner shall relieve Contractor of liability with respect to the Workmanship Warranty.

10.3    Repair of Defects.

10.3.1  The sole and exclusive remedy for breach of the Workmanship Warranty shall be repair, rework or replacement of the relevant Work, at Contractor's sole cost and expense provided, however, that if there is a defect in the Owner Supplied Equipment caused by Owner or another third party not associated with Contractor, Owner shall be responsible for the cost of removing and reinstalling or replacing any Owner Supplied Equipment.  If Contractor is obligated to repair, replace or renew any Equipment, item or portion of the Work hereunder, Contractor will undertake a technical analysis of the problem and correct the "root cause" unless Contractor can demonstrate to Owner's reasonable satisfaction that there is no material risk of the reoccurrence of such problem.

10.3.2  If Owner discovers that the Facility or the Work or any part thereof fails to meet the Workmanship Warranty, Owner will promptly notify Contractor of such failure along with the reasonable basis for its belief that such failure is a breach of the Workmanship Warranty, and to the extent Contractor does not dispute such warranty claim (or is required to following resolution of any dispute in accordance with the terms hereof), Contractor shall repair, rework or replace the Defective Work or portion of the Facility, at Contractor's sole cost and expense. Any repair, rework or replacement carried out by Contractor or Subcontractor should be documented and reported to Owner within 10 Business Days of same.  If, in Owner's professional opinion, the Contractor has not satisfactorily

42

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A75F9518C9BD

repaired the failure, Owner shall have the right to make such repairs at Contractor's cost.

10.3.3 Where the O&M Provider identifies a fault in the system and attributes that fault to the Work, the Contractor shall respond to the formal notice of such issue to the Contractor within 24 hours and shall mobilize to resolve the issue within three business days. The issue shall be resolved no later than the response times listed below from the date and time of formal notice of such issue to the Contractor, according to the extent of the issue. If they fail to address the issue within those time frames the O&M Provider will resolve the issue at the Contractor's cost and the O&M Provider's works will be covered by the Workmanship Warranty.

 10.3.3.1  A fault or issue greater than 1MW – 25 hours

 10.3.3.2  A fault or issue between or equal to 100 kW and 1 MW – 5 Business Days

 10.3.3.3  A fault or issue less than 100 kW – 10 Business Days

10.3.4 All Work performed to repair defects will be done by installers certified by the proper manufacturers and be undertaken in compliance with manufacturer warranties.  Any warranty disputes between the Parties shall be resolved consistent with Article 19.

10.3.5 Owner shall provide Contractor with reasonable access to the Project in order to perform its obligation under this Article 10.3 and the Parties shall schedule such work as necessary so as to minimize disruptions to the operation of the Project. Owner shall have the right to operate and otherwise use the Equipment until such time as Owner deems prudent to suspend such operation or use in order to accommodate Contractor's Warranty Services.

10.3.6 Contractor will use best efforts to perform its warranty obligations pursuant to this Article 10 so as to minimize any adverse effect on the operation of the Facility, including the ability of Owner to meets its obligations and exercise its rights under any agreement for the sale of power from the Facility.

10.3.7 Contractor's obligations under this Article 10.3 shall not be impaired or otherwise adversely affected by any actual or possible legal obligation or duty of any vendor or Subcontractor to Contractor or Owner.

Contractor warrants that all materials incorporated into the Work as part of repairs to and replacements of the Work by Contractor or any Subcontractor, and repairs to and replacements of the Work pursuant to Article 10.3 shall conform to the requirements of this Agreement and the Workmanship Warranty. Contractor shall perform, at its cost and expense,

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7F59518C9BD

such tests as Owner may reasonably request to verify that any correction, repair, replacement or re-performance of the Work pursuant to Article 10.3 complies with the requirements of the Workmanship Warranty.

10.3.8   Contractor shall perform its obligations under this Article 10.3 as promptly as possible after being notified of the noncompliance by Owner, and in any event shall commence performance of its obligations under this Article 10.3 no later than two (2) Business Days after such notice.

10.3.9   If, after notification of a Defect or breach of Warranty, Contractor fails to commence repair, rework or replacement within the relevant time period or shall fail to continue performing or completing, its obligations under this Article 10.3 with respect to such Defect or breach of Warranty, Owner may correct such breach of Warranty so that the Work and Equipment comply with the Warranty (including by instructing the O&M Provider to do so) after giving Contractor three (3) Business Days written notice, and Contractor shall be liable for all reasonable direct costs, charges and expenses incurred by Owner in connection with the same and shall pay the same to Owner upon receipt of invoices with supporting documentation from Owner. Such correction of a breach of the Workmanship Warranty condition shall be deemed to be repair performed by Contractor and the Warranty Period for such corrected Work shall be extended accordingly.

10.3.10   No correction of a Defect or breach of Warranty pursuant to this Section 10.3 shall void the Workmanship Warranty.

10.3.11   No correction or cure shall be considered complete until Owner has reviewed and accepted such remedial work.

10.3.12   So long as Contractor has been notified of a breach of the Workmanship Warranty prior to the end of the Warranty Period, the obligation of Contractor to correct such noncompliance, defect or breach of the Workmanship Warranty shall survive the expiration of the Warranty Period.

10.3.13   Upon completion of any repair, rework or replacement hereunder, all Equipment shall be returned or restored to its proper condition (subject to normal wear and tear), including but not limited to fit alignment, adjustment, operability, and finish.

10.3.14   Contractor shall bear all costs and expenses directly associated with repair, rework or replacement under this Article 10.3, including, all costs of Labor and equipment and of any necessary disassembly removal, replacement, transportation, reassembly, reinstallation, and retesting, as

44

well as reworking, repair, or replacement of such Work, and reassembly of structures, electrical work, machinery, Equipment, or any other obstruction as necessary to give access to the non-conforming item for correction, and for removal, repair and/or replacement of any damage to other work or property that arises from the breach of the Workmanship Warranty.

10.4    Performance Guaranty.

10.4.1 Contractor guaranties that the Work will perform in accordance with the specifications of Exhibit A.

10.4.2 Contractor shall conduct performance testing of the Facility one year, two years, and three years from the date of Substantial Completion in accordance with ExhibitL.

10.4.3 If the works do not satisfy the specifications of ExhibitA, Contractor shall make any modifications to the Facility, at its sole cost and expense, during the Performance Cure Period of sixty (60) days following the delivery of the results of the performance testing in an effort to meet the specifications of ExhibitA

10.4.4 If after the Performance Cure Period, Contractor still fails to achieve the specifications of Exhibit A, then Owner shall be entitled to a Performance Ratio Price Adjustment which shall be calculated in accordance with Exhibit G, L Such adjustment shall be paid within ten days after confirmation by both parties that Contractor has failed to achieve the Performance Guarantee and agreement on the Performance Ratio Price Adjustment amount.

10.4.5 In support of the performance testing process, Owner shall provide Contractor with (i) access rights to the performance data throughout the site operations (direct "read only" access to live/real-time, or historic on a daily basis) for a period of three (3) years from the date of Substantial Completion and subject to the confidentiality provisions of this Agreement during the period of performance of this Agreement and thereafter, and (ii) physical access rights to visit the Site at any time without restriction to spot-check the level of service and care of the O&M provider.

10.5    Enforcement by Owner; Subcontractor Warranties; Assignment of Warranties. Contractor shall obtain for the benefit of Owner the warranties provided by Subcontractors and those warranties of suppliers provided with respect to any Equipment (other than Owner Supplied Equipment) (the "Third Party Warranties"). Contractor shall comply with

the terms and conditions of each Third Party Warranty applicable to the Equipment (as it relates to Owner Supplied Equipment, only to the extent that Owner has previously provided the same to Contractor) so that each such Third Party Warranty remains in full force and effect and, until the end of the Workmanship Warranty Period, Contractor shall be responsible for making claims under and taking all such actions necessary to enforce all Third Party Warranties (excluding Owner Supplied Equipment) with respect to the Facility until the end of the Workmanship Warranty Period. On and from the expiration of the Workmanship Warranty Period (or at the earlier request of Owner), Contractor shall be responsible for the valid assignment of such Third Party Warranties to Owner and thereafter Owner or its O&M provider shall be responsible for administering, maintaining, complying with and supervising all such Third Party Warranties. If, during the Workmanship Warranty Period, any original equipment manufacturer claims that a failure, defect or damage to the Owner Supplied Equipment resulted from improper actions or negligence (not otherwise attributed to Contractor's Personnel) causing the manufacturer to deny such warranty claim on such basis, to the extent that the Owner elects to legally pursue a claim against the original equipment manufacturer in a court of law or other tribunal or governmental proceeding, Owner shall pay all such costs and expenses associated with such pursuit and Contractor shall only have the obligation to assist Owner in such pursuit provided that Owner shall reimburse Contractor for all reasonable costs and expenses incurred by Contractor in providing such assistance. Commencing on the expiration of the Workmanship Warranty Period (or in the event that this Agreement is terminated and Owner has paid Contractor all amounts due and owing under this Agreement, upon such termination date), Contractor shall cause the valid assignment of the manufacturer's warranties for all Equipment (other than Owner Supplied Equipment) incorporated into the Facility to Owner.

