**IN THE UNITED STATES BANKRUPTY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iSun, Inc., *et al.*,[1] | Case No. 24-11144 (TMH) |
| Debtors. | (Jointly Administered)<br>**Related Docket Nos. 65, 185, 186, 226, 230 & 233** |

**LIMITED OBJECTION TO AND RESERVATION OF RIGHTS OF MERCHANTS
NATIONAL BONDING COMPANY, INC. AND GREAT MIDWEST INSURANCE
COMPANY REGARDING DEBTORS' (i) NOTICE OF POTENTIAL CONTRACT
ASSUMPTION AND ASSIGNMENT [DKT. NO. 185], (ii) AMENDED NOTICE OF
POTENTIAL CONTRACT ASSUMPTION AND ASSIGNMENT [DKT. NO. 186], (iii)
SUPPLEMENTAL NOTICE OF POTENTIAL CONTRACT ASSUMPTION AND
ASSIGNMENT [DKT. NO. 226], (iv) SECOND SUPPLEMENTAL NOTICE OF
POTENTIAL CONTRACT ASSUMPTION AND ASSIGNMENT [DKT. NO. 230], (v)
SECOND AMENDED NOTICE OF POTENTIAL CONTRACT ASSUMPTION AND
ASSIGNMENT [DKT. NO. 233], AND (vi) SALE OF ASSETS**

Merchants National Bonding Company, Inc. ("Merchants") and Great Midwest Insurance

Company ("GMIC") (collectively, the "Sureties"), by and through their undersigned counsel,

hereby file this Limited Objection to and Reservation of Rights Regarding the Debtors' (i) Notice

of Potential Contract Assumption and Assignment [Dkt. No. 185], (ii) Amended Notice of

Potential Contract Assumption and Assignment [Dkt. No. 186], (iii) Supplemental Notice of

Potential Contract Assumption and Assignment [Dkt. No. 226], (iv) Second Supplemental Notice

of Potential Contract Assumption and Assignment [Dkt. No. 230], (v) Second Amended Notice of

Potential Contract Assumption and Assignment [Dkt. No. 233], and (vi) sale of assets, and

respectfully state as follows:

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172); (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411); (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (7316) (collectively referred to as the "Debtors").

## INTRODUCTION

1.      As set forth below, the Sureties have collectively extended nearly $80 million of surety credit to certain of the Debtors.  As of the date of the petitions, the Sureties have received multiple claims, have incurred over $2.5 million in losses, and are exposed to millions in additional losses.  The Sureties are—by far—the Debtors' largest and most significant creditors.

2.      The Sureties generally do not oppose the Debtors' attempt to sell their business and maximize the going-concern value of the business for the benefit of creditors.  However, the Sureties have several concerns regarding the sale.

3.      Specifically, in their notices of potential contract assumption and assignment (the "Notices"), the Debtors attempt to assume and assign the Sureties' bonds as part of the sale.  This is not permissible.  Surety bonds are non-assumable financial accommodations under 11 U.S.C. § 365(c)(2) and therefore cannot be assumed and assigned without the consent of the Sureties, which the Debtors do not currently have.  Additionally, the Debtors' attempt to assume and assign these bonds would result in the improper substitution of principal (*i.e.*, the purchaser would be the new principal), rendering the bonds null and void.  To the extent the Court disagrees that the surety bonds are non-assumable financial accommodations, then, as set forth in further detail below, the Sureties object to the proposed cure amounts (all of which are listed as $0) set forth in the Notices.

4.      The Sureties further object to the Notices to the extent the Debtors are attempting to assume and assign contracts which were terminated pre-petition because those contracts are no longer executory and therefore cannot be assumed and assigned.  To the extent the contracts cannot be assumed and assigned, then neither can the bonds relating to those contracts.

5.      Additionally, the Sureties object to the sale to the extent the Debtors are attempting to assign to the successful bidder accounts receivable on construction projects that are not property of the Debtors' estate and in which the Sureties have a superior interest.

