# EXHIBIT A

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $253,321.00 | 09-17-2019 | 04-17-2026 | | 64 | | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT  05403

**Lender:**  NBT Bank, National Association
52 South Broad Street
Norwich, NY  13815

---

**Principal Amount: $253,321.00**                                **Date of Note:  September 17, 2019**

**LOAN PURPOSE.** This loan is for business purposes only. It is not for personal, family or household purposes, or personal investments.

**PROMISE TO PAY.** Peck Electric Co. ("Borrower") promises to pay to NBT Bank, National Association ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Hundred Fifty-three Thousand Three Hundred Twenty-one & 00/100 Dollars ($253,321.00), together with interest on the unpaid principal balance from September 17, 2019, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 4.150% per annum based on a year of 360 days, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 78 payments of $3,676.59 each payment and an irregular last payment estimated at $3,676.38. Borrower's first payment is due October 17, 2019, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on April 17, 2026, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note (if applicable); then to interest; then to principal; then to any insurance premiums (if applicable); then to any fees, and then to any late fees. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: NBT Bank, National Association; 52 South Broad Street; Norwich, NY  13815.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000%** of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by 4.000 percentage points. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**ADDITIONAL DEFAULT - CHANGE IN OWNERSHIP.** Borrower and where applicable, Guarantor, agree that until payment in full of the Liabilities to Lender and so long as they remain indebted to Lender hereunder, Borrower and/or Guarantor shall not, without prior written consent of Lender enter into any merger, consolidation, recapitalization, stock split, reorganization or liquidation, or to suffer the transfer of any stock or security therein, or transfer of any general partnership or other interest in Borrower and/or Guarantor.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** With respect to interest (as defined by federal law) this Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of laws provisions. In all other respects, this Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions. The loan transaction that is evidenced by this Note has been approved, made, and funded, and all necessary loan documents have been accepted by Lender in the State of New York.

# PROMISSORY NOTE
## (Continued)

Loan No: ██████████                                                    Page 2

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**ARBITRATION.** Borrower and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Note or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any collateral securing this Note shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any collateral securing this Note, including any claim to rescind, reform, or otherwise modify any agreement relating to the collateral securing this Note, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Note shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: NBT Bank, National Association 52 South Broad Street Norwich, NY 13815.

**CONSIDERATION.** Borrower acknowledges that this Note/Credit Agreement and any Mortgage or Security Agreement securing it has been given for valuable consideration expressed therein and there are no counter claims, defenses or offsets, legal or equitable, to said Mortgage, Security Agreement, or to said Note secured thereby, and all provisions of said Note, Mortgage and/or Security Agreement are in full force and effect.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

ACKNOWLEDGMENT OF ARBITRATION: BORROWER UNDERSTANDS THAT THIS NOTE CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS NOTE, BORROWER UNDERSTANDS THAT BORROWER WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD BORROWER AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).

BORROWER:

PECK ELECTRIC CO.

By: _____
    Jeffrey Peck, President and CEO of Peck Electric Co.

# COMMERCIAL GUARANTY

| Borrower: | Peck Electric Co.<br>4050 Williston Rd Ste 511<br>South Burlington, VT  05403 | Lender: | NBT Bank, National Association<br>52 South Broad Street<br>Norwich, NY  13815 |
|---|---|---|---|
| Guarantor: | The Peck Company Holdings, Inc.<br>4050 Williston Rd Ste 511<br>South Burlington, VT  05403-6068 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated. However, "Indebtedness" shall not include any liabilities and obligations under any agreement regulated as a "swap" by the Commodity Exchange Act, as amended, unless otherwise agreed in writing.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns (including all schedules), prepared by a tax professional and satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower,

## COMMERCIAL GUARANTY
### (Continued)

   **Page 2**

Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

    **Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

    **Arbitration. Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.**

    **Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

    **Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

    **Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions.**

    **Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

    **Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

    **Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: ███████████

Page 3

writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Peck Electric Co. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation The Peck Company Holdings, Inc., and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means NBT Bank, National Association, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's Promissory Notes and/or Credit Agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the Promissory Notes and/or Credit Agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

ACKNOWLEDGMENT OF ARBITRATION: GUARANTOR UNDERSTANDS THAT THIS GUARANTY CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS GUARANTY, GUARANTOR UNDERSTANDS THAT GUARANTOR WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD GUARANTOR AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 17, 2019.

GUARANTOR:

THE PECK COMPANY HOLDINGS, INC.

By: _____
Jeffrey Peck, President and CEO of The Peck
Company Holdings, Inc.

**RECORD AND RETURN TO:**
NBT BANK, NATIONAL ASSOCIATION
150 Bank Street
Burlington, VT 05401
Attn:  Leo Cruickshank

<u>**LEASEHOLD MORTGAGE**</u>
(Twitchell Hill Road, New Haven, VT)

KNOW ALL PERSONS BY THESE PRESENTS, that **PECK ELECTRIC CO.**, (the "<u>Mortgagor</u>"), having a principal business office at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 in consideration of **a loan in the amount of Two Hundred Fifty-Three Thousand Three Hundred Twenty-One and 00/100 Dollars ($253,321.00)** from **NBT BANK, NATIONAL ASSOCIATION,** a national banking association (the "<u>Bank</u>"), having an office at 150 Bank Street, Burlington, Vermont 05401 by these presents does freely GIVE, GRANT, SELL, CONVEY AND CONFIRM unto the Bank, its successors and assigns, its leasehold interests in real property with an address of 1330 Twitchell Hill Road (also known as 498 Field Days Road), in the Town of New Haven, County of Addison and State of Vermont, described in Schedule A attached hereto (the "<u>Property</u>").

TO HAVE AND TO HOLD the said granted Property, with all the privileges and appurtenances thereof, to the Bank, its successors and assigns, to their own use and behoof forever; and the Mortgagor for itself and its successors and assigns, does covenant with the Bank, its successors and assigns, that until the ensealing of these presents it is the sole owner of the Property, and has good right and title to convey the same in manner aforesaid, that they are FREE FROM EVERY ENCUMBRANCE except as aforesaid; and Mortgagor hereby engages to WARRANT AND DEFEND the same against all lawful claims whatever.

The condition of this Mortgage is such, that if Mortgagor and its successors shall well and truly pay or cause to be paid to Bank, its successors and assigns, the sum of Two Hundred Fifty-Three Thousand Three Hundred Twenty-One and 00/100 Dollars ($253,321.00) pursuant to the terms of a Promissory Note dated of even date hereof, and shall fully comply with all of the other terms and conditions of the Promissory Note and Business Loan Agreement, and shall at all times keep the improvements on the Property satisfactorily insured against loss by fire, for the benefit of the Bank herein, and also comply with the terms of the Lease on said Property, then this Mortgage to be null and void, otherwise to remain in full force and virtue.  And in case of failure to keep such improvements so insured, or to pay required Property expenses, the legal holder of this Mortgage shall have the right to cause such improvements to be so insured in the owner's name and to pay any unpaid taxes and assessments, adding the proper expense thereof to the principal sum secured under this Mortgage. It is also expressly agreed that in case this Mortgage shall be foreclosed and a decree obtained therein, there shall be included in such decree a reasonable attorney's fee in addition to all sums and costs allowed in that behalf by law.

Additionally, as continuing security for the Promissory Note, Mortgagor hereby pledges, assigns and grants to the Bank a security interest in any of the Property constituting fixtures. This Mortgage shall be deemed to be a security agreement and financing statement pursuant to the terms of the Uniform Commercial Code of Vermont. Mortgagor authorizes Bank to record this Mortgage in lieu of a financing statement and to file such financing statements evidencing the security interest hereby granted with the Vermont Secretary of State and/or with the appropriate town clerks' offices and with such other governmental authorities as the Bank shall deem necessary.

Mortgagor hereby grants to Bank a power of sale, and accordingly, Bank shall have all of the rights and powers granted by Vermont law to the holder of a mortgage containing a power of sale, including the right, to the extent permitted by Vermont law, to foreclose Mortgagor's equity of redemption upon a default under this Mortgage, by exercising the power of sale, without first commencing a foreclosure action or obtaining a foreclosure decree, and to give such notices and to do all other acts, including the giving of a foreclosure deed upon completion of the foreclosure sale, as are permitted or required by 12 V.S.A. Sections 4961 <u>et</u> <u>seq.</u> to foreclose a mortgage without judicial action.

Page 1
Leasehold Mortgage

In addition, Mortgagor covenants and agrees as follows:

1.    Preservation and Maintenance of Property. Mortgagor shall not destroy, damage or impair the Property, allow the Property to deteriorate, depreciate or commit waste.

2.    Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Bank.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Mortgage, whether or not then due, with any excess paid to Mortgagor. In the event of a partial taking of the Property, unless Mortgagor and Bank otherwise agree in writing, the sums secured by this Mortgage shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Mortgagor.

If the Property is abandoned by Mortgagor, or if, after notice by Bank to Mortgagor that the condemner offers to make an award or settle a claim for damages, Mortgagor fails to respond to Bank within 30 days after the date the notice is given, Bank is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Mortgage, whether or not then due.

3.    Appointment of Receiver; Bank in Possession. Upon acceleration under Paragraph 9 hereof or abandonment of the Property, Bank, in person, by agent, or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to lease the Property or any part hereof, and to collect all rents of the Property including those past due. All rents collected by Bank or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees and then to the sums secured by this Mortgage. Bank and the receiver shall be liable to account only for those rents actually received.

4.    Compliance with Lease.

(a)    The Lease – Mortgagor's leasehold interest arises from that certain Lease Agreement dated August 22, 2014 between Encore Solar I, LLC as Tenant, and Edward and Shirley Gervais, collectively the Landlord. The Lease was assigned by Encore Middlebury Solar I, LLC to Mortgagor by Solar Project Assignment and Assumption Agreement dated December 4, 2014. The Lease was amended by Amendment to Site Lease dated March 25, 2015. The Gervais conveyed their interest in the Property and the Lease to the Edward and Shirley Gervais Family Trust by Deed dated October 24, 2017 and recorded in Volume 86, Page 468 of the New Haven Land Records.

(b)    Compliance – Mortgagor will pay all rents and will strictly observe and perform on a timely basis all other terms, covenants, and conditions of the Lease. Mortgagor will indemnify, defend, and hold Bank harmless against all losses, liabilities, actions, suits, proceedings, costs including reasonable attorneys' fees claims, demands, and damages whatsoever which may be incurred by reason of Mortgagor's failure to pay rents or strictly observe or perform under the Lease. It shall be a default under this Mortgage if Mortgagor defaults under the Lease and such default is not cured, or if any other event results in the termination or cancellation of Mortgagor's leasehold rights.

5.    Other Agreements Relating to the Lease. Mortgagor further agrees (1) not to surrender, terminate, or cancel the Lease, and (2) not to modify, change, supplement, alter, or amend the Lease, either orally or in writing, without Bank's prior written consent. Any attempt by Mortgagor to do any of the foregoing without Bank's prior written consent will be void and of no force and effect. Unless Mortgagor is in breach or default of any of the terms contained in this Mortgage, Bank will have no right to cancel, modify, change, supplement, alter or amend the leasehold interest. No estate in the Property, whether fee title to the leasehold premises, the leasehold estate, or any subleasehold estate, will merge without Bank express written consent; rather these estates will remain separate and

distinct, even if there is a union of these estates in the landlord, Mortgagor, or a third party who purchases or otherwise acquires the estates. Mortgagor further agrees that if Mortgagor acquires all or a portion of the fee simple title, or any other leasehold or subleasehold title to the Property, that title will, at Bank's option, immediately become subject to the terms of this Mortgage, and Mortgagor will execute, deliver and record all documents necessary or appropriate to assure that such title is secured by this Mortgage.

6. <u>Notices Relating to the Lease</u>. Mortgagor will promptly notify Bank in writing:

(a) if Mortgagor is in default in the performance or observance of any of the terms, covenants, or conditions which Mortgagor is to perform or observe under the Lease;

(b) if any event occurs which would constitute a default under the Lease;

(c) if any notice of default is given to Mortgagor by the landlord under the Lease;

(d) if, pursuant to the Lease, any proceeds received for the Property are deposited with someone other than Bank, whether received from any insurance on the Property or from the taking of any or all of the Property by eminent domain; and

(e) if any arbitration or appraisal proceedings are requested or instituted pursuant to the Lease.

Mortgagor agrees to provide Bank promptly with a copy of all written materials relating to any of the above and to provide Bank with such other information as Bank may reasonably request. Mortgagor agrees that promptly after the execution and delivery of this Mortgage, Mortgagor will notify the landlord under the Lease in writing of the execution and delivery of this Mortgage and of the name and address of Bank and will deliver a copy of this Mortgage to the landlord.

7. <u>Option to Cure Lease Default</u>. Upon Bank's receipt of any written notice of Mortgagor's default under the Lease, Bank may, at Bank's option, cure such default, even though Mortgagor, or any party on behalf of Mortgagor, questions or denies the existence of such default or the nature of the default. Mortgagor expressly grants to Bank the absolute and immediate right to enter upon the Property to such extent and as often as Bank in its sole discretion deems necessary or desirable in order to prevent or cure any such default by Mortgagor.

8. <u>Mortgagor Not Released; Forbearance By Bank Not a Waiver</u>. Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Bank to any successor in interest of Mortgagor shall not operate to release the liability of Mortgagor, and successors in interest. Bank shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Mortgagor and successors in interest. Any forbearance by Bank in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

9. <u>Acceleration; Remedies</u>. Upon Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Bank at Bank's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand or notice and may invoke the power of sale and any other remedies provided herein including but not limited to reasonable attorney's fees.

10. <u>Successors and Assigns Bound</u>. The covenants and agreements of this Mortgage shall bind and benefit the successors and assigns of Bank and Mortgagor.

11. <u>Application of Insurance Proceeds</u>. If the Property shall be wholly or partially destroyed or damaged by fire or other casualty covered by insurance, the Mortgagor shall take all action which may be necessary to enable recovery to be made upon such policies of insurance or awards on account of such taking, condemnation or loss of title in order that the insurance proceeds or award may be collected and paid to Bank to offset amounts owed under the Promissory Note.

12. IF ALL OR ANY PART OF THE PROPERTY, OR ANY INTEREST THEREIN, IS SOLD, TRANSFERRED OR ASSIGNED BY THE MORTGAGOR OR IF THIS MORTGAGE IS ASSUMED, ALL WITHOUT THE BANK'S PRIOR WRITTEN CONSENT, THE LEGAL HOLDER OF THIS MORTGAGE

<div align="right">
Page 3<br>
Leasehold Mortgage
</div>

MAY AT ITS OPTION DECLARE ALL SUMS SECURED BY THIS MORTGAGE TO BE IMMEDIATELY DUE AND PAYABLE.

13.    THE MORTGAGOR AND, BY ITS ACCEPTANCE OF THIS MORTGAGE, THE BANK, HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF:  (A) THIS MORTGAGE OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THE OBLIGATIONS; (B) THE VALIDITY, INTERPRETATION, COLLECTION, OR ENFORCEMENT THEREOF; OR (C) ANY OTHER CLAIM OR DISPUTE HOWEVER ARISING BETWEEN THE BANK AND THE MORTGAGOR.

IN WITNESS WHEREOF, the Mortgagor hereunto sets its hand and seal this _17_ day of September, 2019.

IN THE PRESENCE OF:

_____
Witness

PECK ELECTRIC CO.

By: _____
Jeffrey Peck, Its President & Duly Authorized Agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington in said County this _17_ day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged the foregoing instrument, by him sealed and subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _Kathleen M Boe_

Print Name: _____
Notary Public, State of Vermont
Commission No: _____
My Commission Expires:  01/31/2021

Kathleen M. Boe, Esq.
Notary Public State of Vermont
Commission Expires: 1/31/2021
Commission #0005450

Page 4
Leasehold Mortgage

Schedule A to Leasehold Mortgage

Being all and the same land and premises leased by Peck Electric Co. pursuant to that Site Lease Agreement by and between Edward J. Gervais, Sr. and Shirley A. Gervais (together, "Gervais") and Encore Middlebury Solar I, LLC ("Encore") dated August 22, 2014 (the "Lease"), notice of which is dated October 17, 2014 and recorded on November 10, 2014 in Volume 82, Page 403 of the Land Records (the "Lease Memo"):

> The Lease was amended by Amendment to Site Lease Agreement by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 69 of the Land Records.
>
> The Lease Memo was amended by Amendment to Memorandum/Notice of Lease by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 67 of the Land Records.
>
> The Lease was assigned by Encore to Peck Electric Company as referenced in the Amendment to Solar Project Assignment and Assumption Agreement by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 63 of the Land Records and in the Memorandum of Assignment and Assumption Agreement by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 65 of the Land Records.
>
> Gervais conveyed their interest in the Property and the Lease to the Edward and Shirley Gervais Family Trust dated October 24, 2017 in the Trust Deed from Edward J. Gervais and Shirley A. Gervais to Edward J. Gervais, Trustee of the Edward and Shirley Gervais Family Trust, dated October 24, 2017 and recorded on October 26, 2017 in Volume 86, Page 468 of the Land Records.

The leased premises are a portion of the lands and premises conveyed to Edward J. Gervais and Shirley A. Gervais by Warranty Deed of Susan B. Sawyer (f/k/a Susan B. Bixby) dated March 23, 1983 and recorded in Volume 40, Page 476 of the Land Records. Reference is made to that certain Trust Deed from Edward J. Gervais and Shirley A. Gervais to Edward J. Gervais, Trustee of the Edward and Shirley Gervais Family Trust, dated October 24, 2017 and recorded on October 26, 2017 in Volume 86, Page 468 of the Land Records.

The Property is subject to the following:

1. Matters depicted and notes recited on a plan entitled "Property of Edward J. (Sr.) & Shirley A. Gervais, Addison County, New Haven, Vt." dated June 7, 1989, and revised November 2, 1989, by Rodney R. Orvis, Registered Land Surveyor and is recorded in the Land Records.



{B2065905.1 15495-0008}

2. Matters depicted and notes recited on a subdivision plan of lands of Gervais dated 1983 and of record in Map Slide No. 17 of the Land Records.

3. Terms and conditions of a Lease by and between Edward J. Gervais, Sr. and Shirley A. Gervais to Encore Middlebury Solar I, LLC, a Memorandum of which is dated August 22, 2014, notice of which is dated October 17, 2014 and recorded on November 10, 2014 in Volume 82, Page 403 of the Land Records.

4. Terms and conditions of an Amendment to Site Lease Agreement by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 69 of the Land Records.

5. Amendment to Memorandum/Notice of Lease by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 67 of the Land Records.

6. Terms and conditions of a Solar Project Assignment and Assumption Agreement by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 63 of the Land Records.

7. Memorandum of Assignment and Assumption Agreement by and between Edward J. Gervais, Sr. and Shirley A. Gervais, Encore Middlebury Solar I, LLC and Peck Electric Company, dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 65 of the Land Records.

8. Rights set forth in a Deed dated February 21, 1968 and recorded in Volume 30, Page 387 of the Land Records.

9. Life estate with the power of sale reserved by Edward J. Gervais, Sr. and Shirley A. Gervais in the Trust Deed to Edward J. Gervais, Trustee of the Edward and Shirley Gervais Family Trust, dated October 24, 2017 and recorded on October 26, 2017 in Volume 86, Page 468 of the Land Records

{B2065905.1 15495-0008}

## LANDOWNER'S NOTICE OF PERMIT REQUIREMENTS

Edward J. Gervais, Trustee of the Edward and Shirley Gervais Family Trust dated October 24, 2017 ( the "Trustee" or "Landlord") hereby records this Landowner's Notice of Permit Requirements pursuant to Vermont's Environmental Protection Rules § 1-304(a)(2)(A).

WHEREAS, the Landlord acquired fee title to a certain parcel of land from Edward J. Gervais, Sr. and Shirley A. Gervais (together, "Gervais") pursuant to Trust Deed dated October 24, 2017, recorded in the Town of New Haven land records (the "Land Records") in Volume 86, Page 468 (the "Property").

