## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>iSun, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11144 (TMH)<br><br>(Jointly Administered)<br><br>RE: D.I. 65, 183, 269, 286, 358, 371 and 392 |

## ORDER (I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES; AND (III) GRANTING RELATED RELIEF

Upon the motion dated June 7, 2024 [Dkt. No. 65] (the "Motion")[2] of the Debtors for entry of an order (this "Order"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving the sale (the "Sale") of the Acquired Assets (as defined in the Stalking Horse Agreement) free and clear of all liens, claims, encumbrances, and other interests (as described herein), in accordance with the terms and conditions contained in that certain *Amended and Restated Asset Purchase Agreement*, dated as of August 22, 2024 (as amended and supplemented form time to time and including the exhibits and schedules thereto, the "Stalking Horse Agreement"),[3] by and among the Debtors and Clean

---

[1]   The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172) (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411) ; (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities , Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (7316); (collectively referred to as the "Debtors"). The Debtors' mailing address is: 400 Avenue D, Suite 10 Williston, Vermont 05495, with copies to Gellert Seitz Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse Agreement (as defined herein), the Motion or the Bidding Procedures Order (as defined herein).

[3]   A true and correct copy of the Stalking Horse Agreement is attached hereto as **Exhibit 1**.

Royalties, LLC (together with any affiliated assignee or designee, the "Purchaser"); (ii) approving the assumption and assignment of certain executory contracts and leases set forth on **Exhibit 2** attached hereto (the "Assumed Contracts"); (iii) authorizing the Debtors to take all actions necessary to consummate the transactions contemplated by the Stalking Horse Agreement (the foregoing clauses (i)–(iii) collectively, the "Sale Transaction"); and (iv) granting related relief, all as more fully set forth in the Motion; and this Court having entered the *Order (I) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Enter into the Stalking Horse Agreement, (V) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief;* [Dkt. No. 183] (the "Bidding Procedures Order"); and the Debtors having determined that the Purchaser has submitted the highest or otherwise best bid for the Acquired Assets, in accordance with the Bidding Procedures; and the Court having held a hearing on August 12, 2024 (the "Sale Hearing"), to approve the Sale Transaction; and the Court having reviewed and considered (a) the Motion, (b) the objections to the Motion or the Sale, if any, (c) all other pleadings filed in support of the Motion, and (d) the arguments of counsel made, and the evidence proffered or adduced, in connection with the Sale Hearing and any other hearing related to the Motion; and due notice of the Motion and the form of this Order having been provided; and all objections to the Sale Transaction and this Order having been withdrawn, resolved or overruled; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors and all other parties in interest; and upon the record of the Sale Hearing and the Chapter 11 Cases; and after due deliberation thereon; and good cause appearing therefore,

**THE COURT HEREBY FINDS AS FOLLOWS:**

## **Jurisdiction, Final Order, and Statutory Predicates**

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order hereon under Article III of the U.S. Constitution.

B.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. §158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.  Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this Order.

D.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.      The predicates for the relief requested by this Motion are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## **Corporate Authority**

F.        Upon entry of this Order, each of the Debtors has, to the extent necessary and applicable, (i) full corporate power and authority to execute and deliver the Stalking Horse Agreement and all other documents contemplated thereby (collectively, the "<u>Transaction Documents</u>"), (ii) all corporate authority necessary to consummate the transactions contemplated by the Stalking Horse Agreement and the other Transaction Documents, and (iii) taken (or will be deemed to have taken) all corporate action and formalities necessary to authorize and approve the Stalking Horse Agreement, any other Transaction Documents, and the consummation of the transactions contemplated thereby.  The Sale Transaction has been duly and validly authorized by all necessary corporate action.  No consents or approvals other than those expressly provided for in the Stalking Horse Agreement are required for the Debtors to consummate the Sale Transaction, the Stalking Horse Agreement, the other Transaction Documents or the transactions contemplated thereby.

## **Retention of Jurisdiction**

G.        It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Stalking Horse Agreement, the other Transaction Documents, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes involving the Debtors concerning or relating in any way to, or affecting, the Sale Transaction or the transactions contemplated in the Stalking Horse Agreement and the other Transaction Documents.

**Notice of Sale, Auction, Sale Hearing,**
**Stalking Horse Agreement and Assumption and Assignment**

H.      Actual written notice of the Motion, the Sale Transaction, the Auction, the Sale

Hearing, and transactions contemplated thereby, and a fair and reasonable opportunity to object

and to be heard with respect to the Motion and the relief requested therein, has been given to all

interested persons and entities, including, without limitation, the following parties:  (i) the office

of the U.S. Trustee for the District of Delaware; (ii) counsel to the official committee of unsecured

creditors, if one is appointed; (iii) counsel to the Stalking Horse Bidder; (iv) counsel to the

Prepetition Lender; (v) all parties known by the Debtors to assert a lien on any of the Acquired

Assets; (vi) all entities reasonably known to have expressed an interest in a transaction with respect

to any of the Acquired Assets during the past twelve (12) months; (vii) the United States Attorney's

Office for the District of Delaware; (viii) the Internal Revenue Service; (ix) all state and local

taxing authorities where the Debtors are formed or operate or that otherwise have an interest in the

Acquired Assets; (x) the offices of the attorneys general for the states in which the Debtors operate;

(xi) all other governmental agencies with an interest in the Sale and Sale Transactions; (xii) the

office of the secretary of state in each state in which the Debtors operate or are organized; (xii) all

environmental authorities having jurisdiction over any of the Acquired Assets; (xiv) all other

parties known or reasonably believed to have asserted an interest in the Acquired Assets; (xv) the

counterparties to the Assumed Contracts (the "Assumed Contract Counterparties"); (xvi) the

Debtors' insurance carriers; (xvii) all known creditors of the Debtors; (xviii) all registered holders

of equity interests in the Debtors; and (xix) any party that has requested notice pursuant to

Bankruptcy Rule 2002.

I.      In addition, the Debtors have caused notice of the Motion, the Sale, the Auction,

and the Sale Hearing to be published in *The Burlington Free Press* on July 14, 2024 and *The New*

*York Times* on July 15, 2024 [*see* Dkt. No. 289]. Such notice was sufficient and reasonably calculated under the circumstances to reach persons or entities whose identities are not reasonably ascertained by the Debtors.

J.       In accordance with the provisions of the Bidding Procedures Order and the Assumption Procedures, the Debtors have served the *Amended Notice of Potential Contract Assumption and Assignment* [Dkt. No. 186] and three supplements thereto [Dkt. Nos. 226, 230, 321] (collectively, the "Assumption Notice") upon the Assumed Contract Counterparties, which provided notice (i) that the Debtors seek to assume and assign to the Purchaser the Assumed Contracts, and (ii) the relevant cure costs for the Assumed Contracts. Service of such Assumption Notice was good and sufficient, and appropriate under the particular circumstances, and no other or further notice of the assumption and assignment of the Assumed Contracts or the cure costs is or shall be required. Each of the Assumed Contract Counterparties has had an adequate opportunity to object to the Cure Amounts set forth in the Cure Notice and to the assumption and assignment to the Purchaser of the applicable Assumed Contracts, including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the counterparty from accepting performance by, or rendering performance to, the Purchaser (or its designee) for purposes of Bankruptcy Code section 365(c)(1). All objections, responses, or requests for adequate assurance, if any, have been resolved, overruled, or denied, as applicable.

K.       As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale Transaction has been provided in accordance with sections 102(l), 363, and 365 of the

Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1, 6004-1, and 9013-1. The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures, the Sale Hearing, and the Sale Transaction as required by the Bidding Procedures Order. The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Sale Transaction, the Auction, the Sale Hearing, or the assumption and assignment of the Assumed Contracts to the Purchaser is or shall be required.

### **Business Judgment**

L.      The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale Transaction and the other transactions contemplated by the Transaction Documents.  Entry into the Transaction Documents and the consummation of the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Assumed Contracts, constitutes a reasonable exercise of the Debtors' sound business judgment and such acts are in the best interests of the Debtors, their estates, and all parties in interest. Such business reasons include, but are not limited to, the following: (i) the Stalking Horse Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Sale Transaction presents the best opportunity to maximize the value of the Debtors' estates and is beneficial to the Debtors' estates and is in the best interests of the Debtors and their stakeholders; and (iii) unless the Sale Transaction and all of the other transactions contemplated by the Transaction Documents are concluded expeditiously, recoveries to creditors may be diminished.

