# Exhibit B

**Seventh Amended and Restated**

**Limited Liability Company Agreement**

**of**

**Encore Redevelopment, LLC**

**a Delaware Limited Liability Company**

THE UNITS AND OTHER INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER SET FORTH HEREIN.  SUCH INTERESTS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS, OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page**

Article I ORGANIZATION AND POWERS ............................................................................2

    1.1     Purpose and Powers.................................................................................2

    1.2     Principal Place of Business........................................................................2

    1.3     Fiscal Year. ...........................................................................................3

    1.4     Term. ...................................................................................................3

    1.5     Qualification in Other Jurisdictions.............................................................3

    1.6     Tax Status. ............................................................................................3

Article II MEMBERS; CAPITAL STRUCTURE.......................................................................3

    2.1     Members. ..............................................................................................3

    2.2     Compliance with Securities Laws and Other Laws and Obligations.....................3

    2.3     Limitation of Liability of Members...............................................................4

    2.4     Authority...............................................................................................4

    2.5     No Right to Withdraw. .............................................................................4

    2.6     Rights to Information. ..............................................................................4

    2.7     Confidential Information. ..........................................................................5

    2.8     Units. ..................................................................................................5

Article III BOARD OF DIRECTORS; CERTAIN GOVERNANCE MATTERS...................8

    3.1     Board of Directors...................................................................................8

    3.2     Composition of the Board. ........................................................................8

    3.3     Election of the Board. ..............................................................................8

    3.4     Powers and Duties of the Directors. ...........................................................9

    3.5     Actions Requiring Supermajority Member Consent........................................10

3.6     Committees of the Board of Directors. ...............................................................11

3.7     Board Voting Rights; Meetings; Quorum. ...............................................................18

3.8     Actions of the Board of Directors and Committees. ...............................................19

3.9     Compensation of Directors...............................................................................20

3.10    Transaction with Interested Persons................................................................20

3.11    Reliance. ...............................................................................................20

3.12    Confidentiality Agreement. ...............................................................................20

3.13    Benefit Company. ...............................................................................................20

Article IV OFFICERS ...............................................................................................22

4.1     Enumeration. ...............................................................................................22

4.2     Qualification. ...............................................................................................22

4.3     Tenure. ...............................................................................................22

4.4     Removal. ...............................................................................................22

4.5     Vacancies. ...............................................................................................22

4.6     Confidentiality Agreement. ...............................................................................22

4.7     Compensation of Officers. ...............................................................................22

Article V INDEMNIFICATION ...............................................................................................22

5.1     Right to Indemnification. ...............................................................................22

5.2     Award of Indemnification. ...............................................................................23

5.3     Successful Defense...............................................................................................23

5.4     Advance Payments. ...............................................................................................23

5.5     Definitions...............................................................................................23

5.6     Insurance. ...............................................................................................24

5.7     Non-Exclusivity. ...............................................................................................24

5.8     Member Liability. ...............................................................................................24

**Article VI CAPITAL CONTRIBUTIONS** ..................................................................24

    **6.1**     **Contributions of Capital; Units.** ..............................................................24

    **6.2**     **Additional Capital Contributions.** ...........................................................25

    **6.3**     **Capital Accounts.** ....................................................................................29

**Article VII ALLOCATIONS OF PROFITS, LOSSES, ETC.** .....................................29

    **7.1**     **Allocations Generally.** .............................................................................29

    **7.2**     **Tax Allocations.** ......................................................................................29

    **7.3**     **Special Allocations, Tax Elections and Tax Matters.** ...........................29

    **7.4**     **Allocations in Respect of Incentive Units.** .............................................31

**Article VIII DISTRIBUTIONS** .................................................................................31

    **8.1**     **Distributions Generally, Operating Distributions.** ................................31

    **8.2**     **Capital Transaction Distributions.** .........................................................31

    **8.3**     **Tax Distributions.** ...................................................................................32

    **8.4**     **Liquidating Distributions.** ......................................................................32

    **8.5**     **Limitations on Distributions.** .................................................................32

    **8.6**     **In-Kind Distributions.** ............................................................................33

    **8.7**     **Allocated Adjustment Amounts.** ............................................................33

**Article IX TAX MATTERS AND REPORTS; ACCOUNTING** ................................33

    **9.1**     **Tax Reports to Current and Former Members.** .......................................33

    **9.2**     **Accounting Records.** ...............................................................................33

    **9.3**     **Tax Accounting Method.** .........................................................................34

**Article X RESTRICTIONS ON TRANSFER; RIGHTS OF FIRST REFUSAL;** .......34

    **10.1**     **Prohibited Transfers.** .............................................................................34

    **10.2**     **Effective Date and Requirements of Transfer.** ......................................34

    **10.3**     **Right of First Refusal.** ...........................................................................35

| | | |
|---|---|---|
| 10.4 | Drag-Along Right. | 36 |
| 10.5 | Tag-Along Right. | 37 |
| 10.6 | No Indirect Transfers. | 39 |
| 10.7 | Inside Members Buyout Right. | 39 |

**Article XI DISSOLUTION, LIQUIDATION, AND TERMINATION; DISSOCIATION...39**

| | | |
|---|---|---|
| 11.1 | Dissolution. | 39 |
| 11.2 | Liquidating Distributions. | 39 |
| 11.3 | Orderly Winding Up. | 40 |

**Article XII DEFINITIONS ...40**

| | | |
|---|---|---|
| 12.1 | Terms Defined Elsewhere in the Agreement. | 40 |
| 12.2 | Other Definitions. | 43 |

**Article XIII GENERAL PROVISIONS...50**

| | | |
|---|---|---|
| 13.1 | Offset. | 50 |
| 13.2 | Notices. | 50 |
| 13.3 | Entire Agreement. | 51 |
| 13.4 | Consent to Jurisdiction. | 51 |
| 13.5 | Amendment or Modification. | 51 |
| 13.6 | Binding Effect. | 52 |
| 13.7 | Governing Law; Severability. | 52 |
| 13.8 | Waiver of Certain Rights. | 52 |
| 13.9 | No Right to Continued Service. | 52 |
| 13.10 | Interpretation. | 52 |

**Schedule 2.8  Members**

**Exhibit A      Form of Mutual Confidentiality Agreement**

**Exhibit B      Form of Additional Capital Contribution Notice**

**Exhibit C**     **Form of Book**

**Exhibit D**     **Cash Management Procedures**

**Exhibit E**     **Project Guidelines**

**Exhibit F**     **Form of Project R&W Certificate**

## SEVENTH AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT OF
## ENCORE REDEVELOPMENT, LLC

This Seventh Amended and Restated Limited Liability Company Agreement (the "**Agreement**") of Encore Redevelopment, LLC, a Delaware limited liability company (the "**Company**"), is made as of the 17th day of May, 2023, by and among the Persons identified as the members of the Company on Schedule 2.8 hereto (each a "**Member**" and, collectively, the "**Members**"), and such other Persons who may become Members or Assignees (as defined herein) from time to time in accordance with the terms of this Agreement. Certain capitalized terms used in this Agreement are defined in Section 12.2 below.

A.        The Company was formed as a limited liability company under Chapter 25 of Title 11, et seq., of the Vermont Limited Liability Company Act on August 6, 2007 and was converted to a Delaware limited liability company on even date herewith under Chapter 18 of the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101 et seq., as amended (the "**Act**").

B.        In connection with such conversion, this Agreement, as approved by all the Members, shall constitute the Plan of Domestication for the Company pursuant to the terms of 11 V.S.A. § 4153.

C.        The Members entered into the First Amended and Restated Operating Agreement dated September 28, 2016, the Second Amended and Restated Operating Agreement dated December 30, 2016, the Third Amended and Restated Operating Agreement dated February 13, 2020, the Fourth Amended and Restated Operating Agreement dated October 30, 2020, the Fifth Amended and Restated Operating Agreement dated July 29, 2021, and the Sixth Amended and Restated Operating Agreement dated November 24, 2021 (the "**Prior Agreement**").

D.        On even date herewith, immediately prior to the effectiveness of this Agreement and to facilitate the Purchase Transaction (as such term is defined below), pursuant to separate Unit Repurchase Agreements (the "**Unit Repurchase Agreements**") the Company redeemed and cancelled 63,359 Units from Charles R. Farrell, 9,122 Units from Gardeners Intervale LLC, 2,147 Units from Split Rock Fund, LLC, 11,951 Incentive Units from Alpenglow Energy Solutions, LLC, and 66,686 Incentive Units from PBS Renewable Energy LLC, a Connecticut limited liability company (the "**PBS Member**").

E.        On April 28, 2023, the Company and Maple SETF LLC, a Delaware limited liability company (the "**SUSI Member**"), entered into that certain Membership Interest Purchase Agreement (the "**MIPA**") pursuant to which (a) the SUSI Member agreed to purchase 3,200,000 newly authorized and issued Class A Units from the Company (the "**Purchase Transaction**") and (b) the SUSI Member was granted the right to purchase from the Company up to 9,441,666 Class B Units newly authorized and reserved for the SUSI Member subject to the terms of the MIPA and this Agreement, in each case for a per-Unit purchase price of $12 (subject to possible adjustment as set forth in the MIPA).

F.        Prior to the effectiveness of this Agreement, the Company had 1,179,298 issued and outstanding Units (the "**Existing Units**") and 792,980 Incentive Units held among the

NG-E4TG3SKK 4868-8999-0464v.31

Members of the Company and upon the effectiveness of this Agreement and as of the moment immediately prior to the Initial Closing (as such term is defined in the MIPA), the Existing Units will be reclassified to an equal number of Class B Units on the terms set forth in Section 2.8(b) of this Agreement (the "**Reclassification**").

G. Subject to the occurrence of the Initial Closing, the Loan and Security Agreement dated as of April 29, 2022 by and among the Company, as borrower, and JavCap Holdings LLC and Lacuna Project Investments II, LLC, as lenders, is being fully paid off pursuant to the Payoff Letter dated as of April 26, 2023 and, in consideration for the cancellation of the warrants which the Company may have granted to such lenders pursuant to Section 2.5(f) of the Loan Agreement, the Company is issuing JavCap Holdings LLC and Lacuna Project Investments II, LLC the number of Class B Units respectively set forth for them on Schedule 2.8 to this Agreement.

H. Effective immediately after the Initial Closing, (a) 3,200,000 Class A Units are held by the SUSI Member; (b) 9,441,666 additional Class B Units are authorized to be held in reserve for issuance to the SUSI Member subject to the terms of this Agreement and the MIPA; and (c) the Class B Units and Incentive Units authorized and issued or reserved pursuant this Agreement are in the respective amounts set forth in Section 2.8(c)(i) through Section 2.8(c)(iii) of this Agreement. To the extent set forth in Schedule 2.8, the existing Incentive Units otherwise authorized under the Prior Agreement will remain outstanding.

I. In connection with the foregoing, the Members desire to amend and restate and supersede the Prior Agreement in its entirety as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises, representations and warranties and the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**Article I**
**ORGANIZATION AND POWERS**

1.1 **Purpose and Powers**. The principal business activity and purpose of the Company shall be to engage the development, construction, financing, ownership and operation of renewable energy projects and energy storage projects ("**Projects**") and to engage in any and all other activities as permitted under the Act. The purpose of the Company shall include creating a material positive impact on society and the environment, taken as a whole. The business and purposes of the Company, however, shall not be limited to its initial principal business activity, and if the Board of Directors otherwise determines, it shall have authority to engage in any other lawful business, purpose or activity permitted by the Act and shall possess and may exercise all of the powers and privileges granted by the Act or which may be exercised by any other person, together with any powers incidental thereto, so far as such powers or privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

1.2 **Principal Place of Business**. The Company may locate its principal office place of business at any place or places as the Board of Directors may, from time to time, deem advisable.

1.3     **Fiscal Year**. Except as may otherwise be required by the federal tax laws, the fiscal year of the Company for both financial and tax reporting purposes shall end on December 31st (the "**Fiscal Year**").

1.4     **Term**.  The Company commenced on the date the Certificate of Formation was filed with the Secretary of State and shall continue in existence in perpetuity unless its business and affairs are earlier wound-up following dissolution at such time as this Agreement may specify.

1.5     **Qualification in Other Jurisdictions**. The Board of Directors shall cause the Company to be qualified or registered under applicable laws of any jurisdiction in which the Company owns property or engages in activities and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration, including, without limitation, the appointment of agents for service of process in such jurisdictions, if such qualification or registration is necessary or desirable to permit the Company to own property and engage in the Company's business in such jurisdictions.

1.6     **Tax Status**. The Company is intended to be classified as a partnership for federal and state income tax purposes. This classification for tax purposes shall not create or imply a general partnership, limited partnership or joint venture for state law or any other purpose.

**Article II**
**MEMBERS; CAPITAL STRUCTURE**

2.1     **Members**. The Members of the Company shall be the Persons identified on Schedule 2.8 hereto, as may be amended from time to time in accordance with this Agreement. The Company shall from time to time update and maintain Schedule 2.8 hereto in accordance with the provisions hereof and shall make a copy thereof available to any Member upon written request to the Board of Directors. The Members shall have only such rights with respect to the Company as specifically provided in this Agreement and as required by non-waivable provisions of the Act.

2.2     **Compliance with Securities Laws and Other Laws and Obligations**. Each Member hereby represents and warrants to the Company and acknowledges that (a) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto, (b) it is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time and understands that the Member has no right to withdraw and have its Units repurchased by the Company, (c) it is acquiring Units in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (d) unless the Member holds only Incentive Units, the Member is an "accredited investor" as defined in Rule 501 under the Securities Act of 1933, (e) it understands that the Units in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws, or in accordance with an applicable exemption there from, and the provisions of this Agreement have been complied with, and (f) the execution, delivery and performance of this Agreement do not require it to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any existing law

NG-E4TG3SKK 4868-8999-0464v.31

or regulation applicable to it, any provision of its charter, by-laws or other governing documents (if applicable) or any agreement or instrument to which it is a party or by which it is bound.

2.3     **Limitation of Liability of Members**. No Member in its capacity as a Member shall be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member of the Company. No Member shall have any fiduciary or other duty with respect to the business and affairs of the Company to the fullest extent permitted by applicable law (including Section 18-1101 of the LLC Act). Each Member may exercise its voting or approval rights, if any, in its sole discretion in relation to its proprietary interests in the Company, and no Member shall have any duty (including any fiduciary duty) to the Company or to any other Member in relation to such determinations or otherwise in connection with such Member's rights and responsibilities hereunder or with respect to the Company. No Member shall have any obligation in respect of, the liabilities or obligations of the Company. No Member shall have any obligation to contribute to the Company except as expressly provided in this Agreement. No Member shall have any obligation to return distributions made by the Company except as expressly provided in this Agreement or the Act. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for making its Members (including, without limitation, the Partnership Representative) responsible for the liabilities of the Company.

2.4     **Authority**. Unless specifically authorized by this Agreement or by the Board of Directors, no Member shall be an agent of the Company or have any right, power or authority to act for or to bind the Company, or to undertake or assume any obligation or responsibility of the Company or any other Member.

2.5     **No Right to Withdraw**. So long as a Member continues to hold any Membership Interests, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Membership Interests, such Person shall no longer be a Member. A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Act. No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

2.6     **Rights to Information**. The Board of Directors shall, upon reasonable demand for any purpose reasonably related to the Member's interest as a Member (except as indicated), provide a Member with (a) information regarding the status of the business and financial affairs of the Company; (b) a copy of this Agreement (with all information not pertaining to the requesting Member redacted from <u>Schedule 2.8</u>); (c) information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member, the property and services that each Member agreed to contribute in the future, and the date on which each became a Member; and (d) such other information regarding the affairs of the

NG-E4TG3SKK 4868-8999-0464v.31

Company as is just and reasonable. Further, without request, the Board of Directors shall provide the Members the following documents: (x) an annual financial statement as of the end of the Fiscal Year; and (y) promptly after becoming available, a copy of the Company's federal and state income tax return for each Fiscal Year. Access to information about the Company may be made subject to any reasonable conditions and standards established by the Board of Directors, as permitted by the Act, which may include, but is not limited to, withholding of, or restrictions on, the use of Confidential Information.

2.7     **Confidential Information**.

(a)     No Member, without the consent of the Board of Directors, may use or disclose to others any Confidential Information received from the Company or from any other Member for any purpose other than for the benefit of the Company, as determined by the Board of Directors, or as required by law or order of court, government authority, or arbitrator. The restrictions imposed by this Section 2.7 shall continue to apply to a former Member, notwithstanding such Member's Transfer of its Units. Notwithstanding the foregoing, the restrictions on disclosure set forth in this Section 2.7 shall not apply to any Confidential Information to the extent that such information can be shown to have been: (i) generally available to the public other than as a result of a breach of the provisions of this Agreement; already in the possession of the receiving Person, without any restriction on disclosure, prior to any disclosure of such information to the receiving Person by or on behalf of the Company or any Member pursuant to the terms of this Agreement or otherwise; (ii) lawfully disclosed, without any restriction on additional disclosure, to the receiving Person by a third party who is free lawfully to disclose the same; or (iii) independently developed by the receiving Person without use of any Confidential Information. Notwithstanding the foregoing, to the extent of any conflict between any agreement containing confidentiality obligations that a Member has executed with the Company in his capacity as a Director, officer, employee, consultant or other service provider to the Company (a "**Service Provider NDA**") and this Agreement, the provisions of the applicable Service Provider NDA shall control.

(b)     Except to the extent otherwise required herein, the Company and each Member shall not to disclose the names of any Member except as required by law or order of any court or governmental authority or any arbitration order (in which case, after giving reasonable notice thereof to any such Affiliate to allow such Person the opportunity to oppose such disclosure).

