**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| iSun, Inc., et al.[1] | Case No. 24-11144 (TMH) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM OPINION**

When a company sells its assets, the deal documents are supposed to say what is being sold and who is selling it. Most of the time they do. This dispute arises out of the rare case in which the parties dispute whether the seller is a seller at all.

In August 2024, this Court approved the sale of substantially all the assets of iSun, Inc. and its eleven affiliated debtors to Clean Royalties, LLC. The asset purchase agreement attached to the sale motion described the sellers, on its cover page, as iSun and "each of its affiliates or subsidiaries." The schedule of acquired assets conveyed all the debtors' accounts receivable and listed, by name, three construction contracts belonging to one particular debtor, iSun Industrial, LLC,

---

[1] The Debtors in these Chapter 7 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) iSun, Inc. ("iSun") (0172); (ii) Hudson Solar Service, LLC ("Hudson") (1635); (iii) Hudson Valley Clean Energy, Inc. ("Hudson Valley") (8214); (iv) iSun Corporate, LLC ("iSun Corporate") (4391); (v) iSun Energy, LLC ("iSun Energy") (1676); (vi) iSun Industrial, LLC ("iSun Industrial") (4333); (vii) iSun Residential, Inc. ("iSun Residential") (3525); (viii) iSun Utility, LLC ("iSun Utility") (4411); (ix) Liberty Electric, Inc. ("Liberty") (8485); (x) Peck Electric Co. ("Peck") (5229); (xi) SolarCommunities, Inc. ("SolarCommunities") (7316); and (xii) Sun CSA 36, LLC ("Sun CSA") (collectively referred to as the "Debtors").

whose receivables made up the great bulk of what was being sold. But the agreement's preamble defined the sellers as those entities "listed on the signature page," and the unsigned signature pages attached to the court-approved version omitted iSun Industrial. No one appears to have noticed at the time. iSun Industrial signed the final agreement, the sale closed, and the parties went about their business.

That business included the counterparties to those three construction contracts, Standard Solar, Inc. and its affiliated project entities. The day after the sale order was entered, a Saturday morning in the depth of summer, their counsel emailed Clean Royalties' counsel to say they had seen that the sale order was entered and wanted to discuss the contracts. For the next month, the parties negotiated over the receivables on the shared premise that Clean Royalties now owned them. The negotiations failed, Clean Royalties sued in Vermont state court to collect, and the Standard Solar entities counterclaimed for money damages.

Only then, while preparing those counterclaims, did their counsel make what he candidly described at argument as his find: iSun Industrial never appeared on the form purchase agreement's signature page. From that omission, the Standard Solar entities now construct their defense to this motion. In their telling, iSun Industrial never sold anything, Clean Royalties owns nothing, and the entire course of dealing that followed the sale was a negotiation over assets that were never conveyed.

The argument has the appeal of simplicity. It asks the Court to read two documents and take them at their word. But the word of a contract is the whole of it, not a single page read in isolation. Read in its entirety, and together with the sale order that approved it, the stalking horse agreement admits of only one sensible construction. Every debtor, including iSun Industrial, was authorized to sell, and the receivables and contract rights that the schedules conveyed by name were in fact conveyed. The Standard Solar entities' contrary reading would reduce whole provisions of the agreement to surplusage, would erase the consideration at the center of the bargain this Court approved, and would attribute to sophisticated parties the intention to sell all the debtors' receivables while silently excluding the debtor that held nearly all of them.

The record also establishes that the Standard Solar entities received the notice that due process requires, a conclusion their own conduct confirms, because parties who email the purchaser within a day of a sale order's entry have plainly been apprised of the sale. The motion to enforce the sale order is accordingly granted.

The Standard Solar entities are enjoined from prosecuting their affirmative counterclaims against the purchaser, though their defenses, including recoupment, remain theirs to assert in Vermont, where the question of what is actually owed on these receivables will be litigated.