10.6    Exclusions from Workmanship Warranty. The Workmanship Warranty shall not extend or apply to any failure of the Facility to comply with the Workmanship Warranty that is caused by (a) normal wear and tear resulting from the operation of the Facility; (b) any modifications made to the Facility by any person other than Contractor's Personnel without Contractor's prior written consent; (c) any neglect, abuse, malicious mischief or vandalism affecting the Facility or damage to the Work or Facility not caused by Contractor or its Subcontractors; (d) to the extent that any failure caused by a negligent act of Owner or its employees, affiliates or guests; (e) failure to operate or maintain the Facility or Equipment in accordance with industry standards the manufacturers' guidelines; (f) operation of such Work or Facility by Owner or its representatives, agents or contractors in excess of or outside of the operating parameters or specifications for such Work or Facility as set forth in the applicable user manuals; (g) a Force Majeure Event; (h) the failure of any part, material or equipment, if (A) the manufacturer of the part, material or equipment fails to honor its product warranty to Owner within the timeframe specified in such product warranty or, if not specified, a reasonable timeframe; (B) the warranty for such part, material or equipment has expired; or (C) the part, material or equipment did not benefit from a manufacturer's warranty, and in each case Owner does not remedy by replacement of the part, material or equipment at its own expense; and (i) Contractor's compliance with a specific written direction from Owner if, prior to implementing such direction, Contractor reasonably advised Owner that Owner's written direction would so affect the Workmanship Warranty.

46

10.7    Limitation of Warranty. THE EXPRESS WARRANTIES PROVIDED IN THIS ARTICLE 10 ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OR GUARANTEES OF ANY KIND, WHETHER EXPRESS OR IMPLIED (INCLUDING ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE), RELATING TO CONTRACTOR'S OBLIGATIONS FOR THE WORK, AND ALL SUCH OTHER WARRANTIES AND REPRESENTATIONS ARE HEREBY DISCLAIMED.  THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE 10 SHALL CONSTITUTE THE ENTIRE LIABILITY OF CONTRACTOR WITH RESPECT TO DEFECTS IN THE WORK.

10.8    Serial Defects.

10.8.1 Contractor shall immediately notify Owner if it becomes aware of any defect affecting five percent (5%) or more of the module portion of the Owner Supplied Equipment and shall comply with any reasonable request of Owner to provide assistance to the module supplier in its remedying of any such defects, provided that Contractor shall not be obliged to provide such assistance where it would require Contractor to incur cost.

10.8.2 Should substantially the same defect, having the same root cause, of a non-aesthetic nature, affecting the performance of any component supplied by the Contractor, be identified in 10% of such components, all such components shall be deemed not fit for purpose and Contractor will be obliged to replace all such components on the Project Site.

## ARTICLE 11
## DEFAULT; TERMINATION

11.1    Termination for Convenience.

11.1.1 Notice of Termination for Convenience.  Owner may terminate this Agreement at any time for convenience by providing written notice of termination to Contractor at any time at least thirty (30) Business Days before the effective date of termination.

11.1.2 Contractor's Obligations Upon Termination for Convenience.  Upon the date specified in any notice delivered by Owner under Section 11.1.1, Contractor shall, unless the notice requires otherwise:

(a)    as soon as possible, discontinue Work and demobilize from the Project Site, except in respect of items of Work the value of which would otherwise be lost or as necessary to secure the Project Site or the Work in a safe and secure state (provided that Owner shall be responsible for payment in respect of such items of Work pursuant to Section 11.1.3(b));

(b)     if Owner notifies Contractor that it intends to re-contract the Work or sell the Project and pay the additional amount referred to in Section 11.1.3(e), upon receipt of such payment, assign to Owner or its designee such of the Subcontracts as Owner may reasonably request (to the extent possible), and otherwise cancel orders for undelivered materials (to the extent possible);

(c)     use best efforts to liquidate delivered materials;

(d)     if Owner has notified Contractor it intends to re-contract the Work or sell the Project and pay the additional amount referred to in Section 11.1.3(e), upon receipt of such payment, seek to obtain licenses for Owner's benefit to any proprietary property incorporated into the Work; and

(e)     document the status of the Work and activities taken in connection with termination,

(collectively, the "Demobilization Activities"), all in a manner deemed reasonable by Contractor under the circumstances and in accordance with Prudent Industry Practices.

11.1.3 Payment Upon Termination for Convenience. For the avoidance of doubt, this Section 11.1.3 (Payment Upon Termination for Convenience) shall not apply to any LNTPs between the Parties. After notice of termination, Owner shall, subject to receipt of all necessary information from Contractor, use all reasonable endeavors to pay to Contractor (i) within sixty (60) days, the amounts payable under subsections (a), (b), (c), and (d) of this Section 11.1.3; and (ii) within a mutually agreeable time frame, the amounts payable under subsection (e) of this Section 11.1.3 (collectively, the "Early Termination Charge"):

(a)     all amounts due and not previously paid to Contractor for Work performed and wholly or partially completed (payment for partially completed Work is payable by Owner as follows: one hundred five percent (105%) of Contractor's Direct Costs attributable to such partially completed Work) in accordance with this Agreement prior to the date of notice of termination and for Work thereafter completed pursuant to Section 11.1.2(a) or as specified in such notice, inclusive of amounts withheld under Section 7.7;

(b)     actual costs incurred by Contractor in connection with the Demobilization Activities (e.g., costs of demobilization from the Project Site, cost of completion of Work, amounts paid to

48

Subcontractors, shipping costs, costs of material disposition, etc.) plus fifteen percent (15%) of such costs;

(c) costs of materials for which Contractor is liable to take delivery of and are delivered to Owner, which could not be disposed or utilized;

(d) any sales tax imposed by Applicable Law; and

(e) if and to the extent Owner, following such termination for convenience, within a period of eighteen (18) months, either (i) contracts with any other contractor(s) to complete the Work or (ii) sells the Project for an amount greater than the Investment Price, an additional amount equal to fifteen percent (15%) of the difference between amounts paid under Section 11.1.3(a) to 11.1.3(d) and the Contract Price, subject to a cap of one hundred and twenty five thousand dollars ($125,000), payable within thirty (30) days of the occurrence.

11.2     Termination Upon Contractor's Material Breach.

11.2.1 Event of Default by Contractor. A "Contractor Event of Default" shall mean, with respect to Contractor, the occurrence of any of the following:

(a) Any representation or warranty made by Contractor herein is materially false or misleading in any material respect when made or Contractor fails to perform any of its material obligations contained in this Agreement (other than such covenants or agreements specifically addressed in other provisions of this Section 11.2) and such false representation or warranty or failure of performance is not corrected or cured or initiated to be corrected/cured within ten (10) Business Days after written notice from Owner, or if such remedy cannot reasonably be completed within such period, Contractor fails immediately to commence and diligently pursue remedial action within such period and conclude such action within one hundred twenty (120) days;

(b) Contractor (i) fails to maintain the Parent Guaranty as set forth in Section 7.8 or (ii) fails to make payment to Owner of any undisputed amounts when due and payable and in the case of clause (ii) such failure continues for more than twenty (20) Business Days after written notice from Owner;

(c) Contractor abandons the Work; "Abandon" for the purposes of this paragraph shall mean that Contractor, except to the extent

49

caused by an Event of Delay, has substantially and voluntarily reduced personnel at the Project Site resulting in Contractor not being capable of completing the Work consistent with reasonable and Prudent Industry Practices and in accordance with the Schedule of Work in a material and significant manner and such abandonment continues for more than thirty (30) days after written notice from Owner;

(d)     Contractor assigns or attempts to assign its rights or obligations under this Agreement or any part thereof to any third party except as permitted under this Agreement;

(e)     Contractor is adjudicated insolvent, or if any proceeding is instituted against it seeking to adjudicate Contractor as bankrupt or insolvent and such proceeding is not dismissed within ninety (90) days of its filing, or Contractor makes a general assignment for the benefit of its creditors, has a trustee or receiver appointed for its property, or files a petition to take advantage of any insolvency laws;

(f)     Contractor fails to achieve Mechanical Completion within six (6) calendar months of the Mechanical Completion Deadline; or

(g)     Contractor fails to achieve Substantial Completion within sixty (60) calendar days of Permission to Operate.

11.2.2  Notice of Contractor Event of Default.  Owner may, without prejudice to any other right or remedy that it may have under law or in equity, terminate this Agreement immediately upon delivery of notice to Contractor, provided that (i) Owner notifies Contractor of the Contractor Event of Default, (ii) Contractor does not cure the Contractor Event of Default within the cure period for such Contractor Event of Default set out in Section 11.2.1 (Owner may immediately terminate this Agreement on the occurrence of the events listed in Sections 11.2.1(b)(i), 11.2.1(c), 11.2.1(d), 11.2.1(f) and 11.2.1(g)) and (iii) Owner subsequently notifies Contractor of its intent to terminate the Agreement.