6.     Finally, the Sureties object to the procedure for filing an objection to the sale.  In the Order Approving the Bid Procedures [Dkt. No. 183] (the "Bid Procedures Order"), the deadline for filing an objection to the sale is July 23, 2024 at 4:00 p.m. (EST).  However, the auction for the sale of the assets does not take place until July 24, 2024 at 10:00 a.m. (EST) (i.e., the sale objection is due before the auction has even taken place).  It is impossible for the creditors to know all of the bases upon which they might object to the sale without knowing, among other things, (a) which specific assets are being sold, (b) which specific contracts are being assumed and assigned, or (c) the terms of the asset purchase agreement.  In the Notices, the Debtors appear to have listed every single contract they are a party to as being potentially assumed and assigned to the successful bidder, with no indication whatsoever of the actual contracts the Debtors intend to assume and assign.  Although the Sureties understand that there is a "Post-Auction Objection Deadline" of July 25, 2024 at 4:00 p.m. (EST), the Bid Procedures Order defines that objection as being limited to (a) the identity of the successful bidder, and (b) the ability of the successful bidder to provide adequate assurance of future performance under the assumed contracts.  This procedure does not comport with due process and does not give the Sureties adequate opportunity to file an appropriate objection to the sale and/or the Notices.

## BACKGROUND

7.     On June 3, 2024, the Debtors filed voluntary petitions for relief under chapter 11, title 11 of the United States Code.

8.     As set forth in the declarations accompanying the first day motions, the Debtors state that they are one of the largest solar energy services and infrastructure deployment companies in the country.

9.      As a requirement on many of their construction projects, certain of the Debtors requested that the Sureties extend surety credit to them in the form of surety bonds which guarantee certain of their project obligations.

10.      Merchants, as surety, issued the following performance and payment bonds pre-Petition on behalf of the Debtors:

| Bond No. | Principal | Obligee | Project | Penal Sum[2] |
|---|---|---|---|---|
| NME 1132 | iSun Industrial LLC | BD Solar Norridgewock, LLC | BD Solar Norridgewock, LLC Design – Solar Photovoltaic (PV) System Engineering, Procurement, and Installation | $2,852,165.00 |
| NVT 1018 | iSun Industrial LLC | Halladay Solar, LLC | MHG Middlebury Halladay – Solar Photovoltaic (PV) System Engineering, Procurement, and Installation | $3,436,864.00 |
| 100000127 | Peck Electric Co. | Neagley & Chase Construction Co. | Electrical – ICE Law Enforcement Facility – Project Number: 1587 | $1,391,028.00 |
| NME 1133 | iSun Industrial LLC | BD Solar Larson, LLC | BD Solar Larson LLC Design – Solar Photovoltaic (PV) System Engineering, Procurement, and Installation | $6,379,144.00 |

---

[2] There is a separate payment and performance bond for each bond number, so the penal sum is actually double what is listed here.

| | | | | |
|---|---|---|---|---|
| | | | | **TOTAL** - $14,059,201 |

11.     GMIC, as surety, issued the following surety bonds pre-Petition on behalf of the

Debtors:

| Bond No. | Principal | Obligee | Project | Penal Sum[3] |
|---|---|---|---|---|
| GM224679 | iSun Industrial LLC | BD Solar North Anson, LLC | BD Solar North Anson (Nautilus Solar); Contract #22SV0678 | $3,159,736.00 |
| GM224681 | iSun Industrial LLC | BD Solar Rangeley, LLC | BD Solar Rangeley (Nautilus Solar); Contract #22SV0679 | $3,731,808.00 |
| GM224678 | iSun Industrial LLC | Stone Mill Solar, LLC | MHG Stone Mill (Standard Solar) | $3,334,730.36 |
| GM230490 | iSun Industrial LLC | Encore Redevelopment, LLC | 71 Roderick Road, Winslow ME | $3,092,797.00 |
| GM221390 | iSun Industrial LLC | SV Construction, LLC | Easton (Sunvest Solar) | $3,211,200.00 |
| GM221779 | iSun Industrial LLC | SV Construction, LLC | Limestone 1 (Sunvest Solar) | $3,521,520.00 |
| GM221780 | iSun Industrial LLC | SV Construction, LLC | Limestone 2 (Sunvest Solar) | $2,576,100.00 |
| GM221382 | iSun Industrial LLC | Trolley Tracks Solar, LLC | MHG Trolley Tracks (Standard Solar) | $3,060,735.52 |
| GM221803 | Peck Electric Company, Inc. | Loudon Pleasant Street Solar | Loudon Pleasant Street (Maintenance Bond) | $141,720.00 |
| | | | | **TOTAL** - $25,830,346.88 |

---

[3] There is a separate payment and performance bond for each bond number, so the penal sum is actually double what is listed here.