WHEREAS, pursuant to a Site Lease Agreement dated August 22, 2014, notice of which is recorded in Volume 82, Page 403 of the Land Records, as the same has been amended from time to time (as amended, the "Lease"), Gervais agreed to lease a portion of the Property and to convey certain appurtenant easements, to Encore Middlebury Solar I, LLC, a Vermont limited liability company (the "Tenant"), for the installation, construction, operation, maintenance, repair, improvement, replacement and removal of a solar generating facility and uses incidental thereto (the "Generating Facility"). The rights in and to the Lease and the Generating Facility were assigned to Peck Electric Co. by Encore Middlebury Solar I, LLC by that certain Solar Project Assignment and Assumption Agreement dated March 25, 2015 and recorded on April 6, 2015 in Volume 83, Page 63 of the Land Records. Gervais transferred their rights as Landlord under the Lease to the Trustee in the Trust Deed recorded in Volume 86, Page 468 of the Land Records.

WHEREAS, the Generating Facility will not include the installation of a potable water supply or wastewater system.

WHEREAS, in light of its entry into the Lease with the Tenant, in order to comply with Vermont's water and wastewater permitting rules, the Landlord needs to record in the Land Records the Notice of Permit Requirements pursuant to Vermont's Environmental Protection Rules § 1-304(a)(2)(A).

NOW, THEREFORE, the Landlord hereby states as follows (all capitalized terms used herein and defined in the foregoing Whereas clauses):

Notice of Permit Requirements. In order to comply with applicable state Rules concerning potable water supplies and wastewater systems, a person shall not construct or erect any structure or building on the lot of land described in the Lease if the use or useful occupancy of that structure or building will require the installation of or

{B2063911.1 15495-0008}

connection to a potable water supply or wastewater system, without first complying with the applicable Rules and obtaining any required permit. Any person who owns this Property acknowledges that this lot may not be able to meet state standards for a potable water supply or wastewater system and therefore this lot may not be able to be improved.

Dated this __6__ day of September, 2019.

**LANDLORD**

_Edward J. Gervais_

Edward J. Gervais, Trustee of the
Edward and Shirley Gervais Family Trust
created u/t/a dated October 24, 2017

{B2063911.1 15495-0008}

## LANDLORD ESTOPPEL CERTIFICATE

**Edward J. Gervais, Trustee** of the Edward and Shirley Gervais Family Trust created under trust agreement dated October 24, 2017 having an address at 1330 Twitchell Hill Road, New Haven, Vermont ( the "**Landlord**"), the owner of certain real property leased by **Peck Electric Co.**, a Vermont corporation with its principal place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 (the "**Tenant**") pursuant to the terms of a certain lease dated August 22, 2014, as amended by Amendment to Site Lease dated March 25, 2015 and as assigned by Solar Project Assignment and Assumption Agreement dated March 25, 2015 (as amended and assigned, the "**Lease**"), hereby makes the following certification to **NBT Bank, N.A.**, of 150 Bank Street, Burlington, Vermont 05401 (the "**Lender**") in connection with financing being provided to the Tenant.

1. A copy of the Lease is attached hereto as <u>Exhibit A.</u> The Lease has not been further modified in any respect.

2. The Lease covers the following real property: A portion of the property of the Landlord located at 1330 Twitchell Hill Road (a/k/a 498 Field Days Road), New Haven, Vermont.

3. The term of the Lease is for the period of August 22, 2014 to that date which is twenty five (25) years from the Commissioning Date, as the same is defined in the Net Metering Agreement.

4. The Tenant is not in default under the Lease, nor to Landlord's knowledge has any event occurred that, solely with the passage of time, would constitute a default under the Lease.

5. The current yearly rent payable is $ _2,706.08_ and said rent is payable on _December 31st, 2019_. No rent or other sums payable under the Lease have been paid in advance except for the yearly rent that became due for the current Lease year.

6. To the best of my knowledge, the Landlord is in full compliance with all Landlord's obligations under the Lease and there are no disputes under the Lease.

7. To the best of my knowledge, Tenant is in full compliance with all Tenant's obligations under the Lease.

8. Landlord consents to the Mortgage by Tenant of its leasehold interest in the Lease to NBT Bank, N.A.

{B2063624.1 15495-0008}                    1

Dated this 6th day of September, 2019.

**LANDLORD:**

_Edward J. Gervais_

Edward J. Gervais, Trustee of the
Edward and Shirley Gervais Family Trust
Created u/t/a dated October 24, 2017

STATE OF VERMONT
COUNTY OF __Addison__

At __Middlebury__, this 6th day of September, 2019, personally appeared Edward J. Gervais, Trustee of the Edward and Shirley Gervais Family Trust created u/t/a dated October 24, 2017 and he acknowledged this instrument, by him subscribed, to be his free act and deed in capacity as Trustee of the Edward and Shirley Gervais Family Trust.

Before me, _____

Notary Public

Printed Name: _____

My Commission Expires: 01/31/2021

My Commission No.: _____

Anthony Robert Duprey
NOTARY PUBLIC
State of Vermont
Commission # 0004687
My Commission Expires
January 31, 2021

{B2063624.1 15495-0008}

2

## SITE LEASE AGREEMENT

This Site Lease Agreement ("Lease Agreement") is made on August 22, 2014 by and between Encore Middlebury Solar I, LLC, a Vermont limited liability company (the "Tenant") with a principal place of business at 110 Main Street, Suite 2E, Burlington, Vermont, and Edward and Shirley Gervais (the "Landlord"). The Tenant and the Landlord are sometimes referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Landlord is the owner of certain real property located at 1330 Twitchell Hill Road in New Haven, Vermont with an address set forth and as more particularly described in Exhibit A (the "Property") and Tenant desires to lease a portion of the Property as more particularly described in Exhibit B (the "Premises").

WHEREAS, the Tenant designs, installs, operates and maintains equipment and systems, including solar panels, mounting systems, inverters, transformers, integrators, all electrical lines and conduits required to collect and transmit electrical energy to the delivery point and such additional utility lines, cables, conduits, transformers, wires, meters, monitoring equipment and other necessary and convenient equipment and appurtenances, that produce electricity from exposure to sunlight (the "Project") for sale and distribution to the electric grid.

WHEREAS, the Landlord and the Tenant desire to have the Project on the Premises and acknowledge that the Project is or may become subject to the Net Metering Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, the sufficiency of which is hereby acknowledged by both Parties, the Parties do hereby agree as follows:

1.        **Lease.** The Lessor hereby leases the Premises to the Tenant pursuant to the terms and conditions of this Lease Agreement.

2.        **Permitted Use.** The Tenant may use the Premises to install, operate, maintain, improve and replace the Project for purposes of generating and delivering electricity to the local utility.

3.        **Access to the Premises from the road to the Property.** Landlord agrees at all times to allow Tenant access to the Property from the road to install, operate, maintain, improve and replace the Project on the Premises. Landlord shall also provide Tenant with adequate space on the Property during the construction of the Project for the Tenant's construction of the Project including reasonable staging and laydown areas. The Tenant shall comply with all laws, rules and regulations relating to Tenant's use of the Property and the Premises in connection with the construction and operation of the Project. Tenant shall restore any land used for this purpose to its prior existing condition.

4.        **Construction of the Project.** The installation and construction of the Project shall be performed in a good and workmanlike manner.

5.        **Interconnection.** Tenant shall be responsible for the interconnection of the Project and Landlord shall cooperate with Tenant, any applicable utility and municipal and regulatory authorities in Tenant's pursuit of all permits, approvals and other authorizations that may be required in order to effect the interconnection of the Project.

6.        **Approvals and Permits.** Tenant shall obtain all necessary approvals and permits required for the installation, construction and operation of the Project, and pay all permit fees required in connection with its activities under this Lease and under the Net Metering Agreement. The Landlord shall cooperate with Tenant in obtaining all such approvals and permits and necessary transfer Project permits to Tenant for purposes of operating the Project. To the extent that any permit must be obtained by Landlord, the Landlord agrees that it will grant all material decision-making rights with respect to such permit to Tenant.

7.        **Exposure to Sunlight.** The Landlord covenants that it will use its best efforts to not allow vegetation on its property to grow in a manner or initiate or conduct any activities that could reasonably diminish the exposure of the Panels to sunlight during daylight hours, while this Lease Agreement remains in effect. Tenant shall be responsible for cutting vegetation on the leased premises.

8.        **Use of Subcontractors.** The Tenant shall be permitted to license subcontractors or agents to perform any of its obligations under this Lease Agreement.

9.        **Landlord not to Interfere with the Project.** The Landlord and any representatives thereof shall not tamper with or undertake any maintenance or alterations to the Premises or the Project without the express written permission of the Tenant. The Landlord shall take reasonable measures necessary to ensure that the operation of the Property does not unreasonably impede, interrupt or prevent the generation and supply of electricity by the Project or damage or otherwise adversely impact the installation, operation and maintenance of the Project or the Tenant's performance under this Lease Agreement or the Net Metering Agreement.

10.       **Cooperation in Securing Rebates, Tax Credits and other Economic Benefits.** The Landlord will cooperate with Tenant in completing and filing such applications and other documents as are necessary to permit the Tenant to receive all mandatory or voluntary federal, state, or local renewable energy certificates or emissions or rebates, tax credits and including, without limitation, other economic benefits (the "Environmental Attributes") that are now or may hereafter become available to the Tenant in connection with the Project. Notwithstanding anything to the contrary herein contained, all Environmental Attributes in connection with the Project shall remain the property of the Tenant or its successors and assigns. Tenant shall have the exclusive right to sell, transfer, or convey the Environmental Attributes to any other person in Tenant's sole discretion.

11.       **Term.** This Lease Agreement shall commence upon the execution date set forth on the first page and shall terminate twenty five (25) years from the Commissioning Date as defined in the Net Metering Agreement, unless sooner terminated earlier in accordance with the terms and conditions of this Lease Agreement (the "Term"). If the Parties mutually agree, the Term may be extended beyond the 25 year term, upon such terms as mutually agreed by the Parties.

12.       **Rent.** Tenant shall pay the Landlord rent in the initial amount of $2,500 per acre, per year for the area utilized by the Project, with an annual escalator of 2%.

13.       **Ownership of the Project.** The Project shall be and remain the personal property of the Tenant and shall not be or become fixtures, notwithstanding the manner in which the Project is or may be affixed to the Premises. The Landlord shall not suffer or permit the Project to become subject to any lien, security interest or encumbrance of any kind, and the Landlord expressly disclaims and waives any rights it may have in the Project at any time and from time to time, at law or in equity. The Tenant shall

2

maintain the Project in a good state of repair. The Tenant may grant a security interest in the Project and an assignment for purposes of security to its lender or lenders, and the Landlord shall provide any consent and/or waiver reasonably requested by any lender, consenting to such lender's rights in the Project.

14.      **Removal of the Project and Option to Purchase.** At the end of the Term or upon termination of this Lease Agreement, the Tenant, its successors or assigns shall sever, disconnect, and remove the Project and all of the Tenant's other property from the Premises and restore the Premises to as close to original condition as reasonably possible. The removal, repair and restoration shall be at the sole expense of the Tenant or its successors and assigns. In the alternative, and at its written election, the Landlord shall have the opportunity to purchase the Project in accordance with the terms further outlined in the Net Metering Agreement.

15.      **Quiet Enjoyment.** The Landlord covenants and agrees that the Tenant, provided it remains in compliance with its obligations under this Lease Agreement, shall lawfully and quietly have the right to hold, occupy and enjoy the Premises for the Term of this Lease free from any claim of any entity or person of superior title thereto without hindrance to, interference with the Tenant's use and enjoyment thereof.

16.      **Environmental Matters.** The Tenant shall not be liable for any past, present or future contamination or pollution or breach of environmental laws, if any, relating to the Premises or the Property, unless attributable to the Tenant's activities, its employees contractors or agents. Accordingly: (a) the Tenant shall not be responsible for any work relating to (i) the existence, use, transportation or treatment of Hazardous Materials, or (ii) the storage, handling, use, transportation, treatment, or the disposal, discharge, leakage, detection, removal, or containment of Hazardous Materials, and (b) the Landlord agrees to assume full responsibility for (and protect, indemnify and defend the Tenant against, any liability for response costs for any contamination or pollution or breach of environmental laws related to the Premises and the Property, unless and to the extent attributable to the Tenant's activities. The Tenant may encounter Hazardous Materials when installing, servicing, expanding, modifying or maintaining the Project. In the event the Tenant encounters any Hazardous Material at the Premises, the Tenant shall promptly cease any work in progress in an orderly, safe and efficient manner and inform The Landlord of the nature and location of said Hazardous Materials. It shall then be The Landlord's responsibility to eliminate or contain such Hazardous Materials in a commercially reasonable manner in compliance with law to allow The Tenant to continue or finalize any work in progress.

17.      **Assignment.** This Lease Agreement and the rights of the Tenant hereunder may be assigned by the Tenant. With the written consent of the Tenant, this Lease Agreement may be assigned by the Landlord provided, however, that any such assignment will not relieve the Landlord of any of its obligations hereunder.

18.      **Liability for Injury and Damage.** Tenant shall defend, indemnify and hold harmless the Landlord from any and all liability, loss, cost, damage or expense sustained by reason of the injury or death of any person, and/or damage to or destruction of any property arising from or caused by the Project and/or caused by any act, omission, or neglect of the Tenant or its subcontractors, agents, servants, employees, invitees, visitors or guests, including reasonable attorney's fees and other litigation expenses. Prior to commencing operations, Tenant shall obtain liability insurance naming the Landlord an additional insured for this purpose in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate Tenant shall provide the Landlord with certificate(s) of insurance naming

3

the Landlord as an additional insured and evidencing the procurement of insurance contemplated in this Section 23.

19.        **Revocation.** In the event of a material default in the terms of this Lease Agreement by either the Landlord or the Tenant, the other party may terminate this Lease Agreement. Events that shall constitute a default under this Lease Agreement shall include, but not be limited to, a party's failure to perform or comply with any material provision of this Lease Agreement; an unauthorized assignment, a party's insolvency or inability to pay debts as they mature, or an assignment for the benefit of creditors; or if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by a party.

No party shall be in default under this Lease Agreement unless and until it has been given written notice of a breach of this Lease Agreement by the other party and shall have failed to cure such breach within thirty (30) days after receipt of such notice. When a breach cannot reasonably be cured within such thirty (30) day period, the time for curing may be extended by agreement of the parties for such time as may be necessary to complete the cure, provided that the defaulting party shall have proceeded to cure such breach with due diligence.

20.        **Miscellaneous provisions.**

A.    Applicable Law. This Lease Agreement shall be interpreted and governed by the laws of the State of Vermont.

      a.    Rules of Interpretation. Titles and headings are included in this Lease Agreement for convenience only, and shall not be used for the purpose of construing and interpreting this Lease Agreement. Words in the singular also include the plural and vice versa where the context requires.

      b.    Severability. In the event that any provisions of this Lease Agreement are held to be unenforceable or invalid by any court or regulatory agency of competent jurisdiction, the Landlord and the Tenant shall negotiate an equitable adjustment in the provisions of this Lease Agreement with a view toward effecting the purposes of this Lease Agreement, and the validity and enforceability of the remaining provisions hereof shall not be affected thereby.

      c.    Entire Agreement; Amendments and Waivers. This Lease Agreement constitutes the entire agreements between the Parties and supersedes the terms of any previous agreements or understandings, oral or written. Any waiver or amendment of this Lease Agreement must be in writing. A Party's waiver of any breach or failure to enforce any of the terms of this Lease Agreement shall not affect or waive that Party's right to enforce any other term of this Lease Agreement.

      d.    Further Assurances. Either Party shall execute and deliver instruments and assurances and do all things reasonably necessary and proper to carry out the terms of this Lease Agreement if the request from the other Party is reasonable.

      e.    Recordation. The Parties hereto acknowledge that this Lease Agreement, or a memorandum thereof, may be recorded in the local land records.

4

IN WITNESS WHEREOF, the parties, as evidenced by the signatures of their Duly Authorized Agents, do hereby execute this Lease Agreement this 22 day of August , 2014.

IN PRESENCE OF:

_____
Witness

Encore Middlebury Solar I, LLC.

By: _____
    Chad Farrell
    Duly Authorized Agent

_____
Witness

Edward Gervais

By: _____
    Owner of the Property

_____
Witness

Shirley Gervais

By: _____
    Owner of the Property

5

Exhibit A

Description of the Landlord's Property

6

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $253,321.00 | 09-17-2019 | 04-17-2026 | [redacted] | 64 | [redacted] | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT 05403

**Lender:** NBT Bank, National Association
52 South Broad Street
Norwich, NY 13815

THIS COMMERCIAL SECURITY AGREEMENT dated **September 17, 2019**, is made and executed between **Peck Electric Co. ("Grantor")** and **NBT Bank, National Association ("Lender")**.

GRANT OF SECURITY INTEREST. **For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Inventory, Accounts, Equipment and General Intangibles**

**Solar Electric Generating Equipment, including but not limited to the integrated assembly of photovoltaic panels, mounting assemblies, inverters, converters, metering, lighting fixtures, transformers, ballasts, disconnects, combiners, switches, wiring devices and wiring**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Some or all of the Collateral may be located on the following described real estate:

**1330 Twitchell Hill Rd, New Haven, VT 05472**
**Tax Parcel #0660-100 (the record Owners of the real property is Edward J. Gervais Sr.; Shirley A. Gervais; and Edward and Shirley Gervais Family Trust dated October 24, 2017; 1330 Twitchell Hill Rd; New Haven, VT 05472).**

CROSS-COLLATERALIZATION. In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

FUTURE ADVANCES. In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL. With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Vermont, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

## COMMERCIAL SECURITY AGREEMENT
(Continued)

Loan No: ███████████                                                                      Page 2

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Vermont Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No:█████████                                                                                            Page 4

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Agreement or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** With respect to interest (as defined by federal law) this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of laws provisions. In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions. The loan transaction that is evidenced by the Note and this Agreement has been approved, made, and funded, and all necessary loan documents have been accepted by Lender in the State of New York.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Peck Electric Co. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Peck Electric Co..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No:

Page 5

Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means NBT Bank, National Association, its successors and assigns.

**Note.** The word "Note" means the Note dated September 17, 2019 and executed by Peck Electric Co. in the principal amount of $253,321.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Owner.** The word "Owner" means Peck Electric Co.. The words "Owner" and "Borrower" are used interchangeably.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

ACKNOWLEDGMENT OF ARBITRATION: GRANTOR UNDERSTANDS THAT THIS AGREEMENT CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS AGREEMENT, GRANTOR UNDERSTANDS THAT GRANTOR WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD GRANTOR AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 17, 2019.

GRANTOR:

PECK ELECTRIC CO.

By: _____
     Jeffrey Peck, President and CEO of Peck Electric Co.

LaserPro, Ver. 18.2.0.027  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - VT/NY  L:\CFI\WIN\CFI\LPL\E40.FC  TR-216561  PR-282

<u>**COLLATERAL ASSIGNMENT OF**</u>
<u>**NET METERING AGREEMENT**</u>
(Twitchell Hill Road, New Haven, VT)

**THIS COLLATERAL ASSIGNMENT OF NET METERING AGREEMENT** ("Assignment") is made as of this _11_ day of September, 2019, by **PECK ELECTRIC CO.**, a Vermont corporation with a place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 (hereinafter referred to as "Assignor"), to **NBT BANK, NATIONAL ASSOCIATION**, a national banking association having an office at 150 Bank Street, Burlington, Vermont 05401 (hereinafter referred to as "Bank").

<u>RECITALS</u>

A.      Bank agreed to make a term loan in the amount of Two Hundred Fifty-Three Thousand Three Hundred Twenty-One and 00/100 Dollars ($253,321.00) (the "Loan") to the Assignor.

B.      The Assignor has agreed to enter into this Assignment as additional security for the repayment of the Loan to the Bank evidenced by a Promissory Note payable to Bank in the original principal amount of the Loan dated of even date hereof (the "Note"), together with all other Obligations as defined and owed under the Loan Agreement.

C.      This Assignment covers a Net Metering Agreement by and between Encore Middlebury Solar I, LLC and the Town of Middlebury dated August 19, 2014 (the "NMA"). Encore Redevelopment, LLC then assigned its rights and obligations under the NMA to Assignor hereunder (Peck Electric Company) by a Solar Project Assignment and Assumption Agreement dated December 4, 2017.