**Highest and Best Offer**

M.      As demonstrated by the *Declaration of Rob Vanderbeek in Support of Debtors'
Selection of Successful Bidder and the Proposed Sale Transaction* [Dkt. No. 839] and *Declaration
of Richard NeJame in Support of Debtors' Selection of Successful Bidder and the Proposed Sale
Transaction* [Dkt. No. 837], the Debtors conducted a sale process in accordance with, and have
otherwise complied in all respects with, the Bidding Procedures Order.

N.      The sale process set forth in the Bidding Procedures Order afforded a full, fair, and
reasonable opportunity for any person or entity to make a higher or otherwise better offer to
purchase the Acquired Assets.  The sale process and the Bidding Procedures were non-collusive,
duly noticed, and provided a full, fair and reasonable opportunity for any entity to make an offer
to purchase the Acquired Assets. In accordance with the Bidding Procedures, the Debtors
determined that the bid submitted by the Purchaser and memorialized by the Stalking Horse
Agreement is the Successful Bid (as defined in the Bidding Procedures). The Purchaser was the
Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance
with the Bidding Procedures Order and the Bidding Procedures.  The Stalking Horse Agreement
constitutes the overall highest and best offer for the Acquired Assets.  No other person or entity or
group of persons or entities has offered to purchase the Acquired Assets, on acceptable or more
favorable terms, for an amount that would give greater economic value to the Debtors than the
value being provided by the Purchaser pursuant to the Stalking Horse Agreement in the timeframe
contemplated by the Bidding Procedures Order. The Debtors' determination that the Stalking
Horse Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid
and sound exercise of the Debtors' business judgment. Among other things, the Sale Transaction

is the best alternative available to the Debtors to maximize the return to their estates. The terms and conditions of the Stalking Horse Agreement are fair and reasonable.

## No Fraudulent Transfer

O.    The consideration provided by the Purchaser for the Acquired Assets pursuant to the Stalking Horse Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and applicable law, including, without limitation, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and any other applicable law.

P.    The Purchaser is not a continuation of the Debtors or their respective estates and the Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors.

## Good Faith of Purchaser

Q.    The Transaction Documents were negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. None of the Debtors, the Purchaser, any other party in interest, or any of their respective representatives has engaged in any conduct that would cause or permit the Transaction Documents, or the consummation of the Sale Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under 11 U.S.C. § 363(n), or has acted in bad faith or in any improper or collusive manner with any person or entity in connection therewith. Specifically, the Purchaser has not acted in a collusive manner with any person or entity and the Purchase Price was not controlled by any

agreement among bidders. The Purchaser is not an "insider" of the Debtors as defined in Bankruptcy Code section 101(31).

R.    The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any other applicable or similar bankruptcy and non-bankruptcy law. The Purchaser has acted in good faith and in compliance with the terms of the Bidding Procedures and the Bidding Procedures Order in all respects. Specifically: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets; (ii) the Purchaser complied in all respects with the provisions in the Bidding Procedures Order; (iii) the Purchaser agreed to subject its bid to the competitive Bidding Procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Purchaser pursuant to the Stalking Horse Agreement have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Purchaser and the Debtors; (vi) the negotiation and execution of the Transaction Documents were at arm's-length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing; (vii) the Purchaser did not in any way induce or cause the Debtors' filing of these Chapter 11 Cases; and (viii) the Purchaser has not acted in a collusive manner with any person or entity. The Purchaser will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Stalking Horse Agreement.

## Satisfaction of Section 363(f)

S.    The Debtors may sell the Acquired Assets free and clear of all Liens (as defined in the Stalking Horse Agreement), encumbrances, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, obligations, liabilities, and any other interest of any kind or nature whatsoever against the Debtors or the Acquired Assets, including,

without limitation, any liabilities, debts or obligations arising under or out of, in connection with, or in any way relating to, any acts or omissions, agreements, rights, suits, demands, guaranties, contract rights, contractual commitments, licenses, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income, or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, options, option rights or claims, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, sales, purported sales, assignment and purported assignments of future receipts, claims, rights or interests (including purported undivided partial interests) arising out of "merchant cash advance" agreements or similar agreements, pledges, judgments, demands, rights of first refusal, offsets, rights of setoff, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims, labor rights and claims, employment rights and claims, pension rights and claims, employee benefits rights and claims, wage claims, tax claims (including, without limitation, claims for taxes of or against the Debtors or their assets), assessments, assertions of regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, contractual or other commitment rights and claims, rights of licensees or sublicensees under section 365(n) of the Bankruptcy Code or any similar statute, the costs and expenses of the administration of the Debtors' estates, all other matters of any kind and nature, any derivative, vicarious, transferee or successor liability claims,  and any other rights, claims or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or

subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, legal or equitable, secured or unsecured, senior or subordinated, and whether imposed by agreement, understanding, law, equity or otherwise, arising under or out of, in connection with, or in any way related to the Debtors (or their predecessors), the Debtors' interests in the Acquired Assets, the operation of the Debtors' businesses before the Closing (as defined in the Stalking Horse Agreement), or the transfer of the Debtors' interests in the Acquired Assets to Purchaser, and of all Excluded Liabilities (as defined in the Stalking Horse Agreement) (collectively, and excluding any Assumed Obligations and Assumed Indebtedness, the "Interests"), because, with respect to any party asserting an Interest, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Holders of an Interest in the Acquired Assets to be transferred pursuant to the Stalking Horse Agreement: (i) have, subject to the terms and conditions of this Order, consented to the Sale Transaction or are deemed to have consented; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; or (iii) otherwise fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  Those holders of Interests who did not object or withdrew objections to the Sale Transaction and entry of this Order are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. The Interests of all holders of Liens relating to the Acquired Assets are adequately protected, thereby satisfying section 363(e) of the Bankruptcy Code because such Liens shall attach solely to the sale proceeds in the order of their priority, and with the same validity, extent, force and effect that they have against such Acquired

Assets immediately prior to the Sale Transaction. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests against or in the Acquired Assets (including, for the avoidance of doubt, the DIP Lender) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests which the person or entity has with respect to the Acquired Assets, then with regard to the Acquired Assets that are purchased by the Purchaser pursuant to the Sale Transaction and this Order (i) the Debtors or their designee are hereby authorized to execute and file such statements, instruments, or releases on behalf of the person or entity with respect to the Acquired Assets and (ii) the Purchaser or its designee is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded shall constitute conclusive evidence of the release of Interests against the Acquired Assets.

        T.      The Purchaser would not have entered into the Stalking Horse Agreement and the other Transaction Documents and would not consummate the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Assumed Contracts, (i) if the transfer of the Acquired Assets were not free and clear of all Interests, including, without limitation, rights or claims based on any successor or transferee liability of any kind or nature whatsoever (except as expressly set forth in the Stalking Horse Agreement or this Order with respect to Assumed Obligations) and (ii) if the Purchaser would, or in the future could, be liable for any such Interest. The Purchaser will not consummate the transactions contemplated by the Stalking Horse Agreement and the other Transaction Documents, including the Sale Transaction and the assumption and assignment of the Assumed Contracts, unless this Court expressly orders that none of the Purchaser or the Acquired Assets will have any liability whatsoever with respect

to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Interest.

U.      Not transferring the Acquired Assets free and clear of all Interests would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Acquired Assets other than pursuant to a transfer that is free and clear of all Interests would be of substantially less benefit to the Debtors' estates.

V.      Except as set forth in the Stalking Horse Agreement, the (i) transfer of the Acquired Assets to the Purchaser and (ii) assignment to the Purchaser of the Assumed Contracts, will not subject the Purchaser to any liability whatsoever, including, without limitation, with respect to the operation of the Debtors' businesses or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including any laws affecting antitrust, successor, transferee or vicarious liability.

**Assumption and Assignment of Assumed Contracts**

W.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtors and their estates. The Assumed Contracts being assigned to the Purchaser, if any, are an integral part of the Acquired Assets being purchased by the Purchaser and, accordingly, such assumption and assignment of Assumed Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

X.      To the extent applicable, the Debtors and the Purchaser have (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). The Purchaser has provided adequate assurance of future performance of and under the Assumed Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).