2.8     **Units**.

(a)     **In General**. All interests of Members shall be represented by their units of membership interests in the Company (each a "**Unit**" and, collectively, the "**Units**"). The Units shall not be certificated. There shall be three separate classes of Units authorized for issuance by the Company, with such class designations as set forth below. The Company may issue fractional Units. Except as otherwise provided herein, each Unit shall have the right to cast one vote per Unit on any matter to be approved by the Members entitled to vote thereon. The Members shall be listed on Schedule 2.8, as maintained by the Board of Directors and from time to time amended and supplemented in accordance with this

5

Agreement. As of the date of this Agreement, after giving effect to the Reclassification and the Purchase Transaction, each Member shall hold the number and classes of Units set forth opposite such Member's name on <u>Schedule 2.8</u>. <u>Schedule 2.8</u> shall be amended from time to time so that it sets forth the then current list of Members and the then current number and classes of Units held by the Members, and any such amendment shall not be subject to the Members approval contemplated by <u>Section 3.5</u>.

(b)  As of the date of this Agreement, immediately prior to the Purchase Transaction and after giving effect to the Unit Repurchase Agreements, each issued and outstanding Existing Unit is hereby reclassified into an equal number of Class B Units subject to the terms set forth in this Agreement.

(c)  Upon the effectiveness of this Agreement, the authorized Units are as follows:

(i)  **Class A Units**. 3,200,000 Units are designated as Class A Units. The Class A Units have the right to cast one vote per Class A Unit on any matter to be approved by the Members entitled to vote thereon.

(ii)  **Class B Units**.

(A)  **In General**. 10,604,209 Units are designated as Class B Units, of which 9,441,666 Class B Units shall be held in reserve by the Company for purchase by the SUSI Member in accordance with the terms set forth in this Agreement and the MIPA (the "**Reserved Class B Units**") and the remainder of which are held as of the date hereof as set forth on <u>Schedule 2.8</u>. The Class B Units have the right to cast one vote per Class B Unit on any matter to be approved by the Members entitled to vote thereon.

(B)  **Reserved Class B Units**. To the extent that any of the Reserved Class B Units remain authorized but unissued to the SUSI Member as of the seventh anniversary of this Agreement, all such Reserved Class B Units shall be automatically cancelled without any further action required by the Company. However, if any of the Reserved Class B Units are, at that time, subject to a pending Additional Capital Contribution Notice or otherwise subject to a bona fide dispute under this Agreement or the MIPA, then the subject Reserved Class B Units shall not be cancelled until the final resolution of such Additional Capital Contribution Notice or dispute in a manner that does not require the subject Reserved Class B Units to be issued to the SUSI Member and the SUSI Member to purchase such Reserved Class B Units. Upon any cancellation of Reserved Class B Units, the SUSI Member shall cease to have any right or expectancy with respect to acquiring such Reserved Class B Units.

(iii)  **Incentive Units**. 3,842,641 Units are designated Incentive Units (the "**Incentive Units**"), of which 1,097,093 are held as of the date hereof as set forth on <u>Schedule 2.8</u>. The Company is specifically authorized to issue Incentive

Units under a Plan (if any), each issuance of which shall be in accordance with the Plan and this Agreement, for such consideration and at a strike price or deemed value as the Board of Directors may deem appropriate. All Incentive Units shall be issued subject to vesting, forfeiture and repurchase pursuant to separate agreements (each, a "**Vesting Agreement**"), the provisions of which shall be determined, altered or waived in the sole discretion of the Board of Directors. The Incentive Units shall have no voting rights associated therewith and such units shall not count towards the calculation of the Majority Interest or the Supermajority Interest unless and until any such Incentive Units vest in accordance with the applicable Vesting Agreement and for so long thereafter as such Incentive Units are not forfeited or repurchased under the applicable Vesting Agreement.

(d)     In connection with the issuance of Incentive Units, the Board of Directors shall set a strike price with respect to such Incentive Units (the "**Strike Price**") which shall be set forth in each Vesting Agreement. The determination of the Board of Directors of the Strike Price shall be final, conclusive and binding on all Members. In the event the Board of Directors issues additional Incentive Units with a Strike Price lower than the Strike Price associated with a prior issuance of Incentive Units, the Board of Directors may, in its sole discretion, reduce the Strike Price of the Incentive Units issued at the higher Strike Price.

(e)     Each Incentive Unit is intended to be a "profits interest" within the meaning of IRS Revenue Procedures 93-27 and 2001-43 and is issued with the intention, but without assurance or guarantee, that under current interpretations of the Code the recipient will not realize income upon the issuance of the Incentive Unit, and that neither the Company nor any Member is entitled to any deduction either immediately or through depreciation or amortization as a result of the issuance of such Incentive Unit. Any Person holding a Unit subject to a Vesting Agreement, including, without limitation, any Incentive Unit issued under the Plan, shall make a timely Code Section 83(b) election in accordance with Treasury Regulation 1.83-2 with respect to each such Unit (to the extent applicable).

(f)     Except as otherwise provided herein (including in Section 3.5), the Company may from time to time issue additional Units of any class or series, and create new classes or series of Units, having such rights and preferences as the Board of Directors may determine and in exchange for such consideration as the Board of Directors may deem appropriate. Except as otherwise provided herein (including in Section 3.5), the Board of Directors may make such amendments to this Agreement as it deems appropriate to create and issue additional Units.

(g)     Except as otherwise provided in Article X, no Person shall be admitted as a new Member of the Company unless and until the Board of Directors has approved the admission of such Person as a new Member and such Person has executed this Agreement or a counterpart hereto.

(h)     Before the Company, acting at the direction of the Board of Directors, may issue new Units (including Incentive Units) to any Person other than the SUSI Member, the Company must first provide the SUSI Member with written notice, provided at least 30 days before the Company's intended issuance date for the new Units, of the intended

NG-E4TG3SKK 4868-8999-0464v.31

issuance, the recipient of the intended issuance, and the type, number, and price of the Units which are the subject of the intended issuance. Irrespective of whether the Company provides such notice, the SUSI Member shall have the preemptive right to make a Capital Contribution to purchase such number of Class B Units (including, with respect to an issuance of Incentive Units) for cash, on the same terms (including, with respect to an issuance of Incentive Units, at the Strike Price of the subject Incentive Units) and at the same time, as are necessary for the SUSI Member to maintain its proportionate Membership Interest equal to the number of Units held by SUSI Member immediately prior to the issuance divided by the aggregate number of Units outstanding immediately prior to the issuance. Despite anything to the contrary in this Section 2.8(h), the SUSI Member hereby waives its rights under this Section 2.8(h) with respect to the Unit issuances made as of the date hereof.

### Article III
### BOARD OF DIRECTORS; CERTAIN GOVERNANCE MATTERS

3.1     **Board of Directors**. The business of the Company shall be managed by a Board of Directors (the "**Board of Directors**") who may exercise all the powers of the Company except as otherwise expressly provided by this Agreement.

3.2     **Composition of the Board**. The Board of Directors shall, as of the date of this Agreement, be composed of five (5) directors (each a "**Director**" and collectively the "**Directors**"), comprised as follows:

(a)     one Director, whom shall be appointed by Charles R. Farrell (the "**CF Director Representative**");

(b)     one Director, whom shall be appointed by the PBS Member (the "**PBS Director Representative**" and together with the CF Director Representative, the "**Founder Director Representatives**"); and

(c)     three Directors (the "**SUSI Director Representatives**"), each of whom shall be appointed by the SUSI Member.

Charles R. "Chad" Farrell hereby initially appoints himself as the CF Director Representative.

The PBS Member hereby initially appoints William B. Sturcke as the PBS Director Representative.

The SUSI Member hereby initially appoints Victor Weisberg, Richard Braakenburg and Scott Mackenzie as the SUSI Director Representatives.

3.3     **Election of the Board**.

(a)     Directors shall hold office until their earlier death, disability, resignation or removal. Any Director may resign by delivering his written resignation to the Company. Such resignation shall be effective upon appointment of a replacement Director in

NG-E4TG3SKK 4868-8999-0464v.31

accordance with this Agreement. A Director may only be removed by the Member who appointed such Director but may be removed by that Person at any time and for any reason upon written notice to the removed Director and the Company. Such removal shall be effective upon the Company's receipt of the notice, or at such other time as the notice may provide.

(b) Upon withdrawal or removal of a Director, from and after the date of this Agreement, the Member who appointed such Director shall promptly appoint a replacement Director in its sole discretion.

3.4 **Powers and Duties of the Directors**. The Board of Directors shall have the same fiduciary duties to the Company and to the Members as a director of a Delaware corporation has under Delaware's General Corporation Law, without any variation or waiver of such applicable provisions of Delaware's General Corporation Law; provided, however, that, for the avoidance of doubt, such fiduciary duties shall not apply to the Members or to the Excluded Matters. Subject to the provisions of Section 3.5, the Board of Directors shall have and may exercise on behalf of the Company all of its rights, powers, duties and responsibilities, including without limitation the right and authority:

(a) to manage the business and affairs of the Company and its subsidiaries and for this purpose to employ, retain or appoint any officers, employees, consultants, agents, brokers, professionals or other Persons in any capacity with the Company or its subsidiaries for such compensation and on such terms as the Board of Directors deems necessary or desirable and to delegate to such Persons such of its duties and responsibilities as the Board of Directors shall determine, and to remove such Persons or revoke their delegated authority on such terms or under such conditions as the Board of Directors shall determine;

(b) to approve an Annual Budget and Development Budget each Fiscal Year and approve any amendment to or variance from such Annual Budget and Development Budget;

(c) to approve any amendment to or variance from the Cash Management Procedures;

(d) to form, manage and dissolve any subsidiaries of the Company;

(e) to merge or consolidate the Company or any of its subsidiaries with or into any other entity or otherwise effect the sale of the Company and its business;

(f) to enter into, execute, deliver, acknowledge, make, modify, supplement or amend any contracts, documents or instruments in the name of the Company;

(g) to borrow money or otherwise obtain credit and other financial accommodations on behalf of the Company on a secured or unsecured basis and to perform or cause to be performed all of the Company's obligations in respect of its indebtedness or guarantees and any mortgage, lien or security interest securing such indebtedness;

NG-E4TG3SKK 4868-8999-0464v.31

(h)     to make elections and prepare and file returns regarding any federal, state or local tax obligations of the Company, and to designate one of the Members (or any other Person) to serve as the "Partnership Representative" of the Company for purposes of Section 6223(a) of the Code, with power to manage and represent the Company in any administrative proceeding of the Internal Revenue Service (the "**Partnership Representative**"); and

(i)     Any other matters as contemplated in this Agreement or otherwise associated with the operation and management of the Company and its subsidiaries.

3.5     **Actions Requiring Supermajority Member Consent**. Notwithstanding the provisions of Section 3.4, the Board of Directors shall not cause or attempt to cause or permit the Company or any Subsidiary or any of their respective managers, officers, employees, agents, or representatives to do any of the following with respect to the Company or any Subsidiary without first having obtained the affirmative vote or written consent of a Supermajority Interest:

(a)     increase or decrease the number of Director positions on the Board of Directors;

(b)     form any Subsidiary or branch or foundation of the Company or any Subsidiary (other than a Project SPV LLC);

(c)     acquire or sell any interest in any other Person including through merger, with or acquisition of other entities;

(d)     enter, amend, terminate, or make a material waiver under an agreement for a Sale of the Company or a Restructuring whether of the Company or any Subsidiary;

(e)     declare the Bankruptcy of the Company or any Subsidiary or otherwise submit the Company or any Subsidiary to Bankruptcy;

(f)     authorize, issue, cancel, repurchase, or redeem any Units or any other equity interest in the Company or any Subsidiary (except as expressly set forth in this Agreement or pursuant to the Unit Repurchase Agreements or the Plan (subject, as to an issuance under the Plan, to the approval of the Board));

(g)     make a public offering of any equity interest in the Company or any Subsidiary to be registered with the U.S. Securities and Exchange Commission or a foreign financial regulatory authority or otherwise cause any equity interest in the Company or any Subsidiary to be listed on a stock exchange or over-the-counter exchange.

(h)     incur any indebtedness for borrowed money or cause any Subsidiary to incur any indebtedness for borrower money;

(i)     change the corporate form of the Company or any Subsidiary;

(j)     amend this Agreement or enter or amend any equivalent organizational document of any Subsidiary (except for changes to Schedule 2.8 in compliance with the terms of this Agreement);

(k)     participate in or terminate the Company's or any Subsidiary's participation in a joint venture, partnership, or other for-profit business arrangement with any other Person;

(l)     newly enter into or terminate any line of business of the Company or any Subsidiary;

(m)     materially change the primary focus of the Company's or any Subsidiary's business;

(n)     enter, amend, terminate, or make a material waiver under any agreement between the Company or a Subsidiary and any Member or Director or any Member's or Director's Affiliate;

(o)     commence or settle any litigation, arbitration, or other proceeding that will cause, or is reasonably likely to cause, the Company or any Subsidiary to incur liabilities, losses, damages, costs, or expenses (including legal costs) in excess of $100,000;

(p)     hire or terminate any employee or contractor of the Company or any Subsidiary with a compensation package which makes such person eligible to receive in excess of $125,000 on an annualized basis including salary and bonus;

(q)     amend, terminate, or make a material waiver under the MIPA;

(r)     accept the funding, in the aggregate from the date of this Agreement, of Capital Contributions in excess of $151,699,993.51; provided that if such additional Capital Contributions are authorized, the SUSI Member shall be entitled to purchase additional Units in connection with such additional Capital Contributions subject to a discount of 30% off of the fair market value of such Units determined as of the time of such proposed investment; or

(s)     enter into any agreement to do any of the foregoing that is not expressly made conditional on obtaining the affirmative vote or written consent of a Supermajority Interest (or such lesser threshold as expressly set forth herein), unless such affirmative vote or consent has been given prior to execution of such agreement.

3.6     **Committees of the Board of Directors**.

(a)     **Audit Committee**.

(i)     **Establishment**. The Board of Directors hereby establishes an Audit Committee.

(ii)     **Composition**. The Audit Committee shall consist of three members, none of whom need be a Director, comprised as follows:

(A) one appointee of the Founder Director Representatives (each of whom the Founder Director Representatives may remove and replace at any time for any or no reason provided that such replacement is satisfactory to the SUSI Director Representatives in their reasonable and good faith discretion); and

(B) two appointees of the SUSI Director Representatives (each of whom the SUSI Director Representatives may remove and replace at any time for any or no reason).

(iii) **Initial Appointments**. The Founder Director Representatives hereby initially appoint Chris Clement to the Audit Committee. The SUSI Director Representatives hereby initially appoint Pascal Jockers and Nicolas Kastner to the Audit Committee.

(iv) **Voting**. A decision of the Audit Committee shall require the written approval of a majority of the Audit Committee's members.

(v) **General Responsibilities**. The Audit Committee shall be responsible for selecting the accountants for the Company from time to time, for reviewing the work of the Company's accountants, and for such other functions as may from time to time be delegated to it by the Board of Directors.

(b) **Compensation Committee**.

(i) **Establishment**. The Board of Directors hereby establishes a Compensation Committee.

(ii) **Composition**. The Compensation Committee shall consist of three members, none of whom need be a Director, comprised as follows:

(A) one appointee of the Founder Director Representatives (each of whom the Founder Director Representatives may remove and replace at any time for any or no reason provided that such replacement is satisfactory to the SUSI Director Representatives in their reasonable and good faith discretion); and

(B) two appointees of the SUSI Director Representatives (each of whom the SUSI Director Representatives may remove and replace at any time for any or no reason).

(iii) **Initial Appointments**. The Founder Director Representatives hereby initially appoint William B. Sturcke to the Compensation Committee. The SUSI Director Representatives hereby initially appoint Richard Braakenburg and Pascal Jockers to the Compensation Committee.

(iv) **Voting**. A decision of the Compensation Committee shall require the written approval of a majority of the Compensation Committee's members.

(v) **General Responsibilities**. The Compensation Committee shall be responsible for setting the Company's compensation policies and for such other functions as may from time to time be delegated to it by the Board of Directors.

(c) **Capital Commitment Committee**.

(i) **Establishment**. The Board of Directors hereby establishes a Capital Commitment Committee.

(ii) **Composition**. The Capital Commitment Committee shall consist of seven members, none of whom need be a Director, comprised as follows:

(A) five appointees of the Founder Director Representatives (each of whom the Founder Director Representatives may remove and replace at any time for any or no reason provided that such replacement is satisfactory to the SUSI Director Representatives in their reasonable and good faith discretion); and

(B) two observer appointees of the SUSI Director Representatives (each of whom the SUSI Director Representatives may remove and replace at any time for any or no reason).

(iii) **General Responsibilities**. The Capital Commitment Committee shall have the following responsibilities as well as those that may from time to time be delegated to it by the Board of Directors:

(A) preparing and proposing the Development Budget to be approved by the Board of Directors;

(B) preparing and proposing an estimated Construction Budget, and amendments thereto, to be approved by the Underwriting Committee;

(C) approving development expenses and related early transaction expenses (i.e., costs incurred in interconnection, permitting and design) for Projects presented before the Capital Commitment Committee consistent with the Development Budget and the Cash Management Procedures;

(D) managing the transition of Projects from business development into active project development; and

(E) allocating at-risk development capital to approved Projects (operating within limits set forth in the Development Budget and the Cash Management Procedures).