### Factual and Procedural Background

#### A. The Parties and the EPC Contracts

iSun, Inc. and eleven affiliates, including iSun Industrial, commenced these cases on June 3, 2024. The cases were later converted to chapter 7.[2] Before the petition date, iSun Industrial was party to three engineering, procurement, and construction contracts (the "EPC Contracts") for solar projects in Vermont with Trolley Tracks Solar, LLC, Stone Mill Solar, LLC, and Halladay Solar, LLC (each an "SS Entity").[3] Each SS Entity is affiliated with Standard Solar, Inc., and each EPC Contract directed that notices to the owner be sent care of Standard Solar.[4] On May 20, 2024, Standard Solar issued notices terminating each EPC Contract for convenience.[5]

#### B. The Sale Process and Sale Order

The Court entered the Bidding Procedures Order on July 3, 2024,[6] designating Clean Royalties as the stalking horse bidder. The form of asset

---

[2] See Order Granting Debtors' Motion to Convert These Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code [D.I. 666]; Motion of Clean Royalties, LLC to Enforce the Sale Order Against Halladay Solar, LLC, Stone Mill Solar, LLC, Trolley Tracks Solar, LLC, and Standard Solar, Inc. [D.I. 805], Ex. 15 at 1 n.1 (hereinafter, styled as Ex.) (the "Vanderbeek Decl.").

[3] Exs. 17–19.

[4] Exs. 17–19; Transcript of June 9, 2026 Hearing at 22:1-11 (hereinafter, the "June 9 Tr.") [D.I. 891].

[5] Exs. 4–6.

[6] Order (A) (I) Approving Bid Procedures in Connection With the Sale of Substantially All of the Debtors Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Enter Into the Stalking Horse Agreement, (V) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting

purchase agreement attached to the sale papers was thereafter revised in connection with, among other things, a settlement with the Official Committee of Unsecured Creditors, pursuant to which the schedule of Acquired Assets was expanded to include all the Debtors' accounts receivable.[7]

The Court entered the Sale Order on Friday, August 23, 2024,[8] approving the Amended and Restated Asset Purchase Agreement (the "Stalking Horse Agreement" or "APA") "including any amendments, supplements and modifications thereto,"[9] and approving the sale of the Acquired Assets to Clean Royalties free and clear of all Interests pursuant to sections 363(b) and (f).[10]

The unsigned APA approved under the Sale Order recites that:

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT is made and entered into as of this 9th day of July, 2024 (the "Execution Date"), by and among (i) Clean Royalties, LLC ("Purchaser"), and (ii) iSun, Inc. and each of its affiliates or subsidiaries listed on the signature page of this Agreement (each, a "Seller" and collectively, "Sellers").[11]

---

Related Relief; and (B) (I) Approving the Purchase Agreement; (II) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear; (III) Approving the Assumption and Assignment of Contracts and Leases; and (IV) Granting Related Relief [D.I. 183].

[7] June 9 Tr. at 43:5–13; D.I. 286, 358, 371.

[8] Order (I) Approving the Sale of the Debtors' Assets Free and Clear; (II) Approving the Assumption and Assignment of Contracts and Leases; and (III) Granting Related Relief (the "Sale Order") [D.I. 393].

[9] Sale Order ¶¶ 1, 4.

[10] Id. ¶ 5.

[11] Id., Ex. 1., p. 1.

Although iSun Industrial does not appear on the APA's signature pages, it is explicitly named five times in APA in the disclosures regarding pending litigation and proceedings.[12]

The SS Entities' EPC Contracts also are identified in the APA. At Schedule 1.1(a), the "Stone Mill Solar Pull Test plus EPC," "Trolly [sic] Tracks Solar Pull Test plus EPC," and "Halladay Solar Pull Test" are listed as Acquired Assets.[13]

In addition, Schedule 1.1(a) to the APA defines the Acquired Assets to include, under the heading "Payment Intangibles," "[a]ll accounts receivables held by the Debtors or generated in the course of their business that remain unpaid as of the Closing."[14]

The Debtors closed shortly thereafter, and iSun Industrial executed the final Stalking Horse Agreement.[15] The executed agreement includes iSun Industrial as a seller.[16]

### C. The Post-Sale Communications

On Saturday, August 24, 2024, the day after entry of the Sale Order, counsel for Standard Solar wrote to counsel for Clean Royalties, notifying that "[w]e represent Standard Solar Inc. who was party to certain Agreements with iSun, Inc. that were terminated prepetition. We saw that the sale order was entered and wanted to reach out to you to see if we could discuss the status of certain materials