11.2.3  Consequences of Termination for Default. If Owner elects to terminate this Agreement pursuant to this Section 11.2, then Owner may employ any other person (a "Replacement Contractor") to finish the Work.  In such event, Owner may make such reasonable expenditures as would accomplish the timely completion of the Facility.  Contractor shall provide Owner or any Replacement Contractor, at Contractor's expense, and to the extent not otherwise having been granted and conveyed hereunder, with the right to continue to use any and all intellectual property and other patented and/or proprietary information that Contractor has rights to use, if any, that Owner deems necessary to complete the Facility (including the Design Documents).  If the completion cost utilizing a Replacement Contractor

exceeds the unpaid portion of the Contract Price at the time of the termination of this Agreement, then Contractor shall pay to Owner the amount of such excess within twenty (20) days following receipt of Owner's demand for such payment, which shall be accompanied by reasonable supporting documentation.  Contractor shall remain liable for any amounts paid by Owner to Contractor for work completed by any Subcontractor(s) up to the date of termination. Contractor shall be entitled to payment for Work wholly or partially performed (payment for partially completed work is payable by Owner as follows: one hundred fifteen percent (115%) of Contractor's Direct Costs attributable to such partially completed Work) before the effective date of termination.

11.2.4 <u>Contractor's Obligations Upon Termination for Default</u>.  If this Agreement is terminated in accordance with <u>Section 11.2.2</u>, Contractor shall proceed in accordance with <u>Section 11.1.2</u> and shall be entitled to payment in accordance with <u>Section 11.2.3</u>.

11.3    <u>Termination Upon Owner's Material Breach</u>.

11.3.1 <u>Event of Default by Owner</u>.  An "<u>Owner Event of Default</u>" shall mean, with respect to the Owner, the occurrence of any of the following:

(a)    Any representation or warranty made by Owner herein is false or misleading in any material respect when made or Owner fails to perform any of its material obligations contained in this Agreement (other than such covenants or agreements specifically addressed in other provisions of this <u>Section 11.3</u>) and such false representation or warranty or failure of performance is not corrected or cured within ten (10) Business Days after written notice from Contractor, or if such remedy cannot reasonably be completed within such period, Owner fails promptly to commence and diligently pursue remedial action within such period and conclude such action within one hundred twenty (120) days;

(b)    Owner fails to make payment to Contractor of any undisputed amounts when due and payable and such failure continues for twenty (20) days after written notice thereof has been given to Owner by Contractor;

(c)    Owner assigns or attempts to assign its rights or obligations under this Agreement or any part thereof to any third party except as permitted under this Agreement; or

(d)    Owner is adjudicated insolvent, or if any proceeding is instituted against it seeking to adjudicate Owner as bankrupt or insolvent and such proceeding is not dismissed within ninety (90) days of

51

its filing, or Owner makes a general assignment for the benefit of its creditors, has a trustee or receiver appointed for its property, or files a petition to take advantage of any insolvency laws.

11.3.2 <u>Notice of Owner Event of Default</u>.  Contractor may, without prejudice to any other right or remedy that it may have under law or in equity, terminate this Agreement immediately upon delivery of notice to Owner, provided that (i) Contractor notifies Owner of the Owner Event of Default, (ii) Owner does not cure the Owner Event of Default within the cure period for such Owner Event of Default set out in <u>Section 11.3.1</u> (Contractor may immediately terminate this Agreement on the occurrence of the event listed in <u>Section 11.3.1(c)</u>) and (iii) Contractor subsequently notifies Owner of its intent to terminate the Agreement.

11.3.3 <u>Consequences of Termination by Contractor</u>.  If this Agreement is terminated in accordance with <u>Section 11.3.2</u>, Contractor shall proceed in accordance with <u>Section 11.1.2</u> and shall be entitled to the Early Termination Charge.

11.4    <u>Surviving Obligations</u>.  Termination or completion of this Agreement shall not relieve Contractor or Owner of any obligation hereunder which expressly survives termination or completion hereof and shall not relieve Owner of its payment obligations with respect to any Work already performed consistent with the terms of this Agreement or of obligations by Owner assumed prior to the date of termination.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

12.1    <u>Business Organization</u>.  Each Party represents and warrants that it is an entity duly organized, validly existing and in good standing under the laws of its state of organization and is qualified to do business in the state in which the Project Site is located.

12.2    <u>Litigation</u>.  Each Party represents and warrants that (a) it is not in violation of any laws, ordinances, judgments, decrees, injunctions, writs and orders of any Governmental Authority, which violations, individually or in the aggregate, would adversely affect its performance of its material obligations under this Agreement; and (b) there is no litigation nor any arbitration proceedings by or before any arbitrators, court or other Governmental Authority now pending or (to its knowledge) threatened against it which, if adversely determined, could reasonably be expected to have a material adverse effect on its ability to perform its obligations under this Agreement.

12.3    <u>Corporate Action; Enforceability</u>.  Each Party represents and warrants that (a) it has all necessary organizational power and authority to execute, deliver and perform its obligations under this Agreement; (b) the execution, delivery and performance by it of this Agreement has been duly authorized by all necessary action on its part; and (c) this Agreement has been duly and validly executed and delivered by it and constitutes the legal,

valid and binding obligation of it enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

12.4    Property Ownership; Conditions.  Owner represents and warrants to Contractor that (a) Owner has exclusive and full fee title ownership to the Project Site or valid leasehold interest; (b) the Project Site is free of any and all liens and encumbrances that could have an adverse effect on the Work, the Facility (or the construction, installation, ownership, operating or maintenance thereof) or Contractor's ability to perform any of its obligations hereunder; (c) there are no conditions of any kind, as described in 3.14 at or affecting the Project Site that could have an adverse effect on the Work, the Facility (or the construction, installation, ownership, operating or maintenance thereof) or Contractor's ability to perform any of its obligations hereunder; and (d) to its knowledge, other than to the extent disclosed in the Environmental Study, there are no Hazardous Substances located on the Project Site.

12.5    Licensing.  Contractor represents that it is and shall for the duration of the Work be properly licensed in the State where the Project is located to perform the Work to the extent required by Applicable Laws, and that all architects or engineers performing any of the Work will, for the duration of the Project, be duly licensed in the State where the Project is located if required by Applicable Law.

12.6    Corporate Benefit.  Each Party represents that the entry into and performance of this Agreement is in its commercial interest and to its corporate benefit and the competent corporate bodies have assessed and satisfied themselves as to the existence of such corporate benefit.

12.7    Adequate Resources.  Each Party represents that it has access to adequate resources, including financial resources, to perform all its obligations under this Agreement.

**ARTICLE 13**
**TAXES**

13.1    Contractor Taxes.  The Contract Price includes all corporate income tax assessable on income of Contractor, employee benefit taxes for all Work (whether performed by Contractor or any Subcontractor, and whether performed at the Project Site or elsewhere), taxes imposed upon the Work (excluding any Owner Supplied Equipment and Owner's Scope of Work), taxes imposed upon the wages of the Contractor's Personnel and similar assessments (all such foregoing taxes collectively, the "Contractor Taxes"), but specifically excludes sales and use and other similar taxes on the sale of the Facility.  Owner shall obtain (and provide copies to Contractor) exemption certificates for sales tax imposed on the purchase of Equipment, if obtainable in the State or other jurisdiction relating to the Project Site (if Contractor is assessed sales taxes for Equipment that Owner believed was exempt, Owner shall promptly reimburse Contractor for such taxes paid by Contractor).  If any Contractor Taxes are due and payable, Contractor shall timely pay or cause to be paid such Contractor Taxes.

53

13.2    Sales Tax. In addition to the Contract Price, Owner shall be responsible for all sales, use and similar taxes imposed upon the sale or transfer of the Facility under Applicable Laws and shall provide any appropriate waivers or exemptions.  The Parties will cooperate in effecting any exemption by signing all necessary certificates, as required by Applicable Law.  Owner shall be responsible and shall pay any and all other taxes, charges, and fees directly or indirectly associated with the Project Site, the Facility, the transactions described in this Agreement, and/or the Work including but not limited to sales, use, and excise taxes. If any of the foregoing taxes are due and payable, Owner shall timely pay or cause to be paid such taxes.

**ARTICLE 14
TITLE**

14.1    No Encumbrances.  Contractor warrants that, to the extent of timely payment by Owner to Contractor hereunder, (a) subject to its rights under Section 14.4, it will keep the Work, Equipment, Project and Project Site, as well as any property of Owner and its affiliates, free from liens and will ensure that none of its Subcontractors will file or permit the filing of liens thereon (excluding Pre-Lien Notices); and (b) legal title to and ownership of the Facility and Equipment shall be free and clear of any and all liens, claims, security interests or other encumbrances arising from the Work when title thereto passes to Owner. Contractor agrees to execute such ancillary documents required by Owner or any Financing Party to give effect to this provision.