12.     As consideration for the issuance of the above-referenced bonds, iSun, Inc., iSun, Industrial LLC and non-debtor Jeffrey J. Peck executed indemnity agreements (the "Indemnity Agreements") in favor of Merchants and GMIC.  (**Exhibit A**, Merchants Indemnity Agreement) (**Exhibit B**, GMIC Indemnity Agreement).  Debtor Peck Electric Company was also added as an indemnitor to the Merchants Indemnity Agreement via Amendment.  *Id.*

13.     Each of the Indemnity Agreements provides, among other things, that the funds received and/or to be received by the Debtors in connection with the bonded projects are trust funds to be held in trust for the benefit of, *inter alia*, the surety and all laborers and materialmen working on and/or providing material/equipment to the projects.  *Id.*

14.     In addition, in connection with certain of the bonded contracts, certain of the Debtors entered into funds control agreements which assign the contract funds—divesting those Debtors to rights in the contract funds—to ensure that the funds are used solely for payment of obligations owed by the Debtors under the respective contracts and pursuant to the trusts created under the Indemnity Agreements.

15.     Pre-Petition, the Sureties received several claims on their bonds and the Sureties continue to receive claims post-Petition.

16.     On July 10, 2024, the Debtors filed a Notice of Potential Contract Assumption and Assignment [Dkt. No. 185].

17.     Subsequently, the Debtors filed additional notices of potential contract assumption and assignment [Dkt. Nos. 186, 226, 230, 233] listing additional/modified contracts to be potentially assumed and assigned.

18.     In the Notices, the Debtors list each of the surety bonds as being potentially assumed and assigned to the successful bidder.  The Debtors also list the construction contracts bonded by the Sureties as being potentially assumed and assigned to the successful bidder.

19.     Included within the construction contracts being potentially assumed and assigned to the successful bidder are several contracts that have already been terminated by the contract counterparty and are therefore no longer executory, including, but not limited to, (1) Norridgewock (Merchants Bond No. NME 1132); (2) Rangeley Solar (GMIC Bond No. GM224681); (3) North Anson Solar (GMIC Bond No. GM224679); (4) Trolley Tracks Solar (GMIC Bond No. GM221382); (5) Stone Mill Solar (GMIC Bond No. GM224678); (6) Halladay Solar (Merchants Bond No. NVT 1018); (7) BD Solar Larson (Merchants Bond No. NME 1133); and (8) 71 Roderick Road (GMIC Bond No. GM230490).  (**Exhibit C**, Contract Termination Letters).

## LIMITED OBJECTION BY THE SURETIES

**A.     The Debtors Cannot Assume and Assign the Surety Bonds which are Non-Assumable Financial Accommodations Under 11 U.S.C. § 365(c)(2)**

20.     In the Notices, the Debtors seek to potentially assume and assign the surety bonds to the successful bidder at the auction.  This is not permissible.

21.     Section 365(c)(2) of the Bankruptcy Code provides that "[t]he trustee may not assume or assign any executory contract or unexpired lease of the debtor . . . if . . . such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor."  11 U.S.C. § 365(c)(2).

22.     Surety bonds are credit enhancement instruments that strengthen the creditworthiness of the bond principal in various business transactions and contractual agreements. The bonds provide a guarantee to the obligee that the principal will perform its obligations, thereby reducing the perceived risk associated with engaging the principal in projects or transactions.  By assuming responsibility for potential losses or damages caused by the principal's failure to perform, surety bonds reassure creditors and counterparties of the principal's financial reliability and capability to meet its commitments.