D.      This Assignment secures all obligations, debts and liabilities, plus interest thereon, of Assignor to Bank, as well as all claims by Bank against Assignor, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Assignor may be liable individually or jointly with others, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**NOW THEREFORE** in consideration of Bank making the Loan and entering into the Loan Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Assignor, the Assignor covenants and agrees as follows:

1.      <u>Assignment</u>. The Assignor does hereby assign and set over unto Bank as security for the payment and performance of the Obligations, all amounts hereafter to become due and payable under the NMA, subject to the provisions of the NMA, together with the benefit of all covenants, agreements and provisions contained in the NMA with full power and authority to demand, collect, sue for, recover, receive and give receipts for the said amounts and to enforce

1

payment thereof in the name of the Assignor, its successors and assigns.

Nothing herein contained shall be deemed to have the effect of making Bank responsible for the collection of amounts to become due and payable under the NMA, or for the performance of any covenants, terms and conditions by the Assignor contained or to be contained in the NMA. This Assignment is intended to grant Bank rights as a third party beneficiary in the NMA and Assignor will obtain whatever consents, certifications and acknowledgements from the third parties to the NMA as Bank reasonably requests.

Bank shall be liable to account for only such amounts as it shall actually receive by virtue of this Assignment. Such amounts when so received by Bank shall be applied on account of the monies from time to time due under the Note and Loan Agreement (and any renewals or extensions thereof) in the manner and in the order therein provided for the application of payments received.

The said amounts to become due and payable under the NMA and other benefits hereby assigned to Bank are being taken as collateral security only for the due payment and performance of the Obligations, either wholly or in part, and none of the rights or remedies of Bank under the Loan Agreement shall be delayed or in any way prejudiced by these presents.

2.      Warranties of Assignor. The Assignor represents and warrants to Bank that the NMA has not been assigned to any other third party, that the NMA is in full force and effect, and that neither the Assignor nor the Purchaser is in default of the NMA.

3.      Terms and Conditions.

(a)      Notwithstanding any variation of the terms of the Loan Agreement or any agreement or arrangement with the Assignor or any extension of time for payment or any release of part or parts of the Collateral (as defined in the Loan Agreement), the amounts hereafter to become due and payable under the NMA hereunder and other benefits hereby assigned shall continue as collateral security until the whole of the Obligations shall be fully paid and satisfied.

(b)      The Assignor covenants and agrees from time to time and at all times hereafter, at the request of Bank to execute and deliver at the expense of the Assignor such further assurances to assign to Bank all amounts hereafter to become payable hereunder, as Bank shall reasonably require.

(c)      Provided that no Event of Default (as defined in the Loan Agreement) has occurred and is continuing under the Loan Agreement or under any other of the Loan Documents (as defined in the Loan Agreement), the Assignor shall be entitled to receive all amounts payable to it under the NMA, free from any claim by Bank, and shall not be liable to account therefor to Bank, but immediately upon an Event of Default thereunder Bank upon written notice to the Assignor shall be entitled to all such monies falling due under the NMA subsequent to the date of service of such notice, for so long as such Event of Default continues unremedied.

(d)      Notwithstanding this Assignment, the Assignor shall be solely responsible for

2

performing and complying with all the covenants and other obligations on its part under the terms of the NMA and shall perform all such covenants and obligations contained in the NMA so that the rights and remedies of Bank shall not be in any way delayed or prejudiced.

(e)    Bank may waive any Event of Default under the Loan Documents and shall not be bound to serve any notice as hereinbefore set forth upon the happening of any such Event of Default, but any such waiver shall not extend to any subsequent Event of Default.

4.    Successors and Assigns. This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

5.    Governing Law. This Assignment shall be governed by and construed in accordance with the laws in force in the State of Vermont and the laws of the United States applicable therein.

IN WITNESS WHEREOF the Assignor has executed this Assignment as of the date first above written.

**PECK ELECTRIC CO.**

_____        By: _____
Witness                                      Jeffrey Peck, President and
                                             duly authorized agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington, this 17th day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged this instrument, by him subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _____
                  Print Name: _____
                  Notary Public, State of Vermont
                  Commission No: _____
Kathleen M. Boe, Esq.                  My Commission Expires:  01/31/2021
Notary Public State of Vermont
Commission Expires: 1/31/2021
Commission #0005450

3

## COLLATERAL ASSIGNMENT OF PROJECT DOCUMENTS
(Twitchell Hill Road, New Haven, VT)

FOR VALUE RECEIVED, **PECK ELECTRIC CO.**, a Vermont corporation with a principal place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 ("Assignor"), hereby assigns, transfers and sets over to **NBT BANK, NATIONAL ASSOCIATION,** a national banking association having an office at 150 Bank Street, Burlington, Vermont 05401 ("Bank"), all of Assignor's, rights, title and interest in and to: a certain Group Net Metering Agreement dated August 19, 2014 with the Town of Middlebury, all operation and maintenance services agreements and all related maintenance records, all interconnection agreements, a Certificate of Public Good dated November 26, 2014 (CPG #NM-5056) issued in the name of the Town of Middlebury, and all manufacturer warranties and guarantees entered into by the Assignor or its predecessors in connection with the solar project it operates off Twitchell Hill Road and Field Days Road in New Haven, Vermont (collectively, the "Project Documents" and the rights set forth are collectively referred to herein as the "Assigned Rights").

Terms not defined herein shall have the meanings ascribed to them in the Business Loan Agreement (the "Loan Agreement") between the Assignor and Bank of even date herewith.

1. Assignment as Security.   This Assignment is made to secure:

(a) payment of the Promissory Note from Assignor to Bank, dated of even date in the principal amount of Two Hundred Fifty-Three Thousand Three Hundred Twenty-One and 00/100 Dollars ($253,321.00) (the "Note");

(b) payment, performance and discharge of all Obligations (as defined in the Loan Agreement) and agreements of Assignor under this Assignment, the Note, the Loan Agreement and all other agreements, assignments, documents or instruments executed pursuant thereto (hereinafter collectively referred to as the "Loan Documents"); and

(c) all obligations, debts and liabilities, plus interest thereon, of Assignor to Bank, as well as all claims by Bank against Assignor, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Assignor may be liable individually or jointly with others, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

2. Representations and Warranties of Assignors. Assignor hereby represents and warrants:

(a) that the Assignor has obtained all rights under the Project Documents from Encore Redevelopment, LLC;

-1-

(b)     that the Assignor has full right, power and authority to execute this Assignment; and

(c)     that the Assignor has not assigned, transferred, pledged or otherwise encumbered any interest in the Project Documents or the Assigned Rights described herein.

3.     Covenants of Assignor. Assignor agrees:

(a)     to observe and perform all obligations imposed upon the Assignor under the Project Documents;

(b)     not to execute any other assignment of Assignor's interest in the Assigned Rights or Project Documents without Bank's consent;

(c)     to provide proper notice of this Assignment to the other parties to the Project Documents with evidence of such notice provided Bank within ten (10) business days of the date of this Assignment, and to execute and deliver to Bank such further assurances and assignments of the Assigned Rights as Bank shall from time to time reasonably require to effect the provisions of this Assignment.

4.     Terms and Conditions. This Assignment is made on the following terms and conditions:

(a)     until an Event of Default by Assignor in its obligations under the Loan Documents, Assignor shall have all of the rights and privileges incident to holding of the Assigned Rights, and retain use of and enjoyment of the same;

(b)     upon or at any time after an Event of Default after notice to the Assignor, as described in the Loan Documents, Bank may, at its option, without further notice or proceedings and without regard to the adequacy of the security, either in person or by agent, or by receiver appointed by a court, take, have, use and enjoy the rights and privileges of the holder of the Assigned Rights for such period of time as Bank may deem proper;

(c)     upon payment in full of the principal, interest, and all other indebtedness evidenced by or secured by this Assignment and the Loan Documents, this Assignment shall be void and be of no further effect, provided however, that the affidavit, certificate, letter, or statement of Bank or any officer, agent, or attorney of Bank showing any part of the principal, interest, or other indebtedness remains unpaid shall constitute conclusive evidence of the validity, effectiveness, and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon;

(d)     Bank may take or release other security for payment of the secured principal, interest, or other indebtedness, may release any party primarily or secondarily liable, and may apply any other security held by it to the satisfaction of the secured principal, interest, or other indebtedness without prejudice to any rights under this Assignment;

-2-

(e)     nothing contained in this Assignment and no act done or omitted by Bank pursuant to its terms shall be deemed a waiver by Bank of any rights or remedies under this Assignment, or the Loan Documents. The right of Bank to collect the secured principal, interest, and other Obligations, and to enforce any other security may be exercised by Bank prior to, simultaneously with, or subsequent to any action taken under this Assignment;

(f)     this Assignment, together with the agreements and warranties contained in it, shall inure to the benefit of Bank and any subsequent holder of the Loan Documents of even date, and shall be binding upon Assignor and its successors and assigns; and

(g)     to the extent the Assigned Rights are or are deemed to be collateral subject to the Uniform Commercial Code (the "Code"), this Assignment shall be deemed to create in favor of the Bank a security interest therein, and, in addition to any other right or remedy expressly provided for above, in the event of any default by the Assignor under this Assignment, the Bank shall have all of the rights and remedies of a secured party upon default under the Code.

Dated at Burlington, Vermont, this 17 day of September, 2019.

**PECK ELECTRIC CO.**

By: _____
Witness                                    Jeffrey Peck, President and
                                          Duly Authorized Agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington, this 17th day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged this instrument, by him subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _____
Print Name: _____
Notary Public, State of Vermont

Kathleen M. Boe, Esq.                    Commission No: _____
Notary Public State of Vermont           My Commission Expires:  01/31/2021
Commission Expires: 1/31/2021
Commission #0005450

-3-

# AGREEMENT TO PROVIDE INSURANCE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $253,321.00 | 09-17-2019 | 04-17-2026 | ▮ | 64 | ▮4952 | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:**  Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT  05403

**Lender:**  NBT Bank, National Association
52 South Broad Street
Norwich, NY  13815

**INSURANCE REQUIREMENTS.** Grantor, Peck Electric Co. ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Grantor by Lender. These requirements are set forth in the security documents for the loan. The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

Collateral:     **All Inventory and Equipment.**
**Type:** All risks, including fire, theft and liability.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Lender's Loss Payable/Mortgagee (NBT Bank, NA, ISAOA/ATIMA); and further stipulating that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
**Latest Delivery Date:** By the loan closing date.

Collateral:     **Solar Electric Generating Equipment, including but not limited to the integrated assembly of photovoltaic panels, mounting assemblies, inverters, converters, metering, lighting fixtures, transformers, ballasts, disconnects, combiners, switches, wiring devices and wiring, located at 1330 Twitchell Hill Road, New Haven, VT 05472.**
**Type:** All risks, including fire, theft and liability.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Lender's Loss Payable/Mortgagee (NBT Bank, NA, ISAOA/ATIMA); and further stipulating that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
**Latest Delivery Date:** By the loan closing date.

**INSURANCE COMPANY.** Grantor may obtain insurance from any insurance company Grantor may choose that is reasonably acceptable to Lender. Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**INSURANCE MAILING ADDRESS.** All documents and other materials relating to insurance for this loan should be mailed, delivered or directed to the following address:

NBT Bank, National Association
LDCC
PO Box 405
Norwich, NY  13815

**FAILURE TO PROVIDE INSURANCE.** Grantor agrees to deliver to Lender, on the latest delivery date stated above, proof of the required insurance as provided above, with an effective date of September 17, 2019, or earlier. Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may do so at Grantor's expense as provided in the applicable security document. The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document. GRANTOR ACKNOWLEDGES THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED. IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.** For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 17, 2019.

GRANTOR:

PECK ELECTRIC CO.

By: _____
Jeffrey Peck, President and CEO of Peck Electric Co.

---

**FOR LENDER USE ONLY**
**INSURANCE VERIFICATION**

DATE: _____          PHONE _____

_____

AGENT'S NAME: _____

AGENCY: _____

ADDRESS: _____

INSURANCE COMPANY: _____

POLICY NUMBER: _____

EFFECTIVE DATES: _____

COMMENTS: _____
_____

# DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $253,321.00 | 09-17-2019 | 04-17-2026 | ▮▮▮ | 64 | ▮▮4952 | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT  05403

**Lender:**  NBT Bank, National Association
52 South Broad Street
Norwich, NY  13815

**LOAN TYPE.**  This is a Fixed Rate (4.150%) Nondisclosable Loan to a Corporation for $253,321.00 due on April 17, 2026.

**PRIMARY PURPOSE OF LOAN.**  The primary purpose of this loan is for:

☐ Personal, Family or Household Purposes or Personal Investment.

☐ Finance Purchase, Construction or Improvement of Seasonal or Second Home.

☒ Finance Income-Producing Business or Activity.

**DISBURSEMENT INSTRUCTIONS.**  Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied.  Please disburse the loan proceeds of $253,321.00 as follows:

| | |
|---|---|
| Amount paid to others on Borrower's behalf:<br>$253,321.00 to Community Bank | $253,321.00 |
| Note Principal: | $253,321.00 |

**CHARGES PAID IN CASH.**  Borrower has paid or will pay in cash as agreed the following charges:

| | |
|---|---|
| Prepaid Finance Charges Paid in Cash: | $0.00 |
| Other Charges Paid in Cash:<br>$200.00  Commitment Fee (FAS91)<br>$75.05  UCC Filing Fee | $275.05 |
| Total Charges Paid in Cash: | $275.05 |

**AUTOMATIC PAYMENTS.**  Borrower hereby authorizes Lender automatically to deduct from Borrower's Demand Deposit - Checking account, numbered ▮▮▮ the amount of any loan payment.  If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment.  At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**FINAL LOAN PAYMENT.** The Automatic Payment will not be processed for the final loan payment. Contact Lender for the final amount due.

**FINANCIAL CONDITION.**  BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER.  THIS AUTHORIZATION IS DATED SEPTEMBER 17, 2019.

**BORROWER:**

PECK ELECTRIC CO.

By: _____
Jeffrey Peck, President and CEO of Peck Electric Co.

LaserPro, Ver. 18.2.0.027  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - VT/NY  L:\CFI\WIN\CFI\LPL\I20.FC  TR-216561  PR-282

**NBT Bank, N.A.**
LOAN CLOSING WORKSHEET

Borrower:   Peck Electric Co.

Mailing Address:   4050 Williston Road, Ste 511      Date:   September 17, 2019
South Burlington, VT 05403

**CREDITS:**

| | | |
|---|---|---|
| NBT Bank, N.A. Loan Proceeds | $ | 1,960,328.48 |
| NBT Bank, N.A. Loan Proceeds | $ | 187,683.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 281,391.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 253,321.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 732,997.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 486,137.00 |
| NBT Bank, N.A. Loan Proceeds | $ | - |
| Other | $ | - |
| Other | $ | - |
| Other | $ | - |
| **TOTAL CREDITS** | $ | 3,901,857.48 |

**DEBITS:**

| | | | |
|---|---|---|---|
| Attorney Fees | Carroll, Boe & Pell, PC | $ | 10,286.35 |
| Attorney Fees | Dinse, P.C. | POC | |
| Recording Fees | | $ | 405.00 |
| Flood Determination Fee | | $ | 15.00 |
| Loan Origination Fee | | $ | 1,200.00 |
| Tax Monitoring Fee | | $ | 99.00 |
| Title Insurance | | $ | 3,012.50 |
| Appraisal Fee | | $ | 300.00 |
| UCC Filing Fees | | $ | 314.35 |
| Community Bank NA Payoff | | $ | 1,993,711.92 |
| Community Bank NA Payoff | | $ | 475,889.63 |
| Community Bank NA Payoff | | $ | 731,766.67 |
| Community Bank NA Payoff | | $ | 246,838.34 |
| Community Bank NA Payoff | | $ | 286,568.26 |
| Community Bank NA Payoff | | $ | 67,869.37 |
| Community Bank NA Payoff | | $ | 83,581.09 |
| Other | | $ | - |
| Other | | $ | - |
| **TOTAL DEBITS** | | $ | 3,901,857.48 |

Amount due from Borrower                                           $0.00

ACKNOWLEDGED:

_____   9/17/19
Borrower                                Date

# EXHIBIT B

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $732,997.00 | 09-17-2019 | 09-17-2026 | ▮▮▮▮ | 64 | ▮▮▮▮4952 | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**   Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT  05403

**Lender:**   NBT Bank, National Association
52 South Broad Street
Norwich, NY  13815

---

**Principal Amount: $732,997.00**                                   **Date of Note: September 17, 2019**

**LOAN PURPOSE.** This loan is for business purposes only. It is not for personal, family or household purposes, or personal investments.

**PROMISE TO PAY.** Peck Electric Co. ("Borrower") promises to pay to NBT Bank, National Association ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Hundred Thirty-two Thousand Nine Hundred Ninety-seven & 00/100 Dollars ($732,997.00), together with interest on the unpaid principal balance from September 17, 2019, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 4.250% per annum based on a year of 360 days, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 83 regular payments of $5,869.04 each and one irregular last payment estimated at $422,128.06. Borrower's first payment is due October 17, 2019, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on September 17, 2026, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note (if applicable); then to interest; then to principal; then to any insurance premiums (if applicable); then to any fees, and then to any late fees. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: NBT Bank, National Association; 52 South Broad Street; Norwich, NY  13815.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by 4.000 percentage points. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**ADDITIONAL DEFAULT - CHANGE IN OWNERSHIP.** Borrower and where applicable, Guarantor, agree that until payment in full of the Liabilities to Lender and so long as they remain indebted to Lender hereunder, Borrower and/or Guarantor shall not, without prior written consent of Lender enter into any merger, consolidation, recapitalization, stock split, reorganization or liquidation, or to suffer the transfer of any stock or security therein, or transfer of any general partnership or other interest in Borrower and/or Guarantor.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** With respect to interest (as defined by federal law) this Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of laws provisions. In all other respects, this Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions. The loan transaction that is evidenced by this Note has been approved, made, and funded, and all necessary loan documents have been accepted by Lender in the State of New York.

| | PROMISSORY NOTE | |
|---|---|---|
| Loan No: ███████ | (Continued) | Page 2 |

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**ARBITRATION.** Borrower and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Note or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any collateral securing this Note shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any collateral securing this Note, including any claim to rescind, reform, or otherwise modify any agreement relating to the collateral securing this Note, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Note shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: NBT Bank, National Association 52 South Broad Street Norwich, NY 13815.

**CONSIDERATION.** Borrower acknowledges that this Note/Credit Agreement and any Mortgage or Security Agreement securing it has been given for valuable consideration expressed therein and there are no counter claims, defenses or offsets, legal or equitable, to said Mortgage, Security Agreement, or to said Note secured thereby, and all provisions of said Note, Mortgage and/or Security Agreement are in full force and effect.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

ACKNOWLEDGMENT OF ARBITRATION: BORROWER UNDERSTANDS THAT THIS NOTE CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS NOTE, BORROWER UNDERSTANDS THAT BORROWER WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD BORROWER AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).

BORROWER:

PECK ELECTRIC CO.

By: _____
    Jeffrey Peck, President and CEO of Peck Electric Co.

# COMMERCIAL GUARANTY

| | | | |
|---|---|---|---|
| **Borrower:** | Peck Electric Co.<br>4050 Williston Rd Ste 511<br>South Burlington, VT  05403 | **Lender:** | NBT Bank, National Association<br>52 South Broad Street<br>Norwich, NY  13815 |
| **Guarantor:** | The Peck Company Holdings, Inc.<br>4050 Williston Rd Ste 511<br>South Burlington, VT  05403-6068 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated. However, "Indebtedness" shall not include any liabilities and obligations under any agreement regulated as a "swap" by the Commodity Exchange Act, as amended, unless otherwise agreed in writing.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A)  no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor  any information or documents acquired by Lender in the course of  its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns (including all schedules), prepared by a tax professional and satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower,

## COMMERCIAL GUARANTY
**(Continued)**

Loan No: ███████████     Page 2

Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Arbitration. Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions.

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

Interpretation. In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices. Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in

## COMMERCIAL GUARANTY
### (Continued)

Loan No: ███████████                                                                    Page 3

writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Peck Electric Co. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation The Peck Company Holdings, Inc., and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means NBT Bank, National Association, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's Promissory Notes and/or Credit Agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the Promissory Notes and/or Credit Agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**ACKNOWLEDGMENT OF ARBITRATION: GUARANTOR UNDERSTANDS THAT THIS GUARANTY CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS GUARANTY, GUARANTOR UNDERSTANDS THAT GUARANTOR WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD GUARANTOR AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).**

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 17, 2019.**

GUARANTOR:

THE PECK COMPANY HOLDINGS, INC.