## **Validity of Transfer**

Y.      The transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Interests, as set forth in the Stalking Horse Agreement. The Acquired Assets constitute property of the Debtors and good title is vested in the Debtors within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owners of the Acquired Assets, and no other person has any ownership right, title, or interests therein.

## **Not a *Sub Rosa* Plan**

Z.      The Sale Transaction does not constitute a *sub rosa* chapter 11 plan or an element of such plan for the Debtors, for which approval has been sought without the protections that a disclosure statement would afford. The Sale Transaction does not (i) impermissibly restructure the rights of the Debtors' creditors or equity interest holders, (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors, (iii) impermissibly dictate a plan of

reorganization for the Debtors; or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities.

### **Legal and Factual Bases**

AA.     The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### **General Provisions**

1.     The Motion and the relief requested therein is **GRANTED** and **APPROVED** as set forth herein, the Sale Transaction contemplated thereby and by the Stalking Horse Agreement is approved, and the transactions contemplated by the other Transaction Documents are approved, in each case as set forth in this Order.

2.     This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

3.     Objections to the Motion, if any, or the relief requested therein, the Transaction Documents, the Sale Transaction, the entry of this Order, or the relief granted herein that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby **DENIED** and **OVERRULED** on the merits with prejudice. All withdrawn objections are deemed withdrawn with prejudice. Those parties who did not object to the Motion or the entry of this Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to sections 363(f)(2) and 365(c) of the Bankruptcy Code.

### Approval of the Sale of the Acquired Assets

4.      The Stalking Horse Agreement, including any amendments, supplements and modifications thereto, all other Transaction Documents, and all of the terms and conditions therein, are hereby **APPROVED** in all respects.

5.      Pursuant to 11 U.S.C. §§ 363(b) and (f), the sale of the Acquired Assets to the Purchaser free and clear of all Interests is approved in all respects.

6.      The Purchaser is authorized to apply all DIP Obligations (other than Tranche 4 DIP Obligations) in satisfaction of the Purchase Price and upon the Closing, (i) the Purchase Price shall be deemed satisfied, on a dollar-for-dollar basis, by the DIP Obligations (other than Tranche 4 DIP Obligations) and (ii) the DIP Obligations shall be extinguished upon such application (or, in the case of Tranche 4 DIP Obligations, assumption by the Purchaser), subject to the paragraphs of this Order under the heading "Resolution of ROFR Objections," with respect to timing of such extinguishment.

### Sale and Transfer of the Acquired Assets

7.      The consideration provided by the Purchaser for the Acquired Assets under the Stalking Horse Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and applicable law, including, without limitation, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, and any other applicable law.  The Sale Transaction shall not be avoided or rejected by any person, and costs or damages shall not be imposed or awarded against the Purchaser, under section 363(n) or any other provision of the Bankruptcy Code.

8.      The Sale Transaction authorized herein shall be of full force and effect, regardless of the Debtors' lack or purported lack of good standing in any jurisdiction in which the Debtors

are formed or authorized to transact business. The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the Sale Transaction and the other provisions of this Order; provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

9.      Subject to the terms, conditions, and provisions of this Order, all persons and entities are hereby forever prohibited, enjoined and barred from taking any action that would adversely affect or interfere, or that would be inconsistent (a) with the ability of the Debtors to sell and transfer the Acquired Assets to the Purchaser free and clear of all Interests in accordance with the terms of the Transaction Documents and this Order and (b) with the ability of the Purchaser to acquire, take possession of, use, operate, sell, or otherwise realize on the Acquired Asset in accordance with the terms of the Transaction Documents and this Order; provided, however, that the foregoing restriction shall not prevent any party in interest from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

10.     Pursuant to 11 U.S.C. §§ 105, 363, and 365, the Debtors are hereby authorized to take any and all actions necessary or appropriate to (a) sell the Acquired Assets to the Purchaser, (b) consummate the Sale Transaction and the other transaction contemplated by the Transaction Documents in accordance with, and subject to the terms and conditions of, the Transaction Documents, and (c) transfer and assign all right, title and interest (including common law rights) in their entirety to the Acquired Asset in accordance with and subject to the terms and conditions of the Transaction Documents, in each case without further notice to or order of this Court. The Debtors are further authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Transaction Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse

Agreement, including the related documents, exhibits and schedules and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Stalking Horse Agreement without further notice to or order of this Court. The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any reasonable expenses or costs that are required to be paid to consummate the Sale Transaction or perform their obligations under the Stalking Horse Agreement.

11.     Pursuant to 11 U.S.C. §§ 363(b) and 363(f), the Acquired Asset shall be transferred to the Purchaser upon consummation of the Stalking Horse Agreement (such date, the "Closing Date") free and clear of all Interests. The provisions of this Order authorizing and approving the transfer of the Acquired Assets free and clear of all Interests shall be self-executing, and neither the Debtors nor the Purchaser shall be required to (but may) execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

12.     Following the Closing Date, the Purchaser may, but shall not be required to, file a certified copy of this Order in any filing or recording office in any federal, state, county, or other jurisdiction in which the Debtors are incorporated or have or had real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and, to the extent permitted by applicable law, such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Order as of the Closing. On the Closing Date, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets, including the

Assumed Contracts, or a bill of sale transferring good and marketable title in such assets to the Purchaser. Each and every federal, state, and county governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Agreement; provided that if the prior written approval from a foreign governmental entity is required to consummate the transactions contemplated by the Stalking Horse Agreement, then such authorization shall be obtained on or prior to Closing in accordance with the Stalking Horse Agreement.

13.    All persons and/or entities (including the Debtors or any subsequently appointed trustee or estate representative for the Debtors) who on the Closing Date or thereafter may be or are in possession of some or all of the Acquired Assets (or the proceeds thereof) shall hold such assets in trust for the Purchaser and are hereby directed to surrender possession of the Acquired Assets (or the proceeds thereof) directly to the Purchaser or its designee(s) at the Closing or at such time thereafter as the Purchaser may request.

14.    Except as expressly permitted by the Stalking Horse Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding Interests against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Stalking Horse Agreement and the other Transaction Documents, including the Sale Transaction and the assumption and assignment of the Assumed Contracts, are forever barred, estopped, and permanently enjoined from asserting,

prosecuting, or otherwise pursuing such persons' or entities' Interests, whether by payment, setoff, or otherwise, directly or indirectly, against the Purchaser and its Affiliates, or any successors or assigns, their respective property and the Acquired Assets (including the Assumed Contracts) and the proceeds thereof.  Following the Closing of the Sale Transaction, no party shall interfere with the Purchaser's title to, or use and enjoyment of, the Acquired Assets based on or related to any such Interest or based on any action the Debtors has taken or may take in the Chapter 11 Cases.

15.    At the Closing of the Sale Transaction, (i) each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in or against the Acquired Assets, if any, as such Interests may have been recorded or otherwise exist and (ii) the Debtors and the Purchaser are authorized to take such actions as may be necessary to obtain a release of any and all Interests in, on or against the Acquired Assets, if any, and to the extent contemplated hereby and by the Stalking Horse Agreement.

16.    To the extent provided by section 525 of the Bankruptcy Code, no federal, state, or county governmental unit may deny, revoke, suspend, or refuse to renew any permit, license or similar grant relating to the operation of the Acquired Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Stalking Horse Agreement and the other Transaction Documents, including the Sale Transaction and the assumption and assignment of the Assumed Contracts. Each and every federal, state, and county governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Agreement and the other Transaction Documents, including the Sale Transaction and the assumption and assignment of the Assumed Contracts.

17.     To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and, to the greatest extent available under applicable law and in accordance with the Stalking Horse Agreement and the other Transaction Documents, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing.

18.     Subject to the terms and conditions of this Order, the transfer of the Acquired Assets to the Purchaser pursuant to the Stalking Horse Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Interests.