(iv) **Initial Appointments**. The Founder Director Representatives hereby initially appoint William B. Sturcke, Charles Farrell, Chris Clement, Jesse Stowell, and Phillip Foy to the Capital Commitment Committee. The SUSI Director

NG-E4TG3SKK 4868-8999-0464v.31

Representatives hereby initially appoint Scott Mackenzie and Bernardo Unas to the Capital Commitment Committee.

(v) **Voting**. A decision of the Capital Commitment Committee shall require the written approval of the Capital Commitment Committee members appointed by the Founder Director Representatives deciding on a consensus basis.

(vi) **Meetings**. The Capital Commitment Committee shall meet in person or by teleconference or videoconference on an as-needed basis. Any Capital Commitment Committee member may cause a meeting to be convened upon providing the Capital Commitment Committee with at least ten days prior written notice. The appropriate Officers of the Company will cause the Book for each Project that will be the subject of the meeting to be provided to the Capital Commitment Committee members at least ten business days prior to the scheduled date of the meeting. The Capital Commitment Committee members will aim to provide any issues or questions for the meeting's agenda to the other Capital Commitment Committee members at least five business days prior to the scheduled date of the meeting.

(vii) **Project Business Development**. At a meeting of the Capital Commitment Committee for a Project's proposed business development in advance of its acquisition or development, the Capital Commitment Committee shall review the subject Project reasonably and in good faith, considering the nature and characteristics of the Project and the business goals of the Company, and shall not approve the further business development of the Project unless:

(A) it is able to make, subject to any appropriate and material variances approved by it and the rationale therefor is recorded in writing, reasonable assumptions of returns that are consistent with the Project Guidelines, accounting for reasonable expectations around any changes in these parameters over time; and

(B) it confirms that there are no identified fatal flaws or red flags (e.g., interconnection costs, unmitigable permitting risk, excessive environmental remediation costs, etc.) applicable to the Project.

(viii) **Post-Project Approval Actions**. Upon approving a Project for further business development, the Capital Commitment Committee shall proceed in a reasonably prompt manner to cause the performance, as applicable, of the initial development activities set forth below with respect to such Project, solely using designated Development Funds, and in accordance with (x) the Development Budget, (y) the Cash Management Procedures, and (z) the Project Guidelines:

(A) overseeing further development activities until Pre-NTP Status is reached, including negotiating a form of each Major Project Contract (but excluding, for the avoidance of doubt, executing a Major Project Contract, which shall be subject to the approval of the Underwriting

Committee), concluding the planning and permitting process, and completing all due diligence for the Project (including diligence on the site to be performed by procurement and review of a Phase I environmental site assessment and, if required, a Phase II environmental assessment (in each case, in accordance with the American Society for Testing and Materials ("**ASTM**") standards);

(B)     monitoring Project expenditures for compliance with the Development Budget and maintaining a tracking report with respect thereto;

(C)     if not previously formed, establishing the Project SPV LLC for the Project; and

(D)     developing a preliminary financing model and plan for the applicable Project to evaluate its feasibility.

(ix)     **Budget Applicability**. For the avoidance of doubt, the Capital Commitment Committee may not cause or cause to be made any capital expenditure which would result in any overrun of an applicable Annual Budget, Development Budget, or Construction Budget.

(d)     **Underwriting Committee**.

(i)     **Establishment**. The Board of Directors hereby establishes an Underwriting Committee.

(ii)     **General Responsibilities**. The Underwriting Committee shall have the following authority and responsibilities as well as those that may from time to time be delegated to it by the Board of Directors:

(A)     overseeing further development activities for a Project until NTP Status is reached, including final approval of and execution of each Major Project Contract relevant to the Project;

(B)     preparing and proposing amendments of the Development Budget to the Board of Directors for its approval for Projects approved by the Capital Commitment Committee or identified by it as potential acquisition opportunities (e.g., purchase of single project or portfolio of projects);

(C)     reviewing and revising any estimated Construction Budget proposed by the Capital Commitment Committee and approving such Construction Budget;

(D)     approving expenditure allocations under the Development Budget as needed for a Project to reach NTP Status;

(E)     approving Project acquisitions and divestments; and

NG-E4TG3SKK 4868-8999-0464v.31

(F)     as necessary to commence construction or further optimize the Company's capital structure, approving final Project financing model and plan for the applicable Project and Project and Project portfolio financing, including construction debt, permanent debt, tax equity, investment tax credits, bridge financing, or similar such financings and the maximum amount of equity required to fund construction.

(iii)     **Composition**. The Underwriting Committee shall consist of five members, none of whom need be a Director, comprised as follows:

(A)     two appointees of the Founder Director Representatives (each of whom the Founder Director Representatives may remove and replace at any time for any or no reason provided that such replacement is satisfactory to the SUSI Director Representatives in their reasonable and good faith discretion); and

(B)     three appointees of the SUSI Director Representatives (each of whom the SUSI Director Representatives may remove and replace at any time for any or no reason).

(iv)     **Initial Appointments**. The Founder Director Representatives hereby initially appoint Chris Clement and Jesse Stowell to the Underwriting Committee. The SUSI Director Representatives hereby initially appoint Victor Weisberg, Scott Mackenzie, and Bernardo Unas to the Underwriting Committee.

(v)     **Voting**. A decision of the Underwriting Committee shall require the written approval of at least four members of the Underwriting Committee's members.

(vi)     **Delivery of Book**. The CFO or the CCO will cause the Book for each Project that will be the subject of a meeting to be delivered to the Underwriting Committee members at least ten business days prior to the scheduled date of a meeting regarding a Project's acquisition or development.

(vii)     **Meetings**. The Underwriting Committee shall meet in person or by teleconference or videoconference on an as-needed basis. Any Underwriting Committee member may cause a meeting to be convened upon providing the Underwriting Committee with at least ten business days' prior notice, which notice must (x) state each Project that will be the subject of the meeting; (y) state whether a subject Project is to be considered for its acquisition, development, or divestment; and (z) attach or be followed by (on the same date notice is provided) a complete copy of the current Book for each subject Project. Any Underwriting Committee member may submit written questions regarding a Project proposal to the Underwriting Committee member who called the meeting, and such Underwriting Committee member shall provide written responses to such question in advance of or at the meeting of the Underwriting Committee.

(viii)     **Project Acquisition or Development**.

16

(A) **Review Responsibilities**. At a meeting of the Underwriting Committee for a Project's proposed acquisition or development, the Underwriting Committee shall approve or fail to approve such Project for acquisition or development but shall not approve a Project's proposed acquisition or development unless:

(1) it confirms that the financing model and plan in the Project's Book reasonably demonstrates that the projected financial returns from the Project are generally aligned with the thresholds set forth in the Project Guidelines, subject to any appropriate and material variances approved by the Underwriting Committee; and

(2) (x) it confirms that the Project's Book is a Closed Book; or (y) it confirms that the Project's Book is an Open Book and identifies each item of Supporting Documentation which is outstanding from the Open Book.

(B) **Post-Project Approval Actions**. Upon approving a Project for acquisition or development, the Underwriting Committee shall be responsible for:

(1) to the extent not already approved by the Capital Commitment Committee, approving further external financial commitments towards legal, technical, and similar due diligence for the Project;

(2) where required for a Project, concluding its planning and permitting process;

(3) completing the remaining detailed engineering and procurement for equipment not previously procured;

(4) causing the satisfaction of the Construction-Ready CPs; and

(5) if the Project's Book was an Open Book at the time of the Underwriting Committee's approval, causing and confirming the compilation of the Closed Book (the date when the Construction-Ready CPs are satisfied and the Closed Book is confirmed and compiled, the "**Development Completion Date**").

(C) **Internal Capital Call Notice**. Upon the Development Completion Date, the Underwriting Committee shall determine whether to require an Additional Capital Contribution from the SUSI Member with respect to the Project and, if so, the amount it approves requiring. If the Underwriting Committee determines that an Additional Capital Contribution will be required from the SUSI Member, then the Underwriting Committee shall send a written notice to the Board of

Directors and the CFO containing a compiled copy of the Additional Capital Contribution Notice for issuance by the CFO, which such notice (in such context, the "**Internal Capital Call Notice**") must contain:

> (1)  the Closed Book; and

> (2)  the Additional Capital Contribution amount required (which amount shall be consistent with the maximum percentage of the Construction Budget to be funded by equity (and not debt) as agreed upon in the financing model and plan approved by the Underwriting Committee in the Project's Book).

(ix)  **Project Divestments**. For any proposed Project divestments, the Underwriting Committee shall develop and approve a written plan for the proposed sale; provided that the definitive documentation for the divestiture and the Company's entry and consummation thereof shall remain subject to the approval of the Board of Directors.

(x)  **Budget Applicability**. For the avoidance of doubt, the Underwriting Committee may not cause or cause to be made any capital expenditure which would result in any overrun of an applicable Annual Budget, Development Budget, or Construction Budget.

(e)  **Other Committees**. The Board of Directors may establish other committees from time to time with such responsibilities as may be delegated from time to time to them by the Board of Directors. However, the duties of the committees specified herein may not be delegated to any such new committees.

3.7  **Board Voting Rights; Meetings; Quorum**.

(a)  Regularly scheduled meetings of the Board of Directors may be held without notice at such time, date and place as a majority of the Directors then in office or either Co-CEO may from time to time determine. Special meetings of the Board of Directors may be called, orally, in writing or by means of electronic communication, by a majority of the Directors then in office or by either Co-CEO, designating the time, date and place thereof. Directors may participate in meetings of the Board of Directors by means of telephone conference or similar communications equipment by means of which all Directors participating in the meeting can hear each other, and participation in a meeting in accordance herewith shall constitute presence in person at such meeting. No Director may delegate its rights and obligations to participate in and vote at any meeting of the Board of Directors.

(b)  Notice of the time, date, and place of all special meetings of the Board of Directors shall be given to each Director by the Secretary or Assistant Secretary, or in case of the death, absence, incapacity or refusal of such Persons, by the officer or one of the Directors calling the meeting. Notice shall be given to each Director in person or by telephone, facsimile or electronic mail sent to his business or home address at least 24 hours in advance of the meeting, or by written notice mailed to his business or home

address at least 72 hours in advance of the meeting. Notice need not be given to any Director if a written waiver of notice is executed by him before or after the meeting, or if communication with such Director is unlawful. A notice or waiver of notice of a meeting of the Board of Directors need not specify the purposes of the meeting.

(c)     At any meeting of the Board of Directors, all of the Directors then in office shall constitute a quorum. If a quorum is not achieved at any meeting due to the absence of a Founder Director Representative, then such meeting shall be postponed by the attending Directors to a time no earlier than 24 hours after written notice of such postponement has been given to the Directors. If a quorum is not achieved at the postponed meeting due to the absence of any Founder Director Representative, then the presence of such Founder Director Representative shall not be required to achieve a quorum for that meeting. At any meeting for which a quorum is achieved, each Director shall be entitled to cast one vote (whether in a meeting or by written consent as provided herein) with respect to any matter before the Board of Directors. Less than a quorum may adjourn any meeting from time to time and any meeting may be held as adjourned without further notice upon reaching a quorum.

3.8     **Actions of the Board of Directors and Committees**.

(a)     At any meeting of the Board of Directors at which a quorum is present, the Directors present and holding at least a majority of the votes held by all Directors then in office entitled to be cast thereat may take any action on behalf of the Board of Directors, unless a larger number is required by this Agreement.

(b)     Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if a written consent thereto is signed the Directors having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all Directors entitled to vote thereon were present and voted and filed with the records of the meetings of the Board of Directors. Such consent shall be treated as a vote of the Board of Directors for all purposes.

(c)     Despite anything to the contrary in this Agreement, the approval of at least four Directors shall be required for the Company or any Subsidiary, as applicable, to:

(i)     enter, amend, terminate, or make a material waiver under any agreement between the Company or a Subsidiary and any Member or Director or any Member's or Director's Affiliate;

(ii)     dissolve the Underwriting Committee, increase or decrease the number of positions on the Underwriting Committee, modify the responsibilities of the Underwriting Committee, or modify the voting threshold required for Underwriting Committee action;

(iii)     dissolve the Capital Commitment Committee, increase or decrease the number of positions on the Capital Commitment Committee, modify the responsibilities of the Capital Commitment Committee, or modify the voting threshold required for Capital Commitment Committee action;

NG-E4TG3SKK 4868-8999-0464v.31

(iv)     approve each Annual Budget, Development Budget, or Construction Budget or materially amend any Annual Budget, Development Budget, or Construction Budget;

(v)     hire or terminate any Officer of the Company or any Subsidiary or amend or make a material waiver under any agreement with any Officer;

(vi)     enter, amend, terminate, or make a material waiver under any agreement between the Company or a Subsidiary and any Member or Director or any Member's or Director's Affiliate; or

(vii)     amend, terminate, or make a material waiver under the MIPA, including with respect to the terms and conditions of the SUSI Member's funding, in the aggregate from the date of this Agreement, of Capital Contributions in excess of $151,699,993.51.

3.9     **Compensation of Directors**. The Company shall promptly reimburse in full each Director who is not an employee of the Company or any of its direct or indirect subsidiaries for all such Director's reasonable out-of-pocket expenses, not to exceed $500, incurred in connection with attending any meeting of the Board of Directors or a committee thereof or any board of directors or committee thereof of a subsidiary of the Company.

3.10     **Transaction with Interested Persons**.     The Company may enter into any agreement or contract for the provision of goods or services with any Member or Affiliate thereof; *provided*, *however*, that the terms and conditions of any such agreement or contract shall be on terms no less favorable to the Company than terms available from unrelated parties; and *provided further* that such agreement shall be approved by the Board of Directors.

3.11     **Reliance**. Each Director shall be fully protected in relying in good faith (a) upon the records of the Company and upon such information, opinions, reports or statements presented to such Director by any service provider to the Company as to matters that the Director reasonably believes are within such Person's professional or expert competence or (b) in respect of any specific matter or circumstance requiring interpretation, application, or enforcement of agreements to which the Company is a party, on the advice of legal counsel or qualified industry consultants engaged by the Company to advise it with respect to such matter or circumstance.

3.12     **Confidentiality Agreement**. As a condition to the effectiveness of his or her appointment, a Director shall have signed a confidentiality and assignment of proprietary information agreement with the Company substantially in the form attached hereto as Exhibit A.

3.13     **Benefit Company**.

(a)     In discharging the duties of their positions and in considering the best interests of the Company, a Director shall consider the effects of any action or inaction on:

(i)     the members of the Company;

(ii)	the employees and work force of the Company, its subsidiaries, and its suppliers;

(iii)	the interests of its customers;

(iv)	community and societal factors, including those of each community in which offices or facilities of the Company, its subsidiaries, or its suppliers are located;

(v)	the local and global environment;

(vi)	the short-term and long-term interests of the Company, including benefits that may accrue to the Company from its long-term plans and the possibility that these interests may be best served by the continued independence of the Company; and

(vii)	the ability of the Company to create a material positive impact on society and the environment, taken as a whole.

(b)	In discharging his or her duties, and in determining what is in the best interests of the Company and its members, a Director shall not be required to regard any interest, or the interests of any particular group affected by an action or inaction, including the members, as a dominant or controlling interest or factor. A Director shall not be personally liable for monetary damages for: (i) any action or inaction in the course of performing the duties of a Director under this paragraph if the Director was not interested with respect to the action or inaction; or (ii) failure of the Company to create a material positive impact on society and the environment, taken as a whole.

(c)	A Director does not have a duty to any person other than a member in its capacity as a member with respect to the purpose of the Company or the obligations set forth in this Article, and nothing in this Article express or implied, is intended to create or shall create or grant any right in or for any person other than a member or any cause of action by or for any person other than a member or the Company.

(d)	Notwithstanding anything set forth herein, a Director is entitled to rely on the provisions regarding "best interests" set forth above in enforcing his or her rights hereunder and under state law, and such reliance shall not, absent another breach, be construed as a breach of a Director duty of care, even in the context of a Sale of the Company where, as a result of weighing the interests set forth in subsection (a)(i)-(vii) above, a Director determines to accept an offer, between two competing offers, with a lower price per unit.

(e)	A Director who makes a business judgment in good faith fulfills the duty under this section if the Director: (i) is not interested in the subject of the business judgment; (ii) is informed with respect to the subject of the business judgment to the extent the director reasonably believes to be appropriate under the circumstances; and (iii) rationally believes that the business judgment is in the best interests of the Company.

21

**Article IV**
**OFFICERS**

4.1     **Enumeration**. Except as otherwise provided herein, the Board of Directors may appoint officers to act on behalf of the Company to the Company's officers (each, an "**Officer**" and, collectively, the "**Officers**"), which will as of the date of this Agreement consist of two co-chief executive officers (each a "**Co-CEO**") a Chief Financial Officer (the "**CFO**"), a Chief Operating Officer (the "**COO**"), a Chief Commercial Officer ("**CCO**"), and a Secretary (the "**Secretary**"), and may consist of such other Officers, including one or more Vice Presidents, Assistant Treasurers and Assistant Secretaries, as the Board of Directors may determine. Each Officer shall have the authority expressly granted in the

4.2     **Qualification**. No officer need be a Member or Director. Any two or more offices may be held by the same Person.

4.3     **Tenure**. Each of the Officers shall hold office until his or her resignation or removal. Any Officer may resign by delivering his written resignation to the Company, and such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

4.4     **Removal**. The Board of Directors may remove an Officer at any time for any or no reason.

4.5     **Vacancies**. Any vacancy in any office may be filled by the Board of Directors.

4.6     **Confidentiality Agreement**. As a condition to taking office, an Officer shall have signed a confidentiality and assignment of proprietary information agreement with the Company in form and substance reasonably acceptable to the Board of Directors.