---

[12] Id., Ex. 1, Sch. 4.12.
[13] Id., Sch. 1.1(a).
[14] Id., Ex. 1, Sched. 1.1(a).
[15] Vanderbeek Decl., ¶¶ 3–6.
[16] Ex. 1, p. 33.

with respect to the Agreements."[17] On August 29, 2024, Clean Royalties' counsel responded that "[t]he Purchaser is looking for Standard to pay the outstanding amounts owed by Standard arising from Standard's termination of the contracts (originally owed to iSun and now owed to the Purchaser pursuant to the APA)."[18] Negotiations continued for roughly a month. On September 14, 2024, Standard Solar's in-house counsel wrote that "[w]e are looking to see what amounts that Clean Royalties believe are owed."[19] On September 25, 2024, Standard Solar wrote that "we have been asking iSun, and now Clean Royalties, for these items."[20] At no point in these exchanges did any SS Entity assert that Clean Royalties had not acquired iSun Industrial's receivables.

**D. The Vermont Litigation and this Motion**

In May 2025, Clean Royalties, "as assignee of iSun Industrial, LLC," sued the SS Entities in the Vermont Superior Court to collect the receivables. The SS Entities filed a cross-complaint against Clean Royalties stating that it is brought "to recover money damages incurred as a result of Cross-Defendant's breach of contract," and asserting counts for breach of contract, unjust enrichment, quantum meruit, and declaratory relief.[21]

In the Vermont action, the SS Entities took the position that iSun Industrial was never a "Seller" under the Stalking Horse Agreement because it does not

---

[17] Ex. 7.
[18] Id.
[19] Ex. 8.
[20] Id.
[21] Ex. 3 at 1–2; see also Ex. 2.

appear on the signature pages of the version attached to the Sale Order, and that Clean Royalties therefore never acquired the receivables it sues upon. The Vermont court declined to construe this Court's order in the first instance and the present Motion followed.[22]

### Jurisdiction and Venue

The SS Entities dispute that this Court possesses subject matter jurisdiction. In support of this assertion, they rely on Judge Goldblatt's recent opinion in In re SunPower Corp.[23]

In SunPower, Judge Goldblatt dismissed a motion where he found that the court lacked subject matter over the dispute. There, the movant leased a solar power system from the debtor years before the commencement of that chapter 11 case. The debtor confirmed a plan that provided for the rejection of all executory contracts remaining in the estate. The parties did not dispute that the debtor did not assume the lease and did not assign it to the buyer of the debtor's assets.

The movant contended that the lease was an executory contract that was rejected under the plan. The plan administrator and buyer disputed that point, arguing that the lease was assigned pre-petition.

The movant then filed a motion to interpret and enforce the plan and confirmation order. In part, she sought a ruling that the lease was rejected under the plan and confirmation order. The court observed that the dispute was one

---

[22] Exs. 12-14.
[23] In re SunPower Corp., No. 24-11649 (CTG), 2026 WL 1599285 (Bankr. D. Del. June 3, 2026).

between non-debtors that had little to do with the plan confirmation order and invited the parties to submit briefing about whether the court possessed subject matter jurisdiction over the motion.

In his opinion, Judge Goldblatt observed that "the only serious candidate for jurisdiction is [movant's] argument that the determination that the lease was rejected seeks an interpretation or enforcement of the plan."[24] The court found that there was no dispute about what the plan provided. If a lease was still in the estate, it was rejected. However, the dispute there was about whether the estate held the lease at all at the time of confirmation. This, Judge Goldblatt found, was "simply too distant from any question about the meaning of the plan or confirmation order for this action to be one to enforce the plan or confirmation order."[25]

The court looked primarily to Travelers[26] and Lazy Days' RV Center[27] for guidance. He distinguished the dispute in the motion from the circumstances in those two cases because in both Travelers and Lazy Day's RV Center there was language in the underlying bankruptcy courts orders that either was ambiguous or required interpretation.[28]

The principle animating SunPower is that the factual question of whether the solar power lease ever entered the estate was antecedent to and independent of the

---

[24] Id. at *4.
[25] Id. at *5.
[26] Travelers Indem. Co. v. Bailey, 557 U.S. 137 (2009).
[27] In re Lazy Days' RV Ctr. Inc., 724 F.3d 418 (3d Cir. 2013).
[28] In re SunPower Corp., 2026 WL 1599285, at *8.