14.2    Title to Equipment and the Facility.   Title to the Facility and all Equipment (other than Owner Supplied Equipment) and other materials shall vest in Owner upon the earlier of:  (a) incorporation into the Facility; or (b) as and to the extent Owner has paid for such Equipment (other than Owner Supplied Equipment) and materials; provided, however, that title to the Facility and all Equipment and other materials shall vest in Owner no later than the date of Substantial Completion.

14.3    Work Product.   Contractor shall retain all property rights (including copyright) in the Design Documents and in its standard drawing details, designs, specifications, databases, computer software and any other proprietary property; provided that, Owner shall at all times (including after any termination of this Agreement) have the right to retain copies thereof and, upon transfer of the Facility to Owner, is hereby granted a royalty-free, perpetual, irrevocable, non-transferable (except in connection with a sale of the Facility) license to use such Design Documents, drawings, designs, specifications and any other information of Contractor related to the Facility for the sole purpose of owning, operating, maintaining, repairing, financing, insuring and if so desired, selling, the Facility. Owner's use of any such documents or information for any purpose other than as set forth in this Agreement, or modification to such documents by anyone other than Contractor, shall be at the Owner's sole risk and without liability or legal exposure to Contractor, and Owner shall defend, indemnify and hold harmless Contractor for claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs,

54

experts' fees and reasonable attorneys' fees, resulting from or in connection with such use by Owner.  Upon termination of this Agreement pursuant to Sections 11.1 or 11.3, the license granted hereunder shall terminate; provided, however, if Owner pays the amount set forth in Section 11.1.3, the license shall be reinstated.

14.4    Nonconformity.  In the event of any defect in title or lien on the Equipment, Facility, or Project Site resulting from the action or inaction of Contractor's Personnel, Contractor shall immediately (a)  at its own cost, defend Owner's title to the Work, Facility, Project Site and any Equipment; and (b) remove and discharge any such lien, claim, security interest or other encumbrance from the Equipment, Facility, Work or the Project Site; provided that, if Contractor is unable to so immediately remove and discharge any such encumbrance, Contractor, at its own cost, may provide to Owner in lieu thereof a bond or other collateral, in form and substance reasonably satisfactory to Owner, to indemnify Owner against any loss resulting from such liens, claims, security interests or other encumbrances.

## ARTICLE 15
## INDEMNIFICATION

15.1    Contractor Indemnity. To the fullest extent allowed by law, Contractor agrees to indemnify, defend, and hold harmless Owner Indemnitees, from and against any and all claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs, experts' fees and reasonable attorney's fees, resulting from or in connection with the claims of third parties, whether arising in equity, at common law or by statute, or under the law of contracts, torts (including negligence and strict liability without regard to fault) or property,  and including those arising in favor of or brought by any of Contractor's Personnel (collectively, the "Owner Losses"), for  (a) physical damage to, or physical destruction of, property (including the Owner Supplied Equipment), or death of or bodily injury to any person; (b) (i) actual or alleged infringement or misappropriation by Contractor of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the Facility (excluding in relation to the (1) Owner Supplied Equipment and (2) design set provided by Owner to Contractor), including any deliverable or (ii) Contractor's violation of any third-party license to use intellectual property in connection with the Work (excluding in relation to the (1) Owner Supplied Equipment and (2) the design set provided by Owner to Contractor), including any deliverable; or (c) (i) any release of a Hazardous Substance transported onto the Project by Contractor or anyone for whom Contractor is responsible, (ii) any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation by Contractor or anyone for whom Contractor is responsible of any Applicable Law, or (iii) any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law for which Contractor is responsible, in all cases to the extent caused by negligence, gross negligence or willful misconduct of Contractor or Contractor's Personnel.  Notwithstanding the foregoing, nothing herein shall require Contractor to indemnify, hold harmless or defend an Owner Indemnitee for Owner Losses to the extent such Owner Losses resulted from the negligence, gross negligence or willful misconduct of any Owner Indemnitee.

55

15.2    Owner Indemnity.  To the fullest extent allowed by law, Owner agrees to indemnify, defend, and hold harmless Contractor Indemnitees from and against any and all claims, losses, liabilities, costs, damages, causes of action, expenses, fines, settlements and judgments, including court costs, experts' fees and reasonable attorney's fees, resulting from or in connection with the claims of third parties, whether arising in equity, at common law or by statute, or under the law of contracts, torts (including negligence and strict liability without regard to fault) or property, and including those arising in favor of or brought by any of Owner's personnel (collectively, the "Contractor Losses"), for (a) physical damage to, or physical destruction of, property, or death of or bodily injury to any person; (b) (i) actual or alleged infringement or misappropriation by Owner of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the Facility, including any deliverable or (ii) Owner's violation of any third-party license to use intellectual property in connection with the Work, including any deliverable; or (c)(i) any Hazardous Substance on the Project Site other than Hazardous Substances transported onto the Project Site by Contractor Indemnitees, (ii) any Unknown Site Conditions discovered at the Project Site, provided Contractor materially complies with its obligations under Section 3.15 with respect thereto and any Applicable Laws (if Contractor fails to materially comply, Owner's obligations hereunder may be reduced only to the extent of any prejudice to Owner directly caused by such failure); (iii) any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation by Owner or anyone for whom Owner is responsible of any Applicable Law, or (iv) any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law for which Owner is responsible, in all cases to the extent caused by negligence, gross negligence or willful misconduct of Owner or Owner's personnel.  Notwithstanding the foregoing, nothing herein shall require Owner to indemnify, hold harmless or defend a Contractor Indemnitee for Contractor Losses to the extent such Contractor Losses resulted from the negligence, gross negligence or willful misconduct of any Contractor Indemnitee.

15.3    Notices.  Each Party shall promptly, in the case of Owner, and immediately, in the case of Contractor, notify the other in writing of any claims from any third party that may be covered by the indemnities set forth in this Article 15 within ten (10) Business Days of receipt of notice of such claim from such third party.  The failure of the indemnified Party to promptly, in the case of Owner, and immediately, in the case of Contractor, notify the indemnifying Party will not relieve the indemnifying Party of any indemnification responsibility under this Article 15, except to the extent, if any, that such failure materially prejudices the ability of the indemnifying Party to defend such claim.

15.4    Defense of Claims.  The indemnifying Party under this Agreement ("Indemnitor") shall have the sole right to control the defense of any suit or proceeding with its choice of counsel based on any claim, demand, loss, damage, cause of action, suit or liability for which Indemnitor is responsible under any such indemnification.  Indemnitor shall not settle any claim without the prior written consent of the indemnified Party ("Indemnitee") if such settlement (a) does not include an irrevocable release of all claims against the Indemnitee; (b) materially diminishes any of Indemnitee's rights under this

Agreement or seeks to impose additional obligations on Indemnitee; (c) modifies the Facility or the operation or maintenance of the Facility; or (d) contains a stipulation or admission or acknowledgement of any liability or wrongdoing on the part of Indemnitee. Indemnitee shall give the Indemnitor such assistance as the Indemnitor may reasonably require in such defense, at Indemnitor's expense. Indemnitee shall have the right to be represented in such defense and settlement by counsel of its own choice at its own expense. If the Indemnitor fails to defend diligently such suit or proceeding, the Indemnitee may, in its reasonable discretion, either defend such suit or proceeding or settle the claim which is the basis thereof, without the consent of the Indemnitor, but with prior notice to the Indemnitor, without relieving the Indemnitor of its indemnification obligations hereunder and in each case the Indemnitor shall reimburse the Indemnitee for the settlement payment, expenses, court costs and reasonable attorneys' fees.

15.5    Survival of Indemnity Obligation. The Parties' indemnification obligations contained in this Article 15 shall survive the termination, cancellation or expiration of this Agreement until expiration of any applicable statute of limitations.

**ARTICLE 16**
**LIMITATIONS OF LIABILITY**

16.1    Waiver of Certain Damages. Neither Party nor any of their respective shareholders, members, partners, officers, directors, agents, affiliates, subcontractors, vendors or employees shall be liable to the other Party or its affiliates hereunder for any consequential damages (other than actual and direct damages) or indirect loss or damage arising out of this Agreement, whether such loss or damage arises in contract, tort (including negligence), strict liability, warranty, statute or otherwise, including loss of revenues, loss of profit, cost of capital, loss of goodwill, increased operating costs or any other special or incidental damages. For purposes of the foregoing, (i) Mechanical Completion Delay Liquidated Damages, and (ii) the Capacity Shortfall Liquidated Damages and (iii) the Early Termination Charge shall not be considered consequential, indirect, special, or incidental damages. The Parties further agree that the waivers and disclaimers set forth above shall survive the expiration or termination of this Agreement.