23.     Courts have consistently held that surety bonds are non-assumable financial accommodations which cannot be assumed without the consent of the surety.  *See, e.g.*, *In re Falcon V, L.L.C.*, 620 B.R. 256, 265-66 (Bankr. M.D. La. 2020), *aff'd sub nom. Argonaut Ins. Co. v. Falcon V, L.L.C.*, CV 20-00702-BAJ-SDJ, 2021 WL 4486336 (M.D. La. Sept. 30, 2021), *aff'd sub nom. Matter of Falcon V, L.L.C.*, 44 F.4th 348 (5th Cir. 2022) (holding, among other things, that surety bonds are non-assumable financial accommodations); *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1019-20 (11th Cir. 1992) (same); *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990) (same); *In re Wegner Farms Co.*, 49 B.R. 440, 444 (Bankr. N.D. Iowa 1985) (same).

24.     The Debtors' attempt to assign the bonds to the successful bidder would also result in an improper substitution of principal, rendering the bonds null and void.  74 Am. Jur. 2d Suretyship § 66 (noting that a substitution of principal not assented to by the surety discharges the surety from liability); *Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951, 954 (10th Cir. 1977) (noting that "generally, a surety will not be liable for the default of a new principal to whose substitution it has not consented").

25.     Therefore, the Sureties object to the assumption and assignment of any of the surety bonds without their consent.

### B.      The Sureties Object to the Proposed Cure Amounts

26.     In the Notices, the Debtors list the cure amount for each of the surety bonds as $0. This is not accurate.

27.     Although the law is clear that the surety bonds are non-assumable financial accommodations, in order to assume any contract (financial accommodation or otherwise), the Debtors must first cure all defaults under those contracts.  Here, the Debtors would have to cure all amounts owed to the Sureties under the Indemnity Agreements.

28.     Indemnity agreements are customary in the surety relationship and are typically always required in connection with a surety's issuance of bonds.

29.     The surety relationship is tripartite.  *Bank of Nova Scotia v. St. Croix Drive-In Theatre, Inc.*, 728 F.2d 177, 178 (3d Cir. 1984); § 12:2. Suretyship: A tripartite relationship, 4A Bruner & O'Connor Construction Law § 12:2; *Upper Pottsgrove Twp. v. Int'l Fid. Ins. Co.*, 976 F. Supp. 2d 598, 604 (E.D. Pa. 2013).  This is because there are three parties involved, with each party owing certain obligations to the other parties:

- Principal - this is the party on whose behalf the surety bond is issued.  This is the party which undertakes the primary obligation or debt that the surety guarantees.  The principal owes the surety an indemnity obligation under both a written indemnity agreement and at common law.  In this case, the bond principal is iSun or one of its debtor affiliates.

- Surety – this is the party that issues the bond(s) and which agrees to be responsible for the debt or obligation of the principal if the principal fails to perform its obligation.  The surety essentially acts as a guarantor, providing assurance to the obligee that the debt will be repaid or the obligation will be fulfilled.  In this case, the sureties are Merchants and GMIC.

- Obligee – this is the party to whom the debt or obligation is owed.  In this case, the obligees are the owners or general contractors on the respective construction projects with whom the principal contracted.

30.     Because the surety relationship is tripartite, the underlying contracts must be construed together.  This includes the surety bonds and the associated indemnity agreements.  *See, e.g.*, *Am. Druggists' Ins. Co. v. Shoppe*, 448 N.W.2d 103, 105 (Minn. Ct. App. 1989) (holding that even though a surety bond and accompanying indemnity agreement were signed approximately

ten months apart, the transaction constituted a unitary act and the agreements must be read together); *In re Falcon V, L.L.C.*, 620 B.R. 256, 264 (Bankr. M.D. La. 2020) (noting that a surety bond and indemnity agreement must be construed together); *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 474-75 (Md. 2004) (construing an indemnity agreement and surety bond together); Restatement (Second) of Contracts § 202 (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

31.    Here, each of the Debtor signatories to the Indemnity Agreements expressly acknowledged in the Indemnity Agreements that the Indemnity Agreements were being provided to the Sureties as consideration for the execution by the Sureties of one or more bonds.  (**Exhibit A**, **Exhibit B**).  Therefore, the bonds and the Indemnity Agreements are part of a related transaction and must be construed together.  But for the Debtors providing the Indemnity Agreements as consideration for the execution of the surety bonds, the Sureties would not have issued those bonds.