By: _____
  Jeffrey Peck, President and CEO of The Peck
  Company Holdings, Inc.

**RECORD AND RETURN TO:**
NBT BANK, NATIONAL ASSOCIATION
150 Bank Street
Burlington, VT 05401
Attn: Leo Cruickshank

## LEASEHOLD MORTGAGE
(Case Street, Middlebury, VT)

KNOW ALL PERSONS BY THESE PRESENTS, that **PECK ELECTRIC CO.**, (the "Mortgagor"), having a principal business office at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 in consideration of **a loan in the amount of Seven Hundred Thirty-Two Thousand Nine Hundred Ninety-Seven and 00/100 Dollars ($732,997)** from **NBT BANK, NATIONAL ASSOCIATION**, a national banking association (the "Bank"), having an office at 150 Bank Street, Burlington, Vermont 05401 by these presents does freely GIVE, GRANT, SELL, CONVEY AND CONFIRM unto the Bank, its successors and assigns, its leasehold interests in real property with an address of 3614 Case Street, in the Town of Middlebury, County of Addison and State of Vermont, described in Schedule A attached hereto (the "Property").

TO HAVE AND TO HOLD the said granted Property, with all the privileges and appurtenances thereof, to the Bank, its successors and assigns, to their own use and behoof forever; and the Mortgagor for itself and its successors and assigns, does covenant with the Bank, its successors and assigns, that until the ensealing of these presents it is the sole owner of the Property, and has good right and title to convey the same in manner aforesaid, that they are FREE FROM EVERY ENCUMBRANCE except as aforesaid; and Mortgagor hereby engages to WARRANT AND DEFEND the same against all lawful claims whatever.

The condition of this Mortgage is such, that if Mortgagor and its successors shall well and truly pay or cause to be paid to Bank, its successors and assigns, the sum of Seven Hundred Thirty-Two Thousand Nine Hundred Ninety-Seven and 00/100 Dollars ($732,997) pursuant to the terms of a Promissory Note dated of even date hereof, and shall fully comply with all of the other terms and conditions of the Promissory Note and Business Loan Agreement, and shall at all times keep the improvements on the Property satisfactorily insured against loss by fire, for the benefit of the Bank herein, and also comply with the terms of the Lease on said Property, then this Mortgage to be null and void, otherwise to remain in full force and virtue. And in case of failure to keep such improvements so insured, or to pay required Property expenses, the legal holder of this Mortgage shall have the right to cause such improvements to be so insured in the owner's name and to pay any unpaid taxes and assessments, adding the proper expense thereof to the principal sum secured under this Mortgage. It is also expressly agreed that in case this Mortgage shall be foreclosed and a decree obtained therein, there shall be included in such decree a reasonable attorney's fee in addition to all sums and costs allowed in that behalf by law.

Additionally, as continuing security for the Promissory Note, Mortgagor hereby pledges, assigns and grants to the Bank a security interest in any of the Property constituting fixtures. This Mortgage shall be deemed to be a security agreement and financing statement pursuant to the terms of the Uniform Commercial Code of Vermont. Mortgagor authorizes Bank to record this Mortgage in lieu of a financing statement and to file such financing statements evidencing the security interest hereby granted with the Vermont Secretary of State and/or with the appropriate town clerks' offices and with such other governmental authorities as the Bank shall deem necessary.

Mortgagor hereby grants to Bank a power of sale, and accordingly, Bank shall have all of the rights and powers granted by Vermont law to the holder of a mortgage containing a power of sale, including the right, to the extent permitted by Vermont law, to foreclose Mortgagor's equity of redemption upon a default under this Mortgage, by exercising the power of sale, without first commencing a foreclosure action or obtaining a foreclosure decree, and to give such notices and to do all other acts, including the giving of a foreclosure deed upon completion of the foreclosure sale, as are permitted or required by 12 V.S.A. Sections 4961 et seq. to foreclose a mortgage without judicial action.

Page 1
Leasehold Mortgage

In addition, Mortgagor covenants and agrees as follows:

1.      Preservation and Maintenance of Property. Mortgagor shall not destroy, damage or impair the Property, allow the Property to deteriorate, depreciate or commit waste.

2.      Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Bank.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Mortgage, whether or not then due, with any excess paid to Mortgagor. In the event of a partial taking of the Property, unless Mortgagor and Bank otherwise agree in writing, the sums secured by this Mortgage shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Mortgagor.

If the Property is abandoned by Mortgagor, or if, after notice by Bank to Mortgagor that the condemner offers to make an award or settle a claim for damages, Mortgagor fails to respond to Bank within 30 days after the date the notice is given, Bank is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Mortgage, whether or not then due.

3.      Appointment of Receiver; Bank in Possession. Upon acceleration under Paragraph 9 hereof or abandonment of the Property, Bank, in person, by agent, or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to lease the Property or any part hereof, and to collect all rents of the Property including those past due. All rents collected by Bank or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees and then to the sums secured by this Mortgage. Bank and the receiver shall be liable to account only for those rents actually received.

4.      Compliance with Lease. Mortgagor's leasehold interest was created by that certain Lease Agreement dated May 30, 2018 between Mortgagor as Tenant and Ronald and Susan Fenn as Landlord. Mortgagor will pay all rents and will strictly observe and perform on a timely basis all other terms, covenants, and conditions of the Lease. Mortgagor will indemnify, defend, and hold Bank harmless against all losses, liabilities, actions, suits, proceedings, costs including reasonable attorneys' fees claims, demands, and damages whatsoever which may be incurred by reason of Mortgagor's failure to pay rents or strictly observe or perform under the Lease. It shall be a default under this Mortgage if Mortgagor defaults under the Lease and such default is not cured, or if any other event results in the termination or cancellation of Mortgagor's leasehold rights.

5.      Other Agreements Relating to the Lease. Mortgagor further agrees (1) not to surrender, terminate, or cancel the Lease, and (2) not to modify, change, supplement, alter, or amend the Lease, either orally or in writing, without Bank's prior written consent. Any attempt by Mortgagor to do any of the foregoing without Bank's prior written consent will be void and of no force and effect. Unless Mortgagor is in breach or default of any of the terms contained in this Mortgage, Bank will have no right to cancel, modify, change, supplement, alter or amend the leasehold interest. No estate in the Property, whether fee title to the leasehold premises, the leasehold estate, or any subleasehold estate, will merge without Bank express written consent; rather these estates will remain separate and distinct, even if there is a union of these estates in the landlord, Mortgagor, or a third party who purchases or otherwise acquires the estates. Mortgagor further agrees that if Mortgagor acquires all or a portion of the fee simple title, or any other leasehold or subleasehold title to the Property, that title will, at Bank's option, immediately become subject to the terms of this Mortgage, and Mortgagor will execute, deliver and record all documents necessary or appropriate to assure that such title is secured by this Mortgage.

6.      Notices Relating to the Lease. Mortgagor will promptly notify Bank in writing:

(a) if Mortgagor is in default in the performance or observance of any of the terms, covenants, or conditions which Mortgagor is to perform or observe under the Lease;

Page 2
Leasehold Mortgage

(b) if any event occurs which would constitute a default under the Lease;

(c) if any notice of default is given to Mortgagor by the landlord under the Lease;

(d) if, pursuant to the Lease, any proceeds received for the Property are deposited with someone other than Bank, whether received from any insurance on the Property or from the taking of any or all of the Property by eminent domain; and

(e) if any arbitration or appraisal proceedings are requested or instituted pursuant to the Lease.

Mortgagor agrees to provide Bank promptly with a copy of all written materials relating to any of the above and to provide Bank with such other information as Bank may reasonably request. Mortgagor agrees that promptly after the execution and delivery of this Mortgage, Mortgagor will notify the landlord under the Lease in writing of the execution and delivery of this Mortgage and of the name and address of Bank and will deliver a copy of this Mortgage to the landlord.

7.      Option to Cure Lease Default. Upon Bank's receipt of any written notice of Mortgagor's default under the Lease, Bank may, at Bank's option, cure such default, even though Mortgagor, or any party on behalf of Mortgagor, questions or denies the existence of such default or the nature of the default. Mortgagor expressly grants to Bank the absolute and immediate right to enter upon the Property to such extent and as often as Bank in its sole discretion deems necessary or desirable in order to prevent or cure any such default by Mortgagor.

8.      Mortgagor Not Released; Forbearance By Bank Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Bank to any successor in interest of Mortgagor shall not operate to release the liability of Mortgagor, and successors in interest. Bank shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Mortgagor and successors in interest. Any forbearance by Bank in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

9.      Acceleration; Remedies. Upon Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Bank at Bank's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand or notice and may invoke the power of sale and any other remedies provided herein including but not limited to reasonable attorney's fees.

10.     Successors and Assigns Bound. The covenants and agreements of this Mortgage shall bind and benefit the successors and assigns of Bank and Mortgagor.

11.     Application of Insurance Proceeds. If the Property shall be wholly or partially destroyed or damaged by fire or other casualty covered by insurance, the Mortgagor shall take all action which may be necessary to enable recovery to be made upon such policies of insurance or awards on account of such taking, condemnation or loss of title in order that the insurance proceeds or award may be collected and paid to Bank to offset amounts owed under the Promissory Note.

12.     IF ALL OR ANY PART OF THE PROPERTY, OR ANY INTEREST THEREIN, IS SOLD, TRANSFERRED OR ASSIGNED BY THE MORTGAGOR OR IF THIS MORTGAGE IS ASSUMED, ALL WITHOUT THE BANK'S PRIOR WRITTEN CONSENT, THE LEGAL HOLDER OF THIS MORTGAGE MAY AT ITS OPTION DECLARE ALL SUMS SECURED BY THIS MORTGAGE TO BE IMMEDIATELY DUE AND PAYABLE.

13.     THE MORTGAGOR AND, BY ITS ACCEPTANCE OF THIS MORTGAGE, THE BANK, HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF: (A) THIS MORTGAGE OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THE OBLIGATIONS; (B) THE VALIDITY, INTERPRETATION, COLLECTION, OR ENFORCEMENT THEREOF; OR (C) ANY OTHER CLAIM OR DISPUTE HOWEVER ARISING BETWEEN THE BANK AND THE MORTGAGOR.

Page 3
Leasehold Mortgage

IN WITNESS WHEREOF, the Mortgagor hereunto sets its hand and seal this 7th day of September, 2019.

IN THE PRESENCE OF:

_____
Witness

PECK ELECTRIC CO.

By: _____
Jeffrey Peck, Its President & Duly Authorized Agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington in said County this 17 day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged the foregoing instrument, by him sealed and subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _Kathleen M Boe_

Kathleen M. Boe, Esq.
Notary Public State of Vermont
Commission Expires: 1/31/2021
Commission #0005450

Print Name: _____
Notary Public, State of Vermont
Commission No: _____
My Commission Expires: 01/31/2021

Page 4
Leasehold Mortgage

Schedule A to Leasehold Mortgage

Being all and the same lands and premises leased to Peck Electric Co. pursuant to that Lease Agreement between Ronald Fenn and Susan Fenn, as Landlord, and Peck Electric Co., as Tenant, dated May 24, 2018, notice of which is recorded in Volume ___, Page ___ of the Town of Middlebury land records.

Together with an easement and right of way for ingress and egress, in common with "Lot 2", as the same is depicted on the Plan entitled: "Subdivision Plat of a portion of lands owned by Ronald S. Fenn" dated March 16, 2016, prepared by Kittredge Land Surveying, PLLC, and recorded on March 29, 2016 as Map Page 1457, Map Slide 295 of the Land Record and as further described in the Warranty Deed from Ronald S. Fenn to Ronald S. Fenn dated April 1, 2016 and recorded in Volume 282, Page 511 of the Land Records and in the Warranty Deed from Ronald S. Fenn to Thomas P. McQuade and Katherine R. McQuade dated July 29, 2016 and recorded in Volume 284, Page 726 of the Land Records.

The leased premises is a portion of the lands and premises conveyed to Ronald S. Fenn by Warranty Deed of Della W. Fenn dated October 20, 1987 and recorded in Volume 122, Page 428 of the Land Records

The Property is subject to the following:

1. Easement and right of way granted by Ronald S. Fenn to Green Mountain Power Corporation and Telephone Operating Company of Vermont dba "Consolidated Communications" by instrument dated June 26, 2019 and recorded in Volume 302, Page 35 of the Land Records.
2. Easement and right of way for ingress and egress, in common with "Lot 2", as the same is depicted on the Plan entitled: "Subdivision Plat of a portion of lands owned by Ronald S. Fenn" dated March 16, 2016, prepared by Kittredge Land Surveying, PLLC, and recorded on March 29, 2016 as Map Page 1457, Map Slide 295 of the Land Record and as further described in the Warranty Deed from Ronald S. Fenn to Ronald S. Fenn dated April 1, 2016 and recorded in Volume 282, Page 511 of the Land Records and in the Warranty Deed from Ronald S. Fenn to Thomas P. McQuade and Katherine R. McQuade dated July 29, 2016 and recorded in Volume 284, Page 726 of the Land Records.
3. Easement and right of way described in the Easement Deed of Ronald S. Fenn to Town of Middlebury dated July 12, 2012 and recorded in Volume 260, Page 477 of the Land Records.
4. Easement and right of way described in the Easement Deed of Della Fenn to Lindale Corporation dated August 19, 1986 and recorded in Volume 116, Page 422 of the Land Records.
5. Easements and rights of way described in the Warranty Deed from E.C. Severance and L.W. Forbes to Paul D. Dow dated March 31, 1913 and recorded in Volume 34, Page 772 of the Land Records.
6. Terms and conditions of that certain Lease Agreement by and between Ronald and Susan Fenn, as Landlord, and Peck Electric Co., as Tenant, dated May 30, 2018, notice of which is recorded in Volume __, Page __ of the Land Records.
7. Easements and rights of way depicted on the following plans of record:

{B2065893.1 15495-0008}

A.      "Boundary Plat, Lands of Lindale Mobile Home Park, LLC, State Route 116, Middlebury, Vermont" prepared by Donald L. Hamlin Consulting Engineers, Inc., dated June 4, 2003, recorded October 14, 2004 in Map Slide 626 of the Land Records.

B.      " A Map of a Parcel of Land Prepared for Ronald S. Fenn, Middlebury, Vermont" prepared by Kenneth G. Weston, dated November 15, 2006 and recorded January 18, 2007 in Map Slide 654 of the Land Records.

C.      "A Survey Map prepared for Ronald S. Fenn, Middlebury, Vermont, Showing a Subdivision of a 2-Acre Parcel with Existing Residence and Certain Improvements" prepared by Kenneth G. Weston, dated October 11, 2007 and recorded November 13, 2007 in Map Slide 662 of the Land Records.

D.      "Subdivision Plat of a portion of lands owned by Ronald S. Fenn" dated March 16, 2016, prepared by Kittredge Land Surveying, PLLC, and recorded on March 29, 2016 as Map Page 1457, Map Slide 295 of the Land Records.

8. Vermont Department of Environmental Conservation Wastewater System and Potable Water Supply Permit No. WW-9-1073-1 was issued to Ronald S. Fenn on October 29, 2015 and recorded in Volume 280, Page 346 of the Land Records.

9. Zoning Permit 2016-052 was issued in connection with the 2016 Subdivision on May 13, 2016 and recorded in Volume 283, Page 227 of the Land Records.

10. Terms and conditions of Certificate of Public Good NMP-16-0065, dated November 8, 2017, (the "CPG") issued  to Forefront Power, LLC, notice of which is recorded in Volume 293, Page 176 of the Land Records. The CPG was transferred to Peck Electric, Inc. by Application dated January 17, 2018.

11. Individual Wetland Permit No. 2016-637, DEC ID# RU17-0301 dated January 12, 2018, notice of which is recorded in Volume 294, Page 215 of the Land Records.

12. Stormwater Discharge Permit No. 7556-9020 dated March 28, 2016.

13. State Highway Access and Work Permit No. 40905 issued to Ronald S. Fenn, dated March 29, 2017 and recorded in Volume 294, Page 765 of the Land Records.

{B2065893.1 15495-0008}

# LANDOWNER'S NOTICE OF PERMIT REQUIREMENTS

Ronald Fenn and Susan Fenn (together, the "Landlord") hereby record this Landowner's Notice of Permit Requirements pursuant to Vermont's Environmental Protection Rules § 1-304(a)(2)(A).

WHEREAS, the Ronald S. Fenn acquired fee title to a certain parcel of land from Della W. Fenn pursuant to a Warranty Deed dated October 20, 1987, recorded in the Town of Middlebury land records (the "Land Records") in Volume 122, Page 428 (the "Property").

WHEREAS, pursuant to a Lease Agreement dated May 24, 2018, notice of which is recorded in Volume ___, Page ___ of the Land Records (the "Lease"), the Landlord agreed to lease a portion of the Property and to convey certain appurtenant easements, to Peck Electric Co., a Vermont corporation (the "Tenant"), for the installation, construction, operation, maintenance, repair, improvement, replacement and removal of a solar generating facility and uses incidental thereto (the "Generating Facility").

WHEREAS, the Generating Facility will not include the installation of a potable water supply or wastewater system.

WHEREAS, in light of its entry into the Lease with the Tenant, in order to comply with Vermont's water and wastewater permitting rules, the Landlord needs to record in the Land Records the Notice of Permit Requirements pursuant to Vermont's Environmental Protection Rules § 1-304(a)(2)(A).

NOW, THEREFORE, the Landlord hereby states as follows (all capitalized terms used herein and defined in the foregoing Whereas clauses):

**Notice of Permit Requirements.** In order to comply with applicable state Rules concerning potable water supplies and wastewater systems, a person shall not construct or erect any structure or building on the lot of land described in the Lease if the use or useful occupancy of that structure or building will require the installation of or connection to a potable water supply or wastewater system, without first complying with the applicable Rules and obtaining any required permit. Any person who owns this Property acknowledges that this lot may not be able to meet state standards for a potable water supply or wastewater system and therefore this lot may not be able to be improved.

{B2064760.1 15495-0008}

## LANDLORD ESTOPPEL CERTIFICATE

**Ronald Fenn and Susan Fenn** having an address at 237 Long Pond Road, Danville, New Hampshire 03819 (together, the "**Landlord**"), the owner of certain real property leased by **Peck Electric Co.**, a Vermont corporation with its principal place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 (the "**Tenant**") pursuant to the terms of a certain lease dated May 24, 2018 (the "**Lease**"), hereby makes the following certification to **NBT Bank, N.A.**, of 150 Bank Street, Burlington, Vermont 05401 (the "**Lender**") in connection with financing being provided to the Tenant.

1. A copy of the Lease is attached hereto as <u>Exhibit A.</u> The Lease has not been modified in any respect.

2. The Lease covers the following real property: A portion of the property of the Landlord located at 3546 Case Street (f/k/a 3614 Case Street), Middlebury, Vermont, which is a portion of the lands and premises conveyed to Ronald S. Fenn by Warranty Deed of Della W. Fenn dated October 20, 1987 and recorded in Book 122, Page 428 of the Middlebury land records.

3. The term of the Lease is for the period of May 24, 2018 to May 24, 2043.

4. The Tenant is not in default under the Lease, nor to Landlord's knowledge has any event occurred that, solely with the passage of time, would constitute a default under the Lease.

5. The current monthly rent payable is <u>$425.00</u> and said rent is payable on the first day of each month. No rent or other sums payable under the Lease have been paid in advance except for the monthly rent that became due for the current month.

6. To the best of our knowledge, the Landlord is in full compliance with all Landlord's obligations under the Lease and there are no disputes under the Lease.

7. To the best of our knowledge, Tenant is in full compliance with all Tenant's obligations under the Lease.

8. Landlord consents to the Mortgage by Tenant of its leasehold interest in the Lease to NBT Bank, N.A.

{B2063434.1 15495-0008}                                      1

Dated this _10_ day of September, 2019.

LANDLORD:

_____
Ronald Fenn

_____
Susan Fenn

STATE OF NEW HAMPSHIRE
COUNTY OF ROCKINGHAM

At _Danville, NH_, this _10_ day of September, 2019, personally appeared **Ronald Fenn** and he acknowledged this instrument, by him subscribed, to be his free act and deed.