19.     On the Closing Date, the Purchaser shall remit the Cash Purchase Price minus the DIP Obligations (outstanding as of the Effective Time (as defined below)) but excluding the Tranche 4 DIP Obligations, less (1)  $350,000 for the purposes described in the wind-down term sheet (the "Wind-Down Term Sheet") attached as Exhibit B to the stipulation at D.I. 158-1 (the "Stipulation"), subject to the clarifying terms in paragraph 20, below; (2) $100,000 for Committee professional fees, as set forth in the Stipulation; (3) $100,000 on account of the Cedar Advance Settlement Payment defined below; and (4) $300,000 in resolution of the Committee's objection to the Sale, which use shall be subject to a further stipulation and/or order on the use of cash collateral (which amounts in (1), (2), (3) and (4) shall be paid to the Debtors) to the Prepetition Secured Lender in partial payment of the Prepetition Secured Lender Loan Obligations (as defined in the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative

22

Expense Claims; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief (D.I. #177) (the "Final DIP Order")).  For the avoidance of doubt, the $75,000 funded by the Purchaser at Closing in accordance with the Stipulation shall not constitute cash proceeds of the sale.

20.     The $350,000 referenced in paragraph 19 shall be segregated by the Debtors and held in express trust to be used in accordance with the terms of the Wind-Down Term Sheet to pay (1) allowed fees and costs associated with pursuing the confirmation of a plan of liquidation and the establishment of the liquidation trust as described in the Wind-Down Term Sheet, which fees and costs may include the evaluation of the trust assets, and, (2) upon the effective date of the plan, the remainder shall be disbursed to the liquidating trust to be used in accordance with the Wind-Down Term Sheet and the plan of liquidation.  In the event a liquidating trust is not established due to the conversion or dismissal of all of the Debtors' chapter 11 cases, any order providing for such conversion or dismissal of all (but not less than all) of the Debtors' chapter 11 cases shall expressly provide that an amount equal to any accrued and allowed fees and costs set forth in part (1) of this paragraph shall be held to pay such claims, and all other amounts shall be returned to Decathlon.  Except for the Debtors, the Committee, the Purchaser, and Decathlon, all parties rights to object to such relief in a conversion or dismissal order are reserved.

## No Successor Liability

21.     The Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, or be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Obligations, with respect to the Acquired Assets. Except to the extent the Purchaser assumes Assumed Obligations and Assumed Contracts pursuant to the Stalking Horse

Agreement, neither the purchase of the Acquired Assets by the Purchaser nor the fact that the Purchaser is using any of the Acquired Assets previously operated by the Debtors will cause the Purchaser to be deemed a successor in any respect to the Debtors' businesses or incur any liability derived therefrom within the meaning of any foreign, federal, state or county debt collection practices, insurance, revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

22.    The Purchaser has given substantial consideration under the Stalking Horse Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability against the Purchaser and which shall be deemed to have been given in favor of the Purchaser by all holders of Interests in or against the Debtors, or the Acquired Assets. Upon consummation of the Sale Transaction, the Purchaser shall not be deemed to (a) be the successor to the Debtors, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors, including, without limitation, within the meaning of any foreign, federal, state or county debt collection practices, insurance, revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

23.    Except to the extent the Purchaser has specifically agreed in the Stalking Horse Agreement or as otherwise set forth in this Order, the Purchaser shall not have any liability, responsibility or obligation for any claims, liabilities or other obligations of the Debtors or their

estates, including any (a) claims or liabilities related to the Acquired Assets that relate to the period prior to the Closing or (b) any claims against and liabilities of the Debtors or any of their predecessors, insiders or affiliates or their respective current or former directors, officers, employees or agents. By virtue of the Purchasers' purchase of the Acquired Assets, neither the Purchaser nor any of its Affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors', insiders' or affiliates' or their respective current or former directors, officers, employees or agents) respective businesses or operations or any of the Debtors' (or their predecessors', insiders' or affiliates' or their respective current or former directors, officers, employees or agents) obligations based, in whole or part, directly or indirectly, on any theory of successor, transferee or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, discrimination, labor and employment, any law applicable to debt collection practices, insurance law or products liability law, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes (other than as provided in the Stalking Horse Agreement) arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing (a claim seeking to impose liability on the Purchaser on the foregoing grounds shall be referred to as a "Successor Liability Claim").  Upon the Closing, all Successor Liability Claims shall be deemed compromised and released.  Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Interests against, in or to the Debtors or the Acquired Assets.  The Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the transactions contemplated thereby but for the foregoing protections against potential claims based upon "successor liability" theories.

24.     None of the Purchaser or its Affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution or delivery of the Stalking Horse Agreement or the other Transaction Documents or the entry into and consummation of the sale of the Acquired Assets, except as expressly provided in the Stalking Horse Agreement and this Order.

## **Good Faith**

25.     The transactions contemplated by the Transaction Documents are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided by this Order to consummate the transactions contemplated by the Stalking Horse Agreement and the other Transaction Documents, including the Sale Transaction and the assumption and assignment of the Assumed Contracts shall not alter, affect, limit, or otherwise impair the validity of the sale of the Acquired Assets to the Purchaser, including the assumption, assignment, and/or transfer of the Assumed Contracts. The Purchaser is a good faith purchaser of the Acquired Assets within the meaning of section 363(m) of the Bankruptcy Code and, as such is entitled to, and is hereby granted, the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy Code. The Debtors and the Purchaser will be acting in good faith if they proceed to consummate the Sale Transaction at any time after the entry of this Order.

26.     As a good faith purchaser of the Acquired Assets, the Purchaser has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Purchaser, and the Sale Transaction may not be avoided pursuant to

section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) in respect of the Stalking Horse Agreement, the other Transaction Documents or the Sale Transaction.

**Assumption and Assignment of Assumed Contracts**

27.     Pursuant to 11 U.S.C. §§ 105(a), 363, and 365, as applicable, and subject to and conditioned upon the Closing, the Debtors' assumption and assignment or sale to the Purchaser, and the Purchaser's assumption on the terms set forth in the Stalking Horse Agreement, of the Assumed Contracts is hereby approved.

28.     To the extent applicable in accordance with the Stalking Horse Agreement, the Debtors are hereby authorized in accordance with 11 U.S.C. §§ 105(a), 363, and 365 to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale Transaction, the Assumed Contracts free and clear of all Interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Purchaser.

29.     The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to, and assumption by, the Purchaser, except as provided in the Stalking Horse Agreement.

30.     To the extent required by controlling law as a condition to assumption, assignment or both, all Assumed Contract Counterparties have either expressly consented to assumption and assignment of their contracts prior to the Closing or shall be deemed to have consented to such

assumption and assignment under section 365(c)(1)(B) of the Bankruptcy Code and any other applicable law and the Purchaser, to the extent applicable, shall enjoy all of the Debtors' rights, benefits, and privileges under each such Assumed Contract as of the applicable date of assumption and assignment.

31.     Upon the Debtors' assumption and assignment of the Assumed Contracts under the provisions of this Order, no default shall exist under any Assumed Contract and no Assumed Contract Counterparty to any such Assumed Contract shall be permitted to declare or enforce, or otherwise take action against the Purchaser based on, a default by the Debtors that relates to the period prior to the effective date of such assumption and assignment, including failure to perform any obligations under the relevant Assumed Contract, or that relates to any of the Debtors' financial condition, change in control, or the Chapter 11 Cases. Any provision in an Assumed Contract that prohibits or conditions the assignment or sublease of such Assumed Contract (including the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, declare a default, condition on renewal or extension, or modify any term or condition upon such assignment, sublease, or change of control, constitutes an unenforceable anti-assignment provision that is void and of no force and effect only in connection with the assumption and assignment of such Assumed Contract to the Purchaser. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed Contract.  Nothing in this Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors that any Assumed Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code or,

subject to the terms of the Stalking Horse Agreement, must be assumed and assigned pursuant to the Stalking Horse Agreement or in order to consummate the Sale Transaction.

32.     All cure costs, defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser making the corresponding Cure Payment, if any is specified, for each Assumed Contract set forth on **Exhibit 2**.  All such Cure Payments are hereby fixed and approved.  The Purchaser shall have no liability for any defaults, claims or liabilities arising or accruing prior to the Closing other than the Cure Payments.