4.7     **Compensation of Officers**. The Company shall reimburse each Officer who is not an employee of the Company for all of such Officer's reasonable out-of-pocket expenses incurred in connection with the performance of its duties as such an Officer if and to the extent approved by the Board in advance.

**Article V**
**INDEMNIFICATION**

5.1     **Right to Indemnification**. Subject to the provisions of this Article V, the Company shall indemnify, if and to the fullest extent permitted by the Act, all Indemnified Persons against all Expenses incurred by the Indemnified Persons in connection with any proceeding in which an Indemnified Person is involved as a result of serving in the capacity by reason of which such Person is deemed to be an "**Indemnified Person**" pursuant to Section 5.5 (other than in connection with any claims brought by a Member (a) against another Member or (b) against the Company), provided, that such Indemnified Person acted in good faith on behalf of or at the request of the Company and such Indemnified Person's conduct did not constitute fraud, gross negligence, willful misconduct or, in the case of any Director, breach of any applicable fiduciary obligations.

NG-E4TG3SKK 4868-8999-0464v.31

5.2	**Award of Indemnification**. The determination of whether the Company is authorized under the Act to indemnify the Indemnified Persons hereunder and any award of indemnification shall be made in each instance (a) if there is more than one Indemnified Person, by a majority of the votes held by Directors who are not parties to or the appointees of the parties to the proceeding in question or (b) by independent legal counsel appointed by such Directors. The Company shall be obliged to pay indemnification applied for by the Indemnified Persons unless there is an adverse determination (as provided above) within 45 days after the application. If indemnification is denied, the applicant may seek an independent determination of its right to indemnification by a court, and in such event, the Company shall have the burden of proving that the applicant was ineligible for indemnification under this Article V.

5.3	**Successful Defense**. Notwithstanding any contrary provisions of this Article V, if the Indemnified Person has been wholly successful on the merits in the defense of any proceeding in which it was involved by reason of its position as an Indemnified Person or as a result of serving in such capacity (including termination of investigative or other proceedings without a finding of fault on the part of the Indemnified Person), the Indemnified Person shall be indemnified by the Company against all expenses incurred by the Indemnified Person in connection therewith.

5.4	**Advance Payments**. Except as limited by law, expenses incurred by the Indemnified Person in defending any proceeding, including a proceeding by or in the right of the Company, shall be paid by the Company to the Indemnified Person in advance of final disposition of the proceeding upon receipt of its written undertaking to repay such amount if the Indemnified Person is determined pursuant to this Article V or adjudicated to be ineligible for indemnification, which undertaking shall be an unlimited general obligation but need not be secured and may be accepted without regard to the financial ability of the Indemnified Person to make repayment; provided, however, that no such advance payment of expenses shall be made if it is determined pursuant to Section 5.2 of this Agreement on the basis of the circumstances known at the time (without further investigation) that the Indemnified Person is ineligible for indemnification.

5.5	**Definitions.** For purposes of this Article V: "**Indemnified Person**" includes: (i) any Member, (ii) a Person serving as a Director or an Officer of the Company or in a similar executive capacity appointed by the Directors and exercising rights and duties delegated by the Directors whether prior to the date hereof or hereafter, (iii) a Person serving at the request of the Company as a director, manager, officer, employee or other agent of another organization, including, without limitation, any Subsidiary of the Company, and (iv) any Person who formerly served in any of the foregoing capacities (with respect to matters relating to such services);

(b)	"**Expenses**" means all expenses, including attorneys' fees, appellate fees and disbursements, actually and reasonably incurred in defense of a proceeding or in seeking indemnification under this Article V, and any judgments, awards, fines, penalties and reasonable amounts paid in settlement of a proceeding; and

(c)	"**Proceeding**" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, and any claim which could be the subject of a proceeding.

NG-E4TG3SKK 4868-8999-0464v.31

5.6     **Insurance**. The Board may elect to purchase and maintain liability insurance on behalf of any Director, Officer, agent or employee against any liability or cost incurred by such Person in any such capacity or arising out of its status as such, whether or not the Company would have power to indemnify against such liability or cost.

5.7     **Non-Exclusivity**. The provisions of this <u>Article V</u> shall not be construed to limit the power of the Company to indemnify its or any of its Subsidiaries' directors, members, stockholders, partners, officers, employees or agents to the full extent that would have been permitted by the Act, or to enter into specific agreements, commitments or arrangements for indemnification that would have been or are so permitted under the Act or by other law. The non-conflicting absence of any express provision for indemnification herein shall not limit any right of indemnification existing independently of this <u>Article V</u>.

5.8     **Member Liability**.  To the fullest extent permitted by applicable law, no Member shall be liable pursuant to this Agreement, including under any legal or equitable theory of liability, to the Company or any Member for any direct or indirect losses, claims, damages or liabilities incurred by reason of any act or omission performed or omitted by such Member in its capacity as a Member so long as such act or omission did not constitute fraud, gross negligence, willful misconduct, or a breach of the express terms of this Agreement subject to the terms and limitations set forth herein.

## Article VI
## CAPITAL CONTRIBUTIONS

6.1     **Contributions of Capital; Units**.

(a)     The Members have made Capital Contributions to the Company as set forth on <u>Schedule 2.8</u> hereto. The Members also have received Units in the Company as set forth on <u>Schedule 2.8</u>.

(b)     Each of the Members party to this Agreement (excluding the SUSI Member) hereby agrees and acknowledges that: (i) the number of Units set forth opposite its name on <u>Schedule 2.8</u> hereto reflects all equity interest held by such Member as of the date hereof; (ii) if the Member was party to the Prior Agreement or to any other agreements (including any warrants, vesting agreement or award agreement), such Units replace the equity interest in the Company held by such Member in accordance with the Prior Agreement or any other agreement; and (iii) that such Member has no other equity interest or rights to receive any equity interest in the Company as of the date hereof except pursuant to this Agreement, the MIPA, and the Vesting Agreements, as applicable. Each Member hereby acknowledges that the preceding representations and warranties by such Member are a material inducement to the SUSI Member's entry into this Agreement and its consummation of the Purchase Transaction and, in furtherance thereof, (x) each such Member irrevocably and forever releases, demises, discharges and waives any and all rights or claims of any kind against the Company or the SUSI Member of any nature whatsoever whether known or unknown and whether arising under the Prior Agreement or any other agreement between such Member and the Company that its Unit holdings as of the date hereof are not as set forth on <u>Schedule 2.8</u> as of the date hereof or that it is entitled to

purchase or otherwise receive any additional Units or any payments associated therewith other than pursuant to this Agreement or the other Transaction Agreements, the Post-Closing Plans, or the Individual Employee Benefits Agreements (as such terms are defined in the MIPA) and (y) each such Member who is an employee of the Company irrevocably and forever releases, demises, discharges and waives any other rights or claims of any nature whatsoever whether known or unknown against the Company or the SUSI Member whether arising under the Prior Agreement or otherwise by reason of any facts, acts or occurrences occurring prior to the Initial Closing, provided that nothing contained in this subsection 6.1(b)(y) shall operate to release, demise, discharge or waive any claims on account of, arising out of or relating to or under this Agreement, including as provided in Section 5.5 or the Transaction Agreements (including unpaid salary arising in the ordinary course in accordance with the offer letters included as Individual Employee Benefits Agreements as contemplated in and defined in Section 6.12 of the MIPA).

6.2    **Additional Capital Contributions**.

(a)    **In General**. Subject to clauses (b) and (c), no Member shall be required or entitled to make any additional Capital Contributions to the Company.

(b)    **SUSI Capital Call**.

(i)    **Notice and Additional Capital Contribution**. Until the seventh anniversary of this Agreement or such time as when the SUSI Member has funded, in the aggregate, $151,699,993.51 in Capital Contributions, the CFO may, only as to any Project for which the Development Completion Date has occurred (or will occur simultaneously with the Additional Capital Contribution) and for which an Internal Capital Call Notice has been issued, request that the SUSI Member make an additional Capital Contribution (any additional Capital Contribution requested pursuant to this Section 6.2(b) or Section 6.2(c), an "**Additional Capital Contribution**") by delivering a written notice substantially in the form of Exhibit B attached to this Agreement to the SUSI Member (an "**Additional Capital Contribution Notice**"). The CFO shall include or state the matters set forth in clauses (A) – (C) in any Additional Capital Contribution Notice and shall deliver the certificate described by clause (D) at the time the CFO delivers any Additional Capital Contribution Notice:

(A)    Copies of the Closed Book, including a copy of the Construction Budget for the applicable Project approved by the Underwriting Committee;

(B)    the Additional Capital Contribution amount set forth in the Internal Capital Call Notice;

(C)    the deadline for the Additional Capital Contribution, which shall be no earlier than 15 business days following receipt of the Additional Capital Contribution Notice ("**Additional Capital Contribution Deadline**"); and

(D)     a certificate signed by the CFO that the representations and warranties set forth in <u>Exhibit F</u> attached to this Agreement are true and correct in all material respects; provided that the CFO may reasonably consult with the Company's legal counsel with respect to the matters set forth therein and, in accordance with <u>Section 3.11</u> of this Agreement, rely upon the advice provided.

(ii)     **Obligation to Meet Capital Call**. If the applicable Project has achieved the Construction-Ready CPs and the Additional Capital Contribution Notice complies with the terms of this Agreement, then the SUSI Member shall make the Additional Capital Contribution requested in the Additional Capital Contribution Notice by the Additional Capital Contribution Deadline. However, if the SUSI Member disputes in good faith that an Additional Capital Contribution is required pursuant to this <u>Section 6.2</u> because of a defect in the Additional Capital Contribution Notice or the attachments thereto as contemplated in Section 6.2(b)(i)(A) above, then the SUSI Member shall be entitled to withhold the applicable Additional Capital Contribution unless and until such dispute is resolved or it is determined by a court of competent jurisdiction in the State of Delaware in accordance with <u>Section 13.4</u> that such Additional Capital Contribution is required pursuant to this <u>Section 6.2</u>.

(iii)     **Effect of Meeting Capital Call**. To the extent that the SUSI Member timely funds an Additional Capital Contribution set forth in an Additional Capital Contribution Notice, the SUSI Member shall be issued a number of Reserved Class B Units equal to: (A) the amount of the Additional Capital Contribution which the SUSI Member funded; divided by (B) $12.

(iv)     **Effect of Failure to Meet Capital Call**.

(A)     **Cure Period**. If the SUSI Member fails to make an Additional Capital Contribution required pursuant to this <u>Section 6.2</u>, the Board of Directors shall deliver written notice of such failure to the SUSI Member and the SUSI Member shall have fifteen business days to cure such failure before the Founder Director Representatives may take any of the remedial steps set forth in the remainder of this <u>Section 6.2(b)(iv)</u>.

(B)     **Damages**. If the SUSI Member fails to fully and timely fund an Additional Capital Contribution required pursuant to this <u>Section 6.2</u>, including within the cure period, then the Founder Director Representatives may, without the approval of the SUSI Member Director Representatives and without limiting their ability to pursue either of the actions set forth in <u>Section 6.2(d)(iv)(C)</u>, cause the Company or any Subsidiary to pursue, at the SUSI Member's expense, all direct damages incurred by the Company or any Subsidiary as a result of such failure subject to the limitation that immediately follows. NO CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFIT OR LOST OPPORTUNITY DAMAGES, SHALL BE AVAILABLE AND THE COMPANY (FOR ITSELF AND FOR ANY

NG-E4TG3SKK 4868-8999-0464v.31

SUBSIDIARY) OR ANY SUBSIDIARY HEREBY WAIVES ANY RIGHT TO COLLECT SUCH DAMAGES.

(C) **Third Party Shortfall Contributions**. If the SUSI Member does not fund an Additional Capital Contribution in accordance with Section 6.2(A), then the Founder Director Representatives may cause the Company to solicit offers from any Person or group of Persons who are not already Members to cover all or substantially all of the Additional Capital Contribution amount that the SUSI Member failed to timely and fully fund. If the Founder Director Representatives receive a bona fide offer from such a Person or group of Persons (a "**Project Coverage Offer**" and such Person or group of Persons, collectively, the "**Project Coverage Offeror**") then the Founder Director Representatives may, in their discretion, submit the material terms of the Project Coverage Offer to the Underwriting Committee (with the full Board of Directors and the SUSI Member on copy) for its approval or rejection.

(1) **Project Coverage Offer Approval Considerations**. In determining whether to approve a Project Coverage Offer, the Underwriting Committee shall act reasonably and in good faith considering the Company's business goals, the fact that the Underwriting Committee previously approved the subject Project or Project portfolio and caused an Additional Capital Contribution Notice to be issued in connection therewith, and whether the Project Coverage Offeror has reasonably documented its current and projected financial condition such that it would be reasonably certain to timely and fully complete its economic obligations under the Project Coverage Offer. The Underwriting Committee shall promptly notify the Board of Directors and the SUSI Member of its decision regarding the Project Coverage Offer.

(2) **Project Coverage Offer – Rejected**. If the Underwriting Committee rejects a Project Coverage Offer, then the Founder Director Representatives may, for the avoidance of doubt, continue to cause the Company to solicit other Project Coverage Offers.

(3) **Project Coverage Offer – Approval**. If the Underwriting Committee approves a Project Coverage Offer (an "**Approved Project Coverage Offer**"), then the Board of Directors shall act reasonably and in good faith to cause the Company to negotiate, enter into, and consummate the definitive documentation for the Approved Project Coverage Offer, and to take or cause to be taken all appropriate actions in furtherance thereof. Such definitive documentation shall contemplate the Company forming a Subsidiary limited liability company, causing such Subsidiary to issue membership interests therein to the Project Coverage Offeror

in consideration for its funding of the amounts provided by the Approved Project Coverage Offer, and causing such Subsidiary to act as an intermediary holding company (a "**Project Intermediary Holdco LLC**") between the Company, upstream of it, and the Project SPV LLC or Project SPV LLCs for the Project or Project portfolio, as applicable, with respect to which the SUSI Member failed to fund the Additional Capital Contribution required of it. For the avoidance of doubt, this transaction structure is intended to provide the Project Coverage Offeror with equity and economic interests that solely relate to the Project or Project portfolio that were the subject of the Additional Capital Contribution Notice which the SUSI Member failed to timely and fully meet, and the definitive documentation for an Approved Project Coverage Offer shall contain such terms as necessary to preclude the Project Coverage Offeror from having any economic or other interest or right, of any nature, with respect to the Company or any other Projects. If the definitive documentation for the Approved Project Coverage Offer is not entered into within 60 days of the Underwriting Committee's approval or closed within 90 days of the Underwriting Committee's approval, or if negotiations of the definitive documentation are terminated by any Person for any reason or have been materially inactive for at least 30 days, then the Founder Director Representatives may in their discretion, cause the Company to solicit replacement Project Coverage Offers for submission to the Underwriting Committee.

(c)     **Additional Capital Contributions for SG&A Expenses or Pre-Construction Project Expenses**.

(i)     **Non-Binding Proposal Right**.  The CFO may, from time to time and in the CFO's reasonable determination considering the business goals and available and reserved working capital needs of the Company and its Subsidiaries, submit an Additional Capital Contribution Notice to the SUSI Member to request that it make an Additional Capital Contribution to fund:

(A)     SG&A Expenses set forth in an applicable Annual Budget or amendment thereto for which available working capital will be required for the subject fiscal year; or

(B)     Pre-Construction Project Expenses.

(ii)     **Proposal Review**. The SUSI Member shall consider such a request in its sole discretion but shall not be obligated to make any such Additional Capital Contribution. To the extent that the SUSI Member funds an Additional Capital Contribution pursuant to such a request, the SUSI Member shall be issued a number of Reserved Class B Units equal to: (A) the amount of the Additional Capital Contribution which the SUSI Member funded; divided by (B) $12.

NG-E4TG3SKK 4868-8999-0464v.31

6.3    **Capital Accounts**.

(a)    A separate Capital Account shall be established for each Member and shall be maintained in accordance with applicable regulations under Section 704 of the Code. No Member shall have any obligation to restore any portion of any deficit balance in such Member's Capital Account, whether upon liquidation of its interest in the Company, liquidation of the Company or otherwise. In accordance with Treasury Regulation Section 1.704-1 (b)(2)(iv)(f), the Company may adjust the Capital Accounts of its Members to reflect revaluations (including any unrealized income, gain or loss) of the Company's property (including intangible assets such as goodwill) to the fair market value of such property for book and Capital Account purposes, whenever it issues additional interests in the Company (including any interests with a zero initial Capital Account), or whenever the adjustments would otherwise be permitted under such Treasury Regulation. In the event that the Capital Accounts of the Members are so adjusted, (i) the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-l(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property and (ii) the Members' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Section 704(c) of the Code. It is intended that the Capital Accounts will reflect the amounts to which the Members are entitled over the life of the Company, but a Member's right to distributions shall be determined solely by Article VIII and Article XI.

(b)    Except as otherwise expressly provided herein, no Member may withdraw, or shall be entitled to a return of, any portion of such Member's Capital Contribution.

**Article VII**
**ALLOCATIONS OF PROFITS, LOSSES, ETC.**

7.1    **Allocations Generally**. Except as otherwise provided in Code Section 704(b) (including, without limitation, the nonrecourse liability provisions of Treasury Regulations Section 1.704-2) and subject to Section 7.3, income, gains, losses and deductions for any year or portion thereof as determined for book purposes shall be allocated among the Members in proportion to each Member's Membership Interest, as set forth on Schedule 2.8 attached to this Agreement.

7.2    **Tax Allocations**. The income, gains, losses, deductions and credits of the Company shall be allocated for federal, state and local income tax purposes among the Members in proportion to each Member's Membership Interest, as set forth on Schedule 2.8 attached to this Agreement.