9

terms of SunPower's plan. This was too remote a connection to support the court's subject matter jurisdiction.

The SS Entities argue that the same circumstance exists here. They argue there is no ambiguous language in the Sale Order or Stalking Horse Agreement requiring interpretation, only a factual dispute about whether iSun Industrial's assets were sold. The premise is incorrect.

Unlike SunPower, the parties in this case do not agree on what the Sale Order and Stalking Horse Agreement actually authorize. The SS Entities contend that "Sellers" is unambiguously defined in the Stalking Horse Agreement as "iSun, Inc. and each of its affiliates or subsidiaries listed on the signature page of the Agreement," and that iSun Industrial is not listed on that signature page, therefore iSun Industrial is not a Seller and its assets were not sold.[29]

Clean Royalties contends the opposite. It posits that the Sale Order, read on its face and as a whole, expressly authorized "each of the Debtors" to execute the Stalking Horse Agreement and consummate the Sale, with no carve-out for iSun Industrial, and that the omission of iSun Industrial from the signature page of the unexecuted form of the agreement attached to the Sale Order was a scrivener's error.[30]

This is precisely the kind of dispute that requires construction of the Sale Order. The parties are presenting competing interpretations of the Sale Order's

---

[29] Objection to Motion to Enforce the Sale Order [D.I. 811], ¶¶ 2–3.
[30] Motion to Enforce the Sale Order, ¶¶ 61, 68.

decretal paragraphs and their relationship to the Stalking Horse Agreement's definitional terms. That dispute falls squarely within the Court's retained jurisdiction to "interpret, implement, and enforce the terms and provisions of [the Sale] Order."[31] It is a dispute about what the order means and what it authorizes.

Here, the parties are bringing precisely the conflicting interpretations that SunPower identifies as supporting jurisdiction. The SS Entities read the Stalking Horse Agreement's preamble and signature page to exclude iSun Industrial as a matter of contractual definition. Clean Royalties reads the Sale Order's express authorization of "each of the Debtors" to execute the agreement as resolving any such definitional ambiguity in favor of inclusion. Clean Royalties asks the Court to interpret its own order.

The question of whether iSun Industrial's assets were included in the sale cannot be answered without first determining what the Sale Order authorized. That determination requires the Court to examine the Sale Order's language authorizing "each of the Debtors" to execute the Stalking Horse Agreement, the relationship between the Sale Order and the form agreement attached to it, and whether the Sale Order's multiple provisions specifically addressing iSun Industrial's assets are consistent with a reading that excludes iSun Industrial as a Seller.[32] Those are questions about the meaning of the Sale Order, not questions about facts external to it.

---

[31] Sale Order ¶ G; see also Id. ¶ 78 ("This Court shall retain jurisdiction with respect to the terms of this Order and the Stalking Horse Agreement.").
[32] Motion to Enforce the Sale Order, ¶¶ 67, 68 n.69.

11

In SunPower, the court dismissed the motion because the dispute at issue was entirely antecedent to and independent of any court order, turning on facts that predated the bankruptcy filing by years and that required no construction of the plan's actual terms. The motion before this Court is of a different character. It presents a genuine dispute about the meaning and scope of this Court's own Sale Order and the Stalking Horse Agreement that order approved. Accordingly, the Court retains subject matter jurisdiction over the Motion to Enforce, and the SS Entities' jurisdictional objection is overruled.

### The Evidentiary Rulings

At the hearing, the SS Entities objected under Federal Rule of Evidence 408 to the admission of Exhibits 7, 8, and 9, the post-Sale email communications, arguing that they are settlement communications offered to establish that the SS Entities admitted or waived any objection to Clean Royalties' standing as assignee, which in their view is subsumed within the "validity" of the claim under Rule 408(a).[33] Clean Royalties responded that the exhibits are offered not to prove the validity or amount of the disputed receivables, which remain for the Vermont court, but to show a course of dealing and to establish estoppel, permissible purposes under Rule 408(b).[34]

The Court overruled the objection on the record and confirms that ruling here.[35] Rule 408 is not a blanket prohibition on the admission of evidence touching

---

[33] June 9 Tr. at 15:20–16:2, 18:11–19:3.
[34] Id. at 17:1–18:9.
[35] Id. at 19:15–20:12.