16.2    Limitations of Liability.

16.2.1 It is specifically understood and agreed that there shall be absolutely no personal liability on the part of any of the officers, directors, employees, shareholders or members of the Parties for the payment of any amounts due hereunder, or the performance of any obligations hereunder, and each Party shall look solely to the assets of the other Party for the satisfaction of each and every remedy of such Party in the event of any breach by the other Party. In furtherance of the foregoing, each Party agrees that it shall neither seek nor obtain, nor be entitled to seek or obtain, any deficiency or other judgment against any of the officers, directors, employees, shareholders or members of the other Party for any action or inaction on the part of any shareholder or member or its respective officers, employees, controlling persons, executives, directors, agents, authorized

57

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7EF9518C9BD

representatives or affiliates, and such Party therefore releases such persons from such claims.

16.2.2  Notwithstanding anything to the contrary contained in this Agreement, in no event will the aggregate liability of Contractor to Owner under this Agreement, save as provided in this Section 16.2.2, exceed an amount equal to one hundred percent (100%) of the Contract Price (the "Liability Limitation").   The Liability Limitation shall not apply to or be reduced by:

(a)     any loss, liability or damage arising from or due to the fraud, fraudulent misrepresentation, gross negligence, or willful misconduct of Contractor;

(b)     Contractor's indemnification obligations under Section 15 of this Agreement; and

(c)     any payments received by Contractor or Owner from insurance companies under insurance coverage carried by Contractor pursuant to this Agreement.

For the avoidance of doubt, Contractor's aggregate liability for Mechanical Completion Delay Liquidated Damages, plus the amount of any Capacity Shortfall Liquidated Damages adjustment, shall be limited as set forth in Section 6.8.

16.2.3  Environmental Credits. Owner shall be solely responsible for soliciting and obtaining any Environmental Credits.  Contractor neither makes nor has made any representation or warranty to Owner as to the availability of any Environmental Credits. ANYTHING TO THE CONTRARY IN THIS AGREEMENT NOTWITHSTANDING, CONTRACTOR SHALL HAVE NO LIABILITY TO OWNER OR ANY OTHER PERSON FOR ANY FAILURE BY OWNER OR ANY OTHER PERSON TO OBTAIN ANY ENVIRONMENTAL CREDITS.

**ARTICLE 17**
**INSURANCE REQUIREMENTS**

17.1    Contractor's Insurance Coverage.

17.1.1  Term and Coverage.  Contractor shall procure and maintain, and shall cause each Subcontractor, except as provided below, to procure and to maintain, in full force and effect while this Agreement is in effect with responsible insurance providers (as evidenced by an AM Best rating of A-/VIII or better, and in the case of Builders All Risk coverage, A-/X or better) the following insurance in at least the minimum amounts specified below, as applicable.   The procurement and maintenance of such insurance shall be at Contractor's or Subcontractor's own expense.

58

(a)  Workers' Compensation and Employers Liability.  Workers' compensation insurance in compliance with appropriate federal and state laws, and Employers Liability Insurance with limit of not less than $1,000,000 for bodily injury per occurrence and $1,000,000 in the aggregate, and $1,000,000 disease policy limit.

(b)  Commercial General Liability.  Commercial general liability insurance, occurrence form, including, but not limited to, contractual coverage for all of the provisions of this Agreement, with limits of not less than $5,000,000 per occurrence and $5,000,000 in the aggregate, $5,000,000 Products and Completed Operations aggregate; $5,000,000 Personal Injury and Advertising injury per offense.

(c)  Automobile Liability.  Automobile liability insurance, including vehicles owned, hired and non-owned, with a combined single limit of not less than $1,000,000 per accident.

(d)  Excess Liability.  Excess liability insurance, Umbrella Form, in excess of the limits provided for in the above policies (except Workers' Compensation and Employers Liability insurance), with a limit of not less than $5,000,000.

(e)  Professional Liability.  Professional Liability insurance providing "errors and omissions liability" or equivalent coverage for the work being performed, with limits of not less than $1,000,000 per claim for the duration of this contract and its warranties.  If Contractor subcontracts the design and engineering portion of the Work, then such design or engineering professional (or firm) shall procure and maintain the professional liability (errors & omissions) insurance required in lieu of Contractor proving such professional liability insurance. Notwithstanding the foregoing, Professional Liability insurance is only required for Subcontractors providing design-build professional services.

17.1.2  Any other insurance of Contractor's property that is legally required in any jurisdiction where any part of the work is performed.

17.1.3  Evidence of Insurance.  Owner and Financing Party shall be furnished with satisfactory evidence that the foregoing insurance is in effect, and Owner and Financing Party shall be notified thirty (30) days prior to the cancellation or material change of any such coverage.  Owner and Financing Party shall be named as an additional insured with respect to Contractor's activities under this Agreement under the coverages required by Section 17.1.1.

17.1.4 Contractor's insurance coverage shall be primary coverage without right of contribution from any other insurance carried by Owner or Financing Party and shall require the insurer to waive subrogation against Owner and Financing Party.

17.2    Owner Insurance Requirements.

17.2.1 Term and Coverage.  Owner, or Owner's ultimate parent, shall procure at its own expense and maintain in full force and effect, while this Agreement is in effect, (a) comprehensive general liability insurance for bodily injury and property damage, in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate; (b)  Products and Completed Operations $2,000,000 in the aggregate;  (c) Personal Injury and Advertising injury $1,000,000 per offense; (d) workers' compensation $2,000,000 in the aggregate; (e) automobile liability $2,000,000 per accident and (f) builder's risk as set forth in Section 17.2.2.  All policies procured by Owner, or Owner's ultimate parent, shall require the insurer to waive subrogation against Contractor.

17.2.2 Builders Risk.

(a)    On or prior to construction or erection of the Project, builder's all risk insurance for the benefit of Owner, Financing Party, and the Offtaker, Contractor and all Subcontractors or suppliers performing work at the Project Site.  The policy shall include Contractor and Subcontractors as additional insureds and Financing Party as sole loss payee via an industry standard lender loss payable endorsement approved by the Financing Party, and shall include provisions for non-vitiation.

The builders all risk policy shall cover all construction, erection or installation work including without limitation coverage for mechanical and electrical breakdown and all forms of testing and commissioning required to complete the Project plus resulting or ensuing damage arising out of design error or faulty workmanship, the perils of flood, earthquake, windstorm (named or unnamed), hail, lightning, strike, riot and civil commotion, vandalism and malicious mischief, subject to terms that are consistent with current industry practice insuring real and personal property of the Owner whether on or off the Project Site or the real property (including an off-site storage or warehouse location) and while in the course of inland transit, for an amount of not less than the full replacement cost value of the property and equipment at each location.

Sublimits are permitted with respect to the following perils:

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7EE9518C9BD

(i)    off-site property, in an amount that is not less than the full replacement cost value of any property in storage (including earthquake coverage to the extent payments on such property are required prior to delivery to the Project Site);

(ii)    inland transit, in an amount that is not less than the full replacement cost value of any shipment (unless insured under a separate policy);

(iii)    earth movement (including earthquake), an amount not less than 50% of the Project's total insured values per occurrence and in the annual aggregate when such limits are specific to the Project, or such other amount required or agreed by the Owner and Financing Party;

(iv)    flood, an amount not less than 50% of the Project's total insured values per occurrence and in the annual aggregate for all flood zones, including Project property and equipment located in flood zone A or V when such limits are specific to the Project or such other amount required or agreed by the Owner and Financing Party;

(v)    windstorm (named or unnamed), full policy limits per occurrence and in the annual aggregate for the Project, or such other amount required or agreed by the Owner and Financing Party; and

(vi)    such other coverages customarily sub-limited and/or aggregated or restricted in reasonable amounts consistent with current industry practice with respect to similar risks and acceptable to the Owner and Financing Party, including without limitation, extra expense, expediting expense and ordinance or law coverage including the increased cost of construction to comply with the enforcement of any law that regulates the construction or repair of damaged property including the cost to demolish undamaged portions of the Project, debris removal, pollutant cleanup, professional fees, etc.

Such policy shall include: (a) an automatic reinstatement of limits following each loss (except for the perils of earthquake, windstorm, pollution cleanup, flood and other aggregated limits that typically apply under Section 1.1(a)(vi) above); (b) replacement cost valuation with no deduction for depreciation and no coinsurance clauses (or a waiver thereof) and (c) coverage for physical damage that is not covered by warranty or guaranty, to the extent normally insured.

61

DocuSign Envelope ID: 9AE05666-E5B0-448D-BEEF-A7FE9518C9BD

All such policies may have per occurrence deductibles of not greater than $55,000 for all perils, except five percent (5%) of the value of the Project property damaged (which may be subject to a $100,000 minimum per occurrence), of the Project for earth movement (including earthquake), windstorm and flood and/or as otherwise required by or approved by the Owner and Financing Party. Owner shall use commercially reasonable efforts to obtain a maximum cap of $100,000 for earth movement (including earthquake), windstorm and flood. All deductibles are payable by Owner; provided that with respect to physical loss or damage attributable to Contractor (i.e., caused by Contractor or its Subcontractors, or resulting from acts or omissions for which Contractor is responsible under this Agreement), Contractor shall pay any deductibles for such builder's all risk claims.