32.    The Debtors cannot assume and assign only part of a contract but must assume and assign the entire contract—this includes both the benefits and burdens of the contract.  *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) ("Once the trustee satisfies these requirements it may assume the contract or lease, but it must do so in its entirety."); *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) ("It is well established that as a general proposition an executory contract must be assumed or rejected in its entirety . . . . Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others."); *In re Fleming Companies, Inc.*, 03-10945(MFW), 2004 WL 385517, at *3 (Bankr. D. Del. Feb. 27, 2004), *subsequently aff'd*, 499 F.3d 300 (3d Cir. 2007) ("[A] debtor's assumption and assignment cannot modify an agreement's express terms; it does not require the other party to the contract to agree to changes . . . The contract must be assigned and enforced according to its terms."); *In re Vision Metals, Inc.*, 325 B.R. 138,

146 (Bankr. D. Del. 2005), *opinion after grant of reconsideration*, 327 B.R. 719 (Bankr. D. Del. 2005) ("When a debtor assumes an executory contract it assumes both the benefits and burdens of that contract.").

33.     To the extent the Court permits the Debtors to assume and assign the surety bonds, the Debtors must also assume and assign the associated Indemnity Agreements.

34.     To assume and assign the Indemnity Agreements, the Debtors must first cure the defaults under those agreements.  11 U.S.C. § 365(b)(1)(A).

35.     The Debtors currently owe Merchants approximately $2,631,299.32 under the Merchants Indemnity Agreement, which amount includes, among other things, payments made on bond claims, consultant fees and attorneys' fees (the "Merchants Cure Amount").

36.     The Debtors likewise have an obligation (exoneration, indemnification, collateral security, or otherwise) to GMIC of approximately $1,658,230.58 under the GMIC Indemnity Agreement, which amount includes, among other things, claims made against bonds, consultant fees and attorneys' fees (the "GMIC Cure Amount").[4]

37.     To the extent the Court permits the Debtors to assume and assign the surety bonds and associated Indemnity Agreements, the Debtors must first resolve the Merchants Cure Amount and GMIC Cure Amount.

### C.     The Debtors Cannot Assume and Assign Contracts Which have Been Terminated and Are Therefore Not Executory

38.     Section 365(b) of the Bankruptcy Code only permits the Debtors to assume and assign contracts which are executory.  11 U.S.C. § 365(b).  "An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far

---

[4]  To the extent this Objection is not otherwise resolved and an evidentiary hearing is necessary, the Sureties will supply the final cure numbers with supporting documentation, and, if necessary, will have witnesses at the hearing subject to cross-examination.

unperformed that the failure of either party to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989). It is axiomatic then, that a contract which has been terminated cannot be executory. *In re W. & L. Associates, Inc.*, 71 B.R. 962, 966 (Bankr. E.D. Pa. 1987), *abrogated on other grounds by In re Walnut Associates*, 145 B.R. 489 (Bankr. E.D. Pa. 1992) (it is a "clearly recognized principle that a bankruptcy filing cannot revive a contract that was already terminated pre-petition"); *Matter of Howard Indus., Inc.*, 56 B.R. 5, 6 (Bankr. D.N.J. 1985) (holding that a terminated contract is not executory); *Matter of R.M. Cordova Int'l, Inc.*, 77 B.R. 441, 446-47 (Bankr. D.N.J. 1987) (holding that contracts which were terminated pre-petition are not executory).

39. Here, the Debtors seek to assume and assign construction contracts which were terminated pre-petition and are therefore not executory. (**Exhibit C**; *cf.* Notices). Some of the contracts were terminated for default, and some were terminated for convenience. *See id.* The Debtors cannot assume and assign contracts that are not executory.