Before me, _____
Notary Public

Printed Name: _____

My Commission Expires: _____

> Christine Tracy
> Notary Public, New Hampshire
> My Commission Expires May 17, 2022

STATE OF NEW HAMPSHIRE
COUNTY OF ROCKINGHAM

At _Danville NH_, this _10_ day of September, 2019, personally appeared **Susan Fenn** and she acknowledged this instrument, by her subscribed, to be her free act and deed.

Before me, _____
Notary Public

Printed Name: _____

My Commission Expires: _____

> Christine Tracy
> Notary Public, New Hampshire
> My Commission Expires May 17, 2022

{B2063434.1 15495-0008}                    2

Dated this /0th day of September, 2019.

**LANDLORD**

Ronald Fenn

Susan Fenn

{B2064760.1 15495-0008}

## **LEASE AGREEMENT**

This Lease Agreement (this "Lease") is made between Ronald Fenn and Susan Fenn ("Landlords") and Peck Electric Co. ("Tenant").

ARTICLE 1
Leased Area - Term of Lease - Use of Property

1.01.  <u>Lease.</u>

(a)  Landlords are the owner(s) of the real property located at or near 3614 Case Street, Middlebury, Vermont, described in Exhibit A (the "Property"). Landlords hereby lease a portion of the Property to Tenant, and Tenant hereby leases such portion of the Property from Landlords, together with a right to receive without interference from Landlords all solar energy received by such Property, together with the benefit of easements and rights of way for access and utilities (the "Easements"), and all other rights and privileges appurtenant to the Property, including those described in this Lease (the "Leased Area"), subject to easements, restrictions, covenants, agreements and other matters of record as of the date hereof.  TO HAVE AND TO HOLD the Leased Area and the Easements, together with all rights, privileges and appurtenances thereunto belonging and attaching, unto Tenant.

(b)  The Leased Area consists of approximately three to six acres of the Property as further described in Exhibits B and C.  The Easement is more particularly described in Exhibit B.

1.02 <u>Lease Term.</u>

This Lease shall commence on the date of execution ("Effective Date") and shall expire on the 25th anniversary of the Effective Date, provided that the Term may be extended, at Tenant's election, for up to two additional terms of five (5) years each. Each extension option shall be exercised, if at all, by Tenant's delivery to Landlords of a written notice of the extension not fewer than ninety (90) days prior to the expiration of the then current Term.

1.03  <u>Permitted Use/Project/Equipment.</u>

(a)  The Leased Area may be used for the construction, operation, maintenance, repair and replacement of solar generating facilities (the "Project") designed for the purpose of producing, storing and transmitting solar-generated energy, and for any other use accessory or related thereto, including the right to clear trees, bushes, rocks, crops, vegetation in order to keep the Leased Area clear and unobstructed, so long as any such clearing is consistent with the requirements of the environmental authorities responsible for the Property. No other use of the Leased Area is permitted.

(b)  The Project consists of a 700 +/- kW (DC) solar photovoltaic electric generating facility, including without limitation, solar panels, racks, conduit, inverters, transformers, meters, electrical and communication wires and cables, antennas, security devices, fences, gates, and related fixtures, ancillary equipment and other appurtenances, and related transmission lines, cables, fixtures, utilities and utility interconnections, structures, service roads and any and all related equipment ("Equipment") on the Leased Area.

{B1734303.1 15708-0001}

## RELEASE OF COLLATERAL ASSIGNMENT

The undersigned hereby certifies that the indebtedness secured by a certain Collateral Assignment of Solar Power and Services Agreement from Peck Electric Co. to Community Bank, N.A. dated May 3, 2018, and recorded in Volume 295, Page 862 of the Town of Middlebury land records, has been paid in full and satisfied, and hereby releases said Collateral Assignment.

Dated at South Burlington, Vermont, this _____ day of September, 2019.

**Community Bank, N.A.**

By: _____
Duly authorized agent

STATE OF VERMONT
COUNTY OF CHITTENDEN

At South Burlington in said County, this _____ day of September, 2019, personally appeared _____, duly authorized representative for Community Bank, N.A. and he/she acknowledged this instrument, by him/her subscribed, to be his/her free act and deed, and the free act and deed of Community Bank, N.A.

Before me,       _____
                 Notary Public

                 Printed name: _____
                 My Commission Expires: 1/31/21
                 Commission No.: _____

{B2063977.1 15495-0008}

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $732,997.00 | 09-17-2019 | 09-17-2026 | ▮▮▮▮▮ | 64 | ▮▮▮▮▮ | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:**   Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT 05403

**Lender:**   NBT Bank, National Association
52 South Broad Street
Norwich, NY 13815

THIS COMMERCIAL SECURITY AGREEMENT dated September 17, 2019, is made and executed between Peck Electric Co. ("Grantor") and NBT Bank, National Association ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

    All Inventory, Accounts, Equipment and General Intangibles

    Solar Electric Generating Equipment; including but not limited to the integrated assembly of photovoltaic panels, mounting assemblies, inverters, converters, metering, lighting fixtures, transformers, ballasts, disconnects, combiners, switches, wiring devices and wiring

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

    (A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

    (B) All products and produce of any of the property described in this Collateral section.

    (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

    (D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

    (E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Some or all of the Collateral may be located on the following described real estate:

    3614 Case St, Middlebury, VT 05753
    Tax Parcel #006070.001 (the record owners of the real property is Ronald Fenn and Susan Fenn, 3614 Case St, Middlebury, VT 05753).

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

    **Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

    **Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

    **No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

    **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

    **Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

    **Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Vermont, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

    **Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as

## COMMERCIAL SECURITY AGREEMENT
(Continued)

| | | **Page 2**

otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to

## COMMERCIAL SECURITY AGREEMENT
Loan No: ▮▮▮▮▮▮▮

**(Continued)**

Page 3

discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Vermont Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Page 4

as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Agreement or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** With respect to interest (as defined by federal law) this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of laws provisions. In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions. The loan transaction that is evidenced by the Note and this Agreement has been approved, made, and funded, and all necessary loan documents have been accepted by Lender in the State of New York.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Peck Electric Co. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Peck Electric Co..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ▉▉▉▉▉▉                                                                                          Page 5

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means NBT Bank, National Association, its successors and assigns.

**Note.** The word "Note" means the Note dated September 17, 2019 and executed by Peck Electric Co. in the principal amount of $732,997.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Owner.** The word "Owner" means Peck Electric Co.. The words "Owner" and "Borrower" are used interchangeably.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

ACKNOWLEDGMENT OF ARBITRATION: GRANTOR UNDERSTANDS THAT THIS AGREEMENT CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS AGREEMENT, GRANTOR UNDERSTANDS THAT GRANTOR WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD GRANTOR AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 17, 2019.

GRANTOR:

PECK ELECTRIC CO.

By: _____
    Jeffrey Peck, President and CEO of Peck Electric Co.

LaserPro, Ver. 18.2.0.027 Copr. Finastra USA Corporation 1997, 2019. All Rights Reserved. - VT/NY L:\CFI\WIN\CFILPL\E40.FC TR-217036 PR-282

**COLLATERAL ASSIGNMENT OF**
**SOLAR POWER & SERVICES AGREEMENT**
(Case Street, Middlebury, VT)

**THIS COLLATERAL ASSIGNMENT OF SOLAR POWER & SERVICES AGREEMENT** ("Assignment") is made as of this ⌐⌐ day of September, 2019, by **PECK ELECTRIC CO.**, a Vermont corporation with a place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 (hereinafter referred to as "Assignor"), to **NBT BANK, NATIONAL ASSOCIATION**, a national banking association having an office at 150 Bank Street, Burlington, Vermont 05401 (hereinafter referred to as "Bank").

RECITALS

A.  Bank agreed to make a term loan in the amount of Seven Hundred Thirty-Two Thousand Nine Hundred Ninety-Seven and 00/100 Dollars ($732,997.00) (the "Loan") to the Assignor.

B.  The Assignor has agreed to enter into this Assignment as additional security for the repayment of the Loan to the Bank evidenced by a Promissory Note payable to Bank in the original principal amount of the Loan dated of even date hereof (the "Note"), together with all other Obligations as defined and owed under the Loan Agreement.

C.  This Assignment covers a Solar Power & Services Agreement (General Conditions and Special Conditions and all Exhibits thereto) dated as of November 11, 2015 (the "SPSA") by and between SunEdison Origination1, LLC as Provider ("SunEdison") and Vermont State Colleges/Community College of Vermont as Purchaser. SunEdison then assigned its rights and obligations under the SPSA to Forefront Power, LLC. Forefront Power, LLC then assigned its rights and obligations under the SPSA to Encore Redevelopment, LLC by Assignment and Assumption Agreement dated November 14, 2017. Encore Redevelopment, LLC then assigned its rights and obligations under the SPSA to Assignor hereunder (Peck Electric Company) by a Solar Project Assignment and Assumption Agreement dated December 12, 2017.

D.  This Assignment secures all obligations, debts and liabilities, plus interest thereon, of Assignor to Bank, as well as all claims by Bank against Assignor, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Assignor may be liable individually or jointly with others, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**NOW THEREFORE** in consideration of Bank making the Loan and entering into the Loan Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Assignor, the Assignor covenants and agrees as follows:

1

1.      <u>Assignment</u>. The Assignor does hereby assign and set over unto Bank as security for the payment and performance of the Obligations, all amounts hereafter to become due and payable under the SPSA, subject to the provisions of the SPSA, together with the benefit of all covenants, agreements and provisions contained in the SPSA with full power and authority to demand, collect, sue for, recover, receive and give receipts for the said amounts and to enforce payment thereof in the name of the Assignor, its successors and assigns.

Nothing herein contained shall be deemed to have the effect of making Bank responsible for the collection of amounts to become due and payable under the SPSA, or for the performance of any covenants, terms and conditions by the Assignor contained or to be contained in the SPSA. This Assignment is intended to grant Bank rights as a third party beneficiary in the SPSA and Assignor will obtain whatever consents, certifications and acknowledgements from the third parties to the SPSA as Bank reasonably requests.

Bank shall be liable to account for only such amounts as it shall actually receive by virtue of this Assignment. Such amounts when so received by Bank shall be applied on account of the monies from time to time due under the Note and Loan Agreement (and any renewals or extensions thereof) in the manner and in the order therein provided for the application of payments received.

The said amounts to become due and payable under the SPSA and other benefits hereby assigned to Bank are being taken as collateral security only for the due payment and performance of the Obligations, either wholly or in part, and none of the rights or remedies of Bank under the Loan Agreement shall be delayed or in any way prejudiced by these presents.

2.      <u>Warranties of Assignor</u>. The Assignor represents and warrants to Bank that the SPSA has not been assigned to any other third party, that the SPSA is in full force and effect, and that neither the Assignor nor the Purchaser is in default of the SPSA.

3.      <u>Terms and Conditions</u>.

(a)      Notwithstanding any variation of the terms of the Loan Agreement or any agreement or arrangement with the Assignor or any extension of time for payment or any release of part or parts of the Collateral (as defined in the Loan Agreement), the amounts hereafter to become due and payable under the SPSA hereunder and other benefits hereby assigned shall continue as collateral security until the whole of the Obligations shall be fully paid and satisfied.

(b)      The Assignor covenants and agrees from time to time and at all times hereafter, at the request of Bank to execute and deliver at the expense of the Assignor such further assurances to assign to Bank all amounts hereafter to become payable hereunder, as Bank shall reasonably require.

(c)      Provided that no Event of Default (as defined in the Loan Agreement) has occurred and is continuing under the Loan Agreement or under any other of the Loan Documents (as defined in the Loan Agreement), the Assignor shall be entitled to receive all amounts payable to it under the SPSA, free from any claim by Bank, and shall not be liable to account therefor to

2

Bank, but immediately upon an Event of Default thereunder Bank upon written notice to the Assignor shall be entitled to all such monies falling due under the SPSA subsequent to the date of service of such notice, for so long as such Event of Default continues unremedied.

(d)    Notwithstanding this Assignment, the Assignor shall be solely responsible for performing and complying with all the covenants and other obligations on its part under the terms of the SPSA and shall perform all such covenants and obligations contained in the SPSA so that the rights and remedies of Bank shall not be in any way delayed or prejudiced.

(e)    Bank may waive any Event of Default under the Loan Documents and shall not be bound to serve any notice as hereinbefore set forth upon the happening of any such Event of Default, but any such waiver shall not extend to any subsequent Event of Default.

4.    <u>Successors and Assigns</u>. This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

5.    <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws in force in the State of Vermont and the laws of the United States applicable therein.

IN WITNESS WHEREOF the Assignor has executed this Assignment as of the date first above written.

**PECK ELECTRIC CO.**

_____    By: _____
Witness                                    Jeffrey Peck, President and
                                           duly authorized agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington, this 17th day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged this instrument, by him subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _____
                                           Print Name: _____
Kathleen M. Boe, Esq.                      Notary Public, State of Vermont
Notary Public State of Vermont             Commission No: _____
Commission Expires: 1/31/2021              My Commission Expires: 01/31/2021
Commission #0005450

3

## COLLATERAL ASSIGNMENT OF PROJECT DOCUMENTS
(Case Street, Middlebury, VT)

FOR VALUE RECEIVED, **PECK ELECTRIC CO.**, a Vermont corporation with a principal place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 ("Assignor"), hereby assigns, transfers and sets over to **NBT BANK, NATIONAL ASSOCIATION,** a national banking association having an office at 150 Bank Street, Burlington, Vermont 05401 ("Bank"), all of Assignor's, rights, title and interest in and to: a Solar Power & Services Agreement, all operation and maintenance services agreements and all related maintenance records, all interconnection agreements including a Generation Interconnection Agreement with Green Mountain Power Corporation dated as of December 5, 2017, a Certificate of Public Good dated November 8, 2017, and all manufacturer warranties and guarantees entered into by the Assignor or its predecessors in connection with the solar project it operates off Case Street in Middlebury, Vermont (collectively, the "Project Documents" and the rights set forth are collectively referred to herein as the "Assigned Rights").

Terms not defined herein shall have the meanings ascribed to them in the Business Loan Agreement (the "Loan Agreement") between the Assignor and Bank of even date herewith.

1.    Assignment as Security.    This Assignment is made to secure:

(a)    payment of the Promissory Note from Assignor to Bank, dated of even date in the principal amount of Seven Hundred Thirty-Two Thousand Nine Hundred Ninety-Seven and 00/100 Dollars ($732,997.00) (the "Note");

(b)    payment, performance and discharge of all Obligations (as defined in the Loan Agreement) and agreements of Assignor under this Assignment, the Note, the Loan Agreement and all other agreements, assignments, documents or instruments executed pursuant thereto (hereinafter collectively referred to as the "Loan Documents"); and

(c)    all obligations, debts and liabilities, plus interest thereon, of Assignor to Bank, as well as all claims by Bank against Assignor, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Assignor may be liable individually or jointly with others, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

2.    Representations and Warranties of Assignors. Assignor hereby represents and warrants:

(a)    that the Assignor has obtained all rights under the Project Documents from SunEdison and/or Forefront Power, LLC and/or Encore Redevelopment, LLC;

(b)    that the Assignor has full right, power and authority to execute this

-1-

Assignment; and

(c)     that the Assignor has not assigned, transferred, pledged or otherwise encumbered any interest in the Project Documents or the Assigned Rights described herein.

3.     Covenants of Assignor. Assignor agrees:

(a)     to observe and perform all obligations imposed upon the Assignor under the Project Documents;

(b)     not to execute any other assignment of Assignor's interest in the Assigned Rights or Project Documents without Bank's consent;

(c)     to provide proper notice of this Assignment to the other parties to the Project Documents with evidence of such notice provided Bank within ten (10) business days of the date of this Assignment, and  to execute and deliver to Bank such further assurances and assignments of the Assigned Rights as Bank shall from time to time reasonably require to effect the provisions of this Assignment.

4.     Terms and Conditions. This Assignment is made on the following terms and conditions:

(a)     until an Event of Default by Assignor in its obligations under the Loan Documents, Assignor shall have all of the rights and privileges incident to holding of the Assigned Rights, and retain use of and enjoyment of the same;

(b)     upon or at any time after an Event of Default after notice to the Assignor, as described in the Loan Documents, Bank may, at its option, without further notice or proceedings and without regard to the adequacy of the security, either in person or by agent, or by receiver appointed by a court, take, have, use and enjoy the rights and privileges of the holder of the Assigned Rights for such period of time as Bank may deem proper;

(c)     upon payment in full of the principal, interest, and all other indebtedness evidenced by or secured by this Assignment and the Loan Documents, this Assignment shall be void and be of no further effect, provided however, that the affidavit, certificate, letter, or statement of Bank or any officer, agent, or attorney of Bank showing any part of the principal, interest, or other indebtedness remains unpaid shall constitute conclusive evidence of the validity, effectiveness, and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon;

(d)     Bank may take or release other security for payment of the secured principal, interest, or other indebtedness, may release any party primarily or secondarily liable, and may apply any other security held by it to the satisfaction of the secured principal, interest, or other indebtedness without prejudice to any rights under this Assignment;

(e)     nothing contained in this Assignment and no act done or omitted by Bank

-2-

pursuant to its terms shall be deemed a waiver by Bank of any rights or remedies under this Assignment, or the Loan Documents. The right of Bank to collect the secured principal, interest, and other Obligations, and to enforce any other security may be exercised by Bank prior to, simultaneously with, or subsequent to any action taken under this Assignment;

(f)    this Assignment, together with the agreements and warranties contained in it, shall inure to the benefit of Bank and any subsequent holder of the Loan Documents of even date, and shall be binding upon Assignor and its successors and assigns; and

(g)    to the extent the Assigned Rights are or are deemed to be collateral subject to the Uniform Commercial Code (the "Code"), this Assignment shall be deemed to create in favor of the Bank a security interest therein, and, in addition to any other right or remedy expressly provided for above, in the event of any default by the Assignor under this Assignment, the Bank shall have all of the rights and remedies of a secured party upon default under the Code.

Dated at Burlington, Vermont, this 17 day of September, 2019.

_____
Witness

PECK ELECTRIC CO.

By: _____
Jeffrey Peck, President and
Duly Authorized Agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington, this 17th day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged this instrument, by him subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _____

Kathleen M. Boe, Esq.
Notary Public State of Vermont
Commission Expires: 1/31/2021
Commission #0005450

Print Name: _____
Notary Public, State of Vermont
Commission No: _____
My Commission Expires:  01/31/2021

-3-

# AGREEMENT TO PROVIDE INSURANCE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $732,997.00 | 09-17-2019 | 09-17-2026 | ▮ | 64 | ▮ | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:**  Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT  05403

**Lender:**  NBT Bank, National Association
52 South Broad Street
Norwich, NY  13815

**INSURANCE REQUIREMENTS.**  Grantor, Peck Electric Co. ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Grantor by Lender.  These requirements are set forth in the security documents for the loan.  The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

Collateral:  **All Inventory and Equipment.**
**Type:**  All risks, including fire, theft and liability.
**Amount:**  Full Insurable Value.
**Basis:**  Replacement value.
**Endorsements:**  Lender's Loss Payable/Mortgagee (NBT Bank, NA, ISAOA/ATIMA); and further stipulating that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
**Latest Delivery Date:**  By the loan closing date.

Collateral:  **Solar Electric Generating Equipment; including but not limited to the integrated assembly of photovoltaic panels, mounting assemblies, inverters, converters, metering, lighting fixtures, transformers, ballasts, disconnects, combiners, switches, wiring devices and wiring, located at 3614 Case Street, Middlebury, VT 05753.**
**Type:**  All risks, including fire, theft and liability.
**Amount:**  Full Insurable Value.
**Basis:**  Replacement value.
**Endorsements:**  Lender's Loss Payable/Mortgagee (NBT Bank, NA, ISAOA/ATIMA); and further stipulating that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
**Latest Delivery Date:**  By the loan closing date.