33.     Subject to receipt of its applicable Cure Payment, if any, set forth on **Exhibit 2**, each non-Debtor party to an Assumed Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against the Debtors, the Purchaser, or the property of such parties, any assignment fee, default, breach or claim of pecuniary loss, penalty, or condition to assignment, arising under or related to the Assumed Contracts, existing as of the date that such contracts are assumed, or arising by reason of the consummation of transactions contemplated by the Stalking Horse Agreement or the other Transaction Documents, including the Sale Transaction and the assumption and assignment of the Assumed Contracts.

34.     To the extent an Assumed Contract Counterparty failed to timely object to a cure cost, such cure cost shall be deemed to be finally determined and any such Assumed Contract Counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the cure cost at any time, and such cure cost, when paid, shall completely revive any Assumed Contract to which it relates; *provided* that if the Cure Payment listed on Exhibit 2 for an Assumed Contract is $0.00, then such Assumed Contract shall be revived at the Closing.

35.     The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Assumed Contracts based on the Purchaser's evidence of its financial condition and wherewithal and without any further action by the Purchaser, including, but not limited to, any other or further deposit. Pursuant to section 365(f) of the Bankruptcy Code, the Purchaser has provided adequate assurance of future performance of the obligations under the Assumed Contracts.

36.     Up until the Closing, the Purchaser may remove any Contract as an Assumed Contract by providing written notice of such removal to the Debtors.  The removal of a Contract as an Assumed Contract prior to the Closing shall not limit the Purchaser's ability to subsequently designate such Contract for assumption and assignment pursuant to Section 2.6 of the Stalking Horse Agreement.

### Subsequently Designated Assumed Contracts

37.     If after the date of this Order the Purchaser amends the list of Assumed Contracts to add any new Assumed Contract or if the Purchaser designates any additional Contracts to be assumed pursuant to Section 2.6 of the Stalking Horse Agreement (in each instance, a "Designated Contract"), the Debtors shall follow the following procedures:

(a)     As soon as practicable after receiving notice of the identification of a Designated Contract from the Purchaser, the Debtors shall file a notice identifying the Designated Contract and the proposed cure amount (the "Designation Notice") and serve the Designation Notice on the counterparty to the Designated Contract.

(b)     The affected counterparty shall have ten (10) days from the date of service to file an objection to a Designation Notice.

(c)     If no objection is timely filed, the Designated Contract shall be treated as an Assumed Contract under this Order, provided that it shall be deemed to be assumed and

assigned to the Purchaser without further Court order upon the later of the (i) expiration of the 10-day notice period and (ii) payment of the applicable Cure Cost (if any).  If an objection is timely filed and later withdrawn, the Designated Contract shall be treated as an Assumed Contract under this Order, provided that it shall be deemed to be assumed and assigned to the Purchaser without further Court order upon the later of (x) the date the objection is withdrawn and (y) payment of the applicable Cure Cost (if any).

(d)     If an objection is timely filed and not withdrawn, the Designated Contract shall only be treated as an Assumed Contract pursuant to an Order of the Court.

(e)     Any Court order entered after an objection to a Designation Notice or written agreement between the Purchaser and the counter-party to a Designated Contract may establish a different time upon which the assumption and assignment of that Designated Contract is deemed to be effective or establish a Cure Cost for that Designated Contract different than what is set forth in the Designation Notice.

## Resolution of ROFR Objections and Reservation of Rights

38.     *Definitions*:

(a)     "Encore LLC Assets" means (i) the Debtors' rights and interest under the Membership Unit Purchase Agreement dated as of November 24, 2021, by and between Encore Redevelopment, LLC ("Encore") and iSun, Inc. (the "Encore MUPA") and (ii) the 179,298 Class B membership units in Encore owned by iSun, Inc. (the "Encore Units").

(b)     "Encore LLC Agreement" means that certain Seventh Amended and Restated Operating Agreement of Encore Redevelopment, Inc., dated May 17, 2023, for Encore.

(c)     "Fusion LLC Assets" means the 400,000 Units in Fusion Renewable NA, LLC owned by iSun Utility, LLC ("Fusion NA").

(d)    "Fusion LLC Agreement" that certain Operating Agreement dated August 7, 2022, as amended, for Fusion NA.

(e)    "Deferred Sale Assets" means the Encore LLC Assets and Fusion LLC Assets.

39.    The Deferred Sale Assets (and the proceeds thereof) shall constitute Acquired Assets under the Stalking Horse Agreement.  The Deferred Sale Assets themselves shall not transfer to the Purchaser at Closing.

40.    At Closing, (i) all undrawn DIP Commitments shall be terminated, and (ii) all outstanding DIP Obligations shall be converted to limited recourse obligations of the Debtors and shall be solely secured by,[4] and have recourse to, the Deferred Sale Assets and the proceeds thereof.  The DIP Lender's rights and remedies under the DIP Loan Documents shall be limited to the Deferred Sale Assets (or the proceeds thereof), and the DIP Lender shall have no other rights, entitlements, recourse or remedies against the Debtors or their other assets.

41.    *Initial ROFR Offers*:

(a)    At Closing, the Purchaser shall designate a portion of the DIP Obligations as the consideration for the sale of the Encore LLC Assets (the "Encore Consideration Amount"), and thereafter, the Purchaser shall make an offer for the Encore LLC Assets in the Encore Consideration Amount (the "Encore Offer").

(b)    At Closing, the Purchaser shall designate a portion of the DIP Obligations as the consideration for the sale of the Fusion LLC Assets (the "Fusion Consideration Amount"), and thereafter, the Purchaser may make an offer for the Fusion LLC Assets in the Fusion Consideration Amount (the "Fusion Offer").

---

[4]    Fusion does not agree that the Fusion LLC Assets are or may be encumbered.

Case 24-11144-TMH   Doc 393   Filed 08/23/24   Page 33 of 50

(c)     For the avoidance of doubt, the sum of the Encore Consideration Amount plus the Fusion Consideration Amount may be less than or equal to the outstanding amount of the DIP Obligations as of the Closing, but shall not exceed such amount.  Any DIP Obligations not designated for such purposes shall be extinguished at the Closing of the Sale Transaction; and the DIP Obligation designated for such purpose shall only remain outstanding for purposes of the Encore Offer and Fusion Offer and shall be extinguished in accordance with the next two paragraphs.

42.     *Encore Offer and Sale*:  With respect to the Encore Offer:

(a)     The Debtors shall issue a Transfer Notice (as defined in section 10.3 of the Encore LLC Agreement (the "Encore ROFR Provision")) on account of the Encore Offer.

(b)     If the SUSI Member exercises its rights to acquire the Encore LLC Assets under the Encore ROFR Provision, then the purchase price paid for the Encore LLC Assets shall be indefeasibly paid to the Purchaser and the DIP Obligations equal to the Encore Consideration Amount shall be extinguished.

(c)     If the SUSI Member fails to exercise its rights to acquire the Encore Units by the expiration of the Acceptance Period (as defined in the Encore ROFR Provision), the SUSI Member must either (i) consent to the sale of the Encore Units to the Purchaser pursuant to the Encore Offer or (ii) file an objection with the Court indicating that it does not consent to the sale of the Encore Units to the Purchaser pursuant to the Encore Offer. If the SUSI Member consents to such sale, the Debtors may consummate the sale to the Purchaser, and upon the closing of such sale, the DIP Obligations equal to the Encore Consideration Amount shall be extinguished.  If the SUSI Member objects to such sale, the

Court shall hold a hearing within 15 days of the filing of that objection (or such later date as the Court is available).

(d)     If the Purchaser purchases the Encore Units, the admission of the Purchaser as a member of Encore shall be subject to the terms of the Encore LLC Agreement and, from the consummation of the sale until such admission, the Purchaser shall be an assignee of the Encore Units.

(e)     The Purchaser, Encore and the SUSI Member may agree to another disposition of the Encore LLC Assets, so long as it results in extinguishment of DIP Obligations equal to the Encore Consideration Amount.

43.     *Fusion Offer and Sale*: With respect to the Fusion Offer:

(a)     The Debtors shall issue a Notice (as defined in section 7.2 of Fusion's limited liability company agreement (the "Fusion ROFR Provision")) on account of the Fusion Offer.

(b)     If one or more Members of Fusion timely exercises the right to acquire the Fusion LLC Assets under the Fusion ROFR Provision during the Offer Period (as defined in the Fusion ROFR Provision), then the purchase price paid for the Fusion LLC Assets shall be indefeasibly paid to the Purchaser and DIP Obligations equal to the Fusion Consideration Amount shall be extinguished.