7.3    **Special Allocations, Tax Elections and Tax Matters**.

(a)    If any interest in the Company is transferred, increased or decreased during the year, all items of income, gain, loss, deduction and credit recognized by the Company for such year shall be allocated among the Members under the "closing of the books" method, unless the Board of Directors authorizes use of a different method that the Board

29

of Directors in good faith determines does not disproportionately and adversely affect any one Member or Members.

(b) The Board of Directors shall have the authority to make any tax elections with respect to the Company, to approve any returns regarding any foreign, federal, state or local tax obligations of the Company, and to make all determinations regarding the allocation of income and loss for tax purposes contemplated by this <u>Article VII</u>, which determinations shall be made in good faith and shall not be inconsistent with this <u>Article VII</u>.

(c) **Partnership Representative**. Until changed by the Board, the SUSI Member shall serve as the "partnership representative" (within the meaning of new IRC 6223(a) enacted pursuant to Section 1101(c)(1) of the Bipartisan Budget Act of 2015) (the "Partnership Representative"), who shall have the sole authority to act on behalf of the Company in connection with an audit by the Internal Revenue Service or any state or local taxing authority.

(d) **Tax Elections**. With the approval of the Board, the SUSI Member shall make any and all tax elections for an on behalf of the Company (including, but not limited, any election under the BBA to "opt-out" of the new partnership audit rules for partnerships with 100 or fewer partners or an election under the BBA to have the new rules apply prior to the general effective date) and shall oversee the preparation and filing of returns regarding any federal, state or local tax obligations of the Company. To the extent provided for in Treasury Regulations, revenue rulings, revenue procedures and/or other guidance issued by the Internal Revenue Service after the date hereof, the Company is hereby authorized to, and at the direction of the Board of Directors shall, elect a safe harbor under which the fair market value of any Company interests issued after the effective date of such Treasury Regulations (or other guidance) will be treated as equal to the liquidation value of such Company interests (i.e., a value equal to the total amount that would be distributed with respect to such interests if the Company sold all of its assets for their fair market value immediately after the issuance of such interests, satisfied its liabilities (excluding any nonrecourse liabilities to the extent the balance of such liabilities exceeds the fair market value of the assets that secure them) and distributed the net proceeds to the Members under the terms of this Agreement). In the event that the Company makes a safe harbor election as described in the preceding sentence, each Member hereby agrees to comply with all safe harbor requirements with respect to transfers of such Company interests while the safe harbor election remains effective.

(e) If an allocation of loss or deduction to a Member would result in (or increase) a negative balance in such Member's Capital Account, such loss or deduction shall, to that extent, be allocated (i) first to the other Members with positive balances in their Capital Accounts in proportion to their Units until the Capital Account of each Member has been reduced to zero and (ii) then to the Members in respect of their Units. Subsequent income and gains shall be allocated among the Members (to the extent possible) so as to reverse out the special allocation made pursuant to the preceding sentence.

NG-E4TG3SKK 4868-8999-0464v.31

7.4    **Allocations in Respect of Incentive Units**. If any Incentive Units are forfeited or repurchased by the Company, the Capital Account associated with such Incentive Units shall be divided among the Capital Accounts of the other Members in proportion to their remaining Units.

**Article VIII**
**DISTRIBUTIONS**

8.1    **Distributions Generally, Operating Distributions**.

(a)    Subject to the further provisions of this Article VIII, the Board of Directors may, in its reasonable discretion, determine the amount of any Proceeds Available for Distribution and any Capital Transaction Proceeds and if and when such amounts are to be distributed. The Board of Directors may establish record dates for the purpose of determining the Members of the Company entitled to any distribution.

(b)    If the Board of Directors authorizes a distribution of Proceeds Available for Distribution, any amount distributed shall be distributed to the Members, pro rata, in proportion to the number of Units held by them (excluding, for the avoidance of doubt, Incentive Units that are then unvested).

8.2    **Capital Transaction Distributions**.

(a)    Subject to Section 8.2(b), if the Board of Directors authorizes a distribution of Capital Transactions Proceeds, then the Capital Transaction Proceeds shall be distributed to the Members, as follows:

(i)    first, to the Class A Members, pro rata, the remaining Class A Unreturned Capital Contribution Balance on the Class A Units held by each such Class A Member, until the aggregate amount of the Class A Unreturned Capital Contribution Balance with respect to the Class A Units has been reduced to zero ($0);

(ii)    second to the Class A Members, pro rata, the remaining Class A Unpaid Contingent Liquidation Amount on the Class A Units held by each such Class A Member, until the aggregate amount of the Class A Unpaid Contingent Liquidation Amount with respect to the Class A Units has been reduced to zero ($0);

(iii)    third, an amount equal to the Catch-Up Amount, pro rata, to the Catch-Up Members in proportion their respective Catch-Up Units until the aggregate amount of the Catch-Up Amount with respect to the Catch-Up Units has been distributed; provided that if the total Capital Transaction Proceeds actually distributed to the Class A Members pursuant to Section 8.2(a)(i) and (ii) equal or exceed $65,500,000 then the Class A Members (on a pro rata basis) shall be obligated to pay $7,680,000 to the Company for further distribution to the Catch-Up Members, pro rata in proportion their respective Catch-Up Units ("**Adjustment Payment**"); and

31

(iv)     fourth, to the Members, pro rata, in proportion to their respective Units (excluding, for the avoidance of doubt, Incentive Units that are then unvested).

For the avoidance of doubt, if Capital Transaction Proceeds are to be distributed in connection with a sale of all outstanding Units and an Adjustment Payment would be required, then such Adjustment Payment shall be directly distributed to the Catch-Up Members instead of being distributed to the Class A Members and then paid by the Class A Members to the Company for redistribution to the Catch-Up Members.

If, pursuant to this Section 8.2, any Class A Member becomes obligated to pay an Adjustment Payment, then the Catch-Up Members shall be entitled to collect such amounts from distributions otherwise payable to each such Class A Member pursuant to this Agreement and the Company shall cause such amounts to be distributed directly to the Catch-Up Members.

(b)     Notwithstanding anything herein to the contrary, no Member holding vested Incentive Units shall be included as a "Catch-Up Member" for purposes of, and shall not participate in, distributions pursuant to Section 8.2(a) in respect of Units unless and until an amount per Unit equal to the Strike Price associated with such Incentive Units has been distributed to the Class B Member under Section 8.2(a)(iii), in which case, any Member holding vested Incentive Units shall be included as a "Catch-Up Member" solely as to distributions in excess of such the Strike Price associated with such Incentive Units.

8.3     **Tax Distributions**. Within 90 days after the end of each calendar year, to the extent of any Proceeds Available for Distribution, the Company shall distribute to each Member (any such distribution, a "**Tax Distribution**") an amount such that total distributions with respect to the tax year of the Company most recently ended (including distributions made pursuant to Sections 8.1 and 8.2, and this Section 8.3) are at least equal to the assumed federal and state income tax liability incurred by such Member with respect to such Member's distributive share of the Company's taxable net income for such taxable year. For these purposes, the federal and state income tax liability of a Member attributable to pass-through taxable income shall be deemed equal to 35% of such income. Any Tax Distribution shall be treated as an advance on the Member's rights to distributions under Sections 8.1 and 8.2, and shall reduce the amount of any such distributions. To the extent of Proceeds Available for Distribution, the Company shall make advance Tax Distributions on a quarterly basis in the amounts estimated by the Board of Directors to represent the Members' liabilities for quarterly estimated taxes. Any such advance Tax Distributions shall similarly reduce the Members' rights to distributions under Sections 8.1 and 8.2 and to liquidating distributions (and to the amount of the annual distribution under this Section 8.3).

8.4     **Liquidating Distributions**. Cash or property of the Company available for distribution upon the dissolution of the Company (including cash or property received upon the sale or other disposition of assets in anticipation of or in connection with such dissolution) shall be distributed in accordance with the provisions of Article XI.

8.5     **Limitations on Distributions**.

NG-E4TG3SKK 4868-8999-0464v.31

(a)     No distribution shall be made to a holder of Units to the extent that the distribution would cause or increase a deficit balance in the holder's Adjusted Capital Account, taking into account all distributions and allocations made through the date of the distribution. Distributions may be made to a holder of Units in anticipation of future allocations of income, but only to the extent such distributions may be characterized as "advances" under applicable tax principles. In the event that a distribution to a holder of Units is limited by the provisions of this paragraph, future distributions with respect to such Units will be increased by the same amount to the extent then permitted by this paragraph. The purposes of this paragraph (a) and the related allocation provisions in Section 7.1 are (i) to coordinate the allocation of income to the holders of the Units with the distributions to be made to such holders, (ii) to permit the Incentive Units to be treated as "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43, and (iii) to distort the economic results as little as possible consistent with the foregoing purposes, and these provisions shall be interpreted to further such purposes.

(b)     No distribution shall be made to a Member if and to the extent that such distribution would cause the Company to be insolvent.

8.6     **In-Kind Distributions**. The amount of any in-kind distribution shall be distributed to the Members on the basis of the property's then Fair Market Value and otherwise in accordance with the terms of this Article VIII.

8.7     **Allocated Adjustment Amounts**.  Each Member, excluding the SUSI Member, agrees to pay any Allocated Adjustment Amount (as such term is defined in the MIPA) which is applicable to it pursuant to Section 2.2(d) of the MIPA which is hereby incorporated by reference; provided, however, that no Member shall be required to pay any Allocated Adjustment Amount in excess of the amount of distributions received by it from the Company after December 31, 2022 and prior to the closing under the MIPA. If, pursuant to Section 2.2(d) of the MIPA, any Member becomes obligated to pay an Allocated Adjustment Amount (as such term is defined in the MIPA), then the SUSI Member shall be entitled to collect such amounts from distributions otherwise payable to each such Member pursuant to this Agreement and the Company shall cause such amounts to be distributed directly to the SUSI Member.

**Article IX**
**TAX MATTERS AND REPORTS; ACCOUNTING**

9.1     **Tax Reports to Current and Former Members**. After the end of each Fiscal Year, the Company shall use commercially reasonable efforts to prepare and mail, or cause its accountants to prepare and mail, not later than April 1 following the end of such Fiscal Year, to each Member and, to the extent necessary, to each former Member (or its legal representatives), a report setting forth in sufficient detail such information as is required to be furnished to members by law and as shall enable such Member or former Member (or its legal representatives) to prepare their respective federal and state income tax or informational returns in accordance with the laws, rules and regulations then prevailing.

9.2     **Accounting Records**. The Company shall maintain complete books and records accurately reflecting the accounts, business, transactions and Members of the Company.

33

9.3    **Tax Accounting Method.** The books and accounts of the Company shall be maintained using the accrual method of accounting for tax purposes, unless the Board of Directors duly approves use of an alternate method. Those documents relating to allocations of items of income, gain, loss, deduction or credit and Capital Accounts shall be kept under federal income tax accounting principles as provided herein.

### Article X
### RESTRICTIONS ON TRANSFER; RIGHTS OF FIRST REFUSAL;
### TAG-ALONG RIGHTS AND DRAG-ALONG RIGHTS

10.1    **Prohibited Transfers**.

(a)    Except as otherwise specifically provided herein, no Member holding Class B Units or Incentive Units shall, directly or indirectly via the sale of the applicable Member or any parent thereof, sell, exchange, transfer (by gift or otherwise), assign, distribute, pledge, create a security interest, lien or trust with respect to, or otherwise dispose of or encumber the Units owned by such Member or any interest in or option on or based on the value of the Units (any of the foregoing being referred to as a "**Transfer**") without the prior written consent of the SUSI Member, which consent may be granted or withheld in the reasonable discretion of the SUSI Member. Any purported Transfer of Units in violation of the provisions of this Article X shall be void and of no force and effect whatsoever, and the Company shall not record any such event on its books or treat any such transferee as the owner of such Units for any purpose. Any Transfer permitted by this Agreement shall be termed a "**Permitted Transfer**" and the transferee of any Permitted Transfer shall be termed a "**Permitted Transferee**."

(b)    Notwithstanding anything herein to the contrary, the provisions of Sections 10.1(a), 10.3 and 10.5 shall not apply to Transfers: (i) to a trust established by any Member for the benefit of such Member or such Member's spouse, children, or siblings; (ii) upon the death of any individual Member to such Member's heirs, executors or administrators or to a trust under such Member's will, or between such Member and such Member's guardian or conservator; (iii) to another Member; or (iv) made in accordance with Section 10.7; provided that in each case the applicable transfer complies with Section 10.2 and the transferee shall have executed a counterpart to this Agreement, thereby agreeing to be bound by all the terms and conditions of this Agreement; provided, further, that no further Transfer shall thereafter be permitted hereunder except in compliance with Sections 10.1(a), 10.3 and 10.5.

10.2    **Effective Date and Requirements of Transfer**.

(a)    Any valid Transfer of a Member's Units, or part thereof, pursuant to the provisions of this Agreement, shall be effective as of the close of business on the day in which such Transfer occurs (including fulfillment of all conditions and requirements with respect thereto). The Company shall, from the effective date of such Transfer, thereafter make all further distributions, on account of the Units (or part thereof) so assigned to the Permitted Transferee of such interest, or part thereof. As between any Member and its Permitted Transferee, profits and losses for the fiscal year of the Company in which such

assignment occurs shall be apportioned for federal income tax purposes in accordance with any manner permitted under Section 706(d) of the Code as such Member and its Permitted Transferee may agree to.

(b)     Every Transfer permitted hereunder shall be subject to the following requirements (in addition to any other requirements contained in this Agreement):

(i)     The proposed Transfer will not cause or result in a breach of any agreement binding upon the Company or any Subsidiary or result in any violation of law or any permit held by the Company or any Subsidiary, including without limitation, federal or state securities laws;

(ii)     The proposed Transfer would not cause or require (A) the Company to be an investment company as defined in the Investment Company Act of 1940, as amended or (B) the registration of the Company's securities under federal securities laws;

(iii)     The transferee shall establish to the satisfaction of the Board of Directors that the proposed Transfer would not result in any recapture of any an investment tax credit under Section 48 of the Code or other federal tax credits established under the Code, as applicable, to which the Company, any Affiliate or any third party tax equity investor would otherwise be entitled to in connection with any Project;

(iv)     The applicable transferee shall not constitute a Prohibited Transferee; and

(v)     The transferee shall establish to the satisfaction of the Board of Directors that the proposed Transfer would not adversely affect the classification of the Company as a partnership for federal or state tax purposes, cause the Company to fail to qualify for any applicable regulatory safe harbor from treatment as a publicly traded partnership treated as a corporation under Section 7704 of the Code, cause the termination of the Company's treatment as a partnership under Section 708 of the Code, or have a substantial adverse effect with respect to federal income taxes payable by the Company.

10.3     **Right of First Refusal**.

(a)     **Notice of Right**. If a Member proposes to Transfer any Units (the "**Transferring Member**"), then the Transferring Member shall promptly give written notice (the "**Transfer Notice**") of such proposed Transfer simultaneously to the Company and to the SUSI Member. The Transfer Notice shall describe in reasonable detail the proposed Transfer, including, without limitation, the amount of Units to be transferred (the "**Transfer Units**"), the nature of such Transfer, the material terms of such transfer, the cash consideration to be paid per Transfer Unit (or, in the event that the consideration is other than cash, the value of the consideration shall be determined in good faith by the Transferring Member and the Company) (the "**Transfer Purchase Price Per Unit**"), and the name and address of each prospective purchaser or Transferee (each, in such context, a

"**Proposed Transferee**"). The Transferring Member shall enclose with the Transfer Notice a copy of a written offer, letter of intent or other written document signed by the Proposed Transferee(s) setting forth the proposed terms and conditions of the Transfer.

(b)  **Exercise of Right**. For a period of 30 days following the date (the "**Transfer Notice Date**") on which the Transfer Notice is given by the Transferring Member to the Company and the SUSI Member (the "**Acceptance Period**"), the SUSI Member shall have the right to purchase all, and not less than all, of the Transfer Units on the same terms and conditions as set forth in the Transfer Notice. If the SUSI Member desires to exercise its right to purchase the Transfer Units, it shall give written notice (in such context, "**Purchase Notice**") to the Transferring Member no later than the expiration of the Acceptance Period.

(c)  **Closing**. If the SUSI Member elects to purchase the Transfer Units, the purchase shall be completed in accordance with the terms set forth in the Transfer Notice subject to payment by the SUSI Member of the applicable purchase price (which shall be equal to the product of the number of Transfer Units and the Transfer Purchase Price Per Unit) within 30 days of the receipt by the Transferring Member of the Purchase Notice (extended as may be required to obtain any governmental approvals required pursuant to applicable law) by wire transfer of immediately available funds to an account designated by the Transferring Member

10.4  **Drag-Along Right**.

(a)  If a Sale of the Company is approved by a Supermajority Interest (an "**Approved Sale**"), then each Member shall be required, to the extent required by the Proposed Acquirer (as defined below), (i) to vote all Units at any meeting of Members (or consent pursuant to a written consent in lieu of such meeting) in favor of such Approved Sale, and to raise no objections against the Approved Sale or the process pursuant to which the Approved Sale was arranged; (ii) to waive any and all dissenters', appraisal or similar rights with respect to such Approved Sale; and (iii) if the Approved Sale is structured as a sale or transfer of equity securities by the holders of the Units, to sell or transfer the Units then owned by such Member on the terms and conditions of such Approved Sale. Each Member will take all necessary and desirable actions in connection with the consummation of the transactions pertaining to the Approved Sale, including, without limitation, entering into an agreement reflecting the terms of the Approved Sale, giving customary and reasonable representations and warranties, and executing and delivering customary certificates or other documents.