compromise discussions. It bars use of such evidence "to prove or disprove the validity or amount of a disputed claim," while permitting admission "for another purpose."[36] The disputed claim within the meaning of the Rule is the parties' monetary dispute over what, if anything, remains owing under the terminated EPC Contracts. The exhibits are not offered for that purpose. Indeed, they contain no negotiation over the operative question here, which is whether iSun Industrial sold its receivables under this Court's order. They are offered to show the parties' contemporaneous conduct and understanding following entry of the Sale Order. That is a qualifying other purpose.[37] The weight to be afforded the exhibits is a separate question, addressed below. Exhibits 1 through 15, 17 through 19, and 20 through 44 were admitted without further objection.[38]

## Discussion

### A. The Sale Order Authorized iSun Industrial to Sell as a Seller

A sale order and the purchase agreement it approves are construed together, applying ordinary principles of contract interpretation, and the Court that entered the order is well positioned to determine what it authorized.[39] Those principles include the familiar rule that a contract should be read as a whole and construed,

---

[36] Fed. R. Evid. 408(a), (b).

[37] See Moon Express, Inc. v. Intuitive Machs., LLC, 788 F. App'x. 117, 120–21 (3d Cir. 2019) (finding no abuse of discretion where emails regarding negotiations and course of dealing were admitted at trial over objection under Rule 408).

[38] June 9 Tr. at 20:13–17.

[39] See In re Lazy Days' RV Ctr. Inc., 724 F.3d at 421–23; In re Trico Marine Servs., 450 B.R. 474, 482 (Bankr. D. Del. 2011).

where reasonably possible, to give effect to every provision and to avoid rendering language surplusage.

The SS Entities' argument is admittedly simple: read two documents, and neither says what Clean Royalties contends.[40] The cover page of the APA attached to the Sale Order identifies the sellers as "iSun, Inc. and each of its affiliates or subsidiaries," but the preamble defines "Sellers" as "iSun, Inc. and each of its affiliates or subsidiaries listed on the signature page of this Agreement," and the unsigned signature pages of that version omit iSun Industrial.[41] Because the specific governs the general, the SS Entities contend, iSun Industrial was not a Seller, its receivables were never sold, and there is nothing to enforce.

If the signature pages were the only relevant text, the argument would have force. They are not. The document, read as a whole and together with the Sale Order to which it was attached, admits of only one reasonable construction. All the Debtors, including iSun Industrial, were authorized to sell, and the omission of iSun Industrial from the unsigned signature pages was a drafting lapse rather than a deliberate carve-out of one Debtor's principal assets.

First, as discussed above, Schedule 1.1(a) to the APA defines the Acquired Assets to include "[a]ll accounts receivables held by the Debtors or generated in the course of their business that remain unpaid as of the Closing."[42] The schedule speaks of "the Debtors," a defined population of twelve entities of which iSun

---

[40] June 9 Tr. at 53:21–23.
[41] Ex. 1 at 1; Sale Order, Ex. 1.
[42] Ex. 1, Sched. 1.1(a).

14

Industrial is one, not of "Sellers." On the SS Entities' reading, the parties drafted, and the Court approved, a schedule transferring all the Debtors' receivables while silently excluding the Debtor that held the great bulk of them. The record reflects that iSun Industrial's receivables constituted the substantial majority of the Debtors' receivables, and that the inclusion of all receivables in the Acquired Assets was a negotiated term of the settlement with the Committee that cleared the path to the Sale.[43] The SS Entities' construction reduces the Payment Intangibles provision to near surplusage and contradicts the consideration structure of the approved transaction.

Second, the same schedule, under "Assumed Contracts," transfers "[a]ll of the Sellers' contracts with the owners of the Projects for the performance and completion of such projects, and all of the Sellers' rights and interest in such contracts, regardless of whether such contracts have been or are alleged to have been terminated or are not executory for purposes of section 365 of the Bankruptcy Code listed below under the heading 'Industrial and Commercial Contracted Backlog.'"[44] The Contracted Backlog list that follows expressly identifies the EPC Contracts.[45] The only Debtor party to the EPC Contracts is iSun Industrial.[46] If iSun Industrial were not a Seller, the enumeration of its three contracts on the schedule of assets being sold, in a provision drafted specifically to capture rights

---

[43] June 9 Tr. at 43:5–13, 60:9–17.