17.2.3 <u>Delay in Startup</u>.  If requested by Owner in writing, Contractor shall also maintain or cause to be maintained, with respect to the Project, delay in startup insurance following all perils required and insured above under <u>Section 1.1(a)</u>, including without limitation coverage for inland transit and off-site storage risks, mechanical and electrical breakdown including all forms of testing and commissioning required to complete the Project plus any delay caused by resulting or ensuing damage arising out of design error or faulty workmanship, with limits of not less than the projected equivalent of twelve (12) months of gross revenues, less non-continuing expenses. Contractor shall be entitled to a Change Order for the additional costs incurred to comply with such an Owner request, such additional costs to be pre-agreed between the Parties, properly vouched, and solely a pass-through cost with no margin for Contractor. If coverage is subject to an indemnification period, such period shall not be less than twelve (12) months. Subject to commercial availability and a requirement of the Owner and Financing Party, contingent delay in startup shall also be included with respect to key suppliers and customers with a limit acceptable to the Owner and Financing Party. To the extent inland transit coverage is provided under a policy separate from the builders all-risk policy, such policy shall provide delay in startup insurance with a loss limit and associated indemnity period equivalent to the loss of gross revenues less non-continuing expenses for the longest period of interruption or delay reasonably expected to occur, to the extent available on commercially reasonable terms. The deductible or waiting period shall not exceed thirty (30) days.

17.2.4 <u>Evidence of Insurance</u>.  Contractor shall be furnished with satisfactory evidence that the foregoing insurance is in effect within ten (10) Business Days of issuance of the Notice to Proceed, and Contractor shall be notified thirty (30) days prior to the cancellation or material change of any such coverage.  Contractor shall be named as an additional insured under the coverages required by <u>Sections 17.2.1</u> and <u>17.2.2</u>.

17.2.5 Owner's insurance coverage shall be primary coverage without right of contribution from any other insurance carried by Contractor.  Insurance maintained

by Contractor is for the exclusive benefit of Contractor and shall not inure to the benefit of Owner.  All policies procured by Owner shall require the insurer to waive subrogation against Contractor.

## ARTICLE 18
## RELATIONSHIP OF THE PARTIES

18.1    Contractor is an independent contractor and this Agreement is not, and shall not be construed as, an agreement of partnership, joint venture or employment between Owner and Contractor or between Owner and any of Contractor's Personnel.  The equipment and personnel used by Contractor in performing its obligations under this Agreement shall at all times be under the sole and exclusive control of Contractor.  Contractor shall not create any obligation for Owner, assume any responsibility for Owner or attempt to bind Owner in any way except as expressly permitted herein.   Contractor shall not, in any manner, represent that it is an agent of Owner or associated or affiliated with Owner in any capacity other than as an independent contractor.   Contractor is not authorized to enter into any contract with any person or entity on behalf of Owner and shall not represent itself as being so authorized.

## ARTICLE 19
## DISPUTE RESOLUTION

19.1    Procedure. If representatives of the Parties are unable to resolve a dispute, controversy or claim arising out of or relating to this Agreement or any breach, termination or invalidity hereof (a "Dispute") within ten (10) Business Days after one Party's receipt of notice of such Dispute from the other Party, then each Party shall immediately designate a senior executive with authority to resolve the Dispute.  If the senior executives do not agree upon a resolution of the Dispute within twenty (20) Business Days after the referral to them, either Party by notice to the other Party may submit the Dispute to arbitration as provided in Section 19.2.

19.2    Binding Arbitration.

19.2.1 Any Dispute arising out of or relating to this Agreement that is not resolved in accordance with Section 19.1 shall be submitted to binding arbitration administered by the American Arbitration Association in accordance with its Construction Industry Rules (the "Rules").  The arbitration shall be held in the city of Boston, Massachusetts, which shall be considered the seat of the arbitration.  The Parties will attempt to agree on an arbitrator, failing which the arbitrator will be selected by the Rules.  The arbitrator(s) shall be attorneys actively practicing in the area of construction law.  Discovery shall conclude within 90 days of the appointment of the arbitrator; each party shall be limited to a maximum of three (3) depositions and collection of documents from no more than five (5) custodians per side.

19.2.2 The award shall be made within eight (8) months following the appointment of the arbitrator and the arbitrator shall agree to comply with this schedule before accepting appointment. The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute. The award of the arbitrator(s) shall be accompanied by a reasoned decision. The parties agree that failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witnesses. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above. The award shall be final and binding on the Parties and judgment upon the award may be entered in a court of competent jurisdiction. Owner and Contractor each consent to the nonexclusive jurisdiction of, and to the laying of venue in, the U.S. District Court in Maine, to confirm and enforce the award. All procedural aspects of this Agreement to arbitrate, including the construction and interpretation of this Agreement to arbitrate, the scope of the arbitrable issues, allegations of waiver, delay or defenses as to arbitrability, and the rules governing the conduct of the arbitration, to the extent not governed by the Rules, shall be governed by and construed pursuant to the United States Arbitration Act, 9 U.S.C. §§1-16.

19.2.3 The costs and expenses of the arbitration (excluding attorneys' fees) shall be borne equally by the Parties, and (other than in connection with the enforcement of indemnities pursuant to Article 19, in which event the applicable indemnifying Party shall pay such fees in accordance with such provisions) each Party shall bear the fees, costs and expenses of its own attorneys, regardless of the outcome of the arbitration.

19.2.4 Applicable Law; Limitation on Arbitrators' Authority. In deciding the substance of any Dispute, the arbitrators shall apply the substantive laws of the state in which the Facility is located; provided that, the arbitrators shall have no authority to compel specific performance of this Agreement or, except to the extent included in a Party's damages, in any liquidated damages or in any third party claim for which indemnification is provided hereunder, to award punitive or consequential damages under any circumstances (whether exemplary damages, treble damages, or any other penalty or punitive type of damages) regardless of whether such damages may be available under law. Without limitation on the Parties' indemnification obligations hereunder, the Parties hereby waive their right, if any, to recover punitive damages in connection with any such claims, disputes or disagreements, regardless of whether any such claims, disputes or disagreements arise under the law of contracts, torts (including negligence of every kind and strict liability without fault), property, or at common law or in equity or otherwise. The arbitrators shall certify in their award that they have faithfully applied the terms and conditions of this Agreement and that no part of their award includes any amount for consequential, exemplary or punitive damages prohibited as aforesaid. To the fullest extent permitted by law, the

arbitration proceeding and the arbitrators' award shall be maintained in confidence by the Parties.

19.2.5 <u>Judicial Relief</u>.   Either Party may petition a court of appropriate jurisdiction for non-monetary relief relating to any claim of breach of this Agreement in order to prevent undue hardship relating to any such claimed breach pending the appointment of an arbitration panel as described in <u>Section 19.2.1</u>.

19.2.6 <u>Continuation of Services</u>.   Pending final resolution of any Dispute, whether or not submitted to arbitration hereunder, the Parties shall continue to fulfill their obligations hereunder.

19.2.7 <u>Incorporation and Consolidation</u>.   Contractor shall incorporate the provisions of this <u>Article 19</u> into its agreements with any Subcontractor so that all Subcontractors shall also be bound to this Dispute resolution procedure.  Either Party shall have the right, but not the obligation, to consolidate all related Disputes, whether involving Owner, Subcontractor and/or any third parties, into a single consolidated arbitration or other proceeding.

**ARTICLE 20**
**NOTICES**

20.1    All notices permitted or required to be given under this Agreement shall be in writing and shall be deemed duly given when sent by overnight courier, by personal delivery or upon delivery or refusal thereof if notice is deposited in the mail, postage prepaid, certified, return receipt requested.  All notices shall be delivered or sent to the Parties at the respective addresses set forth below:

| | |
|---|---|
| Owner: | C/O BNRG Maine LLC |
| | 622 Congress Street, Suite 202, |
| | Portland, ME 04101 |
| | Attention: Adam Farkes |
| | Email: afarkes@bnrg.ie |
| | |
| With a copy to: | Richard Jackson |
| | Unit 1B, 3 Custom House Plaza, |
| | Harbourmaster Place, |
| | Dublin 1, D01VY76 |
| | Ireland |
| | Email: |

| Contractor: | iSun Industrial LLC |
| | 400 Avenue D, Suite 10, |
| | Williston, VT 05495 |
| | Attention: Frederick (Kip) Myrick |
| | Email: kip@isunenergy.com |

| With a copy to: | Tylor Thibault |
| | 400 Avenue D, Suite 10, |
| | Williston, VT 05495 |
| | Email: tylor@isunenergy.com |

## ARTICLE 21
## GENERAL PROVISIONS

21.1    Amendments. No amendments or modifications of this Agreement shall be valid unless evidenced in writing and signed by duly authorized representatives of both Parties.