40. The Debtors also cannot assume and assign the contracts that were terminated for convenience because the Sureties have now been released of their obligations on the associated bonds. Because the principal has been released of its obligations under the construction contract by virtue of the termination for convenience, that release likewise extends to the surety. *See, e.g.*, 4A Bruner & O'Connor Construction Law § 12:67 ("The owner's release or compromise of claims against the contractor will also release the surety."); *see also* Restatement (Third) of Suretyship & Guaranty § 39 (1996). This result comports with the principle that a surety's liability is generally coextensive with that of its principal. 11A Couch on Ins. § 163:32; 72 C.J.S. Principal and Surety § 80. Assumption of bonds on bonded contracts that have been terminated for convenience would

effectuate a new, additional extension of credit, as the surety would be asked to reassume obligations on which it has already been released.

41.    Therefore, the Court should reject any attempt by the Debtors to assume and assign contracts which were terminated pre-petition.

    **D.**        **The Debtors Cannot Assign Receivables Which Are Not Property of the Estate**

        **i.**        **The Sureties' Subrogation Rights to Contract Funds**

42.    In accordance with well-settled law, contract funds held by an owner (i.e., the Debtors' contract counterparty) on defaulted bonded projects, or on projects in connection with which the Debtors have failed to pay their subcontractors, suppliers, and laborers, are not "owed" to the debtor/contractor unless and until the defaults and/or failures are cured in full and therefore those funds are not part of the bankruptcy estate. *See, e.g.*, *In re QC Piping Installations, Inc.*, 225 B.R. 553, 564-65 (Bankr. E.D.N.Y. 1998) (holding that amounts due under a construction contract are not property of the estate where there has been a pre-petition default); *In re Pac. Marine Dredging & Const.*, 79 B.R. 924, 929 (Bankr. D. Or. 1987) (same). As explained by the Northern District of Florida:

> Prior to default, [the contractor] had the right to assign progress payments to the bank. Upon default, however, [the contractor] forfeited its rights under the construction contract and the surety, bound under the contract of suretyship, became obligated to complete performance. As assignee of the proceeds of the contract, [the bank] could acquire no right by assignment superior to the right the contractor himself might assert against the owner. When [the surety] undertook to complete the job, it performed "a benefit for the [owner], and has a right to the retained funds and remaining progress money to defray its costs. The surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to setoff, but as a subrogee having the same rights to the funds as the government.

*In re Ward Land Clearing & Drainage, Inc.*, 73 B.R. 313, 316 (Bankr. N.D. Fla. 1987).

43.     Critically, the Sureties' right to the contract funds/accounts receivable has priority over any secured creditor in bankruptcy.  *See id.*; *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962); *In re Modular Structures, Inc.*, 27 F.3d 72 (3d Cir. 1994); *see also U.S. Fid. & Guar. Co. v. APAC-Kansas, Inc.*, 151 F. Supp. 2d 1297, 1300-01 (D. Kan. 2001) (holding that surety's right to the contract balance is superior to interest of secured party in accounts receivable); *Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 848 (1st Cir. 1969), *on reh'g*, (1st Cir. May 5, 1969) (holding that an unsecured surety has priority to accounts receivable over a secured bank); *In re Maxon Eng'g Servs., Inc.*, 332 B.R. 495, 498 (Bankr. D.P.R. 2005) ("The surety's interest is typically found to be prior and superior to that of the parties claiming an interest in the contractor's receivables because the surety is subrogated to the contractor/creditor's right to the contract funds."); *In re Pac. Marine Dredging & Const.*, 79 B.R. 924, 929 (Bankr. D. Or. 1987) (holding that surety had superior interest in contract balances versus a bank which had a perfected security interest in the debtor's accounts receivable).

44.     In *Pearlman*, a priority dispute arose between the trustee of the bankrupt estate and the surety with respect to contract funds retained by the United States, as the owner of the subject construction project.  The surety successfully argued that the monies at issue had not become part of the bankrupt's estate.  *Pearlman*, 371 U.S. at 135.  The Supreme Court held that the funds remained the property of the owner and, by way of subrogation, became the surety's property to the extent necessary to reimburse it for payment of the laborers and materialmen and other costs of contract performance.  *Id.* at 144.

45.     Similarly, in *Modular Structures*, the Third Circuit, relying upon the *Pearlman* decision, ruled that the contract funds held by the owner were not "owed" to the debtor/contractor and, therefore, never became property of the bankruptcy estate to which a bank's lien could apply, since the contractor/debtor breached its contractual obligations to the owner.