**INSURANCE COMPANY.**  Grantor may obtain insurance from any insurance company Grantor may choose that is reasonably acceptable to Lender.  Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**INSURANCE MAILING ADDRESS.**  All documents and other materials relating to insurance for this loan should be mailed, delivered or directed to the following address:

NBT Bank, National Association
LDCC
PO Box 405
Norwich, NY  13815

**FAILURE TO PROVIDE INSURANCE.**  Grantor agrees to deliver to Lender, on the latest delivery date stated above, proof of the required insurance as provided above, with an effective date of September 17, 2019, or earlier.  Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may do so at Grantor's expense as provided in the applicable security document.  The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document.  GRANTOR ACKNOWLEDGES THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED.  IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.**  For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED SEPTEMBER 17, 2019.**

GRANTOR:

PECK ELECTRIC CO.

By: _____
Jeffrey Peck, President and CEO of Peck Electric Co.

---

FOR LENDER USE ONLY
**INSURANCE VERIFICATION**

DATE: _____

AGENT'S NAME: _____

AGENCY: _____

ADDRESS: _____

INSURANCE COMPANY: _____

POLICY NUMBER: _____

EFFECTIVE DATES: _____

PHONE _____

COMMENTS: _____

# DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $732,997.00 | 09-17-2019 | 09-17-2026 | ▮▮▮▮ | 64 | ▮▮▮▮ | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT  05403

**Lender:**  NBT Bank, National Association
52 South Broad Street
Norwich, NY  13815

**LOAN TYPE.**  This is a Fixed Rate (4.250%) Nondisclosable Loan to a Corporation for $732,997.00 due on September 17, 2026.

**PRIMARY PURPOSE OF LOAN.**  The primary purpose of this loan is for:

☐ Personal, Family or Household Purposes or Personal Investment.

☐ Finance Purchase, Construction or Improvement of Seasonal or Second Home.

☒ Finance Income-Producing Business or Activity.

**DISBURSEMENT INSTRUCTIONS.**  Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied.  Please disburse the loan proceeds of $732,997.00 as follows:

| | | |
|---|---|---|
| Amount paid to others on Borrower's behalf: | | $732,997.00 |
| $732,997.00 to Community Bank | | |
| | | |
| Note Principal: | | $732,997.00 |

**CHARGES PAID IN CASH.**  Borrower has paid or will pay in cash as agreed the following charges:

| | |
|---|---|
| Prepaid Finance Charges Paid in Cash: | $0.00 |
| Other Charges Paid in Cash: | $275.02 |
| $200.00  Commitment Fee (FAS91) | |
| $75.02  UCC Filing Fee | |
| | |
| Total Charges Paid in Cash: | $275.02 |

**AUTOMATIC PAYMENTS.**  Borrower hereby authorizes Lender automatically to deduct from Borrower's Demand Deposit - Checking account, numbered ▮▮▮▮ the amount of any loan payment.  If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment.  At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**FINAL LOAN PAYMENT.**  The Automatic Payment will not be processed for the final loan payment. Contact Lender for the final amount due.

**FINANCIAL CONDITION.**  BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER.  THIS AUTHORIZATION IS DATED SEPTEMBER 17, 2019.

**BORROWER:**

PECK ELECTRIC CO.

By: _____
    Jeffrey Peck, President and CEO of Peck Electric Co.

LaserPro, Ver. 18.2.0.027  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - VT/NY  L:\CFI\WIN\CFI\LPL\I20.FC  TR-217036  PR-282

**NBT Bank, N.A.**
LOAN CLOSING WORKSHEET

Borrower:    Peck Electric Co.

Mailing Address:    4050 Williston Road, Ste 511     Date:    September 17, 2019
                    South Burlington, VT 05403

**CREDITS:**

| | | |
|---|---|---|
| NBT Bank, N.A. Loan Proceeds | $ | 1,960,328.48 |
| NBT Bank, N.A. Loan Proceeds | $ | 187,683.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 281,391.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 253,321.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 732,997.00 |
| NBT Bank, N.A. Loan Proceeds | $ | 486,137.00 |
| NBT Bank, N.A. Loan Proceeds | $ | - |
| Other | $ | - |
| Other | $ | - |
| Other | $ | - |
| **TOTAL CREDITS** | $ | 3,901,857.48 |

**DEBITS:**

| | | | |
|---|---|---|---|
| Attorney Fees | Carroll, Boe & Pell, PC | $ | 10,286.35 |
| Attorney Fees | Dinse, P.C. | POC | |
| Recording Fees | | $ | 405.00 |
| Flood Determination Fee | | $ | 15.00 |
| Loan Origination Fee | | $ | 1,200.00 |
| Tax Monitoring Fee | | $ | 99.00 |
| Title Insurance | | $ | 3,012.50 |
| Appraisal Fee | | $ | 300.00 |
| UCC Filing Fees | | $ | 314.35 |
| Community Bank NA Payoff | | $ | 1,993,711.92 |
| Community Bank NA Payoff | | $ | 475,889.63 |
| Community Bank NA Payoff | | $ | 731,766.67 |
| Community Bank NA Payoff | | $ | 246,838.34 |
| Community Bank NA Payoff | | $ | 286,568.26 |
| Community Bank NA Payoff | | $ | 67,869.37 |
| Community Bank NA Payoff | | $ | 83,581.09 |
| Other | | $ | - |
| Other | | $ | - |
| **TOTAL DEBITS** | | $ | 3,901,857.48 |

Amount due from Borrower                                        $0.00

ACKNOWLEDGED:

_____    9/17/19
Borrower                   Date

# EXHIBIT C

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $486,137.00 | 09-17-2019 | 09-17-2026 | [redacted] | 64 | [redacted] | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT 05403

**Lender:** NBT Bank, National Association
52 South Broad Street
Norwich, NY 13815

**Principal Amount: $486,137.00** **Date of Note: September 17, 2019**

LOAN PURPOSE. This loan is for business purposes only. It is not for personal, family or household purposes, or personal investments.

PROMISE TO PAY. **Peck Electric Co. ("Borrower") promises to pay to NBT Bank, National Association ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Hundred Eighty-six Thousand One Hundred Thirty-seven & 00/100 Dollars ($486,137.00), together with interest on the unpaid principal balance from September 17, 2019, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 4.200% per annum based on a year of 360 days, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.**

PAYMENT. **Borrower will pay this loan in 83 regular payments of $5,597.79 each and one irregular last payment estimated at $113,493.32. Borrower's first payment is due October 17, 2019, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on September 17, 2026, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note (if applicable); then to interest; then to principal; then to any insurance premiums (if applicable); then to any fees, and then to any late fees. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

INTEREST CALCULATION METHOD. **Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.**

PREPAYMENT. Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: NBT Bank, National Association; 52 South Broad Street; Norwich, NY 13815.**

LATE CHARGE. If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.**

INTEREST AFTER DEFAULT. Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by 4.000 percentage points. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:

Payment Default. Borrower fails to make any payment when due under this Note.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency. The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

Change In Ownership. Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

Insecurity. Lender in good faith believes itself insecure.

Cure Provisions. If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**ADDITIONAL DEFAULT - CHANGE IN OWNERSHIP.** Borrower and where applicable, Guarantor, agree that until payment in full of the Liabilities to Lender and so long as they remain indebted to Lender hereunder, Borrower and/or Guarantor shall not, without prior written consent of Lender enter into any merger, consolidation, recapitalization, stock split, reorganization or liquidation, or to suffer the transfer of any stock or security therein, or transfer of any general partnership or other interest in Borrower and/or Guarantor.

LENDER'S RIGHTS. Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES. Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

JURY WAIVER. **Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.**

GOVERNING LAW. **With respect to interest (as defined by federal law) this Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of laws provisions. In all other respects, this Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions. The loan transaction that is evidenced by this Note has been approved, made, and funded, and all necessary loan documents have been accepted by Lender in the State of New York.**

# PROMISSORY NOTE
## (Continued)

Loan No: ▮▮▮▮▮▮▮▮▮▮▮   **Page 2**

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**ARBITRATION.** Borrower and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Note or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any collateral securing this Note shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any collateral securing this Note, including any claim to rescind, reform, or otherwise modify any agreement relating to the collateral securing this Note, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Note shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: NBT Bank, National Association 52 South Broad Street Norwich, NY 13815.

**CONSIDERATION.** Borrower acknowledges that this Note/Credit Agreement and any Mortgage or Security Agreement securing it has been given for valuable consideration expressed therein and there are no counter claims, defenses or offsets, legal or equitable, to said Mortgage, Security Agreement, or to said Note secured thereby, and all provisions of said Note, Mortgage and/or Security Agreement are in full force and effect.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

ACKNOWLEDGMENT OF ARBITRATION: BORROWER UNDERSTANDS THAT THIS NOTE CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS NOTE, BORROWER UNDERSTANDS THAT BORROWER WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD BORROWER AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).

BORROWER:

PECK ELECTRIC CO.

By: _____
    Jeffrey Peck, President and CEO of Peck Electric Co.

# COMMERCIAL GUARANTY

| | | | |
|---|---|---|---|
| **Borrower:** | Peck Electric Co.<br>4050 Williston Rd Ste 511<br>South Burlington, VT 05403 | **Lender:** | NBT Bank, National Association<br>52 South Broad Street<br>Norwich, NY 13815 |
| **Guarantor:** | The Peck Company Holdings, Inc.<br>4050 Williston Rd Ste 511<br>South Burlington, VT 05403-6068 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated. However, "Indebtedness" shall not include any liabilities and obligations under any agreement regulated as a "swap" by the Commodity Exchange Act, as amended, unless otherwise agreed in writing.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C)  to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D)  to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E)  to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F)  to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G)  to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H)  to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that  (A)  no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B)  this Guaranty is executed at Borrower's request and not at the request of Lender; (C)  Guarantor has full power, right and authority to enter into this Guaranty; (D)  the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E)  Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F)  upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G)  no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H)  no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I)  Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and  (J)  Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor  any information or documents acquired by Lender in the course of  its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns (including all schedules), prepared by a tax professional and satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender  (A)  to continue lending money or to extend other credit to Borrower; (B)  to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower,

Loan No:████████████

Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration. Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.**

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions.**

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

Interpretation. In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices. Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in

| | **COMMERCIAL GUARANTY** | |
|---|---|---|
| Loan No: ███████ | **(Continued)** | **Page 3** |

writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Peck Electric Co. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation The Peck Company Holdings, Inc., and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means NBT Bank, National Association, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's Promissory Notes and/or Credit Agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the Promissory Notes and/or Credit Agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**ACKNOWLEDGMENT OF ARBITRATION: GUARANTOR UNDERSTANDS THAT THIS GUARANTY CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS GUARANTY, GUARANTOR UNDERSTANDS THAT GUARANTOR WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD GUARANTOR AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).**

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 17, 2019.**

**GUARANTOR:**

**THE PECK COMPANY HOLDINGS, INC.**

By: _____
Jeffrey Peck, President and CEO of The Peck Company Holdings, Inc.



Doc ID: 000422810007 Type: LAN
BK **144**  PG**412-418**

**RECORD AND RETURN TO:**
NBT BANK, NATIONAL ASSOCIATION
150 Bank Street
Burlington, VT 05401
Attn: Leo Cruickshank

## CORRECTIVE
## <u>LEASEHOLD MORTGAGE</u>
(Newfane, VT)

KNOW ALL PERSONS BY THESE PRESENTS, that **PECK ELECTRIC CO.**, (the "<u>Mortgagor</u>"), having a principal business office at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 in consideration of a loan in the amount of **Four Hundred Eighty-Six Thousand One Hundred Thirty-Seven and 00/100 Dollars ($486,137)** from **NBT BANK, NATIONAL ASSOCIATION**, a national banking association (the "<u>Bank</u>"), having an office at 150 Bank Street, Burlington, Vermont 05401 by these presents does freely GIVE, GRANT, SELL, CONVEY AND CONFIRM unto the Bank, its successors and assigns, its leasehold interests in real property with an address of 14 School Street, in the Town of Newfane, County of Windham and State of Vermont, described in Schedule A and Schedule A-1 attached hereto (the "<u>Property</u>").

THIS IS A CORRECTIVE LEASEHOLD MORTGAGE, THE PURPOSE OF WHICH IS TO CORRECT THE SCHEDULE A PROPERTY DESCRIPTION ATTACHED TO THE LEASEHOLD MORTGAGE DATED DECEMBER 19, 2019 AND RECORDED IN BOOK ____, PAGE ____ OF THE NEWFANE LAND RECORDS. THE CORRECT SCHEDULE IS ATTACHED HERETO, AND DESCRIBES A PORTION OF THE WHOLE PROPERTY DESCRIBED IN THE LEASEHOLD MORTGAGE DATED DECEMBER 19, 2019.

TO HAVE AND TO HOLD the said granted Property, with all the privileges and appurtenances thereof, to the Bank, its successors and assigns, to their own use and behoof forever; and the Mortgagor for itself and its successors and assigns, does covenant with the Bank, its successors and assigns, that until the ensealing of these presents it is the sole owner of the Property, and has good right and title to convey the same in manner aforesaid, that they are FREE FROM EVERY ENCUMBRANCE except as aforesaid; and Mortgagor hereby engages to WARRANT AND DEFEND the same against all lawful claims whatever.

The condition of this Mortgage is such, that if Mortgagor and its successors shall well and truly pay or cause to be paid to Bank, its successors and assigns, the sum of Four Hundred Eighty-Six Thousand One Hundred Thirty-Seven and 00/100 Dollars ($486,137) pursuant to the terms of a Promissory Note dated September 17, 2019, and shall fully comply with all of the other terms and conditions of the Promissory Note and Business Loan Agreement, and shall at all times keep the improvements on the Property satisfactorily insured against loss by fire, for the benefit of the Bank herein, and also comply with the terms of the Lease on said Property, then this Mortgage to be null and void, otherwise to remain in full force and virtue. And in case of failure to keep such improvements so insured, or to pay required Property expenses, the legal holder of this Mortgage shall have the right to cause such improvements to be so insured in the owner's name and to pay any unpaid taxes and assessments, adding the proper expense thereof to the principal sum secured under this Mortgage. It is also expressly agreed that in case this Mortgage shall be foreclosed and a decree obtained therein, there shall be included in such decree a reasonable attorney's fee in addition to all sums and costs allowed in that behalf by law.

Additionally, as continuing security for the Promissory Note, Mortgagor hereby pledges, assigns and grants to the Bank a security interest in any of the Property constituting fixtures. This Mortgage shall be deemed to be a security agreement and financing statement pursuant to the terms of the Uniform Commercial Code of Vermont. Mortgagor authorizes Bank to record this Mortgage in lieu of a financing statement and to file such financing statements evidencing the security interest hereby granted with the Vermont Secretary of State and/or with the appropriate town clerks' offices and with such other governmental authorities as the Bank shall deem necessary.

Mortgagor hereby grants to Bank a power of sale, and accordingly, Bank shall have all of the rights and powers granted by Vermont law to the holder of a mortgage containing a power of sale, including the right, to the extent permitted by Vermont law, to foreclose Mortgagor's equity of redemption upon a default under this Mortgage, by exercising the power of sale, without first commencing a foreclosure action or obtaining a foreclosure decree, and to give such notices and to do all other acts, including the giving of a foreclosure deed upon completion of the foreclosure sale, as are permitted or required by 12 V.S.A. Sections 4961 et seq. to foreclose a mortgage without judicial action.

In addition, Mortgagor covenants and agrees as follows:

1. <u>Preservation and Maintenance of Property</u>. Mortgagor shall not destroy, damage or impair the Property, allow the Property to deteriorate, depreciate or commit waste.

2. <u>Condemnation</u>. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Bank.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Mortgage, whether or not then due, with any excess paid to Mortgagor. In the event of a partial taking of the Property, unless Mortgagor and Bank otherwise agree in writing, the sums secured by this Mortgage shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Mortgagor.

If the Property is abandoned by Mortgagor, or if, after notice by Bank to Mortgagor that the condemner offers to make an award or settle a claim for damages, Mortgagor fails to respond to Bank within 30 days after the date the notice is given, Bank is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Mortgage, whether or not then due.

3. <u>Appointment of Receiver; Bank in Possession</u>. Upon acceleration under Paragraph 9 hereof or abandonment of the Property, Bank, in person, by agent, or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to lease the Property or any part hereof, and to collect all rents of the Property including those past due. All rents collected by Bank or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees and then to the sums secured by this Mortgage. Bank and the receiver shall be liable to account only for those rents actually received.

4. <u>Compliance with Lease</u>. Mortgagor's leasehold interest was created by that certain Lease Agreement dated December 10, 2019 between Mortgagor as Tenant or Project Company and **West River Modified Union Education District** as Landlord or Owner. Mortgagor will pay all rents and will strictly observe and perform on a timely basis all other terms, covenants, and conditions of the Lease. Mortgagor will indemnify, defend, and hold Bank harmless against all losses, liabilities, actions, suits, proceedings, costs including reasonable attorneys' fees claims, demands, and damages whatsoever which may be incurred by reason of Mortgagor's failure to pay rents or strictly observe or perform under the Lease. It shall be a default under this Mortgage if Mortgagor defaults under the Lease and such default is not cured, or if any other event results in the termination or cancellation of Mortgagor's leasehold rights.

5. <u>Other Agreements Relating to the Lease</u>. Mortgagor further agrees (1) not to surrender, terminate, or cancel the Lease, and (2) not to modify, change, supplement, alter, or amend the Lease, either orally or in writing, without Bank's prior written consent. Any attempt by Mortgagor to do any of the foregoing without Bank's prior written consent will be void and of no force and effect. Unless Mortgagor is in breach or default of any of the terms contained in this Mortgage, Bank will have no right to cancel, modify, change, supplement, alter or amend the leasehold interest. No estate in the Property, whether fee title to the leasehold premises, the leasehold estate, or any subleasehold estate, will merge without Bank express written consent; rather these estates will remain separate and distinct, even if there is a union of these estates in the landlord, Mortgagor, or a third party who purchases or

otherwise acquires the estates. Mortgagor further agrees that if Mortgagor acquires all or a portion of the fee simple title, or any other leasehold or subleasehold title to the Property, that title will, at Bank's option, immediately become subject to the terms of this Mortgage, and Mortgagor will execute, deliver and record all documents necessary or appropriate to assure that such title is secured by this Mortgage.

6. <u>Notices Relating to the Lease</u>. Mortgagor will promptly notify Bank in writing:

(a) if Mortgagor is in default in the performance or observance of any of the terms, covenants, or conditions which Mortgagor is to perform or observe under the Lease;

(b) if any event occurs which would constitute a default under the Lease;

(c) if any notice of default is given to Mortgagor by the landlord under the Lease;

(d) if, pursuant to the Lease, any proceeds received for the Property are deposited with someone other than Bank, whether received from any insurance on the Property or from the taking of any or all of the Property by eminent domain; and

(e) if any arbitration or appraisal proceedings are requested or instituted pursuant to the Lease.

Mortgagor agrees to provide Bank promptly with a copy of all written materials relating to any of the above and to provide Bank with such other information as Bank may reasonably request. Mortgagor agrees that promptly after the execution and delivery of this Mortgage, Mortgagor will notify the landlord under the Lease in writing of the execution and delivery of this Mortgage and of the name and address of Bank and will deliver a copy of this Mortgage to the landlord.

7. <u>Option to Cure Lease Default</u>. Upon Bank's receipt of any written notice of Mortgagor's default under the Lease, Bank may, at Bank's option, cure such default, even though Mortgagor, or any party on behalf of Mortgagor, questions or denies the existence of such default or the nature of the default. Mortgagor expressly grants to Bank the absolute and immediate right to enter upon the Property to such extent and as often as Bank in its sole discretion deems necessary or desirable in order to prevent or cure any such default by Mortgagor.

8. <u>Mortgagor Not Released; Forbearance By Bank Not a Waiver</u>. Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Bank to any successor in interest of Mortgagor shall not operate to release the liability of Mortgagor, and successors in interest. Bank shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Mortgagor and successors in interest. Any forbearance by Bank in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

9. <u>Acceleration; Remedies</u>. Upon Mortgagor's breach of any covenant or agreement of Mortgagor in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Bank at Bank's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand or notice and may invoke the power of sale and any other remedies provided herein including but not limited to reasonable attorney's fees.

10. <u>Successors and Assigns Bound</u>. The covenants and agreements of this Mortgage shall bind and benefit the successors and assigns of Bank and Mortgagor.

11. <u>Application of Insurance Proceeds</u>. If the Property shall be wholly or partially destroyed or damaged by fire or other casualty covered by insurance, the Mortgagor shall take all action which may be necessary to enable recovery to be made upon such policies of insurance or awards on account of such taking, condemnation or loss of title in order that the insurance proceeds or award may be collected and paid to Bank to offset amounts owed under the Promissory Note.