(c)     If no Member of Fusion timely exercises its rights to acquire the Fusion LLC Assets under the Fusion ROFR Provision, then upon the expiration of the Offer Period, the Debtors and Purchaser may consummate the sale of the Fusion LLC Assets and DIP Obligations equal to the Fusion Consideration Amount shall be extinguished unless Fusion or any of its Members files a written objection to such sale on or before the

expiration of the Offer Period; *provided*, *however*, that any sale shall be subject to the "tag along" rights under section 7.3 of the Fusion LLC Agreement, and if less than all of the Fusion LLC Assets are sold due to the exercise of "tag along" rights, the DIP Obligations shall be extinguished on a ratable basis based on the actual number of units actually acquired by the Purchaser from the Debtors.  The Court shall hold a hearing within 15 days of the filing of such objection (or such later date as the Court is available).  For the avoidance of doubt, all grounds for objection by Fusion or any of its Members to the Fusion Offer or other sale of the Fusion LLC Assets are hereby reserved, including, but not limited to, membership unit transfer restrictions in the LLC Agreement.

      (d)      If the Purchaser purchases the Fusion Units, the admission of the Purchaser as a member of Fusion shall be subject to the terms of the LLC Agreement.

      (e)      The Purchaser and Fusion may agree to another disposition of the Fusion LLC Assets, so long as it results in extinguishment of DIP Obligations equal to the Fusion Consideration Amount.

44.      For the avoidance of doubt, subject to the terms and conditions to the Closing being satisfied or waived in accordance with the Stalking Horse Agreement, the Purchaser shall still be required to deliver at Closing cash in the amount specified in section 3.3(a) of the Stalking Horse Agreement.

## Resolution of Objections

*ReArch*

45.      Notwithstanding anything in this Order or the Transaction Documents to the contrary, the Purchaser shall not assume that certain agreement dated June 27, 2022, by and between ReArch Company and iSun Industrial, LLC.

*BNRG and Nautilus*

46.     Notwithstanding anything to the contrary herein or in any document related to the Sale, any valid, enforceable, perfected and non-avoidable security interests, rights, arguments, claims (including counterclaims), or defenses, including any setoff or recoupment rights and defenses arising in contract, tort, equity, common law or otherwise, that BNRG Renewables Limited, BNIX Mercury LLC, and/or BD Solar Larson LLC, or their respective affiliates, subsidiaries, successors, and assigns (collectively, "BNRG") or BD Solar Norridgewock LLC, BD Solar North Anson LLC, BD Solar Rangeley and Nautilus US Power HoldCo LLC (collectively, "Nautilus Solar") may have against the Debtors, the Debtors' sureties (including, but not limited to, Merchants National Bonding Company, Inc. and Great Midwest Insurance Company) and the Debtors' officers and directors are hereby preserved against such parties and are unaffected by this Sale Order or in any document related to the Sale (each respectively, "BNRG Claims" or "Nautilus Solar Claims").  All contracts, agreements, or other documents between any BNRG or Nautilus Solar entity, on the one hand, and any Debtor, on the other hand (each a "BNRG/Nautilus Agreement") shall not be treated as executory contracts for purposes of section 365 of the Bankruptcy Code nor subject to assumption and assignment by the Debtors to the Purchaser; *provided*, *however*, that the foregoing shall not limit, restrict or impair the Debtors' interests in and rights and claims arising under or related to the BNRG/Nautilus Agreements, if any, which shall be irrevocably sold and transferred to the Purchaser pursuant to section 363 of the Bankruptcy Code at the Closing.  To the extent that this Sale Order or any document related to the Sale transfers or assigns, or purports to transfer or assign (i) any payment intangibles (including accounts receivable) (ii) any other asset (including Avoidance Actions or any other claims or causes of action) or (iii) any document which imposes or purports to impose a payment obligation or credit

obligation owed by BNRG or Nautilus Solar to the Debtors or any monetary claims against BNRG or Nautilus Solar, including under the BNRG/Nautilus Agreements, all of BNRG's and Nautilus Solar's valid, enforceable, perfected and non-avoidable security interests, rights, arguments, and defenses with respect to such alleged claims, obligations and actions, including rights of recoupment, but expressly excluding any right of setoff that cannot be enforced against the Purchaser in a sale made pursuant to section 363(f) of the Bankruptcy Code, are unaffected by any transfer or assignment and fully enforceable against the Purchaser to the same extent enforceable against the Debtors, subject to all applicable defenses, provided that, subject to terms and conditions of this paragraph, the rights of the Purchaser to pursue any purchased monetary rights, claims or interests in or arising under the BNRG/Nautilus Agreements, if any, are fully preserved notwithstanding the non-executory nature of the BNRG/Nautilus Agreements.

*Resolution of Nautilus Solar Claims and Disputes*

47.     In order to facilitate prompt resolution of the Nautilus Solar Claims, any claims by the Purchaser against Nautilus Solar, and any other disputes that Nautilus Solar, on the one hand, and the Purchaser, on the other, may assert against each other with respect to the Nautilus Agreements, the Nautilus Transformers (as defined below) shall be Acquired Assets but shall be transferred subject to the Nautilus Ownership Claims (as defined below) and free and clear of all other Interests, and the Purchaser and Nautilus Solar have agreed as follows:

(a)     Promptly following the entry of this Order, but in all events on or before August 30, 2024 (unless extended by agreement of the parties), the Purchaser and Nautilus Solar shall engage in good faith mediation (the "Stage 1 Mediation") with respect to the following claims and disputes:

(b)     Nautilus Solar's claims that it holds title to certain equipment more particularly described as: (i) DSS1780 1200kVA Padmount Transformer and DSS1781 1000 kVA Padmount Transformer described in JCL Energy Order No. 2009 for the North Anson project; (ii) DSS1782 75 kVA Grounding Transformer described in JCL Energy Order No. 2010 for the North Anson project; (iii) DSS1778 2500 kVA Padmount Transformer described in JCL Energy Order No. 2007 for the Norridgewock project; and (iv) DSS2130 15kV NGR described in JCL Energy Order No. 3036 for the Norridgewock project (collectively, the "<u>Nautilus Solar Transformers</u>" and such claim the "<u>Nautilus Ownership Claims</u>"); and

(c)     Disputed historical facts with respect to the Nautilus Agreements which can be objectively determined without recourse to expert testimony, concerning but not limited to project schedules, delays, payments to subcontractors and vendors, force majeure events, approved and submitted change orders, and completion definitions (the "<u>Historical Facts</u>") and any amounts due to Purchaser (as successor to the Debtors) or Nautilus Solar based on such Historical Facts, with all such amounts subject to adjustment following completion of the Stage 2 Mediation and not paid until such reconciliation.

(d)     Should the Stage 1 Mediation not result in an agreement with respect to the Nautilus Solar Transformers, the parties agree to prompt adjudication of those disputes, whether by arbitration or otherwise in a forum to be agreed to by the parties.  If any Historical Facts remain unresolved at the end of the Stage 1 Mediation, resolution of such Historical Facts shall be moved to the Stage 2 Mediation (defined below).

(e)     Following the Stage 1 Mediation, the Purchaser and Nautilus Solar agree that the parties shall engage in a good faith exchange of information and mediation as to

the balance of the Nautilus Solar Claims and any claims that the Purchaser (as successor to the Debtors) may assert against Nautilus Solar in connection with the Nautilus Agreements (the "Stage 2 Mediation").  The Stage 2 Mediation for a project shall commence on the first business day that is 30 days after the date that the Norridgewock, Rangely, and North Anson projects have all achieved Substantial Completion (which shall be deemed to occur for purposes of Stage 2 Mediation no later than 30 days after commencement of power generation of the subject project); provided that, in no event shall the Stage 2 Mediation commence no later than February 1, 2025 and shall conclude no later than March 1, 2025. Should Stage 2 Mediation not result in a consensual resolution of the parties' claims and a full settlement of the disputes and claims concerning the Nautilus Agreement, the Purchaser and Nautilus Solar agree to pursue binding arbitration for the dispute in a forum, with arbitrators, on a timeline, and pursuant to a process to be jointly agreed to by the conclusion of the Stage 1 Mediation.