(b)  As security for the performance of each Member's obligations in connection with such Approved Sale, after the approval by a Supermajority Interest has been obtained pursuant to Section 10.4(a) above, each Member hereby grants to the Company, with full power of substitution and resubstitution, an irrevocable proxy to vote all Units at all meetings of the Members held or taken after the date of this Agreement with respect to an Approved Sale or to execute any written consent in lieu thereof, and hereby irrevocably appoints the Company, with full power of substitution and resubstitution, as such Member's attorney-in-fact with authority to sign any documents with respect to any such vote or any

NG-E4TG3SKK 4868-8999-0464v.31

actions by written consent of the Members taken after the date of this Agreement with respect to such Approved Sale. This proxy shall be deemed to be coupled with an interest and shall be irrevocable. This proxy shall terminate upon the consummation of or termination of negotiations with respect to, the applicable Approved Sale.

(c)     In the event of an Approved Sale, the Company shall give written notice to each Member within five days of such (the "**Approved Sale Notice**"). The Approved Sale Notice shall set forth (i) the name and address of the proposed acquirer in the Approved Sale (the "**Proposed Acquirer**"); (ii) the terms and conditions of the Approved Sale, including the price and consideration to be paid by the Proposed Acquirer and the terms and conditions of payment; (iii) any other material facts relating to the Approved Sale; and (iv) the date and location of the closing of the Approved Sale. The Company shall enclose with the Approved Sale Notice a copy of any term sheet, letter of intent or other written document with respect to the Approved Sale. Subject to the conditions and limitations set forth in this Agreement, each Member will take all actions deemed necessary or appropriate by a Majority Interest in connection with the Approved Sale.

(d)     This Section 10.4 shall not limit in any manner the ability of the Company to enter into an agreement with respect to, or consummate, a Sale of the Company on terms which do not satisfy the conditions set forth in this Section 10.4; provided, however, in the event of any such non-complying Sale of the Company, the Members shall have no obligation pursuant to this Section 10.4 to take any action with respect to such Sale of the Company.

(e)     In connection with an Approved Sale, any Members that are not accredited investors (as that term is defined in Rule 501 of the Securities Act) will, at the request of the Company, appoint a purchaser representative (as such term is defined in Rule 501 of the Securities Act) reasonably acceptable to the Company. If any such Member appoints a purchaser representative designated by the Company, the Company will pay the reasonable fees of such purchaser representative, but if any such Member declines to appoint the purchaser representative designated by the Company such Member will appoint another purchaser representative (reasonably acceptable to the Company), and such Member will be responsible for the fees of the purchaser representative so appointed.

10.5     **Tag-Along Right**.

(a)     If any Member holding more than 50% of the Membership Interests desires to Transfer any of its Units to any Person that is not an Affiliate of such Member, then the other Members shall have the right to participate in such Transfer (a "**Tag-Along Transfer**") on the terms and conditions set forth in this Section 10.5.

(b)     At least 15 Business Days prior to the consummation of any such desired Transfer (and following the disposing Member's compliance with Section 10.3 if applicable), the disposing Member shall deliver to the other Members a written notice (a "**Tag-Along Notice**") of the proposed Tag-Along Transfer. The Tag-Along Notice shall set forth in reasonable detail (i) the name of the Person to whom the disposing Member's Units are to be sold, (ii) the proposed date, time and location of the closing of the Tag-Along

NG-E4TG3SKK 4868-8999-0464v.31

Transfer and (iii) the proposed amount of consideration for the Tag-Along Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof, and the other material terms and conditions of the Tag-Along Transfer.

(c) Each of the other Members may exercise its right to participate in a Tag-Along Transfer by delivering to the disposing Member of a written notice (a "**Tag-Along Participation Notice**") stating its intention to participate in the Tag-Along Transfer no later than ten (10) Business Days after receipt of the Tag-Along Notice. If more than one Member delivers a Tag-Along Participation Notice electing to participate in the Tag-Along Transfer, then such participating Members and the disposing Member shall participate in the sale on a pro rata basis based on their respective ownership in the Company. The maximum number of Units that each such participating Member and the disposing Member may dispose of pursuant to its rights under this Section 10.5 shall be equal to the product obtained by multiplying (i) the aggregate number of Units covered by the Tag-Along Notice by (ii) a fraction, the numerator of which is the number of outstanding Units owned by such Member and the denominator of which is the total number of outstanding Units owned by the disposing Member and all other participating Members.

(d) A participating Member may not revoke the Tag-Along Participation Notice without the consent of the disposing Member; provided that if a Member revokes its Tag-Along Participation Notice with the consent of the disposing Member, it shall reimburse the disposing Member for all reasonably incurred costs and expenses of the disposing Member in connection with such Tag-Along Participation Notice.

(e) In the event any Member delivers a Tag-Along Participation Notice electing to participate in the Tag-Along Transfer, the consideration received by such Member shall be the same form and amount of consideration to be received by the disposing Member on a pro rata basis and the terms and conditions of such Transfer shall be the same as those upon which the disposing Member sells its Units. A participating Member shall execute the applicable purchase agreement and make or provide the same representations, warranties, covenants, indemnities and agreements as the disposing Member in connection with the Tag-Along Transfer. The participating Members shall take all actions as may be reasonably necessary to consummate the Tag-Along Transfer, including, without limitation, entering into such agreements and delivering instruments and certificates consistent with the instruments and certificates to be delivered by the disposing Member. To the extent that any purchaser refuses to purchase Units from a Member who delivers a Tag-Along Participation Notice despite such Member's compliance with this Section 10.5, the disposing Member shall not sell to such purchaser a number of Units corresponding to the Units that such participating Member is entitled to sell under Section 10.3(b) unless and until the purchaser purchases such Units or the disposing Member purchases such Units on the same terms and conditions upon which the disposing Member sells its Units.

(f) Any proposed Transfer on terms and conditions materially more favorable to the purchaser than those described in the Tag-Along Notice shall again be subject to the rights and procedures set forth in this Section 10.5.

NG-E4TG3SKK 4868-8999-0464v.31

(g)     For the avoidance of doubt, no Transfer under this <u>Section 10.5</u> shall be effective unless, contemporaneously with such Transfer, the purchaser executes a counterpart to this Agreement, thereby agreeing to be bound by all the terms and conditions of this Agreement.

10.6     **No Indirect Transfers**.  The SUSI Member shall not cause or allow any of the SUSI Member Owners to Transfer such SUSI Member Owner's direct or indirect equity in the SUSI Member without compliance with <u>Section 10.5</u>; provided, however, this provision shall not apply to any Transfer to an Affiliate of such Member, a successor entity of such Member or any investment fund or vehicle managed or advised by SUSI Partners AG or any Affiliate thereof.

10.7     **Inside Members Buyout Right**.  Following the eighth anniversary of the date of this Agreement, each of Charles Farrell, the PBS Member, Jesse Stowell, Chris Clement, and Phillip Foy (each, an "**Inside Member**"), shall have the right to require the SUSI Member to purchase all or some of its Units and Incentive Units, as applicable (the "**Buyout Right**").  The SUSI Member shall be obligated to purchase all or some of an Inside Member's Units and Incentive Units if the Inside Member: (a) is employed in good standing and on a full time basis as of the eighth anniversary of the date of this Agreement (in the case of the PBS Member, the subject employee is Blake Sturcke); and (b) within 30 days of such anniversary provides the SUSI Member with a written notice stating that it has elected to exercise his Buyout Right and identifying the type and number of Units with respect to which such right is being exercised (in such context, the "**Bought Units**").  The Inside Member and the SUSI Member shall close on the purchase and sale of the Bought Units within 30 days of when the Inside Member provides its written exercise notice to the SUSI Member, and shall be made pursuant to a membership interest purchase agreement to be executed by them and acknowledged by the Company, containing standards conveyance terms and representations and warranties reasonably agreed upon by the Inside Member and the SUSI Member. The per-Bought Unit purchase price payable by the SUSI Member under the membership interest purchase agreement shall be an amount equal to the lower of: (i) $12; or (ii) fair market value (without a minority discount), as determined by the Inside Member and the SUSI Member acting reasonably and in good faith or, if they cannot promptly agree upon the fair market value, by an independent third party appraiser mutually selected and equally paid for by them. The determination of an independent third-party appraiser shall be final and binding upon the Inside Member and the SUSI Member.

**Article XI**
**DISSOLUTION, LIQUIDATION, AND TERMINATION; DISSOCIATION**

11.1     **Dissolution**. The Company shall be dissolved upon (i) the entry of a decree of judicial dissolution under § 18-802 of the Act; or (ii) the decision of a Supermajority Interest.

11.2     **Liquidating Distributions**. In settling accounts upon winding up and liquidation of the Company, the assets of the Company shall be applied and distributed as expeditiously as possible in the following order:

(a)     To pay (or make reasonable provision for the payment of) all creditors of the Company, including, to the extent permitted by law. Members that are creditors, in satisfaction of liabilities of the Company in the order of priority provided by law, including

39

expenses relating to the dissolution and winding up of the Company, discharging liabilities of the Company, distributing the assets of the Company and terminating the Company as a limited liability company in accordance with this Agreement and the Act); and

(b)　To the Members in accordance with <u>Section 8.2</u>, subject to <u>Section 8.5</u>.

11.3　**Orderly Winding Up**. Notwithstanding anything herein to the contrary, upon winding up and liquidation, if required to maximize the proceeds of liquidation, the Members may, upon approval of a Majority Interest, transfer the assets of the Company to a liquidating trust or trustees.

## Article XII
## DEFINITIONS

12.1　**Terms Defined Elsewhere in the Agreement**. For purposes of this Agreement, the following terms have the meaning set forth in the Section indicated:

| <u>Term</u> | <u>Section</u> |
| --- | --- |
| Acceptance Period | 10.3(b) |
| Act | Preamble |
| Additional Capital Contribution | 6.2(b)(i) |
| Additional Capital Contribution Deadline | 6.2(b)(i)(C) |
| Additional Capital Contribution Notice | 6.2(b)(i) |
| Adjusted Capital Account | 12.2 |
| Adjustment Payment | 6.2(b)(i) |
| Affiliate | 12.2 |
| Agreement | Preamble |
| Annual Budget | 12.2 |
| Approved Project Coverage Offer | 6.2(b)(iv)(C)(3) |
| Approved Sale | 10.4(a) |
| Approved Sale Notice | 10.4(c) |
| ASTM | 3.6(c)(viii)(A) |
| Bankruptcy | 12.2 |
| Board of Directors | 3.1 |
| Book | 12.2 |
| Bought Units | 10.7 |
| Buyout Right | 10.7 |
| Capital Account | 12.2 |
| Capital Contribution | 12.2 |
| Capital Contribution per Unit | 12.2 |
| Capital Transaction Proceeds | 12.2 |
| Cash Management Procedures | 12.2 |
| Catch-Up Amount | 12.2 |
| Catch-Up Member(s) | 12.2 |
| CCO | 4.1 |
| CF Director Representative | 3.2(a) |

NG-E4TG3SKK 4868-8999-0464v.31

| | |
|---|---|
| CFO | 4.1 |
| Class A Contingent Liquidation Amount | 12.2 |
| Class A Member | 12.2 |
| Class A Unpaid Contingent Liquidation Amount | 12.2 |
| Class A Unreturned Capital Contribution Balance | 12.2 |
| Class B Member | 12.2 |
| Closed Book | 12.2 |
| Co-CEO | 4.1 |
| Code | 12.2 |
| Company | Preamble |
| Confidential Information | 12.2 |
| Construction Budget | 12.2 |
| Construction-Ready CPs | 12.2 |
| Control | 12.2 (under Affiliate) |
| COO | 4.1 |
| Development Budget | 12.2 |
| Development Completion Date | 3.6(d)(viii)(B)(5) |
| Development Funds | 12.2 |
| Director(s) | 3.2 |
| Excluded Matters | 12.2 |
| Existing Units | Preamble |
| Expenses | 5.5(b) |
| Fair Market Value | 12.2 |
| Fiscal Year | 1.3 |
| Founder Director Representative(s) | 3.2(b) |
| Incentive Member | 12.2 |
| Incentive Units | 2.8(c)(iii) |
| Indemnified Person | 5.1 |
| Inside Member | 10.7 |
| Internal Capital Call Notice | 3.6(d)(viii)(C) |
| IPO | 12.2 |
| Major Project Contracts | 12.2 |
| Majority Interest | 12.2 |
| Member(s) | Preamble |
| Membership Interest | 12.2 |
| MIPA | Preamble |
| New Securities | 12.2 |
| NTP Status | 12.2 |
| Officer(s) | 4.1 |
| Open Book | 12.2 |
| Partnership Representative | 3.4(h) |
| PBS Director Representative | 3.2(b) |
| PBS Member | Preamble |
| Permitted Transfer | 10.1(a) |
| Permitted Transferee | 10.1(a) |
| Person | 12.2 |

NG-E4TG3SKK 4868-8999-0464v.31

| | |
|---|---|
| Plan | 12.2 |
| Pre-Construction Project Expenses | 12.2 |
| Pre-NTP Status | 12.2 |
| Prior Agreement | Preamble |
| Proceeding | 5.5(c) |
| Proceeds Available for Distribution | 12.2 |
| Prohibited Transferee | 12.2 |
| Project | 1.1 |
| Project Coverage Offer | 6.2(b)(iv)(C) |
| Project Coverage Offeror | 6.2(b)(iv)(C) |
| Project Guidelines | 12.2 |
| Project Intermediary Holdco LLC | 6.2(b)(iv)(C)(3) |
| Project SPV LLC | 12.2 |
| Proposed Acquirer | 10.4(c) |
| Proposed Transferee | 10.3(a) |
| Purchase Notice | 10.3(b) |
| Purchase Transaction | Preamble |
| Reclassification | Preamble |
| Reserved Class B Units | 2.8(c)(ii)(A) |
| Restructuring | 12.2 |
| Sale of the Company | 12.2 |
| Sanctioned Person | 12.2 |
| Sanction | 12.2 |
| Secretary | 4.1 |
| Service Provider NDA | 2.7(a) |
| SG&A Expenses | 12.2 |
| Strike Price | 2.8(d) |
| Subsidiary | 12.2 |
| Supermajority Interest | 12.2 |
| Supporting Documentation | 12.2 |
| SUSI Director Representatives | 3.2(c) |
| SUSI Member | Preamble |
| SUSI Member Owners | 12.2 |
| Tag-Along Notice | 10.5(b) |
| Tag-Along Participation Notice | 10.5(c) |
| Tag-Along Transfer | 10.5(a) |
| Tax Distribution | 8.3 |
| Transfer | 10.1(a) |
| Transfer Notice | 10.3(a) |
| Transfer Notice Date | 10.3(b) |
| Transfer Purchase Price Per Unit | 10.3(a) |
| Transfer Units | 10.3(a) |
| Transferring Member | 10.3(a) |
| Treasury Regulation | 12.2 |
| Unit(s) | 2.8(a) |
| Unit Repurchase Agreements | Preamble |

12.2 **Other Definitions**. For purposes of this Agreement the following terms have the following meanings:

"**Adjusted Capital Account**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year or other relevant period, after giving effect to the following adjustments:

 (a) increase such balance by any amounts which such Member is obligated to restore (pursuant to this Agreement or by law) or is deemed to be obligated to restore pursuant to Treasury Regulation Section 1.74-l(b)(2)(ii)(c) or the penultimate sentence of each of Treasury Regulation Sections 1.74-2(1X5) and 1.74-2(g)(l); and

 (b) decrease such balance by the items described in Treasury Regulation Section 1.74-l(b)(2)(ii)(d)(4), (5) and (6).

"**Affiliate**" means, with respect to any specified Person, (i) any other Person that directly or indirectly controls, is controlled by, or is under common control with such specified Person, (ii) any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, including adoptive relationships, of such Person, and (iii) any trust, family limited partnership, family limited liability company or other estate planning entity, the beneficiaries, partners or members of which are limited to such Person and such Person's spouse, lineal descendants and stepchildren. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of at least 50% of the voting securities, by contract or otherwise.

"**Annual Budget**" means the annual budget of the Company as to any and all administrative and operating expenses of the Company and its Subsidiaries (excluding costs and expenses associated with the acquisition and development of a Project which shall be addressed by a Development Budget and excluding costs and expenses associated with the construction of a Project which shall be addressed by a Construction Budget; provided, for the avoidance of doubt, that the Development Budget and Construction Budget for each Project are distinct components of and not altogether separate from the Annual Budget).

"**Bankruptcy**" means, with respect to any Person, such Person's: (a) making an assignment for the benefit of creditors; (b) filing a voluntary petition in bankruptcy; (c) being adjudged bankrupt or insolvent, or having entered against such Person an order for relief, in any bankruptcy or insolvency proceeding; (d) filing a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (e) filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding of this nature; (f) seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator of such Person or of all or any substantial part of such Person's properties; (g) having commenced against such Person any proceeding seeking reorganization, arrangement,

composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, which proceeding is consented to by such Person or which is not dismissed within 90 days after being commenced; or (h) having a trustee, receiver or liquidator of such Person or of all or any substantial part of such Person's properties appointed without such Person's consent or acquiescence and such appointment is not vacated or stayed within 90 days after such appointment, or the appointment is not vacated within 90 days after the expiration of any such stay.

"**Book**" means, with respect to a Project, a written proposal for and compiled set of documents comprised of the Supporting Documentation then available for the Project, which proposal and compilation shall be in the form of Exhibit C attached to this Agreement.