[44] Ex. 1, Sched. 1.1(a).

[45] Id.

[46] Exs. 17–19.

under terminated and non-executory contracts, would serve no purpose at all.[47] The rule against surplusage forbids that result where, as here, a harmonizing construction is available.

Third, the Sale Order itself authorizes "the Debtors," not a subset of them, to act. The Order provides that "the Debtors are hereby authorized to take any and all actions necessary or appropriate to (a) sell the Acquired Assets to the Purchaser" and "are further authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Transaction Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Agreement . . . without further notice to or order of this Court."[48] "Debtors" in the Sale Order is defined to include all twelve entities.[49] The authorization ran to iSun Industrial as it ran to every other Debtor.

Fourth, the Sale Order's negotiated resolutions presuppose that iSun Industrial's assets and contracts were in the Sale. The Order contains specific provisions addressing objections by counterparties to iSun Industrial contracts, including the carve-outs concerning the BNRG and BD Solar parties and the Nautilus provisions transferring a specifically identified iSun Industrial asset subject to the Nautilus Ownership Claims.[50] Those provisions, like the schedule

---

[47] Cf. In re Weinstein Co. Holdings, LLC, 997 F.3d 497, 505 (3d Cir. 2021) (a debtor's rights under a non-executory contract may be sold as property of the estate).

[48] Sale Order ¶ 10.

[49] Id., n. 1.

[50] Id. ¶¶ 46–47.

entries, would have been unnecessary if iSun Industrial were a stranger to the transaction.

Finally, the SS Entities' charge that iSun Industrial was "added as a party in some backdoor transaction after the fact,"[51] misconceives both the sequence and the legal source of the parties' rights. The Court does not understand Clean Royalties to derive its rights from the unsigned signature pages. It derives them from the Sale Order, under whose authority the Debtors, including iSun Industrial, executed the final Stalking Horse Agreement and closed.[52] Nor did conforming the signature pages to the deal described throughout the document require a further order. The Sale Order permits the Transaction Documents to be "modified, amended or supplemented by the parties thereto . . . without further order of the Court," requiring notice and Court approval only for a modification that "has a material adverse effect on the Debtors' estates."[53] The execution of the agreement by a Debtor whose assets the schedules already conveyed, in exchange for consideration the Court had already found fair and reasonable, had no adverse effect on the estates, material or otherwise. On this record, the Court regards the addition of the missing signature block as ministerial, a conclusion the Chief Restructuring Officer's uncontroverted declaration confirms. At all times the Debtors and Clean

---

[51] June 9 Tr. at 8:7–9.
[52] Id. at 51:7–16; Ex. 1; Vanderbeek Decl. ¶¶ 3–6.
[53] Sale Order ¶ 71.

Royalties intended that each of the Debtors, including iSun Industrial, would be Sellers.[54] The SS Entities offered no contrary evidence.

## B. The SS Entities Received Adequate Notice and Are Bound

Due process in this context requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to be heard.[55] The SS Entities contend that whatever was served on them could not have alerted them that iSun Industrial's assets were being sold because the deal documents omitted iSun Industrial from the signature pages.

The Court takes the concern seriously, and raised it with Clean Royalties' counsel directly.[56] The Court also agrees with the SS Entities on this governing principle – a recital in a sale order that all interested parties were properly served cannot, by itself, bind a party who in fact received no notice.[57] But that principle does not assist the SS Entities because this record establishes actual notice, comprehension, and engagement.

The certificates of service establish that the sale notice was served on the SS Entities at the addresses designated in their own contracts, including care of Standard Solar, Inc., the entity each EPC Contract identified as the notice recipient

---

[54] Vanderbeek Decl. ¶¶ 3–4.
[55] Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (citations omitted).
[56] June 9 Tr. at 31:25–32:3.
[57] Id. at 54:13–55:8.

for its project owner.[58] The Court-approved sale notice disclosed that the Debtors were selling substantially all of their assets, identified the Stalking Horse Agreement, and told recipients how to obtain the underlying documents. Standard Solar appeared in these cases through Delaware counsel on July 22, 2024, before the sale hearing.[59]