21.2    Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Any purported assignment in contravention of this Section 21.2 shall be void.  Except as set forth below, neither Party may assign, pledge or otherwise transfer this Agreement or any right or obligation under this Agreement without first obtaining the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Without Contractor's consent, the Owner may (i) collaterally assign this Agreement to one or more Financing Parties and, in connection with the exercise of remedies pursuant to any such permitted collateral assignment, such Financing Party may complete a further assignment of the Owner's rights and obligations under this Agreement, and (ii) assign all of its rights and obligations under this Agreement to a successor owner of the Project.  No assignment permitted under this Agreement shall relieve the assigning Party of its obligations hereunder except as otherwise agreed by the other Party.

21.3    No Waiver. No waiver of any of the terms and conditions of this Agreement shall be effective unless in writing and signed by the Party against whom such waiver is sought to be enforced.  Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.  The failure of a Party to insist, in any instance, on the strict performance of any of the terms and conditions hereof shall not be construed as a waiver of such Party's right in the future to insist on such strict performance.

21.4    Survival. Any provisions necessary to give effect to the intent of the Parties hereunder after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement.

DocuSign Envelope ID: 9AE05666-E5B0-448D-BE5F-A75E9518C9BD

21.5    Rights and Remedies. Except where this Agreement expressly provides to the contrary, the rights and remedies contained in this Agreement are cumulative and not exclusive of any rights and remedies provided by law or equity.

21.6    Severability. If and for so long as any provision or portion of any provision of this Agreement shall be deemed to be judged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this Agreement except only so far as shall be necessary to give effect to the installation of such invalidity, and any such invalid provision shall be deemed severed from this Agreement without affecting the validity of the balance of this Agreement.

21.7    Compliance with Laws. In performance of their respective obligations under this Agreement, each Party agrees to comply with all Applicable Laws, statutes, rules, regulations, judgments, decrees, injunctions, writs and orders, and all interpretations thereof, of all Government Authorities having jurisdiction over such Party.

21.8    Governing Law; Jurisdiction; Waiver of Jury Trial.

21.8.1 This Agreement is made and shall be interpreted and enforced in accordance with the laws of the State where the Facility is located.  The Parties hereby consent and submit to the personal jurisdiction of the courts in the State where the Facility is located.

21.8.2 EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION.  EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

21.9    Counterpart Execution. The Parties may execute this Agreement in counterparts, which shall, in the aggregate, when signed by both Parties constitute one and the same instrument; and, thereafter, each counterpart shall be deemed an original instrument as against any Party who has signed it. Counterparts may be executed by electronic signature complying with the U.S. federal ESIGN Act of 2000, which shall be

considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Counterparts may be delivered via facsimile or electronic mail (including pdf) and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

21.10  Confidentiality.  The Parties will make best efforts to safeguard confidential information against disclosure by employing the same means to protect such information as that Party uses to protect its own non-public, confidential or proprietary information, any information supplied to it by the other Party and designated in writing as confidential or which by its nature can reasonably be inferred to be confidential, but in no event less than commercially reasonable means.  The Parties shall make individuals within their organization, to whom confidential information is disclosed, aware of this confidentiality provision and shall cause such persons to abide by the agreements herein set forth.  The provisions of this Section 21.10 shall not apply to information within any one of the following categories: (a) information which was in the public domain prior to a Party's receipt thereof or which subsequently becomes part of the public domain by publication or otherwise except by the receiving Party's wrongful act; (b) information which the receiving Party can show was in the receiving Party's possession prior to its receipt thereof through no breach of any confidentiality obligation; (c) information received by a Party from a third party which did not have a confidentiality obligation with respect thereto; or (d) information the disclosure of which is required by Applicable Law or is necessary or appropriate to disclose to a Governmental Authority having jurisdiction over the Parties.

21.11 Financing Assistance.

21.11.1     Contractor shall cooperate with any Financing efforts of Owner, at Owner's sole cost and expense (this applies to Sections 21.11.1 and 21.11.2), including by providing reasonable assistance to Owner, the Financing Parties and the Project insurers.

21.11.2     In connection with such cooperation with Financing efforts, Contractor agrees that that it shall execute and deliver such further instruments and documents, including notices, assignments, acknowledgements, consents and related instruments that may be reasonably required in order to effectuate the purposes or intent of this Agreement, including to facilitate any Financing assignments. Contractor shall cooperate with Owner's efforts in obtaining, maintaining and administering Financing (including any refinancing thereof) on a non-recourse (or other) basis for the Facility and shall procure and/or execute such documents (including consents, certificates and legal opinions from counsel chosen by Contractor and reasonably acceptable to Owner) and do such other things (including providing access to Work locations) as Owner or the Financing Parties may reasonably request (and upon terms and conditions that are customary for similar types of Financing) in connection therewith.

21.11.3     If required by the Financing Parties, Contractor agrees that it shall enter into a direct agreement between the Collateral Agent and Contractor upon

request by Owner to do so, on terms reasonably required by the Financing Parties, including terms (i) acknowledging the Collateral Agent's interests and step-in rights, and providing that Contractor's rights to terminate this Agreement are subject to the Financing Parties' cure rights; (ii) providing for payment of amounts payable by Contractor to Owner under this Agreement directly to accounts maintained by the Collateral Agent and/or the Financing Parties; and/or (iii) under which Contractor agrees not to enter into amendments, modifications or supplements to this Agreement without the consent of the Financing Parties.  For purposes of this Section 21.11, "Collateral Agent" shall mean the person appointed by the Financing Parties to hold such collateral as Owner may pledge to the Financing Parties (including this Agreement, the Work and the Facility) in connection with the Financing of the Project.

21.12  Public Communication.   Neither Party shall publish or release any Public Communication(s) without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), provided that the foregoing shall not restrict disclosures permitted in accordance with Section 21.10.  For the purposes of this Section 21.12, "Public Communication(s)" shall include any publicity, press release or public announcements or public relations materials of any kind relating to the Project generally, the existence of this Agreement, the contents hereof or the transactions contemplated hereby.

21.13  No Confidentiality Regarding Tax Structure or Treatment. Notwithstanding anything to the contrary set forth herein or in any other agreement to which the Parties are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to the transaction, shall not apply to the U.S. federal tax structure or U.S. federal tax treatment of the transaction, and each Party (and any employee, representative or agent of any Party hereto) may disclose to any and all persons, without limitation of any kind, the U.S. federal tax structure and U.S. federal tax treatment of the transaction.  The preceding sentence is intended to cause the transaction not to be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Code and shall be construed in a manner consistent with such purpose.  In addition, each Party acknowledges that it has no proprietary or exclusive rights to the tax structure of the transaction or any tax matter or tax idea related to the transaction.

21.14  Exclusivity.   During the term of this Agreement, Owner agrees that it shall not solicit or enter into any other contracts relating to the provision of solar energy generation system services that are provided under this Agreement for the Project Site, including any contracts relating to the construction or equipment procurement of any solar generation system at the Project Site.

21.15  Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the Project, and merges and supersedes all prior and contemporaneous agreements, commitments, representations, writings and discussions, whether written or oral, between them.

21.16  Incorporation of Recitals. The Recitals are incorporated herein by reference and form a part of this Agreement.

21.17 Novation of Contracts.  Upon Owner's request, Owner will enter into a novation agreement with Contractor to assign the contracts for relevant supplies and equipment, including Owner Supplied Equipment, to be used pursuant to this Agreement.  In exchange for entering into such a novation agreement with Owner, Contractor will charge Owner a fee of three (3) per cent of the value of the aforementioned contracts.  For the avoidance of doubt, the definition of "Owner Supplied Equipment" shall be updated upon novation of the relevant contracts.

## ARTICLE 22
## ANTI-CORRUPTION

22.1    Neither the Contractor nor its Associated Persons shall authorize, promise, offer, provide, accept or agree to offer or give, directly or indirectly, any payment, gift or other advantage with respect to any activities undertaken relating to this Agreement, or any other activity carried out for or on behalf of the Client which,

22.1.1  is intended to, or does, influence any person to act, or reward any person for acting, in breach of an expectation of good faith, impartiality or trust, or which it would otherwise be improper for the recipient to accept; or

22.1.2  is made to or for a Public Official, or to another person at the request of a Public Official, or to any person while knowing or being aware of a high probability that all or a portion of the payment, gift, or other advantage will be offered or given to a Public Official, with the intention of influencing any act or decision of a Public Official in their official capacity, inducing a Public Official to use their influence to affect any act or decision of a government entity, or securing any other improper advantage.

22.2    Neither the Contractor nor its Associated Persons shall otherwise act in a manner contrary to any Anti-Bribery Laws, to which either the Client, the Contractor, or the Contractor's Associated Person is subject.