46.     As set forth in the Contract Termination Notices (Ex. C), several of the Debtors'

bonded contracts have been terminated and several of the Debtors' subcontractors and laborers are

unpaid. Under well-settled law, the funds payable under those contracts are not due the Debtors –

and, thus, not property of the estate – until the Sureties' superior subrogation rights have been

satisfied.

### ii.     The Sureties' Trust Fund Rights

47.     The contract funds are also trust funds under the Indemnity Agreements to be held

in trust for, among others, the benefit of the surety and laborers and materialmen that provide labor

on or material to the projects.  The funds may also constitute statutory trust funds depending on

the state in which the specific project is located.  As trust funds, the funds are not part of the

Debtors' estate and they are not "accounts receivable" belonging to the Debtors.

48.     Therefore, the Court should not permit the Debtors to assume and assign

receivables to the successful bidder which are not property of the estate.  *See e.g.*, *In re Alcon

Demolition, Inc.*, 204 B.R. 440 (Bankr. D.N.J. 1997); *In re McCormick*, 283 B.R. 680 (Bankr.

W.D. Pa. 2002); *In re Fox*, 357 B.R. 770 (Bank. E.D. Ark. 2006); *Dev. Sur. & Indem. Co. v. Bi-

Tech Constr.*, 979 F. Supp. 2d 1307 (S.D. Fla. 2013).

### E.     The Sureties are Being Denied Due Process by Being Forced to File a Sale Objection Before the Auction Has Even Taken Place and Without Having Seen the Asset Purchase Agreement

49.     In the Order Approving the Bid Procedures [Dkt. No. 183] (the "Bid Procedures

Order"), the deadline for filing an objection to the sale is July 23, 2024 at 4:00 p.m. (EST).

However, the auction for the sale of the assets does not take place until July 24, 2024 at 10:00 a.m.

(EST) (i.e., the sale objection is due before the auction has even taken place).

50.     It is impossible for creditors to know all of the bases upon which they might object to the sale without knowing, among other things, (a) which specific assets are being sold, (b) which specific contracts are being assumed and assigned, or (c) the terms of the asset purchase agreement.

51.     In the Notices, the Debtors appear to have listed every single contract they are a party to as being potentially assumed and assigned to the successful bidder, with no indication whatsoever of the actual contracts the Debtors intend to assume and assign.  The Debtors likewise list the cure amounts for almost every single contract as $0, notwithstanding that the Debtors know this is inaccurate.

52.     Although the Sureties understand that there is a "Post-Auction Objection Deadline" of July 25, 2024 at 4:00 p.m. (EST), the Bid Procedures Order defines that objection as being limited to (a) the identity of the successful bidder, and (b) the ability of the successful bidder to provide adequate assurance of future performance under the assumed contracts.

53.     This procedure does not comport with due process and does not provide the Sureties adequate opportunity to file an appropriate objection to the sale and/or the Notices.  At a minimum, the sale hearing, currently scheduled for July 30, 2024, should be adjourned to provide all stakeholders a fair opportunity to evaluate how their rights may be affected by the proposed transaction(s).

## **RESERVATION OF RIGHTS**

54.     The Sureties reserve all rights, including, but not limited to, the right to interpose such further and other objections as may be appropriate.

Dated: July 23, 2024
Wilmington, Delaware                  */s/ Richard Riley*
                                       Richard W. Riley (DE No. 4052)
                                       WHITEFORD, TAYLOR & PRESTON LLC
                                       600 North King Street, Suite 300
                                       Wilmington, Delaware 19801
                                       Telephone: (302) 353-4144
                                       Email: rriley@whitefordlaw.com

16

-and-

Scott A. Zuber, Esq. (admitted *pro hac vice*)
Brian Kantar, Esq. (admitted *pro hac vice*)
Jase A. Brown, Esq. (admitted *pro hac vice*)
CHIESA SHAHINIAN & GIANTOMASI PC
105 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: (973) 325-1500
Email: szuber@csglaw.com
        bkantar@csglaw.com
        jbrown@csglaw.com

*Counsel to Great Midwest Insurance Company and*
*Merchants National Bonding Company, Inc.*