12. IF ALL OR ANY PART OF THE PROPERTY, OR ANY INTEREST THEREIN, IS SOLD, TRANSFERRED OR ASSIGNED BY THE MORTGAGOR OR IF THIS MORTGAGE IS ASSUMED, ALL WITHOUT THE BANK'S PRIOR WRITTEN CONSENT, THE LEGAL HOLDER OF THIS MORTGAGE

MAY AT ITS OPTION DECLARE ALL SUMS SECURED BY THIS MORTGAGE TO BE IMMEDIATELY DUE AND PAYABLE.

13.     THE MORTGAGOR AND, BY ITS ACCEPTANCE OF THIS MORTGAGE, THE BANK, HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF:  (A) THIS MORTGAGE OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THE OBLIGATIONS; (B) THE VALIDITY, INTERPRETATION, COLLECTION, OR ENFORCEMENT THEREOF; OR (C) ANY OTHER CLAIM OR DISPUTE HOWEVER ARISING BETWEEN THE BANK AND THE MORTGAGOR.

IN WITNESS WHEREOF, the Mortgagor hereunto sets its hand and seal this 22nd day of January, 2020.

IN THE PRESENCE OF:

_____
Witness

PECK ELECTRIC CO.

By: _____
Jeffrey Peck, Its President & Duly Authorized Agent

STATE OF VERMONT
COUNTY OF Chittenden , SS.

At Peck Co    in said County this 22nd day of January, 2020, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged the foregoing instrument, by him sealed and subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _____
Print Name: Shannon LaPierre
Notary Public, State of Vermont
Commission No: _____
My Commission Expires: 01/31/2021

Commission
No. 157.0000076
Shannon LaPierre
Notary Public State of Vermont

Page 4
Corrective Leasehold Mortgage

Schedule A

TO CORRECTIVE LEASEHOLD MORTGAGE

Legal Description of Leased Premises

**BEING A PORTION OF real property in the Town of Newfane, County of Windham, State of Vermont, described as follows, and as more particularly shown in Schedule A-1 attached hereto:**

Tract One:
Being all the remaining lands and premises that were conveyed to the Valley Lions Club by Warranty Deed of Philip T. Lane and Priscilla R. Lane dated October 28, 1977 and recorded on November 4, 1977 at Book 46, Page 396 of the Newfane Land Records and being described therein as follows:

"Beginning at an iron pipe located at the easterly limits of the public highway right-of way known as State of Vermont Route 30, which iron pin is at lands of Town of Newfane School District and at the end of a stone wall; thence S 35° 08' E along the stone wall a distance of 207.43 feet to an iron pipe; thence S 19° 25' E along the stone wall a distance of 128.78 feet to an iron pipe; thence N 72° 52' E a distance of 693.25 feet to an iron pipe in a second stone wall; thence N 21° 30' W along the second stone wall a distance of 472.23 feet to an iron pipe at the point of intersection with a third stone wall at lands of Edmunds (the last four courses being along lands of the Town of Newfane School District); thence S 73° 53' E along lands of Edmunds and largely along the third stone wall a distance of 529.44 feet to a stake and stones at lands of Faust; thence S 18° 59' W along lands of Faust a distance of 146.45 feet to a point; thence S 45° 27' W along lands of Faust and lands of Caldwell a distance of 148.14 feet to an iron pipe at lands of Garey; thence S 25° 53' W along lands of said Garey a distance of 133.88 feet to an iron pipe at other lands of Caldwell; thence S 25° 46' W a distance of 82.72 feet; thence S 21° 15' W a distance of 89.06 feet; thence S 17° 05' W a distance of 177.11 feet; thence S 9° 18' W a distance of 183.64 feet; thence S 7° 40' W a distance of 123.39 feet to a stake and stones at lands of Penna, which stake and stones is at the end of a fourth stone wall (the last five courses being along lands of Caldwell); thence N 87° 58' W along lands of Penna and along the fourth stone wall a distance of 165.40 feet to an iron pipe at lands of Lombardi; thence N 86° 59' W along lands of Lombardi and the stone wall a distance of 220.00 feet to an iron pipe at lands of DaBica; thence N 88° 58' W along lands of DaBica and along the stone wall a distance of 278.80 feet to an iron pipe at the end of the wall, which iron pipe is located at the easterly limits of the aforesaid Vermont Route 30; thence N 7° 43' W along said Route 30 a distance of 212.79 feet to a point; thence N 9° 12' W along said Route 30 a distance of 561.57 feet to an iron pipe at the end of a stone wall, the point and place of beginning; containing 13.65 acres.

"The foregoing description is based upon survey drawing prepared by T. E. Schreyer, Jr. of Newfane, Vermont (Registered Land Surveyor No. 66), which survey is dated June 19, 1977 and bears drawing no. 766R.

"Being the remainder of Parcel No. 1 as described in deed of John and Dorothy Tarbell to the Grantors herein dated April 18, 1959 and recorded in Volume 36, Page 201 of the Newfane Land Records.

"Granting, also, all rights of access to the above described parcel as held by the Grantors including the easement excepted and reserved by the Grantors in their deed to Town School District of Newfane dated February 6, 1962 and recorded in Volume 38; Page 10 of the Newfane Land Records and therein described as follows:

{B2103411.1 15495-0008}

A right of way to pass and repass with vehicles and on foot, and to erect telephone lines or lines for the transmission of electrical energy, and pipe lines for water, sewer or drainage over the following described place or parcel of land, viz:

"Beginning at an iron pipe in the ground on the east side of the said highway, and being the northwesterly corner of the premises hereby conveyed, thence running S 68° 00' E 866 feet, more or less, along lands of said Thompson or the prolongation of the Thompson's south line until it intersects the stone wall; thence south 21° 30' E 24 feet along said stone wall; thence N 68° 00' W 866 feet more or less, to a point on the East side of said highway, thence N 9° 07' W 24 feet to the point of beginning. Excepting therefrom two parcels of land estimated to total 0.75 acres, more or less, as conveyed to the State of Vermont by Warranty Deed of Valley Lions Club dated and recorded on September 15, 1993 at Book 73, Page 374 of the Newfane Land Records.

Tract Two:
A certain piece of land in Newfane in the County of Windham and State of Vermont, described as follows, viz:

Beginning at an iron pipe in the ground on the east side of the highway leading from Dummerston to Newfane known as State Route 30, and being the northwesterly corner of the premises hereby conveyed; thence running south 9° 07' E 494.93 feet along the easterly side of said high-way to an iron pipe in the ground for a corner; thence running S 35° 08' E 207.43 feet along a stone wall and lands of Philip T. and Priscilla R. Lane to an iron pipe set in an angle of the stone wall for a corner; thence running S 19° 25' E 128.78 feet along said stone wall and lands of Lane to an iron pipe set in a stone wall for a corner, thence running N 17° 08' E 693.25 feet along lands of said Lane to an iron pipe set in a stone wall for a corner; thence running N 21° 30' W 472.23 feet along said stone wall and lands of said Lane to an iron pipe set in a stone wall for a corner; thence running N 74° 05' W 318.64 feet along said stone wall and lands of Charles Hallenius and wife to an iron pine set in the stone wall for a corner; thence running S 21° 21' E. 156.00 feet along the remains of a stone wall and a barbed wire fence on lands of Albert Thompson and wife to an iron pipe set in said stone wall for a corner; thence running N 68° 00' W 518.10 feet along a barbed wire fence and lands of said Thompson to the place of beginning. The same to contain 10.006 acres of land, be the same more or less.

Being a portion of the same premises as conveyed by Warranty Deed of John C. and Dorothy M. Tarbell to the Grantors dated 18 April 1959, and recorded in Book 36, Page 201 of the Newfane Land Records; and being shown on a Plan dated December 1961 by Ted Schreyer entitled "Land Survey for Town School District of Newfane, to be recorded herewith, to which deed and Plan reference is hereby made for a more particular description.

Excepting therefrom those lands as acquired by the State of Vermont pursuant to a certain Condemnation Order dated July 20, 1993 and recorded in Book 73, Page 112 of the Newfane Land Records.



MEMORANDUM OF LEASE

This Memorandum of Lease is being executed by West River Modified Union Education District (the "Landlord" or "Owner"), and Peck Electric Co., a Vermont corporation with an office located in South Burlington (the "Tenant" or "Project Company"), as of the dates set forth opposite their respective signatures below.

INTRODUCTION

I.      The Landlord and Tenant, entered into a Lease Agreement dated as of December 10, 2019 (the "Lease").

II.     The Landlord and the Tenant desire to provide notice of the Lease by executing this Memorandum of Lease for recording in the Town of Bennington land records pursuant to 27 V.S.A. § 341(c).

MEMORANDUM OF LEASE

The Landlord and the Tenant hereby give notice of the following terms of the Lease:

1.  <u>Parties</u>.  The parties to the Lease and the addresses for the Landlord and the Tenant, are as follows:

<u>Landlord:</u>                             <u>Tenant:</u>

West River Modified Union              Peck Electric Co.
Education District                     Attn: Jeffrey Peck
Attn: Board Chair                      4050 Williston Road, Suite 511
1219 VT Route 30                       South Burlington, VT  05403
Townshend, VT 05353

2.  <u>Date of Execution</u>.  The Lease was executed on December 10, 2019.

3.  <u>Term; Commencement Date; Termination Date</u>.  The original commencement date set forth in the Lease is November 30, 2017 (the "Commercial Operation Date"). The Operating Term of this Lease ("Operating Term") will be for a period of three (3) years from the Effective Date, unless terminated earlier in accordance with the terms of this Lease.

4.  <u>Description of Leased Premises</u>.  The real property subject to the Lease (the "Project Premises") is described on <u>Exhibit A</u> attached hereto.

5.  <u>Rights to Extend or Renew Lease</u>.  Ten (10) three (3) year extension option.

{B2103411.1 15495-0008}

6. <u>Options to Purchase; Rights of First Refusal</u>. None.

7. <u>Assignment of Project Company's Interest</u>.  Project Company may assign or otherwise convey its rights, in whole or in part, under this Lease to a Financing Party or to a successor by merger or acquisition, or to a subsidiary or affiliate of the Project Company without the prior written consent of the Owner.

8. <u>Location of Original Lease</u>.  An original Lease is located at the Landlord's and Tenant's offices located at the address set forth in paragraph 1 above.

9. <u>Effect</u>.  This Memorandum of Lease is intended as a summary of some of the terms and conditions contained in the Lease for purposes of giving notice.  It is not intended to amend, modify, or otherwise alter the terms and conditions of the Lease.  In the event of any inconsistency between the terms of the Memorandum of Lease and the terms of the Lease, the terms of the Lease shall control.

*Signatures and acknowledgments on following pages*

{B2102940.1 15495-0008}

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed as of the
_____ day of___December__, 2019.

<div align="right">

**OWNER:**
**West River Modified Union Education
District**

By:_____
Name:_____
Title:_____
Duly Authorized

</div>

State of Vermont        )
                        )
County of Windham   )

On ___ day of December, 2019, personally appeared _____, duly authorized
_____ of **West River Modified Union Education District**, known to me, or satisfactorily
proven to be the person who is the signatory to the foregoing, and made oath that the foregoing
instrument, was his/her/its free act and deed and the free act and deed of said **West River Modified
Union Education District**.

Before me,

_____
Notary Public
My Commission Expires:
My Commission Number:

[Project Company Signature Page Follows]

{B2102940.1 15495-0008}

PROJECT COMPANY
Peck Electric Co.

By: _____

Name: _Jeffrey Peck_

Title: CEO

Duly Authorized

State of Vermont    )
                    )
County of           )

On _3rd_ day of December, 2019, personally appeared _Jeffrey Peck_, duly authorized _CEO_ of Peck Electric Co., known to me, or satisfactorily proven to be the person who is the signatory to the foregoing, and made oath that the foregoing instrument, was his/her/its free act and deed and the free act and deed of said Peck Electric Co.

Before me, _____

Notary Public _____

My Commission Expires: _1/31/2021_

My Commission Number:

{B2102940.1 15495-0008}

### Schedule A

### TO MEMORANDUM OF LEASE AGREEMENT

#### Legal Description of Leased Premises

Real property in the Town of Newfane, County of Windham, State of Vermont, described as follows:

Tract One:
Being all the remaining lands and premises that were conveyed to the Valley Lions Club by Warranty Deed of Philip T. Lane and Priscilla R. Lane dated October 28, 1977 and recorded on November 4, 1977 at Book 46, Page 396 of the Newfane Land Records and being described therein as follows:

"Beginning at an iron pipe located at the easterly limits of the public highway right-of way known as State of Vermont Route 30, which iron pin is at lands of Town of Newfane School District and at the end of a stone wall; thence S 35° 08' E along the stone wall a distance of 207.43 feet to an iron pipe; thence S 19° 25' E along the stone wall a distance of 128.78 feet to an iron pipe; thence N 72° 52' E a distance of 693.25 feet to an iron pipe in a second stone wall; thence N 21° 30' W along the second stone wall a distance of 472.23 feet to an iron pipe at the point of intersection with a third stone wall at lands of Edmunds (the last four courses being along lands of the Town of Newfane School District); thence S 73° 53' E along lands of Edmunds and largely along the third stone wall a distance of 529.44 feet to a stake and stones at lands of Faust; thence S 18° 59' W along lands of Faust a distance of 146.45 feet to a point; thence S 45° 27' W along lands of Faust and lands of Caldwell a distance of 148.14 feet to an iron pipe at lands of Garey; thence S 25° 53' W along lands of said Garey a distance of 133.88 feet to an iron pipe at other lands of Caldwell; thence S 25° 46' W a distance of 82.72 feet; thence S 21° 15' W a distance of 89.06 feet; thence S 17° 05' W a distance of 177.11 feet; thence S 9° 18' W a distance of 183.64 feet; thence S 7° 40' W a distance of 123.39 feet to a stake and stones at lands of Penna, which stake and stones is at the end of a fourth stone wall (the last five courses being along lands of Caldwell); thence N 87° 58' W along lands of Penna and along the fourth stone wall a distance of 165.40 feet to an iron pipe at lands of Lombardi; thence N 86° 59' W along lands of Lombardi and the stone wall a distance of 220.00 feet to an iron pipe at lands of DaBica; thence N 88° 58' W along lands of DaBica and along the stone wall a distance of 278.80 feet to an iron pipe at the end of the wall, which iron pipe is located at the easterly limits of the aforesaid Vermont Route 30; thence N 7° 43' W along said Route 30 a distance of 212.79 feet to a point; thence N 9° 12' W along said Route 30 a distance of 561.57 feet to an iron pipe at the end of a stone wall, the point and place of beginning; containing 13.65 acres.

"The foregoing description is based upon survey drawing prepared by T. E. Schreyer, Jr. of Newfane, Vermont (Registered Land Surveyor No. 66), which survey is dated June 19, 1977 and bears drawing no. 766R.

"Being the remainder of Parcel No. 1 as described in deed of John and Dorothy Tarbell to the Grantors herein dated April 18, 1959 and recorded in Volume 36, Page 201 of the Newfane Land Records.

"Granting, also, all rights of access to the above described parcel as held by the Grantors including the easement excepted and reserved by the Grantors in their deed to Town School District of Newfane dated February 6, 1962 and recorded in Volume 38; Page 10 of the Newfane Land Records and therein described as follows:

A right of way to pass and repass with vehicles and on foot, and to erect telephone lines or lines for the transmission of electrical energy, and pipe lines for water, sewer or drainage over the following described place or parcel of land, viz:

{B2102940.1 15495-0008}

"Beginning at an iron pipe in the ground on the east side of the said highway, and being the northwesterly corner of the premises hereby conveyed, thence running S 68° 00' E 866 feet, more or less, along lands of said Thompson or the prolongation of the Thompson's south line until it intersects the stone wall; thence south 21° 30' E 24 feet along said stone wall; thence N 68° 00' W 866 feet more or less, to a point on the East side of said highway, thence N 9° 07' W 24 feet to the point of beginning.
Excepting therefrom two parcels of land estimated to total 0.75 acres, more or less, as conveyed to the State of Vermont by Warranty Deed of Valley Lions Club dated and recorded on September 15, 1993 at Book 73, Page 374 of the Newfane Land Records.

Tract Two:
A certain piece of land in Newfane in the County of Windham and State of Vermont, described as follows, viz:

Beginning at an iron pipe in the ground on the east side of the highway leading from Dummerston to Newfane known as State Route 30, and being the northwesterly corner of the premises hereby conveyed; thence running south 9° 07' E 494.93 feet along the easterly side of said high-way to an iron pipe in the ground for a corner; thence running S 35° 08' E 207.43 feet along a stone wall and lands of Philip T. and Priscilla R. Lane to an iron pipe set in an angle of the stone wall for a corner; thence running S 19° 25' E 128.78 feet along said stone wall and lands of Lane to an iron pipe set in a stone wall for a corner, thence running N 17° 08' E 693.25 feet along lands of said Lane to an iron pipe set in a stone wall for a corner; thence running N 21° 30' W 472.23 feet along said stone wall and lands of said Lane to an iron pipe set in a stone wall for a corner; thence running N 74° 05' W 318.64 feet along said stone wall and lands of Charles Hallenius and wife to an iron pine set in the stone wall for a corner; thence running S 21° 21' E. 156.00 feet along the remains of a stone wall and a barbed wire fence on lands of Albert Thompson and wife to an iron pipe set in said stone wall for a corner; thence running N 68° 00' W 518.10 feet along a barbed wire fence and lands of said Thompson to the place of beginning. The same to contain 10.006 acres of land, be the same more or less.

Being a portion of the same premises as conveyed by Warranty Deed of John C. and Dorothy M. Tarbell to the Grantors dated 18 April 1959, and recorded in Book 36, Page 201 of the Newfane Land Records; and being shown on a Plan dated December 1961 by Ted Schreyer entitled "Land Survey for Town School District of Newfane, to be recorded herewith, to which deed and Plan reference is hereby made for a more particular description.

Excepting therefrom those lands as acquired by the State of Vermont pursuant to a certain Condemnation Order dated July 20, 1993 and recorded in Book 73, Page 112 of the Newfane Land Records.

{B2102940.1 15495-0008}

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $486,137.00 | 09-17-2019 | 09-17-2026 | [redacted] | 64 | [redacted] | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT 05403

**Lender:** NBT Bank, National Association
52 South Broad Street
Norwich, NY 13815

THIS COMMERCIAL SECURITY AGREEMENT dated September 17, 2019, is made and executed between Peck Electric Co. ("Grantor") and NBT Bank, National Association ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Inventory, Accounts, Equipment and General Intangibles**

**Solar Electric Generating Equipment, including but not limited to the integrated assembly of photovoltaic panels, mounting assemblies, inverters, converters, metering, lighting fixtures, transformers, ballasts, disconnects, combiners, switches, wiring devices and wiring**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Some or all of the Collateral may be located on the following described real estate:

**14 School St, Newfane, VT 05345**
**Tax Parcel #D-207 (the record owner of the real property is Brookline-Newfane Joint Contract Board, 14 School St, Newfane, VT 05345).**

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Vermont, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as

otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: ▬▬▬▬▬▬▬    Page 3

discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Vermont Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties

## COMMERCIAL SECURITY AGREEMENT
Loan No: ███████████
**(Continued)**
Page 4

as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Agreement or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** With respect to interest (as defined by federal law) this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of laws provisions. In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Vermont without regard to its conflicts of law provisions. The loan transaction that is evidenced by the Note and this Agreement has been approved, made, and funded, and all necessary loan documents have been accepted by Lender in the State of New York.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Peck Electric Co. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Peck Electric Co..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: ███████████                                                                                  **Page 5**

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means NBT Bank, National Association, its successors and assigns.

**Note.** The word "Note" means the Note dated September 17, 2019 and executed by Peck Electric Co. in the principal amount of $486,137.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Owner.** The word "Owner" means Peck Electric Co.. The words "Owner" and "Borrower" are used interchangeably.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

ACKNOWLEDGMENT OF ARBITRATION: GRANTOR UNDERSTANDS THAT THIS AGREEMENT CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS AGREEMENT, GRANTOR UNDERSTANDS THAT GRANTOR WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THIS ARBITRATION AGREEMENT, UNLESS IT INVOLVES A QUESTION OF CONSTITUTIONAL OR CIVIL RIGHTS. INSTEAD GRANTOR AGREES TO SUBMIT ANY SUCH DISPUTE TO AN IMPARTIAL ARBITRATOR IN ACCORDANCE WITH 12 V.S.A. SECTION 5652(B).