*Fusion*

48.    Notwithstanding anything in this Order or the Transaction Documents to the contrary, the Debtors shall not assume and the Purchaser shall not take assignment of (i) that certain Engineering, Procurement, and Construction Agreement dated September 30, 2022 (as amended) between ER Waite Cemetery Solar, LLC and iSun Industrial, LLC and (ii) that certain Engineering, Procurement, and Construction Agreement dated December 31, 2021 (as amended) between Fusion Renewable NA, LLC and iSun Utility, LLC.  The Debtors and Fusion hereby agree, and the Court hereby orders pursuant to Bankruptcy Code section 365(a), that such agreements are hereby rejected. For the avoidance of doubt, all rights of all parties-in-interest are hereby reserved related to the amount of any claim related to rejection of these agreements.

*Merchants/Great Midwest*

49.     For the avoidance of doubt, no surety bonds executed by Merchants National Bonding Company, Inc. or Great Midwest Insurance Company (together, the "Sureties") on behalf of any of the Debtors, including, but not limited to, those surety bonds bearing bond nos. NME 1132, NVT 1018, 100000127, NME 1133, GM224679, GM224681, GM224678, GM230490, GM221390, GM221779, GM221780, GM221382, GM221803 (the "Bonds"), are being assumed, assigned or transferred by the Debtors as part of the Sale Transaction contemplated by this Order.

50.     Notwithstanding anything to the contrary in this Order or the Stalking Horse Agreement, the Purchaser is not acquiring any "Cash", "Cash Collateral", "Cash Equivalents" or receivables that are not property of the Debtors' estate.  For the avoidance of doubt, nothing in this Order shall be deemed to (a) limit the Sureties' valid, enforceable, and non-avoidable subrogation rights, and/or the Sureties' rights as a beneficiary of any valid, enforceable, and non-avoidable trusts granted or created under any indemnity agreements or at law ("Surety Rights"), if any; or (b) impair, release, discharge, preclude, or enjoin any obligations of the Debtors, or any non-Debtor indemnitors to the Sureties, arising out of any valid, enforceable and non-avoidable trusts granted or created under any indemnity agreements, pursuant to any statutory trusts, and/or the Sureties' subrogation rights; or (c) authorize the transfer of any "Cash", "Cash Collateral", "Cash Equivalents" or receivables that are not property of the Debtors' estate(s).  All parties' rights to challenge any such rights or interests are expressly preserved.  In the event any disputes arise with respect to: (x) whether any receivables are property of the Debtors' estate(s), or (y) the nature, extent or applicability of the Surety Rights, or (z) whether any Acquired Assets are subject to Surety Rights but have a value in excess of the obligations owed to the Sureties related to such Surety Rights (for the avoidance of doubt, if there is such an excess it shall be included as part of

the Acquired Assets), then the Sureties, Debtors, and Purchaser agree to use their commercially reasonable best efforts to resolve any such disputes.  If the Sureties, Debtors, and/or Purchaser are unable to resolve any such dispute(s), the parties agree to submit such dispute(s) to this Court for resolution.  The Court retains jurisdiction in connection with any such disputes.  For the avoidance of doubt, Surety Rights do not include any security interest in or setoff rights (as distinguished from the subrogation and trust rights as set forth in clause (a) of this paragraph, including funds held in any funds control accounts) from which the Acquired Assets may be sold "free and clear" of pursuant to section 363(f) of the Bankruptcy Code.

51.     The Purchaser shall be entitled to an accounting of any amounts collected, and the application of such amounts, by the Sureties from the Debtors' current and former customers on all projects covered by the Bonds.

52.     The Sureties shall be entitled to an accounting of any amounts collected, and the application of such amounts, by the Purchaser from the Debtors' current and former customers on all projects covered by the Bonds.

*Ford Motor*

53.     On or after the Closing, the Purchaser may, but shall not be required to, acquire the following vehicles in which Ford Motor Credit Co. ("Ford"), asserts a lien as Acquired Assets and, as a condition to the acquisition of each vehicle, the Debtors shall satisfy the obligations owed to Ford with respect to such vehicle secured by any valid, perfected, enforceable, and non-avoidable security interest, unless Ford consents to a different treatment of its claim; *provided* that the Purchaser may bring any dispute before the Bankruptcy Court concern the extent of such Interest.

| Model | VIN |
|-------|-----|
| 2023 Ford F-150 | 1FTFX1E56PFB49262 |
| 2023 Ford F-150 | 1FTFX1E55PFB37149 |
| 2023 Ford F-150 | 1FTEX1EP6PKF91852 |

| 2023 Ford Super Duty F-250 | 1FTBF2BA3PEC75707 |
|---|---|

54.     The following vehicles in which Ford asserts an Interest are not Acquired Assets and shall not be sold to the Purchaser:  2022 Ford F-150, VIN:  1FTMF1EB0NKF26916; 2022 Ford F-150, VIN:  1FTMF1EP2NKF28145; 2023 Ford F-150, VIN:  1FTMF1EB8PKE30227; 2023 Ford Super Duty F-250, VIN:   1FTBF2BA4PED37048; 2019 Ford F-450, VIN: 1FDUF4HT6KEE49724; 2023 F-150, VIN:   1FTVW1EL3PWG13573; 2022 Ford F-150 Lighting, VIN: 1FT6W1EV6NWG11092.

55.     To the extent that the Purchaser does not acquire a vehicle in which Ford asserts an Interest, the indebtedness related to such vehicle shall be removed from the schedule of Assumed Indebtedness on the Stalking Horse Agreement.

*Ally Bank*

56.     On or after the Closing, the Purchaser may, but shall not be required to, acquire the following vehicles in which Ally Bank ("Ally") asserts a lien as Acquired Assets and, as a condition to the acquisition of each vehicle, the Debtors shall satisfy the obligations owed to Ally with respect to such vehicle secured by any valid, perfected, enforceable, and non-avoidable security interest, unless Ally consents to a different treatment of its claim; *provided* that the Purchaser may bring any dispute before the Bankruptcy Court concern the extent of such Interest:

| Model | VIN |
|---|---|
| 2019 RAM 1500 Quad | 1C6RR7FT8KS673401 |
| 2019 RAM Promaster City Cargo Van | ZFBHRFAB8K6N69130 |
| 2020 Dodge Ram 2500 Crew | 3C6UR5CJ1LG208369 |

57.     The following vehicle in which Ally asserts an Interest is not an Acquired Assets and shall not be sold to the Purchaser:  2019 RAM 2500 Crew, VIN:  3C6UR5CJ4KG574292.

58.     To the extent that the Purchaser does not acquire a vehicle in which Ally asserts an Interest, the indebtedness related to such vehicle shall be removed from the schedule of Assumed Indebtedness on the Stalking Horse Agreement.

*NBT Bank*

59.     Nothing in this Order or the Transaction Documents shall impair any guaranties in favor of NBT Bank, N.A. ("NBT") or any setoff or recoupment rights NBT has against the Deposit Accounts (as defined in NBT's amended objection filed at Docket No. 333).

60.     To the extent that NBT holds a valid, perfected, enforceable and non-avoidable lien on any Acquired Assets (the "NBT Liens" and such collateral, the "NBT Collateral"), such NBT Lien and NBT's rights against the NBT Collateral shall be unimpaired by this Order, the Transaction Documents or the closing of the Sale Transaction, and notwithstanding anything herein to the contrary, the Acquired Assets shall not be sold free and clear of any NBT Lien or any rights NBT has with respect to the NBT Collateral.  The Purchaser shall work in good faith with NBT to complete the Novation Agreements with respect to the Assumed Indebtedness owed to NBT.

61.     NBT's right to argue that its Indebtedness may not be assumed and/or any NBT Collateral sold "free and clear" of the NBT Liens over NBT's objections, is fully preserved, and the rights of other parties to argue otherwise are also preserved.  To the extent any other provision(s) of the Order is inconsistent with above-referenced paragraphs that provision(s) shall not apply to NBT or any NBT Collateral.

*OpSun Systems*

62.     For the avoidance of doubt the EA800 Single Bay Carport supplied by OpSun Systems Inc. under Purchase Order (#PO-ISI-00631), dated April 21, 2022 shall not be an Acquired Asset.