"**Capital Account**" means the capital account maintained by the Company for each Member as described in Section 6.3.

"**Capital Contribution**" means, for any Member, all cash and the agreed fair market value of the property contributed by the Member to the Company from time to time, as set forth as of the date hereof on Schedule 2.8 hereto, and includes, for the avoidance of doubt, Additional Capital Contributions and SG&A Capital Contributions.

"**Capital Contribution per Unit**" means, for any Member, the total Capital Contribution of a Member with respect to each Unit.

"**Capital Transaction Proceeds**" means the net receipts resulting from a Sale of the Company, one or more Subsidiaries, one or more Projects, from a recovery under any insurance policy providing for protection against a loss or any significant portion of the Company's assets, or from a refinancing of institutional debt of the Company or a Subsidiary, in each case after deducting (a) all costs and expenses of the Company directly related to such foregoing matter, (b) the amount (if any) to discharge all debts and obligations of the Company required to be paid as a result of such foregoing matter, and (c) any reasonable reserves as determined by the Board of Directors that are required for the fixed, contingent or future liabilities or obligations of the Company.

"**Cash Management Procedures**" means the procedures set forth in Exhibit D attached to this Agreement.

"**Catch-Up Amount**" means, as of the date when a distribution is to be made under Section 8.2(a)(iii), an aggregate amount for the Catch-Up Units equal to $19,420,000.

"**Catch-Up Members**" means the Class B Members and the Incentive Members (subject to Section 8.2(b)).

"**Catch-Up Units**" means the Class B units and, to the extent vested, the Incentive Units (subject to Section 8.2(b)).

"**Class A Contingent Liquidation Amount**" means, for any Class A Unit, as of a determination date and with respect to a Class A Unit, an amount equal to the product of (a) the

NG-E4TG3SKK 4868-8999-0464v.31

Class A Member's funded Capital Contribution with respect to such Class A Unit, multiplied by (b) twenty percent (20%).

"**Class A Member**" means a Person listed on <u>Exhibit 2.10</u> to this Agreement who owns one or more Class A Units and who is a party to this Agreement, and any additional Person who becomes a Class A Member after the date hereof in accordance with this Agreement.

"**Class A Unpaid Contingent Liquidation Amount**" means, for any Class A Unit, as of a determination date and with respect to a Class A Unit, an amount equal to:

(a)    the Class A Contingent Liquidation Amount with respect to such Class A Unit; less

(b)    the aggregate sum of all distributions previously received with respect to such Class A Unit under:

(i)    Section 8.2(a)(ii);

(ii)    Section 8.3 (but only to the extent allocable to Section 8.2(a)(ii); and

(iii)    Section 8.4 (but only to the extent allocable to Section 8.2(a)(ii)).

"**Class A Unreturned Capital Contribution Balance**" means, for any Class A Unit, as of a determination date and with respect to a Class A Unit, an amount equal to:

(a)    the Class A Member's funded Capital Contribution with respect to such Class A Unit determined as of the date of this Agreement; less

(b)    the aggregate sum of all distributions previously received with respect to such Class A Unit under:

(i)    Section 8.2(a)(i);

(ii)    Section 8.3(but only to the extent allocable to Section 8.2(a)(i)); and

(iii)    Section 8.4 (but only to the extent allocable to Section 8.2(a)(i)).

"**Class B Member**" means a Person listed on <u>Exhibit 2.10</u> to this Agreement who owns one or more Class B Units and who is a party to this Agreement, and any additional Person who becomes a Class B Member after the date hereof in accordance with this Agreement.

"**Closed Book**" means a Book that the Underwriting Committee determines is not missing any Supporting Documentation (other than any Supporting Documentation waived in writing by the Underwriting Committee as inapplicable).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" means all documents and information, whether written or oral (including, without limitation, confidential and proprietary information with respect to customers, sales, marketing, production, costs, business operations and assets), of the Company or its Subsidiaries.

"**Construction Budget**" means, a budget for the construction of a Project to the extent required to achieve commercial operations, including any amendments thereto but only if and to the extent that such Construction Budget and any amendment of the same is approved by the Underwriting Committee in accordance with Section 3.6(d).

"**Construction-Ready CPs**" means, with respect to a Project and, the following:

(a)     an executed long-term offtake agreement with a two-year a minimum term, in form and substance acceptable to the Underwriting Committee, and with an offtaker acceptable to the Underwriting Committee;

(b)     an executed project site control agreement in form and substance and with a counterparty acceptable to the Underwriting Committee;

(c)     the receipt of satisfactory results of site diligence, including the completion and review of a title report and of an environmental site assessment conducted in accordance with ASTM standards;

(d)     an executed interconnection agreement in form and substance and with a counterparty acceptable to the Underwriting Committee;

(e)     an executed Engineering, Procurement and Construction contract in form and substance and with a counterparty acceptable to the Underwriting Committee; and

(f)     the receipt of all required construction permits.

"**Development Budget**" means, the annual development budget pertaining to the "soft costs" for the acquisition and development of Projects required for Projects to reach or maintain NTP Status, including any amendments thereto, such as "soft costs" for site control, licensing, permitting, interconnection applications, offtake, due diligence and third-party technical reports relating thereto.

"**Development Funds**" means the aggregate amount set forth in a Development Budget approved in accordance with this Agreement, which funds shall be deposited, maintained in, and drawn from a separate bank account designated as the "development account."

"**Excluded Matters**" means (a) the exercise of any rights of a Member by such Member, including any voting rights, the approval by a Member of any amendment to this Agreement, and the evaluation by a Member of another Member's compliance with this Agreement and the determination whether to seek any remedies against such Member; (b) the exercise of any voting rights of the members of the Underwriting Committee (whether or not such members are also Directors); and (c) the SUSI Member's election of whether or not to fund Additional Capital Contributions which may be requested from time to time pursuant to Section 6.2(c).

"**Fair Market Value**" means, with respect to any asset, as of the date of determination, the cash price (as determined in the reasonable discretion of the Board of Directors) at which a willing seller would sell, and a willing buyer would buy, each being apprised of all relevant facts and neither acting under compulsion, such asset in an arm's-length negotiated transaction with an unaffiliated third party without time constraints.

"**Incentive Member**" means a Person listed on Exhibit 2.10 to this Agreement who owns one or more Incentive Units that has vested pursuant to the applicable Award Agreement and who is a party to this Agreement, and any additional Person who becomes an Incentive Member after the date hereof in accordance with this Agreement.

"**IPO**" means an offering of securities registered under the Securities Act of 1933, as amended, the issuer of which, immediately before the registration, was not required to file reports under Sections 13 or 15(d) of the Securities Exchange Act of 1934, as amended, or an initial public offering under comparable foreign law.

"**Major Project Contracts**" means each of the following: (i) offtake agreement; (ii) interconnection agreement; (iii) Engineering, Procurement and Construction contract; (iv) power purchase agreement; and (iv) any other agreement related to the construction or operation of a Project which contemplates the payment or receipt of $250,000 per year or $1,000,000 in the aggregate.

"**Majority Interest**" means Members holding more than fifty percent (50%) of the outstanding Units (for the avoidance of doubt, excluding all Incentive Units unless and until any such Incentive Units vest in accordance with the applicable Vesting Agreement and for so long as such Incentive Units are not forfeited or repurchased under the applicable Vesting Agreement).

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its share of distributions as set forth in this Agreement and other items of income, gain, loss and deduction of the Company; (b) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (c) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the Act. The Membership Interest of each Member shall be expressed as a class and number of Units.

"**New Securities**" means any equity securities (or securities exercisable for or convertible into equity securities) of any kind or class issued by the Company after the date hereof, including Units.

"**NTP Status**" means, with respect to a Project, such time as when a full notice to proceed has been issued by the applicable Project SPV LLC for construction to commence on the Project.

"**Open Book**" means a Book that is missing any Supporting Documentation.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity.

"**Plan**" means any equity incentive plan adopted by the Board of Directors for the grant or issuance of Incentive Units to employees, consultants, directors or advisors of the Company or any of its Subsidiaries.

"**Pre-Construction Project Expense**" means, with respect to a Project which has not reached its Development Completion Date, any expenses that relate to such Project's acquisition, pre-construction phase development or interconnection, or procurement (in each case to the extent that the incurrence of such expenses have been approved in accordance with the terms of this Agreement).

"**Pre-NTP Status**" means, with respect to a Project, such time as when the applicable Project SPV LLC is otherwise ready to issue a full notice to proceed for construction to commence on the Project except that one or more of the Major Project Contracts and the applicable financing agreements have not yet been executed.

"**Proceeds Available for Distribution**" means all cash (excluding proceeds from Capital Contributions) after deduction for payments of operating expenses, other cash expenditures, and any amounts set aside for the restoration, increase or creation of reasonable reserves, in each case, as determined by the Board of Directors.

"**Prohibited Transferee**" means, in connection with any proposed Transfer, any Person, which is, or whose Affiliate is, then (i) a party adverse in any pending or threatened (in writing) material action, suit or proceeding to the Company, the SUSI Member or any Affiliate of the SUSI Member; or (ii) a Sanctioned Person.

"**Project Guidelines**" means the criteria and guidelines attached to this Agreement as Exhibit E attached to this Agreement.

"**Project SPV LLC**" means a Subsidiary limited liability company formed for the sole purpose of acting as the direct owner of and "special purpose vehicle" for a single Project designated to it.

"**Restructuring**" means any changes to the capital structure of the Company or any Subsidiary, including all forms of debt financing, capital increase or decrease, creation, issuance, purchase or redemption of Units or other equity interests, repatriation of capital reserves or any public offering of Units and/or a listing of Units on a stock exchange or over-the-counter exchange.

"**Sale of the Company**" means, with respect to the Company or a Subsidiary, an IPO with respect to such company or the (i) the direct or indirect sale of all or substantially all of the Company's assets to any Person or (ii) other than pursuant to Section 6.2(a) or Section 10.3, any transaction, whether by sale of equity interests, sale of assets, sale of capital stock of any corporate holding entity holding Units, merger, recapitalization, reorganization or otherwise, pursuant to

48

which one or more Persons shall own in excess of 50% of the outstanding equity interests of the Company, in each case in a single transaction or series of related transactions. Notwithstanding the foregoing, the Purchase Transaction shall not be a Sale of the Company transaction.

"**Sanctioned Person**" means any target of Sanctions, including, (i) any Person listed in any list of targets identified or designated pursuant to any Sanctions, (ii) Persons, countries, or territories that are the target of any territorial or country-based Sanctions program, (iii) Persons that are a target of Sanctions due to their ownership or control by any Sanctioned Person, or (iv) otherwise a target of Sanctions, including vessels and aircraft, that are designated under any Sanctions program.

"**Sanctions**" means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws imposed, administered or enforced from time to time by (i) the United States of America, including those administered by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), the U.S. Department of State, U.S. Department of Commerce, or through any existing or future statute or Executive Order, (ii) the United Nations Security Council, or (iii) any other governmental authority in any jurisdiction in which the proceeds of the Capital Contributions will be used.

"**SG&A Expenses**" means the Company's general and administrative expenses, considered as a whole, such as costs related to marketing, corporate overhead, and other business support functions.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, limited partnership, association or other business entity (other than a corporation), a majority of membership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership, limited partnership, association or other business entity (other than a corporation) if such Person or Persons will be allocated a majority of limited liability company, partnership, limited partnership, association or other business entity gains or losses or will be or control any manager, managing director or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person will be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"**Supermajority Interest**" means Members holding more than 66.70% of the outstanding Units (for the avoidance of doubt excluding all Incentive Units unless and until any such Incentive Units vest in accordance with the applicable Vesting Agreement and for so long as such Incentive Units are not forfeited or repurchased under the applicable Vesting Agreement).

49

"**Supporting Documentation**" means, with respect to a Project, copies of the following materials for inclusion in the Book for that Project, in each case in form and substance acceptable to the Underwriting Committee:

(a)    a copy of each executed Major Project Document;

(b)    a copy of each executed agreement providing for Project and Project portfolio financing, including construction debt, permanent debt, tax equity, investment tax credits, bridge financing, or similar such financings;

(c)    a survey of the Project site;

(d)    a title insurance policy with respect to the Project site;

(e)    lien search results with respect to the Project SPV LLC and evidence that any liens shown on the lien search results have been satisfied;

(f)    technical and legal third-party due diligence reports, including (i) as to the Project site, a Phase I Environmental Site Assessment and, if required, a Phase II Environmental Assessment (in each case in accordance with ASTM standards), and (ii) as to the agreed form of Engineering, Procurement and Construction contract, O&M program, and similar agreements;

(g)    procured insurance policies naming the applicable Project SPV LLC as an insured;

(h)    the financing model and plan, including a tracking report thereof; and

(i)    all consents, authorizations, approvals, or permits, if any, of any governmental authority or any third party that are reasonably determined to be required in connection with the lawful issuance and sale of any Reserved Class B Units contemplated in connection with the Project.

"**SUSI Member Owners**" means, with respect to the SUSI Member, any entity or entities whose purpose is to directly or indirectly own the equity in the SUSI Member.

"**Treasury Regulation**" means a regulation issued by the United States Department of the Treasury and relating to a matter arising under the Code.

### Article XIII
### GENERAL PROVISIONS

13.1    **Offset**. Whenever the Company is obligated to pay any sum to any Member, any amounts that such Member owes the Company may be deducted from said sum before payment.

13.2    **Notices**. Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents required or permitted to be given under this Agreement must be in writing and shall be deemed to have been given (a) three days after the date mailed by registered or

certified mail, addressed to the recipient, with return receipt requested, or (b) upon delivery to the recipient in person or by courier Such notices, requests and consents shall be given (x) to the Members at the addresses set forth opposite their respective names on Schedule 2.8 or such other address as may be specified by notice to the Board of Directors, and (y) to the Company or the Board of Directors at the address of the principal office of the Company. Whenever any notice is required to be given by this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.3     **Entire Agreement**. This Agreement, including its Recitals, Exhibits and Schedules (each of which are incorporated into this Agreement), together with the MIPA, constitutes the entire agreement of the Member relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

13.4     **Consent to Jurisdiction**. The Members hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth on Schedule 2.8 or such other address as may be specified by notice to the Board of Directors shall be effective service of process for any suit, action or other proceeding brought in any such court. Each party hereto hereby acknowledges and agrees that any controversy that may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

13.5     **Amendment or Modification**. Except as otherwise set forth herein, this Agreement may be modified or amended, and any provision hereof may be waived, by an instrument in writing if such modification, amendment or waiver has been approved by a Supermajority Interest and such writing is signed by a Supermajority Interest; provided, however, that no such amendment, modification or waiver may, without the consent of each affected Member, require any Member to make contributions to the Company or make the Member liable for any debts or obligations of the Company. Any amendment, modification or waiver effected in accordance with this Section 13.5 shall be binding on all Members whether or not any such Member consented thereto or was a party to the instrument effecting the same.

NG-E4TG3SKK 4868-8999-0464v.31

13.6 **Binding Effect**. Subject to the restrictions on transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Member and its heirs, legal representatives, successors and assigns.

13.7 **Governing Law; Severability**. This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, exclusive of its conflict-of-laws principles. In the event of a conflict between the provisions of this Agreement or the Act, the applicable provision of this Agreement shall control, to the extent permitted by law. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision shall be enforced to the fullest extent permitted by law.

13.8 **Waiver of Certain Rights**. Each Member irrevocably waives any right it may have for partition of the property of the Company. The failure of any Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance herewith in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

13.9 **No Right to Continued Service**. Nothing in this Agreement is intended to alter the at-will status of a Member's service to the Company as an employee or in any other capacity.

13.10 **Interpretation**. For the purposes of this Agreement, terms not defined in this Agreement shall be defined as provided in the Act; and all nouns, pronouns and verbs used in this Agreement shall be construed as masculine, feminine, neuter, singular, or plural, whichever shall be applicable. Titles or captions of Articles and Sections contained in this Agreement are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

*[remainder of the page intentionally left blank]*

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | | MEMBER (Non-Individuals): |
|---|---|---|
| April 27, 2023 | | |
| DATE OF EXECUTION | | DATE OF EXECUTION |
| *(signature)* | | |
| MEMBER SIGNATURE | | NAME OF ENTITY |
| Charles R. "Chad" Farrell | | By: _____ |
| PRINT NAME | | Its: _____ |
| | | TITLE _____ |
| (ADDITIONAL MEMBER SIGNATURE, IF ANY) | | PRINT NAME _____ |
| | | ADDRESS: _____ |
| PRINT NAME | | _____ |
| | | _____ |
| ADDRESS: 16 Ferguson Ave. Burlington, VT 05401 | | EMAIL |
| chad@encore.eco | | _____ |
| EMAIL | | |

**ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE**

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| <br><br>DATE OF EXECUTION | 4/27/23<br>DATE OF EXECUTION |
| <br>MEMBER SIGNATURE | PBS Renewable Energy LLC<br>NAME OF ENTITY |
| <br>PRINT NAME | By: _Petra_<br>Its: Manager & CFO |
| (ADDITIONAL MEMBER SIGNATURE, IF ANY) | TITLE Manager & CFO<br><br>PRINT NAME Petra Sturcke |
| <br>PRINT NAME | ADDRESS: 64 Oak Ledge Lane, Wilton, CT 06897 |
| ADDRESS: _____ | <br>EMAIL |
| <br>EMAIL | petra.sturcke@gmail.com |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| _____ <br> DATE OF EXECUTION | _____ <br> DATE OF EXECUTION |
| _____ <br> MEMBER SIGNATURE | Gardener's Intervale, LLC <br> NAME OF ENTITY <br> By: _____ <br> Its: Authorized Agent |
| _____ <br> PRINT NAME | TITLE Member <br> PRINT NAME Addison Raap |
| _____ <br> (ADDITIONAL MEMBER SIGNATURE, IF ANY) | ADDRESS: 181 Kelady Drive <br> Shelburne, VT 05482 |
| _____ <br> PRINT NAME | addisonraap@gmail.com <br> EMAIL |
| ADDRESS:_____ <br> _____ <br> _____ <br> EMAIL | _____ |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| DATE OF EXECUTION | DATE OF EXECUTION |
| *DCF2* <br> MEMBER SIGNATURE <br> DAVID C FARRINGTON JR <br> PRINT NAME | NAME OF ENTITY <br><br> By: _____ <br> Its: _____ |
| (ADDITIONAL MEMBER SIGNATURE, IF ANY) | TITLE _____ <br> PRINT NAME _____ |
| PRINT NAME | ADDRESS: _____ <br> _____ |
| ADDRESS: 110 MAIN ST. <br> BURLINGTON - VT - 05401 <br> dave @ BTVspaces.com <br> EMAIL | EMAIL <br> _____ |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED
LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company
and further hereby agrees to be subject to and bound by the terms and conditions contained in this
Limited Liability Company Agreement as of the date hereof.