The Court asked at argument whether it is realistic, in a jointly administered case where papers routinely refer to "the Debtors" collectively, to expect a creditor receiving such a notice to interrogate which individual Debtors appear on the signature pages of the deal documents.[60] The answer on this record is that no such interrogation was required to put these creditors on notice. A counterparty to three iSun Industrial contracts, examining the Acquired Assets schedule that had been on file since early July, would have found its own three contracts listed by name on the Contracted Backlog and a provision transferring all of the Debtors' receivables.[61] The notice given was reasonably calculated to inform the SS Entities that their contracts and the receivables asserted against them were within the Sale, and it did inform them. The day after the Sale Order was entered, on a Saturday in late August, their counsel wrote to Purchaser's counsel because "[w]e saw that the sale order was entered."[62] Parties who were monitoring the docket closely enough to react within twenty-four hours of entry, and who then negotiated with the

---

[58] Exs. 17-19, 36, 38, 41.
[59] Ex. 32.
[60] June 9 Tr. at 58:1–15.
[61] Id. at 58:21–59:14.
[62] Ex. 7.

Purchaser for a month over the very receivables now at issue, cannot plausibly maintain that the process deprived them of notice or an opportunity to be heard. Their due process objection is overruled.

**C. The SS Entities' Conduct Corroborates the Court's Construction**

Although the Court's ruling rests on the construction of the Sale Order and the Stalking Horse Agreement and on the adequacy of notice, the post-Sale communications corroborate both holdings, and the Court affords them weight for that purpose, consistent with the limited purpose for which they were admitted.

The SS Entities initiated contact with the Purchaser immediately upon entry of the Sale Order. When Clean Royalties stated its position in writing on August 29, 2024, that the amounts at issue were "originally owed to iSun and now owed to the Purchaser pursuant to the APA," the SS Entities disputed whether anything was owed, but never disputed that Clean Royalties had become the owner of whatever was owed.[63] Their in-house counsel thereafter asked "what amounts that Clean Royalties believe are owed" and acknowledged that "we have been asking iSun, and now Clean Royalties, for these items."[64] The Court pressed the SS Entities' counsel on this point at argument. Counsel candidly acknowledged that he could not explain his clients' conduct because he "wasn't a party to those conversations at the time."[65]

The Court accepts, as the SS Entities urge, that parties may negotiate a disputed claim without admitting liability, and that silence in commercial

---

[63] Ex. 7.
[64] Ex. 8.
[65] June 9 Tr. at 62:21–63:5.

negotiation is not invariably acquiescence.[66] The communications are accordingly not treated as a waiver of the merits of the underlying payment dispute, which Clean Royalties itself reserves for the Vermont court.[67] But the question presently before the Court is not what is owed. It only is what the parties understood this Court to have authorized and sold. On that question, the SS Entities' contemporaneous conduct, engaging the Purchaser as the holder of iSun Industrial's receivables from the moments after entry of the Sale Order, is probative and entirely consistent with the construction the Court adopts. The contrary reading the SS Entities now advance surfaced only after litigation commenced, when, as their counsel forthrightly put it, he "stumbled upon" the signature-page omission while preparing the counterclaims.[68] Because the Motion is granted on construction and notice grounds, the Court need not decide whether the same conduct would independently support estoppel, quasi-estoppel, or acquiescence.

### D. The Counterclaims Are Enjoined; Defenses Are Preserved

The remaining relief concerns what Clean Royalties did not buy. The Sale Order provides that all persons and entities holding Interests against or in a Debtor or the Acquired Assets "arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing . . . are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such persons' or entities' Interests,

---

[66] Id. at 49:14–50:6.
[67] Id. at 64:22–65:8.
[68] Id. at 45:5–13.

whether by payment, setoff, or otherwise, directly or indirectly, against the Purchaser and its Affiliates."[69] The Order further provides that the Purchaser is not a successor to the Debtors and shall have no liability for claims relating to the Acquired Assets that relate to the period before Closing, other than Assumed Obligations.[70]

The SS Entities' cross-complaint, on its face, seeks "to recover money damages incurred as a result of Cross-Defendant's breach of contract."[71] At argument, counsel allowed that the word "recover" in that opening statement "is a bit overbroad,"[72] but the pleading says what it says. Each count culminates in a request for a money judgment against the Purchaser on account of alleged prepetition breaches by a Debtor. These are paradigmatic Interests within the meaning of the Sale Order and Third Circuit law, which construes "interests" under section 363(f) broadly to include claims arising from the assets sold.[73]

Nor do the counterclaims fall within the Assumed Obligations exception. Assumed Obligations comprise scheduled obligations, of which these are not, and "obligations relating to any Assumed Contract first arising as of or following the Closing."[74] The EPC Contracts were terminated prepetition, and every breach alleged in the cross-complaint is, by definition, a pre-termination and therefore pre-

---

[69] Sale Order ¶ 14.
[70] Id. ¶¶ 21–23.
[71] Ex. 3 at 1.
[72] June 9 Tr. at 44:6–8.
[73] See In re Trans World Airlines, Inc., 322 F.3d 283, 288–93 (3d Cir. 2003).
[74] Ex. 1, § 1.1.

Closing breach. A buyer in a section 363 sale takes on only the obligations it clearly agrees to assume, and Clean Royalties assumed none of these.[75]

Two important limitations frame this relief. First, consistent with Folger Adam,[76] the injunction reaches the SS Entities' affirmative claims for recovery, not their defenses. If the SS Entities have defenses to Clean Royalties' Vermont complaint, they remain free to assert them in their answer. The Sale Order does not strip the SS Entities of their right to defend.

The most significant of those defenses is recoupment. The Third Circuit held in Folger Adam that a right of recoupment "is a defense and not an interest and therefore is not extinguished by a § 363(f) sale."[77] Recoupment permits a defendant to reduce or extinguish a plaintiff's recovery by asserting a claim arising from the same transaction or occurrence, without affirmatively recovering a money judgment. Because Clean Royalties chose to sue in Vermont on the receivables arising from the EPC Contracts, the SS Entities may invoke their recoupment rights defensively in that action to the extent those rights arise from the same contracts and transactions.

Setoff presents a different question, and this ruling addresses it only to the extent the record requires. Setoff, unlike recoupment, involves the netting of obligations arising from separate transactions. Paragraph 14 enjoins the pursuit of Interests "whether by payment, setoff, or otherwise, directly or indirectly, against

---

[75] See In re Weinstein Co. Holdings, LLC, 997 F.3d 497, 505–06.
[76] Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V., 209 F.3d 252 (3d Cir. 2000).
[77] Id. at 260.

the Purchaser."[78] To the extent the SS Entities seek to assert setoff as an affirmative vehicle for recovering money from Clean Royalties, that relief is enjoined by the plain terms of the Sale Order. Whether the SS Entities possess setoff rights that could operate purely defensively, and whether such a defensive use would be distinguishable from the affirmative recovery the Sale Order forecloses, are questions that were not developed on this record and are not decided here. Those questions, if they arise, are for the Vermont court in the first instance, subject to this Court's retained jurisdiction to interpret the Sale Order.

Second, nothing in this ruling adjudicates the validity or amount of the receivables or of any sums the SS Entities contend they paid or overpaid. Determination of the value of the receivables, if any, remains for the Vermont court.[79]

To the extent any claims in the cross-complaint are recharacterized as defensive, the SS Entities may pursue the substance of those theories defensively in Vermont. What they may not do is prosecute them as affirmative claims for a money judgment against the Purchaser.

## Conclusion

The Sale Order authorized each of the Debtors, including iSun Industrial, to sell the Acquired Assets to Clean Royalties, and the Acquired Assets included all

---

[78] Sale Order ¶ 14.

[79] June 9 Tr. at 57:14–18, 64:22–65:8. Nothing here should be read as determining whether the setoff defense is available to the SS Entities. That is a merits issue reserved to the Vermont court.

the Debtors' unpaid accounts receivable and the Debtors' rights and interests in and under the Stone Mill, Trolley Tracks, and Halladay contracts, regardless of their prepetition termination. Those assets were transferred to Clean Royalties free and clear of all Interests. The SS Entities received adequate notice of the Sale, are bound by the Sale Order, and are enjoined from prosecuting their affirmative counterclaims against Clean Royalties in the Vermont action, without prejudice to their defenses, including recoupment. The Motion is granted. The parties are directed to present a form of order under certification of counsel.

Dated: June 16, 2026
Wilmington, Delaware

_____
Thomas M. Horan
United States Bankruptcy Judge