22.3    The Contractor shall:

22.3.1  maintain sufficient policies and procedures to ensure compliance with this Article 22 and all applicable Anti-Bribery Laws;

22.3.2  notify Client in writing if it becomes aware of any breach of this Article 22, or has reason to believe that it or any of its Associated Persons has

70

received a request or demand, the acceptance of which would be contrary to this Article 22;

22.3.3 notify Client in writing if a Public Official becomes an officer or employee of the Contractor or any of its Associated Persons, or acquires a direct or indirect interest in the Contractor or any of its Associated Persons and the Contractor warrants that neither it, nor any of its Associated Persons, has any Public Officials as direct or indirect owners, officers or employees at the date of this Agreement; And

22.3.4 notify Client in writing if it or any of its Associated Persons are the subject of any police, judicial or regulatory investigation or proceedings in relation to any suspected breach of any Anti-Bribery Laws.

22.4    The Contractor shall ensure that any Associated Person who is performing services in connection with this Agreement does so only on the basis of a written contract which imposes on and secures from such person terms equivalent to those imposed on the Contractor in this Article 22. The Contractor shall be responsible for the observance and performance by such persons of the obligations under this Article 22 and shall be directly liable to Client for any breach by such persons of any of the provisions of this Article 22.

22.5    The Contractor shall provide reasonable assistance and cooperation to Client in relation to any investigation or enquiry by Client into any suspected breach of Anti-Bribery Laws, or to enable Client to perform any activity required by any government, agency or authority in relation to any suspected breach of Anti-Bribery Laws, whether during the term of this Agreement or up to six years after its termination.

22.6    The Contractor shall, on request, certify to Client in writing, compliance with this Article 22 by the Contractor and its Associated Persons. The Contractor shall provide such supporting evidence of compliance as Client may reasonably request.

22.7    The Contractor and any third-party service providers with whom they engage confirms that it will take all reasonable steps to ensure compliance with all applicable money laundering and terrorist financing laws and regulations or any similar rules and regulations in the jurisdictions where they operate.

22.8    Upon request of Client, the Contractor agrees to provide reasonable assistance as may be necessary to procure any documentation that may be required in order to comply with relevant regulatory requests.

**ARTICLE 23**
**MODERN SLAVERY AND TAX EVASION CLAUSE**

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7FF9518C9BD

23.1 Contractor hereby represents, warrants and undertakes to Client as follows:

    23.1.1 it will not engage in any activity, practice or conduct which would constitute tax evasion or tax evasion facilitation under applicable laws and regulations from time to time in force;

    23.1.2 it will comply with all applicable anti-slavery and human trafficking laws and regulations from time to time in force, and will ensure its staff and staff of any of its service providers are paid at least the applicable living wage.

23.2 Contractor will notify Client immediately if at any time the foregoing representations and warranties shall not be true and correct.

23.3 Contractor shall on request certify to Client in writing compliance with any or all of the foregoing clauses and shall provide such supporting evidence of compliance as Client may reasonably request.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7FF9518C9BD

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

iSun Industrial, LLC

By: _Fredrick Myrick_____

Name: _Fredrick Myrick_____

Title: _EVP_____

27 December 2022

Signature Page to Engineering, Procurement and Construction Agreement

DocuSign Envelope ID: 9AE05666-E5B0-448D-BF5F-A7F59518C9BD

ENGINEERING, PROCUREMENT AND
CONSTRUCTION AGREEMENT

BD Solar Rangeley, LLC

By: ROBERT CLEAVES
434DAFC842ED45C...

Name: ROBERT CLEAVES

Title: Manager

27 December 2022

Signature Page to Engineering, Procurement and Construction Agreement

## **Exhibit D**

Notice of Contractor Event of Default and Termination (BD Solar Norridgewock, LLC)



VIA EMAIL AND OVERNIGHT MAIL

May 24, 2024

iSun Industrial LLC
400 Avenue D, Suite 10
Williston, VT 05495
Attention: Frederick Myrick
Email: kip@isunenergy.com

With a copy to:

Tylor Thibault
400 Avenue D, Suite 10
Williston, VT 05495
Email: tylor@isunenergy.com

**RE: Norridgewock Solar - Notice of Contractor Event of Default and Termination**

Dear Frederick,

This letter serves as notice of termination of that certain Engineering, Procurement and Construction Agreement, dated December 27, 2022 (as amended, modified or supplemented, as of the date hereof, including pursuant to all Change Orders duly executed, the "**EPC Agreement**"), by and between BD Solar Norridgewock, LLC (the "**Owner**") and iSun Industrial LLC (the "**Contractor**"). Capitalized terms used herein but not defined herein shall have the meanings set forth in the EPC Agreement.

Owner has elected to terminate the EPC Agreement as a result of one or more Contractor Events of Default, pursuant to Section 11.2 of the EPC Agreement, effective immediately as of the date set forth above. Contractor has failed to achieve Mechanical Completion within six calendar months of the Mechanical Completion Deadline, which is a Contractor Event of Default pursuant to Section 11.2.1(f) of the EPC Agreement, and as to which Owner is entitled to terminate the EPC Agreement immediately.

Owner hereby reserves all of its rights and remedies under the EPC Agreement, at law or in equity, in connection with the failure of Contractor's performance under the EPC Agreement or otherwise, including all rights with respect to any other defaults that may have occurred or are currently occurring under the EPC Agreement.

Sincerely,

BD Solar Norridgewock, LLC

By: Courtney Matsuishi
Its: Secretary

## Exhibit E

Notice of Contractor Event of Default and Termination (BD Solar North Anson, LLC)



VIA EMAIL AND OVERNIGHT MAIL

May 24, 2024

iSun Industrial LLC
400 Avenue D, Suite 10
Williston, VT 05495
Attention: Frederick Myrick
Email: kip@isunenergy.com

With a copy to:

Tylor Thibault
400 Avenue D, Suite 10
Williston, VT 05495
Email: tylor@isunenergy.com

**RE: North Anson Solar - Notice of Contractor Event of Default and Termination**

Dear Frederick,

This letter serves as notice of termination of that certain Engineering, Procurement and Construction Agreement, dated December 27, 2022 (as amended, modified or supplemented, as of the date hereof, including pursuant to all Change Orders duly executed, the "**EPC Agreement**"), by and between BD Solar North Anson, LLC (the "**Owner**") and iSun Industrial LLC (the "**Contractor**"). Capitalized terms used herein but not defined herein shall have the meanings set forth in the EPC Agreement.

Owner has elected to terminate the EPC Agreement as a result of one or more Contractor Events of Default, pursuant to Section 11.2 of the EPC Agreement, effective immediately as of the date set forth above. Contractor has failed to achieve Mechanical Completion within six calendar months of the Mechanical Completion Deadline, which is a Contractor Event of Default pursuant to Section 11.2.1(f) of the EPC Agreement, and as to which Owner is entitled to terminate the EPC Agreement immediately.

Owner hereby reserves all of its rights and remedies under the EPC Agreement, at law or in equity, in connection with the failure of Contractor's performance under the EPC Agreement or otherwise, including all rights with respect to any other defaults that may have occurred or are currently occurring under the EPC Agreement.

*ACTIVE 698894117v2*

Sincerely,

BD Solar North Anson, LLC

By: Courtney Matsuishi
Its: Secretary

**Exhibit F**

Notice of Contractor Event of Default and Termination (BD Solar Rangely, LLC)



VIA EMAIL AND OVERNIGHT MAIL

May 24, 2024

iSun Industrial LLC
400 Avenue D, Suite 10
Williston, VT 05495
Attention: Frederick Myrick
Email: kip@isunenergy.com

With a copy to:

Tylor Thibault
400 Avenue D, Suite 10
Williston, VT 05495
Email: tylor@isunenergy.com

**RE: Rangeley Solar - Notice of Contractor Event of Default and Termination**

Dear Frederick,

This letter serves as notice of termination of that certain Engineering, Procurement and Construction Agreement, dated December 27, 2022 (as amended, modified or supplemented, as of the date hereof, including pursuant to all Change Orders duly executed, the "**EPC Agreement**"), by and between BD Solar Rangeley, LLC (the "**Owner**") and iSun Industrial LLC (the "**Contractor**"). Capitalized terms used herein but not defined herein shall have the meanings set forth in the EPC Agreement.

Owner has elected to terminate the EPC Agreement as a result of one or more Contractor Events of Default, pursuant to Section 11.2 of the EPC Agreement, effective immediately as of the date set forth above. Contractor has failed to achieve Mechanical Completion within six calendar months of the Mechanical Completion Deadline, which is a Contractor Event of Default pursuant to Section 11.2.1(f) of the EPC Agreement, and as to which Owner is entitled to terminate the EPC Agreement immediately.

Owner hereby reserves all of its rights and remedies under the EPC Agreement, at law or in equity, in connection with the failure of Contractor's performance under the EPC Agreement or otherwise, including all rights with respect to any other defaults that may have occurred or are currently occurring under the EPC Agreement.

*ACTIVE 698894768v2*

Sincerely,

BD Solar Rangeley, LLC

By: Courtney Matsuishi
Its: Secretary