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 17, 2019.

GRANTOR:

PECK ELECTRIC CO.

By: _____
    Jeffrey Peck, President and CEO of Peck Electric Co.

LaserPro, Ver. 18.2.0.027  Copr. Finastra USA Corporation 1997, 2019.   All Rights Reserved.   - VT/NY  L:\CFI\WIN\CFI\LPL\E40.FC  TR-217037  PR-282

<u>**COLLATERAL ASSIGNMENT OF**</u>
<u>**SOLAR POWER & SERVICES AGREEMENT**</u>
(Newfane, VT)

**THIS COLLATERAL ASSIGNMENT OF SOLAR POWER & SERVICES AGREEMENT** ("Assignment") is made as of this _17_ day of September, 2019, by **PECK ELECTRIC CO.**, a Vermont corporation with a place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 (hereinafter referred to as "Assignor"), to **NBT BANK, NATIONAL ASSOCIATION**, a national banking association having an office at 150 Bank Street, Burlington, Vermont 05401 (hereinafter referred to as "Bank").

<u>RECITALS</u>

A.     Bank agreed to make a term loan in the amount of Four Hundred Eighty-Six Thousand One Hundred Thirty-Seven and 00/100 Dollars ($486,137.00) (the "Loan") to the Assignor.

B.     The Assignor has agreed to enter into this Assignment as additional security for the repayment of the Loan to the Bank evidenced by a Promissory Note payable to Bank in the original principal amount of the Loan dated of even date hereof (the "Note"), together with all other Obligations as defined and owed under the Loan Agreement.

C.     The Assignor has agreed to assign all of its rights and interests as Provider in certain Solar Power & Services Agreements (General Conditions and Special Conditions and all Exhibits thereto) listed on Exhibit 1 attached hereto and incorporated herein by reference.

D.     This Assignment secures all obligations, debts and liabilities, plus interest thereon, of Assignor to Bank, or any one or more of them, as well as all claims by Bank against Assignor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Assignor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**NOW THEREFORE** in consideration of Bank making the Loan and entering into the Loan Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Assignor, the Assignor covenants and agrees as follows:

1.     <u>Assignment</u>. The Assignor does hereby assign and set over unto Bank as security for the payment and performance of the Obligations, all amounts hereafter to become due and payable under the Solar Power & Services Agreements listed on Exhibit 1 (collectively the "SPSA"), subject to the provisions of the SPSA, together with the benefit of all covenants, agreements and provisions contained in the SPSA with full power and authority to demand, collect, sue for, recover, receive and give receipts for the said amounts and to enforce payment

1

thereof in the name of the Assignor, its successors and assigns.

Nothing herein contained shall be deemed to have the effect of making Bank responsible for the collection of amounts to become due and payable under the SPSA, or for the performance of any covenants, terms and conditions by the Assignor contained or to be contained in the SPSA. This Assignment is intended to grant Bank rights as a third party beneficiary in the SPSA and Assignor will obtain whatever consents, certifications and acknowledgements from the third parties to the SPSA as Bank reasonably requests.

Bank shall be liable to account for only such amounts as it shall actually receive by virtue of this Assignment. Such amounts when so received by Bank shall be applied on account of the monies from time to time due under the Note and Loan Agreement (and any renewals or extensions thereof) in the manner and in the order therein provided for the application of payments received.

The said amounts to become due and payable under the SPSA and other benefits hereby assigned to Bank are being taken as collateral security only for the due payment and performance of the Obligations, either wholly or in part, and none of the rights or remedies of Bank under the Loan Agreement shall be delayed or in any way prejudiced by these presents.

2.      Warranties of Assignor. The Assignor represents and warrants to Bank that the SPSA has not been assigned to any other third party, that each SPSA is in full force and effect, and that neither the Assignor nor the Purchaser is in default of the SPSA.

3.      Terms and Conditions.

(a)      Notwithstanding any variation of the terms of the Loan Agreement or any agreement or arrangement with the Assignor or any extension of time for payment or any release of part or parts of the Collateral (as defined in the Loan Agreement), the amounts hereafter to become due and payable under the SPSA hereunder and other benefits hereby assigned shall continue as collateral security until the whole of the Obligations shall be fully paid and satisfied.

(b)      The Assignor covenants and agrees from time to time and at all times hereafter, at the request of Bank to execute and deliver at the expense of the Assignor such further assurances to assign to Bank all amounts hereafter to become payable hereunder, as Bank shall reasonably require.

(c)      Provided that no Event of Default (as defined in the Loan Agreement) has occurred and is continuing under the Loan Agreement or under any other of the Loan Documents (as defined in the Loan Agreement), the Assignor shall be entitled to receive all amounts payable to it under the SPSA, free from any claim by Bank, and shall not be liable to account therefor to Bank, but immediately upon an Event of Default thereunder Bank upon written notice to the Assignor shall be entitled to all such monies falling due under the SPSA subsequent to the date of service of such notice, for so long as such Event of Default continues unremedied.

(d)      Notwithstanding this Assignment, the Assignor shall be solely responsible for

2

performing and complying with all the covenants and other obligations on its part under the terms of the SPSA and shall perform all such covenants and obligations contained in the SPSA so that the rights and remedies of Bank shall not be in any way delayed or prejudiced.

(e)    Bank may waive any Event of Default under the Loan Documents and shall not be bound to serve any notice as hereinbefore set forth upon the happening of any such Event of Default, but any such waiver shall not extend to any subsequent Event of Default.

4.    Successors and Assigns. This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

5.    Governing Law. This Assignment shall be governed by and construed in accordance with the laws in force in the State of Vermont and the laws of the United States applicable therein.

IN WITNESS WHEREOF the Assignor has executed this Assignment as of the date first above written.

PECK ELECTRIC CO.

Witness

By: _____
Jeffrey Peck, President and
duly authorized agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington, this 17 day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged this instrument, by him subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _____
Print Name: _____
Notary Public, State of Vermont
Commission No: _____
My Commission Expires:  01/31/2021

Kathleen M. Boe, Esq.
Notary Public State of Vermont
Commission Expires: 1/31/2021
Commission #0005450

3

EXHIBIT 1 to
COLLATERAL ASSIGNMENT OF
SOLAR POWER & SERVICES AGREEMENT

1.      Solar Power and Services Agreement dated July 25, 2017 between Forefront Power, LLC and Jamaica Village School.

2.      Solar Power and Services Agreement between SunEdison Origination1, LLC and Vermont State Colleges/Vermont Technical College dated December 21, 2015.

3.      Solar Power and Services Agreement between Forefront Power, LLC and Leland & Gray Union Middle and High School dated August 14, 2017.

4.      Solar Power and Services Agreement between Forefront Power, LLC and Wardsboro Elementary School dated September 5, 2017.

5.      Solar Power and Services Agreement between Forefront Power, LLC and Windham Elementary School dated August 7, 2017.

6.      Solar Power and Services Agreement between Forefront Power, LLC and Townsend Elementary School dated August 14, 2017.

7.      Solar Power and Services Agreement between SunEdison Origination1, LLC and The Brookline-Newfane Joint Contract Board dated August 6, 2015, as amended by Amendment No. 1 to Solar Power & Services Agreement dated June 30, 2017.

The rights of SunEdison Origination 1, LLC were assigned to Forefront Power, LLC by Assignment with Consent to Assignment and Change of Control dated January 30, 2017.

The rights of Forefront Power, LLC were assigned to Encore Redevelopment, LLC by Assignment and Assumption Agreements dated September 29, 2017 and November 14, 2017.

The rights of Encore Redevelopment, LLC were assigned to Peck Electric Co. by Assignment dated December 5, 2017.

4

## COLLATERAL ASSIGNMENT OF PROJECT DOCUMENTS
(Newfane, VT)

FOR VALUE RECEIVED, **PECK ELECTRIC CO.**, a Vermont corporation with a principal place of business at 4050 Williston Road, Suite 511, South Burlington, Vermont 05403 ("Assignor"), hereby assigns, transfers and sets over to **NBT BANK, NATIONAL ASSOCIATION**, a national banking association having an office at 150 Bank Street, Burlington, Vermont 05401 ("Bank"), all of Assignor's, rights, title and interest in and to: Solar Power & Services Agreements, all operation and maintenance services agreements and all related maintenance records, all interconnection agreements including a Generation Interconnection Agreement with Green Mountain Power Corporation dated as of October 18, 2017, a Certificate of Public Good #16-0063-NMP dated July 10, 2017, and all manufacturer warranties and guarantees entered into by the Assignor or its predecessors in connection with the solar project it operates at 14 School Street, Newfane, Vermont (collectively, the "Project Documents" and the rights set forth are collectively referred to herein as the "Assigned Rights").

Terms not defined herein shall have the meanings ascribed to them in the Business Loan Agreement (the "Loan Agreement") between the Assignor and Bank of even date herewith.

1.    Assignment as Security.    This Assignment is made to secure:

(a)    payment of the Promissory Note from Assignor to Bank, dated of even date in the principal amount of Four Hundred Eighty-Six Thousand One Hundred Thirty-Seven and 00/100 Dollars ($486,137.00) (the "Note");

(b)    payment, performance and discharge of all Obligations (as defined in the Loan Agreement) and agreements of Assignor under this Assignment, the Note, the Loan Agreement and all other agreements, assignments, documents or instruments executed pursuant thereto (hereinafter collectively referred to as the "Loan Documents"); and

(c)    all obligations, debts and liabilities, plus interest thereon, of Assignor to Bank, as well as all claims by Bank against Assignor, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Assignor may be liable individually or jointly with others, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

2.    Representations and Warranties of Assignors. Assignor hereby represents and warrants:

(a)    that the Assignor has obtained all rights under the Project Documents from SunEdison and/or Forefront Power, LLC and/or Encore Redevelopment, LLC;

(b)    that the Assignor has full right, power and authority to execute this

-1-

Assignment; and

(c)     that the Assignor has not assigned, transferred, pledged or otherwise encumbered any interest in the Project Documents or the Assigned Rights described herein.

3.     Covenants of Assignor. Assignor agrees:

(a)     to observe and perform all obligations imposed upon the Assignor under the Project Documents;

(b)     not to execute any other assignment of Assignor's interest in the Assigned Rights or Project Documents without Bank's consent;

(c)     to provide proper notice of this Assignment to the other parties to the Project Documents with evidence of such notice provided Bank within ten (10) business days of the date of this Assignment, and to execute and deliver to Bank such further assurances and assignments of the Assigned Rights as Bank shall from time to time reasonably require to effect the provisions of this Assignment.

4.     Terms and Conditions. This Assignment is made on the following terms and conditions:

(a)     until an Event of Default by Assignor in its obligations under the Loan Documents, Assignor shall have all of the rights and privileges incident to holding of the Assigned Rights, and retain use of and enjoyment of the same;

(b)     upon or at any time after an Event of Default after notice to the Assignor, as described in the Loan Documents, Bank may, at its option, without further notice or proceedings and without regard to the adequacy of the security, either in person or by agent, or by receiver appointed by a court, take, have, use and enjoy the rights and privileges of the holder of the Assigned Rights for such period of time as Bank may deem proper;

(c)     upon payment in full of the principal, interest, and all other indebtedness evidenced by or secured by this Assignment and the Loan Documents, this Assignment shall be void and be of no further effect, provided however, that the affidavit, certificate, letter, or statement of Bank or any officer, agent, or attorney of Bank showing any part of the principal, interest, or other indebtedness remains unpaid shall constitute conclusive evidence of the validity, effectiveness, and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon;

(d)     Bank may take or release other security for payment of the secured principal, interest, or other indebtedness, may release any party primarily or secondarily liable, and may apply any other security held by it to the satisfaction of the secured principal, interest, or other indebtedness without prejudice to any rights under this Assignment;

(e)     nothing contained in this Assignment and no act done or omitted by Bank

-2-

pursuant to its terms shall be deemed a waiver by Bank of any rights or remedies under this Assignment, or the Loan Documents. The right of Bank to collect the secured principal, interest, and other Obligations, and to enforce any other security may be exercised by Bank prior to, simultaneously with, or subsequent to any action taken under this Assignment;

(f) this Assignment, together with the agreements and warranties contained in it, shall inure to the benefit of Bank and any subsequent holder of the Loan Documents of even date, and shall be binding upon Assignor and its successors and assigns; and

(g) to the extent the Assigned Rights are or are deemed to be collateral subject to the Uniform Commercial Code (the "Code"), this Assignment shall be deemed to create in favor of the Bank a security interest therein, and, in addition to any other right or remedy expressly provided for above, in the event of any default by the Assignor under this Assignment, the Bank shall have all of the rights and remedies of a secured party upon default under the Code.

Dated at Burlington, Vermont, this 17 day of September, 2019.

PECK ELECTRIC CO.

By: _____
Witness                        Jeffrey Peck, President and
                               Duly Authorized Agent

STATE OF VERMONT
COUNTY OF CHITTENDEN, SS.

At Burlington, this 17 day of September, 2019, personally appeared Jeffrey Peck, President and duly authorized agent of Peck Electric Co., and he acknowledged this instrument, by him subscribed, to be his free act and deed and the free act and deed of Peck Electric Co.

Before me, _Kathleen M Boe_
                Print Name: _____
                Notary Public, State of Vermont
                Commission No: _____
Kathleen M. Boe, Esq.        My Commission Expires:  01/31/2021
Notary Public State of Vermont
Commission Expires: 1/31/2021
Commission #0005450

-3-

# AGREEMENT TO PROVIDE INSURANCE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $486,137.00 | 09-17-2019 | 09-17-2026 | [redacted] | 64 | [redacted] | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT 05403

**Lender:** NBT Bank, National Association
52 South Broad Street
Norwich, NY 13815

**INSURANCE REQUIREMENTS.** Grantor, Peck Electric Co. ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Grantor by Lender. These requirements are set forth in the security documents for the loan. The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

Collateral: **All Inventory and Equipment.**
**Type:** All risks, including fire, theft and liability.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Lender's Loss Payable/Mortgagee (NBT Bank, NA, ISAOA/ATIMA); and further stipulating that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
**Latest Delivery Date:** By the loan closing date.

Collateral: **Solar Electric Generating Equipment, including but not limited to the integrated assembly of photovoltaic panels, mounting assemblies, inverters, converters, metering, lighting fixtures, transformers, ballasts, disconnects, combiners, switches, wiring devices and wiring, located at 14 School Street, Newfane, VT 05345.**
**Type:** All risks, including fire, theft and liability.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Lender's Loss Payable/Mortgagee (NBT Bank, NA, ISAOA/ATIMA); and further stipulating that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
**Latest Delivery Date:** By the loan closing date.

**INSURANCE COMPANY.** Grantor may obtain insurance from any insurance company Grantor may choose that is reasonably acceptable to Lender. Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**INSURANCE MAILING ADDRESS.** All documents and other materials relating to insurance for this loan should be mailed, delivered or directed to the following address:

NBT Bank, National Association
LDCC
PO Box 405
Norwich, NY 13815

**FAILURE TO PROVIDE INSURANCE.** Grantor agrees to deliver to Lender, on the latest delivery date stated above, proof of the required insurance as provided above, with an effective date of September 17, 2019, or earlier. Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may do so at Grantor's expense as provided in the applicable security document. The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document. GRANTOR ACKNOWLEDGES THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED. IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.** For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 17, 2019.**

**GRANTOR:**

**PECK ELECTRIC CO.**

By: ______________________________
Jeffrey Peck, President and CEO of Peck Electric Co.

**FOR LENDER USE ONLY**
**INSURANCE VERIFICATION**

DATE: ____________________ PHONE ____________________

AGENT'S NAME: ____________________
AGENCY: ____________________
ADDRESS: ____________________
INSURANCE COMPANY: ____________________
POLICY NUMBER: ____________________
EFFECTIVE DATES: ____________________

COMMENTS: ____________________

# DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $486,137.00 | 09-17-2019 | 09-17-2026 | [redacted] | 64 | [redacted] | H50 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Peck Electric Co.
4050 Williston Rd Ste 511
South Burlington, VT 05403

**Lender:** NBT Bank, National Association
52 South Broad Street
Norwich, NY 13815

**LOAN TYPE.** This is a Fixed Rate (4.200%) Nondisclosable Loan to a Corporation for $486,137.00 due on September 17, 2026.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ Personal, Family or Household Purposes or Personal Investment.

☐ Finance Purchase, Construction or Improvement of Seasonal or Second Home.

☒ Finance Income-Producing Business or Activity.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $486,137.00 as follows:

| | |
|---|---|
| Amount paid to others on Borrower's behalf: | $486,137.00 |
| $486,137.00 to Community Bank | |
| Note Principal: | $486,137.00 |

**CHARGES PAID IN CASH.** Borrower has paid or will pay in cash as agreed the following charges:

| | |
|---|---|
| Prepaid Finance Charges Paid in Cash: | $0.00 |
| Other Charges Paid in Cash: | $275.02 |
| $200.00 Commitment Fee (FAS91) | |
| $75.02 UCC Filing Fee | |
| [redacted] Total Charges Paid in Cash: | $275.02 |

**AUTOMATIC PAYMENTS.** Borrower hereby authorizes Lender automatically to deduct from Borrower's Demand Deposit - Checking account, numbered [redacted] the amount of any loan payment. If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment. At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**FINAL LOAN PAYMENT.** The Automatic Payment will not be processed for the final loan payment. Contact Lender for the final amount due.

**FINANCIAL CONDITION.** BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED SEPTEMBER 17, 2019.

BORROWER:

PECK ELECTRIC CO.

By: ______________________
Jeffrey Peck, President and CEO of Peck Electric Co.

LaserPro, Ver. 18.2.0.027 Copr. Finastra USA Corporation 1997, 2019. All Rights Reserved. - VT/NY L:\CFI\WIN\CFI\LPL\I20.FC TR-217037 PR-282

**NBT Bank, N.A.**
LOAN CLOSING WORKSHEET

Borrower:    Peck Electric Co.

Mailing Address:    4050 Williston Road, Ste 511       Date:    September 17, 2019
                    South Burlington, VT 05403

**CREDITS:**

| | | |
|---|---|---:|
| NBT Bank, N.A. Loan Proceeds | | $ 1,960,328.48 |
| NBT Bank, N.A. Loan Proceeds | | $ 187,683.00 |
| NBT Bank, N.A. Loan Proceeds | | $ 281,391.00 |
| NBT Bank, N.A. Loan Proceeds | | $ 253,321.00 |
| NBT Bank, N.A. Loan Proceeds | | $ 732,997.00 |
| NBT Bank, N.A. Loan Proceeds | | $ 486,137.00 |
| NBT Bank, N.A. Loan Proceeds | | $ - |
| Other | | $ - |
| Other | | $ - |
| Other | | $ - |
| **TOTAL CREDITS** | | $ 3,901,857.48 |

**DEBITS:**

| | | |
|---|---|---:|
| Attorney Fees | Carroll, Boe & Pell, PC | $ 10,286.35 |
| Attorney Fees | Dinse, P.C. | POC |
| Recording Fees | | $ 405.00 |
| Flood Determination Fee | | $ 15.00 |
| Loan Origination Fee | | $ 1,200.00 |
| Tax Monitoring Fee | | $ 99.00 |
| Title Insurance | | $ 3,012.50 |
| Appraisal Fee | | $ 300.00 |
| UCC Filing Fees | | $ 314.35 |
| Community Bank NA Payoff | | $ 1,993,711.92 |
| Community Bank NA Payoff | | $ 475,889.63 |
| Community Bank NA Payoff | | $ 731,766.67 |
| Community Bank NA Payoff | | $ 246,838.34 |
| Community Bank NA Payoff | | $ 286,568.26 |
| Community Bank NA Payoff | | $ 67,869.37 |
| Community Bank NA Payoff | | $ 83,581.09 |
| Other | | $ - |
| Other | | $ - |
| **TOTAL DEBITS** | | $ 3,901,857.48 |

Amount due from Borrower                                      $0.00

ACKNOWLEDGED:

_____    9/17/19
Borrower                   Date