*Beta Technologies*

63.     Notwithstanding anything in this Order or the Transaction Documents to the contrary, the Development and Services Agreement, dated April 18, 2022 and Roof Sublease, dated November 15, 2023, each between Beta Technologies, Inc. ("BETA") and SolarCommunities, Inc. d/b/a SunCommon shall not be an Assumed Contract or assumed and assigned to the Purchaser absent either further order of the Court or the written agreement of BETA.

*Oracle/Netsuite*

64.     Notwithstanding anything in this Order or the Transaction Documents to the contrary, no contracts, licenses or agreements with Oracle America, Inc., including in its capacity as successor to NetSuite (jointly "Oracle"), shall be an Assumed Contract or assumed and assigned to the Purchaser absent either further order of the Court or the written agreement of Oracle, nor shall transitional use of any Oracle contract or service be authorized by the Purchaser without Oracle's written agreement.

*Cedar Advance, LLC*

65.     In full and final satisfaction of (1) the Objection of Cedar Advance, LLC ("Cedar Advance"), to the Debtors' Motion for Sale and Property Free and Clear of Liens (the "Cedar Advance Objection") [D.I. 272], (2) any interest claimed by Cedar Advance in Acquired Assets, and (3) any interest claimed by Cedar Advance in the Prepetition Secured Lender's collateral, the

Prepetition Secured Lender and Cedar Advance agree that Cedar Advance shall be paid $100,000 from the proceeds of the sale otherwise payable to the Prepetition Secured Lender.

*Creditor's Committee*

66.    The following shall govern the timing of Closing and borrowings under the DIP Facility after the date of this Order through the Closing.

(a)    The Closing will be deemed to have occurred at  11:59 p.m. (ET) on the business day prior to the Closing Date (the "Effective Time").

(b)    The DIP Budget for the period August 10, 2024 through August 23, 2024 (the "Closing Period Budget") shall be the budget attached hereto as Exhibit 3.

(c)    The Debtors shall immediately deposit all cash into their bank accounts. The Debtors shall certify that the stated cash balance is accurate, there are no additional cash accounts other than those represented in the Closing Period Budget, and that no receipts have been converted into cash without such cash being deposited into the bank accounts identified in the Closing Period Budget.

(d)    On the Closing Date, the Debtors shall deliver a borrowing notice in the form attached hereto as Exhibit 4, requesting a Tranche 4 DIP Loan.  Following the Closing, the Debtors shall provide the DIP Lender with copies of their bank statements, upon request of the DIP Lender, for purposes of validating the representations made in the borrowing notice.

(e)    The DIP Lender will make a Tranche 4 DIP Loan one business day after the Closing Date, consistent with the Closing Period Budget, after taking into account the Debtors' cash held in their bank accounts as of the Effective Time (which shall be available to fund unpaid amounts in the Closing Period Budget) and the disbursements made during

the Closing Budget Period but prior to the Effective Time of the Closing, so as to minimize the amount of the Tranche 4 DIP Loan.

(f)    Purchaser shall purchase, and receive (i) all Acquired Assets, (ii) all of the Debtors' interest in the cash on deposit in the loan reserve account at M&T Bank (account ending X3130) (the "Purchased Account"), (iii) all of the cash and receipts received after the Effective Time related to the Acquired Assets.

67.    The following shall be treated as Assumed Liabilities under the Stalking Horse Agreement:

(a)    To the extent not paid pursuant to the Closing Period Budget,

o    Ordinary course wages and pay-roll incurred from August 10, 2024 to the Effective Time of the Closing.

o    Ordinary course employee benefits amounts incurred from August 10, 2024 to the Effective Time of the Closing.

o    All Project Administrative Expenses incurred for any project that is the subject of an Assumed Contract. "Project Administrative Expenses" means amounts owed for goods delivered (materials) or services provided to the Debtors, on or after the Petition Date through the Closing, directly related to and for use in a project. The Debtors shall approve any new Project Administrative Expenses upon DIP Lenders approval.

o    50% of all Project Administrative Expenses incurred for any project that is not the subject of an Assumed Contract, not to exceed $60,000 in the aggregate for all such items.

(b)    All paid time off obligations of the Sellers that are unpaid as of Closing, not to exceed $600,000; *provided* that such employee of Sellers that Purchaser offers employment provides his/her consent to "roll-over" these obligations in lieu of payment in cash at termination.

(c)    Any obligations owed to Salesforce by SunCommon that are entitled to administrative expenses status and unpaid as of Closing, not to exceed $40,000.

(d)    Any rent obligations on SunCommon's Waterbury VT facility that are entitled to administrative expense status and unpaid as of Closing, not to exceed $90,000.

**Additional Provisions**

68.    To the maximum extent permitted by applicable law, and in accordance with the Transaction Documents, the Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the Debtors with respect to the Acquired Assets. To the extent the Purchaser cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect, to the maximum extent permitted by applicable law, while the Purchaser, with commercially reasonable assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government or other approvals for new issuance of Licenses to the Purchaser  The Debtors shall, at Purchaser's sole cost, maintain the Licenses in good standing to the fullest extent allowed by applicable law for the Purchaser's benefit until equivalent new Licenses are issued to the Purchaser.

69.    The terms and provisions of the Transaction Documents and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors and their respective affiliates, successors and assigns, their estates, and their creditors, any statutory committee appointed in these Chapter 11 Cases, the Purchaser, and its respective Affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in, on or against the Acquired Assets to be sold to the Purchaser and all Assumed Contract Counterparties pursuant to the Stalking Horse Agreement and any trustees, examiners, "responsible persons," liquidating trusts, liquidating trustees or other fiduciaries appointed in the Chapter 11 Cases or upon a conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee; and the Transaction Documents shall not be

subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Purchaser hereunder shall remain effective, notwithstanding any subsequent dismissal, conversion or appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

70.     The failure specifically to include any particular provisions of the Stalking Horse Agreement or the other Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Agreement be authorized and approved in its entirety.

71.     The Transaction Documents or any other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement that has a material adverse effect on the Debtors' estates shall only be effective upon the later of (i) five (5) days after filing the applicable modification, amendment or supplement with the Court and (ii) entry of a Court order approving such modification, amendment or supplement, solely to the extent an objection thereto is interposed in the period referred to in clause (i).

72.     The Debtors are authorized to enter into any contract or amend any existing contract necessary to meet their obligations under the Stalking Horse Agreement, including, without limitation, any transition services agreement that may be executed in connection with the Asset Purchase Agreement.

73.     Consistent with section 11.11 of the Stalking Horse Agreement, at the Closing, Clean Royalties, LLC may elect to have any or all of the Acquired Assets (including Assumed Contracts) conveyed or transferred to, or any or all of the Assumed Indebtedness or Assumed Obligations assumed by, one or more of its Affiliates.

74.     Any and all valid and perfected Liens or other Interests in the Acquired Assets shall solely attach to any proceeds of the Sale Transaction immediately upon receipt of such proceeds by the Debtors in the order of priority, and with the same validity, force and effect which they now have against such Acquired Assets, subject to any rights, claims, and defenses of the Debtors, the Debtors' estates or any trustee for any Debtor, as applicable, may possess with respect thereto.

75.     The provisions of this Order are nonseverable and mutually dependent.

76.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale Transaction.

77.     The Debtors and each other person or entity having duties or responsibilities under the Transaction Documents or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Stalking Horse Agreement, to issue, execute, deliver, file and record, as appropriate, the Stalking Horse Agreement and the other Transaction Documents, and to take any action contemplated by the Transaction Documents or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Stalking Horse Agreement, the other Transaction Documents and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall

constitute all approvals and consents required by this Court and the Debtors' members, managers, officer, directors, and shareholders with respect to the implementation and consummation of the Stalking Horse Agreement, the other Transaction Documents and this Order and the transactions contemplated thereby and hereby. The transfer of the Acquired Assets to the Purchaser pursuant to the Transaction Documents does not require any consents other than those specifically provided for in the Stalking Horse Agreement or as provided for herein.

78.      This Court shall retain jurisdiction with respect to the terms of this Order and the Stalking Horse Agreement.

79.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

**Dated: August 23rd, 2024**
**Wilmington, Delaware**

                                         **THOMAS M. HORAN**
                                         **UNITED STATES BANKRUPTCY JUDGE**