MEMBER(S)(Individuals):

MEMBER (Non-Individuals):

_____
DATE OF EXECUTION

_____
DATE OF EXECUTION

_____
MEMBER SIGNATURE

Split Rock Fund LLC
NAME OF ENTITY

By: Reginald Gignoux
Its: Manager

_____
PRINT NAME

TITLE S Manager

_____
(ADDITIONAL MEMBER SIGNATURE, IF
ANY)

PRINT NAME REGINALD GIGNOUX

_____
PRINT NAME

ADDRESS: PO Box 808
Shelburne, VT 05482-0808

ADDRESS:_____
_____

_____
EMAIL

_____
EMAIL

reg.gignoux@splitrocknet.com

EAST\202717850.2

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| _____ <br> DATE OF EXECUTION | _____04/27/2023_____ <br> DATE OF EXECUTION |
| _____ <br> MEMBER SIGNATURE | iSun, Inc. <br> _____ <br> NAME OF ENTITY |
| _____ <br> PRINT NAME | By: _Jeffrey Peck_ Digitally signed by Jeffrey Peck Date: 2023.04.27 15:55:28 -04'00' <br> Its: __Chief Executive Officer__ |
| _____ <br> (ADDITIONAL MEMBER SIGNATURE, IF ANY) | TITLE __Chief Executive Officer__ <br> PRINT NAME __Jeffrey Peck__ |
| _____ <br> PRINT NAME | ADDRESS: __400 Avenue D, Suite 10__ <br> __Williston, VT 05498__ |
| ADDRESS:_____ <br> _____ <br> _____ <br> EMAIL | _____ <br> EMAIL <br> jeff@isunenergy.com |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| <br>DATE OF EXECUTION<br><br><br>MEMBER SIGNATURE<br><br>PRINT NAME<br><br><br><br>(ADDITIONAL MEMBER SIGNATURE, IF ANY)<br><br>PRINT NAME<br><br><br><br>ADDRESS:_____<br><br><br>EMAIL | 05/01/23<br>DATE OF EXECUTION<br><br>Alpenglow Energy Solutions, LLC<br>NAME OF ENTITY<br><br>By: _____<br>Its: Manager<br><br>TITLE Manager<br>PRINT NAME Derek Moretz<br><br>ADDRESS: 15 Green Laurel Trl<br>Fletcher, NC 28732<br><br>EMAIL<br>derek@alpenglowenergysolutions.com |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| DATE OF EXECUTION | DATE OF EXECUTION |
| MEMBER SIGNATURE | NAME OF ENTITY |
| PRINT NAME | By: _____ |
| | Its: _____ |
| Jesse W. Stowell | |
| (ADDITIONAL MEMBER SIGNATURE, IF ANY) | TITLE _____ |
| | PRINT NAME _____ |
| PRINT NAME | ADDRESS: _____ |
| | _____ |
| | _____ |
| | EMAIL |
| ADDRESS: 86 Cityside Dr. Montpelier, VT 05602 | |
| EMAIL jesse.w.stowell@gmail.com | _____ |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| _____<br>DATE OF EXECUTION | _____<br>DATE OF EXECUTION |
| *Christopher Clement*<br>_____<br>MEMBER SIGNATURE | _____<br>NAME OF ENTITY |
| Christopher Clement<br>_____<br>PRINT NAME | By: _____<br>Its: _____ |
| _____<br>(ADDITIONAL MEMBER SIGNATURE, IF ANY) | TITLE _____<br>PRINT NAME _____ |
| _____<br>PRINT NAME | ADDRESS: _____<br>_____ |
| ADDRESS: 1102 Spear Street<br>South Burlington, VT 05403 | _____<br>EMAIL |
| christopher.clement@aya.yale.edu<br>EMAIL | _____ |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| _____<br>DATE OF EXECUTION | _____<br>DATE OF EXECUTION |
| _____<br>MEMBER SIGNATURE | _____<br>NAME OF ENTITY |
| Phillip D. Foy<br>_____<br>PRINT NAME | By: _____<br>Its: _____ |
| _____<br>(ADDITIONAL MEMBER SIGNATURE, IF ANY) | TITLE _____<br>PRINT NAME _____ |
| _____<br>PRINT NAME | ADDRESS: _____<br>_____ |
| ADDRESS: 20 Lyman Avenue<br>Burlington, VT 05401<br>_____ | _____<br>EMAIL |
| phillip.d.foy@gmail.com<br>_____<br>EMAIL | _____ |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| _____<br>DATE OF EXECUTION | 5/2/2023<br>DATE OF EXECUTION |
| _____<br>MEMBER SIGNATURE | Lacuna Project Investments II, LLC<br>NAME OF ENTITY<br>By: _____<br>Its: Authorized Person |
| _____<br>PRINT NAME | TITLE Authorized Person |
| _____<br>(ADDITIONAL MEMBER SIGNATURE, IF ANY) | PRINT NAME Brad Bauer |
| _____<br>PRINT NAME | ADDRESS: 801 Larkspur Landing Circle<br>Larkspur CA 94939 |
| ADDRESS:_____<br>_____ | _____<br>EMAIL |
| _____<br>EMAIL | brad@lacunasustainable.com |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

| MEMBER(S)(Individuals): | MEMBER (Non-Individuals): |
|---|---|
| DATE OF EXECUTION | 5/1/2023 <br> DATE OF EXECUTION <br><br> Javcap Holdings LLC <br> NAME OF ENTITY <br><br> By: <br><br> Its: Manager <br><br> TITLE MANAGER <br><br> PRINT NAME JASON SEGAL <br><br> ADDRESS: 420 LEXINGTON AVENUE, #442 <br> New York, NY 10170 <br><br> jsegal@jav-cap.com <br> EMAIL |
| MEMBER SIGNATURE | |
| PRINT NAME | |
| (ADDITIONAL MEMBER SIGNATURE, IF ANY) | |
| PRINT NAME | |
| ADDRESS: | |
| EMAIL | |

ENCORE REDEVELOPMENT, LLC SEVENTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT MEMBER COUNTERPART SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a Member of the Company and further hereby agrees to be subject to and bound by the terms and conditions contained in this Limited Liability Company Agreement as of the date hereof.

MEMBER(S)(Individuals):

_____
DATE OF EXECUTION

_____
MEMBER SIGNATURE

_____
PRINT NAME

_____
(ADDITIONAL MEMBER SIGNATURE, IF ANY)

_____
PRINT NAME

ADDRESS:_____
_____

_____
EMAIL

MEMBER (Non-Individuals):

17 May 2023
_____
DATE OF EXECUTION

Maple SETF LLC
_____
NAME OF ENTITY

By: Richard Braakenburg
Its: President

TITLE President
PRINT NAME Richard Braakenburg

ADDRESS: 1209 Orange Street
Wilmington, DE 19801

r.braakenburg@susi-partners.com
EMAIL

NG-E4TG3SKK 4868-8999-0464v.30

| Member Name & Address | Capital Contributions | Class A Units | Class B Units | Incentive Units | % of Total Membership Interest* |
|---|---|---|---|---|---|
| Charles R. "Chad" Farrell<br><br>16 Ferguson Avenue, Burlington, VT 05401<br>chad@encore.eco | - | - | 678,399 | - | 12.42572% |
| PBS Renewable Energy LLC<br><br>64 Oak Ledge Lane, Wilton, CT 06897<br>blake.sturcke@gmail.com. | - | - | 13,056 | 618,659 | 11.57064% |
| Gardeners Intervale, LLC<br><br>181 Kelady Drive, Shelburne, VT 05482<br>eak@gfc.com;<br>addisonraap@gmail.com;<br>*and* entelechy@gmail.com | - | - | 117,879 | - | 2.1591% |
| David C. Farrington, Jr<br><br>110 Main Street, Burlington, VT 05401<br>dave@btvspaces.com | - | - | 101,346 | - | 1.85628% |
| Split Rock Fund, LLC<br><br>P.O. Box 808, Shelburne, VT 05482<br>reg.gignoux@splitrocknet.com | - | - | 27,748 | - | 0.50824% |
| iSun, Inc.<br><br>400 Avenue D, Suite 10, Williston, VT 05404<br>john@isunenergy.com | - | - | 179,298 | - | 3.28407% |
| Alpenglow Energy Solutions, LLC<br><br>1946 Messier Hill Road, Northfield, VT 05663<br>derek@alpenglowenergysolutions.com | - | - | - | 129,889 | 2.37908% |

| | | | | | |
|---|---|---|---|---|---|
| Jesse Stowell<br><br>86 Cityside Dr.<br>Montpelier, VT 05602<br>jesse.w.stowell@gmail.com | - | - | 17,184 | 107,340 | 2.28081% |
| Chris Clement<br><br>1102 Spear Street<br>South Burlington, VT 05403<br>christopher.clement@aya.yale.edu | - | - | 8,086 | 144,773 | 2.7998% |
| Phillip Foy<br><br>20 Lyman Avenue<br>Burlington, VT 05401<br>phillip.d.foy@gmail.com | - | - | 7,478 | 96,432 | 1.90324% |
| Lacuna Project Investments II, LLC<br><br>801 Larkspur Landing Circle<br>Larkspur, CA 94939<br>kevin@lacunasustainable.com | - | - | 11,948 | - | 0.21884% |
| JavCap Holdings LLC<br><br>420 Lexington Avenue<br>Suite 442<br>New York, New York 10017<br>jsegal@jav-cap.com | - | - | 121 | - | 0.00222% |
| Maple SETF LLC<br><br>1209 Orange Street,<br>Wilmington, DE 19801<br>fund-admin@susi-partners.com;<br>r.braakenburg@susi-partners.com | $38,400,000 | 3,200,000 | - | - | 58.61197% |
| **Total** | **$38,400,000** | **3,200,000** | **1,162,543** | **1,097,093** | **100%** |

* Percentages rounded to the nearest one hundred-thousandth decimal place.

**Exhibit A**

## <u>MUTUAL CONFIDENTIALITY AGREEMENT</u>

Mutual Confidentiality Agreement dated _____ between Encore Redevelopment, LLC, a Delaware limited liability company, and [FirstName, LastName], residing at [Full_Mailing_Address].

1. **<u>Background</u>**. The parties hereto intend to engage in discussions and negotiations concerning a possible negotiated business transaction (the "Transaction")- In the course of such discussions and negotiations, it is anticipated that each party will disclose or deliver to the other party and to the other party's directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors) (collectively, "Representatives") certain of its trade secrets or confidential or proprietary information for the purpose of enabling the other party to evaluate the feasibility of the Transaction. The parties have entered into this Agreement in order to assure the confidentiality of such trade secrets and confidential or proprietary information in accordance with the terms of this Agreement. As used in this Agreement, the party disclosing Proprietary Information (as defined below) is referred to as the "Disclosing Party" and the party receiving such Proprietary Information is referred to as the "Recipient."

2. **<u>Proprietary Information</u>**. As used in this Agreement, the term "Proprietary Information" shall mean all trade secrets or confidential or proprietary information designated as such in writing by the Disclosing Party, whether by letter or by the use of an appropriate proprietary stamp or legend, prior to or at the time any such trade secret or confidential or proprietary information is disclosed by the Disclosing Party to the Recipient. Notwithstanding the foregoing, information which is orally or visually disclosed to the Recipient by the Disclosing Party, or is disclosed in writing without an appropriate letter, proprietary stamp or legend, shall constitute Proprietary Information if the Disclosing Party, within five (5) days after such disclosure, delivers to the Recipient a written document or documents describing such Proprietary Information and referencing the place and date of such oral, visual or written disclosure and the names of the employees or officers of the Recipient to whom such disclosure was made. In addition, the term "Proprietary Information" shall be deemed to include any notes, analyses, compilations, studies, interpretations, memoranda or other documents prepared by the Recipient or its Representatives which contain, reflect or are based upon, in whole or in part, any Proprietary Information furnished to the Recipient or its Representatives pursuant hereto,

3. **<u>Use and Disclosure of Proprietary Information</u>**. The Recipient and its Representatives shall use the Proprietary Information only for the purpose of evaluating, negotiating or advising with respect to the Transaction and the Proprietary Information shall not be used for any other purpose without the prior written consent of the Disclosing Party. The Recipient and its Representatives shall hold in confidence, and shall not disclose any Proprietary Information of the Disclosing Party; provided, however, that (i) the Recipient may make any disclosure of such information to which the Disclosing Party gives its prior

written consent or which is required by law, regulation or decree; and (ii) any of the Proprietary Information may be disclosed by the Recipient to its Representatives and to any employees ("Affiliated Employees") of any entity which controls, is controlled by or is under common control with, the Recipient who need to know such information for the sole purpose of evaluating, negotiating or advising with respect to the Transaction and who are informed of the confidential nature of such information and of the terms of this Agreement. In any event, the Recipient shall be responsible for any breach of this Agreement by any of its Representatives and Affiliated Employees, and agrees, at its sole expense, to take reasonable measures to restrain its Representatives and Affiliated Employees from prohibited or unauthorized disclosure or use of the Proprietary Information.

4. **Limitation on Obligations**. The obligations of the Recipient specified in Section 3 above shall not apply, and the Recipient shall have no further obligations, with respect to any Proprietary Information to the extent that such Proprietary Information;

a. is generally known to the public at the time of disclosure or becomes generally known through no wrongful act on the part of the Recipient;

b. is m the Recipient's possession at the time of disclosure otherwise than as a result of Recipient's breach of any legal obligation to the Disclosing Party;

c. becomes known to the Recipient through disclosure by sources other than the Disclosing Party having the legal right to disclose such Proprietary Information;

d. is independently developed by the Recipient without reference to or reliance upon the Proprietary Information; or

e. is required to be disclosed by the Recipient to comply with applicable laws or governmental regulations, provided that the Recipient provides prior written notice of such disclosure to the Disclosing Party and takes reasonable and lawful actions to avoid and/or minimize the extent of such disclosure.

5. **Ownership of Proprietary Information**. The Recipient agrees that the Disclosing Party is and shall remain the exclusive owner of the Proprietary Information and all patent, copyright, trade secret, trademark, domain name and other intellectual property rights therein. No license or conveyance of any such rights to the Recipient is granted or implied under this Agreement.

6. **Return of Proprietary Information**. The Recipient shall, upon the written request of the Disclosing Party, return to the Disclosing Party all Proprietary Information received by the Recipient from the Disclosing Party (and all copies and reproductions thereof). In addition, upon any such request, the Recipient shall destroy all Proprietary Information prepared by the Recipient or its Representatives and Affiliated Employees (and all copies and reproductions thereof). Notwithstanding the return or destruction of the Proprietary Information, the Recipient and its Representatives and Affiliated Employees will continue to be bound by their obligations of confidentiality and other obligations hereunder

7. **No Representation or Warranty**, Each party acknowledges and agrees that all Proprietary Information is provided without any representation or warranty, express or

implied, as to the accuracy or completeness thereof. Only those representations and warranties which are made in the final definitive agreement concerning the Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

8.      **<u>Miscellaneous</u>**.

a.      Without the prior written consent of the other party hereto, each party will not, and will cause its Representatives not to, disclose to any person the existence of this Agreement, the fact that Proprietary Information has been made available to either party, the fact that discussions or negotiations are taking place concerning the Transaction or any of the terms, conditions or other facts with respect to the Transaction, including the status thereof, unless required to do so in accordance with Section 4(e) above.

b.      This Agreement supersedes all prior agreements, written or oral, between the Disclosing Party and the Recipient relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged, in whole or in part, except by an agreement in writing signed by the Disclosing Party and (lie Recipient.

c.      This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

d.      This Agreement shall be construed and interpreted in accordance with the internal laws of The State of Delaware, without giving effect to the principles of conflicts of law thereof.

e.      The provisions of this Agreement are necessary for the protection of the business and goodwill of the parties and are considered by the parties to be reasonable for such purpose. The Recipient agrees that any breach of this Agreement will cause the Disclosing Party substantial and irreparable damages and, therefore, in the event of any such breach, in addition to other remedies which may be available, the Disclosing Party shall have the right to seek specific performance and other injunctive and equitable relief.

f.      The term of this Agreement is two years from the date of its execution. For the convenience of the parties, this letter agreement may be executed by facsimile and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both parties.

EXECUTED as a sealed instrument as of the day and year first set forth above.


Encore Redevelopment, LLC


By:_____     By:_____
     Name:                                           Name:
     Title:                                            Title: